**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**ACUSHNET COMPANY'S MEMORANDUM IN OPPOSITION
TO CALLAWAY'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Andrew R. Sommer
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone (202) 783-0800

Dated:  June 29, 2006

## TABLE OF CONTENTS

**Page(s)**

I.     NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.    SUMMARY OF ARGUMENT...................................................................2

III.   STATEMENT OF FACTS. ......................................................................3

IV.   ARGUMENT.......................................................................................3

     A.     Applicable Law.........................................................................3

     B.     The 1996 Agreement Does Not Prohibit Either Party from Seeking Reexamination and Hence the Amendment Would be Futile. ....................................................................................4

          1.     The PTO Has Already Rejected Callaway's Arguments.................4

          2.     Properly Construed, the 1996 Agreement Does Not Prohibit Reexamination. ..................................................6

               a.     The 1996 Agreement Does Not Apply to this Dispute. ................................................................6

               b.     The 1996 Agreement Does Not Preclude "Administrative Proceedings" such as PTO Reexamination....................................................8

               c.     Administrative Reexamination of a Patent is not a Dispute Resolution Process–it is the PTO's Exercise of its Sovereign Duty and is Conducted between Callaway and the PTO .........................................10

     C.     Callaway's Broad Reading of the Agreement Renders the Agreement Void on Public Policy Grounds ...............................................12

V.    CONCLUSION....................................................................................14

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Agere Sys. Guardian Corp. v. Proxim, Inc.*,
   190 F. Supp. 2d 726 (D. Del. 2002)............................................................................4

*Arthur v. Maersk, Inc.*,
   434 F.3d 196 (3d Cir. 2006) ....................................................................................3

*In re Baker Hughes*,
   215 F.3d 1297 (Fed. Cir. 2000) .............................................................................12

*Blacklight Power, Inc. v. Rogan*,
   295 F.3d 1269 (Fed. Cir. 2002) .............................................................................11

*Bremen v. Zapata Off-Shore Co.*,
   407 U.S. 1 (1972).................................................................................................13

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S.  837 (1984).........................................................................................5, 6

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) ..............................................................10, 11, 12, 13

*Foman v. Davis*,
   371 U.S. 178 (1962).............................................................................................3

*Houston Atlas, Inc. v. Del Mar. Sci., Inc.*,
   217 U.S.P.Q. 2d (BNA) 1032 (N.D. Tex. 1982) .................................................11, 12

*Joy Mfg. Co. v. Nat'l Mine Serv. Co.*,
   810 F.2d 1127 (Fed. Cir. 1987) ......................................................................9, 10, 11

*Joy Techs., Inc. v. Manbeck*,
   959 F.2d 226 (Fed. Cir. 1992) .......................................................................... 9, 10

*Lorenz v. CSX Corp.*,
   1 F.3d 1406 (3d Cir. 1993) ...............................................................................3, 4

*Monahan v. City of Wilmington*,
   C. A. No. 05-505-JJF, 2004 U.S. Dist. LEXIS 1322
   (D. Del. Jan. 30, 2004)........................................................................................4

*Newton v. Rumery,*
    480 U.S. 386 (1987)........................................................................................13

*PIC Inc. v. The Prescon Corp.,*
    485 F. Supp. 1302 (D. Del. 1980)........................................................................5

*Patlex v. Mossinghoff,*
    758 F.2d 594 (Fed. Cir. 1988) ........................................................................11, 12

*Phillips Home Builders v. Travelers Ins. Co.,*
    700 A.2d 127 (Del. 1997) .................................................................................7

*Suter v. Munich Reinsurance,*
    223 F.3d 150 (3d Cir. 2000) ............................................................................13

*United  Paperworkers Int'l Union v. Misco, Inc.,*
    484 U.S. 29 (1987).........................................................................................13

*United States v. Utah Const. & Mining Co.,*
    384 U.S. 394 (1966).........................................................................................5

## STATUTES

35 U.S.C. §§ 2(a)(1) .............................................................................................5

35 U.S.C. § 311...................................................................................................1

35 U.S.C. § 314(a)...........................................................................................5, 8, 9

35 U.S.C. § 316(a)..............................................................................................12

37 C.F.R. § 1.555................................................................................................12

145 Cong. Rec. E1789-E1790 (Aug. 5, 1999)............................................................5, 12

Acushnet Company ("Acushnet") hereby opposes Callaway's Motion to Amend its Complaint.  Acushnet will show that Callaway cannot secure any relief on the breach of contract claim it seeks leave to file.  Thus, Callaway's motion to amend its Complaint should be denied as futile.

## I.        NATURE AND STAGE OF PROCEEDINGS

This is an action for patent infringement.  Plaintiff, Callaway Golf Co. ("Callaway'), alleges that Acushnet infringes four patents that Callaway bought from the bankruptcy estate of the Spalding golf ball company.

In its proposed amendment, Callaway seeks to add a new Count V, alleging that Acushnet breached a 1996 Settlement Agreement ("the 1996 Agreement," attached as Ex. A hereto) between Acushnet and Spalding by filing, earlier this year and before this case was filed, an *inter partes* reexamination under 35 U.S.C. § 311 *et seq.* seeking to have the PTO reexamine the four patents-in-suit.  Those reexamination requests have been granted, and the reexaminations are proceeding.[1]

After reexamination was ordered, Callaway filed a petition to the PTO to have the Reexamination Orders vacated as being precluded by the same agreement that Callaway relies on in this Court.  (Ex. B, Callaway Pet. to Vacate.) That petition raised the same contract issues that Callaway raises in its proposed amendment.

The PTO rejected Callaway's argument.  The PTO found that: (1) there is no authority for Callaway's contention that private parties may by contract negate the applicability of the reexamination statute; (2) the contractual provisions, if read to preclude Acushnet from seeking reexamination, would be void as being contrary to public policy; and (3) Callaway failed to point to any authority to suggest that the PTO

---

[1] The Court has before it a fully briefed motion to stay this case pending the outcome of these *inter parties* reexaminations.  (D.I. 9, D.I. 16, D.I. 22.)

ordered reexamination "contrary to a statutory prohibition barring the order."  (Ex. C, Decision Denying Callaway Pet. to Vacate.)[2]

Undaunted by its loss in the PTO, Callaway now seeks to raise the same issue in this litigation by moving to amend its complaint to add the breach of contract claim that the PTO has already rejected.  Callaway's proposed amendment should be rejected as futile.

## II.      SUMMARY OF ARGUMENT

Callaway's motion to amend its Complaint should be denied because its proposed amendment is futile.  Callaway asks leave to amend its Complaint to add a claim for breach of a dispute resolution and forum selection clause of a 1996 Settlement Agreement to which it was not a party.  Callaway's amendment cannot state a claim for relief under any plausible interpretation of the 1996 Agreement because (1) the 1996 Agreement simply is not applicable to this dispute; (2) the 1996 Agreement cannot be read to preclude administrative proceedings, such as reexamination of a patent; (3) reexamination is not a dispute resolution process, but rather the government's performance of its statutory duty entrusted to it by Congress to ensure that only valid patents are maintained.  Moreover, as the PTO has recently decided, reading the 1996 Agreement as expansively as Callaway suggests violates public policy as embodied in the *inter partes* reexamination statute, which was effective nearly four years after the 1996 Agreement was signed. Thus, Callaway cannot state a claim for the breach of the 1996 Agreement under any set of facts and Callaway's motion should be denied.

---

[2] While Callaway has petitioned the Director for reconsideration of its decision, that request will most likely be denied as well. (Ex. D, Acushnet's Opp. to Callaway's Pet.)

### III.     STATEMENT OF FACTS

In 1996, Spalding & Evenflow Companies, Inc., ("Spalding") and Acushnet entered into a Settlement Agreement to resolve an advertising and patent dispute unrelated to the patents at issue litigation.  Spalding later went bankrupt and its golf ball assets, including the 1996 Agreement, were bought by Callaway out of the bankruptcy estate.

The proposed amended complaint alleges that the 1996 Agreement contained a dispute resolution clause that included: (1) an alternative dispute resolution process; and, (2) a forum selection clause that requires that any  "legal proceedings" initiated by either party are to be brought in the United States District Court for the District of Delaware. (Ex. E, Proposed Amended Complaint ¶ 23.)[3]

In September of 2003, Callaway Golf ("Callaway") acquired Spalding's golf ball business out of the bankruptcy court.  (D.I. 1 at ¶ 10.)  Callaway alleges that Callaway and Acushnet complied with the dispute resolution provisions of the 1996 Agreement (Ex. E, at ¶¶ 24-26) but that Acushnet breached the 1996 Agreement by asking the PTO to reexamine the four patents-in-suit.  (*Id.* ¶ 26).   In its prayer for relief, Callaway seeks specific performance of the 1996 Agreement by way of an order directing Acushnet not to participate further in the *inter parties* reexaminations and for unspecified damages.

### IV.     ARGUMENT

#### A.     Applicable Law

At this early stage of the case, leave to amend is generally "freely granted" under Rule 15(a).  *Foman v. Davis*, 371 US 178, 182 (1962).  However, it is well established that leave to amend can be denied when the proposed amendment would be futile.  *See Arthur v. Maersk, Inc.*, 434 F.3d 196, 202-03 (3d Cir. 2006); *Lorenz v. CSX Corp.*, 1 F.3d

---

[3] The Settlement Agreement provides that it is governed by the laws of the State of Delaware, except where the laws of the United States are controlling.  (Ex. A at ¶ 18.)

1406, 1413-14 (3d Cir. 1993); *Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726, 736 (D. Del. 2002) ("If the court determines that an amendment is clearly futile, leave to amend may be denied solely on that basis.").

An amendment to a pleading may be futile if it could not withstand a motion to dismiss. *Monahan v. City of Wilmington*, C.A. No. 00-505-JFF, 2004 U.S. Dist. LEXIS 1322, at *4 (D. Del. Jan. 30, 2004). Additionally amendment may be futile and denied when the claim is barred by res judicata or otherwise is inadequate to secure relief even if leave to amend were granted. *See Lorenz,* 1 F.3d at 1418 (denying amendment to add new claims as time-barred).

> ### B.    The 1996 Agreement Does Not Prohibit Either Party from Seeking Reexamination and Hence the Amendment Would be Futile
>
> #### 1.    The PTO Has Already Rejected Callaway's Arguments

As noted above, the PTO has already rejected the same claim Callaway makes here. In a petition to the Director of the PTO, Callaway asked the PTO to dismiss the pending reexaminations based on the 1996 Agreement.

In a detailed written decision, the PTO thoroughly rejected Callaway's arguments. (Ex. C.) The PTO Director found no basis whatsoever to conclude that the 1996 Agreement bars or prohibits the conduct of the *inter partes* reexaminations, which authority Congress vested in the PTO in 2000 (years after the 1996 Agreement was signed) in order to create an inexpensive alternative to federal court litigation. 145

CONG. REC. E1789-E1790 (Aug. 5, 1999).[4]  Indeed, the PTO found that to the extent that the 1996 Agreement were construed to preclude a reexamination, the contractual provision would be void as contrary to public policy.  (Ex. C at 5.)  The PTO stated:

> [A] contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy.
>
> ***
>
> [P]reventing a third party requestor (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision.

(*Id.*)

In some cases, prior adjudications before an administrative body can preclude a litigant from relitigating the same issues in federal court.  *See United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422 (1966); *PIC Incorporated v. The Prescon Corp.,* 485 F. Supp. 1302, 1308 (D. Del. 1980).  Without deciding whether the PTO decision is preclusive here, there is no question that the Court should give appropriate deference to the PTO's determination.  *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984) .

The PTO is, of course, the agency charged by statute with the examination and reexamination of patents.  35 U.S.C. §§ 2(a)(1) ("The United States Patent and Trademark Office … shall be responsible for the granting and issuing of patents…."); 131 ("The Director shall cause an examination to be made of the application …."); 314(a)

---

[4] In fact, when passing the *inter partes* reexamination statute in 1999 Congress stated:

> Title V is intended to reduce expensive patent litigation in U.S. district courts by giving third-party requesters, in addition to the existing *ex parte* reexamination in Chapter 30 of title 35, the option of *inter partes* reexamination proceedings in the PTO.  Congress enacted legislation to authorize *ex parte* reexamination of patents in the PTO in 1980, but such reexamination has been used infrequently since a third party who requests reexamination cannot participate at all after initiating the proceedings. *** [G]rounds for *inter partes* reexamination are limited to earlier patents and printed publications—grounds that PTO examiners are well-suited to consider.  145 CONG. REC. at E1789.

("reexamination shall be conducted according to the procedures established for initial examination…."). As such, a determination by an agency on a matter within its area of expertise is entitled to deference in a federal court. *Chevron,* 467 U.S. at 844. The PTO has reviewed the arguments Callaway makes here and found them wrong. The PTO indeed found that Callaway's construction of the contract would be contrary to public policy. (Ex. C at 5.)

In such a case, we submit, the Court should be most reluctant to permit Callaway to present what is in all events a most dubious claim that a ten year old agreement between Acushnet and Spalding gives Callaway (a stranger to the agreement) the right to interfere with the Congress's carefully crafted *inter partes* reexamination statute as administered by the PTO. The Court should decline to entertain Callaway's claim in deference to the PTO decision.

## 2. Properly Construed, the 1996 Agreement Does Not Prohibit Reexamination

While Callaway's proposed amendment is misplaced as matter of sound public policy (as the PTO has already determined), Callaway is completely wrong regarding the plain meaning of the 1996 Agreement. By simply reading the Agreement in light of the applicable CAFC precedent, the Court should conclude that the Agreement does not in any way prohibit either party from seeking or participating in a reexamination proceeding before the PTO. As a result, the contract claim Callaway seeks to assert is doomed to fail, and its amendment should be denied as a matter of law.

### a. The 1996 Agreement Does Not Apply to this Dispute

The 1996 Agreement between Acushnet and Spalding provides that, in the event an intellectual property or advertising dispute arises between Acushnet and **Spalding** (the "parties"), the parties are to engage in specified dispute resolution procedures. (Ex. A at ¶¶ 19.2-19.4.) On its face, the Agreement does not in any way purport to apply to

disputes between Acushnet and **non-parties** to the Agreement, like Callaway.  Thus, while Callaway claims to be a "successor" to the Agreement, it simply is not a **party** to the Agreement, and hence the Agreement does not apply to this the present dispute.[5] *Phillips Home Builders v. Travelers Ins. Co.,* 700 A.2d 127, 129 (Del. 1997) ("[I]f the relevant contract language is clear and unambiguous, courts must give the language its plain meaning.").

Indeed, it would be unjust to apply the 1996 Agreement to the present dispute between Acushnet and Callaway.  Settlement agreements, and agreements to mediate and pursue ADR, often rely on an atmosphere of trust and understanding that exist between the parties to the agreement.  Acushnet and Spalding had such a relationship.  However, it would be peculiar indeed if a stranger to the 1996 Agreement were able to buy the contract and assert that Acushnet now must mediate with a different company with whom it had no contract to mediate and where the requisite atmosphere of trust may not exist..  While Callaway may be a "successor" to the agreement, nothing on the face of the 1996 Agreement says that Acushnet must negotiate or pursue ADR with "successors" of Spalding.

On its face, the 1996 Agreement only applies to disputes between Acushnet and Spalding (the "parties" to the agreement).  Because the language of the 1996 Agreement is clear, the 1996 Agreement does not apply here and amendment is futile. *Phillips Home Builders*, 700 A.2d at 129.

---

[5] Callaway pleads that Acushnet and Callaway acted as if the dispute resolution provisions of the 1996 Agreement apply to them.  (Proposed Amended Complaint ¶¶ 24-25.)  Even assuming this is true for purposes of this motion, Acushnet's willingness voluntarily to use a dispute resolution process similar to what was in the 1996 Agreement in no way establishes in Callaway a right to enforce a contract that on its face does not apply to this dispute.

       **b.**    **The 1996 Agreement Does Not Preclude "Administrative Proceedings" such as PTO Reexamination**

Even if Callaway could assert a right, which Acushnet disputes, under controlling CAFC law, reexamination is not a "legal proceeding" covered by the 1996 Agreement. Hence, the requirement in the contract that "legal proceedings" be brought in this Court does not preclude either party from seeking reexamination before the PTO.

Under the Agreement, the parties are first to engage in executive-to-executive discussions. (Ex. A at ¶¶ 19.2-19.4.)   If those meetings fail to resolve the dispute, the parties are to submit that matter first to a neutral third party mediator, and then, if that fails, to Judge Mary Pat Thynge (then known as Judge Trostle). (*Id.* at ¶¶ 19.5-19.6.)

Should these mediations fail to resolve the dispute, the Agreement provides that either party is free to initiate '**legal proceedings**." (*Id*. at ¶ 19.6 (emphasis added).)  The Agreement provides that these "legal proceedings" must be brought in the District of Delaware. (*Id.)*

The 1996 Agreement nowhere addresses or covers the question of seeking reexamination of a patent.  Indeed, the *inter partes* reexamination procedure at issue in this case did not even exist in 1996 when this Agreement was signed.  On its face, nothing in the 1996 Agreement in any way prohibits either party from seeking reexamination of a patent.  Hence, Callaway's claim is baseless and amendment should be denied.

Reexamination is an administrative proceeding between the PTO and the patent owner takes a second look at a patent. (*See infra* at 10.)  Reexamination proceedings are similar to an original patent examination before the PTO.  *See, e.g.*, 35 U.S.C. § 314(a) ("reexamination shall be conducted *according to the procedure established for initial examination* under the provisions of sections 132 and 133.").  The primary difference between *ex parte* reexamination and *inter partes* reexamination is that the third party

8

requester will be permitted to file one reply to a PTO action and the patent owner's reply. *See* 35 U.S.C. § 314(b)(2).[6]

CAFC cases draw a clear distinction between "administrative proceedings" in the PTO and "legal proceedings" in a federal court. *See Joy Mfg. Co. v. Nat'l Mine Serv. Co.*, 810 F.2d 1127, 1130 (Fed. Cir. 1987) ("the district court correctly refused to equate a *request for administrative reexamination* … with filing a suit in a United States Court." (emphasis added)); *Joy Techs., Inc. v. Manbeck*, 959 F.2d 226, 229 (Fed. Cir. 1992) (finding that reexamination is an "administrative proceeding," and that there was "no basis" for the plaintiff "to recharacterize the statutory procedure established by Congress in the reexamination statute" to be akin to litigation brought in the Federal Courts). Moreover, reexamination, an "administrative proceeding," cannot be filed in United States District Court—either by the third party requester or by the PTO itself. *See Joy Techs.*, 959 F.2d at 229 (noting that the plaintiff admitted that the PTO could not bring a declaratory judgment action for patent invalidity in district court).

In the *Joy Manufacturing* case, the patent owner moved in district court to enforce a settlement agreement. *Joy Mfg.*, 810 F.2d 1127. The patent owner argued that by filing an *ex parte* reexamination request in the PTO, the licensee had violated a settlement agreement.[7] *Id.* at 1128. The patent owner requested an injunction preventing the third party requester from "further proceeding in the reexamination procedures in the PTO; to

---

[6] Acushnet's rights in the pending reexamination proceedings are limited by statute. 35 U.S.C. § 314(a). In all events, Acushnet's limited right to participate clearly does not turn the reexamination into a "legal proceeding" within the purview of the 1996 Agreement. Because reexamination is not a "legal proceeding" between the parties within the meaning of the Agreement, the Agreement simply does not prohibit the PTO from conducting this reexamination proceeding.

[7] The agreement in that case stated in pertinent part: "(a) During the term of this Agreement, NATIONAL will not file any suit in any United States Court or any Court in any foreign country challenging or contesting the validity of the Licensed Patents…." *Joy Mfg.*, 810 F.2d at 1129. While the contractual language at issue in the present case is different than that in *Joy Manufacturing*, the fact that the Agreement in this case uses the language "legal proceedings" and not "administrative proceedings" is dispositive.

withdraw its reexamination requests and to retrieve all documents from the PTO." *Id.*
The Court of Appeals for the Federal Circuit concluded that "[t]he settlement agreement
by its literal terms [did] not proscribe the conduct of which" the patent owner
complained. *Id.* at 1129. Further, in denying the patent owner's motion, the Federal
Circuit stated:

> Turning to "patent law," the district court correctly refused
> to equate "a request for administrative reexamination …
> with filing a suit in a United States Court. Its reliance on
> *Etter* as support for this legal conclusion was entirely
> appropriate. The *Etter* decision turned on the precise issue
> here, namely that reexamination and civil litigation were
> distinctly different proceedings.

*Joy Mfg.*, 810 F.2d at 1130 (quoting *In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) ("The
intent that reexamination proceedings and court actions involving challenges to validity
be distinct and independent is reflected in the legislative history of § 303.")).

These cases are dispositive of the present dispute. Here, the 1996 the Agreement
states that any "legal proceeding" is to be brought in the United States District Court for
the District of Delaware. (Ex. A at ¶ 19.7.) Callaway brought its case in this District.
However, the clause relating to "legal proceedings" does not cover or preclude
"administrative proceedings," between the PTO and Callaway, which are substantially
different than "legal proceedings," as recognized by the Federal Circuit in *Joy Mfg.* and
*Etter.  See also Joy Techs., Inc. v. Manbeck*, 959 F.2d at 229.

            **c.**    **Administrative Reexamination of a Patent
is not a Dispute Resolution Process–it is
the PTO's Exercise of its Sovereign Duty
and is Conducted between Callaway and
the PTO**

Callaway argues that Section 19 of the 1996 Agreement applies to "any dispute"
between the parties, and that therefore the only remedy Acushnet has to resolve the

dispute is to mediate and then sue in federal court in Delaware. Callaway's argument is wrong.

Callaway ignores the fundamental difference between the dispute resolution mechanisms specified in the Agreement and a PTO reexamination. Each of the dispute resolution mechanisms in the Agreement are ways for the parties to try to resolve their private dispute. None of these provisions purport to constrain in any way a party's ability to seek patents or to avail itself of the PTO and the statutes Congress has enacted regarding the examination and reexamination of patents.[8]

Reexamination, however, is not a 'dispute resolution' process between private parties. *Joy Mfg.*, 810 F.2d at 1130. Hence, it is not prohibited by paragraph 19 of the Agreement. Reexamination is fundamentally a sovereign government's exercise of its statutory duty to issue valid patents. *See In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) ("When a "substantial question" exists respecting the correctness of [the grant of a patent], it does not conflict but coincides with the nature of the grantee's right when the government reexamines the propriety of the grant it has made, and thereafter reaffirms the grant, substitutes a new grant (amended or new claims), or withdraws the grant in whole or in part...."); *Patlex v. Mossinghoff*, 758 F.2d 594, 604 (Fed. Cir. 1988) ("The reexamination statute's purpose is to <u>correct errors made by the government, to remedy defective governmental (not private) action</u>, and if need be to remove patents that should never have been granted.") (emphasis added); *see also Blacklight Power, Inc. v. Rogan*, 295 F.3d 1269, 1274 (Fed. Cir. 2002) ("The PTO's responsibility for issuing sound and reliable patents is critical to the nation."). Nothing in the 1996 Agreement could even plausibly constrict the PTO's exercise of its statutory authority.

---

[8] Under Callaway's perverse reading of this clause, the parties could not seek additional patent protection or file an interference or do any other thing in the PTO if those additional patents or other PTO procedures might "resolve" a patent dispute. Plainly this is not what the drafters intended.

Rather, reexamination is an administrative proceeding in which the PTO will exercise its authority to determine if a patent is properly issued. *In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) ("litigation and reexamination are distinct proceedings, with ***distinct parties***, purposes, procedures, and outcomes." (emphasis added)). Nothing in the 1996 Agreement addresses or discusses reexaminations and nothing prohibits either party from participating in such reexaminations.

### C.    Callaway's Broad Reading of the Agreement Renders the Agreement Void on Public Policy Grounds

As the PTO has already found, if the 1996 Agreement were so broad as to preclude Acushnet from seeking reexamination, it would be void as contrary to public policy.

A strong public policy supports the PTO's duty to cancel claims that are unpatentable. *See* 35 U.S.C. § 316(a); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q.2d (BNA) 1032, 1037 (N.D. Tex. 1982) (noting that there is an important public interest "in eliminating worthless patents"). The Federal Circuit has recognized that "[w]hen Congress voted the reexamination statute into law, it had before it a voluminous record to the effect that the procedure was an important step forward for the United States patent system and for the public interest that the system is charged to serve." *Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 602 (Fed. Cir. 1985).[9] Th public interest "lies in having valid patents upheld and invalid patents rendered invalid, and hence patents should be reexamined when a substantial question of patentability is raised." *In re Baker Hughes*, 215 F.3d 1297, 1302 (Fed. Cir. 2000) (emphasis added); *see also* 37 C.F.R. § 1.555 ("A patent by its very nature is affected with a public interest."). The Federal

---

[9] Even though Congress had provided for the *ex parte* reexamination procedures, it found that those procedures did not adequately address these public policy interests. Therefore, in 1999—well after the Agreement being asserted by Callaway was inked—Congress provided for a new *inter partes* reexamination procedure to be administered by the Director of the PTO. 145 CONG. REC. E1789-E1790 (Aug. 5, 1999).

Circuit has held that "[t]he innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of a patent thought 'doubtful.'" *In re Etter*, 756 F.2d at 857.

A broad contractual provision preventing a party from seeking reexamination of any patents held by the parties involved in a dispute between them is thus void as being contrary to public policy. *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) (concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("[A] court may refuse to enforce contracts that violate … public policy."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (*citing Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

**V.      CONCLUSION**

The 1996 Agreement does not apply to this dispute, and does not preclude Acushnet from seeking reexamination of the patents in suit by its plain terms. If it did, the 1996 Agreement would be contrary to public policy and unenforceable in any event, as the PTO has already found.

The amendment Callaway seeks would clearly be futile, and hence leave to amend should be denied.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:    _/s/ David E. Moore_____

Alan M. Grimaldi                    Richard L. Horwitz (#2246)
Joseph P. Lavelle                     David E. Moore (#3983)
Andrew R. Sommer                 Hercules Plaza 6th Floor
HOWREY LLP                         1313 N. Market Street
1299 Pennsylvania Avenue, N.W.    P.O. Box 951
Washington, D.C. 20004            Wilmington, DE  19899
Telephone (202) 783-0800         Tel:  (302) 984-6000
                                              rhorwitz@potteranderson.com
Dated:  June 29, 2006             dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

739340

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on June 29, 2006, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF.

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114

I hereby certify that on June 29, 2006, I have Electronically Mailed the documents

to the following non-registered participants:

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

John V. Picone, III
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
picone@fr.com

David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
shuman@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon  LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869

# EXHIBIT A

# SETTLEMENT AGREEMENT

between

## SPALDING & EVENFLO COMPANIES, INC.,
a Delaware corporation,
for itself and on behalf of its Spalding Sports Worldwide Division,
with principal offices in Tampa, Florida;

-and-

## LISCO INC.,
a Delaware corporation
and wholly owned subsidiary of said SPALDING & EVENFLO COMPANIES, INC.
(hereinafter jointly and severally referred to as "Spalding");

-and-

## ACUSHNET COMPANY,
a Delaware corporation,
(hereinafter "Acushnet"),
with principal offices in Fairhaven, Massachusetts.

## SETTLEMENT AGREEMENT

Parties:    SPALDING & EVENFLO COMPANIES, INC.
            LISCO, INC.
            ACUSHNET COMPANY

RECITALS                                                          PAGE

1.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

2.   '959 PATENT RIGHTS' LICENSE  . . . . . . . . . . . . . . . . . . . . . . .   5

3.   '304 PATENT RIGHTS' LICENSE  . . . . . . . . . . . . . . . . . . . . . . .   5

4.   HIGH ACID PATENT RIGHTS' LICENSE . . . . . . . . . . . . . . . . . . . .   7

5.   MULTIPLE LICENSES AND ROYALTIES  . . . . . . . . . . . . . . . . . . .   7

6.   SETTLEMENT OF ADVERTISING CLAIMS  . . . . . . . . . . . . . . . . . .   8

7.   WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

8.   PAYMENT, COSTS AND FEES  . . . . . . . . . . . . . . . . . . . . . . . .  10

9.   DISMISSAL OF CURRENT ACTIONS  . . . . . . . . . . . . . . . . . . . . .  10

10.  DISCLOSURE OF APPLICATIONS  . . . . . . . . . . . . . . . . . . . . . .  11

11.  EFFECT OF AGREEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . .  12

12.  CONFIDENTIALITY AND PUBLIC ANNOUNCEMENT  . . . . . . . . . . . .  12

13.  NON-ADMISSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

14.  SUPERSESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

15.  SUCCESSORS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

16.  EXPIRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

17.  EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

18.  GOVERNING LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

19.  DISPUTE RESOLUTION  . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

## SETTLEMENT AGREEMENT

between

SPALDING & EVENFLO COMPANIES, INC., a Delaware corporation, for itself and on

behalf of its Spalding Sports Worldwide Division, with principal offices in Tampa, Florida;

-and-

LISCO INC., a Delaware corporation and wholly owned subsidiary of said SPALDING &

EVENFLO COMPANIES, INC. (hereinafter jointly and severally referred to as "Spalding");

-and-

ACUSHNET COMPANY, a Delaware corporation, (hereinafter "Acushnet"), with principal

offices in Fairhaven, Massachusetts.

WHEREAS:

A.    Spalding and Acushnet are parties to a Settlement Agreement dated November 15, 1990,

which, for its term of ten (10) years, in situations of patent infringement, requires them, prior

to filing suit, to first notify each other of adverse patent claims, and seek a non-litigious

resolution thereof, including non-binding mediation, if necessary;

B.    Spalding asserted that the manufacture and sale by Acushnet of Titleist DT 90, Titleist

DT 100 and Pinnacle Performance golf balls infringed Lisco Inc.'s U.S. Patent No. 5,329,959

for "Golf Ball Cover Compositions" (the "'959 Patent") and, additionally, that the manufacture

and sale by Acushnet of Super Pinnacle Plus golf balls infringed Lisco Inc.'s U.S. Patent No.

5,368,304 for "Low Spin Golf Ball" (the "'304 Patent"), which assertions were denied by Acushnet;

C.     Acushnet asserted that Spalding's 1995 print advertisements mentioning Acushnet golf balls were actionably false, inaccurate, disparaging and unfair and those assertions were denied by Spalding;

D.     Spalding filed two patent infringement actions (Civil Actions Nos. 95-CV-366 and 95-CV-640) against Acushnet in the United States District Court for the Northern District of Ohio respectively alleging infringement of its '959 Patent through the manufacture and sale of Titleist DT 90, Titleist DT 100 and Pinnacle Performance golf balls and infringement of its '304 Patent through the sale *inter alia* of Super Pinnacle Plus golf balls, and filed another action (Civil Action No. 95-CV-387) seeking a declaration that certain of its 1995 print advertisements were not actionably false, inaccurate, disparaging or unfair and asserting that 1995 Acushnet print advertisements mentioning Spalding golf balls were actionably false, inaccurate, disparaging and unfair, which assertions have been denied by Acushnet;

E.     Acushnet filed a declaratory judgement action against the '959 and '304 Patents in the District Court of Massachusetts (95-CV-10384) and also therein brought an action (95-CV-10376) alleging *inter alia* false advertising and breach of contract by Spalding;

-2-

F.    Acushnet's Massachusetts' actions were transferred to the United States District Court for the Northern District of Ohio and all of said actions have now been transferred from said court to the U.S. District Court of Delaware, whose jurisdiction the parties accept; and

G.    The parties desire to: (i) settle their present disputes relating to the manufacture, sale and advertising of golf balls as aforesaid; (ii) avoid other and similar patent disputes; and (iii) strengthen the procedure for attempting to resolve expeditiously such new intellectual property and advertising disputes as may arise between them.

NOW, THEREFORE, the parties agree as follows:

1.    DEFINITIONS

In this Settlement Agreement, the following terms shall have the meanings indicated:

1.1    Golf Balls:  Balls for use in playing, practicing or simulating the game of golf.

1.2    Golf Ball Business:  The business of and the technology used in making, using and selling golf balls in the United States and foreign countries as participated in by the parties, their affiliates, subsidiaries or related companies.

1.3    Spalding's '959 Patent Rights:  The domestic and foreign patents and applications therefor identified as A-1 on Exhibit A, including without limitation any and all divisionals, continuations, continuations in part applications currently filed and foreign counterparts thereof or applications currently filed which otherwise emanate from the same roots as do the listed patents, whether or not they can be viewed as improvements thereof.

-3-

1.4    Spalding's '304 Patent Rights:  The domestic and foreign patents and applications therefor identified as A-2 on Exhibit A, including without limitation any and all divisionals, continuations, continuations in part applications currently filed and foreign counterparts thereof or applications currently filed which otherwise emanate from the same roots as do the listed patents, whether or not they can be viewed as improvements thereof.

1.5    High Acid Ionomeric Resin:  Resin comprised of an alpha olefin and an alpha, beta ethylenically unsaturated carboxylic acid, wherein the latter comprises greater than 16% (by weight) of the total weight of the resin.

1.6    High Acid Patent Rights:    Any and all foreign or domestic patents or applications:  (1) currently issued or on file and identified as A-3 on Exhibit A; or (2) filed by any of the parties within three years of the Effective Date of this Settlement Agreement, directed to an invention relating to Golf Balls which invention includes in at least one independent claim a cover composition which comprises one or more High Acid Ionomeric Resin(s).    However, such High Acid Patent Rights do not include, either implicitly or explicitly, (a) other patented technology claimed alone; or (b) separately patentable technology claimed in combination with a High Acid Ionomeric Resin; or (c) any patented multilayer golf ball technology, except to the extent such technologies in (a), (b), and (c) preceding are included in Spalding's '304 Patent Rights.

1.7    Spalding's Patent Rights:  The Patent Rights defined in items 1.3, 1.4 and as applicable in 1.6.

-4-

1.8    Disclosure Group:  The senior management of either party, a major stockholder of either party, and the management of any parent of a party, their counsel and auditors who need to know of the terms and conditions of this Settlement Agreement, or any of them.

1.9    Third Party:  Any corporation, company, entity or individual not in the Disclosure Group.

1.10    Net Sales:  The invoice price less any sales taxes or freight charges paid by the seller and any discounts given to the buyer.


2.    '959 PATENT RIGHTS' LICENSE

2.1    In consideration of the one time payment by Acushnet to Spalding of the sum of US$ 535,000.00, Spalding agrees to, and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, paid up, non-transferrable (except to any successor(s) of substantially all of the assets of Acushnet's Golf Ball Business) license under Spalding's '959 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof.

2.2    Acushnet expressly does not waive its right to contest, nor is it estopped from contesting, the validity, enforceability or non-infringement of the Spalding '959 Patent Rights, nor does it concede or otherwise acknowledge the validity, enforceability or non-infringement thereof or of any of them, and Spalding agrees never to assert such waiver or estoppel by reason of this Settlement Agreement.

-5-

3.    '304 PATENT RIGHTS' LICENSE

3.1    In consideration of the one time payment by Acushnet to Spalding of the sum of US$ 100,000.00, Spalding agrees to and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, paid up, non-transferrable (except to any successor(s) of substantially all of the assets of Acushnet's Golf Ball Business) license under Spalding's '304 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, provided the average diameter of such Golf Balls is less than 1.70 inches.

3.2    Acushnet expressly does not waive its right to contest nor is it estopped from contesting the validity, enforceability or non-infringement of the Spalding '304 Patent Rights, nor does it concede or otherwise acknowledge the validity, enforceability or non-infringement thereof or of any of them and Spalding agrees never to assert such waiver or estoppel by reason of this Settlement Agreement.

3.3    Spalding agrees to and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, non-transferable (except to any successor(s) of substantially all assets of Acushnet's Golf Ball Business) license under Spalding's '304 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, the average diameter of such Golf Balls being 1.70 inches or more under all claims thereof, in consideration of the payment to Spalding by Acushnet of a royalty which shall be the greater of (a) or (b):

       a)    a percentage of the Net Sales of Golf Balls sold by Acushnet after the Effective Date of the Settlement Agreement, applicable as follows:

            0-500,000 dozen            5%

            500,001-1,000,000 dozen    4%

1,000,001-2,000,000 dozen 3%

over 2,000,000 dozen       2%; or

b)   $100,000 for each complete calendar year or, if for a period less than a complete calendar year, a pro rata share of $100,000.00.

Such royalty shall be paid quarterly in payments made not later than thirty (30) days following the close of the quarters ending in March, June, September and December in which the sales occurred.

4.   HIGH ACID PATENT RIGHTS' LICENSE

4.1   Each party agrees to and does hereby grant to the other, its subsidiaries and affiliates, an irrevocable, non-exclusive, non-transferrable (except to any successor(s) of substantially all of the assets of its Golf Ball Business) license under its High Acid Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, subject only to the payment of a single three percent (3%) royalty on the Net Sales of its Golf Balls falling within the issued claims of said High Acid Patent Rights.

4.2   Both parties expressly do not agree to waive their rights to contest nor are they estopped by this license from contesting the validity, enforceability or non-infringement of the High Acid Patent Rights held by the other, nor do they acknowledge the validity thereof.

-7-

5.    MULTIPLE LICENSES AND ROYALTIES

     5.1    For any particular Golf Ball model, at most one royalty rate shall apply, as set forth in item 3.3 or 4.1, even though more than one license, as set forth in items 2.1, 3.1, 3.3 and 4.1, may apply.

     5.2    For any Golf Ball model containing High Acid Ionomeric Resin which is covered by any '959 Patent Right which also qualifies as a High Acid Patent Right, the license provided in item 2.1 shall control to the exclusion of the royalty rates set forth in items 3.3 and 4.1.

     5.3    For any Golf Ball model containing High Acid Ionomeric Resin which is covered by any '304 Patent Right which also qualifies as a High Acid Patent Right, the following royalties shall apply:

        a)    the royalty rate set forth in item 3.3 shall control to the exclusion of the royalty rate set forth in item 4.1 for Golf Balls with an average diameter of 1.70 inches or greater; and

        b)    the royalty rate set forth in item 4.1 shall control to the exclusion of the license set forth in item 3.1 for Golf Balls with an average diameter of less than 1.70 inches.

6.    SETTLEMENT OF ADVERTISING CLAIMS

     6.1    Spalding has discontinued and agrees not to resume publication of the advertisements attached hereto as Exhibit E and will pay to Acushnet in full settlement of Acushnet's alleged damages' claims arising out of Spalding's 1995 advertising campaign using such advertisements the sum of US$ 400,000.00.

6.2    Acushnet has discontinued and agrees not to resume publication of the advertisements attached hereto as Exhibit F and will pay to Spalding in full settlement of Spalding's alleged damages claims arising out of Acushnet's 1995 comparative advertising campaign using such advertisements the sum of US$ 100,000.00.

6.3    The parties agree: (i) to utilize demonstrably accurate characterizations when mentioning competing brands of each other by name in the advertising of Golf Balls; and (ii) to recite the methodology being employed, establishing comparisons used in comparative advertising. It is understood and agreed that nothing herein shall prohibit or prevent either party from accurate and fair comparative advertising.

6.4    This Settlement does not constitute an admission of the inaccuracy, truth or falsity of the contested advertisements by either party.

6.5    Spalding agrees to avoid statements for the next fifteen (15) years which might imply that Z-Balata is natural balata (i.e., Z-Balata is longer than other balata balls) and to use Z-Balata always in combination and in the context of a 2-piece construction, and not "balata" alone as in the phrase "balata ball." Moreover, Spalding agrees to avoid in its advertisements phraseology which implies that a golf ball sold under the trademark "Z-balata" is a balata golf ball, such as the phraseology: "Z-balata and other balata balls." However, Spalding, with proper substantiation, is entitled to indicate that its "Z-Balata" golf balls have "balata like" characteristics or possess "balata feel".

6.6    Acushnet agrees to withdraw its opposition to Trademark Application Serial No. 74/513,523 at the United States Patent and Trademark Office (Opposition No. 99000) without prejudice and Spalding agrees to consent thereto.

7.    <u>WAIVER</u>

The parties agree to and do hereby waive any damages for past infringement of any of their respective rights, as well as any damages for unfair competition, except as specified herein.

8.    <u>PAYMENT, COSTS AND FEES</u>

8.1    Acushnet, within five (5) business days of receipt of the signed original of this Settlement Agreement, shall pay to Spalding by check:  the sum of U.S.$ 335,000.00, being the net amount currently due Spalding as a result of this Settlement Agreement.

8.2    The parties agree to be responsible for their own costs and legal fees arising out of any presently pending litigation between them which relates to the Golf Ball Business and the implementation of this Settlement Agreement.

9.    <u>DISMISSAL OF CURRENT ACTIONS</u>

9.1    Concurrent with the execution of this Settlement Agreement, the parties shall take such steps as are necessary to terminate promptly, in accordance herewith, all litigation pending between them which relates to the Golf Ball Business.

9.2    Such steps shall, without limitation, include termination of the following:

9.2.1  Civil Action No. 96-73 MMS, United States District Court for the District of Delaware by Stipulation of Dismissal as annexed in Exhibit B or as otherwise may be required by the court.

-10-

9.2.2   Civil Action No. 96-78 MMS, United States District Court for the District of Delaware by Stipulation of Dismissal as annexed in Exhibit C or as otherwise may be required by the court.

9.2.3   Opposition No. 99000 at the United States Trademark and Patent Office, Trademark Trial and Appeal Board, by Stipulation of Dismissal as annexed in Exhibit D.

9.3     Upon execution of this Settlement Agreement by both parties:

9.3.1   Spalding's counsel and Acushnet's counsel shall sign and file the Stipulations of Dismissal described in 9.2.1 and 9.2.2 as set forth in Exhibits B and C;

9.3.2   Spalding's counsel and Acushnet's counsel shall sign a Stipulation of Dismissal as described in 9.2.3 as set forth in Exhibit D.

10.    DISCLOSURE OF APPLICATIONS

10.1    Within thirty (30) days of the Effective Date of the Settlement Agreement both parties simultaneously shall exchange any and all pending applications which fall within the scope of the patent rights defined in items 1.6-1.7.

10.2    Both parties agree to exchange any and all applications filed after the Effective Date of the Settlement Agreement which fall within the scope of the patent rights defined in items 1.6-1.7 not later than thirty (30) days after the filing date of any such application.

10.3    Each party agrees to hold the existence and contents of the other's applications subject to items 10.1-10.2 in confidence while such information is not available to the public and to limit the disclosure of such information during that period to the Disclosure Group and Third Parties who are full-time employees of either party.

-11-

11.    EFFECT OF AGREEMENT

This Settlement Agreement is intended by the parties, and each of them, to settle fully and compromise the disputes hereinbefore mentioned.


12.    CONFIDENTIALITY AND PUBLIC ANNOUNCEMENT

     12.1    All terms and conditions of this Settlement Agreement shall be held in confidence for a period of five years and may be disclosed during such period only to the Disclosure Group or, with respect only to identification of the licensed patents, persons within the employ of a party who would be benefitted by such knowledge provided, however, that the parties may disclose the terms of this Settlement Agreement when relevant, subject to an appropriate protective order. In such case, however, each party shall seek to restrict by motion or otherwise, disclosure of this Settlement Agreement to the least number of persons who need to know.

     12.2    No public announcement concerning this Settlement shall be made by either party except that the litigation has been resolved amicably.

12.3    Notice of a claimed breach of this confidentiality provision shall be in writing and addressed to:

If Spalding is alleged to have breached:

>Mr. Scott Creelman
>Senior Vice President and
>General Manager – Golf Products Worldwide
>Spalding Sports Worldwide
>425 Meadow Street
>P.O. Box 901
>Chicopee, Massachusetts  01021

with a copy to:

>Robert K. Adikes, Esq.
>Vice President & General Counsel
>Spalding & Evenflo Companies, Inc.
>P.O. Box 30101
>Tampa, Florida  33630

If Acushnet is alleged to have breached:

>Mr. Walter Uihlein
>President and Chief Operating Officer
>Acushnet Company
>333 Bridge Street
>Fairhaven, Massachusetts  02719

with a copy to:

>Gilbert L. Klemann, II, Esq.
>Senior Vice President & General Counsel
>American Brands, Inc.
>1700 East Putnam Avenue
>Old Greenwich, Connecticut  06870

and shall in good faith identify the suspected breaching party and/or persons.  Upon the dispatch of a claim under this Section 12.3, the party alleging the breach may release such

-13-

confidential information as it deems necessary to counter the alleged breach and mitigate damage to itself or competitive advantage to the alleged breaching party.

12.4    The foregoing notwithstanding, nothing herein shall release any party or counsel of their obligations under any protective order entered in the litigations settled hereby and all claims, causes of action, damages and remedies are reserved by the parties for any breach of such protective orders.

13.    NON-ADMISSION

The agreement of the parties to the terms of this Settlement Agreement is not an admission of the truth of any allegations made by one against the other nor of any liability to each other. Acushnet does not admit the validity or enforceability of the Spalding Patent Rights nor the allegation that any of its previously manufactured Golf Balls infringed such rights, nor the validity of the allegations made by Spalding concerning the falsity of Acushnet's advertising. Further the agreement of Spalding to the terms of this Settlement Agreement is not an admission of any of the allegations made by Acushnet against Spalding nor of any liability by Spalding to Acushnet.

14.    SUPERSESSION

This Settlement Agreement embodies the entire understanding of the parties with respect to the matters mentioned and supersedes all prior written or oral understandings or communications with regard to such matters, with the exception of Sections 1-10 and 12-15 of the November 15, 1990 Settlement Agreement.

-14-

15.    SUCCESSORS

This Settlement Agreement is binding upon the parties hereto, their affiliated, related and controlled companies, as well as their representatives and the successors, transferees and assigns of substantially all of their respective Golf Ball Businesses.

16.    EXPIRATION

This Settlement Agreement shall expire upon the expiration of the last to expire patent subject of this Settlement Agreement.

17.    EFFECTIVE DATE

This Settlement Agreement is effective the date of execution by the last party to execute it.

18.    GOVERNING LAW

This Settlement Agreement shall be governed by the laws of the State of Delaware without reference to conflicts of law, except where the law of the United States is controlling.

19.    DISPUTE RESOLUTION

19.1    Any dispute arising out of or relating to patents, including the above mentioned patents, other intellectual property owned or controlled by the parties, or claims relating to advertising shall be resolved in accordance with the procedures specified in this Section, which shall be the sole and exclusive procedure for the resolution of any such disputes.

19.2    The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Settlement Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at higher level of management than the persons with direct responsibility for administration of this Settlement Agreement. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within 15 days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and the response shall include: (a) a statement of each party's position and a summary of arguments supporting that position, and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within 30 days after delivery of the disputing party's notice, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored.

19.3    If the matter has not been resolved by these persons within 45 days of the disputing party's notice, the dispute shall be referred to more senior executives of both parties who have authority to settle the dispute and who shall likewise meet to attempt to resolve the dispute.

19.4    All negotiations pursuant to item 19.2 and 19.3 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

19.5    If the dispute has not been resolved by negotiation within 45 days of the disputing party's notice, or if the parties fail to meet within 30 days, the parties shall endeavor to settle the dispute by non-binding mediation under the then current CPR Model Mediation

-16-

Procedure for Business Disputes in effect on the Effective Date of this Settlement Agreement. Unless otherwise agreed, the parties will select a mediator from the CPR Panels of Neutrals and shall notify CPR to initiate the selection process.

19.6    If the parties fail to achieve acceptable resolution of the dispute at conclusion of the foregoing steps, the dispute shall be referred to Magistrate Judge Mary Pat Trostle or, in the event Magistrate Judge Trostle is unavailable, another judge with authority to mediate disputes within the United States District Court for the District of Delaware.

19.7    At the conclusion of a referral to the Magistrate or other judge as set forth in 19.6, should the dispute remain unresolved, either party may initiate legal proceedings but only in the United States District Court for the District of Delaware, and no other.   Said court retains jurisdiction of the parties for such purposes.


IN WITNESS WHEREOF, the parties through their duly authorized agents, have executed this Settlement Agreement.

Place:   Tampa, FL

Date:    7-31-96

Witness: _Karen A Thomas_

SPALDING & EVENFLO COMPANIES, INC.

By: _Carl L. Whiting_

Its: _President_


Place:   Tampa, FL

Date:    7/31/96

Witness: _Doll R Boh_

LISCO, INC.

By _W Michael Kipplat_

Its: _V.P. Treasurer_


Place: Fairhaven, MA

Date:  8-5-96

Witness: _Joseph J. Newman_

ACUSHNET COMPANY

By: _Robt S. Dull_

Its: _President_


-18-

# EXHIBIT B

## OFFICIAL COMMUNICATION FACSIMILE

## CENTRAL REEXAMINATION UNIT (FAX NO: 571-273-9900)

**Number of pages including this page**    38

| | |
|---|---|
| In re Sullivan<br>Reexamination Proceeding<br>Control No. 95/000,120<br>Filed: January 17, 2006<br>For: U.S. Patent No. 6,210,293 | )<br>)<br>) Examiner: Michael W. O'Neill<br>) Art Unit: 3993<br>) |

**FAX RECEIVED**

**APR 1 3 2006**

**REEXAM UNIT**

| | |
|---|---|
| In re Sullivan<br>Reexamination Proceeding<br>Control No.: 95/000,121<br>Filed: January 17, 2006<br>For: U.S. Patent No. 6,503,156 | )<br>)<br>) Examiner: Michael W. O'Neill<br>) Art Unit: 3993<br>) |

| | |
|---|---|
| In re Sullivan<br>Reexamination Proceeding<br>Control No.: 95/000,122<br>Filed: January 17, 2006<br>For: U.S. Patent No. 6,506,130 | )<br>)<br>) Examiner: Michael W. O'Neill<br>) Art Unit: 3993<br>) |

| | |
|---|---|
| In re Sullivan<br>Reexamination Proceeding<br>Control No.: 95/000,123<br>Filed: January 17, 2006<br>For: U.S. Patent No. 6,595,873 | )<br>)<br>) Examiner: Michael W. O'Neill<br>) Art Unit: 3993<br>) |

Attached to this facsimile communication cover sheet is a Petition to Vacate

Reexamination Orders as Ultra Vires and Certification Under 37 C.F.R. § 1.903, faxed this 13th

day of April, 2006, to the United States Patent and Trademark Office.

Respectfully submitted,

Date: April 13, 2006

Dorothy P. Whelan (Reg. No. 33,814)
J. Patrick Finn III (Reg. No. 44,109)

Fish & Richardson P.C., P.A.
60 South Sixth Street, Suite 3300
Minneapolis, MN 55402
Telephone: (612) 335-5070
Fax: (612) 288-9696

officialfax2.doc
**NOTE:** This facsimile is intended for the addressee only and may contain privileged or confidential
information. If you have received this facsimile in error, please immediately call us collect at
(612) 335-5070 to arrange for its return. Thank you.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Sullivan                 )
Reexamination Proceeding  )
Control No.: 95/000,120    )  Examiner: Michael W. O'Neill
Filed: January 17, 2006     )  Art Unit: 3993
For: U.S. Patent No. 6,210,293 )

**FAX RECEIVED**

In re Sullivan                 )
Reexamination Proceeding  )              **APR 1 3 2006**
Control No.: 95/000,121    )  Examiner: Michael W. O'Neill
Filed: January 17, 2006     )  Art Unit: 3993     **REEXAM UNIT**
For: U.S. Patent No. 6,503,156 )

In re Sullivan                 )
Reexamination Proceeding  )
Control No.: 95/000,122    )  Examiner: Michael W. O'Neill
Filed: January 17, 2006     )  Art Unit: 3993
For: U.S. Patent No. 6,506,130 )

In re Sullivan                 )
Reexamination Proceeding  )
Control No : 95/000,123    )  Examiner: Michael W. O'Neill
Filed: January 17, 2006     )  Art Unit: 3993
For: U.S. Patent No. 6,595,873 )

Central Reexamination Unit
571-273-9900

### PETITION TO VACATE REEXAMINATION ORDERS AS ULTRA VIRES

On April 6 and April 7, 2006, the PTO ordered reexamination of the four patents that are subject to the above-captioned reexamination proceedings. This petition is a timely and authorized filing pursuant to MPEP § 2646(I) because orders granting the reexaminations have issued. Thus, pursuant to 37 C.F.R. § 1.181 and MPEP § 2646, Patent Owner, Callaway Golf Company ("Callaway Golf"), requests the Director to vacate the reexamination orders relating to the aforementioned *inter partes* reexamination proceedings brought by Acushnet Company ("Acushnet"). The undersigned attorneys represent Callaway Golf, which is the assignee of record of the above-referenced U.S.

1

patents. Callaway Golf purchased the assets of the Top-Flite Golf Company in 2003, including the patents in suit.[1]

The four patents that are the subject of Acushnet's *inter partes* reexamination requests are also subject to two Stipulations of Dismissal, filed in and accepted by the United States District Court for the District of Delaware, requiring the parties to ultimately submit all patent disputes to that Court for resolution. Acushnet violated these Stipulations, and the Settlement Agreement underlying them, when it filed the subject *inter partes* reexamination requests. The District Court has exclusive and plenary jurisdiction over any patent dispute between the parties and, as specified in the Stipulations, "retain[s] jurisdiction to resolve any and all disputes arising out of the Settlement Agreement in accordance with the terms of the Settlement Agreement." Acushnet therefore did not have standing to file the *inter partes* reexamination requests, and the Director must vacate them in their entirety.

## PROCEDURAL HISTORY

1.    Callaway Golf's predecessor in interest, Spalding, and Acushnet were parties to a settlement agreement dated November 15, 1990, resolving a long-standing patent dispute regarding golf ball technology. That initial agreement between the parties required that, prior to filing suit over any patent dispute, the parties first notify each other of adverse patent claims and pursue alternative dispute resolution, including non-binding mediation. That initial agreement was for a term of ten years.[2]

2.    Subsequent litigation ensued between the parties in late 1995 that involved claims of unfair advertising and patent infringement, again involving golf ball technology. To resolve that litigation, the parties executed a Settlement Agreement in 1996 that superseded the 1990 agreement and required a specific, multi-step alternative dispute resolution process for any intellectual property dispute, including patent disputes. [Ex. A, 1996 Settlement Agreement.] The agreement specified that if the alternative dispute

---

[1] The agreement underlying this petition was between Spalding & Evenflo Companies Inc., ("Spalding") and Acushnet. For all purposes relevant here, Spalding became Top-Flite Golf. Callaway Golf purchased the assets of Top-Flite Golf in 2003 and therefore, as explained below, is the successor-in-interest to Spalding under the agreement at issue in this petition.
[2] That specific agreement is confidential and cannot be attached to this petition.

2

resolution process was unsuccessful, the only other venue for resolution of any dispute
was a lawsuit in the District Court for the District of Delaware.

3.    The parties incorporated the 1996 Settlement Agreement into their Federal Rule
of Civil Procedure 41 Stipulations of Dismissal. [Ex. B & C, 1996 Stipulations of
Dismissal incorporating the 1996 Settlement Agreement.] These Stipulations were filed
in and accepted by the Delaware District Court. [Ex. D, Docket of Dismissals in the
lawsuits resolved by the 1996 Settlement Agreement.]

4.    Prior to filing the subject *inter partes* reexamination requests, the parties in fact
participated in the mandatory alternative dispute resolution process specified by the 1996
Settlement Agreement, including a non-binding mediation before Magistrate Judge
Thynge of the Delaware District Court. That mediation process was unsuccessful, and
the patent dispute between the parties was not resolved.

5.    On January 17, 2006, while the mediation process was still underway, Acushnet
filed the subject *inter partes* reexamination requests in violation of the Stipulations and
the 1996 Settlement Agreement between the parties.

6.    On February 9, 2006, as allowed under the Stipulations and 1996 Settlement
Agreement, Callaway Golf filed suit against Acushnet in the United States District Court
for the District of Delaware. That suit involves the four above-referenced U.S. patents
and includes, among other issues, the same issues raised by Acushnet's requests for
reexamination.

7.    The PTO order reexaminations on control nos. 95/000,120 and 95/000,121 on
April 7, 2006. The PTO ordered reexaminations on control nos. 95/000,122 and
95/000,123 on April 6, 2006.

3

# THE DIRECTOR MUST VACATE THE INTER PARTES REEXAMINATION ORDERS BECAUSE ACUSHNET DOES NOT HAVE STANDING TO REQUEST REEXAMINATION

The right of a third party to request *inter partes* reexamination is not absolute. The MPEP recognizes that there are circumstances under which the PTO lacks authority to order *inter partes* reexamination, and requires the PTO, in such circumstances, to vacate any orders granting reexamination. MPEP § 2646 (I) states:

"In cases where no discretion to grant a request for reexamination exists, a petition [pursuant to 37 C.F.R. § 1.181] to vacate the decision to grant, or a request for reconsideration, will be entertained." (emphasis in original)

Here, Acushnet lacked standing to file the four subject *inter partes* reexamination requests by virtue of the Stipulations and underlying Settlement Agreement, providing that Acushnet's exclusive forum for challenging patent validity was the United States District Court for the District of Delaware. Acushnet breached the Stipulations and Settlement Agreement by filing these reexamination requests. The PTO, therefore, had no discretion to order reexamination based upon Acushnet's requests.

# ACUSHNET BREACHED THE STIPULATIONS AND SETTLEMENT AGREEMENT BY FILING THE SUBJECT *INTER PARTES* REEXAMINATION REQUESTS

According to section 15 of the 1996 Settlement Agreement, the "Settlement Agreement is binding upon the parties . . . as well as their representatives and the successors, transferees and assigns . . . ." [Ex. A. p. 15, section 15.]

Section 16 states that the "Settlement Agreement shall expire upon the expiration of the last to expire patent subject of this Settlement Agreement." Since the two patents identified by number in the Settlement Agreement (U.S. Patent Nos. 5,328,959[3] and 5,368,304) remain in force, so also does the Settlement Agreement. [*Id.*, at p. 15, section 16.]

---

[3] The '959 patent at issue is U.S. Patent No. 5,328,959, and not 5,329,959, which deals with an unrelated technology, and is listed in the actual text of the 1996 Settlement Agreement. This was a typographical error that the parties realized, but apparently did not remedy prior to the Agreement's execution.

4

Section 19.1 states that "*Any dispute arising out of or relating to patents*, including the above mentioned patents, other intellectual property owned or controlled by the parties . . . *shall* be resolved in accordance with the procedures specified in this Section, which shall be the *sole and exclusive procedure for the resolution of any such disputes*." [*Id.*, at p. 15, section 19.1, (emphasis added).] Sections 19.2-19.6 specify the mandatory alternative dispute resolution procedures, including non-binding mediation before the Delaware District Court.

Section 19.7 states that "[a]t the conclusion of a referral to the Magistrate or other judge as set forth in 19.6, should the dispute remain unresolved, either party may initiate legal proceedings in the United States District Court for the District of Delaware, *and no other. Said court retains jurisdiction of the parties for such purposes*." [*Id.*, at p. 18, section 19.7 (emphasis added).]

The last party executed the Settlement Agreement on August, 5, 1996, and the agreement became effective on that date. [*See*, Ex. A, at p. 15, section 17.]

The District Court, pursuant to the Stipulations of Dismissal executed by the parties, dismissed the respective cases. [*See*, Ex. D.] The Stipulations specifically incorporated the terms and conditions of the 1996 Settlement Agreement. [Exs. B & C, "Pursuant to 41(a)(1)(ii) of the Federal Rules of Civil Procedure and the a Settlement Agreement of August 5, 1996, the terms of which are incorporated herein by reference . . . .".]

The parties also stipulated and agreed that the District Court "shall retain jurisdiction to resolve any and all disputes arising out of the Settlement Agreement in accordance with the terms of the Settlement Agreement." [*Id.*] Thus, even if Acushnet were to dispute the existence of the Settlement Agreement, or its interpretation and Acushnet's breach of that agreement, only the Delaware District Court could resolve any such dispute.

## CONCLUSION

For the foregoing reasons, there is good cause in this case for the Director, pursuant to MPEP § 2646, to vacate the *inter partes* reexamination proceedings. Thus, the undersigned attorneys request that the Director vacate the reexamination orders in an exercise of his discretion and authority under 37 C.F.R. § 1.181 and return jurisdiction to

5

the District Court, where Acushnet agreed previously in settlement of prior litigation to resolve any future disputes, where there is existing litigation between the parties involving the same patents subject to reexamination, and where Acushnet's arguments regarding invalidity can and will be fully and fairly considered.

The Director is authorized to charge any fees or credit any overpayments to Deposit Account No. 06-1050.

Respectfully submitted,

Date: _April 13, 2006_

Dorothy P. Whelan (Reg. No. 33,814)
J. Patrick Finn III (Reg. No. 44,109)

Fish & Richardson P.C.
60 South Sixth Street, Suite 3300
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

# EXHIBIT C



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.                              (For Patent Owner)
P.O. Box 1022
Minneapolis, MN  55440-1022

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW                         (For Third Party Requester)
Washington, DC  20004                               MAILED

                                                    JUN 0 7 2006

In re Callaway Golf Company                :            REEXAM UNIT
  *Inter Partes* Reexamination Proceeding  : DECISION ON PETITION
Control No.: 95/000,120                     : TO VACATE ORDER GRANTING
Filed:    January 17, 2006                  : REEXAMINATION
For:      U.S. Patent No. 6,210,293         :


This is a decision on the April 13, 2006 patent owner petition entitled "PETITION TO VACATE
REEXAMINATION ORDERS AS ULTRA VIRES" under 37 CFR 1.181. On April 27, 2006, the
third party requester filed an opposition to the present petition entitled "ACUSHNET'S
OPPOSITION TO PATENT OWNER'S PETITION TO VACATE REEXAMINATION ORDERS
AS ULTRA VIRES."

Both the petition and the opposition are before the Office of Patent Legal Administration for
consideration.

The patent owner's petition is <u>dismissed</u> for the reasons set forth below.


## REVIEW OF SALIENT FACTS

1.  U.S. Patent No. 6,210,293 (the '293 patent) issued to Michael J. Sullivan on April 3, 2001, and
    is currently assigned to Callaway Golf Company.

2.  A request for *inter partes* reexamination of the '293 patent was filed by a third party
    requester, Acushnet Company (hereinafter "Acushnet"), on January 17, 2006. The request
    was assigned Control No. 95/000,120 (the '120 *inter partes* reexamination proceeding).

3.  On February 9, 2006, the patent owner filed suit against requester Acushnet in the United
    States District court for the District of Delaware. *Callaway Golf Company v Acushnet
    Company*, C.A. No. 06-91 (SLR) (February 9, 2006).

4.  On February 15, 2006, the third party requester filed a paper purporting to withdraw a
    paper requesting suspension of the '120 *inter partes* reexamination proceeding stated to
    have been filed by third party requestor on January 23, 2006.

5.  On March 29, 2006, the Office recognized the February 15, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Offcie would  have taken that paper as a petition for suspension of action without rendering a decision on the petition.

6.  On March 21, 2006, the patent owner filed a petition, requesting that the '120 *inter partes* reexamination proceeding be suspended.

7.  On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition.

8.  On March 31, 2006, the Office issued a decision discarding the March, 2006 petition and opposition papers as improper because reexamination had not yet been ordered.

9.  Reexamination was ordered for the '120 *inter partes* reexamination proceeding on April 7, 2006.

10. On April 13, 2006 the patent owner filed the present petition under 37 CFR 1.181 to vacate the reexamination orders as *ultra vires*.

11. On April 27, 2006 the third party requester filed an opposition to the April 13, 2006 patent owner petition pursuant to MPEP 2646 (I).

## RELEVANT STATUTORY AND REGULATORY LAW
## AND PROCEDURE

35 U.S.C. § 311(a) provides:

"IN GENERAL.— **Any third-party requester at any time may file a request for inter partes reexamination** by the Office of a patent on the basis of any prior art cited under the provisions of  section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

"Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director shall determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. ... " [Emphasis supplied.]

35 U.S.C. § 313 provides:

"If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination shall include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied ]

35 U.S.C. 314(c) provides:

c) SPECIAL DISPATCH.- Unless otherwise provided by the Director for good cause, all *inter partes* reexamination proceedings under this section ... shall be conducted with special dispatch within the Office.

35 U.S.C. § 317 provides:

"a) ORDER FOR REEXAMINATION.- Notwithstanding any provision of this chapter, once an order for *inter partes* reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION.- Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit ... , then neither that party nor its privies may thereafter request an *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action... , and an *inter partes* reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.907 provides in pertinent part:

" (b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office."

MPEP § 2646 (I) provides in pertinent part:

"A petition under 37 CFR 1.181 may... be filed to vacate an *ultra vires* reexamination order, such as where the order for reexamination is not based on prior art patents and printed publications. In cases where no discretion to grant a request for reexamination exists, a petition to vacate the decision to grant, or a request for reconsideration, will be entertained. "Appropriate circumstances" under 37 CFR 1.181(a)(3) exist to vacate the order granting reexamination where, for example:

(A) the reexamination order is not based on prior art patents or printed publications;
(B) reexamination is prohibited under 37 CFR 1.907;
(C) all claims of the patent were held to be invalid by a final decision of a Federal Court after all appeals;
(D) reexamination was ordered for the wrong patent;
(E) reexamination was ordered based on a duplicate copy of the request; or
(F) the reexamination order was based wholly on the same question of patentability raised by the prior art previously considered in an earlier concluded examination of the patent by the Office (e.g., the application which matured into the patent, a prior reexamination, an interference proceeding)."

## DECISION

Patent owner argues that the order granting reexamination is an *ultra vires* action on the part of the Office because the third party requester, Acushnet, lacked standing to file the *inter partes* request. Patent owner bases this argument on allegations that:

(1)  Certain Stipulations of Dismissal resulted in a settlement agreement between patent owner's predecessor in interest, and requester Acushnet entered into a Settlement Agreement on November 10, 1990, for a term of ten years;

(2) The same parties executed a Settlement Agreement in 1996 that superseded the 1990 agreement, and the 1996 Settlement agreement provides, *inter alia*, that the exclusive forum for the third present party requester to resolve patent validity issues with the patent owner is the United States District Court for the District of Delaware; and

(3) The same (present) parties participated in the dispute resolution process pursuant to the 1996 Settlement Agreement, and while the mediation process was underway, Acushnet requester filed a request for the present *inter partes* reexamination proceeding. [1]

It is patent owner's position that filing of the present *inter partes* by requester Acushnet violates the aforementioned Settlement Agreement, and that Acushnet therefore does not have standing to file and maintain the present request for *inter partes* reexamination. [2]  However, taking the facts as given by patent owner are accurate, and that there is a valid Settlement Agreement between patent owner and requester Acushnet, [3] patent owner has simply <u>not</u> established that the order granting the present *inter partes* reexamination proceeding is an *ultra vires* action on the part of the Office.

First, the reexamination statute governing *inter partes* reexamination permits the filing of a request for *inter partes* reexamination of a qualifying patent by **any party at any time;** [4] and it further <u>requires</u> the USPTO Director to (1) determine, within three months of the filing of the request, whether the request raises a substantial new question of patentability affecting any claim of the patent, [5] (2) order and conduct *inter partes* reexamination when such substantial new question is found, [6] and (3) conduct the *inter partes* reexamination proceeding with special dispatch. [7] Patent owner has not cited authority that holds that an agreement by parties in any way relieves the Office from the duty to faithfully follow the mandatory requirements of the *inter partes* reexamination statute, when a party files a request for *inter partes* reexamination. Neither has patent owner cited authority for the proposition that private parties, by agreement, may abrogate the statutory jurisdiction conferred upon the Office to decide the merits of a

---

[1] See patent owner's Petition, pages 2-3.

[2] *Id.*, at pages 4-6

[3] Patent owner has not established the Office has jurisdiction to make a determination regarding the validity and applicability of the Settlement Agreement, or to make any findings regarding the facts alleged in patent owner's petition or the third party requester's opposition to patent owner's petition.  No such determination has been, or will be, undertaken by the Office

[4] 35 U.S.C. §311(a)

[5] 35 U.S.C. § 312(a)

[6] 35 U.S.C. § 313

[7] 35 U.S.C. § 314(c)

request for *inter partes* reexamination and to thereafter conduct an *inter partes* reexamination within the framework provided by the statutes and regulations.

Second, a contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy [8]. In *Lear v. Adkins*, 395 U.S. 653, (1969), the United States Supreme Court determined that prohibiting licensees from challenging the validity of a patent that they had licensed runs afoul of public policy "in permitting full and free competition in the use of ideas which are in reality part of the public domain." *id.* at 670. By analogy, preventing a third party requester (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision. It should also be noted that the settlement agreements entered into in 1990 and 1996 are <u>prior to</u> the enactment in 1999 of the statute authorizing *inter partes* reexamination. Thus it was not even possible for these settlement agreements to address preventing a party to the agreement from filing such a request for reexamination.

Third, MPEP § 2646 (I) sets forth examples of appropriate circumstances that would require the Office to vacate an order for *inter partes* reexamination after granting the order. These circumstances include (1) orders in which a substantial new question of patentability was found based on evidence other than prior art patents or printed publications, (2) circumstances in which estoppels established by 35 U.S.C. § 317(b) as implemented by 37 CFR 1.907 arise out of litigation between the parties **on the patent for which reexamination has been ordered** or the existence of a pending *inter partes* reexamination proceeding on a patent for which *inter partes* reexamination has again been requested by the same party or a party in privity with the requester, (3) the existence of a final, non-appealable Federal Court decision holding all claims of a patent for which *inter partes* reexamination has been ordered invalid, (4) an *inter partes* reexamination order for the wrong patent, or on duplicate copies of the same request for *inter partes* reexamination, and (5) an *inter partes* reexamination ordered based entirely upon the same question of patentability previously considered in an early concluded examination of the patent by the Office. These circumstances address either the issue of a statutory prohibition barring the grant of a request for *inter partes* reexamination, or the grant of an order for reexamination based upon a clear error of a clerical nature. Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to a statutory prohibition barring the order, or due to a clerical error.

Finally, while Congress did establish statutory estoppels requiring either the denial of a request for *inter partes* reexamination, [9] or the conclusion of a pending *inter partes* reexamination proceeding, [10] patent owner has not demonstrated the existence of 35 U.S.C. § 317 estoppel. If Congress had intended for any other basis for an estoppel to apply, it would have included such other basis in the statute. Congress did not provide for an "estoppel" arising out of a settlement agreement or other contractual agreement between parties.

---

[8] *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)(concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386,392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).
[9] 35 U.S.C. § 317(a)
[10] 35 U.S.C. § 317(b)

It is additionally noted that petitioner patent owner requests that the Office return jurisdiction to the District Court conducting the litigation. [11] It is to be observed, however, that Congress provided in 35 U.S.C. § 317(b) that a court validity challenge <u>and</u> *inter partes* reexamination of a patent may occur simultaneously. It is only when one proceeding <u>finally</u> ends, that the issues raised (or that could have been raised) with respect to the validity of a claim in that one proceeding can have estoppel effect on the same issues in the other proceeding. Such is not the case in the present instance. The Office is thus obligated to move forward in the instant *inter partes* reexamination with "special dispatch" despite the presence of the litigation. The present request to vacate/withdraw the instant *inter partes* reexamination request cannot be granted in view of the legislation and implementing rules which require that (1) once an *inter partes* reexamination request is filed, it will be decided, and (2) once the request is determined to raise a substantial new question of patentability of a claim of the patent, the request *will* result in an order for reexamination to resolve the substantial new question, which in turn *will* be followed by reexamination in accordance with 35 U.S.C. §§ 311-314. The statutory language is based on the **public interest** in resolving any reexamination proceeding that is filed.

Withdrawal of a requested and granted *inter partes* reexamination proceeding would leave both the public and the patent owner with an unresolved request for reexamination and unresolved substantial new question of patentability (found to be present via the decision ordering reexamination). The public has a right to such a resolution. Vacating, withdrawing, or otherwise abandoning or terminating the instant reexamination proceeding would abrogate this public right. Rather, the proceeding must continue according to the procedure mandated by the *inter partes* reexamination statute.

In *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001), the court stated, in a decision seeking termination of reexamination based on the absence of a new question of patentability:

> "Under the well established *ultra vires* doctrine, the exhaustion and final agency requirements are excused 'only if plaintiff is able to show that the PTO clearly exceeded its statutory authority', quoting from *Philip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir 1985 (quoting *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977), vacated on other grounds, 571 F.2d 1273 (4th Cir. 1978).

The court went on to state:

> "Put differently, when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusions of underlying proceedings."

After a review of the record, and based upon the above discussion, it is found that patent owner has not established that the Office "clearly exceeded its statutory authority," nor acted "in brazen defiance of its statutory authorization," in the Office's determination that the January 17, 2006 reexamination request properly raised a substantial new question of patentability and should go forward.

---

[11] Presumably *Callaway Golf Company v Acushnet Company*, C.A. No. 06-91 (SLR) (February 9, 2006), discussed briefly above.

For the forgoing reasons, the order granting reexamination remains intact and the *inter partes* reexamination proceeding will continue in accordance with the procedure mandated by the *inter partes* reexamination statute.

## CONCLUSION

1. The patent owner petition filed on April 13, 2006, is <u>dismissed</u>.

2. A copy of this decision will be made of record in the IFW of the '120 *inter partes* reexamination proceeding.

3. Jurisdiction over the '120 *inter partes* reexamination proceeding is returned to the Central Reexamination Unit.

4. Telephone inquiries related to the present decision should be directed to Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to Karen Hastings, Legal Advisor, at 571-272-7717.


*Kenneth M. Schor*

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration


kmh
June 1, 2006


6-6-06
C:\Kiva\Kenpet6\UV\95_120-UV_settlement agreement.doc
C:\Kiva\Kenpet6\IP\95_120-UV_settlement agreement.doc

# EXHIBIT D

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: **6,210,293**

Control No.: **95/000,120**

Inventor: Michael J. SULLIVAN

Issued: April 3, 2001

Appl. 09/470,196

Filed: December 21, 1999

Titled: **MULTI-LAYER GOLF BALL**

**MAIL STOP** *Inter Partes* **REEXAMINATION**
**Central Reexamination Unit – Office of Legal Administration**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## ACUSHNET'S OPPOSITION TO CALLAWAY'S PETITION
## TO THE DIRECTOR FOR RECONSIDERATION

Sir:

Third Party Requester Acushnet Company ("Acushnet") hereby files its Opposition to Patent Owner's Petition to the Director for Reconsideration. This Opposition is being filed within two weeks of the Patent Owner's petition pursuant to M.P.E.P. § 2646 I.

The Director should once again deny Callaway's petition. Callaway's petition should be denied because (1) the 1996 Settlement Agreement ("the Agreement") simply does not, and cannot, preclude reexaminations—a vehicle used by the PTO to serve the public interest in maintaining only valid patents; (2) Callaway's new-found analogies to trademark law do not demonstrate that the PTO is precluded from reexamining the '293 Patent—particularly after the PTO has found the prior art to raise numerous substantial new questions of patentability; and (3) the PTO's interpretation of the M.P.E.P. is in accord with congressional intent as embodied in the Patent Act.

Therefore Callaway's petition should be **DENIED**.

### I.    FACTUAL BACKGROUND

To the extent Callaway's claims had any merit (and they do not, as the Director has already determined), Callaway has waived any basis to complain by over three months of inaction and by taking action contrary to its new-found contract claims, as is clear from the following facts.

In January 2006, Acushnet told Mr. Steve McCracken, General Counsel of Callaway, that if Callaway was going to sue Acushnet for infringement of the '293 Patent and other related patents Acushnet would seek reexamination of Callaway's patents. (Nauman Decl. at ¶ 5.) Callaway never objected to Acushnet's seeking reexamination of its patents. (Nauman Decl. at ¶ 6.) In fact, Callaway proposed and considered a possible settlement of the dispute between the parties by also including the PTO's reexamination of an Acushnet patent.

On January 17, 2006, Callaway's representative told Acushnet that Callaway would file suit against Acushnet the next day. Acushnet had already prepared four requests for reexamination and filed them that day.

After Acushnet filed its requests for reexamination, at Acushnet's request, the parties once again met with Magistrate Judge Thynge to try to resolve this dispute. (Nauman Decl. at ¶ 7.) Callaway delayed filing its suit until after the meeting. During the final meeting with Magistrate Judge Thynge, Callaway never indicated that Acushnet's requests for reexamination violated the Agreement. (*Id.*) The next day, Callaway filed suit against Acushnet in the District of Delaware. (Decl. at ¶ 8.) Callaway's complaint discussed Acushnet's requests for reexamination at length. Even then, Callaway did not claim that Acushnet's requests violated the Agreement. Likewise, Callaway's prior petitions to suspend the reexamination proceedings nowhere suggested that filing the requests for reexamination was anyway inappropriate. (*See* Patent Owner Pet. to Suspend Reexam. of Mar. 21, 2006 (returned/destroyed); Patent Owner Renewed Pet. to Suspend Reexam. of Apr. 28, 2006 (still pending).)

In April of 2006, three months after Acushnet filed its requests to the PTO for *inter partes* reexamination, Callaway concocted an argument based on the Agreement that it was not even a party to and asserted that it precludes the PTO from performing its statutory duty of passing on the substantial new questions of patentability raised by the prior art.

Callaway's most recent petition is its **fourth** attempt to avoid having the expert PTO pass on the prior art invalidity issues raised in the request for reexamination.[1]  Callaway would rather have a jury—without legal training and without the technical expertise of the PTO pass on these issues.  The PTO should reject Callaway's attempts to avoid the administrative review of its dubious patents.

## II.    THE 1996 SETTLEMENT AGREEMENT DOES NOT PRECLUDE THE PTO'S REEXAMINATION OF THE '293 PATENT

### A.    The PTO's Reexamination of the '293 Patent is not a "Legal Proceeding" Between Acushnet and Callaway within the Meaning of the 1996 Agreement.

This *inter partes* reexamination is not a "legal proceeding" between Acushnet and Callaway covered by the Agreement. Rather reexamination is an administrative proceeding in which the PTO is required to determine whether a "substantial new question of patentability" is raised by prior art patents or printed publications and then resolves any such questions.  35 U.S.C. § 312(a); *see also In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) ("litigation and reexamination are distinct proceedings, with ***distinct parties***, purposes, procedures, and outcomes." (emphasis added).)

Acushnet's opposition to Callaway's original petition to have the reexamination orders vacated as *ultra vires* discussed controlling precedent that distinguishes "legal proceedings" from

---

[1] In fact, as discussed at length in the Request for Reexamination, in a 2004 decision, the Board of Patent Appeals and Interferences ("BPAI") affirmed the rejection of an examiner establishing that claims nearly identical to those in this proceeding were unpatentable over prior art now found to raise substantial new questions of patentability in this proceeding.  (U.S. Pat. App. No. 09/873,594, Bd. Of Pat. App. and Inter. Decision mailed Feb. 2, 2004 (**Exhibit A**).)

"administrative proceedings," such as reexamination. (Acushnet Opp. of Apr. 28, 2006 at 6-8.)
This distinction is dispositive here, as the 1996 Agreement only dictates where "legal
proceedings" must be brought, and does not prohibit the PTO from reexamining patents in an
administrative proceeding. *See Joy Mfg. Co. v. Nat'l Mine Service Co.*, 810 F.2d 1127, 1130
(Fed. Cir. 1987) ("the district court correctly refused to equate "a *request for administrative
reexamination* … with filing a suit in a United States Court." (emphasis added).); *Joy Techs., Inc.
v. Manbeck*, 959 F.2d 226, 229 (Fed. Cir. 1992) (reexamination is an "administrative
proceeding," and that there was "no basis" for the plaintiff "to recharacterize the statutory
procedure established by Congress in the reexamination statute" to be akin to litigation brought
in the Federal Courts).

By statute, reexamination is similar to an original patent examination and the principal
parties to the reexamination proceedings are the PTO and the Patent Owner. 35 U.S.C. §§ 312
("the *Director* shall determine whether a substantial new questions of patentability … is raised by
the request."); 313 ("If … *the Director* finds that a substantial new question of patentability
affecting a claim of a patent is raised, the determination shall include an order for inter partes
reexamination of the patent for resolution of the question"); 314(a) ("reexamination shall be
conducted *according to the procedure established for initial examination* under the provisions of
sections 132 and 133.") (all emphasis added).

The primary difference between *ex parte* reexamination and *inter partes* reexamination is
that the Third Party Requester will be permitted to file one reply to a PTO Action and the Patent
Owner's reply. *See* 35 U.S.C. § 314(b)(2). Acushnet's rights in this proceeding are limited by
statute. In all events, Acushnet's limited right to participate clearly does not turn the
reexamination into a "legal proceeding" within the purview of the Agreement.

Administrative reexamination of a patent does not fall within the purview of the
Agreement. The stated purposes of the Agreement was to provide a procedure for the resolution
of "intellectual property disputes as may arise between [the parties]." (Exhibit B at 3, ¶ G.)

Reexamination, however, is not a type of legal proceeding to resolve private disputes between private parties. Reexamination is fundamentally the sovereign government's exercise of its statutory duty to issue valid patents. Nothing in the Agreement could even plausibly constrict the PTO's exercise of its statutory authority. Callaway's contrary argument is fatuously wrong. Because reexamination is not a "legal proceeding" between the parties within the meaning of the Agreement, the Agreement simply does not prohibit the PTO from conducting this reexamination proceeding.

> **B.**   **Reading the Agreement to Preclude Reexamination Runs Afoul of Clear Congressional Intent and Public Policy Embodied in the Patent Act**

A strong public policy supports the PTO's duty to cancel claims that are unpatentable. *See* 35 U.S.C. § 316(a); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q.2d (BNA) 1032, 1037 (N.D. Tex. 1982) (noting that there is an important public interest "in eliminating worthless patents.") The Federal Circuit has recognized that "[w]hen Congress voted the reexamination statute into law, it had before it a voluminous record to the effect that the procedure was an important step forward for the United States patent system and for the public interest that the system is charged to serve." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602 (Fed. Cir. 1985). This public interest "lies in having valid patents upheld and invalid patents rendered invalid, and **hence patents should be reexamined when a substantial question of patentability is raised**." *In re Baker Hughes*, 215 F.3d 1297, 1302 (Fed. Cir. 2000) (emphasis added); *see also* 37 C.F.R. § 1.555 ("A patent by its very nature is affected with a public interest.") The Federal Circuit has held that "[t]he innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of a patent thought 'doubtful.'" *In re Etter*, 756 F.2d at 857.

A broad contractual provision preventing a party from seeking reexamination of **any** patents held by the parties involved in a dispute between them is void as being contrary to public

policy. *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) (concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("a court may refuse to enforce contracts that violate ... public policy."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

### C.    Vacating the Reexamination Proceedings Would Leave Unresolved Substantial New Questions of Patentability

"By extolling the virtues of district court litigation, which may also include challenges to validity which the PTO cannot consider, however, [Callaway] ignores the advantages of a PTO reexamination." *In re Etter*, 756 F.2d at 856. Callaway asserts that "all of the questions relating to patentability raised in the reexaminations, and others which cannot and will not be dealt with in the reexaminations, will be resolved" in the district court litigation. (Patent Owner Pet. of Jun. 16, 2006 at 8.) Callaway misses the point. While district court litigation may result in a holding of invalidity, Congress intended the *inter partes* reexamination proceedings to be a lower cost alternative to costly district court litigation. 145 CONG. REC. E1789-E1790 (Aug. 5, 1999). In fact, when the PTO cancels all of the claims of this patent—or issues them after inevitable claim amendments—many of the issues in the district court litigation will either be moot or may be substantially changed.[2] 35 U.S.C. § 316(a); *see also Bloom Eng'g Co. Inc. v. N. Am. Mfg. Co., Inc.*, 129 F.3d 1247, 149-50 (Fed. Cir. 1997).

---

[2] Based on a BPAI opinion in Application No. 09/873,594 affirming the rejection of almost <u>identical claims,</u> Acushnet is confident that the claims of the '293 Patent, as they currently stand, are unpatentable. *See supra* footnote 1.

Moreover, Callaway ignores the fundamental differences between district court litigation and reexamination proceedings. *In re Etter*, 756 F.2d at 857 ("litigation and reexamination are **distinct proceedings**, with distinct parties, purposes, procedures, and outcomes." (emphasis added).) One procedural difference is that once reexamination has been ordered, the claims are no longer entitled to the presumption of validity afforded by 35 U.S.C. § 282. *Ethicon*, 849 F.2d at 1427 (stating that "In a reexamination proceeding ... there is no presumption of validity and the "focus" of the reexamination "returns essentially to that present in an initial examination," *In re Etter* [internal citation omitted], at which a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application.") A second difference is that in reexamination proceedings, the PTO is to apply the broadest reasonable interpretation of the claim limitations. *See In re Acad. Of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) ("During examination, claims are to be given their broadest reasonable interpretation consistent with the specification, and" this "rule applies to reexaminations as well as initial examinations." (internal quotations omitted).)

Callaway's Petition ignores the fact that administrative reexamination proceedings are fundamentally different than "legal proceedings" before a district court. Callaway has said nothing in its Petition for Reconsideration that Congress did not already take into consideration when Congress entrusted the PTO with the administration of the *inter partes* reexamination statutes.

### III.    CALLAWAY'S ATTEMPTS TO CONFLATE TRADEMARK CANCELLATION PROCEEDINGS WITH *INTER PARTES* REEXAMINATION MUST FAIL

Callaway asserts that cases relevant to trademark cancellation proceedings require the PTO to decide the applicability of the Agreement to these facts and should dictate the outcome here. Callaway cites the *Selva & Sons, Inc.* case to support its position that the Director is

obligated to construe the terms of the Agreement. (Patent Owner's Pet. of Jun. 16, 2006 at 4.)
Callaway is wrong.

Trademark cancellation proceedings are simply not analogous to reexamination
proceedings. Under the Lanham Act, the TTAB may apply "[i]n all inter partes proceedings
equitable principles of laches, estoppel, and acquiescence ...." *Selva & Sons, Inc. v. Nina
Footwear, Inc.*, 705 F.2d 1316, 1323 (Fed. Cir. 1983) (quoting 15 U.S.C. § 1069). Unlike the
Lanham Act, in enacting the Patent Act, Congress explicitly limited the Patent Office's
jurisdiction to deciding whether or not "patents or printed publications" raise substantial new
questions of patentability.[3] *See* 35 U.S.C. §§ 301, 311. Had Congress wanted the PTO to
undertake inquiries regarding the applicability of estoppel by contract, it could have provided a
statutory section in the Patent Act analogous to the one in the Lanham Act. It did not.

The present *inter partes* reexamination proceeding is distinguishable from the
cancellation proceedings in *Selva & Sons* and the *Danskin* case, which involved the applicability
of settlement agreements pertaining to the same trademarks sought to be cancelled. *Selva & Sons*,
705 F.2d at 1318; *Danskin v. Dan River, Inc.*, 498 F.2d 1386, 1387 (Cust. & Pat.App. 1974). In
those cases, the party seeking cancellation had waived its right to contest the marks at all by
settling their previous disputes over those very same marks. *Selva & Sons*, 705 F.2d at 1318;
*Danskin*, 498 F.2d at 1387 (Cust. & Pat.App. 1974). While the TTAB may have the power to

---

[3] There are numerous other notable differences between *inter partes* reexamination Patent Act and cancellation
proceedings under the Lanham Act. First, the Lanham Act does not simply permit "any person" to seek cancellation
of a registered trademark. That person must also establish that they believe they have been harmed by the existence
of the registration. *See* 15 U.S.C. § 1064 ("A petition to cancel a registration of a mark ... may ... be filed as
follows by a person who believes that he is or will be damaged ... by the registration of a mark on the principal
register established by this Act ...") Moreover, cancellation proceedings before the TTAB are adversarial and
between the parties, unlike *inter partes* reexamination proceedings. In fact, *inter partes* cancellation proceedings are
governed by the Federal Rules of Civil Procedure "except as otherwise provided." 37 C.F.R. § 2.116(a).
Cancellation proceedings permit parties to conduct discovery such as taking depositions, propounding interrogatories
and requesting the production of documents. 37 C.F.R. § 2.120. Moreover, the parties to cancellation proceedings
before the TTAB can even move for summary judgment—a procedure that is also governed by the standards
imposed during litigation under Fed. R. Civ. P. 56. Thus, Callaway is simply wrong in trying to analogize TTAB
proceedings—which are clearly adversarial quasi-trials—with *inter partes* reexamination under the Patent Act.

consider such claims, that is not the case here. Here, the PTO has properly undertaken a reexamination proceeding, as it is statutorily obligated to do once it finds substantial new questions of patentability. Without any legal support, Callaway asserts that the PTO is prohibited from performing its statutory duty by a private Settlement Agreement between private parties. Nothing in the reexamination statute suggests that the PTO has the authority to consider such a claim or that the PTO's statutory function can be divested by private agreement. The trademark cases simply are not analogous.

Rather than abdicating its duties (as Callaway suggests), to date, the PTO has followed the mandate provided by Congress: to determine if prior art patents and publications cited by a third-party requester raise substantial new questions of patentability and, if so, to resolve those substantial new questions of patentability either by confirming the patent, canceling the claims, or issuing new claims in amended form. 35 U.S.C. §§ 301, 311, 316. Callaway's attempts to analogize the statutory provisions for seeking cancellation of a trademark before the TTAB to the reexamination statutes simply fall short of the mark.

## IV.    THE PTO'S INTERPRETATION OF ITS OWN POLICIES IS CORRECT

Callaway alleges that the PTO's reading of M.P.E.P. § 2646(I) is "not the law."[4] (Patent Owner's Pet. of Jun. 16, 2006 at 7.) Yet Callaway has not pointed to any law that permits parties, by private agreement to strip the PTO of its duty to reexamine patents once it has determined that there are substantial new questions of patentability.[5] Callaway's arguments about this section of the M.P.E.P. are misplaced.

---

[4] Callaway's argument seems to ignore the fact that the M.P.E.P. does not have the force of law. *See* M.P.E.P., Foreword ("The Manual does not have the force of law or the force of the rules in Title 37 of the Code of Federal Regulations.")

[5] Callaway cites *Blacklight Power* for the proposition that "the USPTO is empowered, and indeed required, to step outside the bounds of the exemplary language of the MPEP when circumstances warrant." [Patent Owner Pet. of Jun. 16, 2006 at 8.] *Blacklight Power* simply does not stand for this proposition as the Federal Circuit found that the PTO followed its regulations and the law. *Blacklight Power* did not address the PTO's application of a section of the M.P.E.P, but rather its application of 35 U.S.C. § 151 (allowance) and 37 C.F.R. § 1.313(b) (withdraw from

First, Callaway asserts that the PTO has construed the M.P.E.P.'s list of possible circumstances in which a Reexamination Order would be *ultra vires* as exhaustive. The PTO's decision denying Callaway's petition did no such thing. In fact, the PTO merely identified broad classes of instances in which a PTO Reexamination Order may be *ultra vires* (including the absence of statutory authority and clerical error), and noted that Callaway failed to show that the PTO lacked the authority to proceed with the reexamination of its patent. (Decision on Pet. to Vacate Reexam. of Jun. 7, 2006 at 5 ("Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to a statutory prohibition barring the order, or due to a clerical error."))

Secondly, Callaway has not identified any law—statutory or otherwise—that would require the PTO to vacate its reexamination Order in this case. Attempting to do so, however, Callaway cites completely irrelevant case law dealing with the interpretation of *a car rental agreement* that included the term "such as" in a disputed provision, and the application of the term "for example" as used in the Harmonized Tariff Schedules of the United States ("HTSUS"). (Patent Owner Pet. of Jun. 16, 2006 at 7 (citing *Hertz Corp. v. Pap*, 923 F. Supp. 914, 920 (N.D. Tex. 1995) (construction of rental agreement) and *Smith v. United States*, 347 F.3d 922, 928 (Fed. Cir. 2004) (interpretation of HTSUS).) Callaway ignores fundamental tenants of administrative law, which require that Callaway show that the PTO's interpretation of the statutes that it has been charged with administering "is [not] reasonably related to the purposes of the enabling legislation." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 606 (Fed. Cir. 1985). The

---

issue) *Blacklight Power, Inc. v. Rogan*, 295 F.3d 1269, 1272-73 (Fed. Cir. 2002). In fact, *Blacklight Power* recognizes a number of the public policy concerns that are implicated here—further supporting the PTO's denial of Callaway's petition to vacate reexamination. *See Blacklight Power*, 295 F.3d at 1273-74 ("[t]he mission of the PTO, require[s] authority to implement § 151 by taking extraordinary action to withdraw a patent from issue <u>when a responsible PTO official reasonably believes that the subject matter may be unpatentable and that the application may have been allowed in error;</u>" and "<u>The PTO's responsibility for issuing sound and reliable patents is critical to the nation.</u>") Accepting Callaway's invitation to vacate reexamination would contravene strong public policy interest in preventing the maintenance of invalid patents, as expressed in the *Blacklight Power* case and discussed *supra* Section II.B-C.

PTO's decision denying Callaway's petition based on its interpretation of the Patent Act is reasonably related to the clearly expressed purpose of the enabling legislation—to give the public a low-cost alternative to patent litigation and to provide a means for the PTO to reconsider its granting of questionable patents to the extent such authority is provided to it by Congress. 145 CONG. REC. E1789-E1790 (Aug. 5, 1999); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q.2d (BNA) 1032, 1037 (N.D. Tex. 1982) (identifying important public interest in "eliminating worthless patents.")

## V.    CONCLUSION

Callaway's petition must be **denied** because: (1) nothing in the Agreement does or can preclude the PTO's reexamination of the '293 Patent and any construction of the Agreement to the contrary would violate public policy embodied in the *inter partes* reexamination statutes; (2) cancellation proceedings before the TTAB and *inter partes* reexamination proceedings are distinct proceedings and are not analogous; (3) the PTO can interpret its own policy embodied in the M.P.E.P., and Callaway cannot show that interpretation to be contrary to congressional intent of the clear language of the statute.

Acushnet hereby certifies that a copy of this Opposition has been served on the Patent Owner at the following address:

> Dorothy P. Whelan
> Fish & Richardson P.C.
> P.O. Box 1022
> Minneapolis, MN 55440-1022

Acushnet does not believe that any fees are due in connection with this filing. However, the U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 08-3038 referencing docket number **00634.0004.RXUS01**.

Respectfully submitted,

Dated: June 28, 2006

Alan M. Grimaldi (Reg. No. 26,599)
Joseph P. Lavelle (Reg. No. 31,036)
Andrew R. Sommer (Reg. No. 53,932)
*Attorneys for Acushnet Company*

**Howrey LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6614 (telephone)
(202) 383-6610 (fax)

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

        Plaintiff,

      v.

ACUSHNET COMPANY,

        Defendant.

Civil Action No. 05-91 (SLR)

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

For its Complaint, Plaintiff alleges:

### PARTIES

1.      Plaintiff Callaway Golf Company ("Callaway Golf") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Carlsbad, California.

2.      Callaway Golf is the parent company of The Top-Flite Golf Company ("Top-Flite"), which is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Chicopee, Massachusetts.

3.      Defendant Acushnet Company ("Acushnet"), upon information and belief, is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Fairhaven, Massachusetts.

4.      Acushnet, upon information and belief, is a wholly-owned operating company of Fortune Brands, Inc. ("Fortune Brands").

5.      Fortune Brands, upon information and belief, is a publicly-traded corporation organized and existing under the laws of the State of Delaware, having a principal place of

business in Lincolnshire, Illinois.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

7.      Acushnet is subject to personal jurisdiction in this District because, upon information and belief, Acushnet is a Delaware corporation and is doing and has done substantial business in this District, including business relating to the sale and distribution for sale of the infringing products as described below.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b).

9.      Callaway Golf is the owner, by assignment, of United States Patent Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873 (the "'293, '156, '130 and '873" patents, respectively).

## BACKGROUND

10.      In 2003, Callaway Golf acquired the intellectual property assets of Top-Flite's predecessor-in-interest, then also known as "The Top-Flite Golf Company," and before that as "Spalding Sports Worldwide, Inc."

11.      Among the assets Callaway Golf acquired was a family of patents that cover a unique blend of materials and properties for golf balls (collectively "the Sullivan patents").

12.      The Sullivan patents disclose technological breakthroughs relating to golf ball construction, particularly the use of a polyurethane cover on a multi-layer solid-core golf ball, resulting in performance that had previously eluded the industry

13.      The Sullivan patents include, but are not limited to, the '293, '156, '130 and '873 patents.

14.      The technology claimed in the Sullivan patents revolutionized the game of golf.

2

In fact, within two years of introduction, the vast majority of professional golfers on the PGA Tour had switched from older golf ball constructions to those incorporating the claimed technology. Some commentators have noted that the technology in the Sullivan patents has done more to change the game of golf than any other equipment advance in the history of the game.

15.    Golf balls with the patented technology offer superior performance, including longer distance, better feel, and improved wear resistance, compared to prior art golf balls.

16.    Callaway Golf and Top-Flite have both had success selling golf balls embodying this technology, including the Callaway Golf® Rule 35®, CTU 30 and Callaway Golf® HX® series of golf balls, the Ben Hogan® series of golf balls, and the Strata® Tour Ace™, Strata® Tour Premier™ and Top-Flite® Strata® TL-Tour™ lines of golf balls.

17.    Acushnet makes and sells golf balls under the Titleist® brand.

18.    Among these balls are the Titleist Pro V1®, Titleist Pro V1x™, and Titleist Pro V1*™ (collectively "the Pro V1 balls").

19.    Acushnet has had great success selling the Pro V1 balls. Acushnet has sold almost a billion dollars' worth of Pro V1 balls since 2000 by incorporating the technology disclosed in the Sullivan patents. Based upon publicly available data, Callaway Golf estimates that Acushnet continues to sell Pro V1 balls at a rate in excess of $200 million per year.

20.    Acushnet touts the Pro V1 balls as the best selling golf balls of all time, and as "The #1 Ball in Golf."

21.    The Pro V1 balls embody the technology of the Sullivan patents, and in particular, embody one or more claims of each of the '293, '156, '130 and '873 patents.

22.    Acushnet has no credible defense to Callaway Golf's infringement claims. Instead, realizing that Callaway Golf was prepared to enforce its rights, Acushnet preemptively

3

filed a request for re-examination of the Sullivan patents with the United States Patent and

Trademark Office ("PTO"). In that request, Acushnet claims that prior art already disclosed or

discussed by Top-Flite in the applications that matured into the Sullivan patents somehow

presents new issues of patentability. Moreover, the prior art Acushnet now claims raises new

issues of patentability for the Sullivan patents is the same art that Acushnet dismissed in its own

arguments to the PTO when it was belatedly seeking a patent on virtually the same technology --

almost four years after the first Sullivan application was filed.

       23.     In 1996, Callaway Golf's predecessor-in-interest, Spalding World Wide Sports

Inc., ("Spalding") sued Acushnet for patent infringement regarding two-piece golf ball

technology. To resolve Spalding's claims of patent infringement and Acushnet's related unfair

competition counter-claims, the parties entered into a settlement agreement on August 5, 1996.

Among the terms and conditions of the settlement agreement is the requirement that the parties

resolve any and all patent-related disputes exclusively via a lawsuit in this Court. Specifically,

the parties agreed in relevant part that "[a]ny dispute arising out of or relating to patents . . . shall

be resolved in accordance with the procedures specified in this Section, which shall be the sole

and exclusive procedure for resolution of any disputes." 1996 Settlement Agreement ("1996

Settlement Agreement") between Callaway Golf's predecessor-in-interest, Spalding and

Acushnet, attached hereto as Exhibit E, at section 19.1, p. 15. Section 19 goes on to specify that

after the parties undertake a multi-step, pre-lawsuit dispute resolution process, including

mediation before Magistrate Judge Thynge, "either party may initiate legal proceedings, but only

in the United States District Court for the District of Delaware, and no other. Said court retains

jurisdiction of the parties for such purposes." *Id.* at section 19.7, p. 18. The 1996 Settlement

Agreement remains in effect today and this Court retains jurisdiction over any disputes "arising

out of or relating to patents" between the parties.

24.      In August 2004 Callaway Golf initiated the pre-lawsuit dispute resolution procedures mandated by the 1996 Settlement Agreement.  Callaway Golf and Acushnet both acknowledged that Callaway Golf was obligated to follow the procedures in the 1996 Settlement Agreement as a successor to Spalding.  Moreover, section 15 of the 1996 Settlement Agreement specifies that the 1996 Settlement Agreement "is binding upon the parties hereto . . . as well as their representatives, successors, transferees and assigns of substantially all of the their respective Golf Ball Businesses."  *Id.* at section 15, p. 15; *see also* section 1.2, p. 3, defining "Golf Ball Business".

25.      For approximately the next 18 months, the parties engaged in the pre-lawsuit dispute resolution procedure mandated by the 1996 Settlement Agreement.  Specifically, Acushnet and Callaway Golf engaged in negotiations by and between senior executives in an attempt to resolve the dispute.  In addition, as required by the settlement agreement, the parties participated in a non-binding mediation, as well as several non-binding mediation sessions before Magistrate Judge Thynge of this Court.

26.      On or about March 17, 2006, Acushnet breached the terms and conditions of the Settlement Agreement by filing four *inter partes* reexamination requests with the PTO for the patents-in-suit, numbers, 95/000120-123.

## COUNT I - INFRINGEMENT OF THE '293 PATENT

27.      Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

28.      Callaway Golf is the owner by assignment of United States Patent No. 6,210,293, entitled "Multi-layer golf ball" ("the '293 patent"), which was duly and legally issued by the

United States Patent and Trademark Office on April 3, 2001. A copy of the '293 patent is attached as Exhibit A to this Complaint.

29.    Acushnet has infringed and both induced and contributed to the infringement of one or more claims of the '293 patent by making, using, selling and/or offering to sell infringing golf balls, including without limitation its Pro V1 balls.

30.    Acushnet has and has had actual notice of the '293 patent.

31.    Acushnet has and has had constructive notice of the '293 patent pursuant to 35 U.S.C. § 287(a).

32.    Acushnet's infringement of the '293 patent has been and continues to be willful.

## COUNT II - INFRINGEMENT OF THE '156 PATENT

33.    Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

34.    Callaway Golf is the owner by assignment of United States Patent No. 6,503,156 B1, entitled "Golf ball having multi-layer cover with unique outer cover characteristics" ("the '156 patent"), which was duly and legally issued by the United States Patent and Trademark Office on January 7, 2003. A copy of the '156 patent is attached as Exhibit B to this Complaint.

35.    Acushnet has infringed and both induced and contributed to the infringement of one or more claims of the '156 patent by making, using, selling and/or offering to sell infringing golf balls, including without limitation its Pro V1 balls.

36.    Acushnet has and has had actual notice of the '156 patent.

37.    Acushnet has and has had constructive notice of the '156 patent pursuant to 35 U.S.C. § 287(a).

6

38.    Acushnet's infringement of the '156 patent has been and continues to be willful.

## COUNT III - INFRINGEMENT OF THE '130 PATENT

39.    Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

40.    Callaway Golf is the owner by assignment of United States Patent No. 6,506,130 B2, entitled "Multi-layer golf ball" ("the '130 patent"), which was duly and legally issued by the United States Patent and Trademark Office on January 14, 2003. A copy of the '130 patent is attached as Exhibit C to this Complaint.

41.    Acushnet has infringed and both induced and contributed to the infringement of one or more claims of the '130 patent by making, using, selling and/or offering to sell infringing golf balls, including without limitation its Pro V1 balls.

42.    Acushnet has and has had actual notice of the '130 patent.

43.    Acushnet has and has had constructive notice of the '130 patent pursuant to 35 U.S.C. § 287(a).

44.    Acushnet's infringement of the '130 patent has been and continues to be willful.

## COUNT IV - INFRINGEMENT OF THE '873 PATENT

45.    Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

46.    Callaway Golf is the owner by assignment of United States Patent No. 6,595,873 B2, entitled "Multi-layer golf ball" ("the '873 patent"), which was duly and legally issued by the United States Patent and Trademark Office on July 22, 2003. A copy of the '873 patent is attached as Exhibit D to this Complaint.

47.    Acushnet has infringed and both induced and contributed to the infringement of

7

one or more claims of the '873 patent by making, using, selling and/or offering to sell infringing golf balls, including without limitation its Pro V1 balls.

48.     Acushnet has and has had actual notice of the '873 patent.

49.     Acushnet has and has had constructive notice of the '873 patent pursuant to 35 U.S.C. § 287(a).

50.     Acushnet's infringement of the '873 patent has been and continues to be willful.

### COUNT V- BREACH OF CONTRACT

51.     Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 26 as if fully set forth herein.

52.     As noted above, Callaway Golf and Acushnet had a binding and enforceable agreement to resolve any and all patent and intellectual property-related disputes using the procedures outlined in the 1996 Settlement Agreement.  In fact, in fulfillment of the final step of the pre-lawsuit dispute resolution procedures required by the 1996 Settlement Agreement, the parties jointly wrote to this Court, citing the 1996 Settlement Agreement and seeking Magistrate Judge Thynge's assistance in mediating the dispute.

53.     At all times, Callaway Golf performed all the duties and conditions of the 1996 Settlement Agreement.  .

54.     Acushnet breached its obligation to exclusively resolve all patent disputes via a lawsuit in the District Court of Delaware by filing its *inter partes* reexamination requests with the PTO to resolve issues of alleged invalidity of Callaway Golf's patents.  This Court already has jurisdiction over the same issues, which are disputed in the present litigation.

55.     Callaway Golf has no adequate remedy at law to cure Acushnet's breach of the 1996 Settlement Agreement.

8

**PRAYER FOR RELIEF**

WHEREFORE, Callaway Golf prays:

1.     That this Court enjoin Defendant, its agents and employees, and any others acting in concert with it, from infringing, inducing the infringement of, or contributing to the infringement of U.S. Patent Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873;

2.     That this Court award Callaway Golf its damages resulting from Defendant's infringement, including lost profits on certain sales and a reasonable royalty on others;

3.     That this Court award Callaway Golf treble damages as a result of Defendant's willful misconduct;

4.     That this Court declare this case an exceptional case pursuant to 35 U.S.C. § 285;

5.     That the Court require Acushnet to specifically perform the terms and conditions of the 1996 Settlement Agreement, including, but not limited to, requiring Acushnet to forbear from further participation in the *inter partes* reexamination proceedings, numbers, 95/000120-123 currently before the PTO;

6.     That this Court award Callaway Golf damages as a result of Defendant's breach of the 1996 Settlement Agreement.

7.     That this Court award Callaway Golf its costs and attorneys' fees and such other relief as is just.

**JURY DEMAND**

Callaway Golf demands trial by jury.

**FISH & RICHARDSON P.C.**


Date:  June 5, 2006          By: _____

9

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
(302) 652-5070 Telephone
(302) 652-0607 Facsimile

Of Counsel:

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
(617) 542-5070 Telephone
(617) 542-8906 Facsimile

John V. Picone III
500 Arguello Street, Suite 500
Redwood City, CA 94063
(650) 839-5070 Telephone
(650) 839-5071 Facsimile

David S. Shuman
12290 El Camino Real
San Diego, CA 92130
(858) 678-5070 Telephone
(858) 678-5099 Facsimile

Attorneys for Plaintiff
Callaway Golf Company

50353991 DOC

10