IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

Plaintiff,

v.

ACUSHNET COMPANY,

Defendant.

C. A. No. 06-91 (SLR)

**DECLARATION OF THOMAS L. HALKOWSKI IN SUPPORT OF
PLAINTIFF CALLAWAY GOLF COMPANY'S REPLY
TO ACUSHNET'S OPPOSITION TO CALLAWAY GOLF'S MOTION TO
AMEND THE COMPLAINT**

I, Thomas L. Halkowski, declare as follows:

1.      I am a member of Fish & Richardson P.C., counsel of record in this action
for Callaway Golf Company ("Callaway").  I am a member of the Bar of the State of
Delaware and am admitted to this Court.  I have personal knowledge of the matters stated
in this declaration and would testify truthfully to them if called upon to do so.

2.      Attached as Exhibit A is a true and correct copy of the Declaration of
Joseph Nauman dated May 30, 2006.

3.      Attached as Exhibit B is a true and correct copy of the Declaration of
Joseph Nauman submitted in Support of Acushnet's Opposition to Patent Owner's
Petition to Vacate Reexamination Orders as *Ultra Vires* to the PTO, dated April 27, 2006.

4.      Attached as Exhibit C is a true and correct copy of Acushnet's Opposition
to Callaway's Petition to Director for Reconsideration filed with the PTO on June 28,
2006.

5.      Attached as Exhibit D is a true and correct copy Acushnet's Opposition to
Patent Owner Callaway's Petition to Suspend *Inter Partes* Reexamination Proceedings
filed with the PTO on March 24, 2006.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of July, 2006, at Wilmington, Delaware.


/s/ *Thomas L. Halkowski*
Thomas L. Halkowski

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2006, I electronically filed **DECLARATION OF THOMAS L. HALKOWSKI IN SUPPORT OF PLAINTIFF CALLAWAY GOLF COMPANY'S REPLY TO ACUSHNET'S OPPOSITION TO CALLAWAY GOLF'S MOTION TO AMEND THE COMPLAINT** with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel.  In addition, the filing will also be sent via hand delivery:

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza, 6th floor
1313 N. Market Street
Wilmington, DE 19801


I hereby certify that on July 7, 2006, I have mailed by United States Postal Service, the document(s) to the following non-registered participants:

Joseph P. Lavelle                           Attorneys for Defendant
Andrew R. Sommer                            ACUSHNET COMPANY
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004



                                        /s/ *Thomas L. Halkowski*
                                        Thomas L. Halkowski

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JOSEPH NAUMAN

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Alan M. Grimaldi
Joseph P. Lavelle
Andrew R. Sommer
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 783-0800

*Attorneys for Defendant Acushnet Company*

Dated:  May 30, 2006

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Callaway Golf Company,

      PLAINTIFF,

  v.

Acushnet company,

      DEFENDANT.

C.A. NO. 06-91 (SLR)

**JURY TRIAL DEMANDED**

### DECLARATION OF JOSEPH NAUMAN

I, Joseph Nauman, Executive Vice President, Corporate and Legal at the Acushnet Company Fairhaven, Massachusetts, hereby declare as follows:

1.    I represent and am Executive Vice President, Corporate and Legal of Acushnet Company ("Acushnet"), located at 333 Bridge Street, Fairhaven, Massachusetts 02719.

2.    I negotiated and witnessed the signing of the 1996 Settlement Agreement between Acushnet, Spalding & Evenflo Companies, Inc. and Lisco, Inc. that Callaway has raised both before this Court and the United States Patent and Trademark Office.

3.    Mr. Arturi of Spalding contacted Acushnet on December 6, 2001 to discuss two Spalding patents, one of which was United States Patent No. 6,210,293. Between that time and October 2002, Acushnet and Spalding met several times in an attempt to resolve this matter. On December 6, 2002, Mr. Arturi contacted me to cancel a meeting to further discuss this matter. That meeting was never rescheduled. Over 20 months passed before Callaway contacted me in late August 2004 to attempt to reengage the dispute resolution process described in the 1996

Declaration of Joseph Nauman

Page 2

Agreement. After being contacted by Callaway, I met with representatives of Callaway in October and December 2004 to further discuss this matter.

4.    Pursuant to Paragraph 19.5 of the Agreement, I was present at a mediation proceeding before David W. Plant between Acushnet and Callaway Golf Company ("Callaway") on August 3, 2005.

5.    Pursuant to Paragraph 19.6 of the Agreement, I was present at a mediation proceeding before Magistrate Judge Mary Pat Thynge on October 28, 2005.

6.    On January 5th and 6th 2006, I met with Mr. Steve McCracken, General Counsel of Callaway to discuss a possible settlement of the dispute between Acushnet and Callaway. During discussions with Mr. McCracken, I informed him that if Callaway were to file suit against Acushnet in Federal Court, Acushnet would request *inter partes* reexamination of Callaway's United States Patent Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873. During the course of those discussions, Mr. McCracken proposed reexamination of an Acushnet patent as part of a potential settlement.

7.    Mr. McCracken never mentioned to me that any reexamination request would violate the 1996 Settlement Agreement. I also believe that based on Mr. McCracken's proposal that Callaway would ask the PTO to reexamine an Acushnet patent that Mr. McCracken did not believe that the Agreement precluded reexamination.

8.    On January 17, 2006 I received a telephone call from Mr. McCracken. On that call Mr. McCracken indicated that Callaway would file suit against Acushnet the next day. I suggested that the parties participate in a telephone call with Magistrate Judge Thynge with the intention of arranging another meeting. Mr. McCracken refused to participate in this telephone call and indicated that Callaway would not agree to such a meeting. Based on this call, Acushnet's

2

Declaration of Joseph Nauman

Page 3

attorneys were instructed to immediately file the four different requests for reexamination that were previously prepared. Acushnet filed its requests for reexamination of Callaway's patents on January 17, 2006. I was surprised that in Callaway's brief Callaway falsely tells the Court that Acushnet "strung along" mediation to buy time to "prepare and file its reexamination requests." This is directly contrary to the facts as set forth above, as well as the facts in Callaway's Opposition. The facts indicate that Acushnet filed its requests for reexamination only hours after Callaway notified Acushnet of its intent to file suit.

9.    On January 18, 2006, at Acushnet's prompting, the parties participated in a conference call with Magistrate Judge Thynge and agreed to meet with her again. During the conference call, Callaway conditioned the meeting with Magistrate Judge Thynge on Acushnet suspending the reexaminations. At one point, Callaway requested that Acushnet prepare a joint request to suspend the reexamination proceedings. Acushnet prepared the joint requests, but Callaway then refused to execute them explaining that it did not want to prejudice its legal position by joining Acushnet in any action at the Patent Office. Acushnet went ahead and filed a request to suspend the reexaminations as a measure of good faith. The meeting with Magistrate Judge Thynge took place on February 8, 2006 in Delaware and I was present. During the course of discussions, Callaway's representatives did not once suggest that Acushnet's requests for reexamination were prohibited by the 1996 Agreement.

11.    I am surprised that Callaway's litigation inspired story has changed. In one of the petitions Callaway filed in the United States Patent Office, Callaway told the Office that Acushnet filed its requests for reexamination "while the mediation process was still underway." However, now Callaway tells the Court that "the parties ... had exhausted the 1996 Agreement's pre-lawsuit dispute resolution procedures." (Callaway Opp. at 6.) While I agree with

3

Declaration of Joseph Nauman

Page 4

Callaway's statement to this Court that the parties' obligations for pre-lawsuit dispute resolution had ended prior to Acushnet's filing of its reexamination requests, I am at a loss to understand its prior misrepresentations to the Patent Office.

12.     Additionally, I was disappointed and surprised that Callaway found it necessary to disclose the terms of a confidential license agreement between the Acushnet and Callaway despite Callaway's contractual obligation to maintain that license agreement in confidence. (Callaway Opp. at 15.)  That license agreement was entered into as settlement of a prior dispute with Callaway.

13.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on May 30, 2006.

_____
Joseph Nauman

DM_US\8349735.v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 30, 2006, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF.

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114

I hereby certify that on May 30, 2006, I have Electronically Mailed the documents

to the following non-registered participants:

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
shuman@fr.com

John V. Picone, III
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
picone@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869

# Exhibit B

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: **6,503,156**

Control No.: **95/000,121**

Inventor: Michael J. SULLIVAN

Issued: January 7, 2003

Appl. 09/873,642

Filed: June 4, 2001

Titled: *GOLF BALL HAVING MULTI-LAYER
COVER WITH UNIQUE OUTER
COVER CHARACTERISTICS*

**MAIL STOP *Inter Partes* REEXAMINATION**
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF JOSEPH NAUMAN

I, Joseph Nauman, Executive Vice President, Corporate and Legal at the Acushnet Company

Fairhaven, Massachusetts, hereby declare as follows:

1.     I represent and am Executive Vice President, Corporate and Legal of Acushnet Company

("Acushnet"), located at 333 Bridge Street, Fairhaven, Massachusetts 02719.

2.     I negotiated and witnessed the signing of the 1996 Settlement Agreement between

Acushnet, Spalding & Evenflo Companies, Inc. and Lisco, Inc. that Callaway discusses in its

Petition to Vacate the Reexamination Orders as *Ultra Vires.*

DM_US\8339571.v1

Declaration of Joseph Nauman
Submitted in Support of Acushnet's Opposition to Patent Owner's Petition to Vacate Reexamination Orders as Ultra Vires
Page 2

3.      Pursuant to Paragraph 19.5 of the Agreement, I was present at a mediation proceeding before David W. Plant between Acushnet and Callaway Golf Company ("Callaway") on August 3, 2005.

4.      Pursuant to Paragraph 19.6 of the Agreement, I was present at a mediation proceeding before Magistrate Judge Mary Pat Thynge on October 28, 2005.

5.      On January 5th and 6th 2006, I met with Mr. Steve McCracken, General Counsel of Callaway to discuss a possible settlement of the dispute between Acushnet and Callaway. During discussions with Mr. McCracken, I informed him that if Callaway were to file suit against Acushnet in Federal Court, Acushnet would request *inter partes* reexamination of Callaway's United States Patent Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873. During the course of those discussions, Mr. McCracken proposed reexamination of an Acushnet patent as part of a potential settlement.

6.      Mr. McCracken never mentioned to me that any reexamination request would violate the 1996 Settlement Agreement.

7.      Acushnet filed its requests for reexamination of Callaway's patents on January 17, 2006. Shortly after filing, the parties agreed to meet with Magistrate Judge Thynge again. This meeting took place on February 8, 2006. I was present at this meeting. During the course of discussions, Callaway's representatives not once suggested that Acushnet's requests for reexamination were prohibited by the 1996 Settlement Agreement.

8.      Following the February 8, 2006 meeting, Callaway filed suit against Acushnet in the United States District Court for the District of Delaware as required by the 1996 Settlement Agreement.

2

DM_US\8339571.v1

9.    I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

_Joseph Nauman_
Joseph Nauman
April 22, 2006

Exhibit C

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: **6,503,156**

Control No.: **95/000,121**

Inventor: Michael J. SULLIVAN

Issued: January 7, 2003

Appl. 09/873,642

Filed: June 4, 2001

Titled: **Golf Ball Having Multi-Layer
Cover with Unique Outer
Cover Characteristics**

**MAIL STOP *Inter Partes* REEXAMINATION**
**Central Reexamination Unit – Office of Legal Administration**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### ACUSHNET'S OPPOSITION TO CALLAWAY'S PETITION
### TO THE DIRECTOR FOR RECONSIDERATION

Sir:

Third Party Requester Acushnet Company ("Acushnet") hereby files its Opposition to Patent Owner's Petition to the Director for Reconsideration. This Opposition is being filed within two weeks of the Patent Owner's petition pursuant to M.P.E.P. § 2646 I.

The Director should once again deny Callaway's petition. Callaway's petition should be denied because (1) the 1996 Settlement Agreement ("the Agreement") simply does not, and cannot, preclude reexaminations—a vehicle used by the PTO to serve the public interest in maintaining only valid patents; (2) Callaway's new-found analogies to trademark law do not demonstrate that the PTO is precluded from reexamining the '156 Patent—particularly after the PTO has found the prior art to raise numerous substantial new questions of patentability; and (3) the PTO's interpretation of the M.P.E.P. is in accord with congressional intent as embodied in the Patent Act.

Therefore Callaway's petition should be **DENIED**.

DM_US\8361155.v1

## I.    FACTUAL BACKGROUND

To the extent Callaway's claims had any merit (and they do not, as the Director has already determined), Callaway has waived any basis to complain by over three months of inaction and by taking action contrary to its new-found contract claims, as is clear from the following facts.

In January 2006, Acushnet told Mr. Steve McCracken, General Counsel of Callaway, that if Callaway was going to sue Acushnet for infringement of the '156 Patent and other related patents Acushnet would seek reexamination of Callaway's patents. (Nauman Decl. at ¶ 5.) Callaway never objected to Acushnet's seeking reexamination of its patents. (Nauman Decl. at ¶ 6.) In fact, Callaway proposed and considered a possible settlement of the dispute between the parties by also including the PTO's reexamination of an Acushnet patent.

On January 17, 2006, Callaway's representative told Acushnet that Callaway would file suit against Acushnet the next day. Acushnet had already prepared four requests for reexamination and filed them that day.

After Acushnet filed its requests for reexamination, at Acushnet's request, the parties once again met with Magistrate Judge Thynge to try to resolve this dispute. (Nauman Decl. at ¶ 7.) Callaway delayed filing its suit until after the meeting. During the final meeting with Magistrate Judge Thynge, Callaway never indicated that Acushnet's requests for reexamination violated the Agreement. (*Id.*) The next day, Callaway filed suit against Acushnet in the District of Delaware. (Decl. at ¶ 8.) Callaway's complaint discussed Acushnet's requests for reexamination at length. Even then, Callaway did not claim that Acushnet's requests violated the Agreement. Likewise, Callaway's prior petitions to suspend the reexamination proceedings nowhere suggested that filing the requests for reexamination was anyway inappropriate. (*See* Patent Owner Pet. to Suspend Reexam. of Mar. 21, 2006 (returned/destroyed); Patent Owner Renewed Pet. to Suspend Reexam. of Apr. 28, 2006 (still pending).)

*In re* U.S. Patent No. **6,503,156**
Control No. **95/000,121**
Page 3 of 12

In April of 2006, three months after Acushnet filed its requests to the PTO for *inter partes* reexamination, Callaway concocted an argument based on the Agreement that it was not even a party to and asserted that it precludes the PTO from performing its statutory duty of passing on the substantial new questions of patentability raised by the prior art.

Callaway's most recent petition is its **fourth** attempt to avoid having the expert PTO pass on the prior art invalidity issues raised in the request for reexamination.[1]  Callaway would rather have a jury—without legal training and without the technical expertise of the PTO pass on these issues.  The PTO should reject Callaway's attempts to avoid the administrative review of its dubious patents.

## II.    THE 1996 SETTLEMENT AGREEMENT DOES NOT PRECLUDE THE PTO'S REEXAMINATION OF THE '156 PATENT

### A.    The PTO's Reexamination of the '156 Patent is not a "Legal Proceeding" Between Acushnet and Callaway within the Meaning of the 1996 Agreement.

This *inter partes* reexamination is not a "legal proceeding" between Acushnet and Callaway covered by the Agreement. Rather reexamination is an administrative proceeding in which the PTO is required to determine whether a "substantial new question of patentability" is raised by prior art patents or printed publications and then resolves any such questions.  35 U.S.C. § 312(a); *see also In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985) ("litigation and reexamination are distinct proceedings, with ***distinct parties***, purposes, procedures, and outcomes." (emphasis added).)

Acushnet's opposition to Callaway's original petition to have the reexamination orders vacated as *ultra vires* discussed controlling precedent that distinguishes "legal proceedings" from

---

[1] In fact, as discussed at length in the Request for Reexamination, in a 2004 decision, the Board of Patent Appeals and Interferences ("BPAI") affirmed the rejection of an examiner establishing that claims nearly identical to those in this proceeding were unpatentable over prior art now found to raise substantial new questions of patentability in this proceeding.  (U.S. Pat. App. No. 09/873,594, Bd. Of Pat. App. and Inter. Decision mailed Feb. 2, 2004 (**Exhibit A**).)

"administrative proceedings," such as reexamination. (Acushnet Opp. of Apr. 28, 2006 at 6-8.)

This distinction is dispositive here, as the 1996 Agreement only dictates where "legal

proceedings" must be brought, and does not prohibit the PTO from reexamining patents in an

administrative proceeding. *See Joy Mfg. Co. v. Nat'l Mine Service Co.*, 810 F.2d 1127, 1130

(Fed. Cir. 1987) ("the district court correctly refused to equate "a *request for administrative

reexamination* ... with filing a suit in a United States Court." (emphasis added).); *Joy Techs., Inc.

v. Manbeck*, 959 F.2d 226, 229 (Fed. Cir. 1992) (reexamination is an "administrative

proceeding," and that there was "no basis" for the plaintiff "to recharacterize the statutory

procedure established by Congress in the reexamination statute" to be akin to litigation brought

in the Federal Courts).

By statute, reexamination is similar to an original patent examination and the principal

parties to the reexamination proceedings are the PTO and the Patent Owner. 35 U.S.C. §§ 312

("the *Director* shall determine whether a substantial new questions of patentability ... is raised by

the request."); 313 ("If ... *the Director* finds that a substantial new question of patentability

affecting a claim of a patent is raised, the determination shall include an order for inter partes

reexamination of the patent for resolution of the question"); 314(a) ("reexamination shall be

conducted *according to the procedure established for initial examination* under the provisions of

sections 132 and 133.") (all emphasis added).

The primary difference between *ex parte* reexamination and *inter partes* reexamination is

that the Third Party Requester will be permitted to file one reply to a PTO Action and the Patent

Owner's reply. *See* 35 U.S.C. § 314(b)(2). Acushnet's rights in this proceeding are limited by

statute. In all events, Acushnet's limited right to participate clearly does not turn the

reexamination into a "legal proceeding" within the purview of the Agreement.

Administrative reexamination of a patent does not fall within the purview of the

Agreement. The stated purposes of the Agreement was to provide a procedure for the resolution

of "intellectual property disputes as may arise between [the parties]." (Exhibit B at 3, ¶ G.)

Reexamination, however, is not a type of legal proceeding to resolve private disputes between

private parties. Reexamination is fundamentally the sovereign government's exercise of its

statutory duty to issue valid patents. Nothing in the Agreement could even plausibly constrict the

PTO's exercise of its statutory authority. Callaway's contrary argument is fatuously wrong.

Because reexamination is not a "legal proceeding" between the parties within the meaning of the

Agreement, the Agreement simply does not prohibit the PTO from conducting this reexamination

proceeding.

### B.    Reading the Agreement to Preclude Reexamination Runs Afoul of Clear Congressional Intent and Public Policy Embodied in the Patent Act

A strong public policy supports the PTO's duty to cancel claims that are unpatentable.

*See* 35 U.S.C. § 316(a); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q.2d (BNA)

1032, 1037 (N.D. Tex. 1982) (noting that there is an important public interest "in eliminating

worthless patents.") The Federal Circuit has recognized that "[w]hen Congress voted the

reexamination statute into law, it had before it a voluminous record to the effect that the

procedure was an important step forward for the United States patent system and for the public

interest that the system is charged to serve." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602

(Fed. Cir. 1985). This public interest "lies in having valid patents upheld and invalid patents

rendered invalid, and **hence patents should be reexamined when a substantial question of**

**patentability is raised**." *In re Baker Hughes*, 215 F.3d 1297, 1302 (Fed. Cir. 2000) (emphasis

added); *see also* 37 C.F.R. § 1.555 ("A patent by its very nature is affected with a public

interest.") The Federal Circuit has held that "[t]he innate function of the reexamination process

is to increase the reliability of the PTO's action in issuing a patent by reexamination of a patent

thought 'doubtful.'" *In re Etter*, 756 F.2d at 857.

A broad contractual provision preventing a party from seeking reexamination of **any**

patents held by the parties involved in a dispute between them is void as being contrary to public

*In re* U.S. Patent No. **6,503,156**
Control No. **95/000,121**
Page 6 of 12

policy. *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) (concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("a court may refuse to enforce contracts that violate ... public policy."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

## C.    Vacating the Reexamination Proceedings Would Leave Unresolved Substantial New Questions of Patentability

"By extolling the virtues of district court litigation, which may also include challenges to validity which the PTO cannot consider, however, [Callaway] ignores the advantages of a PTO reexamination." *In re Etter*, 756 F.2d at 856. Callaway asserts that "all of the questions relating to patentability raised in the reexaminations, and others which cannot and will not be dealt with in the reexaminations, will be resolved" in the district court litigation. (Patent Owner Pet. of Jun. 16, 2006 at 8.) Callaway misses the point. While district court litigation may result in a holding of invalidity, Congress intended the *inter partes* reexamination proceedings to be a lower cost alternative to costly district court litigation. 145 CONG. REC. E1789-E1790 (Aug. 5, 1999). In fact, when the PTO cancels all of the claims of this patent—or issues them after inevitable claim amendments—many of the issues in the district court litigation will either be moot or may be substantially changed.[2] 35 U.S.C. § 316(a); *see also Bloom Eng'g Co. Inc. v. N. Am. Mfg. Co., Inc.*, 129 F.3d 1247, 149-50 (Fed. Cir. 1997).

---

[2] Based on a BPAI opinion in Application No. 09/873,594 affirming the rejection of almost identical claims. Acushnet is confident that the claims of the '156 Patent, as they currently stand, are unpatentable. *See supra* footnote 1.

Moreover, Callaway ignores the fundamental differences between district court litigation and reexamination proceedings. *In re Etter*, 756 F.2d at 857 ("litigation and reexamination are **distinct proceedings**, with distinct parties, purposes, procedures, and outcomes." (emphasis added).) One procedural difference is that once reexamination has been ordered, the claims are no longer entitled to the presumption of validity afforded by 35 U.S.C. § 282. *Ethicon*, 849 F.2d at 1427 (stating that "In a reexamination proceeding ... there is no presumption of validity and the "focus" of the reexamination "returns essentially to that present in an initial examination," *In re Etter* [internal citation omitted], at which a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application.") A second difference is that in reexamination proceedings, the PTO is to apply the broadest reasonable interpretation of the claim limitations. *See In re Acad. Of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) ("During examination, claims are to be given their broadest reasonable interpretation consistent with the specification, and" this "rule applies to reexaminations as well as initial examinations." (internal quotations omitted).)

Callaway's Petition ignores the fact that administrative reexamination proceedings are fundamentally different than "legal proceedings" before a district court. Callaway has said nothing in its Petition for Reconsideration that Congress did not already take into consideration when Congress entrusted the PTO with the administration of the *inter partes* reexamination statutes.

### III.     CALLAWAY'S ATTEMPTS TO CONFLATE TRADEMARK CANCELLATION PROCEEDINGS WITH *INTER PARTES* REEXAMINATION MUST FAIL

Callaway asserts that cases relevant to trademark cancellation proceedings require the PTO to decide the applicability of the Agreement to these facts and should dictate the outcome here. Callaway cites the *Selva & Sons, Inc.* case to support its position that the Director is

obligated to construe the terms of the Agreement. (Patent Owner's Pet. of Jun. 16, 2006 at 4.)
Callaway is wrong.

Trademark cancellation proceedings are simply not analogous to reexamination
proceedings. Under the Lanham Act, the TTAB may apply "[i]n all inter partes proceedings
equitable principles of laches, estoppel, and acquiescence ...." *Selva & Sons, Inc. v. Nina
Footwear, Inc.*, 705 F.2d 1316, 1323 (Fed. Cir. 1983) (quoting 15 U.S.C. § 1069). Unlike the
Lanham Act, in enacting the Patent Act, Congress explicitly limited the Patent Office's
jurisdiction to deciding whether or not "patents or printed publications" raise substantial new
questions of patentability.[3] *See* 35 U.S.C. §§ 301, 311. Had Congress wanted the PTO to
undertake inquiries regarding the applicability of estoppel by contract, it could have provided a
statutory section in the Patent Act analogous to the one in the Lanham Act. It did not.

The present *inter partes* reexamination proceeding is distinguishable from the
cancellation proceedings in *Selva & Sons* and the *Danskin* case, which involved the applicability
of settlement agreements pertaining to the same trademarks sought to be cancelled. *Selva & Sons*,
705 F.2d at 1318; *Danskin v. Dan River, Inc.*, 498 F.2d 1386, 1387 (Cust. & Pat.App. 1974). In
those cases, the party seeking cancellation had waived its right to contest the marks at all by
settling their previous disputes over those very same marks. *Selva & Sons*, 705 F.2d at 1318;
*Danskin*, 498 F.2d at 1387 (Cust. & Pat.App. 1974). While the TTAB may have the power to

---

[3] There are numerous other notable differences between *inter partes* reexamination Patent Act and cancellation
proceedings under the Lanham Act. First, the Lanham Act does not simply permit "any person" to seek cancellation
of a registered trademark. That person must also establish that they believe they have been harmed by the existence
of the registration. *See* 15 U.S.C. § 1064 ("A petition to cancel a registration of a mark ... may ... be filed as
follows by a person who believes that he is or will be damaged ... by the registration of a mark on the principal
register established by this Act....") Moreover, cancellation proceedings before the TTAB are adversarial and
between the parties, unlike *inter partes* reexamination proceedings. In fact, *inter partes* cancellation proceedings are
governed by the Federal Rules of Civil Procedure "except as otherwise provided." 37 C.F.R. § 2.116(a).
Cancellation proceedings permit parties to conduct discovery such as taking depositions, propounding interrogatories
and requesting the production of documents. 37 C.F.R. § 2.120. Moreover, the parties to cancellation proceedings
before the TTAB can even move for summary judgment—a procedure that is also governed by the standards
imposed during litigation under Fed. R. Civ. P. 56. Thus, Callaway is simply wrong in trying to analogize TTAB
proceedings—which are clearly adversarial quasi-trials—with *inter partes* reexamination under the Patent Act.

consider such claims, that is not the case here. Here, the PTO has properly undertaken a reexamination proceeding, as it is statutorily obligated to do once it finds substantial new questions of patentability. Without any legal support, Callaway asserts that the PTO is prohibited from performing its statutory duty by a private Settlement Agreement between private parties. Nothing in the reexamination statute suggests that the PTO has the authority to consider such a claim or that the PTO's statutory function can be divested by private agreement. The trademark cases simply are not analogous.

Rather than abdicating its duties (as Callaway suggests), to date, the PTO has followed the mandate provided by Congress: to determine if prior art patents and publications cited by a third-party requester raise substantial new questions of patentability and, if so, to resolve those substantial new questions of patentability either by confirming the patent, canceling the claims, or issuing new claims in amended form. 35 U.S.C. §§ 301, 311, 316. Callaway's attempts to analogize the statutory provisions for seeking cancellation of a trademark before the TTAB to the reexamination statutes simply fall short of the mark.

## IV.    THE PTO'S INTERPRETATION OF ITS OWN POLICIES IS CORRECT

Callaway alleges that the PTO's reading of M.P.E.P. § 2646(I) is "not the law."[4] (Patent Owner's Pet. of Jun. 16, 2006 at 7.) Yet Callaway has not pointed to any law that permits parties, by private agreement to strip the PTO of its duty to reexamine patents once it has determined that there are substantial new questions of patentability.[5] Callaway's arguments about this section of the M.P.E.P. are misplaced.

---

[4] Callaway's argument seems to ignore the fact that the M.P.E.P. does not have the force of law. *See* M.P.E.P., Foreword ("The Manual does not have the force of law or the force of the rules in Title 37 of the Code of Federal Regulations.")

[5] Callaway cites *Blacklight Power* for the proposition that "the USPTO is empowered, and indeed required, to step outside the bounds of the exemplary language of the MPEP when circumstances warrant." [Patent Owner Pet. of Jun. 16, 2006 at 8.] *Blacklight Power* simply does not stand for this proposition as the Federal Circuit found that the PTO followed its regulations and the law. *Blacklight Power* did not address the PTO's application of a section of the M.P.E.P, but rather its application of 35 U.S.C. § 151 (allowance) and 37 C.F.R. § 1.313(b) (withdraw from

First, Callaway asserts that the PTO has construed the M.P.E.P.'s list of possible circumstances in which a Reexamination Order would be *ultra vires* as exhaustive. The PTO's decision denying Callaway's petition did no such thing. In fact, the PTO merely identified broad classes of instances in which a PTO Reexamination Order may be *ultra vires* (including the absence of statutory authority and clerical error), and noted that Callaway failed to show that the PTO lacked the authority to proceed with the reexamination of its patent. (Decision on Pet. to Vacate Reexam. of Jun. 7, 2006 at 5 ("Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to a statutory prohibition barring the order, or due to a clerical error."))

Secondly, Callaway has not identified any law—statutory or otherwise—that would require the PTO to vacate its reexamination Order in this case. Attempting to do so, however, Callaway cites completely irrelevant case law dealing with the interpretation of *a car rental agreement* that included the term "such as" in a disputed provision, and the application of the term "for example" as used in the Harmonized Tariff Schedules of the United States ("HTSUS"). (Patent Owner Pet. of Jun. 16, 2006 at 7 (citing *Hertz Corp. v. Pap*, 923 F. Supp. 914, 920 (N.D. Tex. 1995) (construction of rental agreement) and *Smith v. United States*, 347 F.3d 922, 928 (Fed. Cir. 2004) (interpretation of HTSUS).) Callaway ignores fundamental tenants of administrative law, which require that Callaway show that the PTO's interpretation of the statutes that it has been charged with administering "is [not] reasonably related to the purposes of the enabling legislation." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 606 (Fed. Cir. 1985). The

---

issue). *Blacklight Power, Inc. v. Rogan*, 295 F.3d 1269, 1272-73 (Fed. Cir. 2002). In fact, *Blacklight Power* recognizes a number of the public policy concerns that are implicated here—further supporting the PTO's denial of Callaway's petition to vacate reexamination. *See Blacklight Power*, 295 F.3d at 1273-74 ("[t]he mission of the PTO, require[s] authority to implement § 151 by taking extraordinary action to withdraw a patent from issue **when a responsible PTO official reasonably believes that the subject matter may be unpatentable and that the application may have been allowed in error;**" and "**The PTO's responsibility for issuing sound and reliable patents is critical to the nation.**") Accepting Callaway's invitation to vacate reexamination would contravene strong public policy interest in preventing the maintenance of invalid patents, as expressed in the *Blacklight Power* case and discussed *supra* Section II.B-C.

PTO's decision denying Callaway's petition based on its interpretation of the Patent Act is reasonably related to the clearly expressed purpose of the enabling legislation—to give the public a low-cost alternative to patent litigation and to provide a means for the PTO to reconsider its granting of questionable patents to the extent such authority is provided to it by Congress. 145 CONG. REC. E1789-E1790 (Aug. 5, 1999); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q.2d (BNA) 1032, 1037 (N.D. Tex. 1982) (identifying important public interest in "eliminating worthless patents.")

## V.    CONCLUSION

Callaway's petition must be **denied** because: (1) nothing in the Agreement does or can preclude the PTO's reexamination of the '156 Patent and any construction of the Agreement to the contrary would violate public policy embodied in the *inter partes* reexamination statutes; (2) cancellation proceedings before the TTAB and *inter partes* reexamination proceedings are distinct proceedings and are not analogous; (3) the PTO can interpret its own policy embodied in the M.P.E.P., and Callaway cannot show that interpretation to be contrary to congressional intent of the clear language of the statute.

Acushnet hereby certifies that a copy of this Opposition has been served on the Patent Owner at the following address:

> Dorothy P. Whelan
> Fish & Richardson P.C.
> P.O. Box 1022
> Minneapolis, MN 55440-1022

Acushnet does not believe that any fees are due in connection with this filing. However, the U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 08-3038 referencing docket number **00634.0004.RXUS04**.

*In re* U.S. Patent No. **6,503,156**
Control No. **95/000,121**
Page 12 of 12

Respectfully submitted,

Dated: <u>June 28, 2006</u>

Alan M. Grimaldi (Reg. No. 26,599)
Joseph P. Lavelle (Reg. No. 31,036)
Andrew R. Sommer (Reg. No. 53,932)
*Attorneys for Acushnet Company*

**Howrey LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6614 (telephone)
(202) 383-6610 (fax)

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: **6,503,156**

Control No.: **95/000,121**

Inventor: Michael J. SULLIVAN

Issued: January 7, 2003

Appl. 09/873,642

Filed: June 4, 2001

Titled: **GOLF BALL HAVING MULTI-LAYER COVER WITH UNIQUE OUTER COVER CHARACTERISTICS**

**MAIL STOP *Inter Partes* REEXAMINATION**
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF JOSEPH NAUMAN

I, Joseph Nauman, Executive Vice President, Corporate and Legal at the Acushnet Company Fairhaven, Massachusetts, hereby declare as follows:

1.      I represent and am Executive Vice President, Corporate and Legal of Acushnet Company ("Acushnet"), located at 333 Bridge Street, Fairhaven, Massachusetts 02719.

2.      I negotiated and witnessed the signing of the 1996 Settlement Agreement between Acushnet, Spalding & Evenflo Companies, Inc. and Lisco, Inc. that Callaway discusses in its Petition to Vacate the Reexamination Orders as *Ultra Vires*.

DM US\8339571.v1

Declaration of Joseph Nauman
Submitted in Support of Acushnet's Opposition to Patent Owner's Petition to Vacate Reexamination Orders as Ultra Vires
Page 2

3.      Pursuant to Paragraph 19.5 of the Agreement, I was present at a mediation proceeding before David W. Plant between Acushnet and Callaway Golf Company ("Callaway") on August 3, 2005.

4.      Pursuant to Paragraph 19.6 of the Agreement, I was present at a mediation proceeding before Magistrate Judge Mary Pat Thynge on October 28, 2005.

5.      On January 5th and 6th 2006, I met with Mr. Steve McCracken, General Counsel of Callaway to discuss a possible settlement of the dispute between Acushnet and Callaway. During discussions with Mr. McCracken, I informed him that if Callaway were to file suit against Acushnet in Federal Court, Acushnet would request *inter partes* reexamination of Callaway's United States Patent Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873. During the course of those discussions, Mr. McCracken proposed reexamination of an Acushnet patent as part of a potential settlement.

6.      Mr. McCracken never mentioned to me that any reexamination request would violate the 1996 Settlement Agreement.

7.      Acushnet filed its requests for reexamination of Callaway's patents on January 17, 2006. Shortly after filing, the parties agreed to meet with Magistrate Judge Thynge again. This meeting took place on February 8, 2006. I was present at this meeting. During the course of discussions, Callaway's representatives not once suggested that Acushnet's requests for reexamination were prohibited by the 1996 Settlement Agreement.

8.      Following the February 8, 2006 meeting, Callaway filed suit against Acushnet in the United States District Court for the District of Delaware as required by the 1996 Settlement Agreement.

2

DM_US\8339571.v1

9.     I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

_____

Joseph Nauman

April 27 2006

# Exhibit A

*(Bd. Pat. App. & Inter. No. 2004-0242 in U.S.*
*Patent Application Serial No. 09/873,594)*

The opinion in support of the decision being entered today was <u>not</u> written
for publication and is <u>not</u> binding precedent of the Board.

Paper No. 17

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

<u>Ex parte</u> MICHAEL J. SULLIVAN

Appeal No. 2004-0242
Application No. 09/873,594

ON BRIEF

Before GARRIS, NASE, and CRAWFORD, <u>Administrative Patent Judges</u>.

NASE, <u>Administrative Patent Judge</u>.

### DECISION ON APPEAL

This is a decision on appeal from the examiner's final rejection of claims 1, 4 to

7, 10 to 13 and 16 to 18, which are all of the claims pending in this application.

We AFFIRM.

Appeal No. 2004-0242                                                    Page 2
Application No. 09/873,594

## BACKGROUND

The appellant's invention relates to golf balls and, more particularly, to improved

standard and oversized golf balls comprising multi-layer covers which have a

comparatively hard inner layer and a relatively soft outer layer such as that produced by

the use of a polyurethane based outer layer.  The improved multi-layer golf balls

provide for enhanced distance and durability properties over single layer cover golf balls

while at the same time offering enhanced "feel" and spin characteristics generally

associated with soft balata and balata-like covers of the prior art (specification, p. 1).  A

copy of the claims under appeal is set forth in the appendix to the appellant's brief.


The prior art references of record relied upon by the examiner in rejecting the

appealed claims are:

| Nesbitt | 4,431,193 | Feb. 14, 1984 |
| Wu | 5,334,673 | Aug. 2, 1994 |


Claims 1, 4 to 7, 10 to 13 and 16 to 18 stand rejected under 35 U.S.C. § 103 as

being unpatentable over Nesbitt in view of Wu.


Rather than reiterate the conflicting viewpoints advanced by the examiner and

the appellant regarding the above-noted rejections, we make reference to the answer

Appeal No. 2004-0242                                                    Page 3
Application No. 09/873,594

(Paper No. 15, mailed June 16, 2003) for the examiner's complete reasoning in support

of the rejections, and to the brief (Paper No. 14, filed March 21, 2003) for the

appellant's arguments thereagainst.


## OPINION

In reaching our decision in this appeal, we have given careful consideration to

the appellant's specification and claims, to the applied prior art references, and to the

respective positions articulated by the appellant and the examiner. As a consequence

of our review, we make the determinations which follow.


**Claimed Subject Matter**

The independent claims on appeal read as follows:

1.    A golf ball comprising:
      a core;
      an inner cover layer disposed on said core and having a Shore D
hardness of 60, [sic] or greater [,] a thickness of from about 0.10 to about 0.01
inches, and comprising a low acid ionomer resin containing no more than 16%
by weight of an alpha, beta unsaturated carboxylic acid; and
      an outer cover layer comprising a polyurethane material.

7.    A golf ball comprising:
      a core;
      an inner cover layer disposed about said core arid having a thickness of
from about 0.10 to about 0.01 inches, and comprising an ionomeric resin
including no more than 16 % by weight of an alpha, beta-unsaturated carboxylic
acid and having a modulus of from about 15,000 to about 70,000 psi; and
      an outer cover layer disposed about said inner cover layer comprising a
polyurethane material.

Appeal No. 2004-0242                                                      Page 4
Application No. 09/873,594

    13.    A golf ball comprising;

            a core;

            an inner cover layer disposed on said core comprising an ionomer resin; and

            an outer cover layer disposed about said inner cover layer comprising a polyurethane material.

## Teachings of Nesbitt

Nesbitt's invention relates to a golf ball and more particularly to a cover

construction for a golf ball.  In the BACKGROUND ART section of the patent (column 1,

lines 9-33), Nesbitt teaches:

> Golf balls having a cover material marketed under the trademark "Surlyn" by E. I. du Pont de Nemours and Company of Wilmington, Del., are known in the art and such cover compositions generally comprise a copolymer of an olefin and at least one unsaturated monocarboxylic acid. Conventional two-piece golf balls are comprised of a solid resilient center or core with molded Surlyn covers. The cover used is normally a hard, high flexural modulus Surlyn resin in order to produce a gain in the coefficient of restitution over that of the center or core.

> In a conventional two-piece golf ball, a hard, high flexural modulus Surlyn resin is molded over a resilient center or core. The hard, highly flexural modulus Surlyn resin for the cover of a two-piece golf ball is desirable as it develops the greatest hoop stress and consequently the greatest coefficient of restitution.

> A two-piece golf ball having a hard, Surlyn resin cover however does not have the "feel" or playing characteristics associated with softer balata covered golf balls. Heretofore balata covered golf balls have been preferred by most golf professionals. If a golf ball has a cover of soft, low flexural modulus Surlyn resin molded directly over a center or core, it is found that little or no gain in coefficient of restitution is obtained.

Nesbitt then teaches in the DISCLOSURE OF THE INVENTION section of the

patent (column 1, line 36, to column 2, line 9) that:

In accordance with the present invention there is provided a golf ball having a multilayer or two-ply cover construction for a solid resilient center or core wherein the multilayer cover construction involves two stage molded cover compositions over a solid center or core of resilient polymeric material wherein an increased coefficient of restitution is attained and wherein the "feel" or playing characteristics are attained similar to those derived from a balata covered golf ball.

The invention embraces a golf ball and method of making same wherein the ball has a solid center or core of resilient polymeric or similar material covered by a first layer or ply of molded hard, highly flexural modulus resinous material or of cellular or foam composition which has a high coefficient of restitution.

The first layer or ply is provided with a second or cover layer of a comparatively soft, low flexural modulus resinous material or of cellular or foam composition molded over the first layer and core or center assembly. Such golf ball has the "feel" and playing characteristics simulating those of a softer balata covered golf ball.

Through the use of the first ply or layer of hard, high flexural modulus resinous material on the core or center, a maximum coefficient of restitution may be attained. The resinous material for the first ply or layer may be one type of Surlyn marketed by E. I. du Pont de Nemours and Company of Wilmington, Del., and the other ply or cover layer may be of a different type of Surlyn resin also marketed by the same company.

The three-piece golf ball of the invention provides a golf ball in which the coefficient of restitution of the golf ball closely approaches or attains that which provides the maximum initial velocity permitted by the United States Golf Association Rules of two hundred fifty feet per second with a maximum tolerance of two percent, which velocity may be readily attained and the playing characteristics or "feel" associated with a balata covered ball secured while maintaining a total weight of the golf ball not exceeding 1.620 ounces without sacrificing any advantages of a golf ball having a standard Surlyn cover of the prior art or a golf ball having a softer balata cover.

Appeal No. 2004-0242                                                    Page 6
Application No. 09/873,594

In the BEST MODE FOR CARRYING OUT THE INVENTION section of the

patent (column 2, line 31, to column 3, line 50), Nesbitt teaches:

Referring to the drawings in detail there is illustrated a golf ball 10 which
comprises a solid center or core 12 formed as a solid body of resilient polymeric
material or rubber-like material in the shape of a sphere. Disposed on the
spherical center or core 12 is a first layer, lamination, ply or inner cover 14 of
molded hard, highly flexural modulus resinous material such as type 1605 Surlyn
marketed by E. I. du Pont de Nemours and Company, Wilmington, Del.[1]

This material of the inner layer 14 being a hard, high flexural modulus
resin produces a substantial gain of coefficient of restitution over the coefficient
of restitution of the core or center. An outer layer, ply, lamination or cover 16 of
comparatively soft, low flexural modulus resinous material such as type 1855
Surlyn marketed by E. I. du Pont de Nemours and Company [2] is then re-molded
onto the inner ply or layer 14, the outer surface of the outer layer or cover 16
being of dimpled configuration providing a finished three-piece golf ball.

According to the United States Golf Association Rules, the minimum
diameter prescribed for a golf ball is 1.680 inches and the maximum weight
prescribed for a golf ball is 1.620 ounces. It is therefore desirable to produce a
golf ball having an improved coefficient of restitution to attain an initial velocity for
the golf ball approaching the maximum velocity limit of 255 feet per second, the
maximum limit provided by the United States Golf Association Rules.

The hard, high flexural modulus resin is employed to increase the
coefficient of restitution in order to attain or approach the maximum initial velocity
for the golf ball. The use of a soft low flexural modulus resin provides little or no
gain in the coefficient of restitution and may tend to reduce the coefficient of
restitution thereby adversely affecting the initial velocity factor.

---

[1] As set forth on page 3 of the appellant's specification Type 1605 Surlyn® (now designated
Surlyn® 8940) is a sodium ion based low acid (less than or equal to 15 weight percent methacrylic acid)
ionomer resin having a flexural modulus of about 51,000 psi.

[2] As set forth on page 4 of the appellant's specification Type 1855 Surlyn® (now designated
Surlyn® 9020) is a zinc ion based low acid (10 weight percent methacrylic acid) ionomer resin having a
flexural modulus of about 14,000 psi.

In producing the golf ball of the invention, the density of the center or core may be varied and the relative thicknesses of the layers, plies or laminations 14 and 16 may be varied within limits so that the golf ball weight does not exceed 1.620 ounces, the minimum diameter not less than 1.680 inches, and the ball be capable of an initial velocity approaching 255 feet per second. However, the finished golf ball may be of larger diameter providing the total weight of the ball does not exceed 1.620 ounces.

Thus, by varying the density of the center or core 12 and varying the thicknesses of the plies or layers 14 and 16 of the cover construction, a golf ball may be produced having a total weight not exceeding 1.620 ounces and a minimum diameter of 1.680 inches and having a comparatively high coefficient of restitution, the ball closely approaching or attaining in play the maximum permitted initial velocity of 255 feet per second.

In the golf ball of the invention the thickness of the inner layer or ply 14 and the thickness of the outer layer or ply 16 may be varied to secure the advantages herein mentioned. It is found that the inner layer 14 of hard, high flexural modulus resinous material, such as Surlyn resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches. The thickness of the outer layer or cover 16 of soft, low flexural modulus resin, such as Surlyn type 1855, may be in a range of 0.020 inches and 0.100 inches.

For example, a center or core 12 having a 0.770 coefficient of restitution is molded with a layer of hard, high modulus Surlyn resin, such as Surlyn type 1605, to form a spherical body of a diameter of about 1.565 inches. This spherical body comprising the core or center 12 and layer 14 of the hard, high modulus Surlyn resin has a coefficient of restitution of 0.800 or more.

This center or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then re-molded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin such as Surlyn type 1855. The outer layer of the soft resin is of a thickness of 0.0575 inches. The soft Surlyn resin cover would have about the same thickness and shore hardness of a balata covered golf ball and would have the advantageous "feel" and playing characteristics of a balata covered golf ball.

It is to be understood that the golf ball of the invention may be made of a diameter greater than 1.680 inches without exceeding the total weight of 1.620

ounces by varying the thickness of the inner layer or ply 14 and the outer cover layer or ply 16 and secure desired "feel" and playing characteristics.

## Teachings of Wu

Wu's invention relates to golf balls and more particularly to polyurethane covered golf balls made from a polyurethane composition of a polyurethane prepolymer cured with a slow-reacting curing agent selected from the group of slow-reacting polyamine curing agents and difunctional glycols. Wu states (column 1, lines 11-14) that such a golf ball has improved resiliency and shear resistance over golf balls made from conventional polyurethane formulations. Wu teaches (column 1, line 15, to column 2, line 44) that:

Conventionally, golf balls are made by molding a cover about a core that is either a solid one-piece core or a wound core made by winding thin elastic thread about a center. The center is either a solid mass or a liquid-filled envelope which has been frozen prior to winding the thread therearound. Golf balls made from a solid core are referred to conventionally as two-piece balls while those with wound cores are referred to as three-piece balls. Attempts have been made to make a one-piece golf ball, i.e. a solid homogeneous golf ball; however, to date no commercially acceptable one-piece golf ball has been made.

Balata had been used as the primary material for covers of golf balls until the 1960's when SURLYN®, an ionomeric resin made by E.I. dupont de Nemours & Co., was introduced to the golf industry. SURLYN® costs less than balata and has a better cut resistance than balata. At the present time, SURLYN® is used as the primary source of cover stock for two-piece golf balls. The problem with SURLYN®-covered golf balls, however, is that they lack the "click" and "feel" which golfers had become accustomed to with balata. "Click" is the sound made when the ball is hit by a golf club while "feel" is the overall sensation imparted to the golfer when the ball is hit.

Appeal No. 2004-0242                                              Page 9
Application No. 09/873,594

It has been proposed to employ polyurethane as a cover stock for golf balls because, like SURLYN®, it has a relatively low price compared to balata and provides superior cut resistance over balata. However, unlike SURLYN®-covered golf balls, polyurethane-covered golf balls can be made to have the "click" and "feel" of balata.

. . .

It has now been discovered that a polyurethane prepolymer cured with a slow-reacting curing agent selected from the group of slow-reacting polyamine curing agents or difunctional glycols produces a golf ball cover that has good durability and performance. Golf balls made in accordance with the present invention have been found to have improved shear resistance and cut resistance compared to golf balls having covers made from either balata or SURLYN®.

Broadly, the present invention is a golf ball product made from a polyurethane prepolymer cured with a slow-reacting curing agent selected from the group of slow-reacting polyamine curing agents or difunctional glycols. The term "golf ball product" as used in the specification and claims means a cover, a core, a center or a one-piece golf ball. The cover of a golf ball made in accordance with the present invention has been found to have good shear resistance, cut resistance, durability and resiliency. Preferably, the polyurethane composition of the present invention is used to make the cover of a golf ball.

**The examiner's rejection**

In the rejection of claims 1, 4 to 7, 10 to 13 and 16 to 18 under 35 U.S.C. § 103

(answer, p. 3), the examiner ascertained[3] that Nesbitt discloses all of the claimed

subject matter except for the outer cover of the golf ball comprising a polyurethane

material. The examiner, in essence, concluded that in view of the teachings of Wu it

---

[3] After the scope and content of the prior art are determined, the differences between the prior art and the claims at issue are to be ascertained. Graham v. John Deere Co., 383 U.S. 1, 17-18, 148 USPQ 459, 467 (1966).

Appeal No. 2004-0242                                                          Page 10
Application No. 09/873,594

would have been obvious to one skilled in the art to have modified Nesbitt's golf ball by

using polyurethane as the outer cover material to increase the durability of the golf ball.


**The appellant's argument**

The appellant argues (brief, pp. 4-7) that the rejection under 35 U.S.C. § 103 is

erroneous since the applied prior art, absent the use of impermissible hindsight[4], does

not suggest the subject matter of independent claims 1, 7 and 13. In the appellant's

view there is no motivation[5] in the applied prior art that would have made it obvious to

one of ordinary skill in the art to have modified the golf ball of Nesbitt to arrive at the

subject matter of independent claims 1, 7 and 13.

---

[4] The use of hindsight knowledge derived from the appellant's own disclosure to support an obviousness rejection under 35 U.S.C. § 103 is impermissible. See, for example, W. L. Gore and Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1553, 220 USPQ 303, 312-13 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984).

[5] Most if not all inventions arise from a combination of old elements. See In re Rouffet, 149 F.3d 1350, 1357, 47 USPQ2d 1453, 1457 (Fed. Cir. 1998). Thus, every element of a claimed invention may often be found in the prior art. See id. However, identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention. See id. Rather, to establish obviousness based on a combination of the elements disclosed in the prior art, there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the appellant. See In re Dance, 160 F.3d 1339, 1343, 48 USPQ2d 1635, 1637 (Fed. Cir. 1998); In re Gordon, 733 F.2d 900, 902, 221 USPQ 1125, 1127 (Fed. Cir. 1984).

Appeal No. 2004-0242                                                    Page 11
Application No. 09/873,594

**Our Determination**

    In applying the test for obviousness[6] we conclude that the teachings of Wu

clearly would have made it obvious at the time the invention was made to a person of

ordinary skill in the art to have modified Nesbitt's golf ball by using polyurethane as the

outer cover material to achieve the expected benefits therefrom taught by Wu (i.e., to

have the "click" and "feel" of balata; improved shear resistance and cut resistance;

durability; and resiliency).    Thus, it would have been obvious to one skilled in the art to

have modified Nesbitt's three-piece golf ball having a spherical core, an inner layer of

type 1605 Surlyn® and an outer layer of type 1855 Surlyn® by replacing the type 1855

Surlyn® in the outer layer with polyurethane as suggested and taught by Wu.

Therefore, the teachings of the applied prior art alone (i.e., without the use of

impermissible hindsight) are suggestive of the subject matter of independent claims 1, 7

and 13.

    In view of our determination above we disagree with the appellant's argument

that the rejection under 35 U.S.C. § 103 is erroneous.    While the appellant has correctly

pointed out the deficiencies of both Nesbitt and Wu on an individual basis,

nonobviousness cannot be established by attacking the references individually when

---

[6] The test for obviousness is what the combined teachings of the references would have
suggested to one of ordinary skill in the art. See In re Young, 927 F.2d 588, 591, 18 USPQ2d 1089, 1091
(Fed. Cir. 1991) and In re Keller, 642 F.2d 413, 425, 208 USPQ 871, 881 (CCPA 1981).

Appeal No. 2004-0242
Application No. 09/873,594

Page 12

the rejection is predicated upon a combination of prior art disclosures. <u>See</u> <u>In re Merck</u>
<u>& Co. Inc.</u>, 800 F.2d 1091, 1097, 231 USPQ 375, 380 (Fed. Cir. 1986). In our view, the
combined teachings of Nesbitt and Wu are clearly suggestive of the claimed subject
matter as set forth above. Lastly, we incorporate the examiner's response to the
appellant's argument (answer, pp. 4-7) as our own.

For the reasons set forth above, the decision of the examiner to reject
independent claims 1, 7 and 13, and claims 4 to 6, 10 to 12 and 16 to 18 dependent
thereon, under 35 U.S.C. § 103 is affirmed.

## CONCLUSION

To summarize, the decision of the examiner to reject claims 1, 4 to 7, 10 to 13
and 16 to 18 under 35 U.S.C. § 103 is affirmed.

Appeal No. 2004-0242                                                    Page 13
Application No. 09/873,594

        No time period for taking any subsequent action in connection with this appeal

may be extended under 37 CFR § 1.136(a).

                                 AFFIRMED




                BRADLEY R. GARRIS                        )
                Administrative Patent Judge              )
                                                         )
                                                         )
                                                         )
                                                         ) BOARD OF PATENT
                JEFFREY V. NASE                          )     APPEALS
                Administrative Patent Judge              )       AND
                                                         ) INTERFERENCES
                                                         )
                                                         )
                                                         )
                MURRIEL E. CRAWFORD                      )
                Administrative Patent Judge              )

Appeal No. 2004-0242                                                  Page 14
Application No. 09/873,594


MICHELLE BUGBEE
SPALDING SPORTS WORLDWIDE, INC.
425 MEADOW STREET
PO BOX 901
CHICOPEE, MA  01021-0901


JVN/jg

# Exhibit B

(1996 Settlement Agreement between Acushnet
Company, Spalding and Lisco)

## SETTLEMENT AGREEMENT

between

**SPALDING & EVENFLO COMPANIES, INC.,**
a Delaware corporation,
for itself and on behalf of its Spalding Sports Worldwide Division,
with principal offices in Tampa, Florida;

-and-

**LISCO INC.,**
a Delaware corporation
and wholly owned subsidiary of said SPALDING & EVENFLO COMPANIES, INC.
(hereinafter jointly and severally referred to as "Spalding");

-and-

**ACUSHNET COMPANY,**
a Delaware corporation,
(hereinafter "Acushnet"),
with principal offices in Fairhaven, Massachusetts.

<u>SETTLEMENT AGREEMENT</u>

Parties:    SPALDING & EVENFLO COMPANIES, INC.
            LISCO, INC.
            ACUSHNET COMPANY

RECITALS                                                              <u>PAGE</u>

1.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

2.    '959 PATENT RIGHTS' LICENSE . . . . . . . . . . . . . . . . . . . . . . . . . .    5

3.    '304 PATENT RIGHTS' LICENSE . . . . . . . . . . . . . . . . . . . . . . . . . .    5

4.    HIGH ACID PATENT RIGHTS' LICENSE . . . . . . . . . . . . . . . . . . . . .    7

5.    MULTIPLE LICENSES AND ROYALTIES . . . . . . . . . . . . . . . . . .    7

6.    SETTLEMENT OF ADVERTISING CLAIMS . . . . . . . . . . . . . . . . .    8

7.    WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

8.    PAYMENT, COSTS AND FEES . . . . . . . . . . . . . . . . . . . . . . . . .    10

9.    DISMISSAL OF CURRENT ACTIONS . . . . . . . . . . . . . . . . . . . . . .    10

10.   DISCLOSURE OF APPLICATIONS . . . . . . . . . . . . . . . . . . . . . . .    11

11.   EFFECT OF AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

12.   CONFIDENTIALITY AND PUBLIC ANNOUNCEMENT . . . . . . . . . . .    12

13.   NON-ADMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

14.   SUPERSESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

15.   SUCCESSORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

16.   EXPIRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

17.   EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

18.   GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

19.   DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

## SETTLEMENT AGREEMENT

between

SPALDING & EVENFLO COMPANIES, INC., a Delaware corporation, for itself and on behalf of its Spalding Sports Worldwide Division, with principal offices in Tampa, Florida;

-and-

LISCO INC., a Delaware corporation and wholly owned subsidiary of said SPALDING & EVENFLO COMPANIES, INC. (hereinafter jointly and severally referred to as "Spalding");

-and-

ACUSHNET COMPANY, a Delaware corporation, (hereinafter "Acushnet"), with principal offices in Fairhaven, Massachusetts.

WHEREAS:

A.    Spalding and Acushnet are parties to a Settlement Agreement dated November 15, 1990, which, for its term of ten (10) years, in situations of patent infringement, requires them, prior to filing suit, to first notify each other of adverse patent claims, and seek a non-litigious resolution thereof, including non-binding mediation, if necessary;

B.    Spalding asserted that the manufacture and sale by Acushnet of Titleist DT 90, Titleist DT 100 and Pinnacle Performance golf balls infringed Lisco Inc.'s U.S. Patent No. 5,329,959 for "Golf Ball Cover Compositions" (the "'959 Patent") and, additionally, that the manufacture and sale by Acushnet of Super Pinnacle Plus golf balls infringed Lisco Inc.'s U.S. Patent No.

5,368,304 for "Low Spin Golf Ball" (the "'304 Patent"), which assertions were denied by Acushnet;

C.    Acushnet asserted that Spalding's 1995 print advertisements mentioning Acushnet golf balls were actionably false, inaccurate, disparaging and unfair and those assertions were denied by Spalding;

D.    Spalding filed two patent infringement actions (Civil Actions Nos. 95-CV-366 and 95-CV-640) against Acushnet in the United States District Court for the Northern District of Ohio respectively alleging infringement of its '959 Patent through the manufacture and sale of Titleist DT 90, Titleist DT 100 and Pinnacle Performance golf balls and infringement of its '304 Patent through the sale *inter alia* of Super Pinnacle Plus golf balls, and filed another action (Civil Action No. 95-CV-387) seeking a declaration that certain of its 1995 print advertisements were not actionably false, inaccurate, disparaging or unfair and asserting that 1995 Acushnet print advertisements mentioning Spalding golf balls were actionably false, inaccurate, disparaging and unfair, which assertions have been denied by Acushnet;

E.    Acushnet filed a declaratory judgement action against the '959 and '304 Patents in the District Court of Massachusetts (95-CV-10384) and also therein brought an action (95-CV-10376) alleging *inter alia* false advertising and breach of contract by Spalding;

-2-

F.     Acushnet's Massachusetts' actions were transferred to the United States District Court for the Northern District of Ohio and all of said actions have now been transferred from said court to the U.S. District Court of Delaware, whose jurisdiction the parties accept; and

G.     The parties desire to: (i) settle their present disputes relating to the manufacture, sale and advertising of golf balls as aforesaid; (ii) avoid other and similar patent disputes; and (iii) strengthen the procedure for attempting to resolve expeditiously such new intellectual property and advertising disputes as may arise between them.

NOW, THEREFORE, the parties agree as follows:

1.     DEFINITIONS

In this Settlement Agreement, the following terms shall have the meanings indicated:

       1.1     Golf Balls:  Balls for use in playing, practicing or simulating the game of golf.

       1.2     Golf Ball Business:  The business of and the technology used in making, using and selling golf balls in the United States and foreign countries as participated in by the parties, their affiliates, subsidiaries or related companies.

       1.3     Spalding's '959 Patent Rights:  The domestic and foreign patents and applications therefor identified as A-1 on Exhibit A, including without limitation any and all divisionals, continuations, continuations in part applications currently filed and foreign counterparts thereof or applications currently filed which otherwise emanate from the same roots as do the listed patents, whether or not they can be viewed as improvements thereof.

-3-

1.4    Spalding's '304 Patent Rights: The domestic and foreign patents and applications therefor identified as A-2 on Exhibit A, including without limitation any and all divisionals, continuations, continuations in part applications currently filed and foreign counterparts thereof or applications currently filed which otherwise emanate from the same roots as do the listed patents, whether or not they can be viewed as improvements thereof.

1.5    High Acid Ionomeric Resin: Resin comprised of an alpha olefin and an alpha, beta ethylenically unsaturated carboxylic acid, wherein the latter comprises greater than 16% (by weight) of the total weight of the resin.

1.6    High Acid Patent Rights:    Any and all foreign or domestic patents or applications: (1) currently issued or on file and identified as A-3 on Exhibit A; or (2) filed by any of the parties within three years of the Effective Date of this Settlement Agreement, directed to an invention relating to Golf Balls which invention includes in at least one independent claim a cover composition which comprises one or more High Acid Ionomeric Resin(s). However, such High Acid Patent Rights do not include, either implicitly or explicitly, (a) other patented technology claimed alone; or (b) separately patentable technology claimed in combination with a High Acid Ionomeric Resin; or (c) any patented multilayer golf ball technology, except to the extent such technologies in (a), (b), and (c) preceding are included in Spalding's '304 Patent Rights.

1.7    Spalding's Patent Rights: The Patent Rights defined in items 1.3, 1.4 and as applicable in 1.6.

-4-

PENY3-494402.3

1.8    <u>Disclosure Group</u>: The senior management of either party, a major stockholder of either party, and the management of any parent of a party, their counsel and auditors who need to know of the terms and conditions of this Settlement Agreement, or any of them.

1.9    <u>Third Party</u>: Any corporation, company, entity or individual not in the Disclosure Group.

1.10    <u>Net Sales</u>: The invoice price less any sales taxes or freight charges paid by the seller and any discounts given to the buyer.

## 2.    '959 PATENT RIGHTS' LICENSE

2.1    In consideration of the one time payment by Acushnet to Spalding of the sum of US$ 535,000.00, Spalding agrees to, and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, paid up, non-transferrable (except to any successor(s) of substantially all of the assets of Acushnet's Golf Ball Business) license under Spalding's '959 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof.

2.2    Acushnet expressly does not waive its right to contest, nor is it estopped from contesting, the validity, enforceability or non-infringement of the Spalding '959 Patent Rights, nor does it concede or otherwise acknowledge the validity, enforceability or non-infringement thereof or of any of them, and Spalding agrees never to assert such waiver or estoppel by reason of this Settlement Agreement.

3.    '304 PATENT RIGHTS' LICENSE

3.1    In consideration of the one time payment by Acushnet to Spalding of the sum of US$ 100,000.00, Spalding agrees to and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, paid up, non-transferrable (except to any successor(s) of substantially all of the assets of Acushnet's Golf Ball Business) license under Spalding's '304 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, provided the average diameter of such Golf Balls is less than 1.70 inches.

3.2    Acushnet expressly does not waive its right to contest nor is it estopped from contesting the validity, enforceability or non-infringement of the Spalding '304 Patent Rights, nor does it concede or otherwise acknowledge the validity, enforceability or non-infringement thereof or of any of them and Spalding agrees never to assert such waiver or estoppel by reason of this Settlement Agreement.

3.3    Spalding agrees to and does hereby grant Acushnet, its subsidiaries and affiliates, an irrevocable, non-exclusive, non-transferable (except to any successor(s) of substantially all assets of Acushnet's Golf Ball Business) license under Spalding's '304 Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, the average diameter of such Golf Balls being 1.70 inches or more under all claims thereof, in consideration of the payment to Spalding by Acushnet of a royalty which shall be the greater of (a) or (b):

        a)    a percentage of the Net Sales of Golf Balls sold by Acushnet after the Effective Date of the Settlement Agreement, applicable as follows:

               0-500,000 dozen     5%

               500,001-1,000,000 dozen    4%

1,000,001-2,000,000 dozen 3%

over 2,000,000 dozen        2%; or

b)     $100,000 for each complete calendar year or, if for a period less than a complete calendar year, a pro rata share of $100,000.00.

Such royalty shall be paid quarterly in payments made not later than thirty (30) days following the close of the quarters ending in March, June, September and December in which the sales occurred.

4.     HIGH ACID PATENT RIGHTS' LICENSE

4.1   Each party agrees to and does hereby grant to the other, its subsidiaries and affiliates, an irrevocable, non-exclusive, non-transferrable (except to any successor(s) of substantially all of the assets of its Golf Ball Business) license under its High Acid Patent Rights to make, use, offer to sell, sell and import Golf Balls under all claims thereof, subject only to the payment of a single three percent (3%) royalty on the Net Sales of its Golf Balls falling within the issued claims of said High Acid Patent Rights.

4.2     Both parties expressly do not agree to waive their rights to contest nor are they estopped by this license from contesting the validity, enforceability or non-infringement of the High Acid Patent Rights held by the other, nor do they acknowledge the validity thereof.

-7-

5.    MULTIPLE LICENSES AND ROYALTIES

5.1    For any particular Golf Ball model, at most one royalty rate shall apply, as set forth in item 3.3 or 4.1, even though more than one license, as set forth in items 2.1, 3.1, 3.3 and 4.1, may apply.

5.2    For any Golf Ball model containing High Acid Ionomeric Resin which is covered by any '959 Patent Right which also qualifies as a High Acid Patent Right, the license provided in item 2.1 shall control to the exclusion of the royalty rates set forth in items 3.3 and 4.1.

5.3    For any Golf Ball model containing High Acid Ionomeric Resin which is covered by any '304 Patent Right which also qualifies as a High Acid Patent Right, the following royalties shall apply:

a)    the royalty rate set forth in item 3.3 shall control to the exclusion of the royalty rate set forth in item 4.1 for Golf Balls with an average diameter of 1.70 inches or greater; and

b)    the royalty rate set forth in item 4.1 shall control to the exclusion of the license set forth in item 3.1 for Golf Balls with an average diameter of less than 1.70 inches.


6.    SETTLEMENT OF ADVERTISING CLAIMS

6.1    Spalding has discontinued and agrees not to resume publication of the advertisements attached hereto as Exhibit E and will pay to Acushnet in full settlement of Acushnet's alleged damages' claims arising out of Spalding's 1995 advertising campaign using such advertisements the sum of US$ 400,000.00.

6.2    Acushnet has discontinued and agrees not to resume publication of the advertisements attached hereto as Exhibit F and will pay to Spalding in full settlement of Spalding's alleged damages claims arising out of Acushnet's 1995 comparative advertising campaign using such advertisements the sum of US$ 100,000.00.

6.3    The parties agree: (i) to utilize demonstrably accurate characterizations when mentioning competing brands of each other by name in the advertising of Golf Balls; and (ii) to recite the methodology being employed, establishing comparisons used in comparative advertising.  It is understood and agreed that nothing herein shall prohibit or prevent either party from accurate and fair comparative advertising.

6.4    This Settlement does not constitute an admission of the inaccuracy, truth or falsity of the contested advertisements by either party.

6.5    Spalding agrees to avoid statements for the next fifteen (15) years which might imply that Z-Balata is natural balata (i.e., Z-Balata is longer than other balata balls) and to use Z-Balata always in combination and in the context of a 2-piece construction, and not "balata" alone as in the phrase "balata ball."  Moreover, Spalding agrees to avoid in its advertisements phraseology which implies that a golf ball sold under the trademark "Z-balata" is a balata golf ball, such as the phraseology: "Z-balata and other balata balls."  However, Spalding, with proper substantiation, is entitled to indicate that its "Z-Balata" golf balls have "balata like" characteristics or possess "balata feel".

6.6    Acushnet agrees to withdraw its opposition to Trademark Application Serial No. 74/513,523 at the United States Patent and Trademark Office (Opposition No. 99000) without prejudice and Spalding agrees to consent thereto.

-9-

7.    WAIVER

The parties agree to and do hereby waive any damages for past infringement of any of their respective rights, as well as any damages for unfair competition, except as specified herein.

8.    PAYMENT, COSTS AND FEES

8.1    Acushnet, within five (5) business days of receipt of the signed original of this Settlement Agreement, shall pay to Spalding by check: the sum of U.S.$ 335,000.00, being the net amount currently due Spalding as a result of this Settlement Agreement.

8.2    The parties agree to be responsible for their own costs and legal fees arising out of any presently pending litigation between them which relates to the Golf Ball Business and the implementation of this Settlement Agreement.

9.    DISMISSAL OF CURRENT ACTIONS

9.1    Concurrent with the execution of this Settlement Agreement, the parties shall take such steps as are necessary to terminate promptly, in accordance herewith, all litigation pending between them which relates to the Golf Ball Business.

9.2    Such steps shall, without limitation, include termination of the following:

9.2.1    Civil Action No. 96-73 MMS, United States District Court for the District of Delaware by Stipulation of Dismissal as annexed in Exhibit B or as otherwise may be required by the court.

-10-

9.2.2  Civil Action No. 96-78 MMS, United States District Court for the District of Delaware by Stipulation of Dismissal as annexed in Exhibit C or as otherwise may be required by the court.

9.2.3  Opposition No. 99000 at the United States Trademark and Patent Office, Trademark Trial and Appeal Board, by Stipulation of Dismissal as annexed in Exhibit D.

9.3     Upon execution of this Settlement Agreement by both parties:

9.3.1  Spalding's counsel and Acushnet's counsel shall sign and file the Stipulations of Dismissal described in 9.2.1 and 9.2.2 as set forth in Exhibits B and C;

9.3.2  Spalding's counsel and Acushnet's counsel shall sign a Stipulation of Dismissal as described in 9.2.3 as set forth in Exhibit D.

10.     DISCLOSURE OF APPLICATIONS

10.1    Within thirty (30) days of the Effective Date of the Settlement Agreement both parties simultaneously shall exchange any and all pending applications which fall within the scope of the patent rights defined in items 1.6-1.7.

10.2    Both parties agree to exchange any and all applications filed after the Effective Date of the Settlement Agreement which fall within the scope of the patent rights defined in items 1.6-1.7 not later than thirty (30) days after the filing date of any such application.

10.3    Each party agrees to hold the existence and contents of the other's applications subject to items 10.1-10.2 in confidence while such information is not available to the public and to limit the disclosure of such information during that period to the Disclosure Group and Third Parties who are full-time employees of either party.

11.    EFFECT OF AGREEMENT

This Settlement Agreement is intended by the parties, and each of them, to settle fully and compromise the disputes hereinbefore mentioned.

12.    CONFIDENTIALITY AND PUBLIC ANNOUNCEMENT

12.1    All terms and conditions of this Settlement Agreement shall be held in confidence for a period of five years and may be disclosed during such period only to the Disclosure Group or, with respect only to identification of the licensed patents, persons within the employ of a party who would be benefitted by such knowledge provided, however, that the parties may disclose the terms of this Settlement Agreement when relevant, subject to an appropriate protective order. In such case, however, each party shall seek to restrict by motion or otherwise, disclosure of this Settlement Agreement to the least number of persons who need to know.

12.2    No public announcement concerning this Settlement shall be made by either party except that the litigation has been resolved amicably.

-12-

12.3    Notice of a claimed breach of this confidentiality provision shall be in writing and addressed to:

If Spalding is alleged to have breached:

> Mr. Scott Creelman
> Senior Vice President and
> General Manager - Golf Products Worldwide
> Spalding Sports Worldwide
> 425 Meadow Street
> P.O. Box 901
> Chicopee, Massachusetts 01021

with a copy to:

> Robert K. Adikes, Esq.
> Vice President & General Counsel
> Spalding & Evenflo Companies, Inc.
> P.O. Box 30101
> Tampa, Florida 33630

If Acushnet is alleged to have breached:

> Mr. Walter Uihlein
> President and Chief Operating Officer
> Acushnet Company
> 333 Bridge Street
> Fairhaven, Massachusetts 02719

with a copy to:

> Gilbert L. Klemann, II, Esq.
> Senior Vice President & General Counsel
> American Brands, Inc.
> 1700 East Putnam Avenue
> Old Greenwich, Connecticut 06870

and shall in good faith identify the suspected breaching party and/or persons.    Upon the dispatch of a claim under this Section 12.3, the party alleging the breach may release such

-13-

confidential information as it deems necessary to counter the alleged breach and mitigate damage to itself or competitive advantage to the alleged breaching party.

  12.4 The foregoing notwithstanding, nothing herein shall release any party or counsel of their obligations under any protective order entered in the litigations settled hereby and all claims, causes of action, damages and remedies are reserved by the parties for any breach of such protective orders.

## 13. NON-ADMISSION

The agreement of the parties to the terms of this Settlement Agreement is not an admission of the truth of any allegations made by one against the other nor of any liability to each other. Acushnet does not admit the validity or enforceability of the Spalding Patent Rights nor the allegation that any of its previously manufactured Golf Balls infringed such rights, nor the validity of the allegations made by Spalding concerning the falsity of Acushnet's advertising. Further the agreement of Spalding to the terms of this Settlement Agreement is not an admission of any of the allegations made by Acushnet against Spalding nor of any liability by Spalding to Acushnet.

## 14. SUPERSESSION

This Settlement Agreement embodies the entire understanding of the parties with respect to the matters mentioned and supersedes all prior written or oral understandings or communications with regard to such matters, with the exception of Sections 1-10 and 12-15 of the November 15, 1990 Settlement Agreement.

-14-

15.   SUCCESSORS

This Settlement Agreement is binding upon the parties hereto, their affiliated, related and controlled companies, as well as their representatives and the successors, transferees and assigns of substantially all of their respective Golf Ball Businesses.

16.   EXPIRATION

This Settlement Agreement shall expire upon the expiration of the last to expire patent subject of this Settlement Agreement.

17.   EFFECTIVE DATE

This Settlement Agreement is effective the date of execution by the last party to execute it.

18.   GOVERNING LAW

This Settlement Agreement shall be governed by the laws of the State of Delaware without reference to conflicts of law, except where the law of the United States is controlling.

19.   DISPUTE RESOLUTION

  19.1   Any dispute arising out of or relating to patents, including the above mentioned patents, other intellectual property owned or controlled by the parties, or claims relating to advertising shall be resolved in accordance with the procedures specified in this Section, which shall be the sole and exclusive procedure for the resolution of any such disputes.

-15-

19.2    The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Settlement Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at higher level of management than the persons with direct responsibility for administration of this Settlement Agreement. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within 15 days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and the response shall include: (a) a statement of each party's position and a summary of arguments supporting that position, and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within 30 days after delivery of the disputing party's notice, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored.

19.3    If the matter has not been resolved by these persons within 45 days of the disputing party's notice, the dispute shall be referred to more senior executives of both parties who have authority to settle the dispute and who shall likewise meet to attempt to resolve the dispute.

19.4    All negotiations pursuant to item 19.2 and 19.3 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

19.5    If the dispute has not been resolved by negotiation within 45 days of the disputing party's notice, or if the parties fail to meet within 30 days, the parties shall endeavor to settle the dispute by non-binding mediation under the then current CPR Model Mediation

-16-

Procedure for Business Disputes in effect on the Effective Date of this Settlement Agreement. Unless otherwise agreed, the parties will select a mediator from the CPR Panels of Neutrals and shall notify CPR to initiate the selection process.

19.6   If the parties fail to achieve acceptable resolution of the dispute at conclusion of the foregoing steps, the dispute shall be referred to Magistrate Judge Mary Pat Trostle or, in the event Magistrate Judge Trostle is unavailable, another judge with authority to mediate disputes within the United States District Court for the District of Delaware.

19.7    At the conclusion of a referral to the Magistrate or other judge as set forth in

19.6, should the dispute remain unresolved, either party may initiate legal proceedings but only

in the United States District Court for the District of Delaware, and no other.   Said court

retains jurisdiction of the parties for such purposes.


IN WITNESS WHEREOF, the parties through their duly authorized agents, have executed this

Settlement Agreement.


Place:  Tampa, FL
Date:   7-31-96                           SPALDING & EVENFLO COMPANIES, INC.

Witness: Karen A Thomas              By: Gard L. Whiting

                                                         Its: President


Place:  Tampa, Fl
Date:   7/31/96                            LISCO, INC.

Witness: Donald R Bohn                By: (W) Michael Kypreht

                                                         Its: V.P. Treasurer


Place:  Fairhaven, MA
Date:   8-5-96                             ACUSHNET COMPANY

Witness: Joseph J. Newman             By: Robt S. Awl

                                                         Its: President


-18-

# Exhibit D

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.: **6,506,130**

Control No.: **95/000,122**

Inventor: Michael J. SULLIVAN

Issued: January 14, 2003

Appl. 09/832,154

Filed: April 10, 2001

Titled: **MULTI LAYER GOLF BALL**

**MAIL STOP *Inter Partes* REEXAMINATION**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## ACUSHNET'S OPPOSITION TO PATENT OWNER CALLAWAY'S PETITION TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS

Sir:

Third Party Requestor Acushnet Company ("Acushnet") files this Opposition to Patent Owner Callaway Golf's ("Callaway") Petition to Suspend Inter Partes Reexamination Proceedings under 37 C.F.R. §§ 1.181, 1.182, 1.183, 1.987 and 35 U.S.C. 314(c). A substantially identical copy of this response is being filed separately in connection with reexamination proceedings on U.S. Patent Nos. 6,210,293 (Control No. 95/000,120), 6,503,156 (Control No. 95/000,121), and 6,595,873 (Control No. 95/000,123).[1]

Callaway has requested that the Director suspend Acushnet's *inter partes* reexamination request in favor of litigation in an effort to circumvent the Patent Act. Congress enacted the *inter partes* reexamination statutes "to reduce expensive patent litigation in U.S. district courts by

---

[1] Although it appears that Callaway filed one petition with hopes that it would be considered in each of Acushnet's requests, this Opposition only addresses the '130 patent. *See* 37 C.F.R. § 1.4(b) ("Since each file must be complete

giving third-party requesters the option of *inter partes* reexamination proceedings in the PTO." 145 Cong. Rec. E1788-02, 1999 WL 593941 (Cong. Rec.) (Aug. 3, 1999). Callaway's petition to suspend is directly contrary to the intent of Congress in enacting the reexamination statute.

To the extent that Callaway's paper is properly filed under 37 C.F.R. § 1.937,[2] Callaway's petition should be **DENIED**.

## PROCEDURAL HISTORY

Acushnet filed the above-identified request for reexamination on January 17, 2006, after its attempts to resolve its dispute with Callaway failed.

On January 18, 2006, with the involvement of United States District Court Magistrate Judge Mary Pat Thynge, the parties agreed to attend a mediation session with Judge Thynge on February 8, 2006. For the sole purpose of facilitating that mediation, Acushnet sought a brief suspension of the request for reexamination. The mediation failed to produce a settlement. Acushnet then requested the withdrawal of its petition to suspend prosecution.[3] Acushnet seeks to have the above-filed reexamination proceedings instituted and to seek an adjudication of these issues in the PTO, as Congress envisioned in enacting the *inter partes* reexamination statute.

On February 9, 2006, Callaway sued Acushnet for infringement of these patents in the United States District Court for the District of Delaware (C.A. No. 06-91) on February 9, 2006. Callaway now seeks to suspend the earlier-filed reexamination proceedings in favor of that litigation.[4]

---

in itself, a separate copy of every paper to be filed in a patent application, patent file, or other proceeding must be furnished for each file to which the paper pertains ....")

[2] The PTO rules prohibit any "unauthorized papers" which address the merits of Acushnet's *inter partes* reexamination request. *See* 37 C.F.R. § 1.939 (b) ("Unless otherwise authorized, no paper shall be filed prior to the initial Office Action on the merits of the *inter partes* reexamination.) Callaway addresses the merits of Acushnet's *inter partes* reexamination request by discussing (1) Acushnet's test data in support of its request; and (2) secondary considerations to be considered under 35 U.S.C. § 103(a), including commercial success. Hence, Callaway's paper appears to be unauthorized.

[3] With respect to paragraph 2 on page 2 of Callaway's petition, Acushnet's petition to suspend action in each of the four *inter partes* reexamination proceedings. Based on a review of public PAIR, it appears that two of the petitions had not been matched with the appropriate files at the PTO. For the sake of completeness, those petitions are attached as **Exhibit A.**

[4] Callaway's statements in footnote 1 of Callaway's petition regarding communications between Acushnet and Callaway are factually incorrect. On January 17, 2006, Mr. Steven McCracken of Callaway and Mr. Joseph Nauman of Acushnet had a telephonic settlement discussion. At the conclusion of that discussion, Mr. McCracken

## I.   THE EQUITABLE DOCTRINE OF ASSIGNOR ESTOPPEL HAS NO BEARING ON THIS PROCEEDING

Callaway's argument that Acushnet is in privity with Callaway is wrong. Far from being in privity, Callaway has sued Acushnet in the United States District Court for the District of Delaware. In the Delaware litigation, Acushnet had pled that the Callaway patents are invalid and unenforceable. Callaway did not move to strike those defenses nor has it otherwise tried to raise the issue of assignor estoppel in the litigation. In fact, if Callaway were to present this argument in Court, Callaway would lose, as the federal courts have rejected Callaway's argument. *See Acushnet Co. v. Dunlop-Maxfli Sports Corp.*, Civ. A. No. 98-717-SLR, 2000 U.S. Dist. LEXIS 10123, * 12 (D. Del. Jun. 29, 2000) (discussed *infra*; **Exhibit B**).

Instead, Callaway asks the Director to find privity between Acushnet and Callaway, and to therefore stay the reexamination proceedings. Callaway asserts that because Mr. Sullivan, an inventor on the '130 patent is currently one of 28 Acushnet vice presidents,[5] Acushnet cannot challenge the validity of this patent. This position is unfounded.[6]

Acushnet is a part of a large, publicly traded, Fortune 500 company—Acushnet plainly is not the alter ego of Mr. Sullivan. Mr. Sullivan does not control or direct Acushnet. Therefore, Acushnet's hiring of Mr. Sullivan does not preclude Acushnet from challenging the validity of the subject patent. In addition, Mr. Sullivan was not involved with Acushnet's development of the Titleist® Pro V1™ golf balls (the allegedly infringing golf balls)—a factor that almost certainly would prevent the application of assignor estoppel to these facts.[7]

---

informed Acushnet that Callaway would file suit the following day, January 18th. As it had previously indicated to Callaway, Acushnet filed the requests for reexamination later the evening of January 17th. It was not until January 18th, after the requests were filed, that Mr. McCracken informed Mr. Nauman of Callaway's decision not to file litigation against Acushnet in favor of further mediation.

[5] Mr. Sullivan's correct title is Vice President Research & Development Product Development. He has held this position since April 1, 2005. Callaway's Petition incorrectly asserts that Mr. Sullivan "is ... the current Acushnet vice president of intellectual property." (Pet. at 5.)

[6] In fact, in 2002 the previous patent owner permitted Mr. Sullivan's involvement in assessing the strength of Spalding's patent portfolio, including the patents of the subject requests for reexamination—a position seemingly directly at odds with Callaway's estoppel position here.

[7] This presupposes that the meaning of "privies" in Rule 1.913 is a reference to the equitable doctrine of assignor estoppel. Acushnet does not necessarily agree with Callaway's conflation of this rule with that doctrine.

### A.    Acushnet and Callaway are Not in "Privity"

Callaway cites no authority to support the proposition that the judge-made doctrine of assignor estoppel applies in *inter partes* reexamination proceedings, wherein infringement is not an issue. Acushnet knows of no such authority. However, even if the doctrine of assignor estoppel were to be recognized in *inter partes* proceedings, this is surely not the case for the Director to recognize or apply this doctrine.

Callaway's arguments that the Director must suspend the *inter partes* reexamination of the above-identified patents because Acushnet hired Mr. Sullivan is obviously over-stated. No party would be able to challenge the validity of a competitor's patent when they have hired an inventor who worked for that competitor.

In the *Dunlop-Maxfli* case, Federal Judge Robinson in the Delaware Federal District Court recognized that to find a company was in privity with a competitor because the inventor was employed by the competitor would preclude "companies from competing for talented employees." *See Dunlop-Maxfli Sports*, 2000 U.S. Dist. LEXIS 10123, at* 12. There, the court concluded that:

> Extending the doctrine of assignor estoppel to defendant would punish it for hiring [the inventor of the patent-in-suit] and using his talents to compete with plaintiff. Assignor estoppel was not designed to prevent companies from competing for talented employees; rather it was intended to prevent the assignor (whether acting individually or through another entity) from "making [a] representation [of the patent's validity] at the time of assignment (to his advantage) and later … repudiating it (again to his advantage)."

*Id.* (citing *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir.1988).)

Callaway greatly exaggerates Mr. Sullivan's position within Acushnet and his financial stake in Acushnet in its misguided attempt to forestall this reexamination proceeding. Mr. Sullivan is one of **28 Vice Presidents** at Acushnet Company. He is not on the Board of Directors at Acushnet. The 28 Vice Presidents report to at least one of four Senior Vice Presidents, four Executive Vice Presidents, two Presidents, or Acushnet's one Chairman, and ultimately to the Company's shareholders. Redacted versions of Acushnet's organizational charts showing where Mr. Sullivan fits into Acushnet's employment structure are attached as

*In re* U.S. Patent No. 6,506,130
Control No. **95/000,122**
Page 5 of 9

**Exhibit C**. Thus, this case bears substantial similarities with the *Dunlop* case, where Judge Robinson found a lack of privity where:

> Defendant is not [the inventor's] corporate disguise. [The Inventor] owns an insignificant number of defendant's shares, he **does not sit on its board of directors**, and he holds **no sway over defendants finances or strategic decisions**. Although [the inventor] is a "Vice President of Research and Development," **the record reveals that there are twenty-six "Vice Presidents" in defendant's organizational structure** and, far from being second command as the title suggests, [the inventor] is subordinate to a "Managing Director of Research and Development."

*Dunlop-Maxfli Sports*, 200 U.S. Dist. LEXIS 10123 at 11-12 (emphasis added).

Suggesting that Mr. Sullivan is using Acushnet—a company founded in 1910—as his alter ego in connection with this request for reexamination is absurd. There is thus no basis to find that Mr. Sullivan is the alter ego of Acushnet.

**B.**    **Mr. Sullivan Was Not Involved With the Design or Production of the Allegedly Infringing Titleist® Pro V1™ Golf Balls**

In assessing the applicability of assignor estoppel, the case law requires that the Director look at "the equities dictated by the relationship between the inventor and company B *in light of the act of infringement*." *Shamrock Techs., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990) (emphasis added) (**Exhibit D**); *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998) (concluding that assignor estoppel applied because the defendant was "far more than a mere shareholder," and that the relationship between two companies was formed so that the defendant "would have the capacity it needed to manufacture the accused devices and to market them outside of France.") (**Exhibit E**); *see also Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) ("What is significant is whether the ultimate infringer availed itself of the inventor's "knowledge and assistance" to conduct infringement.") (**Exhibit F**.)

Callaway's federal court complaint, attached as **Exhibit G**, alleges that Acushnet's Titleist® Pro V1™ golf balls have infringed *inter alia*, the '130 patent since 2000. (**Exhibit G** at ¶ 19.) The Titleist® Pro V1™ golf balls have been available publicly since at least October 11, 2000. (**Exhibit H**.)    This product had been in development for years prior to its release. Mr.

Sullivan did not start work for Acushnet until after the accused Pro V1™ golf balls were on the market.[8] Because the Pro V1™ golf ball was released prior to his arrival at Acushnet, Mr. Sullivan had no substantial role in the development of the Titleist® Pro V1™ golf ball. Nor has had had any substantial role in the design of those golf balls since joining Acushnet. Thus, Mr. Sullivan's position at Acushnet in no way implicates the concerns that sometimes give rise to the equitable doctrine of assignor estoppel.

## II.   CALLAWAY'S OTHER GROUNDS FOR SUSPENDING THE REEXAMINATION PROCEEDINGS ARE CONTRARY TO STRONG PUBLIC POLICY CONSIDERATIONS FAVORING REEXAMINATION OVER LITIGATION

Callaway also contends that because Acushnet has (1) submitted a Rule 1.132 declaration that includes test data in support of Acushnet's reexamination request and (2) has presented evidence that the claims of the '130 patent are obvious under 35 U.S.C. § 103, that the reexamination must be suspended for some undisclosed length of time.[9]   If accepted, Callaway's arguments would lead to the subversion of the *inter partes* reexamination statute— contrary to clear Congressional intent. *See* 145 Cong. Rec. E1788-02, 1999 WL 593941 (Cong. Rec.) (Aug. 3, 1999) (*inter partes* reexamination is provided as a lower cost method of challenging patent validity when compared to litigation) (**Exhibit I**); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988) (concluding that an argument that the District Court will have a more complete record "ignores the advantages of a PTO reexamination," which is "neutral [because] the patentee and the public hav[e] an equal interest in the issuance and maintenance of valid patents." (emphasis added) (**Exhibit J**).)

### A.   The PTO Can Determine the Weight to be Given to Acushnet's Rule 1.132 Declarations

---

[8] In fact, Mr. Sullivan resigned from Top-Flite Golf on October 31, 1999—prior to the filing date of any of the patents upon which Acushnet now seeks reexamination. In fact, Mr. Sullivan was completely unaware of the applications upon which these patents were based prior to their issuance.

[9] Presumably Callaway is requesting that the Director suspend the reexamination indefinitely pending the outcome of the later-filed litigation. The litigation is in its earliest stages. An answer has been filed, but the Court has yet to enter a scheduling order and the resolution in Federal Court is likely years away.

Callaway's petition suggests that the PTO cannot effectively evaluate technical evidence submitted in connection with a Rule 1.132 declaration without the assistance of a district court. That the PTO in fact invites such objective evidence is undisputable. *See* M.P.E.P. § 716.01 *et seq.* (giving examples of types of Rule 1.132 declarations that Applicants may submit in connection with arguments for patentability). The PTO is completely capable of evaluating evidence submitted in declarations and nothing prevents Callaway from submitting declarations of their own.

To assert that the PTO cannot perform this function without a court's assistance ignores long-standing PTO practice and procedure. Thus, Callaway's petition should be denied.

### B.    Neither Callaway nor the PTO Need the District Court to Develop Evidence of Any Alleged Commercial Success

Callaway has represented to both a Federal Court and to the PTO that the alleged invention claimed in the '130 patent is commercially successful. For example, in its Complaint against Acushnet, Callaway asserted that it and the Top-Flite Golf Company "have both had success selling golf balls embodying" the '130 patent. (**Exhibit G** at ¶ 16.) Moreover, in connection with U.S. Patent Application No. 08/070,585, a parent application to the '130 patent, then patent owner Top-Flite submitted extensive evidence relating to alleged commercial success. (**Exhibit K**).

Now to avoid a hearing before this expert tribunal in the course of a procedure expressly provided by Congress, Callaway suddenly asserts that without the additional discovery, the PTO will not be able to make a "full and fair evaluation of patentability." (Pet. at 6.) Callaway, by its own conduct, including evidence that was previously submitted to the PTO during the course of obtaining this very patent has relied on the PTO to evaluate the significance of commercial success evidence in evaluating patentability.[10]

The PTO has been and continues to be fully capable of assessing the strength of commercial success evidence in weighing its import on the question of obviousness and nothing prevents Callaway from submitting a Rule 1.132 declaration in support of its commercial success

---

[10] Similar evidence supporting an allegation of commercial success was submitted by then patent owner Spalding/Top-Flite Golf Company in a number of applications in this patent family. *See, e.g.,* Appeal Brief filed

arguments. Simply because the PTO may need to evaluate evidence of commercial success, does not mean that this *inter partes* reexamination proceeding need be suspended. Thus, Callaway's petition should be denied.

### Conclusion

Callaway's petition must be denied as contrary to clear Congressional intent and as an attempt to subvert the Patent Act. For the reasons discussed above, each of Callaway's arguments fail to rise to the level of establishing "good cause" to suspend the *inter partes* reexamination proceedings. Thus, Acushnet respectfully requests that the Director **deny** Callaway's petition.

Acushnet hereby certifies that a copy of this Opposition has been served on the Patent Owner at the following address:

> The Top-Flite Company, A Wholly
> Owned Subsidiary of Callaway Golf Company
> 2180 Rutherford Road
> Legal Department
> Carlsbad, CA  92008-7328

A copy has also been sent via first class mail to the following address: [11]

> Dorothy P. Whelan
> Fish & Richardson P.C.
> P.O. Box 1022
> Minneapolis, MN 55440-1022

---

Aug. 22, 2001 at 12 (U.S. Pat. App. No. 08/714,661) (section entitled "The Significant Commercial Success of the Claimed Golf Ball Warrants Reversal of the Examiner's Rejection of Claims 1 and 14-32 as Being Obvious.")

[11] On March 22, 2006, Acushnet's counsel received a "courtesy copy" of a notice of change of power of attorney and correspondence address. This is the address provided in that notice.

*In re* U.S. Patent No. 6,506,130
Control No. **95/000,122**
Page 9 of 9

Acushnet does not believe that any fees are due in connection with this filing. However, the U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 08-3038 referencing docket number **00634.0004.RXUS02**.

Respectfully submitted,

Dated: March 24, 2006

Alan M. Grimaldi (Reg. No. 26,599)
Joseph P. Lavelle (Reg. No. 31,036)
Andrew R. Sommer (Reg. No. 53,932)
*Attorneys for Acushnet Company*

**Howrey LLP**
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6614 (telephone)
(202) 383-6610 (fax)