# EXHIBIT 1



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000122 | 01/17/2006 | 6506130 | |

Dorothy P. Whelan
Fish & Richardson
P. O. Box 1022
Minneapolis MN 55440-1022

| EXAMINER |
|---|
| Michael O'Neill |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

04/06/06

# *INTER PARTES* REEXAMINATION
# COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED
STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE
PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to
the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of
this communication.

PTOL-2071 (Rev.07-04)

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000122 | 01/17/2006 | 6506130 | |

| EXAMINER |
|---|
| Michael O'Neill |

Dorothy P. Whelan
Fish & Richardson
P. O. Box 1022
Minneapolis MN 55440-1022

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

04/06/06

# *INTER PARTES* REEXAMINATION
# COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED
STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE
PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to
the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of
this communication.

PTOL-2071 (Rev.07-04)



Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

ALAN M. GRIMaLDI
HOWREY LLP
1299 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,122*.

PATENT NUMBER *6,506,130*.

TECHNOLOGY CENTER *3900*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | [Control No.]95/000,122 | [Patent Under Reexamination]6506130 |
|---|---|---|
| | Examiner | Art Unit | |
| | Michael O'Neill | 3993 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION | Control No. 95/000,122 | Patent Under Reexamination 6506130 |
|---|---|---|
| | Examiner Michael O'Neill | Art Unit 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):     ☐ PTO-892     ☒ PTO-1449 or PTO/SB/08     ☐ Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☐ An Office action is attached with this order.

    ☒ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

DECISION GRANTING INTER PARTES REEXAMINATION

### *Substantial New Question of Patentability*

1.    A substantial new question of patentability affecting claims 1-6 of United States Patent Number 6,506,130 to Sullivan is raised by the present request for *inter partes* reexamination.

### *Extensions of Time*

2.    Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes* reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. § 314(c) requires that *inter partes* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937). Patent owner extensions of time in *inter partes* reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are not available for third party requester comments, because a comment period of 30 days from service of patent owner's response is set by statute. 35 U.S.C. § 314(b)(3).

### *Notification of Concurrent Proceedings*

3.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent 6,506,130 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2686 and 2686.04.

*Requester's Position*

4.    The request indicates that third party requester considers:

    a.    Claim 1 of the Sullivan patent to be unpatentable over:

        i.    Proudfit.

        ii.    Sullivan '831.

        iii.    Nesbitt alone, and Nesbitt taken with Molitor '637.

        iv.    Nesbitt taken with Wu.

        v.    Nesbitt taken with Molitor '751.

    b.    Claim 2 of the Sullivan patent to be unpatentable over:

        i.    Proudfit.

        ii.    Sullivan '831.

        iii.    Nesbitt.

    c.    Claim 3 of the Sullivan patent to be unpatentable over:

        i.    Proudfit.

        ii.    Sullivan '831.

        iii.    Nesbitt.

    d.    Claim 4 of the Sullivan patent to be unpatentable over:

        i.    Sullivan '831.

        ii.    Proudfit taken with Molitor '637.

        iii.    Proudfit taken with Wu.

        iv.    Proudfit taken with Molitor '751.

        v.    Nesbitt alone, and Nesbitt taken with Molitor '637.

        vi.    Nesbitt taken with Wu.

        vii.    Nesbitt taken with Molitor '751.

    e.    Claim 5 of the Sullivan patent to be unpatentable over:

        i.    Sullivan '831.

        ii.    Nesbitt alone, and Nesbitt taken with Molitor '637.

          iii.     Nesbitt taken with Wu.

          iv.     Nesbitt taken with Molitor '751.

          v.     Proudfit taken with Molitor '637.

          vi.     Proudfit taken with Wu.

          vii.     Proudfit taken with Molitor '751.

  f.     Claim 6 of the Sullivan patent to be unpatentable over:

          i.     Sullivan '831.

          ii.     Nesbitt alone, and Nesbitt taken with Molitor '637.

          iii.     Nesbitt taken with Wu.

          iv.     Nesbitt taken with Molitor '751.

          v.     Proudfit taken with Molitor '637.

          vi.     Proudfit taken with Wu.

          vii.     Proudfit taken with Molitor '751.

### Prosecution History of the Sullivan '130 patent

5.    United States Patent Number 6,506,130 issued from an application with the serial number of 09/832,154. Said '154 application was a continuation from application No. 08/870,585, filed on Jun. 6, 1997, now abandoned, which is a continuation of application No. 08/556,237, filed on Nov. 9, 1995, now abandoned, which is a continuation-in-part of application No. 08/542,793, filed on Oct. 13, 1995, now abandoned, which is a continuation-in-part of application No. 08/070,510, filed on Jun. 1, 1993, now abandoned.

6.    The "continuation" portion of this series of applications can be found on pages 41-42 within the 08/070,510 application where it states that:

> Composition D represents the inner layer (i.e. Surlyn 1605) used in
> U.S. Patent No. 4,431,193. Composition E provides a hard, low acid
> ionomeric resin [as the inner layer]. The purpose behind producing
> and testing the balls of Table IV [Table 7] was to provide a subsequent
> comparison in properties with the multi-layer golf balls of the present
> invention [which are high acid ionomer resin inner cover layer with

lower acid ionomer resin to the known prior art golf balls which are
constructed with a low acid ionomer resin inner cover layers of balls D
and E].

Molded intermediate Ball D in Table IV (7) is the intermediate ball (the inner layer
molded onto a solid core) for the Nesbitt '193 patent. Molded intermediate Ball E in
Table IV (7) has as its intermediate ball an ionomer blend of Iotek 7030 and 8000. The
'510 application then concludes on page 45:

> ... it is also noted that the use of the high acid ionomer
> resins as the inner cover material produces a substantial
> increase in the finished balls overall distance properties. In
> this regard, the high acid ionomer resin inner covers of
> balls 1-3 produce an increase of approximately 10 points in
> C.O.R. [coefficient of restitution] over the low acid
> ionomer resin inner covers of balls 4 and about a 25 points
> increase over the prior art balls 5. Since an increase in 3 to
> 6 points in C.O.R. results in an average increase of about 1
> yard in distance, such an improvement is deemed to be
> significant.

It should be noted that the '510 application lacks providing a finished ball using the
molded intermediate Ball E constructed of an ionomer blend of Iotek 7030 and 8000.
Instead, the '510 application uses only the molded intermediate Ball D which is
constructed out of Surlyn 1605 as the finished balls 4 and 5 in Table 8 which are the prior
art balls taught in the Nesbitt. Thus, the '510 appears to lack a finished ball embodiment
description constructed with an inner layer made from two ionomer blends with said
claimed mechanical properties of Shore D hardness, flexural modulus and thickness and
an outer layer made of a polyurethane material with said claimed mechanical properties
of Shore D hardness, flexural modulus and thickness. Instead, the '510 application
discloses only a molded intermediate Ball E made from a 50/50 blend of two ionomers
known as Iotek 7030 and 8000 as shown in Table IV (7) on pages 41-42.

7.    The next application in the chain where the claimed invention could be adequately
describe and enabled is application No. 08/542,793 ('793 application), which is a
continuation-in-part to the '510 application. On page 39, the '793 application discloses:

> "Top Grade" or "TG" is a low acid inner cover ionomer
> resin blend comprising 70.6% Iotek 8000, 19.9% Iotek
> 7010 and 9.6% white masterbatch.

This disclosure describes the claimed inner cover being of two low acid ionomer blends. The outer layer is described in the '793 application as consisting of ionomer resins and non-ionomeric thermoplastic elastomers. Therefore, the inner layer claimed in the '293 patent is described and enabled on the date of filing of the '793 application which is Oct. 13, 1995, and the outer layer claimed in the '130 Patent.

8.      Therefore, based on the above analysis regarding the disclosures of the parent applications of which the Sullivan '130 patent claims 35 U.S.C. § 120 benefit, the inventions claimed in claims 1-6 of **the Sullivan '130 patent have a critical date for purposes of prior art patents and printed publications of Oct. 13, 1995.**

### *The Requester's Position that the '130 Patent lacks Copendency*

9.      The request indicates on pages 12 and 13 that the '130 Patent is not an appropriate continuation application because it lacks copendency because application No. 08/870,585 went abandoned on Feb. 7, 2001 when the Applicant failed to file an appeal brief with two months of a notice of appeal. However, a review of the Office's records show that the Applicant filed a one month extension of time; an additional two months extension of time; and a notice of appeal which provides an Applicant with two months of time. Therefore, the Applicant extended the response time to the final rejection for five months which allow the Applicant to file a response to the final rejection up until April 13, 2001. Application No. 09/832,154, the application to which the '130 Patent issued therefrom, was filed on April 10, 2001. Therefore, the Patent Owner of the '130 Patent maintained proper copendency between the '585 application and the '154 application.

*Substantial New Question vel non*

10.    The substantial new questions of patentability with respect to Nesbitt for claims 1-6 are based solely on patents and/or printed publications already cited/considered in an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> The existence of a substantial new question of patentability
> is not precluded by the fact that a patent or printed
> publication was previously cited by or to the Office or
> considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, there exists a SNQ based solely on Nesbitt (USPN 4,431,193). Nesbitt alone was applied and is now being looked at in a new light. Proudfit, Molitor '637, Molitor '751, and Wu were cited and considered, but not applied. A discussion of the specifics now follows:

## RE. CLAIM 1

### *1. Proudfit*

11.    It is agreed that the consideration of Proudfit raises a SNQ as to claim 1 of the Sullivan patent. The above explanation of the prosecution history of the Sullivan patent, taken with the analysis of the prosecution history of Proudfit set forth below, will lead to the conclusion that the Proudfit patent qualifies as a prior art patent under 35 U.S.C. § 102(b) thus raising a SNQ as to the claims of the Sullivan patent. Because Proudfit was

utilized as a § 102(e) reference in a § 103(a) rejection against the claims in the parent application No. 08/870,585 as evidenced by the acceptance of a Rule 131 declaration withdrawing the Proudfit reference (see Paper #24, mailed 12-7-99), viewing the Proudfit patent as 35 U.S.C. §102(b) prior art that cannot be antedated under 37 CFR 1.131 is a consideration of the teachings in Proudfit in a "new light."

12.     Proudfit has a filing date of Jun. 29, 1992 and is a continuation-in-part of Ser. No. 07/733,789, ('789 application) filed on Jul. 26, 1991, now abandoned. A review of the '789 application appears to not adequately describe and enable an invention of a golf ball having a solid core, an inner layer cover and an outer layer cover. Instead, the '789 application appears to describe and enable a golf ball with a solid core and a single cover layer; instead of the inner and outer cover layers shown in Proudfit's figures 1 and 2. Therefore, Proudfit's teachings of a golf ball having a solid core, an inner layer and outer layer has the effective filing date of Jun 29, 1992; the date of filing the Proudfit application which issued into the Proudfit patent. Proudfit issued on May 24, 1994. The claimed inventions within the Sullivan '130 patent have the critical date of Oct. 13, 1995, more than one year after issuance of the Proudfit patent.

13.     Thus, it is agreed as stated in the request on pages 15-17 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material.

Req. at page 15. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skilled in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22 teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 and a cover 12

which comprises a relatively hard inner layer 13 of one or more ionomer resins and a
relatively soft outer layer 14 of polymeric material as taught in col. 7:21-24. Table 6 in
Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910
which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. Proudfit in
column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit
in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata
and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness
preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of
a relatively soft polyurethane material. Further, there is a substantial likelihood that a
reasonable examiner would consider these teachings important in deciding whether or not
the claim is patentable. Accordingly, Proudfit raises a substantial new question of
patentability as to claim 1, which question has not been decided in a previous
examination of the Sullivan patent.

### 2. Sullivan '831

14.    It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 1
of the Sullivan patent. In light of the explanation of the prosecution history of the
Sullivan patent as to copendency set forth in paragraph 8 above, Sullivan '831 is not prior
art.

### 3. Nesbitt alone, and Nesbitt taken with Molitor '637

15.    It is agreed that the consideration of Nesbitt alone, or Nesbitt and Molitor '637
taken together raises a substantial new question of patentability (SNQ) as to claim 1 of
the Sullivan patent. As pointed out on pages 14-18 of the request, Nesbitt teaches a two
piece golf ball having a solid core with a cover including "an inner layer 14 of hard, high
flexural modulus resinous material" and an "outer layer ... 16 of soft, low flexural
modulus resin." See Nesbitt, col. 1:20-25. Nesbitt also teaches having the inner layer 14
of cellular or non-cellular hard, high flexural modulus resinous material of a thickness in
the range of .020 to .070 inches; while having the outer layer 16 of cellular or non-
cellular soft, low flexural modulus resinous material of a thickness in a range of .020 and

.100 inches. Nesbitt further teaches a suitable material for the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of commercially available Surlyn resins". In this table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a source for potential cellular compositions that may be employed in the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637
> which describes a number of foamable [cellular]
> compositions of a character which may be employed for
> one or both layers 14 and 16 of the golf ball of this
> invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the layer covering the solid core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer 14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming or one or the other or both layers may be altered to provide a variation in the coefficient of restitution of the golf ball. These teachings of viewing Nesbitt alone and

Nesbitt and Molitor '637 taken together were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, is considered to raise a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent. Further, Nesbitt and Molitor '637 taken together are considered to raise a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 4. Nesbitt taken with Wu

16.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to claim 1 of the Sullivan patent. The request on pages 18 and 19 considers that Nesbitt alone teaches the use of a particular soft polyurethane material for use as the outer layer 16. However, it should be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to such sensations and polyurethane covered golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637 taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 5  Nesbitt taken with Molitor '751

17.     It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ

as to claim 1 of the Sullivan patent. As pointed out on pages 20 and 21 of the request,

Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece

golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a

thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a

Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment

in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the

urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a

substantial likelihood that review of the scientific literature would be needed to equate

the Shore D hardness to the Shore C of this blend. These teachings of viewing Nesbitt

taken with Molitor '751 were not present in the prosecution of the application which

became the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim

is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new

question of patentability as to claim 1, which question has not been decided in a previous

examination of the Sullivan patent.

## RE. CLAIM 2

### 1. Proudfit

18.     It is agreed that consideration of Proudfit raises a SNQ as to claim 2 of the

Sullivan patent. Claim 2 is dependent upon claim 1. Claim 2 limits the inner layer

thickness within the range of 0.100 to 0.010 inches thick; the outer layer thickness within

the range of 0.010 and 0.070 and the overall ball diameter at least 1.680 inches. As

pointed out in the request on pages 29-30, Proudfit has a preferred embodiment of a

multilayer golf ball with an inner layer being 0.037 inches thick; an outer layer being

0.0525 inches thick; and an overall diameter of 1.680 inches. See Proudfit, col. 7:40-47.

These teachings of Proudfit were not present in the prosecution of the application that

issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim
is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to
claim 2, which question has not been decided in a previous examination of the Sullivan
patent.

### 2. Sullivan '831

19.     It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 2
of the Sullivan patent. With the above explanation of the prosecution history of the
Sullivan patent dealing with copendency Sullivan '831 is not prior art.

### 3. Nesbitt

20.     It is agreed that consideration of Nesbitt raises a SNQ as to claim 2 of the Sullivan
patent. Claim 2 is dependent upon claim 1. Claim 2 limits the inner layer thickness
within the range of 0.100 to 0.010 inches thick; the outer layer thickness within the range
of 0.010 and 0.070 and the overall ball diameter at least 1.680 inches. As pointed out in
the request on pages 31-32, Nesbitt teaches the inner layer thickness being between 0.020
and 0.070 inches (Nesbitt, col. 3:19-23); the outer layer thickness being between 0.020
and 0.100 inches (Nesbitt, col. 3:22-25) and the minimum diameter of 1.680 inches
(Nesbitt, col. 2:50-52). These teachings of Nesbitt were not present during the
prosecution of the application which issued as the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider these teachings
important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises
a substantial new question of patentability as to claim 2, which question has not been
decided in a previous examination of the Sullivan patent.

## RE. CLAIM 3

### 1. Proudfit

21.     It is **not agreed** that Proudfit in combination with other references teach all of the
limitation of claim 3. Proudfit's preferred embodiment's inner layer is 0.037 inches
thick, see col. 7:43-44. Claim 3 requires the inner layer to be about 0.050 inches thick.

Those skilled in the art measure thickness to the thousandths of an inch. The difference between the Proudfit preferred embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch. This difference equates to a difference of a factor of ten. Further, the requester admits that it is not the chemical but the mechanical properties of the materials used in making golf balls important to those skilled in the art. One of the mechanical properties in constructing a golf ball with materials is the thickness to make a given layer. Therefore, a reasonable examiner would not consider this teaching important in deciding whether or not the claim is patentable. Thus, Proudfit singly or in combination with the other references does not raise a SNQ with respect to claim 3.

### 2. Sullivan '831

22.    It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 3 of the Sullivan patent. With the above explanation of the prosecution history of the Sullivan patent dealing with copendency Sullivan '831 is not prior art.

### 3. Nesbitt

23.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 6 of the Sullivan patent. Claim 3 is dependent upon claim 1. Claim 3 limits the inner and outer cover thickness to 0.050 inches and 0.055, respectively. As pointed out in the request on pages 35-36, Nesbitt teaches that a preferred embodiment has an outer layer of 0.0575 inch thickness. If the standard USGA golf ball has an overall minimum diameter of 1.680 inches and Nesbitt in col. 3:29 teaches that a preferred solid core plus inner thickness diameter is 1.565 inches, then Nesbitt inner layer thickness to match the preferred outer layer and solid core diameter in order to yield a total diameter of 1.680 inches would be about 0.0525 inches to be within the given inner layer range of between 0.020 to 0.070 inches. These teachings of viewing Nesbitt were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of

patentability as to claim 3, which question has not been decided in a previous
examination of the Sullivan patent.

## RE. CLAIM 4

### 1. Sullivan '831

24.    It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 4
of the Sullivan patent. With the above explanation of the prosecution history of the
Sullivan patent dealing with copendency Sullivan '831 is not prior art.

### 2. Proudfit taken with Molitor '637

25.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a
SNQ as to claim 4 of the Sullivan patent. Claim 4 depends from claim 1 and limits the
group of non-ionomeric thermoplastic and thermosetting elastomers to polyurethane. As
stated in the request on pages 37-39 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material.

Req. at page 37. See Proudfit, Abstract and col. 5:43-52. The examiner is making an
editorial note to the request's statement regarding a "three-piece" ball. Those skilled in
the art understand the term "three-piece ball" to constitute a small solid or liquid inner
core with a wound core around the inner core and a cover secured to the wound core.
Those skilled in the art understand the term "two-piece ball" to constitute a large solid
core with a cover layer secured to the core. This cover layer can either constitute one or
multiple layers. For instance, Proudfit as correctly quoted in the request on page 22
teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that
Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 and a cover 12
which comprises a relatively hard inner layer 13 of one or more ionomer resins and a
relatively soft outer layer 14 of polymeric material as taught in col. 7:21-24. Table 6 in
Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910
which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. Proudfit in

column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit
in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata
and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness
preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of
a relatively soft polyurethane material. However, in an analogous golf ball Molitor '637
teaches the use of a polyurethane material as the outer layer, that material being Estane
58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the
specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR)
means a more elastic collision and the farther the ball will travel when struck by the club
face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression
value on a Riehle machine equates to a finished golf ball having better spin control
characteristics when struck by the club face because more of the ball contacts the ridges
on the club face which imparts the back spin on the ball; and 3) the lower the rebound
distance equates to more force need to impart motion on the ball when putting creating a
"deadening effect similar to balata covered balls" which has been shown to decrease
margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-
65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750;
compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the
COR, compression (COMP) and rebound distance (RD) for all finished balls having the
solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|-------|-------------|----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |

| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

26.     Example 18 is taught as having its cover made from a polyurethane material, see
col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16
has a lower COR and lower rebound distance; which teaches the polyurethane material of
example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to
a balata covered ball. Balata is known in the art to be a soft material because it is similar
to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively
soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as
a cover layer to a solid core golf ball. This teaching as to the relative soft polyurethane
material as a substitute for the outer cover layer of Proudfit was not present in the
prosecution of the application which issued as the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider this teaching important
in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with
Molitor '637 raises a substantial new question of patentability as to claim 4, which
question has not been decided in a previous examination of the Sullivan patent.

### 3. Proudfit taken with Wu

27.     It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to
claim 4 of the Sullivan patent. Claim 4 depends from claim 1 and limits the group of
non-ionomeric thermoplastic and thermosetting elastomers to polyurethane. As pointed
out in the request on page 39, Proudfit teaches a golf ball having a multi-layer cover that
is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover
layer. Req. at 39. As known in the art, balata covered balls have durability problems.
However, golfers prefer the balata covered ball not because of the balata chemical
composition itself, but because the material provides a certain "click" and "feel" to the
golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the

mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered ball, any material would be acceptable to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover because it lacks the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 4  *Proudfit taken with Molitor '751*

28.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to claim 4 of the Sullivan patent. Claim 4 depends from claim 1 and limits the group of non-ionomeric thermoplastic and thermosetting elastomers to polyurethane. As pointed out in the request on page 41 and as also discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 41. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata covered ball not because of the balata chemical composition itself, but because the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel"

similar to a balata covered ball, any material would be accepted to a golfer. As pointed out on pages 41 and 42 of the request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Nesbitt alone, and Nesbitt and Molitor '637 taken together

29.     It is agreed that the consideration of Nesbitt alone, and consideration of Nesbitt and Molitor '637 taken together, each raises a substantial new question of patentability (SNQ) as to claim 4 of the Sullivan patent. Claim 4 depends from claim 1 and limits the group of non-ionomeric thermoplastic and thermosetting elastomers to polyurethane. As pointed out on pages 42-44 of the request, Nesbitt teaches a two piece golf ball having a solid core with a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Nesbitt teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a range of .020 and .100 inches. Nesbitt solely teaches a suitable material for the inner layer 14 being a thermoplastic resin

designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now designated
Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains an admission that Surlyn
8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt
solely teaches a suitable material for the outer layer 16 is a thermoplastic resin designated
Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now
designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is
a soft, low flexural modulus resinous material. Moreover, the Sullivan patent admits in
Table 1, found in col. 8, the "typical properties of commercially available Surlyn resins".
In this table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt
refers to Molitor '637 as a source for potential cellular compositions that may be
employed in the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637
> which describes a number of foamable [**cellular**]
> compositions of a character which may be employed for
> one or both layers 14 and 16 of the golf ball of this
> invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two
compositions of Surlyn, one of which is Surlyn 1605 and an example of using a
polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637
teaches that the average thickness of the layer covering the solid core is 0.090 inches.
Nesbitt also teaches the inner, intermediate or first layer 14 on the core 12 may be
slightly foamed to a low degree so as not to materially affect the coefficient of restitution
of the material. Nesbitt further teaches the outer or cover or second layer 16 may be
foamed to a greater degree than the inner layer 14 as the material of the layer 16 is
comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular
and the outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through
the use of foamable material for the first layer 14, the cover layer 16 or both layers, the
degree of foaming or one or the other or both layers may be altered to provide a variation
in the coefficient of restitution of the golf ball. Viewing the teachings of Nesbitt alone, it
is clear that these teachings were not present in the prosecution of the application which
became the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim is patentable. Also, the teachings of Nesbitt and Molitor '637 taken together were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, and Nesbitt and Molitor '637 taken together raise a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

## 2. Nesbitt taken with Wu

30.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to claim 4 of the Sullivan patent. The request on pages 44 and 45 considers Nesbitt solely teaches the use of a particular soft polyurethane material for use as the outer layer 16. However, it should be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to such sensations and polyurethane covered golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637 taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

31.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ
as to claim 4 of the Sullivan patent. Claim 4 depends from claim 1 and limits the group
of non-ionomeric thermoplastic and thermosetting elastomers to polyurethane. As
pointed out on pages 46 and 47 of the request, Molitor '751 explains the advantages of
using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor
'751 teaches the material consists of a blend of a thermoplastic urethane having a Shore
A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see
col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across
columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the
ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review
of the scientific literature would be needed to equate the Shore D hardness to the Shore C
of this blend. These teachings of viewing Nesbitt taken with Molitor '751 were not
present in the prosecution of the application which became the Sullivan patent. Further,
there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the claim is patentable. Accordingly,
Nesbitt taken with Molitor '751 raises a substantial new question of patentability as to
claim 4, which question has not been decided in a previous examination of the Sullivan
patent.

## RE. CLAIM 5

### 1. Sullivan '831

32.    It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 5
of the Sullivan patent. With the above explanation of the prosecution history of the
Sullivan patent dealing with copendency Sullivan '831 is not prior art.

### 2. Nesbitt and Nesbitt and Molitor '637

33.    It is agreed that the consideration of Nesbitt alone and consideration of Nesbitt
and Molitor '637 taken together, each raises a substantial new question of patentability

(SNQ) as to claim 5 of the Sullivan. As pointed out in the request on pages 51-53,
Nesbitt teaches a two piece golf ball having a solid core, figure 1 and col. 2:33 teach the
core shaped as a sphere, with a cover including "an inner layer 14 of hard, high flexural
modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin."
See Nesbitt, col. 1:20-25. Moreover, the outer layer 16 is taught to be dimpled, see
figures 1 and 2 and col. 2:48-49. Furthermore, Nesbitt teaches the inner layer is molded
over the core to form an intermediate ball, see Nesbitt col. 2:34-37. Nesbitt also teaches
having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous
material of a thickness in the range of .020 to .070 inches; while having the outer layer 16
of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a
range of .020 and .100 inches. Nesbitt further teaches a suitable material for the inner
layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits
Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent
contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous
material, see col. 2:54. Also, Nesbitt *alone* teaches a suitable material for the outer layer
16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an
admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the
Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material.
Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of
commercially available Surlyn resins". In Table 1, found in col. 8, the Sullivan patent
admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table Surlyn 8940
is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as
a source for potential cellular compositions that may be employed in the inner and outer
layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637
> which describes a number of foamable [**cellular**]
> compositions of a character which may be employed for
> one or both layers 14 and 16 of the golf ball of this
> invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two
compositions of Surlyn, one of which is Surlyn 1605 and an example of using a

polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637
teaches that the average thickness of the layer covering the solid core is 0.090 inches.
Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in
covering the solid core. There is a substantial likelihood that review the technical
properties of the polyurethane used in Molitor '637 would be needed via product
information sheets or the like. Nesbitt teaches the inner, intermediate or first layer 14 on
the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second
layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the
layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or
noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt
teaches through the use of foamable material for the first layer 14, the cover layer 16 or
both layers, the degree of foaming or one or the other or both layers may be altered to
provide a variation in the coefficient of restitution of the golf ball. The teachings of
Nesbitt alone, and the teachings of Nesbitt and Molitor '637 taken together, were not
present and considered on the record during the prosecution of the application which
became the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim
is patentable. Accordingly, Nesbitt alone, and Nesbitt and Molitor '637 taken together,
are each a basis for concluding that these references raise a substantial new question of
patentability as to claim 5, which question has not been decided in a previous
examination of the Sullivan patent.

### 3. Nesbitt taken with Wu

34.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ
as to claim 5 of the Sullivan patent. The request on pages 55-56 considers Nesbitt solely
teaches the use of a particular soft polyurethane material for use as the outer layer 16.
However, a closer reading of Nesbitt teaches that Nesbitt references the covers taught
Molitor '637 can be used as materials for the covers taught in Nesbitt. See Nesbitt, col.

3:56-60. Molitor '637 teaches the use of particular polyurethane materials for the use as
an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf
ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the
"click" and "feel" of balata which golfers have become accustomed to such sensations
and polyurethane covered golf balls can be made to have a similar "click" and "feel" of
balata. Wu also at least teaches that polyurethanes made according to its invention will
have Shore D hardness directly proportional to the degree of cure of the cover; and this
Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col.
6:26-38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane;
thus, there is a substantial likelihood that a review the mechanical characterization
literature would be needed to determine the flexural modulus of the taught polyurethane
material in Wu. These teachings of viewing Nesbitt mentioning Molitor '637 taken with
Wu were not present in the prosecution of the application which became the Sullivan
patent. Further, there is a substantial likelihood that a reasonable examiner would
consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new
question of patentability as to claim 5, which question has not been decided in a previous
examination of the Sullivan patent.

### 4. Nesbitt taken with Molitor '751

35.     It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ
as to claim 5 of the Sullivan patent. As pointed out on pages 57 and 58 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment
in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the
urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a
substantial likelihood that review of the scientific literature would be needed to equate

the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the specific flexural modulus of the taught polyurethane; thus, a reasonable examiner would have to review the chemical literature to determine the flexural modulus of the taught polyurethane material in Molitor '751. These teachings of viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of patentability as to claim 5, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Molitor '637

36.     It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to claim 5 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is discussed above at item 11 and incorporated herein. It is agreed as stated in the request on pages 58-61 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material.

Req. at page 58. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skill in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 (spherical see figures) and a cover 12 which comprises a

relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
layer 14 (with dimples see figures) of polymeric material as taught in col. 7:21-24. Table
6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910
which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As
admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus
of 51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable
0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either
balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46,
teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in
teaching the outer cover being made of a relatively soft polyurethane material. Although,
Proudfit teaches that its soft elastomer material as a flexural modulus in the range of
about 20,000 to 25,000 psi, see col. 6:28-31. However, in an analogous golf ball Molitor
'637 teaches the use of a polyurethane material as the outer layer, that material being
Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the
specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR)
means a more elastic collision and the farther the ball will travel when struck by the club
face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression
value on a Riehle machine equates to a finished golf ball having better spin control
characteristics when struck by the club face because more of the ball contacts the ridges
on the club face which imparts the back spin on the ball; and 3) the lower the rebound
distance equates to more force need to impart motion on the ball when putting creating a
"deadening effect similar to balata covered balls" which has been shown to decrease
margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-
65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750;
compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the
COR, compression (COMP) and rebound distance (RD) for all finished balls having the
solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|-----|-------------|------------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

37.     Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. However, Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in covering the solid core. Thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material used in Molitor '637. This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a

substantial new question of patentability as to claim 5, which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Wu

38.     It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 5 of the Sullivan patent. As pointed out in the request on pages 62-63, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 62. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material in Wu. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly,

Proudfit taken with Wu raises a substantial new question of patentability as to claim 5,
which question has not been decided in a previous examination of the Sullivan patent.

### 7. Proudfit taken with Molitor '751

39.     It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ
as to claim 5 of the Sullivan patent. As pointed out in the request on pages 64-65 and as
also discussed above Proudfit teaches a golf ball having a multi-layer cover that is
constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer.
Req. at 64. As known in the art, balata covered balls have durability problems.
However, golfers prefer the balata cover ball not because of the balata chemical
composition itself; but the material provides a certain "click" and "feel" to the golfer
upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical
properties associated with the material being used in the manufacture of the ball's cover.
So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any
material would be accepted to a golfer. As pointed out on pages 64 and 65 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment
in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the
urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a
substantial likelihood that review of the scientific literature would be needed to equate
the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the
specific flexural modulus of the taught polyurethane; thus, there is a substantial
likelihood that a review of the mechanical characterization literature would be needed to
determine the flexural modulus of the taught polyurethane material in Molitor '751.
These teachings of viewing Proudfit taken with Molitor '751 were not present in the
prosecution of the application which became the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider these teachings

important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken
with Molitor '751 raises a substantial new question of patentability as to claim 5, which
question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 6

### 1. Sullivan '831

40.    It is **not agreed** that the consideration of Sullivan '831 raises a SNQ as to claim 6
of the Sullivan patent. With the above explanation of the prosecution history of the
Sullivan patent dealing with copendency Sullivan '831 is not prior art.

### 2. Nesbitt alone, and Nesbitt and Molitor '637

41.    It is agreed that the consideration of Nesbitt alone, and consideration of Nesbitt
and Molitor '637 taken together, each raises a substantial new question of patentability
(SNQ) as to claim 6 of the Sullivan. As pointed out in the request on pages 69-71,
Nesbitt teaches a two piece golf ball having a solid core, figure 1 and col. 2:33 teach the
core shaped as a sphere, with a cover including "an inner layer 14 of hard, high flexural
modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin."
See Nesbitt, col. 1:20-25. Moreover, the outer layer 16 is taught to be dimpled, see
figures 1 and 2 and col. 2:48-49. Furthermore, Nesbitt teaches the inner layer is molded
over the core to form an intermediate ball, see Nesbitt col. 2:34-37. Nesbitt solely
teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus
resinous material of a thickness in the range of .020 to .070 inches; while having the outer
layer 16 of cellular or non-cellular soft, low flexural modulus resinous material of a
thickness in a range of .020 and .100 inches. Nesbitt also teaches a suitable material for
the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan
patent admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the
Sullivan patent contains an admission that Surlyn 8940 is a hard, high flexural modulus
resinous material, see col. 2:54. Further, Nesbitt teaches a suitable material for the outer
layer 16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also

contains an admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63.
Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous
material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical
properties of commercially available Surlyn resins". In Table 1, found in col. 8, the
Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this
table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers
to Molitor '637 as a source for potential cellular compositions that may be employed in
the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637
> which describes a number of foamable [cellular]
> compositions of a character which may be employed for
> one or both layers 14 and 16 of the golf ball of this
> invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two
compositions of Surlyn, one of which is Surlyn 1605 and an example of using a
polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637
teaches that the average thickness of the layer covering the solid core is 0.090 inches.
Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in
covering the solid core. There is a substantial likelihood that review the technical
properties of the polyurethane used in Molitor '637 would be needed via product
information sheets or the like. Nesbitt teaches the inner, intermediate or first layer 14 on
the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second
layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the
layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or
noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt
teaches through the use of foamable material for the first layer 14, the cover layer 16 or
both layers, the degree of foaming or one or the other or both layers may be altered to
provide a variation in the coefficient of restitution of the golf ball. These teachings of
Nesbitt alone, and the teachings of Nesbitt and Molitor '637 taken together, were both not
present in the prosecution of the application which became the Sullivan patent. Further,

there is a substantial likelihood that a reasonable examiner would consider these teachings in Nesbitt alone and the teachings of Nesbitt taken with Molitor '637 important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, and Nesbitt and Molitor '637 taken together, each provide a rationale that raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Wu

42.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to claim 6 of the Sullivan patent. The request on pages 72-74 considers Nesbitt solely teaches the use of a particular soft polyurethane material for use as the outer layer 16. However, a closer reading of Nesbitt teaches that Nesbitt references the covers taught Molitor '637 can be used as materials for the covers taught in Nesbitt. See Nesbitt, col. 3:56-60. Molitor '637 teaches the use of particular polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to such sensations and polyurethane covered golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material in Wu. These teachings of viewing Nesbitt mentioning Molitor '637 taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new

Application/Control Number: 95/000,122
Case 1:06-cv-00091-SLR   Document 66-2   Filed 11/21/2006   Page 39 of 89
Art Unit: 3993

Page 33

question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### 4. Nesbitt taken with Molitor '751

43.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to claim 6 of the Sullivan patent. As pointed out on pages 74 and 75 of the request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the specific flexural modulus of the taught polyurethane; thus, a reasonable examiner would have to review the chemical literature to determine the flexural modulus of the taught polyurethane material in Molitor '751. These teachings of viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Molitor '637

44.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to claim 6 of the Sullivan patent. The explanation of how Proudfit constitutes a

prior art patent is discussed above at item 11 and incorporated herein. It is agreed as
stated in the request on pages 76-79 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material.

Req. at page 76. See Proudfit, Abstract and col. 5:43-52. The examiner is making an
editorial note to the request's statement regarding a "three-piece" ball. Those skilled in
the art understand the term "three-piece ball" to constitute a small solid or liquid inner
core with a wound core around the inner core and a cover secured to the wound core.
Those skill in the art understand the term "two-piece ball" to constitute a large solid core
with a cover layer secured to the core. This cover layer can either constitute one or
multiple layers. For instance, Proudfit as correctly quoted in the request on page 22, as
pointed out above in this decision, teaches a golf ball having a two-layer cover, see
Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which
includes a solid core 11 (spherical see figures) and a cover 12 which comprises a
relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
layer 14 (with dimples see figures) of polymeric material as taught in col. 7:21-24. Table
6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910
which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As
admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus
of 51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable
0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either
balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46,
teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in
teaching the outer cover being made of a relatively soft polyurethane material. Although,
Proudfit teaches that its soft elastomer material as a flexural modulus in the range of
about 20,000 to 25,000 psi, see col. 6:28-31. However, in an analogous golf ball Molitor
'637 teaches the use of a polyurethane material as the outer layer, that material being
Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the
specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR)

means a more elastic collision and the farther the ball will travel when struck by the club
face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression
value on a Riehle machine equates to a finished golf ball having better spin control
characteristics when struck by the club face because more of the ball contacts the ridges
on the club face which imparts the back spin on the ball; and 3) the lower the rebound
distance equates to more force need to impart motion on the ball when putting creating a
"deadening effect similar to balata covered balls" which has been shown to decrease
margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-
65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750;
compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the
COR, compression (COMP) and rebound distance (RD) for all finished balls having the
solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---|---|---|---|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

45.    Example 18 is taught as having its cover made from a polyurethane material, see
col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16
has a lower COR and lower rebound distance; which teaches the polyurethane material of
example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to
a balata covered ball. Balata is known in the art to be a soft material because it is similar

to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. However, Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in covering the solid core. Thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material used in Molitor '637. This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Wu

46.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 6 of the Sullivan patent. As pointed out in the request on page 81-82, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 81. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. *Id* Thus, Wu proposes employing a polyurethane material as a cover

layer for a golf ball. Wu also at least teaches that polyurethanes made according to its
invention will have Shore D hardness directly proportional to the degree of cure of the
cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore
D scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus of the
taught polyurethane; thus, there is a substantial likelihood that a review the mechanical
characterization literature would be needed to determine the flexural modulus of the
taught polyurethane material in Wu. These teachings of viewing Proudfit taken with Wu
were not present in the prosecution of the application which became the Sullivan patent.
Further, there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the claim is patentable. Accordingly,
Proudfit taken with Wu raises a substantial new question of patentability as to claim 6,
which question has not been decided in a previous examination of the Sullivan patent.

### 7. Proudfit taken with Molitor '751

47.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ
as to claim 6 of the Sullivan patent. As pointed out in the request on page 82-83 and as
also discussed above Proudfit teaches a golf ball having a multi-layer cover that is
constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer.
Req. at 81. As known in the art, balata covered balls have durability problems.
However, golfers prefer the balata cover ball not because of the balata chemical
composition itself; but the material provides a certain "click" and "feel" to the golfer
upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical
properties associated with the material being used in the manufacture of the ball's cover.
So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any
material would be accepted to a golfer. As pointed out on pages 82 and 83 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment

in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is a substantial likelihood that a review of the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material in Molitor '751. These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### *Summary of SNQs Adopted and Not Adopted*
#### *Requester's SNQs Adopted*

48.    For Claim 1 of the Sullivan patent:

(1) Proudfit.

(3a) Nesbitt alone

(3b) Nesbitt taken with Molitor '637.

(4) Nesbitt taken with Wu.

(5) Nesbitt taken with Molitor '751.


49.    For Claim 2 of the Sullivan patent:

(1) Proudfit.

(3) Nesbitt.


50.    For Claim 3 of the Sullivan patent:

(3) Nesbitt.

51.    For Claim 4 of the Sullivan patent:

      (2) Proudfit taken with Molitor '637.

      (3) Proudfit taken with Wu.

      (4) Proudfit taken with Molitor '751.

      (5a) Nesbitt alone.

      (5b) Nesbitt taken with Molitor '637.

      (6) Nesbitt taken with Wu.

      (7) Nesbitt taken with Molitor '751.

52.    For Claim 5 of the Sullivan patent:

      (2a) Nesbitt alone.

      (2b) Nesbitt taken with Molitor '637.

      (3) Nesbitt taken with Wu.

      (4) Nesbitt taken with Molitor '751.

      (5) Proudfit taken with Molitor '637.

      (6) Proudfit taken with Wu.

      (7) Proudfit taken with Molitor '751.

53.    For Claim 6 of the Sullivan patent:

      (2a) Nesbitt alone.

      (2b) Nesbitt taken with Molitor '637.

      (3) Nesbitt taken with Wu.

      (4) Nesbitt taken with Molitor '751.

      (5) Proudfit taken with Molitor '637.

      (6) Proudfit taken with Wu.

      (7) Proudfit taken with Molitor '751.

*Requester's SNQs Not Adopted.*

54.    For Claim 1 of the Sullivan patent:

      (2) Sullivan '831.

Case 1:06-cv-00091-SLR     Document 66-2     Filed 11/21/2006     Page 46 of 89

55.    For Claim 2 of the Sullivan patent:

      (2)  Sullivan '831.


56.    For Claim 3 of the Sullivan patent:

      (1)  Proudfit.

      (2)  Sullivan '831.


57.    For Claim 4 of the Sullivan patent:

      (1)  Sullivan '831.


58.    For Claim 5 of the Sullivan patent:

      (1)  Sullivan '831.


59.    For Claim 6 of the Sullivan patent:

      (1)  Sullivan '831.


### *Office Action on the Merits*

60.    An Office action on the merits does not accompany this order for *inter partes*
reexamination.  An Office action on the merits will be provided in due course.

## *Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be directed:

>    Please mail any communications to:

>        Attn: Mail Stop "Inter Partes Reexam"
>        Central Reexamination Unit
>        Commissioner for Patents
>        P. O. Box 1450
>        Alexandria, VA  22313-1450

>    Please FAX any communications to:

>        (571) 273-9900
>        Central Reexamination Unit

>    Please hand-deliver any communications to:

>        Customer Service Window
>        Attn:  Central Reexamination Unit
>        Randolph Building, Lobby Level
>        401 Dulany Street
>        Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Michael O'Neill
CRU Examiner
AU 3993

CONF: JF
        HC

# EXHIBIT 2

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000123 | 01/17/2006 | 6595873 | |

Dorothy P. Whelan
Fish & Richardson
P. O. Box 1022
Minneapolis MN 55440-1022

| EXAMINER |
|---|
| Michael O'Neill |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

04/06/06

## *INTER PARTES* REEXAMINATION COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

PTOL-2071 (Rev.07-04)

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,123*.

PATENT NUMBER *6,595,873*.

TECHNOLOGY CENTER *3900*.

ART UNIT *3993*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev 07-04)

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/000,123 | 659587 |
| | Examiner | Art Unit |
| | Michael O'Neill | 3993 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION | Control No. 95/000,123 | Patent Under Reexamination 6595673 | |
|---|---|---|---|
| | Examiner Michael O'Neill | Art Unit 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):   ☐ PTO-892   ☒ PTO-1449 or PTO/SB/08   ☐ Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

☐ An Office action is attached with this order.

☒ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

DECISION GRANTING INTER PARTES REEXAMINATION

## *Substantial New Question of Patentability*

1.      A substantial new question of patentability affecting claims 1-6 of United States Patent Number 6,595,873 to Sullivan is raised by the present request for *inter partes* reexamination.

## *Extensions of Time*

2.      Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes* reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. § 314(c) requires that *inter partes* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937).  Patent owner extensions of time in *inter partes* reexamination proceedings are provided for in 37 CFR 1.956.  Extensions of time are not available for third party requester comments, because a comment period of 30 days from service of patent owner's response is set by statute.  35 U.S.C. § 314(b)(3).

## *Notification of Concurrent Proceedings*

3.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent 6,595,873 throughout the course of this reexamination proceeding.  The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2686 and 2686.04.

### *Requester's Position*

4.      The request indicates that third party requester considers:

   a.      Claim 1 of the Sullivan patent to be unpatentable over:

      i.      Nesbitt (USPN 4,431,193) alone, and Nesbitt and
      Molitor '637 taken together.

      ii.      Nesbitt taken with Wu.

      iii.      Nesbitt taken with Molitor '751.

      iv.      Proudfit taken with Molitor '637.

      v.      Proudfit taken with Wu.

      vi.      Proudfit taken with Molitor '751.

   b.      Claim 2 of the Sullivan patent to be unpatentable over:

      i.      Nesbitt alone, and Nesbitt and Molitor '637 taken
      together; Nesbitt and Wu taken together; or Nesbitt and
      Molitor '751 taken together.

      ii.      Proudfit taken with any one of Molitor '637, Wu, or
      Molitor '751.

   c.      Claim 3 of the Sullivan patent to be unpatentable over:

      i.      Nesbitt alone, and Nesbitt and Molitor '637 taken
      together.

      ii.      Nesbitt taken with Wu.

      iii.      Nesbitt taken with Molitor '751.

      iv.      Proudfit taken with Molitor '637.

      v.      Proudfit taken with Wu.

      vi.      Proudfit taken with Molitor '751.

   d.      Claim 4 of the Sullivan patent to be unpatentable over:

      i.      Nesbitt alone, and Nesbitt and Molitor '637 taken
      together; Nesbitt and Wu taken together; or Nesbitt and
      Molitor '751 taken together.

        ii.     Proudfit taken with any one of Molitor '637, Wu, or Molitor '751.

    e.    Claim 5 of the Sullivan patent to be unpatentable over:

        i.     Nesbitt alone, and Nesbitt and Molitor '637 taken together.

        ii.     Nesbitt taken with Wu.

        iii.    Nesbitt taken with Molitor '751.

        iv.    Proudfit taken with Molitor '637.

        v.     Proudfit taken with Wu.

        vi.    Proudfit taken with Molitor '751.

    f.    Claim 6 of the Sullivan patent to be unpatentable over:

        i.     Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

        ii.     Proudfit taken with any one of Molitor '637, Wu, or Molitor '751.

### *Prosecution History of the Sullivan '873 patent*

5.    United States Patent Number 6,595,873 issued from an application with the serial number of 09/776,278. Said '278 application was a continuation from an application with the serial number of 09/470,196, filed on Dec. 21, 1999, now Pat. No. 6,210,293, which was a continuation of application No. 08/870,585, filed on Jun. 6, 1997, now abandoned, which is a continuation of application No. 08/556,237, filed on Nov. 9, 1995, now abandoned, which is a continuation-in-part of application No. 08/542,793, filed on Oct. 13, 1995, now abandoned, which is a continuation-in-part of application No. 08/070,510, now abandoned.

6.    The "continuation" portion of this series of applications can be found on pages 41-42 within the 08/070,510 application where it states that:

> Composition D represents the inner layer (i.e. Surlyn 1605) used in
> U.S. Patent No. 4,431,193. Composition E provides a hard, low acid
> ionomeric resin [as the inner layer]. The purpose behind producing
> and testing the balls of Table IV [Table 7] was to provide a subsequent
> comparison in properties with the multi-layer golf balls of the present
> invention [which are high acid ionomer resin inner cover layer with
> lower acid ionomer resin to the known prior art golf balls which are
> constructed with a low acid ionomer resin inner cover layers of balls D
> and E].

Molded intermediate Ball D in Table IV (7) is the intermediate ball (the inner layer

molded onto a solid core) for the Nesbitt '193 patent. Molded intermediate Ball E in

Table IV (7) has as its intermediate ball an ionomer blend of Iotek 7030 and 8000. The

'510 application then concludes on page 45:

> ... it is also noted that the use of the high acid ionomer
> resins as the inner cover material produces a substantial
> increase in the finished balls overall distance properties. In
> this regard, the high acid ionomer resin inner covers of
> balls 1-3 produce an increase of approximately 10 points in
> C.O.R. [coefficient of restitution] over the low acid
> ionomer resin inner covers of balls 4 and about a 25 points
> increase over the prior art balls 5. Since an increase in 3 to
> 6 points in C.O.R. results in an average increase of about 1
> yard in distance, such an improvement is deemed to be
> significant.

It should be noted that the '510 application lacks providing a finished ball using the

molded intermediate Ball E constructed of an ionomer blend of Iotek 7030 and 8000.

Instead, the '510 application uses only the molded intermediate Ball D which is

constructed out of Surlyn 1605 as the finished balls 4 and 5 in Table 8 which are the prior

art balls taught in the Nesbitt. Thus, the '510 appears to lack a finished ball embodiment

description constructed with an inner layer made from two ionomer blends with said

claimed mechanical properties of Shore D hardness, flexural modulus and thickness and

an outer layer made of a polyurethane material with said claimed mechanical properties

of Shore D hardness, flexural modulus and thickness. Instead, the '510 application

discloses only a molded intermediate Ball E made from a 50/50 blend of two ionomers

known as Iotek 7030 and 8000 as shown in Table IV (7) on pages 41-42.

Application/Control Number: 95/000,123
Case 1:06-cv-00091-SLR    Document 66-2    Filed 11/21/2006    Page 57 of 89
Art Unit: 3993

Page 5

7.    The next application in the chain where the claimed invention could be adequately
describe and enabled is application No. 08/542,793 ('793 application), which is a
continuation-in-part to the '510 application. On page 39, the '793 application discloses:

>    "Top Grade" or "TG" is a low acid inner cover ionomer
>    resin blend comprising 70.6% Iotek 8000, 19.9% Iotek
>    7010 and 9.6% white masterbatch.

This disclosure describes the claimed inner cover being of two low acid ionomer blends.
However, the outer layer is described in the '793 application as consisting of ionomer
resins and non-ionomeric thermoplastic elastomers and not polyurethane. Urethanes
(polyurethane) include materials from the carbamate group, as well as other functional
groups, such as ester, ether, amide and urea. Therefore, the inner layer claimed in the
'293 patent is described and enabled on the date of filing of the '793 application which is
Oct. 13, 1995, but not the outer layer claimed in the '293 Patent.

8.    The next application in the chain where the claimed invention could be adequately
described or enabled is application No. 08/556,237 ('237 application), which is a
continuation-in-part to the '793 application. Page 46 describes a plurality of golf balls
constructed of a mantel (core and inner layer) consisting of a blend of ionomers, Iotek
8030 and Iotek 7030, and outer layers consisting of Baytec RE832 which is a castable,
thermoset polyurethane material. The claimed invention's outer layer requires the
material to be a relatively soft polyurethane material. The material that is described in
the disclosure that could meet the relatively soft polyurethane material is found on page
24, Estane X-4517. This material is not described as being used in any embodiment
disclosed in the '237 application; although it has been concluded that one of ordinary
skill in the art could make a finished golf ball embodiment of this material as an outer
layer from reading the disclosure contained within the '237 application. Therefore, the
claimed invention in the '837 patent appears adequately described in the '237 application.
The '237 application has an filing date of Nov. 9, 1995.

9.      Therefore, based on the above analysis regarding the disclosures of the parent
applications of which the Sullivan '873 patent claims 35 U.S.C. § 120 benefit, the
inventions claimed in claims 1-6 **the Sullivan '873 patent have a critical date for
purposes of prior art patents and printed publications of Nov. 9, 1995.**

### *Substantial New Question vel non*

10.      The substantial new questions of patentability with respect to Nesbitt for claims 1-
6 are based alone on patents and/or printed publications already cited/considered in an
earlier concluded examination of the patent being reexamined. On November 2, 2002,
Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act
revised the reexamination statute by adding the following new last sentence to 35 U.S.C.
303(a) and 312(a):

> The existence of a substantial new question of patentability
> is not precluded by the fact that a patent or printed
> publication was previously cited by or to the Office or
> considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of
the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not
necessarily preclude the existence of a substantial new question of patentability (SNQ)
that is based exclusively on that old art. Rather, determinations on whether a SNQ exists
in such an instance shall be based upon a fact-specific inquiry done on a case-by-case
basis.

In the present instance, there exists a SNQ based alone on Nesbitt (USPN
4,431,193). Nesbitt alone was applied and is now being looked at in a new light.
Proudfit, Molitor '637, Molitor '751, and Wu were cited and considered, but not applied.
A discussion of the specifics now follows:

## RE. CLAIM 1

### 1. Nesbitt alone and Nesbitt and Molitor '637 taken together

11.    It is agreed that the consideration of Nesbitt alone or Nesbitt and Molitor '637 taken together raises a substantial new question of patentability (SNQ) as to claim 1 of the Sullivan patent. As pointed out on pages 14-18 of the request, Nesbitt teaches a two piece golf ball having a solid core with a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Nesbitt also teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a range of .020 and .100 inches. Nesbitt further teaches a suitable material for the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of commercially available Surlyn resins". In this table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a source for potential cellular compositions that may be employed in the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which describes a number of foamable [**cellular**] compositions of a character which may be employed for one or both layers 14 and 16 of the golf ball of this invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two
compositions of Surlyn, one of which is Surlyn 1605 and an example of using a
polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637
teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified
as Estane 58133. There is a substantial likelihood that a review of the scientific literature
would be needed to determine the Shore D hardness of Estane 58133. Molitor '637
teaches that the average thickness of the layer covering the solid core is 0.090 inches.
Nesbitt teaches the inner, intermediate or first layer 14 on the core 12 may be slightly
foamed to a low degree so as not to materially affect the coefficient of restitution of the
material. Nesbitt teaches the outer or cover or second layer 16 may be foamed to a
greater degree than the inner layer 14 as the material of the layer 16 is comparatively soft.
Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the outer layer
may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of
foamable material for the first layer 14, the cover layer 16 or both layers, the degree of
foaming or one or the other or both layers may be altered to provide a variation in the
coefficient of restitution of the golf ball. These teachings of viewing Nesbitt alone and
Nesbitt and Molitor '637 taken together were not present in the prosecution of the
application which became the Sullivan patent. Further, there is a substantial likelihood
that a reasonable examiner would consider these teachings important in deciding whether
or not the claim is patentable. Accordingly, Nesbitt alone, is considered to raise a
substantial new question of patentability as to claim 1, which question has not been
decided in a previous examination of the Sullivan patent . Further, Nesbitt and Molitor
'637 taken together are considered to raise a substantial new question of patentability as
to claim 1, which question has not been decided in a previous examination of the Sullivan
patent.

### 2. Nesbitt taken with Wu

12.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ
as to claim 1 of the Sullivan patent. The request on pages 18-20 of the request considers
that Nesbitt alone teaches the use of a particular soft polyurethane material for use as the

outer layer 16. However, it should be correctly stated on the record that Nesbitt and
Molitor '637 which is mentioned in Nesbitt teach the use of particular polyurethane
materials for the use as an outer layer. Wu teaches that polyurethane was being used as
the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn
covered golf balls lack the "click" and "feel" of balata which golfers have become
accustomed to such sensations and polyurethane covered golf balls can be made to have a
similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made
according to its invention will have Shore D hardness directly proportional to the degree
of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20
on the Shore D scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning
Molitor '637 taken with Wu were not present in the prosecution of the application which
issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim
is patentable. Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a
substantial new question of patentability as to claim 1, which question has not been
decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

13.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ
as to claim 1 of the Sullivan patent. As pointed out on pages 20-22 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment
in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the
urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a
substantial likelihood that review of the scientific literature would be needed to equate
the Shore D hardness to the Shore C of this blend. These teachings of viewing Nesbitt
taken with Molitor '751 were not present in the prosecution of the application which

became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 4. Proudfit taken with Molitor '637

14.     It is further agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to claim 1 of the Sullivan patent. The above explanation of the prosecution history of the Sullivan patent, taken with the analysis of the prosecution history of Proudfit set forth below, will lead to the conclusion that the Proudfit patent qualifies as a prior art patent under 35 U.S.C. § 102(b) thus raising a SNQ as to the claims of the Sullivan patent. Because Proudfit was utilized as a § 102(e) reference in a § 103(a) rejection against the claims in the parent application No. 08/870,585 as evidenced by the acceptance of a Rule 131 declaration withdrawing the Proudfit reference (see Paper #24, mailed 12-7-99), viewing the Proudfit patent as 35 U.S.C. §102(b) prior art that cannot be antedated under 37 CFR 1.131 is a consideration of the teachings in Proudfit in a "new light."

15.     Proudfit has a filing date of Jun. 29, 1992 and is a continuation-in-part of Ser. No. 07/733,789, ('789 application) filed on Jul. 26, 1991, now abandoned. A review of the '789 application appears to not adequately describe and enable an invention of a golf ball having a solid core, an inner layer cover and an outer layer cover. Instead, the '789 application appears to describe and enable a golf ball with a solid core and a single cover layer; instead of the inner and outer cover layers shown in Proudfit's figures 1 and 2. Therefore, Proudfit's teachings of a golf ball having a solid core, an inner layer and outer layer has the effective filing date of Jun 29, 1992; the date of filing the Proudfit application which issued into the Proudfit patent. Proudfit issued on May 24, 1994. The

claimed inventions within the Sullivan '293 patent have the critical date of Nov. 9, 1995, more than one year after issuance of the Proudfit patent.

16.    Thus, it is agreed as stated in the request on pages 22-25 that Proudfit teaches a

    three-piece [two-piece] solid golf ball that includes a core,
    a hard ionomer inner cover layer and a relatively soft outer
    cover layer made of a balata-based material.

Req. at page 22. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skilled in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22 teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material as taught in col. 7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a relatively soft polyurethane material. However, in an analogous golf ball Molitor '637 teaches the use of a polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression

value on a Riehle machine equates to a finished golf ball having better spin control characteristics when struck by the club face because more of the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound distance equates to more force need to impart motion on the ball when putting creating a "deadening effect similar to balata covered balls" which has been shown to decrease margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---|---|---|---|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| 16 | 0.750 | 95 | 66 |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

17.    Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively

soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

18.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 1 of the Sullivan patent. As pointed out in the request on pages 26 and 27, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 26. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata covered ball not because of the balata chemical composition itself, but because the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered ball, any material would be acceptable to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover because it lacks the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which became the Sullivan

patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Molitor '751

19.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to claim 1 of the Sullivan patent. As pointed out in the request on pages 27-29 and as also discussed above, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 27. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata covered ball not because of the balata chemical composition itself, but because the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered ball, any material would be accepted to a golfer. As pointed out on pages 28 and 29 of the request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not

the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a
substantial new question of patentability as to claim 1, which question has not been
decided in a previous examination of the Sullivan patent.




**RE. CLAIM 2**

*1. Nesbitt*

20.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 2 of the Sullivan
patent. Claim 2 depends directly from claim 1. Claim 2 limits the inner layer to about
0.050 inch thickness and the outer layer to about 0.055 inch thickness. As pointed out in
the request on pages 29-30, Nesbitt teaches that a preferred embodiment has an outer
layer of 0.0575 inch thickness. If the standard USGA golf ball has an overall minimum
diameter of 1.680 inches and Nesbitt in col. 3:29 teaches that a preferred solid core plus
inner thickness diameter is 1.565 inches, then Nesbitt inner layer thickness to match the
preferred outer layer and solid core diameter in order to yield a total diameter of 1.680
inches would be about 0.0525 inches to be within the given inner layer range of between
0.020 to 0.070 inches. These teachings of viewing Nesbitt were not present in the
prosecution of the application which became the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider these teachings
important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises
a substantial new question of patentability as to claim 2, which question has not been
decided in a previous examination of the Sullivan patent.



*2. Proudfit in combination with other references*

21. It is **not agreed** that Proudfit in combination with other references teach all of the
limitations of claim 2. Proudfit's preferred embodiment's inner layer is 0.037 inches
thick, see col. 7:43-44. Claim 2 requires the inner layer to be about 0.050 inches thick.

Those skilled in the art measure thickness to the thousandths of an inch. The difference between the Proudfit preferred embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch. This difference equates to a difference of a factor of ten. Further, the requester admits that it is not the chemical but the mechanical properties of the materials used in making golf balls important to those skilled in the art. One of the mechanical properties in constructing a golf ball with materials is the thickness to make a given layer. Therefore, a reasonable examiner would not consider this teaching important in deciding whether or not the claim is patentable. Thus, Proudfit in combination with the other references does not raise a SNQ with respect to claim 2.

## RE. CLAIM 3

### 1. Nesbitt alone, and Nesbitt and Molitor '637 taken together

22.     It is agreed that the consideration of Nesbitt alone, and consideration of Nesbitt and Molitor '637, each taken together raises a substantial new question of patentability (SNQ) as to claim 3 of the Sullivan. As pointed out in the request on pages 33-36, Nesbitt teaches a two piece golf ball having a solid core, figure 1 and col. 2:33 teach the core shaped as a sphere, with a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Moreover, the outer layer 16 is taught to be dimpled, see figures 1 and 2 and col. 2:48-49. Furthermore, as pointed out in the request, Nesbitt teaches the inner layer thickness being between 0.020 and 0.070 inches (Nesbitt, col. 3:19-23); the outer layer thickness being between 0.020 and 0.100 inches (Nesbitt, col. 3:22-25) and the minimum diameter of 1.680 inches (Nesbitt, col. 2:50-52). Nesbitt alone teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a range of .020 and .100 inches. Nesbitt teaches a suitable material for the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the

Sullivan patent contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of commercially available Surlyn resins". In Table 1, found in col. 8, the Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a source for potential cellular compositions that may be employed in the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> "Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which describes a number of foamable [cellular] compositions of a character which may be employed for one or both layers 14 and 16 of the golf ball of this invention".

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the layer covering the solid core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer 14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming or one or the other or both layers may be altered to provide a variation in the coefficient of restitution of the golf ball. Viewing the teachings of Nesbitt alone, it is clear that these teachings were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim

is patentable. Also, the teaching of Nesbitt and Molitor '637 taken together were not

present in the prosecution of the application which became the Sullivan patent. Further,

there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly,

Nesbitt alone and Nesbitt and Molitor '637 taken together raise a substantial new

question of patentability as to claim 3, which question has not been decided in a previous

examination of the Sullivan patent.

### 2. Nesbitt taken with Wu

23.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ

as to claim 3 of the Sullivan patent. The request on pages 36-38 considers Nesbitt alone

teaches the use of a particular soft polyurethane material for use as the outer layer 16.

However, a closer reading of Nesbitt teaches that Nesbitt references the covers taught

Molitor '637 can be used as materials for the covers taught in Nesbitt. See Nesbitt, col.

3:56-60. Molitor '637 teaches the use of particular polyurethane materials for the use as

an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf

ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the

"click" and "feel" of balata which golfers have become accustomed to such sensations

and polyurethane covered golf balls can be made to have a similar "click" and "feel" of

balata. Wu also at least teaches that polyurethanes made according to its invention will

have Shore D hardness directly proportional to the degree of cure of the cover; and this

Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col.

6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637 taken with Wu

were not present in the prosecution of the application which became the Sullivan patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly,

Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new question of

patentability as to claim 3, which question has not been decided in a previous
examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

24.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ
as to claim 3 of the Sullivan patent. As pointed out on pages 38 and 39 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment
in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the
urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a
substantial likelihood that review of the scientific literature would be needed to equate
the Shore D hardness to the Shore C of this blend. These teachings of viewing Nesbitt
taken with Molitor '751 were not present in the prosecution of the application which
became the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim
is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new
question of patentability as to claim 3, which question has not been decided in a previous
examination of the Sullivan patent.

### 4. Proudfit taken with Molitor '637

25.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a
SNQ as to claim 3 of the Sullivan patent. The explanation of how Proudfit constitutes a
prior art patent is discussed above at item 15 and incorporated herein. It is agreed as
stated in the request on pages 40-43 that Proudfit teaches a

> "three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material."

Req. at page 40. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skill in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid spherical (see Proudfit's figures) core 11 and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 with dimples (again see Proudfit's figures) of polymeric material as taught in col. 7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus of 51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a relatively soft polyurethane material. However, in an analogous golf ball Molitor '637 teaches the use of a polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression value on a Riehle machine equates to a finished golf ball having better spin control characteristics when struck by the club face because more of the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound distance equates to more force need to impart

motion on the ball when putting creating a "deadening effect similar to balata covered balls" which has been shown to decrease margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|-----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

26.     Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a polyurethane material; moreover, a relatively soft polyurethane material as a cover layer to a solid core golf ball. This teaching as to the polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which became the Sullivan

patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 3, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

27.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 3 of the Sullivan patent. As pointed out in the request on pages 43 and 44, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 43. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. Id. Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly,

Proudfit taken with Wu raises a substantial new question of patentability as to claim 3, which question has not been decided in a previous examination of the Sullivan patent.

### 6 Proudfit taken with Molitor '751

28.     It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to claim 3 of the Sullivan patent. As pointed out in the request on pages 45 and 46 and as also discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 45. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As pointed out on pages 48 and 49 of the request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new question of patentability as to claim 3, which question has not been decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,123
Case 1:06-cv-00091-SLR    Document 66-2    Filed 11/21/2006    Page 76 of 89
Art Unit: 3993

Page 24

## RE. CLAIM 4

### 1. Nesbitt

29.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 6 of the Sullivan

patent. Claim 4 is dependent upon claim 3. Claim 4 limits the inner and outer cover

thickness to 0.050 inches and 0.055, respectively; and the overall diameter to be 1.680

inches or greater. As pointed out in the request on pages 47-48, Nesbitt teaches that a

preferred embodiment has an outer layer of 0.0575 inch thickness. If the standard USGA

golf ball has an overall minimum diameter of 1.680 inches and Nesbitt in col. 3:29

teaches that a preferred solid core plus inner thickness diameter is 1.565 inches, then

Nesbitt inner layer thickness to match the preferred outer layer and solid core diameter in

order to yield a total diameter of 1.680 inches would be about 0.0525 inches to be within

the given inner layer range of between 0.020 to 0.070 inches. These teachings of viewing

Nesbitt were not present in the prosecution of the application which became the Sullivan

patent. Further, there is a substantial likelihood that a reasonable examiner would

consider these teachings important in deciding whether or not the claim is patentable.

Accordingly, Nesbitt raises a substantial new question of patentability as to claim 4,

which question has not been decided in a previous examination of the Sullivan patent.


### 2. Proudfit

30.    It is **not agreed** that Proudfit in combination with other references teach all of the

limitation of claim 4. Proudfit's preferred embodiment's inner layer is 0.037 inches

thick, see col. 7:43-44. Claim 4 requires the inner layer to be about 0.050 inches thick.

Those skilled in the art measure thickness to the thousandths of an inch. The difference

between the Proudfit preferred embodiment and the claimed invention is 0.013 inches or

thirteen hundredths of an inch. This difference equates to a difference of a factor of ten.

Further, the requester admits that it is not the chemical but the mechanical properties of

the materials used in making golf balls important to those skilled in the art. One of the

mechanical properties in constructing a golf ball with materials is the thickness to make a given layer. Therefore, a reasonable examiner would not consider this teaching important in deciding whether or not the claim is patentable. Thus, Proudfit in combination with the other references does not raise a SNQ with respect to claim 4.

## RE. CLAIM 5

### *1. Nesbitt alone, and Nesbitt and Molitor '637 taken together*

30.    It is agreed that the consideration of Nesbitt alone and consideration of Nesbitt

and Molitor '637 taken together raises a substantial new question of patentability (SNQ)

as to claim 5 of the Sullivan. As pointed out in the request on pages 50-54, Nesbitt alone

teaches a two piece golf ball having a solid core, figure 1 and col. 2:33 teach the core

shaped as a sphere, with a cover including "an inner layer 14 of hard, high flexural

modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin."

See Nesbitt, col. 1:20-25. Moreover, the outer layer 16 is taught to be dimpled, see

figures 1 and 2 and col. 2:48-49. Furthermore, Nesbitt teaches the inner layer is molded

over the core to form an intermediate ball, see Nesbitt col. 2:34-37. Nesbitt alone teaches

having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous

material of a thickness in the range of .020 to .070 inches; while having the outer layer 16

of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a

range of .020 and .100 inches. Nesbitt alone teaches a suitable material for the inner

layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits

Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent

contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous

material, see col. 2:54. Also, Nesbitt alone teaches a suitable material for the outer layer

16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an

admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the

Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material.

Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of

commercially available Surlyn resins". In Table 1, found in col. 8, the Sullivan patent

admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table Surlyn 8940

is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as

a source for potential cellular compositions that may be employed in the inner and outer

layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637
> which describes a number of foamable [cellular]
> compositions of a character which may be employed for
> one or both layers 14 and 16 of the golf ball of this
> invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two
compositions of Surlyn, one of which is Surlyn 1605 and an example of using a
polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637
teaches that the average thickness of the layer covering the solid core is 0.090 inches.
Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in
covering the solid core. There is a substantial likelihood that review the technical
properties of the polyurethane used in Molitor '637 would be needed via product
information sheets or the like. Nesbitt teaches the inner, intermediate or first layer 14 on
the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second
layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the
layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or
noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt
teaches through the use of foamable material for the first layer 14, the cover layer 16 or
both layers, the degree of foaming or one or the other or both layers may be altered to
provide a variation in the coefficient of restitution of the golf ball. These teachings of
viewing Nesbitt alone and Nesbitt and Molitor '637 taken together were not present in the
prosecution of the application which became the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider these teachings
important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone
and Nesbitt and Molitor '637 taken together raise a substantial new question of
patentability as to claim 5, which question has not been decided in a previous
examination of the Sullivan patent.

## 2. Nesbitt taken with Wu

31.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ
as to claim 5 of the Sullivan patent. The request on pages 54-56 considers Nesbitt alone
teaches the use of a particular soft polyurethane material for use as the outer layer 16.
However, a closer reading of Nesbitt teaches that Nesbitt references the covers taught
Molitor '637 can be used as materials for the covers taught in Nesbitt. See Nesbitt, col.
3:56-60. Molitor '637 teaches the use of particular polyurethane materials for the use as
an outer layer. Wu teaches that polyurethane was being used as the outer layer of golf
ball *circa* 1993. Wu further teaches in col. 1:36-46 that Surlyn covered golf balls lack the
"click" and "feel" of balata which golfers have become accustomed to such sensations
and polyurethane covered golf balls can be made to have a similar "click" and "feel" of
balata. Wu also at least teaches that polyurethanes made according to its invention will
have Shore D hardness directly proportional to the degree of cure of the cover; and this
Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col.
6:26-38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane;
thus, there is a substantial likelihood that a review the mechanical characterization
literature would be needed to determine the flexural modulus of the taught polyurethane
material in Wu. These teachings of viewing Nesbitt mentioning Molitor '637 taken with
Wu were not present in the prosecution of the application which became the Sullivan
patent. Further, there is a substantial likelihood that a reasonable examiner would
consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a substantial new
question of patentability as to claim 5, which question has not been decided in a previous
examination of the Sullivan patent.

## 3. Nesbitt taken with Molitor '751

32.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ
as to claim 5 of the Sullivan patent. As pointed out on pages 57 and 58 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece

golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the specific flexural modulus of the taught polyurethane; thus, a reasonable examiner would have to review the chemical literature to determine the flexural modulus of the taught polyurethane material in Molitor '751. These teachings of viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of patentability as to claim 5, which question has not been decided in a previous examination of the Sullivan patent.

### 4. Proudfit taken with Molitor '637

33.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to claim 5 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is discussed above at item 15 and incorporated herein. It is agreed as stated in the request on pages 58-61 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core,
> a hard ionomer inner cover layer and a relatively soft outer
> cover layer made of a balata-based material.

Req. at page 58. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core.

Those skill in the art understand the term "two-piece ball" to constitute a large solid core
with a cover layer secured to the core. This cover layer can either constitute one or
multiple layers. For instance, Proudfit as correctly quoted in the request on page 22, as
pointed out above in this decision, teaches a golf ball having a two-layer cover, see
Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which
includes a solid core 11 (spherical see figures) and a cover 12 which comprises a
relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
layer 14 (with dimples see figures) of polymeric material as taught in col. 7:21-24. Table
6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910
which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As
admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus
of 51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable
0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either
balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46,
teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in
teaching the outer cover being made of a relatively soft polyurethane material. Although,
Proudfit teaches that its soft elastomer material as a flexural modulus in the range of
about 20,000 to 25,000 psi, see col. 6:28-31. However, in an analogous golf ball Molitor
'637 teaches the use of a polyurethane material as the outer layer, that material being
Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the
specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR)
means a more elastic collision and the farther the ball will travel when struck by the club
face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression
value on a Riehle machine equates to a finished golf ball having better spin control
characteristics when struck by the club face because more of the ball contacts the ridges
on the club face which imparts the back spin on the ball; and 3) the lower the rebound
distance equates to more force need to impart motion on the ball when putting creating a
"deadening effect similar to balata covered balls" which has been shown to decrease
margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-
65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750;

compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|------------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

34.     Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. However, Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in covering the solid core. Thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material used in Molitor '637. This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application

which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 5, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

35.     It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 5 of the Sullivan patent. As pointed out in the request on pages 63-64, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 63. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is a substantial likelihood that a review the mechanical characterization literature would be needed to determine the flexural modulus of the taught polyurethane material in Wu. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which became the Sullivan patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the claim is patentable. Accordingly,
Proudfit taken with Wu raises a substantial new question of patentability as to claim 5,
which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Molitor '751

36.     It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ
as to claim 5 of the Sullivan patent. As pointed out in the request on pages 64 and 65 and
as also discussed above Proudfit teaches a golf ball having a multi-layer cover that is
constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer.
Req. at 64. As known in the art, balata covered balls have durability problems.
However, golfers prefer the balata cover ball not because of the balata chemical
composition itself; but the material provides a certain "click" and "feel" to the golfer
upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical
properties associated with the material being used in the manufacture of the ball's cover.
So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any
material would be accepted to a golfer. As pointed out on pages 69 and 70 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece
golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a
Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment
in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the
urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a
substantial likelihood that review of the scientific literature would be needed to equate
the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the
specific flexural modulus of the taught polyurethane; thus, there is a substantial
likelihood that a review of the mechanical characterization literature would be needed to
determine the flexural modulus of the taught polyurethane material in Molitor '751.
These teachings of viewing Proudfit taken with Molitor '751 were not present in the

prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new question of patentability as to claim 5, which question has not been decided in a previous examination of the Sullivan patent.

## CLAIM 6

### 1. Nesbitt

37.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 6 of the Sullivan patent. Claim 6 depends from claim 5 and limits the inner layer having a higher Shore D hardness than the outer layer. As pointed out in the request on pages 66-67, Nesbitt teaches a first layer of molded hard, high flexural modulus resinous material under a second layer of soft, low flexural modulus resinous material, see e.g. Nesbitt's abstract. This teaching of Nesbitt was not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit

38.    It is agreed that consideration of Proudfit raises a SNQ as to claim 6 of the Sullivan patent. Claim 6 depends from claim 5 and limits the inner layer having a higher Shore D hardness than the outer layer. As pointed out in the request on page 67, Proudfit teaches an inner layer formed from hard resin material and an outer layer formed from a soft material. This teaching of Proudfit was not present in the prosecution of the application which became the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or

not the claim is patentable. Accordingly, Proudfit raises a substantial new question of
patentability as to claim 6, which question has not been decided in a previous
examination of the Sullivan patent.


### *Summary of SNQs Adopted and Not Adopted*

*Requester's SNQs Adopted*

39.    For Claim 1 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.


40.    For Claim 2 of the Sullivan patent:

(1) Nesbitt.


41.    For Claim 3 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.


42.    For Claim 4 of the Sullivan patent:

(1) Nesbitt.

43.    For Claim 5 of the Sullivan patent:

    (1a) Nesbitt alone.

    (1b) Nesbitt and Molitor '637 taken together.

    (2) Nesbitt and Wu taken together.

    (3) Nesbitt and Molitor '751 taken together.

    (4) Proudfit and Molitor '637 taken together.

    (5) Proudfit and Wu taken together.

    (6) Proudfit and Molitor '751 taken together.


44.    For Claim 6 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.


*Requester's SNQs Not Adopted*

45.    For Claim 2 of the Sullivan patent:

    (2) Proudfit in combination with other references.


46.    For Claim 4 of the Sullivan patent:

    (2) Proudfit in combination with other references.


**Office Action on the Merits**

47.    An Office action on the merits does not accompany this order for *inter partes* reexamination.  An Office action on the merits will be provided in due course.

*Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be
directed:

Please mail any communications to:

Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

Please FAX any communications to:

(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should
be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Michael O'Neill
CRU Examiner
AU 3993

# EXHIBIT 3

Commissioner for Patents
United States Patent and Trademark Office
P O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000120 | 01/17/2006 | 6210293 | |

Dorothy P. Whelan
Fish & Richardson P. C.
P. O. Box 1022
Minneapolis MN 55440-1022

| EXAMINER |
|---|
| Michael O'Neill |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

04/07/06

# INTER PARTES REEXAMINATION
# COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED
STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE
PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to
the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of
this communication.

PTOL-2071 (Rev.07-04)

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Howrey LLP
1299 Pennsylvania Avenue N. W.
Washington DC . 20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,120*.

PATENT NUMBER *6,210,293*.

TECHNOLOGY CENTER *3900*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | 95/000,120 | 6210293 |
|---|---|---|
| | Examiner | Art Unit | |
| | Michael O'Neill | 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):  ☐ PTO-892  ☒ PTO-1449 or PTO/SB/08  ☐Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☐ An Office action is attached with this order.

    ☒ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

Application/Control Number: 95/000,120                                             Page 1

Art Unit: 3993

DECISION GRANTING INTER PARTES REEXAMINATION

### *Substantial New Question of Patentability*

1.      A substantial new question of patentability affecting claims 1-8 of United States Patent
Number 6,210,293 to Sullivan is raised by the present request for *inter partes* reexamination.

### *Extensions of Time*

2.      Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*
reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant"
and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. § 314(c) requires that
*inter partes* reexamination proceedings "will be conducted with special dispatch" (37 CFR
1.937). Patent owner extensions of time in *inter partes* reexamination proceedings are provided
for in 37 CFR 1.956. Extensions of time are not available for third party requester comments,
because a comment period of 30 days from service of patent owner's response is set by statute.
35 U.S.C. § 314(b)(3).

### *Notification of Concurrent Proceedings*

3.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to
apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving
Patent 6,210,293 throughout the course of this reexamination proceeding. The third party
requester is also reminded of the ability to similarly apprise the Office of any such activity or
proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2686 and
2686.04.

Application/Control Number: 95/000,120                                      Page 2

Art Unit: 3993

## *Requester's Position*

4.  The request indicates that third party requester considers:

    a.  Claim 1 of the Sullivan patent to be unpatentable over:

        i.  Nesbitt (USPN 4,431,193) alone, and Nesbitt and Molitor '637 taken together.

        ii.  Nesbitt taken with Wu.

        iii.  Nesbitt taken with Molitor '751.

        iv.  Proudfit taken with Molitor '637.

        v.  Proudfit taken with Wu.

        vi.  Proudfit taken with Molitor '751.

    b.  Claim 2 of the Sullivan patent to be unpatentable over:

        i.  Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

        ii.  Proudfit taken with any one of Molitor '637, Wu, Molitor '751, the USGA Rules of Golf (Exhibit M), or patent owner's admission (Exhibit G at 336).

    c.  Claim 3 of the Sullivan patent to be unpatentable over:

        i.  Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

        ii.  Proudfit taken with any one of Molitor '637, Wu, Molitor '751, the USGA Rules of Golf (Exhibit M), or patent owner's admission (Exhibit G at 336).

    d.  Claim 4 of the Sullivan patent to be unpatentable over:

        i.  Nesbitt alone, and Nesbitt and Molitor '637 taken together.

        ii.  Nesbitt taken with Wu.

        iii.  Nesbitt taken with Molitor '751.

Application/Control Number: 95/000,120                                      Page 3
Art Unit: 3993

       iv.    Proudfit taken with Molitor '637.

       v.    Proudfit taken with Wu.

       vi.    Proudfit taken with Molitor '751.

e.    Claim 5 of the Sullivan patent to be unpatentable over:

       i.    Nesbitt alone, and Nesbitt and Molitor '637 taken together;
Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken
together.

       ii.    Proudfit taken with any one of Molitor '637, Wu, Molitor '751,
the USGA Rules of Golf (Exhibit M), and patent owner's admission
(Exhibit G at 336).

f.    Claim 6 of the Sullivan patent to be unpatentable over:

       i.    Nesbitt alone, and Nesbitt and Molitor '637 taken together;
Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken
together.

       ii.    Proudfit taken with any one of Molitor '637, Wu, Molitor '751,
the USGA Rules of Golf (Exhibit M), and patent owner's admission
(Exhibit G at 336).

g.    Claim 7 of the Sullivan patent to be unpatentable over:

       i.    Nesbitt alone, and Nesbitt and Molitor '637 taken together.

       ii.    Nesbitt taken with Wu.

       iii.    Nesbitt taken with Molitor '751.

       iv.    Proudfit taken with Molitor '637.

       v.    Proudfit taken with Wu.

       vi.    Proudfit taken with Molitor '751.

h.    Claim 8 of the Sullivan patent to be unpatentable over:

       i.    Nesbitt alone, and Nesbitt and Molitor '637 taken together;
Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken
together.

ii.    Proudfit taken with any one of Molitor '637, Wu, Molitor '751,

the USGA Rules of Golf (Exhibit M), or patent owner's admission

(Exhibit G at 336).

### *Prosecution History of the Sullivan '293 patent*

5.    United States Patent Number 6,210,293 issued from an application with the serial number

of 09/470,196, filed on Dec. 21, 1999. Said application was a continuation of application No.

08/870,585, filed on Jun. 6, 1997, now abandoned, which is a continuation of application No.

08/556,237, filed on Nov. 9, 1995, now abandoned, which is a continuation-in-part of application

No. 08/542,793, filed on Oct. 13, 1995, now abandoned, which is a continuation-in-part of

application No. 08/070,510, now abandoned.

6.    The "continuation" portion of this series of applications can be found on pages 41-42

within the 08/070,510 application where it states that:

> Composition D represents the inner layer (i.e. Surlyn 1605) used in U.S.
> Patent No. 4,431,193. Composition E provides a hard, low acid ionomeric
> resin [as the inner layer]. The purpose behind producing and testing the balls
> of Table IV [Table 7] was to provide a subsequent comparison in properties
> with the multi-layer golf balls of the present invention [which are high acid
> ionomer resin inner cover layer with lower acid ionomer resin to the known
> prior art golf balls which are constructed with a low acid ionomer resin inner
> cover layers of balls D and E].

Molded intermediate Ball D in Table IV (7) is the intermediate ball (the inner layer molded onto

a solid core) for the Nesbitt '193 patent. Molded intermediate Ball E in Table IV (7) has as its

intermediate ball an ionomer blend of Iotek 7030 and 8000. The '510 application then concludes

on page 45:

> ... it is also noted that the use of the high acid ionomer resins as the
> inner cover material produces a substantial increase in the finished
> balls overall distance properties. In this regard, the high acid
> ionomer resin inner covers of balls 1-3 produce an increase of
> approximately 10 points in C.O.R. [coefficient of restitution] over
> the low acid ionomer resin inner covers of balls 4 and about a 25

> points increase over the prior art balls 5. Since an increase in 3 to
> 6 points in C.O.R. results in an average increase of about 1 yard in
> distance, such an improvement is deemed to be significant.

It should be noted that the '510 application lacks providing a finished ball using the molded
intermediate Ball E constructed of an ionomer blend of Iotek 7030 and 8000. Instead, the '510
application uses only the molded intermediate Ball D which is constructed out of Surlyn 1605 as
the finished balls 4 and 5 in Table 8 which are the prior art balls taught in the Nesbitt. Thus, the
'510 appears to lack a finished ball embodiment description constructed with an inner layer made
from two ionomer blends with said claimed mechanical properties of Shore D hardness, flexural
modulus and thickness and an outer layer made of a polyurethane material with said claimed
mechanical properties of Shore D hardness, flexural modulus and thickness. Instead, the '510
application discloses only a molded intermediate Ball E made from a 50/50 blend of two
ionomers known as Iotek 7030 and 8000 as shown in Table IV (7) on pages 41-42.

7.      The next application in the chain where the claimed invention could be adequately
describe and enabled is application No. 08/542,793 ('793 application), which is a continuation-
in-part to the '510 application. On page 39, the '793 application discloses:

> "Top Grade" or "TG" is a low acid inner cover ionomer resin
> blend comprising 70.6% Iotek 8000, 19.9% Iotek 7010 and 9.6%
> white masterbatch.

This disclosure describes the claimed inner cover being of two low acid ionomer blends.
However, the outer layer is described in the '793 application as consisting of ionomer resins and
non-ionomeric thermoplastic elastomers and not polyurethane. Urethanes (polyurethane) include
materials from the carbamate group, as well as other functional groups, such as ester, ether,
amide and urea. Therefore, the inner layer claimed in the '293 patent is described and enabled
on the date of filing of the '793 application which is Oct. 13, 1995, but not the outer layer
claimed in the '293 Patent.

8.      The next application in the chain where the claimed invention could be adequately
described or enabled is application No. 08/556,237 ('237 application), which is a continuation-

Application/Control Number: 95/000,120                                    Page 6
Art Unit: 3993

in-part to the '793 application. Page 46 describes a plurality of golf balls constructed of a mantel (core and inner layer) consisting of a blend of ionomers, Iotek 8030 and Iotek 7030, and outer layers consisting of Baytec RE832 which is a castable, thermoset polyurethane material. The claimed invention's outer layer requires the material to be a relatively soft polyurethane material. The material that is described in the disclosure that could meet the relatively soft polyurethane material is found on page 24, Estane X-4517. This material is not described as being used in any embodiment disclosed in the '237 application; although it has been concluded that one of ordinary skill in the art could make a finished golf ball embodiment of this material as an outer layer from reading the disclosure contained within the '237 application. Therefore, the claimed invention in the '293 patent appears adequately described in the '237 application. The '237 application has an filing date of Nov. 9, 1995.

9.      Therefore, based on the above analysis regarding the disclosures of the parent applications of which the Sullivan '293 patent claims 35 U.S.C. 120 benefit, the inventions claimed in claims 1-8 of **the Sullivan '293 patent have a critical date for purposes of prior art patents and printed publications of Nov. 9, 1995.**

### *Substantial New Question vel non*

10.     The substantial new questions of patentability with respect to Nesbitt for claims 1-8 are based solely on patents and/or printed publications already cited/considered in an earlier concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based

Application/Control Number: 95/000,120                                                          Page 7
Art Unit: 3993

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance
shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, there exists a SNQ based solely on Nesbitt (USPN 4,431,193).
Nesbitt alone was applied and is now being looked at in a new light. A discussion of the
specifics now follows:

## RE. CLAIM 1

### 1. Nesbitt alone, and Nesbitt and Molitor '637 taken together

11.     It is agreed that the consideration of Nesbitt alone, and Nesbitt and Molitor '637 taken
together raises a substantial new question of patentability (SNQ) as to claim 1 of the Sullivan
patent. As pointed out on pages 14-18 of the request, Nesbitt teaches a two piece golf ball
having a solid core with a cover including "an inner layer 14 of hard, high flexural modulus
resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt,
col. 1:20-25. Nesbitt solely teaches having the inner layer 14 of cellular or non-cellular hard,
high flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while
having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material
of a thickness in a range of .020 and .100 inches. Nesbitt further teaches a suitable material for
the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent
admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent
contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see
col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin
designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now
designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft,
low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found
in col. 8, the "typical properties of commercially available Surlyn resins". In this table Surlyn
8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a
source for potential cellular compositions that may be employed in the inner and outer layers 14
and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which
> describes a number of foamable **[cellular]** compositions of a
> character which may be employed for one or both layers 14 and 16
> of the golf ball of this invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of
Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the
solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the
layer covering the solid core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer
14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16
may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is
comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the
outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of
foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming
or one or the other or both layers may be altered to provide a variation in the coefficient of
restitution of the golf ball. These teachings of viewing Nesbitt alone and Nesbitt and Molitor
'637 taken together were not present in the prosecution of the application which issued as the
Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would
consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Nesbitt alone, is considered to raise a substantial new question of patentability as to
claim 1, which question has not been decided in a previous examination of the Sullivan patent.
Further, Nesbitt and Molitor '637 taken together are considered to raise a substantial new
question of patentability as to claim 1, which question has not been decided in a previous
examination of the Sullivan patent.

### 2. Nesbitt taken with Wu

12.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to
claim 1 of the Sullivan patent. The request on pages 18 and 19 considers that Nesbitt alone
teaches the use of a particular soft polyurethane material for use as the outer layer 16. However,
it should be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in

Nesbitt teach the use of particular polyurethane materials for the use as an outer layer. Wu
teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further
teaches in col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which
golfers have become accustomed to such sensations and polyurethane covered golf balls can be
made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes
made according to its invention will have Shore D hardness directly proportional to the degree of
cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the
Shore D scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637
taken with Wu were not present in the prosecution of the application which issued as the Sullivan
patent. Further, there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt
mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to
claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

13.      It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to
claim 1 of the Sullivan patent. As pointed out on pages 20 and 21 of the request, Molitor '751
explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col.
2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having
a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see
col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7
and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a
Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature
would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of
viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application
which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim is
patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of
patentability as to claim 1, which question has not been decided in a previous examination of the
Sullivan patent.

Application/Control Number: 95/000,120    Page 10

Art Unit: 3993

### 4. Proudfit taken with Molitor '637

14.    It is further agreed that the consideration of Proudfit taken with Molitor '637 raises a

SNQ as to claim 1 of the Sullivan patent. With the above explanation of the prosecution history

of the Sullivan patent taken the with analysis of the prosecution history of Proudfit set forth

below will lead to the conclusion that the Proudfit patent qualifies as a prior art patent under 35

U.S.C. § 102(b) thus raising a SNQ as to the claims of the Sullivan patent because Proudfit was

utilized as a § 102(e) reference in a § 103(a) rejection against the claims in the parent application

No. 08/870,585 as evidenced by the acceptance of a Rule 131 declaration withdrawing the

Proudfit reference (see Paper #24, mailed 12-7-99), viewing the Proudfit patent as 35 U.S.C.

102(b) prior art that cannot be antedated under 37 CFR 1.131 is a consideration of the teachings

in Proudfit in a "new light."

15.    Proudfit has a filing date of Jun. 29, 1992 and is a continuation-in-part of Ser. No.

07/733,789, ('789 application) filed on Jul. 26, 1991, now abandoned. A review of the '789

application appears to not adequately describe and enable an invention of a golf ball having a

solid core, an inner layer cover and an outer layer cover. Instead, the '789 application appears to

describe and enable a golf ball with a solid core and a single cover layer; instead of the inner and

outer cover layers shown in Proudfit's figures 1 and 2. Therefore, Proudfit's teachings of a golf

ball having a solid core, an inner layer and outer layer has the effective filing date of Jun 29,

1992; the date of filing the Proudfit application which issued into the Proudfit patent. Proudfit

issued on May 24, 1994. The claimed inventions within the Sullivan '293 patent have the critical

date of Nov. 9, 1995, more than one year after issuance of the Proudfit patent.

16.    Thus, it is agreed as stated in the request on pages 22-25 that Proudfit teaches a

        three-piece [two-piece] solid golf ball that includes a core, a hard
        ionomer inner cover layer and a relatively soft outer cover layer
        made of a balata-based material.

Req. at page 22. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skilled in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22 teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material as taught in col. 7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a relatively soft polyurethane material. However, in an analogous golf ball Molitor '637 teaches the use of a polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression value on a Riehle machine equates to a finished golf ball having better spin control characteristics when struck by the club face because more of the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound distance equates to more force need to impart motion on the ball when putting creating a "deadening effect similar to balata covered balls" which has been shown to decrease margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

Application/Control Number: 95/000,120                                    Page 12

Art Unit: 3993

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

17.    Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,120                                          Page 13

Art Unit: 3993

### 5. Proudfit taken with Wu

18.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 1 of the Sullivan patent. As pointed out in the request on page 26, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 26. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata covered ball not because of the balata chemical composition itself, but because the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered ball, any material would be acceptable to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover because it lacks the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Molitor '751

19.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to claim 1 of the Sullivan patent. As pointed out in the request on page 27 and as also discussed

Application/Control Number: 95/000,120                                    Page 14
Art Unit: 3993

above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard,

ionomeric inner cover layer and a soft balata outer cover layer. Req. at 27. As known in the art,

balata covered balls have durability problems. However, golfers prefer the balata covered ball

not because of the balata chemical composition itself, but because the material provides a certain

"click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and

"feel" are the mechanical properties associated with the material being used in the manufacture

of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered

ball, any material would be accepted to a golfer. As pointed out on pages 27 and 28 of the

request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-

piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a

thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D

hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE

spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn

1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that

review of the scientific literature would be needed to equate the Shore D hardness to the Shore C

of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in

the prosecution of the application which issued as the Sullivan patent. Further, there is a

substantial likelihood that a reasonable examiner would consider these teachings important in

deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751

raises a substantial new question of patentability as to claim 1, which question has not been

decided in a previous examination of the Sullivan patent.


## RE. CLAIM 2

### 1. Nesbitt

20.     It is agreed that consideration of Nesbitt raises a SNQ as to claim 2 of the Sullivan patent.

Claim 2 depends from claim 1. Claim 2 further defines the claimed invention to have a diameter

of 1.680 inches. As pointed out in the request on pages 29 and 30, Nesbitt teaches that

> according to the United States Golf Association Rules, the
> minimum diameter prescribed for a golf ball is 1.680 inches ....

Application/Control Number: 95/000,120                                    Page 15
Art Unit: 3993

(Nesbitt, col. 2:50-52). This teaching of viewing Nesbitt was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 2, which question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit taken with any one of Molitor '637, Wu, Molitor '751, the USGA Rules of Golf (Exhibit M), and patent owner's admission (Exhibit G at 336) taken together

21.     It is further agreed that consideration of Proudfit, Molitor '637, Wu, Molitor '751, the USGA Rules of Golf (Exhibit M), and patent owner's admission (Exhibit G at 336) taken together raises a SNQ as to claim 2 of the Sullivan patent. However, the patent owner's admission in Exhibit G and Exhibit M *per se* are not needed to raise a SNQ as to claim 2, because Proudfit, Molitor '637, Wu and Molitor '751 all either expressly or inherently recognize the USGA Rules of Golf in the development of their respective inventions. The USGA requires a golf ball to have a minimum overall diameter of 1.680 inches. Claim 2 depends from claim 1. Claim 2 further defines the claimed invention to have a diameter of 1.680 inches. As pointed out on page 30 of the request, Proudfit teaches a total golf ball diameter of 1.680 inches for a golf ball having a core diameter of 1.500 inches, a inner thickness layer of 0.037 inches (yielding an inner diameter of 1.575 inches) and a outer thickness layer of 0.0525 inches. See Proudfit col. 7:43-47. Molitor '637 teaches in col. 4:60-61 that "all golf balls are 1.680"-1.690" in diameter." Wu teaches in col. 47-49 that

> the size of the mold cups is about that of a conventional golf ball mold, i.e. nominally 1.68 inches (4.25 cm) for American sized balls...".

These teachings of viewing Proudfit, Molitor '637, and Wu were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit, Molitor '637, and Wu raises a substantial new

question of patentability as to claim 2, which question has not been decided in a previous

examination of the Sullivan patent.

## RE. CLAIM 3

### 1. Nesbitt

22.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 3 of the Sullivan patent.

Claim 3 depends directly from claim 1. Claim 3 limits the inner layer to about 0.050 inch

thickness and the outer layer to about 0.055 inch thickness. As pointed out in the request on

pages 31-32, Nesbitt teaches that a preferred embodiment has an outer layer of 0.0575 inch

thickness. If the standard USGA golf ball has an overall minimum diameter of 1.680 inches and

Nesbitt in col. 3:29 teaches that a preferred solid core plus inner thickness diameter is 1.565

inches, then Nesbitt inner layer thickness to match the preferred outer layer and solid core

diameter in order to yield a total diameter of 1.680 inches would be about 0.0525 inches to be

within the given inner layer range of between 0.020 to 0.070 inches. These teachings of viewing

Nesbitt were not present in the prosecution of the application which issued as the Sullivan patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt

raises a substantial new question of patentability as to claim 3, which question has not been

decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

23.    It is **not agreed** that Proudfit in combination with other references teach all of the

limitations of claim 3. Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see

col. 7:43-44. Claim 3 requires the inner layer to be about 0.050 inches thick. Those skilled in

the art measure thickness to the thousandths of an inch. The difference between the Proudfit

preferred embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an

inch. This difference equates to a difference of a factor of ten. Further, the requester admits that

it is not the chemical but the mechanical properties of the materials used in making golf balls

important to those skilled in the art. One of the mechanical properties in constructing a golf ball with materials is the thickness to make a given layer. Therefore, a reasonable examiner would not consider this teaching important in deciding whether or not the claim is patentable. Thus, Proudfit in combination with the other references does not raise a SNQ with respect to claim 3.

## RE. CLAIM 4

### 1. Nesbitt alone, and Nesbitt and Molitor '637 taken together

24.    It is agreed that the consideration of Nesbitt alone, and Nesbitt and Molitor '637 taken together raises a substantial new question of patentability (SNQ) as to claim 4 of the Sullivan. As pointed out in the request on pages 34-38, Nesbitt teaches a two piece golf ball having a solid core, figure 1 and col. 2:33 teach the core shaped as a sphere, with a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Moreover, the outer layer 16 is taught to be dimpled, see figures 1 and 2 and col. 2:48-49. Nesbitt also teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a range of .020 and .100 inches. Nesbitt further teaches a suitable material for the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the "typical properties of commercially available Surlyn resins". In Table 1, found in col. 8, the Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a source for potential cellular

compositions that may be employed in the inner and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> "Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which describes a number of foamable [cellular] compositions of a character which may be employed for one or both layers 14 and 16 of the golf ball of this invention".

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the layer covering the solid core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer 14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16 may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming or one or the other or both layers may be altered to provide a variation in the coefficient of restitution of the golf ball. These teachings of viewing Nesbitt alone and Nesbitt and Molitor '637 taken together were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, is consider to raise a substantial new question that has not been decided in a previous examination on the Sullivan patent. Further Nesbitt and Molitor '637 taken together are considered to raise a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

## 2. Nesbitt taken with Wu

25.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to claim 4 of the Sullivan patent. The request on pages 38 and 39 considers that Nesbitt alone teaches the use of a particular soft polyurethane material for use as the outer layer 16. However,

a closer reading of Nesbitt teaches that Nesbitt references the covers taught Molitor '637 can be

used as materials for the covers taught in Nesbitt. See Nesbitt, col. 3:56-60. Molitor '637

teaches the use of particular polyurethane materials for the use as an outer layer. Wu teaches that

polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in

col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers

have become accustomed to such sensations and polyurethane covered golf balls can be made to

have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made

according to its invention will have Shore D hardness directly proportional to the degree of cure

of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D

scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637 taken with

Wu were not present in the prosecution of the application which issued as the Sullivan patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt

mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to

claim 4, which question has not been decided in a previous examination of the Sullivan patent.


### 3. Nesbitt taken with Molitor '751

26.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to

claim 4 of the Sullivan patent. As pointed out on pages 40 and 41 of the request, Molitor '751

explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col.

2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having

a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see

col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7

and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a

Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature

would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of

viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application

which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim is

Application/Control Number: 95/000,120                                    Page 20
Art Unit: 3993

patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of

patentability as to claim 4, which question has not been decided in a previous examination of the

Sullivan patent.

### 4. Proudfit taken with Molitor '637

27.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to

claim 4 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is

discussed above at item 15 and incorporated herein. It is agreed as stated in the request on pages

42-46 that Proudfit teaches a

> "three-piece [two-piece] solid golf ball that includes a core, a hard
> ionomer inner cover layer and a relatively soft outer cover layer
> made of a balata-based material."

Req. at page 42. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial

note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand

the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core

around the inner core and a cover secured to the wound core. Those skill in the art understand

the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core.

This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly

quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having

a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf

ball 10 which includes a solid spherical (see Proudfit's figures) core 11 and a cover 12 which

comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft

outer layer 14 with dimples (again see Proudfit's figures) of polymeric material as taught in col.

7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and

Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As

admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus of

51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches

thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of

balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness

Application/Control Number: 95/000,120                                                Page 21

Art Unit: 3993

preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a

relatively soft polyurethane material. However, in an analogous golf ball Molitor '637 teaches

the use of a polyurethane material as the outer layer, that material being Estane 58133, see col.

18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from

Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and

the farther the ball will travel when struck by the club face (USGA permits a maximum COR of

0.795 for a finished ball); 2) high compression value on a Riehle machine equates to a finished

golf ball having better spin control characteristics when struck by the club face because more of

the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the

lower the rebound distance equates to more force need to impart motion on the ball when putting

creating a "deadening effect similar to balata covered balls" which has been shown to decrease

margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and

col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression

(COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression

(COMP) and rebound distance (RD) for all finished balls having the solid center C described in

col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|-------|-------------|------------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

28.    Example 18 is taught as having its cover made from a polyurethane material, see col.

18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower

COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a polyurethane material; moreover, a relatively soft polyurethane material as a cover layer to a solid core golf ball. This teaching as to the polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

29.     It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 4 of the Sullivan patent. As pointed out in the request on page 46-47, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 26. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. Id. Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this

Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 6. Proudfit taken with Molitor '751

30.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to claim 4 of the Sullivan patent. As pointed out in the request on page 48-49 and as also discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 48. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As pointed out on pages 48 and 49 of the request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not

Application/Control Number: 95/000,120                          Page 24
Art Unit: 3993

the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new
question of patentability as to claim 4, which question has not been decided in a previous
examination of the Sullivan patent.


## RE. CLAIM 5

### 1. Nesbitt

31.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 5 of the Sullivan patent.
Claim 5 is dependent upon claim 4. Claim 5 limits the inner layer thickness within the range of
0.100 to 0.010 inches thick; the outer layer thickness within the range of 0.010 and 0.070 and the
overall ball diameter at least 1.680 inches. As pointed out in the request on pages 50-51, Nesbitt
teaches the inner layer thickness being between 0.020 and 0.070 inches (Nesbitt, col. 3:19-23);
the outer layer thickness being between 0.020 and 0.100 inches (Nesbitt, col. 3:22-25) and the
minimum diameter of 1.680 inches (Nesbitt, col. 2:50-52). These teachings of Nesbitt were not
present in the prosecution of the application which issued as the Sullivan patent. Further, there is
a substantial likelihood that a reasonable examiner would consider these teachings important in
deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new
question of patentability as to claim 5, which question has not been decided in a previous
examination of the Sullivan patent.


### 2. Proudfit

32.    It is agreed that consideration of Proudfit raises a SNQ as to claim 5 of the Sullivan
patent. Claim 5 is dependent upon claim 4. Claim 5 limits the inner layer thickness within the
range of 0.100 to 0.010 inches thick; the outer layer thickness within the range of 0.010 and
0.070 and the overall ball diameter at least 1.680 inches. As pointed out in the request on pages
51-52, Proudfit has a preferred embodiment of a multilayer golf ball with an inner layer being
0.037 inches thick; an outer layer being 0.0525 inches thick; and an overall diameter of 1.680
inches. See Proudfit, col. 7:40-47. These teachings of Proudfit were not present in the
prosecution of the application which issued as the Sullivan patent. Further, there is a substantial

Application/Control Number: 95/000,120                                          Page 25
Art Unit: 3993

likelihood that a reasonable examiner would consider these teachings important in deciding
whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of
patentability as to claim 5, which question has not been decided in a previous examination of the
Sullivan patent.

### RE. CLAIM 6

#### 1. Nesbitt

33.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 6 of the Sullivan patent.
Claim 6 is dependent upon claim 4. Claim 6 limits the inner and outer cover thickness to 0.050
inches and 0.055, respectively. As pointed out in the request on pages 52-53, Nesbitt teaches
that a preferred embodiment has an outer layer of 0.0575 inch thickness. If the standard USGA
golf ball has an overall minimum diameter of 1.680 inches and Nesbitt in col. 3:29 teaches that a
preferred solid core plus inner thickness diameter is 1.565 inches, then Nesbitt inner layer
thickness to match the preferred outer layer and solid core diameter in order to yield a total
diameter of 1.680 inches would be about 0.0525 inches to be within the given inner layer range
of between 0.020 to 0.070 inches. These teachings of viewing Nesbitt were not present in the
prosecution of the application which issued as the Sullivan patent. Further, there is a substantial
likelihood that a reasonable examiner would consider these teachings important in deciding
whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of
patentability as to claim 6, which question has not been decided in a previous examination of the
Sullivan patent.

#### 2. Proudfit

34.    It is **not agreed** that Proudfit in combination with other references teach all of the
limitation of claim 6. Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see
col. 7:43-44. Claim 6 requires the inner layer to be about 0.050 inches thick. Those skilled in
the art measure thickness to the thousandths of an inch. The difference between the Proudfit
preferred embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an

Application/Control Number: 95/000,120                                    Page 26
Art Unit: 3993

inch. This difference equates to a difference of a factor of ten. Further, the requester admits that
it is not the chemical but the mechanical properties of the materials used in making golf balls
important to those skilled in the art. One of the mechanical properties in constructing a golf ball
with materials is the thickness to make a given layer. Therefore, a reasonable examiner would
not consider this teaching important in deciding whether or not the claim is patentable. Thus,
Proudfit in combination with the other references does not raise a SNQ with respect to claim 6.


### RE. CLAIM 7

#### 1 Nesbitt alone, and Nesbitt and Molitor '637 taken together

35.     It is agreed that the consideration of Nesbitt alone, and consideration of Nesbitt and
Molitor '637, each taken together raises a substantial new question of patentability (SNQ) as to
claim 7 of the Sullivan. As pointed out in the request on pages 55-59, Nesbitt teaches a two
piece golf ball having a solid core, figure 1 and col. 2:33 teach the core shaped as a sphere, with
a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an
"outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Moreover, the
outer layer 16 is taught to be dimpled, see figures 1 and 2 and col. 2:48-49. Furthermore, Nesbitt
teaches the inner layer is molded over the core to form an intermediate ball, see Nesbitt col.
2:34-37. Nesbitt also teaches having the inner layer 14 of cellular or non-cellular hard, high
flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while
having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material
of a thickness in a range of .020 and .100 inches. Nesbitt further teaches a suitable material for
the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent
admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent
contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see
col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin
designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now
designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft,
low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found
in col. 8, the "typical properties of commercially available Surlyn resins". In Table 1, found in

col. 8, the Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this
table Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to
Molitor '637 as a source for potential cellular compositions that may be employed in the inner
and outer layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which
> describes a number of foamable [cellular] compositions of a
> character which may be employed for one or both layers 14 and 16
> of the golf ball of this invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of
Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the
solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the
layer covering the solid core is 0.090 inches. Molitor '637 lacks teaching the actually flexural
modulus of the polyurethane used in covering the solid core. There is a substantial likelihood
that review the technical properties of the polyurethane used in Molitor '637 would be needed
via product information sheets or the like. Nesbitt teaches the inner, intermediate or first layer
14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16
may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is
comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the
outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of
foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming
or one or the other or both layers may be altered to provide a variation in the coefficient of
restitution of the golf ball. Viewing the teachings of Nesbitt alone it is clear that these teachings
were not present in the prosecution of the application which became the Sullivan patent. Further,
there is a substantial likelihood that a reasonable examiner would consider these teachings
important in deciding whether or not the claim is patentable. Also, the teachings of Nesbitt and
Molitor '637 taken together were not present in the prosecution of the application which issued
as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would
consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Nesbitt alone and Nesbitt and Molitor '637 taken together raise a substantial new

Application/Control Number: 95/000,120                                              Page 28
Art Unit: 3993

question of patentability as to claim 7, which question has not been decided in a previous
examination of the Sullivan patent.

### 2. Nesbitt taken with Wu

36.     It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to
claim 7 of the Sullivan patent. The request on pages 59-61 considers Nesbitt solely teaches the
use of a particular soft polyurethane material for use as the outer layer 16. However, a closer
reading of Nesbitt teaches that Nesbitt references the covers taught Molitor '637 can be used as
materials for the covers taught in Nesbitt. See Nesbitt, col. 3:56-60. Molitor '637 teaches the
use of particular polyurethane materials for the use as an outer layer. Wu teaches that
polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in
col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers
have become accustomed to such sensations and polyurethane covered golf balls can be made to
have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made
according to its invention will have Shore D hardness directly proportional to the degree of cure
of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D
scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus of the taught
polyurethane; thus, there is a substantial likelihood that a review the mechanical characterization
literature would be needed to determine the flexural modulus of the taught polyurethane material
in Wu. These teachings of viewing Nesbitt mentioning Molitor '637 taken with Wu were not
present in the prosecution of the application which issued as the Sullivan patent. Further, there is
a substantial likelihood that a reasonable examiner would consider these teachings important in
deciding whether or not the claim is patentable. Accordingly, Nesbitt mentioning Molitor '637
taken with Wu raises a substantial new question of patentability as to claim 7, which question
has not been decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,120                                    Page 29
Art Unit: 3993

### 3. Nesbitt taken with Molitor '751

37.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to

claim 7 of the Sullivan patent. As pointed out on pages 61 and 62 of the request, Molitor '751

explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col.

2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having

a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see

col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7

and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a

Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature

would be needed to equate the Shore D hardness to the Shore C of this blend. Molitor '751 lacks

in teaching the specific flexural modulus of the taught polyurethane; thus, a reasonable examiner

would have to review the chemical literature to determine the flexural modulus of the taught

polyurethane material in Molitor '751. These teachings of viewing Nesbitt taken with Molitor

'751 were not present in the prosecution of the application which issued as the Sullivan patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt

taken with Molitor '751 raises a substantial new question of patentability as to claim 7, which

question has not been decided in a previous examination of the Sullivan patent.

### 4. Proudfit taken with Molitor '637

38.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to

claim 7 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is

discussed above at item 15 and incorporated herein. It is agreed as stated in the request on pages

63-67 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core, a hard
> ionomer inner cover layer and a relatively soft outer cover layer
> made of a balata-based material.

Req. at page 63. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial

note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand

the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core around the inner core and a cover secured to the wound core. Those skill in the art understand the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core. This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11 (spherical see figures) and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 (with dimples see figures) of polymeric material as taught in col. 7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus of 51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a relatively soft polyurethane material. Although, Proudfit teaches that its soft elastomer material as a flexural modulus in the range of about 20,000 to 25,000 psi, see col. 6:28-31. However, in an analogous golf ball Molitor '637 teaches the use of a polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high compression value on a Riehle machine equates to a finished golf ball having better spin control characteristics when struck by the club face because more of the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound distance equates to more force need to impart motion on the ball when putting creating a "deadening effect similar to balata covered balls" which has been shown to decrease margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the

Application/Control Number: 95/000,120                                  Page 31

Art Unit: 3993

COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid

center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---|---|---|---|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| 16 | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

39.      Example 18 is taught as having its cover made from a polyurethane material, see col.

18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower

COR and lower rebound distance; which teaches the polyurethane material of example 16 is less

elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball.

Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows

that the polyurethane material in Example 16 is a relatively soft material.  Thus, Molitor '637

teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball.

However, Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in

covering the solid core.  Thus, there is a substantial likelihood that a review the mechanical

characterization literature would be needed to determine the flexural modulus of the taught

polyurethane material used in Molitor '637.  This teaching as to the relative soft polyurethane

material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of

the application which issued as the Sullivan patent.  Further, there is a substantial likelihood that

a reasonable examiner would consider this teaching important in deciding whether or not the

claim is patentable.  Accordingly, Proudfit taken with Molitor '637 raises a substantial new

Application/Control Number: 95/000,120                                    Page 32
Art Unit: 3993

question of patentability as to claim 7, which question has not been decided in a previous
examination of the Sullivan patent.

### 5  Proudfit taken with Wu

40.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 7 of
the Sullivan patent. As pointed out in the request on pages 68-69, Proudfit teaches a golf ball
having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft
balata outer cover layer. Req. at 68. As known in the art, balata covered balls have durability
problems. However, golfers prefer the balata cover ball not because of the balata chemical
composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf
swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties
associated with the material being used in the manufacture of the ball's cover. So long as the
golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to
a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball
manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not
like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become
accustomed to with balata. Id. Thus, Wu proposes employing a polyurethane material as a cover
layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention
will have Shore D hardness directly proportional to the degree of cure of the cover; and this
Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-
38. Wu lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is
a substantial likelihood that a review the mechanical characterization literature would be needed
to determine the flexural modulus of the taught polyurethane material in Wu. These teachings of
viewing Proudfit taken with Wu were not present in the prosecution of the application which
issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner
would consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Proudfit taken with Wu raises a substantial new question of patentability as to
claim 7, which question has not been decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,120                                    Page 33
Art Unit: 3993

## 6. Proudfit taken with Molitor '751

41.     It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to

claim 7 of the Sullivan patent. As pointed out in the request on pages 69-71 and as also

discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a

hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 69. As known in

the art, balata covered balls have durability problems. However, golfers prefer the balata cover

ball not because of the balata chemical composition itself; but the material provides a certain

"click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and

"feel" are the mechanical properties associated with the material being used in the manufacture

of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball;

any material would be accepted to a golfer. As pointed out on pages 69 and 70 of the request,

Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf

ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic

urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of

55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning

across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the

ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the

scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend.

Molitor '751 lacks in teaching the specific flexural modulus of the taught polyurethane; thus,

there is a substantial likelihood that a review of the mechanical characterization literature would

be needed to determine the flexural modulus of the taught polyurethane material in Molitor '751.

These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution

of the application which issued as the Sullivan patent. Further, there is a substantial likelihood

that a reasonable examiner would consider these teachings important in deciding whether or not

the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new

question of patentability as to claim 7, which question has not been decided in a previous

examination of the Sullivan patent.

Application/Control Number: 95/000,120                                        Page 34
Art Unit: 3993

## CLAIM 8

### 1. Nesbitt

42.     It is agreed that consideration of Nesbitt raises a SNQ as to claim 8 of the Sullivan patent.
Claim 8 depends from claim 7 and limits the inner layer having a higher Shore D hardness than
the outer layer.  As pointed out in the request on pages 71-72, Nesbitt teaches a first layer of
molded hard, high flexural modulus resinous material under a second layer of soft, low flexural
modulus resinous material, see e.g. Nesbitt's abstract.  This teaching of Nesbitt was not present
in the prosecution of the application which issued as the Sullivan patent.  Further, there is a
substantial likelihood that a reasonable examiner would consider this teaching important in
deciding whether or not the claim is patentable.  Accordingly, Nesbitt raises a substantial new
question of patentability as to claim 8, which question has not been decided in a previous
examination of the Sullivan patent.

### 2. Proudfit

43.     It is agreed that consideration of Proudfit raises a SNQ as to claim 8 of the Sullivan
patent.  Claim 8 depends from claim 7 and limits the inner layer having a higher Shore D
hardness than the outer layer.  As pointed out in the request on page 72, Proudfit teaches an inner
layer formed from hard resin material and an outer layer formed from a soft material.  This
teaching of Proudfit was not present in the prosecution of the application which issued as the
Sullivan patent.  Further, there is a substantial likelihood that a reasonable examiner would
consider this teaching important in deciding whether or not the claim is patentable.  Accordingly,
Proudfit raises a substantial new question of patentability as to claim 8, which question has not
been decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,120                                                    Page 35

Art Unit: 3993

## *Summary of SNQs Adopted and Not Adopted*

### *Requester's SNQs Adopted*

44.    For Claim 1 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Molitor '751 taken together.

(3) Nesbitt and Wu taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751.


45.    For Claim 2 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.


46.    For Claim 3 of the Sullivan patent:

(1) Nesbitt.


47.    For Claim 4 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.


48.    For Claim 5 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.

Application/Control Number: 95/000,120    Page 36

Art Unit: 3993

49.    For Claim 6 of the Sullivan patent:

(1) Nesbitt.

50.    For Claim 7 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.

51.    For Claim 8 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.

*Requester's SNQs Not Adopted*

52.    For Claim 3 of the Sullivan patent:

(2) Proudfit in combination with other references.

53.    For Claim 6 of the Sullivan patent:

(2) Proudfit in combination with other references.

***Office Action on the Merits***

54.    An Office action on the merits does not accompany this order for *inter partes*
reexamination.  An Office action on the merits will be provided in due course.

Application/Control Number: 95/000,120
Page 37

Art Unit: 3993

### *Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be directed:

Please mail any communications to:

> Attn: Mail Stop "Inter Partes Reexam"
> Central Reexamination Unit
> Commissioner for Patents
> P. O. Box 1450
> Alexandria, VA  22313-1450

Please FAX any communications to:

> (571) 273-9900
> Central Reexamination Unit

Please hand-deliver any communications to:

> Customer Service Window
> Attn:  Central Reexamination Unit
> Randolph Building, Lobby Level
> 401 Dulany Street
> Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Michael O'Neill
CRU Examiner
AU 3993

CONF:

# EXHIBIT 4



Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.usplo.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000121 | 01/17/2006 | 6503156 | |

Dorothy P. Whelan
Fish & Richardson P. C.
P. O. Box 1022
Minneapolis MN 55440-1022

| EXAMINER |
|---|
| Michael O'Neill |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

04/07/06

# *INTER PARTES* REEXAMINATION
# COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED
STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE
PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to
the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of
this communication.

PTOL-2071 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Howrey LLP
1299 Pennsylvania Avenue N. W.
Washington DC ..20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,121.*

PATENT NUMBER *6503156.*

TECHNOLOGY CENTER *3900.*

ART UNIT *3993.*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | | Patent Under Reexamination | |
|---|---|---|---|
| | 95/000,121 | 6503156 | |
| | **Examiner** | **Art Unit** | |
| | Michael O' Neill | 3993 | |

*-- The MAILING DATE f this c mmunication appears on th c ver sheet with the c rresp ndence address. --*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

# ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION

| Control No. 95/000,121 | Patent Under Reexamination 6503156 |
|---|---|
| Examiner Michael O'Neill | Art Unit 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):    ☐ PTO-892    ☒ PTO-1449 or PTO/SB/08    ☐ Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

     ☐ An Office action is attached with this order.

     ☒ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c): Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

Application/Control Number: 95/000,121                                              Page 1

Art Unit: 3993

## DECISION GRANTING INTER PARTES REEXAMINATION

### *Substantial New Question of Patentability*

1.      A substantial new question of patentability affecting claims 1-11 of United States Patent Number 6,503,156 to Sullivan is raised by the present request for *inter partes* reexamination.

### *Extensions of Time*

2.      Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes* reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. § 314(c) requires that *inter partes* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937).  Patent owner extensions of time in *inter partes* reexamination proceedings are provided for in 37 CFR 1.956.  Extensions of time are not available for third party requester comments, because a comment period of 30 days from service of patent owner's response is set by statute. 35 U.S.C. § 314(b)(3).

### *Notification of Concurrent Proceedings*

3.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent 6,503,156 throughout the course of this reexamination proceeding.  The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2686 and 2686.04.

Application/Control Number: 95/000,121                                    Page 2

Art Unit: 3993

### *Requester's Position*

4.      The request indicates that third party requester considers:

      a.      Claim 1 of the Sullivan patent to be unpatentable over:

            i.      Nesbitt (USPN 4,431,193) alone, and Nesbitt and Molitor '637
taken together.

            ii.      Nesbitt taken with Wu.

            iii.      Nesbitt taken with Molitor '751.

            iv.      Proudfit taken with Molitor '637.

            v.      Proudfit taken with Wu.

            vi.      Proudfit taken with Molitor '751.

      b.      Claim 2 of the Sullivan patent to be unpatentable over:

            i.      Nesbitt alone, and Nesbitt and Molitor '637 taken together;
Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken
together.

            ii.      Proudfit taken with any one of Molitor '637, Wu, or Molitor
'751.

      c.      Claim 3 of the Sullivan patent to be unpatentable over:

            i.      Nesbitt alone, and Nesbitt and Molitor '637 taken together;
Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken
together.

            ii.      Proudfit taken with any one of Molitor '637, Wu, or Molitor
'751.

      d.      Claim 4 of the Sullivan patent to be unpatentable over:

            i.      Nesbitt alone, and Nesbitt and Molitor '637 taken together.

            ii.      Nesbitt taken with Wu.

            iii.      Nesbitt taken with Molitor '751.

            iv.      Proudfit taken with Molitor '637.

            v.      Proudfit taken with Wu.

Application/Control Number: 95/000,121                    .                    Page 3

Art Unit: 3993

    vi. Proudfit taken with Molitor '751.

  e. Claim 5 of the Sullivan patent to be unpatentable over:

    i. Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

    ii. Proudfit taken with any one of Molitor '637, Wu, or Molitor '751.

  f. Claim 6 of the Sullivan patent to be unpatentable over:

    i. Nesbitt solely or Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

    ii. Proudfit taken with any one of Molitor '637, Wu, or Molitor '751.

  g. Claim 7 of the Sullivan patent to be unpatentable over:

    i. Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together or Nesbitt and Molitor '751.

    ii. Proudfit taken with any one of Molitor '637, Wu or Molitor '751.

  h. Claim 8 of the Sullivan patent to be unpatentable over:

    i. Nesbitt alone, and Nesbitt and Molitor '637 taken together.

    ii. Nesbitt taken with Wu.

    iii. Nesbitt taken with Molitor '751.

    iv. Proudfit taken with Molitor '637.

    v. Proudfit taken with Wu.

    vi. Proudfit taken with Molitor '751.

  i. Claim 9 of the Sullivan patent to be unpatentable over:

    i. Nesbitt alone, and Nesbitt and Molitor '637 taken together; Nesbitt and Wu taken together; or Nesbitt and Molitor '751 taken together.

    ii. Proudfit taken with any one of Molitor '637, Wu, Molitor '751.

j.      Claim 10 of the Sullivan patent to be unpatentable over:

        i.      Nesbitt alone, and Nesbitt and Molitor '637 taken together;
                Nesbitt and Wu taken together or Nesbitt and Molitor '751.

        ii.     Proudfit taken with any one of Molitor '637, Wu or Molitor
                '751.

k.      Claim 11 of the Sullivan patent to be unpatentable over:

        i.      Nesbitt alone, and Nesbitt and Molitor '637 taken together;
                Nesbitt and Wu taken together or Nesbitt and Molitor '751.

        ii.     Proudfit taken with any one of Molitor '637, Wu or Molitor
                '751.

### *Prosecution History of the Sullivan '156 patent*

5.      United States Patent Number 6,503,156 issued from an application with application No.
09/873,642, which was a continuation of application No. 09/776,278, filed on Feb. 2, 2001, now
Pat. No. 6,595,156, which is a continuation of application No. 09/470,196, filed on Dec. 21,
1999, now Pat. No. 6,210,293. United States Patent Number 6,210,293 issued from an
application with the serial number of 09/470,196, filed on Dec. 21, 1999. Said application was a
continuation of application No. 08/870,585, filed on Jun. 6, 1997, now abandoned, which is a
continuation of application No. 08/556,237, filed on Nov. 9, 1995, now abandoned, which is a
continuation-in-part of application No. 08/542,793, filed on Oct. 13, 1995, now abandoned,
which is a continuation-in-part of application No. 08/070,510, now abandoned.

6.      The "continuation" portion of this series of applications can be found on pages 41-42
within the 08/070,510 application where it states that:

> Composition D represents the inner layer (i.e. Surlyn 1605) used in U.S.
> Patent No. 4,431,193. Composition E provides a hard, low acid ionomeric
> resin [as the inner layer]. The purpose behind producing and testing the balls
> of Table IV [Table 7] was to provide a subsequent comparison in properties
> with the multi-layer golf balls of the present invention [which are high acid
> ionomer resin inner cover layer with lower acid ionomer resin to the known
> prior art golf balls which are constructed with a low acid ionomer resin inner
> cover layers of balls D and E].

Molded intermediate Ball D in Table IV (7) is the intermediate ball (the inner layer molded onto a solid core) for the Nesbitt '193 patent. Molded intermediate Ball E in Table IV (7) has as its intermediate ball an ionomer blend of Iotek 7030 and 8000. The '510 application then concludes on page 45:

> ... it is also noted that the use of the high acid ionomer resins as the inner cover material produces a substantial increase in the finished balls overall distance properties. In this regard, the high acid ionomer resin inner covers of balls 1-3 produce an increase of approximately 10 points in C.O.R. [coefficient of restitution] over the low acid ionomer resin inner covers of balls 4 and about a 25 points increase over the prior art balls 5. Since an increase in 3 to 6 points in C.O.R. results in an average increase of about 1 yard in distance, such an improvement is deemed to be significant.

It should be noted that the '510 application lacks providing a finished ball using the molded intermediate Ball E constructed of an ionomer blend of Iotek 7030 and 8000. Instead, the '510 application uses only the molded intermediate Ball D which is constructed out of Surlyn 1605 as the finished balls 4 and 5 in Table 8 which are the prior art balls taught in the Nesbitt. Thus, the '510 appears to lack a finished ball embodiment description constructed with an inner layer made from two ionomer blends with said claimed mechanical properties of Shore D hardness, flexural modulus and thickness and an outer layer made of a polyurethane material with said claimed mechanical properties of Shore D hardness, flexural modulus and thickness. Instead, the '510 application discloses only a molded intermediate Ball E made from a 50/50 blend of two ionomers known as Iotek 7030 and 8000 as shown in Table IV (7) on pages 41-42.

7.      The next application in the chain where the claimed invention could be adequately describe and enabled is application No. 08/542,793 ('793 application), which is a continuation-in-part to the '510 application. On page 39, the '793 application discloses:

> "Top Grade" or "TG" is a low acid inner cover ionomer resin blend comprising 70.6% Iotek 8000, 19.9% Iotek 7010 and 9.6% white masterbatch.

This disclosure describes the claimed inner cover being of two low acid ionomer blends. However, the outer layer is described in the '793 application as consisting of ionomer resins and

Application/Control Number: 95/000,121                                    Page 6
Art Unit: 3993

non-ionomeric thermoplastic elastomers and not polyurethane. Urethanes (polyurethane) include
materials from the carbamate group, as well as other functional groups, such as ester, ether,
amide and urea. Therefore, the inner layer claimed in the '293 patent is described and enabled
on the date of filing of the '793 application which is Oct. 13, 1995, but not the outer layer
claimed in the '293 Patent.

8.      The next application in the chain where the claimed invention could be adequately
described or enabled is application No. 08/556,237 ('237 application), which is a continuation-
in-part to the '793 application. Page 46 describes a plurality of golf balls constructed of a mantel
(core and inner layer) consisting of a blend of ionomers, Iotek 8030 and Iotek 7030, and outer
layers consisting of Baytec RE832 which is a castable, thermoset polyurethane material. The
claimed invention's outer layer requires the material to be a relatively soft polyurethane material.
The material that is described in the disclosure that could meet the relatively soft polyurethane
material is found on page 24, Estane X-4517. This material is not described as being used in any
embodiment disclosed in the '237 application; although it has been concluded that one of
ordinary skill in the art could make a finished golf ball embodiment of this material as an outer
layer from reading the disclosure contained within the '237 application. Therefore, the claimed
invention in the '156 patent appears adequately described in the '237 application. The '237
application has an filing date of Nov. 9, 1995.

9.      Therefore, based on the above analysis regarding the disclosures of the parent
applications of which claims 35 U.S.C. 120 benefit, the Sullivan '156 patent the inventions
claimed in claims 1-11 of **the Sullivan '156 patent have a critical date for purposes of prior
art patents and printed publications of Nov. 9, 1995.**

### *Substantial New Question vel non*

10.     The substantial new questions of patentability with respect to Nesbitt for claims 1-11 are
based solely on patents and/or printed publications already cited/considered in an earlier
concluded examination of the patent being reexamined. On November 2, 2002, Public Law 107-

273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the
reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

> The existence of a substantial new question of patentability is not
> precluded by the fact that a patent or printed publication was
> previously cited by or to the Office or considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the
statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily
preclude the existence of a substantial new question of patentability (SNQ) that is based
exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance
shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, there exists a SNQ based solely on Nesbitt (USPN 4,431,193).
Nesbitt alone was applied and is now being looked at in a new light. Proudfit, Molitor '637,
Molitor '751, and Wu were cited and considered, but not applied. A discussion of the specifics
now follows:

## RE. CLAIM 1

### 1. Nesbitt alone, and Nesbitt and Molitor '637 taken together

11.    It is agreed that the consideration of Nesbitt alone, and Nesbitt and Molitor '637 taken
together raises a substantial new question of patentability (SNQ) as to claim 1 of the Sullivan
patent. As pointed out on pages 14-18 of the request, Nesbitt teaches a two piece golf ball
having a solid core with a cover including "an inner layer 14 of hard, high flexural modulus
resinous material" and an "outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt,
col. 1:20-25. Nesbitt also teaches having the inner layer 14 of cellular or non-cellular hard, high
flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while
having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material
of a thickness in a range of .020 and .100 inches. Nesbitt further teaches a suitable material for
the inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent
admits Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent
contains an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see

col. 2:54. Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin

designated Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now

designated Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft,

low flexural modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found

in col. 8, the "typical properties of commercially available Surlyn resins". In this table Surlyn

8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor '637 as a

source for potential cellular compositions that may be employed in the inner and outer layers 14

and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which
> describes a number of foamable [**cellular**] compositions of a
> character which may be employed for one or both layers 14 and 16
> of the golf ball of this invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of

Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the

solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches in TABLE 10 an outer layer made

from a thermoplastic polyurethane identified as Estane 58133. There is a substantial likelihood

that a review of the scientific literature would be needed to determine the Shore D hardness of

Estane 58133. Molitor '637 teaches that the average thickness of the layer covering the solid

core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer 14 on the core 12 may

be slightly foamed to a low degree so as not to materially affect the coefficient of restitution of

the material. Nesbitt teaches the outer or cover or second layer 16 may be foamed to a greater

degree than the inner layer 14 as the material of the layer 16 is comparatively soft. Nesbitt

teaches the inner layer 14 may be unfoamed or noncellular and the outer layer may be cellular or

foamed resin or vice versa. Nesbitt teaches through the use of foamable material for the first

layer 14, the cover layer 16 or both layers, the degree of foaming or one or the other or both

layers may be altered to provide a variation in the coefficient of restitution of the golf ball.

These teachings of viewing Nesbitt solely and Nesbitt and Molitor '637 taken together were not

present in the prosecution of the application which issued as the Sullivan patent. Further, there is

a substantial likelihood that a reasonable examiner would consider these teachings important in

deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, is considered to

Application/Control Number: 95/000,121                                                    Page 9
Art Unit: 3993

raise a substantial new question of patentability as to claim 1, which question has not been

decided in a previous examination of the Sullivan patent. Further, Nesbitt and Molitor '637

taken together are considered to raise a substantial new question of patentability as to claim 1,

which question has not been decided in a previous examination of the Sullivan patent.

### 2. Nesbitt taken with Wu

12.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to

claim 1 of the Sullivan patent. The request on pages 18-20 considers that Nesbitt alone teaches

the use of a particular soft polyurethane material for use as the outer layer 16. However, it

should be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in

Nesbitt teach the use of particular polyurethane materials for the use as an outer layer. Wu

teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further

teaches in col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which

golfers have become accustomed to such sensations and polyurethane covered golf balls can be

made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes

made according to its invention will have Shore D hardness directly proportional to the degree of

cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the

Shore D scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637

taken with Wu were not present in the prosecution of the application which issued as the Sullivan

patent. Further, there is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt

mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to

claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

13.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to

claim 1 of the Sullivan patent. As pointed out on pages 20-22 of the request, Molitor '751

explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col.

2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having

Application/Control Number: 95/000,121                              Page 10
Art Unit: 3993

a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see

col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7

and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a

Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature

would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of

viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application

which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the claim is

patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of

patentability as to claim 1, which question has not been decided in a previous examination of the

Sullivan patent.


### 4. Proudfit taken with Molitor '637

14.     It is further agreed that the consideration of Proudfit taken with Molitor '637 raises a

SNQ as to claim 1 of the Sullivan patent. The above explanation of the prosecution history of

the Sullivan patent taken with the below analysis of the prosecution history of Proudfit set forth

below will lead to the conclusion that the Proudfit patent qualifies as a prior art patent under 35

U.S.C. § 102(b) thus raising a SNQ as to the claims of the Sullivan patent because Proudfit was

utilized as a § 102(e) reference in a § 103(a) rejection against the claims in the parent application

No. 08/870,585 as evidenced by the acceptance of a Rule 131 declaration withdrawing the

Proudfit reference (see Paper #24, mailed 12-7-99), viewing the Proudfit patent as 35 U.S.C.

102(b) prior art that cannot be antedated under 37 CFR 1.131 is a consideration of the teachings

in Proudfit in a "new light."


15.     Proudfit has a filing date of Jun. 29, 1992 and is a continuation-in-part of Ser. No.

07/733,789, ('789 application) filed on Jul. 26, 1991, now abandoned. A review of the '789

application appears to not adequately describe and enable an invention of a golf ball having a

solid core, an inner layer cover and an outer layer cover. Instead, the '789 application appears to

describe and enable a golf ball with a solid core and a single cover layer; instead of the inner and

Application/Control Number: 95/000,121                                                    Page 11
Art Unit: 3993

outer cover layers shown in Proudfit's figures 1 and 2. Therefore, Proudfit's teachings of a golf
ball having a solid core, an inner layer and outer layer has the effective filing date of Jun 29,
1992; the date of filing the Proudfit application which issued into the Proudfit patent. Proudfit
issued on May 24, 1994. The claimed inventions within the Sullivan '293 patent have the critical
date of Nov. 9, 1995, more than one year after issuance of the Proudfit patent.

16.     Thus, it is agreed as stated in the request on pages 22-25 that Proudfit teaches a

                three-piece [two-piece] solid golf ball that includes a core, a hard
                ionomer inner cover layer and a relatively soft outer cover layer
                made of a balata-based material.

Req. at page 22. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial
note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand
the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core
around the inner core and a cover secured to the wound core. Those skilled in the art understand
the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core.
This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly
quoted in the request on page 22 teaches a golf ball having a two-layer cover, see Proudfit col.
1:11-12. It is agreed that Proudfit teaches a two-piece golf ball 10 which includes a solid core 11
and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins
and a relatively soft outer layer 14 of polymeric material as taught in col. 7:21-24. Table 6 in
Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are
low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. Proudfit in column 7, lines
37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17
teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in
column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit
lacks in teaching the outer cover being made of a relatively soft polyurethane material.
However, in an analogous golf ball Molitor '637 teaches the use of a polyurethane material as
the outer layer, that material being Estane 58133, see col. 18 of Molitor '637 Example 16. One
skilled in the art reading the specification learns from Molitor '637 that: 1) a higher coefficient of
restitution (COR) means a more elastic collision and the farther the ball will travel when struck

Application/Control Number: 95/000,121                                Page 12
Art Unit: 3993

by the club face (USGA permits a maximum COR of 0.795 for a finished ball); 2) high

compression value on a Riehle machine equates to a finished golf ball having better spin control

characteristics when struck by the club face because more of the ball contacts the ridges on the

club face which imparts the back spin on the ball; and 3) the lower the rebound distance equates

to more force need to impart motion on the ball when putting creating a "deadening effect similar

to balata covered balls" which has been shown to decrease margins of error while putting, thus

making a more forgiving ball to putt.  See col. 6:28-65 and col. 9:19-35.  In Example 16, the

coefficient of restitution (COR) was 0.750; compression (COMP) 95; and rebound distance (RD)

66 inches.  The below table lists the COR, compression (COMP) and rebound distance (RD) for

all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|-----|-------------|-----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

17.    Example 18 is taught as having its cover made from a polyurethane material, see col.

18:63 through col. 19:2.  Comparing Example 16 to Example 18 teaches Example 16 has a lower

COR and lower rebound distance; which teaches the polyurethane material of example 16 is less

elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball.

Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows

that the polyurethane material in Example 16 is a relatively soft material.  Thus, Molitor '637

teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball.

This teaching as to the relative soft polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 1, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

18.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 1 of the Sullivan patent. As pointed out in the request on pages 26 and 27, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 26. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata covered ball not because of the balata chemical composition itself, but because the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered ball, any material would be acceptable to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover because it lacks the "click" and "feel" which golfers had become accustomed to with balata. Id. Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question

Application/Control Number: 95/000,121                                    Page 14
Art Unit: 3993

of patentability as to claim 1, which question has not been decided in a previous examination of
the Sullivan patent.


### 6. Proudfit taken with Molitor '751

19.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to
claim 1 of the Sullivan patent. As pointed out in the request on page 27 and as also discussed
above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard,
ionomeric inner cover layer and a soft balata outer cover layer. Req. at 27. As known in the art,
balata covered balls have durability problems. However, golfers prefer the balata covered ball
not because of the balata chemical composition itself, but because the material provides a certain
"click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and
"feel" are the mechanical properties associated with the material being used in the manufacture
of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata covered
ball, any material would be accepted to a golfer. As pointed out on pages 28 and 29 of the
request, Molitor '751 explains the advantages of using a soft polyurethane material on a two-
piece golf ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a
thermoplastic urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D
hardness of 55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE
spanning across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn
1605 (the ionomer) having a Shore C hardness of 73. There is a substantial likelihood that
review of the scientific literature would be needed to equate the Shore D hardness to the Shore C
of this blend. These teachings of viewing Proudfit taken with Molitor '751 were not present in
the prosecution of the application which issued as the Sullivan patent. Further, there is a
substantial likelihood that a reasonable examiner would consider these teachings important in
deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '751
raises a substantial new question of patentability as to claim 1, which question has not been
decided in a previous examination of the Sullivan patent.

Application/Control Number: 95/000,121                                    Page 15

Art Unit: 3993

<u>RE. CLAIM 2</u>

*1. Nesbitt*

20.     It is agreed that consideration of Nesbitt raises a SNQ as to claim 2 of the Sullivan patent.

Claim 2 depends from claim 1. Claim 2 further defines the claimed invention to have an outer

layer thickness range of 0.01 to 0.05 inches. As pointed out in the request on page 29, Nesbitt

teaches that

> ...thickness of the outer layer or cover 16 ... may be in the range of
> 0.020 inches and 0.100 inches ....

(Nesbitt, col. 3:22-25). This teaching of viewing Nesbitt was not present in the prosecution of

the application which issued as the Sullivan patent. Further, there is a substantial likelihood that

a reasonable examiner would consider these teachings important in deciding whether or not the

claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to

claim 2, which question has not been decided in a previous examination of the Sullivan patent.

*2. Proudfit in combination with other references*

21.     It is agreed that Proudfit in combination with other references teach all of the limitations

of claim 2. Claim 2 requires the outer layer to be about 0.01 to 0.05 inches thick. Proudfit's

range of thickness is between about 0.0450 to 0.0650 inches and in its preferred embodiment's

outer layer is 0.0525 inches thick, see col. 7:40-46. These teachings of viewing Proudfit in

combination with other references were not present in the prosecution of the application which

issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner

would consider these teachings important in deciding whether or not the claim is patentable.

Accordingly, Proudfit in combination with other references raises a substantial new question of

patentability as to claim 2, which question has not been decided in a previous examination of the

Sullivan patent.

Application/Control Number: 95/000,121                                     Page 16
Art Unit: 3993

## RE. CLAIM 3

### 1. Nesbitt

38.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 3 of the Sullivan patent.
Claim 3 depends directly from claim 1. Claim 3 limits the outer layer to about 0.03 to 0.06
inches thick. As pointed out in the request on pages 31-32, Nesbitt teaches that 1) the outer layer
thickness may be in the range of 0.020 inches and 0.100 inches, Nesbitt col. 3:22-25, and and a
preferred embodiment of Nesbitt has an outer layer of 0.0575 inch thickness, see col. 3: 39-40.
This teachings of viewing Nesbitt was not present in the prosecution of the application which
issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner
would consider these teachings important in deciding whether or not the claim is patentable.
Accordingly, Nesbitt raises a substantial new question of patentability as to claim 3, which
question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

39.    It is agreed that Proudfit in combination with other references teach all of the limitations
of claim 3. Claim 3 requires the outer layer to be between about 0.03 to 0.06 inches thick.
Proudfit teaches the range of thickness of its outer layer to be between 0.0450 to 0.0650 inches
thick and a preferred embodiment has an outer layer of 0.0525 inches thick, see Proudfit col.
7:40-46. These teachings have been pointed out in the request on page 32. These teachings of
viewing Proudfit in combination with other references was not present in the prosecution of the
application which issued as the Sullivan patent. Further, there is a substantial likelihood that a
reasonable examiner would consider these teachings important in deciding whether or not the
claim is patentable. Accordingly, Proudfit raises a substantial new question of patentability as to
claim 3, which question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 4

### *1. Nesbitt alone, and Nesbitt and Molitor '637 taken together*

40.     It is agreed that the consideration of Nesbitt alone, and consideration of Nesbitt and

Molitor '637 taken together raises a substantial new question of patentability (SNQ) as to claim 4

of the Sullivan. As pointed out in the request on pages 33-36, Nesbitt solely teaches a two piece

golf ball having a solid core, figure 1 and col. 2:33 teach the core shaped as a sphere, with a

cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an

"outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Moreover, the

outer layer 16 is taught to be dimpled, see figures 1 and 2 and col. 2:48-49. Nesbitt solely

teaches having the inner layer 14 of cellular or non-cellular hard, high flexural modulus resinous

material of a thickness in the range of .020 to .070 inches; while having the outer layer 16 of

cellular or non-cellular soft, low flexural modulus resinous material of a thickness in a range of

.020 and .100 inches. Nesbitt solely teaches a suitable material for the inner layer 14 being a

thermoplastic resin designated Surlyn 1605. The Sullivan patent admits Surlyn 1605 is now

designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains an admission that

Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54. Also, Nesbitt

solely teaches a suitable material for the outer layer 16 is a thermoplastic resin designated Surlyn

1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated Surlyn

9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural

modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the

"typical properties of commercially available Surlyn resins". In Table 1, found in col. 8, the

Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table

Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor

'637 as a source for potential cellular compositions that may be employed in the inner and outer

layers 14 and 16 of golf ball 12 taught in Nesbitt.

> "Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which
> describes a number of foamable [**cellular**] compositions of a
> character which may be employed for one or both layers 14 and 16
> of the golf ball of this invention".

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of
Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the
solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the
layer covering the solid core is 0.090 inches. Nesbitt teaches the inner, intermediate or first layer
14 on the core 12 may be slightly foamed to a low degree so as not to materially affect the
coefficient of restitution of the material. Nesbitt teaches the outer or cover or second layer 16
may be foamed to a greater degree than the inner layer 14 as the material of the layer 16 is
comparatively soft. Nesbitt teaches the inner layer 14 may be unfoamed or noncellular and the
outer layer may be cellular or foamed resin or vice versa. Nesbitt teaches through the use of
foamable material for the first layer 14, the cover layer 16 or both layers, the degree of foaming
or one or the other or both layers may be altered to provide a variation in the coefficient of
restitution of the golf ball. Viewing the teachings of Nesbitt alone, it is clear that these teachings
were not present in the prosecution of the application which issued as the Sullivan patent.
Further, there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the clam is patentable. Also, the teachings of
Nesbitt and Molitor '637 taken together were not present in the prosecution of the application
which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim is
patentable. Accordingly, Nesbitt alone, and Nesbitt and Molitor '637 taken together raise a
substantial new question of patentability as to claim 4, which question has not been decided in a
previous examination of the Sullivan patent.

### 2. Nesbitt taken with Wu

41.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to
claim 4 of the Sullivan patent. The request on pages 36-38 considers Nesbitt solely teaches the
use of a particular soft polyurethane material for use as the outer layer 16. However, a closer
reading of Nesbitt teaches that Nesbitt references the covers taught Molitor '637 can be used as
materials for the covers taught in Nesbitt. See Nesbitt, col. 3:56-60. Molitor '637 teaches the

use of particular polyurethane materials for the use as an outer layer. Wu teaches that
polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in
col. 1:36-46 that Surlyn covered golf balls lack the "click" and "feel" of balata which golfers
have become accustomed to such sensations and polyurethane covered golf balls can be made to
have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made
according to its invention will have Shore D hardness directly proportional to the degree of cure
of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D
scale, see col. 6:26-38. These teachings of viewing Nesbitt mentioning Molitor '637 taken with
Wu were not present in the prosecution of the application which issued as the Sullivan patent.
Further, there is a substantial likelihood that a reasonable examiner would consider these
teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt
mentioning Molitor '637 taken with Wu raises a substantial new question of patentability as to
claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 3. Nesbitt taken with Molitor '751

42.     It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to
claim 4 of the Sullivan patent. As pointed out on pages 38-40 of the request, Molitor '751
explains the advantages of using a soft polyurethane material on a two-piece golf ball, see col.
2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic urethane having
a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of 55 or more, see
col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning across columns 7
and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a
Shore C hardness of 73. There is a substantial likelihood that review of the scientific literature
would be needed to equate the Shore D hardness to the Shore C of this blend. These teachings of
viewing Nesbitt taken with Molitor '751 were not present in the prosecution of the application
which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable
examiner would consider these teachings important in deciding whether or not the claim is
patentable. Accordingly, Nesbitt taken with Molitor '751 raises a substantial new question of

Application/Control Number: 95/000,121                                    Page 20
Art Unit: 3993

patentability as to claim 4, which question has not been decided in a previous examination of the
Sullivan patent.

### 4. Proudfit taken with Molitor '637

43.    It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to
claim 4 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is
discussed above at item 15 and incorporated herein. It is agreed as stated in the request on pages
40-43 that Proudfit teaches a

> "three-piece [two-piece] solid golf ball that includes a core, a hard
> ionomer inner cover layer and a relatively soft outer cover layer
> made of a balata-based material."

Req. at page 40. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial
note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand
the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core
around the inner core and a cover secured to the wound core. Those skill in the art understand
the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core.
This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly
quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having
a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf
ball 10 which includes a solid spherical (see Proudfit's figures) core 11 and a cover 12 which
comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft
outer layer 14 with dimples (again see Proudfit's figures) of polymeric material as taught in col.
7:21-24. Table 6 in Proudfit shows the inner layer being ionomer blend of Surlyn 8940 and
Surlyn 9910 which are low acid ionomer resins of alpha, beta-unsaturated carboxylic acid. As
admitted in the Sullivan patent in Table 1 on col. 8, Surlyn 8940 has a flexural modulus of
51,000 psi. Proudfit in column 7, lines 37-44, teaches the inner layer is preferable 0.037 inches
thick. Proudfit in column 5, lines 15-17 teaches the outer layer being either balata or a blend of
balata and other elastomers. Proudfit in column 7, lines 40-46, teaches the outer layer thickness

Application/Control Number: 95/000,121                                Page 21
Art Unit: 3993

preferably being 0.0525 inches. Proudfit lacks in teaching the outer cover being made of a
relatively soft polyurethane material. However, in an analogous golf ball Molitor '637 teaches
the use of a polyurethane material as the outer layer, that material being Estane 58133, see col.
18 of Molitor '637 Example 16. One skilled in the art reading the specification learns from
Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic collision and
the farther the ball will travel when struck by the club face (USGA permits a maximum COR of
0.795 for a finished ball); 2) high compression value on a Riehle machine equates to a finished
golf ball having better spin control characteristics when struck by the club face because more of
the ball contacts the ridges on the club face which imparts the back spin on the ball; and 3) the
lower the rebound distance equates to more force need to impart motion on the ball when putting
creating a "deadening effect similar to balata covered balls" which has been shown to decrease
margins of error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and
col. 9:19-35. In Example 16, the coefficient of restitution (COR) was 0.750; compression
(COMP) 95; and rebound distance (RD) 66 inches. The below table lists the COR, compression
(COMP) and rebound distance (RD) for all finished balls having the solid center C described in
col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|------------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

44.    Example 18 is taught as having its cover made from a polyurethane material, see col.
18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower

COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a polyurethane material; moreover, a relatively soft polyurethane material as a cover layer to a solid core golf ball. This teaching as to the polyurethane material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new question of patentability as to claim 4, which question has not been decided in a previous examination of the Sullivan patent.

### 5. Proudfit taken with Wu

45.     It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 4 of the Sullivan patent. As pointed out in the request on pages 43-45, Proudfit teaches a golf ball having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 43. As known in the art, balata covered balls have durability problems. However, golfers prefer the balata cover ball not because of the balata chemical composition itself; but the material provides a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and "feel" are the mechanical properties associated with the material being used in the manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once tried as a cover material because golf ball manufacturers were impressed with its durability, see Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click" and "feel" which golfers had become accustomed to with balata. *Id.* Thus, Wu proposes employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that polyurethanes made according to its invention

Application/Control Number: 95/000,121                                    Page 23
Art Unit: 3993

will have Shore D hardness directly proportional to the degree of cure of the cover; and this
Shore D hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-
38. These teachings of viewing Proudfit taken with Wu were not present in the prosecution of
the application which issued as the Sullivan patent. Further, there is a substantial likelihood that
a reasonable examiner would consider these teachings important in deciding whether or not the
claim is patentable. Accordingly, Proudfit taken with Wu raises a substantial new question of
patentability as to claim 4, which question has not been decided in a previous examination of the
Sullivan patent.

### 6. Proudfit taken with Molitor '751

46.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to
claim 4 of the Sullivan patent. As pointed out in the request on pages 45-46 and as also
discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a
hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 43. As known in
the art, balata covered balls have durability problems. However, golfers prefer the balata cover
ball not because of the balata chemical composition itself; but the material provides a certain
"click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and
"feel" are the mechanical properties associated with the material being used in the manufacture
of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball;
any material would be accepted to a golfer. As pointed out on pages 48 and 49 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf
ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic
urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of
55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning
across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the
ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the
scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend.
These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution
of the application which issued as the Sullivan patent. Further, there is a substantial likelihood

Application/Control Number: 95/000,121                                      Page 24
Art Unit: 3993

that a reasonable examiner would consider these teachings important in deciding whether or not
the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new
question of patentability as to claim 4, which question has not been decided in a previous
examination of the Sullivan patent.


## RE. CLAIM 5

### 1. Nesbitt

It is agreed that consideration of Nesbitt raises a SNQ as to claim 5 of the Sullivan patent. Claim
5 is dependent upon claim 4. Claim 5 limits the outer cover to exhibit a Shore D hardness of
about 64 or less. As pointed out in the request on pages 47-48, Nesbitt teaches the outer cover to
be made from Surlyn 1855 (now Surlyn 9020), see Nesbitt, col. 2:45. As pointed out in the
request on page 47, Nesbitt makes a reference to Molitor '637. Molitor '637 teaches the use of a
polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor
'637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that:
1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball
will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished
ball); 2) high compression value on a Riehle machine equates to a finished golf ball having better
spin control characteristics when struck by the club face because more of the ball contacts the
ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound
distance equates to more force need to impart motion on the ball when putting creating a
"deadening effect similar to balata covered balls" which has been shown to decrease margins of
error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35.
In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and
rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and
rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|------------------------|
| 3 | 0.785 | 110 | 70 |

Application/Control Number: 95/000,121                                     Page 25

Art Unit: 3993

| 8 | 0.734 | 105 | 64 |
|---|---|---|---|
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

47.     Example 18 is taught as having its cover made from a polyurethane material, see col.
18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower
COR and lower rebound distance; which teaches the polyurethane material of example 16 is less
elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball.
Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows
that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637
teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball.
There is a substantial likelihood that review of the scientific literature would be needed to deduce
the Shore D hardness of the material taught in Molitor '637 and referred to by Nesbitt because
Nesbitt refers to Molitor '637. These teachings of Nesbitt were not present in the prosecution of
the application which issued as the Sullivan patent. Further, there is a substantial likelihood that
a reasonable examiner would consider these teachings important in deciding whether or not the
claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to
claim 5, which question has not been decided in a previous examination of the Sullivan patent.


*2. Proudfit in combination with other references*

48.     It is agreed that consideration of Proudfit in combination with other references raises a
SNQ as to claim 5 of the Sullivan patent. Claim 5 is dependent upon claim 4. Claim 5 limits the
outer cover to exhibit a Shore D hardness of about 64 or less. As pointed out in the request on

pages 48, Proudfit has a preferred embodiment of a multilayer golf ball with an outer layer being

constructed of a soft material such as balata or a blend of balata and other elastomers. See

Proudfit, col. 5:15-17. There is a substantial likelihood that a review of the scientific literature

would needed to deduce the Shore D hardness of the materials taught in Proudfit because balata

and blends of balata are quite preferred materials to golfers for outer layer coverings. See

Proudfit, col. 1:49-54. These teachings of Proudfit were not present in the prosecution of the

application which issued as the Sullivan patent. Further, there is a substantial likelihood that a

reasonable examiner would consider these teachings important in deciding whether or not the

claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to

claim 5, which question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 6

### 1. Nesbitt

49.     It is agreed that consideration of Nesbitt raises a SNQ as to claim 6 of the Sullivan patent.

Claim 6 is dependent upon claim 4. Claim 6 limits the outer cover thickness from 0.01 to about

0.05 inches. As pointed out in the request on page 49, Nesbitt teaches that the outer cover

thickness may be in the range of 0.020 inches and 0.100 inches. See Nesbitt col. 3:22-25. This

teaching of viewing Nesbitt was not present in the prosecution of the application which issued as

the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would

consider this teaching important in deciding whether or not the claim is patentable. Accordingly,

Nesbitt raises a substantial new question of patentability as to claim 6, which question has not

been decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

50.     It is agreed that Proudfit in combination with other references teach all of the limitation

of claim 6. Claim 6 requires the inner layer to be between about 0.01 to about 0.05 inches thick

and depends from claim 4. Proudfit's range of thickness is between about 0.0450 to 0.0650

inches and in its preferred embodiment's outer layer is 0.0525 inches thick, see col. 7:40-46.

Application/Control Number: 95/000,121                                    Page 27
Art Unit: 3993

These teachings of viewing Proudfit in combination with other references were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit in combination with other references raises a substantial new question of patentability as to claim 6, which question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 7

### 1 Nesbitt

51.    It is agreed that the consideration of Nesbitt solely or Nesbitt and Molitor '637 taken together raises a substantial new question of patentability (SNQ) as to claim 7 of the Sullivan. Claim 7 depends directly from claim 4. Claim 7 limits the outer layer to about 0.03 to 0.06 inches thick. As pointed out in the request on page 50, Nesbitt teaches that the range of thickness may be in the range of 0.020 inches to 0.100 inches. See Nesbitt col. 3, lines 22-25. Moreover, a preferred embodiment of Nesbitt has an outer layer of 0.0575 inch thickness, see Nesbitt col. 3: 39-40. These teachings of viewing Nesbitt were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 7, which question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

52.    It is agreed that Proudfit in combination with other references teach all of the limitations of claim 7. Claim 7 depends from claim 4 and requires the outer layer to be between about 0.03 to 0.06 inches thick. Proudfit teaches the range of thickness of its outer layer to be between 0.0450 to 0.0650 inches thick and a preferred embodiment has an outer layer of 0.0525 inches thick, see Proudfit col. 7:40-46. These teachings have been pointed out in the request on page 32. These teachings of viewing Proudfit in combination with other references was not present in

Application/Control Number: 95/000,121                                    Page 28

Art Unit: 3993

the prosecution of the application which issued as the Sullivan patent. Further, there is a

substantial likelihood that a reasonable examiner would consider these teachings important in

deciding whether or not the claim is patentable. Accordingly, Proudfit raises a substantial new

question of patentability as to claim 7, which question has not been decided in a previous

examination of the Sullivan patent.

## RE. CLAIM 8

### *1. Nesbitt alone, and Nesbitt and Molitor '637 taken together*

36.     It is agreed that the consideration of Nesbitt alone and consideration of Nesbitt and

Molitor '637 taken together, each raises a substantial new question of patentability (SNQ) as to

claim 8 of the Sullivan. As pointed out in the request on pages 52-55, Nesbitt teaches a two

piece golf ball having a solid core, figure 1 and col. 2:33 teach the core shaped as a sphere, with

a cover including "an inner layer 14 of hard, high flexural modulus resinous material" and an

"outer layer ... 16 of soft, low flexural modulus resin." See Nesbitt, col. 1:20-25. Moreover, the

outer layer 16 is taught to be dimpled, see figures 1 and 2 and col. 2:48-49. Furthermore, Nesbitt

teaches the inner layer is molded over the core to form an intermediate ball, see Nesbitt col.

2:34-37. Nesbitt also teaches having the inner layer 14 of cellular or non-cellular hard, high

flexural modulus resinous material of a thickness in the range of .020 to .070 inches; while

having the outer layer 16 of cellular or non-cellular soft, low flexural modulus resinous material

of a thickness in a range of .020 and .100 inches. Nesbitt also teaches a suitable material for the

inner layer 14 being a thermoplastic resin designated Surlyn 1605. The Sullivan patent admits

Surlyn 1605 is now designated Surlyn 8940, see col. 2:55. Further, the Sullivan patent contains

an admission that Surlyn 8940 is a hard, high flexural modulus resinous material, see col. 2:54.

Also, Nesbitt teaches a suitable material for the outer layer 16 is a thermoplastic resin designated

Surlyn 1855. The Sullivan patent also contains an admission that Surlyn 1855 is now designated

Surlyn 9020, see col. 2:63. Further, the Sullivan patent admits Surlyn 9020 is a soft, low flexural

modulus resinous material. Moreover, the Sullivan patent admits in Table 1, found in col. 8, the

"typical properties of commercially available Surlyn resins". In Table 1, found in col. 8, the

Sullivan patent admits Surlyn 8940 has a flexural modulus of 51,000 psi. Also, in this table

Application/Control Number: 95/000,121                                    Page 29
Art Unit: 3993

Surlyn 8940 is listed as having Shore D hardness is 66. Furthermore, Nesbitt refers to Molitor
'637 as a source for potential cellular compositions that may be employed in the inner and outer
layers 14 and 16 of golf ball 12 taught in Nesbitt.

> Reference is made to ... Molitor ... U.S. Pat. No. 4,274,637 which
> describes a number of foamable [**cellular**] compositions of a
> character which may be employed for one or both layers 14 and 16
> of the golf ball of this invention.

Molitor '637 lists examples of solid core golf balls covered with a blend of two compositions of
Surlyn, one of which is Surlyn 1605 and an example of using a polyurethane as a cover over the
solid core, see Tables 2, 3, 4, 5, and 10. Molitor '637 teaches that the average thickness of the
layer covering the solid core is 0.090 inches. Molitor '637 lacks teaching the actually flexural
modulus of the polyurethane used in covering the solid core. There is a substantial likelihood
that review the technical properties of the polyurethane used in Molitor '637 would be needed
via product information sheets or the like at them time the invention was created. Nesbitt
teaches the inner, intermediate or first layer 14 on the core 12 may be slightly foamed to a low
degree so as not to materially affect the coefficient of restitution of the material. Nesbitt teaches
the outer or cover or second layer 16 may be foamed to a greater degree than the inner layer 14
as the material of the layer 16 is comparatively soft. Nesbitt teaches the inner layer 14 may be
unfoamed or noncellular and the outer layer may be cellular or foamed resin or vice versa.
Nesbitt teaches through the use of foamable material for the first layer 14, the cover layer 16 or
both layers, the degree of foaming or one or the other or both layers may be altered to provide a
variation in the coefficient of restitution of the golf ball. These teachings of Nesbitt alone and
the teachings of Nesbitt and Molitor '637 taken together were not present and considered on the
record during the prosecution of the application which issued as the Sullivan patent. Further,
there is a substantial likelihood that a reasonable examiner would consider these teachings
important in deciding whether or not the claim is patentable. Accordingly, Nesbitt alone, and
Nesbitt and Molitor '637 taken together, are each a basis for concluding that these references
raise a substantial new question of patentability as to claim 8, which question has not been
decided in a previous examination of the Sullivan patent.

## 2. Nesbitt taken with Wu

37.    It is agreed-in-part that the consideration of Nesbitt taken with Wu raises a SNQ as to

claim 8 of the Sullivan patent. Nesbitt teaches using type 1605 Surlyn for the inner layer which

is a high flexural modulus resin. There is a substantial likelihood that a review of the scientific

literature would be needed to determine the value of the high flexural modulus resin taught in

Nesbitt. The request on pages 55-57 considers Nesbitt solely teaches the use of a particular soft

polyurethane material for use as the outer layer 16. However, a closer reading of Nesbitt teaches

that Nesbitt references the covers taught Molitor '637 can be used as materials for the covers

taught in Nesbitt. See Nesbitt, col. 3:56-60. Molitor '637 teaches the use of particular

polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being

used as the outer layer of golf ball circa 1993. Wu further teaches in col. 1:36-46 that Surlyn

covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to

such sensations and polyurethane covered golf balls can be made to have a similar "click" and

"feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will

have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D

hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. Wu

lacks in teaching the specific flexural modulus of the taught polyurethane; thus, there is a

substantial likelihood that a review the mechanical characterization literature would be needed to

determine the flexural modulus of the taught polyurethane material in Wu. These teachings of

viewing Nesbitt mentioning Molitor '637 taken with Wu were not present in the prosecution of

the application which issued as the Sullivan patent. Further, there is a substantial likelihood that

a reasonable examiner would consider these teachings important in deciding whether or not the

claim is patentable. Accordingly, Nesbitt mentioning Molitor '637 taken with Wu raises a

substantial new question of patentability as to claim 8, which question has not been decided in a

previous examination of the Sullivan patent.

## 3. Nesbitt taken with Molitor '751

38.    It is agreed that the consideration of Nesbitt taken with Molitor '751 raises a SNQ as to

claim 8 of the Sullivan patent. Nesbitt teaches using type 1605 Surlyn for the inner layer which

Application/Control Number: 95/000,121                                        Page 31
Art Unit: 3993

is a high flexural modulus resin. There is a substantial likelihood that a review of the scientific

literature would be needed to determine the value of the high flexural modulus resin taught in

Nesbitt. As pointed out on pages 57-59 of the request, Molitor '751 explains the advantages of

using a soft polyurethane material on a two-piece golf ball, see col. 2:61-68. Molitor '751

teaches the material consists of a blend of a thermoplastic urethane having a Shore A hardness of

95 or less and an ionomer having a Shore D hardness of 55 or more, see col. 2:38-42. Molitor

'751 teaches an embodiment in the TABLE spanning across columns 7 and 8 having a blend of

Texin 480 AR (the urethane) and Surlyn 1605 (the ionomer) having a Shore C hardness of 73.

There is a substantial likelihood that review of the scientific literature would be needed to equate

the Shore D hardness to the Shore C of this blend. Molitor '751 lacks in teaching the specific

flexural modulus of the taught polyurethane; thus, a reasonable examiner would have to review

the chemical literature to determine the flexural modulus of the taught polyurethane material in

Molitor '751. These teachings of viewing Nesbitt taken with Molitor '751 were not present in

the prosecution of the application which issued as the Sullivan patent. Further, there is a

substantial likelihood that a reasonable examiner would consider these teachings important in

deciding whether or not the claim is patentable. Accordingly, Nesbitt taken with Molitor '751

raises a substantial new question of patentability as to claim 8, which question has not been

decided in a previous examination of the Sullivan patent.


### 4. Proudfit taken with Molitor '637

39.     It is agreed that the consideration of Proudfit taken with Molitor '637 raises a SNQ as to

claim 8 of the Sullivan patent. The explanation of how Proudfit constitutes a prior art patent is

discussed above at item 15 and incorporated herein. It is agreed as stated in the request on pages

59-62 that Proudfit teaches a

> three-piece [two-piece] solid golf ball that includes a core, a hard
> ionomer inner cover layer and a relatively soft outer cover layer
> made of a balata-based material.

Req. at page 59. See Proudfit, Abstract and col. 5:43-52. The examiner is making an editorial

note to the request's statement regarding a "three-piece" ball. Those skilled in the art understand

the term "three-piece ball" to constitute a small solid or liquid inner core with a wound core
around the inner core and a cover secured to the wound core. Those skill in the art understand
the term "two-piece ball" to constitute a large solid core with a cover layer secured to the core.
This cover layer can either constitute one or multiple layers. For instance, Proudfit as correctly
quoted in the request on page 22, as pointed out above in this decision, teaches a golf ball having
a two-layer cover, see Proudfit col. 1:11-12. It is agreed that Proudfit teaches a two-piece golf
ball 10 which includes a solid core 11 (spherical see figures) and a cover 12 which comprises a
relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14
(with dimples see figures) of polymeric material as taught in col. 7:21-24. Table 6 in Proudfit
shows the inner layer being ionomer blend of Surlyn 8940 and Surlyn 9910 which are low acid
ionomer resins of alpha, beta-unsaturated carboxylic acid. As admitted in the Sullivan patent in
Table 1 on col. 8, Surlyn 8940 has a flexural modulus of 51,000 psi. Proudfit in column 7, lines
37-44, teaches the inner layer is preferable 0.037 inches thick. Proudfit in column 5, lines 15-17
teaches the outer layer being either balata or a blend of balata and other elastomers. Proudfit in
column 7, lines 40-46, teaches the outer layer thickness preferably being 0.0525 inches. Proudfit
lacks in teaching the outer cover being made of a relatively soft polyurethane material.
Although, Proudfit teaches that its soft elastomer material as a flexural modulus in the range of
about 20,000 to 25,000 psi, see col. 6:28-31. However, in an analogous golf ball Molitor '637
teaches the use of a polyurethane material as the outer layer, that material being Estane 58133,
see col. 18 of Molitor '637 Example 16. One skilled in the art reading the specification learns
from Molitor '637 that: 1) a higher coefficient of restitution (COR) means a more elastic
collision and the farther the ball will travel when struck by the club face (USGA permits a
maximum COR of 0.795 for a finished ball); 2) high compression value on a Riehle machine
equates to a finished golf ball having better spin control characteristics when struck by the club
face because more of the ball contacts the ridges on the club face which imparts the back spin on
the ball; and 3) the lower the rebound distance equates to more force need to impart motion on
the ball when putting creating a "deadening effect similar to balata covered balls" which has
been shown to decrease margins of error while putting, thus making a more forgiving ball to putt.
See col. 6:28-65 and col. 9:19-35. In Example 16, the coefficient of restitution (COR) was
0.750; compression (COMP) 95; and rebound distance (RD) 66 inches. The below table lists the

Application/Control Number: 95/000,121                                    Page 33

Art Unit: 3993

COR, compression (COMP) and rebound distance (RD) for all finished balls having the solid

center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|------|-------------|----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |
| 12 | 0.756 | 85 | 61 |
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63

through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR

and lower rebound distance; which teaches the polyurethane material of example 16 is less

elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball.

Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows

that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637

teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball.

However, Molitor '637 lacks teaching the actually flexural modulus of the polyurethane used in

covering the solid core. Thus, there is a substantial likelihood that a review the mechanical

characterization literature would be needed to determine the flexural modulus of the taught

polyurethane material used in Molitor '637. This teaching as to the relative soft polyurethane

material as a substitute for the outer cover layer of Proudfit was not present in the prosecution of

the application which issued as the Sullivan patent. Further, there is a substantial likelihood that

a reasonable examiner would consider this teaching important in deciding whether or not the

claim is patentable. Accordingly, Proudfit taken with Molitor '637 raises a substantial new

Application/Control Number: 95/000,121                                    Page 34
Art Unit: 3993

question of patentability as to claim 8, which question has not been decided in a previous

examination of the Sullivan patent.

### 5. Proudfit taken with Wu

40.    It agreed that the consideration of Proudfit taken with Wu raises a SNQ as to claim 8 of

the Sullivan patent. As pointed out in the request on pages 62-64, Proudfit teaches a golf ball

having a multi-layer cover that is constructed from a hard, ionomeric inner cover layer and a soft

balata outer cover layer. Req. at 62. As taught in Proudfit in col. 5:54 to col. 6:5:

> The ionomers used for the inner layer are available from E. I. du Pont de Nemours & Co. under
> the name Surlyn and from Exxon under the name Iotek. Surlyn resins are described in U.S. Pat.
> No. 3,264,272. As described in that patent, various metal ions can be used to neutralize the acid
> groups, including sodium, zinc, lithium, and magnesium. The ionomer resins generally fall into
> three categories which are characterized by hardness or stiffness--standard, high modulus, and low
> modulus. The standard resins have a flexural modulus in the range of about 30,000 to about
> 55,000 psi as measured by ASTM Method D-790. (Standard resins are referred to as "hard
> Surlyns" in U.S. Pat. No. 4,884,814.) The high modulus resins have a flexural modulus in the
> range of about 55,000 to about 100,000 psi. The low modulus resins have a flexural modulus in
> the range of about 2800 to about 8500 psi.

As known in the art, balata covered balls have durability problems. However, golfers prefer the

balata cover ball not because of the balata chemical composition itself; but the material provides

a certain "click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain

"click" and "feel" are the mechanical properties associated with the material being used in the

manufacture of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a

balata cover ball; any material would be accepted to a golfer. As taught in Wu, Surlyn was once

tried as a cover material because golf ball manufacturers were impressed with its durability, see

Wu col. 1:36-46. However, golfers do not like a Surlyn cover for the cover lacked the "click"

and "feel" which golfers had become accustomed to with balata. Id. Thus, Wu proposes

employing a polyurethane material as a cover layer for a golf ball. Wu also at least teaches that

polyurethanes made according to its invention will have Shore D hardness directly proportional

to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30, preferably 12

to 20 on the Shore D scale, see col. 6:26-38. Wu lacks in teaching the specific flexural modulus

of the taught polyurethane; thus, there is a substantial likelihood that a review the mechanical

characterization literature would be needed to determine the flexural modulus of the taught

Application/Control Number: 95/000,121                                             Page 35
Art Unit: 3993

polyurethane material in Wu. These teachings of viewing Proudfit taken with Wu were not
present in the prosecution of the application which issued as the Sullivan patent. Further, there is
a substantial likelihood that a reasonable examiner would consider these teachings important in
deciding whether or not the claim is patentable. Accordingly, Proudfit taken with Wu raises a
substantial new question of patentability as to claim 8, which question has not been decided in a
previous examination of the Sullivan patent.


### 6. Proudfit taken with Molitor '751

41.    It agreed that the consideration of Proudfit taken with Molitor '751 raises a SNQ as to
claim 8 of the Sullivan patent. As pointed out in the request on pages 64-65 and as also
discussed above Proudfit teaches a golf ball having a multi-layer cover that is constructed from a
hard, ionomeric inner cover layer and a soft balata outer cover layer. Req. at 64. As known in
the art, balata covered balls have durability problems. However, golfers prefer the balata cover
ball not because of the balata chemical composition itself; but the material provides a certain
"click" and "feel" to the golfer upon a golf swing. What gives a golf ball a certain "click" and
"feel" are the mechanical properties associated with the material being used in the manufacture
of the ball's cover. So long as the golf ball has a "click" and "feel" similar to a balata cover ball;
any material would be accepted to a golfer. As pointed out on pages 64 and 65 of the request,
Molitor '751 explains the advantages of using a soft polyurethane material on a two-piece golf
ball, see col. 2:61-68. Molitor '751 teaches the material consists of a blend of a thermoplastic
urethane having a Shore A hardness of 95 or less and an ionomer having a Shore D hardness of
55 or more, see col. 2:38-42. Molitor '751 teaches an embodiment in the TABLE spanning
across columns 7 and 8 having a blend of Texin 480 AR (the urethane) and Surlyn 1605 (the
ionomer) having a Shore C hardness of 73. There is a substantial likelihood that review of the
scientific literature would be needed to equate the Shore D hardness to the Shore C of this blend.
These teachings of viewing Proudfit taken with Molitor '751 were not present in the prosecution
of the application which issued as the Sullivan patent. Further, there is a substantial likelihood
that a reasonable examiner would consider these teachings important in deciding whether or not
the claim is patentable. Accordingly, Proudfit taken with Molitor '751 raises a substantial new

Application/Control Number: 95/000,121                                          Page 36

Art Unit: 3993

question of patentability as to claim 8, which question has not been decided in a previous

examination of the Sullivan patent.

## RE. CLAIM 9

### 1. Nesbitt

42.      It is agreed that consideration of Nesbitt raises a SNQ as to claim 9 of the Sullivan patent.

Claim 9 is dependent upon claim 8. Claim 9 limits the outer cover to exhibit a Shore D hardness

of about 64 or less. As pointed out in the request on page 66, Nesbitt teaches the outer cover to

be made from Surlyn 1855 (now Surlyn 9020), see Nesbitt, col. 2:45. As pointed out in the

request on page 66, Nesbitt makes a reference to Molitor '637. Molitor '637 teaches the use of a

polyurethane material as the outer layer, that material being Estane 58133, see col. 18 of Molitor

'637 Example 16. One skilled in the art reading the specification learns from Molitor '637 that:

1) a higher coefficient of restitution (COR) means a more elastic collision and the farther the ball

will travel when struck by the club face (USGA permits a maximum COR of 0.795 for a finished

ball); 2) high compression value on a Riehle machine equates to a finished golf ball having better

spin control characteristics when struck by the club face because more of the ball contacts the

ridges on the club face which imparts the back spin on the ball; and 3) the lower the rebound

distance equates to more force need to impart motion on the ball when putting creating a

"deadening effect similar to balata covered balls" which has been shown to decrease margins of

error while putting, thus making a more forgiving ball to putt. See col. 6:28-65 and col. 9:19-35.

In Example 16, the coefficient of restitution (COR) was 0.750; compression (COMP) 95; and

rebound distance (RD) 66 inches. The below table lists the COR, compression (COMP) and

rebound distance (RD) for all finished balls having the solid center C described in col. 12:47-48.

| Example | COR | Compression | Rebound Distance (in) |
|---------|-----|-------------|----------------------|
| 3 | 0.785 | 110 | 70 |
| 8 | 0.734 | 105 | 64 |
| 10 | 0.719 | 110 | 66 |

| 12 | 0.756 | 85 | 61 |
|----|-------|-----|----|
| 14 | 0.778 | 100 | 69 |
| **16** | **0.750** | **95** | **66** |
| 18 | 0.783 | 95 | 77 |
| 20 | 0.730 | 95 | 58 |
| 21 | 0.715 | 98 | 65 |

Example 18 is taught as having its cover made from a polyurethane material, see col. 18:63 through col. 19:2. Comparing Example 16 to Example 18 teaches Example 16 has a lower COR and lower rebound distance; which teaches the polyurethane material of example 16 is less elastic, i.e. more inelastic, and more of a "deadening effect" similar to a balata covered ball. Balata is known in the art to be a soft material because it is similar to rubber; therefore it follows that the polyurethane material in Example 16 is a relatively soft material. Thus, Molitor '637 teaches using a relatively soft polyurethane material as a cover layer to a solid core golf ball. There is a substantial likelihood that review of the scientific literature would be needed to deduce the Shore D hardness of the material taught in Molitor '637 and referred to by Nesbitt because Nesbitt refers to Molitor '637. These teachings of Nesbitt were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 8, which question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

43.     It is agreed that consideration of Proudfit in combination with other references raises a SNQ as to claim 9 of the Sullivan patent. Claim 9 is dependent upon claim 8. Claim 9 limits the outer cover to exhibit a Shore D hardness of about 64 or less. As pointed out in the request on page 67, Proudfit has a preferred embodiment of a multilayer golf ball with an outer layer being constructed of a soft material such as balata or a blend of balata and other elastomers. See Proudfit, col. 5:15-17. There is a substantial likelihood that a review of the scientific literature

would needed to deduce the Shore D hardness of the materials taught in Proudfit because balata and blends of balata are quite preferred materials to golfers for outer layer coverings. See Proudfit, col. 1:49-54. These teachings of Proudfit were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 9, which question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 10

### 1. Nesbitt

44.    It is agreed that consideration of Nesbitt raises a SNQ as to claim 10 of the Sullivan patent. Claim 10 is dependent upon claim 8. Claim 10 limits the outer cover thickness from 0.01 to about 0.05 inches. As pointed out in the request on page 68, Nesbitt teaches that the outer cover thickness may be in the range of 0.020 inches and 0.100 inches. See Nesbitt col. 3:22-25. This teaching of viewing Nesbitt was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 10, which question has not been decided in a previous examination of the Sullivan patent.

### 2. Proudfit in combination with other references

45.    It is agreed that Proudfit in combination with other references teach all of the limitation of claim 10. Claim 10 requires the inner layer to be between about 0.01 to about 0.05 inches thick and depends from claim 8. Proudfit's range of thickness is between about 0.0450 to 0.0650 inches and in its preferred embodiment's outer layer is 0.0525 inches thick, see col. 7:40-46. These teachings of viewing Proudfit in combination with other references were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit in combination with other

Application/Control Number: 95/000,121                                    Page 39
Art Unit: 3993

references raises a substantial new question of patentability as to claim 10, which question has not been decided in a previous examination of the Sullivan patent.

## RE. CLAIM 11

### 1. Nesbitt

46.    It is agreed that the consideration of Nesbitt solely or Nesbitt and Molitor '637 taken together raises a substantial new question of patentability (SNQ) as to claim 11 of the Sullivan. Claim 11 depends directly from claim 8. Claim 11 limits the outer layer to about 0.03 to 0.06 inches thick. As pointed out in the request on page 69, Nesbitt teaches that the range of thickness may be in the range of 0.020 inches to 0.100 inches. See Nesbitt col. 3, lines 22-25. Moreover, a preferred embodiment of Nesbitt has an outer layer of 0.0575 inch thickness, see Nesbitt col. 3: 39-40. These teachings of viewing Nesbitt were not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Nesbitt raises a substantial new question of patentability as to claim 7, which question has not been decided in a previous examination of the Sullivan patent.

### 2 Proudfit in combination with other references

47.    It is agreed that Proudfit in combination with other references teach all of the limitations of claim 11. Claim 11 depends from claim 8 and requires the outer layer to be between about 0.03 to 0.06 inches thick. Proudfit teaches the range of thickness of its outer layer to be between 0.0450 to 0.0650 inches thick and a preferred embodiment has an outer layer of 0.0525 inches thick, see Proudfit col. 7:40-46. These teachings have been pointed out in the request on page 70. These teachings of viewing Proudfit in combination with other references was not present in the prosecution of the application which issued as the Sullivan patent. Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the claim is patentable. Accordingly, Proudfit raises a substantial new

Application/Control Number: 95/000,121                                    Page 40

Art Unit: 3993

question of patentability as to claim 11, which question has not been decided in a previous

examination of the Sullivan patent.

### Summary of SNQs Adopted and Not Adopted

#### Requester's SNQs Adopted

48.    For Claim 1 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.


49.    For Claim 2 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.


50.    For Claim 3 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.


51.    For Claim 4 of the Sullivan patent:

(1a) Nesbitt alone.

(1b) Nesbitt and Molitor '637 taken together.

(2) Nesbitt and Wu taken together.

(3) Nesbitt and Molitor '751 taken together.

(4) Proudfit and Molitor '637 taken together.

(5) Proudfit and Wu taken together.

(6) Proudfit and Molitor '751 taken together.

52.    For Claim 5 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.

53.    For Claim 6 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.

54.    For Claim 7 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.

55.    For Claim 4 of the Sullivan patent:

    (1a) Nesbitt alone.

    (1b) Nesbitt and Molitor '637 taken together.

    (2) Nesbitt and Wu taken together.

    (3) Nesbitt and Molitor '751 taken together.

    (4) Proudfit and Molitor '637 taken together.

    (5) Proudfit and Wu taken together.

    (6) Proudfit and Molitor '751 taken together.

56.    For Claim 5 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.

57.    For Claim 6 of the Sullivan patent:

    (1) Nesbitt.

    (2) Proudfit in combination with other references.

Application/Control Number: 95/000,121    Page 42

Art Unit: 3993

58.    For Claim 7 of the Sullivan patent:

(1) Nesbitt.

(2) Proudfit in combination with other references.

## *Office Action on the Merits*

59.    An Office action on the merits does not accompany this order for *inter partes*
reexamination. An Office action on the merits will be provided in due course.

Application/Control Number: 95/000,121                           Page 43
Art Unit: 3993

### *Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be directed:

Please mail any communications to:

> Attn: Mail Stop "Inter Partes Reexam"
> Central Reexamination Unit
> Commissioner for Patents
> P. O. Box 1450
> Alexandria, VA  22313-1450

Please FAX any communications to:

> (571) 273-9900
> Central Reexamination Unit

Please hand-deliver any communications to:

> Customer Service Window
> Attn:  Central Reexamination Unit
> Randolph Building, Lobby Level
> 401 Dulany Street
> Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Michael O'Neill
CRU Examiner
AU 3993

CONF:

# EXHIBIT 5



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.                    (For Patent Owner)                **MAILED**
P.O. Box 1022
Minneapolis, MN  55440-1022                                                 **JUL 19 2006**

                                                                            CENTRAL REEXAMINATION UNIT

Alan M. Grimaldi
Howrey LLP                                (For Third Party Requester)
1299 Pennsylvania Avenue NW
Washington, DC  20004


In re Callaway Golf Company                :
   *Inter Partes* Reexamination Proceeding  : **DECISION DENYING**
Control No.: 95/000,122                     : **PETITION**
Filed:    January 17, 2006                  :
For:      U.S. Patent No. 6,506,130         :


This is a decision on the April 28, 2006 patent owner petition entitled "RENEWED PETITION
TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS." Also, on May 5, 2006, the
third party requester filed a paper entitled "ACUSHNET'S OPPOSITION TO PATENT OWNER
CALLAWAY'S RENEWED PETITION TO SUSPEND INTER PARTES REEXAMINATION
PROCEEDINGS."

*Inter partes* reexamination control number 95/000,122, patent owner's renewed petition, and
requester's opposition to patent owner's renewed petition are before the Office of Patent Legal
Administration for consideration.

Patent owner's present petition is taken as a renewed petition under CFR 1.183 for waiver of 37
CFR 1.939, and as a petition under 37 CFR 1.182 for suspension of *inter partes* reexamination
proceeding 95/000,122.  Third party requester's opposition is also taken as a renewed petition
under 37 CFR 1.183 for waiver of 37 CFR 1.939, and as a petition 37 CFR 1.182 to oppose the
patent owner's renewed petition.

### FEES

As the fee for the originally filed patent owner petition was not charged, a petition fee of
$400.00 under 37 CFR 1.17(f) will be charged to the patent owner's Deposit Account No. 06-1050
as authorized in the April 28, 2006 patent owner renewed petition.

As the fee for the originally filed third party requester opposition to patent owner's petition was
not charged, a petition fee of $400.00 under 37 CFR 1.17(f) will be charged to the third party
requester's Deposit Account No. 08-3038, as authorized in the May 5, 2006 third party requester
renewed opposition.

## SUMMARY

The respective 37 CFR 1.183 aspect of the petition of the patent owner to permit entry and consideration of the renewed patent owner petition as a petition to suspend the present *inter partes* reexamination proceeding, and of the third party requester to permit entry and consideration of the third party requester's opposition to the renewed petition to suspend, are granted.

The patent owner renewed petition under 37 CFR 1.182 to suspend the present *inter partes* reexamination proceeding is denied.

## REVIEW OF FACTS

1.  U.S. Patent No. 6,506,130 ("the '130 patent") issued to Michael J. Sullivan on January 14, 2003, and is currently assigned to Callaway Golf Company.

2.  A request for *inter partes* reexamination of the '130 patent was filed by a third party requester, Acushnet Company, on January 17, 2006. The request was assigned Control No. 95/000,122 ("the '122 *inter partes* reexamination proceeding").

3.  On February 9, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '122 *inter partes* reexamination proceeding stated to have been filed by third party requester on January 23, 2006.

4.  On February 16, 2006, the Office recognized the requester's February 15, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

5.  On March 21, 2006, the patent owner filed a petition, requesting that the '122 *inter partes* reexamination proceeding be suspended.

6.  On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition.

7.  On April 11, 2006, an Office decision was issued, discarding both the March 21, 2006 patent owner petition and the March 24, 2006 opposition thereto as being improper premature papers.

8.  On April 6, 2006, reexamination was ordered for claims 1-6, i.e. all of the claims, of the '130 patent.

9.  On April 13, 2006, patent owner filed a petition requesting that the order granting the present reexamination proceeding be vacated as being an *ultra vires* action.

10. On April 27, 2006, third party requester filed an opposition to patent owner's April 13, 2006 petition.

11. On April 28, 2006, patent owner filed the present renewed petition to suspend the '122 *inter partes* reexamination proceeding.

12.  On May 5, 2006, third party requester filed the present opposition to the April 28, 2006 patent owner petition.

13.  On June 7, 2006, the patent owner petition to vacate the '122 *inter partes* reexamination proceeding was dismissed by the Office.

## DECISION

### I.  Relevant Law And Procedure

35 U.S.C. § 311(a) provides:

> IN GENERAL — **Any third-party requester** at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

> "Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. . . ." [Emphasis supplied.]

35 U.S.C. § 313 provides:

> "If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. § 314 (c) provides:

> "Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office."

37 CFR 1.132 provides:

> "When any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section."

37 CFR 1.182 provides:

> "All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Director, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing. Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.183 provides:

"In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a **requirement of the statutes** may be suspended or waived by the Director or the Director's designee, *sua sponte*, or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.907 provides:

"(a) Once an order to reexamine has been issued under § 1.931, neither the third party requester, nor its privies, may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued under § 1.997, unless authorized by the Director.

(b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an *inter partes* reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such *inter partes* reexamination proceeding."

37 CFR 1.913 provides:

"Except as provided for in § 1.907, any person other than the patent owner or its privies may, at any time during the period of enforceability of a patent which issued from an original application filed in the United States on or after November 29, 1999, file a request for *inter partes* reexamination by the Office of any claim of the patent on the basis of prior art patents or printed publications cited under § 1.501."

37 CFR 1.935 provides:

"The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination."

37 CFR 1.937(b) provides:

"The *inter partes* reexamination proceeding will be conducted in accordance with §§ 1.104 through 1.116, the sections governing the application examination process, and will result in the issuance of an *inter partes* reexamination certificate under § 1.997, except as otherwise provided."

37 CFR 1.939 provides:

"(a) If an unauthorized paper is filed by any party at any time during the *inter partes* reexamination proceeding **it will not be considered** and may be returned." [Emphasis supplied.]

(b) Unless otherwise authorized, **no paper** shall be filed prior to the initial Office action on the merits of the *inter partes* reexamination." [Emphasis supplied.]

37 CFR 1.987 provides:

"If a patent in the process of *inter partes* reexamination is or becomes involved in litigation, the Director shall determine whether or not to suspend the *inter partes* reexamination proceeding."

With respect to suspension of *inter partes* reexamination, MPEP § 2684.04(III) provides that:

> "... 'good cause' might be present, for example, where there is an issue that cannot be decided in the reexamination proceeding but affects the resolution of the proceeding. Another example is where there is an issue common to the litigation and the reexamination that can best be decided in court due to the availability in court of discovery and subpoena power (e.g., an issue heavily dependent on presentation of conflicting/contested evidence by the two parties)."

## II.   Procedural Discussion *Re*: Patent Owner's Original (March 21, 2006) Petition To Suspend

On March 21, 2006, patent owner filed a petition to suspend the '122 *inter partes* reexamination proceeding. In the present petition, patent owner takes the position [1] that the original petition to suspend filed on March 21, 2006 was not entered in the '122 proceeding, and was instead discarded, because it was filed prior to issuance of a reexamination order.   This position is inaccurate.

By its terms, 37 CFR 1.939(b) precludes the filing of any paper in an *inter partes* reexamination proceeding prior to "the initial Office action on the merits" in that proceeding, unless the filing of the paper is authorized. At the time of filing of that petition, and at the time of the decision thereon, not only had there been no decision on the request for reexamination, there had also been no Office action on the merits in the *inter partes* proceeding.   The patent owner petition of March 21, 2006 was held to be an improper paper under 37 CFR 1.939 because it was filed prior to the issuance of the initial Office action in the reexamination proceeding. [2]   Not only had *inter partes* reexamination not yet been ordered, no "initial Office action on the merits of the *inter partes* reexamination" had been promulgated in the '122 *inter partes* reexamination proceeding, and a paper prior to that point is barred by regulation unless authorized, in accordance with 37 CFR 1.939(b). [3]

Although patent owner's March 21, 2006 petition requested relief under 37 CFR 1.183, the regulatory provision that provides for waiver of the rules, [4] there was no specific identification of which regulation that patent owner was seeking to waive. However, even if waiver of the provisions of 37 CFR 1.939 had been specifically requested, the March 21, 2006 patent owner petition could not have been granted. As explained in the decision dated April 11, 2006 (by which the March 21, 2006 patent owner petition and third party requester opposition were discarded as being improper papers), U.S.C. § 312(a) requires, *inter alia*, that after a request for *inter partes* reexamination is filed, the Director <u>shall, within three months of the filing of a request for *inter partes* reexamination,</u> determine whether that request raises a substantial new question of patentability affecting any claim of the patent that is the subject of the request. Further, 35 U.S.C. § 313 **requires** that – when the Director does determine that a substantial new question of patentability is raised by the request, then the determination shall include an order for *inter partes* reexamination of the patent concerned.

---

[1] See patent owner's "Renewed Petition to Suspend, page 2, second full paragraph.

[2] See Decision Discarding Improper Papers", April 11, 2006, page 2, paragraph styled "The Patent Owner Petition"

[3] It appears that petitioner patent owner is confusing the terminology "initial Office action on the merits" with the terminology "reexamination order." The terminology "action on the merits" means an action on the patentability of the claims of the patent being reexamined. See, for example, 37 CFR 1.935 which provides that "The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination." Clearly, a reexamination order and "the initial action on the merits of the reexamination are two different things. See also MPEP Chapter 700, wherein it is made clear that in examination proceedings, "action on the merits" is a term of art meaning an action in which a patentability determination is made.

[4] At page 2 thereof, the March 21, 2006 petition requested relief under a variety of regulations, as well as relief pursuant to 35 U.S.C. § 314(c), as does the present renewed petition.

It is clear that consideration of the substance of patent owner's March 21, 2006 petition, and granting it, would have, in effect, required a waiver of 35 U.S.C. §§ 312(a) and 313, because a suspension of the '122 *inter partes* reexamination proceeding would have precluded both a determination of the existence or absence of a substantial new question of patentability, and the promulgation of a reexamination order based on that determination within three months of the filing of the request for reexamination, as required by §§ 312(a) and 313. However, a waiver of the statutes is an action beyond the authority of the Director, and 37 CFR 1.183 expressly recognizes that a requirement of the statutes may not be waived. Therefore, a suspension of the '122 *inter partes* reexamination prior to the determination on the request for reexamination promulgation of the reexamination order, based upon any petition by the parties, was barred.

III.  Procedural Discussion *Re:* The Present Patent Owner Renewed Petition To Suspend

In the present patent owner renewed petition, patent owner takes the position that because an Order granting *inter partes* reexamination has now been issued, the petition to suspend is a proper paper. Patent owner also takes the position that the present renewed petition, (as well as patent owner's March 21, 2006 petition to suspend), is proper because it is authorized by 37 CFR 1.987. [5]

A.  Relief Pursuant to 37 CFR 1.939

Patent owner argues that the present patent owner petition to suspend the '122 reexamination proceeding is now timely under 37 CFR 1.939(b) as reexamination has already been ordered. This position is not persuasive because, as discussed in section II., *supra*, an order for *inter partes* reexamination is not the initial Office action on the merits of the *inter partes* reexamination proceeding. "Action on the merits" is a term of art, and as such, means an action on the patentability of claims. It is clearly so used in the reexamination regulations, for example, in 37 CFR 1.935. [6] Thus, it is clear that the filing of the present patent owner renewed petition to suspend is not authorized by 37 CFR 1.939(b), because the "initial action on the merits " of the '122 *inter partes* reexamination proceeding has not yet been issued by the Office.

B.  Relief Pursuant to 37 CFR 1.987

The patent owner's argues that 37 CFR 1.987 independently authorizes the filing of the present petition to suspend. This too is not persuasive. The plain language of the regulation does not state or imply that it in any way authorizes the filing of a petition to suspend, particularly a petition that would be improper pursuant to one or more of the regulations that implement the *inter partes* reexamination statutes. 37 CFR 1.987 is merely declaratory of the Director's discretionary authority to *sua sponte* suspend an *inter partes* reexamination proceeding in certain circumstances, *i.e.*, when there is both: (a) litigation involving the patent which is the subject of the *inter partes* reexamination proceeding and (b) "good cause" to suspend. 37 CFR 1.987 in no way authorizes the filing of a petition to request such a suspension. The right of parties in this arena is the filing of a Notification of Existence of Prior or Concurrent Proceedings and Decisions pursuant to MPEP § 2686 to provide the Office with information which may, or may not, justify a suspension of action.

Patent owner has not cited a regulation that authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. In fact, no regulation implementing the *inter partes* reexamination statutes authorizes such a petition.

---

[5] *Id*, at footnote 1
[6] See the discussion in footnote 3.

C.  Relief Pursuant to Patent Owner's Petition Under 37 CFR 1.182 and 1.183

Note is taken that the present patent owner renewed petition requests relief under both 37 CFR 1.182 and 1.183. Notwithstanding that patent owner has again failed to specifically identify the regulations(s) for which a waiver under 37 CFR 1.183 is requested, the present renewed petition will be taken as a petition under 37 CFR 1.183 to waive the provisions of 37 CFR 1.939 in order to permit the filing of a paper prior to the issuance of the initial Office action on the merits in the '122 *inter partes* reexamination proceeding. Further, the present renewed petition will also be taken as a petition under 37 CFR 1.182 for a situation "not specifically provided for in the regulations" to permit the filing of a petition to suspend the '122 *inter partes* reexamination proceeding.

1.  37 CFR 1.183 Waiver of 37 CFR 1.939

As discussed in sections I. and II (A), *supra*, 37 CFR 1.939(b) precludes the filing of any paper prior to the initial Office action on the merits of the '122 *inter partes* reexamination proceeding. As no initial Office action on the merits has yet been issued, no patent owner paper may be filed in the '122 *inter partes* reexamination proceeding at this point in the proceeding. However, *inter partes* reexamination has now been ordered. [7] Therefore, suspension of the '122 *inter partes* reexamination proceeding would not require the waiver of any provision of the *inter partes* reexamination statutes; only a waiver of 37 CFR 1.939(b) would be needed to provide for an entry right of the petition paper requesting suspension.

In this instance, it is determined to be in the interests of justice with respect to both parties to the '122 *inter partes* reexamination proceeding that a decision regarding suspension of the '122 *inter partes* proceeding be made as soon as possible, given that (1) a suspension of the proceedings would not impair compliance with the reexamination statutes, and (2) extraordinary circumstances are found to exist, including the fact that this proceeding is but one of four *inter partes* proceedings in which the present parties are involved, and that the present parties are actively involved in litigation with respect to the patents that are the subject of those four *inter partes* reexamination proceedings. Rather than requiring patent owner and third party requester to re-file the petition and opposition thereto after a first action on the merits, it is appropriate to consider the question of suspension now. Further, if suspension were in fact warranted, it would be in the interests of justice that such suspension takes place prior to an action on the patentability of the claims. Finally, there is a public interest, and an interest to be considered by the court in the ongoing litigation, to ascertain, as soon as practical, whether the '122 *inter partes* reexamination proceeding will continue to conclusion, or will presently be suspended pending the outcome of the parallel litigation involving the '130 patent, as well as such future circumstance that would demand that a suspension be lifted, if imposed.

Accordingly, based upon the facts of record and the current circumstances set forth, *supra*, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit filing of the present patent owner renewed petition and the requester's opposition to the renewed petition, and consideration of the substance of both the petition and the opposition.

2.  37 CFR 1.182 Petition to Suspend the '122 *Inter Partes* Reexamination Proceeding

As discussed Section III(B), *supra*, neither 37 CFR 1.987 nor any regulation implementing the *inter partes* reexamination statutes authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. However, the present patent owner renewed petition does request

---

[7] See the "Order Granting *Inter Partes* Reexamination" dated April 6, 2006

consideration pursuant to 37 CFR 1.182, and a proposed suspension of an *inter partes* reexamination proceeding is a situation not specifically provided for in the regulations. For the reasons set forth in the second paragraph of section III(C)(1), *supra*, and based upon the facts of record and the current circumstances, consideration will be given to the substance of the present patent owner renewed petition to suspend the '122 *inter partes* reexamination proceeding, as a situation not specifically provided for in the regulations.

## IV.  Procedural Discussion Of The Third Party Requester Renewed Opposition

The third party requester renewed opposition filed on May 5, 2006, lacks an entry right under 37 CFR 1.939(b) for the same reasons discussed with respect to the renewed patent owner petition. Further, the regulations implementing the *inter partes* reexamination statutes do not expressly provide for the filing of an opposition paper to a patent owner request to suspend an *inter partes* reexamination proceeding.

However, third party requester has submitted the instant opposition pursuant to 37 CFR 1.182 and 1.183. For reasons analogous to those discussed above with respect to the patent owner's renewed petition, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit the filing of the instant opposition to the present patent owner's renewed petition prior to the initial Office action on the merits in the '122 *inter partes* reexamination proceeding. Although the regulations do not specifically provide for a third party requester opposition to a patent owner petition to suspend an *inter partes* reexamination proceeding, for reasons analogous to those discussed above with respect to the patent owner's renewed petition, consideration will be given, pursuant to 37 CFR 1.182, to the requester's opposition to the patent owner's renewed petition.

## V.  Findings And Analysis On The Merits Of Patent Owner's Renewed Petition to Suspend

### A.  Patent Owner's Substantive Position In Support Of Suspension of the '122 *Inter Partes* Reexamination Proceeding

Patent owner states that pursuant to 35 U.S.C. § 314 (c), and the procedure discussed in MPEP § 2686.04(III), there is good cause to suspend the '122 *inter partes* reexamination proceeding. Patent owner asserts the existence of matters to be raised in the concurrent litigation that are argued to affect the resolution of the '122 *inter partes* reexamination proceeding or potentially bar the proceeding. Patent owner also raises issues in which the District Court's discovery and subpoena powers are asserted to be important in deciding matters heavily dependent upon the evidentiary showings of the parties.

#### 1.  Matters Involving Privity And Assignor Estoppel [8]

Patent owner states that the sole inventor of the '130 patent is Michael J. Sullivan, who is now a Vice President of third party requester business entity. Patent owner urges that 37 CFR 1.913 [9] is facially broad enough to cover both current and former patent owners and current and former privies, to bar *inter partes* reexamination. Patent owner argues that Mr. Sullivan is a

---

[8] See *Shamrock Technologies, Inc. v Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789; USPQ2d 1728 (Fed. Cir. 1990), and compare *Acushnet Company v. Dunlop Maxfli Sports Corporation*, 2000 U.S. Dist. LEXIS 10123, Civ. A. No. 98-717-SLR, (D. Del June 29, 2000).

[9] Pursuant to 37 CFR 1.913, a request for *inter partes* reexamination can be filed by any person other than patent owner or its privies

privy of a former patent owner [10] to whom the '130 patent was originally assigned, and that 37 CFR 1.913 should have precluded the filing of the '122 *inter partes* reexamination proceeding.

Patent owner further alleges that, as a Vice President of third party requester, Mr. Sullivan may well be a privy of third party requester. Patent owner argues that the third party requester would therefore be barred from challenging the validity of the '130 patent via the '122 *inter partes* reexamination proceeding by the doctrine of assignor estoppel.

Patent owner's position is that a suspension of the '122 *inter partes* reexamination proceeding is necessary, because these issues can only be resolved by evidence that can uniquely be obtained through the use of the District Court's discovery and subpoena power.

> 2. Additional Matters Requiring The District Court's Discovery And Subpoena Power

Patent owner also urges that the use of the District Court's discovery and subpoena power is required to permit full and fair evaluation of testing undertaken by third party requester that is relied upon by third party requester to support its allegations of patent invalidity. Patent owner points out that third party requester relies upon an invalidity argument under 35 U.S.C. § 103, that objective evidence of commercial success of both the patent owner and an alleged infringer (the third party requester) is relevant to § 103 nonobviousness. Patent owner argues that access to evidence that would establish commercial success of the third party requester's accused products could be obtained utilizing the District Court's discovery and subpoena powers.

> B. Established Standards Demonstrating The Existence of "Good Cause" For Suspension Of *Inter Partes* Reexamination Proceedings

35 U.S.C. § 305 requires that all *ex parte* reexamination proceedings be conducted with special dispatch within the Office. It has been held that, based on the unequivocal statutory requirement for special dispatch, the Office may not suspend a pending *ex parte* reexamination proceeding merely because of the existence of concurrent litigation on the patent that is the subject of reexamination. [11] *Ethicon* discusses certain fundamental concepts regarding concurrent *ex parte* reexamination proceedings in the Office and litigation of the patent that is the subject of reexamination. For example the *Ethicon* court quoted extensively from the decision of the court in *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed. Cir. 1985) (in banc) to point out:

> "That:one challenging validity in court bears the burden assigned by [35 U.S.C.] § 282, that the same party may request reexamination upon submission of art not previously cited, and that, if that art raises a substantial new question of patentability, the PTO may during reexamination consider the same and new and amended claims in light of that art free of any presumption, *are concepts not in conflict*. On the contrary, those concepts are but further indication that *litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes.*" [Emphasis is the Court's]

The *Ethicon* court also cited *Etter* in order to point out that when reexamination and litigation for the same patent are conducted concurrently:

> "...precise duplication of effort does not occur because the PTO and the courts employ different standards of proof when considering validity, and the courts, unlike the PTO during a reexamination of patent claims, are not limited to review of prior art patents or printed publications."

---

[10] The present patent owner acquired rights to the '130 patent from the original owner, Top-Flite.

[11] *Ethicon, Inc., v. Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988)

*Id.,* at 856, at 4.

In contrast to the 35 U.S.C. § 305 which applies only to *ex parte* reexamination, 35 U.S.C. § 314(c) expressly allows for the suspension of an *inter partes* reexamination proceeding within the Office "for good cause," notwithstanding that *inter partes* reexamination proceedings are to be conducted with "special dispatch." Therefore, the question of whether a petition to suspend an *inter partes* reexamination proceeding that is being conducted concurrently with litigation of the patent establishes "good cause" for the suspension of an *inter partes* reexamination proceeding presents a question that differs from the question of suspension of an *ex parte* reexamination proceeding. Pursuant to 35 U.S.C. § 314(c) and 37 CFR 1.987 that implements the statutory provision, the USPTO Director has authority to determine circumstances amounting to "good cause" for suspension of an *inter partes* reexamination proceeding, and to do so on a case-by-case basis.

In *inter partes* reexamination proceedings control numbers 95/000,093 and 95/000,094 (collectively referred to hereinafter as "the Immersion-Sony *inter partes* reexamination proceedings"), the Office granted a patent owner petition to stay the *inter partes* reexamination proceedings due to the existence of concurrent litigation of the patents that were the subject of the reexamination proceedings. [12] The decision suspension granting acknowledged that MPEP § 2684.04 set forth certain criteria as indicia of "good cause" for suspension of an *inter partes* reexamination proceeding, but pointed out that these criteria were merely exemplary. [13] The criteria relied upon by the Office in the Immersion-Sony *inter partes* reexamination proceedings to support a finding of "good cause" to suspend was upheld by the U.S. District Court, Eastern District of Virginia, *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. This criteria establishes a benchmark and standard which the Office can make use of to test the facts and circumstances of record in a given *inter partes* reexamination proceeding in order to determine whether there is "good cause" to suspend that *inter partes* reexamination proceeding, due to the existence of concurrent litigation of the patent being reexamined.

**In the *Sony* scenario:**

The patent claims for which *inter partes* reexamination was requested were not identical to the claims being litigated; there was one non-litigated patent claim (claim 1 in each instance) for which reexamination had been requested in each proceeding. The Office denied patent owner Immersion's first petition to suspend the *inter partes* reexamination proceedings, noting that even if the proceedings were suspended in the Office and judgment was rendered adverse to requester Sony in the concurrent litigation, that would not dispose of all claims in the existing *inter partes* reexamination proceedings, leading to a piecemeal reexamination, and a delay in reexamination of the non-litigated claims. [14] The patent owner then disclaimed claim 1 of each patent, whereby <u>identical patent claims</u> were the subject of both the *inter partes* reexamination proceedings and the concurrent litigation. The Office then granted patent owner Immersion's second petition to suspend the *inter partes* reexamination proceedings.

At the point in time that the Immersion-Sony *inter partes* reexamination proceedings were suspended, <u>the proceedings were at an early stage</u>; the Office's work had been limited only to a finding that the requests for reexamination had raised a substantial new question of

---

[12] See the '093 and '094 proceedings, Decision Granting Petitions To Suspend, November 17, 2005

[13] *Id.*, Decision Granting Petitions To Suspend", November 17, 2005, footnote 6.

[14] *Id.*, "Decision Denying Petitions", August 23, 2005, at page 6.

patentability. The <u>concurrent litigation</u>, on the other hand, <u>was at an advanced stage</u>: (a) a District Court had issued a decision adverse to requester Sony, holding the litigated patent claims to be valid, (b) an appeal of the District Court had been filed in the Court of Appeals for the Federal Circuit ("the Federal Circuit"), and (c) the matter had already been briefed. Thus, there was a substantial likelihood that suspension of the reexamination proceedings would serve to conserve Office of resources, since a final holding of claim validity would statutorily require termination of the Immersion-Sony *inter partes* prosecutions with respect to all of the claims subject to the litigation, which was also all the claims subject to reexamination in those proceedings. It was not in the Office's and parties' interests to engage resources in administrative proceedings that ultimately could be mooted by the concurrent litigation which was soon to be finally resolved. The substantial likelihood that the reexamination prosecutions would terminate and the proceedings be concluded, taken together with the identity of claims in the litigation and the *inter partes* reexamination proceedings, led the Office to conclude that on balance, there was "good cause" to suspend the Immersion-Sony *inter partes* reexamination proceedings, to await the decision by the Federal Circuit. The decision granting suspension noted that should circumstances change, *e.g.*, if the matter were remanded to the District Court by the Federal Circuit without a holding on claim validity, the third party would be free to petition for a resumption of the *inter partes* reexamination proceeding based upon the change in circumstances. The decision also noted that further *inter partes* proceedings on the claims not before the Office and the courts could subsequently be obtained by members of the public.

**In the present instance:**

The facts and circumstances in the '122 *inter partes* reexamination proceeding differ significantly from those present in the Immersion-Sony *inter partes* reexamination proceeding. In contrast to the Immersion-Sony *inter partes* reexamination proceedings, the litigation involving the '130 patent is at an early stage. For example, there is a pending order dated June 2, 2006, referring the matter to a Magistrate Judge for the purposes of exploring joinder of parties, setting September 29, 2006 as a due date for amended papers, and setting a discovery conference for October 18, 2006. The issue of claim construction is still pending, and there are apparently a number of preliminary motions pending. Thus, unlike the Immersion-Sony *inter partes* proceedings in which the litigation had resulted in an appealable holding of claim validity, with the appeal having been filed and briefed to the appellate court, in this instance, it is not even foreseeable when the District Court's holding on the issue of validity might be would be rendered, and what it might be. It certainly cannot be envisioned when the litigation involving the '130 patent will reach a <u>final</u> holding on the validity of the claims of the '130 patent, including any appeal to the Federal Circuit, let alone what that holding is likely to be.

Further, in the '122 *inter partes* reexamination proceeding, patent owner has not established that there that the litigation of the '130 patent will result in a decision on the validity of all of the claims being currently being reexamined, *i.e.*, claims 1-6 of the '130 patent. Thus, it is not even clear that a final holding of claim validity in the litigation would necessarily require conclusion of the '122 *inter partes* reexamination proceeding as to all the claims subject to reexamination.

**As a final point, as to the difference:**

In the Immersion-Sony *inter partes* proceedings Sony chose to permit the District Court litigation to proceed for three years before filing its requests for reexamination only after judgment was entered in Immersion's favor in the litigation. Had Sony filed its requests for reexamination earlier, the reexamination proceedings could have been much farther along in the process, and may likely have been completed at the Office <u>before</u> the district court issued its decision. Also,

the district court might have stayed the litigation to await the Office's decisions in the reexamination proceedings. In the present instance, the requester has filed the '122 *inter partes* reexamination well before the District Court litigation has advanced to conclusion, and the Office proceedings should be available for the District Court.

**In conclusion as to this issue:**

Congress specifically provided estoppel provisions when a "final decision" upholding the validity of patent claims has been reached in a civil action or in a prior *inter partes* reexamination. *See* 35 U.S.C. § 317(b); 35 U.S.C. § 315(c). Thus, if a party's challenge to the validity of certain patent claims has been <u>finally</u> resolved, either through civil litigation or the *inter partes* reexamination process, then that party is barred from making a subsequent request for *inter partes* reexamination (or filing a new civil action) challenging the validity of those same claims. *Id.* Accordingly, while Congress desired that the creation of an *inter partes* reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also contemplated in the statute that a court validity challenge and *inter partes* reexamination of a patent may occur simultaneously; but once one proceeding finally ends, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other. Until that time, however, the Office is obligated to move forward in the *inter partes* reexamination with "special dispatch." Only "good cause" will permit the Office from deviating from that statutory mandate. In this instance, the litigation is at a preliminary stage so that it can not be determined when the litigation will reach a final holding on the issue of claim validity and what that decision is likely to be. Even if there should be a final holding on the issue of claim validity, the patent owner has not established that there is an identity of claims in the '122 *inter partes* reexamination proceeding and those subject to the litigation to thereby statutorily bar proceeding further with the entirety of the reexamination proceeding. Accordingly, the patent owner has not provided the USPTO Director with sufficient basis upon which to conclude that there is "good cause" to suspend the *inter partes* reexamination proceeding to await a final decision on claim validity in the litigation.

### C. Other Patent Owner's Allegations That Good Cause For Suspension Exists

The factors alleged by patent owner to present "good cause" for suspension of the '122 *inter partes* reexamination proceeding have been thoroughly considered. However, for the reasons that follow, these factors do not establish "good cause" for suspension.

#### 1. Privity and Assignor Estoppel

Patent owner argues that because Michael J. Sullivan, the sole inventor of the '130 patent, assigned the '130 patent to patent owner's predecessor in interest, the '122 *inter partes* reexamination proceeding was filed by a "former privy" of patent owner and is therefore barred under 37 CFR 1.913. The purpose of 37 CFR 1.913 is simply declaratory of the statutory mandate of 35 U.S.C. § 311(a) that provides that <u>any third-party requester</u> may, at any time, file a request for *inter partes* reexamination. [15] Patent owner has not established that 37 CFR 1.913,

---

[15] In the Notice of Proposed Rulemaking entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg 18154, 18167 (April 6, 2000) it is stated that proposed rule includes the language "an person other than the patent owner or its privies may ... file a request for *inter partes* reexamination." The commentary stated that the proposed rule "provides for any third-party requester ... to file a request for ... an *inter partes* reexamination ..." That is, the proposed rule was thought to simply echo the statutory language However, the words "other than patent owner or its privies" were deleted from the final rule because a comment to directed proposed rule 1.913 had suggested that the Office had exceeded its authority in excluding patent owner or its privies

nor the statute upon which it is grounded, precludes the filing of a request for *inter partes* reexamination by a party who is a so-called "former privy" of patent owner, especially a party who assigned a patent to an entity other than the present patent owner. Absent citation of controlling authority to the contrary by patent owner, it would appear that the statutory language "any third-party requester" is broadly drawn and would permit a party not in direct privity with a patent owner, i.e., a "former privy" of patent owner, to file a request for *inter partes* reexamination.

Patent owner also argues that the doctrine of assignor estoppel should have precluded the filing of the '122 *inter partes* reexamination proceeding, because sole inventor Sullivan assigned the patent to patent owner's predecessor in interest, but is now a Vice President of the third party requester business entity. However, reexamination is not litigation to determine the validity of patent claims conducted before a court wherein the equitable doctrine of assignor estoppel is applicable. Rather, reexamination is an administrative proceeding to determine the patentability of patent claims, a determination that is not conducted under the equitable considerations attaching to a litigation in which claim validity is determined. As discussed above, *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (*en banc*) makes it clear that litigation and reexamination are distinct proceedings with distinct parties, purposes, procedures and outcomes. Stated differently, although the application of the assignor estoppel doctrine in litigation is a fact intensive issue requiring the finding of facts and the balancing of the equities by the court, [16] a reexamination proceeding is not a determination of patent validity and infringement of patent claims. [17] It is also to be noted that a patent owner is statutorily authorized to file a reexamination request to obtain an advisory opinion as to the applicability of a prior patent or printed publication; such an advisory opinion would be prohibited in litigation as lacking a "case or controversy." If a patent owner can request reexamination of a patent, a party who assigned to the patent owner should likewise be permitted to do so. Therefore, absent citation of authority holding that assignor estoppel applies to reexamination so as to bar a statutorily approved request for *inter partes* reexamination filed by "[A]ny third-party requester at any time," assignor estoppel would not appear to apply generally to reexamination, and specifically to the present *inter partes* reexamination proceeding. Patent owner has argued that a suspension of the '122 *inter partes* reexamination proceeding is necessary because the issue of whether the present requester was barred from filing the '122 *inter partes* reexamination proceeding based on assignor estoppel can only be resolved through

because the language of 35 U.S.C. § 311(c) appeared to permit a patent owner to file a request for an *inter partes* reexamination proceeding. See Final Rule entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 76756, 76764 (December 7, 2000). However, Public Law 107-273, section 12101, 116 Stat. 1901 amended 35 U.S.C. § 311(c) clarify that only the third party requester, and not a patent owner, may file a request for *inter partes* reexamination. Thereafter, the language "other than patent owner or its privies" was added to 37 CFR 1.913. See Final Rule entitled "Changes to Implement the 2002 *Inter Partes* Reexamination and Other Technical amendments to the Patent Statute", 68 Fed. Reg. 70996, 70999 (December 22, 2003).

[16] Compare *Shamrock Technologies, Inc v Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789, 14 USPQ2d 1728 (Fed. Cir. 1990) holding that because inventor Luniewski who had assigned his patent to Shamrock was now a Vice President of MSI was in privity with MSI, that MSI was barred from asserting patent invalidity and unenforceability as defenses to patent infringement with *Acushnet Company v. Dunlop Maxfli Sports Corporation, Civ. A. No 98-717-SLR, 2000 U.S. Dist., LEXIS 10123* (D. Del June 29, 2000) distinguishing *Shamrock* holding that where an inventor had assigned a patent to plaintiff and then became a Vice President of defendant accused infringer the facts and equities did not establish that the inventor was in privity with the defendant and that the defense of patent invalidity was, therefore, available to defendant.

[17] See also *Joy Technologies, Inv. v. Harry F Manbeck, Jr.* 959 F.2d 226, 229 (Fed. Cir. 1992) "Trying to equate its appeal of the reexamination decision to an action analogous to a 'suit at common law,' Joy argues that the reexamination proceeding should be construed as most like a declaratory judgment action where the PTO is seeking a determination that Joy's patent is invalid. It admits, however, that the PTO could not bring such a suit Thus, there is no basis to recharacterize the statutory procedure established by Congress in the reexamination statute."

evidence obtained through the use of the District Court's discovery and subpoena power to ascertain whether an assignor filed the present request. However, since patent owner has not established that the doctrine of assignor estoppel applies in the administrative reexamination of a patent, patent owner's argument has not been shown to establish "good cause" for suspension of the '122 *inter partes* reexamination proceeding.

2.    Additional Matters Requiring The District Court's Discovery and Subpoena Power

Patent owner argues that, in addition to the issues of assignor estoppel and privity, the District Court's discovery and subpoena power is necessary for patent owner to secure objective evidence of commercial success of third party requester's infringing products. Patent owner also argues that patent owner will be able to question tests conducted by third party requester in support of third party requester's arguments of patent invalidity, and that patent owner will be able to obtain the information necessary to question these tests only through the District Court's discovery and subpoena powers. Thus, patent owner reasons that "good cause" exists warranting suspension of the '122 *inter partes* reexamination proceedings.

These arguments are unpersuasive for a number of reasons. First, the provisions of 37 CFR 1.132 apply to the '122 *inter partes* reexamination proceeding, as it does to all *inter partes* reexamination proceedings. Patent owner will in fact have an opportunity in the '122 *inter partes* reexamination proceedings to submit objective test evidence in support of nonobviousness to the same extent that third party requester may submit objective test evidence tending to show nonobviousness. Also, the parties can submit evidence rebutting each other's 37 CFR 1.132 showings. Further, patent owner has submitted no showing that sales of the accused infringer's products are secret data not available publicly, thereby enabling patent owner to secure this data by commissioning research of the matter, without the necessity of the District Court's subpoena and discovery. Speculative allegations that patent owner might require the District Court's subpoena and discovery power in aid of a position taken in litigation does not establish "good cause" for suspension of the '122 *inter partes* reexamination proceeding.

Of greater import, however, is that patent owner's position, if taken to its logical conclusion, would undercut the ability of a third party requester (and, for that matter, a patent owner) to obtain any final result in an *inter partes* reexamination proceeding. Thus, the purpose of the *inter partes* reexamination statutes would be frustrated. For if a party engaged in patent infringement/validity litigation could demonstrate "good cause" for a suspension of an *inter partes* reexamination proceeding merely by invoking the existence of a district court's subpoena and discovery power and coupling that invocation with allegations that the party might need to employ that power in the course of litigation, then any *inter partes* reexamination proceeding for a patent involved in litigation could be readily stayed. It is presumed that if Congress had desired this, Congress would have expressly so stated in the reexamination statutes. However, Congress instead enacted 35 U.S.C. § 314 (c) and the "good cause" standard, a far more flexible and fact specific test allowing the USPTO Director to determine on a case-by-case basis whether to stay a pending *inter partes* reexamination proceeding.

## CONCLUSION

1. The patent owner renewed petition filed April 28, 2006, is <u>granted</u> with respect to the relief requested pursuant to 37 CFR 1.183, to the extent that the substance of patent owner's petition to suspend the '122 *inter partes* reexamination proceeding has been considered under 37 CFR 1.182.

2. The substance of the third party requester opposition filed on May 5, 2006, has been considered pursuant to 37 CFR 1.183.

3. The patent owner's petition under 37 CFR 1.182 to suspend the '122 *inter partes* reexamination is <u>denied</u>.

4. This decision is a final agency action within the meaning of 5 U.S.C. § 704.

5. Telephone inquiries related to the present decision should be directed to the Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to the undersigned at 571-272-7710.

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

sm
July 17, 2006

7-17-06
C:\Kiva\Kenpet6\IP\IP 122_PO_suspend-re-lit_after-Order+before-1stOA.doc

# EXHIBIT 6

Case 3:16-cv-... Document 66-4    Filed 11/21/2006    Page 18 of 50



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO |
|---|---|---|---|---|
| 95/000,122 | 01/17/2006 | 6506130 | 00364.0004RXUS02 | 6325 |

| | |
|---|---|
| 7590    09/02/2006 | EXAMINER |

Dorothy P. Whelan
Fish & Richardson
P.O. Box 1022
Minneapolis, MN  55440-1022

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 09/02/2006

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,122*

PATENT NUMBER *6,506,130*

TECHNOLOGY CENTER *3999*

ART UNIT *3993*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev 07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.
P.O. Box 1022
Minneapolis, MN 55440-1022

(For Patent Owner)

**MAILED**

**SEP 0 7 2006**

CENTRAL REEXAMINATION UNIT

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

(For Third Party Requester)

In re Callaway Golf Company
  *Inter Partes* Reexamination Proceeding
Control No.: 95/000,122
Filed:    January 17, 2006
For:     U.S. Patent No. 6,506,130

: DECISION DENYING
: PETITION FOR
: RECONSIDERATION
: AND RETURNING
: IMPROPER PAPER

This is a decision on the June 16, 2006 patent owner petition entitled "PETITION TO THE DIRECTOR FOR RECONSIDERATION" under 37 CFR 1.181(a)(3). On June 28, 2006, the third party requester filed an opposition to the present petition entitled "ACUSHNET'S OPPOSITION TO CALLOWAY'S PETITION TO DIRECTOR FOR RECONSIDERATION."

The patent owner petition, the third party requester opposition and the present record are before the Office of Patent Legal Administration for consideration.

For the reasons set forth below, the patent owner petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination (i.e., the underlying relief requested).

This decision also addresses the patent owner paper filed on July 21, 2006 styled "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION" as an improper paper.

### FEES

A petition to vacate reexamination on the grounds that the order granting reexamination constitutes an *ultra vires* action on the part of the Office is considered pursuant to 37 CFR 1.181. Accordingly, no fee is due for the patent owner petition for reconsideration or for the third party requester opposition to the petition for reconsideration.

## REVIEW OF SALIENT FACTS

1. U.S. Patent No. 6,503,130 (the '130 patent) issued to Michael J. Sullivan on January 14, 2003, and is currently assigned to Callaway Golf Company.

2. A request for *inter partes* reexamination of the '130 patent was filed by a third party requester, Acushnet Company (hereinafter "Acushnet"), on January 17, 2006. The request was assigned Control No. 95/000,122 (the '122 *inter partes* reexamination proceeding).

3. On February 9, 2006, the patent owner filed suit against requester Acushnet in the United States District court for the District of Delaware. *Callaway Golf Company v Acushnet Company*, C.A. No. 06-91 (SLR) (February 9, 2006).

4. On February 09, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '122 *inter partes* reexamination proceeding stated to have been filed by third party requestor on January 23, 2006.

5. On February 16, 2006, the Office recognized the February 09, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

6. On March 21, 2006, the patent owner then filed a petition, requesting that the '122 *inter partes* reexamination proceeding be suspended.

7. On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition to suspend reexamination.

8. On March 31, 2006, the Office issued a decision holding that the March 21, 2006 petition and the March 24, 2006 opposition papers would be discarded as being improper papers because they had been filed prior to reexamination being ordered.

9. Reexamination was ordered for the '122 *inter partes* reexamination proceeding on April 6, 2006.

10. On April 13, 2006 the patent owner filed a petition under 37 CFR 1.181 to vacate the reexamination order as *ultra vires* (which would in-effect vacate the proceeding).

11. On April 27, 2006 the third party requester filed, pursuant to MPEP 2646 (I), an opposition to the April 13, 2006 patent owner petition to vacate.

12. On April 28, 2006, patent owner filed a renewed petition to suspend the '122 *inter partes* reexamination proceeding.

13. On May 5, 2006 third party requester filed an opposition to the April 28, 2006 renewed patent owner petition to suspend reexamination.

14. On June 7, 2006, the Office dismissed patent owner's April 13, 2006 petition to vacate the '122 *inter partes* order for reexamination.

15. On July 19, 2006, the Office denied patent owner's April 28, 2006 renewed petition to suspend the '122 *inter partes* reexamination proceeding.

16. On June 16, 2006, patent owner filed a petition for reconsideration of the June 7, 2006 decision dismissing the patent owner petition to vacate the '122 *inter partes* order for reexamination.

17. On June 28, 2006, third party requester filed an opposition to the June 16, 2006 patent owner petition for reconsideration.

18. On July 21, 2006, patent owner filed a reply to the June 28, 2006 third party requester opposition.

## RELEVANT STATUTES, REGULATIONS AND PROCEDURE

35 U.S.C. § 311(a) provides:

"IN GENERAL. — **Any** third-party requester **at any time** may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of  section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

"Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. … " [Emphasis supplied.]

35 U.S.C. § 313 provides:

"If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. 314(c) provides:

c) SPECIAL DISPATCH.- Unless otherwise provided by the Director for good cause, all *inter partes* reexamination proceedings under this section … shall be conducted with special dispatch within the Office.

35 U.S.C. §315(b) provides:

"CIVIL ACTION.— A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

35 U.S.C. § 317 provides:

"a) ORDER FOR REEXAMINATION.- Notwithstanding any provision of this chapter, once an order for *inter partes* reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION - Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit . ., then neither that party nor its privies may thereafter request an *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action..., and an *inter partes* reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.907 provides in pertinent part:

" (b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an inter partes reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such inter partes reexamination proceeding. "

MPEP § 2646 (I) provides in pertinent part:

"A petition under 37 CFR 1.181 may ... be filed to vacate an *ultra vires* reexamination order, such as where the order for reexamination is not based on prior art patents and printed publications. In cases where no discretion to grant a request for reexamination exists, a petition to vacate the decision to grant, or a request for reconsideration, will be entertained. "Appropriate circumstances" under 37 CFR 1.181(a)(3) exist to vacate the order granting reexamination where, for example:

(A)  the reexamination order is not based on prior art patents or printed publications;
(B)  reexamination is prohibited under 37 CFR 1.907;
(C)  all claims of the patent were held to be invalid by a final decision of a Federal Court after all appeals;
(D)  reexamination was ordered for the wrong patent;
(E)  reexamination was ordered based on a duplicate copy of the request; or
(F)  the reexamination order was based wholly on the same question of patentability raised by the prior art previously considered in an earlier concluded examination of the patent by the Office (e g , the application which matured into the patent, a prior reexamination, an interference proceeding)

The filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester." [Emphasis supplied ]

## DECISION

I.    Disposition Of The Patent Owner Opposition To Third Party Requester's Opposition To
     Patent Owner's Petition For Reconsideration

Neither the *inter partes* reexamination statutes nor the regulations implementing those statutes
provide for the filing of a patent owner petition for vacatur of an order granting a request for
*inter partes* reexamination. A patent owner petition for vacatur of an order granting a request
for *inter partes* reexamination on the grounds that the grant of the order constituted an *ultra vires*
action on the part of the Office is entertained pursuant to 37 CFR 1.181 in accordance with the
practice set forth in MPEP § 2646(I). MPEP § 2646(I) concludes by stating that "[t]he filing of a
37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single
submission, even if an opposition thereto is filed by a third party requester."

Consequently, the "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF
DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION," filed by
patent owner on July 21, 2006, is an improper paper that lacks an entry right in the present *inter
partes* reexamination proceeding. Therefore the paper (apparently filed by facsimile
transmission as a single paper directed to four *inter partes* reexamination proceeding) is being
returned to patent owner as an attachment to the decision in the '120 *inter partes* reexamination
proceeding. If any additional copies directed to concurrent *inter partes* reexaminations, that is,
the instant proceeding 95/000,122, or of 95/000,121 and 95/000,123, have been filed and are
subsequently matched with the proceedings, such additional copies will be discarded rather
than returned to patent owner.


II. Patent Owner's Position In Support of Vacatur

In the April 13, 2006 petition to vacate the reexamination order as being *ultra vires*, patent owner
argued that the order granting reexamination is an *ultra vires* action on the part of the Office
because the third party requester, Acushnet, lacked standing to file the *inter partes* request.
Patent owner based this argument on allegations that:

(1) Patent owner's predecessor in interest and the present third party requester Acushnet
    entered into a Settlement Agreement on November 10, 1990, for a term of ten years;

(2) The same parties executed a Settlement Agreement in 1996 that superseded the 1990
    agreement, and the 1996 Settlement agreement provides, *inter alia*, that the exclusive forum
    for the third present party requester to resolve patent validity issues with the patent owner
    is the United States District Court for the District of Delaware; and

(3) The same (present) parties participated in the dispute resolution process pursuant to the
    1996 Settlement Agreement, but while the mediation process was underway, Acushnet
    requester filed a request for the present *inter partes* reexamination proceeding. [1]

It was apparently patent owner's position that by filing the present request for *inter partes*
reexamination, requester Acushnet violated the aforementioned Settlement Agreement, and

---

[1] See patent owner's Petition, pages 2-3.

that Acushnet therefore does not have standing to have filed and to now maintain the present request for *inter partes* reexamination.[2]

In the present petition for reconsideration, patent owner argues that:

(1) The Office has the authority and duty to apply the 1996 Settlement Agreement to this case, and that enforcing the 1996 Settlement Agreement would not violate public policy;

(2) The exemplary language in the MPEP § 2646 does not limit the circumstances where the Office can vacate reexamination orders;

(3) Vacating the reexamination would not leave an unresolved substantial new question of patentability; and

(4) The Office's reliance on the decision in *Heinl v. Godici*, 143 F. Supp 2d 593 (District Court, E. D. VA), is inapposite to this case, because *Heinl* dealt with an entirely unrelated issue, and did not involve a settlement agreement.


III. Analysis and Findings

    A.  The Settlement Agreement Between Patent Owner and The Present Requester Does Not Preclude the Present *Inter Partes* Reexamination Proceeding:

Patent owner argues that a trademark cancellation proceeding is analogous to a reexamination proceeding, and seek to apply the decisions in *Selva & Sons v. Nina Footwear, Inc.*, 705 F.2d 1316 (Fed. Cir. 1983) and *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386 (CCPA 1974) to assert that the Office erred in refusing to consider the settlement agreement between the present patent owner and requester in determining whether to proceed with the present reexamination proceeding. With respect to the *Selva & Sons* decision, patent owner opines that because the statute [3] governing trademark cancellation proceedings (that are *inter partes* in nature) states that "any person" is able to file a petition to cancel a registration, *Selva & Sons* is indistinguishable from the facts in the present reexamination proceeding. Patent owner also argues that in *Flex-Foot, Inc v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) the Federal Circuit upheld a clause in a settlement agreement prohibiting a party from challenging the validity of a patent when that party had agreed to a dismissal, with prejudice, of a prior action, after entering into a settlement that included a promise to not challenge the validity of that patent.

However, the decisions in the *Selva & Sons* and *Danskin, Inc.* cases do not appear to be on point as to the question of whether a party to a settlement agreement is barred from requesting reexamination of a United States patent under 35 U.S.C. § 302 *et. seq.*. *Selvo & Sons* was an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding. In *Selvo & Sons*, the court's decision was not grounded on the "any

---

[2] *Id.*, at pages 4-6

[3] 15 U.S.C § 1064, which states in pertinent part:

"A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged, including as a result of dilution under section 1125 (c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3; 1881, or the Act of February 20, 1905:..." [Emphasis added]

party" language of 15 U.S.C. § 1064. Rather, the court noted the existence of 15 U.S.C. § 1069, which states:

> "In all *inter partes* proceedings equitable principles of laches, estoppel and acquiescence, where applicable, may be considered and applied." *Id.* at 1323, 1324

There is no analogue in the reexamination statutes to 15 U.S.C. § 1069, a statute that broadly applies the equitable principles of laches, estoppel and acquiescence to *inter partes* trademark proceedings in the Office. Rather, the *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (*i.e.*, nonappealable) court holding of patent claim validity [4] or the existence of an order granting reexamination. [5] If Congress had intended to make the broad equitable principles set forth in 15 U.S.C. § 1069 applicable to *inter partes* reexamination proceedings, then Congress would have so stated. [6] With respect to the *Danskin, Inc.* case (an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding), it is noted that the' language of 15 U.S.C. § 1069 would also apply, so that application of the broad equitable principles listed in the statute would have been mandated.

In the *Flex-Foot* decision, the court did <u>not</u> *address the issue of whether the Office would be barred from conducting a reexamination proceeding filed by that party*. The court's decision merely upheld that a clause in the settlement agreement would prohibit a party to the settlement agreement from challenging the validity of a patent (and accordingly, the opposing party would have remedies against the party that violated the agreement). The opinion in *Flex-Foot* does not discuss the affect of a reexamination filing by a party in violation of such a settlement agreement, as to whether the reexamination should continue. *Flex-Foot* does not require or suggest that an order granting a reexamination proceeding, based on such a filing, would be *ultra vires* due to the existence of a settlement agreement between a patent owner and third party requester. And, based on the discussion below, there is no reason to believe that an order granting a reexamination proceeding based on such a filing would be *ultra vires* action on the part of the Office.

### B. Reexamination Case Law Does Not Support Vacatur Of The Present Reexamination Proceeding

The settlement agreement asserted by patent owner in the '122 reexamination proceeding does not explicitly address reexamination of a patent. Even if it did, relevant court precedent clearly demonstrates that - because the Office was not, and is not, a party to the settlement agreement, the Office was not, and is not, bound by the settlement agreement.

*Joy Manufacturing Co. v National Mine Service Co*, 810 F.2d 1127 (Fed. Cir. 1987) addressed the question of the effect, if any, that the existence of a settlement agreement between parties to an infringement/validity patent litigation had with respect to a request for *ex parte* reexamination subsequently filed by a party to that settlement agreement. Accused infringer National had entered into an agreement in settlement of an action brought against it for infringing a patent.

---

[4] See 35 U.S.C. § 317(b)

[5] See 35 U.S.C. § 317(a).

[6] In light of the cases cited below in support of the Office's position vis-à-vis the effect of the settlement agreement in the present reexamination proceeding, it is also to be noted that with respect to *ex parte* reexamination, Congress has not mandated any estoppel with respect to the ability of "any person" to file a request for reexamination at "any time."

National agreed that it would not file any suit in any court challenging the validity of the patent. Thereafter, National filed a request for reexamination of the patent, and the patent owner requested an injunction preventing the third party requester from going forward in the reexamination proceeding. The District Court ruled against the patent owner, noting that the settlement agreement by its literal terms did not proscribe the conduct of which the patent owner complained. The Federal Circuit agreed, holding that:

> " ... the district court correctly refused to equate "a request for administrative reexamination . . . with filing a suit in a United States Court." Its reliance on *Etter* as support for this legal conclusion was entirely appropriate. The *Etter* decision turned on the precise issue here, namely, that reexamination and civil litigation were distinctly different proceedings. As stated therein:
>
>> The intent that reexamination proceedings and court actions involving challenges to validity be distinct and independent is reflected in the legislative history of § 303. . . . *756 F.2d at 857, 225 USPQ at 4.* The result in *Etter* is inseparable from the above-quoted premise. [Footnote omitted.]
>
> "In this connection, we also note that the principal relief which Joy seeks – namely, stopping the reexamination of its patent – is not available in these proceedings. *Accord* Manual of Patent Examining Procedure § 2210 (5th ed. 1983); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.,* 217 U.S.P.Q. (BNA) 1032, 1034 (N.D. Tex. 1982), aff'd, 703 F.2d 555 (5th Cir. 1983). The decision by the Commissioner to institute reexamination is not subject to review, *Etter,* 756 F.2d at 857, 225 USPQ at 4; and the injunction sought against National would have no effect on reexamination since National, as the requestor, has no future role to play in that *ex parte* proceeding. "

In the present reexamination proceeding, patent owner has not established that Acushnet's request for reexamination violates the literal terms of the 1996 settlement agreement involved here. The settlement agreement does not facially preclude "administrative proceedings" of any sort, including reexamination within the Office. Further, as was noted in the previous decision dismissing the petition, the settlement agreement was entered into in 1996; prior to the enactment in 1999 of the statute authorizing *inter partes* reexamination. Thus, it is unlikely that the settlement agreement reflects an agreement between the parties thereto to forego administrative relief in the form of a request for *inter partes* reexamination (such *inter partes* proceeding made available after the settlement agreement), and at best, could only be asserted to inferentially contemplate that the parties to the settlement agreement would not seek *ex parte* reexamination (where there is no right to comment on patent owner responses and appeal). *Joy Manufacturing,* and the other cases relied on by the Office, *infra,* all involve *ex parte* examination proceedings. Moreover, even presuming that the settlement agreement between the patent owner and third party requester could be construed to be an agreement precluding the filing of a request for *ex parte* reexamination, the courts have uniformly held that such agreement is without binding effect on the Office and would not bar the Office from granting and conducting an *ex parte* reexamination proceeding, as will now be discussed.

In *Houston Atlas, Inc. et al v. Del Mar Scientific, Inc. et al.,* 217 USPQ 1032, 1037 (N.D. Tex. 1982), the district court considered the situation in which two parties had executed and had entered a consent judgment stating that a particular patent was valid. The consent judgment was entered prior to the enactment of the *ex parte* reexamination statutes. The court expressly addressed the subsequent effect the consent judgment would have on reexamination in the Office, if any. The court stated that private parties cannot bind the Office, or the public it represents, with respect to the validity of a patent, by merely executing the consent judgment and having it entered. The court noted that:

> " ... the Patent Office was not a party to the original proceeding and, as discussed in section IV above, the consent judgment is not binding on the Patent Office or the public which it represents. Simply stated, two private parties cannot bind the Patent Office with respect to the validity of a patent by merely executing, and having entered, a consent judgment stating that the patent is valid. The consent

judgment is not *res judicata* on the Patent Office as there is no evidence that the Patent Office is privity with Defendants. See *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1109-10, 211 USPQ 852, 854-855 (6th Cir. 1981) (party not in privity to executory of consent judgment is not bound by the judgment). Given that the consent judgment is not enforceable against the Patent Office as *res judicata*, the Court must determine whether the Patent Office, by its conduct of the reexamination proceedings and issuance of the order of reexamination is "in a position to frustrate the implementation of [the consent judgment] or the proper administration of justice." The clear answer to this question is in the negative. Section 303 of the Act expressly authorizes the Patent Office to conduct reexamination proceedings on their own initiative without a formal request for reexamination. If the reexamination proceedings in question had been instituted by the Commissioner as a consequence of a citation of prior art from a person other than Canterbury, or if a person other than Canterbury had requested reexamination of patent 3,464,799, this Court would be without power to enjoin the proceedings for the simple reason that the consent judgment is binding only as to Plaintiffs and Defendants. **In short, Plaintiffs' compliant lies not with the institution of the reexamination process, but instead with who requested it.** For this reason, the Court is constrained to conclude that it has no jurisdiction under the All Writs Act to grant the Plaintiffs any relief against the Patent Office." [Emphasis added]

Thus, even though the district court found one of the defendants in *Houston Atlas* to be in contempt of the consent judgment because that defendant had filed a request for reexamination, the district court noted that the Office was expressly authorized by statute to conduct reexamination. The court concluded that a consent judgment to which the Office was not a party could not bind the Office so as to preclude reexamination, even where such reexamination was requested by a party bound by the consent judgment. If such is true with respect to a consent judgment, it follows that a settlement agreement between two private parties to which the Office is not a party also does not bind the Office so as to preclude the Office from carrying out its statutory mandate to reexamine a qualifying patent once a substantial new question of patentability for that patent has been determined to exist for that patent. Therefore, even if one assumes that third party requester in the '122 reexamination proceeding is in violation of the settlement agreement with patent owner such that third party requester might be subject to sanctions by a court of competent jurisdiction for having filed the present request for *inter partes* reexamination, the settlement agreement would still not be binding on the Office so as to preclude the Office from conducting *inter partes* reexamination as requested, because the Office is not a party to that agreement.

Indeed, the courts have held that a final judgment against a party found to have infringed a patent does not prohibit that party from seeking *ex parte* reexamination of the involved patent. In *Kucala Enterprises, Ltd. V. Auto Wax Co., Inc.* 2004 U.S. Dist. LEXIS 5723 (N.D. Ill., 2004), the accused infringer (Kucala) contended that there was no basis in law or fact, by which the judgment could preclude Kucala from filing a request for *ex parte* reexamination, relying on the language of 35 U.S.C. § 302 that permits "any person at any time" to request reexamination of a patent. The court pointed out that it could not bar third party Kucala from seeking reexamination, even under the circumstances of that case, where the third party was found guilty of misconduct such that the court found the patents asserted against the third party to be not invalid. The *Kucala Enterprises, Ltd.* opinion states:

"...the issue here, whether a court can sanction a party by enjoining it from seeking reexamination. At the same time, the cases on which Auto Wax relies fail to address a sanction prohibiting reexamination. [Citations omitted].

"The court is persuaded, in light of the parties' arguments and the court's purposes in the October decision, that the judgment should not bar Kucala from seeking reexamination. The sanction of dismissal conveys to Kucala, "Because of your misconduct, you lose on the claims you filed in this court." In other words, the court finds the patents in suit not invalid. Under the lessons of *Ethicon*, this means only that the presumption of validity survives, not that the patents are valid. Although principles of claim preclusion would bar an adjudged infringer [*16] from filing or defending a future lawsuit relating to

these patents, it would not bar the infringer from seeking reexamination. Therefore, the court will not enjoin Kucala from seeking reexamination of Auto Wax's patents." *Id.* at page 13 of the Court's decision."
[Emphasis added]

In *McNeil-PPC, Inc. v. The Procter & Gamble Co., 19 USPQ2d 1663 (U.S. District Court District of Colorado 1991)*, Procter & Gamble sought leave from the court to file a request for reexamination in the Office of a patent in dispute. The court held that Procter & Gamble did not need permission from the court to file a request for reexamination, and that there does not appear to be any limit on a party's right to request reexamination, but for complying with the requirements of 35 U.S.C. § 302, directed to *ex parte* reexamination. Furthermore, the court observed:

"First, unfair or not, McNeil-PPC points to no authority that would authorize me to prevent or limit P & G's request to the PTO for reexamination of Bradstreet '901 and its participation in that proceeding to the extent allowed by title 35. McNeil-PPC's only argument is that because P & G asked for leave to file the request, it concedes that it is required to do so. I disagree. It may be that P & G was under the erroneous assumption that I had some statutory or common law prerogative to intervene in the PTO reexamination request. McNeil-PPC does not offer, however, any rationale why any such misinterpretation bestows unto me power over the PTO where the power is otherwise absent. Furthermore, at oral argument, P & G took the position that the motion was filed as a courtesy notice and does not constitute any waiver.

"Second, Congress authorizes challengers to take "two bites of the apple." **A nonpatent holder is permitted to both challenge a patent in the PTO and in the district court.** *See In re Etter, 756 F.2d 852, 857, 225 U.S.P.Q. (BNA) 1 (Fed. Cir.), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985).* In *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 7 U.S.P.Q.2D (BNA) 1152 (Fed. Cir. 1988)*, a nonpatent holder was sued for patent infringement. While the action progressed, the nonpatent holder requested reexamination of the subject patent in the PTO. The Federal Circuit, in concluding that the PTO was without the power to stay the reexamination pending outcome of the action and allowing the reexamination and court action to proceed simultaneously, stated:

The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence. Accordingly, different results between the two forums may be entirely reasonable. And, if the district court determines a patent is not invalid, the PTO should continue its reexamination because, the two forums have different standards of proof for determining invalidity. *Ethicon, 849 F.2d at 1428-29.*

"This structure does not automatically lead to inefficient use of judicial resources. Rather than impede jurisdictional efficiency, this dual process has greater potential to promote efficiency, because, as stated in *In re Etter:*

The innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of the patents thought "doubtful." [Citation omitted] When the patent is currently involved in litigation, an auxiliary function is to free the court from any need to consider prior art without the benefit of the PTO's initial consideration."

[Emphasis added]

Thus, the court recognized that duality of the Congressionally enacted structure in which reexamination and litigation co-exist as non-mutually exclusive avenues in which a party may challenge a patent. It appears that insofar as the litigation approach may result in a settlement agreement, that the existence of a settlement agreement does not "sidetrack" a party thereto from pursuing reexamination.

It should also be noted that a contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy. [7] In *Lear v. Adkins*, 395 U.S. 653, (1969), the United States Supreme Court determined that prohibiting licensees from challenging the validity of a patent that they had licensed runs afoul of public policy "in permitting full and free competition in the use of ideas which are in reality part of the public domain." *id.* at 670 . By analogy, preventing a third party requester (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision. As the settlement agreement entered into in 1996 is prior to the enactment in 1999 of the statute authorizing *inter partes* reexamination, it was not even possible for these settlement agreements to address preventing a party to the agreement from filing such a request for reexamination.

Finally, it is recognized that the decisions cited and discussed, *supra*, are not specifically directed to *inter partes* reexamination. However, it is clear that the precedents would apply to *inter partes* reexamination proceedings just as they do in *ex parte* reexamination proceedings. For *ex parte* reexamination, 35 U.S.C. § 302, provides that "[A]ny person at any time may file a request for reexamination by the Office of any claim of a patent ..." For *inter partes* reexamination, 35 U.S.C. § 311(a) provides that "IN GENERAL -Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent ..." [8]

Congress chose to not place any limitation on the ability of a third party requester to request an *ex parte* reexamination proceeding. Thereafter, Congress chose to provide only very limited estoppel provisions with respect to the ability of a third party requester to request an *inter partes* reexamination proceeding, only those estoppel provisions set forth in the statue. [9] Congress could have elected to enact provisions similar to 15 U.S.C. § 1069 so as to place broad estoppel limitations on the ability of a third party requester to seek reexamination in the Office. However, Congress chose not to do so! Moreover, to the extent that the estoppel provisions of 35 U.S.C. § 317(b) might be relevant to the '122 reexamination proceeding, patent owner has not alleged that there has ever been a relevant final (*i.e.* nonappealable) court decision holding that the '130 patent claims are valid. Indeed, patent owner's own statement of the facts indicates that the parties executed Federal Rule of Civil Procedure 41 Stipulations of Dismissal of the prior litigation that were filed in, and accepted by, the Delaware District Court, and that "[t]he Court specifically retained jurisdiction over the parties in relation to disputes arising under the 1996 Settlement Agreement." This clearly does not provide a final court decision regarding the validity of any of the patents covered in the settlement agreement.

---

[7] *Bremen v. Zapata Off-Shore Co .*, 407 U.S. 1 (1972)(concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386,392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).
[8] The caveat ("IN GENERAL") in the statute refers to the estoppel provisions of 35 U.S.C. § 317(b) that would preclude a third party requester from filing a request for reexamination where it has not sustained its burden of proof of claim invalidity in litigation that has become final, or where such litigation has resulted in a final holding of claim validity, as well as the 35 U.S.C. § 317(b) limitation on the filing of co-pending *inter partes* reexaminations.
[9] The *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (i e . nonappealable) court holding of patent claim validity or the existence of an order granting reexamination. See 35 U.S.C. § 317(a) and (b).

C. Vacatur Of The Present Reexamination Proceeding Is Not Supported By The Provisions Of MPEP § 2246(I):

Patent owner argues that the exemplary language in the MPEP § 2646 does not limit the circumstances in which the Office can vacate reexamination orders. To the extent that this is true, it is not relevant here, because the statutes, the case law and the facts in the present reexamination proceeding all indicate that vacatur of the present reexamination proceeding would run contrary to the reexamination statute. Patent owner's arguments to the contrary are not persuasive.

MPEP § 2646(I) addresses vacatur that would be required when a request for *inter partes* reexamination was improperly ordered due either to the existence of a statutory prohibition barring the grant of a request for *inter partes* reexamination, or the existence of a clear error of a clerical nature. Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to any statutory prohibition barring the order, or due to a clerical error. Rather, the *inter partes* reexamination statute clearly provides that when the Office is presented with a request for *inter partes* reexamination that (1) has been filed by a third party requester not subject to the estoppel provisions of 35 U.S.C. § 317, and (2) raises a substantial new question of patentability, the Office must order *inter partes* reexamination and thereafter reexamine the patent. [10] As set forth in Section III (B) of this decision, *supra*, the case law does not support the proposition that the Office has the duty to, or may at its option, disregard the statutory mandate to reexamine the patent due to the existence of a settlement agreement between a patent owner and a third party requester to which the Office is not a party. Indeed, the case law does not support that proposition even where the settlement agreement was reduced to a consent judgment and the third party requester has been held by the court to be in contempt of the consent judgment.

D. Vacating The Present Reexamination Proceeding May In Fact Leave An Unresolved Substantial New Question of Patentability

Patent owner argues that vacatur of the present reexamination proceeding would not leave a substantial new question of patentability unresolved, because such questions (and other questions of patentability beyond the scope of *inter partes* reexamination) will be resolved by the method, and in the forum, established by the parties in the settlement agreement.

This argument ignores two important points. *First*, there is in fact a public interest served by resolution of patentability issues via reexamination proceedings in the Office, and advantages attendant thereto. *Ethicon v. Quigg*, 878 F.2d 1422, 1428 (Fed. Cir. 1989); *In re Etter*, 756 F.2d 852, 856 (Fed. Cir. 1985). There is no assurance that resolution of the dispute between patent owner and third party requester in accordance with the settlement agreement would resolve the substantial new questions of patentability that have been found to exist in the present *inter partes* reexamination proceeding, or in any way result in a benefit to the public in the manner that a reexamination proceeding would. Any resolution in court, or such other forum chosen, may simply resolve the dispute between patent owner and third party requester without resolving the issues of patentability raised by the substantial new question of patentability (e.g., by settlement, or consent judgment, or dismissal without prejudice or based on a conduct issue). Vacatur of a requested and granted *inter partes* reexamination proceeding may well leave both the public and

---

[10] See 35 U.S.C. §§ 311, 312(a), 313(a) and 314(c).

the patent owner with an unresolved request for reexamination and unresolved substantial new question of patentability (found to be present via the decision ordering reexamination). The public has a right to such a resolution. Vacating, withdrawing, or otherwise abandoning or terminating the instant reexamination proceeding would abrogate this public right, to the detriment of the public interest. As discussed in Section III (B) above, ordering and conducting an *inter partes* reexamination proceeding is not optional for the Office. Rather, the *inter partes* reexamination proceeding must continue according to the procedure mandated by the *inter partes* reexamination statute, to carry out the purpose of the statute and resolve the substantial new question of patentability for the public.[11] The proceeding began with the filing of a request for *inter partes* reexamination that satisfied the requirements of 35 U.S.C. § 311. As **required** by 35 U.S.C. § 312, the request for reexamination has been considered. As a result of that consideration, it has been determined that the request raises a substantial new question of patentability for one or more patent claims. Thus, in accordance with 35 U.S.C. § 313, the present proceeding **shall** result in a determination of the patentability of the claims of the '130 patent in light of prior patents and printed publications, to the benefit of the public as well as to the benefit of patent owner and third party requester.

*Second*, while there is no assurance that the resolution of the dispute in accordance with the settlement agreement will be timely, the present reexamination proceeding **will** be conducted with special dispatch pursuant to 35 U.S.C. § 314(c). The public interest in resolving the issues raised in the present reexamination proceeding includes an interest in having those issues resolved in a timely fashion.

E. The Decision in *Heinl v. Godici* Is Clearly Apposite To This Reexamination Proceeding

Patent owner argues that the Office's reliance on *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001) is misplaced. This argument is not persuasive.

*Heinl* was a case in which patent owner sought a decision terminating a reexamination proceeding based on the absence of a new question of patentability. The *Heinl* court stated:

> "Under the well established *ultra vires* doctrine, the exhaustion and final agency requirements are excused 'only if plaintiff is able to show that the PTO clearly exceeded its statutory authority', quoting from *Philip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir 1985 (quoting *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977), vacated on other grounds, 571 F.2d 1273 (4th Cir. 1978)."

The *Heinl* court then stated:

> "Put differently, when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusion of underlying proceedings."

It is abundantly clear that the *Heinl* decision was not cited and discussed because it involved a previous settlement agreement between parties to a reexamination proceeding, and no reading of the Decision on Petition June 7, 2006 can lead to the belief that it was. Rather, *Heinl* was cited because it is clearly applicable to the doctrine of "*ultra vires*" reexamination proceedings in the sense that it provides a benchmark for looking into whether the Office has committed an *ultra*

---

[11] The innate function of the reexamination process is to increase the reliability of the Office's action in issuing a patent by reexamination of patents thought "doubtful." House Report No. 66-1307, 96th Cong., 2d Sess. (1980), 3, reprinted in 1980 U.S. Code Cong. & Ad. News 6460, 6462. (This was emphasized in *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir.) (en banc), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985)).

*vires* act.  That benchmark is a simple one.  Where the Office orders reexamination, the decision of the Office to order reexamination cannot be attacked as being *ultra vires*, unless it is clearly established that the Office has exceeded its statutory authority to order reexamination.

In this instance:

(1) The reexamination statute fails to provide that the equitable doctrines of laches, estoppel and acquiescence can be raised to preclude the Office from ordering *inter partes* reexamination, other than the 35 U.S.C. § 317 exception, which is inapplicable on the facts in the present reexamination proceeding;

(2) The authorities cited and discussed above in Section III (A) clearly indicate that the existence of a settlement agreement (and even the existence of a consent judgment incorporating a settlement agreement) between a patent owner and a third party reexamination requester do not operate to preclude the Office from granting that third party's request for reexamination if the request otherwise satisfies the requirements of the reexamination statutes; and

(3) A public interest in resolving the substantial new question of patentability exists in the present reexamination proceeding, which may not necessarily be timely resolved, or resolved at all, by reason of the dispute resolution provisions of the settlement agreement, and will not be resolved using the standards applicable in reexamination as well as the expertise of the Office.

Thus, the guidance provided by the decision in *Heinl* supports the conclusion that petitioner has not advanced sufficient basis for holding the grant of reexamination in the present *inter partes* reexamination proceeding to be an *ultra vires* action by the Office.  The Office has not "clearly exceeded its statutory authority" in the Office's determination that the January 17, 2006 reexamination request properly raised a substantial new question of patentability and should go forward.

For all the forgoing reasons, as well as those set forth in the June 7, 2006 decision, the order granting the present *inter partes* reexamination remains intact and the *inter partes* reexamination proceeding will continue in accordance with the procedure mandated by the *inter partes* reexamination statute and implementing regulations.

## ADDITIONAL DISCUSSION

The undersigned notes that the patent owner and third party requester are adverse parties with respect to the present *inter* partes reexamination proceeding, and are currently engaged in litigation involving the underlying patent.  While counsel should represent the respective parties zealously, and are entitled to benefit of all of the regulations implementing the *inter partes* reexamination statutes and the examining practice promulgated with respect to those regulations, counsel are reminded of their ongoing obligations to the Office as set forth in Part 10 of Title 37 of the Code of Federal Regulations.  In particular, the provisions of 37 CFR 10.18(b)(2) and (c) should be noted.  Adherence to the provisions of Part 10 will greatly assist the Office in conducting this *inter partes* reexamination proceeding with special dispatch as required by 35 U.S.C. § 314(c).

## CONCLUSION

1. The patent owner's June 16, 2006 petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination.

2. This decision is a <u>final agency action</u> within the meaning of 5 U.S.C. § 704.

3. The patent owner's July 21, 2006 opposition to the third party requester opposition to the patent owner petition for reconsideration lacks an entry right in the present reexamination proceeding, and has not been considered.

4. Jurisdiction over the '122 *inter partes* reexamination proceeding is returned to the Central Reexamination Unit.

5. Telephone inquiries related to the present decision should be directed to Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to Karen Hastings, Legal Advisor, at 571-272-7717.


Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration


kmh/sm

9-07-06
C:\Kiva\Kenpet6\UV\95_122-UV_settlement agreement_deny.doc

# EXHIBIT 7



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. Box 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.          (For Patent Owner)      **MAILED**
P.O. Box 1022
Minneapolis, MN 55440-1022                               **JUL 19 2006**

                                              **CENTRAL REEXAMINATION UNIT**

Alan M. Grimaldi
Howrey LLP                      (For Third Party Requester)
1299 Pennsylvania Avenue NW
Washington, DC 20004


In re Callaway Golf Company           :
  *Inter Partes* Reexamination Proceeding   : **DECISION DENYING**
Control No.: 95/000,123               : **PETITION**
Filed:    January 17, 2006            :
For:    U.S. Patent No. 6,595,873     :


This is a decision on the April 28, 2006 patent owner petition entitled "RENEWED PETITION TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS." Also, on May 5, 2006, the third party requester filed a paper entitled "ACUSHNET'S OPPOSITION TO PATENT OWNER CALLAWAY'S RENEWED PETITION TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS."

*Inter partes* reexamination control number 95/000,123, patent owner's renewed petition, and requester's opposition to patent owner's renewed petition are before the Office of Patent Legal Administration for consideration.

Patent owner's present petition is taken as a renewed petition under CFR 1.183 for waiver of 37 CFR 1.939, and as a petition under 37 CFR 1.182 for suspension of *inter partes* reexamination proceeding 95/000,123. Third party requester's opposition is also taken as a renewed petition under 37 CFR 1.183 for waiver of 37 CFR 1.939, and as a petition 37 CFR 1.182 to oppose the patent owner's renewed petition.

### FEES

As the fee for the originally filed patent owner petition was not charged, a petition fee of $400.00 under 37 CFR 1.17(f) will be charged to the patent owner's Deposit Account No. 06-1050 as authorized in the April 28, 2006 patent owner renewed petition.

As the fee for the originally filed third party requester opposition to patent owner's petition was not charged, a petition fee of $400.00 under 37 CFR 1.17(f) will be charged to the third party requester's Deposit Account No. 08-3038, as authorized in the May 5, 2006 third party requester renewed opposition.

## SUMMARY

The respective 37 CFR 1.183 aspect of the petition of the patent owner to permit entry and consideration of the renewed patent owner petition as a petition to suspend the present *inter partes* reexamination proceeding, and of the third party requester to permit entry and consideration of the third party requester's opposition to the renewed petition to suspend, are granted.

The patent owner renewed petition under 37 CFR 1.182 to suspend the present *inter partes* reexamination proceeding is denied.

## REVIEW OF FACTS

1.  U.S. Patent No. 6,595,873 ("the '873 patent") issued to Michael J. Sullivan on July 22, 2003, and is currently assigned to Callaway Golf Company.

2.  A request for *inter partes* reexamination of the '873 patent was filed by a third party requester, Acushnet Company, on January 17, 2006. The request was assigned Control No. 95/000,123 ("the '123 *inter partes* reexamination proceeding").

3.  On February 9, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '123 *inter partes* reexamination proceeding stated to have been filed by third party requester on January 23, 2006.

4.  On February 15, 2006, the Office recognized the requester's February 15, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

5.  On March 21, 2006, the patent owner filed a petition, requesting that the '123 *inter partes* reexamination proceeding be suspended.

6.  On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition.

7.  On April 11, 2006, an Office decision was issued, discarding both the March 21, 2006 patent owner petition and the March 24, 2006 opposition thereto as being improper premature papers.

8.  On April 6, 2006, reexamination was ordered for claims 1-6, i.e. all of the claims, of the '873 patent.

9.  On April 13, 2006, patent owner filed a petition requesting that the order granting the present reexamination proceeding be vacated as being an *ultra vires* action.

10. On April 27, 2006, third party requester filed an opposition to patent owner's April 13, 2006 petition.

11. On April 28, 2006, patent owner filed the present renewed petition to suspend the '123 *inter partes* reexamination proceeding.

12. On May 5, 2006, third party requester filed the present opposition to the April 28, 2006 patent owner petition.

13. On June 7, 2006, the patent owner petition to vacate the '123 *inter partes* reexamination proceeding was dismissed by the Office.

## DECISION

## I. Relevant Law And Procedure

35 U.S.C. § 311(a) provides:

> IN GENERAL. — **Any third-party requester** at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied]

35 U.S.C. § 312(a) provides in pertinent part:

> "Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. ... " [Emphasis supplied.]

35 U.S.C. § 313 provides:

> "If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. § 314 (c) provides:

> "Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office."

37 CFR 1.132 provides:

> "When any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section."

37 CFR 1.182 provides:

> "All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Director, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing. Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.183 provides:

"In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a **requirement of the statutes** may be suspended or waived by the Director or the Director's designee, *sua sponte*, or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.907 provides:

"(a) Once an order to reexamine has been issued under § 1.931, neither the third party requester, nor its privies, may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued under § 1.997, unless authorized by the Director.

(b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an *inter partes* reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such *inter partes* reexamination proceeding."

37 CFR 1.913 provides:

"Except as provided for in § 1.907, any person other than the patent owner or its privies may, at any time during the period of enforceability of a patent which issued from an original application filed in the United States on or after November 29, 1999, file a request for *inter partes* reexamination by the Office of any claim of the patent on the basis of prior art patents or printed publications cited under § 1.501."

37 CFR 1.935 provides:

"The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination."

37 CFR 1.937(b) provides:

"The *inter partes* reexamination proceeding will be conducted in accordance with §§ 1.104 through 1.116, the sections governing the application examination process, and will result in the issuance of an *inter partes* reexamination certificate under § 1.997, except as otherwise provided."

37 CFR 1.939 provides:

"(a) If an unauthorized paper is filed by any party at any time during the *inter partes* reexamination proceeding **it will not be considered** and may be returned." [Emphasis supplied.]

(b) Unless otherwise authorized, **no paper** shall be filed prior to the initial Office action on the merits of the *inter partes* reexamination." [Emphasis supplied.]

37 CFR 1.987 provides:

"If a patent in the process of *inter partes* reexamination is or becomes involved in litigation, the Director shall determine whether or not to suspend the *inter partes* reexamination proceeding."

With respect to suspension of *inter partes* reexamination, MPEP § 2684.04(III) provides that:

> "... 'good cause' might be present, for example, where there is an issue that cannot be decided in the reexamination proceeding but affects the resolution of the proceeding. Another example is where there is an issue common to the litigation and the reexamination that can best be decided in court due to the availability in court of discovery and subpoena power (e.g., an issue heavily dependent on presentation of conflicting/contested evidence by the two parties)"

## II.  Procedural Discussion *Re:* Patent Owner's Original (March 21, 2006) Petition To Suspend

On March 21, 2006, patent owner filed a petition to suspend the '123 *inter partes* reexamination proceeding. In the present petition, patent owner takes the position [1] that the original petition to suspend filed on March 21, 2006 was not entered in the '123 proceeding, and was instead discarded, because it was filed prior to issuance of a reexamination order.   This position is inaccurate.

By its terms, 37 CFR 1.939(b) precludes the filing of any paper in an *inter partes* reexamination proceeding prior to "the initial Office action on the merits" in that proceeding, unless the filing of the paper is authorized. At the time of filing of that petition, and at the time of the decision thereon, not only had there been no decision on the request for reexamination, there had also been no Office action on the merits in the *inter partes* proceeding.  The patent owner petition of March 21, 2006 was held to be an improper paper under 37 CFR 1.939 because it was filed prior to the issuance of the initial Office action in the reexamination proceeding. [2] Not only had *inter partes* reexamination not yet been ordered, no "initial Office action on the merits of the *inter partes* reexamination" had been promulgated in the '123 *inter partes* reexamination proceeding, and a paper prior to that point is barred by regulation unless authorized, in accordance with 37 CFR 1.939(b). [3]

Although patent owner's March 21, 2006 petition requested relief under 37 CFR 1.183, the regulatory provision that provides for waiver of the rules, [4] there was no specific identification of which regulation that patent owner was seeking to waive. However, even if waiver of the provisions of 37 CFR 1.939 had been specifically requested, the March 21, 2006 patent owner petition could not have been granted. As explained in the decision dated April 11, 2006 (by which the March 21, 2006 patent owner petition and third party requester opposition were discarded as being improper papers), U.S.C. § 312(a) requires, *inter alia,* that after a request for *inter partes* reexamination is filed, the Director shall, within three months of the filing of a request for *inter partes* reexamination, determine whether that request raises a substantial new question of patentability affecting any claim of the patent that is the subject of the request. Further, 35 U.S.C. § 313 **requires** that - when the Director does determine that a substantial new question of patentability is raised by the request, then the determination shall include an order for *inter partes* reexamination of the patent concerned.

---

[1] See patent owner's "Renewed Petition to Suspend, page 2, second full paragraph.

[2] See Decision Discarding Improper Papers", April 11, 2006, page 2, paragraph styled "The Patent Owner Petition"

[3] It appears that petitioner patent owner is confusing the terminology "initial Office action on the merits" with the terminology "reexamination order." The terminology "action on the merits" means an action on the patentability of the claims of the patent being reexamined. See, for example, 37 CFR 1.935 which provides that "The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination." Clearly, a reexamination order and "the initial action on the merits of the reexamination are two different things. See also MPEP Chapter 700, wherein it is made clear that in examination proceedings, "action on the merits" is a term of art meaning an action in which a patentability determination is made.

[4] At page 2 thereof, the March 21, 2006 petition requested relief under a variety of regulations, as well as relief pursuant to 35 U.S.C. § 314(c), as does the present renewed petition

It is clear that consideration of the substance of patent owner's March 21, 2006 petition, and granting it, would have, in effect, required a waiver of 35 U.S.C. §§ 312(a) and 313, because a suspension of the '123 *inter partes* reexamination proceeding would have precluded both a determination of the existence or absence of a substantial new question of patentability, and the promulgation of a reexamination order based on that determination within three months of the filing of the request for reexamination, as required by §§ 312(a) and 313. However, a waiver of the statutes is an action beyond the authority of the Director, and 37 CFR 1.183 expressly recognizes that a requirement of the statutes may not be waived. Therefore, a suspension of the '123 *inter partes* reexamination prior to the determination on the request for reexamination promulgation of the reexamination order, based upon any petition by the parties, was barred.

III.   Procedural Discussion *Re:* The Present Patent Owner Renewed Petition To Suspend

In the present patent owner renewed petition, patent owner takes the position that because an Order granting *inter partes* reexamination has now been issued, the petition to suspend is a proper paper. Patent owner also takes the position that the present renewed petition, (as well as patent owner's March 21, 2006 petition to suspend), is proper because it is authorized by 37 CFR 1.987. [5]

A.   Relief Pursuant to 37 CFR 1.939

Patent owner argues that the present patent owner petition to suspend the '123 reexamination proceeding is now timely under 37 CFR 1.939(b) as reexamination has already been ordered. This position is not persuasive because, as discussed in section II., *supra*, an order for *inter partes* reexamination is not the initial Office action on the merits of the *inter partes* reexamination proceeding. "Action on the merits" is a term of art, and as such, means an action on the patentability of claims. It is clearly so used in the reexamination regulations, for example, in 37 CFR 1.935. [6] Thus, it is clear that the filing of the present patent owner renewed petition to suspend is not authorized by 37 CFR 1.939(b), because the "initial action on the merits " of the '123 *inter partes* reexamination proceeding has not yet been issued by the Office.

B.   Relief Pursuant to 37 CFR 1.987

The patent owner's argues that 37 CFR 1.987 independently authorizes the filing of the present petition to suspend. This too is not persuasive. The plain language of the regulation does not state or imply that it in any way authorizes the filing of a petition to suspend, particularly a petition that would be improper pursuant to one or more of the regulations that implement the *inter partes* reexamination statutes. 37 CFR 1.987 is merely declaratory of the Director's discretionary authority to *sua sponte* suspend an *inter partes* reexamination proceeding in certain circumstances, *i.e.*, when there is both: (a) litigation involving the patent which is the subject of the *inter partes* reexamination proceeding and (b) "good cause" to suspend. 37 CFR 1.987 in no way authorizes the filing of a petition to request such a suspension. The right of parties in this arena is the filing of a Notification of Existence of Prior or Concurrent Proceedings and Decisions pursuant to MPEP § 2686 to provide the Office with information which may, or may not, justify a suspension of action.

Patent owner has not cited a regulation that authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. In fact, no regulation implementing the *inter partes* reexamination statutes authorizes such a petition.

---

[5] *Id.*, at footnote 1.
[6] See the discussion in footnote 3.

C.   Relief Pursuant to Patent Owner's Petition Under 37 CFR 1.182 and 1.183

Note is taken that the present patent owner renewed petition requests relief under both 37 CFR 1.182 and 1.183. Notwithstanding that patent owner has again failed to specifically identify the regulations(s) for which a waiver under 37 CFR 1.183 is requested, the present renewed petition will be taken as a petition under 37 CFR 1.183 to waive the provisions of 37 CFR 1.939 in order to permit the filing of a paper prior to the issuance of the initial Office action on the merits in the '123 *inter partes* reexamination proceeding. Further, the present renewed petition will also be taken as a petition under 37 CFR 1.182 for a situation "not specifically provided for in the regulations" to permit the filing of a petition to suspend the '123 *inter partes* reexamination proceeding.

1.   37 CFR 1.183 Waiver of 37 CFR 1.939

As discussed in sections I. and II (A), *supra*, 37 CFR 1.939(b) precludes the filing of any paper prior to the initial Office action on the merits of the '123 *inter partes* reexamination proceeding. As no initial Office action on the merits has yet been issued, no patent owner paper may be filed in the '123 *inter partes* reexamination proceeding at this point in the proceeding. However, *inter partes* reexamination has now been ordered. [7]   Therefore, suspension of the '123 *inter partes* reexamination proceeding would not require the waiver of any provision of the *inter partes* reexamination statutes; only a waiver of 37 CFR 1.939(b) would be needed to provide for an entry right of the petition paper requesting suspension.

In this instance, it is determined to be in the interests of justice with respect to <u>both</u> parties to the '123 *inter partes* reexamination proceeding that a decision regarding suspension of the '123 *inter partes* proceeding be made as soon as possible, given that (1) a suspension of the proceedings would not impair compliance with the reexamination statutes, and (2) extraordinary circumstances are found to exist, including the fact that this proceeding is but one of four *inter partes* proceedings in which the present parties are involved, and that the present parties are actively involved in litigation with respect to the patents that are the subject of those four *inter partes* reexamination proceedings.   Rather than requiring patent owner and third party requester to re-file the petition and opposition thereto after a first action on the merits, it is appropriate to consider the question of suspension now.  Further, if suspension were in fact warranted, it would be in the interests of justice that such suspension takes place prior to an action on the patentability of the claims.  Finally, there is a public interest, and an interest to be considered by the court in the ongoing litigation, to ascertain, as soon as practical, whether the '123 *inter partes* reexamination proceeding will continue to conclusion, or will presently be suspended pending the outcome of the parallel litigation involving the '873 patent, as well as such future circumstance that would demand that a suspension be lifted, if imposed.

Accordingly, based upon the facts of record and the current circumstances set forth, *supra*, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit filing of the present patent owner renewed petition and the requester's opposition to the renewed petition, and consideration of the substance of both the petition and the opposition.

2.   37 CFR 1.182 Petition to Suspend the '123 *Inter Partes* Reexamination Proceeding

As discussed Section III(B), *supra*, neither 37 CFR 1.987 nor any regulation implementing the *inter partes* reexamination statutes authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. However, the present patent owner renewed petition does request

---

[7] See the "Order Granting *Inter Partes* Reexamination" dated April 6, 2006.

consideration pursuant to 37 CFR 1.182, and a proposed suspension of an *inter partes* reexamination proceeding is a situation not specifically provided for in the regulations. For the reasons set forth in the second paragraph of section III(C)(1), *supra*, and based upon the facts of record and the current circumstances, consideration will be given to the substance of the present patent owner renewed petition to suspend the '123 *inter partes* reexamination proceeding, as a situation not specifically provided for in the regulations.

## IV.  Procedural Discussion Of The Third Party Requester Renewed Opposition

The third party requester renewed opposition filed on May 5, 2006, lacks an entry right under 37 CFR 1.939(b) for the same reasons discussed with respect to the renewed patent owner petition. Further, the regulations implementing the *inter partes* reexamination statutes do not expressly provide for the filing of an opposition paper to a patent owner request to suspend an *inter partes* reexamination proceeding.

However, third party requester has submitted the instant opposition pursuant to 37 CFR 1.182 and 1.183. For reasons analogous to those discussed above with respect to the patent owner's renewed petition, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit the filing of the instant opposition to the present patent owner's renewed petition prior to the initial Office action on the merits in the '123 *inter partes* reexamination proceeding. Although the regulations do not specifically provide for a third party requester opposition to a patent owner petition to suspend an *inter partes* reexamination proceeding, for reasons analogous to those discussed above with respect to the patent owner's renewed petition, consideration will be given, pursuant to 37 CFR 1.182, to the requester's opposition to the patent owner's renewed petition.

## V.  Findings And Analysis On The Merits Of Patent Owner's Renewed Petition to Suspend

### A.  Patent Owner's Substantive Position In Support Of Suspension of the '123 *Inter Partes* Reexamination Proceeding

Patent owner states that pursuant to 35 U.S.C. § 314 (c), and the procedure discussed in MPEP § 2686.04(III), there is good cause to suspend the '123 *inter partes* reexamination proceeding. Patent owner asserts the existence of matters to be raised in the concurrent litigation that are argued to affect the resolution of the '123 *inter partes* reexamination proceeding or potentially bar the proceeding. Patent owner also raises issues in which the District Court's discovery and subpoena powers are asserted to be important in deciding matters heavily dependent upon the evidentiary showings of the parties.

#### 1.  Matters Involving Privity And Assignor Estoppel [8]

Patent owner states that the sole inventor of the '873 patent is Michael J. Sullivan, who is now a Vice President of third party requester business entity. Patent owner urges that 37 CFR 1.913 [9] is facially broad enough to cover both current and former patent owners and current and former privies, to bar *inter partes* reexamination. Patent owner argues that Mr. Sullivan is a

---

[8] See *Shamrock Technologies, Inc. v. Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789; USPQ2d 1728 (Fed. Cir. 1990), and compare *Acushnet Company v. Dunlop Maxfli Sports Corporation*, 2000 U.S. Dist. LEXIS 10123, Civ. A No. 98-717-SLR, (D. Del June 29, 2000).
[9] Pursuant to 37 CFR 1.913, a request for *inter partes* reexamination can be filed by any person other than patent owner or its privies.

privy of a former patent owner [10] to whom the '873 patent was originally assigned, and that 37 CFR 1.913 should have precluded the filing of the '123 *inter partes* reexamination proceeding.

Patent owner further alleges that, as a Vice President of third party requester, Mr. Sullivan may well be a privy of third party requester. Patent owner argues that the third party requester would therefore be barred from challenging the validity of the '873 patent via the '123 *inter partes* reexamination proceeding by the doctrine of assignor estoppel.

Patent owner's position is that a suspension of the '123 *inter partes* reexamination proceeding is necessary, because these issues can only be resolved by evidence that can uniquely be obtained through the use of the District Court's discovery and subpoena power.

### 2. Additional Matters Requiring The District Court's Discovery And Subpoena Power

Patent owner also urges that the use of the District Court's discovery and subpoena power is required to permit full and fair evaluation of testing undertaken by third party requester that is relied upon by third party requester to support its allegations of patent invalidity. Patent owner points out that third party requester relies upon an invalidity argument under 35 U.S.C. § 103, that objective evidence of commercial success of both the patent owner and an alleged infringer (the third party requester) is relevant to § 103 nonobviousness. Patent owner argues that access to evidence that would establish commercial success of the third party requester's accused products could be obtained utilizing the District Court's discovery and subpoena powers.

### B. Established Standards Demonstrating The Existence of "Good Cause" For Suspension Of *Inter Partes* Reexamination Proceedings

35 U.S.C. § 305 requires that all *ex parte* reexamination proceedings be conducted with special dispatch within the Office. It has been held that, based on the unequivocal statutory requirement for special dispatch, the Office may not suspend a pending *ex parte* reexamination proceeding merely because of the existence of concurrent litigation on the patent that is the subject of reexamination. [11] *Ethicon* discusses certain fundamental concepts regarding concurrent *ex parte* reexamination proceedings in the Office and litigation of the patent that is the subject of reexamination. For example the *Ethicon* court quoted extensively from the decision of the court in *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (in banc) to point out:

> "That:one challenging validity in court bears the burden assigned by [35 U.S.C.] § 282, that the same party may request reexamination upon submission of art not previously cited, and that, if that art raises a substantial new question of patentability, the PTO may during reexamination consider the same and new and amended claims in light of that art free of any presumption, *are concepts not in conflict.* On the contrary, those concepts are but further indication that *litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes.*" [Emphasis is the Court's.]

The *Ethicon* court also cited *Etter* in order to point out that when reexamination and litigation for the same patent are conducted concurrently:

> " . precise duplication of effort does not occur because the PTO and the courts employ different standards of proof when considering validity, and the courts, unlike the PTO during a reexamination of patent claims, are not limited to review of prior art patents or printed publications."

---

[10] The present patent owner acquired rights to the '873 patent from the original owner, Top-Flite.

[11] *Ethicon, Inc., v. Quigg,* 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988)

*Id.*, at 856, at 4.

In contrast to the 35 U.S.C. § 305 which applies only to *ex parte* reexamination, 35 U.S.C. § 314(c) expressly allows for the suspension of an *inter partes* reexamination proceeding within the Office "for good cause," notwithstanding that *inter partes* reexamination proceedings are to be conducted with "special dispatch." Therefore, the question of whether a petition to suspend an *inter partes* reexamination proceeding that is being conducted concurrently with litigation of the patent establishes "good cause" for the suspension of an *inter partes* reexamination proceeding presents a question that differs from the question of suspension of an *ex parte* reexamination proceeding. Pursuant to 35 U.S.C. § 314(c) and 37 CFR 1.987 that implements the statutory provision, the USPTO Director has authority to determine circumstances amounting to "good cause" for suspension of an *inter partes* reexamination proceeding, and to do so on a case-by-case basis.

In *inter partes* reexamination proceedings control numbers 95/000,093 and 95/000,094 (collectively referred to hereinafter as "the Immersion-Sony *inter partes* reexamination proceedings"), the Office granted a patent owner petition to stay the *inter partes* reexamination proceedings due to the existence of concurrent litigation of the patents that were the subject of the reexamination proceedings. [12] The decision suspension granting acknowledged that MPEP § 2684.04 set forth certain criteria as indicia of "good cause" for suspension of an *inter partes* reexamination proceeding, but pointed out that these criteria were merely exemplary. [13] The criteria relied upon by the Office in the Immersion-Sony *inter partes* reexamination proceedings to support a finding of "good cause" to suspend was upheld by the U.S. District Court, Eastern District of Virginia, *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. This criteria establishes a benchmark and standard which the Office can make use of to test the facts and circumstances of record in a given *inter partes* reexamination proceeding in order to determine whether there is "good cause" to suspend that *inter partes* reexamination proceeding, due to the existence of concurrent litigation of the patent being reexamined.

In the *Sony* scenario:

The patent claims for which *inter partes* reexamination was requested were not identical to the claims being litigated; there was one non-litigated patent claim (claim 1 in each instance) for which reexamination had been requested in each proceeding. The Office denied patent owner Immersion's first petition to suspend the *inter partes* reexamination proceedings, noting that even if the proceedings were suspended in the Office and judgment was rendered adverse to requester Sony in the concurrent litigation, that would not dispose of all claims in the existing *inter partes* reexamination proceedings, leading to a piecemeal reexamination, and a delay in reexamination of the non-litigated claims. [14] The patent owner then disclaimed claim 1 of each patent, whereby <u>identical patent claims</u> were the subject of both the *inter partes* reexamination proceedings and the concurrent litigation. The Office then granted patent owner Immersion's second petition to suspend the *inter partes* reexamination proceedings.

At the point in time that the Immersion-Sony *inter partes* reexamination proceedings were suspended, <u>the proceedings were at an early stage</u>; the Office's work had been limited only to a finding that the requests for reexamination had raised a substantial new question of

---

[12] See the '093 and '094 proceedings, Decision Granting Petitions To Suspend, November 17, 2005

[13] *Id.*, Decision Granting Petitions To Suspend", November 17, 2005, footnote 6.

[14] *Id.*, "Decision Denying Petitions", August 23, 2005, at page 6.

patentability. The <u>concurrent litigation</u>, on the other hand, <u>was at an advanced stage</u>: (a) a District Court had issued a decision adverse to requester Sony, holding the litigated patent claims to be valid, (b) an appeal of the District Court had been filed in the Court of Appeals for the Federal Circuit ("the Federal Circuit"), and (c) the matter had already been briefed.    Thus, there was a substantial likelihood that suspension of the reexamination proceedings would serve to conserve Office of resources, since a final holding of claim validity would statutorily require termination of the Immersion-Sony *inter partes* prosecutions with respect to all of the claims subject to the litigation, which was also all the claims subject to reexamination in those proceedings.    It was not in the Office's and parties' interests to engage resources in administrative proceedings that ultimately could be mooted by the concurrent litigation which was soon to be finally resolved. The substantial likelihood that the reexamination prosecutions would terminate and the proceedings be concluded, taken together with the identity of claims in the litigation and the *inter partes* reexamination proceedings, led the Office to conclude that on balance, there was "good cause" to suspend the Immersion-Sony *inter partes* reexamination proceedings, to await the decision by the Federal Circuit. The decision granting suspension noted that should circumstances change, *e.g.*, if the matter were remanded to the District Court by the Federal Circuit without a holding on claim validity, the third party would be free to petition for a resumption of the *inter partes* reexamination proceeding based upon the change in circumstances.  The decision also noted that further *inter partes* proceedings on the claims not before the Office and the courts could subsequently be obtained by members of the public.

**In the present instance:**

The facts and circumstances in the '123 *inter partes* reexamination proceeding differ significantly from those present in the Immersion-Sony *inter partes* reexamination proceeding.  In contrast to the Immersion-Sony *inter partes* reexamination proceedings, the litigation involving the '873 patent is at an early stage.  For example, there is a pending order dated June 2, 2006, referring the matter to a Magistrate Judge for the purposes of exploring joinder of parties, setting September 29, 2006 as a due date for amended papers, and setting a discovery conference for October 18, 2006.  The issue of claim construction is still pending, and there are apparently a number of preliminary motions pending.    Thus, unlike the Immersion-Sony *inter partes* proceedings in which the litigation had resulted in an appealable holding of claim validity, with the appeal having been filed and briefed to the appellate court, in this instance, it is not even foreseeable when the District Court's holding on the issue of validity might be would be rendered, and what it might be. It certainly cannot be envisioned when the litigation involving the '873 patent will reach a final holding on the validity of the claims of the '873 patent, including any appeal to the Federal Circuit, let alone what that holding is likely to be.

Further, in the '123 *inter partes* reexamination proceeding, patent owner has not established that there that the litigation of the '873 patent will result in a decision on the validity of all of the claims being currently being reexamined, *i.e.*, claims 1-6 of the '873 patent. Thus, it is not even clear that a final holding of claim validity in the litigation would necessarily require conclusion of the '123 *inter partes* reexamination proceeding as to all the claims subject to reexamination.

**As a final point, as to the difference:**

In the Immersion-Sony *inter partes* proceedings Sony chose to permit the District Court litigation to proceed for three years before filing its requests for reexamination only after judgment was entered in Immersion's favor in the litigation.  Had Sony filed its requests for reexamination earlier, the reexamination proceedings could have been much farther along in the process, and may likely have been completed at the Office <u>before</u> the district court issued its decision. Also,

the district court might have stayed the litigation to await the Office's decisions in the reexamination proceedings. In the present instance, the requester has filed the '123 *inter partes* reexamination well before the District Court litigation has advanced to conclusion, and the Office proceedings should be available for the District Court.

**In conclusion as to this issue:**

Congress specifically provided estoppel provisions when a "final decision" upholding the validity of patent claims has been reached in a civil action or in a prior *inter partes* reexamination. *See* 35 U.S.C. § 317(b); 35 U.S.C. § 315(c). Thus, if a party's challenge to the validity of certain patent claims has been finally resolved, either through civil litigation or the *inter partes* reexamination process, then that party is barred from making a subsequent request for *inter partes* reexamination (or filing a new civil action) challenging the validity of those same claims. *Id.* Accordingly, while Congress desired that the creation of an *inter partes* reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also contemplated in the statute that a court validity challenge and *inter partes* reexamination of a patent may occur simultaneously; but once one proceeding finally ends, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other. Until that time, however, the Office is obligated to move forward in the *inter partes* reexamination with "special dispatch." Only "good cause" will permit the Office from deviating from that statutory mandate. In this instance, the litigation is at a preliminary stage so that it can not be determined when the litigation will reach a final holding on the issue of claim validity and what that decision is likely to be. Even if there should be a final holding on the issue of claim validity, the patent owner has not established that there is an identity of claims in the '123 *inter partes* reexamination proceeding and those subject to the litigation to thereby statutorily bar proceeding further with the entirety of the reexamination proceeding. Accordingly, the patent owner has not provided the USPTO Director with sufficient basis upon which to conclude that there is "good cause" to suspend the *inter partes* reexamination proceeding to await a final decision on claim validity in the litigation.

### C. Other Patent Owner's Allegations That Good Cause For Suspension Exists

The factors alleged by patent owner to present "good cause" for suspension of the '123 *inter partes* reexamination proceeding have been thoroughly considered. However, for the reasons that follow, these factors do not establish "good cause" for suspension.

#### 1. Privity and Assignor Estoppel

Patent owner argues that because Michael J. Sullivan, the sole inventor of the '873 patent, assigned the '873 patent to patent owner's predecessor in interest, the '123 *inter partes* reexamination proceeding was filed by a "former privy" of patent owner and is therefore barred under 37 CFR 1.913. The purpose of 37 CFR 1.913 is simply declaratory of the statutory mandate of 35 U.S.C. § 311(a) that provides that any third-party requester may, at any time, file a request for *inter partes* reexamination. [15] Patent owner has not established that 37 CFR 1.913,

---

[15] In the Notice of Proposed Rulemaking entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 18154, 18167 (April 6, 2000) it is stated that proposed rule includes the language "an person other than the patent owner or its privies may ... file a request for *inter partes* reexamination." The commentary stated that the proposed rule "provides for any third-party requester ... to file a request for ... an *inter partes* reexamination ...." That is, the proposed rule was thought to simply echo the statutory language. However, the words "other than patent owner or its privies" were deleted from the final rule because a comment to directed proposed rule 1.913 had suggested that the Office had exceeded its authority in excluding patent owner or its privies

nor the statute upon which it is grounded, precludes the filing of a request for *inter partes* reexamination by a party who is a so-called "former privy" of patent owner, especially a party who assigned a patent to an entity other than the present patent owner. Absent citation of controlling authority to the contrary by patent owner, it would appear that the statutory language "any third-party requester" is broadly drawn and would permit a party not in direct privity with a patent owner, i.e., a "former privy" of patent owner, to file a request for *inter partes* reexamination.

Patent owner also argues that the doctrine of assignor estoppel should have precluded the filing of the '123 *inter partes* reexamination proceeding, because sole inventor Sullivan assigned the patent to patent owner's predecessor in interest, but is now a Vice President of the third party requester business entity. However, reexamination is not litigation to determine the validity of patent claims conducted before a court wherein the equitable doctrine of assignor estoppel is applicable. Rather, reexamination is an administrative proceeding to determine the patentability of patent claims, a determination that is not conducted under the equitable considerations attaching to a litigation in which claim validity is determined. As discussed above, *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (*en banc*) makes it clear that litigation and reexamination are distinct proceedings with distinct parties, purposes, procedures and outcomes. Stated differently, although the application of the assignor estoppel doctrine in litigation is a fact intensive issue requiring the finding of facts and the balancing of the equities by the court, [16] a reexamination proceeding is not a determination of patent validity and infringement of patent claims. [17] It is also to be noted that a patent owner is statutorily authorized to file a reexamination request to obtain an advisory opinion as to the applicability of a prior patent or printed publication; such an advisory opinion would be prohibited in litigation as lacking a "case or controversy." If a patent owner can request reexamination of a patent, a party who assigned to the patent owner should likewise be permitted to do so. Therefore, absent citation of authority holding that assignor estoppel applies to reexamination so as to bar a statutorily approved request for *inter partes* reexamination filed by "[A]ny third-party requester at any time," assignor estoppel would not appear to apply generally to reexamination, and specifically to the present *inter partes* reexamination proceeding. Patent owner has argued that a suspension of the '123 *inter partes* reexamination proceeding is necessary because the issue of whether the present requester was barred from filing the '123 *inter partes* reexamination proceeding based on assignor estoppel can only be resolved through

---

because the language of 35 U.S.C. § 311(c) appeared to permit a patent owner to file a request for an *inter partes* reexamination proceeding. See Final Rule entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 76756, 76764 (December 7, 2000). However, Public Law 107-273, section 12101, 116 Stat. 1901 amended 35 U.S.C. § 311(c) clarify that only the third party requester, and not a patent owner, may file a request for *inter partes* reexamination. Thereafter, the language "other than patent owner or its privies" was added to 37 CFR 1.913. See Final Rule entitled "Changes to Implement the 2002 *Inter Partes* Reexamination and Other Technical amendments to the Patent Statute", 68 Fed. Reg. 70996, 70999 (December 22, 2003).

[16] Compare *Shamrock Technologies, Inc. v. Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789, 14 USPQ2d 1728 (Fed. Cir. 1990) holding that because inventor Luniewski who had assigned his patent to Shamrock was now a Vice President of MSI was in privity with MSI, that MSI was barred from asserting patent invalidity and unenforceability as defenses to patent infringement with *Acushnet Company v. Dunlop Maxfli Sports Corporation, Civ. A. No. 98-717-SLR, 2000 U.S. Dist., LEXIS 10123* (D. Del June 29, 2000) distinguishing *Shamrock* holding that where an inventor had assigned a patent to plaintiff and then became a Vice President of defendant accused infringer the facts and equities did not establish that the inventor was in privity with the defendant and that the defense of patent invalidity was, therefore, available to defendant.

[17] See also *Joy Technologies, Inv. v. Harry F. Manbeck, Jr.* 959 F.2d 226, 229 (Fed. Cir. 1992) "Trying to equate its appeal of the reexamination decision to an action analogous to a 'suit at common law,' Joy argues that the reexamination proceeding should be construed as most like a declaratory judgment action where the PTO is seeking a determination that Joy's patent is invalid. It admits, however, that the PTO could not bring such a suit. Thus, there is no basis to recharacterize the statutory procedure established by Congress in the reexamination statute."

evidence obtained through the use of the District Court's discovery and subpoena power to ascertain whether an assignor filed the present request. However, since patent owner has not established that the doctrine of assignor estoppel applies in the administrative reexamination of a patent, patent owner's argument has not been shown to establish "good cause" for suspension of the '123 *inter partes* reexamination proceeding.

> 2. Additional Matters Requiring The District Court's Discovery and Subpoena Power

Patent owner argues that, in addition to the issues of assignor estoppel and privity, the District Court's discovery and subpoena power is necessary for patent owner to secure objective evidence of commercial success of third party requester's infringing products. Patent owner also argues that patent owner will be able to question tests conducted by third party requester in support of third party requester's arguments of patent invalidity, and that patent owner will be able to obtain the information necessary to question these tests only through the District Court's discovery and subpoena powers. Thus, patent owner reasons that "good cause" exists warranting suspension of the '123 *inter partes* reexamination proceedings.

These arguments are unpersuasive for a number of reasons. First, the provisions of 37 CFR 1.132 apply to the '123 *inter partes* reexamination proceeding, as it does to all *inter partes* reexamination proceedings. Patent owner will in fact have an opportunity in the '123 *inter partes* reexamination proceedings to submit objective test evidence in support of nonobviousness to the same extent that third party requester may submit objective test evidence tending to show nonobviousness. Also, the parties can submit evidence rebutting each other's 37 CFR 1.132 showings. Further, patent owner has submitted no showing that sales of the accused infringer's products are secret data not available publicly, thereby enabling patent owner to secure this data by commissioning research of the matter, without the necessity of the District Court's subpoena and discovery. Speculative allegations that patent owner might require the District Court's subpoena and discovery power in aid of a position taken in litigation does not establish "good cause" for suspension of the '123 *inter partes* reexamination proceeding.

Of greater import, however, is that patent owner's position, if taken to its logical conclusion, would undercut the ability of a third party requester (and, for that matter, a patent owner) to obtain any final result in an *inter partes* reexamination proceeding. Thus, the purpose of the *inter partes* reexamination statutes would be frustrated. For if a party engaged in patent infringement/validity litigation could demonstrate "good cause" for a suspension of an *inter partes* reexamination proceeding merely by invoking the existence of a district court's subpoena and discovery power and coupling that invocation with allegations that the party might need to employ that power in the course of litigation, then any *inter partes* reexamination proceeding for a patent involved in litigation could be readily stayed. It is presumed that if Congress had desired this, Congress would have expressly so stated in the reexamination statutes. However, Congress instead enacted 35 U.S.C. § 314 (c) and the "good cause" standard, a far more flexible and fact specific test allowing the USPTO Director to determine on a case-by-case basis whether to stay a pending *inter partes* reexamination proceeding.

## CONCLUSION

1.  The patent owner renewed petition filed April 28, 2006, is <u>granted</u> with respect to the relief requested pursuant to 37 CFR 1.183, to the extent that the substance of patent owner's petition to suspend the '123 *inter partes* reexamination proceeding has been considered under 37 CFR 1.182.

2.  The substance of the third party requester opposition filed on May 5, 2006, has been considered pursuant to 37 CFR 1.183.

3.  The patent owner's petition under 37 CFR 1.182 to suspend the '123 *inter partes* reexamination is <u>denied</u>.

4.  This decision is a final agency action within the meaning of 5 U.S.C. § 704.

5.  Telephone inquiries related to the present decision should be directed to the Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to the undersigned at 571-272-7710.

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

sm
July 17, 2006

7-17-06
C:\Kiva\Kenpet6\IP\IP 123_PO_suspend-re-lit_after-Order+before-1stOA.doc

# EXHIBIT 8



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,123 | 01/17/2006 | 6595873 | 00634 0004.RXUS03 | 6324 |

7590     09/07/2006

Dorothy P. Whelan
Fish & Richardson P. C.
P. O. Box 1022
Minneapolis, MN  55402-1022

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 09/07/2006

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC  20004


# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination


REEXAMINATION CONTROL NUMBER *95/000,123*.

PATENT NUMBER *6,595,873*.

TECHNOLOGY CENTER *3999*.

ART UNIT *3993*.


Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.


PTOL-2070 (Rev 07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
MAILED P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

SEP 0 7 2006

CENTRAL REEXAMINATION UNIT

Dorothy P. Whelan
Fish & Richardson P.C.
P.O. Box 1022
Minneapolis, MN 55440-1022

(For Patent Owner)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

(For Third Party Requester)

| | |
|---|---|
| In re Callaway Golf Company | : **DECISION DENYING** |
| *Inter Partes* Reexamination Proceeding | : **PETITION FOR** |
| Control No.: 95/000,123 | : **RECONSIDERATION** |
| Filed:    January 17, 2006 | : **AND RETURNING** |
| For:      U.S. Patent No. 6,595,873 | : **IMPROPER PAPER** |

This is a decision on the June 16, 2006 patent owner petition entitled "PETITION TO THE DIRECTOR FOR RECONSIDERATION" under 37 CFR 1.181(a)(3). On June 28, 2006, the third party requester filed an opposition to the present petition entitled "ACUSHNET'S OPPOSITION TO CALLOWAY'S PETITION TO DIRECTOR FOR RECONSIDERATION."

The patent owner petition, the third party requester opposition and the present record are before the Office of Patent Legal Administration for consideration.

For the reasons set forth below, the patent owner petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination (i.e., the underlying relief requested).

This decision also addresses the patent owner paper filed on July 21, 2006 styled "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION" as an improper paper.

### FEES

A petition to vacate reexamination on the grounds that the order granting reexamination constitutes an *ultra vires* action on the part of the Office is considered pursuant to 37 CFR 1.181. Accordingly, no fee is due for the patent owner petition for reconsideration or for the third party requester opposition to the petition for reconsideration.

# REVIEW OF SALIENT FACTS

1. U.S. Patent No. 6,595,873 (the '873 patent) issued to Michael J. Sullivan on July 22, 2003, and is currently assigned to Callaway Golf Company.

2. A request for *inter partes* reexamination of the '873 patent was filed by a third party requester, Acushnet Company (hereinafter "Acushnet"), on January 17, 2006. The request was assigned Control No. 95/000,123 (the '123 *inter partes* reexamination proceeding).

3. On February 9, 2006, the patent owner filed suit against requester Acushnet in the United States District court for the District of Delaware. *Callaway Golf Company v Acushnet Company*, C.A. No. 06-91 (SLR) (February 9, 2006).

4. On February 09, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '123 *inter partes* reexamination proceeding stated to have been filed by third party requestor on January 23, 2006.

5. On February 16, 2006, the Office recognized the February 09, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

6. On March 21, 2006, the patent owner then filed a petition, requesting that the '123 *inter partes* reexamination proceeding be suspended.

7. On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition to suspend reexamination.

8. On March 31, 2006, the Office issued a decision holding that the March 21, 2006 petition and the March 24, 2006 opposition papers would be discarded as being improper papers because they had been filed prior to reexamination being ordered.

9. Reexamination was ordered for the '123 *inter partes* reexamination proceeding on April 6, 2006.

10. On April 13, 2006 the patent owner filed a petition under 37 CFR 1.181 <u>to vacate</u> the reexamination order as *ultra vires* (which would in-effect vacate the proceeding).

11. On April 27, 2006 the third party requester filed, pursuant to MPEP 2646 (I), an opposition to the April 13, 2006 patent owner petition to vacate.

12. On April 28, 2006, patent owner filed a renewed petition <u>to suspend</u> the '123 *inter partes* reexamination proceeding.

13. On May 5, 2006 third party requester filed an opposition to the April 28, 2006 renewed patent owner petition to suspend reexamination.

14. On June 7, 2006, the Office dismissed patent owner's April 13, 2006 petition <u>to vacate</u> the '123 *inter partes* order for reexamination.

15. On July 19, 2006, the Office denied patent owner's April 28, 2006 renewed petition <u>to</u> <u>suspend</u> the '123 *inter partes* reexamination proceeding.

16. On June 16, 2006, patent owner filed a petition for reconsideration of the June 7, 2006 decision dismissing the patent owner petition <u>to vacate</u> the '123 *inter partes* order for reexamination.

17. On June 28, 2006, third party requester filed an opposition to the June 16, 2006 patent owner petition for reconsideration.

18. On July 21, 2006, patent owner filed a reply to the June 28, 2006 third party requester opposition.

## RELEVANT STATUTES, REGULATIONS AND PROCEDURE

35 U.S.C. § 311(a) provides:

"IN GENERAL — Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

"Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director shall determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications … " [Emphasis supplied.]

35 U.S.C. § 313 provides:

"If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination shall include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. 314(c) provides:

c) SPECIAL DISPATCH.- Unless otherwise provided by the Director for good cause, all *inter partes* reexamination proceedings under this section … shall be conducted with special dispatch within the Office.

35 U.S.C. §315(b) provides:

"CIVIL ACTION.— A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

35 U.S.C. § 317 provides:

"a) ORDER FOR REEXAMINATION.- Notwithstanding any provision of this chapter, once an order for *inter partes* reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION - Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit ..., then neither that party nor its privies may thereafter request an *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action..., and an *inter partes* reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.907 provides in pertinent part:

" (b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an inter partes reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such inter partes reexamination proceeding. "

MPEP § 2646 (I) provides in pertinent part:

"A petition under 37 CFR 1.181 may... be filed to vacate an *ultra vires* reexamination order, such as where the order for reexamination is not based on prior art patents and printed publications. In cases where no discretion to grant a request for reexamination exists, a petition to vacate the decision to grant, or a request for reconsideration, will be entertained. "Appropriate circumstances" under 37 CFR 1.181(a)(3) exist to vacate the order granting reexamination where, for example:

(A)  the reexamination order is not based on prior art patents or printed publications;
(B)  reexamination is prohibited under 37 CFR 1.907;
(C)  all claims of the patent were held to be invalid by a final decision of a Federal Court after all appeals;
(D)  reexamination was ordered for the wrong patent;
(E)  reexamination was ordered based on a duplicate copy of the request; or
(F)  the reexamination order was based wholly on the same question of patentability raised by the prior art previously considered in an earlier concluded examination of the patent by the Office (e.g., the application which matured into the patent, a prior reexamination, an interference proceeding)
....

The filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester." [Emphasis supplied.]

## DECISION

I. Disposition Of The Patent Owner Opposition To Third Party Requester's Opposition To Patent Owner's Petition For Reconsideration

Neither the *inter partes* reexamination statutes nor the regulations implementing those statutes provide for the filing of a patent owner petition for vacatur of an order granting a request for *inter partes* reexamination. A patent owner petition for vacatur of an order granting a request for *inter partes* reexamination on the grounds that the grant of the order constituted an *ultra vires* action on the part of the Office is entertained pursuant to 37 CFR 1.181 in accordance with the practice set forth in MPEP § 2646(I). MPEP § 2646(I) concludes by stating that "[t]he filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester."

Consequently, the "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION," filed by patent owner on July 21, 2006, is an improper paper that lacks an entry right in the present *inter partes* reexamination proceeding. Therefore the paper (apparently filed by facsimile transmission as a single paper directed to four *inter partes* reexamination proceeding) is being returned to patent owner as an attachment to the decision in the '120 *inter partes* reexamination proceeding. If any additional copies directed to concurrent *inter partes* reexaminations, that is, the instant proceeding 95/000,123, or of 95/000,121 and 95/000,122, have been filed and are subsequently matched with the proceedings, such additional copies will be discarded rather than returned to patent owner.

II. Patent Owner's Position In Support of Vacatur

In the April 13, 2006 petition to vacate the reexamination order as being *ultra vires*, patent owner argued that the order granting reexamination is an *ultra vires* action on the part of the Office because the third party requester, Acushnet, lacked standing to file the *inter partes* request. Patent owner based this argument on allegations that:

(1) Patent owner's predecessor in interest and the present third party requester Acushnet entered into a Settlement Agreement on November 10, 1990, for a term of ten years;

(2) The same parties executed a Settlement Agreement in 1996 that superseded the 1990 agreement, and the 1996 Settlement agreement provides, *inter alia*, that the exclusive forum for the third present party requester to resolve patent validity issues with the patent owner is the United States District Court for the District of Delaware; and

(3) The same (present) parties participated in the dispute resolution process pursuant to the 1996 Settlement Agreement, but while the mediation process was underway, Acushnet requester filed a request for the present *inter partes* reexamination proceeding. [1]

It was apparently patent owner's position that by filing the present request for *inter partes* reexamination, requester Acushnet violated the aforementioned Settlement Agreement, and

---

[1] See patent owner's Petition, pages 2-3.

that Acushnet therefore does not have standing to have filed and to now maintain the present request for *inter partes* reexamination.[2]

In the present petition for reconsideration, patent owner argues that:

(1)  The Office has the authority and duty to apply the 1996 Settlement Agreement to this case, and that enforcing the 1996 Settlement Agreement would not violate public policy;

(2)  The exemplary language in the MPEP § 2646 does not limit the circumstances where the Office can vacate reexamination orders;

(3)  Vacating the reexamination would not leave an unresolved substantial new question of patentability; and

(4)  The Office's reliance on the decision in *Heinl v. Godici*, 143 F. Supp 2d 593 (District Court, E. D. VA), is inapposite to this case, because *Heinl* dealt with an entirely unrelated issue, and did not involve a settlement agreement.

III.  Analysis and Findings

A.  The Settlement Agreement Between Patent Owner and The Present Requester Does Not Preclude the Present *Inter Partes* Reexamination Proceeding:

Patent owner argues that a trademark cancellation proceeding is analogous to a reexamination proceeding, and seek to apply the decisions in *Selva & Sons v. Nina Footwear, Inc.*, 705 F.2d 1316 (Fed. Cir. 1983) and *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386 (CCPA 1974) to assert that the Office erred in refusing to consider the settlement agreement between the present patent owner and requester in determining whether to proceed with the present reexamination proceeding. With respect to the *Selva & Sons* decision, patent owner opines that because the statute [3] governing trademark cancellation proceedings (that are *inter partes* in nature) states that "any person" is able to file a petition to cancel a registration, *Selva & Sons* is indistinguishable from the facts in the present reexamination proceeding.   Patent owner also argues that in *Flex-Foot, Inc v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) the Federal Circuit upheld a clause in a settlement agreement prohibiting a party from challenging the validity of a patent when that party had agreed to a dismissal, with prejudice, of a prior action, after entering into a settlement that included a promise to not challenge the validity of that patent.

However, the decisions in the *Selva & Sons* and *Danskin, Inc.* cases do not appear to be on point as to the question of whether a party to a settlement agreement is barred from requesting reexamination of a United States patent under 35 U.S.C. § 302 *et. seq.*. *Selva & Sons* was an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding. In *Selva & Sons* , the court's decision was not grounded on the "any

---

[2] *Id.*, at pages 4-6
[3] 15 U S.C. § 1064, which states in pertinent part:
"A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by **any person** who believes that he is or will be damaged, including as a result of dilution under section 1125 (c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:..." [Emphasis added]

party" language of 15 U.S.C. § 1064. Rather, the court noted the existence of 15 U.S.C. § 1069, which states:

> "In all *inter partes* proceedings equitable principles of laches, estoppel and acquiescence, where applicable, may be considered and applied." *Id.* at 1323, 1324

There is no analogue in the reexamination statutes to 15 U.S.C. § 1069, a statute that broadly applies the equitable principles of laches, estoppel and acquiescence to *inter partes* trademark proceedings in the Office. Rather, the *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (*i.e.*, nonappealable) court holding of patent claim validity [4] or the existence of an order granting reexamination.[5] If Congress had intended to make the broad equitable principles set forth in 15 U.S.C. § 1069 applicable to *inter partes* reexamination proceedings, then Congress would have so stated.[6] With respect to the *Danskin, Inc.* case (an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding), it is noted that the language of 15 U.S.C. § 1069 would also apply, so that application of the broad equitable principles listed in the statute would have been mandated.

In the *Flex-Foot* decision, the court did *not address the issue of whether the Office would be barred from conducting a reexamination proceeding filed by that party.* The court's decision merely upheld that a clause in the settlement agreement would prohibit a party to the settlement agreement from challenging the validity of a patent (and accordingly, the opposing party would have remedies against the party that violated the agreement). The opinion in *Flex-Foot* does not discuss the affect of a reexamination filing by a party in violation of such a settlement agreement, as to whether the reexamination should continue. *Flex-Foot* does not require or suggest that an order granting a reexamination proceeding, based on such a filing, would be *ultra vires* due to the existence of a settlement agreement between a patent owner and third party requester. And, based on the discussion below, there is no reason to believe that an order granting a reexamination proceeding based on such a filing would be *ultra vires* action on the part of the Office.

### B. Reexamination Case Law Does Not Support Vacatur Of The Present Reexamination Proceeding

The settlement agreement asserted by patent owner in the '123 reexamination proceeding does not explicitly address reexamination of a patent. Even if it did, relevant court precedent clearly demonstrates that - because the Office was not, and is not, a party to the settlement agreement, the Office was not, and is not, bound by the settlement agreement.

*Joy Manufacturing Co. v National Mine Service Co*, 810 F.2d 1127 (Fed. Cir. 1987) addressed the question of the effect, if any, that the existence of a settlement agreement between parties to an infringement/validity patent litigation had with respect to a request for *ex parte* reexamination subsequently filed by a party to that settlement agreement. Accused infringer National had entered into an agreement in settlement of an action brought against it for infringing a patent.

---

[4] See 35 U.S.C. § 317(b).

[5] See 35 U.S.C. § 317(a).

[6] In light of the cases cited below in support of the Office's position vis-à-vis the effect of the settlement agreement in the present reexamination proceeding, it is also to be noted that with respect to *ex parte* reexamination, Congress has not mandated any estoppel with respect to the ability of "any person" to file a request for reexamination at "any time."

National agreed that it would not file any suit in any court challenging the validity of the patent. Thereafter, National filed a request for reexamination of the patent, and the patent owner requested an injunction preventing the third party requester from going forward in the reexamination proceeding. The District Court ruled against the patent owner, noting that <u>the settlement agreement by its literal terms did not proscribe the conduct of which the patent owner complained</u>. The Federal Circuit agreed, holding that:

> " ... the district court correctly refused to equate "a request for administrative reexamination . . . with filing a suit in a United States Court." Its reliance on *Etter* as support for this legal conclusion was entirely appropriate. The *Etter* decision turned on the precise issue here, namely, that reexamination and civil litigation were distinctly different proceedings. As stated therein:

>> The intent that reexamination proceedings and court actions involving challenges to validity be distinct and independent is reflected in the legislative history of § 303. . . . *756 F.2d at 857, 225 USPQ at 4.* The result in *Etter* is inseparable from the above-quoted premise. [Footnote omitted.]

> "In this connection, we also note that the principal relief which Joy seeks — namely, stopping the reexamination of its patent — is not available in these proceedings. *Accord* Manual of Patent Examining Procedure § 2210 (5th ed. 1983); *Houston Atlas, Inc v. Del Mar Scientific, Inc.*, 217 U.S.P.Q. (BNA) 1032, 1034 (N.D. Tex. 1982), aff'd, 703 F.2d 555 (5th Cir. 1983). The decision by the Commissioner to institute reexamination is not subject to review, *Etter*, 756 F.2d at 857, 225 USPQ at 4; and the injunction sought against National would have no effect on reexamination since National, as the requestor, has no future role to play in that *ex parte* proceeding."

In the present reexamination proceeding, patent owner has not established that Acushnet's request for reexamination violates the literal terms of the 1996 settlement agreement involved here. The settlement agreement does not facially preclude "administrative proceedings" of any sort, including reexamination within the Office. Further, as was noted in the previous decision dismissing the petition, the settlement agreement was entered into in 1996; <u>prior to</u> the enactment in 1999 of the statute authorizing *inter partes* reexamination. Thus, it is unlikely that the settlement agreement reflects an agreement between the parties thereto to forego administrative relief in the form of a request for *inter partes* reexamination (such *inter partes* proceeding made available after the settlement agreement), and at best, could only be asserted to inferentially contemplate that the parties to the settlement agreement would not seek *ex parte* reexamination (where there is no right to comment on patent owner responses and appeal). *Joy Manufacturing*, and the other cases relied on by the Office, *infra*, all involve *ex parte* examination proceedings. Moreover, even presuming that the settlement agreement between the patent owner and third party requester could be construed to be an agreement precluding the filing of a request for *ex parte* reexamination, the courts have uniformly held that such agreement is without binding effect on the Office and would not bar the Office from granting and conducting an *ex parte* reexamination proceeding, as will now be discussed.

In *Houston Atlas, Inc. et al v. Del Mar Scientific, Inc. et al.*, 217 USPQ 1032, 1037 (N.D. Tex. 1982), the district court considered the situation in which two parties had executed and had entered a consent judgment stating that a particular patent was valid. The consent judgment was entered prior to the enactment of the *ex parte* reexamination statutes. The court expressly addressed the subsequent effect the consent judgment would have on reexamination in the Office, if any. The court stated that private parties cannot bind the Office, or the public it represents, with respect to the validity of a patent, by merely executing the consent judgment and having it entered. The court noted that:

> " ... the Patent Office was not a party to the original proceeding and, as discussed in section IV above, the consent judgment is not binding on the Patent Office or the public which it represents. Simply stated, two private parties cannot bind the Patent Office with respect to the validity of a patent by merely executing, and having entered, a consent judgment stating that the patent is valid. The consent

judgment is not *res judicata* on the Patent Office as there is no evidence that the Patent Office is privity with Defendants. *See Vulcan, Inc. v. Fordees Corp., 658 F.2d 1106, 1109-10, 211 USPQ 852, 854-855 (6th Cir. 1981)* (party not in privity to executory of consent judgment is not bound by the judgment). Given that the consent judgment is not enforceable against the Patent Office as *res judicata*, the Court must determine whether the Patent Office, by its conduct of the reexamination proceedings and issuance of the order of reexamination is "in a position to frustrate the implementation of [the consent judgment] or the proper administration of justice." The clear answer to this question is in the negative. Section 303 of the Act expressly authorizes the Patent Office to conduct reexamination proceedings on their own initiative without a formal request for reexamination. If the reexamination proceedings in question had been instituted by the Commissioner as a consequence of a citation of prior art from a person other than Canterbury, or if a person other than Canterbury had requested reexamination of patent 3,464,799, this Court would be without power to enjoin the proceedings for the simple reason that the consent judgment is binding only as to Plaintiffs and Defendants. In short, Plaintiffs' compliant lies not with the institution of the reexamination process, but instead with who requested it. For this reason, the Court is constrained to conclude that it has no jurisdiction under the All Writs Act to grant the Plaintiffs any relief against the Patent Office." [Emphasis added]

Thus, even though the district court found one of the defendants in *Houston Atlas* to be in contempt of the consent judgment because that defendant had filed a request for reexamination, the district court noted that the Office was expressly authorized by statute to conduct reexamination. The court concluded that a consent judgment to which the Office was not a party could not bind the Office so as to preclude reexamination, even where such reexamination was requested by a party bound by the consent judgment. If such is true with respect to a consent judgment, it follows that a settlement agreement between two private parties to which the Office is not a party also does not bind the Office so as to preclude the Office from carrying out its statutory mandate to reexamine a qualifying patent once a substantial new question of patentability for that patent has been determined to exist for that patent. Therefore, even if one assumes that third party requester in the '123 reexamination proceeding is in violation of the settlement agreement with patent owner such that third party requester might be subject to sanctions by a court of competent jurisdiction for having filed the present request for *inter partes* reexamination, the settlement agreement would still not be binding on the Office so as to preclude the Office from conducting *inter partes* reexamination as requested, because the Office is not a party to that agreement.

Indeed, the courts have held that a final judgment against a party found to have infringed a patent does not prohibit that party from seeking *ex parte* reexamination of the involved patent. In *Kucala Enterprises, Ltd. V. Auto Wax Co., Inc. 2004 U.S. Dist. LEXIS 5723 (N.D. Ill., 2004)*, the accused infringer (Kucala) contended that there was no basis in law or fact, by which the judgment could preclude Kucala from filing a request for *ex parte* reexamination, relying on the language of 35 U.S.C. § 302 that permits "any person at any time" to request reexamination of a patent. The court pointed out that it could not bar third party Kucala from seeking reexamination, even under the circumstances of that case, where the third party was found guilty of misconduct such that the court found the patents asserted against the third party to be not invalid. The *Kucala Enterprises, Ltd.* opinion states:

"...the issue here, whether a court can sanction a party by enjoining it from seeking reexamination. At the same time, the cases on which Auto Wax relies fail to address a sanction prohibiting reexamination. [Citations omitted].

"The court is persuaded, in light of the parties' arguments and the court's purposes in the October decision, that the judgment should not bar Kucala from seeking reexamination. The sanction of dismissal conveys to Kucala, "Because of your misconduct, you lose on the claims you filed in this court." In other words, the court finds the patents in suit not invalid. Under the lessons of *Ethicon*, this means only that the presumption of validity survives, not that the patents are valid. Although principles of claim preclusion would bar an adjudged infringer [*16] from filing or defending a future lawsuit relating to

these patents, it would not bar the infringer from seeking reexamination. Therefore, the court will not enjoin Kucala from seeking reexamination of Auto Wax's patents." *Id.* at page 13 of the Court's decision."
[Emphasis added]

In *McNeil-PPC, Inc. v. The Procter & Gamble Co.*, 19 USPQ2d 1663 (U.S. District Court District of Colorado 1991), Procter & Gamble sought leave from the court to file a request for reexamination in the Office of a patent in dispute. The court held that Procter & Gamble did not need permission from the court to file a request for reexamination, and that there does not appear to be any limit on a party's right to request reexamination, but for complying with the requirements of 35 U.S.C. § 302, directed to *ex parte* reexamination. Furthermore, the court observed:

"First, unfair or not, McNeil-PPC points to no authority that would authorize me to prevent or limit P & G's request to the PTO for reexamination of Bradstreet '901 and its participation in that proceeding to the extent allowed by title 35. McNeil-PPC's only argument is that because P & G asked for leave to file the request, it concedes that it is required to do so. I disagree. It may be that P & G was under the erroneous assumption that I had some statutory or common law prerogative to intervene in the PTO reexamination request. McNeil-PPC does not offer, however, any rationale why any such misinterpretation bestows unto me power over the PTO where the power is otherwise absent. Furthermore, at oral argument, P & G took the position that the motion was filed as a courtesy notice and does not constitute any waiver.

"Second, Congress authorizes challengers to take "two bites of the apple." A nonpatent holder is permitted to both challenge a patent in the PTO and in the district court. *See In re Etter, 756 F.2d 852, 857, 225 U.S.P.Q. (BNA) 1* (Fed. Cir.), *cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985)*. In *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 7 U.S.P.Q.2D (BNA) 1152 (Fed. Cir. 1988)*, a nonpatent holder was sued for patent infringement. While the action progressed, the nonpatent holder requested reexamination of the subject patent in the PTO. The Federal Circuit, in concluding that the PTO was without the power to stay the reexamination pending outcome of the action and allowing the reexamination and court action to proceed simultaneously, stated:

The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence. Accordingly, different results between the two forums may be entirely reasonable. And, if the district court determines a patent is not invalid, the PTO should continue its reexamination because, the two forums have different standards of proof for determining invalidity. *Ethicon, 849 F.2d at 1428-29.*

"This structure does not automatically lead to inefficient use of judicial resources. Rather than impede jurisdictional efficiency, this dual process has greater potential to promote efficiency, because, as stated in *In re Etter*:

The innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of the patents thought "doubtful." [Citation omitted]. When the patent is currently involved in litigation, an auxiliary function is to free the court from any need to consider prior art without the benefit of the PTO's initial consideration."

[Emphasis added]

Thus, the court recognized that duality of the Congressionally enacted structure in which reexamination and litigation co-exist as non-mutually exclusive avenues in which a party may challenge a patent. It appears that insofar as the litigation approach may result in a settlement agreement, that the existence of a settlement agreement does not "sidetrack" a party thereto from pursuing reexamination.

It should also be noted that a contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy. [7] In *Lear v. Adkins*, 395 U.S. 653, (1969), the United States Supreme Court determined that prohibiting licensees from challenging the validity of a patent that they had licensed runs afoul of public policy "in permitting full and free competition in the use of ideas which are in reality part of the public domain." *id.* at 670 . By analogy, preventing a third party requester (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision. As the settlement agreement entered into in 1996 is <u>prior to</u> the enactment in 1999 of the statute authorizing *inter partes* reexamination, it was not even possible for these settlement agreements to address preventing a party to the agreement from filing such a request for reexamination.

Finally, it is recognized that the decisions cited and discussed, *supra*, are not specifically directed to *inter partes* reexamination. However, it is clear that the precedents would apply to *inter partes* reexamination proceedings just as they do in *ex parte* reexamination proceedings. For *ex parte* reexamination, 35 U.S.C. § 302, provides that "[A]ny person at any time may file a request for reexamination by the Office of any claim of a patent ..." For *inter partes* reexamination, 35 U.S.C. § 311(a) provides that "IN GENERAL -Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent ..." [8]

Congress chose to not place any limitation on the ability of a third party requester to request an *ex parte* reexamination proceeding. Thereafter, Congress chose to provide only very limited estoppel provisions with respect to the ability of a third party requester to request an *inter partes* reexamination proceeding, only those estoppel provisions set forth in the statue. [9] Congress could have elected to enact provisions similar to 15 U.S.C. § 1069 so as to place broad estoppel limitations on the ability of a third party requester to seek reexamination in the Office. However, Congress chose not to do so! Moreover, to the extent that the estoppel provisions of 35 U.S.C. § 317(b) might be relevant to the '123 reexamination proceeding, patent owner has not alleged that there has ever been a relevant final (*i.e.* nonappealable) court decision holding that the '873 patent claims are valid. Indeed, patent owner's own statement of the facts indicates that the parties executed Federal Rule of Civil Procedure 41 Stipulations of Dismissal of the prior litigation that were filed in, and accepted by, the Delaware District Court, and that "[t]he Court specifically retained jurisdiction over the parties in relation to disputes arising under the 1996 Settlement Agreement." This clearly does not provide a final court decision regarding the validity of any of the patents covered in the settlement agreement.

---

[7] *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)(concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386,392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

[8] The caveat ("IN GENERAL") in the statute refers to the estoppel provisions of 35 U.S.C. § 317(b) that would preclude a third party requester from filing a request for reexamination where it has not sustained its burden of proof of claim invalidity in litigation that has become final, or where such litigation has resulted in a final holding of claim validity, as well as the 35 U.S.C. § 317(b) limitation on the filing of co-pending *inter partes* reexaminations.

[9] The *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (i.e. nonappealable) court holding of patent claim validity or the existence of an order granting reexamination. See 35 U.S.C. § 317(a) and (b).

C.    Vacatur Of The Present Reexamination Proceeding Is Not Supported By The Provisions
Of MPEP § 2246(I):

Patent owner argues that the exemplary language in the MPEP § 2646 does not limit the
circumstances in which the Office can vacate reexamination orders. To the extent that this is
true, it is not relevant here, because the statutes, the case law and the facts in the present
reexamination proceeding all indicate that vacatur of the present reexamination proceeding
would run contrary to the reexamination statute. Patent owner's arguments to the contrary are
not persuasive.

MPEP § 2646(I) addresses vacatur that would be required when a request for *inter partes*
reexamination was improperly ordered due either to the existence of a statutory prohibition
barring the grant of a request for *inter partes* reexamination, or the existence of a clear error of a
clerical nature. Patent owner has not established that the present *inter partes* reexamination
proceeding was ordered contrary to any statutory prohibition barring the order, or due to a
clerical error.    Rather, the *inter partes* reexamination statute clearly provides that when the
Office is presented with a request for *inter partes* reexamination that (1) has been filed by a third
party requester not subject to the estoppel provisions of 35 U.S.C. § 317, and (2) raises a
substantial new question of patentability, the Office must order *inter partes* reexamination and
thereafter reexamine the patent. [10] As set forth in Section III (B) of this decision, *supra*, the case
law does not support the proposition that the Office has the duty to, or may at its option,
disregard the statutory mandate to reexamine the patent due to the existence of a settlement
agreement between a patent owner and a third party requester to which the Office is not a
party. Indeed, the case law does not support that proposition even where the settlement
agreement was reduced to a consent judgment and the third party requester has been held by
the court to be in contempt of the consent judgment.

D.    Vacating The Present Reexamination Proceeding May In Fact Leave An Unresolved
Substantial New Question of Patentability

Patent owner argues that vacatur of the present reexamination proceeding would not leave a
substantial new question of patentability unresolved, because such questions (and other
questions of patentability beyond the scope of *inter partes* reexamination) will be resolved by the
method, and in the forum, established by the parties in the settlement agreement.

This argument ignores two important points. *First*, there is in fact a public interest served by
resolution of patentability issues via reexamination proceedings in the Office, and advantages
attendant thereto. *Ethicon v. Quigg*, 878 F.2d 1422, 1428 (Fed. Cir. 1989); *In re Etter*, 756 F.2d
852, 856 (Fed. Cir. 1985). There is no assurance that resolution of the dispute between patent
owner and third party requester in accordance with the settlement agreement would resolve the
substantial new questions of patentability that have been found to exist in the present *inter partes*
reexamination proceeding, or in any way result in a benefit to the public in the manner that a
reexamination proceeding would. Any resolution in court, or such other forum chosen, may
simply resolve the dispute between patent owner and third party requester without resolving the
issues of patentability raised by the substantial new question of patentability (e.g., by settlement,
or consent judgment, or dismissal without prejudice or based on a conduct issue). Vacatur of a
requested and granted *inter partes* reexamination proceeding may well leave both the public and

_____
[10] See 35 U.S.C. §§ 311, 312(a), 313(a) and 314(c).

the patent owner with an unresolved request for reexamination and unresolved substantial new question of patentability (found to be present via the decision ordering reexamination). The public has a right to such a resolution. Vacating, withdrawing, or otherwise abandoning or terminating the instant reexamination proceeding would abrogate this public right, to the detriment of the public interest. As discussed in Section III (B) above, ordering and conducting an *inter partes* reexamination proceeding is not optional for the Office. Rather, the *inter partes* reexamination proceeding must continue according to the procedure mandated by the *inter partes* reexamination statute, to carry out the purpose of the statute and resolve the substantial new question of patentability for the public.[11] The proceeding began with the filing of a request for *inter partes* reexamination that satisfied the requirements of 35 U.S.C. § 311. As **required** by 35 U.S.C. § 312, the request for reexamination has been considered. As a result of that consideration, it has been determined that the request raises a substantial new question of patentability for one or more patent claims. Thus, in accordance with 35 U.S.C. § 313, the present proceeding **shall** result in a determination of the patentability of the claims of the '873 patent in light of prior patents and printed publications, to the benefit of the public as well as to the benefit of patent owner and third party requester.

*Second*, while there is no assurance that the resolution of the dispute in accordance with the settlement agreement will be timely, the present reexamination proceeding **will** be conducted with special dispatch pursuant to 35 U.S.C. § 314(c). The public interest in resolving the issues raised in the present reexamination proceeding includes an interest in having those issues resolved in a timely fashion.

### E. The Decision in *Heinl v. Godici* Is Clearly Apposite To This Reexamination Proceeding

Patent owner argues that the Office's reliance on *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001) is misplaced. This argument is not persuasive.

*Heinl* was a case in which patent owner sought a decision terminating a reexamination proceeding based on the absence of a new question of patentability. The *Heinl* court stated:

> "Under the well established *ultra vires* doctrine, the exhaustion and final agency requirements are excused 'only if plaintiff is able to show that the PTO clearly exceeded its statutory authority', quoting from *Philip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir 1985 (quoting *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977), vacated on other grounds, 571 F.2d 1273 (4th Cir. 1978)."

The *Heinl* court then stated:

> "Put differently, when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusion of underlying proceedings."

It is abundantly clear that the *Heinl* decision was not cited and discussed because it involved a previous settlement agreement between parties to a reexamination proceeding, and no reading of the Decision on Petition June 7, 2006 can lead to the belief that it was. Rather, *Heinl* was cited because it is clearly applicable to the doctrine of "*ultra vires*" reexamination proceedings in the sense that it provides a benchmark for looking into whether the Office has committed an *ultra*

---

[11] The innate function of the reexamination process is to increase the reliability of the Office's action in issuing a patent by reexamination of patents thought "doubtful." House Report No. 66-1307, 96th Cong., 2d Sess. (1980), 3, reprinted in 1980 U.S. Code Cong. & Ad. News 6460, 6462. (This was emphasized in *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir.) (en banc), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985)).

*vires* act. That benchmark is a simple one. Where the Office orders reexamination, the decision of the Office to order reexamination cannot be attacked as being *ultra vires*, unless it is clearly established that the Office has exceeded its statutory authority to order reexamination.

In this instance:

(1) The reexamination statute fails to provide that the equitable doctrines of laches, estoppel and acquiescence can be raised to preclude the Office from ordering *inter partes* reexamination, other than the 35 U.S.C. § 317 exception, which is inapplicable on the facts in the present reexamination proceeding;

(2) The authorities cited and discussed above in Section III (A) clearly indicate that the existence of a settlement agreement (and even the existence of a consent judgment incorporating a settlement agreement) between a patent owner and a third party reexamination requester do not operate to preclude the Office from granting that third party's request for reexamination if the request otherwise satisfies the requirements of the reexamination statutes; and

(3) A public interest in resolving the substantial new question of patentability exists in the present reexamination proceeding, which may not necessarily be timely resolved, or resolved at all, by reason of the dispute resolution provisions of the settlement agreement, and will not be resolved using the standards applicable in reexamination as well as the expertise of the Office.

Thus, the guidance provided by the decision in *Heinl* supports the conclusion that petitioner has not advanced sufficient basis for holding the grant of reexamination in the present *inter partes* reexamination proceeding to be an *ultra vires* action by the Office. The Office has not "clearly exceeded its statutory authority" in the Office's determination that the January 17, 2006 reexamination request properly raised a substantial new question of patentability and should go forward.

For all the forgoing reasons, as well as those set forth in the June 7, 2006 decision, the order granting the present *inter partes* reexamination remains intact and the *inter partes* reexamination proceeding will continue in accordance with the procedure mandated by the *inter partes* reexamination statute and implementing regulations.

## ADDITIONAL DISCUSSION

The undersigned notes that the patent owner and third party requester are adverse parties with respect to the present *inter* partes reexamination proceeding, and are currently engaged in litigation involving the underlying patent. While counsel should represent the respective parties zealously, and are entitled to benefit of all of the regulations implementing the *inter partes* reexamination statutes and the examining practice promulgated with respect to those regulations, counsel are reminded of their ongoing obligations to the Office as set forth in Part 10 of Title 37 of the Code of Federal Regulations. In particular, the provisions of 37 CFR 10.18(b)(2) and (c) should be noted. Adherence to the provisions of Part 10 will greatly assist the Office **in conducting this *inter partes* reexamination proceeding with special dispatch as** required by 35 U.S.C. § 314(c).

## CONCLUSION

1.  The patent owner's June 16, 2006 petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination.

2.  This decision is a <u>final agency action</u> within the meaning of 5 U.S.C. § 704.

3.  The patent owner's July 21, 2006 opposition to the third party requester opposition to the patent owner petition for reconsideration lacks an entry right in the present reexamination proceeding, and has not been considered.

4.  Jurisdiction over the '123 *inter partes* reexamination proceeding is returned to the Central Reexamination Unit.

5.  Telephone inquiries related to the present decision should be directed to Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to Karen Hastings, Legal Advisor, at 571-272-7717.


Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration


kmh/sm

9-07-06
C:\Kiva\Kenpet6\UV\95_123-UV_settlement agreement_deny.doc

# EXHIBIT 9



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.                         (For Patent Owner)          **MAILED**
P.O. Box 1022
Minneapolis, MN 55440-1022                                                 **JUL 19 2006**

                                                                           CENTRAL REEXAMINATION UNIT

Alan M. Grimaldi
Howrey LLP                                     (For Third Party Requester)
1299 Pennsylvania Avenue NW
Washington, DC 20004


In re Callaway Golf Company                    :
   *Inter Partes* Reexamination Proceeding      : **DECISION DENYING**
Control No.: 95/000,120                        : **PETITION**
Filed:    January 17, 2006                     :
For:      U.S. Patent No. 6,210,293            :


This is a decision on the April 28, 2006 patent owner petition entitled "RENEWED PETITION
TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS." Also, on May 5, 2006, the
third party requester filed a paper entitled "ACUSHNET'S OPPOSITION TO PATENT OWNER
CALLAWAY'S RENEWED PETITION TO SUSPEND INTER PARTES REEXAMINATION
PROCEEDINGS."

*Inter partes* reexamination control number 95/000,120, patent owner's renewed petition, and
requester's opposition to patent owner's renewed petition are before the Office of Patent Legal
Administration for consideration.

Patent owner's present petition is taken as a renewed petition under CFR 1.183 for waiver of 37
CFR 1.939, and as a petition under 37 CFR 1.182 for suspension of *inter partes* reexamination
proceeding 95/000,120. Third party requester's opposition is also taken as a renewed petition
under 37 CFR 1.183 for waiver of 37 CFR 1.939, and as a petition 37 CFR 1.182 to oppose the
patent owner's renewed petition.

## FEES

As the fee for the originally filed patent owner petition was not charged, a petition fee of
$400.00 under 37 CFR 1.17(f) will be charged to the patent owner's Deposit Account No. 06-1050
as authorized in the April 28, 2006 patent owner renewed petition.

As the fee for the originally filed third party requester opposition to patent owner's petition was
not charged, a petition fee of $400.00 under 37 CFR 1.17(f) will be charged to the third party
requester's Deposit Account No. 08-3038, as authorized in the May 5, 2006 third party requester
renewed opposition.

## SUMMARY

The respective 37 CFR 1.183 aspect of the petition of the patent owner to permit entry and consideration of the renewed patent owner petition as a petition to suspend the present *inter partes* reexamination proceeding, and of the third party requester to permit entry and consideration of the third party requester's opposition to the renewed petition to suspend, are granted.

The patent owner renewed petition under 37 CFR 1.182 to suspend the present *inter partes* reexamination proceeding is denied.

## REVIEW OF FACTS

1.  U.S. Patent No. 6,210,293 ("the '293 patent") issued to Michael J. Sullivan on April 3, 2001, and is currently assigned to Callaway Golf Company.

2.  A request for *inter partes* reexamination of the '293 patent was filed by a third party requester, Acushnet Company, on January 17, 2006. The request was assigned Control No. 95/000,120 ("the '120 *inter partes* reexamination proceeding").

3.  On February 9, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '120 *inter partes* reexamination proceeding stated to have been filed by third party requester on January 23, 2006.

4.  On February 16, 2006, the Office recognized the requester's February 9, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

5.  On March 21, 2006, the patent owner filed a petition, requesting that the '120 *inter partes* reexamination proceeding be suspended.

6.  On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition.

7.  On April 11, 2006, an Office decision was issued, discarding both the March 21, 2006 patent owner petition and the March 24, 2006 opposition thereto as being improper premature papers.

8.  On April 6, 2006, reexamination was ordered for claims 1-6, i.e. all of the claims, of the '293 patent.

9.  On April 13, 2006, patent owner filed a petition requesting that the order granting the present reexamination proceeding be vacated as being an *ultra vires* action.

10. On April 27, 2006, third party requester filed an opposition to patent owner's April 13, 2006 petition.

11. On April 28, 2006, patent owner filed the present renewed petition to suspend the '120 *inter partes* reexamination proceeding.

12.  On May 5, 2006, third party requester filed the present opposition to the April 28, 2006 patent owner petition.

13.  On June 7, 2006, the patent owner petition to vacate the '120 *inter partes* reexamination proceeding was dismissed by the Office.

## DECISION

### I.   Relevant Law And Procedure

35 U.S.C. § 311(a) provides:

> IN GENERAL. — **Any third-party requester** at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

> "Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications . . . " [Emphasis supplied.]

35 U.S.C. § 313 provides:

> "If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. § 314 (c) provides:

> "Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office "

37 CFR 1.132 provides:

> "When any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section."

37 CFR 1.182 provides:

> "All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Director, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing.  Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(f).

37 CFR 1.183 provides:

"In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a **requirement of the statutes** may be suspended or waived by the Director or the Director's designee, *sua sponte*, or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.907 provides:

"(a) Once an order to reexamine has been issued under § 1.931, neither the third party requester, nor its privies, may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued under § 1.997, unless authorized by the Director.

(b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an *inter partes* reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such *inter partes* reexamination proceeding."

37 CFR 1.913 provides:

"Except as provided for in § 1.907, any person other than the patent owner or its privies may, at any time during the period of enforceability of a patent which issued from an original application filed in the United States on or after November 29, 1999, file a request for *inter partes* reexamination by the Office of any claim of the patent on the basis of prior art patents or printed publications cited under § 1.501."

37 CFR 1.935 provides:

"The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination."

37 CFR 1.937(b) provides:

"The *inter partes* reexamination proceeding will be conducted in accordance with §§ 1.104 through 1.116, the sections governing the application examination process, and will result in the issuance of an *inter partes* reexamination certificate under § 1.997, except as otherwise provided."

37 CFR 1.939 provides:

"(a) If an unauthorized paper is filed by any party at any time during the *inter partes* reexamination proceeding **it will not be considered** and may be returned." [Emphasis supplied.]

(b) Unless otherwise authorized, **no paper** shall be filed prior to the initial Office action on the merits of the *inter partes* reexamination." [Emphasis supplied.]

37 CFR 1.987 provides:

"If a patent in the process of *inter partes* reexamination is or becomes involved in litigation, the Director shall determine whether or not to suspend the *inter partes* reexamination proceeding."

With respect to suspension of *inter partes* reexamination, MPEP § 2684.04(III) provides that:

> "... 'good cause' might be present, for example, where there is an issue that cannot be decided in the reexamination proceeding but affects the resolution of the proceeding. Another example is where there is an issue common to the litigation and the reexamination that can best be decided in court due to the availability in court of discovery and subpoena power (e.g., an issue heavily dependent on presentation of conflicting/contested evidence by the two parties)."

## II.    Procedural Discussion *Re:* Patent Owner's Original (March 21, 2006) Petition To Suspend

On March 21, 2006, patent owner filed a petition to suspend the '120 *inter partes* reexamination proceeding. In the present petition, patent owner takes the position [1] that the original petition to suspend filed on March 21, 2006 was not entered in the '120 proceeding, and was instead discarded, because it was filed prior to issuance of a reexamination order.    This position is inaccurate.

By its terms, 37 CFR 1.939(b) precludes the filing of any paper in an *inter partes* reexamination proceeding prior to "the initial Office action on the merits" in that proceeding, unless the filing of the paper is authorized. At the time of filing of that petition, and at the time of the decision thereon, not only had there been no decision on the request for reexamination, there had also been no Office action on the merits in the *inter partes* proceeding. The patent owner petition of March 21, 2006 was held to be an improper paper under 37 CFR 1.939 because it was filed prior to the issuance of the initial Office action in the reexamination proceeding. [2] Not only had *inter partes* reexamination not yet been ordered, no "initial Office action on the merits of the *inter partes* reexamination" had been promulgated in the '120 *inter partes* reexamination proceeding, and a paper prior to that point is barred by regulation unless authorized, in accordance with 37 CFR 1.939(b). [3]

Although patent owner's March 21, 2006 petition requested relief under 37 CFR 1.183, the regulatory provision that provides for waiver of the rules, [4] there was no specific identification of which regulation that patent owner was seeking to waive. However, even if waiver of the provisions of 37 CFR 1.939 had been specifically requested, the March 21, 2006 patent owner petition could not have been granted. As explained in the decision dated April 11, 2006 (by which the March 21, 2006 patent owner petition and third party requester opposition were discarded as being improper papers), U.S.C. § 312(a) <u>requires</u>, *inter alia,* that after a request for *inter partes* reexamination is filed, the Director <u>shall, within three months of the filing of a request for *inter partes* reexamination,</u> determine whether that request raises a substantial new question of patentability affecting any claim of the patent that is the subject of the request. Further, 35 U.S.C. § 313 **requires** that - when the Director does determine that a substantial new question of patentability is raised by the request, then the determination <u>shall</u> include an order for *inter partes* reexamination of the patent concerned.

---

[1] See patent owner's "Renewed Petition to Suspend, page 2, second full paragraph.

[2] See Decision Discarding Improper Papers", April 11, 2006, page 2, paragraph styled "The Patent Owner Petition"

[3] It appears that petitioner patent owner is confusing the terminology "initial Office action on the merits" with the terminology "reexamination order." The terminology "action on the merits" means an action on the patentability of the claims of the patent being reexamined. See, for example, 37 CFR 1.935 which provides that "The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination." Clearly, a reexamination order and "the initial Office action on the merits of the reexamination are two different things. See also MPEP Chapter 700, wherein it is made clear that in examination proceedings, "action on the merits" is a term of art meaning an action in which a patentability determination is made.

[4] At page 2 thereof, the March 21, 2006 petition requested relief under a variety of regulations, as well as relief pursuant to 35 U.S.C. § 314(c), as does the present renewed petition.

It is clear that consideration of the substance of patent owner's March 21, 2006 petition, and granting it, would have, in effect, required a waiver of 35 U.S.C. §§ 312(a) and 313, because a suspension of the '120 *inter partes* reexamination proceeding would have precluded both a determination of the existence or absence of a substantial new question of patentability, and the promulgation of a reexamination order based on that determination within three months of the filing of the request for reexamination, as required by §§ 312(a) and 313. However, a waiver of the statutes is an action beyond the authority of the Director, and 37 CFR 1.183 expressly recognizes that a requirement of the statutes may not be waived. Therefore, a suspension of the '120 *inter partes* reexamination prior to the determination on the request for reexamination promulgation of the reexamination order, based upon any petition by the parties, was barred.

## III.  Procedural Discussion *Re:* The Present Patent Owner Renewed Petition To Suspend

In the present patent owner renewed petition, patent owner takes the position that because an Order granting *inter partes* reexamination has now been issued, the petition to suspend is a proper paper. Patent owner also takes the position that the present renewed petition, (as well as patent owner's March 21, 2006 petition to suspend), is proper because it is authorized by 37 CFR 1.987. [5]

### A.  Relief Pursuant to 37 CFR 1.939

Patent owner argues that the present patent owner petition to suspend the '120 reexamination proceeding is now timely under 37 CFR 1.939(b) as reexamination has already been ordered. This position is not persuasive because, as discussed in section II., *supra*, an order for *inter partes* reexamination is <u>not</u> the initial Office action on the merits of the *inter partes* reexamination proceeding. "Action on the merits" is a term of art, and as such, means an action on the patentability of claims. It is clearly so used in the reexamination regulations, for example, in 37 CFR 1.935. [6] Thus, it is clear that the filing of the present patent owner renewed petition to suspend is not authorized by 37 CFR 1.939(b), because the "initial action on the merits " of the '120 *inter partes* reexamination proceeding has not yet been issued by the Office.

### B.  Relief Pursuant to 37 CFR 1.987

The patent owner's argues that 37 CFR 1.987 independently authorizes the filing of the present petition to suspend. This too is not persuasive. The plain language of the regulation does not state or imply that it in any way authorizes the filing of a petition to suspend, particularly a petition that would be improper pursuant to one or more of the regulations that implement the *inter partes* reexamination statutes. 37 CFR 1.987 is merely declaratory of the Director's discretionary authority to *sua sponte* suspend an *inter partes* reexamination proceeding in certain circumstances, *i.e.*, when there is both: (a) litigation involving the patent which is the subject of the *inter partes* reexamination proceeding and (b) "good cause" to suspend. 37 CFR 1.987 in no way authorizes the filing of a petition to request such a suspension. The right of parties in this arena is the filing of a Notification of Existence of Prior or Concurrent Proceedings and Decisions pursuant to MPEP § 2686 to provide the Office with information which may, or may not, justify a suspension of action.

Patent owner has not cited a regulation that authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding.  In fact, no regulation implementing the *inter partes* reexamination statutes authorizes such a petition.

---

[5] *Id.*, at footnote 1.

[6] See the discussion in footnote 3.

C.  Relief Pursuant to Patent Owner's Petition Under 37 CFR 1.182 and 1.183

Note is taken that the present patent owner renewed petition requests relief under both 37 CFR 1.182 and 1.183. Notwithstanding that patent owner has again failed to specifically identify the regulations(s) for which a waiver under 37 CFR 1.183 is requested, the present renewed petition will be taken as a petition under 37 CFR 1.183 to waive the provisions of 37 CFR 1.939 in order to permit the filing of a paper prior to the issuance of the initial Office action on the merits in the '120 *inter partes* reexamination proceeding. Further, the present renewed petition will also be taken as a petition under 37 CFR 1.182 for a situation "not specifically provided for in the regulations" to permit the filing of a petition to suspend the '120 *inter partes* reexamination proceeding.

1.  37 CFR 1.183 Waiver of 37 CFR 1.939

As discussed in sections I. and II (A), *supra*, 37 CFR 1.939(b) precludes the filing of any paper prior to the initial Office action on the merits of the '120 *inter partes* reexamination proceeding. As no initial Office action on the merits has yet been issued, no patent owner paper may be filed in the '120 *inter partes* reexamination proceeding at this point in the proceeding. However, *inter partes* reexamination has now been ordered. [7]  Therefore, suspension of the '120 *inter partes* reexamination proceeding would not require the waiver of any provision of the *inter partes* reexamination statutes; only a waiver of 37 CFR 1.939(b) would be needed to provide for an entry right of the petition paper requesting suspension.

In this instance, it is determined to be in the interests of justice with respect to both parties to the '120 *inter partes* reexamination proceeding that a decision regarding suspension of the '120 *inter partes* proceeding be made as soon as possible, given that (1) a suspension of the proceedings would not impair compliance with the reexamination statutes, and (2) extraordinary circumstances are found to exist, including the fact that this proceeding is but one of four *inter partes* proceedings in which the present parties are involved, and that the present parties are actively involved in litigation with respect to the patents that are the subject of those four *inter partes* reexamination proceedings.  Rather than requiring patent owner and third party requester to re-file the petition and opposition thereto after a first action on the merits, it is appropriate to consider the question of suspension now.  Further, if suspension were in fact warranted, it would be in the interests of justice that such suspension takes place prior to an action on the patentability of the claims.  Finally, there is a public interest, and an interest to be considered by the court in the ongoing litigation, to ascertain, as soon as practical, whether the '120 *inter partes* reexamination proceeding will continue to conclusion, or will presently be suspended pending the outcome of the parallel litigation involving the '293 patent, as well as such future circumstance that would demand that a suspension be lifted, if imposed.

Accordingly, based upon the facts of record and the current circumstances set forth, *supra*, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit filing of the present patent owner renewed petition and the requester's opposition to the renewed petition, and consideration of the substance of both the petition and the opposition.

2.  37 CFR 1.182 Petition to Suspend the '120 *Inter Partes* Reexamination Proceeding

As discussed Section III(B), *supra*, neither 37 CFR 1.987 nor any regulation implementing the *inter partes* reexamination statutes authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. However, the present patent owner renewed petition does request

---
[7] See the "Order Granting *Inter Partes* Reexamination" dated April 6, 2006.

consideration pursuant to 37 CFR 1.182, and a proposed suspension of an *inter partes* reexamination proceeding is a situation not specifically provided for in the regulations. For the reasons set forth in the second paragraph of section III(C)(1), *supra*, and based upon the facts of record and the current circumstances, consideration will be given to the substance of the present patent owner renewed petition to suspend the '120 *inter partes* reexamination proceeding, as a situation not specifically provided for in the regulations.

## IV.  Procedural Discussion Of The Third Party Requester Renewed Opposition

The third party requester renewed opposition filed on May 5, 2006, lacks an entry right under 37 CFR 1.939(b) for the same reasons discussed with respect to the renewed patent owner petition. Further, the regulations implementing the *inter partes* reexamination statutes do not expressly provide for the filing of an opposition paper to a patent owner request to suspend an *inter partes* reexamination proceeding.

However, third party requester has submitted the instant opposition pursuant to 37 CFR 1.182 and 1.183. For reasons analogous to those discussed above with respect to the patent owner's renewed petition, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit the filing of the instant opposition to the present patent owner's renewed petition prior to the initial Office action on the merits in the '120 *inter partes* reexamination proceeding. Although the regulations do not specifically provide for a third party requester opposition to a patent owner petition to suspend an *inter partes* reexamination proceeding, for reasons analogous to those discussed above with respect to the patent owner's renewed petition, consideration will be given, pursuant to 37 CFR 1.182, to the requester's opposition to the patent owner's renewed petition.

## V.  Findings And Analysis On The Merits Of Patent Owner's Renewed Petition to Suspend

### A.  Patent Owner's Substantive Position In Support Of Suspension of the '120 *Inter Partes* Reexamination Proceeding

Patent owner states that pursuant to 35 U.S.C. § 314 (c), and the procedure discussed in MPEP § 2686.04(III), there is good cause to suspend the '120 *inter partes* reexamination proceeding. Patent owner asserts the existence of matters to be raised in the concurrent litigation that are argued to affect the resolution of the '120 *inter partes* reexamination proceeding or potentially bar the proceeding. Patent owner also raises issues in which the District Court's discovery and subpoena powers are asserted to be important in deciding matters heavily dependent upon the evidentiary showings of the parties.

### 1.  Matters Involving Privity And Assignor Estoppel [8]

Patent owner states that the sole inventor of the '293 patent is Michael J. Sullivan, who is now a Vice President of third party requester business entity. Patent owner urges that 37 CFR 1.913 [9] is facially broad enough to cover both current and former patent owners and current and former privies, to bar *inter partes* reexamination. Patent owner argues that Mr. Sullivan is a

---

[8] See *Shamrock Technologies, Inc. v. Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789; USPQ2d 1728 (Fed. Cir. 1990), and compare *Acushnet Company v. Dunlop Maxfli Sports Corporation*, 2000 U.S. Dist. LEXIS 10123, Civ. A. No. 98-717-SLR, (D. Del June 29, 2000).

[9] Pursuant to 37 CFR 1.913, a request for *inter partes* reexamination can be filed by any person other than patent owner or its privies.

privy of a former patent owner [10] to whom the '293 patent was originally assigned, and that 37 CFR 1.913 should have precluded the filing of the '120 *inter partes* reexamination proceeding.

Patent owner further alleges that, as a Vice President of third party requester, Mr. Sullivan may well be a privy of third party requester. Patent owner argues that the third party requester would therefore be barred from challenging the validity of the '293 patent via the '120 *inter partes* reexamination proceeding by the doctrine of assignor estoppel.

Patent owner's position is that a suspension of the '120 *inter partes* reexamination proceeding is necessary, because these issues can only be resolved by evidence that can uniquely be obtained through the use of the District Court's discovery and subpoena power.

## 2. Additional Matters Requiring The District Court's Discovery And Subpoena Power

Patent owner also urges that the use of the District Court's discovery and subpoena power is required to permit full and fair evaluation of testing undertaken by third party requester that is relied upon by third party requester to support its allegations of patent invalidity. Patent owner points out that third party requester relies upon an invalidity argument under 35 U.S.C. § 103, that objective evidence of commercial success of both the patent owner and an alleged infringer (the third party requester) is relevant to § 103 nonobviousness. Patent owner argues that access to evidence that would establish commercial success of the third party requester's accused products could be obtained utilizing the District Court's discovery and subpoena powers.

## B. Established Standards Demonstrating The Existence of "Good Cause" For Suspension Of *Inter Partes* Reexamination Proceedings

35 U.S.C. § 305 requires that all *ex parte* reexamination proceedings be conducted with special dispatch within the Office. It has been held that, based on the unequivocal statutory requirement for special dispatch, the Office may not suspend a pending *ex parte* reexamination proceeding merely because of the existence of concurrent litigation on the patent that is the subject of reexamination. [11] *Ethicon* discusses certain fundamental concepts regarding concurrent *ex parte* reexamination proceedings in the Office and litigation of the patent that is the subject of reexamination. For example the *Ethicon* court quoted extensively from the decision of the court in *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (in banc) to point out:

> "That:one challenging validity in court bears the burden assigned by [35 U.S.C.] § 282, that the same party may request reexamination upon submission of art not previously cited, and that, if that art raises a substantial new question of patentability, the PTO may during reexamination consider the same and new and amended claims in light of that art free of any presumption, *are concepts not in conflict.* On the contrary, those concepts are but further indication that *litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes.*" [Emphasis is the Court's.]

The *Ethicon* court also cited *Etter* in order to point out that when reexamination and litigation for the same patent are conducted concurrently:

> "...precise duplication of effort does not occur because the PTO and the courts employ different standards of proof when considering validity, and the courts, unlike the PTO during a reexamination of patent claims, are not limited to review of prior art patents or printed publications."

---

[10] The present patent owner acquired rights to the '293 patent from the original owner, Top-Flite.

[11] *Ethicon, Inc., v. Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988)

*Id.*, at 856, at 4.

In contrast to the 35 U.S.C. § 305 which applies only to *ex parte* reexamination, 35 U.S.C. § 314(c) expressly allows for the suspension of an *inter partes* reexamination proceeding within the Office "for good cause," notwithstanding that *inter partes* reexamination proceedings are to be conducted with "special dispatch." Therefore, the question of whether a petition to suspend an *inter partes* reexamination proceeding that is being conducted concurrently with litigation of the patent establishes "good cause" for the suspension of an *inter partes* reexamination proceeding presents a question that differs from the question of suspension of an *ex parte* reexamination proceeding. Pursuant to 35 U.S.C. § 314(c) and 37 CFR 1.987 that implements the statutory provision, the USPTO Director has authority to determine circumstances amounting to "good cause" for suspension of an *inter partes* reexamination proceeding, and to do so on a case-by-case basis.

In *inter partes* reexamination proceedings control numbers 95/000,093 and 95/000,094 (collectively referred to hereinafter as "the Immersion-Sony *inter partes* reexamination proceedings"), the Office granted a patent owner petition to stay the *inter partes* reexamination proceedings due to the existence of concurrent litigation of the patents that were the subject of the reexamination proceedings. [12] The decision suspension granting acknowledged that MPEP § 2684.04 set forth certain criteria as indicia of "good cause" for suspension of an *inter partes* reexamination proceeding, but pointed out that these criteria were merely exemplary. [13] The criteria relied upon by the Office in the Immersion-Sony *inter partes* reexamination proceedings to support a finding of "good cause" to suspend was upheld by the U.S. District Court, Eastern District of Virginia, *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. This criteria establishes a benchmark and standard which the Office can make use of to test the facts and circumstances of record in a given *inter partes* reexamination proceeding in order to determine whether there is "good cause" to suspend that *inter partes* reexamination proceeding, due to the existence of concurrent litigation of the patent being reexamined.

**In the *Sony* scenario:**

The patent claims for which *inter partes* reexamination was requested were not identical to the claims being litigated; there was one non-litigated patent claim (claim 1 in each instance) for which reexamination had been requested in each proceeding. The Office denied patent owner Immersion's first petition to suspend the *inter partes* reexamination proceedings, noting that even if the proceedings were suspended in the Office and judgment was rendered adverse to requester Sony in the concurrent litigation, that would not dispose of all claims in the existing *inter partes* reexamination proceedings, leading to a piecemeal reexamination, and a delay in reexamination of the non-litigated claims. [14] The patent owner then disclaimed claim 1 of each patent, whereby <u>identical patent claims</u> were the subject of both the *inter partes* reexamination proceedings and the concurrent litigation. The Office then granted patent owner Immersion's second petition to suspend the *inter partes* reexamination proceedings.

At the point in time that the Immersion-Sony *inter partes* reexamination proceedings were suspended, <u>the proceedings were at an early stage</u>; the Office's work had been limited only to a finding that the requests for reexamination had raised a substantial new question of

---

[12] See the '093 and '094 proceedings, Decision Granting Petitions To Suspend, November 17, 2005

[13] *Id.*, Decision Granting Petitions To Suspend", November 17, 2005, footnote 6.

[14] *Id.*, "Decision Denying Petitions", August 23, 2005, at page 6.

patentability. The <u>concurrent litigation</u>, on the other hand, <u>was at an advanced stage</u>: (a) a District Court had issued a decision adverse to requester Sony, holding the litigated patent claims to be valid, (b) an appeal of the District Court had been filed in the Court of Appeals for the Federal Circuit ("the Federal Circuit"), and (c) the matter had already been briefed.  Thus, there was a substantial likelihood that suspension of the reexamination proceedings would serve to conserve Office of resources, since a final holding of claim validity would statutorily require termination of the Immersion-Sony *inter partes* prosecutions with respect to all of the claims subject to the litigation, which was also all the claims subject to reexamination in those proceedings.    It was not in the Office's and parties' interests to engage resources in administrative proceedings that ultimately could be mooted by the concurrent litigation which was soon to be finally resolved. The substantial likelihood that the reexamination prosecutions would terminate and the proceedings be concluded, taken together with the identity of claims in the litigation and the *inter partes* reexamination proceedings, led the Office to conclude that on balance, there was "good cause" to suspend the Immersion-Sony *inter partes* reexamination proceedings, to await the decision by the Federal Circuit.  The decision granting suspension noted that should circumstances change, *e.g.*, if the matter were remanded to the District Court by the Federal Circuit without a holding on claim validity, the third party would be free to petition for a resumption of the *inter partes* reexamination proceeding based upon the change in circumstances.  The decision also noted that further *inter partes* proceedings on the claims not before the Office and the courts could subsequently be obtained by members of the public.

**In the present instance:**

The facts and circumstances in the '120 *inter partes* reexamination proceeding differ significantly from those present in the Immersion-Sony *inter partes* reexamination proceeding.  In contrast to the Immersion-Sony *inter partes* reexamination proceedings, the litigation involving the '293 patent is at an early stage.  For example, there is a pending order dated June 2, 2006, referring the matter to a Magistrate Judge for the purposes of exploring joinder of parties, setting September 29, 2006 as a due date for amended papers, and setting a discovery conference for October 18, 2006.  The issue of claim construction is still pending, and there are apparently a number of preliminary motions pending.   Thus, unlike the Immersion-Sony *inter partes* proceedings in which the litigation had resulted in an appealable holding of claim validity, with the appeal having been filed and briefed to the appellate court, in this instance, it is not even foreseeable when the District Court's holding on the issue of validity might be would be rendered, and what it might be. It certainly cannot be envisioned when the litigation involving the '293 patent will reach a <u>final </u>holding on the validity of the claims of the '293 patent, including any appeal to the Federal Circuit, let alone what that holding is likely to be.

Further, in the '120 *inter partes* reexamination proceeding, patent owner has not established that there that the litigation of the '293 patent will result in a decision on the validity of all of the claims being currently being reexamined, *i.e.*, claims 1-6 of the '293 patent.  Thus, it is not even clear that a final holding of claim validity in the litigation would necessarily require conclusion of the '120 *inter partes* reexamination proceeding as to all the claims subject to reexamination.

**As a final point, as to the difference:**

In the Immersion-Sony *inter partes* proceedings Sony chose to permit the District Court litigation to proceed for three years before filing its requests for reexamination only after judgment was entered in Immersion's favor in the litigation.  Had Sony filed its requests for reexamination earlier, the reexamination proceedings could have been much farther along in the process, and may likely have been completed at the Office <u>before</u> the district court issued its decision. Also,

the district court might have stayed the litigation to await the Office's decisions in the reexamination proceedings. In the present instance, the requester has filed the '120 inter partes reexamination well before the District Court litigation has advanced to conclusion, and the Office proceedings should be available for the District Court.

**In conclusion as to this issue:**

Congress specifically provided estoppel provisions when a "final decision" upholding the validity of patent claims has been reached in a civil action or in a prior inter partes reexamination. See 35 U.S.C. § 317(b); 35 U.S.C. § 315(c). Thus, if a party's challenge to the validity of certain patent claims has been <u>finally</u> resolved, either through civil litigation or the inter partes reexamination process, then that party is barred from making a subsequent request for inter partes reexamination (or filing a new civil action) challenging the validity of those same claims. Id. Accordingly, while Congress desired that the creation of an inter partes reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also contemplated in the statute that a court validity challenge and inter partes reexamination of a patent may occur simultaneously; but once one proceeding finally ends, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other. Until that time, however, the Office is obligated to move forward in the inter partes reexamination with "special dispatch." Only "good cause" will permit the Office from deviating from that statutory mandate. In this instance, the litigation is at a preliminary stage so that it can not be determined when the litigation will reach a final holding on the issue of claim validity and what that decision is likely to be. Even if there should be a final holding on the issue of claim validity, the patent owner has not established that there is an identity of claims in the '120 inter partes reexamination proceeding and those subject to the litigation to thereby statutorily bar proceeding further with the entirety of the reexamination proceeding. Accordingly, the patent owner has not provided the USPTO Director with sufficient basis upon which to conclude that there is "good cause" to suspend the inter partes reexamination proceeding to await a final decision on claim validity in the litigation.

### C.   Other Patent Owner's Allegations That Good Cause For Suspension Exists

The factors alleged by patent owner to present "good cause" for suspension of the '120 inter partes reexamination proceeding have been thoroughly considered. However, for the reasons that follow, these factors do not establish "good cause" for suspension.

#### 1.   Privity and Assignor Estoppel

Patent owner argues that because Michael J. Sullivan, the sole inventor of the '293 patent, assigned the '293 patent to patent owner's predecessor in interest, the '120 inter partes reexamination proceeding was filed by a "former privy" of patent owner and is therefore barred under 37 CFR 1.913. The purpose of 37 CFR 1.913 is simply declaratory of the statutory mandate of 35 U.S.C. § 311(a) that provides that <u>any third-party requester</u> may, at any time, file a request for inter partes reexamination. [15] Patent owner has not established that 37 CFR 1.913,

---

[15] In the Notice of Proposed Rulemaking entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg 18154, 18167 (April 6, 2000) it is stated that proposed rule includes the language "an person other than the patent owner or its privies may ... file a request for inter partes reexamination." The commentary stated that the proposed rule "provides for any third-party requester ... to file a request for ... an inter partes reexamination ...." That is, the proposed rule was thought to simply echo the statutory language However, the words "other than patent owner or its privies" were deleted from the final rule because a comment to directed proposed rule 1.913 had suggested that the Office had exceeded its authority in excluding patent owner or its privies

nor the statute upon which it is grounded, precludes the filing of a request for *inter partes* reexamination by a party who is a so-called "former privy" of patent owner, especially a party who assigned a patent to an entity other than the present patent owner. Absent citation of controlling authority to the contrary by patent owner, it would appear that the statutory language "any third-party requester" is broadly drawn and would permit a party not in direct privity with a patent owner, i.e., a "former privy" of patent owner, to file a request for *inter partes* reexamination.

Patent owner also argues that the doctrine of assignor estoppel should have precluded the filing of the '120 *inter partes* reexamination proceeding, because sole inventor Sullivan assigned the patent to patent owner's predecessor in interest, but is now a Vice President of the third party requester business entity. However, reexamination is not litigation to determine the validity of patent claims conducted before a court wherein the equitable doctrine of assignor estoppel is applicable. Rather, reexamination is an administrative proceeding to determine the patentability of patent claims, a determination that is not conducted under the equitable considerations attaching to a litigation in which claim validity is determined. As discussed above, *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (*en banc*) makes it clear that litigation and reexamination are distinct proceedings with distinct parties, purposes, procedures and outcomes. Stated differently, although the application of the assignor estoppel doctrine in litigation is a fact intensive issue requiring the finding of facts and the balancing of the equities by the court, [16] a reexamination proceeding is not a determination of patent validity and infringement of patent claims. [17] It is also to be noted that a patent owner is statutorily authorized to file a reexamination request to obtain an advisory opinion as to the applicability of a prior patent or printed publication; such an advisory opinion would be prohibited in litigation as lacking a "case or controversy." If a patent owner can request reexamination of a patent, a party who assigned to the patent owner should likewise be permitted to do so. Therefore, absent citation of authority holding that assignor estoppel applies to reexamination so as to bar a statutorily approved request for *inter partes* reexamination filed by "[A]ny third-party requester at any time," assignor estoppel would not appear to apply generally to reexamination, and specifically to the present *inter partes* reexamination proceeding. Patent owner has argued that a suspension of the '120 *inter partes* reexamination proceeding is necessary because the issue of whether the present requester was barred from filing the '120 *inter partes* reexamination proceeding based on assignor estoppel can only be resolved through

---

because the language of 35 U.S.C. § 311(c) appeared to permit a patent owner to file a request for an *inter partes* reexamination proceeding. See Final Rule entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 76756, 76764 (December 7, 2000). However, Public Law 107-273, section 12101, 116 Stat. 1901 amended 35 U.S.C. § 311(c) clarify that only the third party requester, and not a patent owner, may file a request for *inter partes* reexamination Thereafter, the language "other than patent owner or its privies" was added to 37 CFR 1.913. See Final Rule entitled "Changes to Implement the 2002 *Inter Partes* Reexamination and Other Technical amendments to the Patent Statute", 68 Fed. Reg. 70996, 70999 (December 22, 2003).

[16] Compare *Shamrock Technologies, Inc. v. Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789, 14 USPQ2d 1728 (Fed. Cir. 1990) holding that because inventor Luniewski who had assigned his patent to Shamrock was now a Vice President of MSI was in privity with MSI, that MSI was barred from asserting patent invalidity and unenforceability as defenses to patent infringement with *Acushnet Company v. Dunlop Maxfli Sports Corporation*, *Civ. A No. 98-717-SLR, 2000 U.S. Dist., LEXIS 10123* (D. Del June 29, 2000) distinguishing *Shamrock* holding that where an inventor had assigned a patent to plaintiff and then became a Vice President of defendant accused infringer the facts and equities did not establish that the inventor was in privity with the defendant and that the defense of patent invalidity was, therefore, available to defendant.

[17] See also *Joy Technologies, Inv. v. Harry F. Manbeck, Jr.* 959 F.2d 226, 229 (Fed. Cir. 1992) "Trying to equate its appeal of the reexamination decision to an action analogous to a 'suit at common law,' Joy argues that the reexamination proceeding should be construed as most like a declaratory judgment action where the PTO is seeking a determination that Joy's patent is invalid. It admits, however, that the PTO could not bring such a suit. Thus, there is no basis to recharacterize the statutory procedure established by Congress in the reexamination statute."

evidence obtained through the use of the District Court's discovery and subpoena power to ascertain whether an assignor filed the present request. However, since patent owner has not established that the doctrine of assignor estoppel applies in the administrative reexamination of a patent, patent owner's argument has not been shown to establish "good cause" for suspension of the '120 *inter partes* reexamination proceeding.

### 2.    Additional Matters Requiring The District Court's Discovery and Subpoena Power

Patent owner argues that, in addition to the issues of assignor estoppel and privity, the District Court's discovery and subpoena power is necessary for patent owner to secure objective evidence of commercial success of third party requester's infringing products. Patent owner also argues that patent owner will be able to question tests conducted by third party requester in support of third party requester's arguments of patent invalidity, and that patent owner will be able to obtain the information necessary to question these tests only through the District Court's discovery and subpoena powers. Thus, patent owner reasons that "good cause" exists warranting suspension of the '120 *inter partes* reexamination proceedings.

These arguments are unpersuasive for a number of reasons. First, the provisions of 37 CFR 1.132 apply to the '120 *inter partes* reexamination proceeding, as it does to all *inter partes* reexamination proceedings. Patent owner will in fact have an opportunity in the '120 *inter partes* reexamination proceedings to submit objective test evidence in support of nonobviousness to the same extent that third party requester may submit objective test evidence tending to show nonobviousness. Also, the parties can submit evidence rebutting each other's 37 CFR 1.132 showings. Further, patent owner has submitted no showing that sales of the accused infringer's products are secret data not available publicly, thereby enabling patent owner to secure this data by commissioning research of the matter, without the necessity of the District Court's subpoena and discovery. Speculative allegations that patent owner might require the District Court's subpoena and discovery power in aid of a position taken in litigation does not establish "good cause" for suspension of the '120 *inter partes* reexamination proceeding.

Of greater import, however, is that patent owner's position, if taken to its logical conclusion, would undercut the ability of a third party requester (and, for that matter, a patent owner) to obtain any final result in an *inter partes* reexamination proceeding. Thus, the purpose of the *inter partes* reexamination statutes would be frustrated. For if a party engaged in patent infringement/validity litigation could demonstrate "good cause" for a suspension of an *inter partes* reexamination proceeding merely by invoking the existence of a district court's subpoena and discovery power and coupling that invocation with allegations that the party might need to employ that power in the course of litigation, then any *inter partes* reexamination proceeding for a patent involved in litigation could be readily stayed. It is presumed that if Congress had desired this, Congress would have expressly so stated in the reexamination statutes. However, Congress instead enacted 35 U.S.C. § 314 (c) and the "good cause" standard, a far more flexible and fact specific test allowing the USPTO Director to determine on a case-by-case basis whether to stay a pending *inter partes* reexamination proceeding.

## CONCLUSION

1. The patent owner renewed petition filed April 28, 2006, is <u>granted</u> with respect to the relief requested pursuant to 37 CFR 1.183, to the extent that the substance of patent owner's petition to suspend the '120 *inter partes* reexamination proceeding has been considered under 37 CFR 1.182.

2. The substance of the third party requester opposition filed on May 5, 2006, has been considered pursuant to 37 CFR 1.183.

3. The patent owner's petition under 37 CFR 1.182 to suspend the '120 *inter partes* reexamination is <u>denied</u>.

4. This decision is a final agency action within the meaning of 5 U.S.C. § 704.

5. Telephone inquiries related to the present decision should be directed to the Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to the undersigned at 571-272-7710.

*[signature]*

_____

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

sm
July 13, 2006

7-17-06
C:\Kiva\Kenpet6\IP\IP 120_PO_suspend-re-lit_after-Order+before-1stOA.doc

# EXHIBIT 10



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO |
|---|---|---|---|---|
| 95/000,120 | 01/17/2006 | 6210293 | 00634 0004 RXUS01 | 6322 |

7590        09/07/2006

Dorothy P. Whelan
Fish & Richardson P. C.
P. O. Box 1022
Minneapolis, MN  55440-1022

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 09/07/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC  20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,120*.

PATENT NUMBER *6,210,293*

TECHNOLOGY CENTER *3999*.

ART UNIT *3793*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.



COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

MAILED

Dorothy P. Whelan
Fish & Richardson P.C.
P.O. Box 1022
Minneapolis, MN 55440-1022

(For Patent Owner) SEP 0 7 2006

CENTRAL REEXAMINATION UNIT

[Enclosure - "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION"]

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

(For Third Party Requester)

In re Callaway Golf Company
  *Inter Partes* Reexamination Proceeding
Control No.: 95/000,120
Filed:    January 17, 2006
For:      U.S. Patent No. 6,210,293

: DECISION DENYING
: PETITION FOR
: RECONSIDERATION
: AND RETURNING
: IMPROPER PAPER

This is a decision on the June 16, 2006 patent owner petition entitled "PETITION TO THE DIRECTOR FOR RECONSIDERATION" under 37 CFR 1.181(a)(3). On June 28, 2006, the third party requester filed an opposition to the present petition entitled "ACUSHNET'S OPPOSITION TO CALLOWAY'S PETITION TO DIRECTOR FOR RECONSIDERATION."

The patent owner petition, the third party requester opposition and the present record are before the Office of Patent Legal Administration for consideration.

For the reasons set forth below, the patent owner petition under 37 CFR 1.181 is (a) granted to the extent that the prior decision has been fully reconsidered, and (b) denied as to the underlying request to vacate the order for reexamination (i.e., the underlying relief requested).

This decision also returns the patent owner paper filed on July 21, 2006 styled "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION." The patent owner reply is being returned to patent owner without decision for the reasons set forth below.

### FEES

A petition to vacate reexamination on the grounds that the order granting reexamination constitutes an *ultra vires* action on the part of the Office is considered pursuant to 37 CFR 1.181. Accordingly, no fee is due for the patent owner petition for reconsideration or for the third party requester opposition to the petition for reconsideration.

## REVIEW OF SALIENT FACTS

1.  U.S. Patent No. 6,210,293 (the '293 patent) issued to Michael J. Sullivan on April 3, 2001, and is currently assigned to Callaway Golf Company.

2.  A request for *inter partes* reexamination of the '293 patent was filed by a third party requester, Acushnet Company (hereinafter "Acushnet"), on January 17, 2006. The request was assigned Control No. 95/000,120 (the '120 *inter partes* reexamination proceeding).

3.  On February 9, 2006, the patent owner filed suit against requester Acushnet in the United States District court for the District of Delaware. *Callaway Golf Company v Acushnet Company*, C.A. No. 06-91 (SLR) (February 9, 2006).

4.  On February 15, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '120 *inter partes* reexamination proceeding stated to have been filed by third party requestor on January 23, 2006.

5.  On March 29, 2006, the Office recognized the February 15, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

6.  On March 21, 2006, the patent owner then filed a petition, requesting that the '120 *inter partes* reexamination proceeding be suspended.

7.  On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition to suspend reexamination.

8.  On March 31, 2006, the Office issued a decision holding that the March 21, 2006 petition and the March 24, 2006 opposition papers would be discarded as being improper papers because they had been filed prior to reexamination being ordered.

9.  Reexamination was ordered for the '120 *inter partes* reexamination proceeding on April 7, 2006.

10. On April 13, 2006 the patent owner filed a petition under 37 CFR 1.181 to vacate the reexamination order as *ultra vires* (which would in-effect vacate the proceeding).

11. On April 27, 2006 the third party requester filed, pursuant to MPEP 2646 (I), an opposition to the April 13, 2006 patent owner petition to vacate.

12. On April 28, 2006, patent owner filed a renewed petition to suspend the '120 *inter partes* reexamination proceeding.

13. On May 5, 2006 third party requester filed an opposition to the April 28, 2006 renewed patent owner petition to suspend reexamination.

14. On June 7, 2006, the Office dismissed patent owner's April 13, 2006 petition to vacate the '120 *inter partes* order for reexamination.

15. On July 19, 2006, the Office denied patent owner's April 28, 2006 renewed petition <u>to suspend</u> the '120 *inter partes* reexamination proceeding.

16. On June 16, 2006, patent owner filed a petition for reconsideration of the June 7, 2006 decision dismissing the patent owner petition <u>to vacate</u> the '120 *inter partes* order for reexamination.

17. On June 28, 2006, third party requester filed an opposition to the June 16, 2006 patent owner petition for reconsideration.

18. On July 21, 2006, patent owner filed a reply to the June 28, 2006 third party requester opposition.

<center>RELEVANT STATUTES, REGULATIONS AND PROCEDURE</center>

35 U.S.C. § 311(a) provides:

"IN GENERAL — **Any** third-party requester **at any time** may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

"Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications ... " [Emphasis supplied.]

35 U.S.C. § 313 provides:

"If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied ]

35 U.S.C. 314(c) provides:

c) SPECIAL DISPATCH.- Unless otherwise provided by the Director for good cause, all *inter partes* reexamination proceedings under this section ... shall be conducted with special dispatch within the Office.

35 U.S.C. §315(b) provides:

"CIVIL ACTION.— A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

35 U.S.C. § 317 provides:

"a) ORDER FOR REEXAMINATION.- Notwithstanding any provision of this chapter, once an order for *inter partes* reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION.- Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit ..., then neither that party nor its privies may thereafter request an *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action..., and an *inter partes* reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.907 provides in pertinent part:

" (b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an inter partes reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such inter partes reexamination proceeding."

MPEP § 2646 (I) provides in pertinent part:

"A petition under 37 CFR 1.181 may ... be filed to vacate an *ultra vires* reexamination order, such as where the order for reexamination is not based on prior art patents and printed publications. In cases where no discretion to grant a request for reexamination exists, a petition to vacate the decision to grant, or a request for reconsideration, will be entertained. "Appropriate circumstances" under 37 CFR 1.181(a)(3) exist to vacate the order granting reexamination where, for example:

(A)  the reexamination order is not based on prior art patents or printed publications;
(B)  reexamination is prohibited under 37 CFR 1.907;
(C)  all claims of the patent were held to be invalid by a final decision of a Federal Court after all appeals;
(D)  reexamination was ordered for the wrong patent;
(E)  reexamination was ordered based on a duplicate copy of the request; or
(F)  the reexamination order was based wholly on the same question of patentability raised by the prior art previously considered in an earlier concluded examination of the patent by the Office (e g , the application which matured into the patent, a prior reexamination, an interference proceeding)

          ....

The filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester." [Emphasis supplied.]

## I.   Disposition Of The Patent Owner Opposition To Third Party Requester's Opposition To Patent Owner's Petition For Reconsideration

Neither the *inter partes* reexamination statutes nor the regulations implementing those statutes provide for the filing of a patent owner petition for vacatur of an order granting a request for *inter partes* reexamination. A patent owner petition for vacatur of an order granting a request for *inter partes* reexamination on the grounds that the grant of the order constituted an *ultra vires* action on the part of the Office is entertained pursuant to 37 CFR 1.181 in accordance with the practice set forth in MPEP § 2646(I). MPEP § 2646(I) concludes by stating that "[t]he filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester."

Consequently, the "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION," filed by patent owner on July 21, 2006, is an <u>improper paper</u> that lacks an entry right in the present *inter partes* reexamination proceeding. Therefore the paper (apparently filed by facsimile transmission as a single paper directed to four *inter partes* reexamination proceeding) is being <u>returned</u> to patent owner as an attachment to the present decision. If additional copies directed to concurrent *inter partes* reexamination proceedings 95/000,121, 95/000,122 and 95/000,123 have been filed and are subsequently matched with the proceedings, such additional copies will be discarded rather than returned to patent owner.

## II.   Patent Owner's Position In Support of Vacatur

In the April 13, 2006 petition to vacate the reexamination order as being *ultra vires*, patent owner argued that the order granting reexamination is an *ultra vires* action on the part of the Office because the third party requester, Acushnet, lacked standing to file the *inter partes* request. Patent owner based this argument on allegations that:

(1) Patent owner's predecessor in interest and the present third party requester Acushnet entered into a Settlement Agreement on November 10, 1990, for a term of ten years;

(2) The same parties executed a Settlement Agreement in 1996 that superseded the 1990 agreement, and the 1996 Settlement agreement provides, *inter alia*, that the exclusive forum for the third present party requester to resolve patent validity issues with the patent owner is the United States District Court for the District of Delaware; and

(3) The same (present) parties participated in the dispute resolution process pursuant to the 1996 Settlement Agreement, but while the mediation process was underway, Acushnet requester filed a request for the present *inter partes* reexamination proceeding. [1]

It was apparently patent owner's position that by filing the present request for *inter partes* reexamination, requester Acushnet violated the aforementioned Settlement Agreement, and

---

[1] See patent owner's Petition, pages 2-3.

that Acushnet therefore does not have standing to have filed and to now maintain the present request for *inter partes* reexamination. [2]

In the present petition for reconsideration, patent owner argues that:

(1) The Office has the authority and duty to apply the 1996 Settlement Agreement to this case, and that enforcing the 1996 Settlement Agreement would not violate public policy;

(2) The exemplary language in the MPEP § 2646 does not limit the circumstances where the Office can vacate reexamination orders;

(3) Vacating the reexamination would not leave an unresolved substantial new question of patentability; and

(4) The Office's reliance on the decision in *Heinl v. Godici*, 143 F. Supp 2d 593 (District Court, E. D. VA), is inapposite to this case, because *Heinl* dealt with an entirely unrelated issue, and did not involve a settlement agreement.

### III.  Analysis and Findings

#### A.  The Settlement Agreement Between Patent Owner and The Present Requester Does Not Preclude the Present *Inter Partes* Reexamination Proceeding:

Patent owner argues that a trademark cancellation proceeding is analogous to a reexamination proceeding, and seek to apply the decisions in *Selva & Sons v. Nina Footwear, Inc.*, 705 F.2d 1316 (Fed. Cir. 1983) and *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386 (CCPA 1974) to assert that the Office erred in refusing to consider the settlement agreement between the present patent owner and requester in determining whether to proceed with the present reexamination proceeding. With respect to the *Selva & Sons* decision, patent owner opines that because the statute [3] governing trademark cancellation proceedings (that are *inter partes* in nature) states that "any person" is able to file a petition to cancel a registration, *Selva & Sons* is indistinguishable from the facts in the present reexamination proceeding.   Patent owner also argues that in *Flex-Foot, Inc v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) the Federal Circuit upheld a clause in a settlement agreement prohibiting a party from challenging the validity of a patent when that party had agreed to a dismissal, <u>with prejudice,</u> of a prior action, after entering into a settlement that included a promise to not challenge the validity of that patent.

However, the decisions in the *Selva & Sons* and *Danskin, Inc.* cases do not appear to be on point as to the question of whether a party to a settlement agreement is barred from requesting reexamination of a United States patent under 35 U.S.C. § 302 *et. seq.*.  *Selva & Sons* was an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding. In *Selvo & Sons* , the court's decision was not grounded on the "any

---

[2] *Id.*, at pages 4-6

[3] 15 U.S.C. § 1064, which states in pertinent part:

"A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by **any person** who believes that he is or will be damaged, including as a result of dilution under section 1125 (c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3; 1881, or the Act of February 20, 1905;..." [Emphasis added]

party" language of 15 U.S.C. § 1064. Rather, the court noted the existence of 15 U.S.C. § 1069, which states:

> "In all *inter partes* proceedings equitable principles of laches, estoppel and acquiescence, where applicable, may be considered and applied." *Id.* at 1323, 1324

There is no analogue in the reexamination statutes to 15 U.S.C. § 1069, a statute that broadly applies the equitable principles of laches, estoppel and acquiescence to *inter partes* trademark proceedings in the Office. Rather, the *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (*i.e..* nonappealable) court holding of patent claim validity [4] or the existence of an order granting reexamination. [5] If Congress had intended to make the broad equitable principles set forth in 15 U.S.C. § 1069 applicable to *inter partes* reexamination proceedings, then Congress would have so stated. [6] With respect to the *Danskin, Inc.* case (an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding), it is noted that the language of 15 U.S.C. § 1069 would also apply, so that application of the broad equitable principles listed in the statute would have been mandated.

In the *Flex-Foot* decision, the court did <u>not</u> address the issue of whether the Office would be barred from conducting a reexamination proceeding filed by that party. The court's decision merely upheld that a clause in the settlement agreement would prohibit a party to the settlement agreement from challenging the validity of a patent (and accordingly, the opposing party would have remedies against the party that violated the agreement). The opinion in *Flex-Foot* does not discuss the affect of a reexamination filing by a party in violation of such a settlement agreement, as to whether the reexamination should continue. *Flex-Foot* does not require or suggest that an order granting a reexamination proceeding, based on such a filing, would be *ultra vires* due to the existence of a settlement agreement between a patent owner and third party requester. And, based on the discussion below, there is no reason to believe that an order granting a reexamination proceeding based on such a filing would be *ultra vires* action on the part of the Office.

## B.   Reexamination Case Law Does Not Support Vacatur Of The Present Reexamination Proceeding

The settlement agreement asserted by patent owner in the '120 reexamination proceeding does not explicitly address reexamination of a patent. Even if it did, relevant court precedent clearly demonstrates that - because the Office was not, and is not, a party to the settlement agreement, the Office was not, and is not, bound by the settlement agreement.

*Joy Manufacturing Co. v National Mine Service Co*, 810 F.2d 1127 (Fed. Cir. 1987) addressed the question of the effect, if any, that the existence of a settlement agreement between parties to an infringement/validity patent litigation had with respect to a request for *ex parte* reexamination subsequently filed by a party to that settlement agreement. Accused infringer National had entered into an agreement in settlement of an action brought against it for infringing a patent.

---

[4] See 35 U.S.C. § 317(b)

[5] See 35 U.S.C. § 317(a).

[6] In light of the cases cited below in support of the Office's position vis-à-vis the effect of the settlement agreement in the present reexamination proceeding, it is also to be noted that with respect to *ex parte* reexamination, Congress has not mandated any estoppel with respect to the ability of "any person" to file a request for reexamination at "any time."

National agreed that it would not file any suit in any court challenging the validity of the patent. Thereafter, National filed a request for reexamination of the patent, and the patent owner requested an injunction preventing the third party requester from going forward in the reexamination proceeding. The District Court ruled against the patent owner, noting that the settlement agreement by its literal terms did not proscribe the conduct of which the patent owner complained. The Federal Circuit agreed, holding that:

> " ... the district court correctly refused to equate "a request for administrative reexamination . . . with filing a suit in a United States Court." Its reliance on *Etter* as support for this legal conclusion was entirely appropriate. The *Etter* decision turned on the precise issue here, namely, that reexamination and civil litigation were distinctly different proceedings. As stated therein:
>
>> The intent that reexamination proceedings and court actions involving challenges to validity be distinct and independent is reflected in the legislative history of § 303. . . . *756 F.2d at 857, 225 USPQ at 4.* The result in *Etter* is inseparable from the above-quoted premise. [Footnote omitted.]
>
> "In this connection, we also note that the principal relief which Joy seeks -- namely, stopping the reexamination of its patent -- is not available in these proceedings. *Accord* Manual of Patent Examining Procedure § 2210 (5th ed. 1983); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q. (BNA) 1032, 1034 (N.D. Tex. 1982), aff'd, 703 F.2d 555 (5th Cir. 1983). The decision by the Commissioner to institute reexamination is not subject to review, *Etter,* 756 F.2d at 857, 225 USPQ at 4; and the injunction sought against National would have no effect on reexamination since National, as the requestor, has no future role to play in that *ex parte* reexamination. "

In the present reexamination proceeding, patent owner has not established that Acushnet's request for reexamination violates the literal terms of the 1996 settlement agreement involved here. The settlement agreement does not facially preclude "administrative proceedings" of any sort, including reexamination within the Office. Further, as was noted in the previous decision dismissing the petition, the settlement agreement was entered into in 1996; prior to the enactment in 1999 of the statute authorizing *inter partes* reexamination. Thus, it is unlikely that the settlement agreement reflects an agreement between the parties thereto to forego administrative relief in the form of a request for *inter partes* reexamination (such *inter partes* proceeding made available after the settlement agreement), and at best, could only be asserted to inferentially contemplate that the parties to the settlement agreement would not seek *ex parte* reexamination (where there is no right to comment on patent owner responses and appeal). *Joy Manufacturing*, and the other cases relied on by the Office, *infra*, all involve *ex parte* examination proceedings. Moreover, even presuming that the settlement agreement between the patent owner and third party requester could be construed to be an agreement precluding the filing of a request for *ex parte* reexamination, the courts have uniformly held that such agreement is without binding effect on the Office and would not bar the Office from granting and conducting an *ex parte* reexamination proceeding, as will now be discussed.

In *Houston Atlas, Inc. et al v. Del Mar Scientific, Inc. et al.*, 217 USPQ 1032, 1037 (N.D. Tex. 1982), the district court considered the situation in which two parties had executed and had entered a consent judgment stating that a particular patent was valid. The consent judgment was entered prior to the enactment of the *ex parte* reexamination statutes. The court expressly addressed the subsequent effect the consent judgment would have on reexamination in the Office, if any. The court stated that private parties cannot bind the Office, or the public it represents, with respect to the validity of a patent, by merely executing the consent judgment and having it entered. The court noted that:

> " ... the Patent Office was not a party to the original proceeding and, as discussed in section IV above, the consent judgment is not binding on the Patent Office or the public which it represents. Simply stated, two private parties cannot bind the Patent Office with respect to the validity of a patent by merely executing, and having entered, a consent judgment stating that the patent is valid. The consent

judgment is not *res judicata* on the Patent Office as there is no evidence that the Patent Office is privity with Defendants. See *Vulcan, Inc. v Fordees Corp , 658 F.2d 1106, 1109-10, 211 USPQ 852, 854-855 (6th Cir. 1981)* (party not in privity to executory of consent judgment is not bound by the judgment). Given that the consent judgment is not enforceable against the Patent Office as *res judicata*, the Court must determine whether the Patent Office, by its conduct of the reexamination proceedings and issuance of the order of reexamination is "in a position to frustrate the implementation of [the consent judgment] or the proper administration of justice." The clear answer to this question is in the negative. Section 303 of the Act expressly authorizes the Patent Office to conduct reexamination proceedings on their own initiative without a formal request for reexamination. If the reexamination proceedings in question had been instituted by the Commissioner as a consequence of a citation of prior art from a person other than Canterbury, or if a person other than Canterbury had requested reexamination of patent 3,464,799, this Court would be without power to enjoin the proceedings for the simple reason that the consent judgment is binding only as to Plaintiffs and Defendants. **In short, Plaintiffs' compliant lies not with the institution of the reexamination process, but instead with who requested it.** For this reason, the Court is constrained to conclude that it has no jurisdiction under the All Writs Act to grant the Plaintiffs any relief against the Patent Office. " [Emphasis added]

Thus, even though the district court found one of the defendants in *Houston Atlas* to be in contempt of the consent judgment because that defendant had filed a request for reexamination, the district court noted that the Office was expressly authorized by statute to conduct reexamination. The court concluded that a consent judgment to which the Office was not a party could not bind the Office so as to preclude reexamination, even where such reexamination was requested by a party bound by the consent judgment. If such is true with respect to a consent judgment, it follows that a settlement agreement between two private parties to which the Office is not a party also does not bind the Office so as to preclude the Office from carrying out its statutory mandate to reexamine a qualifying patent once a substantial new question of patentability for that patent has been determined to exist for that patent. Therefore, even if one assumes that third party requester in the '120 reexamination proceeding is in violation of the settlement agreement with patent owner such that third party requester might be subject to sanctions by a court of competent jurisdiction for having filed the present request for *inter partes* reexamination, <u>the settlement agreement would still not be binding on the Office so as to preclude the Office from conducting *inter partes* reexamination as requested, because the Office is not a party to that agreement.</u>

Indeed, the courts have held that a final judgment against a party found to have infringed a patent does not prohibit that party from seeking *ex parte* reexamination of the involved patent. In *Kucala Enterprises, Ltd. V. Auto Wax Co., Inc. 2004 U.S. Dist. LEXIS 5723 (N.D. Ill., 2004)*, the accused infringer (Kucala) contended that there was no basis in law or fact, by which the judgment could preclude Kucala from filing a request for *ex parte* reexamination, relying on the language of 35 U.S.C. § 302 that permits "any person at any time" to request reexamination of a patent. The court pointed out that it could not bar third party Kucala from seeking reexamination, even under the circumstances of that case, where the third party was found guilty of misconduct such that the court found the patents asserted against the third party to be not invalid. The *Kucala Enterprises, Ltd.* opinion states:

"...the issue here, whether a court can sanction a party by enjoining it from seeking reexamination. At the same time, the cases on which Auto Wax relies fail to address a sanction prohibiting reexamination. [Citations omitted].

"The court is persuaded, in light of the parties' arguments and the court's purposes in the October decision, that the judgment should not bar Kucala from seeking reexamination. The sanction of dismissal conveys to Kucala, "Because of your misconduct, you lose on the claims you filed in this court." In other words, the court finds the patents in suit not invalid. **Under the lessons of *Ethicon*, this means only that the presumption of validity survives, not that the patents are valid. Although principles of claim preclusion would bar an adjudged infringer [*16] from filing or defending a future lawsuit relating to**

these patents, it would not bar the infringer from seeking reexamination. Therefore, the court will not enjoin Kucala from seeking reexamination of Auto Wax's patents." *Id.* at page 13 of the Court's decision."

[Emphasis added]

In *McNeil-PPC, Inc. v. The Procter & Gamble Co., 19 USPQ2d 1663 (U.S. District Court District of Colorado 1991)*, Procter & Gamble sought leave from the court to file a request for reexamination in the Office of a patent in dispute. The court held that Procter & Gamble did not need permission from the court to file a request for reexamination, and that there does not appear to be any limit on a party's right to request reexamination, but for complying with the requirements of 35 U.S.C. § 302, directed to *ex parte* reexamination. Furthermore, the court observed:

> "First, unfair or not, McNeil-PPC points to no authority that would authorize me to prevent or limit P & G's request to the PTO for reexamination of Bradstreet '901 and its participation in that proceeding to the extent allowed by title 35. McNeil-PPC's only argument is that because P & G asked for leave to file the request, it concedes that it is required to do so. I disagree. It may be that P & G was under the erroneous assumption that I had some statutory or common law prerogative to intervene in the PTO reexamination request. McNeil-PPC does not offer, however, any rationale why any such misinterpretation bestows unto me power over the PTO where the power is otherwise absent. Furthermore, at oral argument, P & G took the position that the motion was filed as a courtesy notice and does not constitute any waiver.

> "Second, Congress authorizes challengers to take "two bites of the apple." A nonpatent holder is permitted to both challenge a patent in the PTO and in the district court. *See In re Etter, 756 F.2d 852, 857, 225 U.S.P.Q. (BNA) 1 (Fed. Cir.), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985).* In *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 7 U.S.P.Q.2D (BNA) 1152 (Fed. Cir. 1988),* a nonpatent holder was sued for patent infringement. While the action progressed, the nonpatent holder requested reexamination of the subject patent in the PTO. The Federal Circuit, in concluding that the PTO was without the power to stay the reexamination pending outcome of the action and allowing the reexamination and court action to proceed simultaneously, stated:

>> The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence. Accordingly, different results between the two forums may be entirely reasonable. And, if the district court determines a patent is not invalid, the PTO should continue its reexamination because, the two forums have different standards of proof for determining invalidity. *Ethicon, 849 F.2d at 1428-29*

> "This structure does not automatically lead to inefficient use of judicial resources. Rather than impede jurisdictional efficiency, this dual process has greater potential to promote efficiency, because, as stated in *In re Etter*:

>> The innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of the patents thought "doubtful." [Citation omitted]. When the patent is currently involved in litigation, an auxiliary function is to free the court from any need to consider prior art without the benefit of the PTO's initial consideration."

[Emphasis added]

Thus, the court recognized that duality of the Congressionally enacted structure in which reexamination and litigation co-exist as non-mutually exclusive avenues in which a party may challenge a patent. It appears that insofar as the litigation approach may result in a settlement agreement, that the existence of a settlement agreement does not "sidetrack" a party thereto from pursuing reexamination.

It should also be noted that a contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy. [7] In *Lear v. Adkins*, 395 U.S. 653, (1969), the United States Supreme Court determined that prohibiting licensees from challenging the validity of a patent that they had licensed runs afoul of public policy "in permitting full and free competition in the use of ideas which are in reality part of the public domain." *id.* at 670 . By analogy, preventing a third party requester (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision. As the settlement agreement entered into in 1996 is prior to the enactment in 1999 of the statute authorizing *inter partes* reexamination, it was not even possible for these settlement agreements to address preventing a party to the agreement from filing such a request for reexamination.

Finally, it is recognized that the decisions cited and discussed, *supra*, are not specifically directed to *inter partes* reexamination. However, it is clear that the precedents would apply to *inter partes* reexamination proceedings just as they do in *ex parte* reexamination proceedings. For *ex parte* reexamination, 35 U.S.C. § 302, provides that "[A]ny person at any time may file a request for reexamination by the Office of any claim of a patent ..." For *inter partes* reexamination, 35 U.S.C. § 311(a) provides that "IN GENERAL -Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent ..." [8]

Congress chose to not place any limitation on the ability of a third party requester to request an *ex parte* reexamination proceeding. Thereafter, Congress chose to provide only very limited estoppel provisions with respect to the ability of a third party requester to request an *inter partes* reexamination proceeding, only those estoppel provisions set forth in the statue. [9] Congress could have elected to enact provisions similar to 15 U.S.C. § 1069 so as to place broad estoppel limitations on the ability of a third party requester to seek reexamination in the Office. However, Congress chose not to do so! Moreover, to the extent that the estoppel provisions of 35 U.S.C. § 317(b) might be relevant to the '120 reexamination proceeding, patent owner has not alleged that there has ever been a relevant final (*i.e.* nonappealable) court decision holding that the '293 patent claims are valid. Indeed, patent owner's own statement of the facts indicates that the parties executed Federal Rule of Civil Procedure 41 Stipulations of Dismissal of the prior litigation that were filed in, and accepted by, the Delaware District Court, and that "[t]he Court specifically retained jurisdiction over the parties in relation to disputes arising under the 1996 Settlement Agreement." This clearly does not provide a final court decision regarding the validity of any of the patents covered in the settlement agreement.

---

[7] *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)(concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386,392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

[8] The caveat ("IN GENERAL") in the statute refers to the estoppel provisions of 35 U.S.C. § 317(b) that would preclude a third party requester from filing a request for reexamination where it has not sustained its burden of proof of claim invalidity in litigation that has become final, or where such litigation has resulted in a final holding of claim validity, as well as the 35 U.S.C. § 317(b) limitation on the filing of co-pending *inter partes* reexaminations.

[9] The *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (i.e. nonappealable) court holding of patent claim validity or the existence of an order granting reexamination. See 35 U.S.C. § 317(a) and (b).

C.   Vacatur Of The Present Reexamination Proceeding Is Not Supported By The Provisions
Of MPEP § 2246(I):

Patent owner argues that the exemplary language in the MPEP § 2646 does not limit the circumstances in which the Office can vacate reexamination orders. To the extent that this is true, it is not relevant here, because the statutes, the case law and the facts in the present reexamination proceeding all indicate that vacatur of the present reexamination proceeding would run contrary to the reexamination statute. Patent owner's arguments to the contrary are not persuasive.

MPEP § 2646(I) addresses vacatur that would be required when a request for *inter partes* reexamination was improperly ordered due either to the existence of a statutory prohibition barring the grant of a request for *inter partes* reexamination, or the existence of a clear error of a clerical nature. Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to any statutory prohibition barring the order, or due to a clerical error. Rather, the *inter partes* reexamination statute clearly provides that when the Office is presented with a request for *inter partes* reexamination that (1) has been filed by a third party requester not subject to the estoppel provisions of 35 U.S.C. § 317, and (2) raises a substantial new question of patentability, the Office must order *inter partes* reexamination and thereafter reexamine the patent. [10] As set forth in Section III (B) of this decision, *supra*, the case law does not support the proposition that the Office has the duty to, or may at its option, disregard the statutory mandate to reexamine the patent due to the existence of a settlement agreement between a patent owner and a third party requester to which the Office is not a party. Indeed, the case law does not support that proposition even where the settlement agreement was reduced to a consent judgment and the third party requester has been held by the court to be in contempt of the consent judgment.

D.   Vacating The Present Reexamination Proceeding May In Fact Leave An Unresolved
Substantial New Question of Patentability

Patent owner argues that vacatur of the present reexamination proceeding would not leave a substantial new question of patentability unresolved, because such questions (and other questions of patentability beyond the scope of *inter partes* reexamination) will be resolved by the method, and in the forum, established by the parties in the settlement agreement.

This argument ignores two important points. *First*, there is in fact a public interest served by resolution of patentability issues via reexamination proceedings in the Office, and advantages attendant thereto. *Ethicon v. Quigg*, 878 F.2d 1422, 1428 (Fed. Cir. 1989); *In re Etter*, 756 F.2d 852, 856 (Fed. Cir. 1985). There is no assurance that resolution of the dispute between patent owner and third party requester in accordance with the settlement agreement would resolve the substantial new questions of patentability that have been found to exist in the present *inter partes* reexamination proceeding, or in any way result in a benefit to the public in the manner that a reexamination proceeding would. Any resolution in court, or such other forum chosen, may simply resolve the dispute between patent owner and third party requester without resolving the issues of patentability raised by the substantial new question of patentability (e.g., by settlement, or consent judgment, or dismissal without prejudice or based on a conduct issue). Vacatur of a requested and granted *inter partes* reexamination proceeding may well leave both the public and

---

[10] See 35 U.S.C. §§ 311, 312(a), 313(a) and 314(c).

the patent owner with an unresolved request for reexamination and unresolved substantial new question of patentability (found to be present via the decision ordering reexamination). The public has a right to such a resolution. Vacating, withdrawing, or otherwise abandoning or terminating the instant reexamination proceeding would abrogate this public right, to the detriment of the public interest. As discussed in Section III (B) above, ordering and conducting an *inter partes* reexamination proceeding is not optional for the Office. Rather, the *inter partes* reexamination proceeding must continue according to the procedure mandated by the *inter partes* reexamination statute, to carry out the purpose of the statute and resolve the substantial new question of patentability for the public.[11] The proceeding began with the filing of a request for *inter partes* reexamination that satisfied the requirements of 35 U.S.C. § 311. As **required** by 35 U.S.C. § 312, the request for reexamination has been considered. As a result of that consideration, it has been determined that the request raises a substantial new question of patentability for one or more patent claims. Thus, in accordance with 35 U.S.C. § 313, the present proceeding **shall** result in a determination of the patentability of the claims of the '293 patent in light of prior patents and printed publications, to the benefit of the public as well as to the benefit of patent owner and third party requester.

*Second*, while there is no assurance that the resolution of the dispute in accordance with the settlement agreement will be timely, the present reexamination proceeding **will** be conducted with special dispatch pursuant to 35 U.S.C. § 314(c). The public interest in resolving the issues raised in the present reexamination proceeding includes an interest in having those issues resolved in a timely fashion.

E.    The Decision in *Heinl v. Godici* Is Clearly Apposite To This Reexamination Proceeding

Patent owner argues that the Office's reliance on *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001) is misplaced. This argument is not persuasive.

*Heinl* was a case in which patent owner sought a decision terminating a reexamination proceeding based on the absence of a new question of patentability. The *Heinl* court stated:

> "Under the well established *ultra vires* doctrine, the exhaustion and final agency requirements are excused 'only if plaintiff is able to show that the PTO clearly exceeded its statutory authority', quoting from *Philip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir 1985 (quoting *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977), vacated on other grounds, 571 F.2d 1273 (4th Cir. 1978)."

The *Heinl* court then stated:

> "Put differently, when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusion of underlying proceedings."

It is abundantly clear that the *Heinl* decision was not cited and discussed because it involved a previous settlement agreement between parties to a reexamination proceeding, and no reading of the Decision on Petition June 7, 2006 can lead to the belief that it was. Rather, *Heinl* was cited because it is clearly applicable to the doctrine of "*ultra vires*" reexamination proceedings in the sense that it provides a benchmark for looking into whether the Office has committed an *ultra*

---

[11] The innate function of the reexamination process is to increase the reliability of the Office's action in issuing a patent by reexamination of patents thought "doubtful." House Report No. 66-1307, 96th Cong., 2d Sess. (1980), 3, reprinted in 1980 U.S. Code Cong. & Ad. News 6460, 6462. (This was emphasized in *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir.) (en banc), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985)).

*vires* act. That benchmark is a simple one. Where the Office orders reexamination, the decision of the Office to order reexamination cannot be attacked as being *ultra vires*, unless it is clearly established that the Office has exceeded its statutory authority to order reexamination.

In this instance:

(1) The reexamination statute fails to provide that the equitable doctrines of laches, estoppel and acquiescence can be raised to preclude the Office from ordering *inter partes* reexamination, other than the 35 U.S.C. § 317 exception, which is inapplicable on the facts in the present reexamination proceeding;

(2) The authorities cited and discussed above in Section III (A) clearly indicate that the existence of a settlement agreement (and even the existence of a consent judgment incorporating a settlement agreement) between a patent owner and a third party reexamination requester do not operate to preclude the Office from granting that third party's request for reexamination if the request otherwise satisfies the requirements of the reexamination statutes; and

(3) A public interest in resolving the substantial new question of patentability exists in the present reexamination proceeding, which may not necessarily be timely resolved, or resolved at all, by reason of the dispute resolution provisions of the settlement agreement, and will not be resolved using the standards applicable in reexamination as well as the expertise of the Office.

Thus, the guidance provided by the decision in *Heinl* supports the conclusion that petitioner has not advanced sufficient basis for holding the grant of reexamination in the present *inter partes* reexamination proceeding to be an *ultra vires* action by the Office. The Office has not "clearly exceeded its statutory authority" in the Office's determination that the January 17, 2006 reexamination request properly raised a substantial new question of patentability and should go forward.

For all the forgoing reasons, as well as those set forth in the June 7, 2006 decision, the order granting the present *inter partes* reexamination remains intact and the *inter partes* reexamination proceeding will continue in accordance with the procedure mandated by the *inter partes* reexamination statute and implementing regulations.

## ADDITIONAL DISCUSSION

The undersigned notes that the patent owner and third party requester are adverse parties with respect to the present *inter partes* reexamination proceeding, and are currently engaged in litigation involving the underlying patent. While counsel should represent the respective parties zealously, and are entitled to benefit of all of the regulations implementing the *inter partes* reexamination statutes and the examining practice promulgated with respect to those regulations, counsel are reminded of their ongoing obligations to the Office as set forth in Part 10 of Title 37 of the Code of Federal Regulations. In particular, the provisions of 37 CFR 10.18(b)(2) and (c) should be noted. Adherence to the provisions of Part 10 will greatly assist the Office in conducting this *inter partes* reexamination proceeding with special dispatch as required by 35 U.S.C. § 314(c).

## CONCLUSION

1. The patent owner's June 16, 2006 petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination.

2. This decision is a <u>final agency action</u> within the meaning of 5 U.S.C. § 704.

3. The patent owner's July 21, 2006 opposition to the third party requester opposition to the patent owner petition for reconsideration lacks an entry right in the present reexamination proceeding, and is being <u>returned</u> to patent owner.

4. Jurisdiction over the '120 *inter partes* reexamination proceeding is returned to the Central Reexamination Unit.

5. Telephone inquiries related to the present decision should be directed to Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to Karen Hastings, Legal Advisor, at 571-272-7717.


Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

kmh/sm

9-07-06
C:\Kiva\Kenpet6\UV\95_120-UV_settlement agreement_deny.doc

# EXHIBIT 11



COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.                    (For Patent Owner)          **MAILED**
P.O. Box 1022
Minneapolis, MN 55440-1022                                          **JUL 19 2006**

                                                          CENTRAL REEXAMINATION UNIT

Alan M. Grimaldi
Howrey LLP                                (For Third Party Requester)
1299 Pennsylvania Avenue NW
Washington, DC 20004


In re Callaway Golf Company                      :
  *Inter Partes* Reexamination Proceeding        : **DECISION DENYING**
Control No.: 95/000,121                           : **PETITION**
Filed:    January 17, 2006                        :
For:      U.S. Patent No. 6,503,156               :


This is a decision on the April 28, 2006 patent owner petition entitled "RENEWED PETITION
TO SUSPEND INTER PARTES REEXAMINATION PROCEEDINGS." Also, on May 5, 2006, the
third party requester filed a paper entitled "ACUSHNET'S OPPOSITION TO PATENT OWNER
CALLAWAY'S RENEWED PETITION TO SUSPEND INTER PARTES REEXAMINATION
PROCEEDINGS."

*Inter partes* reexamination control number 95/000,121, patent owner's renewed petition, and
requester's opposition to patent owner's renewed petition are before the Office of Patent Legal
Administration for consideration.

Patent owner's present petition is taken as a renewed petition under CFR 1.183 for waiver of 37
CFR 1.939, and as a petition under 37 CFR 1.182 for suspension of *inter partes* reexamination
proceeding 95/000,121. Third party requester's opposition is also taken as a renewed petition
under 37 CFR 1.183 for waiver of 37 CFR 1.939, and as a petition 37 CFR 1.182 to oppose the
patent owner's renewed petition.

### FEES

As the fee for the originally filed patent owner petition was not charged, a petition fee of
$400.00 under 37 CFR 1.17(f) will be charged to the patent owner's Deposit Account No. 06-1050
as authorized in the April 28, 2006 patent owner renewed petition.

As the fee for the originally filed third party requester opposition to patent owner's petition was
not charged, a petition fee of $400.00 under 37 CFR 1.17(f) will be charged to the third party
requester's Deposit Account No. 08-3038, as authorized in the May 5, 2006 third party requester
renewed opposition.

## SUMMARY

The respective 37 CFR 1.183 aspect of the petition of the patent owner to permit entry and consideration of the renewed patent owner petition as a petition to suspend the present *inter partes* reexamination proceeding, and of the third party requester to permit entry and consideration of the third party requester's opposition to the renewed petition to suspend, are granted.

The patent owner renewed petition under 37 CFR 1.182 to suspend the present *inter partes* reexamination proceeding is denied.

## REVIEW OF FACTS

1. U.S. Patent No. 6,503,156 ("the '156 patent") issued to Michael J. Sullivan on January 7, 2003, and is currently assigned to Callaway Golf Company.

2. A request for *inter partes* reexamination of the '156 patent was filed by a third party requester, Acushnet Company, on January 17, 2006. The request was assigned Control No. 95/000,121 ("the '121 *inter partes* reexamination proceeding").

3. On February 9, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '121 *inter partes* reexamination proceeding stated to have been filed by third party requester on January 23, 2006.

4. On February 16, 2006, the Office recognized the requester's February 9, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

5. On March 21, 2006, the patent owner filed a petition, requesting that the '121 *inter partes* reexamination proceeding be suspended.

6. On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition.

7. On April 11, 2006, an Office decision was issued, discarding both the March 21, 2006 patent owner petition and the March 24, 2006 opposition thereto as being improper premature papers.

8. On April 7, 2006, reexamination was ordered for claims 1-11, i.e. all of the claims, of the '156 patent.

9. On April 13, 2006, patent owner filed a petition requesting that the order granting the present reexamination proceeding be vacated as being an *ultra vires* action.

10. On April 27, 2006, third party requester filed an opposition to patent owner's April 13, 2006 petition.

11. On April 28, 2006, patent owner filed the present renewed petition to suspend the '121 *inter partes* reexamination proceeding.

12. On May 5, 2006, third party requester filed the present opposition to the April 28, 2006 patent owner petition.

13. On June 7, 2006, the patent owner petition to vacate the '121 *inter partes* reexamination proceeding was dismissed by the Office.

## DECISION

## I.   Relevant Law And Procedure

35 U.S.C. § 311(a) provides:

> IN GENERAL — **Any third-party requester** at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied]

35 U.S.C. § 312(a) provides in pertinent part:

> "Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director **shall** determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications ...." [Emphasis supplied]

35 U.S.C. § 313 provides:

> "If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination **shall** include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied]

35 U.S.C. § 314 (c) provides:

> "Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office."

37 CFR 1.132 provides:

> "When any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section."

37 CFR 1.182 provides:

> "All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Director, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing. Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.183 provides:

"In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a **requirement of the statutes** may be suspended or waived by the Director or the Director's designee, *sua sponte*, or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.907 provides:

"(a) Once an order to reexamine has been issued under § 1.931, neither the third party requester, nor its privies, may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued under § 1.997, unless authorized by the Director.

(b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an *inter partes* reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such *inter partes* reexamination proceeding."

37 CFR 1.913 provides:

"Except as provided for in § 1.907, any person other than the patent owner or its privies may, at any time during the period of enforceability of a patent which issued from an original application filed in the United States on or after November 29, 1999, file a request for *inter partes* reexamination by the Office of any claim of the patent on the basis of prior art patents or printed publications cited under § 1.501."

37 CFR 1.935 provides:

"The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination."

37 CFR 1.937(b) provides:

"The *inter partes* reexamination proceeding will be conducted in accordance with §§ 1.104 through 1.116, the sections governing the application examination process, and will result in the issuance of an *inter partes* reexamination certificate under § 1.997, except as otherwise provided."

37 CFR 1.939 provides:

"(a) If an unauthorized paper is filed by any party at any time during the *inter partes* reexamination proceeding **it will not be considered** and may be returned." [Emphasis supplied.]

(b) Unless otherwise authorized, **no paper** shall be filed prior to the initial Office action on the merits of the *inter partes* reexamination." [Emphasis supplied.]

37 CFR 1.987 provides:

"If a patent in the process of *inter partes* reexamination is or becomes involved in litigation, the Director shall determine whether or not to suspend the *inter partes* reexamination proceeding."

With respect to suspension of *inter partes* reexamination, MPEP § 2684.04(III) provides that:

> "... 'good cause' might be present, for example, where there is an issue that cannot be decided in the reexamination proceeding but affects the resolution of the proceeding. Another example is where there is an issue common to the litigation and the reexamination that can best be decided in court due to the availability in court of discovery and subpoena power (e.g., an issue heavily dependent on presentation of conflicting/contested evidence by the two parties)."

## II.   Procedural Discussion *Re:* Patent Owner's Original (March 21, 2006) Petition To Suspend

On March 21, 2006, patent owner filed a petition to suspend the '121 *inter partes* reexamination proceeding. In the present petition, patent owner takes the position [1] that the original petition to suspend filed on March 21, 2006 was not entered in the '121 proceeding, and was instead discarded, because it was filed prior to issuance of a reexamination order.     This position is inaccurate.

By its terms, 37 CFR 1.939(b) precludes the filing of any paper in an *inter partes* reexamination proceeding prior to "the initial Office action on the merits" in that proceeding, unless the filing of the paper is authorized. At the time of filing of that petition, and at the time of the decision thereon, not only had there been no decision on the request for reexamination, there had also been no Office action on the merits in the *inter partes* proceeding. The patent owner petition of March 21, 2006 was held to be an improper paper under 37 CFR 1.939 because it was filed prior to the issuance of the initial Office action in the reexamination proceeding. [2] Not only had *inter partes* reexamination not yet been ordered, no "initial Office action on the merits of the *inter partes* reexamination" had been promulgated in the '121 *inter partes* reexamination proceeding, and a paper prior to that point is barred by regulation unless authorized, in accordance with 37 CFR 1.939(b). [3]

Although patent owner's March 21, 2006 petition requested relief under 37 CFR 1.183, the regulatory provision that provides for waiver of the rules, [4] there was no specific identification of which regulation that patent owner was seeking to waive. However, even if waiver of the provisions of 37 CFR 1.939 had been specifically requested, the March 21, 2006 patent owner petition could not have been granted. As explained in the decision dated April 11, 2006 (by which the March 21, 2006 patent owner petition and third party requester opposition were discarded as being improper papers), U.S.C. § 312(a) <u>requires</u>, *inter alia*, that after a request for *inter partes* reexamination is filed, the Director <u>shall, within three months of the filing of a request for *inter partes* reexamination,</u> determine whether that request raises a substantial new question of patentability affecting any claim of the patent that is the subject of the request. Further, 35 U.S.C. § 313 **requires** that - when the Director does determine that a substantial new question of patentability is raised by the request, then the determination <u>shall</u> include an order for *inter partes* reexamination of the patent concerned.

---

[1] See patent owner's "Renewed Petition to Suspend, page 2, second full paragraph

[2] See Decision Discarding Improper Papers", April 11, 2006, page 2, paragraph styled "The Patent Owner Petition"

[3] It appears that petitioner patent owner is confusing the terminology "initial Office action on the merits" with the terminology "reexamination order." The terminology "action on the merits" means an action on the patentability of the claims of the patent being reexamined. See, for example, 37 CFR 1.935 which provides that "The order for *inter partes* reexamination will usually be accompanied by the initial Office action on the merits of the reexamination." Clearly, a reexamination order and "the initial action on the merits of the reexamination are two different things. See also MPEP Chapter 700, wherein it is made clear that in examination proceedings, "action on the merits" is a term of art meaning an action in which a patentability determination is made.

[4] At page 2 thereof, the March 21, 2006 petition requested relief under a variety of regulations, as well as relief pursuant to 35 U.S.C. § 314(c), as does the present renewed petition.

It is clear that consideration of the substance of patent owner's March 21, 2006 petition, and granting it, would have, in effect, required a waiver of 35 U.S.C. §§ 312(a) and 313, because a suspension of the '121 *inter partes* reexamination proceeding would have precluded both a determination of the existence or absence of a substantial new question of patentability, and the promulgation of a reexamination order based on that determination within three months of the filing of the request for reexamination, as required by §§ 312(a) and 313. However, a waiver of the statutes is an action beyond the authority of the Director, and 37 CFR 1.183 expressly recognizes that a requirement of the statutes may not be waived. Therefore, a suspension of the '121 *inter partes* reexamination prior to the determination on the request for reexamination promulgation of the reexamination order, based upon any petition by the parties, was barred.

## III.   Procedural Discussion *Re:* The Present Patent Owner Renewed Petition To Suspend

In the present patent owner renewed petition, patent owner takes the position that because an Order granting *inter partes* reexamination has now been issued, the petition to suspend is a proper paper. Patent owner also takes the position that the present renewed petition, (as well as patent owner's March 21, 2006 petition to suspend), is proper because it is authorized by 37 CFR 1.987. [5]

### A.   Relief Pursuant to 37 CFR 1.939

Patent owner argues that the present patent owner petition to suspend the '121 reexamination proceeding is now timely under 37 CFR 1.939(b) as reexamination has already been ordered. This position is not persuasive because, as discussed in section II., *supra*, an order for *inter partes* reexamination is not the initial Office action on the merits of the *inter partes* reexamination proceeding. "Action on the merits" is a term of art, and as such, means an action on the patentability of claims. It is clearly so used in the reexamination regulations, for example, in 37 CFR 1.935. [6] Thus, it is clear that the filing of the present patent owner renewed petition to suspend is not authorized by 37 CFR 1.939(b), because the "initial action on the merits " of the '121 *inter partes* reexamination proceeding has not yet been issued by the Office.

### B.   Relief Pursuant to 37 CFR 1.987

The patent owner's argues that 37 CFR 1.987 independently authorizes the filing of the present petition to suspend. This too is not persuasive. The plain language of the regulation does not state or imply that it in any way authorizes the filing of a petition to suspend, particularly a petition that would be improper pursuant to one or more of the regulations that implement the *inter partes* reexamination statutes. 37 CFR 1.987 is merely declaratory of the Director's discretionary authority to *sua sponte* suspend an *inter partes* reexamination proceeding in certain circumstances, *i.e.*, when there is both: (a) litigation involving the patent which is the subject of the *inter partes* reexamination proceeding and (b) "good cause" to suspend. 37 CFR 1.987 in no way authorizes the filing of a petition to request such a suspension. The right of parties in this arena is the filing of a Notification of Existence of Prior or Concurrent Proceedings and Decisions pursuant to MPEP § 2686 to provide the Office with information which may, or may not, justify a suspension of action.

Patent owner has not cited a regulation that authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. In fact, no regulation implementing the *inter partes* reexamination statutes authorizes such a petition.

---

[5] *Id.*, at footnote 1.

[6] See the discussion in footnote 3.

C.   Relief Pursuant to Patent Owner's Petition Under 37 CFR 1.182 and 1.183

Note is taken that the present patent owner renewed petition requests relief under both 37 CFR 1.182 and 1.183. Notwithstanding that patent owner has again failed to specifically identify the regulations(s) for which a waiver under 37 CFR 1.183 is requested, the present renewed petition will be taken as a petition under 37 CFR 1.183 to waive the provisions of 37 CFR 1.939 in order to permit the filing of a paper prior to the issuance of the initial Office action on the merits in the '121 *inter partes* reexamination proceeding. Further, the present renewed petition will also be taken as a petition under 37 CFR 1.182 for a situation "not specifically provided for in the regulations" to permit the filing of a petition to suspend the '121 *inter partes* reexamination proceeding.

1.   37 CFR 1.183 Waiver of 37 CFR 1.939

As discussed in sections I. and II (A), *supra*, 37 CFR 1.939(b) precludes the filing of any paper prior to the initial Office action on the merits of the '121 *inter partes* reexamination proceeding. As no initial Office action on the merits has yet been issued, no patent owner paper may be filed in the '121 *inter partes* reexamination proceeding at this point in the proceeding. However, *inter partes* reexamination has now been ordered. [7] Therefore, suspension of the '121 *inter partes* reexamination proceeding would not require the waiver of any provision of the *inter partes* reexamination statutes; only a waiver of 37 CFR 1.939(b) would be needed to provide for an entry right of the petition paper requesting suspension.

In this instance, it is determined to be in the interests of justice with respect to <u>both</u> parties to the '121 *inter partes* reexamination proceeding that a decision regarding suspension of the '121 *inter partes* proceeding be made as soon as possible, given that (1) a suspension of the proceedings would not impair compliance with the reexamination statutes, and (2) extraordinary circumstances are found to exist, including the fact that this proceeding is but one of four *inter partes* proceedings in which the present parties are involved, and that the present parties are actively involved in litigation with respect to the patents that are the subject of those four *inter partes* reexamination proceedings.   Rather than requiring patent owner and third party requester to re-file the petition and opposition thereto after a first action on the merits, it is appropriate to consider the question of suspension now.  Further, if suspension were in fact warranted, it would be in the interests of justice that such suspension takes place prior to an action on the patentability of the claims.  Finally, there is a public interest, and an interest to be considered by the court in the ongoing litigation, to ascertain, as soon as practical, whether the '121 *inter partes* reexamination proceeding will continue to conclusion, or will presently be suspended pending the outcome of the parallel litigation involving the '156 patent, as well as such future circumstance that would demand that a suspension be lifted, if imposed.

Accordingly, based upon the facts of record and the current circumstances set forth, *supra,* the provisions of 37 CFR 1.939 are waived to the extent necessary to permit filing of the present patent owner renewed petition and the requester's opposition to the renewed petition, and consideration of the substance of both the petition and the opposition.

2.   37 CFR 1.182 Petition to Suspend the '121 *Inter Partes* Reexamination Proceeding

As discussed Section III(B), *supra*, neither 37 CFR 1.987 nor any regulation implementing the *inter partes* reexamination statutes authorizes the filing of a petition to suspend an *inter partes* reexamination proceeding. However, the present patent owner renewed petition does request

---

[7] See the "Order Granting *Inter Partes* Reexamination" dated April 7, 2006.

consideration pursuant to 37 CFR 1.182, and a proposed suspension of an *inter partes* reexamination proceeding is a situation not specifically provided for in the regulations. For the reasons set forth in the second paragraph of section III(C)(1), *supra*, and based upon the facts of record and the current circumstances, consideration will be given to the substance of the present patent owner renewed petition to suspend the '121 *inter partes* reexamination proceeding, as a situation not specifically provided for in the regulations.

## IV. Procedural Discussion Of The Third Party Requester Renewed Opposition

The third party requester renewed opposition filed on May 5, 2006, lacks an entry right under 37 CFR 1.939(b) for the same reasons discussed with respect to the renewed patent owner petition. Further, the regulations implementing the *inter partes* reexamination statutes do not expressly provide for the filing of an opposition paper to a patent owner request to suspend an *inter partes* reexamination proceeding.

However, third party requester has submitted the instant opposition pursuant to 37 CFR 1.182 and 1.183. For reasons analogous to those discussed above with respect to the patent owner's renewed petition, the provisions of 37 CFR 1.939 are waived to the extent necessary to permit the filing of the instant opposition to the present patent owner's renewed petition prior to the initial Office action on the merits in the '121 *inter partes* reexamination proceeding. Although the regulations do not specifically provide for a third party requester opposition to a patent owner petition to suspend an *inter partes* reexamination proceeding, for reasons analogous to those discussed above with respect to the patent owner's renewed petition, consideration will be given, pursuant to 37 CFR 1.182, to the requester's opposition to the patent owner's renewed petition.

## V. Findings And Analysis On The Merits Of Patent Owner's Renewed Petition to Suspend

### A. Patent Owner's Substantive Position In Support Of Suspension of the '121 *Inter Partes* Reexamination Proceeding

Patent owner states that pursuant to 35 U.S.C. § 314 (c), and the procedure discussed in MPEP § 2686.04(III), there is good cause to suspend the '121 *inter partes* reexamination proceeding. Patent owner asserts the existence of matters to be raised in the concurrent litigation that are argued to affect the resolution of the '121 *inter partes* reexamination proceeding or potentially bar the proceeding. Patent owner also raises issues in which the District Court's discovery and subpoena powers are asserted to be important in deciding matters heavily dependent upon the evidentiary showings of the parties.

### 1. Matters Involving Privity And Assignor Estoppel [8]

Patent owner states that the sole inventor of the '156 patent is Michael J. Sullivan, who is now a Vice President of third party requester business entity. Patent owner urges that 37 CFR 1.913 [9] is facially broad enough to cover both current and former patent owners and current and former privies, to bar *inter partes* reexamination. Patent owner argues that Mr. Sullivan is a

---

[8] See *Shamrock Technologies, Inc. v Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789; USPQ2d 1728 (Fed. Cir 1990), and compare *Acushnet Company v. Dunlop Maxfli Sports Corporation*, 2000 U.S. Dist. LEXIS 10123, Civ. A. No. 98-717-SLR, (D. Del June 29, 2000).

[9] Pursuant to 37 CFR 1.913, a request for *inter partes* reexamination can be filed by any person other than patent owner or its privies.

privy of a former patent owner [10] to whom the '156 patent was originally assigned, and that 37 CFR 1.913 should have precluded the filing of the '121 *inter partes* reexamination proceeding.

Patent owner further alleges that, as a Vice President of third party requester, Mr. Sullivan may well be a privy of third party requester. Patent owner argues that the third party requester would therefore be barred from challenging the validity of the '156 patent via the '121 *inter partes* reexamination proceeding by the doctrine of assignor estoppel.

Patent owner's position is that a suspension of the '121 *inter partes* reexamination proceeding is necessary, because these issues can only be resolved by evidence that can uniquely be obtained through the use of the District Court's discovery and subpoena power.

### 2. Additional Matters Requiring The District Court's Discovery And Subpoena Power

Patent owner also urges that the use of the District Court's discovery and subpoena power is required to permit full and fair evaluation of testing undertaken by third party requester that is relied upon by third party requester to support its allegations of patent invalidity. Patent owner points out that third party requester relies upon an invalidity argument under 35 U.S.C. § 103, that objective evidence of commercial success of both the patent owner and an alleged infringer (the third party requester) is relevant to § 103 nonobviousness. Patent owner argues that access to evidence that would establish commercial success of the third party requester's accused products could be obtained utilizing the District Court's discovery and subpoena powers.

### B. Established Standards Demonstrating The Existence of "Good Cause" For Suspension Of *Inter Partes* Reexamination Proceedings

35 U.S.C. § 305 requires that all *ex parte* reexamination proceedings be conducted with special dispatch within the Office. It has been held that, based on the unequivocal statutory requirement for special dispatch, the Office may not suspend a pending *ex parte* reexamination proceeding merely because of the existence of concurrent litigation on the patent that is the subject of reexamination. [11] *Ethicon* discusses certain fundamental concepts regarding concurrent *ex parte* reexamination proceedings in the Office and litigation of the patent that is the subject of reexamination. For example the *Ethicon* court quoted extensively from the decision of the court in *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (in banc) to point out:

> "That:one challenging validity in court bears the burden assigned by [35 U.S.C.] § 282, that the same party may request reexamination upon submission of art not previously cited, and that, if that art raises a substantial new question of patentability, the PTO may during reexamination consider the same and new and amended claims in light of that art free of any presumption, *are concepts not in conflict.* On the contrary, those concepts are but further indication that *litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes.*" [Emphasis is the Court's ]

The *Ethicon* court also cited *Etter* in order to point out that when reexamination and litigation for the same patent are conducted concurrently:

> "...precise duplication of effort does not occur because the PTO and the courts employ different standards of proof when considering validity, and the courts, unlike the PTO during a reexamination of patent claims, are not limited to review of prior art patents or printed publications."

---

[10] The present patent owner acquired rights to the '156 patent from the original owner, Top-Flite.

[11] *Ethicon, Inc*, v. *Quigg*, 849 F.2d 1422, 7 USPQ2d 1152 (Fed Cir. 1988)

*Id.*, at 856, at 4.

In contrast to the 35 U.S.C. § 305 which applies only to *ex parte* reexamination, 35 U.S.C. § 314(c) expressly allows for the suspension of an *inter partes* reexamination proceeding within the Office "for good cause," notwithstanding that *inter partes* reexamination proceedings are to be conducted with "special dispatch." Therefore, the question of whether a petition to suspend an *inter partes* reexamination proceeding that is being conducted concurrently with litigation of the patent establishes "good cause" for the suspension of an *inter partes* reexamination proceeding presents a question that differs from the question of suspension of an *ex parte* reexamination proceeding. Pursuant to 35 U.S.C. § 314(c) and 37 CFR 1.987 that implements the statutory provision, the USPTO Director has authority to determine circumstances amounting to "good cause" for suspension of an *inter partes* reexamination proceeding, and to do so on a case-by-case basis.

In *inter partes* reexamination proceedings control numbers 95/000,093 and 95/000,094 (collectively referred to hereinafter as "the Immersion-Sony *inter partes* reexamination proceedings"), the Office granted a patent owner petition to stay the *inter partes* reexamination proceedings due to the existence of concurrent litigation of the patents that were the subject of the reexamination proceedings. [12] The decision suspension granting acknowledged that MPEP § 2684.04 set forth certain criteria as indicia of "good cause" for suspension of an *inter partes* reexamination proceeding, but pointed out that these criteria were merely exemplary. [13] The criteria relied upon by the Office in the Immersion-Sony *inter partes* reexamination proceedings to support a finding of "good cause" to suspend was upheld by the U.S. District Court, Eastern District of Virginia, *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. This criteria establishes a benchmark and standard which the Office can make use of to test the facts and circumstances of record in a given *inter partes* reexamination proceeding in order to determine whether there is "good cause" to suspend that *inter partes* reexamination proceeding, due to the existence of concurrent litigation of the patent being reexamined.

**In the *Sony* scenario:**

The patent claims for which *inter partes* reexamination was requested were not identical to the claims being litigated; there was one non-litigated patent claim (claim 1 in each instance) for which reexamination had been requested in each proceeding. The Office denied patent owner Immersion's first petition to suspend the *inter partes* reexamination proceedings, noting that even if the proceedings were suspended in the Office and judgment was rendered adverse to requester Sony in the concurrent litigation, that would not dispose of all claims in the existing *inter partes* reexamination proceedings, leading to a piecemeal reexamination, and a delay in reexamination of the non-litigated claims. [14] The patent owner then disclaimed claim 1 of each patent, whereby <u>identical patent claims</u> were the subject of both the *inter partes* reexamination proceedings and the concurrent litigation. The Office then granted patent owner Immersion's second petition to suspend the *inter partes* reexamination proceedings.

At the point in time that the Immersion-Sony *inter partes* reexamination proceedings were suspended, <u>the proceedings were at an early stage</u>; the Office's work had been limited only to a finding that the requests for reexamination had raised a substantial new question of

---

[12] See the '093 and '094 proceedings, Decision Granting Petitions To Suspend, November 17, 2005
[13] *Id*., Decision Granting Petitions To Suspend", November 17, 2005, footnote 6
[14] *Id*., "Decision Denying Petitions", August 23, 2005, at page 6.

patentability. The <u>concurrent litigation</u>, on the other hand, <u>was at an advanced stage</u>: (a) a District Court had issued a decision adverse to requester Sony, holding the litigated patent claims to be valid, (b) an appeal of the District Court had been filed in the Court of Appeals for the Federal Circuit ("the Federal Circuit"), and (c) the matter had already been briefed.    Thus, there was a substantial likelihood that suspension of the reexamination proceedings would serve to conserve Office of resources, since a final holding of claim validity would statutorily require termination of the Immersion-Sony *inter partes* prosecutions with respect to all of the claims subject to the litigation, which was also all the claims subject to reexamination in those proceedings.    It was not in the Office's and parties' interests to engage resources in administrative proceedings that ultimately could be mooted by the concurrent litigation which was soon to be finally resolved. The substantial likelihood that the reexamination prosecutions would terminate and the proceedings be concluded, taken together with the identity of claims in the litigation and the *inter partes* reexamination proceedings, led the Office to conclude that on balance, there was "good cause" to suspend the Immersion-Sony *inter partes* reexamination proceedings, to await the decision by the Federal Circuit.  The decision granting suspension noted that should circumstances change, *e.g.*, if the matter were remanded to the District Court by the Federal Circuit without a holding on claim validity, the third party would be free to petition for a resumption of the *inter partes* reexamination proceeding based upon the change in circumstances.  The decision also noted that further *inter partes* proceedings on the claims not before the Office and the courts could subsequently be obtained by members of the public.

**In the present instance:**

The facts and circumstances in the '121 *inter partes* reexamination proceeding differ significantly from those present in the Immersion-Sony *inter partes* reexamination proceeding.  In contrast to the Immersion-Sony *inter partes* reexamination proceedings, the litigation involving the '156 patent is at an early stage.  For example, there is a pending order dated June 2, 2006, referring the matter to a Magistrate Judge for the purposes of exploring joinder of parties, setting September 29, 2006 as a due date for amended papers, and setting a discovery conference for October 18, 2006.  The issue of claim construction is still pending, and there are apparently a number of preliminary motions pending.  Thus, unlike the Immersion-Sony *inter partes* proceedings in which the litigation had resulted in an appealable holding of claim validity, with the appeal having been filed and briefed to the appellate court, in this instance, it is not even foreseeable when the District Court's holding on the issue of validity might be would be rendered, and what it might be. It certainly cannot be envisioned when the litigation involving the '156 patent will reach a <u>final </u>holding on the validity of the claims of the '156 patent, including any appeal to the Federal Circuit, let alone what that holding is likely to be.

Further, in the '121 *inter partes* reexamination proceeding, patent owner has not established that there that the litigation of the '156 patent will result in a decision on the validity of all of the claims being currently being reexamined, *i.e.*, claims 1-11 of the '156 patent. Thus, it is not even clear that a final holding of claim validity in the litigation would necessarily require conclusion of the '121 *inter partes* reexamination proceeding as to all the claims subject to reexamination.

**As a final point, as to the difference:**

In the Immersion-Sony *inter partes* proceedings Sony chose to permit the District Court litigation to proceed for three years before filing its requests for reexamination only after judgment was entered in Immersion's favor in the litigation.  Had Sony filed its requests for reexamination earlier, the reexamination proceedings could have been much farther along in the process, and may likely have been completed at the Office <u>before</u> the district court issued its decision.  Also,

the district court might have stayed the litigation to await the Office's decisions in the reexamination proceedings. In the present instance, the requester has filed the '121 *inter partes* reexamination well before the District Court litigation has advanced to conclusion, and the Office proceedings should be available for the District Court.

**In conclusion as to this issue:**

Congress specifically provided estoppel provisions when a "final decision" upholding the validity of patent claims has been reached in a civil action or in a prior *inter partes* reexamination. *See* 35 U.S.C. § 317(b); 35 U.S.C. § 315(c). Thus, if a party's challenge to the validity of certain patent claims has been <u>finally</u> resolved, either through civil litigation or the *inter partes* reexamination process, then that party is barred from making a subsequent request for *inter partes* reexamination (or filing a new civil action) challenging the validity of those same claims. *Id.* Accordingly, while Congress desired that the creation of an *inter partes* reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also contemplated in the statute that a court validity challenge and *inter partes* reexamination of a patent may occur simultaneously; but once one proceeding finally ends, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other. Until that time, however, the Office is obligated to move forward in the *inter partes* reexamination with "special dispatch." Only "good cause" will permit the Office from deviating from that statutory mandate. In this instance, the litigation is at a preliminary stage so that it can not be determined when the litigation will reach a final holding on the issue of claim validity and what that decision is likely to be. Even if there should be a final holding on the issue of claim validity, the patent owner has not established that there is an identity of claims in the '121 *inter partes* reexamination proceeding and those subject to the litigation to thereby statutorily bar proceeding further with the entirety of the reexamination proceeding. Accordingly, the patent owner has not provided the USPTO Director with sufficient basis upon which to conclude that there is "good cause" to suspend the *inter partes* reexamination proceeding to await a final decision on claim validity in the litigation.

C.   Other Patent Owner's Allegations That Good Cause For Suspension Exists

The factors alleged by patent owner to present "good cause" for suspension of the '121 *inter partes* reexamination proceeding have been thoroughly considered. However, for the reasons that follow, these factors do not establish "good cause" for suspension.

1.   Privity and Assignor Estoppel

Patent owner argues that because Michael J. Sullivan, the sole inventor of the '156 patent, assigned the '156 patent to patent owner's predecessor in interest, the '121 *inter partes* reexamination proceeding was filed by a "former privy" of patent owner and is therefore barred under 37 CFR 1.913. The purpose of 37 CFR 1.913 is simply declaratory of the statutory mandate of 35 U.S.C. § 311(a) that provides that <u>any third-party requester</u> may, at any time, file a request for *inter partes* reexamination. [15] Patent owner has not established that 37 CFR 1.913,

---

[15] In the Notice of Proposed Rulemaking entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 18154, 18167 (April 6, 2000) it is stated that proposed rule includes the language "an person other than the patent owner or its privies may .. file a request for *inter partes* reexamination." The commentary stated that the proposed rule "provides for any third-party requester ... to file a request for ... an *inter partes* reexamination ...." That is, the proposed rule was thought to simply echo the statutory language. However, the words "other than patent owner or its privies" were deleted from the final rule because a comment so directed proposed rule 1.913 had suggested that the Office had exceeded its authority in excluding patent owner or its privies

nor the statute upon which it is grounded, precludes the filing of a request for *inter partes* reexamination by a party who is a so-called "former privy" of patent owner, especially a party who assigned a patent to an entity other than the present patent owner. Absent citation of controlling authority to the contrary by patent owner, it would appear that the statutory language "any third-party requester" is broadly drawn and would permit a party not in direct privity with a patent owner, i.e., a "former privy" of patent owner, to file a request for *inter partes* reexamination.

Patent owner also argues that the doctrine of assignor estoppel should have precluded the filing of the '121 *inter partes* reexamination proceeding, because sole inventor Sullivan assigned the patent to patent owner's predecessor in interest, but is now a Vice President of the third party requester business entity. However, reexamination is not litigation to determine the validity of patent claims conducted before a court wherein the equitable doctrine of assignor estoppel is applicable. Rather, reexamination is an administrative proceeding to determine the patentability of patent claims, a determination that is not conducted under the equitable considerations attaching to a litigation in which claim validity is determined. As discussed above, *In re Etter*, 756 F.2d 852, 857, 225 USPQ 1, 4, (Fed Cir. 1985) (*en banc*) makes it clear that litigation and reexamination are distinct proceedings with distinct parties, purposes, procedures and outcomes. Stated differently, although the application of the assignor estoppel doctrine in litigation is a fact intensive issue requiring the finding of facts and the balancing of the equities by the court, [16] a reexamination proceeding is not a determination of patent validity and infringement of patent claims. [17] It is also to be noted that a patent owner is statutorily authorized to file a reexamination request to obtain an advisory opinion as to the applicability of a prior patent or printed publication; such an advisory opinion would be prohibited in litigation as lacking a "case or controversy." If a patent owner can request reexamination of a patent, a party who assigned to the patent owner should likewise be permitted to do so. Therefore, absent citation of authority holding that assignor estoppel applies to reexamination so as to bar a statutorily approved request for *inter partes* reexamination filed by "[A]ny third-party requester at any time," assignor estoppel would not appear to apply generally to reexamination, and specifically to the present *inter partes* reexamination proceeding. Patent owner has argued that a suspension of the '121 *inter partes* reexamination proceeding is necessary because the issue of whether the present requester was barred from filing the '121 *inter partes* reexamination proceeding based on assignor estoppel can only be resolved through

---

because the language of 35 U.S.C. § 311(c) appeared to permit a patent owner to file a request for an *inter partes* reexamination proceeding. <u>See</u> Final Rule entitled "Rules To Implement Optional Inter Partes Reexamination Proceedings", 65 Fed. Reg. 76756, 76764 (December 7, 2000). However, Public Law 107-273, section 12101, 116 Stat. 1901 amended 35 U.S.C. § 311(c) clarify that only the third party requester, and not a patent owner, may file a request for *inter partes* reexamination. Thereafter, the language "other than patent owner or its privies" was added to 37 CFR 1.913. <u>See</u> Final Rule entitled "Changes to Implement the 2002 *Inter Partes* Reexamination and Other Technical amendments to the Patent Statute", 68 Fed. Reg. 70996, 70999 (December 22, 2003).

[16] Compare *Shamrock Technologies, Inc. v. Medical Sterilization, Inc. and Robert S. Luniewski*, 903 F.2d 789, 14 USPQ2d 1728 (Fed. Cir. 1990) holding that because inventor Luniewski who had assigned his patent to Shamrock was now a Vice President of MSI was in privity with MSI, that MSI was barred from asserting patent invalidity and unenforceability as defenses to patent infringement with *Acushnet Company v. Dunlop Maxfli Sports Corporation, Civ. A. No. 98-717-SLR, 2000 U.S. Dist., LEXIS 10123* (D. Del June 29, 2000) distinguishing *Shamrock* holding that where an inventor had assigned a patent to plaintiff and then became a Vice President of defendant accused infringer the facts and equities did not establish that the inventor was in privity with the defendant and that the defense of patent invalidity was, therefore, available to defendant.

[17] See also *Joy Technologies, Inv v. Harry F. Manbeck, Jr.* 959 F.2d 226, 229 (Fed. Cir. 1992) "Trying to equate its appeal of the reexamination decision to an action analogous to a 'suit at common law,' Joy argues that the reexamination proceeding should be construed as most like a declaratory judgment action where the PTO is seeking a determination that Joy's patent is invalid. It admits, however, that the PTO could not bring such a suit. Thus, there is no basis to recharacterize the statutory procedure established by Congress in the reexamination statute."

evidence obtained through the use of the District Court's discovery and subpoena power to ascertain whether an assignor filed the present request. However, since patent owner has not established that the doctrine of assignor estoppel applies in the administrative reexamination of a patent, patent owner's argument has not been shown to establish "good cause" for suspension of the '121 *inter partes* reexamination proceeding.

> ### 2. Additional Matters Requiring The District Court's Discovery and Subpoena Power

Patent owner argues that, in addition to the issues of assignor estoppel and privity, the District Court's discovery and subpoena power is necessary for patent owner to secure objective evidence of commercial success of third party requester's infringing products. Patent owner also argues that patent owner will be able to question tests conducted by third party requester in support of third party requester's arguments of patent invalidity, and that patent owner will be able to obtain the information necessary to question these tests only through the District Court's discovery and subpoena powers. Thus, patent owner reasons that "good cause" exists warranting suspension of the '121 *inter partes* reexamination proceedings.

These arguments are unpersuasive for a number of reasons. First, the provisions of 37 CFR 1.132 apply to the '121 *inter partes* reexamination proceeding, as it does to all *inter partes* reexamination proceedings. Patent owner will in fact have an opportunity in the '121 *inter partes* reexamination proceedings to submit objective test evidence in support of nonobviousness to the same extent that third party requester may submit objective test evidence tending to show nonobviousness. Also, the parties can submit evidence rebutting each other's 37 CFR 1.132 showings. Further, patent owner has submitted no showing that sales of the accused infringer's products are secret data not available publicly, thereby enabling patent owner to secure this data by commissioning research of the matter, without the necessity of the District Court's subpoena and discovery. Speculative allegations that patent owner might require the District Court's subpoena and discovery power in aid of a position taken in litigation does not establish "good cause" for suspension of the '121 *inter partes* reexamination proceeding.

Of greater import, however, is that patent owner's position, if taken to its logical conclusion, would undercut the ability of a third party requester (and, for that matter, a patent owner) to obtain any final result in an *inter partes* reexamination proceeding. Thus, the purpose of the *inter partes* reexamination statutes would be frustrated. For if a party engaged in patent infringement/validity litigation could demonstrate "good cause" for a suspension of an *inter partes* reexamination proceeding merely by invoking the existence of a district court's subpoena and discovery power and coupling that invocation with allegations that the party might need to employ that power in the course of litigation, then any *inter partes* reexamination proceeding for a patent involved in litigation could be readily stayed. It is presumed that if Congress had desired this, Congress would have expressly so stated in the reexamination statutes. However, Congress instead enacted 35 U.S.C. § 314 (c) and the "good cause" standard, a far more flexible and fact specific test allowing the USPTO Director to determine on a case-by-case basis whether to stay a pending *inter partes* reexamination proceeding.

## CONCLUSION

1. The patent owner renewed petition filed April 28, 2006, is <u>granted</u> with respect to the relief requested pursuant to 37 CFR 1.183, to the extent that the substance of patent owner's petition to suspend the '121 *inter partes* reexamination proceeding has been considered under 37 CFR 1.182.

2. The substance of the third party requester opposition filed on May 5, 2006, has been considered pursuant to 37 CFR 1.183.

3. The patent owner's petition under 37 CFR 1.182 to suspend the '121 *inter partes* reexamination is <u>denied</u>.

4. This decision is a final agency action within the meaning of 5 U.S.C. § 704

5. Telephone inquiries related to the present decision should be directed to the Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to the undersigned at 571-272-7710.

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

sm
July 3, 2006

7-7-06
C:\Kiva\Kenpet6\IP\IP 121_PO_suspend-re-lit_after-Order+before-1stOA.doc

# EXHIBIT 12



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,121 | 01/17/2006 | 6503156 | 00634.0004 RXUS04 | 6323 |

7590          09/07/2006

Dorothy P. Whelan
Fish & Richardson P. C.
P. O. Box 1022
Minneapolis, MN  55440-1022

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 09/07/2006

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

# Transmittal of Communication to Third Party Requester
## *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER *95/000,121*.

PATENT NUMBER *6,503,156*.

TECHNOLOGY CENTER *3999*

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev 07-04)


COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Dorothy P. Whelan
Fish & Richardson P.C.
P.O. Box 1022
Minneapolis, MN 55440-1022

(For Patent Owner) **MAILED**

**SEP 0 7 2006**

**CENTRAL REEXAMINATION UNIT**

Alan M. Grimaldi
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004

(For Third Party Requester)

In re Callaway Golf Company
  *Inter Partes* Reexamination Proceeding
Control No.: 95/000,121
Filed:   January 17, 2006
For:     U.S. Patent No. 6,503,156

: **DECISION DENYING**
: **PETITION FOR**
: **RECONSIDERATION**
: **AND RETURNING**
: **IMPROPER PAPER**

This is a decision on the June 16, 2006 patent owner petition entitled "PETITION TO THE DIRECTOR FOR RECONSIDERATION" under 37 CFR 1.181(a)(3). On June 28, 2006, the third party requester filed an opposition to the present petition entitled "ACUSHNET'S OPPOSITION TO CALLOWAY'S PETITION TO DIRECTOR FOR RECONSIDERATION."

The patent owner petition, the third party requester opposition and the present record are before the Office of Patent Legal Administration for consideration.

For the reasons set forth below, the patent owner petition under 37 CFR 1.181 is (a) granted to the extent that the prior decision has been fully reconsidered, and (b) denied as to the underlying request to vacate the order for reexamination (i.e., the underlying relief requested).

This decision also addresses the patent owner paper filed on July 21, 2006 styled "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION" as an improper paper.

### FEES

A petition to vacate reexamination on the grounds that the order granting reexamination constitutes an *ultra vires* action on the part of the Office is considered pursuant to 37 CFR 1.181. Accordingly, no fee is due for the patent owner petition for reconsideration or for the third party requester opposition to the petition for reconsideration.

## REVIEW OF SALIENT FACTS

1. U.S. Patent No. 6,503,156 (the '156 patent) issued to Michael J. Sullivan on January 17, 2003, and is currently assigned to Callaway Golf Company.

2. A request for *inter partes* reexamination of the '156 patent was filed by a third party requester, Acushnet Company (hereinafter "Acushnet"), on January 17, 2006. The request was assigned Control No. 95/000,121 (the '121 *inter partes* reexamination proceeding).

3. On February 9, 2006, the patent owner filed suit against requester Acushnet in the United States District court for the District of Delaware. *Callaway Golf Company v Acushnet Company*, C.A. No. 06-91 (SLR) (February 9, 2006).

4. On February 15, 2006, the third party requester filed a paper purporting to withdraw a paper requesting suspension of the '121 *inter partes* reexamination proceeding stated to have been filed by third party requestor on January 23, 2006.

5. On March 29, 2006, the Office recognized the February 15, 2006 paper, and accepted the withdrawal of the January 23, 2006 paper, noting that, had the January 23, 2006 paper been before the Office, the Office would have taken that paper as a petition for suspension of action without rendering a decision on the petition.

6. On March 21, 2006, the patent owner then filed a petition, requesting that the '121 *inter partes* reexamination proceeding be suspended.

7. On March 24, 2006, the third party requester filed an opposition to the March 21, 2006 patent owner petition to suspend reexamination.

8. On March 31, 2006, the Office issued a decision holding that the March 21, 2006 petition and the March 24, 2006 opposition papers would be discarded as being improper papers because they had been filed prior to reexamination being ordered.

9. Reexamination was ordered for the '121 *inter partes* reexamination proceeding on April 7, 2006.

10. On April 13, 2006 the patent owner filed a petition under 37 CFR 1.181 <u>to vacate</u> the reexamination order as *ultra vires* (which would in-effect vacate the proceeding).

11. On April 27, 2006 the third party requester filed, pursuant to MPEP 2646 (I), an opposition to the April 13, 2006 patent owner petition to vacate.

12. On April 28, 2006, patent owner filed a renewed petition <u>to suspend</u> the '121 *inter partes* reexamination proceeding.

13. On May 5, 2006 third party requester filed an opposition to the April 28, 2006 renewed patent owner petition to suspend reexamination.

14. On June 7, 2006, the Office dismissed patent owner's April 13, 2006 petition <u>to vacate</u> the '121 *inter partes* order for reexamination.

15. On July 19, 2006, the Office denied patent owner's April 28, 2006 renewed petition <u>to suspend</u> the '121 *inter partes* reexamination proceeding.

16. On June 16, 2006, patent owner filed a petition for reconsideration of the June 7, 2006 decision dismissing the patent owner petition <u>to vacate</u> the '121 *inter partes* order for reexamination.

17. On June 28, 2006, third party requester filed an opposition to the June 16, 2006 patent owner petition for reconsideration.

18. On July 21, 2006, patent owner filed a reply to the June 28, 2006 third party requester opposition.

## RELEVANT STATUTES, REGULATIONS AND PROCEDURE

35 U.S.C. § 311(a) provides:

"IN GENERAL. — Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent on the basis of any prior art cited under the provisions of section 301." [Emphasis supplied.]

35 U.S.C. § 312(a) provides in pertinent part:

"Not later than 3 months after the filing of a request for *inter partes* reexamination under section 311, the Director shall determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications. ... " [Emphasis supplied.]

35 U.S.C. § 313 provides:

"If, in a determination made under section 312(a), the Director finds that a substantial new question of patentability affecting a claim of a patent is raised, the determination shall include an order for *inter partes* reexamination of the patent for resolution of the question. The order may be accompanied by the initial action of the Patent and Trademark Office on the merits of the *inter partes* reexamination conducted in accordance with section 314." [Emphasis supplied.]

35 U.S.C. 314(c) provides:

c) SPECIAL DISPATCH - Unless otherwise provided by the Director for good cause, all *inter partes* reexamination proceedings under this section ... shall be conducted with special dispatch within the Office.

35 U.S.C. §315(b) provides:

"CIVIL ACTION.— A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

35 U.S.C. § 317 provides:

"a) ORDER FOR REEXAMINATION - Notwithstanding any provision of this chapter, once an order for *inter partes* reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for *inter partes* reexamination of the patent until an *inter partes* reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION - Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit ..., then neither that party nor its privies may thereafter request an *inter partes* reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action..., and an *inter partes* reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.907 provides in pertinent part:

" (b) Once a final decision has been entered against a party in a civil action arising in whole or in part under 28 U.S.C. 1338 that the party has not sustained its burden of proving invalidity of any patent claim-in-suit, then neither that party nor its privies may thereafter request *inter partes* reexamination of any such patent claim on the basis of issues which that party, or its privies, raised or could have raised in such civil action, and an *inter partes* reexamination requested by that party, or its privies, on the basis of such issues may not thereafter be maintained by the Office.

(c) If a final decision in an inter partes reexamination proceeding instituted by a third party requester is favorable to patentability of any original, proposed amended, or new claims of the patent, then neither that party nor its privies may thereafter request inter partes reexamination of any such patent claims on the basis of issues which that party, or its privies, raised or could have raised in such inter partes reexamination proceeding. "

MPEP § 2646 (I) provides in pertinent part:

"A petition under 37 CFR 1.181 may ... be filed to vacate an *ultra vires* reexamination order, such as where the order for reexamination is not based on prior art patents and printed publications. In cases where no discretion to grant a request for reexamination exists, a petition to vacate the decision to grant, or a request for reconsideration, will be entertained. "Appropriate circumstances" under 37 CFR 1.181(a)(3) exist to vacate the order granting reexamination where, for example:

(A)  the reexamination order is not based on prior art patents or printed publications;
(B)  reexamination is prohibited under 37 CFR 1.907;
(C)  all claims of the patent were held to be invalid by a final decision of a Federal Court after all appeals;
(D)  reexamination was ordered for the wrong patent;
(E)  reexamination was ordered based on a duplicate copy of the request; or
(F)  the reexamination order was based wholly on the same question of patentability raised by the prior art previously considered in an earlier concluded examination of the patent by the Office (e.g., the application which matured into the patent, a prior reexamination, an interference proceeding)

The filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester." [Emphasis supplied.]

## DECISION

I.  Disposition Of The Patent Owner Opposition To Third Party Requester's Opposition To
    Patent Owner's Petition For Reconsideration

Neither the *inter partes* reexamination statutes nor the regulations implementing those statutes provide for the filing of a patent owner petition for vacatur of an order granting a request for *inter partes* reexamination. A patent owner petition for vacatur of an order granting a request for *inter partes* reexamination on the grounds that the grant of the order constituted an *ultra vires* action on the part of the Office is entertained pursuant to 37 CFR 1.181 in accordance with the practice set forth in MPEP § 2646(I). MPEP § 2646(I) concludes by stating that "[t]he filing of a 37 CFR 1.181 petition to vacate an *ultra vires* reexamination order is limited to a single submission, even if an opposition thereto is filed by a third party requester."

Consequently, the "REPLY IN SUPPORT OF PETITION FOR RECONSIDERATION OF DECISION ON PETITION TO VACATE ORDER GRANTING REEXAMINATION," filed by patent owner on July 21, 2006, is an improper paper that lacks an entry right in the present *inter partes* reexamination proceeding. Therefore the paper (apparently filed by facsimile transmission as a single paper directed to four *inter partes* reexamination proceeding) is being returned to patent owner as an attachment to the decision in the '120 *inter partes* reexamination proceeding. If any additional copies directed to concurrent *inter partes* reexaminations, that is, the instant proceeding 95/000,121, or of 95/000,122 and 95/000,123, have been filed and are subsequently matched with the proceedings, such additional copies will be discarded rather than returned to patent owner.


II. Patent Owner's Position In Support of Vacatur

In the April 13, 2006 petition to vacate the reexamination order as being *ultra vires*, patent owner argued that the order granting reexamination is an *ultra vires* action on the part of the Office because the third party requester, Acushnet, lacked standing to file the *inter partes* request. Patent owner based this argument on allegations that:

(1) Patent owner's predecessor in interest and the present third party requester Acushnet entered into a Settlement Agreement on November 10, 1990, for a term of ten years;

(2) The same parties executed a Settlement Agreement in 1996 that superseded the 1990 agreement, and the 1996 Settlement agreement provides, *inter alia*, that the exclusive forum for the third present party requester to resolve patent validity issues with the patent owner is the United States District Court for the District of Delaware; and

(3) The same (present) parties participated in the dispute resolution process pursuant to the 1996 Settlement Agreement, but while the mediation process was underway, Acushnet requester filed a request for the present *inter partes* reexamination proceeding. [1]

It was apparently patent owner's position that by filing the present request for *inter partes* reexamination, requester Acushnet violated the aforementioned Settlement Agreement, and

---

[1] See patent owner's Petition, pages 2-3.

that Acushnet therefore does not have standing to have filed and to now maintain the present request for *inter partes* reexamination. [2]

In the present petition for reconsideration, patent owner argues that:

(1) The Office has the authority and duty to apply the 1996 Settlement Agreement to this case, and that enforcing the 1996 Settlement Agreement would not violate public policy;

(2) The exemplary language in the MPEP § 2646 does not limit the circumstances where the Office can vacate reexamination orders;

(3) Vacating the reexamination would not leave an unresolved substantial new question of patentability; and

(4) The Office's reliance on the decision in *Heinl v. Godici*, 143 F. Supp 2d 593 (District Court, E. D. VA), is inapposite to this case, because *Heinl* dealt with an entirely unrelated issue, and did not involve a settlement agreement.


III.  Analysis and Findings

A.  The Settlement Agreement Between Patent Owner and The Present Requester Does Not Preclude the Present *Inter Partes* Reexamination Proceeding:

Patent owner argues that a trademark cancellation proceeding is analogous to a reexamination proceeding, and seek to apply the decisions in *Selva & Sons v. Nina Footwear, Inc.*, 705 F.2d 1316 (Fed. Cir. 1983) and *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386 (CCPA 1974) to assert that the Office erred in refusing to consider the settlement agreement between the present patent owner and requester in determining whether to proceed with the present reexamination proceeding. With respect to the *Selva & Sons* decision, patent owner opines that because the statute [3] governing trademark cancellation proceedings (that are *inter partes* in nature) states that "any person" is able to file a petition to cancel a registration, *Selva & Sons* is indistinguishable from the facts in the present reexamination proceeding.   Patent owner also argues that in *Flex-Foot, Inc v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) the Federal Circuit upheld a clause in a settlement agreement prohibiting a party from challenging the validity of a patent when that party had agreed to a dismissal, <u>with prejudice,</u> of a prior action, after entering into a settlement that included a promise to not challenge the validity of that patent.

However, the decisions in the *Selva & Sons* and *Danskin, Inc.* cases do not appear to be on point as to the question of whether a party to a settlement agreement is barred from requesting reexamination of a United States patent under 35 U.S.C. § 302 *et. seq*.  *Selvo & Sons* was an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding. In *Selvo & Sons*, the court's decision was not grounded on the "any

---

[2] *Id.*, at pages 4-6

[3] 15 U.S.C. § 1064, which states in pertinent part:

"A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by **any person** who believes that he is or will be damaged, including as a result of dilution under section 1125 (c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:...." [Emphasis added]

party" language of 15 U.S.C. § 1064. Rather, the court noted the existence of 15 U.S.C. § 1069, which states:

> "In all *inter partes* proceedings equitable principles of laches, estoppel and acquiescence, where applicable, may be considered and applied." *Id* at 1323, 1324

There is no analogue in the reexamination statutes to 15 U.S.C. § 1069, a statute that broadly applies the equitable principles of laches, estoppel and acquiescence to *inter partes* trademark proceedings in the Office. Rather, the *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (*i.e.*, nonappealable) court holding of patent claim validity [4] or the existence of an order granting reexamination. [5] If Congress had intended to make the broad equitable principles set forth in 15 U.S.C. § 1069 applicable to *inter partes* reexamination proceedings, then Congress would have so stated. [6] With respect to the *Danskin, Inc.* case (an appeal from a decision of the Trademark Trial and Appeal Board in an *inter partes* trademark opposition proceeding), it is noted that the language of 15 U.S.C. § 1069 would also apply, so that application of the broad equitable principles listed in the statute would have been mandated.

In the *Flex-Foot* decision, the court did *not address the issue of whether the Office would be barred from conducting a reexamination proceeding filed by that party.* The court's decision merely upheld that a clause in the settlement agreement would prohibit a party to the settlement agreement from challenging the validity of a patent (and accordingly, the opposing party would have remedies against the party that violated the agreement). The opinion in *Flex-Foot* does not discuss the affect of a reexamination filing by a party in violation of such a settlement agreement, as to whether the reexamination should continue. *Flex-Foot* does not require or suggest that an order granting a reexamination proceeding, based on such a filing, would be *ultra vires* due to the existence of a settlement agreement between a patent owner and third party requester. And, based on the discussion below, there is no reason to believe that an order granting a reexamination proceeding based on such a filing would be *ultra vires* action on the part of the Office.

## B.   Reexamination Case Law Does Not Support Vacatur Of The Present Reexamination Proceeding

The settlement agreement asserted by patent owner in the '121 reexamination proceeding does not explicitly address reexamination of a patent. Even if it did, relevant court precedent clearly demonstrates that - because the Office was not, and is not, a party to the settlement agreement, the Office was not, and is not, bound by the settlement agreement.

*Joy Manufacturing Co. v National Mine Service Co*, 810 F.2d 1127 (Fed. Cir. 1987) addressed the question of the effect, if any, that the existence of a settlement agreement between parties to an infringement/validity patent litigation had with respect to a request for *ex parte* reexamination subsequently filed by a party to that settlement agreement. Accused infringer National had entered into an agreement in settlement of an action brought against it for infringing a patent.

---

[4] See 35 U.S.C. § 317(b).

[5] See 35 U.S.C. § 317(a).

[6] In light of the cases cited below in support of the Office's position vis-à-vis the effect of the settlement agreement in the present reexamination proceeding, it is also to be noted that with respect to *ex parte* reexamination, Congress has not mandated any estoppel with respect to the ability of "any person" to file a request for reexamination at "any time."

National agreed that it would not file any suit in any court challenging the validity of the patent. Thereafter, National filed a request for reexamination of the patent, and the patent owner requested an injunction preventing the third party requester from going forward in the reexamination proceeding. The District Court ruled against the patent owner, noting that the settlement agreement by its literal terms did not proscribe the conduct of which the patent owner complained. The Federal Circuit agreed, holding that:

" ... the district court correctly refused to equate "a request for administrative reexamination . . . with filing a suit in a United States Court." Its reliance on *Etter* as support for this legal conclusion was entirely appropriate. The *Etter* decision turned on the precise issue here, namely, that reexamination and civil litigation were distinctly different proceedings. As stated therein:

The intent that reexamination proceedings and court actions involving challenges to validity be distinct and independent is reflected in the legislative history of § 303. . . . *756 F.2d at 857, 225 USPQ at 4.* The result in *Etter* is inseparable from the above-quoted premise. [Footnote omitted.]

"In this connection, we also note that the principal relief which Joy seeks – namely, stopping the reexamination of its patent – is not available in these proceedings. *Accord* Manual of Patent Examining Procedure § 2210 (5th ed. 1983); *Houston Atlas, Inc. v. Del Mar Scientific, Inc.*, 217 U.S.P.Q. (BNA) 1032, 1034 (N.D. Tex. 1982), aff'd, 703 F.2d 555 (5th Cir. 1983) The decision by the Commissioner to institute reexamination is not subject to review, *Etter*, 756 F.2d at 857, 225 USPQ at 4; and the injunction sought against National would have no effect on reexamination since National, as the requestor, has no future role to play in that *ex parte* proceeding."

In the present reexamination proceeding, patent owner has not established that Acushnet's request for reexamination violates the literal terms of the 1996 settlement agreement involved here. The settlement agreement does not facially preclude "administrative proceedings" of any sort, including reexamination within the Office. Further, as was noted in the previous decision dismissing the petition, the settlement agreement was entered into in 1996; prior to the enactment in 1999 of the statute authorizing *inter partes* reexamination. Thus, it is unlikely that the settlement agreement reflects an agreement between the parties thereto to forego administrative relief in the form of a request for *inter partes* reexamination (such *inter partes* proceeding made available after the settlement agreement), and at best, could only be asserted to inferentially contemplate that the parties to the settlement agreement would not seek *ex parte* reexamination (where there is no right to comment on patent owner responses and appeal). *Joy Manufacturing*, and the other cases relied on by the Office, *infra*, all involve *ex parte* examination proceedings. Moreover, even presuming that the settlement agreement between the patent owner and third party requester could be construed to be an agreement precluding the filing of a request for *ex parte* reexamination, the courts have uniformly held that such agreement is without binding effect on the Office and would not bar the Office from granting and conducting an *ex parte* reexamination proceeding, as will now be discussed.

In *Houston Atlas, Inc. et al v. Del Mar Scientific, Inc. et al.*, 217 USPQ 1032, 1037 (N.D. Tex. 1982), the district court considered the situation in which two parties had executed and had entered a consent judgment stating that a particular patent was valid. The consent judgment was entered prior to the enactment of the *ex parte* reexamination statutes. The court expressly addressed the subsequent effect the consent judgment would have on reexamination in the Office, if any. The court stated that private parties cannot bind the Office, or the public it represents, with respect to the validity of a patent, by merely executing the consent judgment and having it entered. The court noted that:

"... the Patent Office was not a party to the original proceeding and, as discussed in section IV above, the consent judgment is not binding on the Patent Office or the public which it represents. Simply stated, two private parties cannot bind the Patent Office with respect to the validity of a patent by merely executing, and having entered, a consent judgment stating that the patent is valid. The consent

judgment is not *res judicata* on the Patent Office as there is no evidence that the Patent Office is privity with Defendants. See *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1109-10, 211 USPQ 852, 854-855 (6th Cir. 1981) (party not in privity to executory of consent judgment is not bound by the judgment). Given that the consent judgment is not enforceable against the Patent Office as *res judicata*, the Court must determine whether the Patent Office, by its conduct of the reexamination proceedings and issuance of the order of reexamination is "in a position to frustrate the implementation of [the consent judgment] or the proper administration of justice." The clear answer to this question is in the negative. Section 303 of the Act expressly authorizes the Patent Office to conduct reexamination proceedings on their own initiative without a formal request for reexamination. If the reexamination proceedings in question had been instituted by the Commissioner as a consequence of a citation of prior art from a person other than Canterbury, or if a person other than Canterbury had requested reexamination of patent 3,464,799, this Court would be without power to enjoin the proceedings for the simple reason that the consent judgment is binding only as to Plaintiffs and Defendants. **In short, Plaintiffs' compliant lies not with the institution of the reexamination process, but instead with who requested it.** For this reason, the Court is constrained to conclude that it has no jurisdiction under the All Writs Act to grant the Plaintiffs any relief against the Patent Office." [Emphasis added]

Thus, even though the district court found one of the defendants in *Houston Atlas* to be in contempt of the consent judgment because that defendant had filed a request for reexamination, the district court noted that the Office was expressly authorized by statute to conduct reexamination. The court concluded that a consent judgment to which the Office was not a party could not bind the Office so as to preclude reexamination, even where such reexamination was requested by a party bound by the consent judgment. If such is true with respect to a consent judgment, it follows that a settlement agreement between two private parties to which the Office is not a party also does not bind the Office so as to preclude the Office from carrying out its statutory mandate to reexamine a qualifying patent once a substantial new question of patentability for that patent has been determined to exist for that patent. Therefore, even if one assumes that third party requester in the '121 reexamination proceeding is in violation of the settlement agreement with patent owner such that third party requester might be subject to sanctions by a court of competent jurisdiction for having filed the present request for *inter partes* reexamination, <u>the settlement agreement would still not be binding on the Office so as to preclude the Office from conducting *inter partes* reexamination as requested, because the Office is not a party to that agreement.</u>

Indeed, the courts have held that a final judgment against a party found to have infringed a patent does not prohibit that party from seeking *ex parte* reexamination of the involved patent. In *Kucala Enterprises, Ltd. V. Auto Wax Co., Inc.* 2004 U.S. Dist. LEXIS 5723 (N.D. Ill., 2004), the accused infringer (Kucala) contended that there was no basis in law or fact, by which the judgment could preclude Kucala from filing a request for *ex parte* reexamination, relying on the language of 35 U.S.C. § 302 that permits "any person at any time" to request reexamination of a patent. The court pointed out that it could not bar third party Kucala from seeking reexamination, even under the circumstances of that case, where the third party was found guilty of misconduct such that the court found the patents asserted against the third party to be not invalid. The *Kucala Enterprises, Ltd.* opinion states:

"...the issue here, whether a court can sanction a party by enjoining it from seeking reexamination. At the same time, the cases on which Auto Wax relies fail to address a sanction prohibiting reexamination. [Citations omitted].

"The court is persuaded, in light of the parties' arguments and the court's purposes in the October decision, that the judgment should not bar Kucala from seeking reexamination. The sanction of dismissal conveys to Kucala, "Because of your misconduct, you lose on the claims you filed in this court." In other words, the court finds the patents in suit not invalid. Under the lessons of *Ethicon*, this means only that the presumption of validity survives, not that the patents are valid. Although principles of claim preclusion would bar an adjudged infringer [*16] from filing or defending a future lawsuit relating to

these patents, it would not bar the infringer from seeking reexamination. Therefore, the court will not enjoin Kucala from seeking reexamination of Auto Wax's patents." *Id.* at page 13 of the Court's decision."
[Emphasis added]

In *McNeil-PPC, Inc. v. The Procter & Gamble Co., 19 USPQ2d 1663 (U.S. District Court District of Colorado 1991)*, Procter & Gamble sought leave from the court to file a request for reexamination in the Office of a patent in dispute. The court held that Procter & Gamble did not need permission from the court to file a request for reexamination, and that there does not appear to be any limit on a party's right to request reexamination, but for complying with the requirements of 35 U.S.C. § 302, directed to *ex parte* reexamination. Furthermore, the court observed:

"First, unfair or not, McNeil-PPC points to no authority that would authorize me to prevent or limit P & G's request to the PTO for reexamination of Bradstreet '901 and its participation in that proceeding to the extent allowed by title 35. McNeil-PPC's only argument is that because P & G asked for leave to file the request, it concedes that it is required to do so. I disagree. It may be that P & G was under the erroneous assumption that I had some statutory or common law prerogative to intervene in the PTO reexamination request. McNeil-PPC does not offer, however, any rationale why any such misinterpretation bestows unto me power over the PTO where the power is otherwise absent. Furthermore, at oral argument, P & G took the position that the motion was filed as a courtesy notice and does not constitute any waiver.

"Second, Congress authorizes challengers to take "two bites of the apple." A nonpatent holder is permitted to both challenge a patent in the PTO and in the district court. *See In re Etter,* 756 F.2d 852, 857, 225 U.S.P.Q. (BNA) 1 (Fed. Cir.), *cert. denied,* 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985). In *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 7 U.S.P.Q.2D (BNA) 1152 (Fed. Cir. 1988), a nonpatent holder was sued for patent infringement. While the action progressed, the nonpatent holder requested reexamination of the subject patent in the PTO. The Federal Circuit, in concluding that the PTO was without the power to stay the reexamination pending outcome of the action and allowing the reexamination and court action to proceed simultaneously, stated:

The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence. Accordingly, different results between the two forums may be entirely reasonable. And, if the district court determines a patent is not invalid, the PTO should continue its reexamination because, the two forums have different standards of proof for determining invalidity. *Ethicon, 849 F.2d at 1428-29.*

"This structure does not automatically lead to inefficient use of judicial resources. Rather than impede jurisdictional efficiency, this dual process has greater potential to promote efficiency, because, as stated in *In re Etter:*

The innate function of the reexamination process is to increase the reliability of the PTO's action in issuing a patent by reexamination of the patents thought "doubtful." [Citation omitted]. When the patent is currently involved in litigation, an auxiliary function is to free the court from any need to consider prior art without the benefit of the PTO's initial consideration."

[Emphasis added]

Thus, the court recognized that duality of the Congressionally enacted structure in which reexamination and litigation co-exist as non-mutually exclusive avenues in which a party may challenge a patent. It appears that insofar as the litigation approach may result in a settlement agreement, that the existence of a settlement agreement does not "sidetrack" a party thereto from pursuing reexamination.

It should also be noted that a contractual provision preventing a party from seeking reexamination would be void as being contrary to public policy. [7]  In *Lear v. Adkins*, 395 U.S. 653, (1969), the United States Supreme Court determined that prohibiting licensees from challenging the validity of a patent that they had licensed runs afoul of public policy "in permitting full and free competition in the use of ideas which are in reality part of the public domain." *id.* at 670 .  By analogy, preventing a third party requester (and a potential licensee of the subject patent) from requesting reexamination of a patent would be contrary to the public policy embodied in the *Lear v. Adkins* decision.  As the settlement agreement entered into in 1996 is <u>prior to</u> the enactment in 1999 of the statute authorizing *inter partes* reexamination, it was not even possible for these settlement agreements to address preventing a party to the agreement from filing such a request for reexamination.

Finally, it is recognized that the decisions cited and discussed, *supra*, are not specifically directed to *inter partes* reexamination.  However, it is clear that the precedents would apply to *inter partes* reexamination proceedings just as they do in *ex parte* reexamination proceedings. For *ex parte* reexamination, 35 U.S.C. § 302, provides that "[A]ny person at any time may file a request for reexamination by the Office of any claim of a patent ..."  For *inter partes* reexamination, 35 U.S.C. § 311(a) provides that "IN GENERAL -Any third-party requester at any time may file a request for inter partes reexamination by the Office of a patent ..." [8]

Congress chose to not place any limitation on the ability of a third party requester to request an *ex parte* reexamination proceeding.  Thereafter, Congress chose to provide only very limited estoppel provisions with respect to the ability of a third party requester to request an *inter partes* reexamination proceeding, only those estoppel provisions set forth in the statue. [9]  Congress could have elected to enact provisions similar to 15 U.S.C. § 1069 so as to place broad estoppel limitations on the ability of a third party requester to seek reexamination in the Office. However, Congress chose not to do so!  Moreover, to the extent that the estoppel provisions of 35 U.S.C. § 317(b) might be relevant to the '121 reexamination proceeding, patent owner has not alleged that there has ever been a relevant final (*i e.* nonappealable) court decision holding that the '156 patent claims are valid.  Indeed, patent owner's own statement of the facts indicates that the parties executed Federal Rule of Civil Procedure 41 Stipulations of Dismissal of the prior litigation that were filed in, and accepted by, the Delaware District Court, and that "[t]he Court specifically retained jurisdiction over the parties in relation to disputes arising under the 1996 Settlement Agreement."  This clearly does not provide a final court decision regarding the validity of any of the patents covered in the settlement agreement.

---

[7] *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)(concluding that a forum selection clause, while generally enforceable, will not be enforced where it violates the strong public policy of the forum in which suit is brought); *Newton v. Rumery*, 480 U.S. 386,392 (1987) ("The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."); *Suter v. Munich Reinsurance*, 223 F.3d 150 (3d Cir. 2000) (citing *Bremen* for the proposition that federal forum selection clauses should not be enforced where they are contrary to public policy).

[8] The caveat ("IN GENERAL") in the statute refers to the estoppel provisions of 35 U.S.C. § 317(b) that would preclude a third party requester from filing a request for reexamination where it has not sustained its burden of proof of claim invalidity in litigation that has become final, or where such litigation has resulted in a final holding of claim validity, as well as the 35 U.S.C. § 317(b) limitation on the filing of co-pending *inter partes* reexaminations.

[9] The *inter partes* reexamination statute includes limited estoppel provisions that raise specific estoppels based upon the existence of a final (i.e.. nonappealable) court holding of patent claim validity or the existence of an order granting reexamination. See 35 U.S.C § 317(a) and (b).

C.  Vacatur Of The Present Reexamination Proceeding Is Not Supported By The Provisions Of MPEP § 2246(I):

Patent owner argues that the exemplary language in the MPEP § 2646 does not limit the circumstances in which the Office can vacate reexamination orders. To the extent that this is true, it is not relevant here, because the statutes, the case law and the facts in the present reexamination proceeding all indicate that vacatur of the present reexamination proceeding would run contrary to the reexamination statute. Patent owner's arguments to the contrary are not persuasive.

MPEP § 2646(I) addresses vacatur that would be required when a request for *inter partes* reexamination was improperly ordered due either to the existence of a statutory prohibition barring the grant of a request for *inter partes* reexamination, or the existence of a clear error of a clerical nature. Patent owner has not established that the present *inter partes* reexamination proceeding was ordered contrary to any statutory prohibition barring the order, or due to a clerical error. Rather, the *inter partes* reexamination statute clearly provides that when the Office is presented with a request for *inter partes* reexamination that (1) has been filed by a third party requester not subject to the estoppel provisions of 35 U.S.C. § 317, and (2) raises a substantial new question of patentability, the Office <u>must</u> order *inter partes* reexamination and thereafter reexamine the patent. [10] As set forth in Section III (B) of this decision, *supra*, the case law does not support the proposition that the Office has the duty to, or may at its option, disregard the statutory mandate to reexamine the patent due to the existence of a settlement agreement between a patent owner and a third party requester to which the Office is not a party. Indeed, the case law does not support that proposition even where the settlement agreement was reduced to a consent judgment and the third party requester has been held by the court to be in contempt of the consent judgment.

D.  Vacating The Present Reexamination Proceeding May In Fact Leave An Unresolved Substantial New Question of Patentability

Patent owner argues that vacatur of the present reexamination proceeding would not leave a substantial new question of patentability unresolved, because such questions (and other questions of patentability beyond the scope of *inter partes* reexamination) will be resolved by the method, and in the forum, established by the parties in the settlement agreement.

This argument ignores two important points. *First*, there is in fact a public interest served by resolution of patentability issues via reexamination proceedings in the Office, and advantages attendant thereto. *Ethicon v. Quigg*, 878 F.2d 1422, 1428 (Fed. Cir. 1989); *In re Etter*, 756 F.2d 852, 856 (Fed. Cir. 1985). There is no assurance that resolution of the dispute between patent owner and third party requester in accordance with the settlement agreement would resolve the substantial new questions of patentability that have been found to exist in the present *inter partes* reexamination proceeding, or in any way result in a benefit to the public in the manner that a reexamination proceeding would. Any resolution in court, or such other forum chosen, may simply resolve the dispute between patent owner and third party requester without resolving the issues of patentability raised by the substantial new question of patentability (e.g., by settlement, or consent judgment, or dismissal without prejudice or based on a conduct issue). Vacatur of a requested and granted *inter partes* reexamination proceeding may well leave both the public and

---

[10] See 35 U.S.C. §§ 311, 312(a), 313(a) and 314(c).

the patent owner with an unresolved request for reexamination and unresolved substantial new question of patentability (found to be present via the decision ordering reexamination). The public has a right to such a resolution. Vacating, withdrawing, or otherwise abandoning or terminating the instant reexamination proceeding would abrogate this public right, to the detriment of the public interest. As discussed in Section III (B) above, ordering and conducting an *inter partes* reexamination proceeding is not optional for the Office. Rather, the *inter partes* reexamination proceeding must continue according to the procedure mandated by the *inter partes* reexamination statute, to carry out the purpose of the statute and resolve the substantial new question of patentability for the public.[11] The proceeding began with the filing of a request for *inter partes* reexamination that satisfied the requirements of 35 U.S.C. § 311. As **required** by 35 U.S.C. § 312, the request for reexamination has been considered. As a result of that consideration, it has been determined that the request raises a substantial new question of patentability for one or more patent claims. Thus, in accordance with 35 U.S.C. § 313, the present proceeding **shall** result in a determination of the patentability of the claims of the '156 patent in light of prior patents and printed publications, to the benefit of the public as well as to the benefit of patent owner and third party requester.

*Second*, while there is no assurance that the resolution of the dispute in accordance with the settlement agreement will be timely, the present reexamination proceeding **will** be conducted with special dispatch pursuant to 35 U.S.C. § 314(c). The public interest in resolving the issues raised in the present reexamination proceeding includes an interest in having those issues resolved in a timely fashion.

## E. The Decision in *Heinl v. Godici* Is Clearly Apposite To This Reexamination Proceeding

Patent owner argues that the Office's reliance on *Heinl v. Godici*, 143 F. Supp. 2d 593, 601 (E.D. Va. 2001) is misplaced. This argument is not persuasive.

*Heinl* was a case in which patent owner sought a decision terminating a reexamination proceeding based on the absence of a new question of patentability. The *Heinl* court stated:

> "Under the well established *ultra vires* doctrine, the exhaustion and final agency requirements are excused 'only if plaintiff is able to show that the PTO clearly exceeded its statutory authority', quoting from *Philip Morris, Inc. v. Block*, 755 F.2d 368, 370 (4th Cir 1985 (quoting *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914, 920 (4th Cir. 1977), vacated on other grounds, 571 F.2d 1273 (4th Cir. 1978)."

The *Heinl* court then stated:

> "Put differently, when an agency acts in 'brazen defiance' of its statutory authorization, courts need not await the conclusion of underlying proceedings."

It is abundantly clear that the *Heinl* decision was not cited and discussed because it involved a previous settlement agreement between parties to a reexamination proceeding, and no reading of the Decision on Petition June 7, 2006 can lead to the belief that it was. Rather, *Heinl* was cited because it is clearly applicable to the doctrine of "*ultra vires*" reexamination proceedings in the sense that it provides a benchmark for looking into whether the Office has committed an *ultra*

---

[11] The innate function of the reexamination process is to increase the reliability of the Office's action in issuing a patent by reexamination of patents thought "doubtful." House Report No. 66-1307, 96th Cong., 2d Sess. (1980), 3, reprinted in 1980 U.S. Code Cong. & Ad. News 6460, 6462. (This was emphasized in *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir.) (en banc), cert. denied, 474 U.S. 828, 88 L. Ed. 2d 72, 106 S. Ct. 88 (1985)).

*vires* act.  That benchmark is a simple one. Where the Office orders reexamination, the decision of the Office to order reexamination cannot be attacked as being *ultra vires*, unless it is clearly established that the Office has exceeded its statutory authority to order reexamination.

In this instance:

(1) The reexamination statute fails to provide that the equitable doctrines of laches, estoppel and acquiescence can be raised to preclude the Office from ordering *inter partes* reexamination, other than the 35 U.S.C. § 317 exception, which is inapplicable on the facts in the present reexamination proceeding;

(2) The authorities cited and discussed above in Section III (A) clearly indicate that the existence of a settlement agreement (and even the existence of a consent judgment incorporating a settlement agreement) between a patent owner and a third party reexamination requester do not operate to preclude the Office from granting that third party's request for reexamination if the request otherwise satisfies the requirements of the reexamination statutes; and

(3) A public interest in resolving the substantial new question of patentability exists in the present reexamination proceeding, which may not necessarily be timely resolved, or resolved at all, by reason of the dispute resolution provisions of the settlement agreement, and will not be resolved using the standards applicable in reexamination as well as the expertise of the Office.

Thus, the guidance provided by the decision in *Heinl* supports the conclusion that petitioner has not advanced sufficient basis for holding the grant of reexamination in the present *inter partes* reexamination proceeding to be an *ultra vires* action by the Office.  The Office has not "clearly exceeded its statutory authority" in the Office's determination that the January 17, 2006 reexamination request properly raised a substantial new question of patentability and should go forward.

For all the forgoing reasons, as well as those set forth in the June 7, 2006 decision, the order granting the present *inter partes* reexamination remains intact and the *inter partes* reexamination proceeding will continue in accordance with the procedure mandated by the *inter partes* reexamination statute and implementing regulations.

## ADDITIONAL DISCUSSION

The undersigned notes that the patent owner and third party requester are adverse parties with respect to the present *inter* partes reexamination proceeding, and are currently engaged in litigation involving the underlying patent.  While counsel should represent the respective parties zealously, and are entitled to benefit of all of the regulations implementing the *inter partes* reexamination statutes and the examining practice promulgated with respect to those regulations, counsel are reminded of their ongoing obligations to the Office as set forth in Part 10 of Title 37 of the Code of Federal Regulations. In particular, the provisions of 37 CFR 10.18(b)(2) and (c) should be noted.  Adherence to the provisions of Part 10 will greatly assist **the Office in conducting this *inter partes* reexamination proceeding with special dispatch as** required by 35 U.S.C. § 314(c).

## CONCLUSION

1. The patent owner's June 16, 2006 petition under 37 CFR 1.181 is (a) <u>granted to the extent</u> that the prior decision has been fully reconsidered, and (b) <u>denied</u> as to the underlying request to vacate the order for reexamination.

2. This decision is a <u>final agency action</u> within the meaning of 5 U.S.C. § 704.

3. The patent owner's July 21, 2006 opposition to the third party requester opposition to the patent owner petition for reconsideration lacks an entry right in the present reexamination proceeding and has not been considered.

4. Jurisdiction over the '121 *inter partes* reexamination proceeding is returned to the Central Reexamination Unit.

5. Telephone inquiries related to the present decision should be directed to Stephen Marcus, Legal Advisor, at 571-272-7743, or, in his absence, to Karen Hastings, Legal Advisor, at 571-272-7717.


Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration


kmh/sm


9-07-06
C:\Kiva\Kenpet6\UV\95_121-UV_settlement agreement_deny.doc

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**ACUSHNET COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO CERTIFY UNDER 28 U.S.C. § 1292(b) THE COURTS ORDER REGARDING
STAYING LITIGATION PENDING *INTER PARTES* REEXAMINATION**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
OF COUNSEL:                    rhorwitz@potteranderson.com
                               dmoore@potteranderson.com
Alan M. Grimaldi
Joseph P. Lavelle                  Attorneys for Defendant Acushnet Company
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone (202) 783-0800

Dated: November 21, 2006

## TABLE OF CONTENTS

I.    BACKGROUND ...........................................................................................2

II.   THE ORDER DENYING ACUSHNET'S REQUEST FOR A STAY
      SATISFIES THE STANDARDS FOR § 1292(B) CERTIFICATION ..................4

      A.   Legal Standard for § 1292(b) certification.........................................4

      B.   This Case Presents a Controlling Question of Law. ...................................4

           1.   Whether to allow a case to proceed in the face of an
                earlier-filed *inter partes* reexamination is a matter of law
                that materially affects the outcome of the case. .................................6

           2.   A rule analogous to the "first-to-file" rule should
                preclude litigation of patents concurrent with a binding
                *inter partes* reexamination of the same patents. ...............................9

           3.   The outcome of the appeal of the question presented will
                have wide-reaching impact. ...............................................................12

      C.   Substantial Grounds for Disagreement Exist..........................................13

           1.   Every reported decision addressing whether to grant a
                stay pending ongoing *inter partes* reexamination filed
                after the litigation was commenced has granted the stay...............14

           2.   The dearth of case law addressing the question at issue
                here favors certification. ...................................................................15

      D.   An Appeal Will Materially Advance the Litigation. ...................................16

III.  THE COURT SHOULD STAY THIS LITIGATION PENDING
      APPEAL. ...............................................................................................18

      A.   Standard for Granting Stays Pending Appeals..........................................18

      B.   A Stay Pending Appeal is Warranted in the Present Case...........................18

IV.   CONCLUSION..........................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Alloc, Inc. v. Unilin Décor, N.V.*,
C.A. No. 03-253-GMS, 2003 U.S. Dist. LEXIS 11917
(D. Del. July 11, 2003)..................................................................................11

*Bath Iron Works Corp. v. U.S.*,
991 F.2d 811, 1993 WL 118923 (Fed. Cir. 1993) ..............................................8

*Bloom Engineering Co. Inc. v. N. America Manufacturing Co., Inc.*,
129 F.3d 1247 (Fed. Cir. 1997)......................................................................11

*Century Wrecker Corp. v. Vulcan Equip. Co.*,
902 F.2d 43 (Fed. Cir. 1990)...........................................................................15

*Chase Manhatten Bank v. Iridium Afr. Corp.*,
324 F. Supp. 2d 540 (D. Del. 2004).............................................................16, 19

*Cost Brothers, Inc. v. Travelers Indemnity Co.*,
760 F.2d 58 (3d Cir. 1985)................................................................................6

*Crosley Corp. v. Hazeltine Corp.*,
122 F.2d 925 (3d Cir. 1941).........................................................................6, 7

*DUSA Pharms., Inc. v. River's Edge Pharms., LLC*,
2006 U.S. Dist. LEXIS 29852 (D.N.J. May 15, 2006) ......................................14

*EchoStar Techs. Corp. v. TiVo, Inc.*,
2006 U.S. Dist. LEXIS 48431 (E.D. Tex., July 14, 2006)..........................1, 14, 15

*Emhart Industrial, Inc. v. Sankyo Seiki Manufacturing Co.*,
3 U.S.P.Q. 2d (BNA) 1889 (N.D. Ill. 1987) ...............................................10, 17

*Ethicon v. Quigg*,
849 F.2d 1422 (Fed. Cir. 1988).........................................................................3

*Florida East Coast Railway, Co. v. CSX Transp., Inc.*,
No. 91 C 7063, 1993 WL 57534 (N.D. Ill. Mar. 4, 1993) .................................13

*Forsyth v. Kleindienst*,
700 F.2d 104 (3d. Cir. 1983).........................................................................18

*G-I Holdings, Inc., v. Bennet,*
  Civil No. 02-3626 (WGB), 2005 U.S. Dist. LEXIS 31887
  (D.N.J. Dec. 9, 2005) ...............................................................................4, 17

*Genentech, Inc v. Eli Lilly & Co.,*
  998 F.2d 931 (Fed. Cir. 1993)...............................................................7

*Google, Inc. v. America Blind & Wallpaper Factory,*
  No. C 03-05340 JF, 2004 U.S. Dist. LEXIS 27601 (N.D. Cal. April 8, 2004) ............7

*Gould v. Control Laser Corp.,*
  705 F.2d 1340 (Fed. Cir. 1983).............................................................9

*Habasit Belting, Inc. v. Rexnord Industrial, Inc.,*
  161 Fed. App'x 952, 2006 U.S. App. LEXIS 1676 (Fed. Cir., Jan. 9, 2006)...............14

*Hilton v. Braunskill,*
  481 U.S. 770, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987)...............................18

*Ingro v. Tyco Indus., Inc.,*
  1985 U.S. Dist. LEXIS 19300 (N.D. Ill. 1985) .......................................10

*In re JWJ Contracting Co., Inc.,*
  287 B.R. 501 (9th Cir. 2002) ..............................................................17

*Katz v. Carte Blanche Corp.,*
  496 F.2d 747 (3d Cir. 1974)...........................................................4, 5

*Klapper v. Commonwealth Realty Trust,*
  662 F. Supp. 235 (D. Del. 1987)...........................................................19

*Kotrous v. Goss-Jewett Co. of N. California, Inc.,*
  No. Civ. S021520 FCD JFM, 2005 WL 2452606 (E.D. Cal. Oct. 4, 2005)...............19

*Lamont v. Schultz,*
  748 F. Supp. 1043 (S.D.N.Y. 1990), *aff'd*, 948 F.2d 825 (2d Cir. 1991) ............12, 13

*Mann Manufacturing v. Hortex, Inc.,*
  439 F.2d 403 (5th Cir. 1971) ..............................................................7

*Markman v. Westview Instruments, Inc.,*
  517 U.S. 370 (1996)........................................................................17

*Matthews v. Kidder, Peabody & Co.,*
  161 F.3d 156 (3d. Cir. 1998)................................................................8

*Middleton, Inc. v. Minn Mining & Manufacturing,*
　　2004 U.S. Dist. LEXIS 16812 (S.D. Iowa, Aug. 24, 2004)...................................14, 15

*N.J. Transit Policemen's Benevolent Association Local 304 v. New Jersey Transit*
　　*Corp.,* 806 F.2d 451 (3d Cir. 1987) ...........................................................................9

*Nutrition 21 v. United States,*
　　907 F.2d 157 (Fed. Cir. 1990)...................................................................................12

*Ovando v. City of Los Angeles,*
　　92 F. Supp. 2d 1011 (C.D. Cal. 2000) ..............................................................6, 13, 16

*Pegasus Development Corp. v. DirectTV, Inc.,*
　　C.A. No. 00-1020-GMS, 2003 U.S. Dist. LEXIS 8052
　　(D. Del. May 14, 2003)..........................................................................................6, 11

*Rohm & Haas Co. v. Brotech Corp.,*
　　C.A. No. 90-109-SLR, 1992 U.S. Dist. LEXIS 3252
　　(D. Del. Mar. 11, 1992)..............................................................................................17

*Royal Ins. Co. of Amer. v. K.S.I. Trading Corp.,*
　　Civil Action No. 04-CV-867(DMC), 2006 U.S. Dist. LEXIS 40363
　　(D.N.J. June 16, 2006)..................................................................................................5

*Save Power Ltd. v. Syntek Finance Corp.,*
　　121 F.3d 947 (5th Cir. 1997) ........................................................................................7

*Schalliol v. Fare,*
　　206 F. Supp. 2d 689 (E.D. Pa. 2002) ..........................................................................19

*Softview Computer Products, Corp. v. Haworth Inc.,*
　　56 U.S.P.Q. 2d 1633 (S.D.N.Y. 2000)..........................................................................11

*Sony Computer Entertainment America Inc. v. Dudas,*
　　2006 U.S. Dist. LEXIS 36856 (E.D. Va. May 22, 2006) ...............................................16

*Symbol Techs., Inc. v. Lemelson Med., Educ. & Research, Ltd.*
　　2000 U.S. App. LEXIS 23529, 56 U.S.P.Q. 2d 1381 (Fed. Cir. Aug. 30, 2000) ........12

*Taylor v. PPG Industrial, Inc.,*
　　256 F.3d 1315 (Fed. Cir. 2001).....................................................................................4

*Triangle Conduit & Cable Co., Inc. v. National Electric Products Corp.,*
　　125 F.2d 1008 (3d Cir. 1942)........................................................................................8

*U.S. Philips Corp. v. Sears Roebuck & Co.,*
  1992 U.S. App. LEXIS 37824 (Fed. Cir. Dec. 10, 1992) ............................................ 12

*Umatilla Waterquality Protective Association, Inc. v. Smith Frozen Foods, Inc.,*
  962 F. Supp. 1312 (D. Or. 1997) ............................................................. 13, 17

*United Airlines, Inc. v. Mesa Airlines,*
  No. 97 C 4455, 1999 WL 1144962 (N.D. Ill. Oct. 5, 1999) ................................... 6, 13

*United States v. General Dynamics Corp.,*
  4 F.3d 827 (9th Cir. 1993) ......................................................................... 8

*United Sweetner USA, Inc. v. The Nutrasweet Co.,*
  766 F. Supp. 212 (D. Del. 1991) ................................................................ 11

*Voda v. Cordis Corp.,*
  122 Fed. App'x 515, 2005 U.S. App. LEXIS 4394 (Fed. Cir. Feb. 22, 2005) ............ 15

## STATUTES

28 U.S.C. § 1292(b) ................................................................... passim

35 U.S.C. § 311, *et. seq.* ............................................................... 15

35 U.S.C. § 312 .............................................................................. 3

35 U.S.C. § 313 .............................................................................. 3

35 U.S.C. § 314(c) ......................................................................... 3

35 U.S.C. § 315(c) ...................................................................... 9, 15

35 U.S.C. § 316(a) ........................................................................ 10

145 Cong. Rec. E1789-E1790 (Aug. 5, 1999) ....................................... 8, 10

145 Cong. Rec. S14696-03 (Nov. 17, 1999) ............................................. 1

## OTHER SOURCES

Joseph D. Cohen, *What's Really Happening in Inter Partes Reexamination,*
  87 J. Pat. & Trademark Off. Soc'y 207, 217 (2005) ...................................... 18

M.P.E.P. § 2661 ............................................................................. 3

Acushnet Company ("Acushnet") respectfully requests that this Court certify its order denying Acushnet's Motion to Stay Litigation Pending *Inter Partes* Reexamination by the U.S. Patent Office ("the Order") for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Acushnet also seeks a stay of these proceedings while the appeal is pending.

The Order involves the following controlling issue of law:  in what circumstances should a District Court normally stay or decline to stay patent litigation when the patents-at-issue are the subject of a pending <u>first-filed</u> *inter partes* reexamination between the parties to the litigation.

First, this case is exceptional because it presents what appears to be a question of first impression that has not been addressed by prior reported decision in any jurisdiction. While there are a handful of cases in which district courts have been asked to grant stays pending an *inter partes* reexamination (and all courts in those cases granted the stay), each of those cases involved reexamination requests that were filed after commencement of district court litigation. It appears that no court has yet addressed whether and under what circumstances it is appropriate to deny a motion to stay in the face of a first-filed *inter partes* reexamination request. Certification of this question is appropriate not only because it is has never been decided, but also because it presents an important policy question for resolution by the Federal Circuit court. The *inter partes* reexamination procedure was enacted to "reduce expensive patent litigation," a goal which is undermined if district court litigation can typically proceed simultaneously with and despite a first-filed reexamination. 145 Cong. Rec. S14696-03 (Nov. 17, 1999).

Second, there is a substantial ground for difference of opinion since every reported case in which a court has been asked to stay litigation pending *inter partes* reexamination has granted the stay. One recent case granting such a stay, which was decided after the briefing was complete on Acushnet's motion to stay in this case, *see EchoStar Techs. Corp. v. TiVo, Inc.*, 2006 U.S. Dist. LEXIS 48431 (E.D. Tex., July 14, 2006), noted as a principal reason for granting the stay the differences between an *inter*

*partes* reexamination and an *ex parte* reexamination, which are differences at issue in this case.

Finally, immediate appeal of this issue is appropriate because it would materially advance the litigation to have the Federal Circuit decide the stay question. A successful appeal would stay this litigation in favor of allowing the reexaminations to proceed as a first priority. The outcome of the reexaminations will be binding on the parties by statute, and those examinations are likely either to have eliminated or substantially narrowed the issues presented to this Court.

## I.    BACKGROUND

Plaintiff Callaway Golf Company ("Callaway") commenced this lawsuit on February 9, 2006. Before the filing of this action, Acushnet and Callaway had engaged in lengthy negotiations and several mediations regarding the alleged infringement of U.S. Patent Nos. 6,210,293 ("the '293 patent"), 6,506,156 ("the '156 patent"), 6,506,130 ("the '130 patent"), and 6,595,873 ("the '873 patent") (collectively "the patents-in-suit"). These patents claim priority to a large family of patent applications that have been pending before the PTO since 1993. The complete prosecution history of these patents spans ten years and thousands of pages.

On January 17, 2006—before Plaintiff filed the instant action—Acushnet filed requests for *inter partes* PTO reexamination of each of the patents asserted in this subsequently-filed litigation by Callaway. Acushnet requested the PTO to reconsider the patentability of all the claims in each of the patents-in-suit, and consistent with its negotiation position, demonstrated to the PTO how each claim of these patents is invalid over prior art patents and publications.

On April 6, 2006, the PTO agreed with Acushnet that the prior art patents and publications raised numerous substantial new questions of patentability with respect to all of the claims of the '130 patent and the '873 patent, and ordered reexamination of all

claims. *See* Exs. 1 and 2. The next day, the PTO ordered reexamination of all claims of the '293 patent and the '156 patent. *See* Exs. 3 and 4.

Callaway filed numerous petitions in the PTO arguing that the PTO should not address the reexamination requests due to a 1996 Settlement Agreement between Spalding Sports Worldwide, Inc. ("Spalding") and Callaway. The PTO denied all of Callaway's petitions, the last of which was denied on September 7, 2006. *See* Exs. 5-12. In denying Callaway's petitions to suspend each of the reexaminations, the PTO noted that suspending the proceedings would run contrary to Congress' intent that the Director order *inter partes* reexamination within three months of Acushnet's requests. 35 U.S.C. §§ 312, 313. Accordingly, the PTO will proceed to determine the validity of all of the patents-in-suit. By law, these proceedings will be handled by the PTO with "special dispatch."[1] 35 U.S.C. § 314(c). Significantly, if the patents are declared invalid by the PTO this case is over.

On May 5, 2006, Acushnet filed a motion to stay this Court's proceedings pending the PTO's determination of the validity of the patents in the previously-filed *inter partes* reexamination proceedings. Callaway filed its opposition brief on May 19, and Acushnet filed its reply on May 30. This Court denied Acushnet's motion without oral argument on October 18.

---

[1] The PTO gives "special status" to reexamination proceedings. *See* M.P.E.P. § 2661. Of these reexamination proceedings already taken out of turn by the PTO, the PTO gives priority to cases involved in litigation over other reexaminations. *Id. See also Ethicon v. Quigg*, 849 F.2d 1422, 1426 (Fed. Cir. 1988) ("the ordinary, contemporary, and common meaning of special dispatch envisions some type of unique, extraordinary, or accelerated movement").

II.    **THE ORDER DENYING ACUSHNET'S REQUEST FOR A STAY SATISFIES THE STANDARDS FOR § 1292(B) CERTIFICATION**

A.    **Legal Standard for § 1292(b) certification**

Pursuant to 28 U.S.C. § 1292(b), a district court may certify an interlocutory order for appeal in the following circumstances:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). Accordingly, courts review three requirements before granting an interlocutory appeal pursuant to Section 1292(b): (1) whether the order involves a controlling question of law; (2) whether there is substantial ground for difference of opinion; and (3) whether an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See Taylor v. PPG Indus., Inc.*, 256 F.3d 1315, 1316 (Fed. Cir. 2001) (granting permission to appeal where the statutory requirements were met).

B.    **This Case Presents a Controlling Question of Law.**

The Court should certify its Order because it concerns a controlling issue of law that materially affects the outcome of this litigation and will apply to many other patent cases. In particular, this Order involves the question of whether the Court can or should allow litigation to proceed on a patent claim where an <u>earlier-filed</u> *inter partes* reexamination is pending between the same parties to the litigation on the same patents involved in the litigation.

The Third Circuit has held that an issue is a controlling question of law for purposes of 28 U.S.C. § 1292(b) if: (1) it would lead to reversal on appeal if decided erroneously; or (2) the question is "serious to the conduct of the litigation either practically or legally." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974).

4

The question of whether the Court can allow litigation to proceed on a patent claim where an earlier-filed *inter partes* reexamination is pending between the parties to the litigation on the same patents is "serious to the conduct of the litigation," both practically and legally.

Courts evaluate several factors when considering whether a question is "serious to the conduct of the litigation," including "saving time for the District Court, or expense for the litigants." *Royal Ins. Co. of Amer. v. K.S.I. Trading Corp.*, Civil Action No. 04-CV-867(DMC), 2006 U.S. Dist. LEXIS 40363, at *8 (D.N.J. June 16, 2006). Resolution of the issue "need not be determinative of any claim on the merits." *G-I Holdings, Inc., v. Bennet,* Civil. No. 02-3626(WGB), 2005 U.S. Dist. LEXIS 31887, at *9 (D.N.J. Dec. 9, 2005).

Moreover, the fact that the Court ruled on Acushnet's motion to stay in an exercise of discretion does not preclude review of the order. When deciding whether an issue is a controlling question of law, "[t]he key consideration is not whether the order involves the exercise of discretion, but whether it truly implicates the policies favoring interlocutory appeal." *Katz*, 496 F.2d at 756. These policies include: (1) harm to a litigant from an erroneous order, (2) time wasted at trial, and (3) unnecessary litigation expenses for the parties. *Id.*

Here, the question presented strongly implicates the policies favoring interlocutory appeal. In particular, the reason this case should be stayed is primarily to promote Congress' goal of avoiding wasted time at trial and unnecessary litigation expenses.

1. **Whether to allow a case to proceed in the face of an earlier-filed *inter partes* reexamination is a matter of law that materially affects the outcome of the case.**

Courts have frequently held that an issue of law is controlling if its resolution on appeal "could materially affect the outcome of the litigation in the district court." *Ovando v. City of Los Angeles,* 92 F. Supp. 2d 1011, 1025 (C.D. Cal. 2000). Such issues resolve whether claims can be disposed of and the litigation considerably simplified. *See, e.g., United Airlines, Inc. v. Mesa Airlines,* No. 97 C 4455, 1999 WL 1144962, at *1 (N.D. Ill. Oct. 5, 1999).

Whether and to what degree this Court has the discretion to allow patent litigation to proceed in tandem with and in the face of an earlier-filed *inter partes* reexamination is a uniquely undecided question of law that materially affects the outcome of this case. It is true generally that courts hold broad discretion to grant or deny a stay pending reexamination of the patents-in-suit. *See Pegasus Dev. Corp. v. DirectTV, Inc.*, C.A. No. 00-1020-GMS, 2003 U.S. Dist. LEXIS 8052, at *3 (D. Del. May 14, 2003) (citing *Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985)). However, courts have not considered the legal question of whether, and to what limits, that discretion extends to allow a court to deny a motion to stay when the reexamination is (a) *inter partes* and (b) initiated by one of the parties at issue before the lawsuit.

The legal question presented here is similar to the question of how courts deal with first-to-file jurisdictional questions. The factual scenario here is very similar to that in which there is a first-filed declaratory judgment litigation on the validity of certain patents and a subsequently-filed litigation by the patent-holder asserting infringement of the same patents against the party who brought the first action. As a rule, when two courts have concurrent jurisdiction over the parties and issues to a dispute, the first forum in which jurisdiction attaches has priority to consider the case. *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941) ("In all cases of concurrent

jurisdiction, the court which first has possession of the subject matter must decide it."). This principle is referred to as the "first-to-file" rule; and it is only with "sound reason" that courts depart from the rule. *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937-38 (Fed. Cir. 1993) ("We prefer to apply in patent cases the general rule whereby the forum of the first-filed case is favored . . . ."). The policy reasons for the rule are several, as stated in *Crosley*:

> The economic waste involved in duplicating litigation is obvious. Equally important is its adverse effect upon the prompt and efficient administration of justice. In view of the constant increase in judicial business . . . and the continual necessity of adding to the number of judges, at expense of the taxpayers, public policy requires us to seek actively to avoid the waste of judicial time and energy.

122 F.2d at 930.

To decide if the first-to-file rule applies, courts determine whether there is "substantial similarity" between the two actions. *Google, Inc. v. Am. Blind & Wallpaper Factory*, No. C 03-05340 JF, 2004 U.S. Dist LEXIS 27601, * 8-9 (N.D. Cal. April 8, 2004). The rule does not require that the parties or the issues be identical. *Id.* at *12 ("[S]trict identity of parties is not an absolute requirement of the first-to-file rule. . . . Although the two actions obviously are not mirror images of one another, it is clear that the fundamental issue in both actions . . . is identical."); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F. 3d 947, 950 (5th Cir. 1997) ("The rule does not...require that the cases be identical. The crucial inquiry is one of substantial 'overlap.'"); *Mann Mfg. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971) ("[R]egardless of whether or not the suits here are identical, if they overlap on the substantive issues, the cases would be required to be consolidated in . . . the jurisdiction first seized of the issues."); *see also Crosley Corp.*, 122 F.2d at 930 ("The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter.").

7

Accordingly, in applying the first-to-file rule, courts have found that where there is a first-filed action in a first court for declaratory judgment that certain patents are invalid, and a second-filed action in a second court between the same parties on the same patents, the second court should not be permitted to hear the second-filed action. *Triangle Conduit & Cable Co., Inc. v. National Electric Products Corp.*, 125 F.2d 1008, 1009 (3d Cir. 1942) (holding that a district court in a first-filed declaratory judgment patent action for invalidity and non-infringement must enjoin a second-filed suit for infringement of the same patents).

The same "first-to-file" rule should apply to earlier-filed *inter partes* reexamination proceedings. Among the questions that resolution of this issue will present is the interpretation of the statutes enabling *inter partes* reexamination. This will involve statutory interpretation and an examination of the legislative intent of Congress in providing for *inter partes* reexamination. In particular, Congress made clear that one of the primary goals of enabling *inter partes* reexamination was to "reduce expensive patent litigation." 145 Cong. Rec. E1789-E1790 (Aug. 5, 1999). If a patent-owner can simply commence litigation when there is already an *inter partes* reexamination pending, this goal is not met. Such questions of statutory interpretation and legislative intent are appropriate – indeed important – for certification for interlocutory appeal. *See, e.g., Matthews v. Kidder, Peabody & Co.*, 161 F.3d 156, 159 (3d. Cir. 1998) (accepting an interlocutory appeal to interpret a federal statute); *Bath Iron Works Corp. v. U.S.*, 991 F.2d 811, 1993 WL 118923, at *1 (Fed. Cir. 1993) ("A question concerning statutory interpretation involves an issue of substantive law, which is often the subject of a certification ruling.") (unpublished table decision) (citing 9 James W. Moore et al., Moore's Federal Practice ¶ 110.22[2] & n.11 (2d ed. 1992)).[2] *See also United States v.*

---

[2] Although the appeal in *Bath Iron* was certified under § 1292(d)(2), the standards are the same as under § 1292(b).

*General Dynamics Corp*, 4 F.3d 827, 829 (9th Cir. 1993) (accepting certification of
constitutionality of part of Federal Claims Act); *N.J. Transit Policemen's Benevolent
Ass'n Local 304 v. New Jersey Transit Corp*, 806 F.2d 451, 451-52 (3d Cir. 1987)
(accepting certification of a statutory interpretation question).

> 2.    **A rule analogous to the "first-to-file" rule should
> preclude litigation of patents concurrent with a
> binding *inter partes* reexamination of the same
> patents.**

The "first-to-file" rationale that applies to litigation should apply with equal force
where there is a first-filed *inter partes* reexamination of the same patents at issue in a
patent litigation. Here, this litigation and the reexamination involve the same parties and
a substantial overlap of the same issues. A primary dispute before this Court concerns
the invalidity of the four patents-in-suit. Thus, the prior art-based invalidity issues before
the PTO during the *inter partes* reexamination of the same four patents will overlap with
the invalidity issues before this Court. By law, Acushnet will be bound by the PTO's
conclusions regarding prior art that were, or could have been, presented to the PTO
during the *inter partes* reexamination of the patent. 35 U.S.C. § 315(c). Obviously,
Callaway will also be bound by the outcome at the PTO.

A stay of this litigation pending the outcome of the *inter partes* reexamination of
the four patents-in-suit would shift the issue of patent claim invalidity over the prior art
patents and publications from this legal proceeding to an administrative proceeding
before an agency Congressionally authorized and directed to speedily perform such a
review. "One purpose of the reexamination procedure is to eliminate trial of that issue
(when the claim is canceled) or to facilitate trial of that issue by providing the district
court with the expert view of the PTO (when a claim survives the reexamination
proceeding)." *Gould v. Control Laser Corp*, 705 F.2d 1340, 1342 (Fed. Cir. 1983).
Moreover, the reexamination statute brings the PTO's expertise to bear on the validity of

9

patents involved in litigation. *See Ingro v. Tyco Indus., Inc.*, 1985 U.S. Dist. LEXIS 19300 at *9 (N.D. Ill. 1985).

Now that the PTO has granted each of Acushnet's requests for reexamination, the PTO will consider the patentability of each claim of the patents-in-suit in light of the prior art applied against the claims in the reexamination request. The PTO will likely resolve all of Acushnet's prior art-based invalidity defenses, either by declaring the patent claims to be unpatentable and canceling them, confirming one or more of the patent claims, or by allowing the claims following amendments to the claims. 35 U.S.C. § 316(a). If the claims are cancelled or confirmed as is, both parties will be relieved in this litigation of the necessity of obtaining expert reports or presenting factual evidence on complicated prior art now at issue in the PTO. A stay will preserve resources of the parties and reduce expenses, as intended by Congress. 145 Cong. Rec. E1789-E1790 (Aug. 5, 1999) (stating that the *inter partes* reexamination statue "is intended to reduce expensive patent litigation").

By granting a stay and waiting for the PTO to resolve these validity issues, judicial economy is promoted. The binding PTO decision will eliminate the prior art validity issues, streamline any necessary trial, and likely spur a settlement. *Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co.*, 3 U.S.P.Q.2d (BNA) 1889 (N.D. Ill. 1987) (giving seven reasons why reexamination can benefit the Court and the parties including possible settlement, dismissal of suit, and reduction in the complexity and length of trial). As recognized by a court in this District:

> [T]he court will also benefit from the reexamination process in that (1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court.

*Alloc, Inc. v. Unilin Décor, N.V.*, C.A. No. 03-253-GMS, 2003 U.S. Dist. LEXIS 11917 at *7 (D. Del. July 11, 2003); *see also United Sweetner USA, Inc. v. The Nutrasweet Co.*, 766 F. Supp. 212, 218 (D. Del. 1991) ("[W]aiting for the outcome of the PTO reexamination would be the most useful option in that it would simplify issues and aid in preparation for trial."); *Softview Computer Products, Corp. v. Haworth Inc.*, 56 U.S.P.Q.2d 1633, 1635 (S.D.N.Y. 2000). Given the extensive prosecution history and numerous prior art references deemed by the PTO to raise substantial new questions of patentability, this Court would also benefit from "an additional layer of review by the PTO before expending further judicial resources." *Pegasus Dev.*, 2003 U.S. Dist. LEXIS 8052 at *6. In addition, if the PTO determines that the patents-in-suit are invalid, this case will be over.

If claims in dispute are amended and issued during the course of the *inter partes* reexamination the scope of any damages may also be transformed since, by law, damages must be limited to the period after allowance of the claim in amended form. *See* 35 U.S.C. § 316(b); *Bloom Eng'g Co. Inc. v. N. Am. Mfg. Co., Inc.*, 129 F.3d 1247, 1249-50 (Fed. Cir. 1997). Thus, at this stage each of the claims of the patents-in-suit are "moving targets" as a result of the pending *inter partes* reexaminations, and both parties are likely to have to adjust their cases on validity and infringement accordingly as the PTO proceeds to decide the issues before it. Again, judicial economy is fostered by waiting until the PTO decides whether, and in what form, any claim of the patents-in-suit is patentable. *See United Sweetener,* 766 F. Supp. at 217 ("[W]e … do not wish to create unnecessary costs by participating in what one district court has properly labeled a 'race to . . . patent validity determination.") (citation omitted).

Thus, whether to allow a case to proceed in the face of an earlier-filed *inter partes* reexamination is a matter of law that materially affects the outcome of this case.

### 3.    The outcome of the appeal of the question presented will have wide-reaching impact.

The Federal Circuit has found controlling questions of law supporting interlocutory review when the issue is one that affects many other cases. For example, in *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research, Ltd.*, the Federal Circuit granted permission to appeal because the issue of whether laches in prosecution applies to bar enforcement of patent claims affected many other cases. 2000 U.S. App. LEXIS 23529, *2, 56 U.S.P.Q.2d 1381 (Fed. Cir. Aug. 30, 2000) ("We determine in our discretion to grant Symbol's petition, in part because the issue affects not only this case, but many other cases as well."). *See also U.S. Philips Corp. v. Sears Roebuck & Co.*, 1992 U.S. App. LEXIS 37824, *4 (Fed. Cir. Dec. 10, 1992) ("The questions of law are not relevant just to the particular facts of the case, but could be of importance to the bar in general"); *Nutrition 21 v. United States*, 907 F.2d 157, 157 (Fed. Cir. 1990) (noting that the question presented "may have a "far-reaching impact"). Other courts have similarly found a controlling issue of law in such circumstances. *See, e.g., Lamont v. Schultz,* 748 F. Supp. 1043, 1057 (S.D.N.Y. 1990), *aff'd by* 948 F.2d 825 (2d Cir. 1991) (holding that certification would have precedential value for a large number of other suits).

The question presented in this case will similarly have wide-reaching impact. The interplay between litigation and the *inter partes* reexamination procedure is still in its early stages due to the relatively few number of cases in which *inter partes* reexamination is sought and the fact the statute allowing this form of reexamination was only recently enacted. If the Federal Circuit decides the question of whether or not courts should normally hear a later-filed litigation when there has been a first-filed *inter partes* reexamination, this will be greatly instructive to district courts and patent litigation parties, and will necessarily impact patent owners and potential patent infringement defendants in deciding how to proceed with a disputed issue of validity of a patent. In

12

particular, a decision in favor of stay would give weight to Congress' intent in enacting the statute to reduce litigation by giving parties a true alternative to litigation, rather than simply providing a forum in which to resolve their disputes in parallel with district court litigation and thereby adding to the complexity and cost of the resolution process.

## C.    Substantial Grounds for Disagreement Exist.

The Court's Order decided an issue that presents a substantial ground for difference of opinion. Courts have found that a substantial ground for difference of opinion exists where: (1) the intended effect of a statute is unclear; (2) there is a dearth of controlling precedent on an issue; (3) the issue presents a novel question or one of first impression; (4) reasonable minds could differ with the court's view; and (5) the question of law is a close one. *See Ovando,* 92 F. Supp. 2d at 1025 (holding that a substantial ground for difference of opinion existed where the case presented issues of first impression, the closest – but not directly on point – precedent was thirteen years old and the Ninth Circuit might take a different approach than the thirteen-year-old case); *Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.,* 962 F. Supp. 1312, 1323 (D. Or. 1997) (certifying an appeal where the issue was subject to considerable debate and a split of authority existed); *United Airlines,* 1999 WL 1144962, at *1 (holding that a substantial difference of opinion existed because few cases dealt with the issue and the Supreme Court and Seventh Circuit had not ruled on the precise issue); *Florida East Coast Railway Co. v. CSX Transp., Inc.,* No. 91 C 7063, 1993 WL 57534, *2 (N.D. Ill. Mar. 4, 1993) (noting that no cases were found involving the exact same situation and the question of law was a close one as to which there is substantial ground for difference of opinion); *Lamont,* 748 F. Supp. at 1057 (certifying a case that had a number of novel issues).

The issue presented here satisfies all of the circumstances under which courts typically find that a substantial ground for different opinions exists.

13

1.    **Every reported decision addressing whether to grant a stay pending ongoing *inter partes* reexamination filed <u>after</u> the litigation was commenced has granted the stay.**

The fact that reasonable minds could differ with the Court's view on whether to stay this action is evident from the body of case law dealing with stays pending *inter partes* reexamination. In <u>every</u> reported case in which the district court was asked to stay litigation pending resolution of an on-going *inter partes* litigation, the district court granted the stay. *See Habasit Belting, Inc. v. Rexnord Indus., Inc.*, 161 Fed. App'x 952, 2006 U.S. App. LEXIS 1676, *1 (Fed. Cir., Jan. 9, 2006) (dismissing appeal of district court's grant of stay pending second-filed *inter partes* reexamination); *EchoStar Techs. Corp. v. TiVo, Inc.*, 2006 U.S. Dist. LEXIS 48431, *2 (E.D. Tex., July 14, 2006) (granting stay pending resolution of second-filed *inter partes* reexamination); *Middleton, Inc. v. Minn Mining & Mfg.*, 2004 U.S. Dist. LEXIS 16812 (S.D. Iowa, Aug. 24, 2004) (granting stay where there was an *inter partes* reexamination granted after the start of the litigation, although there was some question as to whether the reexamination should have been filed as an *ex parte* reexamination).[3]

The court in *EchoStar*, a case decided after the briefing was complete on Acushnet's motion to stay, elaborated on the unique nature of *inter partes* reexamination requests. In *EchoStar*, the district court granted the defendant's motion for a stay pending the resolution of an *inter partes* reexamination that was requested after the litigation began. The court explicitly discussed the difference in nature between *inter partes* and *ex parte* reexamination proceedings as a primary basis for its grant of the stay:

> Further, Plaintiff fails to consider the potential effect of Defendants' *inter partes* reexamination request. The statute governing *inter partes* reexamination provides for full participation by a third party at all stages

---

[3] The only reported case denying a stay involving *inter partes* reexamination involved the facts where the PTO had not granted the defendant's request for *inter partes* reexamination, which is readily distinguishable from our situation. *DUSA Pharms., Inc. v. River's Edge Pharms., LLC*, 2006 U.S. Dist. LEXIS 29852, *5 (D.N.J. May 15, 2006).

of the proceedings. *See* 35 U.S.C. § 311, *et. seq.*. Unlike an *ex partes* [sic] reexamination, an *inter partes* reexamination allows the third-party requester "to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto[.]  *Id.* at § 314(b)(2).

*EchoStar*, 2006 U.S. Dist LEXIS 48431, *8. The Court went on to state:

> However, and of particular import here, the statute imposes estoppel restraints on a third-party requester. That is, a third-party requester is estopped from relitigating the same issue "which the third-party requester raised or could have raised during the *inter partes* reexamination proceedings." *Id.* § 315(c); *see also Middleton, Inc. v. Minn Mining & Mfg*, 2004 U.S. Dist. LEXIS 16812, 2004 WL 1968669, *10, (S.D. Iowa, 2004). In addition, the third-party requester will be estopped from seeking review of factual determinations made in the *inter partes* reexamination. *Id.* Thus, an *inter partes* reexamination can have no other effect but to streamline ongoing litigation. <u>For these reasons, courts have an even more compelling reason to grant a stay when an *inter partes* reexamination is proceeding with the same parties, which is precisely the case here.</u>

*EchoStar*, 2006 U.S. Dist LEXIS 48431, *9 (emphasis added).

Thus, the entire body of reported case law dealing with the issue of whether to stay litigation pending an *inter partes* reexamination runs counter to the Order in this case.

### 2. The dearth of case law addressing the question at issue here favors certification.

The Federal Circuit has found the second prong of § 1292(b) to be satisfied when there is a question of first impression or lack of controlling precedent. *See Voda v. Cordis Corp*, 122 Fed. App'x 515, 2005 U.S. App. LEXIS 4394, * 2 (Fed. Cir. Feb. 22, 2005) (granting § 1292(b) petition "because of the paucity of law surrounding this issue"); *Century Wrecker Corp. v. Vulcan Equip. Co*, 902 F.2d 43, 43 (Fed. Cir. 1990) (granting interlocutory review noting "this is a question of first impression").

The instant suit is such a case. No reported case has dealt with the precise factual scenario presented in the instant case. In all of the above cases, the *inter partes* reexamination was requested <u>after</u> the litigation commenced. Hence, other than this Court, no courts have had occasion to determine whether the court's discretion to deny a

15

stay extends to the situation where there is a first-filed binding *inter partes* reexamination. In this situation, substantial grounds for disagreement exist. *See, e.g.*, *Chase Manhatten Bank v. Iridium Afr. Corp.*, 324 F. Supp. 2d 540, 545 (D. Del. 2004) (identifying the lack of Delaware case law on an issue as a factor demonstrating that substantial grounds for difference of opinion are present).

While not controlling, at least one court has dealt with an analogous situation that supports Acushnet's view of how the Court should deal with a first-filed *inter partes* reexamination. In *Sony Computer*, the District Court for the Eastern District of Virginia was faced with review of an order by the PTO to suspend *inter partes* reexamination proceedings on patents that were the subject of an earlier-filed litigation pending in the Federal Circuit. *Sony Computer Entm't Am. Inc. v. Dudas*, 2006 U.S. Dist. LEXIS 36856 (E.D. Va., May 22, 2006). This is the reverse of our situation. There, the court held that it was within the PTO's discretion to suspend its *inter partes* reexamination of patents that were the subject of a Federal Circuit appeal. *Id.* It did so for many of the same reasons urged by Acushnet as reasons to stay the instant litigation, *i.e.* judicial economy in light of an earlier-filed, binding action that was likely to resolve the issues. 2006 U.S. Dist. LEXIS 36856, *19-*20. Thus, while there is no case law addressing the issue raised by the Court's Order, it appears that the same rationale would lead to a rule in favor of Acushnet in this case.

The issue presented here is one of first impression on which there is substantial ground for difference of opinion. An immediate appeal would provide much needed guidance. *See Ovando*, 92 F. Supp. at 1025.

### D.    An Appeal Will Materially Advance the Litigation.

Finally, this Court should certify its Order because an appeal will materially advance the current litigation. Courts have considered several factors when analyzing whether an interlocutory appeal would materially advance the litigation, including

whether the appeal would: (1) obviate the need for trial, (2) eliminate complex issues and simplify the trial, or (3) eliminate issues and make discovery less costly. *G-I Holdings, Inc., v. Bennet,* Civil No. 02-3626 (WGB), 2005 U.S. Dist. LEXIS 31887, at *15 (D.N.J. Dec. 9, 2005). *See also In re JWJ Contracting Co., Inc.,* 287 B.R. 501, 506 n.7 (9th Cir. 2002) (granting interlocutory appeal because it would provide an appropriate framework for the court and parties to resolve the underlying dispute); *Umatilla,* 962 F. Supp. at 1323 (holding that the appeal would materially advance the litigation where guidance from the Ninth Circuit would limit the plethora of issues the parties will otherwise have to advance).

If in the present case, as Acushnet contends, Callaway should not be permitted to prosecute its suit on these patents until the first-filed *inter partes* reexamination proceeding is concluded, then trial on the infringement, invalidity and unenforceability of these patents can be avoided entirely or limited by waiting for the resolution of the reexamination proceedings. The PTO's cancellation of one or more claims during reexamination would eliminate trial entirely if all claims are cancelled, or if some but not all claims are cancelled, the burden on the Court and the parties of addressing the remaining claims would be significantly reduced. *Rohm & Haas Co. v. Brotech Corp.,* C.A. No. 90-109-SLR, 1992 U.S. Dist. LEXIS 3252, * 7 (D. Del. Mar. 11, 1992) (noting that "a stay pending reexamination can simplify the issues, present technical expertise from the PTO in relevant issues and assist in preparation for trial."). Similarly, the PTO's treatment during reexamination of the prior art references and the claims will assist this Court in construing the claims, thereby streamlining any necessary *Markman* hearing. *See Emhart Indus.,* 3 U.S.P.Q.2d (BNA) (stating that the reexamination file history may become part of the record should subsequent litigation continue to be necessary); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).

In addition, the chances that the *inter partes* reexamination will result in rejection or alteration of some of the claims of the patents-in-suit are a near certainty. A recent

17

study of *inter partes* reexamination proceedings showed that 98% of all *inter partes* reexaminations involved a rejection, cancellation, or amendment of at least some claims. Joseph D. Cohen, *What's Really Happening in Inter Partes Reexamination,* 87 J. Pat. & Trademark Off. Soc'y 207, 217 (2005). Because of this extremely high likelihood that the claims at issue will be cancelled or amended, and the fact that the outcome of the reexamination will bind both parties, reexamination will materially advance the litigation.

### III.    THE COURT SHOULD STAY THIS LITIGATION PENDING APPEAL.

The Court should also stay this litigation while the appeal of its Order is pending, for it would be less efficient for the Court and the parties to continue litigation of the claims at issue in this case while the Federal Circuit decides whether the Court had the discretion to deny the stay at all. To proceed with these issues while the appeal is pending would waste the resources of the parties and the Court.[4]

#### A.    Standard for Granting Stays Pending Appeals

In deciding whether to exercise its discretion to grant a stay pending appeal, the Court should consider the following factors: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L.Ed.2d 724 (1987).

#### B.    A Stay Pending Appeal is Warranted in the Present Case.

In circumstances similar to this case, courts have granted stays pending appeals of interlocutory orders under § 1292(b). *Forsyth v. Kleindienst,* 700 F.2d 104, 106 (3d. Cir.

---

[4] In the alternative, if the Court decides simply to stay these proceedings pending the *inter partes* reexamination pending at the PTO, Acushnet would have no objection.

1983) (granting a motion to stay district court litigation pending resolution of an issue on appeal); *Schalliol v. Fare*, 206 F. Supp. 2d 689, 701 (E.D. Pa. 2002) (granting motion to stay litigation pending resolution of issue certified to the Third Circuit pursuant to § 1292(b)); *Klapper v. Commonwealth Realty Trust*, 662 F. Supp. 235, 236 (D. Del. 1987) (staying discovery pending resolution of standing issue raised in an interlocutory appeal); *Chase Manhattan*, 324 F. Supp. 2d at 546 (concluding that a stay is appropriate "because the issues awaiting resolution are dependent upon the outcome of the certified appeal"); *Kotrous v. Goss-Jewett Co. of N. California, Inc.*, No. Civ. S021520 FCD JFM, 2005 WL 2452606, at *5 (E.D. Cal. Oct. 4, 2005) (granting a stay of discovery pending appeal because a stay would promote economy of time and effort for the parties and the court);

Acushnet should be granted a stay because it has made a strong showing that it is likely to succeed on appeal. As previously noted, all reported cases dealing with *inter partes* reexaminations have stayed litigation pending the reexamination. And while no case has dealt with a first-filed *inter partes* reexamination, an even stronger argument is made for staying litigation in such an action. Moreover, analogous case law supports a rule that a later-filed litigation should be stayed in the face of a first-filed *inter partes* reexamination, as discussed above.

Second, Acushnet will be irreparably injured absent a stay. In the absence of a stay, the entire force of Acushnet's motion (not having to litigate the validity of the patents-in-suit in two proceedings, the risk of conflicting rulings, and judicial economy) will be mooted, as this litigation likely will have progressed to trial or final resolution before the appeal is concluded. Without a stay, Acushnet would be required to expend considerable time and money proceeding with its defenses against infringement claims that Callaway improperly maintains against Acushnet. Moreover, in the absence of a stay, Acushnet will be required to undergo a lengthy trial that the Federal Circuit (or the patent office) may later determine to have been completely unnecessary.

In contrast, the issuance of a stay will not substantially injure or prejudice Callaway. On the contrary, Callaway will also benefit from a stay because it can avoid spending substantial amounts of time and money on patent claims that might later be determined unnecessary in light of the reexamination proceedings.

Finally, a stay would promote the public interest in several key ways. A stay would conserve the judicial resources of this Court. It would also avoid exposing the jury to unnecessary issues that will only complicate and lengthen an already complex trial. Thus, a stay will promote economy of time and effort for the parties and this Court. Therefore, pending appeal, this Court should stay the litigation.

## IV.    CONCLUSION

For the foregoing reasons, this Court should certify its Order pursuant to § 1292(b) for interlocutory appeal and stay this litigation while the appeal is pending.

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Alan M. Grimaldi
Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone (202) 783-0800

Dated:  November 21, 2006

By:    _/s/ David E. Moore_
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza 6th Floor
        1313 N. Market Street
        Wilmington, DE  19899
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

763475 / 30030

Attorneys for Defendant Acushnet Company

20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 21, 2006, the attached document was

hand delivered to the following persons and was electronically filed with the Clerk of the Court

using CM/ECF which will send notification to the registered attorney(s) of record that the

document has been filed and is available for viewing and downloading:

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114

I hereby certify that on November 21, 2006, I have Electronically Mailed the documents

to the following:

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
denning@fr.com
shuman@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869