IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



CALLAWAY GOLF COMPANY,

Plaintiff,

v.

ACUSHNET COMPANY,

Defendant.

C. A. No. 06-91 (SLR)

**FILED UNDER SEAL – CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER – NOT TO BE DISCLOSED EXCEPT BY COURT ORDER OR WRITTEN STIPULATION OF THE PARTIES**

**PLAINTIFF CALLAWAY GOLF COMPANY'S OPENING BRIEF
IN SUPPORT OF ITS MOTION TO DISQUALIFY DEFENDANT
ACUSHNET COMPANY'S EXPERT DAVID FELKER**

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel:  (302) 652-5070
Fax:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel:  (617) 542-5070
Fax:  (617) 542-8906

Roger A. Denning
W. Chad Shear
Michael A. Amon
12390 El Camino Real
San Diego, CA 92130
Tel:  (858) 678-5070
Fax:  (858) 678-5099

*Attorneys for Plaintiff
Callaway Golf Company*

DATED:  January 17, 2007

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND STAGE OF THE PROCEEDING.................................................1

II.    INTRODUCTION ...........................................................................................1

III.    STATEMENT OF COMPLIANCE WITH LOCAL RULE 7.1.1 .......................4

IV.    FACTUAL BACKGROUND...........................................................................5

    A.    Dr. Felker Regularly Received Privileged and Confidential Information Relevant to this Case in His Role as Vice President for Callaway Golf. ................................5

        1.    Dr. Felker Was Intimately Involved in the Development of Callaway Golf's Premium Golf Balls. .................................................................6

        2.    Dr. Felker Worked Closely with Callaway Golf's Inside and Outside Patent Counsel to Develop Callaway Golf's Patent Strategy, both Offensively and Defensively............................7

    B.    Dr. Felker Also Received Privileged and Confidential Information Relevant to this Case in His Roles as a Consultant and Fact Witness for Callaway Golf......................10

    C.    Dr. Felker Signed Four Confidentiality Agreements with Callaway Golf. ..........................................................11

    D.    Callaway Golf Has Reminded Dr. Felker Repeatedly of His Confidentiality Obligations to the Company....................12

    E.    As Recently as Last Month, Dr. Felker Was Planning to Conduct an Executive Search for Callaway Golf, Before Abruptly Withdrawing Just Before Acushnet Disclosed Him as an Expert in this Litigation. ..........................................13

V.    ARGUMENT.................................................................................................14

    A.    Callaway Golf Had A Reasonable Expectation Of Confidentiality With Dr. Felker................................................15

    B.    Dr. Felker Received Substantial Privileged and Confidential Information Relevant to this Case.......................17

        1.    Dr. Felker's Exposure to Callaway Golf's Privileged Analyses Regarding Related Sullivan Patents, as Well as Other Golf Ball Patents, Makes It Impossible for Him to Consult for

i

## TABLE OF CONTENTS (cont'd)

**Page**

          Acushnet Without Revealing Privileged
          Information. ...................................................................................19

    2.    Dr. Felker's Exposure to Callaway Golf's
        Confidential Technical Information Further
        Supports His Disqualification. .....................................................22

  C.    Relevant Policy Considerations Favor Dr. Felker's
       Disqualification. ........................................................................................24

VI.    CONCLUSION ...................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
    2000 WL 42202 (S.D.N.Y. 2000).] ........................................................15, 17, 21

*In re Data General Corp. Antitrust Litigation*,
    MDL Docket No. 369, 1986 U.S. Dist. LEXIS 21923,
    5 Fed. R. Serv. 3d 510 (N.D. Cal. 1986)........................................................18, 23

*Eastman Kodak Co. v. Agfa-Gevaeri N.V.*,
    No. 02-6564, 2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003)....................... passim

*Koch Refining, Co. v. Jennifer L. Boudreaux MV*,
    85 F.3d 1178 (5th Cir. 1996) ........................................................................15, 24

*Space Systems/Loral v. Martin Marietta Corp.*,
    No. 95-20122 SW, 1995 WL 686369 *2
    (N.D. Cal. 1995)..........................................................................14, 15, 17, 18, 23

*Syngenta Seeds, Inc. v. Monsanto Co.*,
    No. 02-1331-SLR, 2004 WL 2223252 (D. Del. 2004) ...........................................17

*Wang Laboratoriess, Inc. v. Toshiba Corp.*,
    762 F. Supp. 1246 (E.D. Va. 1991) ......................................................14, 15, 21, 24

Plaintiff Callaway Golf Company ("Callaway Golf") hereby respectfully requests that the Court disqualify David Felker from serving as an expert or consultant for defendant Acushnet Company ("Acushnet") in this case. If allowed to consult with Acushnet, Dr. Felker would inevitably rely upon or reveal privileged and confidential information that he learned as Vice President of Research and Development for Callaway Golf Ball Company (a wholly owned subsidiary of Callaway Golf), as well as in his work as a consultant and fact witness for Callaway Golf in previous litigation.

## I.     NATURE AND STAGE OF THE PROCEEDING

Callaway Golf filed this patent infringement case on February 9, 2006, based on Acushnet's manufacture and sale of golf balls that infringe four Callaway Golf patents. [D.I. 1.] Trial is set for December 3, 2007. [D.I. 28.] Fact discovery will close on April 30, 2007, and neither party has begun taking depositions. [D.I. 28; Declaration of Thomas L. Halkowski, submitted herewith ("Halkowski Decl."), ¶¶ 8-9.] Expert discovery will begin on May 30, 2007, with the exchange of opening expert reports. [D.I. 28.]

On December 20, 2006, defendant Acushnet Company ("Acushnet") revealed that it intends to use Dr. David Felker as an expert in this litigation. [Halkowski Decl., ¶ 3, Ex. B.] As provided in the Protective Order, Callaway Golf promptly objected to any disclosure of confidential information to Dr. Felker. [Halkowski Decl., ¶ 4, Ex. C.] If Dr. Felker is allowed <u>even to consult</u> with Acushnet on this case, however, he inevitably will use or reveal privileged and confidential information that he learned during the course of his eight-year relationship with Callaway Golf, as discussed in detail below. Callaway Golf therefore respectfully requests the Court to disqualify Dr. Felker from serving as an expert or consultant for Acushnet in this case.

## II.     INTRODUCTION

Over the past decade, Dr. Felker has worked intimately with Callaway Golf and its subsidiary, Callaway Golf Ball Company ("Callaway Golf Ball"), in several different

1

roles. Most importantly, Dr. Felker was the Vice President of Research and Development
for Callaway Golf Ball from 1996 to 2000. In that role, Dr. Felker was exposed on a
daily basis to privileged and confidential information that is relevant to this litigation.
For example:

- Dr. Felker oversaw the development of Callaway Golf Ball's first
  premium golf balls, including the "Rule 35" and "CTU 30" balls, which
  use the same three-piece design that is the subject of the asserted patents
  in this case and was later used by Acushnet to make the infringing
  products.

- 

- Dr. Felker helped hire Callaway Golf's in-house patent counsel – Mike
  Catania –

- 

Callaway Golf subsequently
purchased the assets of Top-Flite, along with the asserted patents, in 2003.

After leaving Callaway Golf Ball, Dr. Felker continued to consult for Callaway
Golf's legal department on various intellectual property issues. In those roles, Dr. Felker

2

REDACTED

received additional privileged and confidential information of Callaway Golf on topics

that are closely related to the subject matter here:

- Between 2001 and 2002, Dr. Felker continued working with Callaway Golf's in-house patent counsel – Mike Catania – regarding patent preparation and prosecution matters.

- Dr. Felker consulted with Callaway Golf's legal counsel to defend against litigation brought by Maxfli regarding claims of trade secret theft relating to the development of Callaway Golf's first golf balls.

- In the Maxfli case, Dr. Felker testified as a fact witness for Callaway Golf at trial, which was held in this Court in August 2004 and in which Callaway Golf prevailed.  Dr. Felker's testimony concerned the massive amount of work that Callaway Golf Ball had performed to negotiate the golf ball patent landscape prior to the launch of the Rule 35 golf ball in 2000.

- As part of his consulting work on that case, Dr. Felker reviewed documents and refreshed his knowledge regarding the work that Callaway Golf Ball had done to make sure it did not infringe upon or misappropriate any intellectual property rights of its competitors, like Maxfli (and Top-Flite and Acushnet).  In doing so, Dr. Felker again reviewed many of the privileged and confidential documents                    that he reviewed as Vice President of Callaway Golf Ball.

Much of the privileged and confidential information that Dr. Felker learned while

working for Callaway Golf will be central to this litigation.  No issue is more important

in this case than the infringement and validity of the asserted patents.  Because of his

exposure to Callaway Golf's legal theories and strategies

Dr. Felker cannot

advise Acushnet on the infringement or validity of the asserted patents without revealing

or relying upon Callaway Golf's privileged information.  The same problem arises,

although perhaps at a more general level, from Dr. Felker's in-depth knowledge of

Callaway Golf's legal theories and strategies regarding other patents and prior art

concerning three-piece golf balls.  Finally, Dr. Felker possesses considerable confidential

information regarding the development and construction of Callaway Golf's premium

golf balls, which will be important to issues of lost profits and commercial success in the

instant litigation between Callaway Golf and Acushnet.

3

In short, if Dr. Felker is allowed to serve as an expert for Acushnet in this case, he inevitably will reveal or rely upon Callaway Golf's privileged and confidential information, whether he intends to or not. For that reason, Callaway Golf respectfully requests the Court to prevent Acushnet from using Dr. Felker as a consultant or expert in this litigation.[1]

## III.     STATEMENT OF COMPLIANCE WITH LOCAL RULE 7.1.1

Callaway Golf has tried to resolve this issue with Acushnet, to no avail. On December 28, 2006, shortly after Acushnet gave notice of its relationship with Dr. Felker, Callaway Golf sent a letter to Acushnet objecting to the disclosure of confidential information to Dr. Felker and requesting that Acushnet terminate any relationship with Dr. Felker in this case. [Halkowski Decl., ¶ 4, Ex. C.] Having received no substantive response, Callaway Golf followed up with another letter on January 10, 2007, making the same request. [Halkowski Decl., ¶ 5, Ex. D.] Acushnet responded to the second letter on January 12, 2007, acknowledging that it has retained Dr. Felker, but indicating that it will not consult with him regarding this litigation until this issue is resolved. [Halkowski Decl., ¶ 6, Ex. E.] However, when counsel for the parties met and conferred on this issue on January 17, 2007, Acushnet would not agree to terminate its relationship with Dr. Felker regarding this case. [Halkowski Decl., ¶ 7.]

On January 5, 2007, Callaway Golf's General Counsel, Mike Rider, also sent correspondence directly to Dr. Felker, reminding him of his confidentiality obligations to Callaway Golf and asking him to refrain from consulting with Acushnet on this matter. [Declaration of Michael J. Rider (hereinafter "Rider Decl."), ¶ 19, Ex. L.] Dr. Felker responded to Mr. Rider the next day, asking for copies of his Officer Employment Agreement and Consulting Agreement with Callaway Golf, both of which contain

---

[1]     Callaway Golf is not suggesting that Dr. Felker cannot be a fact witness in this case. Rather, Callaway Golf seeks only an order preventing Acushnet from hiring Dr. Felker as an expert or consultant in this case and from otherwise having *ex parte* contact with Dr. Felker regarding this litigation, the patents-in-suit, or Callaway Golf.

REDACTED

confidentiality clauses. [Rider Decl., ¶ 20, Exs. C and G.] At Mr. Rider's direction, copies of those agreements were then sent to Dr. Felker on January 8, 2007, and to counsel for Acushnet on January 9, 2007. [Rider Decl., ¶¶ 20-21.] On January 12, 2007, Mr. Rider sent another e-mail to Dr. Felker attaching two letters that Callaway Golf's legal department had sent to Dr. Felker in late 2002 reminding him of his continuing confidentiality obligations. [Rider Decl., ¶ 22, Ex. M.] Dr. Felker responded to Mr. Rider that same day, stating that he does not recall discussing the specific patents asserted in this case during his work for Callaway Golf, and therefore he "just can't figure out what the specific problem is that you are worried about." [Rider Decl., ¶ 23, Ex. N.] Mr. Rider responded, again on January 12, and explained in detail that, while the asserted patents issued after Dr. Felker left Callaway Golf's employ, Dr. Felker was privy to

. [Rider Decl., ¶ 24, Ex. O.] Mr. Rider further reminded Dr. Felker that he also possesses considerable privileged information regarding Callaway Golf's legal strategies regarding golf ball patents in general. [Id.] Again, Mr. Rider asked Dr. Felker to resign from his work for Acushnet in this case. [Id.] Dr. Felker responded by asking that he be allowed to share the information in Mr. Rider's last e-mail with outside counsel for Acushnet and Callaway Golf has given him permission to do so. [Rider Decl., ¶ 25.] As noted above, counsel for the parties subsequently conferred and because Acushnet has not agreed to terminate its relationship with Dr. Felker regarding this case, Callaway moves this Court to preclude Acushnet from using Dr. Felker as a consultant.

## IV.   FACTUAL BACKGROUND

### A.   Dr. Felker Regularly Received Privileged and Confidential Information Relevant to this Case in His Role as Vice President for Callaway Golf.

When Callaway Golf entered the golf ball market in the mid 1990's, it hired David Felker as Vice President of Research and Development for the Callaway Golf Ball

5

REDACTED

Company, a wholly-owned subsidiary of Callaway Golf. [Halkowski Decl., Ex. B, p. 5 (Dr. Felker's *curriculum vitae*); Rider Decl., ¶ 3.] Building a golf ball company from the ground up was a significant endeavor, as Dr. Felker trumpets in his resume, stating that he was a "[c]harter member of executive team that built $170 M Start-up Company from scratch." [Halkowski Decl., Ex. B, p.5; Rider Decl., ¶ 3.] Dr. Felker goes on to state that he, "[d]esigned and developed the entire R&D function and company's first products." [Halkowski Decl., Ex. B, p.5.]

Dr. Felker had not previously worked in the golf ball industry. To that point, his only post-graduate employment had been as a polymer chemist and superintendent for various DuPont companies. [*Id.*, Ex. B, pp. 5-6.] Indeed, Callaway Golf Ball is the only golf ball company ever to employ Dr. Felker. Since leaving Callaway Golf Ball in 2000, Dr. Felker has been working as a consultant and expert witness as an adjunct to his main business as the owner of an executive recruiting firm. [*Id.*] Accordingly, Dr. Felker learned the vast majority of what he knows about the golf ball business while in the employ of Callaway Golf. [*See* Rider Decl., ¶ 3.]

### 1.    Dr. Felker Was Intimately Involved in the Development of Callaway Golf's Premium Golf Balls.

When Callaway Golf started developing its golf ball business, the premium end of the market was dominated by wound balls (including the Titleist Professional), which were comprised of a small core, rubber windings wrapped around that core, and a single-layer cover. [Declaration of Michael Catania (hereinafter "Catania Decl."), ¶ 8.] Callaway Golf decided to take a different approach, ultimately designing a three-piece golf ball that had a solid rubber core, a hard inner cover layer, and a soft outer cover layer. [*Id.*; Declaration of Steven Ogg (hereinafter "Ogg Decl."), ¶¶ 3-5.] The combination of a hard inner cover and a soft outer cover helps a player maximize distance off the tee while still being able to put spin on the ball around the green. Callaway Golf's first ball – called the Rule 35 ball – incorporated this three-piece design

6

and as Dr. Felker states in his resume, "[t]he Rule 35's performance set a new standard that stunned the golf ball industry." [Halkowski Decl., Ex. B, p. 5; Ogg Decl., ¶ 7.] The Acushnet golf balls accused in this case (called the Titleist Pro V1 family), as well as Callaway Golf's current premium golf balls, still use this revolutionary three-piece construction. [Catania Decl., ¶ 8.]

As Vice President of Research and Development, Dr. Felker was involved in nearly every aspect of designing, testing and manufacturing the Rule 35 ball, as well as several follow-on products. [*Id.*, ¶¶ 11-14; Ogg Decl., ¶¶ 3-5; Rider Decl., Ex. D.] All of the original development teams – including the Core team, the Cover team, and the Aerodynamics team – reported directly to Dr. Felker. [*See id.*(Org. Chart).] In his resume, Dr. Felker describes his work as follows: "Lead the effort that produced four *Demonstrably Superior and Pleasingly Different* (DSPD) golf ball models: *Rule 35, CTU 30, CB-1* and *HX*." [Halkowski Decl., Ex. B, p. 5 (emphasis in original).]

### 2.     Dr. Felker Worked Closely with Callaway Golf's Inside and Outside Patent Counsel to Develop Callaway Golf's Patent Strategy, both Offensively and Defensively.

As part of the development of the Rule 35 ball, and in an effort to bring Dr. Felker and his team up to speed, Callaway Golf

REDACTED

7

2

REDACTED

---

2 All of the information shared with Dr. Felker is still privileged and, while Callaway
Golf will not waive the applicable privileges, it is prepared to provide this
information to the Court *in camera,* should the Court desire, to further examine the
vast exposure that Dr. Felker had to Callaway Golf's privileged information.  In
particular, Callaway Golf has prepared an additional declaration of Michael Rider
attaching:  (1) privileged billing entries from
                                           referencing privileged patent-related discussions
with Dr. Felker by name; and (2) documents created by Dr. Felker detailing Mr.
Fowler's responsibilities for him on patent-related issues.  Callaway Golf is prepared
to immediately submit that declaration and the attached documents, if the Court
desires this additional material.

At that time, Dr. Felker was Vice President and very much involved in the technical and legal issues surrounding the development of the Rule 35 ball.  [*See* Fowler Decl., ¶ 10; Ogg Decl., ¶¶ 3-6; Catania Decl., ¶¶ 10-13.]

In addition to working with Callaway Golf's outside counsel, Dr. Felker also worked with Michael Catania, Esq., who was hired in 1999 to serve as in-house patent counsel for Callaway Golf. [Catania Decl., ¶2.]

This process necessarily involved Mr. Catania providing to Dr. Felker legal impressions and opinions

[Catania Decl., ¶ 10.]

REDACTED

Dr. Felker also consulted with Mr. Catania regarding general research, patent, and development guidelines for Callaway Golf.  [*Id.*, ¶ 6.]  Of course, all of those conversations remain privileged and confidential to this day.  [*Id.*]

9

REDACTED

As a result of Callaway Golf Ball's efforts, the Rule 35 golf ball launched without any initial patent infringement challenges, an accomplishment for which Dr. Felker claims credit on his resume, stating: "Lead the patent effort that enabled the introduction of patented products" and "did so without legal issues at product launch." [Halkowski Decl., Ex. B, p. 5.]

**B.    Dr. Felker Also Received Privileged and Confidential Information Relevant to this Case in His Roles as a Consultant and Fact Witness for Callaway Golf.**

Dr. Felker left Callaway Golf in October of 2000. After his departure, Dr. Felker became a consultant for Callaway Golf. [Rider Decl. ¶ 11, Ex. G.] In that role, he continued to receive confidential and privileged information regarding Callaway Golf's patents and strategies for avoiding patents of others. [Rider Decl., ¶¶ 11, 13.] Dr. Felker's consulting activities were substantial, as he was available at least 100 hours per month to Callaway Golf from April 2001 through December 2002. [Rider Decl., ¶ 11, Ex. G.] As recently as August 10, 2004, Dr. Felker submitted to Callaway Golf an invoice of $28,000 for consulting fees – which Callaway Golf paid. [Rider Decl., ¶ 13, Ex. H (Felker's Final Bill for Maxfli).]

10

REDACTED

Perhaps most relevant, Dr. Felker worked with Callaway Golf's General Counsel (Mike Rider) and outside lawyers in defense of a counterclaim filed by Dunlop Slazenger Group Americas ("Maxfli") for alleged theft of trade secrets. [*Id.*, ¶ 11.] Specifically, Maxfli alleged that Callaway Golf misappropriated trade secrets from Maxfli to develop the Rule 35 golf ball. [*Id.*] In that case, which was tried in this Court in August 2004, Dr. Felker spent over a hundred hours consulting with counsel for Callaway Golf and testifying as a fact witness. [Rider Decl., Ex. H (Felker's final bill for Maxfli).] Callaway Golf paid Dr. Felker for his time pursuant to the Consulting Agreement. [*Id.*] The topics of Dr. Felker's preparation and testimony included the massive research and development effort undertaken by Callaway Golf to develop the Rule 35 golf ball and the lengths to which Callaway Golf went to make sure that it did not infringe any competitor golf ball patents. [Rider Decl., ¶ 11.] Although Dr. Felker's testimony was at a high-level and did not reveal any privileged information, a part of his work on that case involved the review (as recently as August of 2004) of much of the privileged and confidential information                   that he received as Vice President of Callaway Golf Ball. [*Id.*]

### C.    Dr. Felker Signed Four Confidentiality Agreements with Callaway Golf.

Dr. Felker repeatedly recognized his obligation of confidentiality to Callaway Golf. During his employment as Vice President, he signed at least three confidentiality clauses, including one in his Officer Employment Agreement, one in his Second Officer Employment Agreement, and one in his Employee Invention and Confidentiality Agreement. [Rider Decl., Exs. A, B and C.] Those agreements expressly survive the termination of employment and "shall be binding … *in perpetuity*." [*See* Rider Decl., Ex. A, § 11 (emphasis added); Ex. C, § 12 (emphasis added).] Dr. Felker was reminded of his confidentiality obligations during his exit interview with the company. [Rider Decl., Ex. E.]

Moreover, after leaving Callaway Golf's employ, Dr. Felker signed a fourth confidentiality agreement as part of his consulting contract with Callaway Golf. [Rider Decl., Ex. G.] As with the employment agreements, the confidentiality clause of the consulting agreement also extends into perpetuity. [*Id.*]

### D.    Callaway Golf Has Reminded Dr. Felker Repeatedly of His Confidentiality Obligations to the Company.

On numerous occasions since he left the company, Callaway Golf has reminded Dr. Felker of his confidentiality obligations. The first such instance occurred in late 2001, more than a year after Dr. Felker left Callaway Golf, when Acushnet asked Dr. Felker to serve as an expert in litigation against a seller of refinished golf balls. [Rider Decl., ¶¶ 14-15.] At the time, Dr. Felker was in an exclusive consulting relationship with Callaway Golf, and he asked that Callaway Golf allow him to perform the work for Acushnet. [*Id.*] Dr. Felker assured Callaway Golf that the matter would not involve Callaway Golf's intellectual property or products, nor would it involve the construction of golf balls. [*Id.*] Callaway Golf agreed to allow Dr. Felker to consult for Acushnet, but with several restrictions, all of which were set forth in writing in a letter agreement signed by Dr. Felker, Mr. Rider, and Joseph Nauman (Acushnet's General Counsel). [Rider Decl., Ex. I (October 12, 2001 agreement).] The letter agreement provides:

> 1)    Titleist has requested your services only as an expert witness in a third party dispute that does <u>not</u> involve Callaway Golf's intellectual property or products. You will not be providing any services on the design of golf balls for Titleist.
>
> 2)    You hereby confirm your obligation not to disclose any trade secrets or confidential information of Callaway Golf to Titleist, as agreed to in Section 12 of the Officer Employment Agreement and Section 13 of the Consulting Agreement.
>
> 3)    You hereby confirm your agreement not to disclose any trade secret or confidential information of Titleist to Callaway Golf, as previously agreed to in Section 21 of the Consulting Agreement.
>
> …

12

> 5)      Should a dispute arise between Callaway Golf and
> Titleist, you shall immediately cease providing consulting
> services to Titleist if requested to do so by Callaway Golf.
> Titleist agrees to waive its right to claim any conflict in
> Callaway Golf's use of your consulting services in any
> dispute that may arise between Titleist and Callaway Golf.

[*Id.*]

Callaway Golf again reminded Dr. Felker of his confidentiality obligations in

2002, upon the expiration of his formal consulting contract with Callaway Golf. [Rider

Decl., ¶ 16.] In letters dated August 20, 2002, and December 3, 2002, Callaway Golf

discussed the expiration of the contract and explicitly stated that, as of January 1, 2003,

Dr. Felker was free to consult with other golf ball companies. [Rider Decl., Ex. J

(August 20, 2002 letter) and Ex. K (December 3, 2002 letter).] Callaway Golf also

reminded Dr. Felker, however, of his obligations not to use or reveal Callaway Golf's

confidential information, stating:

> As stated in the Employee Invention and Confidentiality
> Agreement signed by you as an employee of Callaway Golf
> Ball Company and the Consulting Agreement entered into
> subsequent to your employment, you shall keep
> confidential all trade secrets and proprietary information
> obtained by you while performing services for Callaway
> Golf. Both of these agreements are binding on you in
> perpetuity.

[Rider Decl., Ex. J (August 20, 2002 letter).]

### E.      As Recently as Last Month, Dr. Felker Was Planning to Conduct an Executive Search for Callaway Golf, Before Abruptly Withdrawing Just Before Acushnet Disclosed Him as an Expert in this Litigation.

Dr. Felker's main business these days is as co-owner of Sanford Rose Associates,

a headhunting firm focused on placing high-level executives in the pharmaceutical and

biotechnology industries. [Halkowski Decl., Ex. B, p. 4.] In November of 2006, Peter

Stiles, a recruiter for Callaway Golf, contacted Dr. Felker to seek his assistance in finding

a person to fill a new senior management position in research and development.

[Declaration of Peter Stiles (hereinafter "Stiles Decl."), ¶ 2.] According to Mr. Stiles, Dr.

Felker was "very interested and eager to work with" Callaway Golf. [Stiles Decl., ¶ 3.]

13

Over the following few weeks, Mr. Stiles and Dr. Felker negotiated the terms of the

engagement and, during the week of December 10, 2006, exchanged several emails

regarding setting up a meeting to sign the contract. [Stiles Decl., ¶¶ 3-4.]

Then, on December 15, 2006, out of the blue, Dr. Felker left the following

voicemail for Mr. Stiles:

> Peter, this is Dave Felker with Sanford Rose Associates. I
> left a message for you yesterday around meeting with you
> guys next week. I am just swamped with our retained
> searches and going on vacation the 20th to the 27th. Now,
> I'm not going to be able to meet with you guys next week.
> And, you know, to tell you the truth, we never take on any
> contingency searches. And although it would be fun
> working with you guys, um, I really can't deviate from that
> model. I know you guys consider my fees too high or
> whatever...that's fine. We'll just pass on this. You know, I
> wish you good luck and everything. I hope everything
> works out for those guys in finding a good person. But
> when I really think about it, if I deviate from my business
> model, it's just not the right thing for me to do. So please
> don't send me any information on, you know, the
> contingency agreement and so forth. You guys have a
> good holiday. Thanks...goodbye.

[Stiles Decl., ¶¶ 5-6 (emphasis added).] Throughout the negotiation process, Dr. Felker

had never expressed any concern about working on a contingency basis. [Stiles Decl., ¶

7; Ogg Decl., ¶ 10.]

Five days after Dr. Felker left this voicemail, Acushnet notified Callaway Golf

that it had retained Dr. Felker as an expert in this case. [Halkowski Decl., ¶ 3, Ex. B.]

## V.    ARGUMENT

Federal courts have the inherent power to disqualify expert witnesses to protect

the integrity of the adversary process and to promote public confidence in the legal

system. [*See Eastman Kodak Co. v. Agfa-Gevaeri N.V.*, No. 02-CV-6564, 2003 WL

23101783 (W.D.N.Y. Dec. 4, 2003) (barring alleged infringer from retaining patent

holder's former employee as an expert; former employee was not an inventor on the

patents-in-suit but had access to relevant confidential information during his

employment); *Space Systems/Loral v. Martin Marietta Corp.*, Civ. No. 95-20122 SW,

1995 WL 686369 *2 (N.D. Cal. 1995) (same); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991) (barring defendant from using expert who previously had privileged communications with plaintiff's counsel regarding the patents-in-issue); *Koch Refining, Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996) (affirming district court's order barring party from using expert who previously had been engaged as an expert by adverse party).]

Courts have developed a two-part inquiry to determine whether disqualification of an expert based on prior relationships with an adversary is appropriate. [*See Eastman Kodak*, 2003 WL 23101783 at *1; Space *Systems*, 1995 WL 686369 at *2; *Wang,* 762 F. Supp. at 1248.] Disqualification is appropriate if: (1) it was "objectively reasonable" for the party seeking disqualification to have concluded that a confidential relationship existed with the expert; and (2) the moving party disclosed to the expert confidential or privileged information relevant to the current litigation. [*Id.*] "Affirmative answers to both inquiries compel disqualification." [*Wang,* 762 F. Supp. at 1248.] In addition, some courts have also considered public interest factors, including fairness and preventing conflicts of interest, in determining whether or not an expert should be disqualified. [*Koch,* 85 F.3d at 1182-83.] The party moving for disqualification bears the burden on these factors. [*Id.* at 1181.]

### A.    Callaway Golf Had A Reasonable Expectation Of Confidentiality With Dr. Felker.

The first prong of the applicable test concerns whether Callaway Golf had a reasonable expectation that it had a confidential relationship with Dr. Felker. In cases like this, where the expert in question is a former employee of the adverse party, courts have relied upon the expert's written confidentiality agreement with his former employer to satisfy this requirement. [*See Eastman Kodak*, 2003 WL 23101783, at *5 n.5; *Space Systems*, 1995 WL 686369, at *2; *Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer,*

15

*Inc.*, 2000 WL 42202 *4 (S.D.N.Y. 2000).] As discussed above, Dr. Felker signed at least <u>four</u> such agreements with Callaway Golf.

First, Dr. Felker signed three separate confidentiality provisions with Callaway Golf Ball as part of: (1) his Officer Employment Agreement; (2) his Second Officer Employment Agreement; and (3) his Employee Invention and Confidentiality Agreement. [Rider Decl., Ex. A, § 11; Ex. B, § 5; Ex. C, § 12.]

By signing these provisions, Dr. Felker recognized and conceded that he would be privy to confidential and trade secret information and that Callaway Golf expected Dr. Felker to refrain from disclosing that information to any third party. [*Id.*] Each confidentiality provision expressly states that it extends in perpetuity. [*Id.*] Moreover, Dr. Felker was specifically reminded of his contractual obligation to refrain from disclosing Callaway Golf's confidential information and trade secrets as part of his exit interview from Callaway Golf and on numerous subsequent occasions. [Rider Decl., Ex. E (Doc from Employment File).]

After leaving Callaway Golf, Dr. Felker signed a consulting agreement with the company, which contained a fourth confidentiality provision. [Rider Decl., ¶¶ 11-12, Ex. G (2001 Consulting Agreement).] Again, Dr. Felker recognized that he was entering into a confidential relationship with Callaway Golf and that Callaway Golf expected Dr. Felker to maintain the confidentiality of its information.

Finally, when Dr. Felker approached Callaway Golf in 2001 to request that he be allowed to consult with Titleist, both Dr. Felker and Acushnet's General Counsel signed another letter agreement expressly confirming Dr. Felker's confidentiality obligations under his Officer Employment Agreement and his Consulting Agreement.[3] [Rider Decl.,

---

[3] In that letter, Dr. Felker agreed that, if a dispute arose between Callaway Golf and Acushnet, he would stop work for Acushnet at Callaway Golf's request. [Rider Decl., Ex. I, ¶ 5.] Now that Dr. Felker's formal consulting agreement has expired, it is unclear whether the separate letter agreement remains binding and Dr. Felker must withdraw at Callaway Golf's request. That is not the focus of this motion, however. Instead, this motion is based on the fact that Dr. Felker has privileged and confidential information

16

REDACTED

Ex. I.] Then again, when Dr. Felker's formal consulting contract expired at the end of

2002, Callaway Golf sent him two separate letters reminding him that his confidentiality

obligations to the company remain effective in perpetuity. [Rider Decl., Ex. J (August

20, 2002 letter) and Ex. K (December 3, 2002 letter).]

Callaway Golf relied upon Dr. Felker not to divulge the privileged and

confidential information to which he was exposed in his work for Callaway Golf.  The

confidentiality agreements that he signed prove that Callaway Golf's reliance was

reasonable. [*See Eastman Kodak*, 2003 WL 23101783, at *5 n.5; *Space Systems*, 1995

WL 686369, at *2; *Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 2000 WL

42202 *4 (S.D.N.Y. 2000).] Accordingly, the first prong of the two-part test is more than

satisfied here.[4]

### B.    Dr. Felker Received Substantial Privileged and Confidential Information Relevant to this Case.

Over the course of their eight-year relationship, Callaway Golf unquestionably

disclosed significant confidential information to Dr. Felker.  Most importantly, Dr. Felker

had scores of privileged conversations with,                                                    ,

Callaway Golf's attorneys regarding golf ball patents,

.  Indeed, Dr. Felker not only was shown attorney work

product information related to the patented technology, but he helped Callaway Golf's

attorneys develop many of the opinions contained in that work product.  In addition, Dr.

---

of Callaway Golf <u>that is related to the pending litigation</u>, and therefore he cannot serve
as a consultant adverse to Callaway Golf.

[4] Acushnet may attempt to rely upon the *Syngenta Seeds* case, in which this Court found
no reasonable expectation of confidentiality, but the facts here are substantially
different. *Syngenta Seeds, Inc. v. Monsanto Co.*, Civ. No. 02-1331-SLR, 2004 WL
2223252 *1 (D. Del. 2004).  In that case, the expert had worked with the moving party
only on "several minor research projects," and the expert's litigation consultation had
consisted of merely reviewing documents and spending a <u>few days</u> preparing for his
deposition. *Id.* at *2.  In stark contrast, Dr. Felker worked for Callaway Golf at an
executive level for four years and was exposed to vast amounts of privileged
information, and later, as a consultant, he devoting at least 100 hours <u>per month</u> to
Callaway Golf over a span of over 20 months from April 2001 through December 2002.
[Rider Decl., ¶ 11, Ex. G (Consulting Agreement).]

Felker has significant confidential information regarding Callaway Golf's development of its premium three-piece golf balls, which will be important to issues of damages and commercial success in this case.  Accordingly, Dr. Felker cannot serve as a consultant or expert for Acushnet.  [*See Eastman Kodak Co.*, 2003 WL 23101783 at *2, *5 n.5; *Space Systems*, 1995 WL 686369 at *2.]

A similar issue was presented in *In re Data General Corp. Antitrust Litig.*, MDL Docket No. 369, 1986 U.S. Dist. LEXIS 21923, 5 Fed. R. Serv. 3d 510 (N.D. Cal. 1986). In *Data General*, the defendant sought to use two of the plaintiff's former employees as paid consultants/experts in the litigation.  [*Id.* at *3-*4.]  The plaintiff objected, arguing that the former employees possessed confidential, and in some cases privileged, information relevant to the case.  [*Id.*]  The court prohibited the defendant from retaining the former employees, stating that, "[t]he court will not place its imprimatur on a program that opens the door to great mischief."  [*Id.* at *4.]  While noting that the defendant is free to hire experts as it sees fit, the court held that "[i]t is not free, however, to raid plaintiffs' roster of former employees where those employees, during their tenure, have become privy to matters protected by the attorney-client or work-product privilege or which are subject to employee agreements protecting [plaintiff's] trade secrets."  [*Id.* at *4-*5.]  The court summarized its rationale and holding as follows:

> The knowledge these witnesses have of matters protected by the attorney-client privilege, trade secret agreements and possibly work-product privilege is so intermingled with knowledge that may be unprotected that the court cannot be assured [defendant] or the former employees will be able to segregate out only those matters that may be disclosed. The danger of disclosure of protected information is substantial. There is no sure way of guarding against disclosure if the employees are permitted to work for defendant on this litigation. [Plaintiff] is entitled to enforce the protective order and the employee agreements. [Defendant] is not entitled to the paid services of these former employees. No matter how well-intentioned counsel and the witnesses may be, the potential for abuse and mischief is great. The court declines to put its stamp of approval on the arrangement proposed. As explained above, [Defendant] is not deprived of these witnesses' testimony, only their services.

18

[*Id.* at \*9-\*10.]

The exact same logic applies in the instant case, and for that reason, the Court

should disqualify Dr. Felker.

        **1.**      **Dr. Felker's Exposure to Callaway Golf's Privileged Analyses**
**, as Well as Other Golf Ball**
**Patents, Makes It Impossible for Him to Consult for Acushnet**
**Without Revealing or Relying Upon Privileged Information.**

As discussed in the fact section above, as Vice President of Research and

Development, Dr. Felker oversaw Callaway Golf Ball's

REDACTED

Through all of these discussions,

Dr. Felker received (and indeed helped develop) Callaway Golf's legal theories regarding

As part of this process, Dr. Felker also was exposed to

REDACTED

The accused Acushnet balls (the
Titleist Pro V1 family) use the same three-piece construction that was so revolutionary in
Callaway Golf's Rule 35 ball, namely a solid core, a relatively hard inner cover layer, and
a relatively soft outer cover layer.  [Catania Decl., ¶ 8.]

Accordingly, all of the privileged information given to Dr. Felker

is

relevant in this case.

20

If Dr. Felker is allowed to turn around and consult with Acushnet – against Callaway Golf – regarding that same technology,

, he undoubtedly, although perhaps inadvertently, would use or rely upon privileged information he learned                                        for Callaway Golf. Regardless of his intentions, Dr. Felker cannot compartmentalize in his mind what information he learned during his work for Callaway Golf and what he might learn in consulting for Acushnet. Instead, his exposure to Callaway Golf's privileged information must disqualify him from working with Acushnet on this case.

This situation is similar to that in *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991). In that case, the defendant hired an expert who had previously discussed the litigation with plaintiff's counsel and had reviewed some of the plaintiff's work product. [*Id.* at 1247.] The court disqualified the expert, finding that, "[w]hile the value of the disclosures is debatable, their essential work-product nature is not." [*Id.* at 1248-49.]

Here, the value of Callaway Golf's disclosure to Dr. Felker is not debatable – it is of extreme value and directly related to issues in this case. While Dr. Felker did not learn the privileged information as an expert for Callaway Golf in this litigation, he received it in his role as Vice President of Callaway Golf Ball and as part of his task of analyzing patent infringement and validity issues for Callaway Golf. As the *Wang* court stated, "[n]o experienced litigator would freely disclose these materials to opposing counsel," and that is exactly what would happen if Dr. Felker is allowed to consult for Acushnet. [*Id.*] To do so would give Acushnet direct access to privileged information developed by Callaway Golf's attorneys. Accordingly, Dr. Felker must be disqualified. [*See also Bristol-Meyers*, 2000 WL 42202 at *5 (disqualifying expert who received confidential information related to the litigation, even though the disclosure took place outside the scope of the litigation).]



Dr. Felker's subsequent consulting work for Callaway Golf further justifies disqualification. In consulting with Callaway Golf on the Maxfli case, Dr. Felker was exposed again to much of the relevant privileged information he received while Vice President for Callaway Golf Ball.

Accordingly, as recently as August of 2004, Dr. Felker has refreshed his memory regarding Callaway Golf's relevant privileged information. [*Id.*, ¶¶ 11-13, Ex. H.] While Dr. Felker's exposure to privileged information as Vice President is more than sufficient to require his disqualification, that he was exposed to more privileged information in his consulting role leaves no room for doubt.

### 2.    Dr. Felker's Exposure to Callaway Golf's Confidential Technical Information Further Supports His Disqualification.

In addition to receiving an overwhelming amount of relevant privileged information, Dr. Felker also has significant confidential technical information of Callaway Golf that will be relevant in this litigation. As Vice President of Research and Development, Dr. Felker was directly responsible for the technical aspects of the design of the Rule 35 golf ball. [Ogg Decl., ¶¶ 3-5; Catania Decl., ¶¶ 9-10.] He established the various development teams, including the core and cover teams for Callaway's golf ball products, and all of the teams reported directly to him. [Rider Decl., Ex. D (Org. Chart).]

REDACTED

These technical issues are relevant in the instant litigation, because the accused Pro V1 golf balls share the same three-piece design that Callaway Golf developed for the Rule 35 golf ball, and because the Rule 35 ball itself is relevant for issues of commercial success and lost profits. [*See* Catania Decl., ¶ 8.] If Dr. Felker is allowed to consult with Acushnet in this case, he would inevitably reveal or rely upon the considerable amount of

confidential information that he knows about Callaway Golf's three-piece golf ball technology and the Rule 35 golf ball in particular.

A similar issue was presented in *Eastman Kodak Co. v. Agfa-Gevaeri N.V.,* No. 02-CV-6564, 2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003). In that case, the accused infringer sought to hire one of the patent holder's former employees as its expert. First, the court found that "[t]here is no question" that the former employee had a confidential relationship with the patent holder based on the confidentiality clause of his employment agreement. [*Id.* at *1 n.2.] The court then considered the second prong of the two-part test: "The critical question then is whether Hailstone received confidential information 'that is relevant' to the current patent litigation during his lengthy employment with [the patent holder]." [*Id.* at *2.] Although the former employee was not an inventor on the asserted patents, the court found that "there is a sufficient connection between the confidential information [the former employee] had access to and the technology at issue in the [asserted] patents to mandate the issuance of a protective order." [*Id.* at *5.]

The same analysis, and same conclusion, applies here. Setting aside the significant amounts of ***privileged*** information that Dr. Felker learned in his work for Callaway Golf, he also was intimately involved in the development of the Rule 35 golf ball and consistently exposed to confidential information, including patent applications, relating to that technology. Moreover, as with the former employee in *Eastman Kodak,* Dr. Felker's knowledge of the relevant technology is based primarily on his work for Callaway Golf – the only golf ball company for whom he has ever been employed. As in *Eastman Kodak,* fairness dictates that Dr. Felker should not be able now to use that confidential information <u>against</u> Callaway Golf as a paid expert in this case. [*See Eastman Kodak,* at *5 n.5 (precluding former employee from serving as "a patent consultant in litigation against his former employer with respect to issues relevant to the very technology he worked on for his former employer"); *See also Space Systems,* 1995 WL 686369 at *2 (finding "no doubt" that expert must be disqualified based on being

23

REDACTED

"privy to substantial confidential information [of the moving party] that is relevant to issues in this case"); *In re Data General Corp.*, 1986 U.S. Dist. LEXIS 21923, at *8-*9 (noting that "each of these employees is a party to a written contract by which he has agreed not to divulge trade secret information," and that "the court will not use its offices to sanction in advance a potential breach").]

## C.    Relevant Policy Considerations Favor Dr. Felker's Disqualification.

Although the Court need not go any further in its analysis that Dr. Felker should be disqualified – *see Wang,* 762 F. Supp. at 1248 (affirmative answers to both prongs of the two-part test compels disqualification) – an analysis of the relevant policy considerations further supports disqualification. The policy considerations that courts consider in favor of disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process. [*See Koch*, 85 F.3d at 1182.] The main policy considerations considered in militating against disqualification are ensuring that the parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling. [*Id.* at 1183.] The courts also consider whether other experts are available, and whether the "opposing party" has time to hire another expert before trial. [*Id.*]

Here, there is a clear conflict of interest in allowing Dr. Felker to act as an expert or consultant for Acushnet against Callaway Golf. As already discussed, Dr. Felker had a very high-level employment relationship with Callaway Golf from 1996 to 2000, as well as a consulting relationship that extended until 2004. In these roles, Dr. Felker was given overwhelming amounts of privileged information on the very topics at issue in this case –

Moreover, Dr. Felker has substantial confidential information regarding technical aspects of Callaway Golf's golf ball development, which also is relevant to several of the issues in this case, including damages. Finally, Dr. Felker signed no fewer than four confidentiality agreements with Callaway Golf.

If allowed to consult with Acushnet, it is inevitable that Dr. Felker would breach his obligation to Callaway Golf and rely upon or reveal privileged and confidential information. Assuming that Dr. Felker would not intentionally reveal any privileged information, the risk of inadvertent disclosure is very high, and such a disclosure would completely undermine the fairness of the judicial process for Callaway Golf in this litigation. Moreover, allowing Dr. Felker to consult adverse to Callaway Golf would punish Callaway Golf

it might encourage companies to avoid seeking such advice in the future. Those policies strongly weigh in favor of disqualification.

With respect to the militating factors, there is no risk that disqualifying Dr. Felker would jeopardize his livelihood. Dr. Felker is President of Sanford Rose – an executive search agency that he started in 2002 – and his expert and consulting work is in addition to his full time job as President of Sanford Rose. Moreover, Callaway is not seeking to prevent Dr. Felker from ever consulting for Acushnet. Rather, it seeks only that Dr. Felker not be permitted to serve as an expert or consult for Acushnet against Callaway Golf. As such, Dr. Felker's livelihood would not be affected if he is disqualified in this case.

Further, Acushnet would not be affected, either. There are many other experts that Acushnet could retain – experts who have not previously received Callaway Golf's privileged information on these issues. Moreover, expert discovery does not commence in this case for another four months. Acushnet still has plenty of time to retain another expert.

Accordingly, the relevant policy considerations all favor disqualifying Dr. Felker from serving as Acushnet's expert or consultant in this litigation.



25

## VI.    CONCLUSION

For the foregoing reasons, Callaway Golf respectfully requests this Court grant its Motion to Disqualify David Felker from Acting as a Consultant or Expert to Acushnet in this case.


Dated:  January 23, 2007          FISH & RICHARDSON P.C.


By:  /s/ *Thomas L. Halkowski*
   Thomas L. Halkowski (#4099)
   919 N. Market Street, Suite 1100
   P.O. Box 1114
   Wilmington, DE 19899-1114
   Tel:  (302) 652-5070
   Fax:  (302) 652-0607

   Frank E. Scherkenbach
   225 Franklin Street
   Boston, MA 02110-2804
   Tel:  (617) 542-5070
   Fax:  (617) 542-8906

   Roger A. Denning
   W. Chad Shear
   Michael A. Amon
   12390 El Camino Real
   San Diego, CA 92130
   Tel:  (858) 678-5070
   Fax:  (858) 678-5099

   Attorneys for Plaintiff
   CALLAWAY GOLF COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2007, I electronically filed the **REDACTED**

**VERSION OF PLAINTIFF CALLAWAY GOLF COMPANY'S MOTION TO**

**DISQUALIFY DEFENDANT ACUSHNET COMPANY'S EXPERT DAVID FELKER**

with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to

the following Delaware counsel.  In addition, the filing will also be sent via hand delivery:

Richard L. Horwitz                      Attorneys for Defendant
David E. Moore                          ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza, 6th floor
1313 N. Market Street
Wilmington, DE 19801


I hereby certify that on January 24, 2007, I have mailed by United States Postal Service,

the document(s) to the following non-registered participants:

Joseph P. Lavelle                       Attorneys for Defendant
Howrey LLP                              ACUSHNET COMPANY
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004


/s/ *Thomas L. Halkowski*
Thomas L. Halkowski