IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REDACTED

| | |
|---|---|
| CALLAWAY GOLF COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>ACUSHNET COMPANY,<br><br>        Defendant. | C. A. No. 06-91 (SLR)<br><br>**FILED UNDER SEAL – CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER – NOT TO BE DISCLOSED EXCEPT BY COURT ORDER OR WRITTEN STIPULATION OF THE PARTIES** |

**DECLARATION OF MICHAEL J. RIDER IN SUPPORT OF PLAINTIFF CALLAWAY GOLF COMPANY'S MOTION TO DISQUALIFY DAVID FELKER AS AN EXPERT IN THIS CASE**

I, Michael J. Rider, declare as follows:

1.      I am Senior Vice President and General Counsel for Callaway Golf Company ("Callaway Golf"), and I am a member of the Bar of the States of California and Arizona in good standing. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.      Prior to being hired by Callaway Golf Ball Company ("Callaway Golf Ball"), then a wholly owned subsidiary of Callaway Golf, Dr. David L. Felker was employed by DuPont Chemical Company, where he worked on, among others things, ionomer chemistry technology.

3.      Dr. Felker was hired by Callaway Golf Ball as Vice President of Research in December 1996 as a charter member of its executive team. Callaway Golf Ball hired Dr. Felker, in part, because of his expertise in ionomer chemistry technology and his past managerial experience. However, Callaway Golf Ball was aware that it would have to train Dr. Felker with respect to golf ball technology and the intellectual property applicable to golf balls. Accordingly, Callaway Golf Ball devoted considerable resources to educating Dr. Felker on the golf ball industry

REDACTED

All of that research – and the privileged advice – was shared with Dr. Felker.

4.    Attached to my declaration as Ex. A is a true and correct copy of Dr. Felker's Officer Employment Agreement that he signed upon joining Callaway Golf Ball. The Agreement included, among other things, Confidential Information non-disclosure clauses that specifically prohibit Dr. Felker from disclosing to any person or entity outside Callaway Golf any trade secret, proprietary and/or confidential information he learned while an employee of Callaway Golf Ball. *See* Ex. A, § 11. That obligation continues in perpetuity. *Id.*

5.    Attached to my declaration as Ex. B is a true and correct copy of an Employee Invention and Confidentiality Agreement that Dr. Felker signed in January of 1997. That Agreement also prohibits Dr. Felker from disclosing any Confidential Information of any kind to any person or entity outside of Callaway Golf Ball. *See* Ex. B, ¶ 5. The Employee Invention and Confidentiality Agreement also extends beyond and survives Dr. Felker's employment with Callaway Golf Ball. *Id.*

6.    Attached to my declaration as Ex. C is a true and correct copy of a second Officer Employment Agreement, signed by Dr. Felker in 1999, that superseded the 1996 employment agreement. As did the previous employment agreement, the 1999 Agreement contains Trade Secret and Confidential Information clauses that prohibit Dr. Felker from disclosing "Trade Secret or Confidential Information" to any person or entity outside of Callaway Golf Ball. *See* Ex. C, §12. Again, that obligation continues in perpetuity. *Id.*

7.    As Vice President of Research, and later Vice President of Research and Development, Dr. Felker regularly was advised by Callaway Golf's legal department, and its outside counsel, regarding a wide variety of issues. As a result, Dr. Felker was the

REDACTED

principal recipient of confidential and privileged information detailing

More examples of the confidential work that were shared with Dr. Felker will be shared with the Court *in camera* and under seal.

8.     Attached to my declaration as Ex. D is a true and correct copy of an organizational chart for Callaway Golf Ball's research and development department.

9.     Dr. Felker's employment with Callaway Golf Ball terminated in October 2000. Attached to my declaration as Ex. E is a true and correct copy of a letter to Dr. Felker reiterating his obligation not to disclose any Confidential Information to any person or entity outside Callaway Golf Ball. Dr. Felker's position as Vice President of Research and Development ended in October 2000.

10.     Attached to my declaration as Ex. F is a true and correct copy of a 2000 fiscal year research and development tax credit study filled out by Dr. Felker for Callaway Golf.

11.     Attached to my declaration as Ex. G is a true and correct copy of a Consulting Agreement that Dr. Felker entered into with Callaway Golf in April of 2001. Dr. Felker served as a consultant to Callaway Golf from 2001 through 2004. The terms of the Consulting Agreement required Dr. Felker to make himself available to Callaway Golf for at least 100 hours per month through at least December 2002. *See id.* Dr. Felker worked with our lawyers and me on several issues, including in Callaway

Golf's defense of a counterclaim filed by Dunlop Slazenger Group Americas ("Maxfli"

for theft of trade secrets. In that case, which was tried in this Court in August 2004, Dr.

Felker testified about the massive research and development effort undertaken by

Callaway Golf Ball to develop the Rule 35 golf ball, a golf ball which is at issue in the

instant action against Acushnet. Dr. Felker spent hundreds of hours preparing for and

testifying in the Maxfli case, and was paid pursuant to the Consulting Agreement for that

effort. It is my belief, which I can explain in detail to the Court *in camera*, that the

confidential and privileged information that was provided in connection with that

engagement is directly relevant to this case.

      12.    The Consulting Agreement between Callaway Golf and Dr. Felker

contains Confidential Information and Trade Secrets clauses that prohibit Dr. Felker from

disclosing any Callaway Confidential Information learned as a result of his consulting

activities with Callaway Golf to any outside entity or person. *See id.*, ¶ 13. That

obligation also extends in perpetuity. *Id.*

      13.    Attached to my declaration as Ex. H is a true and correct copy of a bill

submitted by Dr. Felker in August 2004 for consulting fees related to the Maxfli case.

Dr. Felker was paid as a consultant for his work on the Maxfli case through September of

2004.

      14.    In October 2001 and subsequent to executing the Consulting Agreement

with Callaway Golf, Dr. Felker sought Callaway Golf's permission to enter into a

consulting agreement with Acushnet/Titleist unrelated to this litigation. Specifically, my

recollection is that Dr. Felker asked for permission to work for Acushnet as an expert

witness

Although I was never provided with his testimony or expert report in that case, Dr. Felker

explained that his role would be to test the properties and performance of refinished golf

balls and to opine that the performance of a refinished golf ball was inferior to the

original product. It is my further understanding that none of the work was to involve



testimony on the scope of golf ball patents, patent infringement, or freedom to operate in the area of golf balls. If his testimony was to address those kinds of issues, we would not have consented to the engagement given Dr. Felker's exposure to Callaway Golf confidential and privileged information as an employee and as anticipated by virtue of his consulting relationship. Attached to my declaration as Ex. I is a true and correct copy of the resulting agreement between Joe Nauman, General Counsel of Acushnet, Callaway Golf and Dr. Felker as to the extent to which he is permitted to act as a consultant to Acushnet.

      15.    Specifically, and as set forth in Ex. I, Dr. Felker was permitted to perform limited expert work for Acushnet/Titleist on the condition that he: (1) not provide Acushnet any services related to golf ball design; (2) confirm his obligation not to disclose any trade secret or confidential information to Acushnet; (3) make himself available to fulfill his consulting requirements to Callaway Golf; and (4) immediately cease providing consulting services to Acushnet if a dispute arose between Callaway Golf and Acushnet. *See id.*, ¶¶ 1-5.

      16.    Attached to my declaration as Ex. J is a true and correct copy of a letter I sent to Dr. Felker on August 20, 2002 regarding the expiration of Dr. Felker's Consulting Agreement with Callaway Golf in December of 2002. Attached to my declaration as Ex. K is a true and correct copy of a letter sent by Lisa Stutler of Callaway Golf's legal department to Dr. Felker also regarding the expiration of Dr. Felker's Consulting Agreement with Callaway Golf in December 2002. As the end of Dr. Felker's Consulting Agreement with Callaway Golf approached, I wrote to him to inform him that he was permitted to contact other golf companies to offer his services. *See* Ex. J. In that letter, and in a subsequent letter sent to Dr. Felker by Callaway Golf's legal department, Dr. Felker was reminded of his contractual obligation to not disclose any Callaway Golf confidential or privileged information to any third party. *See id.*; Ex. K.

17.    In early 2006, after Callaway Golf filed this suit against Acushnet, I called Dr. Felker regarding the possibility of serving as an expert witness for Callaway Golf. Dr. Felker told me that because of his involvement with both Callaway Golf and Acushnet, he would not provide any services to either company in relation to this litigation. Although I was disappointed by his response, I told Dr. Felker that I would respect it. I also reminded Dr. Felker that he continued to have privileged and confidential information about Callaway Golf's own development of the Rule 35 golf ball, and that he might be called as a fact witness by Callaway Golf or by Acushnet.

18.    Recently, however, I was asked whether Callaway Golf should engage Dr. Felker's executive search firm, Sanford Rose, to perform a search for a candidate for a position in golf ball research and development. Based on the promise that Dr. Felker made to me, I approved that retention.

19.    Attached to my declaration as Ex. L is a true and correct copy of a letter I sent to Dr. Felker on January 5, 2007. In that letter, I told Dr. Felker that I believe the suit between Callaway Golf and Acushnet constitutes a dispute under the October 12, 2001 letter agreement executed between Callaway Golf, Dr. Felker and Acushnet. *See* Ex. L; *see also* Ex. I. I insisted that Dr. Felker cease all consulting activities with Acushnet adverse to Callaway Golf. *See* Ex. L.

20.    On January 6, 2007, Dr. Felker responded to my January 5 letter and requested copies of his Officer Employment Agreement, Ex. C, and his Consulting Agreement with Callaway Golf, Ex. G. I directed Roger Denning of Fish & Richardson P.C. to send Dr. Felker copies of those documents, which he did on January 8, 2007.

21.    On January 8, 2007, Acushnet's attorneys also requested copies of Dr. Felker's Officer Employment Agreement, Ex. C, and his Consulting Agreement, Ex. G. I again directed Roger Denning to provide copies of those documents to Acushnet's counsel, which he did on January 9, 2007.

22.    Attached to my declaration as Ex. M is a true and correct copy of a January 12, 2007 email I sent to Dr. Felker. On January 12, 2007, Callaway Golf voluntarily sent Dr. Felker additional correspondence relevant to this issue. Specifically, Callaway Golf sent Dr. Felker the August 20, 2002 letter from me to Dr. Felker, Ex. J, and the December 2002 letter from Lisa Stutler to Dr. Felker, Ex. K.

23.    Attached to my declaration as Ex. N is a true and correct copy of a January 12, 2007 email Dr. Felker sent me regarding his consulting activities with Acushnet in this case. On January 12, 2007, Dr. Felker responded to Callaway Golf, stating that he did not see a conflict in consulting for Acushnet in this case, and asking me to call him if I thought there were issues he [Dr. Felker] was overlooking.

24.    Attached to my declaration as Ex. O is a true and correct copy of a January 12, 2007 email from Roger Denning forwarding a message from me to Dr. Felker. On that same day, I responded to Dr. Felker, stating that I believe that he is in possession of Callaway Golf confidential and privileged information relevant to this case and that he would inevitably reveal if he continues as an expert for Acushnet in this case. I reiterated my request that Dr. Felker withdraw as Acushnet's expert in this case and refrain from consulting with Acushnet in any matter related to this suit.

25.    Dr. Felker has not responded, other than to ask that he be allowed to share the information in my email of January 12, 2007, with outside counsel for Acushnet. Through counsel for Callaway Golf, I gave Dr. Felker that permission. I have not had any other communications with Dr. Felker.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ⎣7th day of January, 2007, at Carlsbad, California.

Michael J. Rider, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2007, I electronically filed the **REDACTED VERSION OF DECLARATION OF MICHAEL J. RIDER IN SUPPORT OF PLAINTIFF CALLAWAY GOLF COMPANY'S MOTION TO DISQUALIFY DEFENDANT ACUSHNET COMPANY'S EXPERT DAVID FELKER** with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel.  In addition, the filing will also be sent via hand delivery:

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza, 6th floor
1313 N. Market Street
Wilmington, DE 19801


I hereby certify that on January 24, 2007, I have mailed by United States Postal Service, the document(s) to the following non-registered participants:

Joseph P. Lavelle                           Attorneys for Defendant
Howrey LLP                                  ACUSHNET COMPANY
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004


/s/ *Thomas L. Halkowski*
Thomas L. Halkowski

Exhibit A

# REDACTED
# IN ITS ENTIRETY

Exhibit B

**EMPLOYEE INVENTION AND CONFIDENTIALITY AGREEMENT**
**FOR**
**CALLAWAY GOLF COMPANY**

This Employee Invention and Confidentiality Agreement is made effective as of this _16_ day of _January_, 19_97_ by _David L. Felker_ ("Employee"). As a condition of employment by Callaway Golf Company ("CG"), Employee agrees as follows:

1.      "Confidential Information" includes CG's trade secrets and proprietary information comprising, but not limited to, all patented materials, lab notebooks, copyrighted materials, manufacturing techniques, programs, processes, formulas, codes, research and development related information, business plans and strategies, marketing data, cost of materials data, customer lists, supplier lists, employee lists, and the terms or contents of all contracts or negotiations.

2.      "Invention" includes, but is not limited to, any invention, improvement, discovery, idea, or process, as well as all related notebooks, documentation, and all proprietary information and rights, whether or not patentable, relating to the design, manufacture, use or marketing of golf equipment or other products of CG, conceived or developed by Employee while employed by CG.

3.      Employee transfers and assigns to CG all of Employee's right, title and interest in all Inventions which Employee conceives or reduces to practice during his/her employment with CG to the extent the Inventions either (a) result from any work performed by Employee for CG, or (b) relate to CG's business or CG's actual or anticipated research and development. Employee agrees to disclose to CG all Inventions subject to this agreement and to help CG properly document its rights to such Inventions, and to assist in the preparation of any and all U.S. and foreign patent applications related to such Inventions.

4.      The preceding paragraphs are intended and should be construed to comply with California Labor Code Section 2870 which enables an employee to retain certain inventions which he/she develops in his/her free time, with his/her own equipment and which does not relate to the employee's work for his/her employer, the employer's business or the employer's actual or anticipated research and development.

5.      Employee will not, at any time, whether during or subsequent to the term of his/her employment with CG, in any fashion, form, or manner, unless specifically consented to in writing by CG, either directly or indirectly, use for his/her own benefit, or divulge, disclose, or communicate to any person, firm, entity or corporation not bound by a similar CG Invention and/or Confidentiality Agreement, in any manner whatsoever, any Confidential Information of any kind, nature, or description concerning any matters affecting or relating to the business of CG. The Confidential Information is important material and represents confidential trade secrets, proprietary information and confidential business information of CG, and affects the successful conduct of CG's business and its goodwill. Any breach of any term of this paragraph is a material breach of this agreement.

6.      All equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondences, lists, programs, documentation, and/or other related materials produced as a result of Employee's employment by CG, as well as copyrights, trademarks, and patents resulting from any work done by Employee during the term of his/her employment, other written or graphic records, and the like, affecting or relating to the business of CG, which Employee shall prepare, use, construct, observe, possess, or control, shall be and remain CG's sole property. In the event of termination of employment with CG, Employee agrees to deliver promptly to CG all the foregoing which are then or have been in Employee's possession or under his/her control, and will not take with him/her the originals or copies of CG documents and documentation relating to CG's Confidential Information, except with CG's prior written consent.

7.      In the event Employee violates this agreement, CG may terminate the employment of Employee immediately, bring litigation in any federal or state court of competent jurisdiction to enjoin Employee's breach of this agreement and to recover costs of such litigation, including attorneys' fees, in the event CG is successful in the litigation. This agreement shall be governed by the internal laws of the State of California and shall benefit and bind any successor to Employee or CG.

        Executed the day first above written.

_____
Signature of Employee

Exhibit C

# REDACTED
# IN ITS ENTIRETY

Exhibit D

# REDACTED
# IN ITS ENTIRETY

Exhibit E



———— CALLAWAY GOLF COMPANY ————

September 26, 2000

<u>Hand Delivered</u>

David Felker
30477 Via Maria Elena
Bonsall, CA  92003

      Re:    Termination of Officer Employment Agreement

Dear David:

      This letter confirms that effective September 26, 2000, Callaway Golf Ball Company (the "Company") is terminating your employment with the Company pursuant to Section 8(a) of the Officer Employment Agreement entered into as of January 1, 1999, as modified by a First Amendment to Officer Employment Agreement effective as of January 1, 2000 (collectively the "Agreement") (copies attached).  Under Section 8(a), you will receive the following severance from the Company:

- Any compensation accrued and unpaid as of the date of termination; and
- the immediate vesting of all unvested stock options that would have vested had you remained employed pursuant to the Agreement through December 31, 2002.

      In addition to the foregoing, and subject to the provisions of Section 20 of the Agreement, you shall be entitled to Special Severance equal to:

- Severance payments equal to your former base salary at the same rate and on the same schedule as in effect at the time of termination through December 31, 2002;
- the payment of premiums owed for COBRA insurance benefits for 18 months (the maximum time allowable by COBRA).

      As set forth in section 20 of the Agreement, in order to be eligible for your Special Severance, you must:

- Comply with the terms and conditions of Sections 7(b), 7(c), 7(e), 12, 13 and 18 of the Agreement;

- not, directly or indirectly (whether as agent, consultant, holder of a beneficial interest, creditor, or in any other capacity), engage in any business which engages directly or indirectly in competition with the businesses of the Company or any of its affiliates, or have any interest, direct or indirect, in any person, firm, corporation, or venture which directly or indirectly competes with the businesses of the Company or any of its affiliates. For purposes of this section, the ownership of interests in a broadly based mutual fund shall not constitute ownership of the stocks held by the fund; and

David Felker
September 26, 2000
Page 2

- not, directly, indirectly, or in any other way, disparage the Company, its officers or employees, vendors, customers, products or activities, or otherwise interfere with the Company's press, public and media relations.

Please call me if you have any questions. Thank you for your service to the Company.

Sincerely,

Donna Kaptain
Senior Vice President, Human Resources
Callaway Golf Company

:ls
h:\employ\felker(a) letter092600.doc

Exhibit F





— CALLAWAY GOLF COMPANY —

August 21, 2001

David Felker
30477 Via Maria Elena
Bonsall, CA  92003

RE:    Research and Development Activities

Dear David:

It was good to talk to you a couple of weeks ago.  I hope all is well.

As you probably remember, the Company takes a tax credit for its research and development work.  The basis of the tax credit is our investment in developing new products, including employee salaries.  I am enclosing a form for your signature for the year ended December 31, 2000.  The form lists the big projects for 2000 that you may have contributed to, as well as blank spaces for additional projects that you identify (like CB11).  Can you please complete the form and return it to me as soon as possible, and in any event no later than September 2, 2001.

David, thanks in advance for your cooperation.  If you have any questions, please call me (760) 930-5849, or Julie Maloy (760) 930-5686.

Sincerely,

Michael J. Rider
*Vice President, Associate General Counsel*

cc:      Julie Maloy (w/o enclosure)

MJR:bk   h:\miker\letters\

8-24-01
Mike — Here is the info
you need. Somehow I got
Bret's sheet also ...
I hope things are going
well for you + Callaway.
Regards,
Dave Fell

2180 Rutherford Road • Carlsbad, CA 92008-7328 • Telephone: (760) 931-1771

**Callaway Golf Company**
**Time Survey**
**R&D Tax Credit Study**
**Year Ended 2000**

Employee Name      David Felker
Title
Department      12913

<u>% of Time/Year</u>

**Specific R&D projects (please list separately):**

| | | |
|---|---|---|
| 1 | ERC/ERC2/ERC2 Pro Series | 1 % |
| 2 | Hawkeye VFT/VFT Pro Series | 1 % |
| 3 | Rule 35 product support | 15 |
| 4 | CB-1 product design | 15 |
| 5 | Steelhead X-14 Pro Series product design | 1 % |
| 6 | Blackbird | 2 % |
| 7 | CB-11 product design | 15 % |
| 8 | new poly urethane development | 10 % |
| 9 | | |

**Other activities:**

| | |
|---|---|
| Patent Application Support/Assistance | 5 % |
| Maintenance/Debugging / plant improvement | 15 % |
| Administrative Activities | 10 % |

**Total % of Time For Year Ended 2000**      <u>100%</u>

_____      8/24/01
Signature      Date

H:\TAX_COMN\R&D\2000\[Time Summary1.xls]Sheet2

Exhibit G

ORIGINAL

**CONSULTING AGREEMENT**

This Consulting Agreement ("Agreement") is entered into as of April 1, 2001, between **Callaway Golf Company** ("Callaway Golf"), a Delaware corporation, and **David Felker** ("Consultant").

Recitals

A.      Callaway Golf is in the business of designing, manufacturing and selling golf clubs, golf balls, and related products using trade secrets, patented procedures and other proprietary information. Callaway Golf is currently marketing its products in the United States of America and internationally.

B.      Consultant has experience and expertise in golf ball research, development and design, and Consultant wishes to provide consulting services to Callaway Golf .

C.      Callaway Golf believes that the experience and expertise of Consultant will be of benefit to Callaway Golf; therefore, Callaway Golf desires to enter into this Agreement with Consultant.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the adequacy of which is hereby acknowledged, the parties agree as follows:

1.      Engagement. Callaway Golf hereby engages the services of Consultant as a consultant, and Consultant hereby accepts such engagement, subject to the terms and conditions of this Agreement.

2.      Term. The term ("Term") of this Agreement shall commence on April 1, 2001 and shall continue until December 31, 2002, unless terminated in accordance with Section 16 herein. The Term of this Agreement may be extended one or more times by the mutual written agreement of the parties; however, neither party shall be under any obligation to extend at any time.

3.      Services to be Performed by Consultant. During the Term of this Agreement, Consultant's main contact at Callaway Golf will be Michael J. Rider, or such person as may be designated by Callaway Golf in writing. Consultant shall provide services related to his expertise in the area of research and development, however, Consultant shall not actually research or develop golf balls for Callaway Golf while performing services under this Agreement. Consultant's duties will primarily involve consultation on golf ball patents and designs as they pertain to the defense of the Bridgestone vs. Callaway Golf Ball Company lawsuit. Should Callaway Golf and Consultant subsequently agree that Consultant will provide research and development services to Callaway Golf, this Agreement will be amended, or the parties will enter into a separate written agreement .

Consultant represents that Consultant has the qualifications and ability to perform the services in a professional manner without the advice, control, or supervision of Callaway Golf. While the specific methods and manner of providing the services shall be solely determined by Consultant, Callaway Golf shall have the right to oversee, direct and give advice to Consultant

regarding the general extent, nature and scope of services to be performed by Consultant under this Agreement. Consultant agrees to make himself available to provide consulting services to Callaway Golf 30 hours per month during the months of April, May and June 2001 and 20 hours per month for the balance of the Term of this Agreement, with no carryover of time from month to month.  At Callaway Golf's request, Consultant shall endeavor to provide up to an additional 10 hours per month (i.e., up to 40 hours for the first three months and up to 30 hours in any month thereafter), provided that (i) the provision of such additional time by Consultant does not unduly interfere with Consultant's other activities, and (ii) Consultant receives additional compensation of $100.00 per hour for each additional hour beyond the 30 or 20 hour base amounts.  Normal travel time (e.g. a drive back and forth to Los Angeles) shall be included in the 30 (or 20) hours per month.  Extended travel time (e.g. an overseas plane flight or an overnight stay at a location requested by Callaway Golf) shall not be included in the base amount but shall be compensated as set forth in Section 5(a) below.  So long as Consultant remains a resident of San Diego County (which is Consultant's current intention and expectation), travel time from Consultant's residence to any location within said County, including the Callaway Golf's offices, shall not count toward the base amount (or any overage) and shall not be otherwise compensated.  The services shall be provided by Consultant at such times and in such locations as Callaway Golf and Consultant mutually agree upon from time to time, but expect that many of the services provided may require Consultant to be at the business facilities of Callaway Golf.

4.     Assignment of Rights.

(a)     Callaway Golf shall own all deliverables delivered by Consultant hereunder.

(b)     As used in this Agreement, "Inventions," whether or not they have been patented, trademarked, or copyrighted, means designs, inventions, technologies, methods, innovations, ideas, improvements, processes, materials, sources of and uses for materials, apparatus, plans, systems and computer programs relating to the design, manufacture, use, marketing, distribution and management of Callaway Golf's and/or its affiliates' products.

(c)     All works of authorship produced under this Agreement shall be "work for hire" produced exclusively for Callaway Golf, and all rights thereto shall belong to Callaway Golf. As a material part of the terms and understandings of this Agreement, Consultant hereby assigns to Callaway Golf all works of authorship and all Inventions relating to the current or future business of Callaway Golf and/or its affiliates, and all intellectual property rights therein (including without limitation all patent rights, copyrights, and trade secret rights), which Consultant creates, develops, conceives and/or reduces to practice, either alone or with anyone else, during the course of providing the services under this Agreement, regardless of whether they are suitable to be patented, trademarked and/or copyrighted.

(d)     Consultant agrees to disclose in writing to the President and Chief Executive Officer Callaway Golf any work of authorship and/or Invention relating to the current or future business of Callaway Golf and/or its affiliates, which Consultant develops, conceive and/or reduces to practice, either alone or with anyone else, during the Term of this Agreement. Consultant shall disclose such works of authorship and/or Inventions to Callaway Golf, even if Consultant does not believe that Consultant is required under this Agreement to assign Consultant's interest in such work of authorship and/or Invention to Callaway Golf.  If Callaway Golf  and Consultant disagree as to whether or not a work of authorship and/or an Invention is

2                                                                      David Felker

included within the terms of this Agreement, it will be the responsibility of Consultant to prove that it is not included and/or that assignment to Callaway Golf is not required.

(e)     The obligation to assign as provided in this Agreement does not apply to any work of authorship or any Invention to the extent such obligation would conflict with any applicable state or federal law. All provisions of this Agreement relating to the assignment by Consultant of works of authorship and Inventions are subject to the provisions of California Labor Code Sections 2870, 2871 and 2872.

(f)     Upon Callaway Golf's request, at no expense to Consultant, Consultant shall execute any and all proper applications for patents, copyrights and/or trademarks, assignments to Callaway Golf, and all other applicable documents, and will give testimony when and where requested to perfect the title, copyrights, trademarks and/or patents (both within and without the United States) in all works of authorship and Inventions assigned to Callaway Golf hereunder.

(g)     Consultant and Callaway Golf agree that before Consultant incorporates any Invention owned by Consultant or for which Consultant has the right to grant the rights granted in this Section 4(g) ("Consultant Inventions"), into any report, presentation, recommendation, process, method, tooling, design, machine, equipment, product or other item recommended, presented, developed, implemented or specified by Consultant in Consultant's performance under this Agreement, Consultant will notify Callaway Golf of said Consultant Invention and Callaway Golf will agree in writing upon a royalty to be paid to Consultant in exchange for Consultant's grant of a worldwide license to Callaway Golf under said Consultant Invention to make, have made, sell, import, modify, and use any product or other item embodying or using said Consultant Invention. Consultant will provide to Callaway Golf copies of all patents and patent applications and/or invention disclosures related to all such Consultant Inventions. If Consultant fails to so notify Callaway Golf of said Consultant Invention prior to such incorporation, then Consultant hereby grants to Callaway Golf a non-exclusive, transferable, royalty-free, perpetual, irrevocable, worldwide license under said Consultant Invention to make, have made, sell, import, modify, and use any product or other item embodying or using said Consultant Invention.

(h)     Consultant agrees that if in the course of performing the services, Consultant recommends the use of any third party Inventions which, to the knowledge of Consultant, are or may be covered by patents held by third parties, that Consultant will disclose such information to Callaway Golf.

5.     Compensation. In exchange for the promises and obligations set forth herein, Callaway Golf agrees to pay Consultant during the Term and any extensions thereof, and Consultant agrees to accept such payment as payment in full for the services rendered by Consultant to Callaway Golf pursuant to the terms of this Agreement and the assignment of rights provided for herein, as follows:

(a)     On the first day of each month during the Term of this Agreement, Callaway Golf shall pay Consultant $3,125.00 for up to 30 hours of consulting services per month for the first three months and up to 20 hours per month thereafter. Consultant shall invoice Callaway Golf for service hours provided in excess of 30 per month (or in excess of 20 hours per month from and after July 1, 2001) at the billing rate of $100.00 per hour. Said

3                                                    David Felker

invoices shall be paid monthly, upon receipt and approval of Callaway Golf. Should Callaway Golf request Consultant to travel overseas or to spend the night at a location away from his home, Callaway Golf shall pay Consultant a flat fee of $400.00 for travel time, each way, and $400.00 per night away from home.

Should Callaway Golf terminate this Agreement pursuant to Section 16 prior to December 31, 2002, Callaway Golf shall continue to make monthly payments of $3,125.00 to Consultant through and including December 1, 2002. Upon such a termination, Callaway Golf shall have the right, but not the obligation, to pay any remaining sums due in a lump sum.

(b)    Callaway Golf shall reimburse Consultant for all reasonable, customary and necessary expenses for travel, lodging and materials incurred in the performance of the services to be provided hereunder, except as set forth in Section 3 above relating to travel within San Diego County. On a monthly basis, Consultant shall account for such expenses by submitting a signed invoice itemizing such expenses and attaching original receipts. The amount, nature and extent of such expenses shall always be subject to the control, supervision and direction of Callaway Golf.

(c)    Callaway Golf will comply with all applicable U.S. tax laws and regulations. Consultant agrees to cooperate with Callaway Golf with respect to completion of all documentation necessary for compliance.

(d)    Consultant acknowledges and agrees that, as an independent contractor, Consultant is solely responsible for the payment of any taxes and/or assessments imposed on account of the payment of compensation pursuant to this Agreement, including without limitation, any state unemployment insurance tax, federal, state and foreign income taxes, federal Social Security (FICA) payments, and state disability insurance taxes. Callaway Golf shall not, by reason of Consultant's status as an independent contractor and the representations contained herein, make any withholdings or payments of said taxes or assessments with respect to compensation paid hereunder, provided, however, that if required by law or any governmental agency of competent jurisdiction, Callaway Golf shall withhold any such taxes or assessments from the compensation due Consultant, and any such withholding shall be for Consultant's account and shall not be reimbursed by Callaway Golf to Consultant. Consultant expressly agrees to treat any compensation earned under this Agreement as self-employment income for federal and state tax purposes, and to make all payments of federal and state income taxes, unemployment insurance taxes, and disability insurance taxes when the same may become due and payable with respect to such self-employment compensation earned under this Agreement. Consultant further agrees and undertakes to indemnify and hold harmless Callaway Golf, its officers, directors, agent, employees and the successors or heirs of any of them, from any and all liability loss, damages, expenses, penalties and/or judgments arising out of any failure of Consultant to make any payment of taxes required to be made by Consultant under this Section 5(d), or the failure to comply with any other law or regulation.

6.    Relationship of the Parties.  Consultant acknowledges and agrees (a) that Consultant is a self-employed, independent contractor; (b) that nothing in this Agreement shall be considered to create an employer-employee relationship between Consultant and Callaway Golf; (c) that Consultant shall not be deemed to be an employee of Callaway Golf for any purpose

4                                                          David Felker

whatsoever; and (d) this Agreement does not affect Consultant's rights under any other written agreement with Callaway Golf.

While Consultant is engaged as a Consultant pursuant to this Agreement, Callaway Golf will not provide Consultant with benefits accorded to Callaway Golf employees, regardless of whether Consultant is later re-classified as an employee of Callaway Golf, including but not limited to:

- Workers' compensation insurance;

- Participation in any plan or program offering medical, dental, life or any other type of insurance;

- Overtime benefits;

- Access to any type of employee benefit plan, including but not limited to Callaway Golf's 401k and employee stock purchase plans;

- Vacation leave, pregnancy or family leave, and/or sick pay.

7.    Drug Testing and Background Checks.   If Consultant performs services at Callaway Golf's offices pursuant to this Agreement, Consultant acknowledges that Consultant may be subject to criminal background checks and/or drug testing and agrees to submit to such checks and/or testing at the Company's request.

8.    Extent of Authority.   Consultant shall have no authority or right to commit or bind Callaway Golf and/or its affiliates to any agreement or arrangement or to obligate Callaway Golf and/or its affiliates in any manner.

9.    Exclusive Dealings.   During the term of this Agreement, Consultant agrees to deal exclusively with Callaway Golf and/or its affiliates regarding consultation, research and development, and/or experimental work relating to Callaway Golf's and/or its affiliates products or anticipated products.   Consultant also agrees that during the term of this Agreement, Consultant will not consult with any other person or entity regarding any business which engages directly or indirectly in competition with the business of Callaway Golf and/or its affiliates.

10.    Non-Solicitation.   For one year following the termination of Consultant's engagement as a Consultant with Callaway Golf, Consultant agrees not to ask or encourage directly or indirectly any employees or consultants of Callaway Golf, or any of its affiliates, to leave their employment with or refrain from providing service to Callaway Golf, or any of its affiliates.   Consultant shall make any subsequent employer aware of this non-solicitation obligation.

11.    Suppliers.   During the term of this Agreement, and for one year thereafter, Consultant shall not cause or induce, or attempt to cause or induce, any person or firm supplying goods, services or credit to Callaway Golf and/or its affiliates to diminish or cease furnishing such goods, services or credit.

David Felker

12.    Conflict of Interest.  During the term of this Agreement, Consultant shall not engage in any conduct or enterprise that shall constitute an actual or apparent conflict of interest with respect to Consultant's duties and obligations to Callaway Golf and/or its affiliates.

13.    Confidential Information and/or Trade Secrets.

(a)    Definition.  As used in this Agreement, the terms "Confidential Information and/or Trade Secrets" means all information, whether written or oral, not generally available to the public, regardless of whether it is suitable to be patented, copyrighted and/or trademarked, which is owned by or in the possession of  Callaway Golf and/or its affiliates, including but not limited to (1) concepts, ideas, plans and strategies involved in Callaway Golf's and/or its affiliates' products and business, (2) the processes, formulae and techniques disclosed by Callaway Golf and/or its affiliates or contractors to Consultant or observed by Consultant, (3) the designs, inventions and innovations and related plans, strategies and applications which Consultant develops during the Term of this Agreement in connection with the work performed by Consultant for Callaway Golf, and (4) third party information which Callaway Golf and/or its affiliates has/have promised to keep confidential.  The terms "Confidential Information and/or Trade Secrets" do not include the following:

(i)    Information which, at the time of disclosure or observation, had been previously published or otherwise publicly disclosed;

(ii)    Information which is published (or otherwise publicly disclosed) after disclosure or observation, unless such publication is a breach of this Agreement or is otherwise a violation of the contractual, legal or fiduciary duties owed to Callaway Golf and/or its affiliates, which violation is known to Consultant; or

(iii)    Information which, subsequent to disclosure or observation, is obtained by Consultant from a third person who is lawfully in possession of such information (which information is not acquired in violation of any contractual, legal, or fiduciary obligation owed to Callaway Golf and/or its affiliates with respect to such information, and is known by Consultant) and who is not required to refrain from disclosing such information to others.

(b)    No Disclosure of Confidential Information and/or Trade Secrets.  During the Term of this Agreement, Consultant may have access to and become familiar with various Confidential Information and/or Trade Secrets which Consultant acknowledges are owned and shall continue to be owned solely by Callaway Golf and/or its affiliates or third party contractors. Consultant agrees that Consultant will not, at any time, whether during or subsequent to the term of  this Agreement, use or disclose any Confidential Information and/or Trade Secrets for any purpose except in order to: (1) effectively perform Consultant's services under this Agreement, after Consultant obtains written approval to disclose such information from an authorized representative of Callaway Golf; (2) disclose Confidential Information and/or Trade Secrets to third parties for which Callaway Golf has given its written consent; or (3) disclose Confidential Information and/or Trade Secrets pursuant to a governmental process in which Consultant is compelled to do so. In the event Consultant believes that Consultant is legally required to disclose any Confidential Information and/or Trade Secrets, Consultant shall give reasonable notice to Callaway Golf prior to disclosing such information and shall assist Callaway Golf in taking such legally permissible steps as are reasonable and necessary to protect the

David Felker

Confidential Information and/or Trade Secrets. If Consultant believes that it is necessary for Consultant to disclose Confidential Information and/or Trade Secrets, Consultant shall first obtain written consent to do so from Callaway Golf, and the party to whom the disclosure is to be made shall execute a non-disclosure agreement in a form acceptable to Callaway Golf before Consultant shall make such disclosure.

(c)     No Removal of Callaway Golf and/or its Affiliates' Documents or Information. Consultant understands and agrees that all books, records, customer lists and documents connected with the business of Callaway Golf and/or its affiliates are the property of and belong to Callaway Golf and/or its affiliates or third-party contractors.    Under no circumstances shall Consultant remove from Callaway Golf's and/or its affiliates' facilities any of Callaway Golf's and/or its affiliates' books, records, documents, lists or any copies of the same without Callaway Golf's and/or its affiliates' written permission, nor shall Consultant make any copies of Callaway Golf's and/or its affiliates' books, records, documents or lists for use outside Callaway Golf's and/or its affiliates' office(s) except as specifically authorized by Callaway Golf. Consultant shall return to Callaway Golf and/or its affiliates all books, records, documents and customer lists belonging to Callaway Golf and/or its affiliates upon termination of this Agreement.

(d)     The provisions of Section 13 shall survive the termination or expiration of this Agreement, and shall be binding upon Consultant in perpetuity.  In addition, Consultant agrees that it would be difficult to measure the damage to Callaway Golf and/or its affiliates resulting from any breach by Consultant of the provisions set forth in this Section 13, that injury to Callaway Golf and/or its affiliates from any such breach would be impossible to calculate, and that money damages would therefore be an inadequate remedy for any such breach. Accordingly, Consultant agrees that if Consultant breaches any of the provisions set forth in this Section 13, Callaway Golf and/or its affiliates shall be entitled, in addition to all other remedies it may have, to immediate injunctions or other appropriate orders to restrain any such breach.

14.     Surrender of Company Property. Consultant agrees that upon termination of this Agreement in any manner, Consultant will immediately surrender to Callaway Golf and/or its affiliates all property owned by Callaway Golf and/or its affiliates.

15.     Notices.    Any notice, request, demand or other communication required or permitted hereunder shall be deemed properly given when actually received or within five days of mailing by certified or registered mail, postage prepaid, to the following addresses, or to such addresses as may be furnished from time to time, in writing, to the other party:

| | |
|---|---|
| Callaway Golf: | Callaway Golf Company |
| | 2180 Rutherford Road |
| | Carlsbad, CA  92008 |
| | Attn:  Steven C. McCracken |
| | Senior Executive Vice President, Chief Legal Officer |
| | |
| Consultant: | David Felker |
| | 30477 Via Maria Elena |
| | Bonsall, CA  92003 |

David Felker

16.    Termination.

(a)    Callaway Golf may terminate this Agreement for any reason or no reason by providing thirty (30) days' written notice to Consultant.

(b)    Consultant may terminate this Agreement for any reason or no reason at any time after August 31, 2001, by providing thirty (30) days' written notice to Callaway Golf.

(c)    This Agreement shall terminate upon the occurrence of any of the following events:

(i)    Death of the Consultant;

(ii)    Consultant fails to perform the covenants, agreements or obligations of this Agreement and fails to substantially cure the failure as soon as reasonably possible and in no event later than ten (10) business days after Callaway Golf gives written notice to Consultant of the failure; or

(iii)    Consultant is unable, by reason of any ailment or illness, physical or mental, to perform the services required hereunder.

(d)    The provisions of Sections 4, 10, 11, 13, 20, 21, and 22 shall survive termination of the other provisions of this Agreement.

17.    Advertising Waiver.  Consultant acknowledges that Callaway Golf's advertising features Consultant as a former employee of Callaway Golf Ball Company.  In the event that Callaway Golf seeks to make new commercials or advertisements using Consultant, then Consultant will consider a separate written agreement for the use of Consultant's likeness in such future advertising.

18.    Publicity; Use of Marks.  Consultant shall not at any time use Callaway Golf's or its affiliates' names, trademarks or trade names in any advertising or publicity without the prior written consent of Callaway Golf.

19.    Assignment.  Consultant shall not assign this Agreement or any of Consultant's rights hereunder without the prior written consent of Callaway Golf.  Any attempted assignment by Consultant in violation of this paragraph shall be void.

20.    **Irrevocable Arbitration of Disputes.**

**(a)    Consultant and Callaway Golf agree that any dispute, controversy or claim arising hereunder or in any way related to this Agreement, its interpretation, enforceability, or applicability, or relating to Consultant's provision of services to Callaway Golf, or the termination thereof, that cannot be resolved by mutual agreement of the parties shall be submitted to binding arbitration.  This includes, but is not limited to, alleged violations of federal, state and/or local statutes, claims based on any purported breach of duty arising in contract or tort, including breach of contract, breach of the covenant of good faith and fair dealing, violation of public policy, and violation of any statutory, contractual or common law rights.  The parties agree that arbitration is the parties' only recourse for such claims and hereby waive the right to pursue such claims**

8                                                David Felker

in any other forum, unless otherwise provided by law.  Any court action involving a dispute which is not subject to arbitration shall be stayed pending arbitration of arbitrable disputes.

(b)     Consultant and Callaway Golf agree that the arbitrator shall have the authority to issue provisional relief.  Consultant and Callaway Golf further agree that each has the right, pursuant to California Code of Civil Procedure section 1281.8, to apply to a court for a provisional remedy in connection with an arbitrable dispute so as to prevent the arbitration from being rendered ineffective.

(c)     Any demand for arbitration shall be in writing and must be communicated to the other party prior to the expiration of the applicable statute of limitations.

(d)     The arbitration shall be conducted pursuant to the procedural rules stated in the Commercial Rules of the American Arbitration Association ("AAA") in San Diego.  The arbitration shall be conducted in San Diego by a former or retired judge or attorney with at least 10 years experience in commercial-related disputes, or a non-attorney with like experience in the area of dispute, who shall have the power to hear motions, control discovery, conduct hearings and otherwise do all that is necessary to resolve the matter.  The parties must mutually agree on the arbitrator.  If the parties cannot agree on the arbitrator after their best efforts, an arbitrator from the American Arbitration Association will be selected pursuant to the American Arbitration Association National Rules for Resolution of Commercial/Business Disputes.  Callaway Golf shall pay the costs of the arbitrator's fees.

(e)     The arbitration will be decided upon a written decision of the arbitrator stating the essential findings and conclusions upon which the award is based. The arbitrator shall have the authority to award damages, if any, to the extent that they are available under applicable law(s).  The arbitration award shall be final and binding, and may be entered as a judgment in any court having competent jurisdiction.  Either party may seek review pursuant to California Code of Civil Procedure section 1286, et seq.

(f)     It is expressly understood that the parties have chosen arbitration to avoid the burdens, costs and publicity of a court proceeding, and the arbitrator is expected to handle all aspects of the matter, including discovery and any hearings, in such a way as to minimize the expense, time, burden and publicity of the process, while assuring a fair and just result.  In particular, the parties expect that the arbitrator will limit discovery by controlling the amount of discovery that may be taken (e.g., the number of depositions or interrogatories) and by restricting the scope of discovery only to those matters clearly relevant to the dispute.  However, at a minimum, each party will be entitled to at least one deposition and shall have access to essential documents and witnesses as determined by the arbitrator.

(g)     The prevailing party shall be entitled to an award by the arbitrator of reasonable attorneys' fees and other costs reasonably incurred in connection with the arbitration.

David Felker

(h)    The provisions of this Section shall survive the expiration or termination of the Agreement, and shall be binding upon the parties.

I have read Section 20 and irrevocably agree to arbitrate any dispute identified above.

_____                                      _____
(Consultant's initials)                                               (Callaway Golf's initials)

21.    Disclosure of Others' Confidential Information.  It is the understanding of both Callaway Golf and Consultant that Consultant shall not divulge to Callaway Golf, its affiliates or its third party contractors any confidential information or trade secrets belonging to others, nor shall Callaway Golf seek to elicit from Consultant any such information.  Consistent with the foregoing, Consultant shall not provide to Callaway Golf, and Callaway Golf shall not request, any documents or copies of documents containing such information.  Failure to comply with this obligation by Consultant shall be grounds for immediate termination of this Agreement.

22.    Applicable Law.  This Agreement shall constitute a contract under the internal laws of the State of California and shall be governed in accordance with the laws of said state as to both interpretation and performance.

23.    Entire Agreement/Amendments.  This Agreement reflects the only, sole and entire agreement between the parties relating in any way to the consulting services provided by Consultant.  No statement or promise or different representations have been made which in any way form a part of or modify this Agreement.  No amendment or modification of the terms or conditions of this Agreement shall be valid unless in writing and signed by the parties hereto.

24.    Separate Terms.  Each term, condition, covenant or provision of this Agreement shall be viewed as separate and distinct, and in the event that any such term, covenant or provision shall be held by a court of competent jurisdiction to be invalid, the remaining provisions shall continue in full force and effect.

25.    Waiver.  A waiver by either party of a breach of any provision or provisions of this Agreement shall not constitute a general waiver or prejudice the other party's right otherwise to demand strict compliance with that provision or any other provisions in this Agreement.

10                                                                              David Felker

26.    Nothing in Agreement Contrary to Consultant's Duties or Obligations to any third party. Consultant has represented to Callaway Golf that nothing in this Agreement is contrary to the terms of Consultant's duties or obligations to any third party.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth below, to be effective as of the date first written above.

**Consultant**

**Callaway Golf**



Callaway Golf Company,
a Delaware corporation

David Felker

By: _____

Steven C. McCracken
Senior Executive Vice President,
Chief Legal Officer

Dated: _____4|24|_____, 2001

Dated: _____05·01_____, 2001

(Rev. 4/10/01)
h:\legal\common\lisa\cgc\agreements\consult\2001\felker.doc

David Felker

Exhibit H

# REDACTED
# IN ITS ENTIRETY

Exhibit I

FROM :SRA/SDC                    FAX NO. :7604809020              ct. 17 2001 12:56PM  P1

MJR
10/12/01 File

TO: Mike Rider

From: Dave Felker

Here is the signed copy from
Mike Nauman.  Would you please
respond by Email that you got
this and all is A-OK for me to
proceed?

Thanks,

DLFELKER @ SANFORDROSE.COM

10/17/01  16:27 FAX                                                    ☑001

# ACUSHNET COMPANY

## FAX COVER SHEET

DATE:        October 17, 2001

TO:          David Felker
             Mike Rider

FROM:        Joe Nauman

RE:          Consulting Services

Pages including cover sheet:  3

CONFIDENTIALITY NOTICE: This facsimile transmission (and/or the document accompanying it) may contain confidential information belonging to the sender. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone to arrange for the return of the documents. THANK YOU.

As you requested.

                FOOTJOY

333 Bridge Street, Fairhaven, MA  02719
Phone (508) 979-3293   Fax (508)979-3092

10/17/01  16 27 FAX                                                    ☒002

FROM :SRA/SDC                    FAX NO. :7604809020          Oct. 17 2001 12:19PM P2
    OCT-12-01 FRI 01:06 PM    CALLAWAY GOLF CO LEGAL      FAX NO. 760 930 5022          P. 02



CALLAWAY GOLF COMPANY

ODYSSEY®

October 12, 2001

Mr. David Felker
30477 Via Marta Elena
Bonsall, CA 92003

     Re:    Consulting for Titleist

Dear David:

    This letter is written in response to your request that Callaway Golf Company permit you to provide consulting services to Titleist despite the exclusive services provisions in your Consulting Agreement and in your former Officer Employment Agreement with Callaway Golf.

    Callaway Golf is willing to allow you to perform consulting services for Titleist under the conditions set forth below:

    1)    Titleist has requested your services only as an expert witness in a third party dispute that does not involve Callaway Golf's intellectual property or products. You will not be providing any services on the design of golf balls for Titleist.

    2)    You hereby confirm your obligation not to disclose any trade secrets or confidential information of Callaway Golf to Titleist, as agreed to in Section 12 of the Officer Employment Agreement and Section 13 of the Consulting Agreement.

    3)    You hereby confirm your agreement not to disclose any trade secrets or confidential information of Titleist to Callaway Golf, as previously agreed to in Section 21 of the Consulting Agreement.

    4)    You hereby agree to make yourself available to consult with Callaway Golf, pursuant to the terms of the Consulting Agreement, at the request of Callaway Golf.

    5)    Should a dispute arise between Callaway Golf and Titleist, you shall immediately cease providing consulting services to Titleist if requested to do so by Callaway Golf. Titleist agrees to waive its right to claim any conflict in Callaway Golf's use of your consulting services in any dispute that may arise between Titleist and Callaway Golf.

10/17/01  16:27 FAX                                                          ☒003

FROM :SRA/SDC                    FAX NO. :7604809020           Oct. 17 2001 12:20PM P3

OCT-12-01 FRI 01:07 PM    CALLAWAY GOLF CO LEGAL       FAX NO. 760 930 5022        P. 03

Mr. David Felker
October 12, 2001
Page 2


    Please sign and return the enclosed copy of this letter to me.  Upon my receipt of your signature and the signature of Mr. Nauman on behalf of Titleist, you may proceed to provide consulting services, under the restrictions set forth above, to Titleist.

    Should the circumstances or scope of your consulting arrangement with Titleist change from that described above, please contact me immediately so that I can re-evaluate the Company's position.

                    Sincerely,

                    Michael J. Rider
                    Senior Vice President,
                    Assistant General Counsel


Agreed:

_____
David Felker

Dated: 10/12 , 2001


~~Fortune Brands, Inc.~~
Acushnet Company


By: _____
    Joseph J. Nauman,
    Senior Vice President and General Counsel

Dated: 10 - 17 , 2001


:ls
Enclosure
h:\legal\common\files\letters\felker.doc

Exhibit J





August 20, 2002

Mr. David Felker
30477 Via Maria Elena
Bonsall, CA  92003

     Re:    Consulting Agreement with Callaway Golf Company

Dear David:

     This letter confirms that your Consulting Agreement with Callaway Golf Company expires on December 31, 2002, and that we will not be renewing it.

     This letter will further serve to confirm that it is not a violation of your Consulting Agreement to contact other golf companies now and inform them you will be available to provide services following December 31, 2002. However, please be reminded that pursuant to the terms of your Consulting Agreement, you may not perform consulting services for other golf companies prior to December 31, 2002. Should a consulting opportunity arise prior to December 31 that you would like to explore, please contact me to discuss it.

     As stated in the Employee Invention and Confidentiality Agreement signed by you as an employee of Callaway Golf Ball Company and the Consulting Agreement entered into subsequent to your employment, you shall keep confidential all trade secrets and proprietary information obtained by you while performing services for Callaway Golf. Both of these agreements are binding on you in perpetuity.

     Please sign and return a copy of this letter to me confirming your understanding of the above. Thank you.

                                   Sincerely,

                                   Michael J. Rider
                                   *Senior Vice President,*
                                   *Assistant General Counsel*

Agreed:

David Felker

Dated: ___8/23___, 2002

Enclosure
h:\legal\common\lisa\letters\felker.doc

Exhibit K



December 3, 2002

Mr. David Felker
30477 Via Maria Elena
Bonsall, CA 92003

Re:    Confidentiality Provisions of Consulting Agreement

Dear Mr. Felker:

This letter confirms that your Consulting Agreement with Callaway Golf Company (the "Company") expires on December 31, 2002 and that the Agreement will not be renewed.

I would like to remind you of certain continuing obligations you owe the Company. Pursuant to the terms of the Consulting Agreement you entered into with the Company, you are required to hold in confidence any of the Company's confidential information and/or trade secrets that may have been conveyed to you unless and until any such information is generally available to the public. "Confidential information" means information, whether written or oral, not generally available to the public, regardless of whether it is suitable to be patented, copyrighted and/or trademarked, which is received from the Company and/or its affiliates, either directly or indirectly, including, but not limited to, (a) concepts, ideas, plans and strategies involved in the Company's and/or its affiliates' products, (b) the processes, formulae and techniques disclosed by the Company and/or its affiliates to you or observed by you, and (c) the designs, inventions and innovations, and related plans, strategies and applications in which you were involved in developing during the term of the Consulting Agreement. We trust you will abide by your agreement.

If you have any questions regarding your responsibilities as to the Company's confidential information, please contact me. Thank you for your assistance.

Sincerely,

Lisa M. Stutler
*Employment Contracts Manager*

:jcd
cc: Nadene Dunayevich
     Yuki Guffey

H:\LEGAL\COMMON\Lisa\LETTERS\02Felker.doc

Exhibit L



January 5, 2007

<u>**VIA FED-EX**</u>

David L. Felker, PhD.
Sanford Rose Associates
12707 High Bluff Drive, Suite 200
San Diego, CA 92130

      Re: Callaway Golf v. Acushnet

Dear David:

      Last year, shortly after Callaway Golf sued Acushnet for patent infringement, you promised me that you would not serve as an expert consultant for either party in the litigation between them. You can therefore imagine how concerned I am to learn that you have accepted an engagement to work as an expert for Acushnet in the pending litigation between Acushnet and Callaway Golf. In light of your promise, and considering your employment and consulting history with Callaway Golf, including your significant exposure to privileged information, such an engagement is inappropriate. I ask that you voluntarily end the engagement immediately.

      Additionally, you agreed not to consult with Acushnet on issues adverse to Callaway Golf. I have enclosed a copy of the letter agreement, dated October 12, 2001, and signed by you, me and Joe Nauman, which provides the conditions and limitations of your consulting activities for Acushnet. That agreement provides that, "should a dispute arise between Callaway Golf and Titleist, you shall immediately cease providing consulting services to Titleist if requested to do so by Callaway Golf." To be clear, Callaway Golf hereby requests that you immediately cease any and all consulting activities for Acushnet in this case.

      Please remember your ongoing obligations to Callaway Golf under Section 12 of your Officer Employment Agreement and Section 13 of your Consulting Agreement. Specifically, you are to refrain from disclosing or using any and all Callaway Golf confidential and/or privileged information.

      Please let me know, no later than close of business on Thursday, January 11, whether you have withdrawn from the engagement. If you do not immediately end the engagement, and in light of the expense that Callaway Golf will incur to address this issue, we must reserve our rights to pursue the remedies provided for in Section 18 of your Officer Employment Agreement and Section 20 of your Consulting Agreement, including a claim for damages.



If you have any questions regarding this matter, please feel free to contract Roger Denning of Fish & Richardson P.C.  Mr. Denning can be reached at (858) 678-4784 or denning@fr.com.

Sincerely,

Michael J. Rider
*Senior Vice President, General Counsel*

cc:     Joseph Nauman, Esq. (via facsimile)
        Steven C. McCracken, Esq.
        Frank E. Scherkenbach, Esq.
        Roger A. Denning, Esq.

Enclosures

Exhibit M

## Michael A. Amon

| | |
|---|---|
| **From:** | Roger Denning |
| **Sent:** | Friday, January 12, 2007 2:01 PM |
| **To:** | Callaway/Acushnet |
| **Subject:** | Felker Update E-mail from Rider |

**Attachments:** abs39000.pdf; abs38500.pdf

**REDACTED**

---

**From:** Mike Rider [mailto:MikeR@callawaygolf.com]
**Sent:** Friday, January 12, 2007 1:58 PM
**To:** dfelker@sanfordrose.com
**Cc:** Joe_Nauman@acushnetgolf.com; Steve McCracken; Frank Scherkenbach; Roger Denning
**Subject:** Update

David:

In reviewing additional files relating to your consulting work for Callaway Golf, we came across two more letters, which I have attached as a courtesy. These letters -- dated August 20, 2002, and December 3, 2002 -- reflect that your Consulting Agreement with Callaway Golf was set to expire on December 31, 2002, and that the Consulting Agreement would not prohibit you from consulting for other golf companies after that date.

Please understand that the letters do not change my view of the current situation. In your employment and consulting relationships with Callaway Golf, you directed and were given access to large amounts of privileged and confidential information, much of which is directly relevant to the pending patent case between Callaway Golf and Acushnet. You had access to all of that information when you prepared to testify at trial in the Maxfli case, and that work was the subject of a portion of your testimony at trial in August 2004. Finally, you will also remember that we paid you for the time you spent to prepare to testify in that case.

Your legal obligation to maintain that confidentiality -- documented in your Employee Confidentiality Agreement, Officer Employment Agreement and Consulting Agreement -- survive the termination of those agreements, as pointed out in each of the attached letters. If you were to consult with Acushnet on the pending litigation, you would inevitably reveal or rely upon Callaway Golf's privileged and confidential information. I am sure you can appreciate that it is our view that such an engagement is inappropriate, and I reiterate my request that you end the engagement immediately.

I look forward to hearing from you this afternoon, as you discussed with Mr. Denning yesterday. I am going to be in and out of meetings this afternoon so please reply by email with a copy to Mr. Denning and Mr. Scherkenbach.

Exhibit N

**Michael A. Amon**

| | |
|---|---|
| **From:** | Roger Denning |
| **Sent:** | Friday, January 12, 2007 4:05 PM |
| **To:** | Mike Rider |
| **Cc:** | Callaway/Acushnet |
| **Subject:** | FW: D Felker note: fax numbers |

Mike:


**REDACTED**


--roger

-----Original Message-----
From: David L. Felker [mailto:dlfelker@sanfordrose.com]
Sent: Friday, January 12, 2007 3:46 PM
To: Roger Denning
Cc: Dave Felker (E-mail)
Subject: RE: D Felker note: fax numbers

Mr. Denning,
Would you please pass this note on to Mike Rider?  I am also sending this by fax to you
and Mike.
Thanks,
Dave Felker


Dear Mike,

I have reviewed the documents Mr. Denning sent me. I understand my ongoing obligations to
Callaway Golf under Section 12 of my Officer Employment Agreement and Section 13 of my
Consulting Agreement.

I want to assure you that I have always complied with Sections 12 and 13.  I have never
shared any Callaway confidential information with anyone, and never will.  I fully intend
to continue to respect and comply with all continuing aspects of Sections 12 and 13.

It is my understanding that the patents of concern with this Callaway/Acushnet litigation
didn't even issue until after I left normal employment with Callaway in Oct 2000.  Thus, I
do not believe I ever discussed the relevant Sullivan patents with Callaway while I was a
regular employee at Callaway.   After I left Callaway in Oct 2000, even though I was
involved in some consulting with Callaway, I do not recall ever discussing these Sullivan
patents with Callaway.

In light of this, I just can't figure out what the specific problem is that you are
worried about.  I really want to do the right thing, but I do not see what your specific
concern is.

I would really like to know exactly what are your specific concerns about why you believe
it would be improper for me to take on this work with Acushnet.  Thus, I request that you
please tell me if you have specific concerns. Furthermore, if you have specific concerns,
I request that you share them with me.  Lastly, I request you share this information with
me right away so I can understand as soon as possible what are the specific issues and
concerns of Callaway.

If there are other factors you think I am overlooking, I request you also inform me of
these.

1

After I get your response, I promise I will carefully consider the additional information.

Regards,

Dave


David L. Felker, PhD


-----Original Message-----
From: Roger Denning [mailto:denning@fr.com]
Sent: Friday, January 12, 2007 3:08 PM
To: David L. Felker
Subject: RE: D Felker note: fax numbers


Dr. Felker:

Mr. Rider's fax number is 730.930.5022
And yes, my fax number is 858.678.5099

Thank you and regards,

--Roger Denning

Roger A. Denning | Principal | ~ Fish & Richardson P.C.
12390 El Camino Real | San Diego, CA 92130-2081
main: 858.678.5070 | direct: 858.678.4784 | fax: 858.678.5099
email: denning@fr.com | web: www.fr.com


-----Original Message-----
From: David L. Felker [mailto:dlfelker@sanfordrose.com]
Sent: Friday, January 12, 2007 12:02 PM
To: Roger Denning
Cc: Dave Felker (E-mail)
Subject: D Felker note: fax numbers

Mr Denning,
What is Mike Rider's fax number?  Your number is: 858.678.5099?
Thanks,
Dave


David L. Felker, PhD
Managing Partner, Sanford Rose Associates - Del Mar and Managing Director, Emerging
Ventures Group of SRA

(800) 274-8673
fax (760) 480-9007
mobile (760) 468-0816

... finding people who make a difference

****************************************************************************************
*******************************

This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized use or disclosure is prohibited.
If you are not the intended recipient, please contact the sender by reply email and
destroy all copies of the original message.

IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication
(including any attachments) is not intended or written to be used, and cannot be used, for
the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting,

marketing or recommending to another party any transaction or matter addressed herein.

*****************************************************************************************
*********************************

Exhibit O

# REDACTED
# IN ITS ENTIRETY