IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

        Plaintiff,

    v.

ACUSHNET COMPANY,

        Defendant.

C. A. No. 06-91 (SLR)

**PUBLIC VERSION
FILED JULY 17, 2007**

## CALLAWAY GOLF COMPANY'S PROFFER
## REGARDING ITS REQUEST TO DEPOSE WALLY UIHLEIN

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

*Attorneys for Plaintiff
Callaway Golf Company*

DATED: July 10, 2007

## TABLE OF CONTENTS

**Page**

INTRODUCTION...........................................................................................................1

FACTS JUSTIFYING A DEPOSITION OF MR. UIHLEIN......................................1

   1.   Mr. Uihlein Personally Ordered the Development of the
       Pro V1 Golf Ball..............................................................................................3

   2.   Mr. Uihlein's Private Conversation with Phil
       Mickelson in June of 2000 Was the "Clarion Call" that
       Led to the Introduction of the Pro V1.........................................................4

   3.   Mr. Uihlein Has Admitted that Acushnet Based the
       Introduction of the Pro V1 on the Golf Balls Launched
       by Its Competition (i.e., Callaway Golf) .....................................................5

   4.   Mr. Uihlein Has Touted the Breakthrough Technology
       of the Accused Products, Which Is Contrary to
       Acushnet's Litigation Position....................................................................5

CONCLUSION .............................................................................................................7

**INTRODUCTION**

In this patent infringement case, Callaway Golf has accused Acushnet's flagship product – the Titleist Pro V1 family of golf balls – of infringing four patents. To prove its case, and in particular to prove the importance of the patented technology to Acushnet, Callaway Golf noticed the deposition of Wally Uihlein, Acushnet's Chairman and CEO. Mr. Uihlein played a central role in the development and launch of the accused products. Acushnet refused to produce Mr. Uihlein absent a Court Order. Callaway Golf filed an e-mail request seeking the Court's assistance, and the Court indicated that it would not order Mr. Uihlein's deposition "without a proffer of what information the CEO has to impart, over and above what other executives have already testified to." [*See* Callaway Golf's e-mail request filed May 25, 2007, and the Court's response, filed May 30, 2007.] Callaway Golf appreciates the Court's instruction and respectfully submits this proffer explaining the importance of Mr. Uihlein's deposition.[1]

**FACTS JUSTIFYING A DEPOSITION OF MR. UIHLEIN**

Acushnet does not claim Mr. Uihlein lacks relevant information. There is no question that, with regard to the facts at issue here, Mr. Uihlein did *not* act like the stereotypical CEO, detached from day-to-day decisions. Rather, as described below, Mr. Uihlein was personally and intimately involved in issues that are central to this dispute. For example, Acushnet's internal e-mails and press clippings reveal that Mr. Uihlein:

(1) personally directed his golf ball designers to develop the accused products;

(2) was spurred to introduce the accused products based on a private conversation he had with Phil Mickelson, a PGA professional golfer, about Callaway Golf's earlier Rule 35 ball (which embodies claims of each patent-in-suit);

(3) carefully monitored his competition – including the launch of Callaway Golf's earlier Rule 35 ball – to time the introduction of the accused products; and

---

[1] To lessen the burden on Mr. Uihlein, Callaway Golf has offered to schedule the deposition at a time and place most convenient for him, even if that means delaying it until the Fall.

1

(4) considers the technology of the accused products to be - in his own words - "the most massive paradigm shift ever seen in the golf ball category," which contradicts Acushnet's litigation position that the patented technology is no real advance over the existing art.

That Mr. Uihlein was so intimately involved in the development and launch of the accused golf ball is no surprise. The Pro V1 is Acushnet's most important product, and Mr. Uihlein admitted that he "bet[] the farm" in deciding to develop the Pro V1. [Declaration of Thomas L. Halkowski filed herewith ("Halkowski Decl."), Ex. 1 ("Inside look: Titleist's big makeover," *Golfweek*, August 18, 2001, p. 1).] Looking back on the success of the Pro V1, Mr. Uihlein has said: "The Pro V1 saved this company." [Halkowski Decl., Ex. 2 ("Economy hits golf industry," *SouthCoastToday.com*, July 21, 2002).]

Only Mr. Uihlein can testify about his motivations for orchestrating the development and launch of the Pro V1 golf ball as he did, and Acushnet should not be allowed to shield him from providing testimony regarding those motivations simply because he happens to be the CEO. Similarly, given the obvious relevance and importance of the statements Mr. Uihlein has made about the accused products, Callaway Golf needs to authenticate those statements with Mr. Uihlein and to explore the context and reasons for them.[2]

---

[2]   The case Acushnet cited in opposition to Callaway Golf's e-mail request actually supports Callaway Golf. *See Evans v. Allstate Ins. Co.*, 216 F.R.D. 515 (D. Okla. 2003). *Evans* is an insurance case in which Allstate denied claims stemming from two house fires. *Id.* at 517. The policyholders sought to depose, among others, Allstate's CEO and CFO. *Id.* at 518. The Court protected the executives from deposition, applying the standard that, "unless a high level executive has unique personal knowledge about the controversy, the court should regulate the discovery process to avoid oppression, inconvenience, and burden to the corporation and to the executive." *Id.* at 518-19. As discussed in this brief, Mr. Uihlein certainly has "unique personal knowledge" about the issues for trial, and therefore his deposition is appropriate under *Evans*.

2

**1.    Mr. Uihlein Personally Ordered the Development of the Pro V1 Golf Ball.**

In January of 2000, Callaway Golf introduced a revolutionary golf ball – called the Rule 35 – which was the first golf ball ever to combine a thin outer cover layer of soft polyurethane over an inner cover layer of a hard ionomer. (Those features are key aspects of the patent claims asserted in this case.) This unique combination gave skilled golfers superior distance off the tee while also allowing them to spin the ball on steep approach shots around the greens. Callaway Golf's Rule 35 was a critical success.

Nine months later, Acushnet introduced the accused golf ball – the Titleist Pro V1 – which, just like the Rule 35, has a thin outer cover layer of soft polyurethane over a hard inner cover layer of a hard ionomer. The Pro V1 quickly became Acushnet's best-selling golf ball, and to date it has generated over **Redacted**    sales.

This sequence of events raises a lot of questions: Was the timing of these introductions a coincidence? What motivated Acushnet to develop the Pro V1 golf ball when it did? Who made that decision? Was it based in part on Callaway Golf's Rule 35 ball?

# REDACTED

[Halkowski Decl., Ex. 3 (AC0028868.UR) (brackets in original; emphasis added).]

**REDACTED**

3

**REDACTED** [Halkowski Decl., Ex. 4 (Excerpt

from Deposition of William E. Morgan, p. 52, lines 5-20).]

### REDACTED

**2.   Mr. Uihlein's Private Conversation with Phil Mickelson in June of 2000 Was the "Clarion Call" that Led to the Introduction of the Pro V1.**

**REDACTED** . Mr. Uihlein had a

conversation with professional golfer Phil Mickelson. According to an article in *Golf World* magazine produced by Acushnet, Mr. Mickelson – who had an endorsement contract with Acushnet – had recently tested some of the new golf balls on the market, including the Callaway Golf Rule 35 ball. During that conversation, Mr. Mickelson reportedly told Mr. Uihlein: "You've always had the best product on the market, but right now there are good products out there. I'd like to see what you have in R&D coming out." [Halkowski Decl., Ex. 6 ("Going to Great Lengths," *Golf World*, September 22, 2000, p. 20).]

Mr. Uihlein reportedly described that conversation as the ***"clarion call"*** that drove the introduction of the accused Pro V1 golf balls. [*Id.*] Acushnet launched the Pro V1 golf ball on the PGA Tour four months later.

Why was that conversation a "clarion call" to Acushnet? What had Mr. Mickelson told Mr. Uihlein about the competing golf balls, especially the Rule 35? What else did they discuss? What was it about the Pro V1 that made Mr. Uihlein introduce it in response to his conversation with Mr. Mickelson? What did Mr. Uihlein do in response to the "clarion call?" Only Mr. Uihlein can answer those important questions.

---
5

REDACTED

4

### 3. Mr. Uihlein Has Admitted that Acushnet Based the Introduction of the Pro V1 on the Golf Balls Launched by Its Competition (i.e., Callaway Golf).

Mr. Uihlein has repeatedly admitted that Acushnet took a "wait and see" approach

to introducing the Pro V1, wanting to see what Callaway Golf and its other competitors

came up with first. The following are published quotes by Mr. Uihlein:

- "We had made the decision to wait and see what our competitors came out with at the [2000 PGA Merchandise] show and where we had to be for our product to be better. And once we knew what they had, we really pushed on." [Halkowski Decl., Ex. 1 ("Inside look: Titleist's big makeover," *Golfweek*, August 18, 2001, p. 24).]

- "In a competitive environment, it's better to know what you're shooting at than shooting in the dark .... We watched everyone launch their ships, then we responded." [Halkowski Decl., Ex. 7 ("New Titleist ball is all the rage," *GolfWeb*, October 17, 2000).]

- "Apart from the fact [the V1] has been in development for as long as it has, our strategy is to watch what everybody else is going to do—the feeling is their first shot is their best shot—and respond appropriately." [Halkowski Decl., Ex. 8 ("The Fall Offensive: Manufacturers draw battle lines as new product is released," *Golf World*, October 13, 2000).]

This will likely be an important issue at trial, as Callaway Golf expects Acushnet

to attempt to paint itself as the innovator in golf ball technology. Accordingly, Callaway

Golf needs to authenticate Mr. Uihlein's statements and explore his bases for them.

### 4. Mr. Uihlein Has Touted the Breakthrough Technology of the Accused Products, Which Is Contrary to Acushnet's Litigation Position.

Finally, and perhaps most importantly, Mr. Uihlein has made public statements

that are directly contrary to Acushnet's litigation position in this case. Acushnet's main

defense will be to attack the validity of Callaway Golf's patents and, in particular, to

argue that the asserted patent claims were obvious in light of prior art at the time.

Acushnet will argue that the patented technology – e.g., the use of a thin soft

polyurethane outer cover layer and a hard ionomer inner cover layer – represented no real

advance in golf ball design.

Mr. Uihlein's actions and statements during the launch of the Pro V1 golf ball

directly contradict Acushnet's litigation defense. Throughout the development and

launch of the Pro V1, Mr. Uihlein consistently stated that the technology behind the golf

ball was revolutionary.

Here are selected quotes from Mr. Uihlein describing the Pro V1's development:

- "I think it is *the most massive paradigm shift ever seen in the golf ball category*, and certainly the most intense and accelerated one in any product category I've ever witnessed." [Halkowski Decl., Ex 1 ("Inside look: Titleist's big makeover," *Golfweek*, August 18, 2001, p. 24) (emphasis added).]

- "It would be foolish and naïve to think that 30 days after a discussion I had with Phil Mickelson that voila, something falls out of the white-coated laboratory that represents the magic elixir." [Halkowski Decl., Ex. 6 ("Going to Great Lengths," *Golf World*, September 22, 2000, p. 20).]

Mr. Uihlein also has admitted that he "bet[] the farm" on the Pro V1 golf ball, and

he has attributed the financial success of the company to the Pro V1:

- "The anxiety level was extremely high because we were betting the farm on the success of this ball. We essentially elected to obsolete ourselves in a very important area and put everything behind the Pro V1." [Halkowski Decl., Ex 1 ("Inside look: Titleist's big makeover," Golfweek, August 18, 2001, p. 1).]

- "The Pro V1 saved this company." [Halkowski Decl., Ex. 2 ("Economy hits golf industry," *SouthCoastToday.com*, July 21, 2002).]

Finally, Mr. Uihlein has touted Acushnet's own patent on the technology, which

covers virtually the same invention as the patents-in-suit, but was filed well afterwards.

[Halkowski Decl., Ex. 7 ("New Titleist ball is all the rage," GolfWeb, October 17, 2000)

("[Uihlein] said the patent on the technology for the new ball was issued in 1997, after

two years of research. So what took so long to bring it to market?").]

What did Mr. Uihlein believe was so special about the new technology that he

was willing to risk the entire company on one product? Why did Mr. Uihlein not direct

his designers to pursue this technology earlier? Only Mr. Uihlein can answer those

questions.

6

Given that Acushnet's primary litigation defense is to argue the patented technology was obvious, it is understandable that Acushnet would like to bury its CEO's statements hyping its own (later-filed) patent on the same technology and calling it "the most massive paradigm shift ever seen in the golf ball category." But that is exactly what makes those statements – and Mr. Uihlein's bases therefor – relevant and important in this case, particularly considering that Mr. Uihlein was so critically involved in the development and launch of the accused products. Acushnet cannot be allowed to sweep those statements under the rug. Callaway Golf needs the opportunity to authenticate Mr. Uihlein's statements and explore his bases for making them.[4]

**CONCLUSION**

For these reasons, Callaway Golf respectfully requests that the Court order Acushnet to present Mr. Uihlein for deposition at a time and place to be agreed upon by the parties.

---

[4] While this proffer sets forth key areas regarding the questioning of Mr. Uihlein, it does not, of course, provide an exhaustive discussion of all relevant areas of inquiry.

7

Dated: July 10, 2007                    FISH & RICHARDSON P.C.

By: /s/ *Thomas L. Halkowski*
                        Thomas L. Halkowski (#4099)
                        919 N. Market Street, Suite 1100
                        P.O. Box 1114
                        Wilmington, DE 19899-1114
                        Tel: (302) 652-5070
                        Fax: (302) 652-0607

                        Frank E. Scherkenbach
                        225 Franklin Street
                        Boston, MA 02110-2804
                        Tel: (617) 542-5070
                        Fax: (617) 542-8906

                        Roger A. Denning
                        12390 El Camino Real
                        San Diego, CA 92130
                        Tel: (858) 678-5070
                        Fax: (858) 678-5099

                        Attorneys for Plaintiff
                        CALLAWAY GOLF COMPANY

8

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2007, I electronically filed **PUBLIC**

## VERSION OF CALLAWAY GOLF COMPANY'S PROFFER REGARDING ITS

**REQUEST TO DEPOSE WALLY UIHLEIN** with the Clerk of Court using CM/ECF

which will send electronic notification of such filing(s) to the following Delaware

counsel. In addition, the filing will also be sent via hand delivery on local counsel:

**BY EMAIL AND BY HAND**                       Attorneys for Defendant
Richard L. Horwitz                                        ACUSHNET COMPANY
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza, 6th floor
1313 N. Market Street
Wilmington, DE 19801

**BY EMAIL AND BY FEDERAL EXPRESS**      Attorneys for Defendant
Joseph P. Lavelle                                         ACUSHNET COMPANY
Brian Rosenthal
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

                              /s/ *Thomas L. Halkowski*
                              Thomas L. Halkowski