# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ACUSHNET COMPANY
Plaintiff

VERSUS

SPALDING SPORTS WORLDWIDE
Defendant

CA-00-11631-DPW

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT JUDGE

HEARING ON MOTION FOR PRELIMINARY INJUNCTION

AUGUST 23, 2000

APPEARANCES:

JAMES COYNE KING, ESQ., Hanify & King, P.C., One Federal Street, Boston, Massachusetts 02110, on behalf of the Plaintiff

PETER D. VOGL, ESQ. AND GIANNI P. SERVODIDIO, ESQ. Pennie & Edmonds, LLP, 1155 Avenue of The Americas, New York, New York 10036, on behalf of the Defendant

ANTHONY D. MIRENDA, ESQ., Foley, Hoag & Eliot, LLP, One Post Office Square, Boston, Massachusetts 02109, on behalf of the Defendant

PETER A. ARTURI, ESQ., Spalding Sports Worldwide, Vice-President, Secretary & General Counsel, 425 Meadow Street, Chicopee, Massachusetts 01013, on behalf of the Defendant

VIRGINIA SMITH TAYLOR, ESQ. , Kilpatrick & Stockton, LLP, 1100 Peachtree Street, Atlanta, Georgia 30309, on behalf of the Defendant

Courtroom No. 1 - 3rd Floor
1 Courthouse Way
Boston, Massachusetts 02210
4:35 P.M. - 5:25 P.M.

Pamela R. Owens - Official Court Reporter
1 Courthouse Way - Suite 3200
Boston, Massachusetts 02210

Method of Reporting: Computer-Aided Transcription

CA-00-11631-DPW

AUGUST 23, 2000

THE COURT: Well, let me start with a preliminary matter. And that is why any longer these materials should be filed under seal. What difference does it make?

MR. KING: Your Honor, if I may, James King, Hanify & King for Acushnet Company. Just to identify for you, counsel with me today are Peter Vogl and Gianni Servodidio, both from Pennie & Edmonds in New York. There's a motion to admit pro hac vice. I just wanted to identify for the Court --

THE COURT: Right, but let me -- I appreciate that. I just want to understand why any longer. Now that the parties have put in dispute --

MR. VOGL: May I address that?

THE COURT: Let me tell you my perception.

MR. VOGL: Yes.

THE COURT: Now that the parties have put in dispute the applicability of this settlement agreement -- and that seems to be the issue -- I'm loathe to keep under seal anything that I have to act on. The public is entitled to know what it is that the Court is ruling on. And one of the things I'm ruling on is the construction of not an aging, but somewhat elderly,

settlement agreement.

MR. MIRENDA: Your Honor, from our perspective, the provisions at issue, we have no objection at all that they become part of the public record. In the settlement agreement, there are some, I believe, confidential royalty or other financial-related information that perhaps could be redacted from whatever copy is made public. But from our perspective, certainly there's no issue as to the provisions.

MR. VOGL: I think we can work with that, Your Honor. We can redact some of the numbers.

THE COURT: As to the royalty stuff, that's fine because you're not asking me to decide the question of royalty.

MR. VOGL: No, sir.

THE COURT: Let me just deal with this dismissal or the question raised by the agreement. How would this -- assume that I were to enforce it in respect of this dispute, which clearly was not in the contemplation of the parties at the time, what's the mechanism of enforcement? You go down to the District of Delaware and file an action; is that what happens? I mean, there's a lengthy period of time for the informal resolution of this matter which seems to foreclose the availability of injunctive relief. If

this were an arbitration provision, I'd know how to deal with this under the Federal Arbitration Act. But this isn't an arbitration provision. It's self-help essentially.

MR. MIRENDA: A mediation provision. Yes, Your Honor.

THE COURT: So, how do I enforce it?

MR. MIRENDA: I would suggest that you transfer this matter to the District of Delaware, which is the court that ultimately ought to be --

THE COURT: If this is to be -- I'm being asked to construe what this does. If I do that -- address me in a different way. I'm the District of Delaware now. What do I do? Don't I have to sit back and wait 90 days for you to work this all out?

MR. MIRENDA: Yes, Your Honor. That's what I would suggest. The District of Delaware would stay the action; direct the parties to follow the procedures that are set forth in the agreement; and if those procedures result in what the parties contemplate at the time, which would be a negotiated resolution, then that ends the matter.

THE COURT: If it doesn't work?

MR. MIRENDA: If it does not, then it steps forward to --

THE COURT: So the parties have foreclosed interlocutory relief in aid of a mediation process. That is to say, the disclosure of this or the actual roll-out -- put to one side the preliminary roll-out. But the actual roll-out, delivery, and that sort of thing, if it was improper, it's not something that any court can bar?

MR. MIRENDA: Under the agreement between the parties, Your Honor, that's certainly our position, that that's what the parties agreed to. And, frankly, Your Honor, these are parties who are not strangers to each other. These are parties who have had constant and competitive battles certainly, and legal battles going back over a number of years. This settlement agreement was -- the settlement agreement issue was the culmination of four or five separate actions that all have clustered around --

THE COURT: Golf balls.

MR. MIRENDA: -- golf balls. But these are companies that are in that industry that are battling with each other constantly, and came to the conclusion that -- for good business reasons on both sides -- this process ought to happen anytime there was a dispute over these kinds of issues, intellectual property.

THE COURT: Well, you say these kinds of

issues. It's intellectual property disputes. Is that it -- everything?

MR. MIRENDA: Intellectual property and advertising, Your Honor. That would mean trademark, patent, and claims relating to advertising.

THE COURT: Copyright?

MR. MIRENDA: Copyright, although neither party -- that's not a primary issue for either party, but certainly --

THE COURT: Well, it may not, but I just want to understand if this thing scoops up all of that --

MR. VOGL: Your Honor, may I speak?

THE COURT: You may in a moment, --

MR. VOGL: Sure.

THE COURT: -- Mr. Vogl. What it says -- let me just look at it.

MR. MIRENDA: It's Section (12), Your Honor.

THE COURT: Thank you.

MR. MIRENDA: At page 12 of Exhibit 1 to our motion to dismiss.

THE COURT: Right.

MR. MIRENDA: I'm sorry. That's the confidentiality provision. Of (19), Your Honor. I'm sorry.

THE COURT: So, Mr. Vogl?

MR. VOGL: Your Honor, I just would like to ask if Your Honor did, in fact, have an opportunity to review or at least receive and review our paper that we filed in response to the defendant's motion.

THE COURT: I have. I want to focus on this a bit.

MR. VOGL: Yes, sir. May I explain our position?

THE COURT: Let me understand what you say the scope of (19) is.

MR. VOGL: Yes, sir.

THE COURT: Any dispute arising out of or related to patents, that's not limited to golf ball business patents, is it?

MR. VOGL: No, it's not.

THE COURT: Okay. Other intellectual property owned or controlled by the parties, what does that mean?

MR. VOGL: That's not limited to patents either, Your Honor.

THE COURT: No, not limited to patents. But is it limited to the golf ball business?

MR. VOGL: Yes, Your Honor. If read in conjunction with paragraph (g), which is the purpose of this entire agreement set forth on page three --

THE COURT: Well, but I asked you earlier --

maybe I didn't enunciate it clearly -- are you saying that any dispute arising out of or relating to patents includes patents other than golf ball business patents?

MR. VOGL: No, Your Honor.

THE COURT: It only includes golf balls?

MR. VOGL: Golf ball patents. Yes, sir.

THE COURT: Okay. And, similarly, advertising?

MR. VOGL: Relating to golf balls, Your Honor.

THE COURT: Now, go to (g).

MR. VOGL: Yes, sir.

THE COURT: And it says that their purpose is to settle disputes having to do with the manufacture of golf balls -- the present dispute?

MR. VOGL: Yes.

THE COURT: Avoid other or similar patents. I suppose that could refer to patent disputes arising out of a golf ball business?

MR. VOGL: Yes, Your Honor.

THE COURT: And then striking a procedure for attempting to resolve expeditiously such new intellectual property in advertising disputes as may arise between them, not similar, but any new intellectual property and advertising disputes as may arise between them.

MR. VOGL: Yes.

THE COURT: So it doesn't include the reference to present disputes. It doesn't include the reference to similar patent disputes. It speaks more broadly, doesn't it?

MR. VOGL: But it does use the word "such," Your Honor. It doesn't say "any." It says "such new intellectual property and advertising disputes" which refers back to manufacture, sale, and advertising of golf balls as aforesaid in clause (i).

THE COURT: I'm not sure it does. You say "such as a reference to golf ball disputes or a reference to similar." But an ordinary reading of that would be -- just standing alone -- as a kind of general reference to new intellectual property and advertising disputes.

MR. VOGL: Your Honor, if I could also draw your attention, I think reading clauses without reading the entire agreement that's proposed --

THE COURT: No.

MR. VOGL: I'm not suggesting you are, Your Honor.

THE COURT: No. Listen, we're taking a stroll through the forest. I've identified some of the trees. You're going to help me, too.

MR. VOGL: Of course.

THE COURT: But go ahead.

MR. VOGL: Paragraph (15), if I could indicate that paragraph -- if I could just describe paragraph (g) as setting out the purpose of this agreement, I would argue, Your Honor, that paragraph (15) is quite clear what the end game -- what the contemplated end game -- was going to be when this agreement was executed. And that end game relates exclusively to the golf ball businesses. Successors, transferees, and assigns of substantially all of their respective golf ball businesses are bound by this agreement. No one else, Your Honor. At the time this agreement was drafted, Spalding and Acushnet were both in a variety of other businesses beyond golf balls. They did not specifically address or mandate that successors of any of their other businesses were bound by this agreement. So, it has to be, Your Honor, in a full reading of this agreement, in conjunction with paragraph (15) being a part of it, the golf ball business was specifically called out as being the purpose of the agreement and anybody in the future who acquired -- to whom the business was transferred or to whom it was assigned -- would, in fact, be obligated to live with this agreement if it involved the respective golf ball businesses.

THE COURT: Well, but why can't someone create one of these things and say, "Well, we pretty much know what any such new disputes will be in the golf ball business, but we don't know what they will be in others." And, so, rather than binding our successors as to the others, the paragraph or the subsection (2) of -- is it (19) or (g)?

MR. VOGL: You're going back to (g) being the purpose of the agreement and (19) being --

THE COURT: Yes, (g). If I say, look, this successor agreeement is meant to deal with items (i) and (2) and we're not imposing this obligation on (3) which can be the entire universe of intellectual property disputes that we don't know about, is that -- how is that wrenching this out of context?

MR. VOGL: Well, Your Honor, the parties were certainly aware at the time of the execution of this agreement that they had other businesses that they could have expressly referenced either in (g) or in (15).

THE COURT: But how do they -- let's assume that they did it in this -- let's assume this: That this was meant to cover all their intellectual property disputes that occur in the future in addition to the golf ball business ones that are identified. Is there anything inconsistent with that larger purpose in the

successor clause? How would you write the successor clause any differently if that were the case?

MR. VOGL: I would not limit it to golf ball businesses, Your Honor.

THE COURT: Well, no. But let's say that both of you decide that, hey, we don't know these other businesses yet. We don't know exactly how those are going to work. So, let's just leave that out of the successor --

MR. VOGL: Your Honor, just so you're clear, there was an ongoing vital business at Spalding and at Acushnet in other areas called clubs, called carts.

THE COURT: I understand all of that.

MR. VOGL: Okay.

THE COURT: The question is: Is there anything really structurally inconsistent with having a successor clause that is more narrow than a broadly read "Purpose" clause? And I don't think there is, is there?

MR. VOGL: Well, assuming you're reading the "Purpose" meaning (g), Your Honor, if you read "such" to mean any intellectual property as opposed to just that which is referred to at (i) and (2) --

THE COURT: With that potential reading.

MR. VOGL: -- then no. But I would submit, Your Honor, that that is not the reading --

THE COURT: Okay. Is there any other basis in this --

MR. VOGL: Well, Your Honor, the definitional section of this agreement certainly speaks to golf balls and the golf ball business. It doesn't speak to any other component of the businesses of the companies. So, again, it focuses specifically. It didn't define other aspects of their business that would be also included within this agreement and mandated mediation by this agreement.

THE COURT: Well, but me understand this. Let's look at (a). And he says that you're required to notify each other prior to filing suit of adverse patent claims. Is that only in the golf ball business?

MR. VOGL: I'm sorry. Where are you reading, Your Honor?

THE COURT: (a) on page -- well, it must be page one.

MR. VOGL: Yes.

THE COURT: "In situations of patent infringement, it requires that prior to filing suit" --

MR. VOGL: Yes, I see.

THE COURT: -- and then it says, "limited to patent infringement in the golf ball business."

MR. VOGL: Yes, Your Honor.

THE COURT: And the reason I get to that is because (g) says that.

MR. VOGL: Correct. The other thing you might need to know, Your Honor, is that the 1990 agreement was also limited to golf balls. That's referenced in (a).

THE COURT: Okay. Did it have the same language all the way through?

MR. VOGL: I don't believe there was a mediation provision in that agreement. There may be, but it's not -- it does not -- my colleague is mentioning that there is.

THE COURT: It says there is a duty to seek a non-litigious resolution including non-binding mediation, if necessary. So, it sounds to me like -- I don't know what it sounds to me like.

MR. VOGL: Your Honor, the other thing -- if I could draw your attention to it -- in (g) is, again, the reference in little (3) where it says "strengthen the procedure for attempting." It doesn't say "create." It doesn't say "implement." It doesn't say "provide the procedure for attempting to resolve it." It talks about strengthening.

THE COURT: Do either of you have the 1990 agreement?

MR. VOGL: I do, Your Honor. May I bring it

up?

THE COURT: Yes. Why don't you just pass it up? Do you have a copy of it?

MR. MIRENDA: No, Your Honor.

THE COURT: Let me just take a look at it. [Pause] Why didn't this one work? What happened?

MR. VOGL: It is my understanding, Your Honor, that there was litigation that was initiated by Spalding on these golf balls that were eventually the subject of the 1996 agreement. And upon bringing that case -- that case was brought in Cleveland, Ohio -- we brought an action in Massachusetts for declaratory judgment. The court here in Massachusetts transferred the case as a second filed case back to Cleveland. The court in Cleveland, without rendering an opinion, sent the case to Delaware because both parties are incorporated in Delaware.

THE COURT: You're giving me ideas.

MR. VOGL: I hope not. Both parties are incorporated in Delaware. That's why they were sent. And the judge in Cleveland didn't want to hear the case. We never got a ruling on why.

THE COURT: He just sent it to Delaware.

MR. VOGL: I mean, as you can see --

THE COURT: But did you follow the --

MR. VOGL: There was no mediation proceeding in that case, Your Honor. Spalding did not honor the provisions of that agreement that require mediation and, therefore, it was, in fact, their case that was filed in Cleveland.

The other thing worthy of note perhaps, Your Honor, is that in 1998, there was a proceeding filed by Acushnet against Spalding -- actually, the Etonic Division of Spalding in Delaware -- and that was on a footwear matter. And, specifically, in that case, the Spalding folks did answer the complaint and raised as an affirmative defense the contract, but did not move to suspend the proceedings, stay, or in any way try to preclude the court --

THE COURT: So there hasn't been a ruling on that? I mean, there is no ruling by the court as to the scope of the --

MR. VOGL: That is correct. Well, eventually, it was settled. That case was settled, Your Honor.

MR. MIRENDA: From our perspective, Your Honor, obviously, the fact that that case was settled when the parties had an opportunity to avail themselves of negotiation --

MR. VOGL: It took eight months, Your Honor.

THE COURT: Well, the short of it is I'm not

absolutely sure about this because I haven't given it the full consideration that it will require. But my first cut at it is that this '96 settlement agreement does not mandate the transfer of this kind of case, that really the scope of the settlement agreement is the golf ball business. And it is not meant to extend to the golf shoe business. That's at least a preliminary determination that I make before reaching how we're going to resolve this on an interlocutory basis. I may change my view about that, but I have got to do it on a likelihood of success on the merits. One of the likelihoods of success on the merits is whether or not that they have been mandated in some sort of alternative dispute resolution mechanism. I don't know find that there has been on the basis of what I now know. I'm passing back the 1990 agreement. You'll make a filing of that and make it available to counsel.

MR. VOGL: I will, Your Honor, certainly.

THE COURT: So, now we're on to the question of what to do on interlocutory relief. Let me just ask you, Mr. Vogl, what took you so long?

MR. VOGL: Your Honor --

THE COURT: I mean, it's not the same as the one I had before --

MR. VOGL: Right.