# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3    * * * * * * * * * * * * * *
                                 *
 4    ACUSHNET COMPANY           *
                    Plaintiff    *
 5                               *
         VERSUS                  *   CA-00-11631-DPW
 6                               *
      SPALDING SPORTS WORLDWIDE  *
 7                 Defendant     *
                                 *
 8    * * * * * * * * * * * * * *

 9        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

10            UNITED STATES DISTRICT COURT JUDGE

11      HEARING ON MOTION FOR PRELIMINARY INJUNCTION

12                    AUGUST 29, 2000

13
      APPEARANCES:
14
          JAMES COYNE KING, ESQ., Hanify & King, P.C.,
15        One Federal Street, Boston, Massachusetts  02110,
          on behalf of the Plaintiff
16
          PETER D. VOGL, ESQ. AND GIANNI P. SERVODIDIO, ESQ.
17        AND ELIZABETH S. LANGSTON, ESQ. Pennie & Edmonds,
          LLP, 1155 Avenue of The Americas, New York,
18        New York  10036, on behalf of the Defendant

19        ANTHONY D. MIRENDA, ESQ., Foley, Hoag & Eliot, LLP,
          One Post Office Square, Boston, Massachusetts 02109,
20        on behalf of the Defendant

21        PETER A. ARTURI, ESQ., Spalding Sports Worldwide,
          Vice-President, Secretary & General Counsel,
22        425 Meadow Street, Chicopee, Massachusetts 01013,
          on behalf of the Defendant
23
          VIRGINIA SMITH TAYLOR, ESQ., Kilpatrick & Stockton,
24        LLP, 1100 Peachtree Street, Atlanta, Georgia  30309,
          on behalf of the Defendant
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17            Courtroom No. 1 - 3rd Floor
              1 Courthouse Way
              Boston, Massachusetts 02210
18            10:07 A.M. - 11:04 A.M.
              12:04 P.M. - 12:15 P.M.
19
20
21
        Pamela R. Owens - Official Court Reporter
22         1 Courthouse Way - Suite 3200
            Boston, Massachusetts   02210
23
24    Method of Reporting:   Computer-Aided Transcription
25

1    their ability to offer those shoes. What's happened is
2    that we have specifically -- the 15,000 that are here,
3    certainly those shoes can be relabeled very quickly.
4         THE COURT: I understand that.
5         MR. VOGL: You understand that. Okay.
6
7                    ORAL REASONS FOR JUDGMENT
8    BY THE COURT:
9         As I said, I want to rule from the bench
10   simply because time seems to me to be of the essence,
11   at least in respect of what I should do in dealing with
12   this controversy.
13        And after careful review of all of the
14   materials that the parties have submitted, including the
15   materials that were submitted yesterday and the
16   arguments, all of which I found helpful, it is my
17   determination that I will issue a preliminary injunction
18   barring Spalding from the use of a mark called
19   "eComfort." I say that and will refine it -- with the
20   assistance of the parties -- to permit them to market an
21   Etonic's comfort shoe. But they've got to take the
22   stand-alone "e" out of their promotion material and
23   their mark.
24        This case calls for some explanation,
25   obviously, of the reasons why I take that position and I

```
 1    intend to dictate those reasons into the record subject,
 2    obviously, to the right and obligation to tidy them up
 3    as it becomes necessary.  But the parties are entitled
 4    to a prompt explanation of why I'm doing what I'm doing.
 5              The issues that one confronts in this case
 6    start at the very outset over whether or not this is
 7    the proper forum to resolve this dispute.  This is a
 8    case that arises out of head-to-head competition between
 9    the parties in the golf shoe market.  The parties, as
10    the record indicates, aggressively compete in other golf
11    markets and their prior conflicts have made their way
12    into the courts from time to time.  In fact, they've
13    settled prior litigation through a settlement agreement
14    which provides for future dispute resolution through
15    something like a mediation process.  But that agreement
16    for mediation is limited, I find, to the golf ball
17    business.  It has no applicability here.  For that
18    reason, I will be denying the defendant's motion to
19    dismiss or stay or transfer of this case to permit
20    recourse to what I find to be a golf ball business
21    alternative dispute resolution regime.  And for that
22    reason, as we discussed earlier, I will allow the
23    plaintiff's motion to seal and impound only so much of
24    the settlement agreement as reflects the financial
25    arrangements between the parties.  Those financial
```

1    arrangements in that agreement are irrelevant, in any
2    event, to this litigation.  So, I'm going to instruct
3    the parties to file substitute copies of all documents
4    previously filed under seal excising the references to
5    the financial arrangements as reflected in plaintiff's
6    motion.  Prior sealing orders in this case will be
7    lifted and all documents for which a substitute document
8    has not been submitted by September 15, 2000, will then
9    become available for review by the public if there
10   hasn't been a substitution.
11        So, at issue here, then, is a question having
12   to do with the golf shoe market, particularly the use of
13   the mark "eComfort" to designate a style of golf shoe or
14   a line of golf shoes both parties are beginning to
15   offer.  I find the mark, while having a descriptive
16   component in that it portrays a characteristic --
17   comfort -- of the shoes to which it refers, to be in the
18   category of a suggestive mark.  Coupling the descriptive
19   term with the prefix "e" will cause the mark to connote
20   a particular shoe style or line of shoes by triggering
21   in a prospective golf shoe purchaser's mind an
22   identification with a particular style or line that the
23   parties are marketing.  Although the parties are
24   offering different stylized logos in which the mark
25   appears, considering the total effect, as I must, of the

```
 1    designation of the parties' respective shoe styles or
 2    lines as "eComfort," the experience of the consumer in
 3    addressing this market is essentially the same.  In
 4    various renditions, for example, there is a space
 5    between the "e" and "Comfort."  There are different
 6    stylized logos, as I've indicated.  But the way in which
 7    the market works, based on the record that I have before
 8    me, is that people will orally be requesting particular
 9    shoes and they will be offered shoes orally.  And, so,
10    the dominant experience of identification and
11    designation will be as "eComfort" rather than the
12    stylized logo.  It's apparent -- and both parties by
13    their public statements and their public actions in
14    seeking trademark registration confirmed their
15    understanding that the use of the mark will be by
16    purchasers as to the source of the shoes and not
17    merely as some desirable quality in the merchandise.
18    It's for that reason that I find it to be a mark that is
19    distinctive and as to which there is no need for proof
20    of a secondary meaning.  Of course, we're at the early
21    stages of the identification of this mark and a
22    secondary meaning would be harder to come by at this
23    stage.  Nevertheless, by designating it in the category
24    of suggestive mark, I'm satisfied that the plaintiff has
25    established that there is a mark here that is more than
```

```
 1    merely descriptive.
 2              The parties, I find, proceeded independently
 3    and without apparent knowledge of each other's efforts
 4    in 1999 to develop this distinctive line of shoes for
 5    the golf shoe businesses that they have.  They
 6    independently -- and, again, without apparent knowledge
 7    of the other's similar decision -- determined in 1999 to
 8    designate the line as "eComfort."  The first public use
 9    of the mark, as opposed to some sort of internal
10    discussion of an "eComfort" line, was made by the
11    plaintiff, I find, on or about February 22, 2000, at
12    presentation to Golfsmith, a major retailer of golf
13    equipment, a major customer of the plaintiff to whom
14    representatives of the plaintiff traveled, transporting
15    in commerce samples of the "eComfort" line of shoes on
16    which the mark was affixed.  There were also displays.
17    They had a presentation, featuring existence of the shoe
18    itself, which I find to have been present during that
19    presentation.  And that is sufficient, as far as I'm
20    concerned, to establish their priority use in commerce
21    as required under Section 1127.  This major sales
22    presentation in which promotional materials were
23    prominently displayed containing both the style and its
24    logo for "eComfort," but also the typographical format
25    used in various presentations, including the catalog --
```

1    that is, just upper case, ECOMFORT -- were necessary for
2    purposes of developing a sales presentation and certain
3    kinds of sales commitments which are the initial stages
4    of obtaining purchases of these materials -- this
5    product. This is referred to as commitments. Perhaps
6    the evidence in this case will develop the meaning of
7    that more fully. But I'm satisfied that sealing these
8    commitments, utilizing this mark in this setting, were
9    sufficient in presentation to major distributors to
10   involve the beginning of what I find to have been
11   thereafter throughout the year 2000 a continuous use of
12   the mark in an ordinary course of the plaintiff's
13   business sufficient to establish the plaintiff's
14   priority in use of the mark.
15         The plaintiff had earlier provided what could
16   be identified as some formal public notice by filing an
17   intent to use application under the trademark office.
18   But on this record, I cannot find that the defendant
19   learned of that claim any earlier than March of 2000
20   when the application was located in a search of the
21   available trademark application database.
22         Yet defendant's response was, I think,
23   instructive as well. They sought on their own to
24   perfect some sort of claim to priority by invoicing
25   shoes -- 11 pairs of size 10 shoes, its only "eComfort"

1  line to favor a customer -- thereafter filing its own
2  application at the trademark office claiming an April
3  16th sale as the first use. Because I found that the
4  first use was by the plaintiff on or about February
5  22nd, I reference the defendant's claim because I find
6  it to have been based on a transaction which was not a
7  bona fide use of the mark in the ordinary course of
8  trading, but was rather undertaken with the intent
9  merely to attempt, ineffectively, to reserve the right
10 in the mark. This intent has some relevance to findings
11 that I will make with respect to likelihood of
12 confusion.
13           The parties engaged in skirmishing over their
14 respective marks in correspondence and communications
15 in May and June and ineffectively with the letter of
16 June 20 to Mr. Arturi. During the course of this
17 skirmishing, the defendant asserted that it was looking
18 into possible infringement by the plaintiff. That
19 reference in a press release of, I believe, May 24th,
20 can be read as an infringement of the Etonic's line and
21 it can also be read as an infringement of some sort of
22 right that the defendant was claiming in "eComfort."
23           In any event, it indicated awareness by the
24 defendant that possible legal ramifications were in the
25 offing with respect to the use of this mark.

1           Having found that there is an enforceable
2   mark, a registrable mark, and having found that the
3   priority rests with the plaintiff in this case, I'm
4   obligated, I think, to address the question of the
5   likelihood of confusion arising out of the defendant's
6   use under the plaintiff's mark.
7           I, of course, make these findings, as I've
8   indicated, on the basis of likelihood of success. They
9   are not final determinations. They cannot be because
10  they are presented in interlocutory papers. But,
11  nevertheless, I'm in sufficient comfort to believe that
12  there is a quite substantial likelihood of confusion
13  arising out of the defendant's use of the "eComfort"
14  mark. The marks -- first, the marks, apart from their
15  different stylized logos, are -- for all intents and
16  purposes -- not merely similar; they are identical as
17  shoes are marketed and sold in the marketplace. The
18  logos will be secondary to the designation "eComfort" in
19  the ordering of shoes by distributors, retailers and
20  then customers. These goods are also, for all intents
21  and purposes, identical in that they occupy a particular
22  shoe market niche at a similar price point. The
23  channels of trade, advertising, class of prospective
24  customers in that market niche are the same.
25          And while it is too early in the marketing

1  campaigns to have substantial evidence of actual
2  confusion, I do credit the evidence provided by
3  plaintiff's affiants, that even among relatively
4  sophisticated and focused consumers, such as those who
5  are found in the golf shoe business or market for golf
6  shoes and among the retail sales personnel who serve
7  them, there will be a measure of confusion in the sense
8  of blurring the distinction between the plaintiff's
9  product and that of the defendants when consumers are
10 offered or seek out an "eComfort" shoe.
11       I find that the defendant's intent to forge
12 ahead with its own use of the "eComfort" mark was
13 animated by a not entirely frivolous belief that
14 whatever claim plaintiff has was unenforceable as a
15 legal or a practical matter.  Defendant's purported
16 intent to protect what it asserts as its own claims
17 is a bit more questionable.  But this much is clear:
18 That the intent here was -- after the dispute had
19 crystallized -- was on the part of the defendant to
20 capitalize on the plaintiff's marketing of the
21 "eComfort" mark.
22       It is too much to say that this is a case
23 in which similarities to a certain judgment of Solomon
24 are applicable.  But I do find some similarities in the
25 willingness of Spalding to permit the parties to go

```
 1      ahead with mutual sales under the same mark as against
 2      the determination of the plaintiff to enforce the mark.
 3      This suggests that Spalding is less concerned with the
 4      mark as to which it asserted some claim than is the
 5      plaintiff simply because, as a business matter, Spalding
 6      had made a judgment that it was prepared to move
 7      forward, piggy-backing on marketing and the development
 8      by the plaintiff.  That intent, it seems to me, will go
 9      to questions of balance of hardships and harms.  There
10      is no question that both of the parties sought to
11      maintain their position vigorously here.  Nevertheless,
12      the intent of the defendant, after the assertion of the
13      mark publicly was made by the plaintiff, it seems to me,
14      was not merely to preserve prior marketing development,
15      non-public, but also to capitalize, as I have indicated,
16      on the marketing efforts and potential for good will of
17      the mark that plaintiff properly asserts here.
18              Finally, I turn to the strength of the mark.
19      Again, because we're at the preliminary stage of
20      marketing, it's hard to say with any assurance, but it
21      seems to me that this -- in the golf shoe business -- is
22      going to be a relatively strong mark.  It would be
23      something that the parties and consumers and those who
24      serve them use to identify a particular line of shoes or
25      particular shoe style and will have the effect of
```

1   providing a very strong designation of the source of the
2   product.
3         And, so, for those reasons, I find it very
4   likely that the plaintiff will succeed on the merits of
5   the case which really turns around in its core sense,
6   whether you describe it as infringement or confusion --
7   that is, dilution -- on the question of confusion.
8         I turn then to the question of balance of the
9   hardships. In some sense, there is an almost built-in
10  hardship to a party who has a mark that is being
11  diluted, as I find the plaintiff's mark is diluted here.
12  There is a very substantial investment that has been
13  made in the development of this mark, in the development
14  of promotional material with respect to it, in the
15  development of the marketing. And while we are at the
16  early stages, I find that the plaintiff's likely loss of
17  good will in the sense of appropriation of its right to
18  use this mark to designate its shoes would be quite
19  substantial in the absence of an injunction.
20        The investment is equally strong in some ways
21  on the part of the defendant. And I must consider the
22  harm to the defendant under these circumstances. But
23  part of this is simply a willful choice -- business
24  choice -- on the part of the parties to come into direct
25  conflict. It was signaled by the defendant in its

1 assertions in the press release, its preemptive efforts
2 in a press release, which I do find to be false
3 literally, made to the market, that both parties would
4 choose to go on a collision course. The parties making
5 those kinds of choices make business judgments about how
6 much they're going to continue to invest and what the
7 likelihood of loss is on that investment.
8     And I find that as a pure economic matter,
9 the loss to the defendant of its economic investment
10 with an injunction is roughly the same as the loss to
11 the plaintiff if the injunction is not issued.
12     But that's not enough. Plaintiff, as I
13 indicated in my reference to the willingness of the
14 defendant to give up the mark, has evidenced a
15 willingness to depreciate the value of the mark itself.
16 And that enters into my calculus in this way: That the
17 defendant is, if an injunction is issued, not giving up
18 much that it values in the form of a means of marketing.
19 It certainly is not giving up something that it will use
20 exclusively at all and enforce even though it may have
21 threatened to do so back in May.
22     So, that then leads me to the question of
23 whether or not the particular timing of the request for
24 preliminary injunction should constrain me. The law of
25 trademark has a variety of different themes concerning

1   the doctrine that I'll loosely call laches that requires
2   a party to move relatively promptly if it seeks
3   equitable relief on the part of the court. It is too
4   facile to make reference to the number of six-week cases
5   or eight-week cases or two-month cases. What I have to
6   look at is, I think, whether or not there has been a
7   failure either promptly to contest the matter or to
8   induce the defendant into believing that it need
9   restrain itself and its business judgments pending a
10  final resolution. I don't find that there has been the
11  kind of delay that has concerned the courts. What was
12  going on here was a back and forth through June,
13  through the end of June, concerning respective rights,
14  enforceabilities, and ways of accommodating each other's
15  interests and perhaps settling this case. Courts would
16  create a disincentive to such settlements if they
17  required a trigger-happy approach to coming into court.
18              Moreover, while there was an indication --
19  and I think the market, the marketing of shoe sales and
20  custom and practice in the industry will bear this out
21  -- that the time period during the summer and ramping up
22  to September was critically important here. I do not
23  find that the plaintiff sought to take advantage of the
24  maximum economic exposure by the defendant to cause
25  inordinate or unfair harm to the defendant by bringing

33

1  the preliminary injunction action in the middle of
2  August as it did. The triggering date, as far as I'm
3  concerned, is the press release of June 17th, I
4  believe --
5       MR. VOGL: July 17th, Your Honor.
6       THE COURT: -- excuse me, July 17th -- by
7  Spalding. That effectively indicated that this would be
8  a no-holds barred dispute over the rights to this
9  particular line.
10      Faced with that, then, there was a roughly
11 one-month delay in bringing this. I note that the
12 papers that were submitted were not just slapped
13 together, but rather were carefully prepared. The
14 timing of doing something like that seems to me to be
15 reasonable. Certainly, I would not undertake to provide
16 disincentives to parties who carefully think out and
17 carefully draft their submissions. And, so, I don't
18 find that there is an unfair advantage being taken here
19 by the timing of the preliminary injunction motion.
20 That doesn't mean that there isn't harm to the
21 defendant. But in some ways, the defendant, having
22 chosen willfully to forge ahead here, is in the position
23 of the parricide who throws himself on the mercy of the
24 court as an orphan. They made their own choices --
25 business choices -- here. And they face the

1   consequences of those business choices. I'm not
2   satisfied that they are so substantial that they cannot
3   be mitigated by efforts at replacement of the lining of
4   inner soles and boxing. And as I indicated at the
5   start, I'm not barring them from referring to their shoe
6   as the Etonics Comfort shoe, but they may not use
7   "eComfort" in their presentations.
8           In short, there are economic harms to both
9   parties, but I find that the harm to the plaintiff if I
10  do not issue this injunction far outweighs the harm to
11  the defendant if I do.
12          That brings me finally to the public interest.
13  And ordinarily in a statutory case, one refers to the
14  public interest as having been composed by the Congress
15  in the statute. But there's something more involved
16  here. Throughout the law of unfair competition of which
17  trademark is a part is the fundamental concern of
18  protecting a consumer from confusion. That is -- in
19  some ways -- an effort to empower the consumer to make
20  discriminating choices. Frequently, dilution is a
21  concern with tarnishment. Sometimes, as here, it's a
22  concern with blurring the ability of the consumer to be
23  able to identify with specificity the kind of product
24  that he or she wants because there is an appropriation
25  of a mark deserving of protection. So, I find there's

1   substantial public interest in enjoining the defendant
2   from the use of the "eComfort" mark any further in the
3   marketplace.
4       So, those are the reasons for my determination
5   to allow the motion for preliminary injunction that has
6   been brought by the plaintiff, Acushnet.
7       In terms of the actual format of the order,
8   I'm of the view that paragraph (1) of the proposed form
9   of order is fine and probably would be sufficient. But
10  what I would propose doing -- in light of what I've had
11  to say -- is having the parties present me with an
12  agreed-upon order here. You can work in marking it up
13  -- because I have another matter I have to take up right
14  now -- and then bring it back and I'll issue the order
15  under these circumstances. There may be aspects --
16  practical aspects -- that I'm simply not familiar enough
17  with that I haven't addressed now. But the parties will
18  want to bring it to my attention.
19       MR. VOGL: Very good.
20       THE COURT: All right. So, why don't we take
21  a brief -- I'm sorry. Mr. Mirenda?
22       MR. MIRENDA: Your Honor, two points: One,
23  the question of bond now, obviously, comes up.
24       THE COURT: Talk about it with them. I mean,
25  I'll resolve anything, but they're going to have to pay

```
 1   the -- they are going to have to put up a bond. There's
 2   no question about that.
 3            MR. MIRENDA: We'll do that and come back.
 4            THE COURT: Deal with the bond. Deal with the
 5   formal language of this understanding that this is not
 6   something that you embrace, but now you're trying to
 7   deal with the practicalities of this so I haven't done
 8   anything untoward.
 9            MR. MIRENDA: Yes, Your Honor.
10            THE COURT: All right. We'll be in recess.
11            RECESSED AT 11:04 A.M.
12   (Reconvened at 12:04 P.M.)
13            THE COURT: Okay. Where are we?
14            MR. VOGL: Your Honor, we have agreed to a
15   form of order that we'd like to propose to you.
16            THE COURT: Okay.
17            MR. MIRENDA: I think two issues --
18            MR. VOGL: Two issues that remain.
19            MR. MIRENDA: Can I just hand this handwritten
20   or hand marked-up copy up to the Court?
21            THE COURT: Yes.
22            MR. MIRENDA: The two issues, Your Honor: The
23   first has to do with the "Preamble" paragraph. And the
24   second has to do with the amount of the bond.
25            THE COURT: Okay.
```