IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

               Plaintiff,

    v.

ACUSHNET COMPANY,

               Defendant.

C. A. No. 06-91 (SLR

**PUBLIC VERSION**

**CALLAWAY GOLF COMPANY'S OPENING MARKMAN BRIEF**

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

*Attorneys for Plaintiff*
*Callaway Golf Company*

DATED: August 14, 2007

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS ...........................................2

III.  BACKGROUND ...............................................................................................2

    A.  The Parties .............................................................................................2

        1.  Callaway Golf ............................................................................2

        2.  Acushnet ....................................................................................3

    B.  Golf Ball Nomenclature and Design.......................................................4

        1.  Two-Piece and Three-Piece Balls and Ball
           Nomenclature ............................................................................4

        2.  Golf Ball Design ........................................................................5

    C.  The Patents-In-Suit ................................................................................6

IV.  PRINCIPLES OF CLAIM CONSTRUCTION .....................................................6

V.  DISPUTED TERMS ...........................................................................................7

    A.  A "layer having a Shore D hardness" ......................................................8

        1.  The correct construction of the Shore D limitations
           requires that the measurement be taken on the layer of
           the ball itself.............................................................................8

           a.  The claim language itself compels the
               construction that the measurement be made on
               the ball......................................................................9

           b.  The specification further supports that the Shore
               D measurement be made on the ball itself.........................10

    B.  "Core" ...................................................................................................13

        1.  No construction of "core" is necessary – its plain and
           ordinary meaning is sufficient. .......................................................13

        2.  Should the Court disagree and decide to construe "core,"
           Acushnet's construction is plainly wrong......................................15

            a.  Acushnet's proposed construction is contrary to
                the plain language of the claims and specification ............16

## TABLE OF CONTENTS (cont'd)

**Page**

    b.    Acushnet's proposed construction is refuted by its own patents, its hired expert's testimony, and his patents........................................................................17

    3.    Should the Court feel a construction is necessary, then the proper construction for "core" would be "the foundational part of a golf ball, over which one or more cover layers may be applied."........................................................18

VI.    CONCLUSION................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ASM America, Inc. v. Genus, Inc.*,
    260 F. Supp. 2d 827 (N.D. Cal. 2002) .........................................................................15

*Agere System, Inc. v. Broadcom Corp.*,
    2004 WL. 1658530 (E.D. Pa. July 20, 2004) ............................................................14

*Applera Corp. v. Micromass UK Ltd.*,
    186 F. Supp. 2d 487 (D. Del. 2002), *aff'd*, 60 Fed. Appx. 800,
    2003 WL 1795593 (Fed. Cir. Mar. 11, 2003) ....................................................15, 17

*Bell Atlantic Network Serv., Inc. v. Covad Communications Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001) ................................................................................7

*British Telecomm. PLC v. Prodigy Communications Corp.*,
    189 F. Supp. 2d 101 (S.D.N.Y. 2002) .......................................................................14

*Broadcast Innovation, LLC v. Echostar Communications Corp.*,
    240 F. Supp. 2d 1127 (D. Colo. 2003) ......................................................................15

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ..............................................................................7, 9

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ................................................................................7

*Liquid Dynamics Corp. v. Vaughan Co.*,
    355 F.3d 1361 (Fed. Cir. 2004) ................................................................................7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................7

*STMicroelectronics, Inc. v. Motorola, Inc.*,
    327 F. Supp. 2d 687 (E.D. Tex. 2004) ......................................................................15

*Vitronics Corp. v. Conceptronic., Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................7

*W.E. Hall Co. v. Atlanta Corrugating, LLC*,
    370 F.3d 1343 (Fed. Cir. 2004) ...............................................................................14

## I.    INTRODUCTION

For almost a century, the premium golf ball market was dominated by one type of golf ball – a wound-core golf ball with a soft cover.  Acushnet was the preeminent wound ball company, and therefore dominated the premium golf ball market.  Golfers, many attracted to the game by its tradition and history, were hesitant to change.  However, change they did.  Within one year of the introduction of the technology of the patents in suit, almost *every* professional golfer had changed from the wound core balls of old to the multi-piece ball of the patents in suit, which includes a core, a hard ionomer inner cover layer, and a soft polyurethane outer cover layer.  They changed because these new balls were the first to solve an age-old dilemma – hard balls flew a great distance but performed poorly on shorter shots around the green, which required control and finesse; conversely, soft balls were great for shorter shots but lacked the distance of the hard balls.  The inventor of the patents in suit, Michael Sullivan, solved that dilemma by creating the first ball that could both fly great distances and have the spin necessary for shorter shots.

Callaway Golf was the first company to commercialize Sullivan's patented technology.  When Acushnet saw the amazing performance of the new Callaway Golf ball, Acushnet turned its back on its heritage and almost overnight retooled to produce and sell the accused products despite its enormous investment in the wound balls on which its business previously was based.

Acushnet has previously told the Court "it's no secret that the primary argument that Acushnet is going to advance is one of invalidity."  [Halkowski Decl. Ex. 1 Transcript of February 8, 2007 Hearing at page 68, lines 8-10)].[1]  Not surprisingly, the primary claim construction issue – whether the "hardness" values required by the claims should be measured on the golf ball itself or instead on an isolated "plaque" of material – is driven by Acushnet's invalidity arguments; Acushnet infringes either way.  The only other term in dispute, "core,"

---

[1]    All exhibit citations refer to the accompanying declaration of Thomas L. Halkowski, unless otherwise noted.

relates to noninfringement, but only for a subset of the accused products (the Pro V1* and Pro V1x). In both cases, as the Court will see, not only does the intrinsic evidence lead to only one conclusion, but extrinsic evidence from Acushnet itself shows that Acushnet's proffered claim constructions are unsupported and that Callaway Golf's constructions should be adopted.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Callaway Golf sued Acushnet Company for willfully infringing U.S. Patent Nos. 6,210,293 ("the '293 patent"), 6,503,156 ("the '156 patent"), 6,506,130 ("the '130 patent") and 6,595,873 ("the '873 patent") on February 9, 2006. The parties have engaged in extensive fact discovery, have exchanged expert reports, and are now completing expert depositions. The claim construction hearing is September 28, 2007, and the pre-trial conference is set for November 21, 2007.

## III.    BACKGROUND

### A.    The Parties

#### 1.    Callaway Golf

From its humble beginnings in 1982 making steel-cored, hickory-shafted wedges and putters, to its introduction in 1992 of the "Big Bertha" oversized stainless steel driver that revolutionized the game of golf, Callaway Golf has been on the forefront of innovation in the golf industry. Today its continued innovations have made it the world's largest and most successful manufacturer of golf clubs.

In 1996, Callaway Golf took this spirit of innovation and applied it to the golf ball world, building its ball company from the ground up by developing cutting edge technology that would again lead another revolution in the golf industry – the shift in the premium golf ball market from the wound ball to a multi-layer, polyurethane covered ball. However, Callaway Golf recognized that others had come before it in the golf ball business and that one company in particular had done the fundamental work in the area of multi-layer golf balls. Therefore, in addition to developing its own ball technology, Callaway Golf acquired substantially all of the

golf assets of the Top-Flite Golf Company in 2003.[2]  The assets purchased included the fundamental patent portfolio on multi-layer, polyurethane-covered balls, including the patents in suit.  Top-Flite's portfolio was the fruit of a long history of innovation in its own right, which included developing the first Surlyn®[3] covered balls and later introducing the first multi-layered balls to the market.  Today, Callaway Golf's ball business is a combination of its own product innovation supported by Top-Flite's intellectual property foundation.

### 2.    Acushnet

Acushnet is a wholly-owned subsidiary of Fortune Brands, Inc., a consumer products conglomerate based in Illinois which has collected under one roof a diverse portfolio of companies which include Jim Beam, Maker's Mark, Master Lock and Moen.  Acushnet is the dominant manufacturer of golf balls in the world.  Its products include balls sold under the "Titleist" and "Pinnacle" brand names; the Titleist Pro V1 family of balls is at issue in this case. Throughout its history, Acushnet has been known as a "wound-ball" company – its premium products used wound cores, which consist of a small liquid or solid center surrounded by rubber windings.  But in 2000, in response to Callaway Golf's release of the Rule 35 ball, Acushnet released the Pro V1 – a three-piece solid-cored ball with an ionomer inner cover layer and a polyurethane outer cover layer.

Acushnet has had tremendous success selling the Titleist Pro V1, Titleist Pro V1x, and Titleist Pro V1★ ("Star") balls, all of which practice Callaway Golf's patented technology.  In fact, some commentators noted that the introduction of the technology in Acushnet's Pro V1 line of balls forever changed the game of golf and golf course design.[4]  Acushnet's long-standing dominance of the golf ball market, and particularly the market for expensive, or "premium," golf balls, has allowed it to reap huge revenues and profits from sales of these balls.  At the same time, independent observers also acknowledge that Acushnet only reluctantly joined this

---

[2]    Top-Flite was previously known as Spalding Sports Worldwide, Inc.  Callaway Golf will refer to these entities interchangeably as "Top-Flite".

[3]    Surlyn® is a strong, durable, man-made polymer made by DuPont.

[4]    Mark McClusky, "Golf's New Handicap: Technology" *Wired News,* October 5, 2005. [Halkowski Decl. Ex. 2].

revolution and, having had nothing to do with the original development of the technology, did so late.

### B.     Golf Ball Nomenclature and Design

One of the historical challenges in golf ball design had been the tension between "feel" and "distance." As more fully explained below, "distance" requires a harder ball less likely to spin when struck; spin creates drag and, therefore, shortens the distance that a ball will travel. "Feel" or control, on the other hand, requires a softer ball that will spin when struck – the spin allows a golfer to shape the shot by bending it from right to left or vice versa, or imparting backspin so that the ball will stop quickly on the green. Prior to the advent of the technology at issue here, a golfer had to choose one or the other because no ball could do both things well – the Holy Grail of golf ball designers was a ball that could.

#### 1.     Two-Piece and Three-Piece Balls and Ball Nomenclature

Golf balls are commonly broken down into two categories – two-piece and three-piece balls. Within these two classifications, there are numerous variations and possibilities but within the industry, this is classically how the balls are identified.

"Two-piece" balls have a core and an outer layer. The core can either be "solid" or "wound." In a solid ball, the core is made of rubber and can be one solid piece or multiple layers. The core in a wound ball is made of elastic windings wrapped around either a solid or liquid filled center. Notwithstanding that the core can consist of multiple layers or parts, it is commonly referred to as the first "piece" of a "two-piece" ball. The cover layer is the second piece. It can likewise be made of a variety of materials, depending upon the desired play characteristics. Below is a diagram of a typical two-piece ball, with half of the cover layer cut away. The blue portion is (in this example) the solid rubber core and the white is the cover.



Like two-piece balls, three-piece balls have a core but, unlike a two-piece ball, a three-piece ball has two layers over that core.  A three-piece ball, pictured in Figure 2 of the asserted '873 patent below, has a core 10, an inner cover layer 14 and an outer cover layer 16.  The claim construction issues before the Court concern how to measure the hardness of the two layers 14 and 16, and whether the core 10 must be only one layer or could include a core comprising two layers.



FIG. 2

### 2.    Golf Ball Design

As noted above, one of the greatest challenges faced by golf ball designers was resolving the tension between "distance" and "feel."  Players of all skill levels want a golf ball that travels a great distance.  Historically, to achieve distance, a ball had to be hard so that it would react well when struck by the club face of a fast moving driver, which is the club used to hit the ball a long distance off the tee.  Conversely, to achieve spin, a ball had to be softer so that it would grip to the face of a more "lofted" club like an iron.[5]  The goal of golf ball design was a ball that could do both, as Acushnet's own designers recognized in this document from the 1980s:

**REDACTED**

---

[5]    "Loft" refers to the angle of the face of the club relative to vertical.  Clubs like drivers and woods have a very low loft, somewhere between 7-12 degrees is typical while wedges, the most lofted clubs, typically have a loft from 48-64 degrees.

**REDACTED**                                      But designing a "dual personality" ball was

exceptionally difficult because concepts of "distance" and "feel" were known to be diametrically

opposed. Hard balls lacked the "feel" that allowed a skilled golfer to spin the ball. Softer balls

that spun well did not fly as far. In fact, while Acushnet recognized, even in the 1980s, the

enormous potential of a ball that possessed these dual personalities, it was not until October of

2000 that it actually released a product that embodied them. To Acushnet's surprise and

consternation, it turned out that Top-Flite and Callaway Golf were well ahead of Acushnet.

###    C.    The Patents-In-Suit

The patented technology that is the subject of this case gives players a soft feeling ball

that spins and yet is hard, durable, and carries a great distance when struck with a driver.

Callaway Golf is the owner of United States Patents Nos. 6,210,293, 6,503,156, 6,506,130 and

6,595,873 [Halkowski Decl. Exs. 4-7.] The patents all claim priority to the same application,

United States Application Serial No. 08/070,510, filed June 1, 1993. The named inventor for all

of the patents-in-suit is Michael J. Sullivan. The Sullivan Patents are directed to:

> Improved multi-layer cover[s] which produce[], upon molding
> each layer around a core (preferably a solid core) to formulate a
> multi-layer cover, a golf ball exhibiting enhanced distance (i.e.,
> resilience) without adversely affecting, and in many instances,
> improving the ball's playability (hardness/softness) and/or
> durability (i.e., cut resistance, fatigue resistance, etc.)
> characteristics.

[Halkowski Decl. Ex. 4, U.S. Patent No. 6,210,293, at Col. 5:24-31]

The multilayer balls claimed by the Sullivan Patents generally comprise: (1) a core; (2)

an inner cover layer having a Shore D hardness of 60 or more, made out of a low-acid ionomer

or blend of low-acid ionomers; and (3) an outer cover layer having a Shore D hardness of less

than 64, made out of a polyurethane . [See *id*., Claim 1] Acushnet uses the technology in its

Titleist Pro V1, Titleist Pro V1x, and Titleist Pro V1★ ("Star") balls.

### IV.    PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is an issue of law, which must be resolved by the court. *See Liquid*

*Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). The court construes the

asserted claims to determine their meaning and scope. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim terms are to be interpreted as they would have been by one of ordinary skill in the relevant art at the time of the invention. *Id.* at 1116. The person of ordinary skill in the art is deemed to read the claim term in the context of the entire patent, including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

The starting point of any claim construction is the actual words of the claims. *See Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003).

> In construing claims, the analytical focus ***must begin and remain centered on the language of the claims themselves***, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'

*Id.* (emphasis added). The "single best guide" in defining disputed claim terms is the specification, and it is usually dispositive. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *Bell Atl. Network Serv., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic., Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence. Nonetheless, because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." *Phillips*, 415 F.3d at 1319.

## V.    DISPUTED TERMS

Only two meaningful disputes exist: (1) whether the Shore D hardness of the inner and outer layers of the ball is a required characteristic of the *layers* themselves, as opposed to the raw materials, in isolation, that are used to make the layers, or put another way, whether the hardness is to be measured on the ball or on a separate "plaque" of raw starting material; and (2) the proper construction of the term "core."

7

### A.    A "layer having a Shore D hardness"

Shore hardness is a method of measuring hardness named after Albert Shore, who invented a durometer for measuring the hardness of materials in the 1920s and received a patent on his work in 1930.[6]  There are now seven types of durometers that can be used to measure Shore hardness, denoted A, B, C, D, DO, O, and OO.  The most common in the golf industry are Shore C and D.  The durometers differ by the indentor each uses, which is the point pressed against the ball or material being measured.  [Halkowski Decl. Ex. 8 – ASTM D 2240]  The measurement is taken by placing the point of the durometer on the surface of the material to be tested.  The operator then applies pressure to the surface of the material with the durometer, through the indentor, and produces a number – the Shore measurement.  The measured value is dependent on the indentor used, so while the same measurement protocol is used for both Shore C and Shore D, the values are different and cannot be converted from one to the other.  In either type of measurement, the higher the value, the harder the surface.

In golf, Shore D measurements can be taken in two ways: (1) the hardness of a layer can be measured on the ball itself, commonly called an "on the ball" measurement (the construction proposed by Callaway Golf); or (2) the hardness of the raw materials that are used to make the layer of the ball can be measured on a slab of the raw material, commonly referred to as an "off the ball" measurement (the construction proposed by Acushnet).

### 1.    The correct construction of the Shore D limitations requires that the measurement be taken on the layer of the ball itself.

The claims of the patents-in-suit require that the inner and outer cover layers have a Shore D hardness in a certain range.  Claim 1 of the '873 patent is illustrative:

> A golf ball comprising:
>
> a core;
>
> an inner cover layer disposed on said core, said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and

---

[6] See http://en.wikipedia.org/wiki/Durometer.

an outer cover layer disposed on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a polyurethane material, wherein said golf ball has an overall diameter of 1.680 inches or more, *said inner cover layer having a Shore D hardness of at least 60,* and *said outer cover layer having a Shore D hardness of less than 64*.

[Halkowski Decl. Ex. 7, Claim 1 of the '873 patent (emphasis added)][7]  The correct construction of claim language specifying a "cover layer having a Shore D hardness" of a particular value requires that the measurement be taken on the cover *layers* of the ball itself, as explicitly required by the claim language. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves.").

<blockquote>

**a.     The claim language itself compels the construction that the measurement be made on the ball.**

</blockquote>

The claims of the patents in suit require that the Shore D measurement be on the layer of the ball itself.  The claims require that the "inner cover layer" have "a Shore D hardness of at least 60," and the "outer cover layer" have "a Shore D hardness of less than 64."  The claims are to a golf ball and plainly state that it is the *layer* that has a Shore D hardness in the claimed range.  Measuring the Shore D hardness of the layer requires a measurement on the ball itself.

The claims do not specify the Shore D hardness of any particular material that is used to make the layers.  Indeed, taking claim 1 of the `873 patent as an example, the claims generally do specify what materials must be used in the layers – typically, one or more ionomer resins in the inner cover layer, and polyurethane in the outer cover layer – but the claims do so without specifying the Shore D hardness of the component materials themselves.

Of course, the hardness of a component material affects the hardness of a golf ball layer made from that material, but, as everyone acknowledges – including Acushnet itself, in its own

---

[7]   All of the relevant claims containing a Shore D limitation use the language a "cover layer . . . having a Shore D hardness of . . . ."  [See the '293 Patent, claim 1; the '156 Patent, claims 1, 4, 8, and 9; the '873 patent, claims 1 and 3; and the '130 patent, claims 1 and 5; See also the Joint Claim Construction Statement submitted by the Parties D.I. 191]

patents – the two hardness measurements are distinct.[8]  This is so because the Shore D hardness of the layer on the ball is affected by the processing the material undergoes to create the layer, the thickness of the layer, and what lies beneath the layer being measured.  The patents are concerned with the performance of golf balls, not isolated slabs of material, and the claims are drafted accordingly.

**b.     The specification further supports that the Shore D measurement be made on the ball itself.**

The specification of the patents[9] makes clear that the Shore D hardness of the layers must be taken on the ball itself.  The very first time the concept of hardness is introduced in the specification, it is the hardness of the balls that matters.  "The hardness of the ball is the second principal property involved in the performance of a golf ball."  [Halkowski Decl. Ex. 4, '293 Patent, at Col. 5: 6-7][10]  The "hardness of the ball," of course, must be measured on the ball itself.

Moreover, whenever the patents discuss ball hardness, as opposed to the hardness of a material used to make part of the ball, the hardness measurements reported were clearly made on the layers of the ball itself.  Tables 5-9 and the accompanying text all show this.  For example, the inventor made and tested many sample finished golf balls and intermediate balls (i.e., balls without the outer cover layer), in order to illustrate the principals of his inventions. In every case, the reported Shore value, whether C or D, was taken on the ball itself.  For instance, "EXAMPLE 1" details the creation of intermediate balls and the tests that were performed on them.

> Several intermediate balls (cores plus inner cover layers) were prepared in accordance with conventional molding procedures described above.

---

[8] For example, one Acushnet patent states:  "It should be understood, especially to one of ordinary skill in the art, that there is a fundamental difference between 'material hardness' and 'hardness, as measured directly on a golf ball.'"  [Halkowski Decl. Ex. 9, Acushnet's United States Patent No. 6,960,630,  at Col. 10:8-24]

[9] With small differences not relevant here, the specifications of the patents are substantively identical.

[10] The "first principal property" is resilience, as determined by the coefficient of restitution.  ['293 patent, at Col. 4:23-31]  It is not at issue in the asserted claims or this case.

. . .

> The inner cover compositions designated herein as compositions
> A-E utilized to formulate the intermediate balls are set forth in
> Table 7 below. The **resulting molded intermediate balls were
> tested to determine the** individual compression (Riehle), C.O.R.,
> **Shore C hardness**, spin rate and cut resistance properties. These
> results are set forth in Table 7 [*sic* 5] below.

[*Id.* at Cols. 15:66 – 16:1 & 16:32–38 (emphasis added)]  To make the point even clearer, when

Shore hardness is reported in the referenced Table 5, it appears under the heading "Properties of

Molded Intermediate Balls," as distinct from the other values in the Table – which relate to

"Ingredients of Inner Cover Compositions." There is no question the balls themselves were

tested – the reported Shore measurements were performed on the ball.

An outer cover layer was then added to the intermediate balls discussed above and, again,

the ball itself was tested. "The resulting balls (a dozen balls for each example) were tested and

the various properties thereof are set forth in Table 6A as follows." [*Id.* at Col. 18:37-39]  Table

6A shows the measured Shore values of the finished ball.

**TABLE 6A**

| | | | Finished Balls | | |
|---|---|---|---|---|---|
| Ingredients: | 1 | 2 | 3 | 4 | 5 |
| Inner Cover Composition | A | B | C | D | D |
| Outer Cover Composition | TE-90 | TE-90 | TE-90 | TE-90 | Surlyn ® 9020 |
| Properties of Molded Finished Balls: | | | | | |
| Compression | 63 | 63 | 69 | 70 | 61 |
| C.O.R. | .784 | .778 | .780 | .770 | .757 |
| Shore C Hardness | 88 | 88 | 88 | 88 | 89 |
| Spin (R.P.M.) | 8,825 | 8,854 | 8,814 | 8,990 | 8,846 |
| Cut Resistance | 3–4 | 3–4 | 3–4 | 3–4 | 1–2 |

[*Id.* at Col. 18: 43-58]  Again, data for "Ingredients" is clearly distinguished from the properties,

including the Shore hardness, of "Molded Finished Balls."

Still more finished balls were made with different materials and tested, and, again, the

Shore measurements were made on the ball. "Similar properties [sic] tests were conducted *on*

*these golf balls* and the results are set forth in Table 6B below." [*Id.* at Col. 19: 39-40]

TABLE 6B

Finish Balls

| Ingredients: | 6 | 7 |
| --- | --- | --- |
| Inner Cover Layer Composition | A | D |
| Outer Cover Layer Composition | Estane ℗ 4517 | Surlyn ℗ 9020 |
| Properties of Molded Finished Balls: | | |
| Compression | 67 | 61 |
| C.O.R. | .774 | .757 |
| Shore C Hardness | 74 | 89 |
| Spin (R.P.M.) | 10,061 | 8,846 |
| Cut Resistance | 3–4 | 1–2 |

[*Id.* at Col. 19: 52-66]. Here again, the inventor clearly distinguished between data for the "Ingredients" and the properties, including Shore hardness, of "Molded Finished Balls."

"EXAMPLE 2" of the patents tested various multi-layered balls with different properties to examine the overall effect and again the tests were performed on the ball. "In order to analyze the change in characteristics produced by multi-layer golf balls (standard size) having inner cover layers comprised of ionomer resins blends of different acid levels, a series of experiments were run. Specifically, 14 tests were performed, varying the type of core, inner cover layer and outer cover layer." [*Id.* at Col. 20: 24-29] Table 7 shows the Shore D of the outer layer of the ball.

Yet again, in "EXAMPLE 3" of the patents, more balls were made and the balls themselves were measured. "Multi-layer oversized golf balls were produced utilizing different ionomer resin blends as the inner cover layer (i.e., core plus inner cover layer is defined as 'mantel'). The *'ball data'* of the oversized multi-layer golf balls in comparison with production samples of 'Top-Flite XL' and 'Top- Flite Z-Balata' is set forth below." [*Id.* at Col. 21: 29-34]

TABLE 8

| | 18 | 19 | 20 | 21 Top-Flite ℗ XL | 22 Top-Flite ℗ Z-Balata 90 |
| --- | --- | --- | --- | --- | --- |
| Core Data | | | | | |
| Size | 1.43 | 1.43 | 1.43 | 1.545 | 1.545 |
| COR | .787 | .787 | .787 | — | — |
| Mantel Data | | | | | |
| Material | TG | TG | TG | — | — |
| Size | .161 | 1.61 | 1.61 | — | — |
| Thickness | .090 | .090 | .090 | — | — |
| Shore D | 68 | 68 | 68 | — | — |
| Compression | 57 | 57 | 57 | — | — |
| COR | .815 | .815 | .815 | — | — |
| Ball Data | | | | | |
| Cover | TG | ZB | SD | TG | ZB |
| Size | 1.725 | 1.723 | 1.726 | 1.681 | 1.683 |
| Weight | 45.2 | 45.1 | 45.2 | 45.3 | 45.5 |
| Shore D | 68 | 56 | 63 | 68 | 56 |
| Compression | 45 | 55 | 49 | 53 | 77 |

[*Id.* at Col. 21: 55-66] Again, the cover layers of the balls themselves were tested as opposed to simply a slab of the material used to make the layers.

Finally, "EXAMPLE 4" relates to polyurethane-covered balls specifically. "A limited number of samples were made . . . ." [*Id.* at Col. 22: 32] "All samples were finished using normal production equipment and procedures. The properties of the finished balls are set forth below:" [*Id.* at Col. 22: 65-67] Table 9 contains those properties. Again, the Shore hardness measurements appear under a heading labeled "BALL DATA". [*Id.* at Col. 23: 1-26]

It is difficult to imagine how Sullivan could have been clearer in emphasizing the difference between the properties of the ingredients he used, on the one hand (i.e., provided by off-the-ball measurements), and the properties of the resulting golf balls, on the other (i.e., provided by on-the-ball measurements). Golf ball designers like Mike Sullivan ultimately concern themselves with the properties of finished golf balls, such as on-the-ball hardness, because it is those properties, like hardness, that the club head experiences when striking the ball. It is the ball hardness that is more indicative of the golf ball's overall performance – precisely as the specification of the patents in suit note. [See *Id.* at Col. 5: 6–7 ("The hardness of the ball is the second principal property involved in the performance of a golf ball.")] Accordingly, the Shore D hardness measurements of the "inner cover layer" and "outer cover layer" required by the asserted claims, must be measurements of the "layer" on the ball – not generic slabs of raw material. Thus, "Shore D hardness" should be construed such that the: "The Shore D hardness measurement is performed on the … cover layer on the ball."

B.    "Core"

1.    No construction of "core" is necessary – its plain and ordinary meaning is sufficient.

"Core" is a common term that, in the context of a golf ball, is self-explanatory. The term is clear on its face, and any lay juror would understand it. Thus, there is no need for the Court to

13

construe it, nor is the Court under any obligation to do so.  The reason for Acushnet's contrary

argument is its allegation that, because a few members of its Pro V1 family use a so-called "dual

core," they cannot infringe a claim requiring only a "core."  Putting to one side the questionable

logic of an argument according to which a "dual core" is not a "core," Acushnet's desire to

manufacture a noninfringement argument is insufficient reason for this Court to construe a

simple term.

     As the Federal Circuit has held, some terms are so ordinary and commonly used that the

Court need not define them.  In *W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1350

(Fed. Cir. 2004), the Federal Circuit refused to adopt Hall's proposed construction for "single

piece construction" because it was contrary to the plain meaning of the term.  "The disputed

terms are straightforward: 'open channels' and 'single piece construction.'  . . .  'Single piece' is

sufficiently clear to make even resort to the dictionary unnecessary."  *Id.* at 1350.

     Likewise, many District Courts have refused to apply specific constructions to words any

lay juror would understand.  *British Telecomm. PLC v. Prodigy Communications Corp.*, 189 F.

Supp. 2d 101, 119 (S.D.N.Y. 2002) ("The phrase 'first portion containing information for

display' can be readily understood by the lay reader (of which this Court is one).  It is not a

technical term; the simple English words contained in the phrase need no particular defining, and

it can be understood without recourse to any other material."); *Agere Sys., Inc. v. Broadcom

Corp.*, 2004 WL 1658530, *8, *22 (E.D. Pa. July 20, 2004) (collecting cases and holding that

"first level" and  "predetermined" do not require construction); *STMicroelectronics, Inc. v.

Motorola, Inc.*, 327 F. Supp. 2d 687, 698, 705-6 (E.D. Tex. 2004) (declining to construe several

terms because each is "clear on its face.").

     A lay person understands the term "core."  There is no need for the Court to spend its

resources "set[ting] forth the plain meaning of every word used" in a patent.  *Broadcast*

*Innovation, LLC v. Echostar Communications Corp.*, 240 F. Supp. 2d 1127, 1159 (D. Colo. 2003). The Court merely needs to instruct the jury that the term carries its plain and ordinary meaning.

Moreover, when a term is best defined by the term itself, the Court need not set forth an explicit construction. For example, in *ASM Am., Inc. v. Genus, Inc.*, 260 F. Supp. 2d 827, 850 (N.D. Cal. 2002), the Court refused to construe the phrase "generally circular" because "there is no better way to define 'generally circular' than to simply say 'generally circular.' Accordingly, the Court decline[d] to construe the term." *See also Applera Corp. v. Micromass UK Ltd.*, 186 F. Supp. 2d 487, 508, 524, 526, 528-29 (D. Del. 2002) (agreeing with plaintiff that "construction by the court [is] unnecessary because 'a rod is a rod'" and "the proper construction of rod [is] self-evident"; also holding that "maintaining" and "maintain" are "used in their ordinary sense and require no construction" except to specifically reject limitations implied by the defendant; also refusing to construe a "whereby" clause which had a meaning "self-evident on the face of the claim" and refusing to construe "controlling" because the meaning is clear and well-understood.), *aff'd*, 60 Fed. Appx. 800, 2003 WL 1795593 (Fed. Cir. Mar. 11, 2003) (unpublished). There is no better way to say "core" than simply using the term itself. Therefore, there is no need or obligation for the Court to set forth an explicit construction. The Court simply need instruct the jury that the term "core" carries its ordinary meaning.

### 2. Should the Court decide to construe "core," Acushnet's construction is plainly wrong.

Acushnet has proposed the following construction:

> The singular component of the golf ball that occupies the geometric center of the sphere of the golf ball

[D.I. 191 – Joint Claim Construction Statement] Having a "dual core" in certain infringing products, Acushnet strategically wants "core" to be limited to a "singular component." But there

15

is no support for this construction in the words of the claims, and it actually runs counter to, and in some cases excludes, the multiple types of cores described in the specification. This construction also runs afoul of how one of skill in the art defines the term, as acknowledged by Acushnet and its own hired expert in this case – Robert Statz.

       **a.**    **Acushnet's proposed construction is contrary to the plain language of the claims and specification.**

The claims of the patents-in-suit merely require a core. There is nothing in the language of the claim that requires the term to be limited to "the singular component" at the center of a ball. Nor is there any support for such a limiting construction in the specification.

The patents-in-suit disclose multiple types of cores, some a "singular component" and some not. In the Summary of Invention section of the specification, the inventor makes clear that the invention is directed to the ***cover components*** of the claimed golf balls, and that any type of core may be used:

> The coefficient of restitution (C.O.R.) in ***solid core balls*** is a function of the composition of the molded core and of the cover. In balls containing a ***wound core (i.e., balls comprising a liquid or solid center, elastic windings, and a cover***), the coefficient of restitution is a function of not only the composition of the center and cover, but also the composition and tension of the elastomeric windings. Although both the core and the cover contribute to the coefficient of restitution, the present invention is directed to the enhanced coefficient of restitution (and thus travel distance) which is affected by the cover components.

[Halkowski Decl. Ex. 4, '293 Patent at Col. 4: 41-52] The wound core ball discussed above is made of two components, a liquid or solid center with elastic windings wrapped around it – together, these two components make up the core of the ball. Notably, Acushnet's proposed construction of core being a "singular component" excludes this type of multi-component core. This is plainly incorrect. The patents elsewhere, too, make clear that, while a solid core is preferred, a wound multi-piece core will also work. [*Id.* `293 Patent at Col. 5: 25 ("a core (preferably a solid core)"); Col. 14: 11-12 ("a core (preferably a solid core)"); Col. 15: 23-27 ("Although either solid cores or wound cores can be used in the present invention, as a result of their lower cost and superior performance, solid molded cores are preferred over wound

16

cores.").] Because Acushnet's proposed construction excludes cores specifically disclosed in the specification of the patent, it cannot be correct.

> **b.      Acushnet's proposed construction is refuted by its own patents, its hired expert's testimony, and his patents.**

Acushnet's own patents, its hired expert, and that expert's patents acknowledge that to one of skill in the art, the term core is not limited to the "singular component" at the center of the ball.

First, Acushnet's own patents explain that one of skill in the art knows that a core can include multiple layers. For example, the Background section of Acushnet's United States Patent No. 6,818,705, in discussing generally the types of balls known to those of skill in the art, notes "[s]olid golf balls also include multi-layer golf balls that are comprised of a solid core of one or more layers and/or a cover of one or more layers." [Halkowski Decl. Ex. 10 - United States Patent No. 6,818,705 at Col. 1: 44-47] Notably, a core (even a solid core) may be comprised of one or more layers – not the singular component Acushnet argues for here. Similarly, Acushnet's United States Patent No. 6,634,964 states, in describing generally the types of multilayered balls known to one of skill in the art, "[m]ulti-layer golf balls are comprised of a solid core and a cover, either of which may be formed of one or more layers." [Halkowski Decl. Ex. 11 - United States Patent No. 6,634,964, at Col. 1: 39–41] Again Acushnet acknowledges that a core, including specifically a solid core, can be made of one layer or more than one layer, contrary to Acushnet's proposed "singular component construction." It is important to note that these discussions appear in the "Background" section of the Acushnet patents – the language is not describing the inventions in those patents, but instead is describing what people in the art already know, i.e., that cores can include multiple layers.

Acushnet's own expert, Dr. Statz, testified that the term "core" encompasses both single and dual-core balls – more than the "singular component" Acushnet advocates.

> Q.      Okay. If I were to ask you for a definition of core as used
>          by people in the golf ball industry, what would you tell me?
>
> A.      It's the inner part of the golf ball.

> Q.    Does it have to be a single piece?
>
> A.    No.

[Halkowski Decl. Ex. 12 – Statz Dep. Tr. at Col. 62: 13–21]   Not surprisingly, Dr. Statz's own

patents are to the same effect, as shown in this excerpt from U.S. Patent No. 5,971,869:

> A "cover" or a "core" as these terms are used herein may be
> formed from a single layer or from two or more layers, and, thus,
> may comprise a plurality of layers. … A core, whether formed
> from a single layer or from two or more layers, serves as a center
> for a wound ball.

[Halkowski Decl. Ex. 13 – U.S. Patent No. 5,971,869, at Col. 4: 12-19]  This Statz patent claims

priority to June of 1995, the same general timeframe as the patents in suit.

As this testimony and these patents make clear, one of skill in the art, at the time the

patents in suit were filed, knew that a "core" could consist of more than a singular component.

Thus, in addition to contradicting the intrinsic evidence of the patents in suit, Acushnet's

argument that the core be the "singular component of the golf ball that occupies the geometric

center of the sphere of the golf ball" is contrary to how those of skill in the art use the term in

everyday parlance.

**3.    Should the Court feel a construction is necessary, the proper construction for "core" would be "the foundational part of a golf ball, over which one or more cover layers may be applied."**

If a construction is necessary, the proper construction would be "the foundational part of

a golf ball, over which one or more cover layers may be applied."  As the claims and figures of

the patents-in-suit make clear, the core is distinct from and provides the foundational support for

the cover layers of the ball.  As illustration, Claim 1 of the '293 patent reads

> A golf ball comprising:
>
> a core;
>
> an inner cover layer … molded on said core . . .
>
> an outer cover layer … molded on said inner cover layer….

18

[Halkowski Decl. Ex. 4, '293 patent, Claim 1, at Col. 23: 47-61]  As the claim makes clear, the core is distinct from and the foundation for the inner layer which is, in turn, the foundation for the outer layer.  This is further confirmed by the figures of the patents.



Both Figures 1 and 2 show the core 10 as distinct from and acting as the foundation for inner layer 14 and outer layer 16.  In describing the Figures, the specification notes that the "present invention relates to improved multi-layered golf balls, particularly a golf ball comprising a multilayered cover 12 over a solid core 10, and method for making same."  [*Id.* at Col. 5: 48-50]

In light of the clear language of the claims and the specification, the correct construction of core, should one be necessary at all, is "the foundational part of a golf ball, over which one or more layers may be applied."

## VI.    CONCLUSION

For the foregoing reasons, the Court should adopt the constructions proposed by Callaway Golf and reject those suggested by Acushnet.

Dated:  August 7, 2007                    FISH & RICHARDSON P.C.


                                    By:   */s/ Thomas L. Halkowski* _____
                                          Thomas L. Halkowski (#4099)
                                          919 N. Market Street, Suite 1100
                                          P.O. Box 1114
                                          Wilmington, DE 19899-1114
                                          Tel:  (302) 652-5070
                                          Fax:  (302) 652-0607

                                          Frank E. Scherkenbach
                                          225 Franklin Street
                                          Boston, MA 02110-2804
                                          Tel:  (617) 542-5070
                                          Fax:  (617) 542-8906

                                          David J. Miclean
                                          500 Arguello Street, Suite 500
                                          Redwood City, CA 94063
                                          Tel:  (650) 839-5070
                                          Fax:  (650) 839-5071

                                          Roger A. Denning
                                          12390 El Camino Real
                                          San Diego, CA 92130
                                          Tel: (858) 678-5070
                                          Fax:  (858) 678-5099

                                    **ATTORNEYS FOR PLAINTIFF**
                                    **CALLAWAY GOLF COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2007, the attached document was electronically filed with the Clerk of Court  using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on August 14, 2007, I have Electronically Mailed the document to the following person(s):

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Alan M. Grimaldi, Esq.                      Attorneys for Defendant
Joseph P. Lavelle                           ACUSHNET COMPANY
Brian Rosenthal
Clint Brannon
Kenneth Donnolly
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com

*/s/ Thomas L. Halkowski*
Thomas L. Halkowski

1