**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY | ) | |
| | ) | |
| | ) | C.A. No. 06-91 (SLR) |
| Plaintiff, | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ACUSHNET COMPANY, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ACUSHNET'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
OF U.S. PATENT NOS. 6,210,293; 6,506,130; 6,503,156; AND 6,595,873**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

*Attorneys for Defendant Acushnet Company*

Dated: August 7, 2007
Public Version Dated: August 14, 2007

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   NATURE AND STAGE OF PROCEEDINGS ...................................1

III.  FACTUAL BACKGROUND..................................................................2

      A.    The Patents-in-Suit...................................................................2

      B.    The Prior Art ............................................................................4

IV.   SUMMARY OF ARGUMENT ............................................................5

V.    APPLICABLE LEGAL STANDARDS................................................7

      A.    Summary Judgment Of Invalidity Is Appropriate When There are No
            Genuine Issues of Fact...............................................................7

            1.     Invalidity Standards ........................................................7

VI.   UNDER THE SUPREME COURT's TEST IN KSR, THE PATENTS
      ARE OBVIOUS AS A MATTER OF LAW SINCE THEY AT MOST
      COMBINE KNOWN ELEMENTS IN A PREDICTABLE WAY TO
      YIELD A PREDICTABLE RESULT ................................................10

VII.  THE ASSERTED CLAIMS ARE OBVIOUS OVER PROUDFIT IN
      VIEW OF MOLITOR '751, WU, OR MOLITOR '637 .....................13

      A.    Proudfit itself satisfies every element of the asserted claims except the use
            of polyurethane ......................................................................14

            1.     Proudfit discloses a golf ball comprising a "core," "inner cover
                   layer," and "outer cover layer" ......................................15

            2.     Proudfit discloses that the inner cover layer is a "blend of two or
                   more low acid ionomer resins" ......................................15

            3.     Proudfit discloses that the inner cover layer has a "Shore D
                   hardness of 60 or more"..................................................16

            4.     Proudfit discloses that the inner cover layer has a "thickness of
                   0.100 to 0.010 inches" ...................................................16

            5.     Proudfit discloses that the outer cover layer has a "thickness of
                   0.010 to 0.070 inches" ...................................................17

            6.     Proudfit has an outer cover with a "Shore D hardness of 64 or less"17

B.   Proudfit in view of Molitor '751 discloses a polyurethane outer cover layer with a Shore D hardness less than 64................................................17

C.   Proudfit in view of Wu discloses a polyurethane outer cover layer with a Shore D hardness less than 64 ..................................................20

D.   Proudfit in view of Molitor '637 discloses a polyurethane outer cover layer with a Shore D hardness less than 64................................................22

E.   The remainder of the elements of the asserted claims are also satisfied by Proudfit in view of Molitor '751, Wu, or Molitor '637 ............................23

VIII.  THE ASSERTED CLAIMS ARE ANTICIPATED BY NESBITT ..................23

A.   Nesbitt Incorporates Molitor '637 by Reference .......................................24

B.   Nesbitt, incorporating Molitor '637, satisfies every element of the asserted claims .................................................................................................25

1.   Nesbitt discloses a golf ball comprising a "core," "inner cover layer," and "outer cover layer" .....................................................25

2.   Nesbitt discloses that the inner cover layer is a "blend of two or more low acid ionomer resins" .....................................................26

3.   Nesbitt discloses that the inner cover layer has a "Shore D hardness of 60 or more" ..................................................................27

4.   Nesbitt discloses that the inner cover layer has a "thickness of 0.100 to 0.010 inches" ..................................................................28

5.   Nesbitt discloses that the outer cover layer has a "thickness of 0.010 to 0.070 inches" ..................................................................28

6.   Nesbitt discloses a polyurethane outer cover layer with a "Shore D hardness of 64 or less"..................................................................28

C.   Nesbitt, incorporating Molitor '637 satisfies every other element of the asserted claims ............................................................................................29

IX.   THE ASSERTED CLAIMS ARE OBVIOUS OVER NESBITT IN VIEW OF MOLITOR '751, WU, OR MOLITOR '637 ....................................29

1.   Nesbitt and Molitor '751...............................................................30

2.   Nesbitt and Wu .............................................................................30

3.   Nesbitt and Molitor '637...............................................................32

B.    Nesbitt in view of Molitor '751, Wu, or Molitor '637 satisfies every other element of the asserted claims ...................................................................32

X.    CALLAWAY CANNOT REVIVE THESE INVALID PATENTS BY RELYING ON SECONDARY CONSIDERATIONS ......................................32

XI.    CONCLUSION..................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Am. Standard, Inc. v. Pfizer, Inc.,*
    722 F. Supp. 86, 139 (D. Del. 1989)..................................................................35

*Anderson's-Black Rock, Inc. v. Pavement Salvage, Co.,*
    396 U.S. 57 (1969)..........................................................................6, 32, 34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................................7

*Atlas Powder Co. v. IRECO, Inc.,*
    190 F.3d 1342 (Fed. Cir. 1999)...............................................................8

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................7

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988)..............................................................33

*Friskit, Inc. v. RealNetworks, Inc.,*
    No. C 03-05085 WWS, 2007 U.S. Dist. LEXIS 54192 (N.D. Cal. July 26, 2007) .....12, 13, 36

*Gen. Elec. Co. v. Hoechst Celanese Corp.,*
    740 F. Supp. 305, 317 (D. Del. 1990)........................................................27

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)...........................................................................1, 32

*In re Grasselli,*
    713 F.2d 731 (Fed. Cir. 1983)...............................................................36

*In re Inland Steel Co.,*
    265 F.3d 1354 (Fed. Cir. 2001)..............................................................32

*Iron Grip Barbell Co. v. USA Sports, Inc.,*
    392 F.3d 1317 (Fed. Cir. 2004)..............................................................7, 8

*Johnson & Johnson v. W.L. Gore & Assocs.,*
    436 F. Supp. 704 (D. Del. 1977)...............................................................8

*Joy Technologies, Inc. v. Manbeck,*
    751 F. Supp. 225 (D.D.C. 1990)............................................................37, 38

*KSR International Co. v. Teleflex Inc.*,
    127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ..................................................... *passim*

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007)...........................................................................13

*McNeil-PPC, Inc. v. Perrigo Co.*,
    No. 05 Civ. 1321 (WHP), 2007 U.S. Dist. LEXIS 50255 (S.D.N.Y. July 3, 2007)...............33

*Nike Inc. v. Wolverine World Wide, Inc.*,
    43 F.3d 644 (Fed. Cir. 1994)...............................................................................7

*Pentec, Inc. v. Graphic Controls Corp.*,
    776 F.2d 309 (Fed. Cir. 1985)............................................................................33

*Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001)..........................................................................33

*Schering Corp. v. Geneva Pharmaceuticals*,
    339 F.3d 1373 (Fed. Cir. 2003)............................................................................8

*Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.*,
    444 F.2d 295 (9th Cir. 1970) .............................................................................33

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005)............................................................................8

*Southern Clay Products v. United Catalysts, Inc.*,
    43 Fed. Appx. 379 (Fed. Cir. 2002) ......................................................................8

*Toro Co. v. Deere & Co.*,
    355 F.3d 1313 (Fed. Cir. 2004)............................................................................8

*In re Voss*,
    557 F.2d 812 (C.C.P.A. 1977) ............................................................................24

## STATUTES

35 U.S.C. § 102..................................................................................................27

35 U.S.C. § 103..................................................................................9, 11, 20, 22, 23, 30, 31

35 U.S.C. § 282....................................................................................................7

Fed.R.Civ.P. 56(c) ................................................................................................7

## I.    INTRODUCTION

Defendant Acushnet Company ("Acushnet") files this Memorandum in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent Nos. 6,210,293 ("the '293 patent") (Ex. 1); 6,506,130 ("the '130 patent") (Ex. 2); 6,503,156 ("the '156 patent") (Ex. 3); and 6,595,873 ("the '873 patent") (Ex. 4) (collectively "the patents-in-suit"), which all list as their named inventor Michael J. Sullivan.

The patents-in-suit claim old elements of golf ball technology combined to give predictable results. In particular, the claimed golf balls combine two well-known technologies: a) a three-piece solid construction golf ball; and b) the use of polyurethane as the outer cover layer material. Three-piece solid construction golf balls have been well known since at least 1984, years before the effective filing date of the patents-in-suit of 1995. Polyurethane as a cover material has been well-known since the 1960s.

The scope and content of the prior art and the level of ordinary skill in the art are not disputed. When there are no material disputes regarding these *John Deere* obviousness factors, *see Graham v. John Deere Co.*, 383 U.S. 1 (1966), and the obviousness of the claims at issue is clear from the prior art, the Supreme Court's recent decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007) mandates summary judgment of invalidity.

## II.    NATURE AND STAGE OF PROCEEDINGS

Callaway alleges that Acushnet's Pro V1 golf balls infringe the four patents-in-suit. Acushnet disputes infringement and contends that the patents-in-suit are invalid. A two-week jury trial is scheduled to begin on December 3, 2007. This matter is now before the Court for a *Markman* ruling and disposition of summary judgment motions.

As the Court knows, on January 17, 2007, Acushnet asked the PTO to reexamine all of the patents-in-suit (which all share a similar specification and claim essentially the same subject matter). The PTO concluded that the prior art cited by Acushnet raised many substantial new questions of patentability for all claims in the patents-in-suit. After the PTO rejected Callaway's

multiple motions to stop the reexamination, the PTO Examiner issued office actions rejecting every claim of the patents in suit as unpatentable over the same prior art Acushnet relies on in this motion.[1] As such, each asserted claim currently stands rejected in the PTO. The parties both have submitted their relevant arguments to the PTO for further consideration and are now awaiting an action closing prosecution and ending the reexamination of these claims.

## III.    FACTUAL BACKGROUND

### A.    The Patents-in-Suit

The patents-in-suit relate to solid construction multi-layer balls that use polyurethane as the outer cover material. The patents have an effective priority date of November 9, 1995.[2] However, the applications that led to the patents-in-suit were not filed until much later, in 1999 and 2001.[3] At the time, the patent applications were owned by Spalding. Callaway bought the patents-in-suit at a bankruptcy auction in 2003.

The patents-in-suit all claim essentially the same basic subject matter. The '293 patent is exemplary of these patents. It claims a multi-layer golf ball having a hard ionomer[4] inner cover layer and a soft polyurethane outer cover layer. Figure 1 of the '293 patent showing the multi-layer golf ball is reproduced below:

---

[1] The PTO office action rejecting all claims of the '293 patent is attached hereto as Exhibit 35. Similar office actions were issued for each of the other three patents-in-suit.

[2] The patents-in-suit issued from applications claiming priority in part back to U.S. application No. 08/070,510 ("the '510 application"). The patents-in-suit have almost identical specifications which inform the meaning of their claim terms.

[3] The '293 patent, '130 patent, '156 patent, and '873 patent were filed on Dec. 21, 1999, Apr. 10, 2001, Jun. 4, 2001, and Feb. 2, 2001, respectively.

[4] Golf ball manufacturers have been making covers made of a polymer materials called "ionomers" for decades. *See* Ex. 7 at AC0100932. Ionomers are thermoplastic polymers that are utilized in a wide variety of applications including plastic packaging, football helmets, and golf ball covers. *See id.* at AC0100934. Ionomers, such as those marketed by duPont under the tradename Surlyn, are very durable and allowed a golfer to hit the ball further because they increased the ball's coefficient of restitution. *See id.* at AC0100932.



FIG. 1

The '293 patent discloses an inner cover layer that can be a blend of low acid ionomer resins having a Shore D hardness of 60 or greater.[5] '293 Patent, col. 3:49-53. The outer cover layer is made from a polyurethane having a Shore D hardness of 64 or less. *Id.*, claim 1. The claims of the '293 patent also include limitations directed to certain material properties of the cover layers, such as their thickness or flexural modulus.[6] For example, the '293 patent specification defines a high modulus ionomer as an ionomer having a flexural modulus between 15,000 and 70,000 psi. *Id.*, col. 7:16-19.

The '293 patent claims that the outer cover layer can have a thickness of between about 0.010 inches to about 0.070 inches and that the inner cover layer can have a thickness of between about 0.100 inches to about 0.010 inches to produce a golf ball having a diameter of 1.680 inches or more. *Id.*, col. 14:37-46. The rules of golf proscribe that the ball shall be at least 1.680" in diameter. *See* Ex. 8, at AC0100918. Spalding did not invent this size. The design of nearly all golf balls are constrained by the USGA rules on golf ball size, weight, distance, and spherical symmetry. *Id.*

---

[5] "Shore D hardness is a measure of the resistance of a material to indentation. The higher the Shore D number, the greater the resistance to indentation." , VOL. 2 (ENGINEERING PLASTICS) 38 (1988)

[6] Flexural modulus is a ratio of stress to strain when the material being tested is being flexed. ENGINEERED MATERIALS HANDBOOK, VOL. 2 (ENGINEERING PLASTICS) 18 (1988).

B.    The Prior Art

Solid-core, multi-layer golf-balls such as those claimed by the patents-in-suit have been described by the patent literature since the 1980s. For example, U.S. Patent No. 4,431,193 ("Nesbitt") (Ex. 10) (1984) discloses a multi-layer golf ball with a core, an inner cover layer made of a hard Surlyn material, and an outer cover layer made of a soft Surlyn material. *See, e.g., id.*, Fig. 2; col. 3; ll. 16-25. Similarly, U.S. Patent No. 5,314,187 ("Proudfit") (Ex. 5) (1994) discloses a multi-layer golf ball with a core, an inner cover layer consisting of a blend of low-acid Surlyns (just as in the patents-in-suit), and an outer cover layer consisting of a synthetic balata blend. Cover layers made from blends of low acid ionomers, as claimed in the patents in suit are also shown in U.S. Patent Nos. 4,274,637 ("Molitor '637") (Ex. 12), col. 14, lines 55-65, and 4,674,751 (Molitor '751) (Ex. 13), cols. 7-8.

Polyurethane covers have been known for decades to golf ball designers, as the inventor of the patents in suit admitted.[7] *See also* Ex. 17, Morgan Decl. ¶ 11. One 1976 patent noted that polyurethane-covered balls "had cut resistance comparable to Surlyn covered balls and were found to have even greater abrasion resistance than the Surlyn covered balls." (U.S. Patent No. 3,989,568 ("Isaac") (Ex. 14), col. 5, ll. 15-18.) The same patent notes that polyurethane-covered balls had "click and feel properties which were comparable to those of the balata covered ball." *Id.* Polyurethanes were discussed extensively as golf ball covers in patents and publications many years before the patents-in-suit were filed. *See, e.g. id.* (1976); U.S. Patent No. 4,442,282—Polyurethane Covered Golf Balls (Ex. 15) (1984); Molitor '637 (Ex. 12); Wu (Ex. 8); and Molitor '751 (Ex. 13). These patents taught skilled artisans that polyurethane was a suitable cover material for all types of golf ball constructions.

---

[7] Mr. Sullivan, the named inventor on the patents-in-suit, co-authored two articles that discuss the historical use of polyurethane golf ball covers: M.J. Sullivan & T. Melvin, The Relationship Between Golf Ball Construction and Performance, *Science and Golf II: Proceedings of the World Scientific Congress of Golf.* (1994 E & FN Spon, London) (Ex. 6) at AC0100916; and R. D. Nesbitt, M.J. Sullivan, et. al *"History and Construction of Non-Wound Golf Balls"* Science and Golf III:  Proceedings of the 1998 World Scientific Congress of Golf at 413 (1999) (Ex. 7).

Additionally, well before 1995, polyurethane had been widely-used as a cover material in commercial golf balls, with both solid and wound cores. ███████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████ This ball would become the No. 1 ball played on the PGA Tour during the 1990s. Decl. of Davis Love III (Ex. 18) ¶ 10; Bellis Decl. (Ex. 9) ¶ 24. In fact, this ball was played by about 70% of tour golfers each year from 1994 to 1999. *Id.*

Additionally, polyurethane was being used as a cover layer on solid golf balls at around the same time. For example, by 1995 Titleist had several solid polyurethane covered golf balls listed on the USGA conforming ball list. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████ Furthermore, Acushnet's U.S. Patent No. 5,733,428 (Ex. 20) to Calabria and Wu discloses the method of casting polyurethane covers and demonstrates that the method can be used on wound or solid construction balls alike. Thus, by the mid 1990s, polyurethane had been proven as a commercially viable cover material on both solid and wound balls.

## IV.    SUMMARY OF ARGUMENT

The patents-in-suit combine known elements of golf ball technology in a predictable way and achieve no unexpected results. In particular, the claimed golf balls combine two well-known technologies: a) three-piece solid construction golf ball; and b) the use of polyurethane as a cover layer material.

There are no material facts in dispute that preclude summary judgment. The scope and content of the prior art and the level of ordinary skill in the art are not disputed. Three-piece solid construction golf balls have been well known since at least 1984, a decade before the effective filing date of the patents-in-suit of 1995. Polyurethane has been used as a cover

material for golf balls since the 1960s, and was used as the cover of the most popular ball in the game at the time the patents were filed. When there are no material disputes, and the obviousness of the claims at issue is clear from the prior art, the court should grant summary judgment as a matter of law. *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1745-46 (2007). In fact, the Court does not even need to reach the obviousness question because the patents-in-suit are anticipated by a single reference, Nesbitt.



In addition, as the Court is aware, the patents-in-suit are currently under reexamination in the Patent Office. Now that the Patent Office has been provided the inherent properties of the materials discussed in the prior art (which were not provided to the Patent Office during the original prosecution of the patents-in-suit), the Patent Office has <u>rejected every claim of the patents-in-suit over the same prior art on which</u> <u>Acushnet relies.</u> [D.I. 185.]

Unable to distinguish the prior art, Callaway attempts to rely on "secondary considerations" of non-obviousness, such as commercial success to try to save these patents. However, the Supreme Court has made clear that secondary considerations are used to resolve doubt as to the obviousness of claims, not to inject doubt. *See Anderson's-Black Rock, Inc. v. Pavement Salvage, Co.,* 396 U.S. 57, 60 (1969). Where, as here, the obviousness of the claims is apparent over many pieces of prior art, secondary considerations cannot not save the patents or preclude summary judgment.

In addition, for secondary considerations, such as commercial success, to bear any relevance to the obviousness question, Callaway must establish a "nexus" between such secondary considerations and the claimed invention. Callaway has not done so here and the secondary consideration evidence it proffers hence should be given little or no weight.

## V.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment Of Invalidity Is Appropriate When There are No Genuine Issues of Fact

Summary judgment should be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c).  The use of summary judgment is particularly appropriate in complex patent infringement actions because it is a useful tool to secure a just and speedy determination of the action and to simplify and pare down the issues in such complex cases.  Indeed, the Supreme Court recently reiterated this view in *KSR*, stating that "when the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 127 S. Ct. at 1745; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) ("Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.").

### 1.    Invalidity Standards

A patent is presumed valid, and Acushnet has the burden of proving invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1320 (Fed. Cir. 2004).  However, the presumption of validity seems diminished when, as here, the PTO has issued a patent without acting on full information. *KSR*, 127 S. Ct. at 1745.  When a party presents evidence establishing a prima facie invalidity case, the patentee must come forward with evidence to counter the challenge to the presumption of section 282. *Id.* (citation omitted).  In that instance, the patentee's evidence must create a genuine issue of material fact underlying the invalidity inquiry in order to preclude summary judgment. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (affirming summary judgment of invalidity for anticipation); *Iron Grip*, 392 F.3d at 1320 (affirming summary judgment of invalidity for obviousness).

### a.    Anticipation

Anticipation requires that a single prior art reference disclose each and every limitation of the claimed invention. *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1379-80 (Fed. Cir. 2003). Anticipation is a question of fact, but "without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law." *SmithKline*, 403 F.3d at 1343.

"[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Id.; see also Atlas Powder Co. v. IRECO, Inc.*, 190 F.3d 1342, 1348-49 (Fed. Cir. 1999) ("Because 'sufficient aeration' was inherent in the prior art, it is irrelevant that the prior art did not recognize the key aspect of [the] invention.... An inherent structure, composition, or function is not necessarily known.").

In some cases inherency applies to a property of a material described in a prior art reference. However, "[r]ecognition of the inherent properties of a material does not constitute invention." *Johnson & Johnson v. W.L. Gore & Assocs.*, 436 F. Supp. 704, 725 (D. Del. 1977). In other cases, a claimed new benefit or characteristic of an invention may be inherently present in the prior art. *See Atlas Powder*, 190 F.3d at 1347 ("[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer."). *See also Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004) ("For inherent anticipation, the [prior art reference] must have sufficiently described and enabled at least one embodiment that necessarily featured or resulted in the subject matter embraced by [the claim], but neither description nor contemporaneous recognition of these necessary features or results was required.").

### b.    Obviousness

If the claimed invention is not disclosed in a single prior art reference, a patent may still be invalid if the differences between the subject matter sought to be patented and the prior art is

such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time the invention was made. *See* 35 U.S.C. § 103.

In *KSR*, the Supreme Court expressly directed lower courts to apply a flexible approach in consideration of the obviousness standard:

> In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. ***Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress*** and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.

127 S. Ct. at 1741-43 (emphasis added).

The Court found that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words *teaching*, *suggestion*, and *motivation*, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 1741 (emphasis added). "Common sense teaches ... that ... in many cases, a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 1742. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* The Supreme Court recognized that in many arts, such as the relatively simple rubber art at issue here, an idea that is "obvious to try" may well be obvious in law. *Id.*

Thus, in *KSR*, the Supreme Court has now instructed both lower courts and the PTO to allow for a far more realistic, common sense approach to proof of obviousness in patent cases. Importantly, the Supreme Court also made clear that "[t]he ultimate judgment of obviousness is a legal determination," and that conclusory expert testimony that the patents are not obvious should not deter a finding of obviousness. *Id.* at 1745.

Finally, "secondary considerations [such] as commercial success, long felt but unresolved needs, failure of others, etc., are relevant to the obviousness inquiry. *Graham v. John Deere,* 383 U.S. 1, 17-18 (1966). However, when, the prior art clearly teaches and suggests the claimed invention, a conclusion of obviousness is appropriate notwithstanding any secondary considerations of nonobviousness. *See, e.g., Anderson's-Black Rock, Inc. v. Pavement Salvage,*

*Inc.,* 396 U.S. 57 (1969); *In re Inland Steel Co.,* 265 F.3d 1354, 1366 (Fed. Cir. 2001). Such

secondary considerations may be relevant only to an obviousness analysis; they are irrelevant

and cannot be considered in an anticipation analysis. *See, e.g., W.L. Gore & Assoc, Inc. v.*

*Garlock, Inc.,* 721 F.2d 1540, 1562 n.10 (Fed. Cir. 1984) (Davis, J. dissenting) ( *rev'd in part on*

*other grounds by W.L. Gore & Assoc, Inc. v. Garlock, Inc.,* 842 F.2d 1275 (Fed. Cir. 1988); *In re*

*Fracalossi,* 681 F.2d 792, 796 (CCPA 1982) (Miller, J. concurring).

**VI.    UNDER THE SUPREME COURT'S TEST IN *KSR*, THE PATENTS**
**AND OBVIOUS AS A MATTER OF LAW SINCE THEY AT MOST**
**COMBINE KNOWN ELEMENTS IN A PREDICTABLE WAY TO**
**YIELD A PREDICTABLE RESULT**

The asserted claims of the patents-in-suit claim a three-piece golf ball consisting of a) a

core; b) a relatively hard, stiff ionomer inner cover layer; and c) a relatively soft polyurethane

cover.[8]

There is no dispute that the concept of a three-piece, solid construction golf ball was well

known in the art since at least 1984. In particular, two prior art patents known in the art describe

a golf ball consisting of a) a solid core; b) a relatively hard ionomer inner cover layer; and c) a

relatively soft outer cover layer: Nesbitt (Ex. 10) (1984) and Proudfit (Ex. 5) (1994).

There is also no dispute that use of polyurethane as a golf ball cover layer has been

known since as far back as the 1960s. The most popular golf ball on the professional PGA Tour

as of 1995 was the polyurethane-covered Titleist Professional golf ball, which was an immense

commercial success. At least three prior art patents—Molitor '637 (Ex. 12); Wu (Ex. 8); and

Molitor '751 (Ex. 13)—describe the use of such polyurethane covers.

---

[8] Some of the asserted claims (claims 1-2 of the '130 patent) do not even require that the outer
cover layer must be comprised of polyurethane. In addition, some asserted claims require that
the inner cover is a blend of ionomers.

[BLACK REDACTION BAR]

Thus, the only question that remains is whether it would have been obvious to use a known polyurethane cover on a well known three-piece solid golf ball construction. In this case, the answer to that question is explicitly provided by the prior art references themselves. In particular, Molitor '751 (Ex. 13) explicitly teaches that the polyurethane cover it describes can be used in "balls having a separate solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt...." (Id., col. 3, lines 7-12.) In addition, the Wu patent teaches that the use of polyurethane as a cover material has advantages over other cover materials, like Surlyn® ionomers and balata. (Wu (Ex. 8), col. 1:34-46; col. 2:28-32.)

Accordingly, the explicit teaching of the prior art establishes that it would have been obvious to start with a three-piece solid construction golf ball, like that disclosed in the Nesbitt or Proudfit patents, and replace the outer cover with the polyurethane materials disclosed in the Molitor '751 patent or the Wu patent. Indeed, the explicit teaching of the prior art suggests the combination. [11] Thus, it is hardly surprising that Callaway believed these patents were invalid (before it bought them), and not surprising that the PTO has rejected all the claims of these patents.

The Supreme Court's analysis of the obviousness question in *KSR* is directly on point with the facts in this case. In *KSR*, the Supreme Court held that summary judgment of

---

[9] Dr. Statz, Acushnet's expert, has submitted a declaration attaching his expert report. The declaration and expert report are attached hereto as Exhibit 23, and referred to herein as "Statz Report."

[10] [BLACK REDACTION BAR] Acushnet cites to Dr. Risen's report ("Risen Report") herein, which is attached hereto as Exhibits 24.

[11] [BLACK REDACTION BAR]

obviousness was appropriate where the claims constituted no more than a combination of old elements in a predictable way to yield predictable results. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S. Ct. at 1739.

Like in *KSR*, the patents-in-suit do no more than combine familiar elements (a three-piece solid construction golf ball and a polyurethane cover) to yield predictable results. The combination is suggested explicitly in the prior art and requires nothing more than routine skill. "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 127 S. Ct. at 1740. Here, both the Wu patent and the Molitor '751 patent provide conclusive evidence that a person of ordinary skill in the art would know to use a polyurethane cover to replace the balata or ionomer outer cover layer of a three-piece solid construction golf ball.

In the wake of *KSR*, courts have applied the Supreme Court's reasoning to invalidate patents on very similar facts to those presented in the instant case. For example, the Northern District of California recently applied *KSR* to grant summary judgment that the patents at issue were obvious. *Friskit, Inc. v. RealNetworks, Inc.*, No. C 03-05085 WWS, 2007 U.S. Dist. LEXIS 54192 (N.D. Cal. July 26, 2007). In *Friskit*, the court found that all of the elements of the asserted patents were found in the prior art. *Id.* at ** 6-9. The court held that the invention of the patents at issue "simply arranges old elements with each performing the same function it has been known to perform and yields no more than one would expect from such an arrangement." *Id.* at *10 (citing *KSR*, 127 S. Ct. at 1740) (internal quotation marks omitted). The same reasoning applies here.

The court in *Friskit* also held that the alleged evidence of secondary considerations, including commercial success, long felt need, failure of others, and copying, was not enough to overcome the strong showing of obviousness that was apparent from the prior art. *Id.* at *23. In particular, the court noted that despite evidence of "substantial sales" by defendant, the plaintiff

could not establish a nexus between the commercial success of defendant's product and the claims of the pats in suit by offering "only what it describes as a 'prima facie case of infringement' as evidence of nexus." *Id.* at *24.

The Federal Circuit has also applied the Supreme Court's reasoning in *KSR* to uphold a ruling of summary judgment of a court in this district. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007). In *Leapfrog*, the Federal Circuit upheld a judgment of invalidity due to obviousness, despite the fact that one of the elements of the claim at issue in that patent, a "reader" was not explicitly disclosed in the prior art references. *Id.* at 1162 (noting that "Leapfrog presents no evidence that the inclusion of a reader in this type of device was uniquely challenging or difficult for one of ordinary skill in the art"). The Federal Circuit also upheld the district court's determination that "given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that [the claim at issue] would have been obvious." *Id.*

Hence, like in *KSR* and *Friskit*, summary judgment is appropriate. "Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 127 S. Ct. at 1745-46. In this case, there is no material dispute as to the content of the prior art or the level of ordinary skill in the prior art. The only claim construction issue that is relevant to the invalidity analysis is the proper construction of the "Shore D hardness" limitations of the claims, which is being concurrently briefed by both parties. Under any construction of those limitations, however, the obviousness of the asserted claims is apparent, as demonstrated in detail below, and thus summary judgment is appropriate.

## VII.    THE ASSERTED CLAIMS ARE OBVIOUS OVER PROUDFIT IN VIEW OF MOLITOR '751, WU, OR MOLITOR '637

Proudfit discloses a three-piece solid golf ball that includes a) a core; b) a hard ionomeric inner cover layer made of a blend of low acid ionomer resins; and c) a relatively soft outer cover layer made of balata or a balata-based material. (Proudfit (Ex. 5), Abstract; col. 5, lines 43-52.)

13

Proudfit teaches that: "A number of golfers, primarily professional and low handicap golfers, prefer balata covered balls because of the higher spin rate, control, "feel," and "click" which balata provides." (*Id.*, col. 1, lines 49-52.)

Proudfit alone explicitly or inherently discloses each of the elements of the asserted claims with the exception of the use of polyurethane as the outer cover material.[12]  However, when combined with any of the three polyurethane references (Molitor '751, Wu, or Molitor '637), any such combination satisfies each element of the asserted claims, and renders the asserted claims obvious.

### A.    Proudfit itself satisfies every element of the asserted claims except the use of polyurethane

While each of the asserted claims recite slightly different formulations of the claimed invention, claim 1 of the '293 patent is representative for purposes of this analysis.

Claim 1 of the '293 patent recites:

1. A golf ball comprising:

a core;

an inner cover layer having a Shore D hardness of 60 or more molded on said core, said inner cover layer having a thickness of 0.100 to 0.010 inches, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and

an outer cover layer having a Shore D hardness of 64 or less molded on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a relatively soft polyurethane material.

With the exception of the outer cover layer comprising polyurethane, Proudfit discloses each of these limitations.

---

[12] All asserted claims except for claims 1-2 of the '130 patent recite that the outer cover layer is comprised of polyurethane.  Accordingly, for the reasons set forth herein, Proudfit anticipates claims 1-2 of the '130 patent, and summary judgment is appropriate on that basis as well.

### 1.    Proudfit discloses a golf ball comprising a "core," "inner cover layer," and "outer cover layer"

Proudfit discloses that the three-piece golf ball of its invention uses a solid core, which is covered by an inner cover layer and an outer cover layer:

> FIG. 1 illustrates a two-piece golf ball 10 which includes a **solid core** 11 and a cover 12 which comprises a **relatively hard inner layer** 13 of one or more ionomer resins and a **relatively soft outer layer** 14 of polymeric material.

Proudfit (Ex. 5), col. 7:21-24 (emphasis added). Callaway's expert agrees that Proudfit discloses these limitations. Ex. 22, Risen Tr. at 162:18-21.

Figure 1 of Proudfit, reproduced below, shows the three-piece solid construction described by Proudfit.

## Fig. 1



### 2.    Proudfit discloses that the inner cover layer is a "blend of two or more low acid ionomer resins"

Proudfit discloses that the composition of the inner cover layer is composed of a blend of low-acid ionomers, namely Surlyn® 8940 and Surlyn® 9910:

**TABLE 6**

| Composition of Inner Layer of Cover (Parts by Weight) | |
|---|---|
| Ionomer Type | Blend Ratio |
| Sodium- Surlyn 8940 | 75% |
| Zinc- Surlyn 9910 | 25% |

Proudfit, col. 8:23-30. It is undisputed that Surlyn® 8940 and Surlyn® 9910 are both low-acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic

acid. *See* '293 patent col. 8, ll. 20-27. █████████████████████████
████████████████████████

### 3.    Proudfit discloses that the inner cover layer has a "Shore D hardness of 60 or more"

██████████████████████████████████████████████████

████████████████████████ Surlyn® 8940 has a Shore D hardness of 66 and Surlyn® 9910 has a Shore D hardness of 64. *See, e.g.,* '293 patent, col. 8, Table 1.



### 4.    Proudfit discloses that the inner cover layer has a "thickness of 0.100 to 0.010 inches"

Proudfit discloses a range of potential thicknesses for the inner cover.  In particular, Proudfit discloses that the inner cover layer thickness can be "within the range of about 0.0250 to 0.2875 inch."  Proudfit, col. 7: 37-40.  More specifically, Proudfit discloses that the "preferred dimensions are … an inner layer thickness of 0.037 inch…."  Proudfit col. 7:43-44.  This preferred thickness falls within the claimed range, and thus anticipates the claimed range.

████████████████████████████████████████████████
████████████████████████

### 5.    Proudfit discloses that the outer cover layer has a "thickness of 0.010 to 0.070 inches"

Proudfit discloses a range of potential thicknesses for the outer cover.  In particular, Proudfit discloses that the outer cover layer thickness can be "within the range of about 0.0450 to 0.0650 inch."  Proudfit, col. 7:40-43.  More specifically, Proudfit discloses that the "preferred dimensions are … an outer layer thickness of 0.0525 inch…."  Proudfit col. 7:40-46.  This preferred thickness falls within the claimed range, and thus renders the claimed range obvious.

### 6.    Proudfit has an outer cover with a "Shore D hardness of 64 or less"

Proudfit discloses that the outer cover layer material is a soft material such as balata or a balata-based material.  Proudfit, col. 5:15-17 (disclosing "… an **outer layer of soft material such as balata or a blend of balata and other elastomers**").

Accordingly, there can be no genuine dispute that this limitation is inherently disclosed by Proudfit.

Thus, with the exception of the use of polyurethane as the outer cover layer material, Proudfit itself expressly or inherently discloses each limitation of claim 1 of the '293 patent.  As set forth below, it would be obvious to modify the ball disclosed in Proudfit to replace the outer cover layer with a polyurethane-based cover material.

### B.    Proudfit in view of Molitor '751 discloses a polyurethane outer cover layer with a Shore D hardness less than 64

The Molitor '751 patent discloses cover materials that consist of a blend of polyurethane and ionomers:

The novel cover of the golf ball of the invention is made of a composition comprising a blend of (1) **a thermoplastic urethane** having a shore A hardness less than 95 and (2) an ionomer having a shore D hardness greater than 55.

Molitor '751 patent, col. 2:38-42 (emphasis added). In particular, the Molitor '751 patent discloses several examples, in the Table on columns 7 and 8, of cover materials made of blends of polyurethane and ionomers.

The Molitor '751 patent explains that the polyurethane-based cover material should be used on "two-piece" golf balls. Molitor '751 patent, col. 2:58-64. In explaining what a "two-piece" golf ball is, Molitor '751 explains that:

The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, **but also includes balls having a solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt,** and other balls having non-wound cores.

Molitor '751 patent, col. 2:7-12 (emphasis added). This description of "balls having a solid layer beneath the cover" describes Proudfit as well as Nesbitt, as described above. Molitor '751 explains that the advantages of using the cover including soft polyurethane material on such balls include "playability properties as good or better than balata-covered wound balls" resulting in golf balls that are significantly more durable, and "have better wood playability properties than conventional two-piece balls, and permit experienced golfers to apply spin so as to fade or draw a shot." Molitor '751, patent, col. 2:61-68.

Thus, the Molitor '751 patent explicitly teaches the art to apply the polyurethane cover described therein on balls like Proudfit and Nesbitt, namely balls that have a core, an inner cover layer, and an outer cover layer. ████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

13  ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

The Molitor '751 patent describes that the preferred cover layer material has a "Shore C hardness within the range of 72-76." Shore C hardness measurements are made with the same device as Shore D hardness measurements, but with a different indentor. ASTM D-2240 (Ex. 27), at 1. There are many tools available to obtain accurate ranges of correlation between Shore C hardness measurements and Shore D hardness measurements. All of these tools make clear that a Shore C hardness of between 72 and 76 would fall well under 64 on the Shore D scale. For example, the ASTM D-2240 method itself includes a comparison chart indicating that this would be the case. *Id.*

Spalding used such a Shore-C-to-Shore-D conversion in obtaining the claims of the patents-in-suit. During prosecution of the '873 patent, to overcome a rejection, Spalding used a comparison chart from Rex Gauge company to convert between Shore C and Shore D. Application Serial No. 09/776,278, Response to Office Action, March. 14, 2002, (Ex. 55) at 3 (CW0309056). Specifically, in response to a written description rejection related to the limitation requiring an "outer cover layer having a Shore D hardness of 64 or less," Spalding argued:

> A Shore C of 65 converts to a Shore D of less than 64, approximately 40 to 50, as shown by both Table 4 on page 14 of GB2276628 and a comparison chart from the Rex Gauge Company….

*Id.* The Rex Gauge Chart that Spalding relied on to obtain the '873 patent is shown below:

## Comparison Chart
This chart is for comparison purposes only. This is not and cannot be used as a conversion chart.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| B | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| C | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| D | | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| DO | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| O | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| OO | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| M | | | 30 | 40 | 50 | 60 | 70 | 80 | 90 |

*Id.* at CW0309061. While the chart states that it should not be used as a precise "conversion chart," there can be no dispute that this chart provides a correlation between hardness measurements within certain ranges. This chart demonstrates that a Shore C hardness of 72-76 (as disclosed in Molitor '751) would clearly correlate to a Shore D hardness of less than 60, and certainly less than 64. Callaway should not be heard to argue that such a correlation is inappropriate, when such a correlation was the basis for it obtaining the patents-in-suit in the first place.

If there were any doubt as to whether the cover layer material disclosed in Molitor '751 has a Shore D hardness of less than 64, such doubt has been eliminated through testing.



Thus, there can be no genuine dispute that the combination of Molitor '751 and Proudfit would inherently have a Shore D hardness under 64.

Accordingly, Proudfit in view of Molitor '751 renders the asserted claims obvious under 35 U.S.C. § 103.

### C.    Proudfit in view of Wu discloses a polyurethane outer cover layer with a Shore D hardness less than 64

The Wu patent discloses a polyurethane cover material to be used as the cover material of a golf ball. In particular, Wu explains that there are advantages to using a polyurethane cover material as a substitute for Surlyn® ionomers or balata in a golf ball cover:

> ***The problem with SURLYN®-covered golf balls, however, is that they lack the "click" and "feel" which golfers had become accustomed to with balata.*** "Click" is the sound when the ball is hit by a golf club and "feel" is the overall sensation imparted to the golfer when the ball is hit.
>
> It has been proposed to employ polyurethane as a cover stock for golf balls because, like SURLYN®, it has a relatively low price compared to balata and provides superior cut resistance over balata. ***However, unlike SURLYN®-***

> *covered golf balls, polyurethane-covered golf balls can be made to have the "click" and "feel" of balata.*

Wu, col. 1:36-46 (emphasis added).

In light of this teaching, it would be obvious to replace the balata outer cover layer material of Proudfit with the polyurethane material disclosed in Wu. As the Examiner recognized in the pending reexaminations, persons of ordinary skill in the art had known for decades that polyurethane made an excellent golf ball cover material, and would consider it as a cover layer for any type of construction. *See* Ex. 7 at AC0100935; Ex. 14, Isaac at col. 3, ll. 55-57 ("The core used with [a polyurethane cover ] may be any core which is suitable for use in a golf ball."); Ex. 15, Kolychek at col. 4, ll. 34-42 (stating that polyurethane covers may be used with wound or solid core golf balls).

Indeed, polyurethane was disclosed as an outer cover layer material for a solid-core three-piece golf ball having a Shore D hardness of 40-55 as far back as 1992. *See* Ex. 31, UK Patent Application No. GB 2 248 067 A. In addition to the explicit teachings in the prior art, persons of ordinary skill in the art would have looked to the materials utilized in commercial balls such as the top-selling, polyurethane-covered Titleist Professional. They would have recognized that the material utilized on this ball, polyurethane, performed extremely well, and was wildly commercially successful. Therefore, they would have been motivated substituting this "balata substitute" for the balata of Proudfit's ball.

The Shore D hardness of the polyurethane material described by Wu is well under 64, whether measured "on the ball" or "off the ball."

Accordingly, there can be no genuine dispute that the combination of

Proudfit and Wu satisfies the claimed hardness limitation.



Accordingly, Proudfit in view of Wu renders the asserted claims obvious under 35 U.S.C. § 103.

### D.    Proudfit in view of Molitor '637 discloses a polyurethane outer cover layer with a Shore D hardness less than 64

The Molitor '637 patent also discloses a polyurethane cover material. For example, Molitor '637 discloses using Estane 58133, which is a polyurethane, as a cover material. Molitor '637, col. 18:31-59.

A person of ordinary skill in the art would be motivated to replace the outer cover layer of Proudfit with the polyurethane disclosed in Molitor '637. In the pending reexaminations, the Examiner articulated a motivation to combine these references that would clearly satisfy the Supreme Court's *KSR* standard. Specifically, he noted that based upon prior art patents and publications, polyurethane was well-known as a substitute for balata to those skilled in the art, and was also known to have numerous advantages over balata. *See* Ex. 35, Office Action dated February 27, 2007 at 31. This motivation, based on the printed prior art's teachings would satisfy the Federal Circuit's TSM test. However, when the explicit teachings of Molitor '637 and other polyurethane patents are paired with the broader, implicit knowledge of persons of ordinary skill in the art, as *KSR* requires, this combination becomes unassailable. Once persons of ordinary skill in the art brought to bear their knowledge of polyurethane they would certainly consider replacing the balata of Proudfit with superior-performing polyurethanes such as those disclosed in Molitor '637, more than a decade before Proudfit issued.

The polyurethane disclosed in Molitor '637 also satisfies the claimed Shore D hardness range.



Thus, Proudfit in view of Molitor '637 renders each asserted claim obvious under 35 U.S.C. § 103.

### E. The remainder of the elements of the asserted claims are also satisfied by Proudfit in view of Molitor '751, Wu, or Molitor '637

The attached claim chart identifies in detail for each asserted claim where each element is found in the combination of Proudfit and one of Molitor '751, Wu, or Molitor '637. *See* Appendices A-D. Callaway has not identified any disputes with any limitations not discussed in the body of this paper.

## VIII. THE ASSERTED CLAIMS ARE ANTICIPATED BY NESBITT

Nesbitt discloses a three-piece solid golf ball that includes a) a core; b) a hard ionomeric inner cover layer made of a ionomer resin; and c) a relatively soft outer cover layer made of ionomer resin. Nesbitt, col. 2:30-49. Nesbitt teaches that such a construction provides a desirable coefficient of restitution, which is related to distance, while still attaining the "feel" of a balata covered golf ball. Nesbitt, col. 1:65-2:9.

Nesbitt alone discloses each of the elements of the asserted claims with the exception of the use of blends of ionomers in the inner cover layer, and polyurethane as the outer cover material. However, Nesbitt explicitly refers to using the cover materials disclosed in Molitor '637, which includes a blended ionomer material and a polyurethane cover material. Nesbitt, col. 3:51-61. Accordingly, Nesbitt, incorporating by reference the Molitor '637 patent, anticipates all of the asserted claims.



Acushnet demonstrates below that Nesbitt, incorporating Molitor '637, does in fact anticipate the asserted claims.

### A.    Nesbitt Incorporates Molitor '637 by Reference

Because Nesbitt incorporates Molitor '637 by reference, the disclosures of Molitor '637 and Nesbitt must be viewed as a single prior art reference.

The following passage from Nesbitt properly incorporates Molitor '637 by reference:

> The inner, intermediate, or first layer or ply 14 and the outer cover, second layer or ply 16 or either of the layers may be cellular when formed of a foamed natural or synthetic polymeric material.  Polymeric materials are preferably such as ionomer resins which are foamable.  *Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 and 16 for the golf ball of this invention.*

(Nesbitt, col. 3, ll. 51-61 (emphasis added).)

Nesbitt identifies both the referenced Molitor application serial number (Ser. No. 155,658) and patent number (U.S. Pat. No. 4,274,637), and directs attention to the specific subject matter (polymeric or foamable cover layer materials) that is incorporated into Nesbitt.

The incorporation language examined in *In re Voss,* 557 F.2d 812 (C.C.P.A. 1977), and cited with approval by the Federal Circuit in *Southern Clay Products v. United Catalysts, Inc.*, 43 Fed. Appx. 379 (Fed. Cir. 2002), is virtually identical to that used in Nesbitt.  *Compare In re Voss,* 557 at 816 ("Reference is made to [U.S. Patent No. 2,920,971] . . . for a general discussion of glass-ceramic materials and their production") *with* Nesbitt col. 3, ll. 56-61 ("Reference is

made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 and 16 for the golf ball of this invention."). Hence, not only in view of Patent Office practice in place at the time Nesbitt was filed, but also based on controlling case law, Nesbitt incorporates the foamable materials of Molitor '637 by reference.[14]

### B. Nesbitt, incorporating Molitor '637, satisfies every element of the asserted claims

The elements of claim 1 of the '293 patent, which are recited above with respect to Proudfit, are all expressly or inherently disclosed by Nesbitt, incorporating by reference the Molitor '637 patent.

#### 1. Nesbitt discloses a golf ball comprising a "core," "inner cover layer," and "outer cover layer"

Figure 2 of Nesbitt, reproduced below, shows the three-piece solid construction of the golf ball described therein:



---

[14] Acushnet filed, concurrent with the present motion, a brief setting forth in full the reasons why Nesbitt's reference to Molitor '637 constitutes a proper incorporation by reference.

████████████████████████████████████████████

**2.    Nesbitt discloses that the inner cover layer is a "blend of two or more low acid ionomer resins"**

████████████████████████████████████████████ The inner

cover layer disclosed in Nesbitt consists of Surlyn 1605 (Nesbitt col. 2, ll. 36-38), which the

patents-in-suit state is now designated as Surlyn 8940 ('293 patent, col. 2, ll. 55-56). The

patents-in-suit further identify this resin as "low-acid (less than or equal to 15 weight percent

methacrylic acid)." '293 patent, col. 2, ll. 55-57. Thus, according to the specification of the

patents-in-suit, Nesbitt discloses an inner cover layer comprising an ionomer resin containing no

more than 16% by weight of an alpha, beta-unsaturated carboxylic acid.

In addition, Nesbitt specifically identifies the cover materials disclosed in Molitor '637

for use in a double-cover golf ball. Specifically, Nesbitt states that "Reference is made to the

application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which

describes a number of foamable compositions which may be employed for one or both layers 14

[the inner cover layer] and 16 for the golf ball of this invention" (Nesbitt, col. 3, ll. 54-60).

Molitor '637 teaches, in examples 1-7, the use of a blend of two ionomer resins as a

cover layer: Surlyn 1605 (the ionomer of Nesbitt's inner cover layer); and Surlyn 1557.

Callaway does not dispute this fact. *See* Ex. 28, Response to Office Action Dated February 27,

2007 in Reexam. Cont. No. 95/000,120 at 16 ("Nesbitt is saying to use ionomers . . . and that

Molitor '637 discloses specific examples of suitable foamable ionomer resins.").

████████████████████████████████████████████

Thus, this cover blend, disclosed in Molitor '637 and incorporated by reference into Nesbitt,

comprises a blend of two or more low-acid ionomers each containing no more than 16% by

weight of an alpha, beta unsaturated carboxylic acid. Nesbitt thus satisfies this limitation of claim 1 of the '293 patent.

### 3.    Nesbitt discloses that the inner cover layer has a "Shore D hardness of 60 or more"

The parties dispute the proper construction of this term, but under either party's construction, Nesbitt discloses an inner cover layer with a Shore D hardness of 60 or more. Acushnet proposes that "Shore D hardness" should be construed to mean the hardness of a slab of the cover material on the Shore D scale as measured in accordance with ASTM Method D-2240 (or "off the ball") *See* Joint Claim Chart [D.I. 191] at 2. Table 1 of the '293 patent provides an "off the ball" Shore D hardness measurement for Surlyn 1605 (Surlyn 8940), the inner cover layer of Nesbitt, of 66. Thus, the inner cover layer of Nesbitt's ball would clearly have a Shore D hardness of 60 or more when measured "off the ball."

Furthermore, the blend of low-acid ionomers incorporated into Nesbitt by reference to Molitor '637 also has an "off the ball" Shore D hardness of 60 or more, as it consists of a blend of Surlyn 1605 (8940) and Surlyn 1557 (9650).

Therefore, under Acushnet's proposed claim construction, Nesbitt meets this limitation of claim 1.

Even under Callaway's proposed claim construction, Nesbitt meets this limitation. Callaway proposes that Shore D hardness means that the Shore D measurement is performed on the inner cover layer "on the ball." Joint Claim Chart [D.I. 191] at 2. Callaway's proposed construction, however, cannot save the validity of its claims.

██████████████     Thus, even when measuring this limitation in accordance with Callaway's

proposed claim construction Nesbitt still teaches an inner cover layer with a Shore D hardness of

60 or more. ████████████████████████████████████

████████████████████████████

### 4.    Nesbitt discloses that the inner cover layer has a "thickness of 0.100 to 0.010 inches"

Nesbitt discloses an inner cover layer of 0.020 to 0.070 inches (col. 3, lines 19-23). This

range is entirely encompassed by the range claimed in claim 1 of the '293 patent (0.100 to 0.010

inches), and therefore anticipates it. *See Gen. Elec. Co. v. Hoechst Celanese Corp.,* 740 F.

Supp. 305, 317 (D. Del. 1990).

### 5.    Nesbitt discloses that the outer cover layer has a "thickness of 0.010 to 0.070 inches"

Finally, claim 1 requires that the outer cover layer have a Shore D hardness of 0.010 to

0.070 inches. Nesbitt states that the thickness of the outer layer is 0.0575 inches (Nesbitt, col. 3,

ll. 39-40), which is entirely encompassed by the claimed range. Thus, Nesbitt teaches all of the

limitations of claim 1 of the '293 patent, and renders it invalid under 35 U.S.C. § 102.

### 6.    Nesbitt discloses a polyurethane outer cover layer with a "Shore D hardness of 64 or less"

Claim 1 requires an outer cover layer comprising a relatively soft polyurethane material.

Nesbitt meets this limitation by incorporating by reference the cover materials of Molitor '637.

Specifically, Molitor '637 discloses the use of Estane 58133 polyurethane as a cover material.

(Molitor '637, col. 18).

Claim 1 also requires that the polyurethane of the outer cover have a Shore D hardness of

64 or less. The parties again dispute the proper construction of Shore D hardness, but regardless

of whether it is measured "on the ball" or "off the ball," this claim limitation is satisfied. The

Shore D hardness of Estane 58133 as measured  "off the ball" is 55. Ex. 39, AC0116196.

Callaway has offered no evidence to show that a golf ball made according to the teaching of Nesbitt and Molitor '637 would have an outer cover layer with a Shore D hardness of greater than 64 ████████████████████████████████████████ Once this embodiment has been made and tested, however, we do not have to "predict" what the Shore D hardness of the outer cover would be. We *know* that it is less than 64.

### C.    Nesbitt, incorporating Molitor '637 satisfies every other element of the asserted claims

The attached claim chart identifies where each element of the asserted claims is found in Nesbitt, incorporating by reference the Molitor '637. *See* Appendices A-D. Callaway does not dispute any of the limitations that are not discussed in this paper. For the foregoing reasons, each asserted claim of the '293, '130, and '873 patents as well as claims 1, 3, 4, 5, 7-9, and 11 of the '156 patent are anticipated or alternatively rendered obvious by the disclosure of Nesbitt.

## IX.    THE ASSERTED CLAIMS ARE OBVIOUS OVER NESBITT IN VIEW OF MOLITOR '751, WU, OR MOLITOR '637

Even if Nesbitt does not anticipate the asserted claims, it at least renders the claims obvious in light of Molitor '751, Wu, or Molitor '637.

### 1.    Nesbitt and Molitor '751

As set forth above, Molitor '751 teaches that the polyurethane-ionomer blend described

therein can be used on a ball described by Nesbitt:

> The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, **but also includes balls having a solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt**, and other balls having non-wound cores.

Ex. 13, Molitor '751, col. 2, lines 7-12 (emphasis added). Thus, Molitor '751 provides a clear,

explicit motivation to combine itself with Nesbitt.

As discussed above, Nesbitt itself discloses each limitation of the asserted claims except

for a polyurethane cover layer with a Shore D hardness of 64 or less. This limitation, however,

is met by Molitor '751. Molitor '751 discloses a cover layer comprising Texin 480 AR

polyurethane. When the Shore D hardness of this material is measured "on the ball," it has a

value of 50.1[15] Moreover, as described above, the Molitor '751 patent itself discloses that the

preferred cover material has a Shore C hardness between 72 and 76, which is certainly below 64

on the Shore D scale. Therefore, the combination of Nesbitt and Molitor '751 invalidates the

claims under 35 U.S.C. § 103 under either party's claim construction.

### 2.    Nesbitt and Wu

While Nesbitt discloses a particular soft, low modulus polyurethane material (i.e., Estane

58133) for use in a golf ball cover layer through its incorporation by reference of Molitor '637, it

also would have been obvious to use the polyurethane taught by Wu (i.e., a relatively soft, low

modulus material) as the outer cover layer of Nesbitt at the time of the alleged invention. █████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

---

[15] This test actually used a slightly harder Surlyn (1605). Thus, the actual cover taught by Molitor '751 would be even softer than 50.1.

Nesbitt teaches a multi-layer golf ball having a soft, low modulus polymeric outer cover layer. As set forth above, Wu suggests replacing ionomer covers with the polyurethane covers described by Wu. Ex. 8, Wu, col. 1:36-46.

Therefore, it would have been obvious to modify the golf ball disclosed in Nesbitt to include an outer cover layer made of Wu's soft polyurethane material because it has similar mechanical properties as Nesbitt's exemplary outer cover layer materials, while providing a golf ball having the "click" and "feel" of a balata-covered ball. This rationale was adopted by the BPAI in a related application in affirming an Examiner's rejection of a similar claim. The BPAI held:

> "In applying the test for obviousness we conclude that the teachings of Wu clearly would have made it obvious at the time the invention was made to a person of ordinary skill in the art to have modified Nesbitt's golf ball by using polyurethane as the outer cover material to achieve the expected benefits therefrom taught by Wu (i.e., to have the 'click' and 'feel' of balata; improved shear resistance and cut resistance; durability; and resiliency). Thus it would have been obvious to one skilled in the art to have modified Nesbitt's three-piece golf ball having a spherical core, an inner layer of type 1065 Surlyn® and an outer layer of type 1855 Surlyn® by replacing the type 1855 Surlyn® in the outer layer with polyurethane as suggested and taught by Wu." Ex. 41 at 11, *Ex Parte Sullivan*, PTO Bd. Of Patent App. & Int., Jan. 30, 2004 (decision in U.S. Patent Application Serial No. 08/873,594) (footnote omitted).

Therefore, it would have been obvious to modify the golf ball of Nesbitt to include the polyurethane disclosed by Wu because it provides a golf ball having an improved "click" and "feel" and exhibits improved cut and shear resistance when compared to balata- or ionomer-covered golf balls. Therefore, Nesbitt and Wu render each claim of the patents-in-suit invalid under 35 U.S.C. §103, under either party's construction.

### 3.    Nesbitt and Molitor '637

Nesbitt provides a clear motivation to combine itself with Molitor '637. Nesbitt states at col. 3, ll. 56-61 "Reference is made to the application Ser No. 155,658, of Robert P. Molitor issued into U.S. Patent No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 and 16 [the inner and outer cover] for the golf ball of this invention." Thus, one of ordinary skill in the art would know that they could look to the disclosure of Molitor '637 to find cover materials for use on Nesbitt's ball.

As set forth above, Nesbitt incorporates Molitor '637 by reference. However, Nesbitt and Molitor '637 also render the claims of the patents-in-suit obvious as they disclose each limitation of the claims of the patents-in-suit as set forth above.

### B.    Nesbitt in view of Molitor '751, Wu, or Molitor '637 satisfies every other element of the asserted claims

The attached claim chart identifies where each element of the asserted claims is found in the combinations of Nesbitt and one of Molitor '751, Wu, or Molitor '637. *See* Appendices A-D. Callaway does not dispute any of the limitations that are not discussed in this paper. For the foregoing reasons, each asserted claim of the patents-in-suit is rendered obvious by these combinations under 35 U.S.C. § 103.

### X.    CALLAWAY CANNOT REVIVE THESE INVALID PATENTS BY RELYING ON SECONDARY CONSIDERATIONS

In the reexamination proceedings in the PTO, Callaway attempted to save the validity of these invalid patents by relying on claims of commercial success and other purported "secondary considerations" of non-obviousness. However, there is no "nexus" or evidence to connect the success of the golf balls Callaway relies on to the claims of the patents in suit. Hence the secondary considerations evidence has no probative value on the question of obviousness. In this section, we demonstrate that Callaway's arguments are inadequate as a matter of law and should be rejected.

### a.    Applicable Law

So called "secondary considerations" or "objective indicia of non-obviousness" can have

a role in the obviousness determination. *Graham v. John Deere,* 383 U.S. 1, 17-18 (1966).

However, that role is limited and cannot alter a clear finding of obviousness of a patent over the

prior art.

In *Anderson's-Black Rock, Inc. v. Pavement Salvage, Co.,* 396 U.S. 57 (1969), the

Supreme Court recognized that secondary considerations cannot convert an obvious idea into a

patentable one. *Anderson's-Black Rock,* like this case, involved a combination of two old

elements—a radiant heater and a paving machine – that had no unexpected results but functioned

in combination just as a heater and paving machine would be expected to function. Despite the

enormous commercial success of the invention in the market, the Supreme Court found the

patent invalid. *Id.* at 62-63.

Since *Anderson's-Black Rock,* many cases have followed this principle. Today, it is well

established that secondary considerations cannot save a patent that is clearly obvious in light of

the prior art. *See, e.g., In re Inland Steel,* 265 F.3d at 1366 (objective indicia of nonobviousness

was "insufficient to overcome the strong prima facie obviousness case."); *Sandt Tech, Ltd. v.

Resco Metal and Plastics Corp.,* 264 F.3d 1344 (Fed. Cir. 2001) (secondary considerations,

including commercial success could not overcome the evidence of obviousness). *See also KSR,*

127 S. Cit. at 1734.

Furthermore, the plaintiff must establish a nexus between a claimed invention and any

secondary considerations before secondary consideration such as commercial success can be

given substantial weight. *Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309, 315 (Fed. Cir.

1985). In other words, there must be some connection or nexus between the commercial success

and the claims of the patent, before the commercial success can be considered probative of

whether the patent is non-obvious. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d

1387, 1392 (Fed. Cir. 1988).

Where the patentee cannot establish such a nexus, the alleged evidence of commercial success is given little or no weight. For example, the commercial success of a product sponsored by the preexisting market leader is of limited probative value. *See Pentec*, 776 F.2d at 316 ("Because GC was clearly the market leader well before the introduction of [the product covered by the patent], its sales figures cannot be given controlling weight in this case on the question of obviousness."). *See also Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.,* 444 F.2d 295, 300 (9th Cir. 1970) (finding patent obvious despite commercial success where product was sold by the market leader). This is especially true when the commercial success of a new product results largely from the cannibalization of sales of the market leader's previous products. *See McNeil-PPC, Inc. v. Perrigo Co.*, No. 05 Civ. 1321 (WHP), 2007 U.S. Dist. LEXIS 50255 at ** 33-34 (S.D.N.Y. July 3, 2007).

Finally, when a commercially successful product is covered by multiple patents, it makes it very difficult to attribute commercial success to any one of those patents. *See McNeil-PPC,* 2007 U.S. Dist. LEXIS 50255 at *34 (finding no nexus between commercial success and asserted patent where patented product was covered by three different patents). Obviously, when multiple patents cover a product, one must do more than to show that the claims of a patent cover a product to establish that any particular patent is responsible for success of the product in the market place.

### b.    Secondary Considerations Need Not Be Considered In This Case.

As demonstrated above, the patents in suit are an obvious application of the prior art and are therefore invalid. Prior to the invention of the patents in suit, solid construction multi-layer balls were well known, polyurethane covers were well known, and the "soft-over-hard" double cover construction was well known. The patents in suit merely combine these known elements in a predictable fashion with predictable results, as is demonstrated by the fact that the PTO reexamination Examiner rejected the claims on no less than six separate prior art rejections.

In such a case of demonstrated obviousness, secondary considerations cannot be relied on to save a clearly invalid patent. *Anderson's Black Rock, supra.* Hence, the Court should find these patents invalid as a matter of law and need not consider the commercial success evidence at all.[16]

### c.    Callaway Cannot Establish A Nexus Between The Commercial Success Of The Golf Balls And The Patents-in-Suit.

Even if secondary consideration evidence is considered in this case, it should be given little weight, as Callaway cannot establish a connection or nexus between the commercial success of the Pro V1 or any other golf ball and the claims of the patents in suit. There are several facets to this showing.

### (1)    The Patents Came After The Commercial Success.

The patents-in-suit all are continuations of an application filed by Spalding in 1995. However, the first of the patents-in-suit, the '293 patent, did not publish or issue until April of 2001. *See* '293 patent, Related U.S. Application Data. Spalding did not file the other patents-in-suit until 2001 and they did not issue until 2003.

This is noteworthy because the first balls having a solid core, urethane cover, and multi-layer construction were introduced to the market in 2000, by other companies.



---

[16] In addition, it is black letter law that such secondary considerations cannot be used to rebut an anticipation case, which Acushnet has demonstrated above. *See, e.g., W.L. Gore & Assoc,* 721 F.2d at 1562 n.10; *In re Fracalossi,* 681 F.2d at 796.

[17]

Hence, it is obvious that none of these companies copied or appropriated the teachings of the patent to make their commercial products. ████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

The fact that four companies launched a solid construction ball with a urethane multi-layer cover at about the same time, and all well before the patents-in-suit even issued, strongly suggests the patents are invalid. *See, e.g., Am. Standard, Inc. v. Pfizer, Inc.,* 722 F. Supp. 86, 139 (D. Del. 1989) ("[C]ontemporaneous independent development *before* the patenting of the invention 'can be evidence of obviousness' of the invention....") (emphasis in original). Thus, the fact that these constructions were contemporaneously invented by others is additional evidence of obviousness.

### (2)    Many Patents Cover the Pro V1.

████████████████████████████████████████████████ Scores of patents cover the Pro V1 and the manner of making it. In light of this, it is not possible to connect the success of the Pro V1 to the features of the patents-in-suit.

In fact, **OVER 50** Acushnet patents directed to a wide variety of technologies and processes cover various versions of the Pro V1 golf balls.[19]   Acushnet disputes whether the patents in suit cover the Pro V1. Even assuming, *arguendo*, that they do however, in a product as complex and multi-faceted as the Pro V1, which is covered by scores of patents, it is unreasonable and utterly speculative to suggest, as Callaway does, that because a patent in suit

---

[18] Notably, the only major golf ball maker who did not offer such a ball on the market in the 2000 time frame was Spalding, the company that then owned the patent applications at issue.

[19] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

reads on the Pro V1, the commercial success of the Pro V1 demonstrates that the patent is valid. *See Friskit*, 2007 U.S. Dist. LEXIS 54192, at *24 (granting summary judgment of obviousness despite substantial evidence of commercial success, noting that plaintiff "offers only what it describes as a 'prima facie case of infringement' as evidence of nexus"); *In re Grasselli*, 713 F.2d at 743.

The Pro V1 is a complex possesses many attributes that are not even remotely suggested by the disclosure of the patents in suit. The Pro V1 combines a very thin inner cover with a super thin (0.030") veneer outer layer of castable, patented MDI-based polyurethane.[20] The patents in suit do not teach this combination. Instead, the patents claim broad, general ranges of thicknesses. Furthermore, the polyurethane examples (Nos. 23-25) in the patents look nothing like the Pro V1, as the following table shows:[21]

| Ball Property | '873 Patent Example 4 | Pro V1 |
|---|---|---|
| Core Size | 1.47" | 1.530" |
| Core Compression | 58 | 82 |
| Inner cover material | Iotek 830/7030 blend | Surlyn 8940 / 7940 / 8660 |
| Inner cover thickness | 0.05" | 0.045" |
| Outer cover material | Baytek RE832 | Patented, MDI polyurethane |
| Outer cover thickness | 0.055" | 0.030" |

Thus, while the patents-in-suit may relate generally to urethane covered multi-layer balls, they claim broad general ranges, such as an outer cover having a range thickness between 0.010" (even smaller than the Pro V1), up to 0.1", which is far thicker than anything on the market.

---

[20] *See* Titleist Pro V1 Specifications (available at http://www.titleist.com/golfballs/prov1.asp?spec=1) (Ex. 49).

[21] *Id.*

Within these broad claim ranges, many constructions are possible.   The claims also omit many features important to the Pro V1, such as size of the core and the castable polyurethane cover material patented by Acushnet.  Because the ranges in the patent claims are both broad in some respects, and at the same time omit important features of the Pro V1, it is not possible to attribute the success of the Pro V1 to the patents in suit.  *See Joy Techs.,, Inc. v. Manbeck*, 751 F. Supp. 225, 229 (D.D.C. 1990) ("The claims are broader in scope than the objective evidence if a limitation or element recited in the claim is broader than the limitation or element in the objective evidence or if the objective evidence … contains limitations or elements not recited in the claims (citing *White v. Jeffrey Mining Mach. Co.*, 723 F.2d 1553, 1559 (Fed. Cir. 1983) (internal citations omitted); *In re Fenn*, 639 F.2d 762, 765(CCPA 1981)).

As the scope of the claims of the patents-in-suit are simply not commensurate with the successful products in the market, like the Pro V1, Callaway's efforts to attribute the success of these balls to the patents in suit must fail.

**(3)    Many Other Market Factors Made The
Pro V1 A Success.**

In addition to the above technical features, Callaway's commercial success arguments also overlook the other factors, such as brand loyalty, Titleist's leading position in the market, and external market forces that also contributed greatly to the success of the Pro V1 and other urethane balls.  These other factors further diminish any connection between the success of the Pro V1 (and similar balls) and the patents-in-suit

For example, the Pro V1 is made by Acushnet and sold under the Acushnet premier brand Titleist.  Indeed, Titleist's mission has long been to be the leading brand of the golf professional and the golf pro shop because this represents and reinforces Titleist's reputation for premium quality and performance.  Ex.9, Bellis Decl. at ¶ 21.

38

In the golf ball market, brand is one of the most important factors affecting the commercial success of a golf ball. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Titleist balls, of various constructions, have been the most played ball at the U.S. Open each year for 58 consecutive years. *See* Ex. 9, Bellis Decl. at ¶ 25. For the past 25 years, Titleist has been played by the majority of professional players on the U.S. PGA Tour and more than all other golf balls combined. *Id.* Professional golfers have always preferred Titleist balls (of many different constructions) by a wide margin over other balls. Titleist's strong market position and golfers' allegiance to brands rather than technology, further attenuates Callaway's claim of commercial success as an indicia of non-obviousness.

In addition, external market forces clearly played an important role in the adoption of solid construction, urethane covered golf balls. In 1999 Tiger Woods was one of many golfers on the PGA Tour using the Titleist Professional ball. Ex. 18, Love Decl. at ¶ 24. The Professional is a wound construction golf ball with a urethane cover, and is not covered by the patents-in-suit.

In 1999, Mr. Woods won 10 tournaments with the wound Titleist Professional. In 2000, Mr. Woods switched to a solid, three-piece polyurethane Nike golf ball. In 2000, Mr. Woods won 9 tournaments. Mr. Woods' use of this ball almost certainly sparked an interest in solid construction golf balls. Ex. 18, Love Dec. ¶¶ 23-24.

Several factors likely caused a shift in the type of ball sought by tour professionals. Newer and improved golf equipment such as oversized metal woods and titanium drivers allowed golfers to hit the ball farther with acceptable spin off the tee. Similarly, square grooved golf clubs have affected the types of golf balls that can best benefit today's better players. Additionally, golfer's today are physically stronger and have the power to strike the ball with

high club speeds, and thus benefit from a distance-oriented ball. Finally, Tiger Wood's success with a solid ball in 2000-01 likely attracted the attention of other Tour Professionals. *See* Ex. 18, Love Dec. at ¶ 27.

Once tour professionals demonstrated that they had an interest in this type of construction, all of the major golf ball manufacturers quickly introduced multi-layer polyurethane constructions (except for Spalding, the owner of the patents-in-suit at the time). Hence, there were many market forces at work favoring the adoption of solid construction, multi-layer golf balls. ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████ This further demonstrates the futility of any effort to ascribe the success of the Pro V1 and similar balls to the patents in suit.

* * * *

As the obviousness of the patents in suit is clear, secondary considerations such as commercial success cannot be used to save these invalid patents. However, even if such evidence is considered here, there is no nexus between the success of the Pro V1 and similar balls and the patents in suit and hence such evidence is entitled to little weight.

## XI.    CONCLUSION

Therefore, for all of the foregoing reasons, Acushnet requests that its Motion for Summary Judgment of Invalidity of the patents-in-suit be granted.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: August 7, 2007
Public Version Dated: August 14, 2007

812633 / 30030

By:   */s/ David E. Moore*
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza 6th Floor
       1313 N. Market Street
       Wilmington, DE 19899
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 14, 2007, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on August 14, 2007, I have Electronically Mailed the document to

the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030