IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

        Plaintiff,

    v.

ACUSHNET COMPANY,

        Defendant.

C. A. No. 06-91 (SLR)
**CONFIDENTIAL INFORMATION –
FILED UNDER SEAL – PURSUANT TO
PROTECTIVE ORDER**

**DECLARATION OF WILLIAM M. RISEN, JR. REGARDING
CALLAWAY GOLF'S *OPPOSITION* TO ACUSHNET'S MOTION FOR
PARTIAL SUMMARY JUDGMENT THAT NESBITT (4,431,193)
INCORPORATES PORTIONS OF MOLITOR (4,274,637)**

I, William M. Risen, Jr., declare as follows:

1.      I am a Professor of Chemistry at Brown University. I have been retained by Callaway Golf as a consultant and expert witness in this case. I have prepared an expert report regarding this matter, dated July 6, 2007, which summarizes my qualifications and includes a copy of my curriculum vitae. *See* Risen Rpt. at ¶¶ 1-10, and Appendix A thereto (copy submitted to Court as D.I. 205, Exh. 3). I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.      Based upon my education and work experience in the areas of chemistry, materials science of polymers and other amorphous materials, as well as my consulting work in the golf ball industry, I believe I qualify as one of ordinary skill with regard to the patents-in-suit and exceed that standard of skill in some respects. *See also* D.I. 205, Exh. 3 (Risen Rpt.) at ¶¶ 58-60.

3.     I understand that Acushnet has asserted that the Nesbitt patent, U.S. Patent No. 4,431,193, incorporates by reference portions of the Molitor patent, U.S. Patent No. 4,274,637. According to Acushnet, this incorporation by reference would mean that Nesbitt discloses a polyurethane outer cover as well as an inner cover comprising a blend of low-acid ionomers. *See* D.I. 205, Exh. 3 (Risen Rpt.) at ¶ 73.

4.     I understand that for a document to incorporate by reference material from a second document, it must "identify with detailed particularity what specific material it incorporates" and "clearly indicate where that material is found in the various documents."

5.     The Nesbitt patent stresses the importance of using foamable materials in the outer two layers and particularly identifies "ionomer resins" as being the preferred type of polymeric material. *See, e.g.,* Nesbitt col. 3:54-56. Immediately after identifying the particular class of ionomer foamable materials, Nesbitt refers the reader to the Molitor patent for identification of various such foamable materials. The Molitor patent, like the Nesbitt patent, is also focused upon the use of foamable materials and similarly identifies "ionomer resins" as being the preferred type of polymeric material.

6.     From a review of the entire context of both the Nesbitt and Molitor patents, one of ordinary skill in the art viewing Nesbitt's reference to the Molitor '637 patent (*see* D.I. 205, Exh. 3 (Risen Rpt.) at ¶ 74 (*quoting* Nesbitt col. 3:51-61)), would understand that to the extent Nesbitt was referencing anything from Molitor it was the various types of foamable ionomer resins described in the Molitor '637 patent.

7.     The reference in Nesbitt to the Molitor patent would not be viewed by one of ordinary skill in the art as identifying with "detailed particularity" any information. The Molitor patent discloses literally hundreds of different possible compositions of materials. Nothing in Nesbitt's reference to Molitor identifies with "detailed

2

particularity" any of those materials, and certainly not the use of polyurethane for the outer cover layer of the Nesbitt invention, or a blend of two low-acid ionomers for the inner layer – much less the use of both of these materials combined together in the same golf ball to provide the type of inner and outer layers claimed in Callaway Golf's patents.

       8.     My understanding of how one of ordinary skill in the art would view Nesbitt's reference to the Molitor patent is confirmed by the following testimony of Mr. Nesbitt, himself, the inventor of the '193 patent (*see* Exhibit A, attached hereto):

> Q:    When you read the paragraph in your patent application and you saw the reference to the Molitor '637 patent –
> A:    Right
> Q:    – you just thought that's foamed ionomer resins?
> A:    Right.
> Q:    And you didn't think beyond that, that it could refer to other materials other than ionomer resins?
> A:    No.  Because if you look at my patent, it says over and over again that the ionomer cover can be foamed or not foamed and that's the same foam that Molitor did in his ionomer foam.  The 10-piece ball that was in his test, it was ionomer, and it was foamed.

[Dennis Nesbitt Dep. Tr. at 192:16-193:4.]

> Q.    I just wanted you to turn to Column 17 of Bob Molitor's patent.
> A.    17.
> Q.    Example 10, Table 7, describes a polyethylene cover material; right?
> A.    That's right, high-density polyethylene.
> Q.    And that's a foamable cover composition?
> A.    Yes.
> Q.    And is it your understanding that that is referred to by foamable compositions in your patent?
> A.    No.
> Q.    Just ionomers?
> A.    Just ionomers.  I never read this.  All the reference to foamable in my patent is foamable ionomers, and I knew what Bob Molitor made.  He made a foamable ionomer ball called a 10-piece ball.  It had ionomer.  Mine has ionomer.  And that's strictly ionomer foamable.

[Nesbitt Dep. Tr. at 198:24 – 199:18.]

Q.  In your '193 patent Mr. Rosenthal earlier referenced you to a paragraph that talked about the Molitor patent. Do you remember that?

A.  I remember that.

Q.  If somebody read that to themself and said to you, "Oh, you must have been referring to polyurethane as a potential outer cover material," what would you say to that?

A.  No way.

[Nesbitt Dep. Tr. at 235:13-21.]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of August, 2007 at Rumford, Rhode Island.

William M. Risen, Jr.

4

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2007, the attached document was electronically filed with the Clerk of Court using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on August 20, 2007, I have Electronically Mailed the document to the following person(s):

| | |
|---|---|
| Richard L. Horwitz<br>David E. Moore<br>Potter Anderson & Corroon LLP<br>Hercules Plaza<br>1313 North Market Street, 6th Floor<br>P.O. Box 951<br>Wilmington, DE 19899<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com | Attorneys for Defendant<br>ACUSHNET COMPANY |
| Alan M. Grimaldi, Esq.<br>Joseph P. Lavelle<br>Brian Rosenthal<br>Clint Brannon<br>Kenneth Donnolly<br>Howrey LLP<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>grimaldia@howrey.com<br>lavellej@howrey.com<br>rosenthalB@howrey.com<br>brannonC@howrey.com<br>donnellyk@howrey.com | Attorneys for Defendant<br>ACUSHNET COMPANY |

/s/ Thomas L. Halkowski
Thomas L. Halkowski

1

# EXHIBIT A

Page 142

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2

 3

 4

 5   CALLAWAY GOLF COMPANY,
 6        Plaintiff,

                                    Civil Action
 7   vs.                            No. 06-91 (SLR)
 8   ACUSHNET COMPANY,
 9        Defendant.
10

11                      Hernando, Florida
                    Wednesday, April 11, 2007
12                       Volume II of II
13

                     Videotaped Deposition of
14                      R. DENNIS NESBITT,
15

16        The witness, was called for examination by
     counsel for the Defendant, pursuant to notice,
17   commencing at 1:38 p.m. at the Best Western Citrus
     Hills Lodge, 350 East Norvell Bryant Highway,
18   Hernando, Florida, before Patty A. Carlson,
     Certified Realtime Reporter and Notary Public, when
19   were present on behalf of the respective parties:
20

21   -----------------------------------------------------
22                   DIGITAL EVIDENCE GROUP
23             1111 16th Street, NW Suite 410
24                  Washington, DC  20036
25                      (202) 232-0646
```

1    had not -- strike that.  I think you answered that

2    question.  All right.  Now, have you since filing your

3    application read this patent or portions of it?

4        A.   The Molitor patent?

5        Q.   Yes.

6        A.   No.

7        Q.   Coming back to your 193 patent, the paragraph

8    that we were just focusing on in Column 3, have you ever

9    read that paragraph before?

10       A.   I read it when I reviewed the application; that

11   was the first and only time I saw that.  I didn't add

12   it.  One of the lawyers added it.

13       Q.   Since then you've never read it?

14       A.   The whole patent or just one paragraph?

15       Q.   Just that paragraph.

16       A.   No, I haven't.

17       Q.   I'd like to direct you to the Molitor 637

18   patent.

19       A.   Uh-huh.

20       Q.   In particular, Column 5 of the patent, Line 27.

21           MR. DENNING:  I'm sorry.  Counsel, can you tell

22       me the paragraph -- the column again?

23           MR. ROSENTHAL:  Sure.  It's Column 5, Line 27.

24           MR. DENNING:  Thank you.

25   BY MR. ROSENTHAL:

Page 192

1      Q.   The sentence starts or reads "The range of

2   synthetic polymeric materials which can be used in

3   accordance with this invention, other than the

4   above-described Surlyn resins, is much broader than the

5   range of natural materials.  Suitable polymer materials

6   which may be adapted for use in this invention are as

7   follows," and then it lists a number of synthetic

8   materials.

9      A.   Uh-huh.

10      Q.   Have you ever read that portion of this

11   document before?

12      A.   No.  When they referred to the Molitor

13   patent -- I'm sorry.  When I read that paragraph, the

14   only thing I got out of it was it was the foamed ionomer

15   cover, the, quote, 10-piece golf ball.

16      Q.   When you read the paragraph in your patent

17   application and you saw the reference to the Molitor 637

18   patent --

19      A.   Right.

20      Q.   -- you just thought that's foamed ionomer

21   resins?

22      A.   Right.

23      Q.   And you didn't think beyond that, that it could

24   refer to other materials other than ionomer resins?

25      A.   No.  Because if you look at my patent, it says

1    over and over again that the ionomer cover can be foamed

2    or not foamed and that's the same foam that Molitor did

3    in his ionomer foam.  The 10-piece ball that was in his

4    test, it was ionomer, and it was foamed.

5        Q.    So you were thinking of his ball as opposed to

6    his patent application?

7        A.    Right.  I didn't go into detail on his patent,

8    right.

9        Q.    Okay.  Now, let me direct you to Column 14 of

10   Mr. Molitor's 637 patent.  Under Example 1, the second

11   sentence, it says, "A cover stock was formed by dry

12   blending the components of Table 2 below," and then it

13   lists Surlyn 1605, Surlyn 1557 and then two other

14   ingredients, which I'm not going to read into the

15   record, but they're there.  Do you see that?

16       A.    I see it.

17       Q.    Is this one of the foamable ionomer resin

18   compositions that you thought that you were referring to

19   when you referred to Molitor?

20           MR. DENNING:  Objection.  When you say

21       "referred to Molitor," do you mean in the patent

22       that he said that he didn't write?

23           MR. ROSENTHAL:  I'll rephrase the question.

24   BY MR. ROSENTHAL:

25       Q.    When you read -- strike that.  When you read

1    your patent application and you had an understanding in

2    your own mind of what was being referred to by the

3    foamable compositions in Molitor --

4        A.    Right.

5        Q.    -- is this Example 1 cover material, one of

6    those foamable compositions you thought you were

7    referring to?

8        A.    Yes.    There's is a blend of sodium and zinc

9    ionomers.    It could be the Top-Flite cover formula.    I'm

10   sure because it kept changing.    The titanium dioxide

11   makes it white, and the blowing agent foams it.    It's a

12   cellular -- a lot of them are collagen materials that

13   give off gases when heated, creating little bubbles

14   inside.

15       Q.    And if you look at Example 2 --

16       A.    Yes.

17       Q.    -- it looks like it's --

18       A.    The same.

19       Q.    -- the same.    So Examples 1 through 4 all use

20   the same cover stock, it looks like, in the Molitor

21   patent?

22       A.    It looks like it.

23       Q.    And when you saw the reference to Molitor 637

24   in your application, you thought that these were among

25   the materials that were being referenced --

1    Right now it's not blended.

2        Q.    Sure.  But what it describes as a cover stock

3    formed by dry blending the components of Table 2, that

4    would produce a blended ionomer cover stock; right?

5        A.    That would produce a foamable ionomer cover

6    stock, yes.

7        Q.    Okay.  And reading that description of the

8    foamable cover stock, is it your understanding that the

9    paragraph in Column 3 of your patent, which refers to

10   foamable compositions from the Bob Molitor patent, would

11   refer to that foamable blended cover stock?

12           MR. DENNING:  Objection, asked and answered.

13       A.    Polymeric materials are preferably ionomer

14   resins, which are foamable.  That's what Bob Molitor

15   did.  He foamed a Surlyn resin in a two-piece ball, used

16   Surlyn, a single core, single cover.  The cover was

17   Surlyn.  There's a blowing agent that made it foam.  And

18   that's what I read into that.

19       Q.    Okay.  Your understanding is that this patent

20   describes foamable compositions?

21           MR. DENNING:  Counsel, we've been over this and

22       over this.  I object, asked and answered.

23           MR. ROSENTHAL:  Well, you can make your

24       objection.  The question hasn't been answered.

25           MR. DENNING:  It has been.

1          MR. ROSENTHAL:  In any event, let me just

2     continue with my question.  You can make your

3     objection.

4  BY MR. ROSENTHAL:

5     Q.   The question that I have for you is:  There are

6  foamable compositions described in this patent as you

7  understand it; right?

8     A.   So I see it.  I just read it now.  I know more

9  about it now than I did then.

10    Q.   Sure.  Did you understand the reference in your

11  patent to foamable compositions of this patent to refer

12  to those foamable compositions?

13         MR. DENNING:  Objection, asked and answered.

14    A.   I answered that two or three times.

15    Q.   You testified earlier that polyethylene was a

16  foamable material?

17    A.   Uh-huh.

18    Q.   Can you turn to Column 17.

19    A.   Sorry?

20    Q.   Polyethylene.

21    A.   Oh, yes.  What about it?

22    Q.   I thought you said that was a foamable --

23    A.   I did.

24    Q.   I just wanted you to turn to Column 17 of Bob

25  Molitor's patent.

Page 199

1      A.    17.

2      Q.    Example 10, Table 7, describes a polyethylene

3   cover material; right?

4      A.    That's right, high-density polyethylene.

5      Q.    And that's a foamable cover composition?

6      A.    Yes.

7      Q.    And is it your understanding that that is

8   referred to by foamable compositions in your patent?

9      A.    No.

10     Q.    Just ionomers?

11     A.    Just ionomers.  I never read this.  All the

12  reference to foamable in my patent is foamable ionomers,

13  and I knew what Bob Molitor made.  He made a foamable

14  ionomer ball called a 10-piece ball.  It had ionomer.

15  Mine has ionomer.  And that's strictly ionomer foamable.

16     Q.    Okay.

17     A.    I never read all of this, the other ones that

18  are foamable.

19     Q.    Okay.  I think I just have one more line of

20  questioning on this document.  If you go to Column 18 --

21     A.    Yeah.

22     Q.    -- Example 18.

23     A.    Example 18, yes.

24     Q.    The second sentence states, "A cover stock was

25  formed by casting a liquid thermoset polyurethane foam

Page 234

1          MR. DENNING:  I guess that we should note for

2      the record that Mr. Kennedy is leaving to catch his

3      plane.

4  BY MR. DENNING:

5      Q.   In any of the balls that you manufactured with

6  the Surlyn 1855 over the Surlyn 1605, three-piece balls,

7  did you experience cold-cracking problems?

8      A.   They all passed cold cracking.  In fact, we

9  reviewed documents showing that -- I glanced over it,

10  but I saw that there were submitted for cold crack --

11  oh, sorry.  There were balls submitted for cold-crack

12  testing and balls submitted for guillotine, as well as

13  for static data.  The three balls submitted for

14  cold-crack passed.

15      Q.   Why did you prefer using a nonblended Surlyn

16  for the mantle layer?

17          MR. ROSENTHAL:  Objection to the form of the

18      question.

19      Q.   Let me rephrase it.

20      A.   I know why.

21      Q.   Let me rephrase it for the sake of the record.

22  Earlier I believe you testified that you wanted to use a

23  single Surlyn for the mantle layer of this

24  three-piece --

25      A.   That's correct.

1        Q.    -- is that correct?

2        A.    Right.

3        Q.    Why did you want to do that?

4        A.    Because as Molitor said, it gives superior

5    properties.  It was the best ionomer at that time that

6    gave the highest coefficient.

7        Q.    When you say "coefficient" --

8        A.    Of restitution, COR.

9        Q.    And that's important because it makes the ball

10   go further?

11       A.    Further, yeah.

12             MR. ROSENTHAL:  Objection, leading.

13       Q.    In your 193 patent Mr. Rosenthal earlier

14   referenced you to a paragraph that talked about the

15   Molitor patent.  Do you remember that?

16       A.    I remember that.

17       Q.    If somebody read that to themself and said to

18   you, "Oh, you must have been referring to polyurethane

19   as a potential outer cover material," what would you say

20   to that?

21       A.    No way.

22             MR. ROSENTHAL:  Could you just give me a chance

23       to --

24             THE WITNESS:  You can --

25             MR. ROSENTHAL:  I'm going to object to the

Page 236

1          question.  It calls for speculation and leading.

2                    THE WITNESS:  I already answered it, anyway.

3          Q.   What would you say in response that statement?

4                    MR. ROSENTHAL:  Same objection.

5          A.   It had nothing to do with polyurethane.  I knew

6     what the Molitor ball was.  It was the same ball in the

7     test.  The, quote, 10-piece golf ball, was a foam

8     Surlyn.  That patent was a foam Surlyn patent.  He might

9     have thrown other stuff in it, which I didn't know; but

10    it was a foamed ionomer two-piece.

11         Q.   Mr. Rosenthal also talked about consulting fees

12    and the amount that you have been paid since you left

13    the employ of Spalding and have been a consultant for

14    Top-Flite Golf.  What did you do in return for that

15    compensation?  What have you been doing from '99 to 2006

16    for the company?

17         A.   I continue doing what I was doing and best

18    known for doing and that was working on experimental

19    golf balls.  I got several more patents based upon the

20    work.

21                    As I say, when I retired I worked -- I'm not

22    sure if I worked four days a week and one week off, but

23    I know I worked three days a week with two days off, and

24    I had two months off.  The next year it was two days a

25    week that I worked and still had the two months off to

Page 260

1                    REPORTER'S DEPOSITION CERTIFICATE

2

3       STATE OF FLORIDA

4       COUNTY OF HILLSBOROUGH

5

6           I, PATTY CARLSON, Registered Professional

7       Reporter, Certified Realtime Reporter and Notary Public

8       in and for the State of Florida at Large, hereby

9       certify that the witness appeared before me for the

10      taking of the foregoing deposition, and that I was

11      authorized to and did stenographically and

12      electronically report the deposition, and that the

13      transcript is a true and complete record of my

14      stenographic notes and recordings thereof.

15          I FURTHER CERTIFY that I am neither an attorney,

16      nor counsel for the parties to this cause, nor a

17      relative or employee of any attorney or party connected

18      with this litigation, nor am I financially interested in

19      the outcome of this action.

20          DATED THIS _____ at Tampa,

21      Hillsborough County, Florida.

22

23

24      _____

        PATTY CARLSON, RPR, CRR

25