IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

            Plaintiff,

    v.

ACUSHNET COMPANY,

            Defendant.

C. A. No. 06-91 (SLR)

**PUBLIC VERSION**

**CALLAWAY GOLF'S *OPPOSITION* TO ACUSHNET'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

**FISH & RICHARDSON P.C.**

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel:  (302) 652-5070
Fax:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel:  (617) 542-5070
Fax:  (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel:  (858) 678-5070
Fax:  (858) 678-5099

*Attorneys for Plaintiff*
*Callaway Golf Company*

DATED:  August 20, 2007
REDACTED:  August 24, 2007



# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................1

II.   SUMMARY OF THE ARGUMENT .................................................2

III.  FACTUAL BACKGROUND...............................................................4

IV.   LEGAL STANDARDS GOVERNING SUMMARY
      JUDGMENT OF INVALIDITY...........................................................6

V.    THE PROPER CONSTRUCTION OF THE TERMS .........................7

VI.
                          PROVE NOTHING ABOUT THE
      INHERENT PROPERTIES OF THE PRIOR ART. .............................8

VII.  NESBITT DOES NOT ANTICIPATE ANY OF THE
      ASSERTED CLAIMS. ......................................................................11

      A.    Nesbitt Does Not Incorporate by Reference from
            Molitor '637 the Use of Polyurethane for the Outer
            Cover Layer. ...........................................................................11

      B.    Nesbitt Does Not Incorporate by Reference from
            Molitor '637 the Use of a Blend of Low-Acid Ionomers
            in the Inner Cover Layer. ........................................................12

      C.    Even if Nesbitt Incorporated by Reference the Molitor
            '637 Patent's Disclosure of Polyurethane, There Would
            Still Be Genuine Issues of Material Fact as to Whether
            Nesbitt Inherently Discloses the Claimed Hardnesses............12

            1.    Nesbitt Cannot Incorporate by Reference Any
                  *Specific Type* of Polyurethane, and Therefore
                  Does Not Inherently Disclose any Particular
                  Plaque Hardness or On-the-Ball Hardness for a
                  Polyurethane Cover....................................................13

            2.    The Hardness Value Reported in the Estane
                  58133 Datasheet Discloses a "Plaque" Hardness,
                  Which is Not the Same as the On-the-Ball
                  Hardness Required By the Claims. ..............................14

            3.    The Shore D Hardness of Acushnet's Purported
                  Nesbitt-Molitor '637 Hybrid Golf Ball Does Not
                  Satisfy the Legal Requirements for Inherency............15

            4.    A Belatedly Produced DuPont Memorandum
                  Creates a Genuine Issue of Material Fact as to

**TABLE OF CONTENTS (cont'd)**

Page

Whether Nesbitt Inherently Discloses an Inner
Cover Layer Having a Shore D Hardness of 60
or More.......................................................................................16

VIII.  Proudfit Does NOT Anticipate Claims 1 OR 2 of THE '130
Patent...................................................................................................17

IX.  AT THE VERY LEAST, THERE ARE GENUINE ISSUES OF
MATERIAL FACT AS TO WHETHER Acushnet CAN
PRESENT, WITH CLEAR AND CONVINCING EVIDENCE,
A PRIMA FACIE CASE OF Obviousness...........................................18

A.  Merely Transplanting an Element From One Reference
Into the Disclosure of Another Reference Does Not
Establish Obviousness. ...........................................................18

B.  There is Substantial Evidence That the Superior
Performance of Sullivan's Invention Was Not the
"Predictable Result" of Combining Known Elements. ............18

C.  There Are Genuine Issues of Material Fact as to What
the Proudfit Patent Discloses, Both Alone and in
Combination With Other References.......................................21

1.  Proudfit Does Not Inherently Disclose an Outer-
Cover Shore D Hardness of 64 or Less.......................21

2.  There Is at Least a Genuine Issue of Fact as to
Whether Proudfit Discloses an Inner-Cover
Shore D Hardness of 60 or More. ...............................21

3.  The Combination of Proudfit and Molitor '751
Fails to Disclose an Outer Cover Shore D
Hardness of 64 or Less................................................22

a.  The Same Documents Acushnet Relies
on To Translate Shore C to Shore D
Expressly Caution That They Are Not,
And Cannot Be Used As, Conversion
Charts. ............................................................23

b.  Acushnet's Own Witnesses Have
Confirmed That Accurate and Reliable
Conversion Between Shore C and Shore
D Is Impossible. ..............................................25

4.  The Combination of Proudfit and Wu Fails to
Disclose an Outer Cover Shore D Hardness of 64
or Less.........................................................................26

## TABLE OF CONTENTS (cont'd)

Page

5.  The Combination of Proudfit and Molitor '637
    Fails to Disclose an Outer Cover Shore D
    Hardness of 64 or Less...................................................27

D.  There Are Genuine Issues of Material Fact as to What
    Nesbitt Discloses, Both Alone and in Combination With
    Other References.............................................................29

    a.  The Combination of Nesbitt with Molitor
        '751, Wu, or Molitor '637 Fails to
        Disclose an Outer Cover Shore D
        Hardness of 64 or Less......................................29

    Acushnet's Proposed Construction: Shore D
        Measured on Plaque.........................................30

    Callaway Golf's Proposed Construction: Shore
        D Measured on Cover Layer.............................30

    Nesbitt 30

    Nesbitt discloses no polyurethane outer cover.
        For the two claims that do not require
        polyurethane, Acushnet relies on the
        datasheet hardness for the Surlyn
        disclosed in Nesbitt, but DuPont's
        datasheets do not provide reliable
        disclosures of the inherent hardnesses of
        Surlyn plaques.  [See section VI, ,
        above.]............................................................30

    Nesbitt discloses no polyurethane outer cover.
        For the two claims that do not require
        polyurethane, Acushent relies on the
        plaque hardness from DuPont's
        datasheets, but those datasheets do not
        provide reliable disclosures of the
        inherent hardnesses of Surlyn plaques,
        and therefore cannot be used as the basis
        for estimating the on-the-ball hardness of
        a Surlyn cover layer.  [See section VI,
        above.]............................................................30

    Molitor '751...........................................................30

    Acushnet has cited no evidence of the plaque
        hardness of any cover formulation
        disclosed in Molitor '751...................................30

iii

**TABLE OF CONTENTS (cont'd)**

Page

The on-the-ball Shore C hardness disclosed in Molitor '751 does not inherently disclose a Shore D hardness of 64 or less. [See section IX.C.3, above.] Acushnet's "hybrid" golf balls prove nothing about the intrinsic properties of Molitor '751. [See section VII, above.]..................................................30

Wu       30

Acushnet has cited no evidence of the plaque hardness of any cover formulation disclosed in Wu.................................................................30

A person of ordinary skill in the art would not understand the properties of the Titleist Professional to represent any inherent property of the Wu patent. [See section IX.C.4, above.] Acushnet's "hybrid" golf balls prove nothing about the intrinsic properties of Wu. [See section VII, above.]............................................................30

Molitor '637..................................................................................30

Acushnet has cited no evidence of the plaque hardness of any *foamed* cover formulation disclosed in Molitor '637. [See section IX.C.5, above.] ............................................30

Acushnet's "hybrid" golf balls prove nothing about the intrinsic properties of Molitor '637. [See section VII, above.] Also, in creating hybrid balls with a "Molitor '637" outer cover, Acushnet departed from Molitor's teachings of how thick to make that cover layer. [See section IX.C.5, above.]..................................................30

b.      Even in Combination With Other References, Nesbitt Does Not Inherently Disclose an Inner Cover Layer Having a Shore D Hardness of 60 or More ....................................31

2.     Nesbitt Does Not Incorporate by Reference Any Disclosure of a Blended Low-Acid Ionomer Inner Cover Layer, and Neither Molitor '751 Nor Wu Provides This Disclosure......................................................31

iv

# TABLE OF CONTENTS (cont'd)

**Page**

3.   Nesbitt, in Combination With Molitor '637,
     Teaches Away From an Outer Cover Layer
     Thickness in the Claimed Range...................................................31

X.   SECONDARY CONSIDERATIONS ...................................................................32

A.   There Are at Least Genuine Issues of Material Fact as to
     Whether the Pro V1's Phenomenal Success Is Due, at
     Least in Part, to Its Incorporation of the Patented
     Features.............................................................................................34

     1.   Callaway Golf Can Easily Carry Its Burden to
          Show a Nexus Between the Patented Features
          and the Pro V1's Success. ............................................................35

     2.   Acushnet Has Not Shown By Clear and
          Convincing Evidence That it Can Rebut
          Callaway Golf's Strong Evidence of Nexus.................................36

     3.   Acushnet's Argument The Pro V1 is Not
          "Commensurate in Scope" With the Asserted
          Claims Mischaracterizes the Law. ...............................................37

B.   Acushnet Cannot Ignore the Additional Secondary
     Factors That Weigh in Favor of Non-Obviousness. ...............................39

XI.  CONCLUSION.....................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Advanced Display System, Inc. v. Kent State University*,
212 F.3d 1272 (Fed. Cir. 2000)...................................................................11, 13

*Akzo N.V. v. ITC*,
808 F.2d 1471 (Fed. Cir. 1986)........................................................................32

*Applied Materials, Inc. v. Adv. Semiconductor Materials America, Inc.*,
98 F.3d 1563 (Fed. Cir. 1996)...........................................................................36

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985)..............................................................................6

*Biacore, AB v. Thermo Bioanalysis Corp.*,
79 F. Supp. 2d 422 (D. Del. 1999). ................................................................31

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991)........................................................6, 21, 33, 36

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988), *cert. denied*,
488 U.S. 956 (1988)..............................................................31, 33, 34, 35, 36

*Eaton Corp. v. Parker-Hannifin Corp.*,
292 F. Supp. 2d 555 (D. Del. 2003)..................................................................31

*In re Fenn*,
639 F.2d 762 (C.C.P.A. 1981) .........................................................................37

*Finish Engineering Co. v. Zerpa Industrial, Inc.*,
806 F.2d 1041 (Fed. Cir. 1986)........................................................................39

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997).......................................................................33

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
919 F.2d 720 (Fed. Cir. 1990)..............................................................17, 18, 31

*Graham v. John Deere Co.*,
383 U.S. 1 (1966).............................................................................................6, 31

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
909 F.2d 1464 (Fed. Cir. 1990)............................................................................6

*In re Hollingsworth*,
253 F.2d 238 (C.C.P.A. 1958) .........................................................................37

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

*Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
  802 F.2d 1367 (Fed. Cir. 1986)..................................................................17

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,*
  106 F.3d 1563 (Fed. Cir. 1997)..................................................................33

*Joy Manufacturing, Inc. v. Manbeck,*
  751 F. Supp. 225 (D.D.C. 1990)................................................................37

*Minnesota Mining & Manufacturing Co. v. Johnson & Johnson
  Orthopaedics, Inc.,*
  976 F.2d 1559 (Fed. Cir. 1992)..................................................................38

*Monarch Knitting Machine Corp. v. Sulzer Morat GMBH,*
  139 F.3d 877 (Fed. Cir. 1998)....................................................................6

*In re Rijckaert,*
  9 F.3d 1531 (Fed. Cir. 1993)..........................................................8, 20, 26

*Robotic Vision System, Inc. v. View Engineering, Inc.,*
  189 F.3d 1370 (Fed. Cir. 1999)..................................................................6

*Ruiz v. A.B. Chance Co.,*
  234 F.3d 654 (Fed. Cir. 2000)...................................................................31

*Scripps Clinic & Research Foundation v. Genentech, Inc.,*
  927 F.2d 1565 (Fed. Cir. 1991)........................................................6, 33, 34

*Semiconductor Energy Laboratories Ltd. v. Chi Mei Optoelectronics,*
  485 F. Supp. 2d 1089 (N.D. Cal. 2007) ....................................................23

*In re Sernaker,*
  702 F.2d 989 (Fed. Cir. 1983)...................................................................31

*Simmons Fastener Corp. v. Illinois Tool Works, Inc.,*
  739 F.2d 1573 (Fed. Cir. 1984)..................................................................32

*Stratoflex, Inc. v. Aeroquip Corp.,*
  713 F.2d 1530 (Fed. Cir. 1983)..................................................................32

*Trintec Industrial Inc. v. Top-USA Corp.,*
  295 F.3d 1292 (Fed. Cir. 2002)..................................................................21

*Wesley Jessen Corp. v. Bausch & Lomb, Inc.,*
  209 F. Supp. 2d 348 (D. Del. 2002)......................................................8, 10

*White v. Jeffrey Mining Machinery Co.,*
  723 F.2d 1553 (Fed. Cir. 1983)..................................................................37

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

### STATUTES

35 U.S.C. § 102..........................................................................................................5

35 U.S.C. § 103. .........................................................................................................5

35 U.S.C. § 282...........................................................................................................6

Fed. R. Civ. P. 56(e) .................................................................................................10

Fed. R. Evid. 703 ........................................................................................................9

# I.    INTRODUCTION

Better than any golf ball design in history, Michael Sullivan's patented construction – and the golf balls that embody it, such as the Titleist Pro V1 – attain superior performance by minimizing the trade-offs associated with various aspects of golf ball design. In the prior art, a ball that had good distance typically had to be hard, which reduced controllability, spin, and "feel." Balls with good feel and spin, such as balata-covered balls or two-piece urethane-covered wound balls, achieved those properties at the expense of distance. There was also a need for a ball that, while offering the feel of balata, did not suffer from the poor durability traditionally associated with soft covers.

Like any invention, Sullivan's construction incorporated elements known in the prior art in other contexts, but it was Sullivan who discovered how to combine these elements in a way that achieved extraordinary results that none of his peers could have predicted. Others, in fact, had tried and failed to make multi-layer balls with Sullivan's patented polyurethane-over-ionomer construction.

Since 2000, golf balls that embody Sullivan's design, including Acushnet's infringing Titleist Pro V1, Pro V1x, and Pro V1 Star, have attained overwhelming and unprecedented success. Acushnet's revenues from the infringing products, for example, now exceed $1 billion. Sullivan's invention has been a critical success as well as a commercial one – Golf Magazine recently named the "urethane-covered three piece ball" the most recent of only fourteen "great leaps forward" in golf technology since 1890.

Faced with significant liability for infringement, Acushnet has clung to the hope that the Sullivan patents might be found invalid, but its arguments fall far short of the high standard required for summary judgment. All of the prior art Acushnet relies on was already considered by the Patent Office during the prosecution of the patents-in-suit, and the three examiners who considered the patents-in-suit correctly found that Sullivan's claims were novel and non-obvious over that art. Acushnet even relies on an

incorporation-by-reference argument that the Patent Office summarily rejected in the ongoing *inter partes* reexamination of the patents-in-suit.. Finally, in attempting to rely on the doctrine of inherency to supply disclosures missing from its prior art references, Acushnet cites properties of golf balls that it made for this litigation, despite the fact that these balls did not exist in the prior art, and are not recreations of any ball that did.

Hoping to avoid subjecting its dubious invalidity arguments to the scrutiny of a jury, Acushnet has asked the Court to resolve the matter on summary judgment. Acushnet's evidence, however, is not sufficient to carry its burden of clear and convincing evidence, particularly in the context of summary judgment, where that evidence must be viewed in the light most favorable to the non-moving party. Likewise, Acushnet cannot dispel the genuine issues of material fact regarding (1) what the prior art discloses, (2) whether the benefits of the claimed inventions were predictable, and (3) the strong evidence of secondary considerations of non-obviousness, particularly commercial success.

## II.    SUMMARY OF THE ARGUMENT[1]

1.    Acushnet has not shown invalidity by clear and convincing evidence, nor has it demonstrated the absence of genuine issues of material fact regarding the content of the prior art, the predictability of the benefits the claimed invention achieves, and the many secondary considerations of non-obviousness. On a motion for summary judgment, all evidence must be viewed in the light most favorable to the non-moving party, so Acushnet's purported proof of invalidity – which is questionable in any context

---

[1] This brief focuses upon providing an explanation of record evidence that exists in addition to the report submitted by the expert engaged by Callaway Golf, William M. Risen, Jr.. *See* D.I. 205, Exh. 3 (complete copy of the Risen Expert Report). While Callaway Golf does not burden the record by repeating the extensive analysis set forth in the Risen expert report, that report on its own provides ample facts and opinion to establish the existence of genuine issues of material fact regarding each of the arguments pursued in Acushnet's motion for summary judgment. *See, e.g., id.* at ¶¶ 61-67 (re inherency issues); ¶¶ 68-90 (re anticipation issues); ¶¶ 91-210 (re obviousness and inherency issues); ¶¶ 211-305 (re detailed discussion of objective factors of non-obviousness).

– is not nearly sufficient to permit Acushnet to prevail on its motion for summary judgment of invalidity.

2.    The Nesbitt patent fails to anticipate any of the asserted claims because it does not expressly disclose or incorporate by reference either (a) polyurethane as a cover material or (b) a blend of low-acid ionomers.  Even if Nesbitt did incorporate by reference "polyurethane," generally, that general incorporation would not be specific enough to inherently disclose any particular Shore D hardness – let alone the claimed Shore D hardness – either for a polyurethane "plaque" or a polyurethane golf ball layer. Finally, a DuPont memorandum Acushnet produced only after the close of expert discovery indicates that DuPont's ionomer datasheets cannot be relied on to show the inherent hardness of Nesbitt's inner cover layer.

3.    The Proudfit patent does not anticipate claims 1 and 2 of the '130 patent because it does not inherently disclose an outer cover layer having the required Shore D hardness of 64 or less.  The belatedly produced DuPont memorandum also raises genuine issues of material fact as to whether Proudfit inherently discloses an ionomeric inner cover layer with the required Shore D hardness of 60 or more.

4.    Acushnet cannot show a prima facie case of obviousness based on the combination of Nesbitt or Proudfit with the Molitor '751, Wu, or Molitor '637 patents. None of these latter three references inherently discloses the outer- and inner-cover layer hardnesses that are missing from Nesbitt and Proudfit   Moreover, the combination of Nesbitt and Molitor '637 teaches away from an outer cover layer with a thickness in the claimed range.

5.    Even if Acushnet could demonstrate a prima facie case of obviousness, it cannot ignore or rebut the exceptionally strong evidence of secondary considerations of non-obviousness, especially commercial success.  This evidence must be considered, and must be interpreted in the light most favorable to the non-moving party.

3

6.

REDACTED

## III.    FACTUAL BACKGROUND

In the early 1990's, Michael Sullivan, the most prolific golf ball inventor of all

time, succeeded in constructing a ball that provides distance without sacrificing control,

provides control without sacrificing distance, and provides durability without sacrificing

either distance or control.  Essentially, Sullivan's invention achieves these performance

advantages by employing a polyurethane outer cover and a low-acid ionomer inner cover

over a large core.  [Risen Decl. at ¶ 3.]

Sullivan applied for and eventually obtained four patents on this construction:

U.S. Patents Nos. 6,210,293 ("the '293 patent"), 6,503,156 ("the '156 patent"), 6,506,130

("the '130 patent"), and 6,595,873 ("the '873 patent").  These patents were assigned to

Sullivan's employer, Spalding, who in 2003 sold the assets of its golf ball business,

including the patents-in-suit, to Callaway Golf.[2]

In 2000, defendant Acushnet Co. began selling the Titleist Pro V1, a "premium"

golf ball that features a polyurethane outer cover, an inner cover of a blend of low acid

ionomers, and a large core.  The ball became an immediate and unprecedented success,

earning lavish praise from reviewers and players for its combination of distance, control,

and durability.  Acushnet later released the Titleist Pro V1 Star and Pro V1x, "dual core"

versions of the Pro V1, which also attained exceptional commercial and critical success.

In 2007, Golf Magazine cited the Titleist Pro V1 as an example of the "urethane-covered

---

[2]    Although Callaway Golf purchased the golf ball business at auction, Acushnet
mischaracterizes the process when it describes the assignment of the patents as part of
a bankruptcy auction.  Callaway Golf purchased all of Spalding's golf ball business
and employed most of its employees.  It did much more than merely purchase the
patents-in-suit.

three-piece ball," the most recent of only fourteen "great leaps forward" in golf technology since 1890.    Acushnet's revenues from sales of the Titleist Pro V1 golf balls now exceed $1 billion. [Halkowski Decl. Ex. 1, C. Morfit, "Great Leaps Forward," *Golf Magazine* After lengthy and ultimately unsuccessful licensing negotiations, Callaway Golf filed the present action against Acushnet in 2006, based on Acushnet's infringement of the four Sullivan patents by manufacturing and selling the Titleist Pro V1, Pro V1 Star, and Pro V1x. [D.I. 1.] Acushnet responded by claiming, inter alia, that the patents were not infringed, and were invalid as anticipated under 35 U.S.C. § 102 and obvious under 35 U.S.C. § 103. [D.I. 6.]

Acushnet's anticipation defenses rely on two primary prior art references:  U.S. Patent No. 4,431,193 to Nesbitt and U.S. Patent No. 5,314,187 to Proudfit.  Though Nesbitt, on its face, includes no mention of polyurethane, Acushnet alleges that Nesbitt incorporates by reference U.S. Patent No. 4,274,637 ("Molitor '637"), and thereby discloses the use of polyurethane golf ball covers.  Proudfit likewise lacks any disclosure of polyurethane, but is asserted as anticipatory prior art against '130 claims 1 and 2, the only two asserted claims that do not require polyurethane.  Neither of these references anticipates the asserted claims, however, because Nesbitt does not specifically incorporate any part of Molitor '637 by reference, and both Nesbitt and Proudfit fail to disclose (expressly or inherently) the claimed "Shore D" hardnesses for the inner and outer cover layers.

Acushnet further contends that the asserted claims are invalid as obvious under a combination of either Nesbitt or Proudfit with any of three secondary references that disclose polyurethane as a cover material:  U.S. Patent No. 4,674,751 to Molitor ("Molitor '751"), U.S. Patent No. 5,334,637 to Wu, and the Molitor '637 patent.  Even in combination with these three other patents, Nesbitt and Proudfit still fail to disclose the hardness limitations of the asserted claims.  Moreover, all five of these references were

5

considered by the Patent Office during the prosecution of the patents-in-suit, and Nesbitt, in particular, is discussed in detail in the specification of the patents-in-suit..

Acushnet's obviousness arguments also fly in the face of extraordinarily strong evidence of "secondary considerations of non-obviousness," including the long-felt but unsatisfied need for golf balls that provide the performance of the claimed inventions, the overwhelming commercial success of golf balls that use Sullivan's patented construction, and the extravagant industry praise for those products. Indeed, it is doubtless because of the commercial success of the infringing products that Acushnet continues to practice the patents-in-suit despite clear proof of infringement.

## IV. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT OF INVALIDITY

An issued patent is presumed to be valid. 35 U.S.C. § 282. This presumption can be overcome only by clear and convincing evidence that the conditions for patentability have not been met. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed. Cir. 1999). Because each claim carries this presumption, an invalidity analysis must be conducted on a claim-by-claim basis. *See Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1266-67 (Fed. Cir. 1991). The presumption of validity is especially hard to overcome when the Patent Office considered the allegedly invalidating prior art during prosecution. *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). As the Federal Circuit has stated: "When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

As the party seeking summary judgment, Acushnet bears the burden of demonstrating that there are no genuine issues of material fact. *See Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed. Cir. 1991). In addressing whether a genuine issue of material fact exists, the evidence "must be viewed in the light most favorable to the opponent of the motion," and doubts must be resolved in favor of the non-moving party. *Id.* (citations omitted).

Every obviousness analysis requires an analysis of the scope and content of the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). This analysis cannot be based on hindsight. *Id.* at 664; *see also Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*, 139 F.3d 877, 882 (Fed. Cir. 1998) ("It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve a desired result.") (citation omitted). A reference must be considered for all that it teaches, including aspects that diverge and teach away from the claimed invention at issue. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 (Fed. Cir. 1985). Each of those lessons is appropriate here.

## V.    THE PROPER CONSTRUCTION OF THE TERMS

Concurrently with their summary judgment motions, the parties have submitted *Markman* briefing addressing the constructions of the asserted claims. There are only two terms in dispute:

(1) An "[inner or outer] cover layer having a Shore D hardness" – Acushnet contends that this term refers to the hardness of the cover material formed into a flat, rectangular "plaque" of material. [D.I. 207 at 10-20.] In fact, this term should be construed to refer to the hardness of the cover layer as it exists on the intermediate or finished golf ball, which is the meaning the claims plainly intend by reciting "an [inner or outer] cover layer having a Shore D hardness . . . ." [D.I. 204 at 9-13.]

(2) "Core" – Acushnet seeks to narrow the simple and unambiguous claim term "core" by limiting it to "the *singular* component of the golf ball that occupies the

7

geometric center of the golf ball," which would inappropriately exclude the multi-layer cores described in the specification of the patents-in-suit [D.I. 207 at 20-21.] The term "core" has an ordinary meaning and needs no construction, but if the Court believes the term deserves clarification, the proper construction would be "the foundational part of a golf ball, over which one or more layers may be applied." [D.I. 204 at 13-14, 19.]

Of the two terms in dispute, only "Shore D hardness" relates to the issues raised in Acushnet's motion for summary judgment of invalidity and in this opposition. Even then, as will be shown, under either party's construction of "Shore D hardness," Acushnet cannot demonstrate that it is entitled to judgment as a matter of law or that there are no genuine issues of material fact.

**VI.**

### PROVE NOTHING ABOUT THE INHERENT PROPERTIES OF THE PRIOR ART.

As an initial matter, it is important to point out that each of Acushnet's anticipation and obviousness arguments impermissibly relies at least in part on

REDACTED

---

[3]   In his deposition, Dr. MacKnight was forced to admit that the Nesbitt patent does not, in fact, disclose a  core formulation. [Halkowski Decl. Ex. 2, 08/02/07 William MacKnight Depo. Tr. 41:18-24].

REDACTED

*See Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F. Supp. 2d 348, 393 (D. Del. 2002) (holding that, because samples prepared by expert to show inherent properties of prior art reference deviated from the embodiments disclosed in that reference, they were incompetent as evidence of inherency). Accordingly, Acushnet's anticipation and obviousness arguments based on                    must fail. *See id.*[4]

REDACTED

---

[4]   To rely on inherency in its obviousness arguments, Acushnet must not only show that the prior art possessed the allegedly inherent property, but also that a person of ordinary skill in the art would have recognized that inherency. *See In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) ("That which may be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown.") (quoting *In re Spormann*, 363 F.2d 444, 448 (C.C.P.A. 1966)). Clearly, one could not have known, in 1995,



Evidence submitted in support of a motion for summary judgment must be admissible. Fed. R. Civ. P. 56(e). Accordingly, in each of the anticipation and obviousness arguments Acushnet presents in its motion,

must be disregarded. *See Wesley Jessen*, 209 F. Supp. 2d at 393. At the very least, genuine issues of material fact exist as to whether a person of skill in the art would understand                                        to represent inherent properties of the prior art. For that reason alone, Acushnet's motion for summary judgment of invalidity should be

---

5

denied.  As demonstrated below, however, summary judgment is inappropriate for many other reasons as well.

## VII.    NESBITT DOES NOT ANTICIPATE ANY OF THE ASSERTED CLAIMS.

### A.    Nesbitt Does Not Incorporate by Reference from Molitor '637 the Use of Polyurethane for the Outer Cover Layer.

Because the Nesbitt patent does not provide any mention of polyurethane as a cover material, Acushnet, to show anticipation, has attempted to argue that Nesbitt incorporates by reference the mention of polyurethane in the Molitor '637 patent.[6]  In the ongoing *inter partes* reexamination of the patents-in-suit, the Patent Office has already considered, and rejected this argument; it should fare no better here.

For reasons discussed in more detail in Callaway Golf's pending Motion for Summary Judgment of No Anticipation [D.I 202 at 8-14], and in Callaway Golf's opposition to Acushnet's motion for partial summary judgment of incorporation by reference, Nesbitt's reference to Molitor's use of "foamable compositions" lacks the clarity and specificity required to constitute an incorporation by reference of polyurethane.  *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

Briefly stated, Nesbitt's only reference to Molitor appears in a very narrow and specific context – discussing the possibility of "foaming" the ionomers used in Nesbitt's cover layers.  With no incorporation by reference of polyurethane, Nesbitt cannot anticipate claims 1, 2, 4, or 5 of the '293 patent, claims 1-11 of the '156 patent, claims 4 and 5 of the '130 patent, or claims 1 or 3 of the '873 patent (*i.e.*, all of the asserted claims but for claims 1 and 2 of the '130 patent).

---

[6]    Although Acushnet's brief presents the issue as whether Nesbitt "incorporates Molitor '637 by reference" [D.I. 216 at 24.], Nesbitt clearly does not incorporate Molitor '637 in its entirety.  The parties' dispute focuses on whether Nesbitt incorporates particular parts of Molitor '637 by reference, in particular, Molitor's disclosures of polyurethane and of low-acid ionomer blends.

**B.    Nesbitt Does Not Incorporate by Reference from Molitor '637 the Use of a Blend of Low-Acid Ionomers in the Inner Cover Layer.**

The majority of the asserted claims also require an inner cover layer comprising a blend of two or more low-acid ionomers.  Nesbitt does not disclose the use of a blend of ionomers for any layer.  Accordingly, Acushnet again attempts 'to rely upon incorporation by reference, i.e., that Nesbitt incorporates by reference not only a polyurethane outer cover layer, but also a blend of low-acid ionomers for the inner cover layer.  As with the polyurethane outer cover, Acushnet ignores the rule of *Advanced Display* that requires that the host document "identify with detailed particularity what specific material it incorporates" and "clearly indicate where that material is found in the various documents."  *Advanced Display*, 212 F.3d at 1282.

Although Nesbitt mentions Molitor '637 in the context of discussing foamed ionomers, Nesbitt does not "clearly indicate" any part of Molitor '637 that specifically discloses a blend of low-acid ionomers.  Had Nesbitt wished to incorporate these specific formulations by reference, he could have done so very simply, by "clearly indicating" the Surlyn blend used in Examples 1-4 of Molitor's specification.  Because Nesbitt's reference to Molitor lacks this specificity, Nesbitt cannot incorporate by reference Molitor's disclosure of blended low-acid ionomer covers.  With no incorporation by reference of blended ionomers, Nesbitt cannot anticipate asserted claims 1 and 2 of the '293 patent, claims 1-4 and 6-7 of the '156 patent, claim 1 of the '873 patent, and claims 1, 2 and 4 of the '130 patent (including the only two claims that do not require polyurethane – claims 1 and 2 of the '130 patent).

**C.    Even if Nesbitt Incorporated by Reference the Molitor '637 Patent's Disclosure of Polyurethane, There Would Still Be Genuine Issues of Material Fact as to Whether Nesbitt Inherently Discloses the Claimed Hardnesses.**

Neither Nesbitt nor Molitor '637 discloses any hardness for any material or golf ball layer.  Thus, even if Nesbitt incorporated by reference Molitor's reference to

12

polyurethane, it still would not disclose the hardness limitations of the asserted claims. Acushnet therefore attempts to rely upon the argument that Nesbitt *inherently* discloses the requisite hardnesses for the inner and outer cover layers. As discussed below, that argument fails or, at the very least, presents genuine issues of material fact that preclude summary judgment in Acushnet's favor.

> 1. **Nesbitt Cannot Incorporate by Reference Any *Specific Type* of Polyurethane, and Therefore Does Not Inherently Disclose any Particular Plaque Hardness or On-the-Ball Hardness for a Polyurethane Cover.**

Polyurethane is available in many different formulations, which exhibit varying hardnesses; thus, "polyurethane" has no intrinsic hardness, either as a plaque or as a golf ball cover layer. [Risen Decl. at ¶ 5] Therefore, even if Nesbitt incorporated by reference "polyurethane," generally, that incorporation would not be specific enough to imply any particular Shore D hardness, under either Acushnet's construction of that term (measured on a plaque) or Callaway Golf's construction (measured on the ball).

To try to get around this problem, Acushnet points to a particular type of polyurethane, Estane 58133, that is disclosed in Molitor '637. Even if Nesbitt were found to incorporate by reference Molitor's mention of polyurethane (which it does not), Nesbitt certainly does not "identify with particularity" Estane 58133 or "clearly indicate" where in the Molitor '637' patent this specific type of polyurethane is discussed. Therefore, Nesbitt cannot be read to incorporate by reference Estane 58133 or any other specific type of polyurethane. *See Advanced Display*, 212 F.3d at 1282 (incorporation by reference can be found only when host document "identifies with particularity" material to be incorporated and "clearly indicates" where in the other reference that disclosure appears).

Thus, even if Nesbitt incorporated by reference Molitor '637's disclosure of "polyurethane," that incorporation would be too general to support a finding Nesbitt

13

inherently discloses <u>any</u> particular Shore D hardness for a polyurethane outer cover, and the anticipation argument fails.

      2.    **The Hardness Value Reported in the Estane 58133 Datasheet Discloses a "Plaque" Hardness, Which is Not the Same as the On-the-Ball Hardness Required By the Claims.**

Even if Nesbitt could somehow be found to incorporate by reference a disclosure of Estane 58133, Nesbitt would still fail to anticipate the asserted claims. Under the proper construction of the term "an outer cover layer having a Shore D hardness," the hardness measurement must be of the ***outer cover layer*** itself, not of a "plaque" of the raw material from which that layer is formed. [D.I. 204 at 8-12.] As explained in Callaway Golf's pending Motion for Summary Judgment of No Anticipation, Acushnet's inherency argument fails as a matter of law under Callaway's "on-the-ball" construction. [D.I. 202 at 13-14.] The Estane datasheet to which Acushnet cites reports the hardness of the raw material formed into a rectangular plaque, not the measurement of the on-the-ball hardness of an outer cover layer of the claimed thickness. [D.I. 204 at 15.] Even Acushnet and its experts agree that the plaque hardness of a material is different from the on-the-ball hardness of a cover made of that material, and that there is no way to correlate those two measurements. [D.I.203, Ex. 9, 3/27/07 Jeffrey Dalton Dep. Tr. at 59:7-25; Ex. 8, 8/1/07 Robert Statz Dep. Tr. at 300:7-11; Ex. 1, MacKnight Dep. Tr. at 93:19-94:1; Ex. 7, U.S. Patent No. 6,960,630, col. 10:8-24.]

Accordingly, under the proper claim construction, Acushnet cannot rely on a datasheet to show that the Estane mentioned in Molitor '637 would produce an outer cover layer that, in the claimed thickness, would inherently (that is, *inevitably*) exhibit a Shore D hardness of 64 or less.

3. **The Shore D Hardness of Acushnet's Purported Nesbitt-Molitor '637 Hybrid Golf Ball Does Not Satisfy the Legal Requirements for Inherency.**

Acushnet cannot point to any measurement of "on-the-ball" hardness for a polyurethane outer cover layer in any three-piece prior art golf ball, because no such ball existed in the prior art.  Mike Sullivan was the first person ever to create such a ball, and the patents-in-suit are the recognition of his innovation.

The only "on-the-ball" measurement Acushnet can point to for "Nesbitt, incorporating Molitor '637"



Accordingly, summary judgment is inappropriate for that reason, as well.

15

4.    **A Late-Produced DuPont Memorandum Creates a Genuine Issue of Material Fact as to Whether Nesbitt Inherently Discloses an Inner Cover Layer Having a Shore D Hardness of 60 or More.**

The ionomers disclosed in Nesbitt, and the ionomers that go into the blend disclosed in Molitor '637, are sold by DuPont under the trade name "Surlyn®."  A 1996 DuPont memorandum Acushnet produced *only after the completion of expert depositions in this case*

This document impeaches almost all of the invalidity arguments advanced by Acushnet in its motions for summary judgment (and in its expert reports), and it undermines any basis for summary judgment based on the inherent properties of materials disclosed in  prior art patents.

The document, a memorandum from



The                                    undermines Acushnet's argument that DuPont's datasheets disclose the inherent Shore D hardness of the Surlyn 1605 used in Nesbitt's inner cover layer and of the blend of ionomers disclosed in Molitor '637.  Accordingly,

16

REDACTED

there is now a genuine issue of material fact as to whether any of the disclosed ionomers have an inherent plaque Shore D hardness of 60 or more.

Acushnet has argued that because Surlyn 1605 – disclosed in Nesbitt – has a reported plaque hardness above 60, and because an on-the-ball hardness for a given material is always higher than the plaque hardness of that material, Nesbitt's Surlyn 1605 inner cover would have an "on-the-ball" hardness greater than 60.  But particularly given

it is unclear whether the plaque hardness of Surlyn 1605 is 60 or more, and thus also unclear whether the on-the-ball hardness of Nesbitt's inner cover layer would be 60 or more.  The same can be said for the blend of ionomers from Molitor '637 on which Acushnet attempts to rely for the asserted claims requiring an inner cover layer comprising a blend of ionomers.

## VIII.  PROUDFIT DOES NOT ANTICIPATE CLAIMS 1 OR 2 OF THE '130 PATENT.

Callaway Golf has asserted two claims, claims 1 and 2 of the '130 patent, that do not specifically require polyurethane in the outer cover formulation.  Rather, these claims require that the outer cover comprise "a relatively soft polymeric material selected from the group consisting of non-ionomeric thermoplastic and thermosetting elastomers." Consequently, Acushnet has argued that Proudfit, which discloses a balata or balata-polybutadiene outer cover layer, includes all the limitations of 'those two claims.

As explained in detail in Callaway Golf's pending Motion For Summary Judgment of No Anticipation, Proudfit fails to anticipate claims 1 and 2 of the '130 patent for at least two reasons:  (1) Acushnet cannot show that Proudfit's disclosure of a balata or balata-polybutadiene outer cover layer inherently discloses an outer cover layer having a Shore D hardness of 64 or less; and (2) Acushnet has presented no evidence that the

properties of the Wilson Ultra Tour Balata golf ball represent inherent properties of the Proudfit patent. [D.I. 202 at 19-23.]

## IX. AT THE VERY LEAST, THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER ACUSHNET CAN PRESENT, WITH CLEAR AND CONVINCING EVIDENCE, A PRIMA FACIE CASE OF OBVIOUSNESS.

### A. Merely Transplanting an Element From One Reference Into the Disclosure of Another Reference Does Not Establish Obviousness.

Throughout its brief, Acushnet urges that it would have been obvious to "replace" Nesbitt's ionomer outer cover or Proudfit's balata-blend outer cover with a polyurethane outer cover. [D.I. 216 at 11, 12, 17, 18-19, 21, 22, 31.] In doing so, and ignoring the other elements of the claims, Acushnet impermissibly implies that the mere possibility of mixing-and-matching elements of the prior art makes the claimed inventions obvious. It has long been settled law that what matters is whether the invention *as a whole* would have been obvious to one of skill in the art at the time the invention was made. *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990) (section 103 "requires analysis of the claimed invention as a whole"); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383 n.6 (Fed. Cir. 1986). In *Hybritech*, the Federal Circuit rejected precisely the same "substitution" approach that Acushnet advocates here:

> *Focusing on the obviousness of substitutions and differences instead of on the invention as a whole*, as the district court did in frequently describing the claimed invention as the mere substitution of monoclonal for polyclonal antibodies in a sandwich assay, was a *legally improper* way to simplify the difficult determination of obviousness.

*Id.* at 1383 (emphasis added).

### B. There is Substantial Evidence That the Superior Performance of Sullivan's Invention Was Not the "Predictable Result" of Combining Known Elements.

"An analysis of obviousness of a claimed combination must include consideration of the results achieved by that combination." *Gillette*, 919 F.2d at 725. When the prior

art does not suggest that combining known elements would achieve the claimed invention's "superior properties," that factor weighs in favor of finding the invention non-obvious. *Id.*

Acushnet makes much of the Supreme Court's statement in *KSR* that the obviousness inquiry should consider whether combining known elements in new a way achieves a predictable result. [D. I. 216 at 11-12.] Accordingly, Acushnet's brief repeats the mantra that Sullivan's claims do nothing more than combine elements known in the prior art to achieve a "predictable result." [Id. at 5, 12.] In mentioning "predictable results," however, *KSR* did not effect a sea change in the law – it simply stated the corollary to the well-established rule that when superior results were ***not predictable***, that factor favors a finding of patentability. *See Gillette*, 919 F.2d at 725.

In this case, there is ample evidence to create at least a genuine issue of material fact as to whether it was "predictable" that combining a polyurethane outer cover and a low-acid ionomer inner cover blend in a multi-layer ball (using the thicknesses and hardnesses specified by the claims) would achieve the indisputably superior results achieved by Sullivan's invention. Chris Cavallaro, a senior product development manager at Acushnet and a named inventor on dozens of Acushnet's golf ball patents, confirmed that golf ball design is not a predictable art:

> Q.  . . . In your experience as a golf ball designer, is golf ball design a predictable discipline?
> A.  In my opinion, no.
> Q.  What do you mean by that?
> A.  Because just changing one particular material – one material may perform differently than another material, totally out of the realm of the design that you're looking to achieve.

[Halkowski Decl. Ex. 4, 4/18/07 Chris Cavallaro Depo. Tr. at 188:5-13.]

Dean Snell, one of the developers of the Titleist Pro V1, testified that in 1996, when Acushnet began the "Veneer" project (the multi-layer golf ball project from which the Pro V1 emerged), there was no certainty that a polyurethane outer cover would

19

achieve the desired performance goals, and that other materials were also under consideration:

> Q.    When the Veneer project began, was one of the objectives of the project to use a urethane cover specifically or were other candidates under consideration?
>
> A.    There were other covers and ways under consideration as well.
>
> Q.    When the Veneer project began, it wasn't clear from the outset that urethane was going to achieve the performance goals you wanted?
>
> A.    When something begins, it's never clear.

[Halkowski Decl., Ex.5, 4/05/07 Dean Snell Depo. Tr. at 36:22-37:6.]

Acushnet's expert, Dr. Statz, testified that it was not possible to predict the optimum thickness for a golf ball layer of a given composition:

> Q.    . . . Why wouldn't it be clear, knowing the material and the thickness, whether you would get the advantage of having a soft outer cover layer at all?
>
> A.    Without doing the experiments, you have a thin layer on – on this fairly hard, stiff material that's underneath.  The club sees -- a pitching wedge or something like that, sees a cover material that's soft  and flexible and you get high spin on the ball.
>
> Q.    Okay.
>
> A.    So what is the optimum thickness for that layer?  Without doing the experiments, you can't tell.

[Halkowski Decl., Ex.6, 08/01/07 Robert Statz Depo. Tr. at 344:10-24.]

Therefore, there is at least a dispute of fact – based on the admissions of Acushnet's own witnesses and experts – over whether the advantages conferred by utilizing the particular materials, hardnesses, and thicknesses recited in the asserted claims would have been "predictable" to a person of skill in the art at the time the invention was made.

REDACTED

C.    **There Are Genuine Issues of Material Fact as to What the Proudfit Patent Discloses, Both Alone and in Combination With Other References.**

Like Nesbitt, Proudfit fails to expressly disclose a Shore D hardness for any material, either as measured on a plaque or as a cover layer measured on the golf ball. Acushnet attempts to fill in this missing limitation through inherency, but Acushnet cannot show, even for a single combination of references, that this limitation would be present and that a person of skill in the art would know it to be present. *See In re Rijckaert*, 9 F.3d 1531, 1584 (Fed. Cir. 1993) ("Obviousness cannot be predicated on what is unknown.").

1.    **Proudfit Does Not Inherently Disclose an Outer-Cover Shore D Hardness of 64 or Less.**

As discussed above (section VIII) and in Callaway Golf's pending Motion For Summary Judgment of No Anticipation [D.I. 202 at 19-23], Acushnet has presented no evidence that Proudfit discloses an outer cover layer having a Shore D hardness of 64 or less. Thus, in any obviousness combination based on Proudfit, this limitation must be included in some other reference.

2.    **There Is at Least a Genuine Issue of Fact as to Whether Proudfit Discloses an Inner-Cover Shore D Hardness of 60 or More.**

As it does for the Nesbitt patent, Acushnet attempts to rely on DuPont datasheets as the basis for its argument that Proudfit's blended ionomer inner cover would have a plaque Shore D hardness of 60 or more, and that, therefore, the on-the-ball hardness of a cover made from this blend would also be 60 or more.

The                                                    discussed in detail above (section VII.C.4), introduces a genuine issue of material fact as to whether DuPont's datasheets provide reliable information regarding the plaque hardnesses of the ionomers in Proudfit's inner-cover blend. That puts at issue whether the reported plaque hardnesses are reliable, and consequently, because Acushnet's only evidence of the inherent on-the-ball hardness

21

of Proudfit's inner cover blend is based on the plaque hardness of that blend, the on-the-ball hardness of Proudfit's blend has likewise become a genuine issue of material fact.

### 3.    The Combination of Proudfit and Molitor '751 Fails to Disclose an Outer Cover Shore D Hardness of 64 or Less.

Neither Proudfit nor Molitor '751, separately or in combination with each other, teaches a golf ball in which an outer cover, disposed over an inner cover layer and a core, exhibits a Shore D hardness of 64 or less. Because Proudfit discloses no hardness for any composition or ball layer, Acushnet relies on the '751 patent for its disclosure of a two-piece ball (that is, a ball with a single-layer cover) in which the cover has a **Shore C** hardness of 72. Shore C hardness is different from Shore D hardness. Recognizing that the '751 patent lacks any express disclosure of Shore D hardness, Acushnet contends that the '751 patent inherently discloses a cover having an on-the-ball Shore D hardness of 64 or less because a Shore C hardness of 72 necessarily equates to a Shore D hardness of 64 or less.[7]

Inherency, however, cannot be proved by "possibilities or probabilities." *Trintec Indus. Inc. v. Top-USA Corp.*, 295 F.3d 1292, 1297 (Fed. Cir. 2002); *Continental Can*, 948 F.2d at 1268-69. To prevail on this obviousness argument, Acushnet must show clear and convincing evidence that a sample with a Shore C hardness of 72 *necessarily* has a Shore D hardness of 64 or less. *Trintec*, 295 F.3d at 1295.

Acushnet cannot meet this burden, particularly on summary judgment, when factual inferences must be drawn in Callaway Golf's favor. As discussed below, all available evidence, including the documents Acushnet relies on for its conversions and the testimony of Acushnet's own witnesses, establishes that a Shore C value cannot be translated into a Shore D value with the certainty required to show inherency. Thus,

---

[7]    Acushnet has cited no evidence of what the plaque Shore D hardness would be for any outer cover material disclosed by Proudfit (balata or a balata-polybutadiene blend) or any urethane cover formulation disclosed by Molitor '751. [D.I. 202 at 21, citing Statz Depo. Tr. at 277:17-278:5.]

22

there is a genuine dispute as to whether a person of ordinary skill would interpret Molitor's disclosure of a polyurethane cover having an on-the-ball Shore C hardness of 72 to necessarily disclose a cover having an on-the-ball Shore D hardness of 64 or less, based on the testimony of Acushnet's own witnesses.

> **a.** **The Same Documents Acushnet Relies on To Translate Shore C to Shore D Expressly Caution That They Are Not, And Cannot Be Used As, Conversion Charts.**

Acushnet claims that "[t]here are many tools available to obtain accurate ranges of correlation between Shore C hardness measurements and Shore D measurements," and that "[a]ll of these tools make clear that a Shore C hardness between 72 and 76 would fall well under 64 on the Shore D scale." [D.I. 216 at 19.] Acushnet, however, cites only two such "tools," both of which, though styled as "comparison charts," expressly caution against using them as <u>conversion</u> charts.[8]

First, Acushnet' relies on a chart provided in the ASTM D-2240 specification, a publication that outlines a method for obtaining Shore D values from a sample of a standard size, shape, and thickness. The chart plainly states: "This is not and cannot be used as a conversion reference."

**NOTE 2—Durometer scale comparison chart only. This is not and cannot be used as a conversion reference.**

```
Type A                    10 20 30 40 50 60 70 80 90 100
Type B                       10 20 30 40 50 60 70 80 90 100
Type C                    10    20 30   40   50 60 70 80 90 100
Type D                       10       20    30 40 50 60 60 70 80 90 100
Type DO               10  20  30   40  50  60   70  80  90  100
Type O         10 20 30 40 50 60 70 80 90 100
Type OO 10 20 30 40 50 60 70 80    90       100
```

[D.I. 216 Ex. 27.]

---

[8] Acushnet claims it relies on these charts for "correlations," not "conversions" – which, of course, is a distinction without a difference. [D.I. 216 at 20.] Acushnet cannot dispute that it is using these charts in a manner the charts themselves unambiguously discourage.

Second, Acushnet relies on the "Rex Gauge" chart to support its argument that Shore C values can be translated into Shore D values. The Rex Gauge chart is substantially identical to the one in the D-2240 standard, and it contains the same explicit warning, this time with underscores for emphasis: "This is <u>not</u> and <u>cannot</u> be used as a conversion chart."

**Comparison Chart** *This chart is for comparison purposes only. This is not and cannot be used as a conversion chart.*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | | 10 | 20 | 30 40 50 60 | 70 80 90 | 100 | | | | |
| B | | | 10 20 30 40 50 60 | 70 80 90 100 | | | | | | |
| C | | | 10 | 20 30 40 | 50 60 70 80 90 100 | | | | | |
| D | | | | 10 | 20 | 30 40 50 60 70 80 90 100 | | | | |
| DO | | | 10 20 30 40 | 50 60 | 70 | 80 90 100 | | | | |
| O | | 10 20 30 40 50 60 70 80 | 90 100 | | | | | | | |
| OO | 10 20 30 40 50 60 70 80 | 90 | 100 | | | | | | | |
| M | | 30 40 50 60 70 80 90 | | | | | | | | |

[D.I. 216 at 19.][9]

Despite that each chart expressly cautions that it cannot be used as a conversion reference, that is precisely what Acushnet would have this Court do. Given the unequivocal warnings against interpreting the charts in this manner, there is at least a genuine issue of material fact as to whether a person of ordinary skill in the art would

---

[9]   In the excerpt Acushnet cites from the '873 prosecution history, Spalding's attorney remarked only that "[a] Shore C of 65 converts to a Shore D of less than 64, approximately 40 to 50." [D.I. 217, Ex. 55 at 3.] Callaway Golf is not disputing its attorney's observation that, generally, the Shore D value measured on a given sample is less than the Shore C value measured from that sample (i.e., that a sample with a Shore C of 65 would have a Shore D that is at least one unit lower). What Acushnet must prove here is considerably different – Acushnet must show with clear and convincing evidence that a sample with a Shore C hardness of *72* will not merely normally, but *always*, have a Shore D hardness of 64 or less. *See Semiconductor Energy Lab. Ltd. v. Chi Mei Optoelectronics*, 485 F. Supp. 2d 1089, 1112 (N.D. Cal. 2007) (evidence that element was "normally present" was insufficient to show it was always present, and thus inherent, in prior art).

infer from these charts that a sample with a Shore C hardness of 72 would necessarily exhibit a Shore D hardness of 64 or less.

>    **b.    Acushnet's Own Witnesses Have Confirmed That Accurate and Reliable Conversion Between Shore C and Shore D Is Impossible.**

Acushnet's expert witness, Dr. Statz, confirmed that a Shore C-to-Shore D conversion is, at best, a "rule of thumb":

>    Q.    So you can't really say that a specific Shore C value translates into a specific Shore D value, can you?
>    A.    Oh, no. Not – it's a rule of thumb. Okay. It's not an exact extrapolation. It's not an exact conversion.

[Halkowski Decl., Ex. 6, Statz Tr. at 242:9-14.]

Acushnet's other technical expert, Dr. MacKnight, testified that it would be "dangerous" to estimate a Shore D measurement from a Shore C measurement:

>    Q.    If you wanted to know what the Shore C measurement for any of these hardness results would be, could that be accurately derived from the Shore D measurements?
>    A.    Actually, I don't think -- there is, of course, an overlap in the scales, the Shore A and the Shore C and the Shore D. And there's even a little diagram in the ASTM description of how the tests are conducted which show that. **But it would be a dangerous thing, I think, to take a table like that and estimate the Shore C based on what the Shore D is.** You could do it, and it probably wouldn't be terribly inaccurate, but I would hesitate to do it.
>    Q.    Do you have any notion of how accurate or inaccurate a Shore D to Shore C conversion might be, or Shore C to Shore D?
>    A.    Not really, no.

[Halkowski Decl. Ex. 2, MacKnight Tr. at 114:4-21 (emphasis added).]

David Bulpett, the manager of Acushnet's analytical laboratory, explained that he did not even consider it possible to "convert" between a Shore C and Shore D measurement:

>    Q.    Have you ever tried to convert a Shore D measurement into a Shore C measurement, or vice versa?

| | |
|---|---|
| A. | I think "convert" is a strong word that I'm not comfortable using. |
| Q. | Why does that make you uncomfortable? |
| A. | "Conversion," to me, means having two scales where one can look up a single, well-accepted conversion factor; for instance, English to metric units of measure or what have you. There's no debate about what the conversion factor is. That's a conversion. <u>One cannot go that far when talking about hardness measurements.</u> |
| Q. | Because in hardness measurements there is no single conversion factor between C and D? |
| A. | That's correct. It's material-dependent. If you're talking about the values generated after testing a sample, that is material-dependent. |

[Halkowski Decl., Ex.7, 05/25/07 David Bulpett Depo. Tr. at 57:11-58:4 (emphasis added).]

Thus, there is at the very least a genuine issue of material fact as to whether a person of ordinary skill in the art would interpret the '751 patent's disclosure of a cover having a Shore C hardness of 72 as necessarily having a Shore D hardness of 64 or less.

### 4. The Combination of Proudfit and Wu Fails to Disclose an Outer Cover Shore D Hardness of 64 or Less.

Neither Proudfit nor Wu, separately or in combination with each other, teaches a golf ball in which an outer cover, disposed over an inner cover layer and a core, exhibits a Shore D hardness of 64 or less. Because neither Proudfit nor Wu discloses a hardness for any composition or ball layer, Acushnet attempts to argue that Wu inherently discloses a cover with a Shore D hardness of 64 or less. In an attempt to maintain its inherency argument, Acushnet asks the Court

[D.I. 216 at 21.] As its sole evidence of any relationship between the Wu patent and the



REDACTED

described in example 1 of the Wu patent had a Shore D hardness of about 58 Shore D when tested according to ASTM standards on the cover of a ball." [*Id.* at 21-22.][10]

Acushnet's attempt to prove the inherent disclosure of the Wu patent by a testimonial reference to                          runs afoul of the rule that, to rely on inherency in an obviousness argument, it is not enough for a defendant to show that the allegedly inherent claim limitation was necessarily present in the prior art – the defendant must also show that a person of ordinary skill in the art would have known that property to be inherent to that reference. *Rijckaert*, 9 F.3d at 1534. There is no mention of the                          in the Wu patent; hence, nothing in the Wu patent would lead a person of skill in the art to understand that any particular polyurethane formulation discussed in Wu's patent was embodied in the                          Conversely, there is no evidence that one of skill in the art would have understood the hardness of a                          to represent the inherent hardness of a cover made from one of Wu's polyurethane compositions.

This case, therefore, is one in which an infringer is impermissibly attempting to relying on "a retrospective view of inherency" based on observations made in the context of litigation rather than properties known by persons of skill in the art at the time the invention was made. *See id.* At the very least, there exists a genuine issue of material fact as to whether Wu, either alone or in combination with Proudfit, inherently discloses a cover with a Shore D hardness of 64 or less.

### 5.    The Combination of Proudfit and Molitor '637 Fails to Disclose an Outer Cover Shore D Hardness of 64 or Less.

Because neither Proudfit nor Molitor '637 includes any disclosure of Shore D hardness for any composition, either as a plaque or a golf ball layer, Acushnet argues that

---

[10]    Acushnet has cited no evidence of what the plaque Shore D hardness would be for any outer cover material disclosed by Proudfit (balata or balata-polybutadiene blend) or any urethane cover formulation disclosed by Wu. [D.I. 202 at 21, citing Statz Dep. Tr. at 277:17-278:5.]

the '637 patent's disclosure of an Estane 58133 polyurethane cover inherently discloses a cover with a Shore D hardness of 64 or less.

Acushnet's argument fails under either party's construction of "Shore D hardness." Under Acushnet's proposed "on the plaque" construction, Acushnet has cited no evidence of what the plaque Shore D hardness would be for any outer cover material disclosed by Proudfit or any foamed urethane cover formulation disclosed in Molitor '637. Although Acushnet relies on the plaque Shore D hardness reported in the Estane 58133 datasheet, all of the golf ball covers disclosed in Molitor '637 are foamed. [D.I. 202 at 12, citing MacKnight Dep. Tr. at 68:3-14.] The Estane datasheet provides a plaque hardness for unfoamed Estane. [Risen Decl. at ¶ 7] The Shore D hardness measured on a foamed plaque would be different than the Shore D hardness measured on an unfoamed plaque. [Risen Decl. at ¶ 7.]

Under the correct "on the ball" construction, the only evidence Acushnet offers regarding the on-the-ball hardness of Molitor's Estane cover is

One additional consideration further distances                with a "Molitor '637" outer cover from what Molitor '637 actually discloses. As discussed above, all of the covers described in Molitor '637 are "foamed," that is, they contain pockets of air. [See D.I. 202 at 12, citing MacKnight Dep. Tr. at 68:3-14.] Molitor '637 discloses that injection-molded covers less than 0.060 inches thick cannot achieve "functional foaming." [D.I. 203, Ex. 2, ('637 patent) col. 5:3-7.] Despite this admonition,

**D.    There Are Genuine Issues of Material Fact as to What Nesbitt Discloses, Both Alone and in Combination With Other References.**

Like Proudfit, Nesbitt fails to disclose any Shore D hardness for any material or golf ball cover layer.  Just as Acushnet's obviousness combinations based on Proudfit fail to provide this missing disclosure, the combinations based on Nesbitt fail for the same reasons.

**a.    The Combination of Nesbitt with Molitor '751, Wu or Molitor '637 Fails to Disclose an Outer Cover Shore D Hardness of 64 or Less.**

The following chart summarizes why, under either party's construction of "Shore D hardness," the Nesbitt, Molitor '751, Wu, and Molitor '637 patents lack any inherent disclosure of an outer cover layer having a Shore D hardness of 64 or less.  These summaries are discussed in greater detail elsewhere in this brief, in the sections regarding no anticipation by Nesbitt (section VII) and no obviousness by combinations of Proudfit with Molitor '751, Wu, and Molitor '637 (section IX.C).

|  | Acushnet's Proposed Construction: Shore D Measured on Plaque | Callaway Golf's Proposed Construction: Shore D Measured on Cover Layer |
|---|---|---|
| **Nesbitt** | Nesbitt discloses no polyurethane outer cover. For the two claims that do not require polyurethane, Acushnet relies on the datasheet hardness for the Surlyn disclosed in Nesbitt, but DuPont's datasheets do not provide reliable disclosures of the inherent hardnesses of Surlyn plaques. [See section VI, , above.] | Nesbitt discloses no polyurethane outer cover. For the two claims that do not require polyurethane, Acushent relies on the plaque hardness from DuPont's datasheets, but those datasheets do not provide reliable disclosures of the inherent hardnesses of Surlyn plaques, and therefore cannot be used as the basis for estimating the on-the-ball hardness of a Surlyn cover layer. [See section VI, above.] |
| **Molitor '751** | Acushnet has cited no evidence of the plaque hardness of any cover formulation disclosed in Molitor '751. | The on-the-ball Shore C hardness disclosed in Molitor '751 does not inherently disclose a Shore D hardness of 64 or less. [See section IX.C.3, above.]<br><br>prove nothing about the intrinsic properties of Molitor '751. [See section VII, above.] |
| **Wu** | Acushnet has cited no evidence of the plaque hardness of any cover formulation disclosed in Wu. | A person of ordinary skill in the art would not understand the properties of the Titleist Professional to represent any inherent property of the Wu patent. [See section IX.C.4, above.]<br><br>prove nothing about the intrinsic properties of Wu. [See section VII, above.] |
| **Molitor '637** | Acushnet has cited no evidence of the plaque hardness of any *foamed* cover formulation disclosed in Molitor '637. [See section IX.C.5, above.] | prove nothing about the intrinsic properties of Molitor '637. [See section VII, above.]<br><br>Acushnet departed from Molitor's teachings of how thick to make that cover layer. [See section IX.C.5, above.] |



b.    **Even in Combination With Other References, Nesbitt Does Not Inherently Disclose an Inner Cover Layer Having a Shore D Hardness of 60 or More**

Molitor '637 and Wu do not contemplate a ball having an "inner cover layer," and Molitor '751, although it mentions in passing that such balls are possible, does not suggest what such a layer might be composed of or what properties it might have. Thus, in any obviousness combination based on Nesbitt, the Nesbitt patent is the only reference that could provide any inherent disclosure of inner-cover hardness. However, as discussed above, the belatedly produced Hagman memorandum casts doubt on whether DuPont's datasheets, upon which Acushnet relies, accurately disclose the inherent Shore D hardness of Proudfit's and Nesbitt's inner cover layers (under either party's construction of "Shore D hardness").

2.    **Nesbitt Does Not Incorporate by Reference Any Disclosure of a Blended Low-Acid Ionomer Inner Cover Layer, and Neither Molitor '751 Nor Wu Provides This Disclosure.**

Neither Nesbitt, nor Wu, nor Molitor '751 discloses a cover comprising a blend of low-acid ionomers. Thus, Nesbitt, in combination with either Wu or Molitor '751, cannot render obvious any of the claims that require that the inner cover layer comprise such a blend: claims 1-2 of the '293 patent; claims 1-7 of the '156 patent; claims 1, 2, and 4 of the '130 patent; and claim 1 of the '873 patent.

3.    **Nesbitt, in Combination With Molitor '637, Teaches Away From an Outer Cover Layer Thickness in the Claimed Range.**

Nesbitt states that the outer cover layer "may be in a range of 0.020 to 0.100 inches. [D.I. 203, Ex. 3, ('193 patent) col. 3:24-25.] The Molitor '637 patent suggests that, regardless of what the cover layer is made of, it should be 0.090 to 0.125 inches thick. [*Id.* Ex. 2, ('637 patent) col. 4:61-5:12.] Reading these references together, one of skill in the art would be led away from creating an outer cover layer with a thickness in the claimed range of 0.010 to 0.070 inches, and would instead be led to make an outer

cover layer with a thickness in the range where the disclosures of Nesbitt and Molitor overlap: 0.090 to 0.100 inches. [Risen Decl. at ¶ 6.]

Thus, the combination of Nesbitt and Molitor '637 cannot render obvious any claim that includes the limitation of an outer cover having a thickness between 0.010 and 0.070 inches: such as claims 1-2 of the '293 patent; claims 1-11 of the '156 patent; claim 2 of the '130 patent; and claims 1 and 3 of the '873 patent.

## X.    SECONDARY CONSIDERATIONS

By arguing that "secondary considerations need not be considered in this case," and that the Court "need not consider the commercial success evidence at all" (A. Br. at 34-35), Acushnet contradicts the law and invites reversible error. "[A]n analysis of obviousness must address objective evidence of nonobvoiusness, if any." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)); *see also Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (district court erred by failing to consider evidence of secondary considerations). Only after all evidence of nonobviousness has been considered can a conclusion on obviousness be reached. *Gillette*, 919 F.2d at 725; *Biacore, AB v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 464 (D. Del. 1999). Even if a challenger's prima facie case of obviousness is made and not fully rebutted, the court cannot ignore secondary considerations of non-obviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 956 (1988). Moreover, secondary considerations require a finding of nonobviousness "if the matter be otherwise doubtful." *Eaton Corp. v. Parker-Hannifin Corp.*, 292 F. Supp. 2d 555, 577 (D. Del. 2003) (quoting *In re Sernaker*, 702 F.2d 989, 996 (Fed. Cir. 1983)).

In *Stratoflex, Inc. v. Aeroquip Corp.*, the Federal Circuit emphasized the critical role secondary considerations play in any consideration of obviousness:

> [E]vidence rising out of the so-called "secondary considerations"
> must always when present be considered en route to a
> determination of obviousness. [Citations omitted.] Indeed,



> *evidence of secondary considerations may often be the most*
> *probative and cogent evidence in the record*. It may often
> establish that an invention appearing to have been obvious in light
> of the prior art was not.  It is to be considered as part of all the
> evidence, not just when the decisionmaker remains in doubt after
> reviewing the art.

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

In its recent *KSR* decision, the Supreme Court confirmed its holding in *Graham* that secondary considerations of non-obviousness are an integral part of any obviousness analysis.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. –, 127 S. Ct. 1727, 1734 (2007). *Graham*, the Court wrote, "continues to define the inquiry that controls" the determination of patentability under Section 103.  *Id.*

Acushnet has good reason to try to divert attention from secondary considerations – where (as here) the evidence of secondary considerations, particularly commercial success, is "extremely strong," it is "entitled to great weight."  *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed. Cir. 1984); *see also Akzo N.V. v. ITC*, 808 F.2d 1471, 1481 (Fed. Cir. 1986) (commercial success is "a strong factor favoring nonobviousness").  Acushnet's infringing Titleist Pro V1 golf balls have been a phenomenal success; Acushnet's revenues from these products                    The Pro V1 has earned extravagant praise from the industry, including one reviewer's opinion that the Pro V1 "changed golf as we know it."  [Halkowski Decl., Ex. 15 (AC89543).] Golf Magazine named the "urethane covered three-piece ball," as exemplified by the Titleist Pro V1, the most recent of only fourteen "great leaps forward" in golf technology since 1890. [Halkowski Decl., Ex. 1, C. Morfit, "Great Leaps Forward," *Golf Magazine]* Thus, Acushnet cannot be more wrong when it argues that this is a case in which secondary considerations "should be given little if no weight." [D.I. 216 at 6.]  On the contrary, if there were ever a case when secondary considerations are strong enough to overcome a prima facie showing of obviousness, this is it.  Here, Acushnet's weak arguments of obviousness, all of which rely on insufficient evidence of inherency, are

rebutted by overwhelming commercial success directly related to the patented features; unprecedented industry praise; and compelling evidence that others had tried and failed to make the claimed invention.

### A.    There Are at Least Genuine Issues of Material Fact as to Whether the Pro V1's Phenomenal Success Is Due, at Least in Part, to Its Incorporation of the Patented Features.

The secondary consideration of "commercial success" can be shown by evidence of the success of an infringing product. *See Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997). In this case, it is not seriously contested that the accused Titleist Pro V1, Pro V1x, and Pro V1 Star golf balls do, in fact, infringe, but even if it were, the Court, in considering Acushnet's motion for summary judgment of invalidity, would have to draw the factual inference of infringement in Callaway Golf's favor. *See Scripps*, 927 F.2d at 1571.

"If a patentee makes the requisite showing of nexus between commercial success and the patented invention, *the burden shifts to the challenger to prove that the commercial success is instead due to other factors* extraneous to the patented invention, such as advertising or superior workmanship." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (emphasis added). "A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is *not* due to factors other than the patented invention." *Demaco*, 851 F.2d at 1394 (emphasis in original).

Thus, to make a prima facie showing of "nexus" between the Pro V1's commercial success and its incorporation of the patented features, Callaway Golf does not have to show that those features are the only reason for the Pro V1's success. *See id.*; *see also Continental Can*, 948 F.2d at 1273 ("It is not necessary, however, that the patented invention be solely responsible for the commercial success . . . ."). Once Callaway Golf establishes facts sufficient to permit an inference of nexus, the burden shifts to Acushnet

to show that, in fact, the success of the Pro V1 is **not** attributable to the use of the patented construction. *See Demaco*, 851 F.2d. at 1392-93.

In this case, Callaway Golf can easily show a nexus between the patented features and the accused products' success. Acushnet, on the other hand, cannot meet its burden to show that the patented features are **not** responsible for the Pro V1's success, particularly in the context of summary judgment, when the facts must be viewed in the light most favorable to the non-moving party. *Scripps*, 927 F.2d at 1571.

1.    **Callaway Golf Can Easily Carry Its Burden to Show a Nexus Between the Patented Features and the Pro V1's Success.**

Callaway Golf's case for nexus is simple and powerful. In the Pro V1, the infringing urethane-over-ionomer multi-layer construction results in superior performance, and this superior performance is directly responsible for the Pro V1's success.

The patented construction – and any golf ball that embodies it, such as the Titleist Pro V1 – achieves its performance advantages by minimizing the trade-offs associated with various aspects of golf ball design. [Risen 2nd Decl. at ¶ 3.] Essentially, the invention solves three interrelated problems. first, attaining good distance without sacrificing controllability, spin, and "feel"; second, providing good feel and spin without sacrificing distance; and third, providing the feel and control of a balata cover without sacrificing durability. [*Id* at ¶ 3.]

REDACTED

By incorporating the patented design, the Pro V1 achieves the performance advantages that design provides, and it is those characteristics that have made the Pro V1 a success. Mr. Morgan recently stated in a sworn declaration that "[t]he reason for the success of the Titleist Pro V1 beginning in 2000 is that like no other ball before it, Pro V1

delivered the combined attributes of long distance off the tee with soft feel and control into the green." [Halkowski Decl., Ex.8 (Morgan Bridgestone Decl.) ¶ 73.] Similarly, Jerry Bellis, Acushnet's Vice-President of Sales and Marketing, has stated that the Pro V1 "provides outstanding distance, durability, not-too-much sidespin [and] 'drop and stop' control better than any other ball for average golfers, just like it does for the Tour Pros." [Halkowski Decl., Ex. 9 (Bellis Bridgestone Decl.) ¶ 74.]

Not surprisingly, Acushnet's advertising emphasizes that the inclusion of a urethane outer cover and an ionomer inner cover enhances performance. Specifically, Acushnet has touted both the "high performance soft and thin urethane elastomer cover" of the Pro V1 as well as its "speed enhancing, spin controlling ionomer casing." [Halkowski Decl. Ex. 10, at AC127693-95.]

Viewed in the light most favorable to Callaway Golf, this evidence shows that Callaway Golf can demonstrate a prima facie case of nexus, shifting the burden to Acushnet to show that the patented features are **not** responsible for the Pro V1's success. *See Demaco*, 851 F.2d at 1394.

### 2.   Acushnet Has Not Shown By Clear and Convincing Evidence That it Can Rebut Callaway Golf's Strong Evidence of Nexus.

Acushnet cannot show – particularly in the context of summary judgment, where the evidence must be viewed in the light most favorable to the non-moving party – that the incorporation of the patented features is in no way responsible for the success of the Titleist Pro V1. Acushnet, in fact, cites no evidence suggesting that the patented features *do not* contribute to the Pro V1's success. Acushnet merely raises the possibility that marketing; or brand recognition; or "market forces"; or improvements in golfers' physical strength; or square-grooved clubs; or Tiger Woods' switch from the Titleist Professional to a Nike ball; or other, unidentified aspects of the Pro V1's construction, have also increased sales of the Pro V1 balls. [D.I. 216 at 36-40.] Even assuming, for the sake of argument, that all of these factors have contributed to the success of the Pro V1, none

shows what Acushnet is obligated to prove – that the patented features are not in any way responsible for the Pro V1's success. *See Continental Can*, 948 F.2d at 1273; *Demaco*, 851 F.2d at 1394.

Moreover when Acushnet argues that its advertising has contributed to the commercial success of the Pro V1, it is important to consider that the construction of the ball – in fact, the same elements claimed by the patents-in-suit – has been the subject of that advertising. [*See* Halkowski Decl., Ex. 10 AC127693-95 (discussed in section X.A.1, above.] Also, because the performance of a golf ball is dictated by its construction, Acushnet advertising that emphasizes the Pro V1's performance is promoting the benefits derived from the patents-in-suit.

### 3. Acushnet's Argument The Pro V1 is Not "Commensurate in Scope" With the Asserted Claims Mischaracterizes the Law.

Acushnet argues, incorrectly, that "the scope of the claims of the patents-in-suit are simply not commensurate with the successful products in the market," and that therefore, that the commercial success of the Pro V1 cannot be associated with the asserted claims. [D.I. 216 at 37-38.] Specifically, Acushnet urges that the patents "claim broad general ranges" for thickness, and that the Pro V1 represents only one possible construction within that range. [*Id.*]

Acushnet's argument ignores the law. "[A] patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on the success in the marketplace of the embodiment that was commercialized." *Applied Materials, Inc. v. Adv. Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1570 (Fed. Cir. 1996). In *Applied Materials*, the Federal Circuit reiterated the long-standing rule that:

> [I]f evidence as to commercial success is to be persuasive it must
> appear that such success resulted from the invention as claimed,
> but that principle does not necessarily require that, when a
> particular range is claimed, there must have been successful
> commercial operation at every point in the range.

*In re Hollingsworth*, 253 F.2d 238, 240-241 (C.C.P.A. 1958).

The cases Acushnet relies on are inapposite. Significantly, none was decided in the context of a motion for summary judgment of invalidity.

In *Joy Manufacturing*, the court found, after a bench trial, that the "main reason" for the commercial success of an embodying product was a feature not recited in the claims. *Joy Mfg., Inc. v. Manbeck*, 751 F. Supp. 225, 231 (D.D.C. 1990). Here, there is at least a genuine issue of material fact – which, on summary judgment, must be inferred in Callaway Golf's favor – as to whether the claimed features are not, in any way, responsible for the Pro V1's success. [*See* section X.A.1, above (regarding evidence of nexus) and section X.A.2, above (discussing Acushnet's failure to rebut showing of nexus).]

In *White*, the Federal Circuit reversed a jury verdict of non-obviousness because the patentee had failed to make a showing of nexus. *White v. Jeffrey Mining Machinery Co.*, 723 F.2d 1553, 1559 (Fed. Cir. 1983). In that case, the fact that an embodying product had been successful did not "support an implication that the jury found that a nexus existed between such success and the claimed invention." *Id.* Here, in contrast, there is substantial evidence of nexus, which, in the context of summary judgment, must be viewed in the light most favorable to Callaway Golf. [*See* section X.A.1, above (regarding evidence of nexus).]

In *Fenn*, the C.C.P.A found that a single technical brochure was insufficient to demonstrate a nexus between the claimed features and the "commercial acceptance" of the embodying product. *In re Fenn*, 639 F.2d 762, 765 (C.C.P.A. 1981).[11] In this case, Callaway Golf has far more than a single document to establish nexus, and, on summary

---

[11]    Even in that case, the court *reversed* the Patent Office's obviousness rejection, holding that the applicant's "showing of unexpected superiority" was sufficient to overcome the prima facie case of obviousness. *Fenn*, 639 F.2d at 765.

judgment, that evidence must be given appropriate weight. [*See* section X.A.1, above (regarding evidence of nexus).]

### B.    Acushnet Cannot Ignore the Additional Secondary Factors That Weigh in Favor of Non-Obviousness.

In its struggle to de-emphasize the commercial success of the Pro V1 and the damaging effect of that success on Acushnet's obviousness defense, Acushnet has failed to address other well-established secondary factors of non-obviousness. Like commercial success, these other factors ***must*** be considered before reaching any conclusions on obviousness. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("[O]bjective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached.").

For example, an entire brief could be filled with examples of industry praise for the technology and performance of the Pro V1, but, for purposes of this motion, it should suffice to mention only a few.

- Golf Magazine named the "urethane covered three-piece ball," as exemplified by the Titleist Pro V1, the most recent of only fourteen "great leaps forward" in golf technology since 1890. [Halkowski Decl., Ex. 1, C. Morfit, "Great Leaps Forward," Golf Magazine]

-

Mickelson has stated that the Pro V1 "has had the greatest impact on the game of golf – more than any other piece of equipment in the history of the game" [Halkowski Decl., Ex. 13, at AC89598], and that



39

•

Naturally, Acushnet would prefer the Court overlook the secondary consideration of industry praise, but it would be error to do so. *See Finish Eng'g. Co. v. Zerpa Indus., Inc.*, 806 F.2d 1041, 1044-45 (Fed. Cir. 1986) (where evidence included "favorable trade articles" and "favorable customer response," district court erred in granting summary judgment of obviousness).

## XI.     CONCLUSION

For the foregoing reasons, Callaway Golf respectfully requests that the Court DENY Acushnet's motion for summary judgment of invalidity on the grounds that Acushnet has not demonstrated entitlement to judgment as a matter of law, and has not shown the absence of genuine issues of material fact regarding its defenses of anticipation and obviousness.

REDACTED

Dated:  August 20, 2007        FISH & RICHARDSON P.C.

By:  /s/ *Thomas L.  Halkowski*
      Thomas L. Halkowski (#4099)
      919 N. Market Street, Suite 1100
      P.O. Box 1114
      Wilmington, DE 19899-1114
      Tel:  (302) 652-5070
      Fax:  (302) 652-0607

      Frank E. Scherkenbach
      225 Franklin Street
      Boston, MA 02110-2804
      Tel:  (617) 542-5070
      Fax:  (617) 542-8906

      Roger A. Denning
      12390 El Camino Real
      San Diego, CA 92130
      Tel:  (858) 678-5070
      Fax:  (858) 678-5099

Attorneys for Plaintiff
CALLAWAY GOLF COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2007, the attached document was electronically filed with the Clerk of Court  using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on August 24, 2007, I have Electronically Mailed the document to the following person(s):

Richard L. Horwitz, Esq.                          Attorneys for Defendant
David E. Moore, Esq.                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Alan M. Grimaldi, Esq.                            Attorneys for Defendant
Joseph P. Lavelle, Esq.                           ACUSHNET COMPANY
Kenneth Donnelly, Esq.
Brian Rosenthal, Esq.
Clint Brannon, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com

*/s/ Thomas L. Halkowski*
Thomas L. Halkowski