## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ACUSHNET'S MEMORANDUM OF LAW IN SUPPORT OF
## ITS MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF
## CALLAWAY'S EXPERT WITNESS GARTH L. WILKES

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

*Attorneys for Defendant*
*Acushnet Company*

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel:  (202) 783-0800

Dated:  September 10, 2007
Public Version Dated:  September 17, 2007

819291 / 30030

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  NATURE AND STAGE OF PROCEEDINGS .....................................................2

III. FACTUAL BACKGROUND ...................................................................................3

    A.   The Patents-in-Suit.........................................................................................3

    B.   The Accused Balls ..........................................................................................5

    C.   Dr. Wilkes' Report..........................................................................................7

        1.   Dr. Wilkes is an expert in polymer science, not golf ball
            construction or statistics..............................................................8

        2.   Dr. Wilkes' opinions ...................................................................9

        3.   ████████████████████████████████████
            ███.............................................................................11

IV.  SUMMARY OF ARGUMENT .................................................................................15

V.   LEGAL STANDARDS FOR ADMISSIBILITY OF EXPERT
    TESTIMONY .........................................................................................................16

VI.  ARGUMENT............................................................................................................19

    A.   Dr. Wilkes has no Scientific Basis to Testify About Infringement by the
        Entire Population of Accused Balls ................................................................19

    B.   Dr. Wilkes Should not be Permitted to Simply Parrot Back Acushnet's
        Own Documents and Testimony......................................................................23

    C.   Dr. Wilkes is not Qualified to Provide Opinions About the Differences
        Between Dual Core and Single Core Golf Balls..............................................25

VII. CONCLUSION..........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Advanced Medical Optics, Inc. v. Alcon Inc.,*
  C.A. No. 03-1095-KAJ, 2005 U.S. Dist. LEXIS 5803 (D. Del. Apr. 7, 2005) .................18, 27

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,*
  222 F. Supp. 2d 423 (S.D.N.Y. 2002), *aff'd, In re Omeprazole Patent Litigation*, 84
  Fed. Appx. 76 (Fed. Cir. 2003) ..............................................................................................20

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
  350 F.3d 316 (3d Cir. 2003)..............................................................................18, 21, 26, 27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)..................................................................................................16, 17, 26

*Ecolab, Inc. v. Amerikem Labs., Inc.,*
  98 F. Supp. 2d 569 (D.N.J. 2000) .....................................................................................18, 21

*Galentine v. Estate of William R. Stekervetz,*
  273 F. Supp. 2d 538 (D. Del. 2003)......................................................................................16, 18

*General Electric Co. v. Joiner,*
  522 U.S. 136 (1997)..........................................................................................................17, 19, 23

*Izumi Products Co. v. Koninklijke Philips Electronics N.V.,*
  315 F. Supp. 2d 589 (D. Del. 2004), *aff'd,* 140 Fed. Appx. 236
  Fed. Cir. 2005) .................................................................................................17, 18, 21, 23

*J & J Snack Foods, Corp. v. Earthgrains Co.,*
  220 F. Supp. 2d 358 (D.N.J. 2002) .....................................................................................22

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999)..........................................................................................................16, 17, 18

*Magistrini v. One Hour Martinizing Dry Cleaning,*
  180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd,* 68 Fed. Appx. 356 (3d Cir. 2003)........................22

*Ortiz v. Yale Materials Handling Corp.,*
  No. 03-3657 (FLW), 2005 U.S. Dist. LEXIS 18424 (D.N.J. Aug. 24, 2005) .............21, 24, 25

*S.E.C. v. Lipson,*
  46 F. Supp. 2d 758 (N.D. Ill. 1998) .......................................................................................25

*Southern Clay Prods, Inc. v. United Catalysts, Inc.*,
No. H-98-1756, 2001 U.S. Dist. LEXIS 1951 (S.D. Tex. Feb. 2, 2001) ................................20


**OTHER AUTHORITIES**

Fed. R. Evid. 702 ........................................................................................................16, 17, 23, 27

## I.    INTRODUCTION

Defendant Acushnet Company ("Acushnet") files this Memorandum in support of its

Motion to Exclude the Testimony and Report of Callaway's Expert Witness Garth L. Wilkes.

The opinions of Dr. Wilkes, Callaway's infringement expert, are not based on any

scientific methodology, let alone reliable and accepted methodology. ███████████████

███████████████████████████████████████████████████ It is well-

established that such unfounded extrapolation is not a proper basis for opinion testimony. ██

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

Dr. Wilkes has never tested an Acushnet golf ball (or any golf ball for that matter).



████████████████████████████████ In the face of such

evidence, Dr. Wilkes must do more than offer his *ipse dixit* infringement conclusion—instead he

must construct a statistical model, perform proper testing of statistical samples, and draw

scientifically-reliable conclusions from that methodology.  He has done none of the above.

In addition, Dr. Wilkes is not a golf ball expert. Indeed, under his own definition, Dr. Wilkes is not even a person of ordinary skill in the art of golf ball construction, nor does he provide any evidence that has investigated the knowledge of such a person. Yet Dr. Wilkes purports to testify that accused dual-core construction golf balls (Pro V1x and Pro V1*) are equivalent to single-core construction golf balls. Callaway cannot prop up Dr. Wilkes to provide this self-serving testimony from a witness who does not have the requisite experience to provide such an opinion.

For those reasons, the Court should exercise its "gatekeeper" responsibility to prevent Callaway from presenting Dr. Wilkes' unfounded, unqualified, and unhelpful testimony to the jury.

## II.    NATURE AND STAGE OF PROCEEDINGS

Callaway alleges that three families of Acushnet golf balls (the Pro V1, Pro V1x, and Pro V1* balls) infringe the four patents-in-suit. Acushnet disputes infringement and contends that the patents-in-suit are invalid. A two-week jury trial is scheduled to begin on December 3, 2007. The parties filed several motions for summary judgment related to the validity of the patents-in-suit and Callaway's breach of contract claim. Oral argument on those motions, and on claim construction, is scheduled for September 28, 2007. Neither party moved for summary judgment on infringement issues.

In support of its infringement assertion, Callaway submitted an expert report by Dr. Garth Wilkes, not a golf ball expert but instead an expert in the field of polymer science, in which Dr. Wilkes opined that the accused balls infringe certain claims of the patents-in-suit.[1] ███████

---

[1] ██████████████████████████████████████



Second, Dr. Stephen Fienberg, a preeminent statistics expert, opined that Dr. Wilkes failed to provide any scientifically reliable statistical basis for any conclusion about whether all of the accused balls infringe. Dr. Fienberg opined that since even the limited evidence examined by Dr. Wilkes shows that a substantial number of balls fall outside the asserted claims, a proper statistical analysis would be necessary to form any conclusion about infringement by the entire batch of accused balls.[3]

## III.   FACTUAL BACKGROUND

### A.   The Patents-in-Suit

In general, the patents-in-suit[4] describe and claim a golf ball comprising three components: a core; an inner cover layer; and an outer cover layer. Acushnet provided a background of the patents-in-suit in earlier filings, and does not repeat that description here. [D.I.

---

[2] Mr. Puckett's expert report ("Puckett Report") is submitted as Ex. 9 (Exhibits referenced herein ("Ex. ___") refer to the Appendix to Acushnet's Memorandum of Law in Support of its Motion to Exclude the Testimony and Report of Callaway's Expert Witness Garth L. Wilkes, filed contemporaneously herewith.)

[3] Dr. Fienberg's expert report ("Fienberg Report") is submitted as Ex. 8.

[4] U.S. Patent Nos. 6,210,293 ("the '293 patent"); 6,506,130 ("the '130 patent"); 6,503,156 ("the '156 patent"); and 6,595,873 ("the '873 patent") (collectively "the patents-in-suit").

216, at 3-6]. However, there are two aspects of the asserted claims that are relevant to this

motion.

First, each of the asserted claims recite a limitation on the "Shore D hardness" of one or

both of the cover layers. Generally speaking, the asserted claims require the inner cover layer to

have a Shore D hardness of 60 or more, and the outer cover layer to have a Shore D hardness of

64 or less.[5] The parties dispute how the "Shore D hardness" limitations should be construed.

Acushnet asserts that the Shore D hardness must be measured in accordance with ASTM D-

2240, which requires an "off the ball" measurement of a slab of material. Callaway asserts that

the Shore D hardness must be measured "on the ball," which is not in accordance with the

ASTM D-2240 standard. The parties have briefed their respective positions on this claim

construction issue. [D.I. 204, 207, 262, 260].

Second, each of the asserted claims recites a "core" or "spherical core" over which the

inner cover layer is applied.[6] Again, the parties dispute how these terms should be construed.

Acushnet contends that the "core" of the golf ball refers to the innermost component (*i.e.,* the

---

[5] These limitations are formulated somewhat differently in each of the asserted claims. In particular, each of the asserted claims recites an inner cover layer having a "Shore D hardness of 60 or more," "Shore D hardness of about 60 or more," or "Shore D hardness of at least 60." In addition, each of the asserted claims other than claims 4, 6-8, and 10-11 of the '156 patent recites an outer cover layer having a "Shore D hardness of 64 or less" or "Shore D hardness of about 64 or less."

[6] In particular, claim 1 of the '293 patent recites: "an inner cover layer … molded on said core…." Claim 4 of the '293 patent recites: "an inner cover layer … molded over said spherical core…." Claim 1 of the '156 patent recites: "an inner cover layer disposed on said core…." Claim 4 of the '156 patent recites: "an inner cover layer disposed about said core…." Claim 8 of the '156 patent recites: "an inner cover layer disposed on said core…." Claim 1 of the '130 patent recites: "an inner cover layer … molded on said core…." Claim 5 of the '130 patent recites: "an inner cover layer … molded over said spherical core…." Claim 1 of the '873 patent recites: an inner cover layer disposed on said core…." Claim 3 of the '873 patent recites: "an inner cover layer … disposed on said spherical core…." All of the other asserted claims depend from those independent claims

singular component that occupies the geometric center of the sphere of the ball). Callaway argues that the term "core" should be left undefined, and if it is defined, should be defined to mean anything under the cover. [D.I. 204 at 13-19].

Claim 1 of the '293 patent, reproduced below, illustrates a representative recitation of the "Shore D hardness" and "core" limitations:

1. A golf ball comprising:

*a core*;

*an inner cover layer having a Shore D hardness of 60 or more molded on said core*, said inner cover layer having a thickness of 0.100 to 0.010 inches, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and

*an outer cover layer having a Shore D hardness of 64 of less molded on said inner cover layer*, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a relatively soft polyurethane material. (Ex. 4, '293 patent, at col. 23:47-62)[7].

## B.    The Accused Balls

Callaway alleges that three families of Acushnet golf balls infringe the asserted claims of the patents-in-suit: The Pro V1, Pro V1x, and Pro V1* families of golf balls. These golf balls are described briefly below.

The Pro V1 golf ball is a three-component golf ball that comprises a core, an inner cover layer, and an outer cover layer. The figure below illustrates a cross-sectional view of the general construction of the Pro V1 balls:

7



The Pro V1x and Pro V1* golf balls differ from the Pro V1 balls in that they are four-component balls rather than three-component balls. Instead of a single solid core, the Pro V1x and Pro V1* balls have two separate solid pieces under the cover layers: a core and a "mantle." The mantle is formed around the core to form a separate solid rubber layer beneath the inner cover layer. The figure below illustrates a cross-sectional view of the general construction of the Pro V1x and Pro V1* balls:



There have been several different versions of the Pro V1 and Pro V1x golf balls over the years. In particular, there was a version of the Pro V1 introduced in each of 2000, 2001, 2002, 2005, and 2007 and there was a version of the Pro V1x introduced in each of 2002, 2005, and 2007. Each separate version of a ball is marked on the side of the ball with a unique "side stamp" that can be used to identify which version a particular ball is. The side stamps of the accused balls that Acushnet has made and sold are as follows:

| Pro V1 | Pro V1x | Pro V1* |
|---|---|---|
| Pro V1 392 | ◄•Pro V1x 332•► | ◄Pro V1 ★ 392► |
| ◄•Pro V1 • 392► | ◄Pro V1x-332► | |
| ◄•Pro V1 392•► | ◄--Pro V1x--► | |
| ◄Pro V1-392► | | |
| ◄--Pro V1--► | | |

Ex. 3, Acushnet's Supplemental Response to Interrogatory No. 1, at 4-6.



### C.     Dr. Wilkes' Report

Callaway submitted an expert report of Dr. Garth Wilkes in support of its assertion that the accused balls infringe the asserted claims. Dr. Wilkes' report consists of a few pages of

conclusory statements, with no analysis, followed by charts that were largely recycled from Callaway's infringement contentions in response to Acushnet's interrogatories.

### 1.  Dr. Wilkes is an expert in polymer science, not golf ball construction or statistics

Dr. Wilkes is not a golf ball expert. Instead, Dr. Wilkes is a professor of chemistry at Virginia Tech with no working golf ball experience. Ex. 2, Wilkes Tr. at 39:20-22; Ex.1, Wilkes Report Ex. A, at 1-2. Dr. Wilkes describes himself in his report as "an expert in the field of polymer science, specifically processing-structure-property behavior of polymeric materials." Ex 1, Wilkes Report at 1. While Acushnet does not dispute Dr. Wilkes' expertise in the area of polymer science, there is no evidence that he has any expertise whatsoever in the design or construction of golf balls. Nor does he claim to have such expertise anywhere in his expert report.

8



## 2. Dr. Wilkes' opinions













## IV.    SUMMARY OF ARGUMENT

There are several flaws in Dr. Wilkes' analysis that should preclude him from providing his unfounded opinions on infringement to the jury.



Second, to the extent that Callaway intends to use Dr. Wilkes merely to relay the results of Acushnet's own testing to the jury, that is not the proper subject of expert testimony. Experts should apply scientifically reliable methodologies to form well-founded conclusions about data—they should not be used merely to relay to the jury test data that they had no part in creating. Here, with the exception of his unfounded conclusion that "most" of the accused balls infringe, Dr. Wilkes does nothing more than simply regurgitate Acushnet's own documents and testimony.

Third, Dr. Wilkes should not be permitted to testify as to whether dual core golf balls, like the Pro V1x and Pro V1*, fall within the claims of the patents-in-suit, literally or under the doctrine of equivalents. Dr. Wilkes is not a golf ball expert, and whatever his expertise in polymer science, there is absolutely nothing in his background that should permit him to testify as to what the purpose of a golf ball core is, and whether a dual-core is substantially different than a single core.

## V.    LEGAL STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

The admissibility of expert testimony in federal courts is governed by the Federal Rules of Evidence. Rule 702 reads as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, an expert witness' testimony must pass a three pronged test in order to be admissible; the expert must be sufficiently *qualified* to testify; the testimony must be *reliable*, in the sense of being based on an acceptable methodology; and the testimony must be *relevant*, assisting the trier of fact by fitting to the data of the case. *Galentine v. Estate of William R. Stekervetz*, 273 F. Supp. 2d 538, 540-43 (D. Del. 2003).

The Supreme Court established the standards that an expert's testimony must meet in order to be considered reliable in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). There, the Supreme Court charged trial courts with the responsibility of acting as "gatekeepers" to exclude unreliable expert testimony. *Id.* at 597. Moreover, *Callaway, as the party offering expert testimony, bears the burden of establishing the admissibility* of Dr. Wilkes' testimony by a preponderance of the evidence. *Id.* at 592.

The Court expanded on its *Daubert* decision, making clear it applied to non-scientific experts, and was a broad inquiry, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Court has provided a non-exclusive series of factors which should be considered in a determination of reliability. A court must determine, when reviewing an expert's testimony, "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant]

16

discipline." *Id.* at 149, *citing Daubert*, 509 U.S. at 592. In order to determine this, the court may consider whether the methodology employed has been tested; whether it has been subjected to peer review; what the known rate of error for the methodology is; and whether the methodology is generally accepted in the relevant community. *Kumho Tire*, 526 U.S. at 149-50.

The Supreme Court has also warned against unfounded extrapolation of existing data to a conclusion that is not supported by proper analysis of such data:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In order to show that an expert is qualified to render an expert opinion, this Court and the Third Circuit have articulated the following standard:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman."

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600 (D. Del. 2004),

*aff'd,* 140 Fed. Appx. 236 (Fed. Cir. 2005) (*quoting Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.

1998)). Despite this liberal application of the qualification requirement, courts in the Third

Circuit have nonetheless properly taken their "gatekeeper" responsibility seriously to ensure that the jury does not hear unreliable testimony from unqualified experts. Courts are careful to limit the testimony of an expert witness to his or her specific field of expertise: "Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify

him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field." *Advanced Med. Optics, Inc. v. Alcon Inc.*, C.A. No. 03-1095-KAJ, 2005 U.S. Dist. LEXIS 5803, *5 (D. Del. Apr. 7, 2005).

In determining whether testimony is reliable, courts in the Third Circuit[12] examine several factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-juridical uses to which the method has been put.

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (*quoting In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)). However, these factors are neither exclusive nor mandatory, and should be examined by the court if they are relevant to the particular facts at hand. *Izumi Prods. Co.*, 315 F. Supp. 2d at 601 (*citing Kumho Tire Co.*, 526 U.S. at 137).

The third, relevance prong of the inquiry requires that expert testimony assist the trier of fact to determine a fact in issue. To do this, it must fit the facts of the case. *Galentine*, 273 F.Supp. 2d at 543. While a court is not deciding the correctness of the opinion itself, which is within the purview of the jury, it is necessary for the court to determine that the expert has applied the methodology which has been determined reliable to the relevant facts in an accurate manner.

---

12 Third Circuit law governs the admissibility of expert testimony. *See Ecolab, Inc. v. Amerikem Labs., Inc.*, 98 F. Supp. 2d 569, 576 n.13 (D.N.J. 2000) (citing *Odetics, Inc. v. Storage Tech., Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999)).

## VI.    ARGUMENT

### A.    Dr. Wilkes has no Scientific Basis to Testify About Infringement by the Entire Population of Accused Balls

Dr. Wilkes has no scientific basis to conclude that the "vast majority" of accused balls

infringe. Dr. Wilkes has applied no scientific methodology whatsoever to reach such a

conclusion. Instead, his theory boils down to the unscientific, baseless speculation that *since*

*some balls infringe, most balls infringe*. Such opinion testimony, unfounded in sound scientific

methodology, has no place in a federal court.



Despite this data,

Dr. Wilkes did not perform any statistical analysis whatsoever.

The only possible explanation for Dr. Wilkes' conclusion is that because the *mean* Shore

D hardness values reported in Acushnet's documents are usually less than 64, virtually all balls

have a Shore D hardness of less than 64. This is junk science. This "methodology," if it can

---

13 The measurements that Dr. Wilkes relies on were taken "on the ball." If Acushnet prevails in its claim construction arguments, such measurements would not be relevant to infringement in any event and should be excluded from Dr. Wilkes' testimony. Even if the Court deems "on the ball" measurements relevant, however, Dr. Wilkes has improperly extrapolated from the "on the ball" data he has examined, as set forth in this section.

even be called that, ignores all accepted principles of statistics. When data has a distribution, reference to the average data of a sample cannot inform a conclusion about the entire population. Instead, attention must be given to how the data is distributed to form any conclusion about the entire population.

The District Court for the Southern District of New York made precisely that observation in refusing to give weight to expert testimony that tried to rely merely on average figures. *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 521-523 (S.D.N.Y. 2002), *aff'd, In re Omeprazole Patent Litig.*, 84 Fed. Appx. 76 (Fed. Cir. 2003). There, in a bench trial, the expert tried to show that a claim limitation requiring a water content of no more than 1.5% by weight was satisfied by testing six samples of products and showing that the average measured water content was 1.42%. *Id.* at 522. The Court rejected this approach, noting that the standard deviation, which the expert testified was at least 0.2, supported only a conclusion that the sample data was accurate within a range of 1.22% to 1.62%. *Id.* The Court also relied on the general statistical rule that for a normal distribution, "approximately 68% of the population members lie within one standard deviation of the mean, and approximately 95% lie within two standard deviations of the mean." *Id.* at 522 n.64. Applying that general rule, the Court noted that based on the expert's testing, approximately 95% of the population would fall within 1.02% and 1.82%, which was further reason to hold that the evidence did not support a finding that the products in general had a water content of less than 1.5%. *Id.*

Similarly, here, Dr. Wilkes should not be permitted to testify to a jury that because he has seen Shore D hardness measurements whose *average* falls below 64, that virtually all balls in the population (which Callaway says consists of *more than 360 million balls*) would thus have a Shore D hardness under 64. Such a methodology has no support in any scientific literature or

20

peer review, and is not a reliable methodology to support a conclusion about the population of accused balls. *Calhoun*, 350 F.3d at 321; *See also S. Clay Prods, Inc. v. United Catalysts, Inc.*, No. H-98-1756, 2001 U.S. Dist. LEXIS 1951, **25-28 (S.D. Tex. Feb. 2, 2001) (rejecting defendant's expert's testimony that was based on an "mean percent volume" methodology that he developed himself, which was not accepted in the statistical field, was contradicted other evidence in the record, and which plaintiff's statistical expert called misleading). Such testimony would be misleading and prejudicial, and entirely unhelpful to the jury.

Many courts in the Third Circuit have rejected expert testimony where it is based only on conclusions formed from a subset of data, without any statistical or other scientific analysis to justify extrapolation to the entire population of data. For example, this Court was faced with a very similar situation in *Izumi Prods. Co.* There, plaintiff's expert offered testimony that defendants' electric razor products infringed despite having examined only two of the 116 accused infringing razors. 315 F. Supp. 2d at 602. This Court precluded the expert from testifying about infringement under the doctrine of equivalents because it would be "based solely on his subjective belief." *Id.* Other courts in this circuit have come to similar conclusions. *See Ortiz v. Yale Materials Handling Corp.*, No. 03-3657 (FLW), 2005 U.S. Dist. LEXIS 18424, at **21-23 (D.N.J. Aug. 24, 2005) (excluding expert testimony that was based solely on a review of forklift accident reports, with no "technical, statistical, or mathematical analyses with respect to such data"); *Compare Ecolab*, 98 F. Supp. 2d at 578 (finding it proper to extrapolate testing of certain products to the entire product line, but only upon a showing that the other untested products were made with an identical process and a virtually identical formula).

Dr. Wilkes' conclusions are also unreliable because he did not review data from a statistically valid sample. Dr. Wilkes' analysis is analogous to cases in which experts have tried

to rely on survey evidence that is not drawn from a proper representative sample of a population.

In those cases, the Third Circuit has made clear that surveys must be drawn from a representative

sample of the population to support a conclusion about the entire population:

> A proper universe must be examined and a representative sample must be
> chosen.... It is essential that the sample design ... meet the standards of objective
> surveying and statistical techniques.

*J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002) (*quoting*

*Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)); *see also Magistrini v.*

*One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 605-06, (D.N.J. 2002), *aff'd,* 68 Fed.

Appx. 356 (3d Cir. 2003) (excluding expert testimony that relied on sample testing without

regard for whether the samples were statistically significant or had an acceptable confidence

interval). Here, there is no evidence that the scattered testing reports that Dr. Wilkes relies on

constitute a representative sample of golf balls, that represent the various conditions that may

affect the hardness measurements of the outer cover layers of the golf balls.

   As Dr. Fienberg sets forth in his expert report, if a conclusion were to be drawn about the

entire population of accused balls, one would have to develop a sound statistical model to

sample, test, and draw conclusions about the distribution of hardness measurements in such balls.

Ex.8, Fienberg Report at ¶¶ 30-31. For example, one would need to determine how the Shore D

hardness measurements are affected by: a) variations in manufacturing conditions; b) variations

caused by the measuring equipment; c) variations depending on where the measurement is taken

on the ball; d) variations caused by the human element of testing; e) variations between different

batches of manufactured balls; f) variations based on the amount of time between manufacturing

of the ball and testing of the ball; and g) variations in where the balls were stored or how they

had been handled since manufacture. *Id.* at ¶ 31. Dr. Wilkes has done none of the above.

In short, Dr. Wilkes' analysis does exactly what the Supreme Court prohibited in *General Electric*; he has tried to offer "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert" by offering an unjustified extrapolation of existing data with no scientific basis for doing so. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). Such unfounded conclusions should not be permitted to infect the jury's role as a fact-finder. Since Callaway cannot meet its burden of showing that Dr. Wilkes bases his opinions on scientifically valid methodology, his testimony should be excluded. *Izumi Prods. Co.*, 315 F. Supp. 2d at 601.

**B.    Dr. Wilkes Should not be Permitted to Simply Parrot Back Acushnet's Own Documents and Testimony**

The bulk of Dr. Wilkes' expert report (with the exception of the "dual core" issue, discussed below) does no more than regurgitate Acushnet's own testing documents and testimony. For the Shore D hardness limitations, for example, Dr. Wilkes does no more than assert that the limitations are met, and cite to Acushnet's own documents and testimony as support.[14] This is not science; it is an exercise in reading. This sort of testimony provides no assistance to the jury whatsoever. Instead, it is an attempt by Callaway to dress its infringement evidence up by presenting it with a single witness who adds nothing at all to the documents and testimony that he cites in his report.

An expert should not be permitted, as Dr. Wilkes is trying to do, to be merely a vehicle for the presentation of evidence to a jury. Instead, expert testimony is supposed to assist the trier of fact, by applying some sort of scientific or specialized analysis to a set of data to provide information that would not otherwise be readily available to they jury. Fed. R. Evid. 702

---

[14] For both "on the ball" and "off the ball" constructions of Shore D hardness, Dr. Wilkes does no more than recite evidence, with no analysis of his own.. Thus, Dr. Wilkes' testimony is unhelpful and should be excluded regardless of the construction that the Court adopts for the "Shore D hardness" limitations.

(allowing expert opinion testimony only "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

Here, the jury does not need Dr. Wilkes' help to read the test data that he relies on. More importantly, Dr. Wilkes does not provide any such help in any event; he does not provide any explanation of the test data that would assist the jury in understanding it. Similarly, the jury does not need, and Dr. Wilkes does not provide, any help in understanding the testimony of Mr. Dalton and Mr. Cavallaro, whose depositions Dr. Wilkes cites in his report.[15] Since Dr. Wilkes' report does not add anything to the data itself (he performs no analysis whatsoever on the data), there is no need for his testimony.

Courts have regularly precluded experts from testifying where their testimony does nothing other than restate or summarize data or facts that can easily be understood by a jury. For example, in *Ortiz*, the court excluded an expert's testimony where the expert did no more simply relay the results of accident reports, that he did not prepare, and did not apply any scientific analysis of his own to the data of those reports:

> Sevart's simple review of the numbers in the chart, which does not incorporate any kind of statistical or mathematical analysis, offers no substantial support for his opinion…. It is clear from Sevart's testimony during the hearing that he employed no special skill or technique different from a layperson in forming his opinion and conclusions regarding forklift safety.

15



*Ortiz*, 2005 U.S. Dist. LEXIS 18424, at *25. Similarly, Dr. Wilkes' summarization of the Acushnet testing documents and testimony that he cites is not helpful to the jury.

It is hard to imagine why a jury would need a polymer chemist to read the black and white test results set forth in Acushnet's own documents, and read the testimony of Acushnet's own witnesses. The situation might be different if Dr. Wilkes had performed some testing of his own, or performed some statistical analysis of the data, or opined that balls with Shore D hardness measurements over 64 infringed under the doctrine of equivalents. But Dr. Wilkes did none of that. Instead, he simply restates claim elements and cites to documents. This is a job that a layperson can easily do, and it is a job that properly rests with the jury. *See S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

### C. Dr. Wilkes is not Qualified to Provide Opinions About the Differences Between Dual Core and Single Core Golf Balls

Other than simply regurgitating the evidence, Dr. Wilkes provides only one piece of substantive expert opinion in his report. Namely, Dr. Wilkes opines that "dual core" golf balls, like the accused Pro V1x and Pro V1* golf balls infringe the claims literally and under the doctrine of equivalents. But Dr. Wilkes has ***no qualifications whatsoever*** to render that opinion.

Acushnet does not question Dr. Wilkes' expertise in the field of polymer science, in which he clearly has a wealth of experience and training. But that experience and training has no applicability to the question of whether a dual core golf ball satisfies the claims.

Dr. Wilkes is unquestionably <u>not</u> an expert in golf ball construction or design. He has never worked in the golf ball industry. Ex. 2, Wilkes Tr. 39:20-22. He has never designed a golf ball. *Id.* at 7:8-13. He has never tested a golf ball. *Id.* at 39:7-19. Before writing his report, he had never even seen a golf ball manufacturing or testing facility. *Id.* at 38:14-40:9. Dr. Wilkes'

proffered testimony as to the function a core plays in golf ball construction, and whether a dual core performs the same function, is way outside the realm of his expertise.

While the qualification prong of the *Daubert* test is applied liberally in the Third Circuit, it is still a requirement that the expert must "possess specialized expertise." *Calhoun*, 350 F.3d at 321 (*quoting Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)). In addition, as the Third Circuit has noted, the more specific the testimony, the more specific the expertise must be. "While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun*, 320 F.3d at 322.





Allowing an expert witness to opine about areas on which he or she has no expertise, like Dr. Wilkes, is prohibited by Rule 702 and the cases applying that rule. For example, in *Calhoun*, the Third Circuit upheld the district court's preclusion of a safety expert from testifying as to the relative safety of the accelerating mechanism of different jet ski models. 350 F.3d at 323. Despite the fact that the expert had sixteen years of safety experience, including extensive experience with jet skis, the district court found that he could not provide such testimony because he "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or their accelerating mechanisms." *Id. See also Advanced Med. Optics,* 2005 U.S. Dist. LEXIS 5803, at **26-27 (excluding testimony of a renowned ophthalmologist because he lacked expertise in the specific technology of the patent).

Similarly here, Dr. Wilkes' testimony regarding whether "dual core" golf balls infringe goes way outside the scope of his expertise, which is polymer science. Thus, that portion of his testimony should not be admitted.

When Dr. Wilkes' unfounded opinions regarding "dual core" golf balls are precluded, all that remains of his report is his unhelpful regurgitation of Acushnet's own evidence, to which he

applies no analysis of his own.  For that reason, Dr. Wilkes' report, and testimony based on that report, should be excluded in its entirety.

## VII.    CONCLUSION

Therefore, for all of the foregoing reasons, Acushnet requests that the Court exclude Dr. Wilkes' report and preclude Dr. Wilkes from offering any expert testimony at trial.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 783-0800

Dated:  September 10, 2007
Public Version Dated:  September 17, 2007
819291 / 30030

By:    */s/ David E. Moore*
         Richard L. Horwitz (#2246)
         David E. Moore (#3983)
         Hercules Plaza 6th Floor
         1313 N. Market Street
         P.O. Box 951
         Wilmington, DE  19899
         Tel:  (302) 984-6000
         rhorwitz@potteranderson.com
         dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 17, 2007, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on September 17, 2007, I have Electronically Mailed the document

to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030