IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | C.A. No. 06-91 (SLR) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ACUSHNET'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF CALLAWAY'S EXPERT WITNESS BRIAN NAPPER

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

*Attorneys for Defendant*
*Acushnet Company*

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 783-0800

Dated: September 10, 2007
Public Version Dated: September 17, 2007

819350 / 30030

# TABLE OF CONTENTS

I.    INTRODUCTION ..........................................................................................................1

II.   FACTUAL BACKGROUND .........................................................................................3

   A.    Material Facts...........................................................................................................3

   B.    The facts dictate a royalty theory, with damages of about $10 million. ...............6

   C.    Napper's Fanciful Damages Claim. ........................................................................7

III.   ARGUMENT. ...............................................................................................................9

   A.    Applicable Law. .......................................................................................................9

     1.    The Federal Rules of Evidence ........................................................................9

     2.    The *Daubert* Decision Requires the Court to Act as a Gatekeeper to Preclude
       Admission of Improper Expert Testimony ....................................................10

     3.    The Burden of Proof Lies on the Party Offering the Expert Witness............12

   B.    Napper's Lost Profit Calculation Should Be Excluded from Evidence.............12

     1.    Mr. Napper Ignores The Period 2001-03......................................................13

     2.    Focusing on April 2001, the Time the Infringement Began, Compels an Award
       Based on a Reasonable Royalty....................................................................15

     3.    Mr. Napper Fails to Account for Non-Infringing Alternatives in the "But-For"
       World. ...........................................................................................................16

     4.    Mr. Napper's $30/dozen "Premium Ball" market recreation is also flawed and his
       lost profits calculation must be excluded for this additional reason..............20

     5.    Mr. Napper's Reasonable Royalty Analysis Must Be Excluded. ..................28

IV.   CONCLUSION............................................................................................................33

## TABLE OF AUTHORITIES

**CASES**

*American Bearing Co., Inc. v. Litton Industries,*
    540 F. Supp. 1163 (E.D. Pa. 1982) ..................................................................17, 20

*Applied Materials Research Corp. v. U.S. Surgical Corp.,*
    435 F.3d 1356 (Fed. Cir. 2006)..........................................................................6, 13

*Astrazeneca L.P. v. Tap Pharm. Prods.,*
    C.A. No. 04-1332-KAJ 2006 U.S. Dist. LEXIS 40620 (D. Del. May 18, 2006) ...................11

*Berlyn, Inc. v. Gazette Newspapers, Inc.,*
    214 F. Supp. 2d 530 (D. Md. 2002)......................................................................23

*Blue Dane Simmental Corp. v. American Simmental Assoc.,*
    178 F.3d 1035 (8th Cir. 1999) ............................................................................11

*Bonesmo v. The Nemours Found.,*
    253 F. Supp. 2d 801 (D. Del. 2003).......................................................................12

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996)..................................................................................28

*Broadcom Corp. v. Qualcomm, Inc.,*
    No. 06-4292 slip op. (3d Cir. Sept. 4, 2007)..........................................................21

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)....................................................................................28, 32

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)........................................................................................20

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
    350 F.3d 316 (3d Cir. 2003)...........................................................................10, 20

*Cardiac Pacemakers, Inc. v. St. Jude's Medical Center,*
    418 F. Supp. 2d 1021 (S.D. Ind. 2006) ........................................................13, 17, 18

*Claar v. Burlington N.R.R.,*
    29 F.3d 499 (9th Cir. 1994) ..............................................................................11

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ............................................................................11

*Daubert v. Merrill Dow Pharm., Inc.,*
    509 U.S. 579 (1993)...................................................................................... *passim*

*De Jager Constr. v. Schleininger,*
    938 F. Supp. 446 (D. Mich. 1996) .............................................................28, 30, 32

*DSU Med. Corp. v. JMS Co.,*
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...................................................................28

*Eastman Kodak v. Image Technical Servs., Inc.,*
    504 U.S. 451 (1992)...................................................................................................23

*Ericsson, Inc. v. Harris Corp.,*
    352 F.3d 1369 (Fed. Cir. 2003).................................................................................16

*First & First, Inc. v. Dunkin' Donuts, Inc.,*
    1990 U.S. Dist. LEXIS 7432 (E.D. Pa. Mar. 27, 1990)..........................................22

*Galentine v. The Estate of William R. Stekervetz,*
    273 F. Supp. 2d 538 (D. Del. 2003)............................................................................9

*General Elec. Co. v. Joiner,*
    552 U.S. 136 (1997)...................................................................................................10

*General Motors Corp. v. Devex Corp.,*
    461 U.S. 648 (1983).....................................................................................................6

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970)....................................................................29, 32

*Grain Processing Corp. v. American Maize-Products Co.,*
    185 F.3d 1341 (Fed. Cir. 1999)....................................................................... *passim*

*Isco Int'l v. Conductus, Inc.,*
    C.A. No. 01-487-GMS, 2003 U.S. Dist. LEXIS 1885 (D. Del. Feb 10, 2003) .......16

*Izumi Prods. Co. v. Koninklijke Philips Electronics N.V.,*
    315 F. Supp. 2d 589 (D. Del. 2004)..........................................................................11

*Johnson Electric North America, Inc. v. Mabuchi Motor America Corp.,*
    103 F. Supp. 2d 268 (S.D.N.Y. 2000).......................................................................17

*Kannankeril v. Terminix Int'l, Inc.,*
    128 F.3d 802 (3d Cir. 1997).......................................................................................10

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)..............................................................................10, 11, 27, 28

*Lantech, Inc. v. Novell, Inc.*,
   2001 U.S. Dist. LEXIS 24816 (D. Utah Feb. 13, 2001) ....................................................17, 28

*Micro Chemical, Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003)..............................................................................29

*Moore v. Ashland Chem., Inc.*,
   151 F.3d 269 (5th Cir. 1998) (en banc) .....................................................................20

*Murrow Furniture v. Thomasville Furniture Ind., Inc.*,
   889 F.2d 524 (4th Cir. 1989) ................................................................................22

*Oxford Gene Tech., Ltd. v. Mergen Ltd.*,
   345 F. Supp. 2d 431 (D. Del. 2004).........................................................................12

*Panduit Corp. v. Stahlin Bros Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) .............................................................................6, 15

*Photovest Corp. v. Fotomat Corp.*,
   606 F.2d 704 (7th Cir. 1979) ................................................................................21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)..............................................................................21, 24

*Smithers v. C&G Custom Module Hauling*,
   172 F. Supp. 2d 765 (E.D. Va. 2000) ......................................................................12

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*,
   188 F.3d 11 (1st Cir. 1999)..................................................................................21

*Studiengesellschaft Kohle v. Dart Industries, Inc.*,
   862 F.2d 1564 (Fed. Cir. 1988).............................................................................30

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
   427 F. Supp. 2d 1022 (D. Kan. 2006)......................................................................24

*Unisply, S.A. v. American Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995)................................................................................30

*United Food Mart., Inc. v. Motiva Enterprises, L.L.C.*,
   404 F. Supp. 2d 1344 (S.D. Fla. 2005) .....................................................................24

*Victus, Ltd. v. Collezione Europa U.S.A., Inc.*,
   26 F. Supp. 2d 772 (M.D.N.C. 1998) ......................................................................20

*Wechsler v. Macke Int'l Trade, Inc.*,
   486 F.3d 1286 (Fed. Cir. 2007)...............................................................................6

*Whitaker v. Van Fossan,*
279 F.2d 245 (4th Cir. 1961) ................................................................11


**STATUTES**

35 U.S.C. § 284................................................................................6


**OTHER AUTHORITIES**

F.R.E. 403 ...................................................................................10

F.R.E. 702 ............................................................................9, 10, 19, 24

Defendant Acushnet Company ("Acushnet") files this memorandum in support of its

Motion to Exclude the Testimony and Report of Callaway's Expert Witness Brian Napper.

## I.    INTRODUCTION

Plaintiff Callaway Golf Company ("Callaway") alleges infringement of four patents-in-

suit, the first of which, U.S. Patent 6,210,293 ("the '293 Patent"), issued on April 3, 2001. [D.I.

217 Ex. 1-4]. Callaway accuses Acushnet's Pro V1 golf balls of infringement.

Callaway has submitted an expert report on damages from Mr. Napper. ███████████

████████████████████████████████████████████████████████████████████████

██████████████ However, Mr. Napper's methodology is so fundamentally deficient and

speculative that it must be excluded. In particular, the report should be excluded for at least the

following reasons:

First, despite the fact that the alleged infringement began in April 2001 when the first

patent-in-suit issued, Mr. Napper attempts to calculate lost profits beginning in September 2003,

when Callaway bought the patents in suit, while ignoring the intervening period. Mr. Napper

should have followed the Federal Circuit decision in *Grain Processing Corp. v. American Maize-*

*Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) and attempted to reconstruct the "but for" world

beginning with the time the alleged infringement began. Had he done so, he could not have

concluded that lost profits are available, since in the "but for" world, Acushnet would have

negotiated a license in 2001 and hence would not be infringing from then on. Alternatively, had

~~Mr. Napper excluded Acushnet's ProV1 from the market entirely starting in 2001, where he was~~

required to, the existence of alternative technologies and other uncertainties make a claim for lost

---

[1] Exhibits referenced herein ("Ex. ___") refer to the Appendix to Acushnet's Memorandum of
Law in Support of its Motion to Exclude the Testimony and Report of Callaway's Expert
Witness Brian Napper, filed contemporaneously herewith.)

profits in 2003 so highly speculative as to not be admissible under *Grain Processing Corp.*, 185 F.3d 1341. In any event, Mr. Napper does not even try to account for these uncertainties, and he simply ignores the period 2001-03 in reconstructing the market under his lost profits analysis.

Second, Mr. Napper ignores the undisputed evidence as to what the patentee would have accepted for a license in 2001. In 2001, the patents-in-suit were owned by Spalding. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ Yet when concocting his fanciful request for ████████ in damages, Mr. Napper ignores (or dismisses as not relevant) this actual evidence as to what the patentee was prepared to accept for a license. Mr. Napper's disregard for undisputed evidence of what the patentee, in its own words, was prepared to accept for a license to the patents in suit renders his report unprincipled and properly excluded.

Third, in his rush to fashion a "big number" for damages, Mr. Napper also completely ignores the existence of non-infringing alternative golf balls that existed, both in 2001 and thereafter. The presence of these alternative choices to customers would eliminate (or at least greatly reduce) any claim for lost profits and render any lost profit claim speculative. *Grain Processing* required Mr. Napper to account for these alternatives and for alternative courses of action available to Acushnet in the absence of the Pro V1 in the but for world beginning in April 2001. Mr. Napper's report does not attempt to account for any of this. Instead his method involves merely a mechanical and arbitrary computation that ignores the market as it actually existed historically, and as it would have existed in the but for world.

Fourth, even if there were a principled basis to consider Mr. Napper's lost profit calculation (which there is not), his definition of what products compete and do not compete with balls that employ the technology of the patents-in-suit is itself so arbitrary and unprincipled that his report would have to be excluded on that basis alone. To support Callaway's lost profits claim, Mr. Napper was required to construct the but for market and determine competing balls in that market with sound economic analysis and proof. He has not done so.

Finally, where Mr. Napper purports to calculate damages based simply on a reasonable royalty, his report is also methodologically flawed. Mr. Napper ignores again the evidence of what the patentee would have accepted for a license, to rely instead on documents that are remote in time or are inadmissible settlement agreements. His methodology, ███████████

████████████████████████████████████████

████████████████████████████████████████

would only mislead and confuse the jury. This portion of his report should be also excluded.

## II.    FACTUAL BACKGROUND

### A.    Material Facts.

The following facts are material to this motion and substantially undisputed.

At all times relevant to this case, defendant Acushnet has been the market leader and predominant seller of golf balls in the United States and the world. Acushnet's "Titleist" brand of golf balls has for over 40 years been the leading golf ball used by PGA tour players and other skilled professionals. [D.I. 217, Ex. 9 ¶ 25]. Most years, Titleist balls are used by 60-75% of the golfers in this highly skilled segment of the market. [D.I. 217, Ex. 9 ¶ 51]. Titleist brand balls and other Acushnet balls are also very popular among golfers of all skill levels, in part because all golfers (even the least skilled) desire to use the products used by professional players. *Id.* at

¶¶ 23-25. Acushnet's marketing emphasizes this "trickle down" popularity of balls, in a marketing strategy Acushnet calls the "Pyramid of Influence." *Id.*

During the 1990s, the leading tour golf ball on the market was a Titleist ball called the "Professional." *Id.* at ¶ 29. The Professional was a non-infringing product (and not accused of infringement) made with a wound core and a polyurethane cover. *Id.* at ¶ 55. By 2000, Titleist also offered to tour players successful solid-construction golf balls to tour players that are not accused of infringement here, including the Titleist HP2. *Id.* at ¶ 36.

In mid-2000, Acushnet introduced the Titleist Pro V1, the ball accused of infringement in this case. *Id.* at ¶¶ 64-70. ███████████████████████████████████

████████████████████████████    █████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

The first patent in suit to issue, the '293 Patent, issued in April 2001, after the Pro V1 was on the market. Thus, the alleged infringement began in April 2001. At this time, Spalding, a company then unaffiliated with Callaway (and regarded as the second largest manufacturer of golf balls), held rights to the patents-in-suit. Spalding did not make a ball that practiced the patent in suit in 2001, however, and would not do so until 2002. Kennedy Dep. Tr. [D.I. 265, Ex. 65] at 65:10-13. The remaining patents in suit issued to Spalding over the next several years.

Soon after the '293 Patent issued, Spalding called the patent to Acushnet's attention. The parties conducted some license negotiations, which did not reach fruition. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

[black redaction bars]

In 2003, Spalding was placed into bankruptcy by its owners in order to try to sell its

assets. In a September 2003 bankruptcy auction, Callaway Golf purchased the patents-in-suit.

Ex. 7, McCracken Dep. Tr. at 39. [black redaction bars]



Callaway won the auction and acquired the patents in September 2003. Ex. 7,

McCracken Dep. Tr. at 255:11-26:7. [black redaction bars]

2 [black redaction bars]

████████████████████████████████████████████████████

████████████████████████████████████████████

### B.   The facts dictate a royalty theory, with damages of about $10 million.

The role of patent damages is to compensate the patentee for the infringement that has occurred. 35 U.S.C. § 284. Patent damages are not windfalls nor are they designed to be punitive. *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983).

It is a bedrock legal principle that patent damages, whether determined by a reasonable royalty or lost profits, must be calculated by focusing on the market as it existed at the time the infringement began. *See Applied Materials Research Corp. v. U.S. Surgical Corp.,* 435 F.3d 1356, 1363 (Fed. Cir. 2006) ("Consistent with our precedent, reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed. We are required to identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation at the time that infringement began, not an earlier one."); *Grain Processing Corp.*, 185 F.3d at 1450 (lost profits analysis requires "a reconstruction of the market, as it would have developed absent the infringing product").

A patentee can recover its lost profits if it proves that "but for" the infringement it would have made the sales in question. Otherwise, a patentee normally recovers damages based on a "reasonable royalty" theory. *Panduit Corp. v. Stahlin Bros Fibre Works, Inc.*, 575 F.2d 1152, 1157 (6th Cir. 1978). The availability *vel non* of lost profits is a question of law for the court to determine. *Weehsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007).

Application of the law to the facts of this case is straightforward. The alleged infringement began in April 2001, when the first patent issued. Spalding, who then owned the patents, did not offer a competing ball that used the patent's teachings, and would have been

remitted to recovering damages on a reasonable royalty theory. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ Thus,

damages should be calculated based on a hypothetical negotiation for a license between

Acushnet and Spalding in 2001.

Furthermore, while the parties' experts may argue at the margins about how the *Georgia*

*Pacific* factors apply here, █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

### C.    Napper's Fanciful Damages Claim.

Unconstrained by fact or law, Mr. Napper's report seeks damages of either ███████,

based on a lost profits theory, or over ████████ under a reasonable royalty theory.  (Ex. 1 at

6).  Mr. Napper's report is beyond aggressive advocacy, and its flaw warrants its exclusion.  The

Court should exercise its gate-keeper function on the principles of the *Daubert* case and its

progeny.

Mr. Napper claims lost profits damages for Callaway beginning in September 2003, using

a "market share" approach—that is he computes Callaway's lost profits by applying Callaway's

---

████████████████████████████████████████████████

███████████

market share to Acushnet's sales.  (Ex. 1, Napper Report at 35.) ███████████

██████████████████████████████████████████████

██████████████████ He makes no attempt to reconstruct what would have happened

during this period "but for" any infringement, and this error is fatal.

Mr. Napper recognizes the need to identify products that compete with the accused Pro

V1 balls in order to identify acceptable substitutes in a marketplace place without the Pro V1.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████ This, too, is a methodological error.

To his calculation of lost profits beginning in September 2003, Mr. Napper adds at the

end an alleged reasonable royalty on all of Acushnet's accused sales before September 2003. *Id.*

at 36.  This tacked-on royalty shows the obvious flaw in Mr. Napper's approach. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

Mr. Napper's report also presents an alternative damages opinion based strictly on a

reasonable royalty. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

In support of this opinion, Mr. Napper cites several inadmissible settlement agreements that he describes as providing for an ongoing royalty. *Id.* at 55-57. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

## III.    ARGUMENT.

### A.    Applicable Law.

#### 1.    The Federal Rules of Evidence.

Federal Rules of Evidence 702 governs the admissibility of expert testimony in federal district courts:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under this standard, an expert witness' testimony must pass at least a three pronged test in order to be admissible:  the expert must be sufficiently *qualified* to testify; the testimony must be *reliable*, in the sense of being based on an acceptable methodology; and the testimony must be *relevant*, assisting the trier of fact by fitting to the data of the case. *Galentine v. The Estate of William R. Stekervetz*, 273 F. Supp. 2d 538, 540-43 (D. Del. 2003).

2.    **The *Daubert* Decision Requires the Court to Act as a Gatekeeper to Preclude Admission of Improper Expert Testimony.**

Under the Supreme Court's decisions in *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), the Court serves a gatekeeper function, and must determine if proffered expert testimony is admissible under Rule 702. The Supreme Court, in *Daubert,* noted that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (citations omitted).

Expert testimony must be "more than belief or unsupported speculation." *Daubert,* 509 U.S. at 590. Further, "nothing in Daubert of the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 552 U.S. 136 (1997). ("A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.")

Under Rule 702, an expert's testimony must be reliable to be admitted. *See Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir. 1997). Expertise in a subject area alone is not sufficient. The expert must apply a reliable methodology to the facts of the case. *See Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 324 (3d Cir. 2003). The Third Circuit uses a multi-factor test to determine whether an expert's testimony is considered reliable. Suggested factors that a court should consider include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the

expert witness testifying based on the methodology; and (8) the non-juridical uses
to which the method has been put.

*Id.* at 321 (*quoting In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir. 1994)).  This

list of factors is neither mandatory nor exclusive, but is instead intended to provide guideposts

for the court in determining reliability; the court should examine such factors if they are relevant

to the particular facts at hand.  *Izumi Prods. Co. v. Koninklijke Philips Electronics N.V.*, 315 F.

Supp. 2d 589, 601 (D. Del. 2004) (*citing Kumho Tire Co.*, 526 U.S. at 137).

An expert report must be excluded where the expert fails to take into account relevant

facts and variables.  An expert must have "good grounds" for his opinion, and his report must be

closely tied to the facts in a case.  *See Daubert*, 509 U.S. at 590 (expert must have "good

grounds" for his opinion); *Astrazeneca L.P. v. Tap Pharm. Prods.*, C.A. No. 04-1332-KAJ 2006

U.S. Dist. LEXIS 40620, at *17 (D. Del. May 18, 2006) (excluding expert who failed "to have

taken account of and corrected for enough variables to allow a rational cause-and-effect

conclusion to be drawn.").  Thus a reliable expert considers and takes into account the possibility

of alternatives to his analysis; and an expert who fails to is excluded.  *See Concord Boat Corp.,

et al. v. Brunswick Corp. et al.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000) (expert's "opinion

should not have been admitted because it did not incorporate all aspects of the economic reality

of the stern drive engine market and because it did not separate lawful from unlawful conduct.");

*Blue Dane Simmental Corp. et al. v. American Simmental Assoc. et al.*, 178 F.3d 1035, 1040-41

(8th Cir. 1999); *Claar v. Burlington N.R.R.*, 29 F.3d 499, 509 (9th Cir. 1994) (reliability rests on

whether the expert has accounted for obvious alternative explanations.);  *Whitaker v. Van

Fossan*, 279 F.2d 245, 246 (4th Cir. 1961) ("even if he [the expert] were competent to render the

opinion he ventured, it was not receivable if he failed to take into account every relevant

factor."); *Smithers v. C&G Custom Module Hauling*, 172 F. Supp. 2d 765, 772 (E.D. Va. 2000)
(expert failed to take into account variables which created doubt about the reliability of his
opinions and rendered them inadmissible under Daubert).

### 3.    The Burden of Proof Lies on the Party Offering the Expert Witness.

The burden of proof of admissibility of an expert witness rests on the party who is
attempting to offer that witness' testimony at trial. *See Oxford Gene Tech., Ltd. v. Mergen Ltd.*,
345 F. Supp. 2d 431, 434 (D. Del. 2004). The expert must himself develop his opinion and the
justification for it in his report. "The opposing party is not required to depose the expert to
develop what his opinion is or the reasons for it." *Bonesmo v. The Nemours Found.*, 253 F.
Supp. 2d 801, 810-11 (D. Del. 2003).

### B.    Napper's Lost Profit Calculation Should Be Excluded from Evidence.

Mr. Napper's lost profit analysis is fatally flawed in that the lost profit methodology is
applied inaccurately and is based on little more than Mr. Napper's *ipse dixit* and far fetched
reconstruction of the "but for" world in September 2003.

The analysis an expert must undertake to establish a claim to lost profits is set forth in
*Grain Processing Corp.*, 185 F.3d 1341: "To recover lost profits, the patent owner must show
'causation in fact,' establishing that 'but for' the infringement, he would have made additional
profits." *Id.* at 1349. This analysis requires a detailed consideration of the market – it is
necessary to determine what would have occurred had there never been any infringement. *Id.* at
1350.

While such a reconstruction is by its nature a hypothetical exercise, *Grain Processing*
expressly teaches that it must not "laps[e] into pure speculation." *Id.* To ensure that it does not,

a determination of lost profits "requires **sound economic proof** of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.* (emphasis added).

Moreover, in *Grain Processing* the court emphasized that an alleged infringer cannot be considered to have simply stood still in the absence of infringement: "a fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have taken had he not infringed." *Id.* The court in particular stressed that, "*[w]ithout the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative.*" *Id.* (emphasis added.)

Here, Mr. Napper's lost profits analysis is fatally flawed by two, related methodological errors: (1) he begins his lost profit analysis in 2003, not in 2001 when the infringement began; and, (2) as a result of the first error, he fails to account for or even consider competition that would have existed and that would have eliminated (or greatly reduced) any lost profits.

### 1.     Mr. Napper Ignores The Period 2001-03.

Whether calculated as reasonable royalty or by lost profits, patent damages are calculated by looking at the market as it existed at the time the infringement began. *See Applied Materials,* 435 F.3d at 1363; *Grain Processing,* 185 F.3d. at 1450. *Accord, Cardiac Pacemakers, Inc. v. St. Jude's Medical Center,* 418 F. Supp. 2d 1021, 1039 (S.D. Ind. 2006) (*Grain Processing* instructs that the court's reconstruction of the market "take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed."). Mr. Napper ignores this basic principle and hence his reconstruction of the market is meaningless and irrelevant.

As noted already, Mr. Napper ignores the period of alleged infringement from April 2001-September 2003. Instead, he assumes that Callaway can begin recovering lost profits in

September 2003 based on a reconstruction of the market beginning in September 2003, the date

when it bought the patents from Spalding's bankrupt estate.  Mr. Napper never evaluates what

would have happened had Acushnet stopped infringing in 2001; he never even attempts to

evaluate how the market would have developed if the Pro V1 were not in it; and he never

attempts to evaluate the non-infringing alternatives available to Titleist in April 2001 (both

wound balls and solid construction balls not accused of infringement) and how the market would

have responded had the unquestioned market leader – Acushnet's *Titleist* brand – offered a

different, non-infringing ball beginning in 2001.

Instead of conducting a realistic and appropriately framed economic analysis, Mr. Napper

calculates damages by crudely and bluntly eliminating Acushnet as a competitor in what he calls

a "premium" ball market beginning in 2003, and then dividing up the share of sales made by

Acushnet's Pro V1 among the other competitors in his (also erroneously constructed) "premium"

ball market.  Mr. Napper then awards Callaway lost profits on its "share" of this "market," and

comes up with ███████████ in damages.

Plainly, Mr. Napper cannot reach this incorrect result unless he ignores the period 2001-

03; ignores the alternatives available to Acushnet if it could not sell the Pro V1 during this

period; ignores the fact that elsewhere in his report he assumes Acushnet and Spalding would

have negotiated a paid up license in 2001 for the patents in suit and hence the Pro V1 would be

licensed by 2003; and ignores all of complexities of actually calculating the nature of

competition in a properly defined relevant golf ball market.  Indeed, Mr. Napper has ignored

nearly every relevant inquiry.  The only certainty one can derive from Mr. Napper's report is that

it is virtually 100% certain that the "but for" market, properly constructed, **would look nothing

like the market Napper posits.**

14

It is relevant to note that Mr. Napper is not an economist, he is an accountant. ████████ ████████████████████████████████████████████████████████████████ he has no formal degree in the subject.[4] ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Mr. Napper has also not published any papers in the realm of economics. *See* Ex.1, Napper Report, Ex. 1. As an accountant, he possesses skill in taking a predefined market and determining from sales documents what lost profits were. Where he is conspicuously lacking in expertise, however, is in the economic areas needed to define that market in the first place. He certainly does not possess the skill level required to supply "sound economic proof of the nature of the market" as required by *Grain Processing*, 185 F.3d at 1350.

>        2.    **Focusing on April 2001, the Time the Infringement Began, Compels an Award Based on a Reasonable Royalty.**

As Spalding, the original patent owner, did not make a ball that practiced the '293 Patent until years later, the damages Spalding would have recovered would be based on a reasonable royalty. *See Panduit Corp.*, 575 F.2d at 1157. ("When actual damages, e.g. lost profits, cannot be proved, the patent owner is entitled to a reasonable royalty.") ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Thus, a proper analysis of patent damages would find that damages were calculated as a reasonable royalty, based on a hypothetical negotiation in April 2001. This analysis would thus exclude any

---

[4] ████████████████████████████████████████████████████████████ ████████████████████████████████████████

lost profit award, as the hypothetical license that the parties would negotiate would be for the life

of the patents.

### 3.      Mr. Napper Fails to Account for Non-Infringing Alternatives in the "But-For" World.

Although using the 2003 date is wrong as a matter of law, to create a lost profits model

for the time after September 2003, Mr. Napper would be required to reconstruct a "but-for

world" where Acushnet's accused products were not present. *Grain Processing*, 185 F.3d at

1350 ("The 'but for' inquiry therefore requires a reconstruction of the market, as it would have

developed absent the infringing product."); *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377

(Fed. Cir. 2003); *Isco Int'l v. Conductus, Inc.*, C.A. No. 01-487-GMS, 2003 U.S. Dist. LEXIS

1885, at *4 (D. Del. Feb. 10, 2003).  In other words, Mr. Napper would have to try to recreate the

market in September 2003 as it would have looked if Acushnet had stopped selling the Pro V1 in

April 2001.  Mr. Napper never even tries to undertake this analysis.

Instead of conducting a correct analysis, Mr. Napper takes the world as it existed in

September 2003,[5] and assumes that Acushnet could not have sold the Pro V1 ball, and divides

those sales between the other participants in the marketplace.  This crude approach does not rise

to the level of analysis required under *Grain Processing*, 185 F.3d 1341.  The flaws in this

approach are many.

Most obviously, Napper's approach fails to consider how the market would have

developed from 2001 until September 2003 had the Pro V1 been removed from the market in

2001.  Where a damages model fails to take into account the effect of actions of competitors in

the marketplace, courts have shown themselves willing to exclude evidence or experts entirely.

*See American Bearing Co., Inc. v. Litton Industries*, 540 F. Supp. 1163, 1174 (E.D. Pa. 1982).

The same case cited an earlier holding further criticizing a failure to include reasonable reactions

from competitors:

> Perhaps the most blatant defect in plaintiff's damage model for lost profits is its
> failure to account for any lawful competition. Surely plaintiff cannot have
> expected the defendants to sit idly by… To postulate damages on the assumption
> that they would not individually react by reducing their prices and therefore
> require plaintiff to further reduce its price, thus reducing its profit, is absurd. Nor
> did plaintiff present any evidence from which the jury could, without speculation,
> determine what the affect of lawful competition would have been and reduce the
> damages accordingly.

*Id. See also Lantech, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816 (D. Utah Feb. 13, 2001)

(excluding expert testimony based on lack of independent economic analysis of facts).

Mr. Napper never considers in his report the issue of how the market would have

developed if the Pro V1 were withdrawn in April 2001. In all likelihood, he ignores this issue

because the analysis would be so highly speculative and uncertain so as to preclude a lost profits

award. For example, Mr. Napper would have to ask and answer, at least the following questions

in order to recreate the but for market in September 2003.

○ How would Acushnet have responded if the Pro V1 were removed from the market?
  What products would it offer instead? Any market reconstruction must take into
  account the alternatives available to the accused infringer. *See Grain Processing,* 185
  F.3d 1341; *Cardiac Pacemakers,* 418 F. Supp. 2d 1021; *see also Johnson Electric*
  *North America, Inc. v. Mabuchi Motor America Corp.*, 103 F. Supp. 2d 268
  (S.D.N.Y. 2000) (court excluded the expert testimony regarding lost profits where the
  expert completely excluded the defendant from the but-for market he constructed

absent infringement, where the defendant had access to non-infringing product
alternatives).

o   Given that Acushnet was the market leader in premium golf balls (however that is
    defined) with over 60% of the tour players, how would the market place have
    changed if Acushnet offered a different product in 2001? What balls would players
    have chosen, from whom, and in what percentages? What effect would this have on
    the future of the market?

o   Acushnet offered other solid construction, non-infringing balls, such as the HP Tour
    in 2001. What percentage of the market would have switched to that ball if promoted
    as the premier Titleist product? How would other manufacturers have responded to
    this offering?

o   What percentage of players would have kept playing the Titleist Professional wound
    ball in the absence of the Pro V1 as of April 2001? What effect would this have on
    sales of solid construction, multi-layer balls of the type claimed in the patent?

o   Might Acushnet have taken a license to the '293 Patent family, or even acquired
    Spalding or the patents-in-suit? *See Cardiac Pacemakers, Inc.,* 418 F. Supp. 2d at
    1039 (holding that one non-infringing alternative that must be considered in a lost
    profits case is the possibility that defendant would retain "a valid license to compete
    independently in the market.")

Mr. Napper never considers any of these issues.[6] Moreover, there is essentially no

evidence in the record on any of these issues, and any attempt to recreate a "but for" world in

---

[6] His failures to consider these issues also removes his analysis from within the bounds of
acceptable rigor among economists. *Grain Processing*, 185 F.3d at 1350, is clear that Mr.
Napper has to offer sound economic proof.

2003 based on events in 2001 would likely be far too speculative to be admissible under *Grain Processing*. However, Mr. Napper does not even try to conduct this analysis.

Instead, Mr. Napper apparently assumes that the Pro V1 remains on the market until September 2003, and that at that point he can divide up Acushnet's sales and give the lion's share to Callaway. This approach however, is wrong. Under *Grain Processing*, Mr. Napper was required to reconstruct the but for world as if the Pro V1 was eliminated in April 2001; he was not free to pick a year when Pro V1 sales peak and they divide that year up as he wishes.

Thus, Mr. Napper's entire artificial, improper lost profits claim comes crashing down on itself. Mr. Napper was required to look at damages at the time the alleged infringement began. He did not, and this was error that requires exclusion of his report and testimony. His lost profit model simply falls apart because he is unable to recreate the "but for" world in September 2003 as it would have existed if Acushnet had withdrawn the Pro V1 in April 2001. Indeed, he never even tries.

Finally, to justify the marketplace in 2003 that he wants to split up for lost profits purposes, Mr. Napper implicitly must assume that Acushnet was licensed up until September 2003. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████ This is another error warranting exclusion of the report.

Thus, Mr. Napper's lost profit model is fatally flawed, wrong, and not probative of anything. The court should strike the lost profits analysis under Fed.R.Evid. 702.

4.     ████████████████████████████

Mr. Napper's lost profit analysis should also be excluded because he did not utilize

reliable methodology in reconstructing his hypothetical but for "premium" golf ball market. [7]

A reliable definition of the segment of products that compete with one another in the golf

ball market is an obvious prerequisite to a reliable determination of lost profits in the absence of

the accused product. *Cf. Crystal Semiconductor Corp. v. Tritech Microelectronics* Int'l, 246

F.3d 1336, 1360 (Fed. Cir. 2001) ("[L]ost profits due to lost sales depend on how the patentee

and the infringer interact in the market"). Defining such specific product markets is no simple

task, but rather a highly technical economic question. *See Victus, Ltd. v. Collezione Europa*

*U.S.A., Inc.*, 26 F. Supp. 2d 772, 786 (M.D.N.C. 1998) (delineating the products that compete in

a market is a "difficult economic question.") Markets are defined, in economics and in the real

world, by products that are substitutable for one another. Substitutability is the hallmark of a

proper market definition. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)

(defining a product market by "the reasonable interchangeability of use or the cross-elasticity of

demand between the product itself and substitutes for it."); *see also The American Bearing Co.*,

---

[7] ████████████████████████████████████████████████████
████████████████████████████████████████████ Such seat of the pants assumption is not sufficient to constitute "sound economic
proof of the nature of the market." *Grain Processing*, 185 F.3d at 1350. It certainly fails to meet
the *Daubert* factors of having been subjected to peer review and publication, being generally
accepted in the field, being testable, or even having any known or potentially known rate of
error. *See Calhoun*, 350 F.3d at 321. Expert admissibility requires reliability, and reliability
"requires some objective, independent verification of the expert's methodology." *Moore v.
Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Where an expert is attempting
to request a damage award for lost profits ████████████████████████, it is hardly
unreasonable to expect him to perform at least a perfunctory economic analysis.

729 F.2d at 949 ("The outer boundaries of a product market are defined by the reasonable interchangeability of use between the product itself and substitutes for it."); *Broadcom Corp. v. Qualcomm, Inc.*, No. 06-4292, slip op at 12 (3d Cir. Sept. 4, 2007) (Ex. 25) ("Competing products are in the same market if they are readily substitutable for one another; the market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir. 1979) ("High cross-elasticity of demand between two products suggests that they are in the same market.")

Thus, economists define an economic market by grouping together products which customers are willing to substitute. This is the very economic nature of a product market and the lost profits inquiry – if the Pro V1 is unavailable because of infringement issues, it is necessary to consider what golf balls customers will buy in its place. Mere assumption is not sufficient here; the Federal Circuit requires "sound economic proof." *Grain Processing*, 185 F.3d at 1350.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Such a simplistic reliance on a limited subset of documents is not a substitute for true expert analysis. "Expert opinions … are no better than the data and methodology that underscore them." *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999).

a.   **Mr. Napper's methodology for market segmentation is flawed and not based on the facts of the case.**

Mr. Napper lists four elements he claims to have considered in determining that a retail price point of ███████████ was the appropriate market segment upon which to base his lost profit analysis: "1) price points; 2) customer usage profiles (including skill level); 3) distribution channels and 4) technology profile." Ex. 1, Napper Report at 24. When Mr. Napper's report is examined, however, it becomes apparent that he exclusively uses the price point, and the other factors are mere window dressing for his predetermined decision to define the premium golf ball market segment as those balls which retail for ██████████.

Unquestionably, price is a relevant characteristic in defining a market. Basic economic theory teaches that consumers will substitute between similar products that are similarly priced if the products have similar features. However, price is only a factor in substitutability; it cannot be seen as a definition of substitutability in and of itself. *See First & First, Inc. v. Dunkin' Donuts, Inc.*, 1990 U.S. Dist. LEXIS 7432, at *253 (E.D. Pa. Mar. 27, 1990) ("Market distinctions based solely on 'price/quality' have routinely been rejected as 'unrealistic' and 'economically meaningless,' particularly if the differences 'are actually a spectrum of price and quality differences."); *see also Murrow Furniture v. Thomasville Furniture Ind., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.") Without some actual analysis of the substitutability of goods, Napper's effort to define a market based on price alone is doomed to fail.

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



The bottom line is that there is no consistency in the golf ball industry as to how a "premium" golf ball market should be defined.

Courts have consistently refused to permit experts to rely on non-economically determined product markets defined by documents from the parties. *See Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 539 (D. Md. 2002) ("To the extent that [plaintiff's expert] relied on market research done by defendants or statements by the defendants regarding their perceptions of competition, market, and the like, there is no indication tat these assessments were based on proper market research.")  Such documents are not a substitute for the expert function of proper research. *See Eastman Kodak v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) (A "proper [product] market can be determined only after a factual inquiry into the

'commercial realities' faced by consumers."); *Queen City Pizza, Inc.*, 124 F.3d at 440 (Same). Simply paying lip-service to performing economic analysis to determine a market is not sufficient; an expert is required to actually follow recognized and reliable economic techniques. *See Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006); *United Food Mart., Inc. v. Motiva Enterprises, L.L.C.*, 404 F. Supp. 2d 1344, 1352 (S.D. Fla. 2005) (rejecting testimony regarding whether two gas stations competed where expert "failed to test his hypothesis by reference to specific facts of the case," "employed a simplistic methodology," and "performed no assessment of the actual behavior of potential customers").

Mr. Napper is therefore incorrect to rely on a few documents as dispositive of the existence of a ███████████████ market for "premium" golf balls. Callaway must show that Mr. Napper's testimony meets the requirements of Rule 702, and, in the case of lost profits analysis, this requires him to demonstrate "sound economic proof" of his chosen market. *Grain Processing*, 185 F.3d at 1350. Absent such sound economic proof, and indeed absent any economic analysis whatsoever, Mr. Napper's testimony is inadmissible.

What Mr. Napper's approach fails to do is to analyze the central issue on market definition – in the absence of the Pro V1, what balls would those consumers purchase? Documents produced in this case show the economic inconsistency of defining the relevant market based on ███████████████ price point without considering customer demand and substitutability. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████



Mr. Napper did not even discuss consumer surveys such as this in his analysis. Mr. Napper's assertion that highly skilled golfers play the Pro V1 is irrelevant to the true issue – what would all Pro V1 users play in the absence of that ball.  The evidence shows that many of the balls they would play retail at ▮▮▮▮▮▮▮▮▮▮, and so Mr. Napper's proposed market fails to capture much of the relevant competition, including many non-infringing balls produced by Acushnet itself.

Finally, Mr. Napper looks to the technology of the Pro V1, and in particular its construction as a multi-layer urethane-covered ball to support his market definition.  Ex. 1,

Napper Rep. at 21-23.  Once again, however, Mr. Napper fails to take the critical step of demonstrating that individuals who play such balls *only* play such balls, and would not substitute a different ball if the Pro V1 were unavailable. ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

Unless Mr. Napper can provide evidence that once a player uses a multi-layer urethane covered ball, he or she never returns to another construction, then he cannot justify excluding those balls from his product market.

### b.    Mr. Napper's methodology produces absurd results.

Mr. Napper's unprincipled adherence to a price point of █████████████████ to define his relevant product market leads to economically implausible results. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

---

8 ██████████████████████████████████████████████████
██

Such an anomaly is not harmless – it flies in the face of basic economic principles regarding demand and substitutability. A basic rule of economics is that if two products are in competition, and one falls in price, demand will shift towards the newly lower price product. Under Mr. Napper's analysis, such basic economics is ignored, such that reducing the price of a golf ball ▮▮▮▮▮▮▮▮▮▮ would not make it a stronger competitor to the Pro V1; instead under Mr. Napper's theory, it would no longer compete with the Pro V1 at all. The result of such economic absurdity is dramatic to Mr. Napper's lost profits analysis. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

All of these errors in basic economics have the same effect – they magnify the lost profits claimed by Callaway through Mr. Napper's report. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Such flawed results cannot be considered to flow from a sound methodology, and cannot be seen as helpful to the jury in determining the amount of lost profits to which Callaway may be entitled.

Mr. Napper's market segmentation analysis is not based on any economic principles. Under *Daubert* and *Kumho Tire*, an expert must use a reliable methodology to perform his analysis. Under *Grain Processing*, the reliable methodology for lost profits analysis requires sound economic proof, and a market which includes analysis of what the alleged infringer would have done had they not produced the allegedly infringing product. Mr. Napper fails to perform either of these analyses.

Where an expert provides such evidence that flies in the face of established theory, and clearly assists his employer's litigation position, the Court must question the independence of

such analysis. "Experts are not to be 'hired guns' employed merely to support a party's position. The purpose of the court's gatekeeper role is to avoid having the jury consider testimony that is unreliable." *Lantech*, 2001 U.S. Dist. LEXIS 24816, at *27. This evidence is clearly such testimony. Under *Daubert* and *Kumho Tire*, then, it must be excluded. *See also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) (excluding expert testimony where projections were based on assumptions); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1158 (N.D. Cal. 2003) ("In the Court's mind the analytical gap between the data used and the opinion presented is far too great to permit the opinion to be introduced").

### 5. Mr. Napper's Reasonable Royalty Analysis Must Be Excluded.

Mr. Napper's reasonable royalty analysis should be excluded too because he fails to consider the single most probative evidence in the case, namely the actual discussions, objectives, and admissions of the patentee's as to what they would have taken for a license.

An expert's failure to consider important evidence warrants exclusion of his report. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict"). Courts also reject expert testimony that is seen as 'cherry-picking' only the beneficial testimony and ignoring negative evidence, even if that evidence is not undisputed. *See De Jager Constr. v. Schleininger*, 938 F. Supp. 446, 455 (D. Mich. 1996) (excluding accounting expert based on his "*modus operandi* of making unsupported assertions and projections, of deliberately ignoring documents and figures which would strike a certified public accountant in the face, and of picking and choosing among purported facts to maximize plaintiff's damages"). Note, in particular, that this is not a case where the evidence is in dispute

28

and the plaintiff's expert calculates damages based on his view of the evidence. *Compare Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When, as here the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.") Here Mr. Napper simply ignores actual, undisputed evidence of what the patentee was prepared to take for a license to the patent. Such an analysis, which ignores the single most probative evidence in the case as to a reasonable royalty, is methodologically flawed, produces clearly unreliable results, cannot help the jury, and should be excluded.



In a *Georgia-Pacific* analysis, the first factor to be considered in the calculation of a reasonable royalty rate is "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." 318 F. Supp. at 1120. In this situation, there was no established royalty for the patents-in-suit

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ Evidence of prior licenses, and prior licensing practice is strongly probative of a reasonable royalty. *See Unisply, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (the patentee's prior license agreements "should carry considerable weight in calculating a reasonable royalty rate."); *Studiengesellschaft Kohle v. Dart Industries, Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) (looking to prior licensing behavior as "highly relevant in determining the floor royalty rate.").

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Mr. Napper has chosen to ignore this evidence. Either he was not aware of it, in which case he has failed to exercise the due care required of an expert should to ensure his opinions are sound, or he was aware of it and chose to ignore it, in which case he has engaged in cherry-picking of evidence in order to justify a higher damages award for Callaway. *See De Jager Constr.*, 938 F. Supp. at 455. In either case, his testimony is unreliable and should be excluded.

b.    ~~Other license negotiations.~~

Napper also ignores other evidence of actual license negotiations concerning the patents.

████████████████████████████████████

████████████████████████████████████

30

High redaction





An expert witness is not permitted simply to ignore factual evidence in the record, hoping that if he does not mention it, it will go away.  In fact, if undisputed evidence contradicts a statement made by an expert, then that evidence of the expert is inadmissible.  *See Brooke Group Ltd.*, 509 U.S. at 242 (1993).  Cherry-picking only beneficial testimony and ignoring contrary evidence is also grounds for exclusion.  *See De Jager Constr.*, 938 F. Supp. at 455 ▄

32

Mr. Napper's testimony is not only irreconcilable with the factual record in this case, but it is based on selective use of the record with the sole purpose of increasing Callaway's alleged damages. As such, his opinion should be excluded.

## IV.    CONCLUSION

For the foregoing reasons, Acushnet respectfully requests that Mr. Napper's report and testimony be excluded from this case.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: September 10, 2007
Public Version Dated: September 17, 2007
819350 / 30030

By:    */s/ David E. Moore*
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza 6th Floor
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899
        Tel: (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 17, 2007, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on September 17, 2007, I have Electronically Mailed the document

to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030