IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

        Plaintiff,

   v.

ACUSHNET COMPANY,

        Defendant.

C. A. No. 06-91 (SLR)

**PUBLIC VERSION**

## CALLAWAY GOLF'S *OPPOSITION* TO ACUSHNET COMPANY'S MOTION TO EXCLUDE THE EXPERT TESTIMONY AND REPORT OF BRIAN NAPPER

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

David J. Miclean
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel: (650)839-5070
Fax: (650)839-5071

*Attorneys for Plaintiff*
*Callaway Golf Company*

DATED: September 28, 2007

## Table of Contents

                                                                    **Page**

I.      INTRODUCTION ...................................................................................1

II.     SUMMARY OF ARGUMENT .............................................................3

III.    STATEMENT OF FACTS ......................................................................4

        A.      Factual Background Regarding the Technology Covered
                By the Patents-In-Suit..............................................................4

                1.      Callaway Golf ................................................................4

                2.      Golf Ball Design and the Patents-in-Suit......................5

                3.      Acushnet .........................................................................6

                4.      Negotiations Between Top-Flite and Acushnet
                        For a License to the Patents-In-Suit..............................8

                5.      Mr. Napper's Methodology in Calculating
                        Damages..........................................................................9

IV.     APPLICABLE LEGAL STANDARDS ................................................10

        A.      Evidence Standard for Expert Opinions .................................10

        B.      Calculation of Damages – Legal Standard...............................11

V.      ARGUMENT........................................................................................12

        A.      Mr. Napper is a "Qualified" Damages Expert. ........................12

        B.      Mr. Napper's Lost Profits Analysis is Reliable and
                Reasonable, and Therefore Should be Admitted at Trial.......15

                1.      Legal Standard for Calculating Lost Profits .................15

                2.      Nothing in the Law Requires Mr. Napper To
                        Begin His Lost Profits "But For" Causation
                        Analysis On the Date of First Infringement...................16

                3.      Acushnet's Argument That There Can Be No
                        Lost Profits Because Acushnet Would Have
                        Received A License In April 2001 Is Contrary to
                        the Law and Leads to Absurd Results.............................18

                4.      Even Though No Legal Requirement Exists To
                        Do So, Mr. Napper Looked at the Market For the
                        Entire Period of Infringement, Including April
                        2001-September 2003. ...................................................20

i

**Table of Contents**
continued

                                                                        **Page**

        5.    As Endorsed by the Federal Circuit, Mr. Napper
              Accounts for Non-Infringing Alternatives By
              Allocating Market Share To Callaway Golf and
              All Other Competitors................................................................20

        6.    Mr. Napper's "Above $30/Dozen" Premium Ball
              Market Is Appropriate and Shows with
              Reasonable Probability That Callaway Golf
              Would Have Made a Portion of the Infringing
              Pro V1 Sales Absent Their Presence from the
              Market...........................................................................................24

        7.    Any Alleged "Flaws" in Mr. Napper's Lost
              Profits Analysis go to Credibility, Not
              Admissibility...............................................................................26

    C.  Mr. Napper's Reasonable Royalty Calculus Takes Into
        Account All Relevant Evidence In Determining the
        Appropriate Royalty.............................................................................27

        1.    A Hypothetical Negotiation Puts the Parties in a
              Different Position Than An Actual Negotiation
              Where The Accused Infringer Challenges
              Infringement And Validity Of The Asserted
              Patents..........................................................................................28

        2.    Mr. Napper Accounted for the Actual
              Negotiations Regarding the Patents-In-Suit and
              Gave Them the Appropriate Weight in Reaching
              his Reasonable Royalty Opinion.................................................31

    D.  Mr. Napper's Testimony Will Assist the Jury In
        Determining the Extent of Acushnet's Infringement, and
        the Harm Caused to Callaway Golf from that
        Infringement.........................................................................................34

VI. CONCLUSION...............................................................................................35

<u>Table of Authorities</u>

**Page(s)**

<u>CASES</u>

*Ajinomoto Co. v. Archer-Daniels-Midland Co.,*
    1998 WL. 151411 (D. Del. 1998), *aff'd,* 228 F.3d 1338 (Fed. Cir. 2000) .........................30

*American Bearing Co., Inc. v. Litton Industries,*
    540 F. Supp. 1163 (E.D. Pa. 1982) ...............................................................22

*Applera Corp. v. Micromass U.K. Ltd.,*
    204 F. Supp. 2d 724 (D. Del. 2002) ...............................................16, 17, 22

*BIC Leisure Prods., Inc. v. Windsurfing Int'l., Inc.,*
    1 F.3d 1214, 1219 (Fed. Cir. 1993)) .............................................................22

*Compare Applied Medical Resources Corp. v. U.S. Surgical Corp.,*
    435 F.3d 1356 (Fed. Cir. 2006).....................................................................17

*Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.,*
    246 F.3d 1336 (Fed. Cir. 2001)............................................................. passim

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993).................................................................................10, 11

*Ericsson, Inc. v. Harris, Corp.,*
    352 F.3d 1369 (Fed. Cir. 2003)............................................................. passim

*Fiskars, Inc. v. Hunt Manufacturing Co.,*
    279 F.3d 1378 (Fed. Cir. 2002)......................................................................12

*Georgia-Pacific Corp v. U.S. Plywood Corp,*
    318 F. Supp. 1116 (S.D.N.Y. 1970)...............................................................30

*Grain Processing Corp. v. American Maize-Products, Co.,*
    185 F.3d 1341 (Fed. Cir. 1999)...............................................................16, 24

*Hanson v. Alpine Valley Ski Area, Inc.,*
    718 F.2d 1075 (Fed. Cir. 1983)......................................................................17

*Inlince Connection Corp. v. AOL Time Warner, Inc.,*
    470 F. Supp. 2d 424 (D. Del.2007).................................................................11

*Kannankeril v. Terminix International, Inc.,*
    128 F.3d 802 (3rd Cir. 1997) ..........................................................................11

*King Instruments Corp. v. Perego,*
    65 F.3d 941,953 ......................................................................................18, 19

*Lantech, Inc. v. Novell, Inc.,*
    2001 U.S. Dist. LEXIS 24816 (D. Utah Feb. 13, 2001) ................................22

**Table of Authorities**
continued

**Page(s)**

*LePage's, Inc. v. 3M,*
    324 F.3d 141 (3rd Cir. 2003) ..................................................................14

*Micro Checmical, Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) ................................................................11

*Micro Chemical, Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) ..................................................29, 30, 35

*Oxford Gene Technology Ltd. v. Mergen Ltd.,*
    345 F. Supp. 2d 431 (D. Del. 2004) ............................................29, 30, 33

*Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,*
    75 F.2d 1152 (6th Cir. 1978) ......................................................16, 30, 32

*In re Paoli R.R. Yard PCB Litigation,*
    35 F.3d 717 (3rd Cir. 1994)) (emphasis added) .......................................11

*Rite-Hite Corp. v. Kelley Co., Inc.,*
    56 F.3d 1538 (Fed. Cir. 1995) ........................................................ passim

*Schneider v. Fried,*
    320 F.3d 396 (3rd Cir. 2003) .............................................................11, 13

*State Industries Inc. v. Mor-Flo Industries, Inc.*
    883 F.2d 1573, 1577 ....................................................................... passim

**STATUTES**

35 U.S.C. § 284 ...........................................................................................12, 29

Fed. R. Evid. Rule 702 ..............................................................................10, 14

REDACTED

## I.    INTRODUCTION

Despite the fact that Callaway Golf Company's ("Callaway Golf") damages expert – Brian Napper – has been qualified as a damages expert and has testified at trial at least 15 times in the past four years and at least four times in this court alone, Acushnet Company ("Acushnet") seeks to attack Mr. Napper's reputation and qualifications, and to effectively disqualify Mr. Napper as an expert.  Acushnet's motion merely shows it does not like Mr. Napper's opinions; not that any of his opinions lack a reasonable basis.  Acushnet is trying to prevent the jury from hearing that it has earned at least in revenue, and made at least                           in profits from the sale of its Pro V1 golf balls that infringe the Callaway Golf patents being litigated here, and that it has caused Callaway Golf to suffer more than                           damages.

To that end, Acushnet's motion attempts to manufacture flaws in Mr. Napper's expert report and testimony in hopes of disqualifying him and hiding from the jury the true extent of Acushnet's willful infringement.  By moving to exclude Mr. Napper's testimony, Acushnet seeks to cap damages at                 – the amount of damages that Acushnet's expert opines is appropriate – thereby producing an over windfall *to Acushnet* for its willful infringement of Callaway Golf's patents.  This should not be permitted.

Acushnet seeks to disqualify Mr. Napper on three bases: (1) Mr. Napper allegedly should have created the "but for" world for lost profits starting at the date of first infringement (instead of the date used by Mr. Napper, which was when the necessary factors to establish lost profits were reasonably supported by substantial evidence); (2) the premium ball market (more than $30 per dozen) used by Mr. Napper for his lost profits analysis allegedly does not account for what "*all Pro V1 users* [would] play in the absence of that ball," D.I. 286 at 25 – a level of mathematical precision neither required by law nor practical to obtain; and (3) Mr. Napper's reasonable royalty analysis does not treat as dispositive unconsummated negotiations over the patents-in-suit, which would be

1

counter to the proper analysis of a hypothetical negotiation under *Georgia Pacific*, the presumptions of infringement and validity not present in the real negotiations, and the actual facts of those real negotiations. Acushnet also tries to mix apples and oranges in its desperate attempt to exclude Mr. Napper, by mixing a lost profits analysis with reasonable royalty law (and vice versa).[1]

As shown below, Mr. Napper's damage opinions – both the lost profits analysis and reasonable royalty analysis – are based on sound economic principles, and comply with all the requirements of the applicable case law. In determining the lost profits market, Mr. Napper complied with applicable law in defining a reasonable "but for" market in the absence of Acushnet's infringing Pro V1 balls. There is absolutely no legal requirement that Mr. Napper start his lost profits analysis at the time of first infringement as opposed to the date when the necessary factors for lost profits are established. Further, although Acushnet admits it is not necessary for Mr. Napper's "but for" market to establish with absolute certainty Callaway Golf's lost profits, that is essentially the standard Acushnet asks this Court apply to Mr. Napper's analysis. Yet, under the law, all that is required is that Mr. Napper's analysis reasonably reflect that Callaway Golf would have made additional sales in the absence of Acushnet's infringing Pro V1 golf ball. This he does.

In addition, contrary to what Acushnet argues regarding reasonable royalty, Mr. Napper took into account and gave appropriate consideration to the unsuccessful negotiations between Spalding and Acushnet in 2001 in calculating the reasonable royalty.[2] However, because of significant differences between the hypothetical

---

[1] As explained below, by improperly conflating the elements of a reasonable royalty analysis with a lost profits analysis, Acushnet's arguments would never allow any patentee to recover both lost profits and reasonable royalty (for different sales) unless the patentee was selling an embodying (or competing) product on the date of first infringement. This is contrary to, and far exceeds, what is required by the law.
[2] Acushnet fails to advise the court that despite a few failed negotiations, no license has *ever* been executed for any of the patents-in-suit.

negotiation and the actual negotiations that occurred – in the hypothetical negotiations the patents are deemed valid, enforceable and infringed, whereas in the actual negotiation Acushnet challenged validity and denied infringement – Mr. Napper determined (contrary to Acushnet's expert) that the actual negotiations are not *the* determining factor in calculating the reasonable royalty, but are only *a* factor to consider in the overall reasonable royalty analysis.

For the reasons discussed below, the Court should deny Acushnet's motion to exclude Mr. Napper's expert testimony and report from trial. The jury should assess the credibility of the damages measure advanced by Callaway Golf through Mr. Napper's testimony.

## II.    SUMMARY OF ARGUMENT

Acushnet's motion to disqualify Mr. Napper from testifying on patent infringement damages in this case is founded on faulty legal theories and erroneous conclusions. Disagreement with Mr. Napper's opinions is not a basis for exclusion. Acushnet's instant motion should be denied because:

1.    There is no legal or other requirement that Mr. Napper's "but"for" market for lost profits has to start at the time of infringement or such damages can never be claimed. Entitlement to lost profits can only be established when the evidence supporting such a claim is present. Mr. Napper properly established that such evidence supported a claim in 2003, rather than the date of first infringement in 2001.

2.    The relevant market that Mr. Napper applied – the premium golf ball market based on an above $30 per dozen price point – captures the golf balls that compete with the ProV1, and is a reasonable approach to evaluating lost profits under a *State Industries Inc. v. Mor-Flo Industries, Inc.,* 883 F.2d 1573, 1577 lost market share analysis.

3.    Mr. Napper's analysis of a reasonable royalty based on a hypothetical negotiation under the *Georgia Pacific* case established an 8% running royalty, as opposed

3

to the $10 million lump sum opined by Acushnet's expert.  Unlike Acushnet's expert, Mr. Napper followed the law in evaluating the hypothetical negotiation for reasonable royalty, where unconsummated negotiations are merely *a* factor to consider, as opposed to being *the* one and only dispositive factor, and where more than lip service must be paid to the presumptions of validity, infringement and enforcement in the hypothetical negotiation – a consideration which dramatically changes the leverage between the parties.

## III.    STATEMENT OF FACTS

### A.    Factual Background Regarding the Technology Covered By the Patents-In-Suit

#### 1.    Callaway Golf

From its humble beginnings in 1982 making steel-cored, hickory-shafted wedges and putters, to its introduction in 1992 of the "Big Bertha" oversized stainless steel driver that revolutionized the game of golf, Callaway Golf has been on the forefront of innovation in the golf industry.  Today its continued innovations have made it the world's largest and most successful manufacturer of premium golf clubs.

In 1996, Callaway Golf took its spirit of innovation and applied it to the golf ball world, building its ball company from the ground up by developing cutting edge technology that would lead another revolution in the golf industry.  Specifically, in late 1999, after more than three years of research and development, Callaway Golf created what was considered the holy grail by golf designers – a ball that combined long distance off the tee, with soft feel and spin around the green.  Callaway Golf's innovative use of ball construction and polymer chemistry caused a major shift in the premium golf ball market[3] from the wound ball (products that use wound cores, which consist of a small

---

[3]    Golf balls played by tour professionals and low handicap golfers.

liquid or solid center surrounded by rubber windings) to a multi-layer, solid-core, polyurethane covered ball ("multi-layer balls").



Wound Ball

Solid Core, Multi-Layer,
Polyurethane Covered Ball

FIG. 2

However, Callaway Golf recognized that Spalding/Top-Flite had done the fundamental work in the area of multi-layer golf ball development and, importantly, had a formidable patent portfolio covering what Callaway Golf was trying to do. Therefore, in addition to developing its own ball technology, Callaway Golf acquired substantially all of the golf assets of the Top-Flite Golf Company in 2003.[4] The assets purchased included the fundamental patent portfolio on multi-layer balls, including the patents-in-suit. Top-Flite's patent portfolio was the fruit of a long history of innovation in its own right, which included developing the first Surlyn®[5] covered balls and later introducing the first multi-layered balls to the market. Today, Callaway Golf's ball business is a combination of its own product innovation supported by Top-Flite's intellectual property foundation.

**2.     Golf Ball Design and the Patents-in-Suit**

One of the greatest challenges faced by golf ball designers was resolving the tension between "distance" and "feel." Prior to the advent of the technology claimed in

---

[4]     Top-Flite was previously known as Spalding Sports Worldwide, Inc. Callaway Golf will refer to these entities interchangeably as "Top-Flite."

[5]     Surlyn® is a strong, durable, man-made polymer made by DuPont.

the patents-in-suit, a golfer had to choose one or the other because no ball could do both things well. The holy grail of golf ball designers was a performance ball that could combine long distance on the drive, with soft feel around the greens. Players of all skill levels want a golf ball that travels a great distance. Historically, to achieve distance, a ball had to be hard so that it would react well when struck by the club face of a fast moving driver, which is the club used to hit the ball a long distance off the tee. Conversely, to achieve spin, a ball had to be softer so that it would grip to the face of a more "lofted" club like an iron. The goal of golf ball design was a ball that could do both, [See Halkowski Dec. Ex. 1 at 435.]

But designing a "dual personality" ball was exceptionally difficult because concepts of "distance" and "feel" were known to be diametrically opposed. Hard balls lacked the "feel" that allowed a skilled golfer to spin the ball. Softer balls that spun well did not fly as far. Thus, golf ball manufacturers had been unable to produce a golf ball that incorporated both distance and feel. To the industry competitors' surprise and consternation, it turned out that Top-Flite and Callaway Golf were well ahead of other market competitors in this endeavor.

The patented technology that is the subject of this case gives players a soft feeling ball that spins and yet is hard, durable, and carries a great distance when struck with a driver. Callaway Golf is the owner of United States Patents Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873 (collectively the "patents-in-suit").

### 3.    Acushnet

Acushnet is a wholly-owned subsidiary of Fortune Brands, Inc., a consumer products conglomerate based in Illinois, which has collected under one roof a diverse portfolio of companies which include Jim Beam, Maker's Mark, Master Lock and Moen. Acushnet is the dominant manufacturer of golf balls in the world. Its products include balls sold under the "Titleist" and "Pinnacle" brand names; the Titleist Pro V1 family of

6

balls is at issue in this case. Throughout its history, Acushnet has been known as the "wound-ball" company. But, in response to declining sales of its premium balls and Callaway Golf's release of the Rule 35 ball in early 2000, which employed the technology disclosed in the patents-in-suit, Acushnet was faced with the decision to abandon its core wound technology and try to play catch-up with Callaway Golf and others, or face extinction. In late 2000, Acushnet released the Pro V1 – a three-piece solid-cored ball with an ionomer inner cover layer and a polyurethane outer cover layer which also practices the claims of the patents-in-suit.[6]

Acushnet has had tremendous success selling the Titleist Pro V1, Titleist Pro V1x, and Titleist Pro V1★ ("Star") balls, all of which practice Callaway Golf's patented technology. Acushnet's long-standing dominance of the golf ball market, and particularly the market for expensive, or "premium," golf balls, has allowed it to reap huge revenues and profits from sales of these balls. In addition to allowing Acushnet to reap profits and maintain its market dominance among pro tour players, the introduction of the Pro V1 line of balls sounded the death knell for its wound ball offerings, including the Titleist Professional and the Titleist Tour Balata. Those balls simply could not compete with the performance of the Pro V1 line of balls.

At the same time, independent observers acknowledge that Acushnet only reluctantly joined this revolution to multi-layer balls and, having had nothing to do with the original development of the technology, did so late. In fact, Acushnet only introduced the ProV1 because Callaway Golf and others had established the revolutionary performance of the multi-layer balls. Acushnet knew it had to play catch-up because its wound premium balls had dropped in sales volume after the introduction

---

[6] While Acushnet recognized many years earlier the enormous potential of a ball that possessed both distance and feel, it was not until October of 2000 that it actually had a commercially viable product that embodied both those characteristics.

REDACTED

by competitors of multi-layer balls.  Suddenly, Acushnet was afraid of being labeled the "wound ball company."

Acushnet's use of the patented technology in its Titleist Pro V1, Titleist Pro V1x, and Titleist Pro V1★ ("Star") balls has made its Pro V1 line of products the

[*See* Halkowski Dec. Ex. 2. ]

### 4. Negotiations Between Top-Flite and Acushnet For a License to the Patents-In-Suit

The first of the patents-in-suit to issue was the '293 patent in April 2001.  By that time, Acushnet had already experienced unprecedented success with the Pro V1, with tour pros switching to the Pro V1 in competition, and capturing an unprecedented        of the on-course golf ball market in just 4 months of it being introduced to the consumers. *Id.*  At that time, Acushnet was concerned enough about the issuance of the '293 patent that it obtained an opinion of counsel regarding the '293 patent.

In December 2001, after the Pro V1 had been on the market for more than a year and had continued to experience phenomenal success to the point that Acushnet was forced to increase its capacity to meet demand for the Pro V1, Callaway Golf's predecessor in interest in the patents-in-suit – Top-Flite – approached Acushnet regarding licensing the '293 patent.  [*See* Halkowski Dec. Ex. 3].  At that time, Peter Arturi, Top-Flite's general counsel, requested that

*Id.*

Top-Flite's original proposal to Acushnet was

Acushnet's net sales of multi-layer golf balls utilizing the technology.  [*See* Halkowski Dec. Ex. 4.].                    As a result, Top-Flite made a second license offer

[*See* Halkowksi Dec. Ex. 5.]                         [*See*

8

REDACTED

D.I. 285 at 29]. In its final communication on the subject, Top-Flite stated that

' [*See* Halkowski Dec. Ex. 6 (emphasis added)]. After that, negotiations for the '293 patent terminated between Top-Flite and Acushnet.[7]

### 5.    Mr. Napper's Methodology in Calculating Damages

Based on his experience in calculating damages in more than 50 patent infringement cases and in valuing patents and patent portfolios, Callaway Golf retained Mr. Napper to offer his opinion at trial regarding what damages, if any, Callaway Golf had sustained as a result of Acushnet's infringement of the patents-in-suit.[8] In performing his analysis, Mr. Napper and his team looked at more than 51,000 pages of documents, including documents produced by Acushnet and Callaway Golf, and documents obtained from industry specific data researchers, third party marketing firms, public sources, and many others. [*See* D.I. 285, Ex. 1 at 18-19]. Mr. Napper and his team also reviewed more than 20 depositions taken in this case, generated more than 209 tables, and spent more than 1,476 hours analyzing that data in formulating the report served in this case.

In formulating his opinion that Callaway Golf was entitled to lost profits for a portion of the infringing Pro V1 sales and a reasonable royalty on the remainder, Mr. Napper

*See id.* at 19-36, 37-61; Halksowski Dec. Ex. 7 at 34:8-16.]

This includes performing an analysis under *Panduit* and *Mor-Flo* for the lost profits

---

[7] During the 2001-2002 time frame Top-Flite was also negotiating with Callaway Golf for a license to the '293 patent. Those negotiations led to Callaway Golf's acquisition of the Top-Flite assets.

[8] Callaway Golf notes that based on Mr. Napper's experience, Acushnet's counsel, the Howrey firm, have also retained Mr. Napper to offer his opinion regarding patent damages in other cases as recently as April 2006.

calculus, and an analysis of the *Georgia-Pacific* factors for the reasonable royalty determination. As shown below, both of these methodologies are reliable and have been repeatedly accepted by this and other courts in determining patent damages.

## IV.     APPLICABLE LEGAL STANDARDS

### A.     Evidence Standard for Expert Opinions

Rule 702 of the Federal Rules of Evidence requires that the evidence or testimony offered by a witness qualified as an expert by knowledge, skill, *experience*, training or education "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). The Third Circuit has interpreted Rule 702 to have three major requirements: (1) the proffered witness must qualify as an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.[9]  *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3rd Cir. 1997). This has been termed the "qualification, reliability and fit" test. *Schneider v. Fried*, 320 F.3d 396, 405 (3rd Cir. 2003).

The determination of whether to exclude expert evidence is committed to the trial court's discretion. However, in making this determination,

> there is a significant risk that district judges will set the threshold too high and will in fact force plaintiffs to prove their case twice. Reducing this risk is particularly important because the *Federal Rules of Evidence display a preference for admissibility*.
>
> The Third Circuit has held that the exclusion of critical evidence is an *"extreme"* sanction not normally to be imposed absent a showing of willful deception or "flagrant disregard" of a court order by the proponent of the evidence.

---

[9] "Whether proffered evidence should be admitted at trial is a procedural issue not unique to patent law." *Micro Checmical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). Therefore, the district court's decision whether to admit expert testimony is governed by the law of the regional circuit in which the district court sits. *Id.*

*Inlince Connection Corp. v. AOL Time Warner, Inc.*, 470 F. Supp. 2d 424, 429-30 (D. Del.2007) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749-50, 791-92 (3rd Cir. 1994)) (emphasis added); *see also Kannankeril*, 128 F.3d at 806 ("Rule 702, which governs the admissibility of expert testimony, *has a liberal policy of admissibility*" (emphasis added)) .

To avoid the risk of improperly imposing this extreme sanction, the proferrers of the expert testimony only need show by a preponderance of the evidence that their opinions are reliable, not that the assessments of their experts are correct. *Incline*, 470 F. Supp. 2d at 430. As the Supreme Court emphasized in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Incline*, 470 F. Supp. 2d at 430.

As discussed below, Mr. Napper's opinions are reliable and well founded, and should be admitted. If Acushnet wants to challenge Mr. Napper's opinions, it can cross-examine him and present its expert's opinions at trial. Disqualifying Mr. Napper because Acushnet disagrees with Mr. Napper's opinion is neither an appropriate sanction, nor warranted here.

**B.      Calculation of Damages – Legal Standard**

The patent code provides that, upon a finding of infringement of a valid patent, the court shall award to the patentee "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Section 284 instructs that the damages award shall be "in no event less than a reasonable royalty; the purpose of this alternative is not to direct the form of compensation, but to set a floor below which damage awards may not fall." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995). However, if the patentee is in the market with a competing product at any time there are infringing sales, the patentee is entitled to "lost profits as actual damages to the extent

11

they can be proven and a reasonable royalty for the remainder." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l., Inc.*, 246 F.3d 1336, 1353-54 (Fed. Cir. 2001) ("a patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation and a reasonable royalty for any remaining infringing" sales). In calculating lost profits, absolute certainty is not required; rather a party must only show with reasonable probability that he would have made additional sales in the absence of the infringing product. *Crystal Semiconductor*, 246 F.3d at 1353-54; *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1383 (Fed. Cir. 2002).

## V.     ARGUMENT

As shown below, Mr. Napper's expert report and testimony regarding both lost profits and reasonable royalty are admissible at trial because they comply with the "qualification, reliability and fit" test articulated by the Third Circuit. *See Schneider*, 320 F.3d at 405.[10] Thus, Acushnet's present motion should be denied.

### A.     Mr. Napper is a "Qualified" Damages Expert.

A review of Mr. Napper's *curriculum vitae*, the list of cases he has been retained to work on, and the testimony and opinions he has offered in this case demonstrate that Mr. Napper is qualified to testify as a damages expert in patent cases such as this. As evidenced by Tab 1a to his expert report and by his deposition testimony in this case, over the past four years, Mr. Napper has been qualified to testify as a damages expert at trial or in arbitrations in at least 19 different cases, the majority of which were patent related. [*See* D.I. 285, Ex. 1, Tab 1a; Halksowski Dec. Ex. 7 at 55:12-75:10]. Of those, numerous cases involved testimony by Mr. Napper regarding a lost profits calculation. [*See e.g., id.* at 55:12-57:5; 58:7-59:5; 62:5-63:8.] Mr. Napper has also offered his expert opinion on damages through expert reports and/or deposition in at least 38 other cases

---

[10] *See* fn. 8, *supra*.

REDACTED

over the same period of time. [*See* D.I. 285, Ex. 1, Tab 1a.] There again, a majority of the cases involved damages related to patent infringement.

Besides offering testimony regarding damages arising from patent infringement, Mr. Napper's consulting services include: (1) intellectual property valuation, i.e.,

including

and (2) intellectual property asset management, i.e.,

[*See* Halkowski Dec. Ex. 7 at 12:17-13:15; 15:21-16:20.] Mr. Napper has also been invited to teach and guest lecture on the topic of intellectual property valuation and patent damages several times, including at the University of California at Berkeley and at Brigham Young University. [*Id.* at 21:15-22:9; 25:15-22.]

The extent of Mr. Napper's experience in testifying on patent damages issues, valuing intellectual property, and advising clients on intellectual property asset management amply qualify him to offer expert opinion testimony regarding Callaway Golf's damages resulting from Acushnet's infringement in this case. *See* Fed. R. Evid. 702 ("a witness qualified as an expert by knowledge, skill, *experience*, training or education may testify thereto in the form of an opinion or otherwise." (emphasis added)); *LePage's, Inc. v. 3M*, 324 F.3d 141, 165 n.16 (3rd Cir. 2003) (finding that plaintiff's proffered witness qualified as an expert under Rule 702 because, among other things, he had served as an expert witness in complex cases, "including five antitrust cases.").

In its opening brief, Acushnet implies that Mr. Napper's report and testimony should be excluded because "Mr. Napper is not an economist, he is an accountant." [D.I. 285 at 19.] Even though Acushnet's counsel – the Howrey firm – has retained Mr. Napper as an expert within the last two years, it now argues that Mr. Napper does not possess the skill level to adequately identify the relevant market. [*Id.*] Acushnet's

13

arguments are directly contrary to the Federal Circuit's holding in *Ericsson, Inc. v. Harris, Corp.*, 352 F.3d 1369, 1377-78 (Fed. Cir. 2003).

In *Ericsson*, which Acushnet cites for a different purpose, the defendant cross-appealed the jury's damages award, arguing that the plaintiff's damages expert,

> *an accountant* named Daniel Jackson, improperly based his definition of the so-called "Harris market" on one witness's testimony, rather than on *market research* and *recognized economic principles* such as cross-elasticity of demand between the infringing product and available substitutes.

*Ericsson*, 352 F.3d at 1376 (emphasis added). In affirming the jury's damages award, the Federal Circuit stated that plaintiff's "accountant" expert "reconstructed the 'but for' market by segmenting the market and determining Ericsson's lost profits based on its market share, a method that has met with this court's approval on previous occasions." *Id.* (citations omitted).

Here, as in *Ericsson*, Mr. Napper, an accountant with significant experience in calculating patent damages, properly segmented the infringing and competing golf balls into the "premium" golf ball market based on

[*See* Halkowski Dec. Ex. 8, Ex. 9 at 152:6-15; Ex. 10 at 72:10-17.] As shown in more detail below, this was a proper and reasonable method for segmenting the market. [*See* Section V(B)(5) & (6), *infra*.] Following the Federal Circuit's guidance, Mr. Napper then calculated Callaway Golf's lost profits based on market share. [*See id.*] Although the analysis that Mr. Napper performed in this case is unique to the facts of this case, Mr. Napper has performed lost profits analyses in patent infringement matters several times before. [*See e.g.*, Halkowski Dec. Ex. 7 at 55:12-57:5; 58:7-59:5; 62:5-63:8.] Given Mr. Napper's practical and educational experience in performing this type of analysis, Mr. Napper is more than qualified to perform, properly calculate and opine regarding Callaway Golf's lost profits in this case.

Because Mr. Napper qualifies as an expert to opine on patent damages, Callaway Golf has satisfied the "qualification" prong of the Third Circuit's Rule 702 test.

### B.   Mr. Napper's Lost Profits Analysis is Reliable and Reasonable, and Therefore Should be Admitted at Trial.

#### 1.   Legal Standard for Calculating Lost Profits

To recover lost profits, the burden initially rests on the patentee to show a *reasonable probability* that "but for" the infringement, the patentee would have made the infringer's sales. *Crystal Semiconductor*, 246 F.3d at 1353-54; *Mor-Flo*, 883 F.2d at 1577 (same); *Rite-Hite*, 56 F.3d at 1545 (same); *Grain Processing Corp. v. American Maize-Prods., Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (same); *Applera Corp. v. Micromass U.K. Ltd.*, 204 F. Supp. 2d 724, 778 (D. Del. 2002) (same). "Once the patent owner establishes a reasonable probability of 'but for' causation, the burden shifts to the accused infringer to show that the patent owner's 'but for' causation claim is unreasonable for some or all of the lost sales." *Rite-Hite*, 56 F.3d at 1544; *Grain Processing*, 185 F.3d at 1349.

The Federal Circuit has affirmed lost profit awards based on a "*wide variety* of reconstruction theories where the patentee presented reliable economic evidence of 'but for' causation." *Crystal Semiconductor*, 246 F.3d at 1355-56 (emphasis added). For example, the Federal Circuit has approved the four-factor test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), as a non-exclusive way for a patentee to prove entitlement to lost profits, i.e., for the patentee to make a *prima facie* showing of "but for" causation. *See Rite-Hite*, 56 F.3d at 1545; *Applera*, 204 F. Supp. 2d at 778. In addition, the Federal Circuit has approved variations on the *Panduit* test where the patentee demonstrated its market share percentage, and was awarded lost profits based on its pro rata market share, with a reasonable royalty for all remaining infringing sales. *See Ericsson*, 352 F.3d at 1377-78; *Crystal Semiconductor*, 246 F.3d at 1356; *Mor-Flo*, 883 F.2d at 1578. "In sum, courts have given patentees

15

**REDACTED**

*significant latitude* to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement." *Grain Processing*, 185 F.3d at 1350 (emphasis added).

Regardless of the method employed to calculate lost profits, the patentee need not negate *all possibilities* that the purchaser might have bought a different product or might have foregone the purchase altogether. *Mor-Flo*, 883 F.2d at 1577; *Rite-Hite*, 56 F.3d at 1545 ("The patentee need not negate *every possibility* that that purchaser might not have purchased a product other than its own, absent the infringement." (emphasis added)); *Applera*, 204 F. Supp. 2d at 778 (same). Rather, the patentee is only required to show a reasonable probability that it would have made the sales for which lost profits are claimed "but for" the infringement. *Crystal Semiconductor*, 246 F.3d at 1353-54; *Mor-Flo*, 883 F.2d at 1577; *Applera*, 204 F. Supp. 2d at 778.

2.    **Nothing in the Law Requires Mr. Napper To Begin His Lost Profits "But For" Causation Analysis On the Date of First Infringement.**

Contrary to what Acushnet argues as its basis for disqualification, *no legal requirement exists for Mr. Napper to begin his "but for" causation analysis at the time of first infringement*. Acushnet does not and cannot cite any legal authority that requires the "but for" causation analysis to begin at the time of first infringement. Rather, Acushnet seeks to improperly conflate the requirements of the hypothetical negotiation used to determine a reasonable royalty (which does require analysis at the time of first infringement) with the legal requirements for determining lost profits (which does not require analysis at the time of infringement – but only evaluation at a point in time when "but for" causation exists).[11] Indeed, Acushnet's own expert

---

[11] *Compare Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) ("We have held that a *reasonable royalty* determination for purposes of making a damages evaluation *must* relate to the time infringement occurred" (emphasis added)); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) ("the *key element* in setting a *reasonable royalty* … is the necessity to return

16

REDACTED

[*See* Halkowski Dec. Ex. 11 at 531:3-22.]

This critical error in Acushnet's argument is further evidenced by the draft jury instructions promulgated by this Court for patent cases. Model jury instruction 6.5, regarding lost profits for lost sales, has no requirement that "but for" causation be established as of the date of first infringement. *See Uniform Jury Instructions for Patent Cases in the District of Del.*, Instruction 6.5.[12] By contrast, model jury instruction 6.10, titled "Reasonable Royalty As A Measure of Damages," specifically requires:

> In determining a reasonable royalty, [a juror] should place yourself at the point in time when you believe the arms length negotiation that I just referred to would have been likely to have occurred. ***This is typically just before liability for infringement would begin* ....**

*Id.* at Instruction 6.10 (emphasis added). Through its jury instructions, this Court recognizes the different analytical approaches for the determination of "but for" causation for purposes of lost profits, and the date of first infringement for purposes of a reasonable royalty, and does not confuse the two in the manner Acushnet advocates.

In claiming lost profits, Callaway Golf must only show with a reasonable probability that it would have made those sales *for which lost profits are claimed* "but for" Acushnet's infringing Pro V1 sales. *Crystal Semiconductor*, 246 F.3d at 1353-54; *Mor-Flo*, 883 F.2d at 1577. Callaway Golf is only seeking lost profits starting from September 2003 forward, when all factors necessary to prove lost profits are present and supported by substantial evidence. Moreover, because there are multiple competitors in

---

to the date when the ***infringement began*****.**" (emphasis added)); <u>with</u>, *Crystal Semiconductor*, 246 F.3d at 1354 ("A patentee may obtain lost profits damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation.").

[12] "In order to show that the patent owner [plaintiff] would have made the sales the [defendant] made, the [plaintiff] must show that: (1) there was demand for the patented product; (2) [plaintiff] had the ability to meet the market demand; and (3) no acceptable non-infringing substitutes were available." *Uniform Jury Instructions for Patent Cases in the District of Del.*, Instruction 6.5.

the market, Callaway Golf only seeks lost profits on its market share percentage of those infringing Pro V1 sales for each year from September 2003 forward pursuant to a *Mor-Flo* analysis. [*See* D.I. 285, Ex. 1 at 32-35.]  As such, Callaway Golf is only required to show by a reasonable probability that it would have made those Pro V1 sales equal to its market share for each year lost profits are claimed.  As shown below, Mr. Napper has done precisely this. [*See* D.I. 285, Ex. 1 at 32-36; Sections V(B)(5) & (6), *infra*.]

>    **3.    Acushnet's Argument That There Can Be No Lost Profits Because Acushnet Would Have Received A License In April 2001 Is Contrary to the Law and Leads to Absurd Results.**

The Federal Circuit has repeatedly held that, upon a showing that a valid, enforceable patent is infringed, the patentee is entitled to "lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation *and* a reasonable royalty for any remaining infringing" sales. *Crystal Semiconductor*, 246 F.3d at 1353-54 (emphasis added); *see also Mor-Flo*, 883 F.2d at 1577.

Despite this axiom of patent damages, Acushnet erroneously argues that because it is deemed to have negotiated a license in 2001 under Mr. Napper's separate reasonable royalty analysis, that hypothetical license precludes Callaway Golf from claiming any lost profits for any subsequent period. [*See* D.I. 285 at 15-16.]  Such an argument flies in the face of both established Federal Circuit law, e.g., *Mor-Flo*, 883 F.2d at 1577; *King Instruments Corp. v. Perego*, 65 F.3d 941,953, 65 F.3d at 953, and the guidance offered by the District of Delaware's model jury instruction 6.5.  Moreover, if true, this argument would preclude any patentee from ever obtaining damages in the form of lost profits *and* a reasonable royalty unless that patentee was selling an embodying (or competing) product on the date of first infringement.  Such a result works contrary to the underlying goal of patent damages – "to afford the [patentee] *full* compensation for the infringement."[13]  *Rite-Hite*, 56 F.3d at 1547 (citation omitted; emphasis added).

---

[13] The lost profits and reasonable royalty analyses are both legal fictions that attempt to fully compensate the patentee for the infringer's wrongdoing.

In *Rite-Hite*, the infringer appealed, among other things, the patentee's right to obtain lost profits on the patentee's lost sales of competing (rather than embodying) products, and the trial court's award of a reasonable royalty for infringing sales not included in the lost profits damages. *See id.* at 1543, 1554. In affirming both the lost profits award and the reasonable royalty rate, the Federal Circuit confirmed the well established rule that a patentee is entitled to "lost profits as actual damages to the extent they can be proven and a reasonable royalty for the remainder." *Mor-Flo*, 883 F.2d at 1577; *King*, 65 F.3d at 953 (affirming an award of lost profits and a reasonably royalty). Moreover, a proper reading of the applicable cases instructs that when calculating patent damages under Section 284, the court/jury first determines whether a patentee has proven lost profits damages, and second determines any remaining reasonable royalty damages. *See Mor-Flo*, 883 F.2d at 1577 ("lost profits as actual damages to the extent they can be proven and a reasonable royalty for the ***remainder***."); *Crystal Semiconductor*, 246 F.3d at 1353-54 ("lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation and a reasonable royalty for ***any remaining infringing" sales***.).

This interpretation is further confirmed by the District of Delaware's model jury instructions for patent cases. Model jury instruction 6.5 reads:

> In determining damages, you must ***first*** determine if [plaintiff] has proven its entitled to lost profits. Only if you find that [plaintiff] is not entitled to lost profits will you ***then*** determine [plaintiff's] damages based upon a reasonable royalty.

*Uniform Jury Instructions for Patent Cases in the District of Del.*, Instruction 6.5 (emphasis added; bracket's original).

Therefore, based on a proper reading of the relevant case and statutory guidance, Acushnet's hypothetical negotiation in April 2001, resulting from the reasonable royalty analysis, does not preclude lost profits damages. Mr. Napper properly first determined Callaway Golf's damages from lost profits, and subsequently calculated the reasonable

19

royalty for any remaining infringing sales not included as lost profits.  [*See* D.I. 285, Ex. 1 at 36.]

### 4. Even Though No Legal Requirement Exists To Do So, Mr. Napper Looked at the Market For the Entire Period of Infringement, Including April 2001-September 2003.

Even though he was not required to do so, Mr. Napper began his damages analysis in May 2001.  [*See* Halkowski Dec. Ex. 7 at 131:12-134:4.]  In conducting that analysis, Mr. Napper looked at the period of time from May 2001 to September 2003 to determine whether '                                                 ' during that time.  [*Id.* at 132:23-133:2.]  Mr. Napper concluded that :

[*Id.* at 195:7-196:18.]

Based on those concerns, Mr. Napper started his lost profits

.  [*Id.* at 195:20-196:18.]

Contrary to what Acushnet argues in its opening brief, Mr. Napper did not "ignore[] the period of alleged infringement from April 2001-September 2003" in his lost profits analysis.  [*See* D.I. 283 at 13.]  Quite the opposite, he specifically looked at that period and determined that there were concerns regarding evidence sufficient to prove all the elements of "but for" causation.  Thus, Mr. Napper made the more reasonable and conservative decision to claim only lost profits from September 2003 forward.

### 5. As Endorsed by the Federal Circuit, Mr. Napper Accounts for Non-Infringing Alternatives By Allocating Market Share To Callaway Golf and All Other Competitors.

Acushnet also attacks the reliability of Mr. Napper's lost profits analysis for allegedly failing to account for non-infringing alternatives that could potentially take sales (and therefore profits) away from Callaway Golf.  However, in its rush to criticize,

**REDACTED**

Acushnet ignores controlling Federal Circuit law that permits Mr. Napper to account for non-infringing alternatives using a market share approach under *Mor-Flo*, as Mr. Napper did here, in lieu of individually evaluating claimed non-infringing substitutes.

As already discussed, the Federal Circuit has approved the *Panduit* four-factor test as a reliable method to show "but for" causation in claiming lost profits. *See Rite-Hite*, 56 F.3d at 1545; *Applera*, 204 F. Supp. 2d at 778. Under *Panduit*, the patentee must show: (1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) capacity to exploit the demand in the absence of the infringing products, and (4) the amount of profit the patentee would have made. *See Rite-Hite*, 56 F.3d at 1545; *Applera*, 204 F. Supp. 2d at 778. With respect to the second factor – the consideration of non-infringing substitutes – which is the focus of Acushnet's attack, the Federal Circuit has specifically held that "*a patentee may rely on proof of market share in lieu of proof of non-infringing substitutes in a lost profits analysis.*" *Ericsson*, 352 F.3d at 1378 (citing *BIC Leisure Prods., Inc. v. Windsurfing Int'l., Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993)) (emphasis added); see also *Mor-Flo*, 883 F.2d at 1577-78 (same).[14]

---

[14] Despite Acushnet's knowledge of at least *Mor-Flo* and Mr. Napper's reliance on it in his lost profits analysis, Acushnet does not cite to *Mor-Flo*, in its *Daubert* motion. [*See* Halkowski Dec. Ex. 7 at 40:11-16 (                                     Moreover, the facts in *Ericsson*, which relate directly to an appeal of lost profits for patent infringement, are also ignored in lieu of cases dealing with lost profits for antitrust violations. *See e.g., American Bearing Co., Inc. v. Litton Industries*, 540 F. Supp. 1163, 1174 (E.D. Pa. 1982) (involving economist's testimony in an antitrust suit); *Lantech, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816 (D. Utah Feb. 13, 2001) (excluding expert testimony in an antitrust suit). Acushnet's reliance on antitrust cases is dubious, at best, particularly because Acushnet's own expert is on record as differentiating the "market" for purposes of lost profits in patent infringement cases from the "market" for purposes of antitrust cases. *See* Richard B. Troxel and William O. Kerr, *Calculating Intellectual Property Damages*, 2006 Edition. Thompson/West Publishing, § 3.3, p. 45 ("The definition of a relevant market in patent matters tends to be more distinct, and generally narrower than the definition used by economists in antitrust matters.")

REDACTED

     In determining Callaway Golf's lost profits, Mr. Napper allocated to Callaway Golf a percentage of the infringing Pro V1 sales commensurate with Callaway Golf's share of the above $30/dozen premium ball market.  For example, in 2005, Acushnet sold approximately              in the above $30/dozen premium ball market, accounting for

       Callaway Golf/Top-Flite sold

      and all other market participants sold approximately

        [*See* D.I. 285, Ex. 1, Tabs 7 & 9.]  In determining Callaway Golf's lost profits for 2005, Mr. Napper attributed

Callaway Golf as lost profits based on its pro rata market share in the absence of the infringing Pro V1.  All other infringing sales were credited to other market participants, including     to Acushnet itself for its sale of non-infringing products in the above $30/dozen premium ball market.  This analysis was performed for *each period* in which Callaway Golf claims lost profits, starting in September 2003.

     As the Federal Circuit held in *Mor-Flo*, Acushnet receives a windfall from this approach because:

> To the extent infringing competitors [get] credit for sales that should have gone to [Callaway Golf], the share of the market against which [Acushnet's] damages might be addressed is reduced. … *[I]n these circumstances the presence of or absence of acceptable non-infringing substitutes does not matter.*

*Mor-Flo*, 883 F.2d at 1578 (emphasis added).

     Moreover, even if Mr. Napper were required to individually evaluate alleged non-infringing substitutes in his analysis (which he is not when using a *Mor-Flo* market share approach), Callaway Golf (or Mr. Napper) has been presented with no credible evidence that Acushnet had or could have developed any *acceptable, non-infringing* alternatives

**REDACTED**

to the infringing Pro V1.[15] As the accused infringer, it is Acushnet's burden to show the existence of acceptable, non-infringing alternatives; after all, Acushnet chose to produce the Pro V1 rather than another, potentially non-infringing product. *Grain Processing*, 185 F.3d at 1353. To have attempted to determine what Acushnet would have offered as an alternative would wander into the realm of pure speculation. Thus, it was far more reasonable for Mr. Napper to look at actual market conditions for each year lost profits are claimed, and allocate the sales of the infringing Pro V1 balls based on market share for that year – an approach that has repeatedly met with the Federal Circuit's approval.

---

[15] To date, Acushnet has at best identified five *potential* products that it believes to be "acceptable, non-infringing alternatives:" (1)              (2)·              (3)         (4)              ·, and (5) none of these balls are "acceptable" and/or "non-infringing." Initially, the        (both older wound ball technology), and        were not even sold by Acushnet or in the market at the time lost profits are sought. Under *Grain Processing*, such balls would not even be properly considered as acceptable, non-infringing substitutes. *Grain Processing*, 185 F.3d at 1354.

More importantly, with respect to the        , the·        the·  XT, and the        none of those balls offer the performance characteristics of the Pro   ·, and would therefore not have been acceptable to tour professionals in light of Callaway Golf's multi-layer market offerings such as the Rule 35, CTU 30, or HX Tour. [*See* Halkowski Dec Ex.12 ·        ·, and Ex. 13 (        ·  With respect to the alleged        alternative, that ball was never commercially available, suffers from substantial performance deficiencies as compared to the Pro V1 (and potentially the Callaway Golf balls) as noted by the developer, and more importantly, would be covered by other Callaway Golf patents. Therefore that alternative is neither acceptable, nor non-infringing. *See Rite-Hite*, 56 F.3d at 1548; Richard B. Troxel and William O. Kerr, *Calculating Intellectual Property Damages*, 2006 Edition. Thompson/West Publishing, § 3.19, p. 77 ("if a potential substitute product is itself infringing, it cannot be considered to be acceptable as a substitute in the but-for market").

Notwithstanding all these reasons why these alleged alternatives do not need to be considered in an evaluation of lost profits, Mr. Napper included some of the        sales for the period of lost profits as part of his conservative approach to establishing the premium ball market. *See* Section V(B)(6), *below*.

**REDACTED**

> 6.    Mr. Napper's "Above $30/Dozen" Premium Ball Market Is
> Appropriate and Shows with Reasonable Probability That
> Callaway Golf Would Have Made a Portion of the Infringing
> Pro V1 Sales Absent Their Presence from the Market.

Acushnet also criticizes Mr. Napper's lost profits analysis on alleged deficiencies

in his "above $30/dozen" premium ball market definition.  As shown here, Acushnet's

criticisms fail because Mr. Napper's analysis establishes with reasonable probability that

Callaway Golf would have made Acushnet's sales absent the infringing Pro V1.  Indeed,

Acushnet's own expert acknowledged that Callaway Golf would have made

[*See* Halkowski Dec. Ex. 11 at 580:21-581:9.]  Instead,

Acushnet and its expert seek to require that Mr. Napper's lost profits analysis determine

"what would *all Pro V1 users* play in the absence of that ball."  [D.I. 285 at 25 (emphasis

added).]  This is much more than the law demands.

As already discussed, the purpose of patent damages under Section 284 is "to

afford the [patentee] full compensation for the infringement."  *Rite-Hite*, 56 F.3d at 1547

(citation omitted).  To this end, a patentee who claims lost profits is required to show

only with *reasonable probability* that it would have made the infringer's sales (or a

portion thereof) absent the infringing product.  *Crystal Semiconductor*, 246 F.3d at 1353-

54; *Mor-Flo*, 883 F.2d at 1577.  The patentee is not required to negate *every possibility*

that the purchaser might have bought a different product or might have foregone the

purchase altogether.  *Mor-Flo*, 883 F.2d at 1577.

A comparison of the golf balls included in Mr. Napper's above $30/dozen

premium ball market to the balls identified by Acushnet (and its damages expert) and

Callaway Golf demonstrate the reasonableness of Mr. Napper's lost profits analysis for

those years in which lost profits are claimed.  For example, during his deposition, George

Sine, Acushnet's Rule 30(b)(6) witness on the identification of golf balls that compete

with the Pro V1, testified that in determining what balls compete with the Pro V1, he

24

**REDACTED**

would

[*See* Halkowski Dec. Ex. 9 at 159:15-21 (emphasis added).]  Mr. Sine

specifically identified those balls he thought fell within that category:

[*Id.* at 160:2-167:13; 203:23-204:2.]

Of those balls identified by Mr. Sine as competitive with the Pro V1 that are

available for sale in the United States, all except the                are included in Mr.

Napper's above $30/dozen premium ball market definition.  With respect to the

only sold 5940 dozen balls in 2006 compared to more than 8 million dozen

balls included in Mr. Napper's above $30/dozen market.  This represents approximately

0.07% of the balls that are in Mr. Napper's identified market.  Also, Mr. Napper's above

$30/dozen premium ball market conservatively includes many more golf balls than just

those identified by Mr. Sine.  As such, Mr. Napper's analysis gives credit to competitors

for sales that might have otherwise gone to Callaway Golf if Acushnet's own view of Pro

V1-competing balls were used.  Thus, Mr. Napper's market definition reduces the basis

for which Callaway Golf can claim lost profits against the infringing Pro V1, and shows

with reasonable probability that Callaway Golf would have made those sales.  *See Mor-*

*Flo*, 883 F.2d at 1578.

Callaway Golf documents relied upon by Acushnet's damages expert to criticize

Mr. Napper's market definition reveal similar results as to the reasonableness of Mr.

Napper's market definition.  For example, in 2003, Callaway Golf placed golf ball

---

[16] Mr. Sine also stated that certain balls from            and            would be
included in his list of tour played balls, although he could not identify specific models.
Mr. Napper's above $30/dozen market includes offerings from        . and

**REDACTED**

offerings in the United States in one of three categories: Performance, Distance, and Spin. [*See* Halkowski Dec. Ex. 14; D.I. 285; Ex. 8, p. 43, n.131.] All infringing Pro V1 balls were identified as part of the "Performance" category, along with 25 other balls, for a total of 28 different ball models. [*See* Halkowksi Dec. Ex. 14]. Of those 28 balls identified by Callaway Golf in the "Performance" segment, 25 of those are included in Mr. Napper's above $30/dozen premium ball market in 2003. Of the three ball models not included in Mr. Napper's market for 2003, two of those, the                 and the                                have no recorded ball sales for 2003. Thus, in reality, only one ball model –                    – is excluded when using Mr. Napper's above $30/dozen premium ball market definition. [*See also* Halkowski Dec. Ex. 8 (all balls identified by Acushnet in the                                   are included in Mr. Napper's market for lost profits analysis).]

Further, of the balls identified in Acushnet's documents as competitive with the Pro V1, all those (as well as a number of other balls) are included in Mr. Napper's above $30/dozen premium market. [*See e.g.*, Halkowski Dec. Ex. 21; Ex. 15; Ex. 16 and Ex.17].

Although Mr. Napper's market analysis may not "negate every possibility that the purchaser might have bought a different product," his analysis shows with reasonable probability that Callaway Golf would have made a portion of Acushnet's sales in the absence of the infringing Pro V1 from the market. Thus, Mr. Napper's above $30/dozen premium ball market complies with the requirements of controlling Federal Circuit law and his opinions on lost profits should be admitted at trial.

### 7. Any Alleged "Flaws" in Mr. Napper's Lost Profits Analysis go to Credibility, Not Admissibility.

As shown above, Mr. Napper's lost profits analysis meets the reliability prong of the Third Circuit's Rule 702 test. All of Acushnet's attacks are more properly directed at

attacking Mr. Napper's credibility, not to the admissibility of Mr. Napper's analysis. The Federal Circuit's holding in *Ericsson* is directly on point.

It is worth repeating that in *Ericsson*, the defendant cross-appealed the jury's damages award, arguing that the plaintiff's damages expert,

> improperly based his definition of the so-called "Harris market" on one witness's testimony, rather than on ***market research*** and ***recognized economic principles such as cross-elasticity of demand between the infringing product and available substitutes*** … [and] failed to take into account available lower-power SLICs that were noninfringing substitutes for those covered by the '222 patent..

*Ericsson*, 352 F.3d at 1376 (emphasis added). In affirming the jury's lost profits award, the Federal Circuit concluded that the damages expert's market definitions and allocations – identified from documents produced in the case and testimony from various witnesses – "were supported by ***substantial and economically sound evidence***." *Id.*

For the reasons articulated in *Ericsson*, Mr. Napper's analysis is admissible at trial. As in *Ericsson*, Mr. Napper looked to documents produced in this case and to the testimony of witnesses, including employees of both Callaway Golf and Acushnet, in performing his lost profits analysis. [D.I. 285, Ex. 1 at 24-25.] Moreover, in defining the relevant market, Mr. Napper also looked at the players that play certain balls and the technology employed in manufacturing balls. [*Id.* at 25-26.] As in *Ericsson*, Mr. Napper's opinions are based on sound economic principles, comply with the reliability test of Rule 702, and are admissible at trial. All of Acushnet's criticisms of Mr. Napper's opinions and report go to the weight that should be afforded Mr. Napper's testimony, not its admissibility.

Accordingly, Mr. Napper's lost profits testimony and report should admitted at trial.

### C.   Mr. Napper's Reasonable Royalty Calculus Takes Into Account All Relevant Evidence In Determining the Appropriate Royalty

Mr. Napper's reasonable royalty opinions and testimony are also reliable and should be presented to the jury at trial. First, Mr. Napper considered ***all*** relevant

evidence in determining his reasonable royalty rate, and the resulting damages, including the actual negotiations by the parties, in conducting his *Georgia-Pacific* analysis. Second, Mr. Napper's running royalty rate of 8% is reasonable and supported by the evidence when viewed in light of the parties' bargaining positions in the hypothetical negotiation, and the facts surrounding the actual negotiations in and around 2001-2002. As such, his opinions comply with the controlling case law, and are admissible.

> **1.    A Hypothetical Negotiation Puts the Parties in a Different Position Than An Actual Negotiation Where The Accused Infringer Challenges Infringement And Validity Of The Asserted Patents.**

Under Section 284, a patentee is entitled to not less than a reasonable royalty on the infringer's sales for which the patentee has not established entitlement to lost profits. *See* 35 U.S.C. § 284; *Oxford Gene Technology Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 441 (D. Del. 2004). The Federal Circuit has endorsed the conceptual framework of a hypothetical, arm's length negotiation between a willing licensor and a willing licensee as a means for determining a reasonable royalty. *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) (citations omitted); *Oxford Gene*, 345 F. Supp. 2d at 441. Although the Federal Circuit has not prescribed a specific methodology for calculating a reasonable royalty in the context of the hypothetical negotiation, it has endorsed the use of the fifteen factors set forth in *Georgia-Pacific Corp v. U.S. Plywood Corp*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) as a non-exclusive method for calculating a reasonable royalty. *Micro Chemical*, 317 F.3d at 1393; *Oxford Gene*, 345 F. Supp. 2d at 441 (courts "regularly rely upon the fifteen" *Georgia Pacific* factors in calculating a reasonable royalty.).

No matter how it is calculated,

> the setting of a reasonable royalty after infringement cannot be treated ... as the equivalent of ordinary royalty negotiations among truly willing patent owners and licensees. That would constitute a pretense that infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy on every patent owner. ... [T]he

28

> infringer would have nothing to lose, and everything to gain if he
> could count on paying only the normal, routine royalty non-
> infringers might have paid.   … [T]he infringer would be in a
> "heads-I-win, tails-you-lose" position.

*Panduit*, 575 F.2d at 1158.  As such, the hypothetical negotiation differs significantly

from an actual negotiation in at least three ways.  First, the patents are presumed valid,

enforceable, and infringed for purposes of the hypothetical negotiation.  *See Ajinomoto*

*Co. v. Archer-Daniels-Midland Co.*, 1998 WL 151411 at *50 (D. Del. 1998), *aff'd*, 228

F.3d 1338 (Fed. Cir. 2000); *see also* Richard B. Troxel and William O. Kerr, *Calculating*

*Intellectual Property Damages*, 2006 Edition. Thompson/West Publishing, § 5.8, pp.

213-216.  This is substantially different from an actual negotiation where an accused

infringer will likely contest infringement and validity, as Acushnet did in real

negotiations over the patents in suit.  [*See* Halkowski Dec. Ex. 18 at 142:4-143:18.]

Second, the patentee and the licensee are assumed to know all relevant business facts.

Third, experts are "permitted to consider facts and events that occurred after infringement

began even though those facts could not have been known by the hypothesized

negotiators."  *Ajinomoto*, 1998 WL 151411 at *50; Richard B. Troxel and William O.

Kerr, *Calculating Intellectual Property Damages*, 2006 Edition. Thompson/West

Publishing, § 5.8, pp. 213-216.

     These assumptions all serve to strengthen the bargaining position of the patentee -

- Callaway Golf/Top-Flite – as compared to the an actual negotiation.  This also  results

in reasonable royalties from damages awards that typically *exceed* the royalties resulting

from voluntary negotiations that take place outside of litigation.  [*See* Halkowski Dec.

Ex. 18 at 143:19-144:9; Richard B. Troxel and William O. Kerr, *Calculating Intellectual*

*Property Damages*, 2006 Edition. Thompson/West Publishing, § 5.8, p. 213-216].

Indeed, Acushnet's expert

                         [*See* Halkowski Dec. Ex. 18 at 159:1-16;

# REDACTED

Richard B. Troxel and William O. Kerr, *Calculating Intellectual Property Damages*, 2006 Edition. Thompson/West Publishing, § 5.8, p. 213].

Despite the stronger, more advantageous bargaining position that Callaway Golf/Top-Flite is presumed to have in the hypothetical negotiation, Acushnet argues that Mr. Napper's determination of a 8% running royalty is "fanciful" and not grounded in fact or law. [*See* D.I. 285 at 7-9.] Acushnet seeks to improperly cap damages at a million lump sum royalty – the amount of damages that Acushnet's expert opines is appropriate – and to hide from the jury the more than            in revenue that Acushnet has earned from its infringement of the patents-in-suit. Acushnet's argument, however, again ignores the purpose of patent damages.

As discussed throughout this opposition, the purpose of Section 284 is to afford the patentee, Callaway Golf, full compensation for Acushnet's infringement, i.e., *for the use made by Acushnet of the patents-in-suit*. *See Rite-Hite*, 56 F.3d at 1547 (citation omitted). As admitted by Acushnet's employees and evidenced by the financial documents produced in this case, Acushnet has earned more than            in revenue from the sale of its infringing Pro V1 golf balls, with an average gross profit margin of            [*See* Halkowski Dec. Ex. 19 14:6-16:7; D.I. 285 at 46-47, Ex. 1, Tab 12a.] In other words, Acushnet has made more than            in gross profits from using the technology of the patents-in-suit to sell the infringing Pro V1 ball.

Yet, Acushnet seeks to limit Callaway Golf's damages to *a portion* of what it's predecessor-in-interest – Top-Flite – was negotiating for in the 2001-2002 time frame.[17] This is contrary to the admonition in *Panduit* that a "reasonable royalty [set] after

---

[17] In the actual negotiation so heavily relied upon by Acushnet to support its lump sum royalty of            \Acushnet ignores Top-Flite's final offer to Acushnet for a license to the '293 patent in October 2002 which appears to have been a return to its original position of an up front payment of            [*See* Halkowski Dec. Ex 6]. Acushnet never responded to this final offer, and there were no further communications between Top-Flite and Acushnet regarding a license to the '293 patent.

30

# REDACTED

infringement cannot be treated ... as the equivalent of ordinary royalty negotiations ... [because it] would constitute a pretense that infringement never happened." *Panduit*, 575 F.2d at 1158. Moreover, such an outcome would allow Acushnet to pay less than what Spalding/Top-Flite was requesting in the actual negotiations, and result in a windfall to Acushnet for its infringing use of the patented technology – an ionomer inner cover layer and a polyurethane outer cover layer that has made the Pro V1 the

' [*See* Halkowski Dec. Ex. 2].

Mr. Napper's analysis seeks to properly and reasonably compensate Callaway Golf for Acushnet's use of the technology directly responsible for imparting on the infringing Pro V1 the "holy grail" combination of distance and feel, credited for making it the success it is. Mr. Napper's royalty analysis is reasonable and should be admitted at trial.

> 2.    **Mr. Napper Accounted for the Actual Negotiations Regarding the Patents-In-Suit and Gave Them the Appropriate Weight in Reaching his Reasonable Royalty Opinion.**

The basis for Acushnet's *Daubert* attack on Mr. Napper's reasonable royalty analysis is two-fold. First, Acushnet criticizes Mr. Napper's determination that the royalty should be running as opposed to lump sum. Second, Acushnet criticizes Mr. Napper's supposed failure to consider the testimony of Peter Arturi (Top-Flite's General Counsel in 2001-2002), and three unconsummated license negotiations involving the patents-in-suit[18]: (1)

---

[18] *See* n.2, *supra*.

# REDACTED

[*See* D.I. 285 at 29-32.]  As shown here, Mr. Napper did consider all of this information, and gave it all the appropriate weight in rendering his opinions on the reasonable royalty.  [*See* D.I. 285, Ex. 1 at 38-41, 54-58.]  That Mr. Napper's opinion as to the importance and/or relevance of those facts differs from what Acushnet (or its damages expert) believes to be appropriate, does not provide a sufficient basis to warrant the exclusion of Mr. Napper's opinion.  At most, it allows Acushnet to challenge Mr. Napper's opinions on cross-examination at trial, nothing more.

This Court's opinion in *Oxford Gene* is particularly instructive in light of Acushnet's attack on Mr. Napper.  *See Oxford Gene*, 345 F. Supp. 2d at 441-42.  There, the plaintiff moved to exclude the testimony of defendant's patent damages expert, arguing that the expert "improperly ignored factors critical to the assessment of a reasonable royalty and that he makes dubious assumptions and incredible conclusions that ... [are] inherently unreliable."  *Id.* (internal quotations omitted; bracket and ellipses original).  Specifically, the plaintiff there argued that defendant's damages expert: (1) improperly ignored plaintiff's "most favored licensee obligations," (2) improperly ignored plaintiff's existing licenses to the patent-in-suit, and (3) improperly ignored actual negotiations between the plaintiff and the defendant that occurred around the time of the hypothetical negotiation.  *Id.*

In **denying** the plaintiff's motion to exclude defendant's damages expert, the Court stated: plaintiff's "basic attack is that Dr. Latham relies too heavily on two of the fifteen *Georgia-Pacific* factors."  *Id.*  The Court held that, by its terms, plaintiff's attack is "applicable to the *weight that should be given* Dr. Latham's opinion, *not its admissibility*."  *Id.* (emphasis added).

---

[19]  Acushnet's expert essentially views these three negotiations as dispositive of the royalty issue, and fails to give appropriate weight to the other *Georgia-Pacific* factors, or to the assumptions inherent in the hypothetical negotiation.

# REDACTED

As in *Oxford Gene*, Mr. Napper conducted his reasonable royalty calculation using the methodology set forth in *Georgia-Pacific*. [See D.I. 285, Ex. 1 at 36-37.] In performing his analysis, Mr. Napper considered all of the facts that Acushnet claims Mr. Napper ignored, and gave each its appropriate weight in his *Georgia-Pacific* analysis. For example, Mr. Napper considered the ***entirety*** of Mr. Arturi's deposition testimony, not merely that portion that Acushnet points to in its brief. [*See* Halkowski Dec. Ex. 20 at 321:20-323:19.] Mr. Napper explained that in his opinion, Mr. Arturi's testimony was

[20] [*Id.* at 321:25-322:8.] Mr. Napper placed greater, but not exclusive, emphasis on the contemporaneous documents because they were unambiguous regarding Top-Flite's position during those negotiations, i.e., they showed that Top-Flight was requesting a

[*Id.* at 322:21-25; Halkowski Decl., Ex. 6].

Although Acushnet (and its expert) may disagree with Mr. Napper's analysis, such disagreement does not warrant the exclusion of Mr. Napper's opinions. *See Micro Chemical*, 317 F.3d at 1393 (holding that application of the *Georgia-Pacific* methodology to plaintiff's version of the disputed facts is a proper manner to calculate a reasonable royalty.).

In conducting his *Georgia-Pacific* analysis, Mr. Napper also considered the three negotiations involving Top-Flite, Acushnet and Callaway Golf regarding the patents-in-suit. [*See* D.I. 285, Ex. 1 at 38-40 (

*See* D.I.

---

[20] During his deposition taken on March 15, 2007, Mr. Arturi was asked to recall from memory Top-Flite's position in a negotiation that occurred between December 2001 and October 2002. Although he was shown some of the correspondence between Top-Flite and Acushnet, he was not shown the specific correspondence detailing Top-Flite's offer to Acushnet that included a running royalty.

33

# REDACTED

285, Ex. 1 at Tab 2

Halkowski Dec. Ex. 7 at 192:17-194:2

and Halkwoski Ex. 20 at 320:2-321:19

Here too, Mr. Napper gave each of these facts the appropriate weight in determining his reasonable royalty under *Georgia-Pacific*; and here too, any disagreement that Acushnet (or its expert) has with Mr. Napper's opinion goes to credibility, not admissibility.

In addition, Mr. Napper also considered in his reasonable royalty analysis licenses for other, similar golf ball patents, several of which have provisions for running royalties around        [*See* D.I. 285, Ex. 1 at 54-58.]  For example, in the period from 1986-87, Top-Flite entered into two separate licenses related to the

[*Id.* at 56.]  Both of those licenses had running royalty provisions of going forward if the licensees used the        to manufacture golf balls.  [*Id.*]  Thus, Mr. Napper conducted a complete and proper *Georgia-Pacific* analysis in reaching his opinion that Callaway Golf is entitled to a        running royalty in this case.

Because Callaway Golf has met its burden to show that Mr. Napper's reasonable royalty analysis is reliable under the applicable case law, Mr. Napper's opinions regarding a reasonable royalty for Acushnet's infringement should be admitted at trial.

### D.    Mr. Napper's Testimony Will Assist the Jury In Determining the Extent of Acushnet's Infringement, and the Harm Caused to Callaway Golf from that Infringement.

The purpose of Section 284 is to compensate the patentee – Callaway Golf – for the use made by Acushnet of the patents-in-suit.  Mr. Napper's opinions and testimony will provide vital evidence quantifying both the extent of the use by Acushnet of the patents-in-suit, and the harm suffered by Callaway Golf as a result of Acushnet's

34

**REDACTED**

infringement.  Accordingly, Mr. Napper's opinions will aid the jury in its ultimate determination of damages necessary to adequately compensate Callaway Golf for the infringement.

With respect to the use made by Acushnet, Mr. Napper will be able to provide evidence to the jury regarding the success of the Pro V1 as manifested in the number of units sold, and the revenue earned by Acushnet for its sale of the Pro V1.  In other words, through Mr. Napper, Callaway Golf will be able to show the jury that Acushnet's use of the patents-in-suit has resulted in the sale of more than          dozen Pro V1 balls since its introduction in 2001, generating more than                with an average gross profit margin of        resulting in profits of over

With respect to the harm suffered by Callaway Golf, Mr. Napper will provide evidence as to the probable number of sales that Callaway Golf lost because of Acushnet's infringement.  Related to this, Mr. Napper will provide evidence regarding the money damages necessary to adequately compensate Callaway Golf for Acushnet's infringement.

As shown, Mr. Napper's testimony and report will directly aid the jury in its ultimate determination of damages, and complies with the "fit" prong of the Rule 702 test.  Because Mr. Napper's testimony and opinions comply with all three prongs of the "qualifications, reliability, and fit" test articulated by Third Circuit, Mr. Napper's testimony and expert report are admissible and should be permitted at trial.

**VI.     CONCLUSION**

For the foregoing reasons, Callaway Golf respectfully asks that the Court deny Acushnet Company's motion to exclude the expert testimony and report of Brian Napper regarding damages in this case.

Dated:  September 21, 2007          FISH & RICHARDSON P.C.


By:  /s/ Thomas L. Halkowski
     Thomas L. Halkowski (#4099)
     919 N. Market Street, Suite 1100
     P.O. Box 1114
     Wilmington, DE 19899-1114
     Tel:  (302) 652-5070
     Fax:  (302) 652-0607

     Frank E. Scherkenbach
     225 Franklin Street
     Boston, MA 02110-2804
     Tel:  (617) 542-5070
     Fax:  (617) 542-8906

     Roger A. Denning
     12390 El Camino Real
     San Diego, CA 92130
     Tel:  (858) 678-5070
     Fax:  (858) 678-5099

     Attorneys for Plaintiff
     CALLAWAY GOLF COMPANY

36

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2007, the attached document was electronically filed with the Clerk of Court using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on September 21, 2007, I have Electronically Mailed the document to the following person(s):

Richard L. Horwitz, Esq.                    Attorneys for Defendant
David E. Moore, Esq.                        ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Alan M. Grimaldi, Esq.                      Attorneys for Defendant
Joseph P. Lavelle, Esq.                     ACUSHNET COMPANY
Kenneth Donnelly, Esq.
Brian A. Rosenthal, Esq.
Clint Brannon, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com

_/s/ Thomas L. Halkowski_
Thomas L. Halkowski

37