# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ACUSHNET COMPANY, | ) | |
| | ) | **PUBLIC VERSION** |
| Defendant | ) | |

## ACUSHNET'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF CALLAWAY'S EXPERT WITNESS BRIAN NAPPER

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
OF COUNSEL:
Hercules Plaza 6th Floor
1313 N. Market Street
Joseph P. Lavelle
P.O. Box 951
Kenneth W. Donnelly
Wilmington, DE 19899
Brian A. Rosenthal
Tel: (302) 984-6000
HOWREY LLP
rhorwitz@potteranderson.com
1299 Pennsylvania Ave., N.W.
dmoore@potteranderson.com
Washington, D.C. 20004
Tel: (202) 783-0800

*Attorneys for Defendant Acushnet Company*

Dated: September 28, 2007
Public Version Dated: October 5, 2007
823691 / 30030

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................3

  A.    Mr. Napper's Lost Profits Analysis Must Be Excluded ...........................3

    1.    Mr. Napper's Lost Profits Market Is Fundamentally Flawed as a Matter of Law ....................................................................................3

    2.    Mr. Napper Fails To Provide Sound Economic Proof of the Nature of the Market ...........................................................................5

    3.    Callaway Misrepresents Acushnet's Argument Regarding the Likely Effect of License Negotiations. ............................................8

    4.    Mr. Napper's $30 and Over per Dozen Market Is Irretrievably Flawed and Produces Absurd Results ...........................................10

      a.    Mr. Napper's Market Definition Is not the Product of Sound Economic Analysis .................................................10

      b.    Mr. Napper's Market Definition Produces Economically Unjustifiable Results ......................................................13

    5.    Mr. Napper Cannot Be Qualified by Looking at his Past Testimony ........................................................................................14

  B.    Mr. Napper's Reasonable Royalty Analysis Does Not Fit the Facts of the Case and Must Be Excluded. .............................................................15

III.    CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Bearing Co. v. Litton Indus., Inc.*,
   540 F. Supp. 1163 (E.D. Pa. 1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984)....................................7

*Aro Mfg. Co., Inc. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964)............................................................................................1, 4, 6

*Barber v. United Airlines, Inc.*,
   17 Fed. Appx. 433 (7th Cir. 2001)....................................................................16, 19

*Brooks v. Outboard Marine Corp.*,
   234 F.3d 89 (2d Cir. 2000)..............................................................................12

*Capital Funding v. Chase Manhattan Bank USA*,
   191 Fed. Appx. 92 (3d Cir. 2006)....................................................................20

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   418 F. Supp. 2d 1021 (S.D. Ind. 2006) ...................................................................9

*De Jager Constr. v. Schleininger*,
   938 F. Supp. 446 (W.D. Mich. 1996) ...................................................................16

*DSU Med. Corp. v. JMS Co., Ltd.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...................................................................5

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000)..........................................................................14, 15

*Enter. Mfg. Co. v. Shakespeare Co.*,
   141 F.2d 916 (6th Cir. 1944) ...................................................................10

*Ericsson Inc. v. Harris Corp.*,
   352 F.3d 1369 (Fed. Cir. 2003)..........................................................1, 5, 11, 12

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..........................................................................18, 19

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999).......................................................... passim

*Hughes Tool Co. v. G.W. Murphy Indus., Inc.*,
   491 F.2d 923 (5th Cir. 1973) ...................................................................11

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   2003 U.S. App. LEXIS 27796 (Fed. Cir. June 6, 2003) ......................................5, 20

*Isco Int'l v. Conductus, Inc.*,
    C.A. No. 01-487, 2003 U.S. Dist. LEXIS 1885 (D. Del. Feb. 10, 2003),
    *aff'd*, 123 Fed. Appx. 974 (Fed. Cir. 2005) ..........................................................................1, 5

*Izumi Prods. Co. v. Koninkluke Philips Elects.*,
    140 Fed. Appx. 236 (Fed. Cir. 2005)..........................................................................16

*Johnson Elec. N.A., Inc. v. Mabuchi Motor Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000)..........................................................................1, 5

*Material Techs, Inc. v. Carpenter Tech. Corp.*,
    No. 01-2965, 2005 U.S. Dist. LEXIS 32087 (D.N.J. June 28, 2005)......................................16

*Micro Chem., Inc. v. Lextron*,
    317 F.3d 1387 (Fed. Cir. 2003)..........................................................................19

*MicroStrategy, Inc. v. Bus. Objects*,
    429 F.3d 1344 (Fed. Cir. 2005)..........................................................................18

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007)..........................................................................16, 18

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)..........................................................................4

*Rosco, Inc. v. Mirror Lite Co.*,
    No. CV-96-5658, 2007 U.S. Dist. LEXIS 57223 (E.D.N.Y. Aug. 6, 2007)..............................5

**RULES**

Fed. R. Evid. 702 ..........................................................................14, 16

## I.    INTRODUCTION

Callaway's opposition brief misrepresents both the governing law and the facts of the case in a vain attempt to rehabilitate Mr. Napper. As Acushnet has demonstrated, and as Callaway has failed to disprove, Mr. Napper's testimony and report in regards to lost profits are not reliable, and fail to meet the prerequisites of controlling law. This truth is perhaps nowhere better highlighted than in Mr. Napper's failure to reconstruct the "but for" market beginning from the time of first infringement, which unquestionably departs from Federal Circuit case law.

Under controlling case law, in order to qualify for lost profits damages a plaintiff must reconstruct a market but for infringement starting at the time that infringement began. This is so even when the plaintiff is only claiming damages from a later point in time. Callaway disagrees, but without citation to any authority (and claiming that Acushnet has no authority, when it cited plenty), and maintains that a but for market may be reconstructed from whichever point in time a plaintiff desires. Callaway is wrong, and its argument not just ignores the controlling cases, but flies in the face of economic good sense. *See Aro Mfg. Co., Inc. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999); *Ericsson Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003); *Isco Int'l v. Conductus, Inc.*, C.A. No. 01-487, 2003 U.S. Dist. LEXIS 1885, at *4 (D. Del. Feb. 10, 2003), *aff'd*, 123 Fed. Appx. 974 (Fed. Cir. 2005); *Johnson Elec. N.A., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284-85 (S.D.N.Y. 2000).

Mr. Napper completely fails to consider what the market would look like had the Pro V1 never been launched. Instead, he begins consideration of the hypothetical but for market in 2003, the point at which Callaway acquired the patents-in-suit. [D.I. 286, Ex. 1 at 27]. Thus, Mr. Napper does not, despite the requirements of the case law, recreate a scenario ***but for***

*infringement*. In *his* recreated market, infringement occurred for two years. On the basis of this error alone, Callaway is, as a matter of law, not entitled to lost profits damages.

Further, Mr. Napper's methodology, or lack thereof, in defining the correct market, at any point in time, also fatally flaws that section of his report. The governing law requires that an expert reconstruct the market using "sound economic proof." *Grain Processing*, 185 F.3d at 1350. Mr. Napper, an accountant, admits to a lack of education in economics, and admits to not knowing the meaning of the basic economic principles that underlie any attempt to construct a market. Not surprisingly, the economic market that he reconstructs and applies to his lost profits calculations has no basis in economic principles. Mr. Napper also ignores economic realities and economically-relevant real world facts. Despite clear requirements for a but for market to include consideration of alternatives available for a company accused of infringement, Mr. Napper makes no such adjustments. Instead, he inexplicably assumes that Titleist, the market leader in golf ball manufacturing, and in particular the most dominant seller of tour-played golf balls for decades, would simply leave that field of sale almost entirely.[1] In refusing to consider Acushnet's array of alternatives, Mr. Napper departs yet again from controlling case law, and shows his methodology to be fundamentally flawed, rendering at a minimum, again, the portion of his opinion regarding lost profits unreliable.

Further still, Mr. Napper's opinion in regards to reasonable royalty damages also fails to fit the undisputed facts of the case and should be excluded. ███████████████████████

███████████████████████████████████████████████████████████████████████████

---

[1] It helps Callaway's cause, of course, that Mr. Napper begins his market reconstruction not at the point of alleged infringement, but two years later. By reconstructing the market beginning only after Acushnet focused all of its manufacturing and marketing efforts on the Pro V1, Mr. Napper is able to ignore all the potential options available to Acushnet in 2001 without the Pro V1, which if properly considered, would change entirely the hypothetical outcome.

████████████████████████ Mr. Napper reaches this astonishingly high number through selective use of the evidence. Such cherry-picking of evidence is grounds to exclude an expert's testimony. Mr. Napper ignores any evidence that would point to a lower royalty. ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

In its opposition brief, Callaway acknowledges these flaws in Mr. Napper's testimony, yet still maintains Mr. Napper may be admitted. Callaway seeks to take a liberal standard of admissibility and turn it into a free pass on *Daubert*. Mr. Napper's report is contrary to the law, and is neither reliable nor does it fit the undisputed facts of the case. As such, Mr. Napper's testimony on lost profits as well as his testimony on a reasonably royalty must be excluded.

## II.    ARGUMENT

### A.    Mr. Napper's Lost Profits Analysis Must Be Excluded.

#### 1.    Mr. Napper's Lost Profits Market Is Fundamentally Flawed as a Matter of Law.

Callaway and Mr. Napper ignore the legal standard for recovering lost profits in a patent infringement case as set forth by the Federal Circuit in *Grain Processing*, 185 F.3d 1341 and other authorities. The burden is on the owner of the allegedly infringed patents to "show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits." *Id.* at 1349. In order to do this, it is necessary to construct a hypothetical market – "a reconstruction of the market, as it would have developed ***absent the infringing product***, to determine what the patentee 'would . . . have made.'" *Id.* at 1350 (emphasis added, internal

citations omitted). The hypothetical market but for infringement is important to the calculation of lost profits damages because it serves as a proxy for causation. Damages for lost profits are claimable only if *caused* by the infringement – thus, an expert must hypothesize what sales the plaintiff would have made *absent infringement* to determine what level of profits have been lost.

The Supreme Court has defined damages in this situation as "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been *if the infringement had not occurred*." *Aro Mfg.. Co*, 377 U.S. at 507 (*citing Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552 (1886)) (emphasis added). The Court defined the central question as, "*had the Infringer not infringed*, what would the Patent Holder-Licensee have made?" *Aro Mfg.*, 377 U.S. at 507 (emphasis added, internal citations omitted). The Federal Circuit has likewise held that a lost profits analysis must be based upon "sound economic proof of the nature of the market and likely outcomes *with infringement factored out of the economic picture*." *Id.* (emphasis added). In other words, an expert on damages may not simply assume that the alleged infringer stands pat in the absence of infringement:

> [A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken *had he not infringed*. *Without the infringing product*, a rational would-be infringer is likely to offer an acceptable, noninfringing alternative, if available, to compete … rather than leave the market altogether.

*Id.* at 1350-51 (emphasis added).

Thus, the law is clear that to carefully construct, using sound economic analysis, a picture of the marketplace at the time of claiming lost profits, Mr. Napper was required to reconstruct the market as if Acushnet had never infringed in the first instance. Mr. Napper does not do this. On this basis alone, his lost profits testimony must be excluded. *See also Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (damages for patent

infringement represent the difference between the patent holder's financial condition with and without infringement); *Ericsson*, 352 F.3d at 1377; *Integra Lifesciences I, Ltd. v. Merck KGaA*, 2003 U.S. App. LEXIS 27796, at \*26 (Fed. Cir. June 6, 2003) ("The correct determination of [the date of infringement] is essential."); *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1148 (N.D. Cal. 2003) (lost profits represent "the profits on sales a patent holder would have made absent the infringement."); *Rosco, Inc. v. Mirror Lite Co.*, No. CV-96-5658, 2007 U.S. Dist. LEXIS 57223, at \*28 (E.D.N.Y. Aug. 6, 2007) ("Under ***either a lost profit or reasonable royalty measure***, the patent holder must 'reconstruct the market to project economic results' of what would have occurred ***had the market developed absent the infringing product***.") (emphasis added) (internal citations omitted); *Isco Int'l.*, 2003 U.S. Dist. LEXIS 1885, at \*4; *Johnson Elec. N.A.*, 103 F. Supp. 2d at 284-85.

Callaway and Mr. Napper simply ignore the requirements of law. Callaway claims that "no legal requirement exists for Mr. Napper to begin his but for causation analysis at the time of the first infringement." [D.I. 300 at 16]. But as justification it cites to cases and jury instructions that merely show that a plaintiff may seek lost profits ***damages*** from any given point in the period of infringement. *Id.* at 16-17. Acushnet does not deny this, but this is not relevant to the fact that an expert is required to reconstruct a hypothetical market in which infringement never occurred. Since Mr. Napper did not do so, his lost profits testimony must be excluded.

### 2. Mr. Napper Fails To Provide Sound Economic Proof of the Nature of the Market.

Because Mr. Napper chose to begin his analysis of the but for market in September 2003, it permits him to ignore factors which the governing case law specifically requires him to consider: the reasonable alternative actions of the alleged infringer. *Grain Processing*, 185 F.3d at 1350-51. By the time Callaway acquired the patents-in-suit, the Pro V1 was already

established as the dominant force in the market ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████ In the true but for market, a market where "the infringement had not

occurred," *Aro Mfg.*, 377 U.S. at 507, Acushnet would never have been in this position. Instead,

Acushnet, faced with the inability to market the Pro V1 without infringement, would have been

presented with a series of alternatives. Acushnet could have continued production and marketing

of its existing range of tour balls, in particular the Titleist Professional; it could have obtained a

license from Spalding for the patents-in-suit; it could have placed greater marketing emphasis on

non-infringing solid construction tour balls, such as the Titleist HP2; or it could have

implemented various design-arounds that would have allowed the Pro V1 to be sold without

infringing the patents-in-suit. These then are the "relevant, alternative actions the infringer

foreseeably would have undertaken." *Grain Processing*, 185 F.3d at 1350.

By 2003, however, the situation was fundamentally different. Acushnet had focused on

the Pro V1, and retooled its entire production and marketing to sell that ball. Mr. Napper takes

the market at that moment, and divides up the Pro V1 share between the other participants in the

market. In doing so, he not only does not consider and reconstruct a proper hypothetical market,

but ignores the alternative courses of action which were available to Acushnet over the preceding

period of alleged infringement.

Despite a clear prescription in *Grain Processing* and other case law to begin the but for

market analysis at the point of infringement, and to consider alternative actions by the alleged

infringer, Mr. Napper feels such a consideration is unnecessary. When faced with notice of this

fatal omission in Acushnet's *Daubert* motion, Callaway seeks to explain it away by denying it,

claiming in a footnote to its Opposition that Mr. Napper did consider these alternatives. [D.I.

300 at 23 n. 15]. When this footnote is considered, however, it is apparent that Mr. Napper's

consideration is fundamentally flawed, and fails even to approach that which is required of an

expert in the field. *See Am. Bearing Co. v. Litton Indus., Inc.*, 540 F. Supp. 1163, 1174 (E.D. Pa.

1982), *aff'd*, 729 F.2d 943 (3d Cir. 1984) (excluding expert for failure to effect of competitive

actions on the market).

Mr. Napper's first critique of Acushnet's alternatives to infringement is that "the

Professional, Tour Balata … and HP Tour were not even sold by Acushnet or in the market at the

time lost profits are sought." [D.I. 300 at 23 n. 15]. This is precisely the error of which Mr.

Napper is guilty. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Acushnet's possible alternatives cannot simply be dismissed in this

fashion by Mr. Napper. Whatever the outcome of such choices in an infringement-free,

reconstructed market, one thing is categorically certain. The market in September 2003 would

have been very different from that blindly adopted by Mr. Napper, rendering his lost profits

analysis inherently unreliable.

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ In

a world but for infringement, such alternative balls could and would have been marketed by

Acushnet. Mr. Napper fails to consider this too.

What Mr. Napper does, as explained in Callaway's brief, is simply look at the period 2001-2003, and determine that Spalding did not have sufficient capacity to justify a lost profits claim for those years. [D.I. 300 at 20]. Acushnet does not challenge that conclusion. However, what Mr. Napper categorically fails to do is to consider the effect of the multiple options available to Acushnet at the point of first infringement, instead noting, irrelevantly, that some of these options were not available two years later (because of what had occurred in the market including infringement), while merely waving others off as being unacceptable, without a single scintilla of evidence as to why that might be the case. [*Id.* at 23 n.15].

Thus, again, Mr. Napper's methodology is fundamentally flawed. The law required him to establish a market but for infringement, which takes into account alternative actions available to Acushnet had infringement never occurred and is backed by "sound economic proof." *Grain Processing*, 185 F.3d at 1350. Mr. Napper's analysis, however, establishes a market including in excess of two years of infringement, ignores the alternatives available to Acushnet, and contains no basis in economic realities or accepted economic theory. As a matter of law, a failure to start the but for market at the point of infringement, including the alternatives available to Acushnet *at that point,* renders Mr. Napper's report unreliable, and it must therefore be excluded.

### 3.    Callaway Misrepresents Acushnet's Argument Regarding the Likely Effect of License Negotiations.

In regards to Mr. Napper's failure to consider that Acushnet could have licensed the patents-in-suit in the but for world, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Callaway's opposition erects a straw man against which it feels able to argue. Callaway accuses Acushnet of arguing that lost profits and reasonable royalty damages are never available together, because the reasonable royalty hypothetical negotiation *ipso facto* grants a license to the alleged infringer. [D.I. 300 at 18-20]. This misconstrues Acushnet's argument.

Acushnet is not here discussing the results of the reasonable royalty hypothetical negotiations. Instead, as *Grain Processing* makes abundantly clear, Mr. Napper must consider non-infringing alternatives, including non-infringing courses of actions on the part of the alleged infringer. One of the possible alternatives, according to undisputed evidence in the case, is the purchase of a license by Acushnet from Spalding in 2001 to practice the patents-in-suit. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 418 F. Supp. 2d 1021, 1039 (S.D. Ind. 2006) (noting that a decision not to merge with a rival, leaving that competitor with a license to compete in the market merited status as an alternative under *Grain Processing*). ███████████

████████████████████████████████████████████████████████

████████████████████  It is therefore indisputable that a viable alternative to infringement available to Acushnet in 2001 was the purchase of such a license.

What is in dispute, of course, is the price that would have been charged for such a license.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  Presuming the patents to be valid and infringed and that Acushnet was forced to remove the Pro V1 from the marketplace in 2001 in the hypothetical world, there can be no doubt that Acushnet would have settled with Spalding on a license figure. Damages must therefore be seen as capped at whatever level the Court such an agreement would have required. ███████████████████████████████████████

████████████████████████████████████████████████████████

What is key, however, is that Mr. Napper at no point considers such a possibility, either in 2001, when he should have reconstructed his market but for infringement, or even in 2003, when he erroneously does begin reconstruction. ██████████████████████████████

███████████████████████████████████████████████████████████████

Despite Callaway's claims, this requirement to consider alternatives, including the possibility of a negotiated license, does not "preclude any patentee from ever obtaining damages in the form of lost profits and a reasonable royalty." [D.I. 300 at 18]. The reasonable royalty hypothetical negotiations are a different situation. The case law recognizes that there may be a situation where a patent holder does not wish to license a patent, and yet a reasonable royalty rate can still be set. *See, e.g., Enter. Mfg. Co. v. Shakespeare Co.*, 141 F.2d 916, 919 (6th Cir. 1944).

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ In a situation where the patent holder was not willing to issue a license, then the reconstruction of the lost profits market but for infringement could not include such a license as creating an acceptable, non-infringing alternative. Where, as here, the evidence indisputably shows such a license was available, an expert must take such a possibility into consideration. Mr. Napper nowhere takes account of this possibility. As such his methodology is fundamentally flawed, and again, his report and testimony must be excluded.

> **4.    Mr. Napper's $30 and Over per Dozen Market Is Irretrievably Flawed and Produces Absurd Results.**
>
> **a.    Mr. Napper's Market Definition Is not the Product of Sound Economic Analysis.**

As Acushnet demonstrates in its opening brief, Mr. Napper's selection of the relevant market for analysis of lost profits has no basis in economic theory. [D.I. 285 at 20-26]. In its reply, Callaway fails to address any of these issues. The basis of these errors once again is Mr.

Napper's failure to understand the basic concept of economics that underlies market

construction; substitutability. The critical fact that an expert must show is what products Pro V1

users would substitute for that ball, were it not available, beginning in 2001.

Neither Mr.

Napper in his report, nor Callaway in its Opposition, provides any indication of why these balls

should not be considered substitutes for the Pro V1.

Such refusal to follow the basic economic principles of market definition does not

demonstrate the "sound economic proof" required under *Grain Processing*, 185 F.3d at 1350.

Such a failure to truly define an economic market renders Mr. Napper's reliance on raw market

share data inadmissible. *Hughes Tool Co. v. G.W. Murphy Indus., Inc.*, 491 F.2d 923, 930 (5th

Cir. 1973) ("[W]ith no definite market, clearly the variables are too many and the speculative

nature of lost profits too great to form a basis for recovery.").

Callaway recognizes that Mr. Napper's analysis is flawed, but attempts to maintain that

such clear errors go to the weight the jury should give his report, rather than its admissibility.

[D.I. 300 at 26-27]. In doing so, Callaway relies on *Ericsson*, 352 F.3d 1369. In *Ericsson*, the

Federal Circuit affirmed a jury's lost profits award, finding that the expert's market definition

was "supported by substantial and economically sound evidence." *Id.* at 1378. What Callaway

overlooks is the form this analysis took. In *Ericsson*, the expert based his market definition on the high costs that a customer would incur to switch providers; these barriers to entry meant that "noninfringing substitutes were necessarily excluded from the 'Ericsson market' because of [compatibility issues]." *Id.* at 1377. The facts in that case therefore made reliance on documents showing existing sales patterns plausible and economically correct, as customers could not easily switch suppliers. Here there are no such barriers to competition. A customer using a Pro V1 one round can switch to a Nike One Platinum the next round, or a Titleist DT the following week. According to Mr. Napper, however, only the Nike ball would be a substitute. The DT is too low priced to be included in Mr. Napper's market, regardless of how many consumers would choose it. In *Ericsson*, where market conditions prevented easy substitutability, defining the market as the expert did was sound economic analysis. Here, however, there is no such justification. Mr. Napper's market definition, based solely on price, flies in the face of basic economic theory, presumes consumer irrationality, and produces absurd results. Such errors do not go to weight, they go to the very heart of the reliability and fit of Mr. Napper's testimony.[2]

---

[2] ████████████████████████████████████████████████████

████ Acushnet is unaware of any case law, and Callaway provides none, that would require a defendant to quantify damages on behalf of the plaintiff. Callaway has that burden, not Acushnet. Further, it is routinely held that the absence of rebuttal expert testimony is not sufficient to permit an otherwise unqualified expert witness to be admitted. *See, e.g., Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir. 2000). ("The plaintiff's argument that this gate-keeping role disappears when a proposed expert witness is not challenged by an opposing expert witness thus runs counter to the thrust of *Daubert* and *Kumho Tire*. Nowhere in either opinion is there language suggesting that testimony could only be 'called sufficiently into question' by a rebuttal expert.")

**b.    Mr. Napper's Market Definition Produces
Economically Unjustifiable Results.**

What's more, Callaway has no answer whatsoever as to Acushnet's showing that Mr.

Napper's "price point" definition, as he applies it, produces absurd results that contradict the

basic laws of economics. [D.I. 285 at 6-28]. It is a fundamental tenet of economics that if two

products compete with one another, then lowering the price of one of the products makes it a

*stronger* competitor. If two brands of butter are substitutes, and one brand drops in price from

$3 per pound to $2 per pound, then it is more attractive to consumers and more competitive with

the other brand. Under Mr. Napper's analysis, however, the opposite is true. A dozen golf balls

retailing at $31 is considered a Pro V1 substitute. The very same balls, sold in the very same

store, placed the next day on sale and retailing for $29, drop out of Mr. Napper's universe of

substitutes, only to reappear once the price promotion is ended. Consumers in Mr. Napper's but

for infringement market are seen as inherently irrational – they view products as alternatives to

their chosen ball only when priced highly enough, regardless of any other qualities the ball may

possess. Similarly, a lower quality, lower performing ball can immediately become a competitor

of the Pro V1 by the simple expedient of a price rise that places it over $30 a dozen.[3]

Such results defy well established economic principles, yet they are the logical result of

Mr. Napper's tunnel vision, defining markets and substitutes by price alone. Callaway at no

stage in its opposition addresses this fundamental flaw in Mr. Napper's analysis. Instead, once

again, Callaway erects a straw man, claiming that Acushnet demand an impermissibly high

degree of precision from Mr. Napper. [D.I. 300 at 24]. This is simply not the case. Acushnet

does not demand Mr. Napper calculate precisely what ball every purchaser of the Pro V1 would

---

[3] In fact, if Mr. Napper's "economics" hold true, his analysis is still flawed by failing to consider
that Acushnet would have had numerous Pro V1 substitute it could have marketed in the but for
world simply by raising the price of balls priced in the high $20s to just above $30 per dozen.

have purchased in the absence of that ball from the market. What the controlling case law does require, however, is that Mr. Napper reconstruct the but for market using "sound economic proof." *Grain Processing*, 185 F.3d at 1350. A market that assumes consumer irrationality, and excludes balls from being substitutes simply because their price temporarily falls is not one that meets this standard.

### 5.  Mr. Napper Cannot Be Qualified by Looking at his Past Testimony.

Callaway erroneously claims that reviewing Mr. Napper's past experience as an expert witness is sufficient to determine his suitability to serve as an expert in this case. [D.I. 300 at 12-15]. This is wrong. That Mr. Napper has testified as a damages witness in 18 trials or arbitrations, *id.* at 12, or offered opinion in 38 other cases, *id.*, is not germane to today's question. The question here, of course, is whether Mr. Napper is qualified to, and actual does, provide reliable economic analysis that fits the facts of *this* case, not of prior cases.

The case law in this circuit shows that prior testimony is not relevant in a determination of admissibility under *Daubert*. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 744 n.5 (3d Cir. 2000) ("[T]he mere fact that Copemann was previously admitted as an expert witness ... is irrelevant to the determination whether he is qualified ... in this case"). Admissibility in different cases, with different fact patterns, and in different courts is no substitute for meeting the standard for admissibility laid out in *Daubert* and its progeny in this case.[4] As the Third Circuit has made clear, "the crucible of litigation makes for a poor classroom." *Id.*

Further irrelevant is the fact, cited by Callaway, that Acushnet's counsel has hired Mr. Napper as an expert in other cases. [D.I. 300 at 13]. Acushnet does not dispute that Mr. Napper

---

[4] When Fed. R. Evid. 702 talks of qualification through "experience," it is experience in the real world in the relevant field that counts, not experience in the courtroom testifying.

is an expert accountant.  What he is not, by his own lack of understanding of basic economics, is an expert in the areas necessary to reconstruct a but for market.  Mr. Napper has no economic academic background or training, besides on the job litigation training.  He fails to understand the basic principles of economics as they relate to market definition, in particular substitutability concepts. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

When a proposed expert's qualifications are tenuous, then the Court should pay especially strict attention to ensuring that expert's methodology is acceptable. *See e.g. Elcock*, 233 F.3d at 744 (applying strict scrutiny to expert's methodology where only "marginally qualified.").  As can be seen, Mr. Napper's methodology is fundamentally flawed.  Especially combined with his clear lack of relevant economic understanding, this renders his report and testimony inadmissible.

**B.    Mr. Napper's Reasonable Royalty Analysis Does Not Fit the Facts of the Case and Must Be Excluded.**

Mr. Napper's report also includes his estimation of the reasonable royalty that would have been generated in a hypothetical negotiation between Acushnet and Spalding for a license for the patents in suit. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5] Cross elasticity of demand between two products indicates the degree of change of quantity demanded of one product in response to a price change of another. Ex. 5, Paul Samuelson and William Nordhaus, Economics, 17th Ed. at 760 (2001). Mr. Napper also shows a misunderstanding even of the basic concept of price elasticity of demand. ████████████████ This is incorrect.  Price elasticity of demand measures the responsiveness of quantity demanded to a change in price.  It measures the percentage increase in demand from a given percentage decrease in price, not simply that a fall in price will lead to an increase in demand. Ex. 5 at 773.

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Cherry-

picking evidence is impermissible for an expert witness, and is grounds for exclusion of

testimony. *See Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because

. . . Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court

correctly barred his testimony because such a selective use of facts fails to satisfy the scientific

method and *Daubert*, and thus fails to 'assist the trier of fact.' Fed. R. Evid. 702." [sic]); *see also*

*Material Techs, Inc. v. Carpenter Tech. Corp.*, No. 01-2965, 2005 U.S. Dist. LEXIS 32087, at

*22 (D.N.J. June 28, 2005); *De Jager Constr. v. Schleininger*, 938 F. Supp. 446, 455 (W.D.

Mich. 1996).

███████████████████████████████████████████████████

██████████████████████████████ Callaway claims that "Mr. Napper

considered all relevant evidence in determining his reasonable royalty rate, and the resulting

damages ... in conducting his *Georgia Pacific* analysis." [D.I. 300 at 27-28].  Unfortunately, the

word of Callaway and Mr. Napper on this is not sufficient.  An expert cannot simply claim to

have performed necessary analysis; his report must demonstrate that he has done so.  *See*

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1355 (Fed. Cir. 2007)

(confirming exclusion of expert by District of Delaware where expert claimed to rely on a broad

range of sources, but failed in her report to "explain how her reliance on any of the other sources

of information supported her inference"); *Izumi Prods. Co. v. Koninkluke Philips Elects.*, 140

Fed. Appx. 236, 244 (Fed. Cir. 2005). █████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ Callaway's defense of Mr. Napper's reliance on this

scant, irrelevant and cherry-picked evidence goes nowhere.

████████████████████████████████████████████████

████████████████████████ What Mr. Napper does not demonstrate or even explain at any

stage is why these agreements are more pertinent or probative than other agreements showing

significantly lower levels of royalties. Both agreements predate the hypothetical negotiation by

more than *thirteen* years. ███████████████████████████████████

████████████████████████████████████████████████

Other agreements as close to the facts of the present scenario or closer exist, yet Mr. Napper and

Callaway make no attempt to explain why these two license agreements are the most germane.

[D.I. 287, Ex. 8 at 11-16]. Instead their importance is presumed, when the case law tells us that

other things being equal, the closer a license agreement is to the date of a hypothetical

negotiation, the greater the weight it should be given.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

On the other hand, Mr. Napper claims to have considered all other evidence relevant, yet

there is no indication in his report of why other, seemingly more probative evidence has been

---

6 Callaway's argument here creates a perverse incentive for patent holders to make outrageous
demands in negotiations, if it is known that a reasonable royalty award can never drop below
what they requested, however unreasonable that number might have been.

discounted or dismissed.  *See PharmaStem Therapeutics*, 491 F.3d at 1355; *see also*

*MicroStrategy, Inc. v. Bus. Objects*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) (affirming exclusion

of expert for failure to "consider enough factors to make his or her opinion sufficiently reliable").

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

        Despite Mr. Napper's protestations of even-handedness, it is clear that his report on

reasonable royalties does not fit the facts of the case.  *See General Elec. Co. v. Joiner*, 522 U.S.

136, 146 (1997).  He has selected only that evidence which supports an unreasonably high

royalty rate, and ignored without justification or analysis undisputed evidence that counters such

a rate. Such cherry-picking of evidence exposes Mr. Napper's analysis as a "because I say so"

methodology, and is clearly grounds to exclude his opinions. *Barber*, 17 Fed. Appx. at 437.

      Finally, the lack of fit to this case in Mr. Napper's opinions is also apparent when the

total amount requested is examined. ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

      At a minimum, Mr. Napper was required to explain why his damages number so widely

differs from the real world values. He and Callaway do not do this, and so Mr. Napper's

reasonable royalty opinion can only be seen as the product of flawed methodology, which clearly

includes the selective use of the facts, and fails to provide the required level of fit to the actual

record of this case.

      Contrary to Callaway's claims, this is not a situation where experts disagree over the

facts of a case. *See, e.g., Micro Chem., Inc. v. Lextron*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Mr. Napper flat out ignores the facts, and moves from being an expert witness to a hired gun.

Callaway asserts these failings go to the weight h evidence should be given. Case law shows,

however, that when an expert is *so* disconnected from the facts of the case, his report can only

serve to confuse the jury, and must be excluded. *General Elec. Co.*, 522 U.S. at 146 ("[N]othing

in either *Daubert* or Federal Rules of Evidence requires a district court to admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that

there is simply too great an analytical gap between the data and the opinion proffered."); *see also*

*Capital Funding v. Chase Manhattan Bank USA*, 191 Fed. Appx. 92, 96 (3d Cir. 2006); *Integra*

*Lifesciences*, 2003 U.S. App. LEXIS 27796, at *30 ("Integra purchased Telios (together with all

of its products, patents, and know-how) for $20,000,000 in 1996. A $15,000,000 award figure to

compensate for infringement of only some of Telios' patents before Integra's acquisition seems

unbalanced in view of the overall acquisition price.").

As such, in addition to excluding Mr. Napper's lost profits analysis, this Court should

exclude his opinion on reasonable royalties under *Daubert* and its progeny.

## III.    CONCLUSION

For these and the reasons set forth in Acushnet's Memorandum of Law in Support of its

Motion to Exclude Mr. Napper [D.I. 285], Mr. Napper's report and testimony must be excluded.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: September 28, 2007
Public Version Dated: October 5, 2007
823691 / 30030

By:    */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 5, 2007, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on October 5, 2007, I have Electronically Mailed the document to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114
halkowski@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
denning@fr.com
shuman@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5



SEVENTEENTH EDITION

# EC✿NOMICS

SAMUELSON ✿ NORDHAUS

# ECONOMICS

## Seventeenth Edition

### PAUL A. SAMUELSON
Institute Professor Emeritus
Massachusetts Institute of Technology

### WILLIAM D. NORDHAUS
A. Whitney Griswold Professor of Economics
Yale University



Boston  Burr Ridge, IL  Dubuque, IA  Madison, WI  New York  San Franscisco  St. Louis
Bangkok  Bogotá  Caracas  Kuala Lumpur  Lisbon  London  Madrid  Mexico City
Milan  Montreal  New Delhi  Santiago  Seoul  Singapore  Sydney  Taipei  Toronto

**760**                                                              ❋ GLOSSARY OF TERMS

**Constant returns to scale.** See returns to scale.

**Consumer price index (CPI).** A price index that measures the cost of a fixed basket of consumer goods in which the weight assigned to each commodity is the share of expenditures on that commodity by urban consumers in 1982–1984.

**Consumer surplus.** The difference between the amount that a consumer would be willing to pay for a commodity and the amount actually paid. This difference arises because the marginal utilities (in dollar terms) of all but the last unit exceed the price. Under certain conditions, the money value of consumer surplus can be measured (using a demand-curve diagram) as the area under the demand curve but above the price line.

**Consumption.** In macroeconomics, the total spending, by individuals or a nation, on consumer goods during a given period. Strictly speaking, consumption should apply only to those goods totally used, enjoyed, or "eaten up" within that period. In practice, consumption expenditures include all consumer goods bought, many of which last well beyond the period in question—e.g., furniture, clothing, and automobiles.

**Consumption function.** A schedule relating total consumption to personal disposable income (DI). Total wealth and other variables are also frequently assumed to influence consumption.

**Consumption-possibility line.** See budget line.

**Cooperative equilibrium.** In game theory, an outcome in which the parties act in unison to find strategies that will optimize their joint payoffs.

**Corporate income tax.** A tax levied on the annual net income of a corporation.

**Corporation.** The dominant form of business organization in modern capitalist economies. A corporation is a firm owned by individuals or other corporations. It has the same rights to buy, sell, and make contracts as a person would have. It is legally separate from those who own it and has "limited liability."

**Correlation.** The degree to which two variables are systematically associated with each other.

**Cost, average.** Total cost (refer to **cost, total**) divided by the number of units produced.

**Cost, average fixed.** Fixed cost divided by the number of units produced.

**Cost, average variable.** Variable cost (refer to **cost, variable**) divided by the number of units produced.

**Cost, fixed.** The cost a firm would incur even if its output for the period in question were zero. Total fixed cost is made up of such individual contractual costs as interest payments, mortgage payments, and directors' fees.

**Cost, marginal.** The extra cost (or the increase in total cost) required to produce 1 extra unit of output (or the reduction in total cost from producing 1 unit less).

**Cost, minimum.** The lowest attainable cost per unit (whether average, variable, or marginal). Every point on an average cost curve is a minimum in the sense that it is the best the firm can do with respect to cost for the output which that point represents. Minimum average cost is the lowest point, or points, on that curve.

**Cost-push inflation.** Inflation originating on the supply side of markets from a sharp increase in costs. In the aggregate supply-and-demand framework, cost-push is illustrated as an upward shift of the *AS* curve. Also called supply-shock inflation.

**Cost, total.** The minimum attainable total cost, given a particular level of technology and set of input prices. Short-run total cost takes existing plant and other fixed costs as given. Long-run total cost is the cost that would be incurred if the firm had complete flexibility with respect to all inputs and decisions.

**Cost, variable.** A cost that varies with the level of output, such as raw materials, labor, and fuel costs. Variable costs equal total cost minus fixed cost.

**Crawling (or sliding) peg.** A technique for managing a nation's exchange rate that allows the exchange rate (or the bands around the rate) to "crawl" up or down by a small amount each day or week (say, 0.25 percent per week).

**Credit.** (1) In monetary theory, the use of someone else's funds in exchange for a promise to pay (usually with interest) at a later date. The major examples are short-term loans from a bank, credit extended by suppliers, and commercial paper. (2) In balance-of-payments accounting, an item such as exports that earns a country foreign currency.

**Cross elasticity of demand.** A measure of the influence of a change in one good's price on the demand for another good. More precisely, the cross elasticity of demand equals the percentage change in demand for good A when the price of good B changes by 1 percent, assuming other variables are held constant.

**Crowding-out hypothesis.** The proposition that government spending or government deficits reduce the amount of business investment.

**Currency.** Coins and paper money.

**Currency appreciation (or depreciation).** See **depreciation** (of a currency).

**Currency board.** A monetary institution operating like a central bank for a country that only issues currency that is fully backed by assets denominated in a key foreign currency, often the U.S. dollar.

**Current account.** See balance of trade.

**Cyclical budget.** See actual, cyclical, and structural budget.

the different players are the pay-offs.

**Payoffs.** See payoff table.

**Perfect competition.** Refer to competition, perfect.

**Personal income.** A measure of income before taxes have been deducted. More precisely, it equals disposable personal income plus net taxes.

**Personal saving.** That part of income which is not consumed; in other words, the difference between disposable income and consumption.

**Personal saving rate.** The ratio of personal saving to personal disposable income, in percent.

**Phillips curve.** A graph first devised by A. W. Phillips, showing the tradeoff between unemployment and inflation. In modern mainstream macroeconomics, the downward-sloping "tradeoff" Phillips curve is generally held to be valid only in the short run; in the long run, the Phillips curve is usually thought to be vertical at the nonaccelerating inflation rate of unemployment (or NAIRU).

**Policy ineffectiveness theorem.** A theorem which asserts that, with rational expectations and flexible prices and wages, anticipated government monetary or fiscal policy cannot affect real output or unemployment.

**Portfolio theory.** An economic theory that describes how rational investors allocate their wealth among different financial asset—that is, how they put their wealth into a "portfolio."

**Positive economics.** See normative vs. positive economics.

**Post hoc fallacy.** From the Latin, *post hoc, ergo propter hoc,* which translates as "after this, therefore because of this." This fallacy arises when it is assumed that because event A precedes event B, it follows that A *causes* B.

**Potential GDP.** High-employment GDP; more precisely, the maximum

level of GDP that can be sustained with a given state of technology and population size without accelerating inflation. Today, it is generally taken to be equivalent to the level of output corresponding to the **nonaccelerating inflation rate of unemployment** (or **NAIRU**). Potential output is not necessarily maximum output.

**Potential output.** Same as potential GDP.

**Poverty.** Today, the U.S. government defines the "poverty line" to be the minimum adequate standard of living.

**PPF** See production-possibility frontier.

**Present value** (of an asset). Today's value for an asset that yields a stream of income over time. Valuation of such time streams of returns requires calculating the present worth of each component of the income, which is done by applying a discount rate (or interest rate) to future incomes.

**Price.** The money cost of a good, service, or asset. Price is measured in monetary units per unit of the good (as in 3 dollars per 1 hamburger).

**Price discrimination.** A situation where the same product is sold to different consumers for different prices.

**Price-elastic demand** (or elastic demand). The situation in which price elasticity of demand exceeds 1 in absolute value. This signifies that the percentage change in quantity demanded is greater than the percentage change in price. In addition, elastic demand implies that total revenue (price times quantity) rises when price falls because the increase in quantity demanded is so large. (Contrast with **price-inelastic demand.**)

**Price elasticity of demand.** A measure of the extent to which quantity demanded responds to a price change. The elasticity coefficient (price elasticity of demand $E_p$) is percentage change in quantity de-

manded divided by percentage change in price. In figuring percentages, use the averages of old and new quantities in the numerator and of old and new prices in the denominator; disregard the minus sign. Refer also to **price-elastic demand, price-inelastic demand, unit-elastic demand.**

**Price elasticity of supply.** Conceptually similar to **price elasticity of demand,** except that it measures the supply responsiveness to a price change. More precisely, the price elasticity of supply measures the percentage change in quantity supplied divided by the percentage change in price. Supply elasticities are most useful in perfect competition.

**Price flexibility.** Price behavior in "auction" markets (e.g., for many raw commodities or the stock market), in which prices immediately respond to changes in demand or in supply. (In contrast, refer to **administered prices.**)

**Price index.** An index number that shows how the average price of a bundle of goods has changed over a period of time. In computing the average, the prices of the different goods are generally weighted by their economic importance (e.g., by each commodity's share of total consumer expenditures in the consumer price index).

**Price-inelastic demand** (or inelastic demand). The situation in which price elasticity of demand is below 1 in absolute value. In this case, when price declines, total revenue declines, and when price is increased, total revenue goes up. Perfectly inelastic demand means that there is no change at all in quantity demanded when price goes up or down. (Contrast with **price-elastic demand** and **unit-elastic demand.**)

**Prisoner's dilemma.** A famous game in which the non-cooperative equilibrium is inefficient.