IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALLAWAY GOLF COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-091-SLR |
| | ) |
| ACUSHNET COMPANY, | ) |
| | ) |
| Defendant. | ) |

Thomas L. Halkowski, Esquire of Fish & Richardson P.C., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Frank E. Scherkenbach, Esquire of Fish and Richardson P.C., Boston, Massachusetts; Roger A. Denning, Esquire of Fish and Richardson P.C., San Diego, California.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Joseph P. Lavelle, Esquire, Kenneth W. Donnelly, Esquire, and Brian A. Rosenthal, Esquire of Howrey LLP, Washington, D.C.

**MEMORANDUM OPINION**

Dated: November 20, 2007
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Callaway Golf Company ("plaintiff" or "Callaway") filed this action against Acushnet Company ("defendant" or "Acushnet") on February 9, 2006, alleging infringement of U.S. Patent Nos. 6,506,130 ("the '130 patent"), 6,503,156 ("the '156 patent"), 6,210,293 ("the '293 patent"), and 6,595,873 ("the '873 patent"). (D.I. 1) Plaintiff alleges that defendant's Titleist Pro V1® brand golf balls embody the technology claimed in one or more claims of the asserted patents. (Id. at ¶¶ 17-21) Pending before the court are plaintiff's motions for summary judgment of no anticipation (D.I. 200) and for breach of contract (D.I. 197). Also pending before the court are defendant's motions for summary judgment of invalidity (D.I. 215) and no breach of contract (D.I. 213), as well as defendant's motion for partial summary judgment that U.S. Patent No. 4,274,637 to Molitor ("Molitor '637") is incorporated by reference into a particular piece of prior art (D.I. 201). The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1338.

## II. BACKGROUND

### A. Technology at Issue

Golf balls are typically identified as two-piece or three-piece balls. Two-piece balls have a core, which is either solid or "wound," and an outer layer. A core that is considered solid is made of rubber and can be one solid piece or multiple layers. A wound core is made of elastic windings wrapped around either a solid or liquid-filled center. Three-piece balls have an additional layer covering the core, so that the ball is characterized as having a core, an inner cover layer and an outer cover layer.

The challenge faced by golf ball designers has been to create a ball that is both capable of traveling great distances and of achieving the desired "feel," or spin. Historically, balls would have to be very hard in order to achieve distance when struck by a fast-moving driver. To achieve spin, however, balls had to be softer so that they would better grip to the face of angled clubs such as irons. The patents at issue present "dual personality" balls that achieve a marriage of these diametrically-opposed objectives.

### B. Patents

Michael J. Sullivan is the sole named inventor on each of the '130, '156, '293, and '973 patents in suit (collectively, the "Sullivan patents"). The Sullivan patents have substantially identical specifications, and claim priority to the same application.[1]

The Sullivan patents each claim a multi-layer golf ball comprising a core, an inner cover layer made of a low acid ionomer, and an outer cover layer made of polyurethane.[2] The claims differentiate between the hardness and thickness of these layers. For example, claim 1 of the '293 patent claims:

1. A golf ball comprising: a core; an inner cover layer having a **Shore D hardness of 60 or more molded on said core**, said inner cover layer having a **thickness of 0.100 to 0.010 inches**, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and an outer cover layer having a **Shore D hardness of 64 or less molded on said inner cover layer**, said outer cover layer having a **thickness of 0.010 to 0.070 inches**, and said outer cover layer comprising a relatively soft polyurethane material.

---

[1]U.S. Patent Application No. 08/070,510, filed June 1, 1993.

[2]Two of the asserted claims, claims 1 and 2 of the '130 patent, do not require that the outer cover layer include polyurethane.

2

(Emphasis added)  By way of contrast, claim 1 of the '156 patent claims:

> 1. A golf ball comprising: a core; an inner cover layer disposed on said core, said inner cover layer having a **Shore D hardness of at least 60**, said inner cover layer comprising a blend of two or more low acid ionomer resins, each containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and an outer cover layer disposed on said inner cover layer, said outer cover layer having a **Shore D hardness of about 64 or less**, a **thickness of from about 0.01 to about 0.07 inches**, and comprising a polyurethane material.

(Emphasis added)

### C. Products

Plaintiff and defendant have both had success selling multi-layer golf balls.

Plaintiff markets several balls embodying the patented technology, including the

Callaway Golf® Rule 35®, the CTU 30, Callaway Golf® HX®, Ben Hogan®, Strata®,

Tour Ace®, and Top-Flite® balls.  (D.I. 1 at ¶ 16)  Defendant markets and sells golf

balls under the Titleist® brand, including the Titleist Pro V1®, Titleist Pro V1x®, and

Titleist Pro V1*® series of balls (collectively, the "Pro V1 balls").  (Id. at ¶ 19)

### D. The 1996 Settlement Agreement and Reexaminations

In 1996, Acushnet entered into an agreement with Spalding and Evenflo

Companies, Etc. ("Spalding"), plaintiff's predecessor-in-interest, and Lisco, Inc., a

wholly owned subsidiary of Spalding, to resolve various patent-related claims ("the

Agreement").  (D.I. 199, ex. 1)  The Agreement contained a "Dispute Resolution"

clause, providing that

> [a]ny dispute arising out of or relating to patents, including the above mentioned patents, other intellectual property owned or controlled by the parties, or claims relating to advertising shall be resolved in accordance with the procedures specified in this [s]ection, which shall be the sole and exclusive procedure for the resolution of any such disputes.

3

(Id. at 15, ¶ 19.1) The Agreement continues to detail a procedure involving negotiations and mediation. (Id. at 16-17, ¶¶ 19.2-6) If mediation fails to resolve a dispute, the Agreement provides that,

> [a]t the conclusion of a referral to the Magistrate or other judge as set forth in 19.6, should the dispute remain unresolved, either party may initiate legal proceedings but only in the United States District Court for the District of Delaware, and no other. Said court retains jurisdiction of the parties for such purposes.

(Id. at 18, ¶ 19.7)

After two unsuccessful mediations in 2005 regarding Spalding's rights under the Sullivan patents, Acushnet filed inter partes reexamination requests for each patent with the United States Patent and Trademark Office ("PTO") on January 17, 2006.[3] (D.I. 199, exs. 5-8) Plaintiff filed the present infringement action shortly thereafter on February 9, 2006. (D.I. 1)

The reexaminations of the Sullivan patents are still pending as of the date of this opinion. Each of the asserted claims in this lawsuit[4] have been rejected under 35 U.S.C. § 102 and/or § 103(a) on non-final office actions in the respective reexaminations.[5] More specifically, the claims of the '130, '156 and '293 patents have been rejected as obvious, while the claims of the '873 patent have been rejected as anticipated and as obvious. The prior art cited in the reexaminations is relied on by

_____

[3]Each reexamination request was executed on January 13, 2006. (D.I. 199, exs. 5-8)

[4]Plaintiff asserts claims 1, 2, 4, and 5 of the '293 patent; claims 1-11 of the '156 patent; claims 1, 2, 4, and 5 of the '130 patent; and claims 1 and 3 of the '873 patent.

[5]RE 95/000,120, 95/000,121, 95/000,122, and 95/000,123.

4

defendant in its invalidity case in the present litigation.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Anticipation

Defendant contends that the asserted claims of the Sullivan patents are invalid as anticipated by U.S. Patent No. 4,431,193 to Nesbitt ("Nesbitt"). (D.I. 216 at 23-29) Defendant concedes that Nesbitt, standing alone, does not anticipate the asserted claims because it does not disclose: (1) the use of polyurethane as the outer cover layer material; or (2) the use of blends of ionomers in the inner cover layer. (Id. at 23) However, defendant asserts that Nesbitt anticipates the asserted claims because it incorporates by reference Molitor '637, which teaches these missing limitations. (Id.)

#### 1. Incorporation by Reference

##### a. Standard

Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." Advanced Display Sys. Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted).

> Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document. Incorporation by reference provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.

Id. (citations omitted). Incorporation by reference requires a statement "clearly identifying the subject matter which is incorporated and where it is to be found." In re

6

Seversky, 474 F.2d 671, 674 (C.C.P.A. 1973). "[A] mere reference to another application, or patent, or publication is not an incorporation of anything contained therein. . . ." Id.

Put another way, the host document "must cite the material in a manner that makes clear that it is effectively part of the host document as if it were explicitly contained therein." Advanced Display Sys., 212 F.2d at 1282. It must, therefore, both (1) "identify with detailed particularity what specific material it incorporates"; and (2) "clearly indicate where that material is found in the various documents." Id. (citations omitted). While anticipation is a question of fact, the question of whether and to what extent material has been incorporated by reference into a document is a question of law. Id. at 1283. "[T]he standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity." Id.

### b. Analysis

Nesbitt discloses a three-piece golf ball having a core, a hard inner layer made of an ionomer resin, and a relatively soft outer layer made of ionomer resin. (D.I. 216 at 23) The relevant passage from Nesbitt states:

The inner, intermediate, or first layer or ply 14 and the outer cover, second layer or ply 16 or either of the layers may be cellular when formed of a foamed natural or synthetic polymeric material. **Polymeric materials are preferabl[e] such as ionomer resins which are foamable**. Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 **which describes a number of foamable compositions of a character which may be employed for one or both layers 14 and 16** for the golf ball of this invention.

(Col. 3, ll. 51-61) (emphasis added) Nesbitt proceeds to state that the inner layer may

7

be "preferably partially or only slightly foamed," the outer layer "may be foamed to a greater degree" than the inner layer, and that "the degree of foaming of one or the other or both layers may be altered to provide a variation in the coefficient of restitution of the golf ball." (Col. 3, ll. 62-68; col. 4, ll. 7-11)

The parties do not dispute that polyurethane is not an ionomer resin. Molitor '637 undisputedly discloses polyurethane in addition to many other possible choices of foamable cover materials, such as vinyl resins, acrylic resins, balata, and several types of polyolefins, as well as mixtures of these resins. (D.I. 205, ex. 3 at ¶ 102; Molitor '637, col. 5, ll. 33-55[6]) Many, if not most, of these resins are, unlike polyurethane, ionomer resins.

Defendant asserts that Nesbitt meets the Federal Circuit's standard iterated in Applied Display Systems because it: (1) identifies Molitor '637 by its serial number; (2) directs attention to the specific subject matter of "a number of foamable cover layer materials" that is incorporated into Nesbitt; and (3) "provides explicit instructions

---

[6]"Homopolymeric and copolymeric substances, such as (1) vinyl resins formed by the polymerization of vinyl chloride or by the copolymerization of vinyl chloride with unsaturated polymerizable compounds, e.g., vinyl esters; (2) polyolefins such as polyethylene, polypropylene, polybutylene, transpolyisoprene, and the like, including copolymers of polyolefins; (3) polyurethanes such as are prepared from polyols and organic polyisocyanates; (4) polyamides such as polyhexamethylene; (5) polystyrene, high impact polystyrene, styrene acrylonitrile copolymer and ABS, which is acrylonitrile, butadiene styrene copolymer; (6) acrylic resins as exemplified by the copolymers of methylmethacrylate, acrylonitrile, and styrene, etc.; (7) thermoplastic rubbers such as the urethanes, copolymers of ethylene and propylene, and transpolyisoprene, block copolymers of styrene and cispolybutadiene, etc.; and (8) polyphenylene oxide resins, or a blend with high impact polystyrene known by the trade name 'Noryl.' This list is not meant to be limiting or exhaustive, but merely illustrates the wide range of polymeric materials which may be employed in the present invention. Mixtures of the above described material may also be used."

8

regarding the use of these foamable compositions as the cover layers in his two-piece ball." (D.I. 205 at 5) Plaintiff argues that Nesbitt does not specify, let alone with "detailed particularity," the use of polyurethane or ionomer blends by Molitor '637, nor does it "clearly indicate" where Molitor '637 discusses polyurethane or ionomer blends. (D.I. 242 at 5, 8)

The court agrees with plaintiff. There is no dispute that Molitor '637 discloses – in its text and examples – resins that are both ionomers and nonionic resins.[7] Nesbitt does not point to, or otherwise specify, the incorporation of polyurethane from Molitor '637. Nesbitt does not point to, or otherwise specify, the use of a blend of two ionomer resins as a cover layer, as disclosed in Molitor '637. Nor does Nesbitt point to any particular text or example of Molitor '637 which would tend to bridge these gaps. Moreover, although not specifically limited to ionomer resins, the reference to Molitor '637 occurred immediately following the statement that foamable ionomer resins are preferred. The court finds that Molitor '637 is mentioned in Nesbitt to identify examples of suitable resins, preferably ionomer resins, and not to specifically incorporate polyurethane.

The cases cited by defendant do not contradict the court's finding. (D.I. 205 at 4) In In re Voss, 557 F.2d 812 (C.C.P.A. 1977), the Court of Customs and Patent Appeals examined the effect of the following language:

_____

[7]Although the relevant passage from Molitor '637 (supra n.6) potentially encompasses hundreds of resins, examples 1-7 of Molitor '637 disclose only one ionomer resin composition, a blend of Surlyn® 1605 and Surlyn® 1557. Nevertheless, Nesbitt does not point to, or otherwise specify, the incorporation of this ionomer resin composition from Molitor '637.

9

A glass-ceramic material is originally formed as a glass which is then phase separated, by a controlled uniform devitrification throughout, to develop a fine crystalline structure within a glassy matrix, the material thus produced having physical properties materially different from the parent glass and more nearly characteristic of a conventional crystalline ceramic material. Reference is made to United States Patent No. 2,920,971, granted to S.D. Stookey, for a general discussion of glass-ceramic materials and their production.

557 F.2d at 815-16. Finding that an incorporation by reference had been effected, the

court stated that

[g]lass-ceramic materials are merely starting materials for appellant's strengthening process. Rather than include in his application a detailed discussion of how to prepare such **known starting materials**, appellant, for economy, referred the skilled artisan to Stookey '971.

Id. at 817 (emphasis added). Defendant in this case assimilates the language of

incorporation used in Nesbitt to the cited language of In re Voss. (D.I. 216 at 24)

Nesbitt, however, does not contain the level of detail found in the patent application in

Voss, nor does it attempt to incorporate Molitor '637 for the purpose of exemplifying

"known starting materials" for an improved process, as in that case.

Similarly, where the material sought to be incorporated is a known preparation

method, a slightly less detailed disclosure may suffice where an intent to incorporate a

specific aspect of the reference is demonstrated. Relying on In re Voss, the Federal

Circuit in its non-precedential opinion of Southern Clay Products, Inc. v. United

Catalysts, Inc., 43 Fed.Appx. 379, 384 (Fed. Cir. 2002), found the following disclosure

sufficient to incorporate the bond-breaking techniques described:

Exemplary of **commonly employed** physical or comminuting techniques for breaking the bonds between the colloidal particles in a clay particle aggregate are those techniques disclosed in United States Pat. Nos. Re. 25,965; 3,253,791; 3,307,790; and 3,348,778 [Cohn]. Generally speaking, the techniques disclosed in these patents effect some type of grinding or comminuting either by shear or abrasion so as to break the bonds in the clay

10

aggregate particle and thus form several colloidal particles therefrom.

(U.S. Patent No. 3,951,850 ("Clocker") col. 1, ll. 46-55) (emphasis added) "By citing to

and specifically identifying the bond-breaking techniques discussed by Cohn, Clocker

has demonstrated the intent to make that information part of the specification." Id.

(finding asserted claims anticipated by Clocker patent). In the present case, no specific

resin, such as polyurethane, is identified by the passage in Nesbitt, nor is the resin

employed as a starting material, as opposed to an essential component of one or both

the inner and outer cover layers of the ball.

Finally, defendant relies on In re Hughes, 550 F.2d 1273 (C.C.P.A. 1977), in

which the Court of Customs and Patent Appeals found that the following passage

effectuated an incorporation by reference:

> Copending application Ser. No. 131,108, filed Aug. 14, 1961 by Jack Hurst and
> Harry D. Anspon describes the preparation of aqueous dispersions of
> water-insoluble, self-emulsifiable ethylene polymers containing pendent
> carboxylate salt groups which can be suitably employed in the process of this
> invention. As described therein, water-insoluble, but self-emulsifiable ethylene
> polymers containing pendent carboxylate salt groups are prepared by the
> hydrolysis in an aqueous medium of the acrylate groups of a thermoplastic
> ethylene-alkyl acrylate inter-polymer employing elevated temperatures, a metallic
> base, and, optionally, a nitrogenous base to produce a stable aqueous
> dispersion of the ethylene polymer. Reference is made to application Ser. No.
> 131,108 for complete descriptions of methods of preparing aqueous polymeric
> dispersions applicable in the hereinafter described invention.

Id. at 1274-75. Again, despite similarities between the final sentence of this passage

and the statement of incorporation in Nesbitt, the patent application in Hughes clearly

contains a superior level of detail to that present in Nesbitt. Moreover, while the

passage in Hughes specifically identified the subject matter (the hydrolysis reaction) to

11

be incorporated,[8] Nesbitt does not specify any particular resin disclosed in Molitor '637.

For the aforementioned reasons, the court finds that Nesbitt does not describe the use of polyurethane or blends of ionomer resins in Molitor '637 with sufficient particularity to effectuate an incorporation by reference of those features. Because the asserted claims require both limitations, Nesbitt does not anticipate as a matter of law.[9] See, gen., In re Saunders, 444 F.2d 599, 603 (C.C.P.A. 1971) (disclosure of siloxane surfactant formula and statement that "[t]he above-described siloxane-oxlkylene block copolymers can be prepared in accordance with the procedures described and claimed in the copending application of D.L. Bailey and F.M. O'Connor, Serial No. 417,935," found to convey to persons of skill in the art only that "Bailey taught now to make surfactants of this general type" and would not expressly indicate that Bailey's other compounds could also be employed) (finding pending claims not anticipated by the purported combination reference); see also Zenon Environ., Inc. v. U.S. Filter Corp., Nos. Civ. A. 06-1266 and 06-1267, 2007 WL 3275025, *7-9 (Fed. Cir. 2007) (finding that the following statement did not incorporate by reference the entire disclosure of the prior art reference: "The vertical skein is not the subject matter of this invention and any prior art vertical skein may be used. Further details relating to the construction and

---

[8]The Hughes court noted that the specification "does not purport to provide a complete description of the hydrolysis reaction. Rather, [it] incorporates by reference application Ser. No. 131,108 for complete descriptions of these methods." 550 F.2d at 1276 (internal quotations and parentheses omitted).

[9]The court respectfully disagrees with the conclusion of the PTO, which has found that Nesbitt incorporates by reference Molitor '637 "[s]ince the language in Nesbitt for incorporation by reference is virtually identical to the language used in In re Hughes and In re Voss." (D.I. 328 at 25)

12

deployment of a most preferred skein are found in the parent U.S. Pat. No. 5,639,373, and in Ser. No. 08/690,045, the relevant disclosures of each of which are included by reference thereto as if fully set forth herein."); Telecordia Techs., Inc. v. Lucent Techs., Inc., Nos. Civ. A. 04-875 & 04-876, 2007 WL 1295532, *11-13 (finding statement "[f]or broadband services previous contributions have indicated that packet-mode techniques are a way to achieve flexibility at rates lower than the broadband channel rate (T1D1.1/85-113, T1D1.1/85-149)," accompanied by statement of improvement regarding the present invention, did not include the specific subject matter to be incorporated) (granting summary judgment of no anticipation). The court, therefore, denies defendant's motion for partial summary judgment that Nesbitt incorporates Molitor '637 by reference (D.I. 201). To the extent each is premised on Nesbitt, the court grants plaintiff's motion for summary judgment of no anticipation (D.I. 200) and denies defendant's motion for summary judgment of invalidity (D.I. 215).

### 2. Inherency

Plaintiff seeks a judgment that neither Nesbitt nor U.S. Patent No. 5,314,187 to Proudfit ("Pruodfit '187") anticipates the asserted claims that require a Shore D hardness of 64 of less, because neither reference discloses, expressly or inherently, a Shore D hardness for the outer cover layer.[10]

### a. Law of anticipation based upon inherency

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. See Key Phar. v. Hercon Labs. Corp.,

---

[10]Defendant does not move for summary judgment of invalidity on this issue. (D.I.s 215, 216)

161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. See id. A finding of anticipation will invalidate the patent. See Applied Med. Resources Corp. v. U.S. Surgical Corp., 147 F.3d 1374, 1378 (Fed. Cir. 1998). Issued patents are presumed valid, and the "underlying determination of invalidity . . . must be predicated on facts established by clear and convincing evidence." Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362 (Fed. Cir. 1998) (citations omitted).

A prior art reference may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. See Continental Can Co. USA v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is "necessarily present" and not one that may be established by "probabilities or possibilities." See id. at 1268-69. That is, "'[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient.'" Id. at 1269 (emphasis in original) (citations omitted).

### b. On the ball Shore-D hardness of Nesbitt and Proudfit '187

In its memorandum order of the same date, the court has construed "cover layer having a Shore D hardness" to describe a hardness measurement taken "on the ball." There is no dispute that Nesbitt discloses the use of Surlyn® 1855 resin as the outer cover layer of the ball, which material has a Shore D hardness of 55 as measured "off the ball." (Nesbitt, col. 3, ll. 34-44; D.I. 238, ex. 8 at 146:5-14; D.I. 202 at 15) There is no indication, however, that this measurement invariably correlates to an "on the ball"

14

measurement of less than 64.[11]

Defendant proffers the declaration of William J. MacKnight, who was retained by
defendant to oversee the preparation and testing of several golf balls and test for Shore
D hardness of the outer layer ("the MacKnight testing").[12]   (D.I. 238 at 15, citing D.I. 217
[sic], ex. 30 at ¶ 33) According to defendant, Dr. MacKnight reviewed golf balls
constructed with a core as described by Nesbitt, ionomer-blend inner cover layers
disclosed in Molitor '637, and polyurethane outer layers as disclosed in Molitor '637; the
resulting "on the ball" Shore D hardness was 62. (D.I. 217, ex. 30 at ¶ 33, results for
ball 1)

The court previously has found that Nesbitt does not specifically incorporate
Molitor '673's disclosure of an ionomer-blend inner cover layer. The balls reviewed by
Dr. MacKnight, therefore, were neither completely representative of Nesbitt, nor were

---

[11]Acushnet's expert, Dr. Robert Statz, testified that hardness values "can be
different between a plaque measurement and an on the ball measurement" provided
thickness is taken into account. (D.I. 203, ex. 8 at 301:7-11) Mr. Jeffrey Dalton,
Acushnet's Rule 30(b)(6) witness, testified that "a number of things come into play in
the difference between Shore D on the ball versus on the slab or on a test specimen,"
such as thickness, as "you also have an influence of what's underneath the layer that
you're trying to measure[.]" (Id., ex. 9 at 59:13-25) Another Acushnet expert, Dr.
MacKnight, testified that "Shore hardness measurements don't measure [a]
fundamental property of the material, and so there isn't generally a theoretical method
of predicting what the values will be." (Id., ex. 1 at 93:23-94:1) Finally, U.S. Patent No.
6,960,630, assigned to Acushnet, states that "[h]ardness, when measured directly on a
golf ball (or other spherical surface) is a completely different measurement and,
therefore, results in a different hardness value . . . the two measurement techniques are
not linearly related and, therefore, one hardness value cannot easily be correlated to
the other." (Id., ex. 7 at col. 10, ll. 14-24)

[12]Although the court, in a memorandum order issued this date, has granted
plaintiff's motion to exclude the MacKnight testing, the court will address the merits of
defendant's contentions for purposes of this discussion.

they completely representative of Proudfit '187. The court finds the fact that these balls ostensibly had Shore D hardness values of less than 64 insufficient to demonstrate that balls made according to the disclosure of Nesbitt independently, or Proudfit '187 independently, invariably had Shore D hardness values of less than 64. See Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991) (extrinsic evidence used to fill a gap in a reference "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill") (citations omitted); Wesley Jennsen Corp. v. Bausch & Lomb, Inc., 209 F. Supp. 2d 348, 393 (D. Del. 2002) (samples prepared to demonstrate inherency made with components of multiple references were insufficient to carry defendant's burden on inherency, as the substitutions would not be recognized by persons of ordinary skill as necessarily present in one prior art reference).

Defendant places much emphasis on the fact that plaintiff did not provide its own testing to controvert Dr. MacKnight's report. (D.I. 238 at 15) This, however, does not alter the fact that defendant's hybrid balls do not represent any embodiment of any prior art reference. At best, defendant's evidence demonstrates that Nesbitt and/or Proudfit '187 possibly has the properties at issue; absent more, a reasonable jury could not find either reference anticipatory. See Continental Can Co. USA, 948 F.2d at 1269. Plaintiff's motion for summary judgment of no anticipation (D.I. 200) is granted on this ground.

### c. Proudfit '187 and the Wilson Ultra Tour Balata ball

Plaintiff seeks a judgment that Proudfit '187 and the Wilson Ultra Tour Balata

16

golf ball (the "Wilson Balata," which defendant asserts embodies Proudfit '187), do not anticipate claims 1 or 2 of the '130 patent[13] because neither discloses a golf ball having an outer cover layer having a Shore D hardness of 64 or less and a blend of low-acid ionomers in the inner cover layer.[14]  (D.I. 202 at 19-20)

Defendant asserts that the Wilson Balata available in 1993 used the outer cover layer disclosed in Table 7 of Proudfit '187.  (D.I. 238 at 17)  In support, defendant presents the declaration of Mr. Proudfit, obtained specifically for purposes of this motion practice.  Mr. Proudfit has declared that Proudfit '187 discloses an inner cover layer composed of a blend of Surlyn® 8940 and Surlyn® 9910, both low-acid ionomers.  (Id., ex. 5 at ¶ 5)  Mr. Proudfit also declares that "[t]he outer cover layer of the [Wilson Balata] ball on sale in 1993 was the composition set forth in Table 7 of the [Proudfit] '187 patent."  (Id. at ¶ 6)  Defendant has produced a document detailing defendant's in-house testing of the Wilson Balata in 1993, which states that the cover layer had a "primary component" of c-polybutadiene and an "other polymer" of "synthetic balata." (D.I. 238, ex. 10 at AC0072945)  Defendant found the "hardness" of the ball to be 52.

---

[13]Unlike the remainder of the Sullivan patent claims at issue, claims 1 and 2 of the '130 patent do not specifically require polyurethane in the outer cover formulation. Independent claim 1 of the '130 patent reads:

> 1. A golf ball comprising: a core; an inner cover layer having a Shore D hardness of 60 or more molded on said core, the inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and an outer cover layer having a Shore D hardness of 64 or less molded on said inner cover layer, said outer cover layer comprising a relatively soft polymeric material selected from the group consisting of non-ionomeric thermoplastic and thermosetting elastomers.

[14]Proudfit '187 does not expressly disclose a Shore D hardness value for its various embodiments.

17

(Id.)

Mr. Proudfit, in a 1993 declaration to the PTO, stated that "[t]he balata layer of the Ultra Tour Balata Ball also includes polybutadiene and the other ingredients which are listed in Table 7 of the application in addition to synthetic balata." (D.I. 216, ex/ 47 at ¶ 14) In Mr. Proudfit's 2007 declaration, he states that the Wilson Balata comprised only the composition of Table 7.[15] Neither party has deposed Mr. Proudfit in this case, because Mr. Proudfit was not listed in defendant's initial disclosures or interrogatory responses as a potential witness in this case, nor did defendant produce his declaration until after the close of fact and expert discovery. Given the inconsistencies between Mr. Proudfit's 1993 and 2007 declarations, and defendant's untimely disclosure of Mr. Proudfit as a critical witness to the anticipation defense asserted by defendant in this regard, the court declines to consider Mr. Proudfit's 2007 declaration amongst defendant's evidence regarding anticipation on summary judgment.

Proudfit '187 and the Wilson Balata are discrete, separate items of prior art for purposes of anticipation. There is no dispute that the two limitations in question are not explicitly present within the four corners of Proudfit '187. If the Surlyn® 8940 and Surlyn® 9910 resins disclosed in Proudfit '187 (Table 6) are, in fact, low-acid ionomers, defendant could introduce this evidence at trial through one of its other witnesses. Defendant, however, cannot meet its burden on inherency with respect to the outer cover layer. Notwithstanding the fact that Mr. Proudfit identified components of the Wilson Balata outer cover layer not present in Proudfit '187 Table 7 (balata and

---

[15]It is unclear whether "synthetic balata" comprises the ingredients listed in Table 7.

18

synthetic balata), defendant's only evidence regarding Shore D hardness, the allegedly "inherent" limitation in question, is its 1993 testing document, which merely records a "hardness" of 52 without mention as to whether this was recorded on the ball or off the ball.[16] Therefore, no comparison to claims 1 and 2 of the '130 patent can readily be made. In sum, defendant's inherency theory is too attenuated and unsubstantiated at several steps to prove that Proudfit '187 anticipates claims 1 and 2 of the '130 patent. Plaintiff's motion for summary judgment of no anticipation (D.I. 200) is granted on this ground.

### B. Obviousness

Before the court is defendant's motion for summary judgment of invalidity. (D.I. 215) With respect to obviousness, defendant asserts that Proudfit '187 and Nesbitt disclose each limitation of the asserted claims except polyurethane for the outer cover layer, which is disclosed in Molitor '751, Wu, and Molitor '637. Plaintiff argues that defendant has not made a prima facie case of obviousness because none of these references disclose, explicitly or implicity, an outer cover layer with a Shore D hardness less than 64, and an inner cover layer with a Shore D hardness more than 60.[17]

By its claim construction order of the same date, the court has determined that Shore D measurements of the patented balls must be made "on the ball." Under the

---

[16]There is also no indication of whether this value represents the result from a single test or multiple tests and, if the latter, in what manner the results are reported (mean or median). Such information is critical in determining whether the evidence could support a determination that the claimed Shore D hardness values are always or "necessarily" present in a ball disclosed in Proudfit '187.

[17]Plaintiff has not brought its own motion for summary judgment that the Sullivan patents are not invalid as obvious on these grounds.

19

court's construction, it follows that the patented ball must be constructed before the Shore D value of the outer cover layer can be measured. Indeed, plaintiff has presented evidence that the composition of the core and inner layers of the golf ball have some bearing on a Shore D measurement taken on the ball. (See supra n.12)

As discussed previously in the context of anticipation, the court finds that neither Nesbitt nor Proudfit '187 inherently discloses an outer cover layer with a Shore D hardness of 64 or less. Neither Molitor '751, Wu, or Molitor '637 expressly provide this limitation and, to prove obviousness, it is not enough for defendant to demonstrate that this limitation is inherently present in Molitor '751, Wu, or Molitor '637. Even if one of the asserted prior art references inherently discloses a Shore D hardness of 64 or less **for the ball(s) of that reference**, that is no indication of the Shore D hardness which a person of skill in the art would expect **for the patented balls**, i.e., the combination of elements from Nesbitt or Proudfit '187 and Molitor '751, Wu, or Molitor '637. Defendant must put forward evidence that tends to demonstrate that persons of ordinary skill in the art had knowledge that combining these references would result in an "on the ball" Shore D hardness of less than 64, and some motivation to combine the references to provide this result.[18] See In re Rijckaert, 9 F.3d 1531, 1534 (Fed. Cir. 1993) ("That which may be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown. . . Such a retrospective view of inherency is not a substitute for some

_____

[18]This should be distinguished from a general motivation to combine these various pieces of art relating to golf balls. There is no indication, in the prior art or elsewhere, of an "an apparent reason to combine the known elements in the fashion claimed by the patent at issue." See KSR Intern. Co. v. Teleflex Inc., 127 S.Ct. 1727, 1741 (2007). Nor is any reasonable expectation of success indicated.

20

teaching or motivation supporting an obviousness rejection.") (citations omitted).

With respect to the disclosures of the asserted references, defendant puts

forward the following: (1) Molitor '751 discloses a "Shore C" hardness of 72-76 for its

preferred cover layer, which is equivalent to an on the ball Shore D value of less than

64 when this cover layer is combined with either (a) the core and inner layer of Proudfit

'187, as confirmed by the MacKnight testing, or (b) the core and inner layer of Nesbitt,

as confirmed by the MacKnight testing; and (2) balls made with both the core and inner

layer of (a) Proudfit '187 or (b) Nesbitt and either the outer cover layer of (c) Wu or (d)

Molitor '637 were all measured to have on the ball Shore D hardness values under 64.

Defendant's positions are all predicated on the MacKnight testing, that is, after-

manufacture, on the ball testing of golf balls containing the stated combinations of

elements.

Again, even assuming that the MacKnight test results were accurate, there is no

indication that Dr. MacKnight, a person of skill in thermoplastics, knew or appreciated

that making balls of these combinations of elements (i.e., the patented balls) would

have outer cover layer Shore D values less than 64 prior to making and testing them.[19]

_____

[19]Defendant asserts that "Dr. MacKnight's testing is instructive of what a person
of ordinary skill in the art would **be able to readily ascertain** as to the 'on the ball'
hardness of the Molitor '637 polyurethane. A person of ordinary skill in the art would
easily be able to make the Proudfit ball, replacing the outer cover layer with the Molitor
'637 polyurethane, and find that the Shore D hardness 'on the ball' is 59.4, which is less
than 64, as Dr. MacKnight did." (D.I. 265 at 13) (emphasis added)  Callaway's expert,
Dr. Risen, testified that, if he wanted to know what the Shore D of a ball made in a
particular way was, "[he]'d make the ball and measure it." (D.I. 265, ex. 57 at 135:10-
136:8)  What a person of skill would be able to readily ascertain upon completion of this
task is not equivalent to a motivation to combine to achieve a desired result, and a
reasonable expectation of success in doing so; such evidence is lacking on this record.

21

Similarly, there is no indication that persons of skill in the art, given the claimed combination of core, inner layer, and outer cover layer features and materials pieced together from the prior art, would have known or expected the resultant ball to have Shore D values less than 64 as claimed.[20]

The closest evidence in this regard is defendant's assertion that the Shore C hardness disclosed in Molitor '751 (between 72 and 76) "is certainly below 64 on the Shore D scale" according to the charts of record. (D.I. 216 at 19-20, 30) One chart provided is the ASTM standard (D.I. 217, ex. 27); a second chart was submitted during prosecution of the '873 patent for the purpose of approximating Shore D hardness from Shore C values. (Id., ex. 55 at 3) Plaintiff underscores that each chart plainly states that it cannot be used as a conversion chart. (D.I. 244 at 23-24) According to the MacKnight testing, a golf ball prepared with a core and inner cover layer described by Proudfit '187, and a cover material harder than that described by Molitor '751, was asserted to have an "on the ball" Shore D hardness of 51.2. (D.I. 217, ex. 30 at ¶¶ 25,

---

[20]The court respectfully disagrees with the conclusion of the PTO on obviousness. Claim 1 of the '130 patent stands rejected as obvious in view of Nesbitt and Molitor '637, which is mentioned in Nesbitt (presumptively providing motivation to combine). The examiner has applied the following logic to find that the limitation "a Shore D hardness of 60 or more molded on said core" is disclosed by this combination: (1) Nesbitt discloses an inner cover layer of "molded hard" resin such as Surlyn® 1605, now designated as Surlyn® 8940; and (2) Surlyn® 8940 has a Shore D hardness of 65. (D.I. 328 at 40) Similarly, the examiner has reasoned that the "Shore D hardness of 64 or less molded on said inner cover layer" is disclosed by the asserted combination of prior art since: (1) Nesbitt references Molitor '637 with respect to the outer cover layer; (2) Molitor '637 discloses a polyurethane outer layer identified as Estane® 58133; (3) Estane 58133 has a Shore D hardness of 55, as demonstrated by an "Estane® Thermoplastic Product Data Sheet." (Id.) There is no indication that either resource utilized by the PTO in determining Shore D hardness reflected on the ball, as compared to plaque, testing of that property.

33) However, Dr. MacKnight testified that a straight conversion would be "dangerous," and also admitted that a comparative estimate of Shore D based on Shore C hardness "probably wouldn't be terribly inaccurate." (Id., ex. 2 at 114:4-21) Plaintiff has also adduced evidence which tends to demonstrate that the advantages conferred by utilizing the particular materials, hardnesses, and thicknesses of different cover layers is potentially unpredictable. (D.I. 244 at 20, citing D.I. 217, ex. 5 at 36:22-37:6, id., ex. 6 at 344:10-24)

In addition to the lack of direct evidence on this point introduced by defendant, plaintiff's evidence regarding the correlation tables suffices to create a genuine issue of material fact as to whether a person of ordinary skill in the art would have had a motivation to combine the claimed elements to achieve a Shore D hardness of less than 64, and a reasonable expectation of success in doing so. See Gilette Co. v. S.C. Johnson & Son, Inc., 919 F.2d 720, 724 (Fed. Cir. 1990) ("An analysis of obviousness of a claimed invention must include consideration of the results achieved by that combination."); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1383 n.6 (Fed. Cir. 1986) (stating that courts may not "[f]ocus[ ] on the obviousness of substitutions or differences rather than the invention as a whole"). The court finds, therefore, that summary judgment of invalidity is inappropriate at this stage. Defendant's motion (D.I. 215) is denied.

## C. Breach of Contract

The parties have each moved for summary judgment on the breach of contract issue. (D.I. 197, 213)

### 1. The parties are bound by the Agreement

23

As a threshold matter, defendant asserts that plaintiff is not a party to the Agreement and, therefore, defendant was not required to follow the Agreement with respect to its patent disputes with plaintiff. (D.I. 214 at 8-9, D.I. 239 at 14) The Agreement was entered into between Spalding and defendant. Section 15 of the Agreement plainly provides that "[the Agreement] is binding upon the parties hereto, their affiliated, related and controlled companies, as well as their representatives and the **successors**, transferees and assigns of substantially all of their respective Golf Ball Businesses."[21]  (D.I. 199, ex. 1 at § 15) Defendant does not dispute that Spalding's golf ball business became an independent company that was acquired by plaintiff. (D.I. 214 at 4)

In addition, in 1995, defendant sought (and obtained) a mediation before Magistrate Judge Thynge of this court, and represented to Judge Thynge at the outset that the Agreement provided that plaintiff (not Spalding) and defendant should mediate the present dispute. (D.I. 199, ex. 4) Defendant's general counsel has previously declared to this court that he was present at this mediation "between Acushnet and Callaway Golf Company" pursuant to sections 19.5 and 19.6 of the Agreement. (D.I. 24, ¶¶ 4, 5) Finally, defendant has invoked section 19.2 of the Agreement to request information from plaintiff regarding its damages theories. (D.I. 199, exs. 10, 11)[22]

---

[21]"Golf Ball Business" is defined as "[t]he business of and the technology used in making, using, and selling golf balls in the United States and foreign countries as participated in by the parties, their affiliates, subsidiaries or related companies." (D.I. 199, § 1.2)

[22]Defendant stated that it would, "of course treat th[at] information as confidential pursuant to paragraph 19.4 of the [A]greement." (D.I. 199, ex. 10)

Defendant engaged in two mediation proceedings with plaintiff, as prescribed by the
Agreement.

The court finds that plaintiff is a "successor" as described by the Agreement; the
Agreement, therefore, governs the dealings between plaintiff and defendant.[23]
Defendant has performed under the Agreement under this understanding,[24] and has not
adduced sufficient evidence to create a genuine issue of material fact on this issue.

## 2. The PTO's findings are not controlling

Defendant asserts that the PTO has considered, and rejected, plaintiff's
interpretation of the Agreement. (D.I. 214 at 6-7) On April 13, 2006, plaintiff filed a
petition with the PTO to vacate the reexamination filed by defendant in view of the
Agreement. (Id., ex. D) The PTO declined, on jurisdictional grounds, "to make a
determination regarding the validity and applicability of [the Agreement], or to make any
findings regarding the facts alleged in [the] patent owner's petition or the third party
requester's opposition to [the] patent owner's petition." (Id. at 4, n.3) Assuming
plaintiff's rendition of the facts were accurate and the Agreement to be valid and

---

[23]Thatcher v. Kohl's Dept. Stores, Inc., 397 F.3d 1370, 1373 (Fed. Cir. 2005),
cited by defendant, is distinguishable on its facts. In Thatcher, the consent judgment
contained "successors-in-interest" language when discussing the obligations of one
party, but not the other. Id. at 1372-73. Accordingly, as no one other than the named
party was expressly given the right to proceed with a contempt action to enforce the
judgment pursuant to its terms, the Federal Circuit found this to be the "functional
equivalent of the parties' express intent to exclude language of assignment." Id. at
1375 (holding that named party and its assignee "must live with the consequence of
failing to include similar language of assignability here").

[24]Ironically, defendant contemporaneously asserts that plaintiff's interpretation of
the Agreement "runs to a potentially infinite array of patents, held by multiple **as yet
unknown** companies." (D.I. 264 at 16) (emphasis added)

enforceable, the PTO dismissed plaintiff's request on the following grounds: (1) plaintiff cited no authority for the proposition that private parties may abrogate the PTO's statutory jurisdiction to conduct and decide the merits of a request for inter partes reexamination; (2) "a contractual provision preventing a party from seeking reexamination would be void as contrary to public policy" allowing licensees to challenge the validity of patents; (3) the Agreement was executed prior to the enactment of the statute authorizing inter partes reexamination, "[t]hus it was not even possible for [the Agreement] to address preventing a party to the [A]greement from filing such a request for reexamination"; (4) there was no indication that the reexamination was ordered contrary to a statutory prohibition or due to clerical error; and (5) Congress did not provide for an "estoppel" arising out of a settlement or other contractual agreement between parties. (Id. at 4-5) The PTO concluded that the reexamination must proceed in the public interest of resolving the substantial new question of patentability. (Id. at 6)

Respectfully, the court owes no deference to the PTO's interpretation of the legal effect of the Agreement or, more generally, the legality of a provision that purports to prevent parties from filing inter partes reexaminations. The reexamination at issue having been filed, and a substantial new question of patentability recognized, the PTO was clearly within its jurisdiction to dismiss plaintiff's request to halt the proceedings. It does not follow, however, that defendant was not in breach when it filed its inter partes reexamination request in the first instance.

### 3. The Agreement prohibits any procedures not specified therein

The Agreement expressly provides that "[a]ny dispute arising out of or relating to

26

patents" be resolved by the procedures set forth therein, which are "the sole and exclusive procedure[s] for the resolution of any such dispute." (D.I. 199, ex. 1 at § 19.1) These procedures included mediation and litigation in this district;[25] reexamination proceedings are not listed as a possible alternative and, therefore, are precluded as possible remedies to any disputes involving the Sullivan patents.[26] (Id. at §§ 19.5-19.7) There is no need for the court to determine whether an <u>inter</u> <u>partes</u> reexamination is a "legal proceeding," insofar as defendant breached the Agreement in any event: If it is a legal proceeding, defendant breached by filing a legal proceeding in the wrong forum; if it is not, defendant breached because the Agreement only allows for legal proceedings.[27]

The fact that <u>inter</u> <u>partes</u> reeexamination proceedings were not introduced by

---

[25]Defendant's emphasis on the "permissive" language regarding the Agreement's provision that either party "**may** initiate legal proceedings but only in the United States District Court for the District of Delaware, and no other" is misplaced. (D.I. 199 at § 19.7; D.I. 239 at 5) (emphasis added) That the parties did not seek to mandate expensive and time-consuming patent litigation has no bearing on whether litigation is the exclusive, post-mediation remedy.

[26]Indeed, the fact that defendant filed its reexamination requests after two failed mediation attempts, and requested a stay of this litigation pending the outcome of the reexaminations, is highly inconsistent with defendant's assertion that an <u>inter</u> <u>partes</u> reexamination is not a dispute resolution process.

[27]The Federal Circuit has found that an <u>ex</u> <u>parte</u> reexamination may qualify as "other litigation" for purposes of laches. <u>See</u> <u>Vaupel Textilmaschinen KG v. Meccanica Euro Italia APA</u>, 944 F.2d 870, 876-77 (Fed. Cir. 1991). Although <u>inter</u> <u>partes</u> reexaminations are more adversarial by their nature and, in fact, were enacted to reduce patent litigation in district courts (145 CONG. REC. E1789-E1790 (Aug. 5, 1999)), the Federal Circuit has pronounced, albeit in a factually distinguishable case, that it "do[es] not equate a request for administrative reexamination by the United States Patent and Trademark Office with filing a suit in a United States Court." <u>See</u> <u>Joy Manufacturing Co. v. National Mine Svc. Co.</u>, 810 F.2d 1127, 1129 (Fed. Cir. 1987).

27

statute until three years after the Agreement was signed does not change the effect of
the controlling language. Defendant asserts that, if the parties intended to exclude
reexaminations, they would have specifically noted and excluded ex parte
reexaminations as a possible remedy.[28] The court disagrees. The Agreement excludes
any other "proceedings" not initiated in this court. It, therefore, succeeds in "guard[ing]
against the possibility of a change in law." (D.I. 239 at 12)

Finally, defendant asserts that it would run afoul of public policy to interpret the
Agreement so as to prohibit the defendant's reexamination filings; if litigation is the only
available forum, defendant asserts, then neither party would be able to: (1) "file a new
patent adverse to the other's products"; (2) "file an interference with the PTO in the
case that the other party filed for a new patent"; or (3) participate in a trademark
opposition in the PTO." (D.I. 239 at 11) None of these circumstances, however,
constitute a "dispute arising out of or relating to [issued] patents," as required by the
Agreement.

Section 19.7 of the Agreement is akin to a forum selection clause; the parties
have not contracted away their rights to contest the validity of each other's patents, but
have agreed to do so before a court, rather than before the PTO. The parties' interests
in adjudicating the validity of issued patents is not compromised.[29] The public interest is

---

[28]A 2001 agreement between the parties specifically prohibits the filing of inter
partes reexaminations. The court, however, declines to use a separate and later-
executed contract to aid in its interpretation of the contract at issue.

[29]Defendant argued in its motion to stay the current litigation (pending completion
of the reexaminations) that the court could benefit from the PTO's review of validity;
however, the court is capable of resolving a broader spectrum of disputes than the
PTO.

28

not compromised here, as the public is not a party to the Agreement, and other third parties may still challenge the validity of the parties' patents through reexamination. Absent a compelling reason not to honor the parties' choice of forum for their patent disputes,[30] the court concludes that, based upon the foregoing discussion, defendant violated the Agreement by filing the inter partes reexaminations to contest the validity of the Sullivan patents. Plaintiff's motion (D.I. 197), therefore, is granted; defendant's motion (D.I. 213) is denied.

## V. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment of breach of contract (D.I. 197) is granted; plaintiff's motion for summary judgment of no anticipation (D.I. 200) is granted; defendant's motion for partial summary judgment regarding incorporation by reference (D.I. 201) is denied; defendant's motion for summary judgment of no breach of contract (D.I. 213) is denied; and defendant's motion for summary judgment of invalidity (D.I. 215) is denied. An appropriate order shall issue.

---

[30]Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1369 (Fed. Cir. 2001) ("[T]here is a strong public interest in settlement of patent litigation and that upholding the terms of a settlement encourages patent owners to agree to settlements – thus fostering judicial economy.") (citing Foster v. Hallco Mfg. Co., Inc., 947 F.2d 469, 477 (Fed. Cir. 1991)).

29