# FISH & RICHARDSON P.C.

Suite 1100
919 N. Market Street
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

**Thomas L. Halkowski**
(302) 778-8407

Email
halkowski@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

November 27, 2007

**<u>VIA ECF</u>**
The Honorable Sue L. Robinson
United States District Court
for the District of Delaware
844 King Street
Wilmington, DE  19801

Re:    *Callaway Golf Company v. Acushnet Company*
       USDC-D. Del. - C. A. No. 06-91 (SLR)



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear  Judge Robinson:

Callaway Golf submits this letter in response to Acushnet's letter of November 24 (D.I. 352), in which Acushnet addressed Callaway Golf's motion *in limine* regarding Acushnet's non-prior art "hybrid" golf balls and urged reconsideration of Acushnet's motion for summary judgment of invalidity regarding the '130 patent.

**Inadmissibility of the Hybrid Golf Balls**

Despite the Court's recognition that the hybrid balls "do not represent any embodiment of any prior art reference" (D.I. 347 at 16), Acushnet's letter brief persists in referring to these creations as "prior art balls." (D.I. 352 at 1-2.) Acushnet's continued use of this misnomer further illustrates why these balls should be excluded from evidence – at trial, Acushnet's presentation of these balls will mislead the jury into believing that the balls are genuine prior art, or representative of genuine prior art, which they clearly are not.

As the Court has acknowledged, the hybrid golf balls were created and tested by Acushnet's employees and attorneys, not by its testifying expert, Dr. Statz, or its now-excluded expert, Dr. MacKnight.  (*See* D.I. 346 at 2.)  The Court excluded Dr. MacKnight's testimony regarding the hybrid balls because his involvement with their manufacture and testing was, at best, attenuated.  Although Acushnet has suggested that Dr. Statz can provide the "evidentiary predicate" for the admission of these balls (D.I. 352 at 1-2), Dr. Statz is not capable of establishing either the relevance or the reliability of the hybrid balls, much less their testing.

In suggesting that Dr. Statz "opines as to the relevance of these prior art golf balls" (*id.* at 3), Acushnet mistakenly provides an expansive view of Dr. Statz's expert report.  The only places where Dr. Statz even mentions the hybrid balls are the paragraphs in which he merely cites the Shore D hardnesses measured for those balls, and summarily concludes that those measurements support a finding of obviousness. (*E.g. id.*, Ex. 1, at ¶¶ 78, 84, 93, 102, 106, 113).  Dr. Statz's report is devoid of any details regarding how or why the hybrid golf balls were conceived of, made, or tested.

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
November 27, 2007
Page 2


In his deposition, Dr. Statz confirmed that he had nothing to do with the particular manufacturing specifications and processes by which the hybrid balls were made.  In fact, he conceded the balls had been made before he ever became involved with this litigation.  (Statz Depo. Tr., Ex. A at 220:23-221:6.)  Among other things, Dr. Statz testified that he had no knowledge of why certain thicknesses were selected for the cover layers of the hybrid balls.  (*Id.* at 432:16-20.)

Because Dr. Statz's report says nothing about the actual hybrid balls apart from citing the bare test results, Acushnet has attempted to argue that Dr. Statz's general discussions of what the prior art discloses, and the ways in which these references might be combined, provide a foundation for admitting the particular hybrid golf balls created by Acushnet's attorneys and employees.  (D.I. 352 at 2-3.)  As the Court has recognized, however, the particular design and construction choices embodied in the hybrid balls are not disclosed in any prior art reference, nor are they the inevitable result when multiple references are combined.  (D.I. 347 at 16 and n.18.)  In this case, the insight and motivation required to transform the disparate disclosures of the prior art into the golf balls at issue came not from Dr. Statz, Dr. MacKnight, Mr. Dalton, or any other potential witness, but from Acushnet's trial counsel:

> Q.     Paragraph 10, you say, "I directed the preparation of three inner cover layer materials."  Who selected those materials?
> A.     The attorneys.
> Q.     Similarly, let's turn to page 5, Paragraph 13 where you say, "I directed the preparation of three outer cover layer materials."  Who selected those materials?
> A.     The attorneys.
> Q.     So the selection of the core materials, inner cover materials and outer cover materials in the golf balls you made were all made by attorneys, correct?
> A.     Correct.
> Q.     Those were the attorneys at the Howrey law firm?
> A.     Correct.  That would be specifically Mr. Rosenthal.

(MacKnight Depo. Tr., Ex. B at 52:20-53:12.)  Thus, it appears that Mr. Rosenthal, one of Acushnet's trial lawyers, would be the only witness capable of explaining the thought processes involved in creating the particular hybrid golf balls Acushnet seeks to use.  Needless to say, it would be highly irregular if Mr. Rosenthal were to provide any testimony to the jury – much less testimony regarding the motivations driving one of ordinary skill in the art regarding the manufacture of the hybrid golf balls.

Moreover, the critical role Acushnet's trial counsel played in the creation of the hybrid golf balls undermines Dr. Statz's ability to rely on those balls to reach his

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
November 27, 2007
Page 3

conclusions on invalidity.  Evidence created by counsel for the purposes of winning a lawsuit cannot qualify under Fed. R. Evid. 703 as the basis for an expert opinion, as it cannot possibly be considered "of a type reasonably relied upon by experts in the particular field."  As this Court has previously held, alleged recreations of prior art cannot provide the basis for expert testimony on invalidity when those recreations depart from the embodiments actually disclosed in the prior art.  *Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F. Supp. 2d 348, 393 (D. Del. 2002).

Finally, the Court has acknowledged that, regardless of whatever hardness properties the hybrid balls may exhibit, those properties are irrelevant to Acushnet's obviousness defenses unless Acushnet can establish that a person of ordinary skill in the art in 1995 would have known that the various prior art combinations would actually yield a golf ball with an outer-cover Shore D hardness of 64 or less.  (D.I. 347 at 20-21, *citing In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993).)  The hybrid balls themselves clearly cannot show what a person of ordinary skill in the art in 1995 would have known, since those balls did not exist until Acushnet's attorneys generated them in 2007.[1]  To the extent Dr. Statz could possibly testify about what a person of ordinary skill in the art may have known or expected in 1995, he can (and must) do so without reference to the hybrid golf balls.

In summary, neither Dr. Statz nor any other Acushnet witness can lay a sufficient foundation for admitting the hybrid balls into evidence.  Even if the hybrid balls were otherwise admissible, their relevance – if any – would  be far outweighed by the prejudice Callaway Golf would suffer from the likelihood that the jury would misconstrue the hybrid balls as genuine prior art.

**Reconsideration of Denial of Summary Judgment re '130 Claims 1 and 2**

In an effort to pare down the number of patent claims presented at trial, Callaway Golf has elected to present only one claim, claim 5, from the '130 patent.[2]  This election should moot Acushnet's request for reconsideration of the Court's denial of summary judgment regarding '130 claims 1 and 2.  Nevertheless, and setting aside

---

[1]  Acushnet has previously argued to the Court that a person of skill in the art would have known the hardness of the hybrid balls by making them and testing them.  (*See* D.I. 297 at 1, 10.)  Under this argument (which does not appear in Dr. Statz's expert report), the hardnesses of the hybrid balls would *not* have been known in 1995, since, at that time, no one had ever made any of those balls.

[2]  The other claims Callaway Golf has elected to present at trial are claims 1, 4, and 5 of the '293 patent; claims 1-3 of the '156 patent; and claims 1 and 3 of the '873 patent.

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
November 27, 2007
Page 4

the procedural improprieties of Acushnet's request for reconsideration, Callaway Golf observes that the Court's ruling should stand for at least the following two reasons.

First, the Court predicated its denial of summary judgment regarding '130 claims 1 and 2 in part on its refusal to give effect to the surprise declaration of James Proudfit. (D.I. 347 at 18.) Although the parties were able to later arrange for Mr. Proudfit's deposition, that does not alter the fact that Acushnet failed to disclose this witness in a timely fashion to allow for full discovery.[3] Thus, Acushnet's proffer of Mr. Proudfit's affidavit was properly declined, and, without this support, Acushnet's request for summary judgment was properly denied.

Second, the Court also based its denial of summary judgment on Acushnet's failure to present sufficient evidence regarding the on-the-ball Shore D hardness of the outer cover of the Wilson Ultra Tour Balata. (D.I. 347 at 18-19.) Acushnet's letter of November 24th nowhere contests this independent basis for the denial of its motion.

Respectfully,

*/s/ Thomas L. Halkowski*

Thomas L. Halkowski

TLH:sb

Attachments

cc      Clerk of Court (via hand delivery)
        Counsel of record (via ECF & e-mail)

80052108.doc

---

[3]   Acushnet notes that it disclosed Mr. Proudfit on August 31, 2007. (D.I. 352 at 4.) However, Acushnet disclosed Mr. Proudfit as a witness only after it filed his declaration with its summary judgment opposition (D.I. 238 at Ex. 5) on August 20, 2007.

# Exhibit A

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4     CALLAWAY GOLF COMPANY,

5                     Plaintiff,

6             v.                   C.A. No. 06-91 (SLR)

7     ACUSHNET COMPANY,

8                     Defendant.

9

10

11

12     _____

13                   Tuesday, July 31, 2007

14             VIDEOTAPED DEPOSITION of Nonparty Expert

15     Witness DR. ROBERT J. STATZ, Volume 1, taken by

16     Plaintiff, pursuant to agreement, held at the

17     offices of Fish & Richardson, P.C., 919 North

18     Market Street, Wilmington, Delaware, before Amy

19     E. Sikora, CRR, CSR, RPR, CLR, Certified Realtime

20     Reporter, Certified Shorthand Reporter, Registered

21     Professional Reporter, Certified LiveNote Reporter,

22     and Notary Public within and for the State of New York.

23     JOB No. 69923

24

25

Page 2

```
 1        A P P E A R A N C E S:

 2        FISH & RICHARDSON, P.C.

 3        Attorneys for Plaintiff

 4              225 Franklin Street

 5              Boston, Massachusetts  02110

 6        BY:  FRANK SCHERKENBACH, ESQ.

 7                  -and-

 8        FISH & RICHARDSON, P.C.

 9              12390 El Camino Real

10              San Diego, California  92130-2081

11        BY:  DAVID S. SHUMAN, ESQ.

12        HOWREY LLP

13        Attorneys for Defendant

14              1299 Pennsylvania Avenue, NW

15              Washington, D.C.  20004-2402

16        BY:  BRIAN A. ROSENTHAL, ESQ.

17

18        ALSO PRESENT:

19        THOMAS DELVECCHIO, Videographer

20

21

22

23

24

25
```

Page 219

1      That's controlled by how you mold it.

2              Q.      Okay.  If I misspoke, I'm sorry.

3                      But my question is, can you

4      predict the hardness of a golf ball layer by

5      knowing the hardness -- the Shore hardness of

6      the same material on a plaque?

7                      MR. ROSENTHAL:  Objection.

8                      Go ahead.

9              A.      Within reason, yes.  Soft a

10     materials give you soft covers.  That's what

11     we've been doing.

12             Q.      I don't mean qualitatively soft

13     or hard, I mean the number.

14             A.      You'd have to look at

15     MacKnight's data to see exactly.  Because I

16     never did a, you know, side-by-side

17     comparison of plaque hardness and ball

18     hardness with different cover thicknesses.

19             Q.      So do you have an opinion one

20     way or the other whether it's possible to

21     predict the hardness of a cover layer of a

22     golf ball based on the hardness -- knowing

23     the hardness of the material on a plaque?

24                     MR. ROSENTHAL:  Objection.

25                     Incomplete hypothetical.

Page 220

1          A.      I just thought I answered that
2     question.  If you specify the thickness of
3     the material and how you put it on, yes, it
4     can be predicted, within, you know, a
5     reasonable range.
6          Q.      Did -- did Dr. MacKnight do that
7     before he made his balls?  Did he predict
8     what the hardnesses would be?
9          A.      I don't know.  I've never talked
10    to Bill.  I can't say I never talked to him.
11    I talked to him 30 years ago at an ionomer
12    conference, but not since then.
13         Q.      Okay.
14         A.      Actually, would be an
15    interesting question to ask him.
16         Q.      Did you predict what the
17    hardnesses of the MacKnight balls would be
18    before they were made?
19         A.      No.  MacKnight made the balls
20    before I was involved with this, so I didn't
21    know what he was doing until Brian showed me
22    the data.
23         Q.      Okay.  So you didn't ask
24    Dr. MacKnight to make any particular golf
25    balls?

Page 221

```
1              A.      No.

2              Q.      You weren't involved in the

3      process of deciding what --

4              A.      No.

5              Q.      -- he made?

6              A.      No, not at all.

7              Q.      Was it ever explained to you

8      what he did or why he did it?

9              A.      Oh, yes.  There is a write-up.

10     And I understand what he did and why he did

11     it.

12             Q.      Okay.  Apart from his report,

13     which obviously we can read, did anyone ever

14     explain to you orally why Dr. MacKnight made

15     the selections he did and what actually he

16     asked to be done?

17             A.      Not until I talked to Brian.

18             Q.      What did Mr. Rosenthal tell you?

19             A.      That Bill made these examples to

20     measure the hardness on golf balls with

21     compositions that were related to what's in

22     the patent.

23             Q.      Do you know who made the

24     selection of what --

25             A.      No.
```

Page 222

1          Q.       -- combinations were used to
2     make the balls?
3          A.       No, I don't.  That was done
4     before I was involved.
5          Q.       When you say it was done before
6     you were involved, you mean before you were
7     even contacted to work on the case?
8          A.       I don't know that.
9          Q.       Okay.  When were you first
10    presented with Dr. MacKnight's results?
11         A.       Three, four weeks ago.
12         Q.       Well, sometime before you --
13    obviously before you filed your expert
14    report; right?
15         A.       Yes, I guess.  I've been
16    traveling since Brian and I did the expert
17    report.  I've been to Alaska and I've been to
18    Colorado for a week, so --
19         Q.       Okay.
20         A.       -- could be a little bit mixed
21    up as to the time schedule here.
22         Q.       Okay.  Your report is dated
23    June 1, 2007.  I'll just represent that to
24    you.  So can you estimate for me how long in
25    advance of that date you first became aware

Page 291

 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4     CALLAWAY GOLF COMPANY,

 5                        Plaintiff,

 6                v.                      C.A. No. 06-91 (SLR)

 7     ACUSHNET COMPANY,

 8                        Defendant.

 9

10

11

12     _____

13                     Wednesday, August 1, 2007

14                CONTINUED VIDEOTAPED DEPOSITION of Nonparty

15     Expert Witness DR. ROBERT J. STATZ, Volume 2, taken

16     by Plaintiff, pursuant to agreement, held at the

17     offices of Fish & Richardson P.C., 919 North Market

18     Street, Wilmington, Delaware, before Amy E. Sikora,

19     CRR, CSR, RPR, CLR, Certified Realtime Reporter,

20     Certified Shorthand Reporter, Registered Professional

21     Reporter, Certified LiveNote Reporter, and Notary

22     Public within and for the State of New York.

23     JOB No. 69924

24

25

DR. ROBERT J. STATZ
VOLUME 2
08/01/07

Page 292

```
 1          A P P E A R A N C E S:

 2     FISH & RICHARDSON, P.C.

 3     Attorneys for Plaintiff

 4          225 Franklin Street

 5          Boston, Massachusetts   02110

 6     BY:  FRANK SCHERKENBACH, ESQ.

 7               -and-

 8     FISH & RICHARDSON, P.C.

 9          12390 El Camino Real

10          San Diego, California   92130-2081

11     BY:  DAVID S. SHUMAN, ESQ.

12     HOWREY LLP

13     Attorneys for Defendant

14          1299 Pennsylvania Avenue, NW

15          Washington, D.C.   20004-2402

16     BY:  BRIAN A. ROSENTHAL, ESQ.

17

18     ALSO PRESENT:

19     THOMAS DELVECCHIO, Videographer

20

21

22

23

24

25
```

Page 431

1          A.      Well, you can base it on the

2      table.  You can base it on Mike Sullivan's

3      data in some of his patents.  If you look

4      very carefully, he'll give plaque hardness

5      and then he'll give hardness on a ball, and

6      he'll give C and D mixed together.  Go

7      through and look at those, and you'll find

8      that a 72C is definitely less than a 64.

9          Q.      All right.  Let's not cover old

10      ground.  Let's move on.

11          A.      Okay.  Well, I mean, when I did

12      this it wasn't old ground.  Okay.  Okay.  I

13      didn't have any comments for a few pages

14      here.  I must have been tired.  Not to say

15      that if I were fresh I couldn't find some

16      more comments.

17              Okay.  Criticizes MacKnight's

18      experiments several times.  I think one of

19      the things he pointed out was that the inner

20      layer thickness picked by MacKnight to

21      demonstrate the hardness of the outer cover

22      was the wrong thickness, but if you look in

23      Sullivan's patents, when he did the Nesbitt

24      ball as prior art, he picked just about the

25      same thickness of the inner layer.  Do you

Page 432

1      want to look at that?

2           Q.      No.  I understand.  I understand

3      the comments.

4           A.      I mean, you have to make a

5      choice, otherwise you're there 'til the cows

6      come home.

7           Q.      Because most of the prior

8      references, including Nesbitt, disclose a

9      range for the layers; right?

10          A.      Right, right.  A very broad

11     range.  And so you pick out a -- Mike picked

12     out around 50 to 60 mil. thickness as the

13     inner layer, and so did MacKnight.  So was

14     MacKnight's choice wrong?  I don't think so.

15     It was a good -- good starting point.

16          Q.      Do you know why Dr. MacKnight

17     made the choices he made as to thicknesses

18     and so forth?

19          A.      No.  I wasn't party to the

20     experiments that were done.

21          Q.      Right.  Okay.  Continue, please.

22          A.      We talked about Proudfit's

23     examples.  Think we've talked about that

24     enough.  I mean, Proudfit's ball was

25     definitely a soft covered ball over a hard,

Page 433

```
 1        stiff mantle, over a cross-linked
 2        polybutadiene core.
 3                    (Discussion off the record.)
 4            A.      Okay.  Okay.  There was a mark I
 5        made on page 29.  "Proudfit's disclosure of
 6        balata outer cover does not inherently
 7        disclose an outer cover Shore D hardness."
 8                    You can make Proudfit's
 9        composition, and you can measure the Shore D
10        hardness.  The Shore D hardness is less than
11        64.
12            Q.      How do you know what Proudfit's
13        composition was?
14            A.      I think it's in Proudfit's
15        patent, and I think MacKnight did that.
16            Q.      For the outer cover layer?
17            A.      Yes.
18            Q.      Okay.
19            A.      Okay, all right.  Okay.  Okay.
20        This is interesting.  You're at 193.  "I also
21        believe that a person of ordinary skill in
22        the art would not have any way of
23        experimentally determining the acid content
24        of any ionomer or ionomers in the mantle of
25        the Ultra Tour balata ball."  Okay.
```

# Exhibit B

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    CALLAWAY GOLF COMPANY,

5                  Plaintiff,

6            VS              C.A. No. 06-91(SLR)

7    ACUSHNET COMPANY,

8                  Defendant.

9

10

11

12    _____

13

14    VIDEOTAPED DEPOSITION OF WILLIAM J. MacKNIGHT

15                Boston, Massachusetts

16              Thursday, August 2, 2007

17

18

20

21    Court Reporter:

     Loretta Hennessey

22    RDR, CRR

23    JOB No. 69926

24

25

Page 2

```
 1   APPEARANCES:

 2

 3   FISH & RICHARDSON, P.C.

 4   By David S. Shuman, Esq.

 5   12390 El Camino Road

 6   San Diego, California 92130-2081

 7   shuman@fr.com

 8   858-678-4307  FAX:  858-678-5099

 9   Counsel for the Plaintiff.

10

11   HOWREY, LLP

12   By Clinton H. Brannon, Esq.

13   1299 Pennsylvania Avenue

14   Washington, D.C.  20004-2402

15   202-383-6647  FAX: 202-318-8540

16   brannonc@howrey.com

17   Counsel for the Defendant.

18

19

20   ALSO PRESENT: Jason Lachapelle, Videographer

21

22

23

24

25
```

Page 51

1   A.   It started back in the early 1980s.

2   Q.   Okay.  So it's probably not the same case I'm

3        thinking of --

4   A.   Probably not.

5   Q.   -- that wound up in '96?

6   A.   I don't think so, but I don't know.

7              MR. BRANNON:  I think it's the '90

8        settlement agreement; it was a 1990 settlement

9        agreement.

10             MR. SHUMAN:  Okay.  That helps.

11  Q.   What was your role, Dr. MacKnight, in the

12       Acushnet/Spaulding litigation over the Molitor

13       blended ionomer patent?

14  A.   I was retained as an expert.

15  Q.   By Acushnet?

16  A.   By Acushnet.

17  Q.   Do you recall the general topic of your

18       testimony?

19  A.   I didn't testify in that case.

20  Q.   Were you deposed in that case?

21  A.   I was not.

22  Q.   Did you give an expert report in that case?

23  A.   I gave an affidavit.

24  Q.   Declaration?

25  A.   I suppose -- I frankly don't understand what

WILLIAM J. MacKNIGHT                                      08/02/07

Page 52

1       the legal terms mean.

2   Q.  I've always used them interchangeably.

3   A.  Okay.  Then that would be correct.

4   Q.  Okay.  Do you remember what the substance of

5       your affidavit was?

6   A.  Honestly, I don't, but it had to do with an

7       identical composition of matter arrived at by

8       preparing ionomer blends in different ways.

9       Let's put it -- that's vague, but, I'm sorry,

10      that's the best I can do.

11  Q.  I understand.  It's kind of a long time ago.

12              Oh, before I go on, have you ever

13      met or spoken to Terry Melvin?

14  A.  No.

15  Q.  Okay.  Well, then, I don't need to ask any more

16      questions about him.

17              Let's go back to your declaration,

18      paragraph 10 on Page 4.

19  A.  Yes.

20  Q.  Paragraph 10, you say, "I directed the

21      preparation of three inner cover layer

22      materials."  Who selected those materials?

23  A.  The attorneys.

24  Q.  Similarly, let's turn to page 5, Paragraph 13

25      where you say, "I directed the preparation of

WILLIAM J. MacKNIGHT                                    08/02/07

Page 53

1         three outer cover layer materials."  Who
2         selected those materials?
3    A.   The attorneys.
4    Q.   So the selection of the core materials, inner
5         cover materials and outer cover materials in
6         the golf balls you made were all made by
7         attorneys, correct?
8    A.   Correct.
9    Q.   Those were the attorneys at the Howrey law
10        firm?
11   A.   Correct.  That would be specifically Mr.
12        Rosenthal.
13   Q.   Given that Mr. Rosenthal selected the materials
14        for the core and cover layers of these golf
15        balls, what was your responsibility related to
16        the creation and testing of these golf balls?
17   A.   My responsibility was to see that the testing
18        was carried out properly and that true
19        experimental results were obtained from it.
20   Q.   Did you direct in any way the selection of
21        materials or manner of construction for these
22        golf balls?
23   A.   We discussed some of that before.  I was
24        certainly consulted about some of the issues
25        involved, and that's what I can say.

Page 54

1   Q.  And you testified that other than the Papi 94

2       issue, you were not otherwise consulted about

3       how to construct the golf balls?

4               MR. BRANNON:  Objection,

5       mischaracterizes.

6   A.  The injection molding issue, for example.

7   Q.  That's correct.

8   A.  Another issue --

9   Q.  Other than the Papi 94 and injection molding

10      issue, were there any other ways --

11  A.  Yes.

12  Q.  -- in which you were consulted about the

13      construction of the golf balls?

14  A.  Yes, whether they should be painted or not.

15  Q.  Did you make a decision on that issue?

16  A.  I had an input on that issue.

17  Q.  What was your input?

18  A.  I decided that it should, in my opinion.

19  Q.  Why?

20  A.  Because I thought, and this is based on limited

21      knowledge, that we wanted to make as realistic

22      a golf ball as we could.

23  Q.  Were there any other ways in which you

24      contributed input as to how the golf balls were

25      to be created?

Page 55

1  A.  I don't recall, other than what I said earlier.

2  Q.  Okay.  So as you recall it now, the three ways

3      you've mentioned you contributed to the

4      construction of these golf balls were deciding

5      whether or not they should be painted, whether

6      to use injection molding versus compression

7      molding, and what to do about the use of Papi

8      94, correct?

9  A.  Those are three specific ones I recall.  There

10     probably are others.

11 Q.  Okay.  But you don't recall any other ways you

12     were consulted about how to construct these

13     balls?

14 A.  Not as I sit here, no.

15 Q.  Okay.

16 A.  Well, I'll revise that.  I was consulted about

17     conditioning after they were made, but that's

18     later, that's post.

19 Q.  When you say "conditioning," what do you mean?

20 A.  Well, as is well known, and this has to do with

21     materials, not golf balls, particularly, but

22     so-called semi-crystalline polymer materials,

23     which a lot of these fall into that category,

24     can change properties over time, over long

25     periods of time because of the changes in the