# FISH & RICHARDSON P.C.

Suite 1100
919 N. Market Street
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

**Thomas L. Halkowski**
302 778-8407

Email
halkowski@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

MUNICH

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

**VIA ECF**

December 3, 2007

The Honorable Sue L. Robinson
United States District Court
for the District of Delaware
844 King Street
Wilmington, DE 19801

Re:  *Callaway Golf Company v. Acushnet Company*
     USDC-D. Del. - C. A. No. 06-91 (SLR)

Dear Judge Robinson:

Callaway Golf respectfully responds to the arguments raised in Acushnet's December 3, 2007, letter regarding the admissibility of eight exhibits: PX-713, 722, 723, 984, 1090, 1152, 1195, and 1177.

Regarding the documents containing quotations by Acushnet's CEO (all but PX-1177), Acushnet argues that "the rest of the articles (the portions not quoting any Acushnet officials)" are hearsay and are inadmissible under F.R.E. 802.  To be clear, Callaway Golf is only interested in the quotations of Acushnet's CEO, Wally Uihlein.[1]  Since Callaway Golf will not discuss the remaining portions of these articles, the remaining portions are not being used for the truth of what is in them. This removes those portions from the definition of hearsay under F.R.E. 801.

Acushnet cites no authority whatsoever for the proposition that reporters must come to trial to repeat direct quotations in their articles.  Such a rule would be unworkable, and this is precisely why newspaper and magazine articles are self-authenticating under F.R.E. 902(6).  When an author in a newspaper or magazine puts something in a quotation, it is safe to assume that they are simply repeating what a person said to them.  If Acushnet is concerned that its CEO is being misquoted, it can ask its employees at trial to rebut and contradict these statements.  But this does not mean that the articles are untrustworthy; indeed, while Acushnet makes insinuations, it never states that any of these quotations is in any way inaccurate.

Regarding relevance, infringement is now conceded, so there is no dispute that praise for the Acushnet products is praise for products embodying the asserted patents.

---

[1] If the Court would prefer to use redacted copies of these articles, Callaway Golf can prepare such exhibits.  The Federal Rules of Evidence, however, generally favor using complete copies of documents.  *See* F.R.E. 106.

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
December 3, 2007
Page 2


Acushnet argues that these articles do not necessarily show a nexus between Pro V1 success and the patented inventions, but that is a question of weight, not admissibility. Callaway Golf intends to put on evidence, including (but certainly not limited to) these exhibits, to prove that the success of the accused products is in fact due to the patented features; the jury should be allowed to consider all the evidence when making its decision on obviousness.

Acushnet's suggestion that Callaway Golf chose not to take Mr. Uihlein's deposition is revisionist history. Callaway Golf repeatedly requested this deposition, and was repeatedly blocked by Acushnet. Callaway Golf sent proffers to Acushnet, and later to this Court in an emergency e-mail and in briefing. The fact that, rather than continuing to fight over this issue, the parties mutually chose to resolve that motion without requiring a ruling by the Court does not change the fact that Acushnet went to extraordinary lengths to shield its CEO from a deposition. Acushnet's letter is part of the same strategy – it is not about excluding hearsay, but about hiding from the jury damaging admissions made at the highest levels of the company.

Finally, regarding PX-1177, Acushnet attacks the reliability of this article, but its own employees have relied on this document in sworn declarations made in other proceedings in this very District. *See* Exhibit A (Declaration of William E. Morgan, Acushnet Senior Vice President of Research & Development for Golf Balls, at ¶¶ 11 & 32); Exhibit B (Declaration of Davis Love III at ¶¶ 17-18). Acushnet apparently believed that these declarations (citing this article) were accurate enough to submit as Exhibits I and K to a May 29, 2007, filing with the Patent and Trademark Office. Certainly, then, this article is reliable enough to come into evidence during this litigation.

If Acushnet wants to challenge the statements in these documents, including its CEO's own admissions, it can do so through its witnesses. Just because Acushnet now dislikes the substance of these documents, however, does not mean that Callaway Golf should not be able to use them and ask the Court to admit them into evidence during trial.

Respectfully,

*/s/ Thomas L. Halkowski*

Thomas L. Halkowski

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD.,      )
and BRIDGESTONE GOLF, INC.,        )
                                    )
            Plaintiffs,            )
                                    )
    v.                              )
                                    )      C. A. No. 05-132 (JJF)
ACUSHNET COMPANY,                   )
                                    )
            Defendant.             )
                                    )
_____     )

## DECLARATION OF WILLIAM E. MORGAN

I, William E. Morgan, hereby state as follows:

1)  I am currently the Senior Vice President of Research & Development for Golf
    Balls at Acushnet Company ("Acushnet"). In that position, I am responsible for
    all golf ball R&D at Acushnet. With the exception of two years in golf club
    operations (1987-1988) I have worked in R&D at Acushnet since I joined the
    company in 1986. I have been directly responsible for Acushnet Company's golf
    ball product development since 1989.

2)  I have 25 years of experience in the golf industry. Before joining Acushnet, I
    worked at the Ben Hogan Company from 1982 to 1986. At Hogan I was a
    member of the golf ball R&D team working on both wound and solid two-piece
    golf balls.

3)  I graduated from the University of Dallas with a BS Biochemistry in 1977.

4)  I am an inventor on over 40 US Patents, all related to golf ball technology. I am
    named as an inventor on over 20 additional US Patent applications published and
    pending.

RISEN
Exhibit No. 18 for I.D.
Date: 7/21/07
Reporter: K.A. Smith

Case No. 06-91 (SLR)

**PX-678**

Date Entered: _____

By: _____

2

5) I have been an invited speaker at numerous venues related to golf: US PGA Sectional Meetings (OH, HI, OK, KY, NY Metropolitan), Swedish PGA, UK customer seminars, UK PGA Expo, Acushnet Customer seminars, and the US Patent and Trademark Office.

6) By my education and first hand experience in the industry, I am qualified to testify as an expert in golf balls and golf ball technology, including the innovations in the golf balls over the past 25 years.

7) Other than the patents identified above, I have not authored any publications in the past ten years.

8) I have never testified before as an expert. I am not being paid by Acushnet to testify as an expert witness. I am employed by Acushnet and draw a salary, but my compensation is in no way dependent on my testimony or the outcome of the case.

## ACUSHNET'S HISTORY WITH SOLID CONSTRUCTION GOLF BALLS

9) Initially, let me discuss the development and introduction of solid construction golf balls at Acushnet, from my perspective of one who was actually involved in the development of these products. I will also discuss some of the other significant developments in solid golf ball technology based on my personal knowledge and experience in this area. In so doing, I want to correct the very misleading and incomplete discussion in the Blair and Calabria Declarations. I will focus first on the period up until the mid-1990s, before we began development of the Pro V1.

### 1960s

10) Entering the 1960s, the ball of choice for both tour professionals and recreational golfers was the same, the wound core, balata covered ball. James Bartsch did some very early work on the use of cross-linked polybutadiene as a core material for golf balls, and was awarded several patents in this time frame, for example, U.S. Patents Nos. 3,313,545 and 3,438,933. A period of development ensued with the introduction of solid (non-wound) golf balls. Initially introducing unitary

3

or one piece balls, a number of ball makers began production of at least small quantities of solid golf balls.

11) Spalding, one of the ball makers that had produced one piece balls, tried to improve the one piece design by adding a layer of material covering a solid core of what was essentially one piece ball material. This cover was initially a blend of plastics including ABS and urethane but later converted to a new plastic from DuPont, Surlyn. Spalding introduced the Executive ball in 1967, which some have called the first modern, solid-core, two-piece golf ball. *See Great Leaps Forward, The Evolution of the Game,* Golf Magazine (Feb. 2007). Acushnet Company began investigation of solid constructions and urethane cover materials in the 1960s. The Surlyn covered two-piece ball all but eliminated the Bartsch-type one-piece ball.

## 1970s

12) Acushnet's first patent related to solid construction golf balls issues in 1974 [US Pat 3,791,655 "Solid Rubber Golf Ball," by Schweiker and Jepson, filed 12/01/1971]. Others would follow.

13) Acushnet's first patent related to urethane cover materials issues in 1976 [US Pat 3,989,568 "Polyurethane Covered Golf Balls," by Isaac, filed 11/21/1974]. The Isaac patent makes specific reference to its applicability for both wound and solid construction golf balls [col3, line55]. Others would follow.

14) During the 1970s most ball makers developed products with Surlyn covers and at this time both Surlyn two piece and Surlyn covered wound core balls were introduced. Acushnet elected to first market a Surlyn covered wound core ball named the Titleist DT in 1974.

15) In 1974, the Acushnet Golf Center (AGC) is created as the ultimate R&D indoor test lab where we measure ball speed, launch angle, spin rate, club head speed, swing path, angle of attack. Acushnet was awarded numerous technology patents related to the AGC and its applications. Computer data and analysis was used for the first time to provide greater insight into swing, ball and club and helps to accelerate new products to market. Featured in a 1980 Golf Digest article titled "Is This the Ultimate Swing Analyzer?" the AGC was the forerunner of today's

4

launch monitors. Using launch condition information and models of golf ball flight, scientists have been able to understand how golf equipment can be improved and selected to achieve improved player performance. For example, beyond increasing ball speed, driver distance is increased with higher launch angles and lower ball spin.

**1980s**

16) In the fall of 1980, Acushnet Company entered the solid golf ball category with the Pinnacle two-piece ball. This was a solid core golf ball with a Surlyn cover. The Pinnacle was a resounding success, and we introduced the Pinnacle 384 and Pinnacle Gold during the 1980s. Some within our company began to wonder whether the tremendous gains we made in the two-piece ball segment would transform our flagship brand from "Titleist" to "Pinnacle."

17) During the mid 1980s, Acushnet revived project activity related to urethane covered golf balls. By the late 1980s, Acushnet opened Ball Plant II, specifically designed for the production of solid golf balls.

18) John Calabria, whose Expert Report has been presented by Bridgestone in this matter, was hired by Acushnet in 1988 and worked almost exclusively in the management of project activity related to urethane golf balls. In the late 1980s, Mr. Calabria worked at Acushnet to develop both wound and solid construction urethane covered golf balls. His projects ranged from retractable pin injection molding urethane covers on solid cores to casting urethane covers on both wound and solid cores. Of Mr. Calabria's 10 issued US patents (see Calabria report), 7 relate to urethane covered golf balls and are assigned to Acushnet Company. Each of these 7 makes specific reference towards applicability for making urethane covered, solid core golf balls.

19) Spalding introduced the Tour Edition a large core two-piece ball with a cover comprising a mixture of ionomer and urethane. Within two years the cover composition is changed to all ionomer.

20) Multi-layer balls began to appear during this time frame. Kasco displays dual core multilayer solid golf balls at the PGA Show in the mid-1980s. Multilayer balls begin to appear in patents (including patents from Kamatari/Kasco, Sumitomo,

5

and Wilson). Due to their appearance at the PGA show and the early patents, multilayer solid designs were being considered by Acushnet R&D in the 1980s (Jerome 1986, Cadorniga 1987, Llort 1988.)

## 1990-1995

21) In January 1991 Acushnet introduced the first Titleist branded solid construction golf ball, the Titleist HVC, featuring a large 1.550" diameter core. This core was a larger than all other two-piece balls except the Spalding Tour Edition. In early 1993 Acushnet extended its line of Titleist branded two-piece balls with the large 1.580" diameter core and soft covered Titleist HP2. The HP2 core was larger than any other two-piece ball core. Large cores had become an integral component of Acushnet's effort in solid construction technology. The 1993 and 1994 Titleist Golf Ball Booklets "Total Performance Runs in the Family" describes four models of Titleist golf balls. With HP2 and HVC in the line-up, half of the Titleist models offered in these years are of a solid construction. Additionally Acushnet continued to successfully market a family of Pinnacle Golf balls, all of which were solid construction.

22) In early 1993 Acushnet began the production of urethane covered wound balls with the limited introduction of the Tour Prestige ball. While we continued to build capacity, the early production was sold only in Japan and the process improved and expanded. In Feb 1993 at a presentation at a press conference in Japan introducing the Tour Prestige, John Calabria offered "We feel confident that the superior performance of the Tour Prestige can be applied to wound and two-piece constructions."

23) Later in the same year a test market of the same ball (but named Professional) began in the US and it rapidly became a runaway market leader. To this day, despite numerous additions to urethane cover molding capacity and several changes to product design (including a conversion to Pro V1) we have never arrived at a period of excess capacity. We will add additional capacity in 2007.

24) The introduction of the cast urethane cover by Titleist is a product design change equal in magnitude to the introduction of the modern solid core or the Surlyn cover in the 1960s. The cast urethane cover offered the feel and short game spin

6

characteristics of balata covered balls with greater driver distance and durability approaching that of Surlyn. For years, Acushnet was the only manufacturer of this type of cover material. Indeed, John Calabria, now an expert witness for Bridgestone, was recruited by Maxfli to build a urethane capability for Maxfli. This led to litigation between our companies relating to our claims that Maxfli and Calabria misappropriated our trade secrets, which litigation was later settled in our favor.

25) In 1993 Wilson began selling the first solid construction double cover multilayer golf ball in the US market. The Wilson Ultra Tour Balata golf ball had a solid core, a Surlyn inner cover and a rubber outer cover comprised of polybutadiene and trans-polyisoprene (balata). Conceptually this was a ball which would have two-piece like low spin and distance off the tee combined with a higher wound ball-like spin into the green.

26) An Acushnet Competitive Ball Presentation at the Sales Meeting January 1994 demonstrates we were already investigating multilayer balls at that time. At that same meeting "Titleist Franchise Plans" does not read like a "wound ball company" document. A reference to Competitive Balls identifies five distinct types of golf balls:

    a.  Wound Performance

    b.  Wound Durable

    c.  Solid Performance

    d.  Solid Distance

    e.  Layered Construction

At the time of that presentation Acushnet already produced balls of the first four types and held impressive market share in each. The layered construction category was already being experimentally considered. Just as investigations in solid cores and urethane cover materials begun in the late 1960s would lead to products such as Pinnacle, Titleist HVC & HP2, and Titleist Professional, the layered construction investigations begun in the early 1990s [and earlier!] would culminate in products like the Titleist Pro V1.

7

27) Later in 1994, Bridgestone introduced the Altus Newing in Japan. Like Ultra
Tour Balata it was a double cover multilayer solid ball, but had a fairly small core
at about 1.410" diameter, a thick Hytrel inner cover and a thick and hard ionomer
outer cover. Unlike the Ultra Tour Balata, which had a soft outer cover
presumably intended to mimic the soft feel and short game spin of a wound balata
golf ball, the Altus Newing's thick hard cover produced low spin on all shots.
The Altus Newing was a low-spin, long distance ball and was not positioned by
Bridgestone to compete with tour-played golf balls. The Altus Newing achieved
some success in Japan but has never been sold in the United States.

28) Note in particular how different the Altus Newing was from the Pro V1. First, the
Altus Newing had a small core, compared with the large core on the Pro V1.
Second, the Altus Newing had a thick, hard ionomer outer cover over a relatively
softer yet still thick, inner cover. The Pro V1 is exactly the opposite, it has a very
thin and soft outer cover over a relatively hard inner cover. The cover layer on
the Altus Newing is much thicker than the Pro V1 cover layers. The Pro V1 uses
a cast urethane outer cover. The Altus Newing did not use urethane technology.
Hence, the Pro V1 is entirely different from the Altus Newing.

29) Not only is the construction of the Pro V1 different from the Altus Newing, the
golfers to whom the ball was targeted were different. Pro V1 was planned for use
at the highest levels of the game and has been the most played ball in competitive
golf for six years. Altus Newing was not aimed at Tour players and had virtually
no history on Tour. It is completely wrong for Mr. Blair to imply, as he does, that
the Altus Newing ball was in some way the design objective for the Pro V1.

30) Titleist Golf Ball booklets were also published in 1995 and 1996, though some
models had been added (Professional, DT 2-Piece) and others changed; one thing
remained constant: half of Titleist golf ball models were of a solid construction.

31) More than two and a half years passed before Bridgestone, in late-1996,
introduced a solid core double cover ball in the U.S. That ball, the Precept
Dynawing, differed from Altus Newing having a slightly bigger, though still
small core of about 1.445" in diameter, an ionomer inner cover and ionomer outer
cover. The inner and outer covers on the Dynawing were softer than the Newing

8

and the Dynawing core was made a little larger. This resulted in a softer feel and higher spin. While this still was not sufficiently changed to render Dynawing a "tour" ball, it did make it more playable into the green than the seriously low spinning Newing. Again, the Precept Dynawing had nothing in common with the Pro V1. Dynawing had only limited success in the US.

32) In 1996, Top Flite introduced the Strata, the first solid construction ball with a multi-layer cover used on Tour. The Top Flite Strata ball appeared in shops in April 1996, at least six months before Bridgestone's Precept Dynawing. This ball was a significant development among tour players, as Golf Magazine noted in the *Great Leaps Forward* article cited above. I consider Acushnet and Top Flite as among the key innovators in solid golf ball construction. I do not think that Bridgestone is among that group, nor have I heard anyone (other than Bridgestone in this case) make that claim. Bridgestone has made some quality products over the years, but to suggest that it is a leader in solid construction technology is another serious error of overstatement that Mr. Blair makes.

33) In this regard, I want to mention one other event that occurred during this time frame. In 1995 Acushnet test marketed a two-piece cast urethane covered golf ball known as the Pro 2-piece. Though it was warmly received by players, Acushnet decided NOT to introduce the product. We did so because we learned that moisture migrated through the urethane over time degrading the resilience of the solid core (this was not a factor with wound cores).

34) This is an example of how we think and operate at Acushnet. We do not introduce balls until we are rigorously sure of the ball's quality, performance, and long term durability. We take the time to learn how to make our products and make them right, before we introduce them. While Mr. Blair seems to take some notice of our efforts to get the Pro V1 technology right in the late-1990s, the inference he draws, that we were a struggling with the technology, is completely wrong and misguided. The reality is that we would not introduce new technology or new balls until we mastered the technology, how to make the ball, and how to assure that it meets our quality standards. These are core parts of our culture, and are a primary reason we have been so successful. For Mr. Blair to infer from this

9

attention to detail that we were "struggling" is a serious error. Perhaps if he ever worked in the golf ball business and had more experience in knowing what it takes to bring a high-quality golf ball to market he would not make this error.

## DEVELOPMENT OF THE PRO V1

35) The Titleist Pro V1 ball is a solid construction ball, having a large 1.550" solid core, a thin and stiff casing layer, for low driver spin and high speed, and a very thin, or "veneer" outer cover of cast polyurethane to produce a softer feel and higher spin in the short game. The "V" in Pro V1 stands for "Veneer," a reference to the thin "veneer" cover layer on the ball. When we conceived of the idea for Pro V1, I used the term veneer to describe the thin-ness of the urethane outer cover layer we were hoping to achieve.

36) Acushnet developed the Pro V1. It was invented and developed by researchers in my group. We developed the ball by combining three Acushnet technologies into a superior golf ball. We did not copy this technology from anyone. We did not copy the technology for this ball, or any of our products, from Bridgestone, Bridgestone patents, or Bridgestone products. We invented the Pro V1, and all our products, by our own hard work, creativity, and diligence.

### Project X

37) In particular, I want to rebut the suggestion Mr. Blair makes that the Pro V1 was the outgrowth of our research project called "Project X" and rebut the suggestion that we were trying to develop a ball that was like or similar to the Bridgestone Altus Newing. Mr. Blair is entirely wrong about both of these matters. The Pro V1 was not part of our "Project X," despite the loose nomenclature we sometimes used, and the Pro V1 was NOT in any way developed to copy or mimic the Altus Newing ball. The Pro V1 is a completely different construction from the Altus Newing. The Pro V1 was developed using our own technology.

38) Importantly, the Altus Newing and Pro V1 designs were intended to fulfill the requirements of two different users. Pro V1 is a ball which can be played successfully by the game's best players and aspiring golfers who hope to emulate the play of accomplished golfers. One element of the success of Pro V1 is that it

can be played by tour players and higher handicap players with neither group
sacrificing an element of ball performance. The Altus Newing, on the other hand,
is a low spin ball from tee to green and serves only those golfers seeking low spin
for straighter flight. While Newing can help less skilled players hit straighter and
longer shots, it does not provide a better player with the control required for
scoring shots into the green.

39) "Project X" was a term we used to describe our research into certain multi-layer
technologies. We were considering, for example, putting a multi-layer cover
(which could be of various constructions) on our Titleist balls, either a solid ball
or a Titleist wound construction ball. Project X was about this "dual cover"
technology, as is clear from the title and substance of the documents that Mr.
Blair points to in his report.

40) Sometime in 1995 Acushnet began vigorously investigating the opportunities to
produce multilayer designs, considering a variety of construction types (Cavallaro
email "Multi-layer Type Construction Update" 6/8/1995). Later in the same year
the term Project X was adopted to refer to this project activity (Morgan copy of
Sine "Project Multi-Layer Identity Directive" 10/30/1995 has "Project X"
handwritten on the first page). After this point in time the use of the term
Project X was commonplace and many people began to describe various
constructions types as X1, X2, X0, Xw, etc. Despite an occasional effort to
standardize the nomenclature, there was seldom a uniform description of the
various versions of X1, X2, etc. (for example: Morgan "Bill's Update for the
Product Strategy Team" 4/1/1996).

41) Project X was Acushnet's first effort to plant a stake in the emerging multilayer
construction segment. Acushnet's primary focus was solid multilayer, though
some discussion related to wound types did take place. Similarly other ball
makers focused primarily on solid multilayer balls, although as late as 1997
Bridgestone was still selling a wound-core double cover ball (Precept Tour
Double Cover). We did look at the Altus Newing ball as part of the Project X
effort, but only to understand what the competitors (Bridgestone and others) were
doing. In a similar fashion we looked at Wilson's Ultra Tour Balata and the many

11

versions of Kasco's dual core multilayer golf balls. As noted above, the Altus Newing had a hard outer cover and a softer inner cover. This was a design we were also considering at the time in Project X. However, we did not copy or try to duplicate the Altus Newing. We planned to make a better golf ball, and we did, using our own technology.

42) Late in 1996, the first product from Acushnet's Project X activity was introduced. The Titleist Episode ball, a solid core double cover ball, was introduced in Japan. The Japan introduction was selected because it was a small market in which we could conduct a limited introduction (as we had done with the Prestige three years earlier). The introduction of Episode was followed in 1997 with a similar double cover multilayer solid ball in the US named HP2 Distance. The following year three models of Cobra branded double cover multilayer balls were added. This was the actual result of the Project X effort. Project X did not mature into the Pro V1, contrary to Mr. Blair's misunderstanding.

43) At one point in the 1990s, Acushnet had industry leading market share in double cover solid multilayer (HP2 Distance, circa 1997) and dual core solid multilayer (HP Eclipse, circa 1999). When Acushnet introduced the dual core HP Eclipse, it was the ONLY manufacturer to sell both dual core and double cover multilayer balls. Acushnet had established itself as an industry leader in multilayer solid designs BEFORE the introduction of the Pro V1.

**Acushnet Dual Core Technology.**

44) In addition to Project X, during the mid 1990s Acushnet embarked on a second project path in multilayer design. It was believed based on our success with large core two piece designs (1.550" HVC, 1.580" HP2) that excellent multilayer designs would be possible from dual cores rather than double covers because thinner covers (as in not double) necessarily meant larger engines (cores). A two prong approach was adopted: (1) Discussions were started with Kasco to purchase cores and/or license technology; and (2) we began to develop internal dual core process capability. The Kasco related project was termed "NuCorp" and began in 1996 (Allen email "Nucorp Meeting" 10/2/1996). By 1999 it was apparent that Kasco would be unable to consistently meet Acushnet Quality

12

standards and we went to market with the dual core HP Eclipse multilayer solid golf ball using dual cores produced at Acushnet Ball Plant 3.

### Development of the Pro V1.

45) The Pro V1 was actually developed as a third alternative in multilayer design. Sometime in late 1995 or early 1996 the veneer concept was invented as an alternative multilayer design to the Project X double cover activity or the Nucorp dual core activity. The Veneer project is what would lead to the Pro V1.

46) The term "veneer" was coined coincidentally with the concept to use a very thin, soft cast polyurethane cover over a more rigid inner layer of Surlyn.[1] Both wound and solid veneer designs were considered. Veneer experimentation continued through 1996 and by early 1997 an initial patent application was filed. Veneer experimentation and development of the process necessary to make the product continued through the 1990s with versions being listed on the USGA Conforming Ball List in the late 1990s.

47) One version of the veneer concept tested particularly well both in machine and player tests. It incorporated three Acushnet industry leading technologies:

    a. a large solid core (Acushnet lead the industry in large core designs: 1.550" HVC in 1991, 1.580" HP2 in 1993)

    b. a multilayer solid construction (Acushnet leads industry by having already achieved market success with both double cover and dual core models)

    c. a thin cast urethane outer cover (Acushnet leads industry in urethane casting (first in 1993) and in thin cover molding (nominally 0.030"))

By the end of the 1990s, this ball was simply known in Acushnet labs and in Strategy discussions as "Veneer."

48) When we decided to launch the Veneer as a top of the line performance ball, it was renamed "Pro V1" – "V" for veneer. My team and I spend many months

---

[1] As mentioned above, unfortunately our nomenclature was not uniform at this time, and this may have confused Mr. Blair. For example an early reference to tour player tests of "veneer" product includes a use of the term $X^2$. (Hebert email "Layered Ball testing with Brad Faxon" 6/20/1996). An early use of the term veneer can be found about the same time. (Sine "Layered cover Product Strategy Considerations" 5/16/1996 includes Project $X^W$ also called Elastomer Veneer).

13

perfecting the manufacturing techniques for the ball, prior to its launch in the Fall of 2000. Our hard work paid off, as the Pro V1 became an immediate success.

49) The following chart demonstrates how the Pro V1 resulted from the combining of three technologies where Acushnet was already the proven industry leader.



50) The Pro V1 was invented in our laboratories in Fairhaven, Mass. We invented the ball ourselves, and developed it ourselves from our own industry leading technologies. We are very proud of what we did. We did not copy any other company's technology into the Pro V1, from Bridgestone or anyone else.

51) We later added the Pro V1x to the product line, which incorporated our technology development in dual core balls. Once again, the Pro V1x is entirely the result of Acushnet engineering and we developed this ball ourselves.

52) I'd like to point out that as of this writing, Bridgestone has yet to introduce a solid golf ball with an outer cover layer as thin as used on the original Pro V1 in 2000. Their thinnest cover appeared in 2005 and is still more than 30% thicker than original Pro V1. Furthermore Bridgestone has yet to employ large rubber

14

cores in their multilayer solid designs. Two of the three construction elements found in the original Pro V1 have yet to be incorporated into a Bridgestone golf ball: large solid cores and thin urethane covers. Pro V1 is not a copy of any Bridgestone golf ball.

## THE ROLE OF PATENTS AT ACUSHNET

53) The golf ball art is a crowded field in terms of patents. A survey that we did recently located over 1,968 patents issued in the golf ball art between 1980 and today.

54) A large percentage of these patents have been issued to Acushnet. For the same period 1980-2006, approximately 576 patents were issued to Acushnet on golf ball technology, or approximately 30 % all US golf ball patents were issued to Acushnet during this period. These patents cover all aspects of golf ball technology, including cores, covers, dimples, manufacturing techniques, testing techniques, to name a few.

55) One way to appreciate the amount of creative work we did on the Pro V1 family of balls is to look at the number of patents we have received on the technology used in those balls. Attached hereto (Exhibit A) is a table listing the Acushnet U.S. patents used in Pro V1 and Pro V1x.

56) As you can see, there are about 68 Acushnet patents used in making the Pro V1 and Pro V1x. Most of these patents, about 55 of them, relate to inventions we made since we began working on the veneer program in the mid-1990s. We filed our first patent application describing the veneer technology used in the Pro V1 in 1997 (This patent application has issued as U.S. Patent No. 5,885,172. However, the issued claims are related to the use of a stiffer inner cover, like a high acid Surlyn, which we do not use in the Pro V1). Since then, many more patents and patent applications have developed from our work on the veneer project and later on the Pro V1 family of balls.

57) Looking at these patents can also further rebut the suggestion in the Blair and Calabria declarations that Acushnet was just a "wound ball" company. For the period 1980-1999 (before the Pro V1 was introduced) Acushnet was awarded 254

15

patents on golf balls. In reviewing these patents, we find that over 70, or about 28% were directed to technologies used specifically in solid construction balls. About 22, or approximately 9% of the patents were specific to wound construction balls, and that the rest related to technologies that were of general applicability to either type of ball. This data shows that we were doing substantial research directed to solid construction balls before 1999, and that we were awarded many US patents in that area. Solid construction technology was an area where we were engaged in substantial research and development long before 2000, and the patent data certainly documents this fact.

58) In addition to securing our own patents, Acushnet also reviews patents from our competitors. As this is a crowded art, reviewing patents that issue is a good way for us to keep track of what our competitors are doing in terms of research and developments. We do not read patents to copy or mimic what our competitors do, but rather we try to stay current on areas where our competitors are doing research. In my experience, every manufacturer does the same thing, and this is a common practice in the golf ball industry.

59) We also review patents to try and be sure we do not infringe valid patents of others. I am not a patent lawyer, and when these legal issues come up we have patent lawyers who help us. The patent lawyers help us determine which of our competitors' patents are valid, and what the patents of our competitors cover.

60) However, from my perspective as head of research and development, I know that we sometimes design our products to avoid infringing the patents of our competitors. One example is the Bridgestone patent No. 5,252,652. This patent relates to using about 0.05 to about 2 parts of a sulfur compound (such as PCTP or a zinc salt of PCTP) when making a golf ball core. When we were investigating using PCTP in golf balls, we located this patent. Now, we do not wish to infringe a competitor's patent, so we first contacted Bridgestone to see if they would license the patent to us. Bridgestone first said they would, then later refused.

61) In order to be sure we did not infringe this patent, we used much more than 2 parts of the sulfur compound in the Pro V1. We use about 15% more PCTP than

16

what is covered by the Bridgestone patent, even though the PCTP is expensive. However, by doing so, I feel confident that we are outside of the Bridgestone patent, if that patent is valid. This is a good example of how by reviewing patents we sometimes can design our products to avoid infringement of competitors' patents.

62) I understand that the patent system promotes innovation by encouraging companies like ours to "design around" and avoid competing patents. That is exactly what happens sometimes in our company. When faced with competitor patents in an area, we seek to innovate to find new solutions to allow us to sell products that are not covered by competitor patents.

## DISAGREEMENTS WITH THE BLAIR DECLARATION.

63) While I disagree with many things in the Blair declaration, there are several very fundamental errors made in that Declaration. Blair erroneously asserts that the seven Bridgestone patents in suit establish that Bridgestone is "a leader in the development of new solid golf ball technology." (Blair Declaration at 19). Blair wrongly asserts that these patents "improved the performance of solid balls, eliminating the need for players to choose between a solid core ball for distance, and a wound ball for spin and control." (at 20). Likewise, Blair wrongly tries to create the illusion that these seven Bridgestone patents are responsible for the success of solid golf balls, and even asserts that these balls were the reason for Tiger Woods' success on tour. Blair is either very misinformed, or simply wrong about these issues.

## Bridgestone was not the leader in solid golf ball technology.

64) First of all, the notion that Bridgestone was the leader in the development of solid construction balls during the 1990 is simply and objectively wrong. Two-piece solid construction golf balls were well advanced and widely sold by many manufacturers BEFORE Bridgestone entered the US market in any meaningful way. The first multilayer solid golf balls broadly disclosed were those of Kasco which were sold in Japan and repeatedly presented at golf trade shows in the US beginning in the mid-1980s. Wilson was the first to manufacture and market a

17

multilayer ball in the US. The Top Flite Strata series of golf balls appeared in the US market before Bridgestone. The Top-Flite Strata ball is generally credited by industry sources as the first commercially available multi-layer golf ball available on tour.

65) Likewise, the earliest patents in multilayer design to do not belong to Bridgestone. Bridgestone has not been first to disclose, first to market or first to patent. I do not believe they have ever had leading market share in multilayer designs and certainly since early 2001 Pro V1 has held the largest share among any golf balls and been the most widely used ball in professional golf. While I have many times expressed that Bridgestone makes quality golf balls, I can find no support for the claim that Bridgestone is the "leader in the development of solid construction balls."

66) In terms of volume of solid construction golf balls made and sold, Spalding, Top-Flite, and Acushnet are clearly the industry leaders, not Bridgestone. Likewise, in terms of solid construction research and development, Spalding was securing patents on multi-layers golf balls in the 1980s. See, e.g., Nesbitt, No. 4,431,193; Molitor, Nos. 4,274,637 and 4,674,751. After Wilson introduced the multi-layer Ultra Tour Balata in the early 1990s, Acushnet and most other golf ball companies were actively researching multi-layer golf ball technology in the early 1990s. Bridgestone was no different from any other competitor in this regard. Nearly everyone in the industry would regard Acushnet as one of the leaders in this technology in my view.

67) Bridgestone was one of many competitors in the 1990s. Like nearly all competitors, it filed patents on solid golf balls and multi-layer technology during the 1990s. Acushnet filed many such patents as well. Bridgestone was one of many competitors. Bridgestone was smaller than most in terms of sales, and better than some in terms of product quality. However, Blair's attempt to portray Bridgestone as the leader in solid ball construction in the 1990s is simply wrong and factually unfounded.

**The patents in suit are not responsible for the success of solid, multi-layer balls.**

18

68) Blair's contention that the Bridgestone patents in suit are responsible for the success of solid golf balls, or that these patents "eliminate[ed] the need for players to choose between a solid core ball for distance, and a wound ball for spin and control" is entirely wrong and displays a genuine lack of understanding of our business.

69) Initially, I note that Blair provides absolutely no basis (other than he says so) to support his conclusion that these Bridgestone patents are the reason for the success of solid golf balls. Witness:

    a.  Blair cites no industry sources or other objective sources for his conclusion that these patents are the reason for the success of solid construction, multi-layer golf balls. There is no such evidence, to my knowledge.

    b.  Blair notes that Bridgestone introduced solid golf balls, like the Altus Newing, that were successful in Japan. However, Blair offers no reason to believe that these Bridgestone balls use the technology of any of the patents in suit, or that the success of these balls in Japan is any way attributable to the use of these patents.

    c.  While Blair relies at length on Tiger Woods' success with a Bridgestone made ball, he provides no evidence that that ball used any of the Bridgestone patents in suit or that the Woods' success was attributable to these patents. Most people in the industry, I suspect, would attribute Woods' success to his skill and performance. I have never heard anyone attribute Woods' success to the Bridgestone patents in suit, and I certainly do not attribute Woods' success to these Bridgestone patents.

70) The fact that Bridgestone got seven patents over the 1990s and 2000s itself certainly does not show that these patents are the reasons why solid golf balls are successful. As noted above, there are thousands of patents in this art and certainly hundreds of patents on solid construction golf ball. Blair simply has no reason to conclude that these seven Bridgestone patents are reason solid golf balls or multi-layer solid golf balls were successful.

19

71) Reading pages 18-20 of the Blair report, it appears that Blair was confused or misled by the fact that some of the patents in suit describe their objective as giving exceptional driving distance to the ball while having good spin and feel characteristics around the green. It appears that in reading this, Blair may have concluded that Bridgestone invented the idea of a solid ball that would have good distance off the tee, while having the feel and spin of a wound ball on approach shots to the green. If so, Blair is very wrong.

72) The reality is that those in the art have known since the 1980s that a multi-layer solid golf ball had the potential to create a long traveling ball with good spin and feel characteristics. These objectives are recited in the Spalding patents from the 1980s (such as Nesbitt and Molitor above) and have been recited by most solid construction and multi-layer golf ball patents since then.

73) The concept of combining the driving distance attribute of solid two-piece golf balls with the feel and short game control of soft-covered wound balls was well established by the late 1970s. Many golfers had begun to use both types of balls within a single round of golf, alternating ball types according to the nature of individual holes or wind direction. The USGA held the opinion that this practice was "taking away some of the skill required to play the game." This quote appears in an April 1979, GolfDigest article describing the USGA's plan to implement a rule limiting players to the use of a single ball type within a round of competitive golf. (*USGA Adopting "One-Ball"* Rule, attached, exhibit B). Publications including the idea of combining these attributes within a single ball also appeared as early as 1979. In December 1979, Golf Digest's 1980 Equipment Preview:*How to Pick the Right Ball for Your Game* (attached, exhibit C) reports a Dunlop assertion that the Black Maxfli XLT-15 combines "the best of both worlds." This "best of both worlds" premise has driven two-piece and multilayer solid golf ball product development since that time. The idea is more than 25 years old. The objective was restated through the 1980s and 1990s by multiple parties. The reason for the success of the Titleist Pro V1 beginning in 2000 is that like no other ball before it, Pro V1 delivered the combined attributes of long

20

distance off the tee with soft feel and control into the green. The market's response to the Pro V1 clearly indicates that something new had been created.

74) To emphasize this point, we went back and reviewed prior art patents in the area of solid golf balls and multi-layer solid golf balls. We found over 55 Spalding patents, some going back into the 1980s, that say they are directed to or provide the benefit of long distance off the tee plus soft or good feel and spin around the green. We found over 20 Callaway patents that say the same thing. We found over 60 Sumitomo patents that say essentially the same thing. Perhaps more to the point, we found over 150 Bridgestone patents that recite this "long and soft" design objective. It seems that this is just something Bridgestone said in nearly every patent application it filed on solid construction golf balls.

75) In short, the twin goals of "long and soft" are a design objective in undertaking nearly all solid construction golf ball design. The recitation of this goal is ubiquitous in solid golf ball patents, and there is nothing at all special or noteworthy about the fact that the "long and soft" goal was recited as a goal of the patents in suit. Moreover, there is no reason to think that these patents in the lawsuit were the particular ones that "eliminate[ed] the need for players to choose between a solid core ball for distance, and a wound ball for spin and control" as Blair incorrectly asserts.

76) Simply stated the Bridgestone patents in suit did not invent multi-layer solid golf balls and did not invent solid golf balls that for the first time imparted long distance, low spin, or good playability to solid balls. These objectives were known to be desirable long before the patents in suit and were a design objective of nearly all research in solid golf balls. Blair badly distorts this reality.

**Acushnet was not "slow to react."**

77) Finally, Both Mr. Blair and Mr. Calabria try to paint Acushnet as a "wound ball company" that was slow to react to the advent of solid golf ball construction. Once again, they greatly misstate and overstate the actual facts.

78) The facts simply do not support or bear out the conclusion that Acushnet was "slow to react" to competition from solid construction golf balls.

21

   a.  As noted above, Acushnet sold our first solid golf ball in 1980, years before Bridgestone sold one in the US.

   b.  By the 1990s, we were one of the top 2-3 sellers of solid golf balls in the US.

   c.  By 1994 approximately 50% of our golf ball unit sales were of solid golf balls.

   d.  We had a wealth of solid golf ball technology at our disposal, and we invested heavily in solid golf ball technology throughout the 1990s.

79) I, and others at Acushnet, understood that solid golf balls could one day be a technology that professional players wanted to play. Mr. Calabria, as a member of Acushnet Company, even tested early versions of urethane two-piece solid balls with Tour and other professional golfers. We recognized that certain objective facts about the game of golf could make solid construction balls a design that increased in interest.

   a.  Solid golf balls could be made to travel a long way off the tee. The golf ball industry knew this for a long time.

   b.  In all other segments of the game other than among Tour players, solid construction golf balls were well accepted, and solid construction technology was improving every year.

   c.  The pros were becoming better athletes, were better conditioned than ever before, and generally demonstrated a better work ethic than in the past. As a result they could consistently swing the club harder. Distance would follow from this higher club speed, and it was reasonable to wonder whether professional players would come to demand golf balls that would provide them greater distance.

   d.  The equipment players used was getting better every year and balls could be hit farther. In particular, the advent of metal woods, oversized metal woods, and titanium drivers made the widespread use of solid construction, long distance balls more plausible.

   e.  The use of launch monitors, pioneered by Acushnet with the AGC was becoming widespread. Acushnet had built more portable versions and

22

through the 1990s was both testing and educating golfers. The launch parameters necessary to achieve long driving distance were being discussed in terms of angles, speed and spin. Products were being evaluated in light of their capability of achieving optimized parameters. It was well known that lower driver spin could be achieved with solid designs. This activity was similarly taking place in Japan notably by Bridgestone using their Science Eye devices. Anyone associated with the design of golf products through this period knew well that the goal was to achieve the combination of two-piece distance ball launch conditions off the driver and soft-covered wound ball performance into the green.

    f.   In light of all of this, the demand for solid golf balls that could be driven a long way yet still have soft feel and improved control into the green was quite foreseeable to me.

80) I maintained substantial research and development at Acushnet in solid construction balls and multi-layer balls during the 1990s for several reasons. A large percentage of our sales were of solid construction balls, and in R&D we were constantly seeking to improve those products. From the beginnings of Acushnet Company we have always looked for ways to make better golf balls and exploring new construction technology and new materials is how that is done. It is the history of our company and the history or our success. In this respect there was nothing unusual about our work to develop solid construction or multilayer golf balls.

81) However, in addition, we have long built the Titleist brand on, among other things, acceptance by the premier players in the game. If the premier players were to desire to play a solid construction ball, I believed that Titleist needed to be prepared to provide one, and I devoted a significant amount of my research budget to investigating this technology. John Calabria (in the 1980s) and others would test solid constructions with tour professional years before they gained widespread use on the tours. Tour player feedback to prototypes created and tested in our laboratories would steer us in the direction that would lead to products like the Titleist Pro V1. It is no accident that when we introduced the

23

Pro V1, it became the leading ball on tour and in the market.   My team had spent years working to develop our own technology.   The results speak for themselves.

82) Far from being slow to react, we were very prepared, executed better than our competitors, and developed the best solid ball on the market using Acushnet technology.

I declare, under penalty of perjury, that the foregoing is true and correct.

_____
William E. Morgan

Executed on: 20 Feb. 2007

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRIDGESTONE SPORTS CO., LTD., )
and BRIDGESTONE GOLF, INC., )
                                   )
           Plaintiffs, )
                                     )
        v. )
                                       )
ACUSHNET COMPANY,          )     C. A. No. 05-132 (JJF)
                                     )
           Defendant. )

## DECLARATION OF DAVIS LOVE III

I, Davis Love III, hereby state as follows:

1.       I have been a professional golfer playing on the PGA Tour since 1985. I have
been asked by Acushnet Company ("Acushnet") to provide my opinions on
certain issues from the perspective on a touring golf professional.

## BACKGROUND INFORMATION

2.       I have been around the game of golf all my life. My dad was a professional golfer
and I was raised around the sport. After attending the University of North
Carolina, I became a pro golfer in 1985. I have competed on the tour for over 20
years. I have won 19 PGA tour events, including the PGA Championship in
1997. I have also competed in and won various international events.

3.       I have not provided expert testimony under oath on any other occasion in the past
four years.

4.       I am not receiving any fee for my testimony in this case. I have a sponsorship
agreement with Acushnet Company. However, that agreement does not cover or
address my testimony in this matter. My compensation from Acushnet Company

Case No. 06-91 (SLR)

**PX-680**

Date Entered: _____

By: _____

RISEN
Exhibit No. 20 for I.D.
Date: 7/21/07
Reporter: K.A. Smith

2

is in no way dependent upon my testimony in this case or the outcome of this case.

5.   I have authored one book, *Every Shot I Take*. The book was written to honor my dad, for all he taught me about golf and about life.

## TITLEIST BRAND GOLF BALLS

6.   For at least the past 20 years, I have played *Titleist* brand golf balls made by Acushnet. I did so, and do so today, because I consider them the best golf balls on the market and the ones best suited for my game.

7.   Professional golfers and skilled amateurs are very particular about the golf equipment they use. Professional golfers generally are very knowledgeable about the choices available to them, select their equipment carefully after testing competing products, and try to select the equipment that will give them the best chance of being successful.

8.   Many skilled amateurs are very selective about their equipment as well. High quality golf equipment is relatively expensive, and players who purchase their equipment tend to consider their purchases with care, in my experience. However, brand loyalty and an interest in playing the products played by professional golfers also seem to influence the purchasing choices made by skilled amateurs.

9.   During the 1990s, I played the Titleist *Professional* line of golf balls. This was a ball with a urethane outer cover over a rubber thread winding around a liquid center rubber core. I was very successful with this golf ball during the 1990s. I won 12 tournaments had over 50 top ten finishes with this ball, including winning the 1997 PGA Championship. It was a very good ball that had good distance characteristics combined with very good spin and feel on approach shots.

10.  By any objective measure, the *Titleist Professional* would have to be considered the leading ball on tour in terms of quality, design, and performance during the 1990s. Various firms keep track of the balls played on tour by professional players. The data shows that the *Titleist Professional* balls were the overwhelming choice of players on tour during the 1990s. The *Professional* was

3

played by about 70% of the tour golfers each year from 1994 to 1999. The percentage of tour events won by players using the Titleist *Professional* ball during this time frame was even higher than 70%. Nearly every week, a pro tour event was won by a player playing the Titleist *Professional*. Of course, each golfer chose a ball that he/she considered best for their game. While personal preferences sometimes differed, the overwhelming support that the Titleist *Professional* had on tour during this time frame led me, and I think most objective observers, to conclude that the *Professional* was the top quality, top performing ball on the tour during the 1990s.

11.     Most golf ball manufacturers during the 1990s also offered performance balls with wound core constructions. For example, Bridgestone, while a relatively small presence among tour players during the 1990s, offered both solid construction and wound construction golf balls. Indeed, Nick Faldo won the 1996 Masters golf tournament playing a wound ball made by Bridgestone.

### THE TITLEIST *PRO V1*

12.     In October 2000, Acushnet introduced the *Titleist Pro V1* ball. The *Pro V1* was a solid construction ball with a very large core, a thin Surlyn intermediate layer, and a very thin outer cover of cast urethane. I tested the *Pro V1* and switched to it 2000. I found that the ball gave exceptional distance off the tee and yet had an optimum spin profile and flight trajectory that allowed for precise targeting on approach shots.

13.     Once again, my experience was also shared by most players on tour. The first week it was introduced, over 40 Titleist players switched from the Professional ball to the *Pro V1*. Over the next six months, 13 of 17 events were won by players playing the *Pro V1*. It was a very good ball, sold by a manufacturer, Acushnet, that had a long history of making quality golf balls, both wound construction and solid construction, and it was rapidly accepted on Tour.

14.     Today, the *Pro V1* family of golf balls remains the leader on tour. More tour players play the *Pro V1* and *Pro V1*x than any other ball by a wide margin. As tour players can chose a ball to play from among many different golf balls from

4

different manufacturers, the broad support for the *Pro V1* family indicates that most tour players consider this to be the best quality and best performing product available to them. The statistics today show that in terms of players using the ball, events won, and money winnings, the *Pro V1* is far and away the leading ball chosen by tour professionals.

15.    Attached hereto is an Acushnet document summarizing the success of the *Pro V1* last year. In 2006, The *Pro V1* was first in worldwide tour players, with 22,742. The nearest competitor had 2,394 players. In 2006, the *Pro V1* was first in worldwide wins, with 150. The nearest competitor won 27 tournaments. The *Pro V1* was also first in worldwide money winnings, with nearly $350 million won. The nearest competitor won about $300 million less.

16.    As one can see, these objective indications plainly suggest that the *Pro V1* is considered the superior ball on tour by the vast majority of tour players worldwide.

## SOME HISTORY ON SOLID GOLF BALLS

17.    Solid golf balls have been available in the market for as long as I can remember. According to an article in *Golf* Magazine entitled: *Innovations GREAT LEAPS FORWARD, The Evolution of a Game 1890-Today* (Feb. 2007), the modern two-piece, solid core ball was introduced by Spalding in 1967. (copy attached) That ball was called the Spalding Executive.

18.    That same article named the introduction of the Top-Flite Strata ball in 1996 as an innovation in multi-layer solid balls. Finally, the article noted that in 2000 the Titleist *Pro V1* "became the industry leader almost the minute it entered the market in the fall of 2000" due to its "superior mix of distance and control around the greens."

19.    Golf ball companies have been offering solid construction balls since before I joined the tour. The Spalding *Top-Flite* line of solid construction balls have been on the market and had a small following for some time. I understand that Acushnet introduced its first solid construction ball in 1979, and has made solid

construction balls for over 25 years. Wilson and others also introduced solid construction golf balls in the market long ago.

20.    I do not consider Bridgestone Sports to be an innovator or leader in solid golf ball construction and I have not heard others attribute the success of solid golf ball constructions to Bridgestone Sports or Bridgestone technology. In fact, to my recollection, Bridgestone was a fairly late entrant into the solid ball segment, and it did not offer a multi-layer solid construction ball on tour until the late 1990s.

21.    I have read the declaration of Nick Price in this case. I know that Mr. Price played a two-piece solid construction Bridgestone ball, and had good success in the first half of the 1990s. In some ways, this is easy for me to understand. Mr. Price is a physically strong golfer, who is very skilled and creates a high launch angle with his swing. In addition, large steel construction drivers became available in the early 1990s and Mr. Price used one. A solid construction ball like the Bridgestone Precept EV had relatively low spin, which probably was well suited to Mr. Price's game when he used a large steel driver.

22.    However, Mr. Price's experience was not typical. Very few other players on tour shared Mr. Price's preference for these solid balls and few played the ball. Indeed, Bridgestone itself was not fully committed to solid balls in this era, and offered wound construction balls on tour as well.

23.    As most players know, Tiger Woods switched to a three-piece solid construction Nike ball in May 2000 and, over the next year, won four major tour events. The Nike ball was made by Bridgestone, as I understand it. Tiger's success certainly contributed to an interest in solid construction golf balls.

24.    However, it is important to bear in mind that Tiger's success does not demonstrate or prove the superiority of the Nike ball he played. First of all, Tiger is a highly skilled golfer who had a remarkable year in 2000-01. He was at the top of his game and performing at the highest levels of achievement. It is probably the case that he would have won these tournaments irrespective of the ball he played. Indeed, in the one year before Tiger switched to the Nike ball he won essentially the same number of tournaments, ten, using a Titleist *Professional* wound ball, as he won the next year using the Nike solid ball, nine. Hence, it would be rather

6

misleading to suggest that the ball alone was responsible for Tiger's remarkable success.

25.    Further, it is interesting to note that Tiger's success did not cause the Nike ball to become the predominant ball on tour or in the market. To the contrary, the overwhelming majority of golfers did not switch to solid construction balls until after Acushnet introduced the *Pro V1*.

26.    Nike asked me to switch to the Nike ball in 2000. I tested that ball, and found that, for my game, it was inferior to the Titleist balls. Hence, I continued to play the Titleist Professional until Acushnet introduced the *Pro V1 in October 2000*. Most other golfers on tour made the same decision. The *Pro V1*, not the Nike ball, is the most widely played ball on tour. If Tiger's success were attributable to the ball itself, rather than the player, you would expect greater acceptance of the ball by other tour players, and that is not what happened.

27.    In my opinion, the success of multi-layer solid construction balls on tour and in the marketplace can be attributed to several factors. First, improved equipment, especially oversized metal woods and titanium drivers that are used today are well suited to a ball that will provide exceptional distance and acceptable spin off the tee. Second, today's golfers are better athletes and have more power and skill to strike the ball with high club speeds. Third, while professional golfers do not have to buy their golf balls, most amateur players do buy them, and the improved durability of solid construction balls over older, balata cover balls has been a factor. I also think that Tiger Wood's success with a solid ball in 2000-01 grew the interest in this construction among many golfers.

28.    Finally, I think that objectively (and based on the industry acclaim it has received) Titleist's *Pro V1* ball is an important reason why solid construction, multi-layer balls are so successful today. The *Pro V1* is played by a wide range of professional and amateur players, and is highly successful on tour and other golf competitions. The *Pro V1* is obviously accepted by many, many professionals as the ball that best meets their needs. In addition, the Titleist brand has a long standing reputation for making high quality, high performance golf balls for players at all levels of the game.

7

29.    I understand that Acushnet brought several of its own technologies to bear in developing the *Pro V1*. The ball has a very large core (about 1.55") which creates great energy and power. The ball has a very thin intermediate layer, made possible through Acushnet advances in ball manufacturing techniques, and a very thin, cast urethane cover. Again, the ability to cast a very thin urethane cover on a golf ball is an advance that I understand was created by Acushnet.

30.    I am a professional golfer, not a rubber chemist, engineer, or patent lawyer. It is not my place to evaluate any particular patents or to try to assess what role a patent did nor did not play in the development of this technology. I can say that from my personal experience and observation, the Titleist *Pro V1* family of golf balls has performed better than any other solid golf ball I have tested. I can say that the *Pro V1* has been the ball of choice for the majority of golfers on tour, as was the *Titleist Professional* before it, and were the Titleist balata balls before that. This tells me that most professional golfers find that Acushnet technology best meets their needs.

8

## CONCLUSION

31.    If asked to do so at trial, I am prepared to testify to the above as an expert witness. I understand that I have the right to supplement my report if I learn new information between now and trial, and I exercise that right. I would also expect that if I testified I trial I would want to use one or more exhibits to demonstrate my testimony.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: February 6, 2007