IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

  Plaintiff,

v.

ACUSHNET COMPANY,

  Defendant.

C. A. No. 06-91 (SLR)

REDACTED

## DECLARATION OF THOMAS L. HALKOWSKI IN SUPPORT OF PLAINTIFF CALLAWAY GOLF COMPANY'S RESPONSE LETTER TO ACUSHNET'S NOVEMBER 21, 2007 LETTER TO THE COURT

I, Thomas L. Halkowski, declare as follows:

1.    I am a member of Fish & Richardson P.C., counsel of record in this action for Callaway Golf Company ("Callaway"). I am a member of the Bar of the State of Delaware and am admitted to this Court. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.    Attached as Exhibit A is a true and correct copy of the November 15, 2007 deposition transcript of Phil Mickelson.

3.    Attached as Exhibit B is a true and correct copy of the September 22, 2000 Golf World article, "Going to Great Lengths," labeled AC 000089569.

4.    Attached as Exhibit C is a true and correct copy of the August 18, 2001 *Golf Week* article, "Inside look: Titleist's big makeover," labeled AC 0089551 - 89552.

5.    Attached as Exhibit D is a true and correct copy of a November 17, 2000 press release, "Acushnet Company Announces Multi-Year Equipment Deal with Phil Mickelson," labeled AC 0131632 - 131633.

6.    Attached as Exhibit E is a true and correct copy of a May 14, 2007 letter from Roger Denning to Brian Rosenthal.

7.    Attached as Exhibit F is a true and correct copy of the August 29, 2007 deposition transcript of William Young.

8.    Attached as Exhibit G is a true and correct copy of an September 29, 2007 e-mail string between Michael Amon and Brian Rosenthal.

9.    Attached as Exhibit H is a true and correct copy of the October 1, 2007 Disclosure of Rebuttal Fact Witnesses by Plaintiff Callaway Golf Company.

10.    Attached as Exhibit I is a true and correct copy of a November 14, 2007 letter from Roger Denning to Brian Rosenthal.

11.    Attached as Exhibit J is a true and correct copy of the September 5, 2007 Disclosure of Fact Witnesses by Defendant Acushnet Company.

12.    Attached as Exhibit K is a true and correct copy of an April 30, 2007 e-mail from Roger Denning to Brian Rosenthal.

13.    Attached as Exhibit L is a true and correct copy of a November 7, 2007 Notice of Subpoena to Gregory Norman.

14.    Attached as Exhibit M is a true and correct copy of the November 7, 2007 Third Set of Requests for the Production of Documents and Things to Plaintiff [Nos. 181-195], by Defendant Acushnet Company.

15.    Attached as Exhibit N is a true and correct copy of a March 16, 2007 e-mail from Roger Denning to Brian Rosenthal.

16.    Attached as Exhibit O is a true and correct copy of an April 27, 2007 letter from Roger Denning to Brian Rosenthal and Clint Brannon.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of November, 2007, at Wilmington, Delaware.

*/s/ Thomas L. Halkowski*
Thomas L. Halkowski

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2007, I electronically filed **DECLARATION**

**OF THOMAS L. HALKOWSKI IN SUPPORT OF PLAINTIFF CALLAWAY GOLF**

**COMPANY'S RESPONSE LETTER TO ACUSHNET'S NOVEMBER 21, 2007**

**LETTER TO THE COURT** with the Clerk of Court using CM/ECF which will send

electronic notification of such filing(s) to the following Delaware counsel.

I hereby certify that on November 27, 2007, I have Electronically Mailed the document to

the following person(s):

Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Attorneys for Defendant
ACUSHNET COMPANY

Alan M. Grimaldi, Esq.
Joseph P. Lavelle
Brian Rosenthal
Clint Brannon
Kenneth Donnolly
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com

Attorneys for Defendant
ACUSHNET COMPANY

/s/ *Thomas L. Halkowski*
Thomas L. Halkowski

50450966.doc

# Exhibit A

SEALED DOCUMENT

# Exhibit B

# Going to great lengths



TO HEAR PHIL MICKELSON TELL IT, THE top-secret Titleist prototype golf balls in his bag do everything but glow in the dark. They travel longer. They react like homing devices from 150 yards in, not juicing off greens like the old solid-core balls but sticking to putting surfaces like Velcro. And here's the scary part: They self-correct. "I tested a couple of other balls, two of the new ones on the market," Mickelson said last week. "I told [Acushnet president and CEO] Wally [Uihlein] at the U.S. Open, 'You've always had the best product on the market, but right now there are good products out there. I'd like to see what you have in R&D coming out.'"

That, as Uihlein admitted Monday, was the clarion call. Titleist had the patent on a new-age ball to counter the offensives mounted by Nike and Callaway, but Mickelson's nudge pushed Titleist's "Laboratory Test Ball" into production. As Uihlein said, "It would be foolish and naïve to think that 30 days after a discussion I had with Phil Mickelson that *voila*, something falls out of the white-coated laboratory that represents the magic elixir."

Hey, whatever it takes. Mickelson had the Titleist prototypes in his bag Sept. 11 in his "Shell's Wonderful World of Golf" match against Fred Couples. He reached all the par-5s with nothing more than a 6-iron. On the final hole, he bombed a drive in the 445-yard range. "I'm playing a game right now that is different from any game I ever played," said Mickelson.

Over at Callaway, the spokesman is Arnold Palmer, as much a traditionalist as anyone in the game, the man who first whispered in Buzz Taylor's ear in 1998 that technology was threatening to ruin the integrity of the game, giving the then-USGA president a platform on which to stand. Two summers later Palmer is featured in a stunning new Callaway print ad, wearing a pink shirt, holding the company's red Rule 35 ball, grinning from ear to ear. There is not a word of type on the image—Callaway wants the picture to say it all. Palmer averaged more than 300 yards in driving distance at the Novell Utah Showdown in Utah last month—and shot 69, his low round of the year—using the Callaway ball. In a Callaway infomercial, the man ranked No. 1 in the *Golf World Business* Personality Index says the joy has returned to the game. It lends tremendous credibility to the hard-core efforts being made at Callaway's headquarters in Carlsbad to justify its $170 million investment in a golf ball plant.

Nike, meanwhile, has Tiger Woods and his performance at the Canadian Open. Using his Tour Accuracy ball, Woods launched a drive at Glen Abbey's par-5 18th hole in the second round that traveled 380 yards. Two days later, on the same hole with the tournament on the line, he hit a 218-yard 6-iron from a fairway bunker that looked as though it was cutting into the water, made a slight left-hand turn in the air and pitched 15 feet *behind* the flag. Afterward, he said he should have hit a 7-iron.

Woods has won six of nine starts since switching to the Tour Accuracy, including three major championships. He didn't three-putt once at Pebble Beach. He didn't hit a bunker at St. Andrews. He completed the career grand slam. Yet those two bombs in Canada were the shots that have come to define his phenomenal summer.

"We were hoping to get him in the ball after the majors," said Kel Devlin, director of tour operations for Nike. "Now we wish we had him in it before the Masters."

## The battle between Ely Callaway, Phil Knight and Wally Uihlein right now isn't about who can build the longest driver, but who can make the best solid-core, non-wound ball.

The bottom line is this is more than a trend. When Mark O'Meara won two majors in 1998 with the Spalding Strata, it did not send Callaway, Nike and finally Titleist off in mad pursuit of making the equivalent three-piece, thin-covered ball. Now the game has changed. The battle between Ely Callaway, Phil Knight and Wally Uihlein right now isn't about who can build the longest driver, but who can make the best solid-core, non-wound ball.

If all the claims for these new solid balls are true, the USGA may be in a quandary. The USGA may need a standard other than the Initial Velocity Test and they are working on one. But construction delays have pushed back the introduction of its new golf ball monitor. If and when it establishes one, any roll back in standards could cost the USGA millions in legal fees, and if the battle goes to court, the manufacturers are likely to fight for every innovation that's in their research and development pipelines. "My reaction is not specific to what Tiger Woods or Phil Mickelson may be playing," insists Dick Rugge, senior technical director for the USGA. "The USGA has been studying balls for some time and is considering different options on what we might do in the future. We have not yet announced any particular plan in that regard. I think the results Mr. Woods gets are primarily based on his incredible skill."

For now, the scientists just keep pushing the envelope. In a telephone interview Sunday, Gary Player said he believes it's only a matter of time before an athlete comes along who is bigger and stronger than the 6-foot-2, 180-pound Woods and drives the first green at Augusta.

It sounds as though Phil Mickelson has a chance to do it next year. ◗

CONFIDENTIAL - Subject to Protective Order

AC0089569

# Exhibit C

# Inside look: Titleist's big makeover

**BY JOHN STEINBREDER**

Fairhaven, Mass.

Not quite a year ago, in the weeks following the debut of the Pro V1 at the Invensys Classic in Las Vegas, Titleist executives were feeling good about the ball's introduction.

"We had a lot of momentum and awareness coming out of Vegas," says George Sine, vice president of golf ball marketing and strategic planning worldwide for Acushnet. "And that's just what you want with a new product."

The Pro V1's instant success – including play by tournament winner Billy Andrade and six top 10s – was a mixed blessing, however. The company was going to have to start making the balls available to consumers well before its planned March 2001 introduction – five months away – and had only about 1,000 dozen on hand, less than a month's inventory.

As limited quantities shipped to Sun Belt markets for sale in December, Titleist management began grappling with whether to undertake a vast conversion of much of its wound-ball production capability – even before the success of the Pro V1 was assured – that would end up costing $15 million.

Now, with the company's makeover complete, it is being characterized as nothing short of a business miracle by at least one industry analyst.

"There were a number of days when we had cottonmouth and tight underwear," says Wally Uihlein, the chief executive officer of Acushnet Co., the parent of Titleist. "The anxiety level was extremely high because we were betting the farm on the success of this ball. We essentially elected to obsolete ourselves in a very important area and put everything behind the Pro V1."

Titleist executives recently told *Golfweek* how the company responded to events that followed the ball's introduction – and how it managed the rapid changeover.

A year ago, the executives were saying very little, quietly preparing their response to those who questioned whether Titleist's

see Titleist, page 23

8/8/01

## Titleist cont'd from p. 1

long-time stranglehold on the ball market might be in jeopardy – a number that grew dramatically after Tiger Woods switched to the Nike Tour Accuracy ball in May 2000.

Woods had been playing the Titleist Professional, a wound ball with a liquid-filled center. But when he teed up a solid Nike, he spurred a shift to nonwound balls as players sought more distance without sacrificing critical feel properties.

And most of Titleist's franchise for professional and serious amateur golfers centered around wound golf balls, such as Professional and Tour Prestige. When Woods made his change, Titleist was deriving 45 percent of its total ball revenues from wound products. So when the shift toward the use of solid construction balls among touring professionals began, Titleist seemed to be in a heap of trouble.

"That was certainly my take," says Casey Alexander, special situations analyst for Gilford Securities in New York. "At the end of last year, I considered Titleist to be the most at-risk ball company, primarily because of what was happening in that area and the fact that their premium ball business was mostly wound."

Nearly a year later, Alexander admits he was dead wrong.

"As far as I'm concerned, Titleist has pulled off a business miracle," says Alexander. "It has not only managed to hold onto its share of the ball business but also grow in what has been a brutally competitive market. The company has converted almost half its production capacity from one kind of manufacturing to another, and done so with remarkable speed and efficiency. And in the process, it has produced the hottest product in golf."

That product, of course, is the Pro V1, and almost anyone who carries a handicap has heard of it. The ball features a large rubber core, an ionomer casing and a thin urethane cover that combine to give greater distance and feel. Titleist spokesman Phil Mickelson calls it "the best ball that's ever been created," and dozens of touring pros, whether they are under contract to the Fairhaven, Mass., equipment maker or not, have rushed to put it in play. Weekend golfers practically dive into water hazards to fetch ones they dumped into the drink, and club pros have hoarded sleeves of Pro V1s like black-market diamonds, selling precious dribs and drabs to their members while they badger sales reps for more.

The product is so sought after that, according to Titleist executives, Pro V1 captured an astonishing 10.5 percent share of balls sales at on- and off-course golf specialty stores for June, just seven months after it went on the market.

How did Titleist pull it off?

It wasn't easy, it wasn't cheap, and it didn't happen overnight.

"We first started building Pro V1 prototypes in the mid-1990s," says Uihlein. "We had some of our Tour players hit what we called a Professional II, which had a urethane cover like the Professional but a solid core. However, we didn't think it was good enough to bring to market."

That didn't stop Titleist from continuing to work on that concept, and in 1997 the company filed its first patent for the future Pro

AC0089551

V1. Development of the then-unnamed golf ball continued at a fairly steady pace through the 2000 PGA Merchandise Show in Orlando, Fla.

"But then things really accelerated," Uihlein says. "We had made the decision to wait and see what our competitors came out with at the show and where we had to be for our product to be better. And once we knew what they had, we really pushed on."

According to an industry executive who asked that his name not be used, Titleist officials were particularly impressed with the new Callaway Rule 35 golf ball, and they told the research and development team to come up with something better in very short order.

In June 2000, shortly after Woods officially switched to the new Nike Tour Accuracy, Titleist orchestrated what it called the 100-man march, in which it had more than 100 Tour players test its latest ball, comparing it with its own products as well as those produced by competitors.

"That lasted a couple of months, with Phil Mickelson being our Chuck Yeager, our lead test pilot," Uihlein says. "When all was said and done, we had between 80 percent and 90 percent saying they would put the new ball in play. So we were ready to go."

By that time, the "new ball" had acquired an official moniker, Pro V1, which was nothing more than a code name created by Bill Morgan, Acushnet senior vice president of golf ball research and development.

"We needed to give it a name, any name, so we could submit it to the USGA for approval," says Morgan.

The next step was to put the ball in tournament play, and that came last October at the Invensys Classic in Las Vegas when 47 PGA touring pros, about a third of the field, played the new Pro V1 after it made its debut on the U.S. Golf Association's conforming list. And just about everybody playing in the Vegas event was talking up the ball by the end of the tournament.

Even more players teed up the Pro V1 at the next Tour stop, and pros began converting in droves. The media quickly picked up the story, and that got the general golf public worked up. Everyone, it seemed, had to have the new ball, and the quirky code name Morgan had given it quickly became one of the most recognizable in golf. Shortly after the Las Vegas tournament, executives at Titleist decided to keep the Pro V1 name because it had gathered tremendous cachet in only a few weeks.

That presented a number of production difficulties, especially as it related to capacity. The original plan was for Titleist to keep producing urethane-covered golf balls at a rate of roughly 3.5 million to 4 million dozen a year,

with the Pro V1 eventually replacing the Professionals, Tour Prestiges and Tour Balatas it was making. All of that would take place at Ball Plant No. 1 in Acushnet, Mass., where the company had seven manufacturing cells.

"We had been making some prototype balls in April and May, and in the summer of 2000 we decided to dedicate one cell exclusively to Pro V1 production," says Morgan.

And at the time of the Vegas debut, Uihlein says the company only had about four weeks of inventory on hand, perhaps 1,000 dozen golf balls.

"Remember," Uihlein says, "we were planning for a March introduction. And that would have allowed us the time to build our production capacity."

But the consumer response to Pro V1 did not give Titleist that luxury of time, and the company feverishly began converting urethane-cover production to that new ball. (The Pro V1 cover is thinner than those used for Professional and Tour Prestige and the material is somewhat different.) Titleist also announced that it no longer would produce Tour Prestige or Tour Balata, and cut way back on the making of Professional. At the same time, Titleist began adding production cells, and by the middle of 2001 it had a total of 12 in operation, with more being planned for 2002.

"Not only were we getting almost 100 percent cannibalization on our urethane-cover balls, but we were also picking up share from some of our other lines, and from competitors," says Uihlein. "That's why the production numbers went up."

According to company officials, Titleist is producing urethane-covered balls at a rate of 5 million dozen a year, 95 percent of which are Pro V1s, and is gearing up to go to 6 million as it gets ready to introduce some new Pro V1 product early in 2002.

"We did in two months what we normally had to accomplish in six," says Sine. "But we had no choice."

Not surprisingly, it has not been a very stress-free undertaking.

"Yes, we were very confident about this ball because we were getting a lot of enthusiastic feedback from our Tour players," Uihlein says. "Still, it was a challenging process, and the speed at which this all took place is unprecedented, especially as it related to increasing capacity to meet the demand. I think it is the most massive paradigm shift ever seen in the golf ball category, and certainly the most intense and accelerated one in any product category I've ever witnessed."

Pretty big talk, to be sure. But people have been saying things like that about Pro V1 ever since Las Vegas.

True to its reputation, the ball has gone a long way in a very short time.    o

CONFIDENTIAL - Subject to Protective Order

AC0089552

# Exhibit D

**ACUSHNET COMPANY**

Case No. 06-91 (SLR)

**PX-1200**

Date Entered: _____

By: _____

## ACUSHNET COMPANY ANNOUNCES MULTI-YEAR
## EQUIPMENT DEAL WITH PHIL MICKELSON

*World's 3rd-Ranked Golfer to Continue Playing Titleist Golf Ball and*

*Wearing FootJoy Shoes and Glove. Adds Titleist Clubs and Golf Bag to Arsenal.*

**Fairhaven, MA (November 17, 2000)** - Acushnet Company, manufacturer of the Titleist®, FootJoy® and Cobra® golf brands, announced today it has agreed to a multi-year equipment deal with the world's third-ranked golfer, Phil Mickelson. The five-year agreement, which commences January 1, 2001, provides for Mickelson to continue playing Titleist golf balls, and wearing FootJoy golf shoes and gloves. He will also play Titleist golf clubs and carry a Titleist golf bag. No other terms were disclosed.

Mickelson, who has won 17 PGA TOUR events since turning professional in 1992, captured four titles this year, including the TOUR Championship, and finished second on the PGA TOUR money list with over $4.7 million in winnings. He has earned at least one victory in seven of his eight full seasons on the PGA TOUR.

Commenting on the announcement, Wally Uihlein, Acushnet Company's Chairman and CEO explained, "Phil Mickelson is among the game's greatest and most respected golfers and we are proud to have him as an ambassador for the Titleist and FootJoy brands. Phil has relied upon Titleist golf balls throughout his illustrious career and his input was instrumental in the development of the new Pro V1 that has achieved immediate acceptance and success on the worldwide professional tours. We are delighted that Phil has chosen to play an even larger role in the success of the Acushnet Company family and we will continue to work with him to develop golf clubs that will help assist him in his quest to become the best player he can be."

Mickelson who pronounced the new Pro V1 golf ball as "the greatest technological advancement I have ever experienced in my playing career" after winning the TOUR Championship, ranked among the top 5 players in several performance categories this year. He finished second in scoring average, and third in top 10 finishes, driving distance, putting average and all-around.

"I am excited to have the opportunity to work directly with individuals like Terry McCabe and Larry Bobka (irons), Steve Mata (drivers), Bob Vokey (wedges) and Scotty Cameron (putters), who design and develop the Titleist equipment I will be playing," commented Mickelson. "In addition, no other company can match a service staff at any level of golf like Bill Young (Vice President of Tour Relations) and Titleist and FootJoy."

With the extension of Mickelson's agreement, 7 of the world's top 10 players have chosen to play the #1 ball in golf in 2001 and beyond, including Ernie Els, David Duval, Volvo Order of Merit winner Lee Westwood, Davis Love III, Masters champion Vijay Singh and Darren Clarke. Titleist was the overwhelming choice of more winners in the golf ball (31), driver (20), iron (14) and putter (25) categories on the 2000 PGA TOUR.

Highly Confidential Information
OUTSIDE COUNSEL ONLY
Subject to Protective Order

AC0131632

Titleist, FootJoy, Cobra and Pinnacle® comprise the major golf brands of Acushnet Company, an operating company of Fortune Brands, Inc. (NYSE-FO). To learn more about the Acushnet Company brands, please visit us online at www.titleist.com, www.cobragolf.com, www.footjoy.com, and www.pinnaclegolf.com, or call Joe Gomes, Director of Communications (508.979.3211).

**Highly Confidential Information**
**OUTSIDE COUNSEL ONLY**
**Subject to Protective Order**

AC0131633

# Exhibit E

SEALED DOCUMENT

# Exhibit F

SEALED DOCUMENT

# Exhibit G

**From:** Rosenthal, Brian [mailto:RosenthalB@howrey.com]
**Sent:** Thursday, September 27, 2007 6:59 PM
**To:** Michael A. Amon
**Cc:** Donnelly, Ken; Brannon, Clinton
**Subject:** RE: Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Thanks Mike.

Brian.

---

**From:** Michael A. Amon [mailto:Amon@fr.com]
**Sent:** Thursday, September 27, 2007 6:54 PM
**To:** Rosenthal, Brian
**Cc:** Donnelly, Ken; Brannon, Clinton
**Subject:** RE: Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Brian,

We agree and will plan on exchanging rebuttal witness lists on Monday, October 1, 2007.

Mike

| **Website** | **vCard** | **Bio** |
|---|---|---|

|  |  | **Michael A. Amon** |
|---|---|---|
|  |  | **Associate** |
|  |  | amon@fr.com |
| Tel: (858) 678-4708 | | **Fish & Richardson P.C.** |
| Fax: (858) 678-5099 | | 12390 El Camino Real |
|  | | San Diego, Ca 92130 |

---

**From:** Rosenthal, Brian [mailto:RosenthalB@howrey.com]
**Sent:** Thursday, September 20, 2007 6:21 AM
**To:** Michael A. Amon
**Cc:** Donnelly, Ken; Brannon, Clinton
**Subject:** RE: Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Mike, it seems like since the 30th falls on a Sunday, the exchange of rebuttal lists should take place on Monday, Oct. 1. Please let me know if you agree. Thanks.

---

**From:** Michael A. Amon [mailto:Amon@fr.com]
**Sent:** Wednesday, September 05, 2007 7:01 PM
**To:** Rosenthal, Brian
**Cc:** Donnelly, Ken; Brannon, Clinton
**Subject:** RE: Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Brian,

I confirm that the parties are to exchange witness lists at 8:00 pm EST (5:00 pm PST) by email.

With respect to your view regarding the scope of the witness list, you are now changing what we agreed when Callaway Golf agreed to continue the date for the exchange of witness lists.  In our conversation last week, you agreed that the scope of the witness list exchange included all witnesses to be called at trial, whether live or by deposition.  This was confirmed in my email of August 30, 2007 to you.  Your email from earlier today now changes that agreement.  Moreover, we do not agree with your changed interpretation of the scope of the witnesses to be listed.  We read the Court's order to require the parties to list all fact witnesses that may be called to testify at trial, either live or by deposition.  Callaway Golf's witness list shall comply with a reading of the Court's order that includes both live and deposition witnesses.  We suggest that your witness list also comply with this interpretation.  If, at trial,  Acushnet attempts to introduce any testimony, either live or by deposition, from a witness not listed on its witness list to be exchanged later today, Callaway Golf reserves its right to object to any such testimony.

With respect to the date for exchange of rebuttal witnesses, we agree that the date originally called for an exchange on September 30th.  My email of August 30th reference September 28th as the exchange for rebuttal witness lists because the is the first business day prior to Sunday, September 30th.  Callaway Golf has no problem exchanging rebuttal witness lists on Sunday, September 30, 2007.  We will plan accordingly.

Regards,

Mike Amon

| Website | vCard | Bio |
|---------|-------|-----|

|  |  |  |
|---|---|---|
|  |  | **Michael A. Amon** <br> **Associate** <br> amon@fr.com |
|  |  |  |
| **Tel: (858) 678-4708** <br> **Fax: (858) 678-5099** |  | **Fish & Richardson P.C.** <br> 12390 El Camino Real <br> San Diego, Ca 92130 |

---

**From:** Rosenthal, Brian [mailto:RosenthalB@howrey.com]
**Sent:** Wednesday, September 05, 2007 3:28 PM
**To:** Michael A. Amon
**Cc:** Donnelly, Ken; Brannon, Clinton
**Subject:** RE: Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Michael, thanks for your call earlier today.  As we agreed, we are exchanging our list of witnesses today at 8:00 Eastern by email.  Also, as I mentioned, we do not read the Court's scheduling order to require that the list of witnesses include deposition witnesses – we believe the scheduling order only calls for the exchange of live witnesses at this time.

In addition, according to my calculations, the scheduling order originally called for the exchange of rebuttal witness lists on September 30. 2007, which falls on a Sunday, so we assumed that that exchange would take place on September 30, 2007.  Could you please let me know where you are getting September 28 from? Thanks a lot.

Brian.

---

**From:** Michael A. Amon [mailto:Amon@fr.com]
**Sent:** Thursday, August 30, 2007 7:47 PM
**To:** Rosenthal, Brian
**Cc:** Brannon, Clinton
**Subject:** Callaway Golf v. Acushnet, Case No. 06-91 (SLR): Exchange of Witness Lists

Dear Brian,

This is to confirm that the parties have agreed to extend the date for the exchange of witness lists until September 5, 2007.  Each party's list shall include all witnesses (fact and expert) that may be called to testify at trial, whether live or through deposition testimony.  The date for the exchange of rebuttal witnesses will not change, and the parties will exchange rebuttal witness lists on September 28, 2007.

Regards,

Mike

| Website | vCard | Bio |
|---------|-------|-----|

| | | |
|---|---|---|
| | | **Michael A. Amon**<br>**Associate**<br>amon@fr.com |
| **Tel: (858) 678-4708**<br>**Fax: (858) 678-5099** | | **Fish & Richardson P.C.**<br>12390 El Camino Real<br>San Diego, Ca 92130 |

********************************************************************************************
****************************************

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

********************************************************************************************
****************************************

-------------------------------------------------------------------------------------------------
This email and any attachments contain information from the law firm of Howrey LLP, which m
ay be confidential and/or privileged.
The information is intended to be for the use of the individual or entity named on this email.
If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of
the contents of this email is prohibited.
If you receive this email in error, please notify us by reply email immediately so that we can arra
nge for the retrieval of the original documents at no cost to you.

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

       Plaintiff,

    v.

ACUSHNET COMPANY,

       Defendant.

C. A. No. 06-91 (SLR)

**PLAINTIFF CALLAWAY GOLF COMPANY'S
DISCLOSURE OF REBUTTAL FACT WITNESSES**

Plaintiff Callaway Golf Company ("Callaway Golf") hereby submits the following disclosure of rebuttal fact witnesses pursuant to Paragraph 2(g) of the Court's Scheduling Order filed June 2, 2006. Callaway Golf specifically reserves the right to supplement or amend this list by adding or removing fact witness as appropriate. In addition to the witness(es) identified by name below, Callaway Golf reserves the right to call at trial as rebuttal witnesses any individual(s) identified by name in Callaway Golf's initial disclosure of fact witnesses, Acushnet Company's initial disclosure of fact witnesses, and Acushnet Company's disclosure of rebuttal witnesses. This list should not be taken as a representation that Callaway Golf will call any of these witnesses to testify at trial and should not be understood to preclude Callaway Golf from calling additional witnesses not listed to testify. Subject to these representations, Callaway Golf identifies the following individuals who may have factual knowledge relevant to the issues in this action:

    -- Phil Mickelson

Dated:  October 1, 2007                    FISH & RICHARDSON P.C.


By:   *s/ Thomas L. Halkowski*
        Thomas L. Halkowski (#4099)
        919 N. Market Street, Suite 1100
        P.O. Box 1114
        Wilmington, DE 19899-1114
        Tel:  (302) 652-5070
        Fax:  (302) 652-0607

        Frank E. Scherkenbach
        225 Franklin Street
        Boston, MA 02110-2804
        Tel:  (617) 542-5070
        Fax:  (617) 542-8906

        Roger A. Denning
        12390 El Camino Real
        San Diego, CA 92130
        Tel: (858) 678-5070
        Fax:  (858) 678-5099

        Attorneys for Plaintiff
        CALLAWAY GOLF COMPANY

50440863(f).doc

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2007, I served PLAINTIFF CALLAWAY

GOLF COMPANY'S DISCLOSURE OF REBUTTAL FACT WITNESSES on opposing

counsel at the following addresses:

*VIA HAND-DELIVERY*                          Attorneys for Defendant ACUSHNET
Richard L. Horwitz, Esq.                     COMPANY
   rhorwitz@potteranderson.com
David E. Moore, Esq.
   dmoore@potteranderson.com
Potter Anderson & Corroon LLP
Hercules Plaza, 6th floor
1313 N. Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000

*VIA EMAIL AND U.S. FIRST CLASS*             Attorneys for Defendant ACUSHNET
*MAIL*                                       COMPANY
   Alan M. Grimaldi, Esq.
   grimaldia@howrey.com
Joseph P. Lavelle, Esq.
   lavellej@howrey.com
Brian A. Rosenthal, Esq.
   rosenthalb@howrey.com
Vivian S. Kuo, Esq.
   kuov@howrey.com
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone:  (202) 383-6989


                                             *s/ Thomas L. Halkoswki*
                                             Thomas L. Halkowski

# Exhibit I

SEALED DOCUMENT

# Exhibit J

**From:** Rosenthal, Brian [mailto:RosenthalB@howrey.com]
**Sent:** Wednesday, September 05, 2007 5:00 PM
**To:** Michael A. Amon
**Cc:** Lavelle, Joseph; Donnelly, Ken
**Subject:** List of Fact Witnesses

Mike,

Per paragraph 2(g) of the Court's scheduling order, we identify the following fact witnesses:

Steve McCracken
Peter Arturi
Mike Rider
Mike Yagley
Mike Catania
Steve Ogg
Tom Kennedy
Scott White
Dr. Risen
Jim Proudfit
Jim Galipeau
Davis Love III
Brad Faxon
Jeff Dalton
Troy Lester
ShenShen Wu
Joe Nauman
Jerry Bellis
Ed Hebert
Bill Morgan
Herb Boehm
Michael Sullivan
Bill Burke
David Bulpett
Dr. MacKnight
Dr. Statz
Troy Puckett
Dr. Fienberg
Dr. Kerr

We also reserve the right to call anyone on Callaway's witness list.


Brian A. Rosenthal
Howrey LLP
1299 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Phone: 202.383.7108 (direct)
Cell: 703.989.7879
Fax: 202.383.6610
RosenthalB@howrey.com

**********************************************************************

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or return e-mail and delete it from his or her computer.

*********************************************************************

----------------------------------------------------------------------------------------------
This email and any attachments contain information from the law firm of Howrey LLP, which m
ay be confidential and/or privileged.
The information is intended to be for the use of the individual or entity named on this email.
If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of
the contents of this email is prohibited.
If you receive this email in error, please notify us by reply email immediately so that we can arra
nge for the retrieval of the original documents at no cost to you.

# Exhibit K

# SEALED DOCUMENT

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## NOTICE OF SUBPOENA AD TESTIFICANDUM AND DUCES TECUM

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Acushnet Company has served or will serve the attached subpoena on

Gregory John Norman c/o Roger Denning, Esq., Fish & Richardson P.C., 12390 El Camino Real,

San Diego, CA 92130. Please be advised that the examination will be conducted before a

person duly authorized and will be recorded by stenographic and videographic means. The

examination will commence at 9:30 a.m. on November 26, 2007 at Jupiter Beach Resort & Spa,

5 North A1A, Jupiter, FL 33477-5190, or at such other time and place as agreed to by the parties.

You are invited to attend and cross-examine.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: November 7, 2007
830460 / 30030

By:    /s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

CALLAWAY GOLF COMPANY

V.

ACUSHNET COMPANY

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] C.A. No. 06-91 (SLR)
District of Delaware

TO: Gregory John Norman,
    c/o Roger Denning, Esq., Fish & Richardson P.C., 12390 El Camino Real, San Diego, CA 92130

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Jupiter Beach Resort & Spa, 5 North A1A, Jupiter, FL 33477-5190 | November 26, 2007 9.30 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

(See Attached "Exhibit A" for Documents and Things Requested)

| PLACE | DATE AND TIME |
|---|---|
| To be agreed | November 15, 2007 9.00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant | November 7, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kenneth W. Donnelly, Tel: 202-383-7495
Howrey LLP, 1299 Pennsylvania Ave N.W., Washington D.C. 20004

American LegalNet, Inc.
www.FormsWorkflow.com

✎ AO88 (Rev. 12/06) Subpoena in a Civil Case

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                         DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(C) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(D) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

American LegalNet, Inc.
www.FormsWorkflow.com

### EXHIBIT "A" TO SUBPOENA DUCES TECUM TO GREGORY JOHN NORMAN

The following instructions and definitions are to be used for purposes of responding to this Subpoena.

### INSTRUCTIONS

1.    In producing documents, furnish all documents within your possession, custody, or control as well as all documents within the possession, custody, or control of your agents; representatives; employees; officers; directors; attorneys; parent, subsidiary, or affiliated corporations; or anyone else acting on your behalf. This subpoena duces tecum also embraces originals, identical copies if originals are unavailable, and non-identical copies (whether different from the originals because of notes made on such copies or otherwise) of the documents described in this subpoena duces tecum.

2.    Pursuant to Federal Rule of Civil Procedure 45(d)(1), documents produced in response to this subpoena duces tecum shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the demand.

3.    Documents attached to each other or consisting of multiple pages must not be separated.

4.    Documents are to be produced in full and in their unexpurgated form; redacted documents shall not constitute compliance with this subpoena, unless such documents are redacted pursuant to any claim of privilege, as set forth below.

5.    If you withhold documents covered by this subpoena by reason of a claim of privilege, a written list is to be furnished identifying each such document for which the privilege is claimed together with the following information, (a) the date of the document; (b) the name of its author, authors, or preparers and an identification by employment and title of each such person; (c) the name of each person who was sent or furnished with the document, together with an

identification of each such person; (d) a brief description of the document; (e) a statement of the basis for the claim of privilege; and (f) the paragraph of this Exhibit A to which the document relates. In the case of privileged documents relating to meetings or to other conversations, all participants in the meeting or conversation are to be identified.

6.    You are to retain copies of all documents relevant to this suit that are currently in existence.   In the event that documents called for by this subpoena were formerly in your possession, custody or control and have been lost or destroyed, such documents are to be identified in writing as follows: addresser, addressee, persons who prepared or authorized the documents, indicated or blind copies, dates of the preparation or transmittal, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, dates of loss or destruction, and if destroyed, the manner of destruction, reason for destruction, persons authorizing destruction and persons destroying the documents.

7.    To the extent permitted and authorized by law, this subpoena duces tecum shall be deemed continuing so as to require further and supplemental responses and production if you obtain additional documents between the time of initial production and the time of trial.

8.    Each paragraph herein shall be construed independently and not by reference to any other paragraph for the purpose of limitation.

9.    The terms "and" and "or" shall be construed conjunctively and disjunctively so as to acquire the broadest meaning possible.

10.    The singular and masculine form of a noun or pronoun shall embrace, and shall be read and applied as, the plural or the feminine or neutral, as the particular context makes appropriate.

11.    NOTICE: computer generated or stored documents, including without limitation, computer files or data, electronic mail, and information on hard disk, CD-Rom, DVD, DAT, tape

2

cartridge, or any other storage medium, including those documents that have been erased but are retrievable, constitute documents within the meaning of these document requests. An inspection of your computer systems may be necessary to assure compliance with these requests. All responsive documents stored in machine-readable form shall be produced in electronic form and in hard-copy form with the printout date and file name and location appearing on the copy.

12.    When used in this subpoena the following words and phrases shall have the meanings set forth below:

### DEFINITIONS

1.    "You" means Gregory J. Norman, and includes all staff or other employees of yours or of any business entities under your control, including, but not limited to any agents, representatives or employees acting or purporting to act on your behalf.

2.    "Callaway" means Callaway Golf Company, and any parent, subsidiary, partner (including general and limited partners) member and/or affiliated entities, past or present, of Callaway, and any person or entity, past or present, acting on behalf of Callaway, including each of its present officers, executives, general partners, limited partners, directors, employees, attorneys, agent and/or representatives. The term "Callaway" shall include all predecessors in interest to all or any portion of its golf ball-related business, including, without limitation, the Top-Flite Golf Company.

3.    "Spalding" means Spalding Sports Worldwide, Inc. and any parent, subsidiary, partner (including general and limited partners) member and/or affiliated entities, past or present of Spalding, and any person or entity, past or present, acting on behalf of Spalding, including each of its present and former officers, executives, general partners, limited partners, directors, employees, attorneys agents and/or representatives. "Spalding" shall include all predecessors

3

and successors in interests to all or any portion of its golf ball-related business, including, without limitation, the Top-Flite Golf Company.

4.    "Acushnet" means the Acushnet Company, and any parent, subsidiary, partner (including general and limited partners) member and/or affiliated entities, past or present, of Acushnet, and any person or entity, past or present, acting on behalf of Acushnet, including each of its present officers, executives, general partners, limited partners, directors, employees, attorneys, agent and/or representatives.

5.    "Titleist golf ball" means any golf ball made or sold by Acushnet under the Titleist® brand, including without limitation any versions or prototypes of the Titleist Pro V1, Pro V1x, and/or Pro V1* golf balls.

6.    "Callaway golf ball" means any golf ball made or sold by Callaway under the Callaway Golf® brand, including without limitation any versions or prototypes of the Callaway Golf® Rule 35®, Callaway Golf® CTU 30, Callaway Golf® HX® Red, Callaway Golf® HX® Blue, Callaway Golf® HX® Tour, Callaway Golf® HX® Tour 56, Callaway Golf® HX® Tour Improved, and Callaway Golf® HX® Tour 56 Improved golf balls.

7.    "Patents-in-suit" means U.S. Patent Nos. 6,210,293; 6,503,156; 6,506,130; and 6,595,873.

8.    The word "Document" is used herein in its broadest sense to include everything that is contemplated by Rule 26 and Rule 34 of the Federal Rules of Civil Procedure, including Documents stored in hard copy or electronic form. Electronic Documents include electronic mail and Documents stored on any media accessible by electronic means, including SMS messages and voicemails. A comment or notation appearing on any "Document" and not a part of the original text to be considered a separate "Document."

4

9.     "Thing" means any tangible object other than a Document.

10.    "Person" or "Persons" includes not only natural individuals, but also, without limitation, firms, partnerships, associations, corporations, and other legal entities, and divisions, departments, or other units thereof.

11.    "Including" shall mean "including but not limited to."

12.    The terms "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the individual request more inclusive.

13.    The singular and masculine form of any noun or pronoun shall embrace and be read and applied as embracing the plural, the feminine, and the neuter, except where circumstances clearly make it inappropriate.

14.    The terms "refer," "referring," "relate," or "relating," as used herein include, but are not limited to, the following meanings:  bearing upon, concerning, constituting, discussing, describing, evidencing, identifying, concerning, mentioning, in connection with, pertaining to, respecting, regarding, responding to, or in any factually or logically relevant to the matter described in the request.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 1

All contracts, letters or memos of understanding and/or agreements between you and Callaway, executed at any time.

### REQUEST FOR PRODUCTION NO. 2

All documents relating to the negotiation of any contracts, agreements and/or other understandings between you and Callaway, whether or not executed, including without limitation communications regarding terms and drafts.

5

REQUEST FOR PRODUCTION NO. 3

All communications between you and Callaway that refer or relate to the characteristics of golf balls.

REQUEST FOR PRODUCTION NO. 4

All communications between you and Callaway that refer or relate to any Callaway golf ball.

REQUEST FOR PRODUCTION NO. 5

All communications between you and Callaway that refer or relate to any Titleist golf ball.

REQUEST FOR PRODUCTION NO. 6

All documents reflecting communications or discussions between you and any person, including emails, text messages, letters or other documents you sent to or received from your agents, the press, Tour players, friends, or anyone else regarding Titleist golf balls and/or Callaway golf balls.

REQUEST FOR PRODUCTION NO. 7

All documents that refer or relate to communications between you and Acushnet.

REQUEST FOR PRODUCTION NO. 8

All documents that refer or relate to your decision to enter into any and all agreements whereby you endorsed or used any golf ball, including without limitation any Callaway or Titleist golf ball.

REQUEST FOR PRODUCTION NO. 9

All documents that refer or relate to your testing and/or use of any golf ball, including without limitation any Callaway or Titleist golf ball.

6

REQUEST FOR PRODUCTION NO. 10

All documents that refer or relate to communications between you and Callaway.

REQUEST FOR PRODUCTION NO. 11

Documents sufficient to show the amount paid to you or offered to be paid to you, whether in the form of money or any other form of compensation, by Callaway at any time.

REQUEST FOR PRODUCTION NO. 12

All advertisements for golf equipment, including without limitation golf balls and golf clubs, in any country, including but not limited to those appearing in print media, on-line, on television, and on radio, in which you appear.

REQUEST FOR PRODUCTION NO. 13

All documents reflecting interviews with you or quotes attributed to you referring or relating to performance or construction of golf balls, including without limitation Callaway golf balls and/or Titleist golf balls.

REQUEST FOR PRODUCTION NO. 14

All documents related to this litigation and/or the patents-in-suit.

REQUEST FOR PRODUCTION NO. 15

All communications between you and any other party, including without limitation Callaway, that refer or relate to this litigation.

REQUEST FOR PRODUCTION NO. 16

All communications between you and any other party, including without limitation Callaway, that refer or relate to the patents-in-suit.

REQUEST FOR PRODUCTION NO. 17

All documents referring or relating to attempts to select or design a golf ball for your use.

7

REQUEST FOR PRODUCTION NO. 18

All documents referring or relating to any payments, including without limitation compensation or reimbursements, received, offered, requested or due from any party for any work, meetings, or testimony related to this litigation.

REQUEST FOR PRODUCTION NO. 20

All documents referring or relating to any comparisons between Callaway or Titleist golf balls and any other golf balls.

REQUEST FOR PRODUCTION NO. 21

All documents referring or relating to the effect multi-layer golf balls have had on the game of golf, including without limitation equipment design or golf course architecture.

REQUEST FOR PRODUCTION NO. 22

All documents reflecting interviews with you or quotes attributed to you referring or relating to the performance, characteristics, or construction of golf balls, including without limitation the effect of changes in design on the design of golf equipment and golf course architecture.

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 7, 2007, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on November 7, 2007, I have Electronically Mailed the document to

the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
denning@fr.com
shuman@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
lamberson@fr.com
cjordan@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030

# Exhibit M

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**ACUSHNET'S THIRD SET OF REQUESTS FOR THE PRODUCTION OF**
**DOCUMENTS AND THINGS TO PLAINTIFF [NOS. 181-195]**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Acushnet

Corporation ("Acushnet") hereby requests that Plaintiff Callaway Golf Company

("Callaway") produce the documents and things hereinafter described by November 15,

2007 at the offices of Howrey LLP, 1299 Pennsylvania Avenue, NW, Washington, D.C.

20004.

**DEFINITIONS**

Acushnet incorporates by reference all definitions included in its First Set of

Requests for the Production of Documents and Things to Plaintiff. Acushnet further

defines the following terms:

1.      The term "Norman" shall mean Mr. Gregory J. Norman, and includes all staff or

other employees of his or of any business entities under his control, including, but not

limited to any agents, representatives or employees acting or purporting to act on his

behalf.

2.      "Titleist golf ball" means any golf ball made or sold by Acushnet under the

Titleist® brand, including without limitation any versions or prototypes of the Titleist Pro

V1, Pro V1x, and/or Pro V1* golf balls.

3.      "Callaway golf ball" means any golf ball made or sold by Callaway under the

Callaway Golf® brand, including without limitation any versions or prototypes of the

Callaway Golf® Rule 35®, Callaway Golf® CTU 30, Callaway Golf® HX® Red, Callaway Golf® HX® Blue, Callaway Golf® HX® Tour, Callaway Golf® HX® Tour 56, Callaway Golf® HX® Tour Improved, and Callaway Golf® HX® Tour 56 Improved golf balls.

4.      "Patents-in-suit" means U.S. Patent Nos. 6,210,293; 6,503,156; 6,506,130; and 6,595,873.

## INSTRUCTIONS

1.      These requests are continuous in nature, and pursuant to Fed. R. Civ. P. 26(e), Callaway is under a duty to timely supplement and amend each prior response to a request for production if Callaway learns that the response is in some material respect incomplete or incorrect, or if any information or documents are hereafter acquired.

2.      Produce all responsive Documents and things in Callaway's possession, custody or control, wherever located.

3.      Produce entire Documents and Things, including attachments, enclosures, cover letters, memoranda, and appendices, with all staples and clips attached and with all associated file folders, dividers and file labels.

4.      Produce Documents and Things as they are kept in the ordinary course of business or organized and labeled to correspond to the document request number(s) to which they are responsive.

5.      To the extent that two or more requests may be construed as calling for the production of the same document, or to the extent that the request would otherwise be objectionable as repetitive, overlapping, duplicative, or the like, only one copy of any given document need be produced. Any document bearing marks that are not part of the original text, or any non-identical reproduction thereof, however, is to be considered a separate document and must be separately produced. Moreover, if the documents are

produced as they are kept in the ordinary course of business, identical copies of the same documents maintained in separate files must be produced.

6.      If a requested document is in language other than English, both the original and any existing English language translation must be produced.

7.      Pursuant to Fed. R. Civ. P. 34(a), produce any data compilations from which information can be obtained, including deleted electronic mail messages that can be recovered.

8.      In the event that you claim that a request is overly broad, unduly burdensome, or otherwise objectionable, you shall respond to that portion of the request that is not allegedly overbroad, unduly burdensome, or otherwise objectionable.

## REQUESTS FOR PRODUCTION

Request for Production No. 181:

All contracts and/or agreements between Norman and Callaway, executed at any time.

Request for Production No. 182:

All documents relating to the negotiation of any contracts and/or agreements between Norman and Callaway, whether or not executed, including without limitation communications regarding terms and draft agreements.

Request for Production No. 183:

All communications between Norman and Callaway that refer or relate to the characteristics of golf balls.

Request for Production No. 184:

All communications between Norman and Callaway that refer or relate to any Callaway golf ball.

Request for Production No. 185:

All communications between Norman and Callaway that refer or relate to any Titleist golf ball.

Request for Production No. 186:

All documents that refer or relate to any decision by Norman decision to enter into any and all agreements with Callaway whereby Norman would endorse or use Callaway golf equipment, including, but not limited to Callaway golf balls and golf clubs.

Request for Production No. 187:

All documents that refer or relate to Norman's testing and/or use of any Callaway golf ball.

Request for Production No. 188:

All documents that refer or relate to Norman's testing and/or use of any Titleist golf ball.

Request for Production No. 189:

Documents sufficient to show the amount paid to Norman, whether in the form of money or any other form of compensation, by Callaway from 2000 to the present.

Request for Production No. 190:

All Callaway advertisements, including but not limited to those appearing in print media, on-line, on television, and on radio, in which Norman appears.

Request for Production No. 191:

All documents reflecting interviews with Norman or quotes attributed to Norman referring or relating to performance or construction of golf balls, including without limitation Callaway golf balls and/or Titleist golf balls, including without limitation the effect of changes in golf ball design on the design of golf equipment and gold course architecture.

Request for Production No. 192:

All communications between Norman and Callaway that refer or relate to this litigation.

4

Request for Production No. 193:

All communications between Norman and Callaway that refer or relate to the patents-in-suit.

Request for Production No. 194:

All documents referring or relating to attempts to select or design a golf ball for Norman's use.

Request for Production No. 195:

All documents referring or relating to any payments, including without limitation compensation or reimbursements, received, offered, requested or due to Mr. Norman from any party for any work, meetings, or testimony related to this litigation.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

| | |
|---|---|
| Joseph P. Lavelle | By:  /s/ David E. Moore |
| Kenneth W. Donnelly | Richard L. Horwitz (#2246) |
| Brian A. Rosenthal | David E. Moore (#3983) |
| HOWREY LLP | Hercules Plaza 6th Floor |
| 1299 Pennsylvania Ave., N.W. | 1313 N. Market Street |
| Washington, D.C.  20004 | Wilmington, DE  19899 |
| Tel:  (202) 783-0800 | Tel:  (302) 984-6000 |
| | rhorwitz@potteranderson.com |
| Dated:  November 7, 2007 | dmoore@potteranderson.com |

*Attorneys for Defendant Acushnet Company*

830435

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 7, 2007, a true and correct copy of

the within document was caused to be served on the attorney of record at the following addresses

as indicated:

### VIA HAND DELIVERY

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114

### VIA ELECTRONIC MAIL

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

David S. Shuman
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
shuman@fr.com

John V. Picone, III
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
picone@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721875

# Exhibit N

SEALED DOCUMENT

# Exhibit O

# SEALED DOCUMENT