IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

                Plaintiff,

    v.

ACUSHNET COMPANY,

                Defendant.

C. A. No. 06-91 (SLR)



## CALLAWAY GOLF COMPANY'S BRIEF IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION

FISH & RICHARDSON P.C.

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

*Attorneys for Plaintiff*
*CALLAWAY GOLF COMPANY*

Dated: January 16, 2008

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................2

II.   NATURE AND STAGE OF THE PROCEEDINGS ...........................................7

III.  SUMMARY OF THE ARGUMENT ....................................................8

IV.   STATEMENT OF FACTS ...............................................................10

    A.   Callaway Golf and the Rule 35 .........................................................10

        1.   Professionals not contractually obligated to play any particular ball chose the Rule 35 ...........................................13

        2.   The Rule 35's superior performance quickly translated into increased sales ......................................14

    B.   The Introduction of the Pro V1 ..........................................................15

    C.   Acushnet's Use of the Technology of the Patents-In-Suit Allowed It to Maintain Its Market Position. ...........................................17

        1.   The high-performing Pro V1 has allowed Acushnet to garner even more professional golfers ...............................................................19

        2.   Through the popularity of the Pro V1, Acushnet has been able to entice retailers to sell its products to the exclusion of competitors' products ..............................................................19

    D.   Acushnet has Furthered Its Ill-Gotten Reputation as a Technology Leader Through Misleading and Deceptive Press Releases ..........................................................................20

    E.   Acushnet Also Publicly Touts, to Callaway Golf's Detriment, that the PTO Has Determined the Patents-In-Suit are Invalid – a Misleading Statement It Can Only Make Because It Breached the 1996 Settlement Agreement ...............................................................21

V.    ARGUMENT ...................................................................................22

    A.   Legal Standard for Entry of Permanent Injunction ...................................22

    B.   The Traditional Four-Factor Analysis Supports Issuance of a Permanent Injunction in This Case ...................................25

i

## TABLE OF CONTENTS (cont'd)

Page

1.  Callaway Golf has been irreparably harmed by Acushnet's infringement, and, without an injunction, will continue to suffer irreparable harm .......................................................................26

    a.  Acushnet's infringing Pro V1 deprives Callaway Golf of market opportunities, intangible benefits, and sales of golf-related products ................................................28

    b.  Acushnet's infringing Pro V1 supports its exclusive contracts that block opportunities to compete ................................31

    c.  Acushnet is cementing a dominant position in the still-developing segment of the market for solid-core premium golf balls .............................................................33

    d.  Acushnet's other tactics irreparably harm Callaway Golf's image and reputation. ...........................35

    e.  The patented technology substantially encompasses the Pro V1, rather than being merely a "minor component" of the infringing product ............................................38

2.  Callaway Golf has no adequate remedy at law. ...........................38

3.  The balance of hardships favors an injunction ...........................40

4.  The public interest will not be harmed by a permanent injunction ................................................43

VI.  CONCLUSION .................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.,*
2006 WL 2735499 (D. Minn. Sept. 25, 2006) ............................................................25

*800 Adept, Inc. v. Murex Securities, LLC,*
505 F. Supp. 2d 1327 (M.D. Fla. Apr. 12, 2007) .....................................2, 3, 11, 12, 25

*Acumed LLC v. Stryker Corp.,*
2007 WL 4180682 (D. Or. Nov. 20, 2007) ................................................................25

*Baden Sports, Inc. v. Kabushiki Kaisha Molten,*
2007 WL 2790777 (W.D. Wash. Sept. 25, 2007) ........................................................25

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*
2006 WL 3446144 (N.D. Ill. Nov. 11, 2006) .........................................................2, 25

*Brooktrout, Inc. v. Eicon Networks Corp.,*
2007 WL 1730112 (E.D. Tex. June 14, 2007) ...........................................................25

*Commonwealth Scientific and Industrial Research Organization v.
Buffalo Tech. Inc.,*
492 F. Supp. 2d 600 (E.D. Tex. 2007) .............................................................. passim

*eBay Inc. v. MercExchange, LLC,*
126 S. Ct. 1837 (2006) ...................................................................................23, 24

*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.,*
F.3d 2007 WL 2482122 (Fed. Cir. Sep. 5, 2007) ......................................................23

*IMX, Inc. v. LendingTree, LLC,*
469 F. Supp. 2d 203 (D. Del. 2007) .................................................................11, 26

*Johns Hopkins University v. Datascope Corp.,*
2007 WL 2682001 (D. Md. Aug. 9, 2007) ................................................................25

*MGM Well Services, Inc. v. Mega Lift Systems, LLC,*
2007 WL 1231682 (S.D. Tex. Apr. 25, 2007) .......................................................14, 25

*MPT, Inc. v. Marathon Labels, Inc.,*
2007 WL 184747 (N.D. Ohio Jan. 19, 2007) .............................................................25

*Martek Biosciences Corp. v. Nutrinova Inc.,*
2007 WL 3181307 (D.Del. Oct. 30, 2007) ......................................................25, 27, 28

*MercExchange, LLC v. eBay, Inc.,*
2007 WL 2172587 (E.D. Va. July 27, 2007) ............................................................26

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Muniauction, Inc. v. Thomson Corp.,*
2007 WL 2225847 (W.D. Pa. July 31, 2007) .........................................................2, 25

*Novozymes A/S v. Genencor International, Inc.,*
474 F. Supp. 2d 592 (D. Del. 2007)...............................................3, 24, 25, 27

*O2 Micro International Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
2007 WL 869576 (E.D. Tex. Mar. 21, 2007) .........................................................25

*Odetics, Inc. v. Storage Tech. Corp.,*
14 F. Supp. 2d 785 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir.
1999) ....................................................................................................................13, 14

*Ortho-McNeil Pharm., Inc. v. Mylan Laboratoriess Inc.,*
2007 WL 869545 (D.N.J. Mar. 20, 2007)..........................................................25

*PPG Industrial, Inc. v. Guardian Industrial Corp.,*
75 F.3d 1558 (Fed. Cir. 1998)........................................................................16

*Paice LLC v. Toyota Motor Corp.,*
2006 WL 2385139 (E.D. Tex. Aug. 16, 2006) .........................................................26

*Praxair, Inc. v. ATMI, Inc.,*
479 F. Supp. 2d 440 (D. Del. 2007).................................................................26

*Precision Automation, Inc. v. Technical Services, Inc.,*
2007 WL 4480739 (D.Or. Dec. 14, 2007) .........................................................25

*Reebok International, Ltd. v. J. Baker, Inc.,*
32 F.3d 1552 (Fed. Cir. 1994)........................................................................27

*Rosco, Inc. v. Mirror Lite Co.,*
2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006) .........................................................25

*Sanofi-Synthelabo v. Apotex, Inc.,*
492 F. Supp. 2d 353 (S.D.N.Y. 2007)...............................................................25

*Smith & Nephew, Inc. v. Synthes (U.S.A.),*
466 F. Supp. 2d 978 (W.D. Tenn. 2006)...................................11, 13, 14, 25

*Sundance, Inc. v. DeMonte Fabricating, Ltd.,*
2007 WL 37742 (E.D. Mich. Jan. 4, 2007)..........................................................26

*Sundance, Inc. v. Demonte Fabricating Ltd.,*
2007 WL 3053662 (E.D. Mich. Oct. 19, 2007) .........................................................25

*Techs., Inc. v. Microsoft Corp.,*
434 F. Supp. 2d 437 (E.D. Tex. 2006)................................................................3, 26

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Telequip Corp. v. The Change Exchange,*
  2006 WL 2385425 (N.D.N.Y. Aug. 15, 2006) ...........................................................25

*Tivo Inc. v. Echostar Communications Corp.,*
  446 F. Supp. 2d 664 (E.D. Tex. 2006)...........................................................6, 7, 25, 28

*Transocean Offshore Deepwater Drilling, Inc., v. GlobalSantaFe Corp.,*
  2006 WL 3813778 (S.D. Tex. Dec. 27, 2006) ...........................................................25

*Vas-Cath, Inc. v. Curators of University of Mo.,*
  2007 WL 4287865 (W.D. Mo. Dec. 6, 2007) ...........................................................25

*Verizon Services Corp. v. Vonage Holdings Corp.,*
  --F.3d--, 2007 WL 2781869 (Fed. Cir. Sept. 26, 2007)..........................................24

*Visto Corp. v. Seven Networks, Inc.,*
  2006 WL 3741891 (E.D. Tex. Dec. 19, 2006).....................................................12, 25

*W.L. Gore,*
  842 F.2d 1275 (Fed. Cir. 1988).................................................................................14

*Wald v. Mudhopper Oilfield Svcs., Inc.,*
  2006 WL 2128851 (W.D. Okla. July 27, 2006)........................................................25

*Windsurfing International v. AMF, Inc.,*
  782 F.2d 995 (Fed. Cir. 1985), *cert. denied*, 477 U.S. 905 (1986)............................14

### STATUTES

35 U.S.C. § 283...............................................................................................................23

## I.    INTRODUCTION

Defendant Acushnet directly competes against Callaway Golf through the sale of infringing Pro V1 golf balls. Callaway Golf suffers harm from the ongoing infringement that is direct, immediate, and not wholly compensable by any money damages which might be awarded in 2009 or later. Thus, whatever impact *eBay v. MercExchange* may have in cases where the plaintiff-patentee has no business or market at stake, this is the prototypical direct-competitor-case in which the *eBay* concurrences acknowledge a permanent injunction remains an appropriate remedy, and in which courts following *eBay* have continued to routinely enter permanent injunctions.

Among the more important facts supporting injunctive relief in this case are:

(i) Callaway Golf has spent, to date, hundreds of millions of dollars to develop its golf ball business. That effort began, as Mike Yagley described at trial, with a huge investment of time, energy and money and resulted in the Rule 35 ball, which as it turned out used Mike Sullivan's soon-to-issue patents. Although offered by a company new to the golf ball business, when the Rule 35 golf ball was launched it enjoyed immediate success in the market, was played by elite professional golfers, and received extensive praise from professional players. However, Callaway Golf's market success was undercut when Acushnet introduced the infringing Titleist Pro V1. Acushnet only did so after it received troubling input from its tour players who were threatening to switch away from Acushnet's wound golf balls, and after Acushnet studied the Rule 35 ball and other similar balls and improved its own product in response. History would certainly have been different had Acushnet not used the infringing Pro V1 to compete with Callaway Golf and others during this critical time when nearly all elite golfers abandoned "wound core/balata cover" technology and adopted solid-core / multilayer / urethane-cover constructions. By launching the Pro V1, Acushnet was able both to retain the vast cadre of professional staff players that it had under contract and to dilute the performance advantages of competitive

balls that might have otherwise induced Titleist users to switch. Thus, the very promising launch of the Rule 35 and the market growth of its progeny was unfairly constrained by competition from the infringing Pro V1. While entry of an injunction cannot change history – and indeed probably cannot even displace Acushnet in the short term from its leading market position – an injunction will give Callaway Golf a meaningful opportunity to secure a share of the market of the sort it would have had, and should have had, absent Acushnet's infringement.

(ii) As Acushnet's own witnesses testified at trial, there are many important collateral benefits that flow from having a leadership position with respect to premium golf balls. For example, success in this high-profile part of the golf ball business enhances a company's reputation, brand loyalty and goodwill in a way that success in other more mundane parts of the business do not. The "pyramid of influence," which is Acushnet's lifeblood, is driven by use of premium Titleist products on the professional tours and by those elite golfers who buy the very best performing and most expensive golf balls. As the Court heard at trial, Titleist's premium-priced golf balls are at the very heart of its pyramid marketing plan. Thus, Acushnet's ability to sell the infringing premium Pro V1 drove increased sales of not only the Pro V1, but also of non-premium golf balls and other golf equipment – areas where Callaway Golf also competes against Acushnet. While there is no dispute that these collateral benefits accrue as a result of marketplace leadership with respect to premium golf balls, quantifying the benefits is virtually impossible. Thus, receiving a payment – many years after-the-fact – from Acushnet for the sales of premium golf balls lost to Acushnet's Pro V1 would not compensate for the lost sales of all the other golf products that resulted from Acushnet's continued enjoyment of its pyramid of influence marketing scheme. An injunction is the only means to level the playing field with respect to the unfair advantage Acushnet enjoys for increased sales of golf equipment, including golf balls, other than the Pro V1.

2

(iii) Injunctive relief is also particularly appropriate as a matter of equity in this case, given Acushnet's litigation and public relations tactics. For years Acushnet asserted that it did not infringe the patents-in-suit, maintaining that position throughout the pleading, discovery and pre-trial proceedings in this case. Then, on the eve of trial, Acushnet finally admitted what it had to concede – it has been infringing the patents at issue for years. With respect to validity, Acushnet also fought before this Court for an "off the ball" claim construction that was later contradicted by its own witness during the trial.[1]

Outside the courtroom, Acushnet has misled the public both before and after receipt of the verdict. First, in a press release issued shortly after suit was filed, Acushnet tried to create the impression that it had developed the Pro V1 before the filing of the patents in suit:

> The patents at issue are directed to multi-layer, solid construction golf balls with urethane outer covers. **Acushnet received its *first* patent covering this technology on March 3, 1999. The oldest of the Callaway patents being asserted was *not filed until* December 12, 1999 and issued on March 15, 2001.** The other three Callaway patents were all filed in 2001, well after the Titleist Pro V1 was introduced at the Invensys Classic on October 12, 2000.

[Halkowski Decl. Ex. A (PX831 at CW280259 (emphasis added)).] This statement creates the impression that the Pro V1 and the first Acushnet patent covering it came before the Sullivan inventions protected by the patents-in-suit – an assertion Acushnet knows to be false. Acushnet has never disputed that the patents-in-suit had effective filing dates no later than 1995 and, both in the pretrial order and during trial, ***conceded*** that the effective filing

---

[1] In its claim construction brief, Acushnet argued that "Shore D hardness" should be construed to mean a hardness measured *"off the ball"* on a plaque of raw material, rather than directly on the inner or outer cover layer itself (i.e., "on the ball"). [D.I. 207 at 10-20.] At trial, however, Acushnet's Vice President of Intellectual Property, Jeffrey Dalton, readily conceded that it was common in the golf industry, and "standard practice" at Acushnet, to measure Shore D hardnesses directly *on the ball*. [Dalton Tr. 462:21-463:21, 464:9-21, 516:5-9. (All testimony from the Trial Transcript is referenced hereinafter as "[witness] Tr. [page]")]

3

date for Callaway Golf's patent applications was 1995 – long before the 1997 filing date

for the first Acushnet patent relating to the Pro V1.[2]

Acushnet continued to publicize this misleading theme in other public statements

made *after* trial:

> **Acushnet said it received its first patent covering this technology on
> March 3, 1999 while the oldest of the four Callaway patents at issue
> was *not filed until* December 12, 1999** and issued on March 15, 2001. The
> other three patents were filed in 2001. The Callaway patents were acquired
> in 2003 when the company purchased Top-Flite Golf from bankruptcy. The
> Pro V1 was introduced at the Invensys Classic on October 12, 2000.

[Halkowski Decl. Ex. B, "Callaway Gets Nod In Pro V1 Patent Infringement Jury Verdict,"

*Golf Digest*, Dec. 14, 2007 (emphasis added)] If Acushnet is willing to mislead the public

regarding the undisputed fact that the relevant patent application for Callaway Golf's

patents came years *before* Acushnet's Pro V1, one can only imagine how Acushnet will

spin the outcome of these proceedings in the absence of an injunction that states exactly

what Acushnet and its agents can and cannot do.

(iv) Prior to trial, Acushnet did everything it could to escape the jury (and this

Court) and have the Patent Office decide validity instead:

> Acushnet will show that on the particular facts of this case a stay of this
> action pending the outcome of PTO examination proceedings on the four
> patents-in-suit is warranted. In particular, in this case the PTO has nearly
> 13 years of extensive experience in dealing with the patent family that
> includes the patents-in-suit.

[Acushnet Reply to Callaway's Opposition to Acushnet's Motion to Stay Litigation, D.I.

22, at 1] When Acushnet lost its request for a stay, it sought reconsideration – three times.

Yet, during trial, it argued the exact opposite – that the jury, and not the Patent Office, was

in the best position to assess the validity of the asserted patents:

---

[2]  As explained below in footnote 6, Acushnet's effort to use the Hebert '172 patent (the
"first patent covering this technology" referred to in Acushnet's press release) in its
public relations campaign is remarkable, given that Acushnet effectively disavowed
that patent in this litigation and sought to conceal its existence from the jury.

> [Y]ou, the jury, having heard all the evidence, are in a much better position
> to decide if these patents are valid than the Patent Office was when it issued
> them.

[Acushnet Closing Tr. 1297:19-22] Then, outside the courtroom and after receipt of the

verdict, Acushnet switched positions again and said:

> The patents at issue are directed to multi-layer, solid construction golf balls
> with urethane outer covers and we continue to believe that we will
> ultimately prevail in having all claims of the Spalding patents found invalid.
> Our confidence is supported by recent decisions taken by the U.S. Patent
> and Trademark Office (PTO). Specifically, on January 17, 2006, before this
> lawsuit was filed, we asked the PTO to re-examine each of the four asserted
> patents. In early 2007, initial office actions from *the PTO found all claims
> of all four patents to be invalid*. Just last month, the PTO issued a second
> office action on one of the patents, again determining it to be invalid. We
> are awaiting favorable action on the other three. This pivotal information
> was not allowed into evidence by the Court. *We believe that the PTO
> determination is correct* and are confident that the Court and PTO will
> render final decisions that these patents are invalid, utilize no new
> technology and should never have been originally granted.

[Halkowski Decl. Ex. B (quoting Joseph Nauman, Acushnet's General Counsel) (emphasis

added).] Acushnet will clearly say whatever is most expedient given its audience and

objectives at the time. An injunction would go a long way toward preventing further

chicanery.

    (v) Acushnet's PR attacks upon the patents-in-suit continue to harm Callaway

Golf's reputation and standing in the market as an innovator, and are particularly

inequitable given this Court's determination that the reexaminations Acushnet continues to

tout were improperly filed in breach of the parties' contract. It is hard to imagine a more

inequitable situation than the one in which Callaway Golf would find itself in the absence

of an injunction: continuing to face a powerful competitor who disavows the Court's

rulings and the jury's verdict in the name of an administrative proceeding it filed

improperly, and knowing that it need not face even the prospect of money damages for its

wrongdoing for years. While there is no way to remedy this harm (not least because the

reexaminations are proceeding notwithstanding the Court's finding of breach of contract

and the jury's verdict that the patents are valid), issuance of an injunction would at least mitigate some of the damage to Callaway Golf's reputation, standing, and goodwill.

(vi) Lastly, and perhaps most egregiously, during trial Acushnet tried to avoid liability by emphasizing to the jury that a decision to uphold the validity of the patents would set up a roadblock and remove the Pro V1 from the market:

- "These patents, the only thing Callaway is doing with these patents is trying to use them to create a roadblock so that Acushnet can't sell the Pro V1." [Acushnet Closing Tr. 1297:16-18]

- "Let me conclude. You remember the first thing we did when we got together last Wednesday was we watched a patent video about the patent system and you learned in that video that what a patent is[,] is a right that the government gives you to exclude others from using your invention. They exclude others from making, using and selling the patented subject. And effectively it's a government monopoly, that you get the right to put up roadblocks, but you can only set up the roadblocks if the patent is valid. What Callaway is trying to do in this case is use these Sullivan patents as a roadblock to stop the sales of the Pro V1. And it shouldn't succeed because these patent aren't valid." [Acushnet Closing Tr. 1328:15-1329:3]

- "You have to add something new and useful to the art in order to get the exclusive right of a patent. Sullivan patents don't do that and so it's not right that they be used to keep the Pro V1 off the market." [Acushnet Closing Tr. 1329:22-25]

Having summoned the specter of an injunction to improperly seek the jury's sympathy, Acushnet should now in fairness be subject to that injunction.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On November 20, 2007, the Court resolved several issues on summary judgment, granting Callaway Golf's motions for breach of contract and no anticipation, and denying Acushnet's motions for summary judgment of anticipation, incorporation-by-reference, and no breach of contract. [D.I. 348.] The issues left remaining for trial were the infringement and alleged obviousness of nine claims in Callaway Golf's four patents-in-suit, U.S. Patents Nos. 6,210,293; 6,503,156; 6,504,130; and 6,595,873.

Shortly before trial, and notwithstanding the enormous time and effort to which it had put Callaway Golf and the Court in litigating the issue, Acushnet stipulated that it has all along been infringing all nine asserted claims in the four patents-in-suit. [D.I. 367.] Following a six-day jury trial on Acushnet's defense of obviousness, the jury returned a verdict rejecting Acushnet's invalidity attacks and supporting the validity of eight of the nine asserted claims.

On December 20, 2007, the Court entered judgment that claims 1 and 4 of the '293 patent; claims 1-3 of the '156 patent; claim 5 of the '130 patent; and claims 1 and 3 of the '873 patent are valid and infringed, and that claim 5 of the '293 patent is invalid as obvious. [D.I. 404.]

## III.    SUMMARY OF THE ARGUMENT

Given the jury's verdict and this Court's judgment that eight of the asserted patent claims are valid, as well as Acushnet's admitted infringement, Callaway Golf requests a permanent injunction against the manufacture and sale of Acushnet's Titleist Pro V1 line of golf balls because:

1.    Callaway Golf and Acushnet are direct competitors in the golf ball market and, most importantly, directly compete against one another with respect to multi-layer premium golf balls. Callaway Golf's continuing efforts to compete in the golf ball market have been blunted by the combination of Acushnet's historical status as a leading golf ball producer and by Acushnet's introduction of the infringing Pro V1 golf balls. Absent an injunction, Callaway Golf's efforts to expand its position with respect to premium golf balls and thereby bolster its reputation with those golfers at the top of the pyramid of influence will be diluted because of the misuse of its own technology against it in the marketplace. The loss of business in this important segment, along with the lost opportunity to enhance Callaway Golf's goodwill and brand loyalty, is irreparable.

2.    By selling the infringing Pro V1 products, Acushnet has not only reaped enormous financial gains, but has been able to bolster the Titleist brand and its customers'

REDACTED

loyalty to that brand. These factors enhance Acushnet's ability, now and in the future, to market, sell, and profit from not only the infringing golf balls but any golf ball bearing the Titleist logo, as well as other related products such as Titleist-branded golf clubs and golf apparel and Acushnet's FootJoy-branded golf shoes. Ball, shoe, and glove contracts are common on the professional tours, and the Titleist and FootJoy brands are closely linked. Callaway Golf directly competes with Acushnet in each of these product categories, and will be irreparably harmed if Acushnet's competing products can continue to ride the coattails of the Pro V1's success on the professional tours and with consumers. As a result, Acushnet's actions harm Callaway Golf's ability to sell all its products. Absent an injunction, Callaway Golf will continue to suffer these effects, which, though substantial, are difficult to quantify.

       3.     The balance of hardships tips in Callaway Golf's favor because the harm to Acushnet appears limited to the normal concerns of an infringer who is required to stop infringing – none of which is cognizable in the balance of harms analysis.

Indeed, Acushnet has repeatedly argued that marketing and other factors unrelated to performance have driven the commercial success of the Pro V1. Presumably, Acushnet can and will simply switch its manufacturing and marketing efforts to support other types of golf balls if the Pro V1 is enjoined, and those other golf balls will have similar success. Given Acushnet's own assertions, therefore, it will suffer minimal harm from the requested injunction.

       4.     The public interest will not be harmed by an injunction. The products at issue do not concern public health or safety. Moreover, if the infringing golf balls are removed from the stream of commerce, consumers will still have multiple companies from whom they can purchase golf balls, including premium golf balls. Indeed, Acushnet itself will be able to continue to sell all of its golf balls other than the Pro V1 line of products



and, as noted above,

Golfers will face no shortage of choices.

5.    Callaway Golf has tailored the scope of the requested injunction to minimize any adverse effects on innocent third parties such as: (a) golf distributors and retailers, who would be permitted to sell their remaining inventory of the infringing products; and (b) professional golfers under contract with Acushnet, who would be permitted to honor their current contracts with Acushnet through the remainder of the 2008 golf season.

## IV.    STATEMENT OF FACTS

### A.    Callaway Golf and the Rule 35

From its humble beginnings in 1982 making steel-cored, hickory-shafted wedges and putters, to its introduction in 1991 of the "Big Bertha" oversized stainless steel driver that revolutionized the game of golf, Callaway Golf has been on the forefront of innovation in the golf industry.  Its continued innovations have made it the world's leading and most successful manufacturer of premium golf clubs.

In 1996, Callaway Golf took this spirit of innovation and applied it to the golf ball world, building its ball company from the ground up.  Rather than purchase another company or buy a ball and re-label it, Callaway Golf developed the Rule 35 from scratch at a cost of over $150 million, tens of thousands of man hours, and several years of work. [Yagley Decl. ¶ 4; Yagley Tr. 1048:9-14]  The Rule 35 golf ball had a pioneering construction that outperformed the previously dominant premium wound balls.[3]

---

[3] The Rule 35 used the Sullivan inventions claimed in the patents-in-suit.  Callaway Golf, however, addressed Spalding's assertions of infringement by purchasing Spalding's golf ball assets and the relevant intellectual property in 2003 at the cost of approximately $175 million [Halkowski Decl., Ex. N (PX698) excerpts from Callaway Golf 2003 Annual Report at 21].



other professional golfers who tested the Rule 35, including

---

REDACTED

[Yagley Decl. ¶ 8]  To a person, these professionals were amazed that with its first attempt to design and manufacture a golf ball, Callaway Golf had made a golf ball that provided much better performance in terms of distance, without sacrificing spin and feel around the green as compared to other balls used by tour professionals at that time.  [*Id.* at ¶ 9.]

These tour professionals made clear that, given the choice between the wound ball that they were playing at that time and the Rule 35, they would choose the Rule 35 because of its combination of superior distance with control and feel around the green.  [*Id.* at ¶ 9.] However, because many were under contract with Titleist through the end of 2000, they were not able to switch to the Rule 35 immediately; instead they would have to play out the remainder of their contracts.  Based on their reactions, however, and based on what was happening on other professional tours where golfers could freely choose what ball to play, Callaway Golf anticipated signing contracts with a significant number of PGA Tour professionals to play the Rule 35 when their existing contracts expired at year-end 2000. [*Id.* at ¶ 10.]



### 1.    Professionals not contractually obligated to play any particular ball chose the Rule 35

In late 1999 and early 2000, most if not all of the PGA Tour professionals were under contract with golf ball manufacturers – mainly, Titleist – to play only that company's golf balls. [Bellis Tr. 282:12-17; Nauman Tr. 920:7-15] Regardless of how much better the Rule 35 performed over their current ball, those professionals were not allowed to switch. [Nauman Tr. 923:10-15] However, on other tours, like the Ladies Professional Golf Association Tour ("LPGA") and the Senior PGA Tour (now "Champions Tour"), where far fewer golfers were under contract and thus were able to choose the best ball, a significant number of golfers switched to the Callaway Golf Rule 35. [Yagley Decl. ¶¶ 11-12] For example, the Darrell Survey, an industry survey of who is playing what ball at which tournament, demonstrates that between January 2000 and December 2000, 25.8% of tour professionals on the Senior PGA Tour switched from their previous, non-Callaway Golf ball to playing the Callaway Golf Rule 35. [*Id.*] Similarly, by December 2000, 10.8% of LPGA Tour professionals had switched to playing the Callaway Golf Rule 35. The chart below, which is based on actual Darrell Survey data, shows this:



[*Id.*, Ex. 1.]  Because of its superior performance, Callaway Golf anticipated a similar

migration of PGA Tour players toward the Rule 35.  An exodus of the best players from

wound balls manufactured by Acushnet and others would have generated significant and

irreplaceable market buzz that, through the pyramid of influence as explained below, would

have trickled down through the game's players at all levels.  However, as, the chart also

shows, because of the Pro V1, that never happened.

### 2.    The Rule 35's superior performance quickly translated into increased sales

The Rule 35 made a big splash in the golf ball industry when it was introduced to

professional golfers in January 2000 – among other things, the Rule 35 was used to win one

of the very first tournaments in 2000.  [*See* Yagley Tr. 1046:6-13; Yagley Decl. ¶ 6.]  The

Rule 35 golf ball also experienced a rapid increase in sales.  [Yagley Decl. ¶ 14.]  This was

particularly significant given that it was Callaway Golf's first golf ball offering.  From

March 2000 when the first Rule 35 golf balls were sold publicly, through October 2000,

when Acushnet first released the Titleist Pro V1 to tour professionals, Callaway Golf was

making significant sales gains.  [Yagley Decl. ¶ 14.]  The data for 2000 in Acushnet's own demonstrative chart used at trial shows this clearly:



But, again as Acushnet's own chart also shows, that momentum ended when the Titleist Pro V1 was introduced to consumers.  Callaway Golf's Rule 35 sales leveled off in 2001, and the ramp which Callaway Golf expected, and which had begun in 2000, was squelched. [Yagley Decl. ¶ 15.]

### B.     The Introduction of the Pro V1

As the groundswell began to grow for the Rule 35 and Callaway Golf was able to interest more and more professionals with its product, Titleist, the undisputed market leader, became concerned.

In October 2000, Acushnet finally introduced the Titleist Pro V1

However, Acushnet only did so after testing the Rule

REDACTED

35 and other golf balls, comparing those results to its prototype, and modifying that

prototype to improve its performance.  [Morgan Tr. 433:11-434:6]

The Pro V1's launch quite simply stole the praise and buzz that Callaway Golf was

enjoying for having revolutionized the industry:

[Halkowski Decl., Ex. C (Mickelson Depo. 46:18-47:12 (emphasis added)); *see also*

Yagley Tr. 1049:9-21; Yagley Decl. ¶¶ 14-15, Exs. 2 & 3.]

In fact,

recognizing the unprecedented performance gain that the technology provided, more than

45 PGA Tour professionals put the Pro V1 in play at the very first tournament that they

could, with eight of the top ten finishers playing it – a first in golf ball history.  [Bellis Tr.

218:14-22; Hebert Tr. 1104:3-8]  Because the Pro V1 was quickly adopted by the vast

majority of tour pros under contract with Titleist [Bellis Tr. 307:14-16], it permitted

Acushnet to maintain its status as the number one ball on the professional tours.

Maintaining its status as the number one ball on the professional tours was key to

Acushnet's marketing of the Pro V1 through the pyramid of influence,

REDACTED

C.     **Acushnet's Use of the Technology of the Patents-In-Suit Allowed It to Maintain Its Market Position.**

The pyramid of influence is premised on the concept that golf is an aspirational sport in which golfers are influenced by better players for guidance on what equipment they play. As Gerald Bellis, Acushnet's Executive Vice President for Titleist Sales and Marketing, testified, the pyramid of influence is a marketing strategy where the equipment choices made by tour professionals, such as Tiger Woods, Phil Mickelson and Davis Love III, impact the purchasing decisions of other golfers. [Bellis Tr. 226:10-227:7; 280:5-281:12; *see also* Halkowski Decl., Ex. G ((PX582) at AC101060.UR); Yagley Decl. ¶¶ 17-18.] At the top of the pyramid of influence are the tour professionals – the players that most people see playing in PGA Tour golf tournaments broadcast on major television networks. [Bellis Tr. 280:22-281:4; Yagley Decl., ¶ 17.] Below the tour professionals, in the second level of the pyramid, are the club pros, followed by the avid golfers in the third level, the recreational golfers in the fourth level, and the beginner golfers at the bottom of the pyramid. [*Id.*] This strategy is fundamental to building product usage among consumers. [Yagley Decl. ¶ 18.]

Prior to the introduction of the Pro V1, Acushnet did not have a solid core, multi-layer, polyurethane covered ball available for tour usage or for sale. [Bellis Tr. 319:1-10] Nor did Acushnet have any other ball that could compete with the superior performance of the Callaway Golf Rule 35.

It was only by infringing with the Pro V1 that

Acushnet could compete. Again, Acushnet's own trial demonstrative reproduced above [Yagley Decl., Exh. 3] clearly shows how the Pro V1 enabled Acushnet to minimize Callaway Golf's market position while maximizing its own. Bringing that chart up to date, and including in it all of Callaway Golf's premium golf ball products which have competed with the Pro V1 over the years,[5] confirms that, regardless of Callaway Golf's efforts, Acushnet's market position improves year over year due to its ability to sell the infringing Pro V1:



---

[5] Acushnet's chart included only those Callaway Golf balls which practiced one or more of the patents-in-suit. From 2000-2003, that includes all Callaway Golf balls that competed with the Pro V1. However, beginning in 2004, Callaway Golf's further technical innovations resulted in premium balls that competed with the Pro V1 but did not practice the patents (though these products of course continued to use the fundamental solid core/ionomer mantle/polyurethane outer cover construction). Even though Acushnet itself did not include these products and even though including them shows that, overall, Callaway Golf has made progress (albeit slow) in the premium golf ball business, Callaway Golf has included them in the chart above to ensure the Court has an accurate picture of the relevant market impacts of the Pro V1. The point remains that the Pro V1 continues to gain share, and thus confer on Acushnet collateral benefits, which Callaway Golf would otherwise enjoy.



It is only by stopping Acushnet's infringement that the Court can begin to put Callaway Golf in the position it would have enjoyed, and should enjoy, as the owner of the patented technology.

### 1.    The high-performing Pro V1 has allowed Acushnet to garner even more professional golfers

Acushnet admits that the Pro V1 has infringed the asserted patents – the first of which issued in 2001 – and continues to infringe to this day.  [D.I. 367 (stipulation of infringement)]  The performance that the Pro V1 enjoys through using the patented technology has allowed Acushnet to compete in the marketplace, making legitimate competition all the more difficult – even for balls like Callaway Golf's current HX Tour and HX Tour 56, which have innovated beyond the limits of the patents-in-suit and perform even better than the Pro V1.

In 2000, when its principal premium golf ball offerings were wound golf balls, Titleist's ball count on all professional tours was approximately 57%.  [Yagley Decl., ¶ 24.] Titleist's ball count on all professional tours increased to 69% in 2007 when it offered only infringing solid core golf balls and when those tour professionals who played Titleist balls played a Pro V1 ball almost exclusively.  [*Id.*]  Thus, the infringement substantially improved Acushnet's tour position, at the expense of competitors like Callaway Golf.

### 2.    Through the popularity of the Pro V1, Acushnet has been able to entice retailers to sell its products to the exclusion of competitors' products

Given the overall popularity of the Pro V1, Acushnet has been able to exclude Callaway Golf from many retailers altogether – creating the "Titleist Exclusive Pro Shop." Under this program, Acushnet offers pro shops on golf courses special incentives if they agree to carry and sell only Acushnet's Titleist and Pinnacle branded golf balls.  [Yagley Decl., ¶¶ 25-28.]  Prior to the introduction of the Pro V1, Callaway Golf had successfully sold its golf ball products in some of these pro shops which had not yet become captive to



Acushnet. [*Id.*] But, after the Pro V1's rapid success, Acushnet was able to negotiate many exclusive relationships. [*Id.*] These types of arrangements were either not in existence prior to the introduction of the Titleist Pro V1 or were not nearly as widespread. [*Id.*] Through its infringement, Acushnet has therefore enjoyed a level of success that not only enables it to compete very effectively, but to thwart altogether the possibility of competition in hundreds of pro shops where the Pro V1 has paved the way to Acushnet exclusivity. Through this strategy, Acushnet also has been able to minimize the impact of Callaway Golf's current offerings, which in fact perform better than the Pro V1.


    **D.**    **Acushnet has Furthered Its Ill-Gotten Reputation as a Technology Leader Through Misleading and Deceptive Press Releases**

    After Callaway Golf filed suit in this Court – in accord with the parties' 1996 Settlement Agreement – Acushnet released a statement that falsely suggested the patents-in-suit were filed only after the Pro V1 was introduced, and that Acushnet, not Callaway Golf, was the first to patent the key technology:

> The patents at issue are directed to multi-layer, solid construction golf balls with urethane outer covers. **Acushnet received its *first* patent covering this technology on March 3, 1999.**[6] **The oldest of the Callaway patents being asserted was *not filed until* December 12, 1999 and issued on March 15, 2001.** The other three Callaway patents were all filed in 2001, well after the Titleist Pro V1 was introduced at the Invensys Classic on October 12, 2000.

[Halkowski Decl. Ex A ((PX831) CW280259 (emphasis added)).] However, there is no dispute, nor has there ever been, that all of the patents in suit are entitled to priority dates at

---

[6] As noted above, this statement, which has been repeated in substance in several Acushnet public statements, is a direct reference to the Hebert '172 patent, which issued on March 3, 1999. The Court will recall that, at trial, Acushnet struggled repeatedly to hide from the jury the fact that its own employees had in fact patented the same "technology" for which Mike Sullivan received the patents-in-suit. Yet, when it serves its public relations goals to claim otherwise, Acushnet has no qualms about emphasizing that very fact.

least as early as 1995. [D.I. 334 ¶¶ 16-17 (Statement of Admitted Facts)] Yet, Acushnet

repeated the substance of this misleading representation after the verdict:

> Acushnet said it received its first patent covering this technology on
> March 3, 1999 while the oldest of the four Callaway patents at issue
> was not filed until December 12, 1999 and issued on March 15,
> 2001. The other three patents were filed in 2001.

[Halkowski Decl. Ex. B]  And Joseph Nauman, Acushnet's Vice President and General

Counsel, has apparently been spreading this misleading information to any unsuspecting

reporter who will listen:

> One patent directly related to the Pro V1 was issued in 1999, before
> Spalding's 1999 application that led to a patent in 2001, Nauman
> said.

[Halkowski Decl. Ex. I ("Legal battles over Acushnet Co.'s high-end golf ball will last a

long time," *South Coast Today*, Jan. 6, 2008]  It is inequitable tactics like this – which the

issuance of an injunction would substantially curtail – that continue to support Acushnet's

ill-gotten reputation as a technology leader.

### E. Acushnet Also Publicly Touts, to Callaway Golf's Detriment, that the PTO Has Determined the Patents-In-Suit are Invalid – a Misleading Statement It Can Only Make Because It Breached the 1996 Settlement Agreement

After mediations had failed and Callaway Golf notified Acushnet (as required) of

its intention to bring suit, Acushnet immediately filed for *inter partes* reexamination of all

of the Sullivan patents-in-suit. As the Court has found, this was a direct breach of the 1996

Settlement Agreement. Despite this finding, Acushnet continues to publicize the current

status of those reexaminations and uses them to publicly disavow the Court's rulings and

the jury's verdict:

> The patents at issue are directed to multi-layer, solid construction golf balls
> with urethane outer covers and we continue to believe that we will
> ultimately prevail in having all claims of the Spalding patents found invalid.
> Our confidence is supported by recent decisions taken by the U.S. Patent
> and Trademark Office (PTO). Specifically, on January 17, 2006, before this
> lawsuit was filed, we asked the PTO to re-examine each of the four asserted
> patents. In early 2007, initial office actions from **the PTO found all claims**

> **of all four patents to be invalid**. Just last month, the PTO issued a second
> office action on one of the patents, again determining it to be invalid. We
> are awaiting favorable action on the other three. This pivotal information
> was not allowed into evidence by the Court. **We believe that the PTO
> determination is correct** and are confident that the Court and PTO will
> render final decisions that these patents are invalid, utilize no new
> technology and should never have been originally granted.

[Halkowski Decl. Ex. B (quoting Joseph Nauman, Acushnet's General Counsel) (emphasis

added).] The net effect of Acushnet's ongoing efforts to capitalize on its breach and

publicize interim rulings by the PTO has been to tarnish Callaway Golf's image, credibility

and reputation in the court of public opinion.

## V.     ARGUMENT

### A.     Legal Standard for Entry of Permanent Injunction

The Patent Act provides broad discretion for issuance of injunctive relief,

specifying that "[t]he several courts having jurisdiction of cases under this title may grant

injunctions in accordance with the principles of equity to prevent the violation of any right

secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Under

Section 283, a district court can enjoin both "infringement of the patent by the adjudicated

products and infringement by products not more than colorably different from the

adjudicated products." [*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.*, --F.3d--,

2007 WL 2482122, at *8 (Fed. Cir. Sep. 5, 2007)] (internal quotations and citations

omitted). This suit concerns two direct competitors – a circumstance which routinely leads

to the award of injunctive relief – as well as unique facts that call for issuance of an

injunction.

The Supreme Court recently confirmed the standard for the entry of permanent

injunctions in patent cases in *eBay Inc. v. MercExchange, LLC*, 126 S. Ct. 1837 (2006).

Referring to the express language of the Patent Act, 35 U.S.C. § 283, the *eBay* Court held

that "the decision whether to grant or deny injunctive relief rests within the equitable

discretion of the district courts, and . . . such discretion must be exercised consistent with

traditional principles of equity, in patent disputes no less than in other cases governed by

such standards." *Id.* at 1841; *see also* [*Verizon Services Corp. v. Vonage Holdings Corp.*, -

-F.3d--, 2007 WL 2781869, at *12 (Fed. Cir. Sept. 26, 2007)] (noting that a district court's

decision to grant an injunction is reviewed for abuse of discretion and affirming injunction

in-part). Under well-established equitable principles:

> a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 126 S. Ct. at 1839. The *eBay* Court rejected the application of any general rule

unique to patent law that would result in a *per se* or categorical denial or grant of injunctive

relief. *Id.* at 1840.

     Chief Justice Roberts, writing in concurrence, emphasized that the Court's opinion

"rests on the proposition that a major departure from the long tradition of equity practice

should not be lightly implied." *eBay*, 126 S. Ct. at 1841. He specifically noted that "[f]rom

at least the early 19th century, courts have granted injunctive relief upon a finding of

infringement in the vast majority of patent cases." *Id.* (citation omitted). Thus, while there

is no general rule that a patentee is *entitled* to a permanent injunction upon a finding of

infringement, "there is a difference between exercising equitable discretion pursuant to the

established four-factor test and writing on an entirely clean slate." *Id.* In this regard,

Justice Roberts noted that "a page of history is worth a volume of logic" in applying the

traditional principles of equity to grant injunctions when patent infringement is found. *Id.*

at 1842 (*quoting New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).

     This Court, in *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13

(D. Del. 2007), has similarly observed that the Supreme Court in *eBay* "did not state that

the loss of the right to exclude could not be irreparable harm" and explained:

> [T]he statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash. These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology.

In fact, consistent with *eBay*, the great majority of district courts considering entry of permanent injunctions against adjudged patent infringers have decided to grant such relief. Callaway Golf has identified 33 post-*eBay* patent cases in which district courts applied the four-factor analysis in considering motions for permanent injunctive relief. Permanent injunctions were granted in twenty-six of these cases.[7] The vast majority of those cases involved a situation like that here: the parties were head-to-head competitors in a market in which one or both used the patented technology in its products. Of the seven cases where a permanent injunction was denied, two were based simply upon a failure of the plaintiff to submit sufficient evidence to carry its burden, rather than a decision on the merits that

[7]  *See Precision Automation, Inc. v. Technical Services, Inc.*, 2007 WL 4480739 (D.Or. Dec. 14, 2007); *Vas-Cath, Inc. v. Curators of University of Mo.*, 2007 WL 4287865 (W.D. Mo. Dec. 6, 2007); *Acumed LLC v. Stryker Corp.*, 2007 WL 4180682 (D. Or. Nov. 20, 2007); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 2007 WL 3181307 (D.Del. Oct. 30, 2007); *Sundance, Inc. v. Demonte Fabricating Ltd.*, 2007 WL 3053662 (E.D. Mich. Oct. 19, 2007); *Baden Sports, Inc., v. Kabushiki Kaisha Molten*, 2007 WL 2790777 (W.D. Wash. Sept. 25, 2007); *Johns Hopkins Univ. v. Datascope Corp.*, 2007 WL 2682001 (D. Md. Aug. 9, 2007); *Muniauction, Inc. v. Thomson Corp.*, 2007 WL 2225847 (W.D. Pa. July 31, 2007); *Sanofi-Synthelabo v. Apotex, Inc.*, 492 F. Supp. 2d 353 (S.D.N.Y. 2007); *Commonwealth Scientific and Industrial Research Organization v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600 (E.D. Tex. 2007); *Brooktrout, Inc. v. Eicon Networks Corp.*, 2007 WL 1730112 (E.D. Tex. June 14, 2007); *MGM Well Services, Inc. v. Mega Lift Systems*, LLC, 2007 WL 1231682 (S.D. Tex. Apr. 25, 2007); *800 Adept, Inc. v. Murex Securities, LLC*, 505 F. Supp. 2d at 1337 (M.D. Fla. Apr. 12, 2007); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 2007 WL 869576 (E.D. Tex. Mar. 21, 2007); *Ortho-McNeil Pharm., Inc. v. Mylan Labs. Inc.*, 2007 WL 869545 (D.N.J. Mar. 20, 2007); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007); *MPT, Inc. v. Marathon Labels, Inc.*, 2007 WL 184747 (N.D. Ohio Jan. 19, 2007); *Visto Corp. v. Seven Networks, Inc.*, 2006 WL 3741891 (E.D. Tex. Dec. 19, 2006); *Transocean Offshore Deepwater Drilling, Inc., v. GlobalSantaFe Corp.*, 2006 WL 3813778 (S.D. Tex. Dec. 27, 2006); *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144 (N.D. Ill. Nov. 11, 2006); *Rosco, Inc. v. Mirror Lite Co.*, 2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978 (W.D. Tenn. 2006); *3M Innovative Properties Co. v. Avery Dennison Corp.*, 2006 WL 2735499 (D. Minn. Sept. 25, 2006); *Tivo Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664 (E.D. Tex. 2006); *Telequip Corp. v. The Change Exchange*, 2006 WL 2385425 (N.D.N.Y. Aug. 15, 2006); *Wald v. Mudhopper Oilfield Svcs., Inc.*, 2006 WL 2128851 (W.D. Okla. July 27, 2006).

injunctive relief was improper, and the denial was without prejudice.[8]  In the five remaining

cases, where injunctive relief was denied on the merits, either the plaintiff was not a

competitor of the defendant and brought suit merely in support of its licensing efforts, or

the patented invention was a minor component of the infringing product — neither of

which is true here.[9]

**B.    The Traditional Four-Factor Analysis Supports Issuance of a Permanent Injunction in This Case**

Callaway Golf directly competes against Acushnet in the golf ball market and, most

relevant to this case, in the premium golf ball segment of that market.  This segment is led

by multi-layered, solid-construction, polyurethane-covered balls, like Callaway Golf's Rule

35 which was covered by the patents-in-suit and was introduced before Acushnet's Pro V1.

However, Acushnet's launch of the infringing Pro V1 thwarted Callaway Golf's initial

---

[8]  *See Praxair, Inc. v. ATMI, Inc.*, 479 F.Supp.2d 440, 443-4 (D. Del. 2007) (" [Plaintiff] has not provided or described any specific sales or market data to assist the court,' … [Plaintiff] may renew its motion for injunctive relief following appellate review of the jury verdict." (internal citations omitted)); *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 226 (D. Del. 2007) ("Absent any specific information regarding the effect of defendant's infringing operation on the [infringing system] on plaintiff's business, the court is reluctant to make a determination based solely on the considerations present in the current record. … the court is inclined to give plaintiff the opportunity to provide additional evidence which will aid its determination of the issue.").

[9]  *See MercExchange, LLC v. eBay, Inc.*, 2007 WL 2172587, at *9 (E.D. Va. July 27, 2007) ("[Plaintiff] has followed a consistent course of seeking to maximize the money it can obtain from licensing its patents to market participants allegedly utilizing such patents…") (emphasis omitted); *Sundance, Inc. v. DeMonte Fabricating, Ltd.*, 2007 WL 37742, at *2 (E.D. Mich. Jan. 4, 2007) ("[Plaintiff] licenses the [patent-in-suit] to others, and offered to license it to [infringer] prior to filing suit against it, thus demonstrating that money damages are adequate.); *Voda v. Cordis, Corp.*, 2006 WL 2570614, at *5 (W.D. Okla. Sept. 5, 2006) ("plaintiff identifies no harm to himself; rather, he relies on alleged harm to a non-party [exclusive licensee]. . . . [S]uch harm is irrelevant because [licensee] elected not to sue to enforce the patent rights."); *Paice LLC v. Toyota Motor Corp.*, 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16, 2006) ("Plaintiff, throughout post-trial motions, has extended Defendants an offer to license its technology."); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006) ("[Infringer] only uses the infringing technology as a small component of its own software, and it is not likely that any consumer of [infringer's] software purchases these products for their [infringing] functionality.").

success and continuing Pro V1 sales have shaped the market in a way that has prevented, and continues to prevent, Callaway Golf from occupying the market position it deserves. This is true in part because Acushnet's admitted infringement has enabled it to further enhance its position with professionals, retailers, and consumers. Despite Callaway Golf's best efforts, which include improving upon the Sullivan patents and developing a ball that outperforms the Pro V1 [Kennedy Tr. 954:22-955:16; 1016:10-17], Callaway Golf has been unable to dislodge Acushnet from the position that it gained largely through the use of infringing technology. To protect its further investment in new technology and to allow it an opportunity to fairly compete in the marketplace based on the merits of its products and its patent portfolio, Callaway Golf seeks injunctive relief. These are the types of facts upon which courts have routinely granted injunctive relief, even in the wake of *eBay*, and Callaway Golf respectfully requests this Court similarly grant injunctive relief here.

        **1.**     **Callaway Golf has been irreparably harmed by Acushnet's infringement, and, without an injunction, will continue to suffer irreparable harm**

The Federal Circuit has recognized that the injury to a patentee from a competitor's infringement may include harm from the effect of the infringement on the market:

> The patent statute provides injunctive relief to preserve the legal interest of the parties against future infringement which may have market effects never fully compensable in money. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.

*Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (internal citation omitted). When the patentee and the infringer are head-to-head competitors, the patentee enjoys "a right, granted by Congress, not to assist its rival with the use of [the patentee's] proprietary technology." *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007); *see also Martek Biosciences Corp. v. Nutrinova Inc.*, 2007 WL 3181307, at

*16 (D.Del. Oct. 30, 2007).[10]  Under such circumstances, the patentee's statutory right to

exclude infringers from the market represents a benefit that cannot be equated by an award

of cash.  *Id.*  For example, where a defendant's infringement has "shaped the market" to the

patentee's disadvantage, resulting in long-term customer loss, these collateral effects of

infringement demonstrate a situation where the patentee cannot be adequately compensated

by money damages alone.  *See TiVo Inc. v. Echostar Commn's Corp., 446 F. Supp. 2d 664,*

*670 (E.D. Tex. 2006); see also Commonwealth Sci. & Indus. Research Org. v. Buffalo*

*Tech., Inc.,* 492 F. Supp. 2d 600, 605 (E.D. Tex. 2007) ("[W]hen an infringer saturates the

market for a patented invention with an infringing product . . . that infringer violates the

patent holder's exclusionary right in a way that cannot be compensated through money

damages.") (hereinafter "*CSIRO*").

     Here, Acushnet's ongoing infringement in the market for golf balls, and particularly

in the high-profile market segment of premium golf balls where Callaway Golf and

Acushnet compete head-to-head, has irreparably harmed and continues to irreparably harm

Callaway Golf.[11]

---

[10] *Martek,* 2007 WL 3181307, at *16:

    "The court next finds that legal remedies are not adequate to compensate Martek for the infringement of the '594 and '281 patents. The statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages. *Fisher-Price, Inc. v. Safety 1st, Inc.,* 279 F.Supp.2d 526, 528 (D.Del.2003) (citation omitted). Indeed, as previously mentioned, Lonza is Martek's only competitor in the food and beverage vegetarian DHA market, and Martek has a right to exclude its rival from using its proprietary technology. *Novozymes A/S v. Genencor Intern., Inc.,* 474 F.Supp.2d 592, 613 (D.Del.2007)."

[11] Similarly, Acushnet's infringing Pro V1 irreparably harmed Spalding's efforts to expand its customer base for premium multi-layer golf balls. Historically, Spalding had been one of Acushnet's principal rivals, not only with regard to premium golf balls but also with regard to golf balls used by recreational players. [*See generally* Halkowski Decl. Ex. M (PX 1175)] For decades, Spalding was at the forefront of solid-core ball technology, first inventing ionomer covered balls that revolutionized the game of golf for the recreational golfer and then, later, inventing the concept of and selling multilayer solid-core balls. [*See* Morgan Tr. 443:20-444:10; Kennedy Tr. 936:12-937:11; 940:3-17; 941:5-14]
Spalding also sold premium golf balls, including its Strata multilayered golf ball that was launched in 1996. [Kennedy Tr. 941:5-9; 960:8-10] To compete with premium golf balls such as the Pro V1, however, Spalding later developed a polyurethane-covered



a.  **Acushnet's infringing Pro V1 deprives Callaway Golf of market opportunities, intangible benefits, and sales of golf-related products**

Prior to the year 2000, Acushnet had relied upon the old wound ball technology for the vast bulk of its premium golf ball sales. In January of 2000, Callaway Golf's Rule 35 golf ball was one of the first solid-core/multi-layer/urethane covered premium golf balls. [Yagley Decl. ¶ 5.][12] The Rule 35 golf ball surprised those in the business, received substantial praise, and was an initial success.

In fact, by December 2000, Callaway Golf's share of the market had grown substantially.[13] [Yagley Decl., ¶ 14.]

When Callaway Golf launched the Rule 35, Acushnet adopted a "wait and see" approach, unsure of how this new golf ball construction would be received. [Halkowski Decl. Ex. L (PX984)] Acushnet launched the infringing Pro V1 only after: (i) observing Callaway Golf's success and the entrance of others;

(iii) testing Callaway Golf's Rule 35 ball for itself; and then, (iv) tweaking the Pro V1 prototype.

); *see also* Bellis Tr. 301:21-302:4; Halkowski Decl. Ex. D (PX 985); Morgan Tr. 433:11-434:6] Because many professional golfers were already under

---

multilayered ball that was launched in 2002. [Kennedy Tr. 948:20-951:2; 966:18-967:1; 1015:17-1016:5] While Spalding faced a variety of financial issues, there's no denying that Acushnet's infringing Pro V1 marginalized Spalding's efforts to compete in this segment of the market just as Acushnet's infringement deflected Callaway Golf's entrance.

[12] Nike and Bridgestone apparently began marketing urethane-over-ionomer golf balls as early as 1999. No evidence exists in the record regarding whether the Nike or Bridgestone golf balls practice the asserted claims of the patents-in-suit.

[13] Indeed, as noted above, among those players on the Senior PGA Tour and LPGA (who were typically not bound to exclusive contracts for playing golf balls from a particular company) there was substantial shift toward the use of Callaway Golf's Rule 35 after its launch. [Yagley Decl. ¶¶ 11-12.]



contract and obligated to play a Titleist ball, Acushnet's launch of the Pro V1 was immediately supported by the large number of Acushnet-contracted pros.

The Pro V1's success generated a buzz that was felt down the entire pyramid of influence – a buzz that was stolen from Callaway Golf:

Yagley Tr. 1049:9-21] At the expense of Callaway Golf, [14] Acushnet got its "edge" back and was perceived as a market and technology leader rather than the company that, in reality, had "watched and waited," tested the Callaway Golf Rule 35 golf ball, adjusted its prototype, and then finally launched an infringing product.[15]

After the Pro V1 entered the marketplace, not surprisingly, Callaway Golf's sales were significantly affected, and continued to be affected as the Pro V1 became an extraordinary success. [Yagley Decl. ¶¶ 14-15, Exs. 2 & 3.] *Black & Decker*, 2006 WL 3446144, at *4 ("Loss of market share is a key consideration in determining whether a

---

[14]  For example, when *Golf* magazine listed the "3-piece Urethane Golf Ball" as the most recent of only fourteen "great leaps forward" in golf over the last century, it attributed this advance to Titleist, not to Callaway Golf (or Spalding), even though the Callaway Golf Rule 35 ball was released almost a full year before the Titleist Pro V1 became commercially available.  [Halkowski Decl. Ex J (PX1177)]

[15]  *See, e.g., Muniauction*, 2007 WL 2225847, at *2 ("Defendants' infringement has . . . done harm to plaintiff's reputation as the leading innovator in this field. . . . Such a harm is not compensable in damages, and is irreparable, making equitable relief appropriate."); *Black & Decker*, 2006 WL 3446144, at *4 ("[H]arm to reputation . . . is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure.  Because [patentee] has presented evidence that its reputation as an innovator . . . may be harmed by the continued selling and marketing of [infringing products], this factor weighs in favor of a permanent injunction.") (quotations omitted); *800 Adept*, 505 F. Supp. 2d 1337 at *6 ("[W]here a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to usurp the pioneering company's market position and goodwill.").

plaintiff has suffered irreparable harm."). Callaway Golf's pioneering efforts were neutralized, its market position was undercut, and the good will that it should have enjoyed as a market and technology leader who had just spent $150 million developing a new technology was lost. *z4*, 434 F. Supp. 2d at 440 (describing "lost profits, the loss of brand name recognition or the loss of market share" as "the type of injuries that are often incalculable and irreparable."); *800 Adept*, 505 F. Supp. 2d 1337, at *6 ("[W]here a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to usurp the pioneering company's market position and goodwill." ). While specific lost sales can of course be compensated, money cannot remedy all the other incalculable harms associated with loss of market position, including lost opportunities to secure new customers and capture market share – market share that would have enhanced Callaway Golf's reputation, brand-loyalty, and goodwill.   [Yagley Decl. ¶¶ 17-18.]

Enhancement of Callaway Golf's intangible assets including reputation, brand-loyalty, and goodwill, would have, in turn, supported increased sales of golf balls and equipment other than just the Rule 35, and would have been very complementary to Callaway Golf's hard earned reputation as an innovator in golf equipment.[16]  [*Id.*] Therefore, the loss of business following Acushnet's launch of the infringing Pro V1 also supports a finding of irreparable harm regarding other golf-related products.  *See, e.g., Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 592, 598 (D. Del. 2007) (granting permanent injunction where evidence showed that after defendant's infringing product entered the market, plaintiff's share of that market dropped from 80% to 50%); *see CSIRO*, 492 F. Supp. 2d at 605 (noting that the damage that infringement causes to "the patent holder's good will or brand name recognition" is impossible to quantify, and therefore represents harm not adequately compensable by monetary damages).  Thus, Acushnet's

---

[16] Ball, shoe, and glove contracts are common on the professional tours, and Acushnet's Titleist and FootJoy brands are closely linked. [*See, e.g.*, Bellis Tr. 204:15-24; Nauman Tr. 911:22-912:16]



infringing Pro V1 has caused, and continues to result in, irreparable harm to Callaway Golf by taking away sales, undercutting Callaway Golf's reputation, goodwill and other intangible assets, as well as diminishing opportunities to sell other golf-related products. Moreover, the historical market data cited above suggest that, although Callaway Golf continues to suffer irreparable harm, it could expand its sales of premium balls if and when sales of the Pro V1 are enjoined.

> **b.    Acushnet's infringing Pro V1 supports its exclusive contracts that block opportunities to compete**

Acushnet's launch of the Pro V1 in late 2000 came at a critical time – just as its contracts with professional golfers were nearing expiration and

Acushnet has exclusive endorsement contracts with a substantial number of professional players requiring that they use a Titleist golf ball – players it kept because of the infringing Pro V1. [Bellis Tr. 282:12-17; Nauman Tr. 920:7-15; 923:10-15]

Acushnet focused a substantial portion of its case at trial on explaining the marketing reality referred to as the pyramid of influence – that the purchasing decisions of less-skilled golfers are influenced by those of higher skill. [*See, e.g.,* Bellis Tr. at 226:10-227:3; Yagley Decl. ¶¶ 17-18; Halkowski Decl. Ex. G ((PX582) at AC101060.UR).] At the top of this pyramid are the professional golfers. Acushnet has capitalized on the

phenomenal success of the Pro V1 among those professional players – which was driven by the performance of the ball as enabled by the patents-in-suit – to defend, maintain and extend its sales of premium golf balls.  [*See* Bellis Tr. at 307:14-16;

Acushnet's exclusive endorsement contracts, therefore, ensure that the pyramid of influence supports sales of the Pro V1 and allows Acushnet to remain in place as the market leader.

The pyramid of influence, however, only works if Acushnet is able to provide a ball at least roughly comparable in performance to what is available from others.  [Yagley Decl. ¶ 18; Bellis Tr. 282:5-7; 226:10-227:7]  It all proceeds from performance.  If Acushnet is unable to provide the Pro V1, the professional golfers (as their exclusive endorsement contracts with Acushnet expire) would be more likely to consider the use of golf balls from other manufacturers, such as Callaway Golf, in order to secure the proven benefits of a golf ball with a solid core, ionomer inner-layer, and polyurethane outer layer.

By virtue of its brand strength and leadership of the golf ball market – both of which have been supported over the last seven years by the phenomenal success of the infringing Pro V1 – Acushnet can also entice retailers (notably pro shops) into "Titleist Exclusive" agreements whereby the vendor carries only Titleist and Pinnacle golf balls. [Yagley Decl. ¶¶ 25-28.]  Of course, since Titleist and Pinnacle golf balls other than the Titleist Pro V1 do not infringe the patents in suit, Callaway Golf will not be able to claim damages for those sales, resulting in irreparable harm when Acushnet leverages its infringement of Callaway Golf's proprietary technology to support non-infringing products.  Allowing Acushnet to continue infringing sales of the Pro V1 – and the exclusive arrangements supporting sales of its other products – maintains the status quo, under which Callaway Golf must compete against its own technology for shelf space in these outlets.  Thus, an injunction precluding sales of the Pro V1 would help give Callaway Golf a fair chance to  compete with Acushnet and grow its sales of all of its golf balls.

        **c.**      **Acushnet is cementing a dominant position in the still-developing segment of the market for solid-core premium golf balls**

Until 2000, the leading premium golf balls for many decades had been wound golf balls. [Kennedy Tr. 939:4-8] However, as noted above, polyurethane-covered, solid-construction, multi-layered golf balls were then introduced. [Bellis Tr. 307:9-308:6] These solid-construction balls obsoleted the wound ball that had dominated for nearly a century, and drove a huge change in premium golf balls. [Kennedy Tr. 939:4-8; Bellis Tr. 307:9-308:6] . Again, Acushnet's own graph (this one not from a trial demonstrative but from an actual Acushnet internal document admitted at trial) shows this dramatic impact:



[Halkowski Decl. Ex. M (graph from PX 1175 at AB 0118092 (with color added))]

Acushnet's infringement, coming at a critical time in the earliest stages of the development of these new balls, was and continues to be particularly damaging to Callaway Golf. *TiVo*, 446 F. Supp. 2d at 670 ("Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm – Plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures.").

Also, golfers, particularly skilled golfers, are creatures of habit and once they have found a ball that they like, they tend to stick with it. Getting professional golfers, those at the very top of the pyramid of influence, to change is particularly difficult:

> Q.    Is it generally true among pro players that it's difficult to get a pro player to switch from one golf ball company to another golf ball company in terms of the balls that they use?
>
> A.    Yes. That's generally true.

[White Tr. 892:12-893:17; *see also* Yagley Decl. ¶ 18.] Moreover, a golfer who develops a loyalty to a certain manufacturer's golf ball at one time will be more likely to purchase the manufacturer's future golf ball offerings. [*Id.*] This type of customer has been called a "sticky customer," because of the difficulty in getting them to switch away from their initial product choice. When faced with a market containing many "sticky customers," the harm resulting from infringement is amplified:

> One thing the parties agree on is that DVR customers are "sticky customers," that is they tend to remain customers of the company from which they obtain their first DVR. Dkt. No. 737 at 30 (EchoStar); Dkt. No. 747 at 1 (Tivo). Thus, the impact of Defendants' continued infringement is shaping the market to Plaintiff's disadvantage and results in long-term customer loss.

*TiVo*, 446 F. Supp. 2d at 670.

Exceedingly superior performance, of course, can move substantial numbers of skilled golfers to a new golf ball:

> My opinion is that, although I said earlier that our golf ball -- we perceive our golf ball to be technologically superior and a better product, the -- we're not technologically superior and better by quantum leaps. If we were able to come out with a golf ball that was significantly better than the PRO V1 or any other golf ball, for that matter, I'm confident that we would become the number one golf ball manufacturer. That's true for anybody. But right now, because there are such finite differences, their tour validation and their long-term tour strategy gives them a competitive edge.

[Halkowski Decl. Ex. H (White Depo. 182:8-19)] The inventions of the Sullivan patents provided this type of leap in technology by providing performance vastly superior to the



old wound ball technology, which had dominated premium golf ball construction for decades. Callaway Golf's Rule 35 was, therefore, able to make significant gains when it was first launched. But the infringing Pro V1 enabled Acushnet – and continues to enable it – to displace Callaway Golf's premium golf balls.

The irreparable harm caused by Acushnet's infringing Pro V1 continues today, despite Callaway Golf's expenditure of significant time, effort and money to produce a better golf ball. Callaway Golf, in fact, spent approximately $175 million to acquire golf ball assets from Spalding [Halkowski Decl., Ex. N (excerpts from Callaway Golf's 2003 Annual Report (PX698) at 21)], including its latest technology for manufacturing golf balls with an ultra-thin polyurethane cover. [Kennedy Tr. 954:22-955:16] Use of this technology – both prior to and after the acquisition – has resulted in a golf ball technically superior to the Pro V1.                                                         , and Halkowski Decl. Ex. H (White Depo. 182:8-19)] But Acushnet's sale of the infringing Pro V1, and its ability to offer that ball to professionals under contract, has prevented Callaway Golf from gaining the full benefit of its investment. Thus, the longer that Acushnet is allowed to sell the infringing Pro V1 and cement its current position, the more difficult it will be for Callaway Golf to gain its fair share of this business.

**d.    Acushnet's other tactics irreparably harm Callaway Golf's image and reputation.**

Acushnet's resort to the PTO's reexamination process and Acushnet's public statements continue to irreparably harm Callaway Golf's reputation. First, as a preemptive strike against Callaway Golf, Acushnet in January 2006 launched *inter partes* reexaminations of the four patents-in-suit in the U.S. Patent & Trademark Office. The Court has ruled that Acushnet's maneuver was a breach of the 1996 Settlement Agreement between Acushnet and Callaway Golf's predecessor in interest, Spalding. [*See* D.I. 347 (granting Callaway Golf's motion for summary judgment of breach of contract due to

34

Acushnet's breach of the provision requiring that this Court be the sole and exclusive

venue for future patent disputes).]

Then, after Callaway Golf filed suit in this Court in accord with the parties' 1996

Settlement Agreement, Acushnet released a statement that mistakenly suggested the

applications for the patents-in-suit were filed only after the Pro V1 was introduced, and that

Acushnet, not Callaway Golf, was the first to patent the key technology:

> The patents at issue are directed to multi-layer, solid construction golf balls
> with urethane outer covers. **Acushnet received its first patent covering
> this technology on March 3, 1999.** The oldest of the Callaway patents
> being asserted was not filed until December 12, 1999 and issued on March
> 15, 2001. **The other three Callaway patents were all filed in 2001, well
> after the Titleist Pro V1 was introduced at the Invensys Classic on
> October 12, 2000.**

[Halkowski Decl. Ex. A (CW280259 (PX831) (emphasis added)).] Acushnet repeated this

misleading information in another press release after the verdict. [Halkowski Decl. Ex. B]

In Court, however, Acushnet has never disputed that the patents-in-suit, irrespective of

their actual filing dates, are entitled to a priority date of 1995 – a date long-before the 1997

filing date of the earliest patent Acushnet acquired for the Pro V1 golf balls.[17] [*See, e.g.*,

D.I. 334 ¶¶ 16-17 (Statement of Admitted Facts).]

Similarly, after Acushnet admitted that the Pro V1 infringed the patents-in-suit (D.I.

367 (stipulation of infringement)) and the jury returned a verdict affirming the validity of

eight of the nine asserted claims, Acushnet issued a press release highlighting the

reexamination proceedings and criticizing the Court's decision to exclude evidence of them:

> The patents at issue are directed to multi-layer, solid construction golf balls
> with urethane outer covers and we continue to believe that we will
> ultimately prevail in having all claims of the Spalding patents found invalid.
> Our confidence is supported by recent decisions taken by the U.S. Patent
> and Trademark Office (PTO). Specifically, on January 17, 2006, **before this**

---

[17] As noted above, Acushnet's implicit reference to and reliance on the Hebert '172
patent in its public statements directly contradicts the position it took before the Court
and jury, where Acushnet first tried to hide and then explain away the fact that the
Hebert patent even existed – much less that it covered the same "technology" as the
patents-in-suit.

> **lawsuit was filed, we asked the PTO to re-examine each of the four asserted pat**ents. In early 2007, initial office actions from the PTO found all claims of all four patents to be invalid. Just last month, the PTO issued a second office action on one of the patents, again determining it to be invalid. We are awaiting favorable action on the other three. **This pivotal information was not allowed into evidence by the Court.** We believe that the PTO determination is correct and are confident that the Court and PTO will render final decisions that these patents are invalid, utilize no new technology and should never have been originally granted."

[Halkowski Decl. Ex. B (quoting Joseph Nauman, Acushnet's General Counsel) (emphasis added).]  Thus, even after the Court's ruling that Acushnet's initiation of the reexaminations was a breach of the 1996 Settlement Agreement, Acushnet has continued to make public statements touting the reexamination proceedings as well as denigrating the jury's verdict and the Court's judgment in this matter on the basis that they differ from interim decisions made in the on-going reexaminations.

There is little that Callaway Golf can do to stop Acushnet's campaign of misinformation.[18]  Acushnet has been able to dominate the spin in the media in a way that Callaway Golf and others have not been able to undo.  More critically, at this juncture there is no way to undo Acushnet's wrongful decision to pursue reexaminations of the patents-in-suit.  But the Court can at least partially address Acushnet's tactics by entering an injunction that would put this case on a path to promptly receive a final decision from the Federal Circuit regarding liability, which, in turn, should trump the wrongfully-commenced and unnecessary PTO proceedings.

In any event, the net effect of Acushnet's tactics is clear – the tarnishment of Callaway Golf's image, credibility and reputation as an innovator and owner of valuable patent rights.  While nothing can fully compensate for the harm caused by Acushnet's improper resort to the PTO's reexamination process and its continued PR tactics, the equitable remedy of an injunction would at least ameliorate some of the irreparable damage

---

[18] The Court, of course, could ultimately decide, as part of the injunction or by separate order, to prevent Acushnet from further publicizing or capitalizing on the improperly-filed reexamination proceedings.

to Callaway Golf by firmly enforcing the patent rights that have now withstood the test of extensive litigation.

        e.      **The patented technology substantially encompasses the Pro V1, rather than being merely a "minor component" of the infringing product**

Another important factor to be considered is whether the infringing product "primarily, if not completely, mimics the patented invention." *IMX, Inc. v. Lending Tree, L.L.C.*, 469 F. Supp. 2d 203, 225 (D. Del. 2007). A finding of irreparable harm is supported when the infringing use of the plaintiff's technology is not merely a "minor component" of the patented invention. *Id.* Here, the patented inventions do not represent a minor or insignificant aspect of the infringing products.

Thus, here the patented invention is not a "minor component" of the infringing product; rather, the patented invention *is* the infringing product – a factor that strongly favors a finding of irreparable harm. *See IMX*, 469 F. Supp. 2d 203, 225.

        2.      **Callaway Golf has no adequate remedy at law.**

The insufficiency of legal remedies to compensate Callaway Golf for Acushnet's infringement is shown, first and foremost, by the same evidence demonstrating irreparable harm that Callaway Golf has discussed above. Irreparable injury is a basis for showing inadequacy of legal remedy, and accordingly the concepts of 'irreparable injury' and 'no adequate remedy at law' often overlap in the context of a permanent injunction. *800 Adept*, 505 F. Supp. 2d 1337 at *6 (citations omitted); *see also Smith & Nephew*, 466 F. Supp. 2d at 982-3 ("Although stated as two separate factors under *eBay*, the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff.") (citations omitted). Indeed,

> when an infringer saturates the market for a patented invention
> with an infringing product or damages the patent holder's good
> will or brand name recognition by selling infringing products, that
> infringer violates the patent holder's exclusionary right in a

> manner that cannot be compensated through monetary damages.
> This is because it is impossible to determine the portions of the
> market the patent owner would have secured but for the infringer's
> actions or how much damage was done to the patent owner's brand
> recognition or good will due to the infringement.

*CSIRO*, 492 F. Supp. 2d at 605. These factors, discussed above, support a finding that

legal remedies are inadequate to compensate Callaway Golf for harm caused by Acushnet's

infringement. Other factors, discussed below, support the same finding.

Courts have recognized that injunctive relief is warranted in addition to, and is not

inconsistent with, an award of money damages for past patent infringement:

> It is true that the jury awarded a large damages verdict. Those
> damages, however, are designed to compensate [the patentee]
> fairly and reasonably for its past injury. . . . Although future
> damages may compensate [the patentee] for an *approximate* loss,
> that does not make them adequate in the sense that they are a
> suitable proxy for injunctive relief. What makes legal remedies
> inadequate under the circumstances of this case is the inability to
> calculate the plaintiff's future losses with precision. An injunction
> against the continued use of the plaintiff's intellectual property is
> the proper remedy to prevent future infringement.

*Visto*, 2006 WL 3741891, at *4 (emphasis in original). "In other words, injunctive relief

operates to protect the interest of a patentee against future infringement, the market effects

of which may not be fully compensable in the form of monetary damages." *800 Adept*, 505

F. Supp. 2d at 1337.

Moreover, here, no damages have yet been awarded, and no such compensation

will occur for years. Absent issuance of an injunction, Acushnet pays nothing for the harm

it is has done in the past and nothing for the foreseeable future and, yet, remains free to

continue: (i) selling infringing premium golf balls; (ii) enjoying all the intangible benefits

that flow from leading this high-profile segment of the overall market; (iii) using its

enhanced status to sell additional golf-related products and lock out competitors from a

segment of the pro shops; and (iv) pursuing its campaign of misinformation in the press. In

this case, therefore, the only meaningful way to enforce Callaway Golf's patent rights is by

the issuance, in equity, of the requested injunction.

District courts have also cited the threat of continued infringement as a significant consideration favoring injunctive relief. *See, e.g., Smith & Nephew*, 466 F. Supp. 2d at 984 ("Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue. Monetary damages generally are not an adequate remedy against future infringement because the central value of holding a patent is the right to exclude others from using the patented product."). Here, Acushnet's public statements leave no doubt that it intends to continue infringing the asserted patents despite its assertions that designing around the patents is trivial. *See, e.g.*, Halkowski Decl., Ex. I (article reporting that, "Acushnet Co. will fight any injunction aimed at preventing the company from manufacturing and selling its golf balls, according to a statement."). Thus, no adequate remedy in law exists to address all the harms caused by Acushnet's continuing infringement of the asserted patents.

### 3.    The balance of hardships favors an injunction

Like the "irreparable harm" and "inadequate remedy at law" factors, and for many of the same reasons discussed above, the balance of hardships in this case strongly favors a grant of injunctive relief. Generally speaking, the harm that Callaway Golf will endure if a permanent injunction is not entered in this case is a continuation of the irreparable harm that it has already suffered as a consequence of Acushnet's infringement. Callaway Golf will also be deprived of its right to exclude others from practicing its patents, which the courts have recognized as being, itself, a hardship. *See Odetics, Inc. v. Storage Tech. Corp.,* 14 F. Supp. 2d 785, 797 (E.D. Va. 1998), *aff'd,* 185 F.3d 1259 (Fed. Cir. 1999) ("A compulsory license, which may arise from a refusal to enjoin, is fundamentally at odds with the right of exclusion built into our patent system.") (citation omitted).

By way of comparison, the harm that Acushnet will endure if a permanent injunction is entered is that it will no longer be able to infringe Callaway Golf's patents. This hardship is imposed by law, rather than by the particular circumstances of this case,

REDACTED

and should not be considered an unreasonable hardship. *See MGM*, 2007 WL 1231682, at *15.[19]

*See W.L. Gore*, 842 F.2d 1275,1281-82 (Fed. Cir. 1988) ("If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest the court should place a strong hand upon him") (quoting *General Elec. Co. v. New Eng. Elec. Mfg. Co.*, 128 F. 738, 740 (2d Cir. 1904)).

Indeed, Callaway Golf, itself, has recently managed to innovate beyond the claims of the pioneering Sullivan inventions to arrive at the HX Tour golf balls. [Kennedy Tr. 954:9-955:16; 1007:5-1008:19; 1013:2-1014:1; 1016:10-17.][20] Even if the allegations of a

---

[19] Whatever loss Acushnet may suffer from ceasing the sale of the infringing products is irrelevant to the balancing of hardships, since any such harm would stem from Acushnet's own wrongful infringement. *See Windsurfing Int'l v. AMF, Inc.*, 782 F. 2d 995, 1003 n.12 (Fed. Cir. 1985), *cert. denied*, 477 U.S. 905 (1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 797 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999) (stating that any harm infringer may suffer from unavailability of design-around "stems from [the infringer's] own wrongful infringement" and therefore does not shift balance of hardships to infringer); *see also CSIRO*, 492 F. Supp. 2d at 606; *Smith & Nephew*, 466 F. Supp. 2d at 984.

non-infringing alternative now being made by Acushnet are less than accurate made-for-litigation sound-bites, Callaway Golf's actual experience confirms that a motivated company can innovate beyond the patents in an effort to make an even better ball. After all, the patent system is supposed to reward innovators, not those who merely follow-on with infringing products and then use their marketing muscle and misleading PR tactics to maintain their leading position.

Lastly, the infringing Pro V1 golf balls are not Acushnet's only product, or even its only golf ball product. Acushnet is a huge company that sustains itself on, *inter alia*, revenues from Titleist NXT Tour, NXT Extreme, and DT SoLo golf balls as well as five varieties of Pinnacle golf balls; Cobra golf clubs; FootJoy gloves, shoes, and apparel, and Scotty Cameron putters. [*See* Bellis Tr. 204:15-205:7; Burke Tr. 1081:18-1082:1] Moreover, the potential hardship from enjoining the infringing product also would be mitigated by revenues from an extraordinarily broad and diverse variety of businesses and brands owned by Acushnet's corporate parent, Fortune Brands, Inc. – a $10-billion conglomerate. In addition to Acushnet and its golf brands, Fortune Brands owns a number of businesses in the wine and spirits industry (*e.g.* Jim Beam and Maker's Mark bourbon, Sauza tequila, Courvoisier cognac, Canadian Club whisky, Laphroaig scotch, Gilbey's gin and vodka) and the home and hardware industry (*e.g.,* Moen faucets, Master Lock padlocks, Therma-Tru doors, Simonton windows, and Waterloo tool chests). [Halkowski Decl. Ex. Q (excerpts from Fortune Brands, Inc. Form 10-K (Mar. 1, 2007) at 5-6).] In fact, Fortune Brands has recently emphasized that weaknesses in one of its businesses can be offset by strengths in another. [Halkowski Decl. Ex. S (October 2007 Fortune Brands Press Release) ("[P]rofit growth for our spirits and wine brands helped offset the impact of the U.S. housing correction.")] Thus, this is far from the type of case where an injunction against the infringing products would deal a fatal blow to the infringer's commercial viability.

41



### 4. The public interest will not be harmed by a permanent injunction

The Federal Circuit has recognized "the strong public policy favoring the enforcement of patent rights." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1998). "The public maintains an interest in protecting the rights of patent holders as well as enforcing adequate remedies for patent infringement. Permanent injunctions serve that interest." *CSIRO*, 492 F. Supp. 2d at 607. Under "rare and limited circumstances," the right of a patent owner to injunctive relief may be overcome by public health or safety concerns, but where products of the same general kind as those to be enjoined are obtainable from sources other than the infringer, the public interest favors an injunction. *See id.*

Removing the Pro V1 from the stream of commerce will in no way deprive the public of a product implicating health or safety concerns – much less deprive the public of the convenience of a ready supply of high performance premium golf balls, or even three-piece urethane-over-ionomer golf balls. Once the Pro V1 is enjoined, there is nothing to suggest that the standard market forces along with the collective sales efforts of Callaway Golf and other manufacturers of premium polyurethane-covered multi-layer golf balls such as Bridgestone, Srixon, TaylorMade and Nike would be unable to fulfill the demand previously met by the infringing Titleist balls.[21]

_____



Moreover, Callaway Golf has tailored the scope of its request for injunctive relief to minimize the impact on innocent third parties such as golf distributors and retailers, and professional golfers under contract to Acushnet for the 2008 golf season. Under Callaway Golf's proposed order, submitted herewith, retailers would be permitted to sell their remaining inventories of the infringing products, and professional golfers under contract with Acushnet will be exempted from the scope of the injunction for the remainder of the current 2008 season.

## VI.    CONCLUSION

For the foregoing reasons, Callaway Golf respectfully requests that the Court GRANT its motion for a permanent injunction against the Titleist Pro V1, Pro V1x, Pro V1 Star, and any golf ball that is no more than a colorable variation of any of those products.

Dated:  January 16, 2008               FISH & RICHARDSON P.C.

By:  /s/ Thomas L.  Halkowski
      Thomas L. Halkowski (#4099)
      919 N. Market Street, Suite 1100
      P.O. Box 1114
      Wilmington, DE 19899-1114
      Tel:  (302) 652-5070
      Fax:  (302) 652-0607

      Frank E. Scherkenbach
      225 Franklin Street
      Boston, MA 02110-2804
      Tel:  (617) 542-5070
      Fax:  (617) 542-8906

      Roger A. Denning
      12390 El Camino Real
      San Diego, CA 92130
      Tel: (858) 678-5070
      Fax:  (858) 678-5099

Attorneys for Plaintiff
CALLAWAY GOLF COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2008, the attached document was electronically filed with the Clerk of Court using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on January 16, 2008, I have Electronically Mailed the document to the following person(s):

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Alan M. Grimaldi, Esq.                      Attorneys for Defendant
Joseph P. Lavelle                           ACUSHNET COMPANY
Brian Rosenthal
Clint Brannon
Kenneth Donnolly
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com


                                    /s/ Thomas L. Halkowski
                                    Thomas L. Halkowski