# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,      )

          )

        Plaintiff,     )    C.A. No. 06-91 (SLR)

          )

      v.          )

          )

ACUSHNET COMPANY,       )    **PUBLIC VERSION**

          )

        Defendant.    )

## ACUSHNET'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR POST TRIAL RELIEF

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza 6th Floor
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

Dated: January 22, 2008
Public Version Dated: January 24, 2008
844252 /30030

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   ACUSHNET SHOULD BE GRANTED JUDGMENT OF INVALIDITY, ON
      ALL THE ASSETED CLAIMS, AS A MATTER OF LAW............................................2

      A.    Summary Of Argument.............................................................................2

      B.    Applicable Law To Rule 50(b) Motions Based On Obviousness............................4

      C.    The Claims At Issue Are Invalid As A Matter Of Law Under The "On The
            Ball" Claim Construction............................................................................5

            1.    The Patents In Suit............................................................................5

            2.    The Prior Art Generally ....................................................................6

            3.    Proudfit With Molitor '751 Or Wu Discloses All Claim Elements............7

                  a.    Proudfit '187 .........................................................................8

                  b.    Molitor '751 Or Wu................................................................9

            4.    Motivation To Combine The References Existed..................................9

            5.    Reasonable Expectation Of Success .................................................11

            6.    Polyurethane Shore D Hardness "On The Ball" ................................13

            7.    The Asserted Claims Are Invalid Over The Wilson Ultra Tour
                  Balata Ball In View Of Molitor Or Wu .......................................15

      D.    The PTO Did Not Consider All The Evidence In This Trial....................16

      E.    Secondary Considerations Do Not Save The Sullivan Patents.............................17

            1.    Law Of Secondary Considerations ...............................................18

            2.    Commercial Success .....................................................................20

      F.    Grant Of JMOL Invalidating The Sullivan Patents Is Proper.................24

      G.    The Claims Are Invalid Under The "Off The Ball" Construction........................27

III.  IN THE ALTERNATIVE TO JUDGMENT AS A MATTER OF LAW,
      ACUSHNET SHOULD BE GRANTED A NEW TRIAL ON THE VERDICTS
      AGAINST IT, ON SEVERAL ALTERNATIVE GROUNDS .........................................29

      A.    The Verdicts Were Irreconcilably Inconsistent And Against The Clear
            Weight Of Evidence; A New Trial Should Be Granted For Either Or Both
            Of These Reasons ....................................................................................30

            1.    The Verdicts For Callaway Cannot Be Reconciled With The
                  Verdict For Acushnet.....................................................................30

            2.    The Great Weight Of The Evidence Stands Against The Verdict,
                  And Manifest Injustice Calls For A New Trial.........................33

i

B.      A New Trial Should Be Granted At Which The Test Balls May Be Admitted Into Evidence ........................................................................34

         1.     The Excluded Test Ball Evidence Was Relevant ........................35

         2.     The Court Erred In Excluding The Test Ball Evidence............................36

C.      Other Evidentiary Errors And Resulting Prejudice To Acushnet Justify A New Trial ......................................................................................39

         1.     Acushnet Was Prejudiced By The Court's Erroneous Admission Of Evidence Regarding Acushnet's Veneer Concept And Hebert Patent, And Related Errors ........................................................39

         2.     Dr. Risen's Direct Exceeded The Scope Of His Report ............................43

         3.     The Court Erred In Excluding *Ex Parte Sullivan* ........................45

         4.     The Court Erred In Excluding The Reexamination Files From Evidence........................................................................................48

         5.     If Acushnet Is Not Granted Judgment As A Matter Of Law, As Argued Above, The Court's Erroneous Claim Construction Ruling Warrants At Least A New Trial ..............................................49

IV.    OTHER ISSUES ........................................................................................50

V.    CONCLUSION............................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (2007).................................................................................28

*Allied Chemical Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980)....................................................................................30

*Anderson's-Black Rock, Inc. v. Pavement Salvage, Co.*,
396 U.S. 57 (1969)................................................................................3, 18

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988)..................................................................................46

*In re Berg*,
320 F.3d 1310 (Fed. Cir. 2003)................................................................46

*Blancha v. Thomas*,
972 F.2d 507 (3d Cir. 1992)......................................................................36

*CVI/Beta Ventures v. Tura LP*,
112 F.3d 1146 (Fed. Cir. 1997)................................................................28

*Cabinet Vision v. Cabnetware*,
1998 U.S. Dist. LEXIS 22763 (S.D. Cal., Sept. 30, 1998).......................32

*Chandler v. Roudebush*,
425 U.S. 840 (1976)..................................................................................46

*Coleman v. Home Depo, Inc.*,
306 F.3d 1333 (3d Cir. 2002)....................................................................38

*Collins v. Wayne Corp.*,
621 F.2d 777 (5th Cir. 1980) ....................................................................39

*In re Comisky*,
499 F.3d 1365 (Fed. Cir. 2007)................................................................41

*Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*,
807 F.2d 955 (Fed. Cir. 1986)..................................................................26

*Daiichi Sankyo Co. v. Apotex, Inc.*,
501 F.3d 1254 (Fed. Cir. 2006)..................................................................1

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd,*
851 F.2d 1387 ................................................................................................................19

*Dickinson v. Zurko,*
527 U.S. 150 (1999)........................................................................................................46

*Dippin Dots Inc. v. Mosey,*
476 F.3d 1337 (Fed. Cir. 2007).......................................................................................4

*Dystar GmbH v. C.H. Patrick,*
464 F.3d 1356 (Fed. Cir. 2006)...............................................................................17, 25

*Finch v. Hercules Inc.,*
941 F. Supp. 1395 (D. Del. 1996)..................................................................................35

*Fineman v. Armstrong World Industrial, Inc.,*
980 F.2d 171 (3d Cir. 1992)...........................................................................................33

*Fresenius Medical,*
2006 WL 1330003 (N.D. Cal. May 15, 2006)..................................................26, 27, 49

*Frisket, Inc. v. RealNetworks, Inc.,*
2007 U.S. Dist. LEXIS 54192 (N.D. Cal. July 26, 2007)..............................................25

*Fromson v. Advance Offset Plate,*
755 F.2d 1549 (Fed. Cir. 1985)......................................................................................26

*GNB Battery Techn., Inc. v. Exide Corp.,*
876 F. Supp. 605 (D. Del. 1995)....................................................................................31

*Genzyme Corp. v. Atrium Corp.,*
315 F. Supp. 2d 552 (D. Del. 2004)..........................................................................30, 39

*Graham v. John Deere & Co.,*
383 U.S. 1 (1963)......................................................................................................17, 18

*Hartness International, Inc. v. Simplimatic Engineering Co.,*
819 F.2d 1100 (Fed. Cir. 1987)......................................................................................32

*Honeywell International, Inc. v. Universal Avionics System Corp.,*
289 F. Supp. 493 (D. Del. 2003)...............................................................................44, 45

*ID Sec. System Can. v. Checkpoint System,*
249 F. Supp. 2d 622 (E.D. Pa. 2004)............................................................................31

*In re Icon,*
    496 F.3d 1374 (Fed. Cir. 2007)..........................................................................13

*In re Inland Steel,*
    265 F.3d 1354 (Fed. Cir. 2001)..........................................................................18

*Joy Technologies, Inc. v. Manbeck,*
    751 F. Supp. 225 (D.D.C. 1990)......................................................................23, 24

*KSR v. Teleflex,*
    127 S. Ct. 1727 (2007)................................................................................ *passim*

*Key Technology, Inc., v. Simco/Ramic Corp.,*
    137 F.R.D. 322 (D. Or. 1991)............................................................................40

*Knoster v. Ford Motor Co.,*
    200 Fed. Appx. 106 (3d Cir. 2006)....................................................................46

*Leapfrog Enterprises v. Fisher-Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007)......................................................................13, 25

*Life Technologies, Inc. v. Clontech Laboratory, Inc.,*
    224 F.3d 1320 (Fed. Cir. 2000)..........................................................................40

*Lightning Lube, Inc. v. Witco Corp.,*
    802 F. Supp. 1180 (D.N.J. 1992), *aff'd,* 4 F.3d 1153 (3d Cir. 1993) ......................30

*Lind v. Schenley Industrial, Inc.,*
    278 F.2d 79 (3d Cir. 1960)................................................................................34

*In re Longi,*
    759 F.2d 887 (Fed. Cir. 1985)............................................................................31

*Loral Fairchild Corporation, v. Matsushita Electric Ind. Co. Ltd.,*
    208 F. Supp. 2d 344 (E.D.N.Y. 2000) ..............................................................47, 48

*Malek v. Federal Insurance Co.,*
    994 F.2d 49 (2d Cir. 1993)................................................................................39

*Malley-Duff & Associate, Inc. v. Crown Life Insurance Co.,*
    734 F.2d 133 (3d Cir. 1984)............................................................................30, 31

*McMillan v. Weeks Marine, Inc.,*
    478 F. Supp. 2d 651 (D. Del. 2007)....................................................................45

*McNeil-PPC, Inc. v. Perrigo Co.,*
  2007 U.S. Dist. LEXIS 50255 (S.D.N.Y. July 3, 2007) .....................................................19, 21

*McQueeney v. Wilmington Trust Co.,*
  779 F.2d 916 (3d Cir. 1985)...........................................................................................35, 36

*Monarch Knitting Machine Corp. v. Sulzer Morat GmbH,*
  139 F.3d 877 (Fed. Cir. 1998)................................................................................................22

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
  243 F.3d 1316 (Fed. Cir. 2001)..............................................................................................31

*Ormco Corp. v. Align Technology, Inc.,*
  463 F.3d 1299 (Fed. Cir. 2006).......................................................................................8, 9, 10

*Pannu v. Iolab Corp.,*
  155 F.2d 1334 (Fed. Cir. 1998)................................................................................................4

*Pentec, Inc. v. Graphic Controls Corp.,*
  776 F.2d 309 (Fed. Cir. 1985)................................................................................................19

*Perkins-Elmer Corp. v. Computervision Corp.,*
  732 F.2d 888 (Fed. Cir. 1984)..............................................................................................4, 5

*Pfizer, Inc. v. Apoptex, Inc.,*
  480 F.3d 1348 (Fed. Cir. 2007)........................................................................................25, 26

*Pharmastem Therapeutics, Inc., v. Viacell, Inc.,*
  491 F.3d 1342 (Fed. Cir. 2007).....................................................................................4, 25, 47

*Repola v. Morebark Industrial, Inc.,*
  934 F.2d 483 (3d Cir. 1991)...................................................................................................30

*Richardson-Vicks Inc., v. Upjohn Co.,*
  122 F.3d 1476 (Fed. Cir. 1997).....................................................................................1, 3, 4, 34

*Roebuck v. Drexel University,*
  852 F.2d 715 (3d Cir. 1988)...................................................................................................33

*Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.,*
  264 F.3d 1344 (Fed. Cir. 2001)..............................................................................................19

*Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.,*
  444 F.2d 295 (9th Cir. 1970) .................................................................................................19

*Syngenta Seeds, Inc. v. Monsanto Co.*,
  404 F. Supp. 2d 594 (D. Del. 2005), *aff'd*, 231 Fed. Appx. 954 (Fed. Cir. 2007) ..................33

*Titanium Metals Corp., v. Banner*,
  778 F.2d 775 (Fed. Cir. 1985)..............................................................................................8

*In re Van Geuns*,
  988 F.2d 1181 (Fed. Cir. 1993)..........................................................................................41

*Young Dental Manufacturing Co., Inc. v. Q3 Special Products, Inc.*,
  112 F.3d 1137 (Fed. Cir. 1997)......................................................................................37, 38

## STATUTES

35 U.S.C. § 103................................................................................................................18

35 U.S.C. § 112..........................................................................................................14, 15

Fed. R. Civ. P. 26(a)(2)(B) ...............................................................................................45

Fed. R. Civ. P. 59(a) ........................................................................................................30

Fed. R. Evid. 803(8)..........................................................................................................46

## MISCELLANEOUS

*Ex Parte Sullivan*, 2004-0242 (B.P.A.I. 2004) ..............................................................45

## I.    INTRODUCTION

On January 7, 2008, Acushnet Company ("Acushnet") timely filed its renewed motion for judgment as a matter of law and moved for a new trial, following entry of the Court's Judgment on December 20, 2007. D.I. 409, 404.[1] Under an agreed-upon schedule (D.I. 408), this is Acushnet's opening brief in support of its motions.

Acushnet seeks judgment as a matter of law that claims 1 and 4 of Patent No. 6,210,293; claims 1-3 of Patent No. 6,503,156; claim 5 of Patent No. 6,506,130; and claims 1 and 3 of Patent No. 6,595,873 are invalid. The jury found claim 5 of the '293 patent invalid, and the Court entered judgment of invalidity as to that claim.

Acushnet will show that the evidence adduced at trial can support only one legal conclusion -- that all the claims-in-suit are obvious and invalid. Obviousness is a question of law based on underlying factual inquiries. *Daiichi Sankyo Co. v. Apotex, Inc.,* 501 F.3d 1254, 1256 (Fed. Cir. 2007); *Richardson-Vicks Inc., v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed. Cir. 1997). Hence, the Court should grant Acushnet's motion and find all the claims at issue invalid.

Alternatively, Acushnet seeks a new trial on the claims found valid by the jury's verdict. A new trial is warranted because, among other things: (1) the jury's verdict in favor of Callaway is irreconcilably inconsistent with its verdict in favor of Acushnet on claim 5 of the '293 patent; (2) the jury's verdict is against the clear weight of evidence; and (3) evidentiary and other errors of the Court resulted in substantial prejudice to Acushnet's ability to present its case at trial.

---

[1] Acushnet moved at trial for Rule 50(a) judgment. The Court reserved ruling. T.Tr. 1295-1296.

## II.    ACUSHNET SHOULD BE GRANTED JUDGMENT OF INVALIDITY, ON ALL THE ASSETED CLAIMS, AS A MATTER OF LAW

### A.    Summary Of Argument

The Sullivan patents (DX 1-4) claim a multi-layer golf ball comprising a core, a low acid ionomer (or a blend of ionomers) as the inner cover, and a polyurethane outer cover. The claims specify the hardness, and sometimes the thicknesses, of the cover layers. In particular, the polyurethane is required to have a hardness of less than 64, measured on the Shore D scale.

The Proudfit '187 Patent (DX-10) discloses every element of the claims except the polyurethane cover. Polyurethane, however, is a common golf ball cover material, as shown for example in the Molitor '751 Patent (DX-11) or the Wu Patent (DX-13). The combination of the Proudfit patent with either Molitor '751 or Wu, discloses every element of the claims at issue.

An express motivation to combine the references exists, as Molitor '751 teaches that its polyurethane cover can be used on a multi-layer ball such as the Nesbitt '193 Patent (DX-9) or Proudfit. Likewise, Wu teaches that polyurethane can be used as a replacement for balata, the cover material on Proudfit. The content of these prior art references was not disputed at trial.

Moreover, a motivation to combine also exists in the nature of the claimed invention. Polyurethane has been used as a golf ball cover for decades. The use of polyurethane as a cover for a three-piece ball, instead of the balata or Surlyn covers found on Proudfit '187 or Nesbitt, was a routine replacement with no unexpected results. Indeed, in the months after the introduction of the successful Titleist Professional polyurethane-covered golf ball, and the issuance of the Wu patent covering the ball's new castable polyurethane formulation, at least **four** separate entities (Acushnet, Sullivan, Callaway, and Nike/Bridgestone), working independently, designed a multi-layer ball with a polyurethane cover. T. Tr. 241:12-244:15. This evidence adds further to the strong support for a finding of obviousness.

2

The only teaching of the prior art plaintiff seriously disputed at trial was whether Proudfit

combined with Molitor '751 or Wu would result in a ball with a polyurethane cover having a

Shore D hardness of less than 64 measured "on the ball," which is how the Court construed the

claims. Based on the evidence introduced at trial, a reasonable juror could only have found that

the "less than 64" limitation was met. Specifically:

- Molitor '751 taught that its polyurethane cover material should be used with a Shore
  C hardness of 72-76, measured "on the ball." DX-11, Col. 7, lines 27-29. It also
  states that the cover composition should be adjusted to ensure that the required
  hardness is met when the cover was molded on the ball. *Id.* lines 35-53.

- Shore hardness comparison charts of the time show that a 72-76 Shore C hardness
  corresponds to a Shore D hardness in a range less than 60 (and certainly well less than
  64). *See* PX-804. The applicant used comparison charts in the PTO to get one of the
  patents-in-suit (*see* PX-8 at CW0309059-61), and cannot seriously dispute their
  usefulness and teaching in the art. T. Tr. 603:6-604:22

- Other evidence, including Dr. Risen's patents, showed that Shore C measurements of
  around 71 covert to Shore D of approximately 48-49. *E.g.,* DX-1108 at col. 51-52
  (Table 34). So, while no perfect "one-to-one" or linear conversion from Shore C to D
  may exist, the evidence clearly shows that Shore C hardness of 72-76 will be less than
  64 Shore D, by an appreciable amount, and that artisans knew that.

- Many measurements of polyurethane are in evidence and all show that polyurethane
  is a soft material, having a Shore D hardness in the 40s or low 50s off the ball. The
  evidence shows that while the hardness may increase some when measured on the
  ball, there is no evidence that an artisan would have believed the Shore D hardness to
  increase so much as to exceed 64 Shore D, on the ball. T. Tr. 615:15-617:24.

In light of this showing, and in the absence of any contrary evidence, no reasonable juror

could conclude that the Shore D hardness of polyurethane on the cover of a ball having the

Proudfit construction would have a hardness greater than 64.

Finally, the commercial success of the Pro V1 does not support a finding that the patents-

in-suit are nonobvious. Where, as here, the obviousness of the claims is apparent over many

pieces of prior art, secondary considerations cannot save the patents. *See Anderson's-Black Rock,*

*Inc. v. Pavement Salvage, Co.,* 396 U.S. 57, 60 (1969). Further, the evidence shows that balls

3

such as the Callaway Rule 35 used the teaching of the Sullivan patents and yet "struggled" in the market. T.Tr. 1048:6-7 (admitting the Rule 35 was not a commercial success); PX-1185. In fact, Callaway has completely abandoned the claimed technology. Tr.T. 1012:18-1014:18. The evidence also shows that the Pro V1's success is due to many factors unrelated to the patents-in-suit. Hence, its success does not support the "legal inference" that the patents are nonobvious.

### B.    Applicable Law To Rule 50(b) Motions Based On Obviousness

To prevail on a renewed motion for judgment as a matter of law, a party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed. Cir. 1998).

Obviousness is a question of law that requires the Court to decide "whether the subject matter of the claimed invention would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter of the invention pertains." *Pharmastem Therapeutics, Inc., v. Viacell, Inc.,* 491 F.3d 1342, 1359 (Fed. Cir. 2007).

The jury's determination that some claims were not proven invalid is reviewed *de novo*. *Dippin' Dots Inc. v. Mosey,* 476 F.3d 1337, 1343 (Fed. Cir. 2007). The facts underlying the jury verdict, whether explicitly found or implicit in the verdict, are reviewed to determine if they are supported by substantial evidence. *Id. See Richardson-Vicks,* 122 F.3d at 1479 ("In analyzing the correctness of a JMOL overturning a jury verdict, we must consider the facts before the trial court, and then determine whether the trial court's ultimate judgment on obviousness is correct as a matter of law."). Substantial evidence means more than just a scintilla of it. The evidence must be relevant evidence "adequate to support the finding under review." *Perkins-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed. Cir. 1984).

4

### C.    The Claims At Issue Are Invalid As A Matter Of Law Under The "On The Ball" Claim Construction

#### 1.    The Patents In Suit

The patents-in-suit relate to multi-layer golf balls that use polyurethane as the outer cover material. DX-1, Abstract. The patents have effective priority dates of November 9, 1995 for the '293, '156, and '873 patents, and October 13, 1995 for the '130 patent. D.I. 334, Ex. 1 at 3.

The patents all claim essentially the same basic subject matter. The '293 patent is exemplary of these patents. Claim 1 claims "[a] golf ball comprising:"

> a core;
>
> an inner cover layer having a Shore D hardness of 60 or more molded on said core, said inner cover layer having a thickness of 0.100 to 0.010 inches, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and
>
> an outer cover layer having a Shore D hardness of 64 or less molded on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a relatively soft polyurethane material.

Prior art golf balls used polyurethane covers which had Shore D hardness values of less than 64 "on the ball." T.Tr. at 467:1-25. The idea to use polyurethane on a multilayer ball was not new. Rather, the use of polyurethane on a three piece construction was explicitly proposed in Molitor '751. DX-10, col. 3, lines 1-12.

The inventor's lab notebook supports the obviousness of the claimed subject matter. The inventor wrote that his idea was "generally equivalent to [Nesbitt '193]." DX-972 at CW611786.01. He added that he intended merely to make a ball like Nesbitt's using newer materials that were not available to Nesbitt in 1981. *Id.*

The Court should find that Sullivan's work remaking Nesbitt's ball in 1995, using cover materials already known in the art by 1995 is the application of only routine skill in the art.[2]

_____

[2] It was agreed that the critical date for the patents-in-suit is in late-1995. D.I. 334, Ex. 1 at 3.

This seems to be a straightforward application of the Supreme Court's directions in *KSR* that obviousness should be based on a more practical, common sense analysis and that the level of obviousness in an art increases over time. *KSR v. Teleflex*, 127 S. Ct. 1727, 1746 (2007). Sullivan admitted that polyurethane had been used as a cover for solid balls for "decades." T. Tr. 793:24-794:6; DX-843 at 413. A practitioner of ordinary skill certainly can take known materials, like polyurethane, and assemble a ball following the directions of the prior art, such as the Nesbitt patent or Proudfit patent. To grant a patent to this routine practice retards progress in the art, as already known techniques are no longer available to competitors.

Nor did the inventor believe his polyurethane covers were a breakthrough in the art. Polyurethane covers were not even the inventor's preferred mode of making a three-piece golf ball in 1995, at the time he filed his application. T.Tr. 786:14-22. Spalding, the owner of the patents until it filed for bankruptcy, never used the patents and instead made balls, such as the "Strata," using Surlyn over Surlyn covers. *Id.* at 786:23-789:8; 1015:17-1016:5.

## 2.    The Prior Art Generally

Solid-core, multi-layer golf balls have been described by the patent literature since the 1980s. For example, the Nesbitt patent (DX-9) that the inventor sought to mimic discloses a multi-layer ball with a core, an inner cover layer made of a hard Surlyn material, and an outer cover layer made of a soft Surlyn material. *See, e.g., id.,* Fig. 2; col. 3, lines 16-25. Similarly, Proudfit discloses a multi-layer ball with a core, an inner cover layer consisting of a blend of low-acid Surlyns (as in the patents-in-suit), and an outer cover consisting of a synthetic balata blend. *See* DX-10 at Tables 5, 6, and 7.

Polyurethane covers have been known for decades, as Mr. Sullivan admitted. T.Tr. 793:24-794:6; *see also* DX-843 at AC0100935. Polyurethanes were discussed extensively as golf ball covers in patents and publications before the patents-in-suit were filed. *See, e.g., id.;*

Molitor '637 (DX-12, col. 18, line 33-col.19, line 10); Wu (DX-13, *passim*); and Molitor '751 (DX-11, col. 2, lines 33-57). These patents taught skilled artisans that polyurethane was a suitable cover material for all types of golf balls.[3]

Additionally, well before 1995, polyurethane had been widely-used as a cover material in commercial golf balls, with both solid and wound cores. The Spalding Executive golf ball, for example, was a solid core golf ball that used a cover with polyurethane and was sold years before Sullivan filed the '293 patent application in 1995. T.Tr. 789:18-790:1.

Acushnet launched its first urethane-covered ball in Japan in 1993. T.Tr. 351:20-352:6. This ball was renamed the Titleist Professional and launched in the U.S. later that year. *Id.* This ball used the "Wu polyurethane" described in DX-13. *Id.* 352:11-25. The cast polyurethane design in this patent was very successful. The Professional would become the No. 1 ball played on the PGA Tour during the 1990s. *Id.* 357:4-10.

### 3. Proudfit With Molitor '751 Or Wu Discloses All Claim Elements

The Proudfit patent discloses all of the elements of the patents-in-suit except for the polyurethane outer cover. Molitor '751 (DX-11) and Wu (DX-13) disclose such a polyurethane cover, and the combination of Proudfit with Molitor '751 or Wu meets all of the elements of the claims-at-issue. Most of this evidence is entirely undisputed. Indeed, even Callaway's expert, Dr. Risen, agreed that the combination of Proudfit with either Molitor '751 or Wu discloses all of the claim elements except for the Shore D hardness of the polyurethane. T.Tr. 1212:11-1215:2. We review the evidence briefly here. *See also* D.I. 217, App. A-D (invalidity charts on file).

---

[3] One 1976 patent noted that polyurethane-covered balls "had cut resistance comparable to Surlyn covered balls and were found to have even greater abrasion resistance than the Surlyn covered balls" and also that polyurethane-covered balls had "click and feel properties ... comparable to those of the balata covered ball." DX-267 at col. 5, lines 15-18, 20-22.

### a.    Proudfit '187

Proudfit discloses a three-piece solid golf ball that includes: a) a core; b) a hard ionomeric inner cover layer made of a blend of low acid ionomer resins; and c) a relatively soft outer cover layer made of balata or a balata-based material. DX-10, Abstract; col. 5, lines 43-52.

Proudfit discloses that the inner cover layer is a blend of low-acid ionomers, namely Surlyn® 8940 and Surlyn® 9910. Col. 8, lines 23-30. These grades of Surlyn are both low-acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxyl acid. DX-1 at col. 8, lines 15-23. Surlyn® 8940 has a Shore D hardness of 65 and Surlyn® 9910 has a Shore D hardness of 64. T.Tr. 585:2-586:1. Therefore, the blend of materials disclosed by Proudfit has a Shore D hardness of 60 or more, measured off the ball. Its hardness would measure even higher "on the ball," and was never in dispute. *Id.*

Proudfit discloses that the inner cover layer thickness can be "within the range of about 0.0250 to 0.2875 inch." DX-10 col. 7, lines 37-40. The patent states that the "preferred dimensions are ... an inner layer thickness of 0.037 inch...." *Id.* col. 7:43-44. This preferred thickness falls within the claimed range. Hence, the inner cover limitations of the patents-in-suit are met by Proudfit. *See, e.g., Titanium Metals Corp., v. Banner,* 778 F.2d 775, 782 (Fed. Cir. 1985) ("[W]hen, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if *one* of them is in the prior art."); *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311 (Fed. Cir. 2006) (overlap creates prima facie obviousness).

With respect to the outer cover thickness, Proudfit discloses that the "preferred dimensions are ... an outer layer thickness of 0.0525 inch...." DX-10 col. 7:40-46. This preferred thickness falls within the claimed range, and thus anticipates the claimed range. However, in the Proudfit patent, this cover material is a blend of synthetic balata (trans-polyisoprene) and polybutadiene. DX-10 col. 7, lines 46-55.

8

### b.    Molitor '751 Or Wu

Molitor '751 discloses a cover material made of a blend of polyurethane and an ionomer. DX-11, col. 2, lines 38-42. As detailed below, Molitor '751 contains an express teaching that its urethane can be used on a three-piece ball such as Nesbitt or Proudfit. *Id.*, col. 2, lines 7-12. It also teaches that the cover should have an "on the ball" Shore C hardness of 72-76. *Id.* at col. 7, lines 27-39. As described below, this corresponds to a hardness of far less than Shore D 64.

Wu discloses the novel, castable polyurethane used on the *Titleist* Professional ball, and later used on the Pro V1. T.Tr. 350:3-353:14. It is a soft, durable polyurethane that was very successful in the market place. T. Tr. 357:4-10. The patent also contains an express teaching that the Wu polyurethane could be used in place of balata or Surlyn as a cover material. The Wu polyurethane is soft and is measured at a Shore D hardness of 48 to 50 off the ball. *Id.* 493:23-494:3. On the Professional, the polyurethane had an "on the ball" Shore D hardness of 56. *Id.* 467:15-18. It would have a Shore D hardness of less than 64 as the cover of a three-piece ball as well. *Id.* 618:12-23.[4] Thus, the combination of Proudfit with either Molitor '751 or Wu disclosed all of the elements of the patents-in-suit.

### 4.    Motivation To Combine The References Existed

The evidence established a motivation and express teaching to combine the polyurethane references (Molitor '751 or Wu) with Proudfit to make the claimed combination.

First, Molitor '751 contains an express teaching to combine its polyurethane cover with a three piece ball, such as Nesbitt or Proudfit. It states that the polyurethane-based cover material should be used on "two-piece" golf balls, DX-11, col. 2, lines 58-64, and further explains:

> The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, **but also includes balls having a solid layer**

---

[4]   The Court excluded test ball data (D.I. 217, Ex. 34 at AC0131042) showing that the Wu polyurethane had a hardness of 56.8 when put on the core and inner cover of the Proudfit ball.

> **beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to
> Nesbitt, and** other balls having non-wound cores.

*Id.* at col. 2:7-12 (emphasis added). This description of "balls having a solid layer beneath the

cover" describes Proudfit as well as Nesbitt.

Molitor '751 explains that using a cover including soft polyurethane material on such balls

results in "playability properties as good or better than balata-covered wound balls" as well as

making golf balls that are significantly more durable. *Id.* col. 2:61-68. Thus, Molitor explicitly

teaches and motivates the art to apply the polyurethane cover described therein on balls like

Proudfit and Nesbitt, namely that have a core, an inner cover layer, and an outer cover layer.

The Wu patent tells the art to use the Wu polyurethane cover material in place of

balata covers, such as used on the Proudfit ball. Wu explains that there are advantages to using

a polyurethane cover material as a substitute for Surlyn® ionomers or balata in a golf ball cover:

> The problem with SURLYN-covered golf balls, however, is that they lack the
> "click" and "feel" which golfers had become accustomed to with balata. "Click"
> is the sound when the ball is hit by a golf club and "feel" is the overall sensation
> imparted to the golfer when the ball is hit.
>
> It has been proposed to employ polyurethane as a cover stock for golf balls because,
> like SURLYN, it has a relatively low price compared to balata and provides
> superior cut resistance over balata. However, unlike SURLYN- covered golf
> balls, polyurethane-covered golf balls can be made to have the "click" and "feel"
> of balata.

DX-13, col. 1, lines 36-46. Hence, Wu expressly motivates an artisan to use the Wu

polyurethane in place of a balata or Surlyn cover.

In addition, as in *KSR*, 127 S. Ct. 1727, the motivation to combine in this case is also

found in teachings of the prior art itself. In *KSR*, the Court noted that when a technique had been

used to improve one device, and if an artisan would recognize that it would "improve similar

devices in the same way, using the technique is obvious ...." *Id.* at 1740.

10

Here, polyurethane was a well known cover material, used on wound and solid golf balls, and known to have good durability and resilience. T.Tr. 549:12-551:15; 611:19-612:3; DX-843 at AC0100935. Then in 1994 the Wu patent disclosed a castable polyurethane that was especially desirable and was used on the Professional golf ball, the leading tour-played ball in the 1990s. T.Tr. 357:4-10. By April 1995, Kevin Harris of Acushnet asked Ms. Wu to make several balls having the basic construction of the Pro V1 -- a solid center, hard ionomer inner cover, and Wu polyurethane outer cover. DX-830. Acushnet was testing such a ball with professional players in 1996. T.Tr. 362:7-16. In September 1995, Mr. Sullivan at Spalding, also after seeing the Wu patent, asked a technician to make the same type of balls. PX-614; T.Tr. at 782:2-784:8. This work apparently led to the filing of the patent application that led to the patents-in-suit. T.Tr. 782:18-783:8. Callaway too, working independently, had the same idea in 1997, and this led to the Rule 35 ball. *Id.* 1033:14-1034:13; *see* DX-886. Nike/Bridgestone also independently developed a polyurethane-covered three-piece ball called the Nike "Tour Accuracy" or Bridgestone "MC Tour Premium," which was on the market in the late-1990s. *Id.* 242:25-244:2.

Thus, all told, at least four separate companies had the same basic idea described in the Sullivan patents in a short period after the Wu patent was published and the Titleist Professional became successful. All worked independently. None saw or copied the patents-in-suit, which did not issue until years later, beginning in 2001. This close in time and independent adoption further demonstrates the obvious nature of the combination of polyurethane, a soft durable material, with a multi-layer construction. As undisputed evidence, it adds even more to the already compelling case for the obviousness of the patents-in-suit.

## 5.    Reasonable Expectation Of Success

It was simply the exercise of ordinary skill in the art in 1995 to apply polyurethane, such as taught by Wu's 1994 patent, to prior art three-piece balls to achieve the same results --

11

improved durability over balata and improved spin, click, and feel over Surlyn. *See KSR*, 127 S.
Ct. at 1739, T. Tr. at 617:25-618:11. Also, one of ordinary skill would have a reasonable
expectation that using polyurethane on a three-piece ball would give one a useful combination
and have a Shore D hardness of less that 64, as the Sullivan claims require.

The evidence shows that polyurethane is a soft, flexible material with a Shore D
hardness, measured "off the ball" in the 40s or low 50s. T.Tr. 615:17-616:2; *id.* at 467:1-468:14;
*id.* at 493:23-494:3. While the hardness may go up some amount measured "on the ball,"
polyurethane is sufficiently soft that the resulting "on the ball" hardness would be much less than
64. *Id.* 616:3-618:23. For example, the Wu polyurethane is measured at a Shore D hardness of
around 48 Shore D off the ball. *Id.* 615:17-616:2. On the Professional ball, the Wu polyurethane
had a Shore D hardness of 56 measured "on the ball." *Id.* 467:15-18. There is no contrary
evidence, and there is no question that in using a polyurethane cover on a three-piece ball, one
would have a reasonable expectation of making a cover with a Shore D hardness of less than 64.[5]

---

[5] Callaway elicited testimony from some witnesses to the effect that the golf ball art was an
"unpredictable" art and that one has to try a combination to gauge its results. T.Tr. 941:18-
942:1. The jury was entitled to credit this testimony as a general statement of golf ball design.
But such "unpredictability" is of no moment on the question of combining polyurethane with a
three piece ball. As to the combination itself, the motivation to combine is expressly taught in
art such as Molitor '751. In addition, polyurethane was a known cover material, and its selection
for an outer cover was a straightforward matter. DX-843 at AC0100934.

Similarly, as to the hardness "on the ball," there is nothing "unpredictable" about this
measurement. Soft materials "off the ball" generally stay soft on the ball. T.Tr. 617:15-24; *see
also, e.g., id.* 461:5-465:6; 467:5-7; 467:8-468:19. Knowing the exact hardness on the ball
requires only a routine measurement (*e.g., id.* Tr.T. 462:18-469:16; 494:5-495:10; 497:15-25;
500:18-503:1; 970:20-972:5), safely approximated with the knowledge that the hardness will be
somewhat harder on the ball than off (*id.* 617:15-24; *e.g., id.*, 461:5-465:6; 467:5-7; 467:8-
469:16). This is not at all "unpredictable."

While some aspects of golf ball design may be unpredictable, that gnomic utterance has no
pertinence to the combination of polyurethane on a three-piece ball as claimed in these patents.

Similarly, it was the exercise of ordinary skill (and typical) to develop golf balls to achieve a Shore D hardness of less than 64. Prior art golf balls produced for the professional market were routinely designed to have a Shore D hardness of well below 64. T.Tr. 461:5-20; 464:22-469:7. A relatively soft outer cover was what was expected by the professional golfer, (*id.* 461:7-25; 462:10-14; 464:25-469:16; 237:23-238:2); it was no invention to produce a cover having the hardness value in a range already used and demanded by golfers.[6]

### 6.    Polyurethane Shore D Hardness "On The Ball"

The only limitation of the prior art disputed by Callaway was whether the prior art taught that the polyurethane cover material had a Shore D hardness of less than 64, measured "on the ball." T. Tr.at 1212:11-1215:2. Significantly, however, Callaway offered **no evidence** that the "on the ball" hardness was in fact greater than 64. Rather, it merely questioned whether a hardness less than 64 Shore D was disclosed by the prior art, or whether a *specific* value from any conversion of Shore C to Shore D could be known with absolute certainty.

A reasonable juror could reach only one conclusion on this point -- namely that the Molitor '751 patent taught that the Shore C hardness "on the ball" should be in the range of 72-76, and that this range taught an "on the ball" hardness in a range less than 64 Shore D. Without dispute, Molitor '751 states that the preferred hardness for the polyurethane cover material is 72-76, Shore C, and that the content of the cover can be modified slightly to maintain the required Shore C hardness on the ball. DX-11, Col. 7, lines 25-43. Further, without dispute, hardness

---

[6] Thus, even if one assumes, contrary to the evidence, that an "on the ball" hardness less than Shore D 64 was not knowable directly from the prior art references, the combinations of Proudfit with Molitor '751 or Wu nonetheless render the patents obvious under *KSR*. *See, e.g., Leapfrog Enters. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (while the combination argued lacked a reader, a reader was well-known and not uniquely challenging to implement, and thus the patent was obvious); *In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007) ("[W]e do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art.").

comparison charts used by ordinary artisans show that a hardness measurement in the 72-76

range, Shore C, is equivalent to a measurement on the Shore D scale in a range well less than 64.

While Callaway challenged whether the Shore C range of 72-76 of Molitor amounted to a

Shore D hardness of less than 64, the substantial evidence of record proved otherwise. Dr.

Risen, Callaway's expert witness and consultant, was of the view that "you can't make such a

conversion." T.Tr. 1162:3-18. The evidence conclusively rebuts this conclusion—viz:

- The ASTM, the standards body that promulgates the Shore C and D standards, publishes "comparison charts" that allow users to compare values on the Shore C and D scales. (PX-804). A copy of the comparison chart is set forth below:

| Type A | | | | 10 20 30 40 50 60 70 80 90 100 | | | |
|---|---|---|---|---|---|---|---|
| Type B | | | | 10 20 30 40 50 60 70 80 90 100 | | | |
| Type C | | | | 10    20 30    40    50 60 70 80 90 100 | | | |
| Type D | | | | 10      20      30 40 50 60 60 70 80 90 100 | | | |
| Type DO | | | 10 20 30    40   50   60    70    80    90    100 | | | | |
| Type O | | 10 20 30 40 50 60 70 80 90 100 | | | | | | |
| Type OO | 10 20 30 40 50 60 70 80    90    100 | | | | | | | |

- As the chart and accompanying text explain, no simple, linear relation exists between Shore C and D measurements and a direct conversion from C to D cannot be done with the chart. But the comparison charts do show an approximate relation between the scales. A Shore C of 72-76 compares to a Shore D in the 50s, and certainly less than 60 and less than 64 on the chart. While we may not know if 72C "converts" exactly to 50D or 51D, an artisan knew from the chart that the range 72-76C would be less than 60 Shore D.

- During the prosecution of the '873 Patent, Callaway used one of these comparison charts to argue that Shore C values in the specification could be "converted" to Shore D values as claimed in the claims. PX-8 at CW0309061. Clearly, one skilled in the art would understand that such a comparison could be made, as Callaway did so itself in order to get the patents in the first instance.[7]

---

[7] Callaway's very misleading trial argument that the PTO did not accept this argument is belied by the facts. T.Tr. 1238:23-1241:4. The record shows that the PTO maintained its rejection under 35 U.S.C. § 112 not because the C to D conversion could not be made, but because the specification did not support the entire range of the claims (i.e., it did not disclose hardnesses for the *entire range* up to 64 Shore D, but only to 45, to which 65 Shore C corresponds). This is a point completely unrelated to the Shore C to D conversion. PX-8 at CW0309065. The PTO rejected these claims because they were too broad given their modest disclosures -- not because the Shore C values did not disclose a Shore D value less than 64.

- The patents-in-suit correlate Shore C to Shore D in several places. The "Summary of the Invention" section states that polyurethane has "a Shore D hardness of about 45 (i.e., Shore C hardness of about 65)." *E.g.*, DX-1, Col. 3, lines 53-54. Thus, by reading the patents themselves one learns that a Shore C of 65 is a Shore D of about 45. Again, by looking at the comparison charts one sees that a slightly higher Shore C of 72-76 will be much less than Shore D 64. Table 9 of the patent contains similar data.

- Dr. Statz, and the inventor, Mr. Sullivan, both testified from their experience that a Shore C of 72-76 was much less than a Shore of 64. T.Tr. 601:7-602:3; *id.* 802:20-803:17.

- Dr. Risen's patents showed materials having Shore C measurements in the 70s that were converted to Shore D measurements of much less than 64, often to values in the high-40s on the Shore D scale, which is consistent with the patents-in-suit, the comparison charts, and the testimony of Dr. Statz and Mr. Sullivan. *E.g.* DX-1108 table 27.

**There is no contrary evidence.** Callaway offered no evidence that a Shore C measurement of 72-76 could correspond to a Shore D measurement greater than 64. It argued only that a direct "conversion" could not be done. The evidence showed irrefutably, however, that a comparison could be done, and that artisans did use such comparison charts to compare Shore C and Shore D measurements. T.Tr. at 601:7-19.[8]

Every element of the claims-in-suit is present in the combination of Proudfit's three-piece golf ball with either Molitor '751 or Wu. As a result, the patents are invalid as obvious.

### 7. The Asserted Claims Are Invalid Over The Wilson Ultra Tour Balata Ball In View Of Molitor Or Wu

Judgment of invalidity as a matter of law should also be granted with respect to the Wilson Ultra Tour Balata in view of either the Molitor '751 or Wu patents. Acushnet proved with ample clear and convincing evidence that the Wilson Ultra Tour Balata ball that was on sale in 1993 (DX-145.3) had all of the features of the asserted claims with the exception of a polyurethane outer cover. T.Tr. at 339:14-21; 340:20-23; 341:10-345:13; 497:15-498:2; 499:5-

---

[8] Of course, the Court excluded actual measurements of the hardness of Molitor's polyurethane which showed that the hardness was indeed less than 64. D.I. 217, Ex. 34 at AC0131042; D.I. 362. Nonetheless, the evidence in the record supports no other conclusion.

11; 500:6-25; 502:1-503:1; 507:22-508:22; 528:18-25; 532:1-533:22; DX-1030; DX-68 at

AC0072945; DX-1044; DX-1033; DX-1035; DX26.1. This evidence included testimony

(including that of the inventor of the Wilson ball, Mr. Proudfit), contemporaneous testing

documents, and recent testing documents. Callaway did not dispute any of this evidence, nor did

it offer any contrary evidence. In addition, Dr. Statz testified that it would be obvious to use the

polyurethane of Molitor '751 or Wu as the outer cover of the Wilson Ultra Tour Balata ball itself

(as distinct from the Proudfit patent). T.Tr. 594:13-595:24; 619:5-8. Dr. Risen did not address

these prior art combinations in his testimony. Indeed, he could not do so, since his report

contained no opinions with respect to these combinations, as he confirmed in his deposition. Ex.

1, Risen Tr. at 243:25-244:9; 16:14-17. Since the evidence and opinions offered by Acushnet

with respect to these combinations were wholly uncontroverted, and they establish clearly and

convincingly the obviousness of the asserted claims, judgment as a matter of law is appropriate.

**D.    The PTO Did Not Consider All The Evidence In This Trial**

Contrary to the arguments plaintiff made to the jury, the evidence was much more

detailed and complete than the record before the PTO during the initial examination. As a result,

the rationale for applying a presumption of validity is diminished. *See KSR,* 127 S. Ct. at 1745.

Plaintiff argued that the key prior art references, Proudfit, Wu, and Molitor '751 were

before the PTO during the prosecution of the Sullivan patents. While this is true so far as it goes,

it overlooks many factors. First, Sullivan removed Proudfit as prior art with an improper

declaration in the '585 application. DX-27 at CW0300437-442, 449. Moreover, the PTO did

not have before it the information on the hardness of the Proudfit inner cover layers, nor the fact

that the inner layers were low acid ionomers. While Proudfit discloses the brand of Surlyns used

in the inner layer, the applicant never submitted data sheets or other information that would

allow the PTO to understand the relevance of the Proudfit patent, and in particular to let the PTO

16

know that Proudfit disclosed a low acid inner cover with a Shore D harness greater than 60D. In fact, Spalding likely misled the Examiner about Proudfit's inner cover, arguing erroneously that Proudfit "does not disclose an inner cover layer with a carboxylic acid." PX-8 at CW 0309032.

Likewise, while the patents-in-suit mention the Molitor '751 patent in their specification (*e.g.*, DX-1, Col. 5, lines 13-15), the applicant never told the PTO that Molitor discloses a polyurethane cover or that it contained an express teaching to combine polyurethane with the three-piece Nesbitt ball. Indeed, the citation of Molitor '751 in the specification, as teaching that soft covers allow accomplished golfers to impart spin to the ball, seems intended to discourage the examiner from reading the reference.

Also, the real world evidence of the Wilson Ultra Tour Balata and Professional golf balls was not before the PTO, nor was the evidence of multiple, near simultaneous development of polyurethane covered three-piece balls by four independent groups. T.Tr. 614:3-25. In all these respects, the Court heard much more evidence bearing on this issue than did the PTO.

### E.    Secondary Considerations Do Not Save The Sullivan Patents

The evidence demonstrated that the *Titleist* Pro V1 was a very successful product. Callaway asserted that this success was objective evidence that the patents-in-suit are non-obvious, both because of how successful the ball was and because the success was unexpected. These secondary considerations, Callaway maintained, demonstrate nonobviousness.

While the existence or not of so called "secondary considerations" is a question of fact, the weight to be accorded these secondary considerations is part of the ultimate determination of obviousness as a matter of law. *Graham v. John Deere & Co.*, 383 U.S. 1, 35-36 (1966); *Dystar GmbH v. C.H. Patrick*, 464 F.3d 1356, 1371 (Fed. Cir. 2006). In this case, the Court should accord the secondary consideration evidence little or no weight. In all events, the secondary considerations do not save the patents in suit from the conclusion that they are obvious.

17

### 1.    Law Of Secondary Considerations

In *Graham v. John Deere & Co.*, the Supreme Court addressed for the first time the

standard for obviousness under 35 U.S.C. § 103. In focusing on what it called "secondary

considerations" relating to non-obviousness, the Court stated:

> Such secondary considerations as commercial success, long felt but unsolved needs,
> failure of others, etc. might be utilized to give light to the circumstances surrounding the
> origin of the subject matter sought to be patented. As indicia of obviousness or non-
> obviousness, these inquiries may have relevancy.

383 U.S. at 17-18.

One of the patents in *Graham* covered a spray nozzle used on aerosol containers. The

patentee argued that the invention was a great commercial success, that the patentee had

succeeded where others failed to make the invention, and that these facts support patentability.

*Id.* at 35. The Court noted that these "legal inferences" or "subtests" for obviousness may be

helpful in certain cases. *Id.* at 35-36. However, in *Graham,* the great commercial success could

not overcome the fact that the prior art was too close and the patented idea was obvious. Hence,

the Supreme Court held the patent invalid, despite the commercial success.

Similarly, in *Anderson's-Black Rock, Inc. v. Pavement Salvage, Co.,* 396 U.S. 57

(1969), the Supreme Court recognized that secondary considerations cannot convert an obvious

idea into a patentable one. *Anderson's-Black Rock,* like this case, involved a combination of

two known elements -- a radiant heater and a paving machine -- that had no unexpected results

but functioned in combination just as a heater and paving machine would be expected to function.

Despite the enormous success of the invention, the patent was still found invalid. *Id.* at 62-63.

Since *Anderson's-Black Rock,* Federal Circuit cases have followed the principle that

secondary considerations cannot save a patent that is clearly obvious in light of the prior art.

*See, e.g., In re Inland Steel,* 265 F.3d 1354, 1366 (objective indicia of non-obviousness were

"insufficient to overcome the strong prima facie obviousness case"); *Sandt Tech, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344 (Fed. Cir. 2001) (secondary considerations, including commercial success, could not overcome obviousness). *See also KSR*, 127 S. Ct. at 1745.

Furthermore, the patentee must establish a nexus between a claimed invention and any secondary considerations before they can be given weight. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985). In other words, there must be some connection between the commercial success and the claims of the patent, before the commercial success can be considered probative of whether the patent is non-obvious. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Where the patentee cannot establish such a nexus, the alleged secondary consideration is given little or no weight. For example, the commercial success of a product sponsored by the preexisting market leader is of limited probative value, as the success of then products is likely attributable to brand reputation. *See Pentec*, 776 F.2d at 316 ("Because GC was clearly the market leader well before the introduction of [the product covered by the patent], its sales figures cannot be given controlling weight … in this case on the question of obviousness."). *See also Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.*, 444 F.2d 295, 300 (9th Cir. 1970) (same). This is especially true when the commercial success of a new product results largely from the cannibalization of sales of the market leader's previous products. *See McNeil-PPC, Inc. v. Perrigo Co.*, 516 F. Supp. 2d 238, 254 (S.D.N.Y. 2007).

Finally, when a commercially successful product is covered by multiple patents, it makes it very difficult to attribute commercial success to any one of those patents. *See id.* at 254-55 (finding no nexus between commercial success and asserted patent where patented product was covered by three different patents).

### 2.    Commercial Success

The commercial success of the Pro V1 does not establish that claims at issue are non-obvious for three compelling reasons. First, the prior art is too close and the obviousness too clear for any secondary considerations evidence to change the result. Second, the required nexus is not present; plaintiff proved only that the Pro V1 was a success, not that this success was due in any quantifiable way to the use of the patents as opposed to existing ideas in the art, or other technology or patents. Third, it is undisputed that many other factors unrelated to technology and performance played a major role in the success of the Pro V1. Hence, the legal inference of validity that plaintiff seeks to draw from the Pro V1 success is not warranted.

First, the evidence of obviousness in this case, discussed above, is compelling. Secondary considerations, even if present, cannot save a clearly invalid patent, as the Supreme Court makes clear in *Graham v. John Deere* and *Anderson v. Black Rock.*

Second, the absence of a nexus between the success of the Pro V1 and anything novel in the Sullivan patents further precludes the inference of non-obviousness that plaintiff seeks to draw. The core of the problem with Callaway's commercial success argument is that the patent claims are overbroad (and hence invalid). Putting polyurethane on a three-piece ball was not even a new idea (Molitor taught it), much less the critical ingredient in commercial success. Many balls had polyurethane covers. Some, such as the Pro V1, succeeded. Some, like the Callaway Rule 35, Callaway's own commercial embodiment, "struggled" and failed outright.

For example, the data from PX-1185 compares the sales of the Pro V1 to the combined sales of **all** the Callaway balls that ever practiced the Sullivan patents. The evidence shows that the Pro V1 was vastly more successful than all of the Callaway balls combined. As all of the balls on this chart practiced at least one of the patents-in-suit, it seems self-evident that the success of the Pro V1 is due to factors other than those patents.

20



In addition, Nike and Bridgestone also introduced three-piece, solid core balls with polyurethane covers to the market, and the Nike ball (the Tour Accuracy) was even adopted by Tiger Woods. T.Tr. 251:8-251:18. Despite his support, these balls still had only limited success on tour and in the market. *Id.* 244:15-245:21. Once again, the evidence suggests that the success of the Pro V1 is due to factors other than practicing the invention. If Spalding and Callaway truly believed that practicing the claims of the Sullivan patents was the reason the Pro V1 was successful, one wonders why Spalding never chose to use this claimed technology in its products, and why Callaway has since abandoned it completely.

The evidence of contemporaneous, independent adoption of the same basic idea by other companies is strong evidence of obviousness. Callaway (Rule 35), Nike (Tour Accuracy), Bridgestone (Precept Tour Premium), and Titleist (Pro V1) all introduced polyurethane covered, multi-layer solid construction balls in the market before the patents-in-suit even issued.[9]

---

[9] The Callaway Rule 35 was introduced in early 2000. T.Tr. 244:3-244:7. The Bridgestone MC Tour Premium was introduced in October 1999. *Id.* 242:22-243:9.

None of these companies copied or appropriated the patents to make their commercial products. Indeed, Titleist had been working on a solid construction ball with a urethane cover as early as 1995, many years before the Pro VI was launched, and all of that work was done without any knowledge of the patents-in-suit. T.Tr. 367:24-368:21; DX-830. The fact that four companies launched a solid construction ball with a urethane multi-layer cover at about the same time, and all well before the patents-in-suit even issued, strongly suggests the patents are invalid. *See, e.g., Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 883-84 (Fed. Cir. 1998) (considering contemporaneous invention by others in obviousness analysis).

In addition, the actual construction of the Pro V1 is nowhere disclosed in the Sullivan patents. The patents claim broadly any polyurethane and any low acid ionomers. The patents claim broadly ranges of hardnesses (greater than 60, less than 64) and thicknesses of the covers (outer covers can be as small as 0.010 inches (which is thinner than the dimples of most balls) to 0.070 inches (more than twice the size of the Pro V1 cover)). As Mr. Yagley and others testified, small changes in design can have a large influence on the final commercial product. T.Tr. 1038:5-1039:9. Moreover, Mr. Yagley showed that many vastly different balls (over 3000) can use the claimed technology, many having poor, undesirable playing characteristics. *Id.* 1036:10-1038:9. All of this work thus falls within the claims of the Sullivan patents. Hence, the broad, very general disclosure of these patents in no way discloses the actual construction of the Pro V1.

The Pro VI design possesses many attributes that are not even remotely suggested by the disclosure of the patents-in-suit. It combines a very thin inner cover with a super thin (0.030") veneer outer layer of castable, Wu polyurethane. T.Tr. 361:8-24. The patents do not teach this combination. Instead, they claim broad, general ranges of thicknesses.

The claims also omit many features important to the Pro V1, such as size of the core and the castable polyurethane cover material patented by Acushnet. Because the ranges in the patent claims are both broad in some respects, and at the same time omit important features of the Pro V1, it is not possible to attribute the success of the Pro V1 to the patents in suit. *See Joy Techs., Inc. v. Manbeck,* 751 F. Supp. 225, 229-30 (D.D.C. 1990) ("The claims are broader in scope than the objective evidence [of non-obviousness] if a limitation or element recited in the claim is broader than the limitation or element in the objective evidence ... or if the objective evidence ... contains limitations or elements not recited in the claims (citing *White v. Jeffrey Mining Mach. Co.,* 723 F.2d 1553, 1559 (Fed. Cir. 1983); *In re Fenn,* 639 F.2d 762, 765 (CCPA 1981).).

Finally, the evidence established that many factors other than the patents-in-suit led to the success of the Pro V1. Other factors, such as brand loyalty, Titleist's leading position in the market, and external market forces also contributed greatly to the success of the Pro V1. These other factors further diminish any connection between the Pro V1's success and the patents.

For example, the Pro V1 is sold under the Acushnet premier brand Titleist. As Callaway's own personnel testified, Titleist's Pro V1 success is due in large part to its brand reputation, tour acceptance, greater distribution and penetration, and are in many more pro shops. T.Tr. at 897:4-25; 1073:11-1074:11. Titleist's mission has long been to be the leading brand of the golf professional and the golf pro shop because this represents and reinforces Titleist's reputation for premium quality and performance. *Id.* 221:18-227:20. In the golf ball market, brand is one of the most important factors affecting the commercial success of a golf ball. *Id.* 892:17-893:1. Spalding also recognized the power inherent in the Titleist brand and identified it as one of Titleist's key strengths. *Id.* 871:4-872:7.

23

Titleist balls, of various constructions, have been the most played ball at the U.S. Open each year for decades. T.Tr. 224:9-227:20. For the past 25 years, Titleist has been played by the majority of professional players on the U.S. PGA Tour and more than all other golf balls combined. *Id.* Professional golfers have always preferred Titleist balls (of many different constructions) by a wide margin over other balls. Titleist's strong market position, and golfers' allegiance to brands rather than technology, further attenuates Callaway's claim of commercial success as an indicia of non-obviousness. T. Tr. 891:14-892:6; 896:7-898:13.

In addition, external market forces clearly played an important role in the adoption of solid construction, urethane covered golf balls. In 1999 Tiger Woods switched to a solid, three-piece polyurethane Nike golf ball. He won nine tournaments in 2000. Mr. Woods' use of this ball almost certainly sparked an interest in solid construction golf balls. *Id.* 251:8-18. Several other factors also contributed to this shift in the type of ball sought by tour professionals. Newer and improved golf equipment such as oversized metal woods and titanium drivers allowed golfers to hit the ball farther with acceptable spin off the tee. Additionally, golfer's today are physically stronger and have the power to strike the ball with high club speeds, and thus benefit from a distance-oriented ball. *Id.* at 249:22-251:2.

Indeed, Callaway's own marketing personnel have testified that there are many factors that have been primary driving forces behind the commercial success of the Pro VI other than the performance of the ball itself, including the factors set forth above. T.Tr. 1074:11:-1075:2. This further demonstrates the futility of any effort to ascribe the success of the Pro VI and similar balls to the patents-in-suit.

### F.    Grant Of JMOL Invalidating The Sullivan Patents Is Proper

Clear and convincing evidence demonstrates that the Sullivan patents are invalid. The combination of the Proudfit and Molitor '751 or Proudfit and Wu references, for example,

24

disclose every element of the claims; the motivation to combine the references exists, and the use of polyurethane on a three piece ball was shown to be the exercise of routine skill in the art.

The Supreme Court's analysis of the obviousness question in *KSR* is directly on point with the facts in this case. In *KSR*, the Supreme Court held that summary judgment of obviousness was appropriate where the claims constituted no more than a combination of old elements in a predictable way to yield predictable results. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S. Ct. at 1739. *See also Leapfrog Enters.*, 485 F.3d at 1162; *Pharmastem Therapeutics*, 491 F.3d at 1359-65; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364-71 (Fed. Cir. 2007); *Dystar*, 464 F.3d at 1371; *Frisket, Inc. v. RealNetworks, Inc.*, 2007 499 F.Supp. 2d 1145, 1147-49 (N.D. Cal. 2007).

Like in *KSR*, the patents-in-suit do no more than combine familiar elements (a three-piece solid construction golf ball and a polyurethane cover) to yield predictable results. The combination is suggested explicitly in the prior art and requires nothing more than routine skill. "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 127 S. Ct. at 1740. Here, both Wu and Molitor '751 provide conclusive evidence that a ordinary artisan would know to use a polyurethane cover to replace the balata or ionomer outer cover layer of a three-piece solid construction golf ball. Similarly, as discussed above, the prior art shows that it was known that tour-played golf balls were soft (less than 64). T.Tr. 461:17-462:14; *id.* at 465:4-468:19.

In this case, a grant of judgment as a matter of law that the claims at issue are invalid is proper. The jury found one claim invalid. The evidence before the Court demonstrates that the

patents are invalid. There are no material facts that are disputed or where unique deference is due

the jury verdict. What is at issue in this case is the legal question of whether the patents are invalid

based on a weighing of all the relevant facts. The Court conducts this inquiry as a matter of law,

and should find the claims at issue are invalid as obvious.

In addition, the Court may give due consideration to the PTO's actions in connection with

the patents-in-suit. The Federal Circuit has stated that a district court, in addressing patent

invalidity, should give regard to a PTO reexamination proceeding as part of the evidence bearing

on the validity of the patent. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d

955, 961 (Fed. Cir. 1986) (district court failed to "give any credence to the PTO reexamination

proceeding"); *Pfizer, Inc.*, 480 F.3d at 1360 (basis of an "examiner's initial finding of prima

facie obviousness of an issued patent" is a consideration "the trial court must consider in context

of the totality of the evidence 'in determining whether the party asserting invalidity has met its

statutory burden ....'") (quoting *Fromson v. Advance Offset Plate*, 755 F.2d 1549, 1555 (Fed.

Cir. 1985) (examination proceedings are "evidence the court must consider")). A case in point is

*Fresenius Medical Care Holdings v. Baxter Int'l, Inc.*, wherein the district court was urged in

summary judgment proceedings to ignore both pending reexamination proceedings and a final

Board decision of the PTO in a related application to the patents-in-suit. 2006 WL 1330003

(N.D. Cal. May 15, 2006). The district court rejected such argument, determining this evidence

relevant and admissible on the question of validity of the patents at issue. *Id.* at *4.

Here, at least two different patent examiners have found the patents-in-suit to be invalid

during the pending reexaminations, over the same prior art that was before the jury. Additionally,

as required during *inter partes* reexamination, these Examiners conferred with two other

Examiners prior to issuing each office action. MPEP § 2660 IV. The other two Examiners also

signed-on to these office actions. *See, e.g.* Ex. 2 ('873 reexam) at 170. The record in those proceedings is voluminous, and attests to the care and expertise the Patent Examiners have given to this work. *See* D.I. 185 Exs. A-D; D.I. 118, Exs. 1-4; D.I. 328 Ex. 1 & Ex. 2 (make exhibit of latest '873 action). While these actions are not final, it would be a mistake, Acushnet submits, not to give due consideration to the fact that the PTO has consistently found these patents to be invalid during the reexaminations over the same prior art. The actions of this body, charged by Congress with responsibility and expertise in these matters, tend to confirm the result proven in this Court, namely that the claims at issue are invalid.

Likewise, the Court may note the final, unappealed January 2004 decision of the Patent Office Board of Appeals in *Ex parte Sullivan.* D.I. 217, Ex. 41. There the Board of Appeals rejected as obvious over Nesbitt in view of Wu claims nearly the same as those in the claims at issue here. Callaway sought such claims as part of a continuation application for the '873 patent. *See* Ex. 3 (U.S. P.T.O. Patent Continuity Data). The PTO Board stated:

> [T]he [1994] teachings of Wu clearly would have made it obvious at the time the invention ... to a person of ordinary skill in the art to have modified Nesbitt's golf ball by using polyurethane as the outer cover material to achieve the expected benefits therefrom taught by Wu (i.e., to have the "click" and "feel" of balata; improved shear resistance and cut resistance; durability; and resiliency). Thus, it would have been obvious to one skilled in the art to have modified Nesbitt's three-piece golf ball having a spherical core, an inner cover layer of type 1605 Surlyn and an outer cover layer type of 1855 Surlyn by replacing the type 1855 Surlyn in the outer cover layer with polyurethane as suggested and taught by Wu.

D.I. 217, Ex. 41 at 11(emphasis added); *id.* at 8-9. Here as well, the Board of Appeals' decision supports the combination of the Wu polyurethane reference with the references showing a three-piece ball, such as Nesbitt and Proudfit, and also supports the obviousness of the patents-in-suit.

## G.    The Claims Are Invalid Under The "Off The Ball" Construction

In its claim construction ruling (D.I. 345), the Court ruled that while there was support in the specification for measurements made both "on" and "off" the ball, the "semantics" of the

claim supported an "on the ball" construction, as the claim specified the hardness of a layer, rather than the material of which the cover layer was made.

Acushnet respectfully suggests that this construction was in error. First, the construction the Court adopted simply cannot be correct. Other claims, such as claim 4 of the '293 Patent, similarly claim "a cover layer" having a modulus within a specified range. (DX-1 at Col. 24, lines 29-33). However, it is undisputed that the flexural modulus of a cover layer material cannot be measured "on the ball." D.I. 207 at 14-16. Hence, the reference to a "cover layer" in this claim must mean a reference to the material of which the cover layer is made. As the term "cover layer" must be construed consistently in each claim, *see CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997), the intrinsic evidence of the claims themselves dictate that the Shore D measurements refer to the properties of the cover layer material, an "off the ball" measurement.

Likewise, the Court's approach ignores a plain specification definition for the hardness measurement. The specification states that Shore D measurements are made using the ASTM D-2240 standard. DX-1, col. 16, lines 49-50. This is a measurement "off the ball," and on a plaque. The specification definition should control under established precedent. *See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.")

We respectfully submit that the evidence at trial demonstrated another flaw in the "on the ball" construction. As the evidence at trial demonstrates, the "on the ball" hardness measurement often is dependent on the thickness of the cover layer. T. Tr. 615:22-617:2. In particular, at cover thicknesses of less than 0.050", the hardness measurement will depend on the thickness of the cover, as a thinner cover causes the measurement to be effected by the substrate of the ball. T. Tr.

28

615:15-616:20. As the patents cover a broad range of thicknesses, from 0.01 to 0.07" for the outer cover, for example, the reference to an "on the ball" hardness is simply ambiguous. This ambiguity is avoided by construing the measurement, as defined in the patent, to be the measurement of the material hardness of a plaque, made off the ball. The plaque measurement is fixed, and is not dependent on cover thickness. Based on this additional evidence, the Court should revise its claim construction and find the hardness should be measured "off the ball."

If the Court corrects the claim construction to allow the Shore D hardness of various layers to be measured "off the ball," then judgment as a matter of law for Acushnet is required. As with other evidence, the Shore D measurements of all the various materials "off the ball" is undisputed and all meet the claims at issue. The dispute about whether a Shore C measurement on the ball can be converted to a Shore D value is no longer an issue, as the "off the ball" hardnesses of the Molitor '751 and Wu polyurethanes are not in dispute and meet the limitations at issue.

Either way, Acushnet maintains that it should be granted judgment as a matter of law that the claims at issue are invalid. In the alternative, if the Court believes it would be more appropriate to grant a new trial under the corrected claim construction, Acushnet so moves.

## III.   IN THE ALTERNATIVE TO JUDGMENT AS A MATTER OF LAW, ACUSHNET SHOULD BE GRANTED A NEW TRIAL ON THE VERDICTS AGAINST IT, ON SEVERAL ALTERNATIVE GROUNDS

For each of the claims for which the jury found in Callaway's favor, Acushnet seeks a new trial as an alternative to judgment as a matter of law.[10] The jury's verdicts in favor of Callaway are against the great weight of the evidence presented at trial, and are furthermore

---

[10] The claims on which Acushnet seeks a new trial are claims 1 and 4 of the '293 patent, 1-3 of the '156 patent, 5 of the '130 patent, and 1 and 3 of the '873 patent. The jury's verdict on claim 5 of the '293 patent is unchallenged and should stand. Callaway did not renew within ten days of the judgment its Rule 50(a) motion, nor request a new trial, on this claim.

inconsistent with the verdict on claim 5 of the '293 patent. Several erroneous evidentiary rulings, which substantially prejudiced Acushnet, also justify a new trial.

Rule 59 of the Federal Rules of Civil Procedure allows a court, in its discretion, to grant a new trial "on all or some of the issues" in an action in which there has been a trial jury "for any reason for which new trial has heretofore been granted in an action at law in Federal Court...." Fed. R. Civ. P. 59(a). *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). New trials are commonly granted in at least the following circumstances: (1) where the verdict is against the clear weight of the evidence, and a miscarriage of justice must be prevented; (2) where the verdict is facially inconsistent, and cannot reasonably be reconciled based on the evidence heard by the jury; (3) where improper arguments unfairly influenced the verdict outcome; and/or (4) where substantial (i.e., prejudicial) errors were made in the admission or rejection of evidence. *See generally Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993); *Genzyme Corp. v. Atrium Med. Corp.*, 315 F. Supp. 2d 552, 562 (D. Del. 2004).

### A.   The Verdicts Were Irreconcilably Inconsistent And Against The Clear Weight Of Evidence; A New Trial Should Be Granted For Either Or Both Of These Reasons

#### 1.   The Verdicts For Callaway Cannot Be Reconciled With The Verdict For Acushnet

Inconsistent jury verdicts warrant a new trial. *See, e.g., Malley-Duff & Assoc. v. Crown Life Ins. Co.*, 734 F.2d 133, 145-46 (3d Cir. 1984); *Repola v. Morebark Indus.*, 934 F.2d 483, 485 (3d Cir. 1991) (remanding for a new trial where the verdict was "inconsistent and utterly irreconcilable"). While a court should endeavor to interpret a jury's findings as consistent whenever possible, a verdict that is inexplicably inconsistent, or reflects confusion on the part of the jury, should be set aside and a new trial granted.

30

If a jury returns an apparently inconsistent verdict, "the district court [should first] carefully review the different portions of the jury's verdict for a means to reconcile them" on any reasonable theory consistent with the evidence and jury instructions. *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1326 (Fed. Cir. 2001).[11] If, however, after undertaking a careful review, there exists no "legal basis, supported by the evidence" upon which the inconsistent verdict might reasonably be based, a new trial should be given. *GNB Battery Tech., Inc. v. Exide Corp.*, 876 F. Supp. 605, 608, 610 (D. Del. 1995) (citations omitted). On the other hand, a jury verdict is *not* reconcilable by reference to theories or evidence not advanced, or by reference to speculative arguments or wild inferences. *See Malley-Duff*, 734 F.2d at 145-46; *ID Sec. Sys. Can. v. Checkpoint Sys.*, 249 F. Supp. 2d 622, 652 (E.D. Pa. 2004).

Here, the verdict of invalidity on claim 5 of the '293 patent demonstrates that Acushnet proved by clear and convincing evidence that this patent claim is obvious over prior art. It is impossible to reconcile the validity verdicts in favor of Callaway with the invalidity verdict on claim 5 of the '293 patent in favor of Acushnet. Secondary considerations were not advanced on a claim by claim basis. **Moreover, the claims-in-suit are not patentably distinguishable.**

In fact, in the original examinations, PX-5 to PX-8, the PTO issued double patenting rejections on all of these patent claims. The '130, '156 and '873 patent claims were rejected for double patenting in view of the '293 patent claims. *See* PX-5 at CW0308327-28; PX-6 at CW0308062; DX-8 at CW0309017. To get the patents despite the double patenting, Spalding agreed to file terminal disclaimers in each case. PX-5 to PX-8. A rejection for double patenting means that the Patent Office determined that the claims were not patentably distinct from claims of the earlier patent or applications. *See In re Longi*, 759 F.2d 887, 893 (Fed. Cir. 1985).

---

[11] Resolution of an actual or apparent inconsistency may be achieved, for example, by properly granting a JMOL motion for Acushnet as to the verdicts in Callaway's favor, thus resolving the inconsistency. *See Mycogen*, 243 F.3d at 1326.

The opposing verdicts on claims 4 and 5 of the '293 patent are fundamentally irreconcilable as a matter of law. Since claim 5 of the '293 is dependent from claim 4, claim 4 must be invalid if claim 5 is invalid. *See, e.g, Cabinet Vision v. Cabnetware*, 1998 U.S. Dist. LEXIS 22763, at *25 (S.D. Cal. Sept. 30, 1998) *aff'd in relevant part, rev'd in part,* 2000 U.S. App. LEXIS 2030, at *13-14 (Fed. Cir. Feb. 14, 2000) (verdict that rendered broader independent claim valid, but dependent claim invalid, was inherently inconsistent). *See also generally Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987).

Similarly, claim 3 of the '873 patent, which the jury upheld, has nearly the identical scope as claim 5 of the '293 patent that was found invalid. There are only minor, semantical distinctions between these two claims, such as that claim 3 of the '873 patent applies the term "disposed on" versus "molded over" and does not use "about" in reference to "at least 60" Shore D hardness. None of the differences between these two claims was at issue in the trial.

In the same vein is claim 5 of the '130 patent. It is again broader than claim 5 of the '293 and virtually the same as claim 4 of that patent. No legally sufficient and plausible basis can reconcile this verdict with the verdict on claim 5 of the '293 patent. All of these verdicts, seemingly distinguishing the obviousness of claim 5 of the '293, over that of claim 4 of the '293 patent, claim 3 of the '873 patent, and claim 5 of the '130 patent, cannot be allowed to stand.

The remaining claims (claim 1 of the '293 patent, claims 1-3 of the '156 patent, and claim 1 of the '873 patent) differ from the above claims only by claiming a *blend* of ionomers for the inner cover. However, this cannot matter to the jury's determination of obviousness. Proudfit discloses such a blend of ionomers. *See* DX-10, col. 8, lines 23-30; *see supra* at 7-9. In fact, Callaway's expert never disputed that Proudfit taught an inner cover layer blend that satisfies the ionomer elements of all of the claims; nor did he opine that there was a patentable

32

difference between some of the claims over the body of prior art due to the presence or absence of a blend of ionomers. *E.g.*, T.Tr. 1158:7-59:8; 1212:11-1213:17. Thus, there is no legal basis, supported by the evidence and arguments, upon which the differing verdicts on the "blend of ionomer" claims can be reconciled.

In short, if claim 5 of the '293 patent is obvious, then the other claims must also be obvious. None of the evidence can support a scenario that rationally, and within the bounds of a proper obviousness determination, reconciles the verdicts. The inconsistencies in the jury's determination warrant a new trial.

### 2.    The Great Weight Of The Evidence Stands Against The Verdict, And Manifest Injustice Calls For A New Trial

A court may also grant a new trial if the verdict is against the great weight of evidence, and if it would result in a manifestly unjust verdict to allow it to stand. This is just the situation.

A new trial can be granted even when judgment as a matter of law on the issue of the claim would be inappropriate. *See, e.g., Fineman v. Armstrong World Indus.*, 980 F.2d 171, 211 (3d Cir. 1992); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir. 1988). "Unlike a JMOL motion, the court need not view the evidence in the light most favorable to the verdict winner …." *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 600 (D. Del. 2005), *aff'd*, 231 Fed. Appx. 954 (Fed. Cir. 2007). While in some cases the evidence may even logically present a number of inferences supporting the verdict, if the great weight of it falls the other way, the court does not abuse its discretion to grant a new trial. *See Fineman*, 980 F.2d at 211.

In the context of a jury's *factual* findings, the cases of course teach that the district court must proceed cautiously in granting a new trial based on manifest injustice, so as not to substitute its judgment for the jury's independent evaluation of the facts. Nevertheless, "[w]here a trial is long and complicated and deals with subject matter not lying within the ordinary

knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is

necessary where the litigation deals with material which is familiar and simple ...." *Lind v.*

*Schenley Indus.,* 278 F.2d 79, 90-91 (3d Cir. 1960) (identifying a patent case as example).

Here, judgment as a matter of law should be granted, as briefed above. *See supra* at 2-29.

However, even if that motion is not granted, the evidence reviewed on that motion should

indicate to the Court that the verdicts in Callaway's favor are against the clear weight of

evidence and manifestly unjust. To allow these claims to stand on the present jury verdict, when

especially, in view of the irreconcilable inconsistencies cited above it appears that the jury was

confused, arbitrary, or hopelessly conflicted, would allow a serious miscarriage of justice.

Further, the ultimate question of obviousness is a question of law. *Richardson-Vicks, Inc.*

*v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed. Cir. 1997). Hence, the Court must also be careful not

to "abdicate [its] role as the ultimate decision maker on the question of obviousness." *Id.* In this

case, the content of the prior art, the scope of the patent claims, and the level of ordinary skill in

the art were not in material dispute  The evidence favored a legal finding of obviousness on

every claim tried to the jury, not merely claim 5 of the '293 patent. If judgment as a matter of

law is not appropriate, it is at least appropriate for the Court to grant a new trial.

### B.    A New Trial Should Be Granted At Which The Test Balls May Be Admitted Into Evidence

A new trial is warranted based on the improper exclusion of the golf balls Acushnet made

from the teachings of the prior art combinations Dr. Statz relied on. *See* D.I. 346 & 362. The

Court erred by precluding Acushnet from introducing this clearly relevant evidence. The Court

further erred when it essentially provided a road map for Callaway to avoid the admission of this

evidence while cross examining Dr. Statz. These errors were highly prejudicial to Acushnet.

The inquiry in evaluating a motion for new trial on the basis of evidentiary errors requires that the Court determine: "(1) whether an error was in fact committed, and (2) whether [it] was so prejudicial that denial of a new trial would be 'inconsistent with substantial justice.'" *Finch v. Hercules Inc.,* 941 F. Supp. 1395, 1414 (D. Del. 1996). With respect to the second prong of this, a new trial should granted on an erroneous evidentiary ruling unless "it is 'highly probable' that [it] did not affect [the objecting party's] substantial rights." *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 924 (3d Cir. 1985) (holding standard same in civil cases as in criminal cases).

### 1.    The Excluded Test Ball Evidence Was Relevant

The excluded ball test evidence was clearly relevant. The claim construction required Acushnet to prove that the polyurethanes of the asserted prior art combinations would have a hardness less than 64 Shore D, as measured on the ball. The test balls proved exactly this. Indeed, it is hard to imagine more probative evidence of what the Shore D hardness of the combinations would be than measurements of balls made according to those combinations. Even Callaway's expert, Dr. Risen, admitted that the best way to determine what the Shore D hardness of a ball disclosed in the prior art would be is to "make the ball and measure it." D.I. 297, Ex. 1, Risen Dep. Tr. at 133:23-134:8. Acushnet's substantial rights were prejudiced by not being able to offer this most relevant evidence.

The issue of the outer cover Shore D hardness of the prior art combinations was the single most important and disputed issue in the case. The test evidence would have demonstrated that the combinations of prior art that Acushnet asserts yielded balls whose outer cover Shore D hardness is well under the claimed 64 Shore D. The tests demonstrated, for example, that balls made with the cover of the Molitor '751 patent and the core and inner cover of the Proudfit patent (as suggested by Molitor '751) had an average outer cover Shore D hardness of 51.2 measured "on the ball." D.I. 217, Ex. 23 ¶ 113; D.I. 217, Ex. 30 at ¶ 33, *id.,* Ex.

35

34 at AC0131412. Similarly, the Wu cover applied to Proudfit yielded an average outer cover

Shore D hardness of 56.8 measured "on the ball." D.I. 217, Ex. 23 ¶ 106; D.I. 217, Ex. 30 at ¶

33, *id.*, Ex. 34 at AC0131412.

The test balls could have come into evidence through percipient witnesses, namely

Messrs. Dalton and Galipeau. Mr. Dalton directly supervised every aspect of the creation of the

golf balls, and could have testified that they in fact were made according to the specifications set

forth in the prior art references. D.I. 265, Ex. 63 ¶¶ 4-9. Mr. Galipeau, who works at the testing

lab PTLI, directly supervised the measurements that were made on the balls, which resulted in

the test report. *Id.* at ¶¶ 11-14; Ex. 6., Galipeau Dep. Tr. 1-45.

Given the focus on the issue of the Shore D hardness of the outer cover of the prior art

combinations, as measured on the ball, the exclusion of Acushnet's evidence of precisely those

measurements was highly prejudicial. *See also Blancha v. Raymark Indus.*, 972 F.2d 507, 516

(3d Cir. 1992) ("Evidence should be excluded under Rule 403 only sparingly since the evidence

excluded is concededly probative. The balance under the rule should be struck in favor of

admissibility.").

### 2.    The Court Erred In Excluding The Test Ball Evidence

Initially, the Court's exclusion of Dr. MacKnight's testimony seemed to be based on a

misperception of his role with respect to Acushnet's invalidity case. It appears that the Court

was under the impression that Acushnet would offer the testing evidence without the supporting

testimony of an expert, such as Dr. Statz, who could explain the relevance of the evidence. *See*

Pretrial Conf. Tr. 34:15-20; 36:24-37:4. But Dr. Statz had discussed in his report each prior art

combination he relied on for his opinion that the patents are invalid, and why the test results for

those combinations were relevant. *See, e.g.* D.I. 217, Ex. 23 ¶¶ 84, 93, 102, 106 and 113

(discussing obviousness of claim 1 of the '293 patent with reference to the testing of the balls).

36

The Court's conclusion that that the test balls were created at the behest of lawyers is not a persuasive reason to exclude the evidence. As evident from the face of Dr. MacKnight's declaration, the testing evidence generated by him was initially created and submitted to the Patent Office for purposes of the reexamination shortly before Dr. Statz's expert report was served in this case. D.I. 217, Ex. 30 at ¶ 1. Lawyers are often involved in the preparation of tests submitted to the PTO. In addition, the balls created were based on those combinations of prior art argued to the PTO in the reexamination and that Dr. Statz intended to rely on in his expert report. Lawyers are often involved in the coordination of testing between two experts.

Dr. MacKnight was retained for his expertise in testing, to assure that the test data submitted to the PTO and to this Court was done properly and fairly. He was not retained as an invalidity expert, despite what the Court may have thought. It was not proper to exclude his testimony because he was not also the invalidity expert in the case, and hence he did not select the balls to tested. His expertise in testing and supervision of the testing would have been helpful and relevant. That he was directed (by counsel or by anyone else for that matter) as to what balls to test is utterly immaterial to his ability to properly oversee the testing and to opine as to the appropriateness of the testing.

The only case relied on by Callaway for the exclusion of the test golf balls, *Wesley Jessen Corp. v. Bausch & Laumb, Inc.*, was not on point. 209 F. Supp.2d 348 (D. Del. 2002). There the testing in question (which was not even excluded) departed from and was inconsistent with the teachings of the prior art. *Id.* at 373, 393. Here, however, the combination balls were made by following the directions of the prior art combinations that Dr. Statz addresses.

The evidence here is similar to that admitted in *Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.*, 112 F.3d 1137 (Fed. Cir. 1997). There, the Federal Circuit affirmed the

admissibility of a model of prior art over objections that it did not accurately represent the prior art. *Id.* at 1145. The Federal Circuit noted that any such arguments could be developed in cross-examination, and that the probative value of the evidence was not outweighed by potential prejudice. *Id.* at 1146. Similarly here, Acushnet's testing evidence should have been admitted.

Even if Dr. MacKnight's testimony itself was properly excluded, the test balls themselves were independently admissible and should have been admitted. As set forth above, the test balls, no matter how or why created, are highly probative evidence of what the Shore D hardness of the polyurethane covers of Molitor '751 and Wu would have been when applied to the Proudfit ball.

Any Rule 403 concerns over prejudice or confusion that might have resulted from the admission of the test balls could have been cured in any number of ways. For instance, Acushnet offered that the balls themselves need not be shown to the jury, to avoid any Callaway's concern that the jury might think the balls actually existed in 1995. T. Tr. at 753:21-22 ("If it helps to not actually display the balls, we could do that.") In addition, curative instructions could have been given, explaining that the balls are not prior art and were not in existence in 1995, but instead were created as test evidence for this case. In addition, direct examination and cross examination would have reduced any potential for confusion or prejudice. *See also Coleman v. Home Depo, Inc.*, 306 F.3d 1333, 1343-44 (3d Cir. 2002) ("There is a "strong presumption that relevant evidence should be admitted." Under Rule 403, "probative value of evidence must be 'substantially outweighed' by the problems in admitting the evidence. As a result, evidence that is highly probative is exceptionally difficult to exclude.").

The Court's order, conditioning the admissibility of the test balls on Callaway's cross-examination of Dr. Statz, was a further prejudicial error. Since the balls were relevant evidence, their admissibility should not have been conditioned on Callaway's cross-examination of Dr.

38

Statz. Acushnet had the burden of proof at trial. It was should have been allowed to use the test ball evidence to meet its burden. Yet the Court put the issue in Callaway's hands, and provided a road map for Callaway to follow to ensure the exclusion of this evidence. The ultimate result was materially prejudicial. Dr. Statz relied on the test ball evidence to support his conclusions regarding obviousness under an "on the ball" construction. It was error and prejudicial to deny Dr. Statz the right to rely on materials cited in his expert report and independently admissible.

The Court in effect ruled that Acushnet may only prove obviousness by showing the "on the ball" Shore D hardness of prior art combinations, but at the same time excluded the most probative evidence of what that "on the ball" hardness would be. Those rulings were in error, and caused Acushnet extreme prejudice, that could be addressed via a new trial.

### C.    Other Evidentiary Errors And Resulting Prejudice To Acushnet Justify A New Trial

The prejudicial exclusion of the test ball evidence was magnified by other evidentiary errors. These additional errors -- and Callaway's further ability to exploit them -- provide still additional reasons for a new trial. "[T]he combination of several errors may require reversal even though each error by itself would have been harmless." *Collins v. Wayne Corp.,* 621 F.2d 777, 786 n.6 (5th Cir. 1980); *see also Malek v. Federal Ins. Co.,* 994 F.2d 49, 55 (2d Cir. 1993). Likewise, the extent of argument based or in reliance on tainted rulings may also factor into whether an evidentiary ruling was prejudicial. *See Genzyme Corp.,* 315 F. Supp. 2d at 561 n.5.

### 1.    Acushnet Was Prejudiced By The Court's Erroneous Admission Of Evidence Regarding Acushnet's Veneer Concept And Hebert Patent, And Related Errors

The Court erred in admitting testimony about the Acushnet Hebert Patent (PX-17), the Hebert Invention record, and testimony that Acushnet employees "believed they invented something" with the Veneer concept. Such subjective testimony did great violence to the jury's

39

understanding and application of the person of ordinary skill in the art standard and prejudiced

Acushnet because the jury could not thereafter properly apply the obviousness test.

Obviousness must be determined from the objective perspective of the hypothetical

person of ordinary skill in the art. *See, e.g, KSR,* 127 S. Ct. at 1742 ("The question is not

whether the combination was obvious to the patentee but whether the combination was obvious

to a person with ordinary skill in the art."); *Life Techs., Inc. v. Clontech Lab, Inc.,* 224 F.3d 1320,

1325 (Fed. Cir. 2000). Thus, the question of whether the inventors of the Hebert patent, a patent

not in suit and having different claims and a different specification, thought they "invented

something" was utterly irrelevant to this case and it was error to admit it. *See, e.g., Key Tech.,*

*Inc., v. Simco/Ramic Corp.,* 137 F.R.D. 322, 324-25 (D. Or. 1991) ("Whether or not [the

infringer] subjectively believed that any product of [patentee] was patentable is irrelevant to the

[infringer's] defense that the patents of [patentee] are not valid.").

Further, even assuming that subjective testimony regarding obviousness is appropriate

(which it is not), the statements of Messrs. Morgan and Hebert regarding their belief as to the

novelty of the veneer concept merely applied a layperson's understanding of that term.

Obviously, neither Messrs. Morgan nor Hebert were offered or qualified as experts in this case.

Despite his extensive experience in making golf balls, the Court stated, in the presence of the

jury, that Mr. Morgan was not a person of ordinary skill in the art (T. Tr. at 456:2-8). Then,

despite denigrating Mr. Morgan's experience, the Court nevertheless allowed Callaway to elicit

testimony as to what Mr. Morgan thought was novel or obvious:

> Q:    And you thought your Veneer concept was different and new
> because it had a solid-core three-piece construction with an ionomer inner
> cover and a polyurethane, a cast polyurethane outer cover.  Right?
>
> A:    A thin cast-polyurethane cover of the new composition, yes.

T. Tr. at 439:12-15. Neither of these witnesses are attorneys or patent law experts, nor

otherwise qualified to render an expert opinion as to the patentability, novelty, or non-

obviousness of an invention. Thereafter, Callaway argued that these individuals belief that they

"thought they invented something" was relevant to the obviousness of the Sullivan patents.

Further still, the differences between the veneer concept, the Hebert patent, and the

patents-in-suit were never explained to the jury. In fact, the Court prohibited this. The claims of

the Hebert patent differ from those of the patents-in-suit, and thus cover different inventions.

The jury did not learn this. Callaway would try to sidestep this issue by arguing that the fact that

Acushnet thought the Hebert *concept* was patentable is enough to show that the Sullivan patents

are non-obvious. But it is black letter law that concepts are not patentable. *See In re Comiskey,*

499 F.3d 1365, 1377 (Fed. Cir. 2007). Not only do such arguments about so-called "patentable

concepts" fail to demonstrate that the Hebert patent is comparable to the Sullivan patents, they

provide another example of the dangers inherent to having an inventor testify regarding

patentability -- the inventors clearly did not understand that mere concepts are never patentable

and that the claims define the patentable aspects of an invention. *See, e.g., In re Van Geuns,* 988

F.2d 1181 (Fed. Cir. 1993). Thus, Callaway's argument that the claims can be ignored in any

comparison between the veneer concept and the Sullivan patents is wrong, and directly contrary

to the Supreme Court's *KSR* decision. *See* 127 S. Ct. at 1742 ("[w]hat matters is the objective

reach of the claim. If the claim extends to what is obvious, it is invalid under § 103"). Thus, the

only way to make a legally meaningful comparison is by performing a detailed claim analysis.

The differences between the Hebert patent claims and those of the patents-in-suit are

significant. The Sullivan claims, which only require that the cover "comprise polyurethane," are

so broad as to encompass any of the hundreds of types of polyurethane in any amount

whatsoever, including thermoplastic polyurethanes. The Hebert claims are limited specifically to cast outer cover layers, which would exclude thermoplastic polyurethanes . *See, e.g.,* PX-17, claim 1. Callaway's own witnesses noted the importance of the distinction between thermoplastic and cast urethane covers. T. Tr. 1051:13-1052:10. The Sullivan claims, however, make no such distinction. Similarly, the inner cover layer of Hebert requires that the flexural modulus of the inner cover layer be so high that many claims are limited to high-acid ionomers (PX-17, claims 4-6). The Sullivan claims, on the other hand, all explicitly claim low-acid ionomers. To explain these differences to a jury would have required a detailed analysis and time-consuming satellite litigation of exactly the type the Court indicated it would not allow. Hence, Callaway's arguments created the appearance of a similarity between the Hebert patent and the patents-in-suit that Acushnet could not effectively rebut.

The prejudice to Acushnet created by Callaway's arguments was compounded by repeated reference to the Hebert patent during Callaway's opening in ways not allowed by the Court at trial. No fewer than 7 slides from Callaway's opening statement featured the Hebert patent. *See* Ex. 4, slides 31, 32, 33, 39, 40, 56, and 57. For example, in its argument, Callaway referred to the license Callaway took to the Hebert patent, suggesting that Callaway had acted appropriately by taking the license, while Acushnet was now acting improperly. T.Tr. at 186:10:187:2; Opening Statement, slide 39. However, this license was never offered or admitted at trial. Such statements considerably prejudiced Acushnet. Similarly, Callaway featured the Hebert patent, and arguments that Acushnet employees believed that they had "invented something" extensively in its closing argument as well. T.Tr. at 1341:2-22; 1342:18-1344:15.

The prejudice to Acushnet was further amplified by the Court's decision not to allow Acushnet to introduce that Callaway ▮▮▮▮▮▮▮▮▮▮▮▮▮ -- a patent actually in suit

-- at the time it was owned by Spalding. *See* D.I. 373; *see, e.g.*, D.I. 217, Ex. 21 (Callaway letter to Spalding asserting patent invalid ███████████████). If the jury heard that Callaway licensed the Hebert patent, because they thought there was an invention, the jury should have also heard that Callaway ███████████████████, because Callaway thought it invalid.

The Hebert evidence, which constituted an excessive amount of Callaway's case, was irrelevant. Furthermore, the way it was handled during the trial proceedings greatly prejudiced Acushnet and prevented the jury from properly applying the test for obviousness. A new trial is thus warranted in which the evidence of the Hebert patent and the subjective beliefs of inventors as to whether they "invented something" should be excluded.

### 2.    Dr. Risen's Direct Exceeded The Scope Of His Report

Dr. Risen's testimony on direct examination went outside the scope of his expert report and Acushnet timely objected pursuant to the Court's procedures. Since Acushnet was unduly prejudiced by Dr. Risen's undisclosed testimony, a new trial is warranted.

Specifically, Dr. Risen testified that there was no motivation to combine Nesbitt with Molitor '751 or Proudfit with Molitor '751. T.Tr. at 1171:4-9 ("I don't know of any motivation to do it"); 1168:13-1170:4 ("I don't know of any motivation to combine it or try it"). These opinions, however, are nowhere set forth in Dr. Risen's expert report, submitted on July 6, 2007. Acushnet objected during Dr. Risen's testimony to these questions. *Id.* 1171:10; 1168:17-21.

Dr. Risen's opinions with respect to the combination of Nesbitt in view of Molitor '751 are set forth in paragraphs 133-156 of his report. At his deposition, he testified that these paragraphs set forth *all* of his opinions as to why he thinks that Nesbitt in view of Molitor '751 does not render the asserted claims obvious. Ex. 1, Risen Tr. at 209:10-14. His opinions with respect to that combination consisted entirely of alleged technical distinctions between the

43

combination and the asserted claims, rather than an opinion that someone of ordinary skill would not have been motivated to combine the references. *See* Ex. 5, Risen Rep. ¶¶ 133-156.

Similarly, Dr. Risen did not state in his report that there would be no motivation to combine Proudfit with Molitor '751. Dr. Risen's opinions with respect to that combination are set forth in paragraphs 179-189 of his report. *See* Ex. 1, Risen Tr. at 225:3-10. Again, Dr. Risen's opinions with respect to that combination consisted entirely of alleged technical distinctions between the combination and the asserted claims; he does not opine that the motivation to combine the references was absent in the art. *See* Ex. 5 ¶¶ 179-189.

It was not surprising that Dr. Risen did not contest that there was motivation to combine these references in his report. Molitor '751 teaches these combinations on the face of the patent. In his deposition, Dr. Risen ***agreed*** that the reference to Nesbitt in Molitor '751 was a suggestion to use the cover of Molitor '751 on the ball of Nesbitt. Ex. 1, Risen Tr. at 81:20-82:5. It was not until Dr. Risen took the stand (after Dr. Statz had already testified) that he first expressed the opinion that there was a lack of motivation to combine these references.

Since the opinions Dr. Risen expressed were not in his expert report, the jury should not have heard them. "As noted in the case law of this jurisdiction, the testimony of expert witnesses is limited to the information contained in their expert reports." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 289 F. Supp.2d 493, 500 (D. Del. 2003). The procedure for dealing with objections to expert testimony outside the scope is set forth under the Court's guidelines:

> If a party objects on the record to an expert's Testimony based on claims that the testimony falls beyond the scope of his/her expert report, such objections shall be addressed during post-trial proceedings. If the court determines that the expert's testimony was impermissibly broad, the party proffering such testimony may be sanctioned, inter alia, by having to assume the costs for a new trial.

Guidelines for Civil Trials Before Judge Robinson at 3.

Dr. Risen's testimony outside the scope of his report warrants a new trial here. A fundamental question presented to the jury was whether the asserted claims were obvious over certain combinations of prior art. Dr. Risen was permitted to testify, for the first time and after Acushnet had already presented Dr. Statz's testimony, that certain of those combinations were not motivated in the art. Had Acushnet known that Dr. Risen would present such testimony, it would have focused on the motivation issue during Dr. Statz's direct examination, and would have been prepared to cross-examine Dr. Risen on that topic. Indeed, as set forth above, Dr. Risen's inconsistent statements in his deposition (where he admitted that Molitor '751 explicitly suggests a combination with Nesbitt) could have been employed to impeach Dr. Risen's opinion if Acushnet had advance notice, as was required under the Federal Rules.

It is this very purpose that underlies the requirement that an expert's testimony cannot exceed the scope of his or her report. "The purpose of this disclosure rule is to give opposing parties a reasonable opportunity to prepare for effective cross examination or to secure their own expert witness." *McMillan v. Weeks Marine, Inc.*, 478 F. Supp.2d 651, 659-660 (D. Del. 2007) (citing Advisory Committee Notes to Fed. R. Civ. P. 26(a)(2)(B)).

Since Acushnet has demonstrated that Dr. Risen's motivation-related testimony exceeded the scope of his expert report and it was unduly prejudiced, a new trial is warranted.

### 3.    The Court Erred In Excluding *Ex Parte Sullivan*

The Court erred in preventing Acushnet from introducing the patent prosecution history of an important continuing application of the '873 patent -- in particular, the *Ex Parte Sullivan*, 2004-0242 (B.P.A.I. 2004) decision. D.I. 217, Ex. 41, identified as DX-15. As discussed above, in *Ex Parte Sullivan*, the Board of Patent Appeals found in a *final* decision that one of skill in the art would have been motivated to combine polyurethane with three-piece golf balls. *See* D.I. 217, Ex. 41 at 11. Callaway was a party to this decision, and did not appeal from it.

45

In deciding that Acushnet could not introduce this piece of prosecution history for the jury's consideration, the Court excluded highly germane evidence of the PTO's considered view of pertinent prior art and the motivation to combine a three-piece ball, such as Nesbitt with Wu, in a related application. At the trial, Callaway disputed whether one of skill would be motivated to combine polyurethane and three-piece references. *E.g.,* T.Tr. 1141-46, 1149-1153, 1170. The excluded decision shows that the PTO found that exact combination was motivated and proper. *See supra* 9-11. Thus, it was error and prejudicial to exclude the evidence.

Conclusions, findings and opinions in government reports are admissible, if relevant, absent a showing of untrustworthiness. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 161-70 (1988); *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) ("Prior administrative findings made with respect to [a relevant issue in the case] may, of course, be admitted as evidence at a federal-sector trial de novo."); *Knoster v. Ford Motor Co.*, 200 Fed. Appx. 106 (3d Cir. 2006) (findings are "presumed trustworthy" and opposing party "bear[s] the burden of coming forward enough negative factors [to show] that the report should not be admitted'"); Fed. R. Evid. 803(8). In the case of the PTO, courts are bound to respect with some deference the PTO's administrative findings, and to give appropriate deference especially to its expertise findings under which it is charged by Congress. *See Dickinson v. Zurko*, 527 U.S. 150, 152 (1999). As observed in *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003):

> As persons of scientific competence in the fields in which they work, examiners and administrative patent judges on the Board are responsible for making findings, informed by their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons. Absent legal error or contrary factual evidence, those findings can establish a prima facie case of obviousness.

Further, as two Federal Circuit judges have each observed, "a reasonable jury may give weight to the examiner's view of [a] reference when deciding whether invalidity has been proved

46

by clear and convincing evidence." *Pharmastem*, 491 F.3d at 1371 (J. Newman, dissenting op.).

"When the party asserting invalidity relies on references that were considered during examination or reexamination, that party 'bears the added burden of the deference that is due to a qualified government agency presumed to have done its job.'" *Id.* at 1366 (J. Bryson, majority).

It was error to exclude the PTO's other determinations in the file history of these patents, particularly where, in the case of *Ex Parte Sullivan*, a final board decision had been reached in a matter in which Callaway had fully participated. A case especially on point, briefed to the Court at trial, is *Loral Fairchild Corp., v. Matsushita Electr. Indus. Co.*, 208 F. Supp. 2d. 344 (E.D.N.Y. 2000). Here, Circuit Judge Rader, sitting by designation, concluded that a claim rejection in applications related to the patents-in-suit were admissible in a jury trial on validity.

As in *Loral*, the rejections at issue in *Ex Parte Sullivan* were on claims closely related and similar to the patents-in-suit, and went to an issue in the trial (the obviousness of combining Wu with three-piece golf balls). *See Loral,* 208 F. Supp. 2d at 360. Allowing the evidence would have added substantial weight to Acushnet's case on Wu's teachings and a combination of Nesbitt with Wu. As Callaway was quick to remind the jury repeatedly, "to find the claims invalid, there must be clear and convincing evidence that the PTO should not have issued the patent." Ex. 4 at 26.

The Court's decision not only affected the evidence actually seen by the jury, but also the jury's interpretation of the evidence. Drummed in by Callaway from the start of its opening through to its closing argument, the jury's perception of the PTO's "blessing" upon the patents-in-suit, as somehow tried-and-true-valid over all of the prior art in the trial, was surely distorted as Callaway took full advantage of the Court's disposition on this issue. Callaway made these remarks, for example, just a minute into its opening:

47

> Now, you have the patents in front of you, and in deciding that issue it really boils
> down to something simple: [T]here are three patent examiners who looked at the
> four patents collectively. Okay? Did those three patent examiners, different
> people, make a mistake when they looked at exactly the same prior art that
> Acushnet now says invalidates these patent ... So that's what the validity issue
> boils down to in this case.

T.Tr. 161:8-17. Callaway went on to feature as many as six slides on this point,

featuring the "three patent examiners" who had once passed on the validity of the patents-

in-suit. *See* Ex. 4 at 21-26; T.Tr. 181:4-182:25.

   Then, at the trial's end, the theme was played again, still longer. *See, e.g,* T.Tr.

1139, 1353-55, 1358-59. Most egregiously, Callaway began the body of its discussion

concerning the validity of the patents with this statement:

> Now, can the Patent Office make a mistake? Sure. ... We're all human and a
> mistake could have been made. ***But you have not actually heard from Acushnet.
> They're not arguing the Patent Office made a mistake. They are just arguing
> that you should see things their way instead of the way the Patent Office did.***

*Id.* 1339:14-19. As a whole, it is clear that these arguments were designed to suggest repeatedly

that the PTO had done its analysis of the prior art correctly when issuing the patents-in-suit. Yet

we know that not to be true -- we know that the PTO itself would strongly disagree with

Callaway. Acushnet could have rebutted and erased the sting of these lopsided, half-truth

arguments if it had been permitted to introduce evidence such as the *Ex Parte Sullivan* decision.

The end result of the Court's error was prejudicial, warranting a new trial.

### 4.    The Court Erred In Excluding The Reexamination Files From Evidence

   The reexamination evidence supporting the invalidity of the patents-in-suit, including the

file histories of the reexaminations, DX-340 to DX-343 (*see* D.I. 115, Exs. A-D, D.I. 118; Exs.

1-4; D.I. 328, Ex. 1), should have been allowed to be mentioned and admitted in the trial as well,

and for many of the same reasons noted above. The Court, in error, did not allow it.

Again, Callaway made the most of the Court's decisions not allowing either or both the Board decision or the reexaminations to be admitted or mentioned. Callaway's opening statement illegitimately ***strengthened*** a presumption of validity, a strengthening it had no right to impress upon the jury, in view of the PTO's decisions already. *See* T.Tr. 161:6-17; *see also* T.Tr. 181:4-182:25 & Ex. 4 at 21-26. Acushnet filed an overnight objection to this, and asked again that Court consider allowing evidence of the reexamination proceedings and the Board of Patent Appeals decision into the trial. D.I. 379 & 380. The Court did not agree. T.Tr. 257:12-261:1, 354:15-24. In the closing argument, Callaway then took advantage once again. *See* T.Tr. 1139, 1353-55, 1358-59. *See also Fresenius Medical*, 2006 WL 1330003 at *4 (considering reexaminations and noting that patentee cannot have it both ways: "it cannot be overlooked that, when it suits it, [plaintiff] relies on numerous PTO documents" and "repeatedly refers to the fact that the decisions of the patent examiner are given great deference" and allowed the patents).

### 5. If Acushnet Is Not Granted Judgment As A Matter Of Law, As Argued Above, The Court's Erroneous Claim Construction Ruling Warrants At Least A New Trial

Acushnet has argued respectfully above that the Court should reconsider its "on the ball" claim construction and, in adopting Acushnet's claim construction, grant judgment as a matter law in Acushnet's favor on all claims-in-suit. *See supra* 5-16. However, should the Court reconsider and reverse its prior claim construction ruling, but for any reason not grant judgment as a matter of law, Acushnet submits that, at a minimum, a new trial is warranted in which the proper "off the ball" claim construction is used. A proper claim construction here would have affected the outcome of the trial, given that one of the central issues before the jury revolved around Callaway questioning whether hardness less than Shore D 64, "on the ball," was disclosed by the prior art. The Court's pre-trial *Markman* ruling, which Acushnet respectfully submits was in error, was thus prejudicial to Acushnet's ability to present its case at trial.

49

## IV.   OTHER ISSUES

Finally, Acushnet also renews its objections to the Court's denial of Acushnet's Motion

for Partial Summary Judgment that Nesbitt incorporates Molitor by Reference (D.I. 348), as a

further basis for post-trial relief.  As this issue related to validity of the claims tried, the validity

of such claims should be determined as a matter of law, or else retried, in view of the prior art

reference Nesbitt incorporating Molitor '637.  This has been briefed already, and Acushnet will

not repeat its arguments here, but refers the Court to its prior briefing.  *See* D.I. 217, 238, 265.

Likewise, Acushnet continues to maintain that the Court erred to dismiss on summary

judgment and just before trial the issue of invalidity of claims 1-2 of the '130 patent.  D.I. 348,

373.  Contrary to the Court's decision before trial, a case and controversy must surely still exists

in view of the present litigation itself on the '130 patent.  Pretrial Conf. Tr. 6:8-9:20.  If summary

judgment is not given outright on these claims, they should be included in any new trial.

## V.   CONCLUSION

Acushnet respectfully requests that the Court grant JMOL under Rule 50(b) that the claims

at issue in this case are invalid as obvious, or in the alternative order a new trial under Rule 59.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 783-0800

Dated:  January 22, 2008
Public Version Dated:  January 24, 2008
844252 /30030

By:    */s/ David E. Moore*
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Hercules Plaza 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE  19899
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

50

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 24, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on January 24, 2008, I have Electronically Mailed the document to

the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
denning@fr.com
shuman@fr.com
shear@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
lamberson@fr.com
cjordan@fr.com
compton@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030

# EXHIBIT 1

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF DELAWARE
 2
        - - - - - - - - - - - - - - - - - -
 3
    CALLAWAY GOLF COMPANY,
 4
                      Plaintiff,
 5
          vs.                         Civil Action No.
 6                                    06-91 (SLR)
    ACUSHNET COMPANY,
 7
                      Defendant.
 8
        - - - - - - - - - - - - - - - - - -
 9

10

                      Boston, Massachusetts
11                   Friday, July 20, 2007
                        Volume I of II
12

13              Videotaped Deposition of
              WILLIAM M. RISEN, JR., Ph.D.
14

15       The witness was called for examination by
    counsel for the Defendant, pursuant to notice,
16  commencing at 9:41 a.m. at the Law Offices of Fish &
    Richardson, P.C., 25 Franklin Street, Boston,
17  Massachusetts, before Kimberly A. Smith, Certified
    Realtime Reporter, Registered Diplomate Reporter, and
18  Notary Public for the Commonwealth of Massachusetts,
    when were present on behalf of the respective
19  parties:

20

21  ------------------------------------------------

22              DIGITAL EVIDENCE GROUP

23          1111 16th Street, N.W., Suite 410

24          Washington, D.C.  20036

25              (202) 232-0646
```

Page 81

1    disclosed in Nesbitt?

2        A.    That sentence that you just read to me

3    certainly would suggest that.  But let me see whether

4    the context of that is that they are the subject of

5    his invention.

6        Q.    Please take your time and do that.

7        A.    I don't see where else the phrase

8    "two-piece ball" is used --

9        Q.    Maybe I can help you.

10       A.    -- in the claims.  If you can help me, that

11   would be nice.

12       Q.    Sure.  It may be in the claims, but if you

13   go to the previous column, Column 2, on line 61,

14   Mr. Molitor states, "Two-piece balls made with the

15   cover of the invention have short iron playability

16   properties as good as or better than balata-covered

17   wound balls but are significantly more durable."

18              Do you see that?

19       A.    Yes.

20       Q.    Does that sentence in combination with the

21   one on Column 3 that we just read suggest to you that

22   Mr. Molitor is suggesting using his cover materials

23   on a three-piece solid construction ball like that

24   disclosed in Nesbitt?

25       A.    I think that's a reasonable interpretation

Page 82

```
 1    at this stage, yes, um-hum.

 2        Q.   You wouldn't disagree with that

 3    interpretation?

 4        A.   No.  I'd have to go through it again and

 5    make doubly sure, but it sounds about right.

 6        Q.   So going back then to the question that I

 7    had earlier, is it fair to say that Mr. Molitor, at

 8    least as of the date of the issuance of this patent

 9    in 1987, had also thought of using polyurethane-based

10    cover materials as the outer cover material -- Strike

11    that.  I'm going to rephrase that question.

12                Is it fair to say that prior to

13    Mr. Sullivan's effective filing date, 1995, that

14    Mr. Molitor had also thought of using a polyurethane-

15    based cover material as the outer cover layer in a

16    three-piece solid construction ball?

17        A.   I don't know what the "also" refers to

18    but -- and I'm not sure what you mean by a thermal

19    plastic or polyurethane-based ball.  Some of these

20    that are contained in his tables and perhaps in the

21    claims, although at least in the tables are not

22    necessarily basically polyurethane.  They might

23    comprise it.

24        Q.   I've let my language slip a little bit

25    again.  Let me try to be more specific.  And let me
```

Page 133

```
 1        Q.   If a specification describes how to make a

 2   particular material or a particular cover layer and

 3   describes how to make the rest of the golf ball

 4   construction, does the cover layer have an inherent

 5   hardness as measured on the ball?

 6             MR. SHUMAN:  Objection.  Form.

 7             THE WITNESS:  Any particular material

 8   formed in a particular way with a particular

 9   composition and particular history will have a

10   measurable hardness, so long as it's a solid.

11   BY MR. ROSENTHAL:

12        Q.   Right.  And that hardness is inherent to

13   that particular material made in that particular way,

14   right?

15             MR. SHUMAN:  Objection.  Form.

16             THE WITNESS:  I'm not sure of the use of

17   the word "inherent" there.  It has a property.

18   BY MR. ROSENTHAL:

19        Q.   And if you make a material in that

20   specified way, that material will necessarily have a

21   hardness, correct?

22        A.   Depends on what "in that specified way"

23   means.  If you mean including putting it on the ball,

24   for example, so that it develops the same kinds of

25   stresses and strains and all of that sort of thing,
```

1    if you do the same experiment twice, you should get

2    the same answer.

3         Q.    So if a patent specification describes the

4    composition and how to create a cover layer and

5    describes the rest of the construction of the ball,

6    will that cover layer necessarily have a particular

7    hardness?

8         A.    I'm not sure that I got all of that.

9    But if -- You're saying that everything else is

10   identical, everything is identical between two balls?

11        Q.    Um-hum.

12        A.    Including their time/temperature history,

13   their mechanical history, the way in which they were

14   produced, the composition, the inner core, the outer

15   core, everything is identical, two balls coming out

16   of the same machine?  They should have essentially

17   the same measured property, in this case hardness,

18   if -- within the statistical distribution of such

19   measurements.

20        Q.    You don't believe that you can accurately

21   predict mathematically what that property is, do you?

22        A.    Which property?

23        Q.    The property of Shore D hardness of --

24   Let me ask the full question.

25                    If there is such a specification that

Page 209

```
 1    I wish I could tell you what number it is.

 2    Unfortunately I didn't write it down.

 3         A.    It's 8.

 4         Q.    Risen Exhibit 8?

 5         A.    Yes.

 6         Q.    Could you take that one out.  We're going

 7    to discuss your analysis of the Nesbitt plus Molitor

 8    '751, which begins on page 21 of your report.

 9         A.    Okay.

10         Q.    Now, does this section of your report from

11    paragraphs 133 to 156 set forth all of your opinions

12    as to why that combination does not render the

13    asserted claims obvious?

14         A.    I believe so.

15         Q.    Now, in the '751 patent, we discussed

16    earlier the reference on Column 3 to the Nesbitt

17    patent on lines 7 through 12.  Do you recall that?

18         A.    Yes.

19         Q.    Now, you read this as a suggestion to a

20    person reading this patent to use the cover materials

21    disclosed in this patent on a ball like the Nesbitt

22    ball, right?

23              MR. SHUMAN:  Objection.  Form.

24              THE WITNESS:  I don't read it as a

25    suggestion of any sort.  I think he simply said --
```

Page 225

 1  doesn't render obvious the asserted claims, right?

 2       A.    I think that's correct.

 3       Q.    And on page 29 from paragraphs 179 to 189,

 4  those are your opinions as to why the Proudfit plus

 5  Molitor '751 patent doesn't render the asserted

 6  claims obvious, right?

 7       A.    I'm just looking to see if this is a place

 8  where headings were left out.  I'm not sure.  Anyway,

 9  that's probably not significant, so yes, that's

10  right.

11       Q.    With respect to the Proudfit plus Molitor

12  '751 combination, as I read this, the only claim

13  limitation that you believe is missing from that

14  combination is the outer cover Shore D hardness being

15  less than 64, right?

16       A.    Well, that's certainly missing.  I'm just

17  looking to see if the cover -- the outer cover

18  thickness limitations are contained in the sum of

19  those two.  And I would have to -- This is Proudfit

20  plus --

21       Q.    Molitor '751.

22       A.    '751.  Proudfit.  Where's Proudfit?

23  Proudfit is '187?  Yes.  Here.  I'm not sure that

24  there's really significant or functional overlap of

25  the ranges in outer cover thicknesses in Proudfit

Page 237

```
 1              IN THE UNITED STATES DISTRICT COURT
                        DISTRICT OF DELAWARE
 2     - - - - - - - - - - - - - - - - - -

 3
     CALLAWAY GOLF COMPANY,
 4
                    Plaintiff,
 5
          vs.                        Civil Action No.
 6                                   06-91 (SLR)
     ACUSHNET COMPANY,
 7
                    Defendant.
 8
     - - - - - - - - - - - - - - - - - -
 9

10
                    Boston, Massachusetts
11               Saturday, July 21, 2007
                      Volume II of II
12
13               Videotaped Deposition of
               WILLIAM M. RISEN, JR., Ph.D.
14
15        The witness was called for examination by
     counsel for the Defendant, pursuant to notice,
16   commencing at 9:35 a.m. at the Law Offices of Fish &
     Richardson, P.C., 25 Franklin Street, Boston,
17   Massachusetts, before Kimberly A. Smith, Certified
     Realtime Reporter, Registered Diplomate Reporter, and
18   Notary Public for the Commonwealth of Massachusetts,
     when were present on behalf of the respective
19   parties:

20
21   -------------------------------------------------------
22              DIGITAL EVIDENCE GROUP
23         1111 16th Street, N.W., Suite 410
24            Washington, D.C.  20036
25                 (202) 232-0646
```

Page 243

1    I can't tell you exactly the performance changes in

2    any particular ball, but I'm sure that there are

3    differences.

4          Q.    Generally speaking, are you familiar with

5    what sort of differences in terms of performance are

6    achieved by using a dual core?

7          A.    Not in detail.

8          Q.    I want to resume our discussion of your

9    expert report.  So if you could -- I think it's on

10   the top of your exhibit list.

11         A.    Okay.

12         Q.    If you could turn to page 30 of your

13   report, which is Risen Exhibit 1.

14         A.    Okay.

15         Q.    Section 7 begins on the bottom of that page

16   and then continues on.  In this section of the report

17   you discuss the combination of the Wilson Ultra Tour

18   balata ball and either the Titleist Professional or

19   the Titleist Professional two-piece, correct?

20         A.    Yes.

21         Q.    And it's your opinion that the combinations

22   of these balls do not render any of the asserted

23   claims obvious?

24         A.    Yes.

25         Q.    Is there anywhere in your report where you

Page 244

```
 1    address the combination of the Wilson Ultra Tour

 2    balata ball and the Wu reference or the Wilson Ultra

 3    Tour balata ball and the Molitor '751 reference?

 4         A.   I don't believe the Wilson Ultra Tour

 5    balata and the Wu reference is discussed.  Maybe I'm

 6    mistaken, but I don't think so.  And the Wilson Ultra

 7    Tour balata ball and -- What was the other one?

 8         Q.   Molitor '751.

 9         A.   I don't believe so.

10         Q.   With respect to your discussion in this

11    Section 7 of your report regarding combinations of

12    balls, on paragraph 190 on the top of page 31 of your

13    report --

14         A.   Yes.

15         Q.   I'm sorry.  I pointed you to the wrong

16    paragraph.  Paragraph 193.

17         A.   193.

18         Q.   You state that "I also believe...a person

19    of ordinary skill in the art would not have had any

20    way of experimentally determining the acid content of

21    any ionomer or ionomers in the mantle of the Ultra

22    Tour balata ball."

23                   Do you see that?

24         A.   I do.

25         Q.   You understand it is a requirement --
```

# EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

| CONTROL NO. | FILING DATE | PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000,123 | 01/17/06 | 6,595,873 | |

DOROTHY P. WHALEN
FISH & RICHARDSON P.C.
P.O. BOX 1022
MINNEAPOLIS, MN 55440-1022

| EXAMINER |
|---|
| GELLNER, J. |

| ART UNIT | PAPER |
|---|---|
| 3993 | |

DATE MAILED:

01/07/08

# *INTER PARTES* REEXAMINATION
# COMMUNICATION

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED
STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE
PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to
the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of
this communication.

PTOL-2071 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

ALAN M. GRIMALDI
HOWREY LLP
1299 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004

# Transmittal of Communication to Third Party Requester
# *Inter Partes* Reexamination

REEXAMINATION CONTROL NUMBER 95/000,123.

PATENT NUMBER 6,595,873.

TECHNOLOGY CENTER 3999.

ART UNIT 3993.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

| *OFFICE ACTION IN* INTER PARTES *REEXAMINATION* | Control No. 95/000,123 | Patent Under Reexamination 6595873 | |
|---|---|---|---|
| | Examiner Jeffrey L. Gellner | Art Unit 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on <u>30 April 2007</u>
Third Party(ies) on <u>30 May 2007</u>

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
   <u>2</u> MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
   30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1.☒ Notice of References Cited by Examiner, PTO-892
2.☒ Information Disclosure Citation, PTO/SB/08
3.☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-6</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2.  ☐ Claims _____ have been canceled.
3.  ☐ Claims _____ are confirmed. [Unamended patent claims]
4.  ☐ Claims _____ are patentable. [Amended or new claims]
5.  ☒ Claims <u>1-6</u> are rejected.
6.  ☐ Claims _____ are objected to.
7.  ☐ The drawings filed on _____    ☐ are acceptable    ☐ are not acceptable.
8.  ☐ The drawing correction request filed on _____ is:    ☐ approved.  ☐ disapproved.
9.  ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
       ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No <u>95000123</u>.
10. ☐ Other _____

| *Notice of References Cited* | Application/Control No. 95/000,123 | Applicant(s)/Patent Under Reexamination 6595873 | |
|---|---|---|---|
| | Examiner Jeffrey L. Gellner | Art Unit 3993 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | In re Hughes, 550 F.2d 1273 (C.C.P.A. 1977). |
| | V | In re Voss, 557 F.2d 812 (C.C.P.A. 1977). |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 20071105

| *OFFICE ACTION IN* INTER PARTES *REEXAMINATION* | Control No. 95/000,123 | Patent Under Reexamination 6595873 | |
|---|---|---|---|
| | Examiner Jeffrey L. Gellner | Art Unit 3993 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on <u>30 April 2007</u>
Third Party(ies) on <u>30 May 2007</u>

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
    <u>2</u> MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response*:
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II. SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-6</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>1-6</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____     ☐ are acceptable     ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:     ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
        ☐ been received.     ☐ not been received.     ☐ been filed in Application/Control No <u>95000123</u>.
10. ☐ Other _____

Application/Control Number:                                          Page 2
95/000,123
Art Unit: 3993

## DETAILED ACTION

This 2nd Action Non-Final is in response to the Patent Owner's response received 20

April 2007 and the Third Party Requester's response received 30 May 2007. The action is non-

final and not an action closing prosecution because, upon review of the arguments presented by

the Third Party Requester, Examiner has newly adopted in this office action Grounds 1, 8, 15,

22, 29, and 36 of rejection.

## *IDS*

The IDS received 5 Nov. 2007 is acknowledged. A signed 1449 accompanies this office

action. The marked through entries, or documents, could not be found by the Examiner in the

image file wrapper (IFW). Patent Owner should review the IFW to ensure that the entries are

properly presented.

## *Statutory Basis for Grounds of Rejections - 35 USC § 102 and 103*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person

Application/Control Number:                                    Page 3
95/000,123
Art Unit: 3993

     having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.


### *Third Party Requester's Grounds of Rejections*

#### *Re. Claim 1*

**Ground #1.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193 (Nesbitt).

**Ground #2.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637, (Molitor '637).

**Ground #3.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673, (Wu).

**Ground #4.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751, (Molitor '751).

**Ground #5.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in view of Molitor et al., U.S. Pat. No. 4,274,637.

**Ground #6.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No. 5,334,673.

**Ground #7.** The requester submits that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,674,751.


#### *Re. Claim 2*

**Ground #8.** The requester submits that claim 2 is unpatentable under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

Application/Control Number:                                    Page 4
95/000,123
Art Unit: 3993

    **Ground #9.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637.

    **Ground #10.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673.

    **Ground #11.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751.

    **Ground #12.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,274,637.

    **Ground #13.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No. 5,334,673.

    **Ground #14.**  The requester submits that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,674,751.


*Re. Claim 3*

    **Ground #15.**  The requester submits that claim 3 is unpatentable under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

    **Ground #16.**  The requester submits that claim 3 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637.

    **Ground #17.**  The requester submits that claim 3 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673.

Application/Control Number:                                          Page 5
95/000,123
Art Unit: 3993

    **Ground #18.** The requester submits that claim 3 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat.

No. 4,674,751.

    **Ground #19.** The requester submits that claim 3 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S.

Pat. No. 4,274,637.

    **Ground #20.** The requester submits that claim 3 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No.

5,334,673.

    **Ground #21.** The requester submits that claim 3 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S.

Pat. No. 4,674,751.


*Re. Claim 4*

    **Ground #22.** The requester submits that claim 4 is unpatentable under 35 U.S.C. §

102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

    **Ground #23.** The requester submits that claim 4 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat.

No. 4,274,637.

    **Ground #24.** The requester submits that claim 4 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No.

5,334,673.

    **Ground #25.** The requester submits that claim 4 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat.

No. 4,674,751.

    **Ground #26.** The requester submits that claim 4 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S.

Pat. No. 4,274,637.

**Ground #27.** The requester submits that claim 4 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No. 5,334,673.

**Ground #28.** The requester submits that claim 4 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,674,751.

*Re. Claim 5*

**Ground #29.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

**Ground #30.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637.

**Ground #31.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673.

**Ground #32.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751.

**Ground #33.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,274,637.

**Ground #34.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No. 5,334,673.

**Ground #35.** The requester submits that claim 5 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S. Pat. No. 4,674,751.

Application/Control Number:                                    Page 7
95/000,123
Art Unit: 3993

*Re. Claim 6*

**Ground #36.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

**Ground #37.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat.
No. 4,274,637.

**Ground #38.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat. No.
5,334,673.

**Ground #39.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat.
No. 4,674,751.

**Ground #40.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S.
Pat. No. 4,274,637.

**Ground #41.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No.
5,334,673.

**Ground #42.**  The requester submits that claim 6 is unpatentable under 35 U.S.C. §
103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Molitor et al., U.S.
Pat. No. 4,674,751.

### *Summary of Grounds Adopted vel non*

Proposed Grounds Adopted by the Examiner: 1-11,15-22, 23-25, 29-42.

Proposed Grounds Not Adopted by the Examiner: 12-14, and 26-28.

### *Summary of the Grounds of Rejections*

Application/Control Number:                                    Page 8
95/000,123
Art Unit: 3993

Claims 1-6 are rejected under 35 U.S.C. § 102(b) as being unpatentable over Nesbitt,

U.S. Pat. No. 4,431,193 (Nesbitt) with incorporation by reference of Molitor et al., U.S. Pat. No.

4,274,637 (Molitor '637).

Claims 1-6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt, U.S.

Pat. No. 4,431,193 (Nesbitt) in view of Molitor et al., U.S. Pat. No. 4,274,637 (Molitor '637).

Claims 1-6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt, U.S.

Pat. No. 4,431,193 (Nesbitt) mentioning Molitor et al., U.S. Pat. No. 4,274,637 (Molitor '637) in

view of Wu, U.S. Pat. No. 5,334,673, (Wu) as evidenced by Exhibit C.

Claims 1-6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt, U.S.

Pat. No. 4,431,193 (Nesbitt) mentioning Molitor et al., U.S. Pat. No. 4,274,637 (Molitor '637) in

view of Molitor et al., U.S. Pat. No. 4,674,751 (Molitor '751).

Claims 1, 3, 5 and 6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over

Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S. Pat. No. 4,274,637

(Molitor '637).

Claims 1, 3, 5 and 6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over

Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Wu, U.S. Pat. No. 5,334,673 (Wu).

Application/Control Number:                                    Page 9
95/000,123
Art Unit: 3993

   Claims 1, 3, 5 and 6 are rejected under 35 U.S.C. § 103(a) as being unpatentable over

Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S. Pat. No. 4,674,751

(Molitor '751).

### Proposed Third Party Requester's Rejections

*Issue of Inherency*

Multiple proposed rejections that the third party requester submits are based on the

inherent properties of the materials. In order to prove the inherent properties of these materials

the requester has provided "product data sheets" for the following materials: SURLYN (Exhibit

I) and ESTANE (Exhibit J). These "product data sheets" have publication dates later than the

critical date of the claimed inventions. Also, the third party requester has provided other

Exhibits to prove or evidence inherency, e.g. Exhibit C (description of a golf product

performance characteristics); Exhibits G and L (patent owners admissions)

MPEP § 2124 lists exceptions to the rule that the publication date must precede the

critical data of the claimed invention: "...facts [that] include the characteristics and properties of

a material... ". The Shore D hardness and flexural modulus are characteristics and properties of a

material. Thus, it is appropriate to use these "product data sheets" to show such a universal fact

as the inherent properties of a known material. Moreover, See also MPEP § 2112.01: "Where

the claimed and prior art products are identical or substantially identical in structure or

composition, or are produced by identical or substantially identical processes, a prima facie case

of either anticipation or obviousness has been established. *In re Best*, 562 F.2d 1252, 1255, 195

USPQ 430, 433 (CCPA 1977)." And, "Products of identical chemical composition can not have

mutually exclusive properties." "A chemical composition and its properties are inseparable.

Therefore, if the prior art teaches the identical chemical structure, the properties applicant

discloses and/or claims are necessarily present. *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d

1655, 1658 (Fed. Cir. 1990)."

Application/Control Number:                                    Page 11
95/000,123
Art Unit: 3993

<u>Re. Claim 1</u>

**Proposed Third Party Requester Rejection: Ground #1**

The requester submits that claim 1 is unpatentable under 35 U.S.C. § 102(b) as being

anticipated by Nesbitt, U.S. Pat. No. 4,431,193 (Nesbitt).

In the request on pages 14 through 18 the third party requester proposes that claim 1 be

rejected based upon Nesbitt alone with the incorporation by reference of Molitor '637. The third

party requester points out that Molitor '637 is incorporated by reference into Nesbitt because

Nesbitt refers to Molitor '637. (See Nesbitt col. 3, ll. 54-60).

**This rejection is <u>adopted in this office action</u>.**

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

| Claim 1 | Nesbitt (primary) with Molitor '637 (incorporation by reference) |
|---|---|
| A golf ball comprising: | "The disclosure embraces **a golf ball** and method of making the same..." (Nesbitt, Abstract; and FIGS. 1 & 2) |
| a core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises **a solid center or core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere. (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed on said core, | "Disposed on the spherical center or core 12 is a first layer, lamination, ply or **inner cover** 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt , col. 2, ll. 34-37). |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness **in the range of 0.020 inches and 0.070 inches.**" (Nesbitt, col. 3, ll. 19-23). |
| said inner cover layer comprising a blend | "Reference is made to the application Ser. No. 155,658 of |

Application/Control Number:                                    Page 12
95/000,123
Art Unit: 3993

| | |
|---|---|
| of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | Robert P. **Molitor** issued into U.S. Pat. No. 4,274,**637** which describes a number of foamable compositions of a character which may be employed for ... layers 14 ... for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). <br> **Molitor '637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| an outer cover layer disposed on said inner cover layer, | "An **outer layer**, ply, lamination or **cover** 16 ... is then **remolded onto the inner ply or layer** 14 ..." (Nesbitt, col. 2, ll. 43-47). |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The **thickness of the outer layer or cover** 16 of soft, low flexural modulus resin such as SURLYN type 1855, **may be in the range of 0.020 inches and 0.100 inches**." (Nesbitt, col. 3, ll. 22-25). |
| and said outer cover layer comprising a polyurethane material, | **Molitor '637**: ESTANE 58133 is a polyurethane material. (Molitor, col. 18) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches ..." (Nesbitt, col. 2: ll. 50-52). <br> "This center or core 12 and inner layer of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ..." (Nesbitt, col. 3, ll. 34-38). |
| said inner cover layer having a Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). <br> Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47. |
| and said outer cover layer having a Shore D hardness of less than 64. | **Molitor '637** teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As mentioned above, Nesbitt incorporating by reference Molitor '637 as describing an number of compositions suitable for the inner cover layer 14. Of particular interest in this case are Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN 1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No. 4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15%

Application/Control Number:                          Page 13
95/000,123
Art Unit: 3993

by weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in

the art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt incorporating

by reference Molitor '637 inherently teaches using as an inner layer at least one ionomer resin

having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid. Also, as

mentioned above, Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic

polyurethane identified as ESTANE 58133. A review of the scientific literature yields that

ESTANE 58133 has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU

Product Data Sheet". A Shore D hardness of 55 is within the range claimed of Shore D hardness

less than 64. Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the

claim limitation of providing a outer cover layer of polyurethane material having a Shore

hardness of less than 64. Nesbitt discloses its outer layer was made from SURLYN 1855 (now

SURLYN 9020). This material had inherently flexural modulus of about 14,000 psi and a Shore

hardness of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN". Moreover,

as admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

Application/Control Number:                                      Page 14
95/000,123
Art Unit: 3993

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334.

 This rejection of claim 1 based on Nesbitt with incorporation by reference of Molitor

'637 was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.


Ground 1: Patent Owner's Argument

 Patent Owner does not argue this rejection.


Ground 1: Third Party Requester's Comments

 Third Party Requester argues that the language of Nesbitt at col. 3, lines 56-61, was a

proper incorporation by reference of Molitor '637. In the 1st Office Action the Examiner stated

that the language of Nesbitt was not proper incorporation of reference because the perfecting root

words of "incorporate" and "reference" were not in the reference statement (1st Office Action

pages 10-11). Third Party Requester's rebuttal is that the standard used by the Examiner was not

the standard for incorporation by reference during prosecution of the Nesbitt patent (Third Party

Requester's Comments at pages 3-5). The Third Party Requester bolsters this argument by citing

several court decisions (Third Party Requester's Comments at pages 5-6).


Ground 1: Examiner's Response to the Argument and Comments

 Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection. The language of incorporation used in Nesbitt is found at col. 3,

lines 54-61, and states that "Polymeric materials are preferably such as ionomer resins which are

foamable. **Reference is made** to the application Ser. No. 15,658, of Robert P. Molitor issued

into U.S. Patent No. 4,274,637 which describes a number of foamable compositions of a

character which may be employed for one or both layers . . . " (emphasis added).

The pertinent language of incorporation by reference quoted in *In re Hughes* is found at

550 F.2d 1275 and states that "**Reference is made** to application Ser. No. 131,108 for complete

description of methods of preparing aqueous polymeric dispersions applicable in the hereinafter

described invention" (emphasis added). This language was held to incorporate '108.

The pertinent language of incorporation by reference quoted in *In re Voss* is found at 557

F.2d 816 and states that "**Reference is made** to United States Patent No. 2,920,971, granted to

S.D. Stookey '971, for a general discussion of glass-ceramic materials and their production"

(emphasis added). This language was held to incorporate '971.

Since the language in Nesbitt for incorporation by reference is virtually identical to the

language used in *In re Hughes* and *In re Voss*, the Examiner concludes that Nesbitt incorporates

by reference Molitor '637.


**Proposed third party requester rejection:  Ground #2**

The requester submits on pages 14-18 of the request that claim 1 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al.,

U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

Application/Control Number:                                    Page 16
95/000,123
Art Unit: 3993

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

| Claim 1 | Nesbitt (primary) with Molitor '637 (teaching) |
|---|---|
| A golf ball comprising: | "The disclosure embraces **a golf ball** and method of making the same..." (Nesbitt, Abstract; and FIGS. 1 & 2) |
| a core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises **a solid center or core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere.  (Nesbitt, col. 2, II. 31-34). |
| an inner cover layer disposed on said core, | "Disposed on the spherical center or core 12 is a first layer, lamination, ply or **inner cover** 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt , col. 2, II. 34-37). |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness **in the range of 0.020 inches and 0.070 inches.**" (Nesbitt, col. 3, II. 19-23). |
| said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | "Reference is made to the application Ser. No. 155,658 of Robert P. **Molitor** issued into U.S. Pat. No. 4,274,**637** which describes a number of foamable compositions of a character which may be employed for ... layers 14 ... for the golf ball of this invention." (Nesbitt, col. 3, II. 54-60). <br> <u>Molitor '637</u>: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, I. 22 to col. 16, I. 34). |
| an outer cover layer disposed on said inner cover layer, | "An **outer layer**, ply, lamination or **cover** 16 ... is then **remolded onto the inner ply or layer** 14 ..." (Nesbitt, col. 2, II. 43-47). |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The **thickness of the outer layer or cover** 16 of soft, low flexural modulus resin such as SURLYN type 1855, **may be in the range of 0.020 inches and 0.100 inches.**" (Nesbitt, col. 3, II. 22-25). |
| and said outer cover layer comprising a polyurethane material, | <u>Molitor '637</u>: ESTANE 58133 is a polyurethane material. (Molitor, col. 18) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches ..." (Nesbitt, col. 2: II. 50-52). <br> "This center or core 12 and inner layer of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer |

Application/Control Number:                          Page 17
95/000,123
Art Unit: 3993

| | |
|---|---|
| | or cover layer 16 of a soft, low flexural modulus resin ..." (Nesbitt, col. 3, ll. 34-38). |
| said inner cover layer having a Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47. |
| and said outer cover layer having a Shore D hardness of less than 64. | Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

Application/Control Number:                                      Page 18
95/000,123
Art Unit: 3993

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Also, as mentioned above,

Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane

identified as ESTANE 58133. A review of the scientific literature yields that ESTANE 58133

has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU Product Data

Sheet". A Shore D hardness of 55 is within the range claimed of Shore D hardness less than 64.

Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the claim

limitation of providing a outer cover layer of polyurethane material having a Shore hardness of

less than 64. Nesbitt discloses its outer layer was made from SURLYN 1855 (now SURLYN

9020). This material had inherently flexural modulus of about 14,000 psi and a Shore hardness

of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN". Moreover, as

admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334. Thus, because the

actual chemical composition of the material is not critical to the practice of the invention with

respect to its mechanical performance, i.e. its "click and feel" for a golfer, one of ordinary skill

in the art at the time the invention was made would find it obvious to substitute one material for

another material if both materials had substantially the same mechanical properties.

This rejection of claim 1 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 2: Patent Owner's Argument

Application/Control Number:                                    Page 19
95/000,123
Art Unit: 3993

 Patent Owner argues that the combination of Nesbitt and Molitor '637 is improper

because: (1) Nesbitt's entire focus is on golf balls with all-ionomer resins, preferably foamable,

two-layer covers and references Molitor '637 for examples of foamable ionomer resins. Hence,

Nesbitt teaches away from the disclosure of Molitor '637's disclosure of non-ionomeric resins,

including polyurethane (Patent Owner's Response at page 15 to middle of page 16); (2) in a

deposition (Exhibit F) Nesbitt, himself, stated that he did not consider use of polyurethane as an

outer cover material (Patent Owner's Response at middle of page 16); (3) Nesbitt combined

with Molitor '637 is improper because their individually disclosed thicknesses for the outer layer

are divergent (Patent Owner's Response at top of page 17; (4) neither reference discloses a

Shore D hardness of 64 or less for the outer layer measured on the ball with the Examiner relying

on commercial literature of ESTANE polyurethane (Exhibit J) for a hardness value. This value

is not probative because hardness values of the same material will differ depending upon the

total construction of the ball (Patent Owner's Response at middle of page 18); (5) one of

ordinary skill did not know at the time of the claimed invention to use a thin, polyurethane cover

layer have a Shore hardness of 64 or less on the ball before the patent at issue taught this

construction (Patent Owner's Response at top of page 16); and, (6) the combination

impermissibly uses hindsight construction by scouring the prior art to locate individual claim

elements (Patent Owner's Response at bottom of page 19).


Ground 2: Third Party Requester's Comments

 As to the Patent Owner's first argument, the Third Party Requester states that the plain

language of Nesbitt is that the outer or inner cover layers can be of a synthetic polymeric

Application/Control Number:                          Page 20
95/000,123
Art Unit: 3993

material and that Molitor '637 gives examples of synthetic polymeric materials, including

polyurethane (Third Party Requester's Comments at page 19 to top of page 20).

As to the Patent Owner's second argument, the Third Party Requester states that the Fed.

Cir. takes a dim view of testimony for a patent's meaning from inventors after the fact citing *Bell*

*& Howell Document Mgmt. Prods. Co. v Altek Sys.* (Third Party Requester's Comments at

middle of page 20).

As to the Patent Owner's third argument, the Third Party Requester states that the range

of thicknesses in the two patents overlay and disclose in part the same ranges, and, hence a

person of ordinary skill would find it obvious to substitute one layer material for another (Third

Party Requester's Comments at bottom of page 20 to top of page 21).

As to the Patent Owner's fourth argument, the Third Party Requester states that an expert

in the art produced a three-piece ball with the core and inner layer of Nesbitt and the cover of

Molitor '637. The ball exhibited Shore hardness values within those of the claimed values

(Third Party Requester's Comments at bottom of page 21 to top of page 22).

As to the Patent Owner's fifth argument, the Third Party Requester states that golf balls

with a core and inner and outer layers were known before the filing of the '873 patent (Third

Party Requester's Comments at page 17 to page 19). Further, polyurethane has been used in golf

ball covers before the filing of the '873 patent (Third Party Requester's Comments at page 17 to

page 19).

As to the Patent Owner's sixth argument, the Third Party Requester states that the

combination of a ball with the core and inner layer of Nesbitt with an outer polyurethane layer is

proper in light of the decisions in *Ex parte Sullivan* and *KSR v. Teleflex* (Third Party Requester's

Application/Control Number:                                      Page 21
95/000,123
Art Unit: 3993

Comments at page 14 to page 16). In *Sullivan* a split panel of the BPAI held that ""[i]n applying

the test for obviousness, we conclude that the teaching of WU clearly would have made it

obvious at the time of the invention was made to a person of ordinary skill in the art to have

modified Nesbitt's golf ball by using polyurethane as the outer cover material to achieve the

expected benefits therefrom taught by Wu (i.e., to have the "click" and "feel" of balata, improved

shear resistance and cut resistance; durability; and resiliency)."" (Third Party Requester's

Comments at middle of page 14). In *KSR* a unanimous Court held that ""[c]ommon sense

teaches . . . that . . . in many cases, a person of ordinary skill will be able to fit the teachings of

multiple patents together like pieces of a puzzle."" (Third Party Requester's Comments at top of

page 16).


Ground 2: Examiner's Response to the Argument and Comments

        Examiner agrees with the comments of the Third Party Requester and the rejection of

claim 1 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained.

Although Nesbitt's emphasis (in his patent and deposition) may be on all-ionomer resins, it is

settled law that a patent teaches all that it discloses. including nonpreferred embodiments (MPEP

2123(I)). Since Nesbitt references the Molitor '637 patent, one of ordinary skill would logically

look at its complete disclosure which includes the use of polyurethane as an outer cover. The

combination is proper because, in addition to the holdings quoted by the Third Party Requester in

their comments, the Supreme Court has held that "[w]hen there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable solutions, a

person of ordinary skill has good reason to pursue the known options within his or her technical

Application/Control Number:                                     Page 22
95/000,123
Art Unit: 3993

grasp. If this leads to the anticipated success, it is likely the product not of innovation but of

ordinary skill and common sense" (slip opinion of *KSR* at middle of page 17). Here, the problem

of producing a golf ball with distance, durability, "click," and feel was known (Patent Owner's

Response at bottom of page 4). Polyurethane was a known solution for providing "click" and

feel (Third Party Requester's Comments *id.*). The resulting golf ball with a polyurethane outer

cover layer had the expected results (*Sullivan* at page 11). Thus, the golf balls of claim 1 are of

ordinary skill and common sense.


**Proposed third party requester rejection:  Ground #3**

The requester submits on pages 18-20 of the request that claim 1 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Pat.

No. 5,334,673, (Wu).

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt

mentioning Molitor '637 in view of Wu, as evidenced by Exhibit C.

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Wu discloses, teaches or suggests the claim limitations. As reported in the Order granting

reexamination, it needs to be correctly stated on the record that Nesbitt and Molitor '637 which

is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer

layer.

| Claim 1 | Nesbitt (primary) mentioning Molitor '637 with Wu (teaching) |
|---|---|
| A golf ball comprising: | "The disclosure embraces **a golf ball** and method of making the same..." (Nesbitt, Abstract; and FIGS. 1 & 2) |
| a core; | "Referring to the drawings in detail there is illustrated a golf ball |

Application/Control Number:                    Page 23
95/000,123
Art Unit: 3993

| | 10 which comprises **a solid center or core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere.  (Nesbitt, col. 2, II. 31-34). |
|---|---|
| an inner cover layer disposed on said core, | "Disposed on the spherical center or core 12 is a first layer, lamination, ply or **inner cover** 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt , col. 2, II. 34-37). |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness **in the range of 0.020 inches and 0.070 inches.**" (Nesbitt, col. 3, II. 19-23). |
| said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | "Reference is made to the application Ser. No. 155,658 of Robert P. **Molitor** issued into U.S. Pat. No. 4,274,**637** which describes a number of foamable compositions of a character which may be employed for ... layers 14 ... for the golf ball of this invention." (Nesbitt, col. 3, II. 54-60). <br> <u>Molitor '637</u>: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, I. 22 to col. 16, I. 34). |
| an outer cover layer disposed on said inner cover layer, | "An **outer layer**, ply, lamination or **cover** 16 ... is then **remolded onto the inner ply or layer** 14 ..." (Nesbitt, col. 2, II. 43-47). <br> <u>Wu</u>: "Preferably, a golf ball is made in accordance with the present invention by molding a cover about a core wherein the cover is formed from a polyurethane composition comprising a polyurethane prepolymer and a slow-reacting polyamine curing agent or a difunctional glycol." (Wu, col. 3, II. 62-66). |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The **thickness of the outer layer or cover** 16 of soft, low flexural modulus resin such as SURLYN type 1855, **may be in the range of 0.020 inches and 0.100 inches.**" (Nesbitt, col. 3, II. 22-25). |
| and said outer cover layer comprising a polyurethane material, | <u>Molitor '637</u>: ESTANE 58133 is a polyurethane material. (Molitor, col. 18) <br> <u>Wu</u>: "[t]he present invention is a golf ball product made from a polyurethane prepolymer cured with a slow-reacting curing agent selected from the group of slow-reacting polyamine curing agents or difunctional glycols. The term "golf ball product" as used in the specification and claims means a cover, a core, a center or a one-piece golf ball. The cover of a golf ball made in accordance with the present invention has been found to have good shear resistance, cut resistance, durability and resiliency. **Preferably, the polyurethane composition of the present invention is used to make the** |

Application/Control Number:                                    Page 24
95/000,123
Art Unit: 3993

| | cover of a golf ball." (Wu, col. 2, ll. 33-44). |
|---|---|
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches ..." (Nesbitt, col. 2: ll. 50-52).<br>"This center or core 12 and inner layer of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ..." (Nesbitt, col. 3, ll. 34-38).<br>Wu: "[t]he size of the mold cups is about that of a conventional golf ball mold, i.e. nominally 1.68 inches (4.25 cm) for American sized balls and nominally 1.62 inches (4.10 cm) for British sized balls." (Wu, col. 5, ll. 47-50). |
| said inner cover layer having a Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47. |
| and said outer cover layer having a Shore D hardness of less than 64. | Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133.<br>Wu: "With polyurethanes made in accordance with the present invention, the degree of cure which has taken place is dependent upon, inter alia, the time, temperature, type of curative, and amount of catalyst used. It has been found that the degree of cure of the cover composition is directly proportional to the hardness of the composition. A hardness of about 10D to 30D, Shore D hardness for the cover stock at the end of the intermediate curing step (i.e. just prior to the final molding step) has been found to be suitable for the present invention. More preferred is a hardness of about 12D to 20D." (Wu, col. 6, ll. 27-38). |

As mentioned above, Nesbitt mentioning Molitor '637 teaches the use of particular

polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being

used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that SURLYN

covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to

such sensations and polyurethane covered golf balls can be made to have a similar "click" and

"feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will

have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D

hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. This

teaching of Shore D hardness is directed to an intermediate curing step product prior to the final

molding process to finish the golf ball. Exhibit C demonstrates the actual finished golf ball

product having the cover layer that Wu teaches within its disclosure. Exhibit C teaches that the

golf ball taught therein is covered by the following patents: 4,783,078; 4,846,910; 4,858,923;

4,904,320; 4,915,390; 5,007,594; 5,080,367; 5,133,509; **5,334,673**; and D339,074. The '673

Patent teaches the cover sock of the Exhibit C finished golf ball. Exhibit C teaches that the golf

ball taught therein has a cover material made from an "elastomer", having a thickness of .050",

and 58 Shore D hardness. All three properties are within the range of mechanical properties of

the claim invention (polyurethane is an elastomer, cover layer thickness ranges from 0.010 to

0.070 inches and the Shore D hardness is less that 64). Because it has been admitted by the

inventor of the Sullivan '893 patent that the particular chemical properties of the materials (the

chemical composition) used in the construction of a golf ball lack criticality as compared to the

mechanical properties (the Shore D hardness, flexural modulus, layer thickness) of those

compounds used for constructing the different layers (Exhibit G at 334), one of ordinary skill in

the art at the time the invention was made would find it obvious to incorporate the teachings of

Wu which inherently include the teachings of Shore hardness for the fully cured cover layer as

taught in Exhibit C as obvious equivalent materials in order to achieve the same end result of

providing a cover layer that has the same "click" and "feel" of a balata cover which the extra

durability of an elastomeric material.

Application/Control Number:                                        Page 26
95/000,123
Art Unit: 3993

This rejection of claim 1 based on Nesbitt in view of Wu was proposed by the third party

requester in the request for reexamination and is being adopted essentially as proposed in the

request.


Ground 3: Patent Owner's Argument

Patent Owner argues that the combination of Nesbitt and Wu is improper because: (1)

the Wu patent is silent on the thickness of the polyurethane layer (Patent Owner's Response at

page 20); (2) the Wu patent is silent on the Shore hardness value and in a deposition Ms. Wu

said she could not predict what the hardness would be of a finished golf ball (Patent Owner's

Response at page 20); (3) the Titleist 1 ball, which Examiner uses to disclose the proper

hardness of the outer layer, or cover, because the ball's commercial literature lists the Wu patent,

is not competent evidence because Wu's patent's claims are silent as to hardness (Patent

Owner's Response at bottom of page 20 to top of page 21); (4) the claimed invention is the

synergistic combination of features and the Examiner impermissibly uses hindsight to

reassemble the ball (Patent Owner's Response at bottom of page 21 to top of page 22); and, (5)

the BPAI's divided opinion (the decision in *Ex parte Sullivan*) is not binding and the claim here

is more narrow (Patent Owner's Response at page 22).


Ground 3: Third Party Requester's Comments

As to the Patent Owner's first argument, the Third Party Requester states that Nesbitt

discloses the claimed thickness at its claim 6 (Third Party Requester's Comments at bottom of

page 23).

Application/Control Number:                                    Page 27
95/000,123
Art Unit: 3993

As to the Patent Owner's second argument, the Third Party Requester states that Nesbitt

discloses the claimed Shore D hardness value at col. 2, lines 43-49, when used with and the

Surlyn Data Sheet (Third Party Requester's Comments at bottom of page 23).

As to the Patent Owner's fourth argument, the Third Party Requester states that

motivation to make this combination is found as stated in the opinion of *ex parte Sullivan* (Third

Party Requester's Comments at middle of page 22).

As to the Patent Owner's fifth argument, the Third Party Requester states that the opinion

in *Ex parte Sullivan* sets forth cogent reasoning for the combination and the differences is scope

between the claims are either explicit disclosed or inherent to Nesbitt or Wu, or mere design

choice (Third Party Requester's Comments at pages 22-24).


Ground 3: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester and the rejection of

claim 1 under 35 USC 103(a) as being obvious by Nesbitt in view of Wu is maintained. As to

the Patent Owner's first and second arguments, Nesbitt discloses an overlapping thickness range

for the outer cover of 0.020 inches to 0.100 inches (col. 3, lines 22-25) and its Shore hardness

value of 55 ("Surlyn 1855" of col. 3, lines 22-25, which has a Shore D hardness of 55 (from

Surlyn data sheet for Surlyn 9020)) which is less than the claimed value of 64.

As to the Patent Owner's third argument, Examiner considers the Wu patent to describe

the Titleist cover because the patent and the Titleist's commercial literature have characteristics

in common such as being "cut-resistant" (Wu patent at col. 2 line 41; Titleist 1's commercial

literature at text above "Titleist Professional Specifications") and ball velocities of 253.0 ft./sec.

(Wu patent at col. 8 Table IV; Titleist 1's commercial literature at "Titleist Professional Specifications"). These two characteristics combined with the fact that the Titleist 1 cites the Wu patent leads to the conclusion that the cover of the Titleist 1 is within the ambit of the composition claimed in the Wu patent. Hence, the Titleist 1 commercial literature accurately recites other characteristics on which the Wu patent is silent, such as Shore D hardness. Whether Wu, herself, knew the hardness of an outer layer made of her composition is not dispositive because of the commercial literature for the Titleist 1.

As to the Patent Owner's fourth and fifth arguments, the combination is proper because the Supreme Court has held that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within her or her grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense" (slip opinion *KSR* at middle of page 17). Here, the problem of producing a golf ball with distance, durability, "click," and feel was known (Patent Owner's Response at bottom of page 4). Polyurethane was a known solution for providing "click" and feel (Wu at col. 1 lines 40-46). Nesbitt discloses that a golf ball with his inner and outer thicknesses have both distance feel (*generally* Nesbitt at col. 1, lines 65-78, continuing to col. 2, lines 1-9). The resulting two-layer golf ball with an outer polyurethane layer had the expected results (*Sullivan* at page 12) and not, therefore, synergistic. Thus, the golf balls disclosed by the combination of Nesbitt and Wu are of ordinary skill and common sense. Since this combination has the elements cited in claim 1 of Sullivan '873, the decision in *Ex parte Sullivan* is supportive but not dispositive or binding.

**Proposed third party requester rejection: Ground #4**

The requester submits on pages 20-22 of the request that claim 1 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751, (Molitor '751).

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt mentioning Molitor '637 in view of Molitor '751.

Below is a claim chart identifying the claim limitations and where Nesbitt discloses, teaches or suggests the claim limitations. As reported in the Order granting reexamination, it needs to be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer layer.

| Claim 1 | Nesbitt (primary) mentioning Molitor '637 with Molitor '751 (teaching) |
|---|---|
| A golf ball comprising: | "The disclosure embraces **a golf ball** and method of making the same..." (Nesbitt, Abstract; and FIGS. 1 & 2) |
| a core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises **a solid center or core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere. (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed on said core, | "Disposed on the spherical center or core 12 is a first layer, lamination, ply or **inner cover** 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt , col. 2, ll. 34-37). |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness **in the range of 0.020 inches and 0.070 inches.**" (Nesbitt, col. 3, ll. 19-23). |
| said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | "Reference is made to the application Ser. No. 155,658 of Robert P. **Molitor** issued into U.S. Pat. No. 4,274,**637** which describes a number of foamable compositions of a character which may be employed for ... layers 14 ... for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). <br> Molitor '**637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and |

Application/Control Number:                                          Page 30
95/000,123
Art Unit: 3993

| | SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
|---|---|
| an outer cover layer disposed on said inner cover layer, | "An **outer layer**, ply, lamination or **cover** 16 ... is then **remolded onto the inner ply or layer 14 ...**" (Nesbitt, col. 2, ll. 43-47). |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The **thickness of the outer layer or cover** 16 of soft, low flexural modulus resin such as SURLYN type 1855, **may be in the range of 0.020 inches and 0.100 inches.**" (Nesbitt, col. 3, ll. 22-25). |
| and said outer cover layer comprising a polyurethane material, | Molitor '637: ESTANE 58133 is a polyurethane material. (Molitor, col. 18) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches ..." (Nesbitt, col. 2: ll. 50-52). "This center or core 12 and inner layer of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ..." (Nesbitt, col. 3, ll. 34-38). |
| said inner cover layer having a Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47. |
| and said outer cover layer having a Shore D hardness of less than 64. | Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As shown above in the claim chart, Nesbitt mentioning Molitor '637 suggests the use of a soft outer cover layer including a polyurethane material. In an analogous golf ball, Molitor '751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability properties similar to wound, balata-covered balls is to provide about an inner resilient molded core **a cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76. The novel **cover of the golf ball** of the invention is made of a composition comprising a blend of (1) **a thermoplastic urethane having a shore A hardness less than 95** and (2) **an ionomer having a shore D hardness greater than 55**.

(Molitor '751, col. 2, ll.33-49 (emphasis added)).

Moreover, in explaining what constitutes a two-piece golf ball, Molitor '751 teaches that:

> The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, **but also includes balls having a separate solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt,** and other balls have non-wound cores.

(Molitor '751, col. 3, ll. 7-12 (emphasis added)).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of less than 85, preferably 70-80, most preferably 72-76. As described in Molitor '751's TABLE bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover is taught to have a Shore C hardness of 73. Patent Owner has admitted that a Shore C hardness of 73 is equal to a Shore D hardness of 47, *see* U.S. Pat. No. 6,905,648, Table 19 (Exhibit L). Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore C value to a Shore D value for the polyurethane material. How one of ordinary skill in the art "translates" a Shore C value to a Shore D value is by taking the known Shore hardness values with a given range, in this instance Shore C, for given materials, in this instance polyurethane golf ball covers materials, and taking corresponding measurements with a different set of Shore gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs from performing this procedure wherein the range of known Shore C values are the abscissa and the range of measured Shore D values are the ordinate. Then, said plot can be use to read equivalent Shore D value for any given Shore C value within the known range of Shore C. This is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness value for any given Shore C hardness value.

Application/Control Number:                                        Page 32
95/000,123
Art Unit: 3993

As stated in the request on page 21

It would have been obvious to one of ordinary skill in the art at the time of the
invention to substitute the soft outer cover layer of Nesbitt and replace it with an
outer cover layer made of the soft polyurethane material taught by Molitor '751 to
provide a golf ball that includes "playability properties as good or better than
balata-covered wound balls but are significantly more durable," and "have better
wood playability properties than conventional two-piece balls, and permit
experienced golfers to apply spin so as to fade or draw a shot" while having
improved puttability. (Molitor '751, col. 2, ll. 61-68)

This rejection of claim 1 based on Nesbitt in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 4: Patent Owner's Argument

The Patent Owner argues that the rejection is improper because: (1) Molitor '751

describes the cover of his golf ball with hardness values in terms of Shore C, hence, one of

ordinary skill would not look to combine this teaching with the patent of Nesbitt, with hardness

values recorded in terms of Shore D, because the two hardness values, or scales, have no simple

mathematical correlation (Patent Owner's Response at page 23); and, (2) no motivation to

combine Nesbitt with Molitor '751 because the Molitor '751 ball's construction is a hard core

with a soft cover, the cover having a thickness twice the thickness of the Sullivan '873 claims

and an order of magnitude softer (Patent Owner's Response at top of page 24).


Ground 4: Third Party Requester's Comments

Third Party Requester counter argues that, for argument (1) hardness values of Shore C and Shore D are convertible as evidenced by, *inter alia*, the Sullivan '873 patent itself (Third Party Requester's Comments at bottom of page 25). For argument (2), the Third Party Requester states that motivation to combine exists because, *inter alia*, Molitor '751, itself, states that its cover can be used with the three-piece, two-cover golf ball of Nesbitt (Third Party Requester's Comments at bottom of page 27).

Ground 4: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester, and the rejection of claim 1 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '751 is maintained. As to the Patent Owner's first argument, Examiner specifically agrees with the Third Party Requester's comments that a correlation, or conversion, exists between the two hardness scales, Shore C and Shore D, because Sullivan '873 give a conversion of the two scales at col. 3, lines 42-43. Further, the quote used by the Patent Owner from the ASTM D-2240 standard stating that ""no simple relationship exists"" (Patent Owner's Response at middle of page 23) does not preclude a conversion factor, even if complex. Since the Supreme Court has recently held that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," even a complex calculation suffices to permit conversion of the two scales (slip opinion of *KSR* at middle of page 17). Hence, one of ordinary skill would not be deterred from use of prior art regardless of the hardness scale used to define its various layers.

As to the second argument, Examiner considers the language of the Molitor '751 that "[t]he phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core

and a cover, but also includes balls having a separate solid layer beneath the cover as disclosed,

for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls, having non-wound cores"

provides motivation to combine the two references.  Molitor '751 provides motivation, for

example, at col. 1, lines 11-15, where it states that the invention is concerned with a "golf ball

useful in making balls, particularly two-piece balls, having superior short iron and other

playability characteristics."

Further, the Supreme Court has held that "[w]hen there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable solutions, a

person of ordinary skill has good reason to pursue the known options within her or her grasp.  If

this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill

and common sense" (slip opinion KSR at middle of page 17).  Here, the problem of producing a

golf ball with distance, durability, "click," and feel was known (Patent Owner's Response at

bottom of page 4).  Polyurethane was a known solution for providing playability properties

(Molitor '751 at abstract).  The resulting golf ball with a polyurethane outer cover had the

expected results (Sullivan '873 at abstract).  Thus, the golf ball disclosed in claim 1 of Sullivan

'873 is of ordinary skill and common sense.

As to the argument of different thicknesses of the layers, Nesbitt discloses the thickness

of an inner layer being in a range from 0.020 inches to 0.070 inches at col. 3, lines 19-25.  These

ranges overlap the ranges of claim 1.  Finally, for the argument of a Shore value of at least 60 for

the inner cover, Nesbitt discloses use of "hard, highly flexual modulus resinous material such as

type 1605 Surlyn" for this layer at col. 2, lines 36-39.  Surlyn 1605, now Surlyn 8940, has a

Shore D hardness of 65 (Third Party Requester's Comments at page 27, n.82).

Application/Control Number:                                    Page 35
95/000,123
Art Unit: 3993

**Proposed third party requester rejection:  Ground #5**

The requester submits on pages 22-25 of the request that claim 1 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in view of

Molitor et al., U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit  in view

of Molitor '637.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 1 | Proudfit |
| --- | --- |
| A golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) |
| an inner cover layer disposed on said core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material."  (Proudfit, col. 7, ll. 21-24) |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "The **thickness of the inner layer** can be within the range of **about 0.0250 to 0.2875** inch to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40) "The preferred dimensions are ... and **inner layer thickness of 0.037 inch...**" (Proudfit, col. 7, ll. 43-44) |

Application/Control Number:                                    Page 36
95/000,123
Art Unit: 3993

| | |
|---|---|
| said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | "The composition of the inner cover layer is described in Table 6." <br><br> **TABLE 6** <br> Composition of Inner Layer of Cover <br> (Parts by Weight) <br><br> Ionomer Type — Blend Ratio <br> Sodium- Surlyn 8940 — 75% <br> Zinc- Surlyn 9910 — 25% <br><br> (Proudfit, col. 8, ll. 22-30) |
| an outer cover layer disposed on said inner cover layer, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material**." (Proudfit, col. 7, ll. 21-24) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch.  The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |
| and said outer cover layer comprising a polyurethane material, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "The preferred dimensions are a core diameter of 1.500 inch, and inner layer thickness of 0.037 inch (inner layer diameter of 1.575 inch). and an outer layer thickness of 0.0525 inch (**total ball diameter of 1.680 inch**)." (Proudfit, col. 7, ll. 43-47) |
| said inner cover layer having a Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6." <br><br> **TABLE 6** <br> Composition of Inner Layer of Cover <br> (Parts by Weight) <br><br> Ionomer Type — Blend Ratio <br> Sodium- Surlyn 8940 — 75% <br> Zinc- Surlyn 9910 — 25% <br><br> (Proudfit, col. 8, ll. 22-30) <br><br> See below with respect to Shore D hardness. |
| and said outer cover layer having a Shore D hardness of less than 64. | "...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

Application/Control Number:                                    Page 37
95/000,123
Art Unit: 3993

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core, inner layer and outer layer) with the layers within the range of claimed thicknesses each layer made from a material having the mechanical properties substantially similar to the claimed mechanical properties. What Proudfit lacks in clearly disclosing are the particular mechanical and chemical properties of the claimed invention. However, Proudfit either incorporates by reference these mechanical and chemical properties and/or the materials used within the Proudfit golf ball inherently have these mechanical and chemical properties. For instance, Proudfit incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention. (Proudfit, col. 1, ll.39-43). The '981 patent discloses the preferably amount of unsaturated carboxylic acid is "from about 5[%] to about 15% by weight." ('981 Pat, col. 3, ll. 59-60). If Proudfit discloses using blends SURLYN the chemical for making the inner cover and the '981 Patent is the formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid. As taught from Exhibit I, SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, see Exhibit I. Therefore, this cover blend inherently has a hardness of 60 or more. Proudfit discloses the outer layer being a blend of balata. An example of the blend is disclosed in Table 7 reproduced below.

Application/Control Number:                                          Page 38
95/000,123
Art Unit: 3993

TABLE 7

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .10 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one of the first types of synthetic rubber or elastomer. As described in the Rule 132 Declaration of Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52. Thus, Proudfit's outer layer cover inherently has a Shore hardness of less than 64.

While Proudfit lacks disclosing the outer layer being made from polyurethane, in an analogous golf ball, Molitor '637 teaches using polyurethane, see Molitor '637, col. 5, ll. 33-41 and col. 18, examples 16 and 17. The request points out on page 25, ll. 7-15, why the use of polyurethane to one of ordinary skill in the art would be readily apparent given that those skilled in the art were more critical of the mechanical properties of a particular material then the chemical composition (material type) of the material and those remarks are incorporated herein. In other words, it was not critical to the "golf ball inventions" of those skilled in the art as to what materials were used to construct the golf balls so long as the materials had the desired mechanical properties which would yield the particular mechanical performance parameters the inventors were trying to achieve, e.g. improved processability; improved durability; cost effectiveness; user acceptance of performance (similar "click" and "feel" to balata) of the golf ball product made from those materials. The request on page 25, ll. 16-25, explains why one of

ordinary skill in the art would be motivated to substitute the outer cover layer taught in Molitor

'637 for the outer cover layer disclosed in Proudfit and those remarks are incorporated herein.

Therefore, one of ordinary skill in the art would find the claimed invention as obvious for

the motivation given in the request on page 25, ll. 16-25.

This rejection of claim 1 based on Proudfit in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 5: Patent Owner's Argument

The Patent Owner argues that the rejection is improper because: (1) Proudfit does not

describe a golf ball with an outer layer with a Shore D hardness value of 64 or less because the

Hebert Declaration's analysis of the Wilson Ultra Tour (as representative of the Proudfit patent)

is not correct (Patent Owner's Response middle of page 25 to middle of page 27);  (2) the

thickness of Molitor '637's cover layer cannot be combined with thickness of Proudfit's cove

layer which is significantly thinner (Patent Owner's Response middle of page 27);  and,  (3) the

rejection is impermissible hindsight reconstruction of substitution of materials when the

invention, exemplified by the Titleist Pro V1, is a commercial blockbuster (Patent Owner's

Response bottom of page 27 to top of page 28).


Ground 5: Third Party Requester's Comments

Third Party Requester counter argues that, for argument (1) the Wilson Ultra Tour is

representative of the Proudfit patent because both disclose a three-piece golf ball with an outer

Application/Control Number:                                    Page 40
95/000,123
Art Unit: 3993

cover layer of cis-polybutadiene and synthetic balata (trans-polyisoprene), an inner layer of Na

and Zn Surlyns, and a compression of 100 (Third Party Requester's Comments at page 31); (2)

the thickness layers in the two patents overlap hence one of ordinary skill would realize that the

cover materials could be substituted (Third Party Requester's Comments at page 29); and (3) the

motivation set forth in the rejection by the Examiner satisfies the requirements *KSR* and is

consistent with the motivation to combine Nesbitt and WU identified by the BPAI (Third Party

Requester's Comments at middle of page 30) and that the '873 claim does not disclose the

Titleist Pro V1 golf ball (Third Party Requester's Comments at pages 34-37).


Ground 5: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester, and the rejection of

claim 1 under 35 USC 103(a) as being obvious by Proudfit in view of Molitor '637 is

maintained. As to the Patent Owner's first argument, the Examiner accepts the Hebert

Declaration as competent evidence because it is a sworn declaration. As such, the Examiner will

not probe the Declarant's veracity. Since the Wilson Pro Tour had an outer cover made of c-

polybutadiene and synthetic balata (trans-polyisoprene) with a Shore D hardness of 52 (Exhibit

A of Hebert Declaration), the over cover of Proudfit is considered to have the same hardness

value since its composition is the same (Proudfit at col. 8, Table 7; *see* MPEP 2112.01(II)).

As to Patent Owner's second argument, Proudfit discloses that the outer cover can be

from 0.0450 to 0.0650 inches in thickness. Molitor '637 discloses an outer cover thickness of

0.060 inches or thicker (Molitor '637 at col. 5, lines 3-7). Since these values overlap in the

Application/Control Number:                                    Page 41
95/000,123
Art Unit: 3993

region of 0.060 inches, one of ordinary skill would find it obvious to look to Molitor '637 for an

outer cover for the golf ball of Proudfit.

As to Patent Owner's third argument, Examiner considers the language of Molitor '637

that "one skilled in the art can produce a golf ball having the desirable qualities of both Balata

and Surlyn resin covered golf balls" (Molitor '637 at col. 2, lines 43-45) to provide motivation to

combine the two references. One of the compositions disclosed by Molitor '637 is polyurethane

(Molitor '637 at col. 5, lines 33-55). Therefore, one of ordinary skill, having the three-piece ball

disclosed by Proudfit would look to Molitor '637 for over cover material to achieve a golf ball

with the desired qualities of Balata and Surlyn.

Further, the Supreme Court has held that "[w]hen there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable solutions, a

person of ordinary skill has good reason to pursue the known options within her or her grasp. If

this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill

and common sense" (slip opinion KSR at middle of page 17). Here, the problem of producing a

golf ball with distance, durability, "click," and feel was known (Patent Owner's Response at

bottom of page 4). Polyurethane was a known solution for providing playability properties

(Molitor '637 at abstract). The resulting golf ball with a polyurethane outer cover had the

expected results (Sullivan '873 at abstract). Thus, the golf ball disclosed in claim 1 of Sullivan

'873 is of ordinary skill and common sense.

The Examiner does not reach the argument proffered by the Patent Owner that the Titleist

Pro V1 golf ball exemplifies the instant claim language.

Application/Control Number:                                    Page 42
95/000,123
Art Unit: 3993

**Proposed third party requester rejection:  Ground #6**

The requester submits on pages 26-27 of the request that claim 1 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S.

Pat. No. 5,334,673.

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Wu.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 1 | Proudfit |
|---|---|
| A golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) |
| an inner cover layer disposed on said core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "The **thickness of the inner layer** can be within the range of **about 0.0250 to 0.2875** inch to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40) "The preferred dimensions are ... and **inner layer thickness of 0.037 inch...**" (Proudfit, col. 7, ll. 43-44) |
| said inner cover layer comprising a blend of two or more ionomer resins, at least | "The composition of the inner cover layer is described in Table 6." |

Application/Control Number:                                    Page 43
95/000,123
Art Unit: 3993

| | |
|---|---|
| one of which contains no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | **TABLE 6**<br><br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30) |
| an outer cover layer disposed on said inner cover layer, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material.**" (Proudfit, col. 7, ll. 21-24) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |
| and said outer cover layer comprising a polyurethane material, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "The preferred dimensions are a core diameter of 1.500 inch, and inner layer thickness of 0.037 inch (inner layer diameter of 1.575 inch). and an outer layer thickness of 0.0525 inch (**total ball diameter of 1.680 inch**)." (Proudfit, col. 7, ll.43-47) |
| said inner cover layer having a Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br><br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30) |
| and said outer cover layer having a Shore D hardness of less than 64. | "...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17) This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

As expressed in the request on page 26 and identified above within the claim chart,

Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer

and a soft balata blend outer cover layer. Proudfit lacks in disclosing the use of polyurethane as

Application/Control Number:                                      Page 44
95/000,123
Art Unit: 3993

the material for the outer cover layer. Instead, as shown in Table 7, reproduced below, Proudfit

discloses the outer cover layer being made of a blend of balata.

### TABLE 7

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls. As

admitted by the patent owner

> Despite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-hit.
> Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). The next step in golf ball cover technology to overcome the

problems with balata was the use of SURLYN as an outer cover. However, as described in the

request on page 26 Wu teaches the problem with SURLYN as a outer cover on a golf ball.

> **The problem with SURLYN covered golf balls ... is that they lack the "click" and "feel"**
> **which golfers had become accustomed to with balata.** "Click" is the sound when the ball is hit
> by a golf club and "feel" is the overall sensation imparted to the golfer when the ball is hit.
>
> It has been proposed to employ polyurethane as a cover stock for golf balls because, like
> SURLYN, it has a relatively low price compared to balata and provides superior cut resistance
> over balata. **However, unlike SURLYN covered golf balls, polyurethane-covered golf balls**
> **can be made to have the "click" and "feel" of balata.**

(Wu col. 1, ll. 36-46 (emphasis added)).

As explained in the request on page 26, line 22 through page 27, line 27 those skilled in

the art at the time the claimed invention was made were more critical of the mechanical

properties of the materials that constructed the layers which impacted the performance of the golf

ball more than the materials themselves. See Exhibit G. As identified above Proudfit lacks

Application/Control Number:                                    Page 45
95/000,123
Art Unit: 3993

disclosing polyurethane as the outer cover layer.  In analogous golf ball device, Wu's

polyurethane material inherently has a flexural modulus of 23,000 psi as averred within the Rule

132 Declaration of Jeffrey L. Dalton at para. 7.  Proudfit's outer cover layer material is disclosed

as having a flexural modulus of between about 20,000 psi and 25,000 psi.  (Proudfit, col. 6, ll.

28-31)  Thus, Wu's cover material's flexural modulus falls within the range of Proudfit's cover

material.  Moreover, Wu's polyurethane material inherently has a Shore D hardness of about 58.

See Decl. of Dalton at para. 6.  Thus, as evidenced by this declaration, Wu's polyurethane

material falls within the claimed range of the outer layer material have a Shore D hardness of

less than 64.

        Thus, as pointed out in the request on page 27, lines 3-18, one of ordinary skill in the art

at the time the invention was made would find it obvious to substitute Wu's polyurethane golf

ball cover material for Proudfit's balata-blend cover material for the advantages described in this

part of the request which are incorporated herein.

        This rejection of claim 1 based on Proudfit in view of Wu was proposed by the third

party requester in the request for reexamination and is being adopted essentially as proposed in

the request.


Ground 6: Patent Owner's Argument

        The Patent Owner argues that the rejection is improper because: (1) while the patent of

Wu describes the use of polyurethane as an outer cover, it discloses neither the thickness nor the

Shore D hardness of this polyurethane layer (Patent Owner Response at middle of page 28);  (2)

Wu, herself, at her deposition could not predict the final hardness value of her cover (Patent

Owner Response at middle of page 28); (3) the Dalton Declaration is not competent evidence of

the hardness value of Wu's polyurethane layer (Patent Owner Response at bottom of page 28);

and, (4) no motivation to combine the references, absent hindsight, because motivation to try,

*i.e.*, to substitute one material for another, is not the standard (Patent Owner Response at top of

page 29).


Ground 6: Third Party Requester's Comments

Third Party Requester counter argues that, for argument (4), applying the standard of

*KSR* would result in one of ordinary skill using polyurethane as a golf ball cover since it had

been know for decades as an excellent golf ball material (Third Party Requester's Comments at

middle of page 32). Further, the rationale of *Ex parte Sullivan* would equally apply here (Third

Party Requester's Comments at middle of page 32).


Ground 6: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester, and the rejection of

claim 1 under 35 USC 103(a) as being obvious by Proudfit in view of Wu is maintained. As to

the Patent Owner's first, second, and third argument, the Examiner accepts the Dalton

Declaration as competent evidence because it is a sworn declaration. As such, the Examiner will

not probe the Declarant's veracity. Hence, the Shore D hardness value for Wu's cover is

considered to be 58. The thickness of the outer cover is found in Proudfit where it is disclosed

that the thickness can be from 0.0450 to 0.0650 inches (Proudfit at col. 7, lines 40-47). Wu's

deposition is not dispositive, here, because of the Dalton Declaration.

Application/Control Number:                                    Page 47
95/000,123
Art Unit: 3993

As to Patent Owner's fourth argument, Examiner considers the language of Wu, itself, to

provide motivation to combine because golf balls made with polyurethane possess" improved

shear resistance and cut resistance compared to golf balls having covers made from either balata

or SURLYN" (Wu at col. 2, lines 29-32). Also, golf balls with polyurethane covers "can be

made to have the "click" and "feel" of balata" (Wu at col. 1, lines 44-46). Therefore, one of

ordinary skill, having the three-piece ball disclosed by Proudfit would look to Wu for outer cover

material to achieve a golf ball with the desired qualities of Balata and Surlyn.

Further, the Supreme Court has held that "[w]hen there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable solutions, a

person of ordinary skill has good reason to pursue the known options within her or her grasp. If

this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill

and common sense" (slip opinion *KSR* at middle of page 17). Here, the problem of producing a

golf ball with distance, durability, "click," and feel was known (Patent Owner's Response at

bottom of page 4). Polyurethane was a known solution for providing playability properties (Wu

at col. 1 lines 27-46). The resulting golf ball with a polyurethane outer cover had the expected

results (Sullivan '873 at abstract). Thus, the golf ball disclosed in claim 1 of Sullivan '873 is of

ordinary skill and common sense.

Finally, the Court has explicitly approved of the "obvious to try" standard for

combinations as above (slip opinion *KSR* at middle of page 17).


**Proposed third party requester rejection:  Ground #7**

Application/Control Number:                                          Page 48
95/000,123
Art Unit: 3993

The requester submits on pages 27-29 of the request that claim 1 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in view of

Molitor et al., U.S. Pat. No. 4,674,751, (Molitor '751).

Claim 1 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '751.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 1 | Proudfit |
|---------|----------|
| A golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1. One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) |
| an inner cover layer disposed on said core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) |
| said inner cover layer having a thickness of from about 0.100 to about 0.010 inches, | "The **thickness of the inner layer** can be within the range of **about 0.0250 to 0.2875** inch to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40) "The preferred dimensions are ... and **inner layer thickness of 0.037 inch...**" (Proudfit, col. 7, ll. 43-44) |
| said inner cover layer comprising a blend of two or more ionomer resins, at least one of which contains no more than 16% by weight of alpha, beta-unsaturated | "The composition of the inner cover layer is described in Table 6." |

Application/Control Number:                                          Page 49
95/000,123
Art Unit: 3993

| carboxylic acid; and | TABLE 6 |
|---|---|
| | **Composition of Inner Layer of Cover (Parts by Weight)** |
| | Ionomer Type — Blend Ratio; Sodium- Surlyn 8940 — 75%; Zinc- Surlyn 9910 — 25% |
| | (Proudfit, col. 8, ll. 22-30) |
| an outer cover layer disposed on said inner cover layer, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material.**" (Proudfit, col. 7, ll. 21-24) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |
| and said outer cover layer comprising a polyurethane material, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17) |
| wherein said golf ball has an overall diameter of 1.680 inches or more, | "The preferred dimensions are a core diameter of 1.500 inch, and inner layer thickness of 0.037 inch (inner layer diameter of 1.575 inch). and an outer layer thickness of 0.0525 inch (**total ball diameter of 1.680 inch**)." (Proudfit, col. 7, ll.43-47) |
| said inner cover layer having a Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6." TABLE 6 **Composition of Inner Layer of Cover (Parts by Weight)** Ionomer Type — Blend Ratio; Sodium- Surlyn 8940 — 75%; Zinc- Surlyn 9910 — 25% (Proudfit, col. 8, ll. 22-30) |
| and said outer cover layer having a Shore D hardness of less than 64. | "...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17) This material inherently has a Shore D hardness of less than 64. |

As expressed in the request on page 27 and identified above within the claim chart,
Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer
and a soft balata blend outer cover layer. Proudfit lacks in disclosing the use of polyurethane as
the material for the outer cover layer. Instead, as shown in Table 7, reproduced below, Proudfit
discloses the outer cover layer being made of a blend of balata.

Application/Control Number:                                          Page 50
95/000,123
Art Unit: 3993

### TABLE 7

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls. As

admitted by the patent owner:

> [d]espite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-
> hit. Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). With this disadvantage of balata covered golf balls, golf ball

designers looked for materials that would provide the same "click" and "feel" golfers expected

and have increased durability.

As pointed out in the request on page 28, lines 4-15, in an analogous golf ball, Molitor

'751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> **a cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> The novel cover of the golf ball of the invention is made of a composition comprising a blend of
> (1) a **thermoplastic urethane having a shore A hardness** less than 95 and (2) an ionomer having
> a shore D hardness greater than 55. The ionomer comprises olefinic groups having two to four
> carbon atoms copolymerized with acrylic or methacrylic acid groups and cross-linked with metal
> ions, preferably sodium or zinc ions. **The primary components of the blended cover are set at a
> weight ratio so as to result in a cover material after molding having a shore C hardness
> within the range of 70 to 85, preferably 72 to 76.** Preferably, the urethane component of the
> cover material has a tensile strength greater than 2500 psi and an elongation at break greater than
> 250%. A preferred cover material comprises about 8 parts of the thermoplastic urethane and
> between 1 and 4 parts ionomer. Preferably, the cover is no greater than 0.060 inch thick. Thinner
> covers appear to maximize the short iron playability characteristics of the balls.

(Molitor '751, col. 33-57 (emphasis added)). Thus, Molitor '751 teaches having a outer cover

layer with a Shore C hardness less than 85 and preferably between 72 and 76. Moreover,

Application/Control Number:                                          Page 51
95/000,123
Art Unit: 3993

Molitor '751 teaches what golf balls are included in the definition of "two-piece" ball within its

instant specification.

> The phrase "two-piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as
> disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-
> wound cores.**

Molitor '751, col. 3, ll. 7-12 (emphasis added)).  Proudfit, likewise, teaches the two-piece golf

balls can fit within this definition.

> FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which
> comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
> layer 14 of polymeric material.

(Proudfit, col. 7, ll. 21-24).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76.  As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73.  Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material.  How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance a polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A).  A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate.  Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C.   This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

 As stated in the request on page 29

> Therefore, it would have been obvious to one of ordinary skill in the art at the
> time of the invention to substitute the soft outer cover layer of Nesbitt and replace
> it with an outer cover layer made of the soft polyurethane material taught by
> Molitor '751 to provide a golf ball that includes "playability properties as good or
> better than balata-covered wound balls but are significantly more durable," and
> "have better wood playability properties than conventional two-piece balls, and
> permit experienced golfers to apply spin so as to fade or draw a shot" while
> having improved puttability.  (Molitor '751, col. 2, ll. 61-68)

 This rejection of claim 1 based on Proudfit in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 7: Patent Owner's Argument

 The Patent Owner argues that the rejection is improper because: (1) Molitor '751

describes the cover of his golf ball with hardness values in terms of Shore C, hence, one of

ordinary skill would not look to combine this teaching with the patent of Proudfit to have a ball

with Shore D harness values, because the two hardness values, or scales, have no simple

mathematical correlation (Patent Owner's Response at middle of page 29);  and, (2) no

motivation to combine Proudfit with Molitor '751 because the Molitor '751 ball's construction is

different than that of the claimed golf balls (Patent Owner's Response at bottom of page 29

continuing to top of page 30).


Ground 7: Third Party Requester's Comments

     Third Party Requester counter argues that, for argument (1) hardness values of Shore C

and Shore D are convertible as evidenced by many published methods (Third Party Requester's

Comments at middle of page 33). For argument (2), the Third Party Requester states that

motivation to combine exists because Molitor '751, itself, states that its cover can be used with

the three-piece golf balls (Third Party Requester's Comments at top of page 34).


Ground 7: Examiner's Response to the Argument and Comments

     Examiner agrees with the comments of the Third Party Requester, and the rejection of

claim 1 under 35 USC 103(a) as being obvious by Proudfit in view of Molitor '751 is

maintained. As to the Patent Owner's first argument, Examiner agrees with the Third Party

Requester's comments that a correlation, or conversion, exists between the two hardness scales,

Shore C and Shore D, because, *inter alia*, Sullivan '873 give a conversion of the two scales at

col. 3, lines 42-43. Hence, one of ordinary skill would not be deterred from use of prior art

regardless of the hardness scale used to define its various layers.

     As to the second argument, Examiner considers the language of the Molitor '751 that

"[t]he phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core

and a cover, but also includes balls having a separate solid layer beneath the cover as disclosed,

Application/Control Number:                                    Page 54
95/000,123
Art Unit: 3993

for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls, having non-wound cores"

provides motivation to combine the two references. Proudfit, like Nesbitt, disclose golf balls

with a core, inner cover, and inner cover. Molitor '751 provides motivation, for example, at col.

1, lines 11-15, where it states that the invention is concerned with a "golf ball useful in making

balls, particularly two-piece balls, having superior short iron and other playability

characteristics."

Further, the Supreme Court has held that "[w]hen there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable solutions, a

person of ordinary skill has good reason to pursue the known options within her or her grasp. If

this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill

and common sense" (slip opinion *KSR* at middle of page 17). Here, the problem of producing a

golf ball with distance, durability, "click," and feel was known (Patent Owner's Response at

bottom of page 4). Polyurethane was a known solution for providing playability properties

(Molitor '751 at abstract). The resulting golf ball with a polyurethane outer cover had the

expected results (Sullivan '873 at abstract). Thus, the golf ball disclosed in claim 1 of Sullivan

'873 is of ordinary skill and common sense.

### Re. Claim 2

**Proposed third party requester rejection:  Ground #8**

The requester submits on pages 29 and 30 of the request that claim 2 is unpatentable

under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193, (Nesbitt).

Application/Control Number:                                      Page 55
95/000,123
Art Unit: 3993

**This rejection is __adopted__ in this office action.**

Claim 2 is rejected under 35 U.S.C. § 102(b) as being anticipated by Nesbitt (with

incorporation by reference of Molitor '637).

The below claim chart identifies the new limitations introduced by dependent claim 2.

| Claim 2 | Nesbitt (Molitor '637 incorporated by reference) |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Thus, because all new limitations of claim 2 are found within Nesbitt and from the above

analysis within Ground #2 claim 1 is anticipated by Nesbitt with Molitor '637 incorporated by

reference.

This rejection of claim 2 based on Nesbitt with incorporation by reference of Molitor

'637 was proposed by the third party requester in the request for reexamination and __is being__

__adopted__ essentially as proposed in the request.

Ground 8: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.

Ground 8: Third Party Requester's Comments

Third Party Requester's arguments for this claim are the same as given *supra* at "Ground

1: Third Party Requester's Comments."

Application/Control Number:                                                    Page 56
95/000,123
Art Unit: 3993

Ground 8: Examiner's Response to the Argument and Comments

Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection.  See "Ground 1:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #9**

As an alternative to Ground #8, the requester submits on pages 29 and 30 of the request

that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 2 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 2.

| Claim 2 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Thus, because all new limitations of claim 2 are found within Nesbitt and from the above

analysis within Ground #2 claim 1 is obvious by Nesbitt in view of Molitor '637, claim 2 is

likewise obvious by Nesbitt in view of Molitor '637.

Application/Control Number:                                          Page 57
95/000,123
Art Unit: 3993

This rejection of claim 2 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 9: Patent Owner's Argument

Patent Owner argues that the minimum thickness for the outer layer of the cover of

Molitor '637 is 0.060 inches while this claim requires a thickness of 0.055 for this layer (Patent

Owner's Response at middle of page 17).


Ground 9: Third Party Requester's Comments

Third Party Requester counter argues that Nesbitt discloses a range of 0.020 to 0.100

inches for the thickness of the outer cover of a golf ball (Nesbitt at col. 3, lines 22-25). The

holding in *KRS* would dictate that one of ordinary skill would know to use the material of

Molitor '637, polyurethane, with the thickness of Nesbitt (Third Party Requester's Comments at

middle of page 21).


Ground 9: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester, and the rejection of

claim 2 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained.

Since Nesbitt references the Molitor '637 patent, one of ordinary skill would logically look at its

complete disclosure which includes the use of polyurethane as an outer cover. Using the

thickness values of Nesbitt with polyurethane would be obvious because Nesbitt states that "the

Application/Control Number:                                    Page 58
95/000,123
Art Unit: 3993

thickness of the inner layer . . . and the thickness of outer layer . . . may be varied to secure the

advantages herein mentioned" at col. 3, lines 16-19.  The advantages Nesbitt wishes to achieve

are both distance and feel in one golf ball (Nesbitt at col. 2, lines 1-9).


**Proposed third party requester rejection:  Ground #10**

Also as an alternative to Ground #8, the requester submits on pages 29 and 30 of the

request that claim 2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S.

Pat. No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673, (Wu).

Claim 2 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Wu.

The below claim chart identifies the new limitations introduced by dependent claim 2.

| Claim 2 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Thus, because all new limitations of claim 2 are found within Nesbitt and from the above

analysis within Ground #3 claim 1 is obvious by Nesbitt in view of Wu, claim 2 is likewise

obvious by Nesbitt in view of Wu.

This rejection of claim 2 based on Nesbitt in view of Wu was proposed by the third party

requester in the request for reexamination and is being adopted essentially as proposed in the

request.

Application/Control Number:                                        Page 59
95/000,123
Art Unit: 3993

Ground 10: Patent Owner's Argument

    Patent Owner does not specifically argue this rejection.

Ground 10: Third Party Requester's Comments

    Third Party Requester does not specifically counter argue this rejection.

Ground 10: Examiner's Response to the Argument and Comments

    Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 2 under 35 USC 103(a) as being obvious by Nesbitt in view of Wu is

maintained.    See "Ground 3:  Examiner's Response to the Argument and Comments,"

*supra*.

**Proposed third party requester rejection:  Ground #11**

    Also as an alternative to Ground #8, the requester submits on pages 29 and 30 that claim

2 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No.

4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751, (Molitor '751).

    Claim 2 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '751.

    The below claim chart identifies the new limitations introduced by dependent claim 2.

| Claim 2 | Nesbitt |
|---------|---------|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a |

Application/Control Number:                                          Page 60
95/000,123
Art Unit: 3993

| | range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
|---|---|
| said outer cover layer has a thickness of about 0.055 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Thus, because all new limitations of claim 2 are found within Nesbitt and from the above

analysis within Ground #4 claim 1 is obvious by Nesbitt in view of Molitor '751, claim 2 is

likewise obvious by Nesbitt in view of Molitor '751.

This rejection of claim 2 based on Nesbitt in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 11: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.


Ground 11: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.


Ground 11: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 2 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'751 is maintained.   See "Ground 4:  Examiner's Response to the Argument and

Comments," *supra*.

Application/Control Number:                                      Page 61
95/000,123
Art Unit: 3993

**Proposed third party requester rejection:  Ground #12**

The requester submits on pages 30 and 31 of the request that claim 2 is unpatentable

under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in

view of Molitor et al., U.S. Pat. No. 4,274,637.

**This rejection is <u>not adopted</u>**.

Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 2 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.

Ground 12: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.

Ground 12: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.

Ground 12: Examiner's Response to the Argument and Comments

Application/Control Number:                                    Page 62
95/000,123
Art Unit: 3993

     For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.


**Proposed third party requester rejection:  Ground #13**

     The requester submits on pages 30 and 31 of the request that claim 2 is unpatentable

under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in

view of Wu, U.S. Pat. No. 5,334,673, (Wu).

     **This rejection is <u>not adopted</u>.**

     Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 2 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.


Ground 13: Patent Owner's Argument

     Patent Owner does not specifically argue this rejection.


Ground 13: Third Party Requester's Comments

Application/Control Number:                                    Page 63
95/000,123
Art Unit: 3993

Third Party Requester does not specifically counter argue this rejection.


Ground 13: Examiner's Response to the Argument and Comments

For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.


**Proposed third party requester rejection:  Ground #14**

The requester submits on pages 30 and 31 that claim 2 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in view of Molitor et

al., U.S. Pat. No. 4,674,751, (Molitor '751).

**This rejection is not adopted.**

Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 2 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.


Ground 14: Patent Owner's Argument

Application/Control Number:                                    Page 64
95/000,123
Art Unit: 3993

Patent Owner does not specifically argue this rejection.

Ground 14: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.

Ground 14: Examiner's Response to the Argument and Comments

For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.

Re. Claim 3

**Proposed third party requester rejection:  Ground #15**

The requester submits that claim 3 is unpatentable under 35 U.S.C. § 102(b) as being

anticipated by Nesbitt, U.S. Pat. No. 4,431,193 (Nesbitt).

In the request on pages 32 through 36 the third party requester proposes that claim 3 be

rejected based upon Nesbitt alone with the incorporation by reference of Molitor '637.  The third

party requester points out that Molitor '637 is incorporated by reference into Nesbitt because

Nesbitt refers to Molitor '637.  (See Nesbitt col. 3, ll. 54-60).

**This rejection is <u>adopted</u> in this office action.**

Claim 3 is rejected under 35 U.S.C. § 102(a) as being anticipated by Nesbitt.

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

Application/Control Number:                                    Page 65
95/000,123
Art Unit: 3993

| Claim 3 | Nesbitt (primary) with Molitor '637 (incorporated by reference) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or core formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "Disposed on the spherical center or core 12 is a first layer, lamination , ply or inner cover 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37).<br>"[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>"[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61).<br>**Molitor '637:** Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| having a modulus of from about 15,000 to about 70,000 psi; and | see below |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60).<br>**Molitor '637:** Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55.<br>"[T]he outer layer or cover 16 being of dimpled configuration ...." (Nesbitt, col. 2, lines 48-49; Fig. 2.) |
| said outer cover layer comprising a polyurethane based material and | **Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Application/Control Number:                                    Page 66
95/000,123
Art Unit: 3993

As mentioned above, Nesbitt incorporates by reference Molitor '637 as describing an

number of compositions suitable for the inner cover layer 14.  Of particular interest in this case

are Examples 1-7 within Molitor '637.  Examples 1-7 use a ratio of SURLYN 1605 and

SURLYN 1557.  The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat.

No. 4,690,981.  The preferred composition in the '981 Patent has "from about 5[%] to about 15%

by weight of unsaturated carboxylic acid."  '981 Pat., col. 3, ll. 59-60.  Those of ordinary skill in

the art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph.  Thus, based on this evidence, Nesbitt incorporating

by reference Molitor '637 inherently teaches using as an inner layer at least one ionomer resin

having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid.  Moreover, as

stated above, it has been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi.

This teaching of flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

This rejection of claim 3 based on Nesbitt incorporating by reference Molitor '637 was proposed

by the third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 15: Patent Owner's Argument

     Patent Owner does not argue this rejection.


Ground 15: Third Party Requester's Comments

     Third Party Requester's arguments for this claim are the same as given *supra* at "Ground

1: Third Party Requester's Comments."


Ground 15: Examiner's Response to the Argument and Comments

     Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection.  See "Ground 1:  Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #16**

     The requester submits on pages 32 through 36 that claim 3 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al.,

U.S. Pat. No. 4,274,637, (Molitor '637).

     Claim 3 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

     Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

Application/Control Number:                                    Page 68
95/000,123
Art Unit: 3993

| Claim 3 | Nesbitt (primary) with Molitor '637 (teaching) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or core formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "Disposed on the spherical center or core 12 is a first layer, lamination , ply or inner cover 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37). "[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). "[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61). **Molitor '637:** Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| having a modulus of from about 15,000 to about 70,000 psi; and | see below |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). **Molitor '637:** Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55. "[T]he outer layer or cover 16 being of dimpled configuration ...." (Nesbitt, col. 2, lines 48-49; Fig. 2.) |
| said outer cover layer comprising a polyurethane based material and | **Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Application/Control Number:                                    Page 69
95/000,123
Art Unit: 3993

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi. This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

This rejection of claim 3 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 16: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at "Ground 2: Patent Owner's Argument," *supra*.

Ground 16: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter arguments are the same as those at "Ground 2: Third Party Requester's Comments," *supra*.

Ground 16: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the rejection of claim 3 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained.   See "Ground 2:  Examiner's Response to the Argument and Comments," *supra*.

**Proposed third party requester rejection:  Ground #17**

The requester submits on pages 36 through 38 that claim 3 under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Wu, U.S. Patent No. 5,334,673, (Wu).

Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nesbitt mentioning Molitor '637 in view of Wu, as evidenced by Exhibit C.

Application/Control Number:                                    Page 71
95/000,123
Art Unit: 3993

      Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Wu discloses, teaches or suggests the claim limitations.  As reported in the Order granting

reexamination, it needs to be correctly stated on the record that Nesbitt and Molitor '637 which

is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer

layer.

| Claim 3 | Nesbitt (primary) mentioning Molitor '637 with Wu (teaching) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or core formed as a solid body of resilient polymeric material or rubber-like material in the shape of a sphere." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "Disposed on the spherical center or core 12 is a first layer, lamination , ply or inner cover 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37).<br>"[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>"[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61).<br>**Molitor '637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557.  (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| having a modulus of from about 15,000 to about 70,000 psi; and | see below. |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60).<br>"[C]enter or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin such as SURLYN 1855." (Nesbitt, col. 3, ll. 33-38 and Nesbitt, figure 1).<br>**Molitor '637**: Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover |

Application/Control Number:                                          Page 72
95/000,123
Art Unit: 3993

| | material has inherently a Shore D hardness of 55. |
| | **Wu**: "With polyurethanes made in accordance with the present invention, the degree of cure which has taken place is dependent upon, inter alia, the time, temperature, type of curative, and amount of catalyst used.  It has been found that the degree of cure of the cover composition is directly proportional to the hardness of the composition.  A hardness about 10D to 30D, Shore D hardness for the cover stock at the end of the intermediate curing step (i.e. just prior to the final molding step) has been found to be suitable for the present invention.  More preferred is a hardness of about 12D to 20D." (Wu, col. 6, ll. 27-38). |
| said outer cover layer comprising a polyurethane based material and | **Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material.  Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates".  (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14.  Of particular interest in this case are

Examples 1-7 within Molitor '637.  Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557.  The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981.  The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid."  '981 Pat., col. 3, ll. 59-60.  Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Application/Control Number:                                     Page 73
95/000,123
Art Unit: 3993

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi. This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

As mentioned above, Nesbitt mentioning Molitor '637 teaches the use of particular

polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being

used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that SURLYN

covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to

such sensations and polyurethane covered golf balls can be made to have a similar "click" and

"feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will

have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D

hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. This

teaching of Shore D hardness is directed to an intermediate curing step product prior to the final

molding process to finish the golf ball. Exhibit C demonstrates the actual finished golf ball

product having the cover layer that Wu teaches within its disclosure. Exhibit C teaches that the

golf ball taught therein is covered by the following patents: 4,783,078; 4,846,910; 4,858,923;

4,904,320; 4,915,390; 5,007,594; 5,080,367; 5,133,509; **5,334,673**; and D339,074. The '673

Patent teaches the cover sock of the Exhibit C finished golf ball. Exhibit C teaches that the golf

ball taught therein has a cover material made from an "elastomer", having a thickness of .050",

and 58 Shore D hardness. All three properties are within the range of mechanical properties of

the claim invention (polyurethane is an elastomer, cover layer thickness ranges from 0.010 to

0.070 inches and the Shore D hardness is less that 64). Because it has been admitted by the

inventor of the Sullivan '893 patent that the particular chemical properties of the materials (the

chemical composition) used in the construction of a golf ball lack criticality as compared to the

mechanical properties (the Shore D hardness, flexural modulus, layer thickness) of those

compounds used for constructing the different layers (Exhibit G at 334), one of ordinary skill in

the art at the time the invention was made would find it obvious to incorporate the teachings of

Wu which inherently include the teachings of Shore hardness for the fully cured cover layer as

taught in Exhibit C as obvious equivalent materials in order to achieve the same end result of

providing a cover layer that has the same "click" and "feel" of a balata cover which the extra

durability of an elastomeric material.

This rejection of claim 3 based on Nesbitt mentioning Molitor '637 in view of Wu as

evidenced by Exhibit C was proposed by the third party requester in the request for

reexamination and is being adopted essentially as proposed in the request.


Ground 17: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as

those at "Ground 3: Patent Owner's Argument," *supra*.


Ground 17: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 3: Third Party Requester's Comments," *supra*.

Application/Control Number:                                    Page 75
95/000,123
Art Unit: 3993


Ground 17: Examiner's Response to the Argument and Comments

    Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Nesbitt in view of Wu is

maintained.   See "Ground 3:  Examiner's Response to the Argument and Comments,"

*supra*.


**Proposed third party requester rejection:  Ground #18**

    The requester submits on pages 38 through 40 that claim 3 under 35 U.S.C. § 103(a) as

being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No.

4,674,751, (Molitor '751).

    Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nesbitt mentioning

Molitor '637 in view of Molitor '751.

    Below is a claim chart identifying the claim limitations and where Nesbitt discloses,

teaches or suggests the claim limitations.  As reported in the Order granting reexamination, it

needs to be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in

Nesbitt teach the use of particular polyurethane materials for the use as an outer layer .

| Claim 3 | Nesbitt (primary) mentioning Molitor '637 with Molitor '751 (teaching) |
|---|---|
| A golf ball comprising: | "The disclosure embraces **a golf ball** and method of making the same..." (Nesbitt, Abstract; and FIGS. 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises **a solid center or core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a **sphere**.  (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer having Shore D | "Disposed on the spherical center or core 12 is a first layer, |

Application/Control Number:                                    Page 76
95/000,123
Art Unit: 3993

| | |
|---|---|
| hardness of at least 60 disposed on said spherical core, | lamination, ply or **inner cover** 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt , col. 2, ll. 34-37).<br><br>"[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br><br>"[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29).<br><br>also see below |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; and | "Reference is made to the application Ser. No. 155,658 of Robert P. **Molitor** issued into U.S. Pat. No. 4,274,**637** which describes a number of foamable compositions of a character which may be employed for ... layers 14 ... for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60).<br><br>**Molitor '637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| having a modulus of from about 15,000 to about 70,000 psi; and | see below |
| an outer cover layer having a Shore D hardness of about 64 or less disposed on said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | "An **outer layer**, ply, lamination or **cover** 16 ... is then **remolded onto the inner ply or layer** 14 ..." (Nesbitt, col. 2, ll. 43-47).<br><br>"[C]enter or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an **outer or cover layer 16 of a soft, low flexural modulus resin such as SURLYN 1855.**" (Nesbitt, col. 3, ll. 33-38 and Nesbitt, figure 1).<br><br>"Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60).<br><br>See figure 1 of Nesbitt for the disclosure of a plurality of dimples on the outer layer. |
| said outer cover layer comprising a polyurethane material and | **Molitor '637**: ESTANE 58133 is a polyurethane material. (Molitor, col. 18) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The **thickness of the outer layer or cover** 16 of soft, low flexural modulus resin such as SURLYN type 1855, **may be in the range of 0.020 inches and 0.100 inches**." (Nesbitt, col. 3, ll. 22-25). |

As shown above in the claim chart, Nesbitt mentioning Molitor '637 suggests the use of a

soft outer cover layer including a polyurethane material.  In an analogous golf ball, Molitor '751

teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> **a cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> The novel **cover of the golf ball** of the invention is made of a composition comprising a blend of
> (1) **a thermoplastic urethane having a shore A hardness less than 95** and (2) **an ionomer
> having a shore D hardness greater than 55**.

(Molitor '751, col. 2, ll. 33-49 (emphasis added)).

Moreover, in explaining what constitutes a two-piece golf ball, Molitor '751 teaches that:

> The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as
> disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt**, and other balls have non-wound
> cores.

(Molitor '751, col. 3, ll. 7-12 (emphasis added)).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76.  As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73.  Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material.  How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

Application/Control Number:                                    Page 78
95/000,123
Art Unit: 3993

with a given range, in this instance Shore C, for given materials, in this instance polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate. Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C. This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

> As stated in the request on page 39

> It would have been obvious to one of ordinary skill in the art at the time of the
> invention to substitute the soft outer cover layer of Nesbitt and replace it with an
> outer cover layer made of the soft polyurethane material taught by Molitor '751 to
> provide a golf ball that includes "playability properties as good or better than
> balata-covered wound balls but are significantly more durable," and "have better
> wood playability properties than conventional two-piece balls, and permit
> experienced golfers to apply spin so as to fade or draw a shot" while having
> improved puttability. (Molitor '751, col. 2, ll. 61-68)

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph.  Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid.  Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi.  This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

This rejection of claim 3 based on Nesbitt mentioning Molitor '637 in view of Molitor

'751 was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

Ground 18: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as

those at "Ground 4: Patent Owner's Argument," *supra*.

Ground 18: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 4: Third Party Requester's Comments," *supra*.

Ground 18: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'751 is maintained.   See "Ground 4:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #19**

The requester submits on pages 40 through 43 that claim 3 under 35 U.S.C. § 103(a) as

being obvious over Proudfit in view of Molitor '637.

Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Proudfit in view of

Molitor '637.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 3 | Proudfit |
|---|---|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2)<br>"Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) |

|  | See figure 1 of Proudfit for the disclosure of a spherical shaped core. |
|---|---|
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) <br> See below for Shore D limitation. |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; | "The composition of the inner cover layer is described in Table 6." <br><br> **TABLE 6** <br> Composition of Inner Layer of Cover (Parts by Weight) <br> <table><tr><td>Ionomer Type</td><td>Blend Ratio</td></tr><tr><td>Sodium- Surlyn 8940</td><td>75%</td></tr><tr><td>Zinc- Surlyn 9910</td><td>25%</td></tr></table> <br> (Proudfit, col. 8, ll. 22-30) <br> See below for % by weight limitation. |
| and having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790.  (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.) <br> "Specific standard SURLYN resins which can be used in the inner cover include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.) |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material.**" (Proudfit, col. 7, ll. 21-24) <br> "... **an outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) <br> This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| and said outer cover layer comprising a polyurethane material and | "... **an outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch.  The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |

Application/Control Number:                                    Page 82
95/000,123
Art Unit: 3993

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core,

inner layer and outer layer) with the layers within the range of claimed thicknesses each layer

made from a material having the mechanical properties substantially similar to the claimed

mechanical properties.  What Proudfit lacks in clearly disclosing are the particular mechanical

and chemical properties of the claimed invention.  However, Proudfit either incorporates by

reference these mechanical and chemical properties and/or the materials used within the Proudfit

golf ball inherently have these mechanical and chemical properties.  For instance, Proudfit

incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention.  (Proudfit,

col. 1, ll.39-43).  The '981 patent discloses the preferably amount of unsaturated carboxylic acid

is "from about 5[%] to about 15% by weight."  ('981 Pat, col. 3, ll. 59-60).  If Proudfit discloses

using blends SURLYN the chemical for making the inner cover and the '981 Patent is the

formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such

as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more

than 16% by weight of an alpha, beta-unsaturated carboxylic acid.  As taught from Exhibit I,

SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, see

Exhibit I.  Therefore, this cover blend inherently has a hardness of 60 or more.  Proudfit

discloses the outer layer being a blend of balata.  An example of the blend is disclosed in Table 7

reproduced below.

Application/Control Number:                                    Page 83
95/000,123
Art Unit: 3993

### TABLE 7

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polylsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one

of the first types of synthetic rubber or elastomer. As described in the Rule 132 Declaration of

Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the

golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52. Thus, Proudfit's

outer layer cover inherently has a Shore hardness of less than 64.

While Proudfit lacks disclosing the outer layer being made from polyurethane, in an

analogous golf ball, Molitor '637 teaches using polyurethane, see Molitor '637, col. 5, ll. 33-41

and col. 18, examples 16 and 17. The request points out on page 42, ll. 17-25, why the use of

polyurethane to one of ordinary skill in the art would be readily apparent given that those skilled

in the art were more critical of the mechanical properties of a particular material then the

chemical composition (material type) of the material and those remarks are incorporated herein.

In other words, it was not critical to the "golf ball inventions" of those skilled in the art as to

what materials were used to construct the golf balls so long as the materials had the desired

mechanical properties which would yield the particular mechanical performance parameters the

inventors were trying to achieve, e.g. improved processability; improved durability; cost

effectiveness; user acceptance of performance (similar "click" and "feel" to balata) of the golf

ball product made from those materials. The request on page 43, ll. 1-9, explains why one of

Application/Control Number:                                    Page 84
95/000,123
Art Unit: 3993

ordinary skill in the art would be motivated to substitute the outer cover layer taught in Molitor

'637 for the outer cover layer disclosed in Proudfit and those remarks are incorporated herein.

Therefore, one of ordinary skill in the art would find the claimed invention as obvious for

the motivation given in the request on page 43, ll. 1-9.

This rejection of claim 3 based on Proudfit in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 19: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as

those at "Ground 5: Patent Owner's Argument," *supra.*


Ground 19: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 5: Third Party Requester's Comments," *supra.*


Ground 19: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Proudfit in view of Molitor

'637 is maintained.   See "Ground 5:  Examiner's Response to the Argument and

Comments," *supra.*

Application/Control Number:                                          Page 85
95/000,123
Art Unit: 3993

**Proposed third party requester rejection:  Ground #20**

The requester submits on pages 43 through 45 that claim 3 under 35 U.S.C. § 103(a) as

being obvious over Proudfit, U.S. Pat. No. 5,314,187, in view of Wu, U.S. Pat. No. 5,334,673

(Wu).

Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Proudfit in view of

Wu, as evidenced by Exhibit C.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 3 | Proudfit |
|---|---|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) See figure 1 of Proudfit for spherical shaped core. |
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) See below with respect to the Shore D limitation |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; | "The composition of the inner cover layer is described in Table 6." |

| | TABLE 6 |
|---|---|
| | **Composition of Inner Layer of Cover** (Parts by Weight) |

| | Ionomer Type | Blend Ratio |
|---|---|---|
| | Sodium- Surlyn 8940 | 75% |
| | Zinc- Surlyn 9910 | 25% |

| | |
|---|---|
| | (Proudfit, col. 8, ll. 22-30)<br>See below for the % by weight limitation. |
| and having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790. (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.) "Specific standard SURLYN resins which can be used in the inner layer include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.) |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material**." (Proudfit, col. 7, ll. 21-24)<br>"... **an outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17)<br>This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| and said outer cover layer comprising a polyurethane material and | "... **an outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |

Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that SURLYN covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to such sensations and polyurethane covered golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30,

preferably 12 to 20 on the Shore D scale, see col. 6:26-38.  This teaching of Shore D hardness is

directed to an intermediate curing step product prior to the final molding process to finish the

golf ball.  Exhibit C demonstrates the actual finished golf ball product having the cover layer that

Wu teaches within its disclosure.  Exhibit C teaches that the golf ball taught therein is covered by

the following patents: 4,783,078; 4,846,910; 4,858,923; 4,904,320; 4,915,390; 5,007,594;

5,080,367; 5,133,509; **5,334,673**; and D339,074.  The '673 Patent teaches the cover sock of the

Exhibit C finished golf ball.  Exhibit C teaches that the golf ball taught therein has a cover

material made from an "elastomer", having a thickness of .050", and 58 Shore D hardness.  All

three properties are within the range of mechanical properties of the claim invention

(polyurethane is an elastomer, cover layer thickness ranges from 0.010 to 0.070 inches and the

Shore D hardness is less that 64).  Because it has been admitted by the inventor of the Sullivan

'893 patent that the particular chemical properties of the materials (the chemical composition)

used in the construction of a golf ball lack criticality as compared to the mechanical properties

(the Shore D hardness, flexural modulus, layer thickness) of those compounds used for

constructing the different layers (Exhibit G at 334), one of ordinary skill in the art at the time the

invention was made would find it obvious to incorporate the teachings of Wu which inherently

include the teachings of Shore hardness for the fully cured cover layer as taught in Exhibit C as

obvious equivalent materials in order to achieve the same end result of providing a cover layer

that has the same "click" and "feel" of a balata cover which the extra durability of an elastomeric

material.

This rejection of claim 3 based on Proudfit in view of Wu as evidenced by Exhibit C was

proposed by the third party requester in the request for reexamination and <u>is being adopted</u>

essentially as proposed in the request.


Ground 20: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as

those at "Ground 6: Patent Owner's Argument," *supra*.


Ground 20: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 6: Third Party Requester's Comments," *supra*.


Ground 20: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Proudfit in view of Wu is

maintained.   See "Ground 6:  Examiner's Response to the Argument and Comments,"

*supra*.


**Proposed third party requester rejection:  Ground #21**

The requester submits on pages 43 through 45 that claim 3 under 35 U.S.C. § 103(a) as

being obvious over Proudfit in view of Molitor '751.

Application/Control Number:                                    Page 89
95/000,123
Art Unit: 3993

Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Proudfit in view of

Molitor '751.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 3 | Proudfit |
|---------|----------|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls,** and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2)<br>"Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55)<br>See figure 1 of Proudfit for spherical shaped core. |
| an inner cover layer having Shore D hardness of at least 60 disposed on said spherical core, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24)<br>See below with respect to the Shore D limitation. |
| said inner cover layer comprising an ionomeric resin including no more than 16% by weight of alpha, beta-unsaturated carboxylic acid; | "The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30)<br>See below with respect to the % by weight limitation. |
| and having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790.  (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.) |

Application/Control Number:                                          Page 90
95/000,123
Art Unit: 3993

| | |
|---|---|
| | "Specific standard SURLYN resins which can be used in the inner layer include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.) |
| an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12** which comprises a relatively hard inner layer 13 of one or more ionomer resins **and a relatively soft outer layer 14 of polymeric material**." (Proudfit, col. 7, ll. 21-24)<br><br>"... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17)<br>This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| and said outer cover layer comprising a polyurethane material and | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |

As expressed in the request on page 45 and identified above within the claim chart,
Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer
and a soft balata blend outer cover layer. Proudfit lacks in disclosing the use of polyurethane as
the material for the outer cover layer. Instead, as shown in Table 7, reproduced below, Proudfit
discloses the outer cover layer being made of a blend of balata.

| TABLE 7 | |
|---|---|
| Composition of Outer Layer (Parts by Weight) | |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 13.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls. As
admitted by the patent owner

Application/Control Number:                                    Page 91
95/000,123
Art Unit: 3993

> Despite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-hit.
> Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). With this disadvantage of balata covered golf balls, golf ball

designers looked for materials that would provide the same "click" and "feel" golfers expected

and have increased durability.

As pointed out in the request on page 45, lines 11-15, in an analogous golf ball, Molitor

'751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> **a cover having a shore C hardness less than 85,** preferably 70-80, and most preferably 72-76.
> The novel cover of the golf ball of the invention is made of a composition comprising a blend of
> (1) **a thermoplastic urethane having a shore A hardness less than 95 and** (2) an ionomer having
> a shore D hardness greater than 55. The ionomer comprises olefinic groups having two to four
> carbon atoms copolymerized with acrylic or methacrylic acid groups and cross-linked with metal
> ions, preferably sodium or zinc ions. **The primary components of the blended cover are set at a
> weight ratio so as to result in a cover material after molding having a shore C hardness
> within the range of 70 to 85, preferably 72 to 76.** Preferably, the urethane component of the
> cover material has a tensile strength greater than 2500 psi and an elongation at break greater than
> 250%. A preferred cover material comprises about 8 parts of the thermoplastic urethane and
> between 1 and 4 parts ionomer. Preferably, the cover is no greater than 0.060 inch thick. Thinner
> covers appear to maximize the short iron playability characteristics of the balls.

(Molitor '751, col. 33-57 (emphasis added)). Thus, Molitor '751 teaches having a outer cover

layer with a Shore C hardness less than 85 and preferably between 72 and 76. Moreover,

Molitor '751 teaches what golf balls are included in the definition of "two-piece" ball within its

instant specification.

> The phrase "two-piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as
> disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-
> wound cores.**

Molitor '751, col. 3, ll. 7-12 (emphasis added)). Proudfit, likewise, teaches the two-piece golf

balls can fit within this definition.

Application/Control Number:                                    Page 92
95/000,123
Art Unit: 3993

> FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which
> comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
> layer 14 of polymeric material.

(Proudfit, col. 7, ll. 21-24).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76. As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73. Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material. How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance a polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate. Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C. This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

As stated in the request on page 46

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to substitute the soft outer cover layer of Nesbitt and replace it with an outer cover layer made of the soft polyurethane material taught by Molitor '751 to provide a golf ball that includes "playability properties as good or better than balata-covered wound balls but are significantly more durable," and "have better wood playability properties than conventional two-piece balls, and permit experienced golfers to apply spin so as to fade or draw a shot" while having improved puttability. (Molitor '751, col. 2, ll. 61-68)

This rejection of claim 3 based on Proudfit in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 21: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as

those at "Ground 7: Patent Owner's Argument," *supra*.

Ground 21: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 7: Third Party Requester's Comments," *supra*.

Ground 21: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

Application/Control Number:                                          Page 94
95/000,123
Art Unit: 3993

'751 is maintained.   See "Ground 7:  Examiner's Response to the Argument and

Comments," *supra*.

<p style="text-align:center">Re. Claim 4</p>

**Proposed third party requester rejection:  Ground #22**

The requester submits on pages 47 and 48 of the request that claim 4 is unpatentable

under 35 U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193, (Nesbitt).

In the request on pages 47 through 48 the third party requester proposes that claim 3 be

rejected based upon Nesbitt alone with the incorporation by reference of Molitor '637.  The third

party requester points out that Molitor '637 is incorporated by reference into Nesbitt because

Nesbitt refers to Molitor '637.  (See Nesbitt col. 3, ll. 54-60).

**This rejection is <u>adopted</u> in this office action.**

Claim 4 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 4.

| Claim 4 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably a thickness in a range of 0.020 inches and 0.070 inches."  (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches, | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches."  (Nesbitt, col. 3, ll. 22-25). |
| said golf ball having an overall diameter of 1.680 inches or more. | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches...." (Nesbitt, col. 2: ll. 50-52.)<br>"This center or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of |

Application/Control Number:                                    Page 95
95/000,123
Art Unit: 3993

| | 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ...." (Nesbitt, col. 3, ll. 34-38.) |
|---|---|

Thus, because all new limitations of claim 4 are found within Nesbitt and from the above

analysis within Ground #16 claim 3 is anticipated by with incorporation by reference of Molitor

'637, claim 4 is likewise anticipated by Nesbitt with incorporation by reference of Molitor '637.

This rejection of claim 4 based on Nesbitt with incorporation by reference of Molitor

'637 was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.


Ground 22: Patent Owner's Argument

Patent Owner does not argue this rejection.


Ground 22: Third Party Requester's Comments

Third Party Requester's arguments for this claim are the same as given *supra* at "Ground

1: Third Party Requester's Comments."


Ground 22: Examiner's Response to the Argument and Comments

Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection. See "Ground 1: Examiner's Response to the Argument and

Comments," *supra.*


**Proposed third party requester rejection:  Ground #23**

Application/Control Number:                                    Page 96
95/000,123
Art Unit: 3993

As an alternative to Ground #21, the requester submits on pages 47 and 48 of the request

that claim 4 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 4 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 4.

| Claim 4 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches, | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |
| said golf ball having an overall diameter of 1.680 inches or more. | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches...." (Nesbitt, col. 2: ll. 50-52.) "This center or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ...." (Nesbitt, col. 3, ll. 34-38.) |

Thus, because all new limitations of claim 4 are found within Nesbitt and from the above

analysis within Ground #16 claim 3 is obvious by Nesbitt in view of Molitor '637, claim 4 is

likewise obvious by Nesbitt in view of Molitor '637.

This rejection of claim 4 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 23: Patent Owner's Argument

Application/Control Number:                                    Page 97
95/000,123
Art Unit: 3993

Patent Owner argues that the minimum thickness for the outer layer of the cover of

Molitor '637 is 0.060 inches while this claim requires a thickness of 0.055 for this layer (Patent

Owner's Response at middle of page 17).


Ground 23: Third Party Requester's Comments

Third Party Requester counter argues that Nesbitt discloses a range of 0.020 to 0.100

inches for the thickness of the outer cover of a golf ball (Nesbitt at col. 3, lines 22-25). The

holding in *KRS* would dictate that one of ordinary skill would know to use the material of

Molitor '637, polyurethane, with the thickness of Nesbitt (Third Party Requester's Comments at

middle of page 21).


Ground 23: Examiner's Response to the Argument and Comments

Examiner agrees with the comments of the Third Party Requester, and the rejection of

claim 4 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained.

Since Nesbitt references the Molitor '637 patent, one of ordinary skill would logically look at its

complete disclosure which includes the use of polyurethane as an outer cover. Using the

thickness values of Nesbitt with polyurethane would be obvious because Nesbitt states that "the

thickness of the inner layer . . . and the thickness of outer layer . . . may be varied to secure the

advantages herein mentioned" at col. 3, lines 16-19. The advantages Nesbitt wishes to achieve

are both distance and feel in one golf ball (Nesbitt at col. 2, lines 1-9).


**Proposed third party requester rejection:  Ground #24**

Application/Control Number:                                    Page 98
95/000,123
Art Unit: 3993

As an alternative to Ground #21, the requester submits on pages 47 and 48 of the request

that claim 4 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Wu, U.S. Pat. No. 5,334,673.

Claim 4 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Wu.

The below claim chart identifies the new limitations introduced by dependent claim 4.

| Claim 4 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches, | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |
| said golf ball having an overall diameter of 1.680 inches or more. | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches...." (Nesbitt, col. 2: ll. 50-52.) "This center or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ...." (Nesbitt, col. 3, ll. 34-38.) |

Thus, because all new limitations of claim 4 are found within Nesbitt and from the above

analysis within Ground #17 claim 3 is obvious by Nesbitt in view of Wu, claim 4 is likewise

obvious by Nesbitt in view of Wu.

This rejection of claim 4 based on Nesbitt in view of Wu was proposed by the third party

requester in the request for reexamination and is being adopted essentially as proposed in the

request.

Ground 24: Patent Owner's Argument

Application/Control Number:                                          Page 99
95/000,123
Art Unit: 3993

    Patent Owner does not specifically argue this rejection.


Ground 24: Third Party Requester's Comments

    Third Party Requester does not specifically counter argue this rejection.


Ground 24: Examiner's Response to the Argument and Comments

    Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 4 under 35 USC 103(a) as being obvious by Nesbitt in view of Wu is

maintained.   See "Ground 3:  Examiner's Response to the Argument and Comments,"

*supra.*


**Proposed third party requester rejection:  Ground #25**

    As an alternative to Ground #21, the requester submits on pages 47 and 48 of the request

that claim 4 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751.

    Claim 4 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '751.

    The below claim chart identifies the new limitations introduced by dependent claim 4.

| Claim 4 | Nesbitt |
|---|---|
| wherein said inner cover layer has a thickness of about 0.050 inches, and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23). |
| said outer cover layer has a thickness of about 0.055 inches, | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

Application/Control Number: 95/000,123
Art Unit: 3993

Page 100

| said golf ball having an overall diameter of 1.680 inches or more. | "According to the United States Golf Association Rules, the minimum diameter prescribed for a golf ball is 1.680 inches...." (Nesbitt, col. 2: ll. 50-52.)<br>"This center or core 12 and inner layer 14 of hard resinous material in the form of a sphere is then remolded into a dimpled golf ball of a diameter of 1.680 inches minimum with an outer or cover layer 16 of a soft, low flexural modulus resin ...." (Nesbitt, col. 3, ll. 34-38.) |
|---|---|

Thus, because all new limitations of claim 4 are found within Nesbitt and from the above analysis within Ground #18 claim 3 is obvious by Nesbitt in view of Molitor '751, claim 4 is likewise obvious by Nesbitt in view of Molitor '751.

This rejection of claim 4 based on Nesbitt in view of Molitor '751 was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Ground 25: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.

Ground 25: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.

Ground 25: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the rejection of claim 4 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '751 is maintained. See "Ground 4: Examiner's Response to the Argument and Comments," *supra*.

Application/Control Number:                                    Page 101
95/000,123
Art Unit: 3993


**Proposed third party requester rejection:  Ground #26**

The requester submits on pages 48 and 49 of the request that claim 4 is unpatentable

under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in

view of Molitor et al., U.S. Pat. No. 4,274,637.

**This rejection is <u>not adopted</u>.**

Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 4 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.


Ground 26: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.


Ground 26: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.

Application/Control Number:                                    Page 102
95/000,123
Art Unit: 3993

Ground 26: Examiner's Response to the Argument and Comments

      For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.

**Proposed third party requester rejection:  Ground #27**

      The requester submits on pages 48 and 49 of the request that claim 4 is unpatentable

under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in

view of Wu, U.S. Pat. No. 5,334,673, (Wu).

      **This rejection is <u>not adopted</u>**.

      Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 4 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.

Ground 27: Patent Owner's Argument

      Patent Owner does not specifically argue this rejection.

Application/Control Number:                                    Page 103
95/000,123
Art Unit: 3993

Ground 27: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.

Ground 27: Examiner's Response to the Argument and Comments

For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.

**Proposed third party requester rejection:  Ground #28**

The requester submits on pages 48 and 49 that claim 4 is unpatentable under 35 U.S.C. §

103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187, (Proudfit) in view of Molitor et

al., U.S. Pat. No. 4,674,751, (Molitor '751).

**This rejection is <u>not adopted</u>.**

Proudfit's preferred embodiment's inner layer is 0.037 inches thick, see col. 7:43-44.

Claim 4 requires the inner layer to be about 0.050 inches thick.  Those skilled in the art measure

thickness to the thousandths of an inch.  The difference between the Proudfit preferred

embodiment and the claimed invention is 0.013 inches or thirteen hundredths of an inch.  This

difference equates to a difference of a factor of ten.  Further, the requester admits that it is not the

chemical but the mechanical properties of the materials used in making golf balls important to

those skilled in the art.  One of the mechanical properties in constructing a golf ball with

materials is the thickness to make a given layer.  Therefore, for these reasons this proposed

rejection is not adopted.

Application/Control Number:                                    Page 104
95/000,123
Art Unit: 3993

Ground 28: Patent Owner's Argument

    Patent Owner does not specifically argue this rejection.


Ground 28: Third Party Requester's Comments

    Third Party Requester does not specifically counter argue this rejection.


Ground 28: Examiner's Response to the Argument and Comments

    For the reasons stated in the above explanation, the non-adoption of this rejection

is maintained.


<u>Re. Claim 5</u>

**Proposed third party requester rejection:  Ground #29**

    The requester submits on pages 50 through 54 that claim 5 is unpatentable under 35

U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

    In the request on pages 50 through 54 the third party requester proposes that claim 5 be

rejected based upon Nesbitt alone with the incorporation by reference of Molitor '637.  The third

party requester points out that Molitor '637 is incorporated by reference into Nesbitt because

Nesbitt refers to Molitor '637.  (See Nesbitt col. 3, ll. 54-60).

    **This rejection is <u>adopted</u> in this office action.**

    Claim 5 is rejected under 35 U.S.C. 102(b) as anticipated by Nesbitt.

    Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

Application/Control Number:                                    Page 105
95/000,123
Art Unit: 3993

| Claim 5 | Nesbitt (primary) with Molitor '637 (incorporation by reference) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or **core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a **sphere**." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "Disposed on the spherical center or core 12 is a **first layer, lamination, ply or inner cover 14** of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37). |
| said inner cover having Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). "[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). See below with respect to the Shore D limitation |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61). Molitor '637: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). See below with respect to % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi, | see below |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches; and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | "An outer layer, ply, lamination or cover 16 of comparatively soft, low flexural modulus resinous material ... is then re-molded onto the inner ply or layer 14 ...." (Nesbitt, col. 2, ll. 43-47.) "[T]he outer layer or cover 16 being of dimpled configuration...." (Nesbitt, col. 2, lines 48-49 and Figure 2.) |
| said outer cover having a Shore D hardness of about 64 or less, | Nesbitt: "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). Molitor '637: Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55. |
| said outer cover layer comprising a polyurethane, | Nesbitt: "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this |

Application/Control Number:                                    Page 106
95/000,123
Art Unit: 3993

| | |
|---|---|
| | invention." (Nesbitt, col. 3, ll. 54-60). |
| | **Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi, and | **Exhibit J:** Estane 58133 Product Information Sheet: Estane 58133 has a modulus of 25,000 psi. |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

As mentioned above, Nesbitt incorporates by reference Molitor '637 as describing an

number of compositions suitable for the inner cover layer 14. Of particular interest in this case

are Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and

SURLYN 1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat.

No. 4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15%

by weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in

the art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Application/Control Number:                                      Page 107
95/000,123
Art Unit: 3993

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi. This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

Exhibit J is a product information sheet for Estane 58133 a material that is taught to be

used as an outer layer. Exhibit J teaches that Estane 58133 has a flexural modulus of 25,000 psi.

This rejection of claim 5 based on Nesbitt incorporating by reference Molitor '637 was

proposed by the third party requester in the request for reexamination and is being adopted

essentially as proposed in the request.


Ground 29: Patent Owner's Argument

Patent Owner does not argue this rejection.


Ground 29: Third Party Requester's Comments

Third Party Requester's arguments for this claim are the same as given *supra* at "Ground

1: Third Party Requester's Comments."


Ground 29: Examiner's Response to the Argument and Comments

Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection. See "Ground 1: Examiner's Response to the Argument and

Comments," *supra*.

Application/Control Number:                                    Page 108
95/000,123
Art Unit: 3993

**Proposed third party requester rejection:  Ground #30**

The requester submits on pages 50 through 54 that claim 5 is unpatentable under 35

U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al.,

U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 5 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nesbitt in view of

Molitor '637, as evidenced by Exhibit J.

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Molitor '637 discloses, teaches or suggests the claim limitations.

| Claim 5 | Nesbitt (primary) with Molitor '637 (teaching) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or **core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a **sphere**." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "Disposed on the spherical center or core 12 is a **first layer, lamination, ply or inner cover 14** of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37). |
| said inner cover having Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). "[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). See below with respect to the Shore D limitation |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61). **Molitor '637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). See below with respect to % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi, | see below |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of |

Application/Control Number:                           Page 109
95/000,123
Art Unit: 3993

| inches; and | a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23.) |
|---|---|
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | "An outer layer, ply, lamination or cover 16 of comparatively soft, low flexural modulus resinous material ... is then re-molded onto the inner ply or layer 14 ...." (Nesbitt, col. 2, ll. 43-47.) "[T]he outer layer or cover 16 being of dimpled configuration...." (Nesbitt, col. 2, lines 48-49 and Figure 2.) |
| said outer cover having a Shore D hardness of about 64 or less, | **Nesbitt**: "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). **Molitor '637**: Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55. |
| said outer cover layer comprising a polyurethane, | **Nesbitt**: "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). **Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi, and | **Exhibit J**: Estane 58133 Product Information Sheet: Estane 58133 has a modulus of 25,000 psi. |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

Application/Control Number:                                    Page 110
95/000,123
Art Unit: 3993

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph.  Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid.  Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi.  This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

Exhibit J is a product information sheet for Estane 58133 a material that is taught to be

used as an outer layer.  Exhibit J teaches that Estane 58133 has a flexural modulus of 25,000 psi.

This rejection of claim 5 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 30: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 2: Patent Owner's Argument," *supra*.

Application/Control Number:                                    Page 111
95/000,123
Art Unit: 3993

Ground 30: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 2: Third Party Requester's Comments," *supra*.

Ground 30: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 3 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 2:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #31**

The requester submits on pages 54 through 56 that claim 5 under 35 U.S.C. § 103(a) as

being obvious over Nesbitt, U.S. Pat. No. 4,431,193, (Nesbitt) in view of Wu, U.S. Patent No.

5,334,673, (Wu).

Claim 5 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nesbitt mentioning

Molitor '637 in view of Wu, as evidenced by Exhibit C and Decl. of Dalton at para. 7.

Below is a claim chart identifying the claim limitations and which reference Nesbitt or

Wu discloses, teaches or suggests the claim limitations.  As reported in the Order granting

reexamination, it needs to be correctly stated on the record that Nesbitt and Molitor '637 which

is mentioned in Nesbitt teach the use of particular polyurethane materials for the use as an outer

layer.

Application/Control Number:                                    Page 112
95/000,123
Art Unit: 3993

| Claim 5 | Nesbitt (primary) mentioning Molitor '637 with Wu (teaching) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or **core** formed as a solid body of resilient polymeric material or rubber-like material in the shape of a **sphere**." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "Disposed on the spherical center or core 12 is a **first layer, lamination, ply or inner cover 14** of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37). |
| said inner cover having Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). "[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). See below with respect to the Shore D limitation. |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61). Molitor '637: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). See below with respect to the % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi, | see below |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches; and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | "An outer layer, ply, lamination or cover 16 of comparatively soft, low flexural modulus resinous material ... is then re-molded onto the inner ply or layer 14 ...." (Nesbitt, col. 2, ll. 43-47.) "[T]he outer layer or cover 16 being of dimpled configuration...." (Nesbitt, col. 2, lines 48-49 and Figure 2.) |
| said outer cover having a Shore D hardness of about 64 or less, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). Molitor '637: Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55. |
| said outer cover layer comprising a polyurethane, | Molitor '637: See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic |

| | |
|---|---|
| | polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). <br> <u>Wu</u>: "With polyurethanes made in accordance with the present invention, the degree of cure which has taken place is dependent upon, inter alia, the time, temperature, type of curative, and amount of catalyst used.  It has been found that the degree of cure of the cover composition is directly proportional to the hardness of the composition.  A hardness about 10D to 30D, Shore D hardness for the cover stock at the end of the intermediate curing step (i.e. just prior to the final molding step) has been found to be suitable for the present invention.  More preferred is a hardness of about 12D to 20D." (Wu, col. 6, ll. 27-38). |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi, and | see below |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches."  (Nesbitt, col. 3, ll. 22-25). |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14.  Of particular interest in this case are

Examples 1-7 within Molitor '637.  Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557.  The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981.  The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid."  '981 Pat., col. 3, ll. 59-60.  Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Moreover, as stated above, it has

been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi. This teaching of

flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

As mentioned above, Nesbitt mentioning Molitor '637 teaches the use of particular

polyurethane materials for the use as an outer layer. Wu teaches that polyurethane was being

used as the outer layer of golf ball *circa* 1993. Wu further teaches in col. 1:36-46 that SURLYN

covered golf balls lack the "click" and "feel" of balata which golfers have become accustomed to

such sensations and polyurethane covered golf balls can be made to have a similar "click" and

"feel" of balata. Wu also at least teaches that polyurethanes made according to its invention will

have Shore D hardness directly proportional to the degree of cure of the cover; and this Shore D

hardness ranges from 10 to 30, preferably 12 to 20 on the Shore D scale, see col. 6:26-38. This

teaching of Shore D hardness is directed to an intermediate curing step product prior to the final

molding process to finish the golf ball. Exhibit C demonstrates the actual finished golf ball

product having the cover layer that Wu teaches within its disclosure. Exhibit C teaches that the

golf ball taught therein is covered by the following patents: 4,783,078; 4,846,910; 4,858,923;

4,904,320; 4,915,390; 5,007,594; 5,080,367; 5,133,509; **5,334,673**; and D339,074. The '673

Patent teaches the cover sock of the Exhibit C finished golf ball. Exhibit C teaches that the golf

ball taught therein has a cover material made from an "elastomer", having a thickness of .050",

and 58 Shore D hardness. All three properties are within the range of mechanical properties of

the claim invention (polyurethane is an elastomer, cover layer thickness ranges from 0.010 to

0.070 inches and the Shore D hardness is less that 64). Claim 5 also claims the flexural modulus

of the material be within the range of 1,000 psi to 30,000 psi. The Declaration of Dalton

declares that Example 1 in Wu is about 23,000 psi. Because it has been admitted by the inventor

of the Sullivan '893 patent that the particular chemical properties of the materials (the chemical

composition) used in the construction of a golf ball lack criticality as compared to the

mechanical properties (the Shore D hardness, flexural modulus, layer thickness) of those

compounds used for constructing the different layers (Exhibit G at 334), one of ordinary skill in

the art at the time the invention was made would find it obvious to incorporate the teachings of

Wu which inherently include the teachings of Shore hardness for the fully cured cover layer as

taught in Exhibit C as obvious equivalent materials in order to achieve the same end result of

providing a cover layer that has the same "click" and "feel" of a balata cover which the extra

durability of an elastomeric material.

This rejection of claim 5 based on Nesbitt mentioning Molitor '637 in view of Wu as

evidenced by Exhibit C and Decl. of Dalton, para. 7 was proposed by the third party requester in

the request for reexamination and is being adopted essentially as proposed in the request.


Ground 31: Patent Owner's Argument

Patent Owner does not specifically argue this rejection, except that the Dalton

Declaration is not competent evidence to disclose Wu's cover's flex modulus because of

Dalton's employment with the Requester (Patent Owner's Argument at middle of page 21). The

other arguments are the same as those at "Ground 3: Patent Owner's Argument," *supra*.

Application/Control Number:                                    Page 116
95/000,123
Art Unit: 3993


Ground 31: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.   The counter

arguments are the same as those at "Ground 3: Third Party Requester's Comments," *supra*.


Ground 31: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 5 under 35 USC 103(a) as being obvious by Nesbitt in view of Wu is

maintained.   See "Ground 3: Examiner's Response to the Argument and Comments," *supra*.   As

to the Patent Owner's argument on the use of Dalton Declaration, the Examiner accepts the

declaration as competent evidence because it is a sworn declaration.   As such, the Examiner will

not probe into the Declarant's veracity.


**Proposed third party requester rejection:  Ground #32**

The requester submits on pages 56 through 58 that claim 5 under 35 U.S.C. § 103(a) as

being obvious over Nesbitt, U.S. Pat. No. 4,431,193, in view of Molitor et al., U.S. Pat. No.

4,674,751, (Molitor '751).

Claim 5 is rejected under 35 U.S.C. 103(a) as being unpatentable over Nesbitt mentioning

Molitor '637 in view of Molitor '751, as evidenced by Exhibit J.

Below is a claim chart identifying the claim limitations and where Nesbitt discloses,

teaches or suggests the claim limitations.  As reported in the Order granting reexamination, it

Application/Control Number:                          Page 117
95/000,123
Art Unit: 3993

needs to be correctly stated on the record that Nesbitt and Molitor '637 which is mentioned in

Nesbitt teach the use of particular polyurethane materials for the use as an outer layer .

| Claim 5 | Nesbitt (primary) mentioning Molitor '637 with Molitor '751 (teaching) |
|---|---|
| A multi-layer golf ball comprising: | "The disclose embraces a golf ball and method of making same...." (Nesbitt, Abstract; FIGS 1 & 2) |
| a spherical core; | "Referring to the drawings in detail there is illustrated a golf ball 10 which comprises a solid center or core formed as a solid body of resilient polymeric material or rubber-like material in the shape of a **sphere**." (Nesbitt, col. 2, ll. 31-34). |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "Disposed on the spherical center or core 12 is a first layer, lamination , ply or inner cover 14 of molded hard, highly flexural modulus resinous material...." (Nesbitt, col. 2, ll. 34-37). See below with respect to the Shore D limitation. |
| said inner cover having Shore D hardness of at least 60, | "[I]nner cover 14 of molded hard, highly flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). "[A] center or core 12 ... is molded with a layer of hard, high modulus SURLYN resin, such as SURLYN type 1605..." (Nesbitt, col. 3, ll. 27-29). See below with respect to % by weight limitation. |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid and | "Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 [inner] and 16 [outer] for the golf ball of this invention." (Nesbitt, col. 3, ll. 56-61). **Molitor '637**: Molitor teaches, in examples 1-7, cover materials including a blend of two ionomer resins: SURLYN 1605 and SURLYN 1557. (Molitor '637, col. 14, l. 22 to col. 16, l. 34). |
| having a modulus of from about 15,000 to about 70,000 psi, | see below |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches; and | "It is found that the inner layer of hard, high flexural modulus resinous material such as SURLYN resin type 1605, is preferably of a thickness in a range of 0.020 inches and 0.070 inches." (Nesbitt, col. 3, ll. 19-23.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | "An outer layer, ply, lamination or cover 16 of comparatively soft, low flexural modulus resinous material ... is then re-molded onto the inner ply or layer 14 ...." (Nesbitt, col. 2, ll. 43-47.) "[T]he outer layer or cover 16 being of dimpled configuration...." (Nesbitt, col. 2, lines 48-49 and Figure 2.) |
| said outer cover having a Shore D hardness of about 64 or less, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60). **Molitor '637**: Teaches the use of ESTANE 58133 in Examples 16 and 17. (Molitor '637, col. 18, ll. 32-60) See below why this cover material has inherently a Shore D hardness of 55. |

Application/Control Number:                          Page 118
95/000,123
Art Unit: 3993

| said outer cover layer comprising a polyurethane, | **Nesbitt:** "Reference is made to the application Ser. No. 155,658 of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for ... layers ... 16 for the golf ball of this invention." (Nesbitt, col. 3, ll. 54-60).<br>**Molitor '637:** See TABLE 10 which teaches ESTANE 58133 is a thermoplastic polyurethane, thus is a polyurethane based material. Moreover, Molitor '637 teaches the cover materials include "polyurethanes such as are prepared from polyols and organic polyisocyanates". (Molitor '637, col. 5, ll. 39-41; col. 18, ll. 32-60 (Examples 16 and 18)). |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi, and | **Exhibit J:** Estane 58133 Product Information Sheet: Estane 58133 has a modulus of 25,000 psi. |
| said outer cover layer having a thickness of from about 0.010 to about 0.070 inches. | "The thickness of the outer layer or cover 16 of soft, low flexural modulus resin such as SURLYN type 1855, may be in the range of 0.020 inches and 0.100 inches." (Nesbitt, col. 3, ll. 22-25). |

As shown above in the claim chart, Nesbitt mentioning Molitor '637 suggests the use of a soft outer cover layer including a polyurethane material. In an analogous golf ball, Molitor '751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability properties similar to wound, balata-covered balls is to provide about an inner resilient molded core **a cover having a shore C hardness less than 85,** preferably 70-80, and most preferably 72-76. The novel **cover of the golf ball** of the invention is made of a composition comprising a blend of (1) **a thermoplastic urethane having a shore A hardness less than 95** and (2) **an ionomer having a shore D hardness greater than 55.**

(Molitor '751, col. 2, ll.33-49 (emphasis added)).

Moreover, in explaining what constitutes a two-piece golf ball, Molitor '751 teaches that:

> The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, **but also includes balls having a separate solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt,** and other balls have non-wound cores.

(Molitor '751, col. 3, ll. 7-12 (emphasis added)).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of less than 85, preferably 70-80, most preferably 72-76. As described in Molitor '751's TABLE bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

Application/Control Number:                          Page 119
95/000,123
Art Unit: 3993

is taught to have a Shore C hardness of 73.  Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material.  How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A).  A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate.  Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C.  This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

As stated in the request on page 58

It would have been obvious to one of ordinary skill in the art at the time of the
invention to substitute the soft outer cover layer of Nesbitt and replace it with an
outer cover layer made of the soft polyurethane material taught by Molitor '751 to
provide a golf ball that includes "playability properties as good or better than
balata-covered wound balls but are significantly more durable," and "have better
wood playability properties than conventional two-piece balls, and permit
experienced golfers to apply spin so as to fade or draw a shot" while having
improved puttability.  (Molitor '751, col. 2, ll. 61-68)

As mentioned above, Nesbitt references Molitor '637 as describing an number of compositions suitable for the inner cover layer 14. Of particular interest in this case are Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN 1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No. 4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN 1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan '873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873 Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid. Moreover, as stated above, it has been identified that one resin in Nesbitt has a flexural modulus of 51,000 psi. This teaching of flexural modulus falls within the range claimed (15,000 psi to 70,000 psi).

This rejection of claim 5 based on Nesbitt mentioning Molitor '637 in view of Molitor '751 as evidenced by Exhibit J was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Application/Control Number:                                    Page 121
95/000,123
Art Unit: 3993

Ground 32: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 4: Patent Owner's Argument," *supra*.

Ground 32: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 4: Third Party Requester's Comments," *supra*.

Ground 32: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 5 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 4:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #33**

The requester submits on pages 58 through 62 that claim 5 under 35 U.S.C. § 103(a) as

being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor, U.S. Pat. No.

4,274,637 (Molitor '637.)

Claim 5 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '637.

Application/Control Number:                          Page 122
95/000,123
Art Unit: 3993

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 5 | Proudfit |
|---|---|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1. One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) See figure 1 of Proudfit for the spherical shape of the core. |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) "The inner layer can be molded in one of two methods: 1. Injection molded over the core in a manner which is conventionally used to injection mold ionomers over a solid core. 2. Injection mold halfshells, place halfshells over a solid core, compression mold the inner cover over the core." (Proudfit, col. 8, lines 32-38.) |
| said inner cover having Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6." <br> **TABLE 6** <br> Composition of Inner Layer of Cover (Parts by Weight) <br><table><tr><td>Ionomer Type</td><td>Blend Ratio</td></tr><tr><td>Sodium- Surlyn 8940</td><td>75%</td></tr><tr><td>Zinc- Surlyn 9910</td><td>25%</td></tr></table> (Proudfit, col. 8, ll. 22-30) See below with respect to the Shore D limitation. |
| said inner cover layer comprising an | "The composition of the inner cover layer is described in Table |

Application/Control Number:                    Page 123
95/000,123
Art Unit: 3993

| | |
|---|---|
| ionomeric resin having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid and | **TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>Ionomer Type — Blend Ratio<br>Sodium- Surlyn 8940 — 75%<br>Zinc- Surlyn 9910 — 25%<br><br>(Proudfit, col. 8, ll. 22-30)<br>See below with respect to the % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790. (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.)<br>"Specific standard SURLYN resins which can be used in the inner layer include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.)<br>"The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>Ionomer Type — Blend Ratio<br>Sodium- Surlyn 8940 — 75%<br>Zinc- Surlyn 9910 — 25%<br><br>(Proudfit, col. 8, ll. 22-30) |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches | "the thickness of the inner layer can be within the range of about 0.0250 to 0.2875 inches to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40.)<br>"The preferred dimensions are ... inner layer thickness of 0.037 inch ...." (Proudfit, col. 7, ll.43-44.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | see Figure 1 |
| said outer cover having a Shore D hardness of about 64 or less | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17)<br>This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| said outer cover layer comprising a polyurethane, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers**." (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a modulus | "The relatively soft elastomeric material of the outer layer has a |

Application/Control Number:                            Page 124
95/000,123
Art Unit: 3993

| in a range of about 1,000 to about 30,000 psi | flexural modulus in the range of about 20,000 to 25,000 psi, and in one specific embodiment had a flexural modulus of from 22,165 to 22,379 psi.  (Proudfit, col. 6, ll. 28-31.) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch.  The preferred dimensions are ... an outer layer thickness of 0.0525 inch...."  (Proudfit, col. 7, ll. 40-46) |

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core, inner layer and outer layer) with the layers within the range of claimed thicknesses each layer made from a material having the mechanical properties substantially similar to the claimed mechanical properties.  What Proudfit lacks in clearly disclosing are the particular mechanical and chemical properties of the claimed invention.  However, Proudfit either incorporates by reference these mechanical and chemical properties and/or the materials used within the Proudfit golf ball inherently have these mechanical and chemical properties.  For instance, Proudfit incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention.  (Proudfit, col. 1, ll.39-43).  The '981 patent discloses the preferably amount of unsaturated carboxylic acid is "from about 5[%] to about 15% by weight." ('981 Pat, col. 3, ll. 59-60).  If Proudfit discloses using blends SURLYN the chemical for making the inner cover and the '981 Patent is the formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid.  As taught from Exhibit I, SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, see Exhibit I.  Therefore, this cover blend inherently has a hardness of 60 or more.  Proudfit

Application/Control Number:                                    Page 125
95/000,123
Art Unit: 3993

discloses the outer layer being a blend of balata.  An example of the blend is disclosed in Table 7

reproduced below.

**TABLE 7**

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one

of the first types of synthetic rubber or elastomer.  As described in the Rule 132 Declaration of

Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the

golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52.  Thus, Proudfit's

outer layer cover inherently has a Shore hardness of less than 64.

While Proudfit lacks disclosing the outer layer being made from polyurethane, in an

analogous golf ball, Molitor '637 teaches using polyurethane, see Molitor '637, col. 5, ll. 33-41

and col. 18, examples 16 and 17.  The request points out on page 62, ll. 3-9, why the use of

polyurethane to one of ordinary skill in the art would be readily apparent given that those skilled

in the art were more critical of the mechanical properties of a particular material then the

chemical composition (material type) of the material and those remarks are incorporated herein.

In other words, it was not critical to the "golf ball inventions" of those skilled in the art as to

what materials were used to construct the golf balls so long as the materials had the desired

mechanical properties which would yield the particular mechanical performance parameters the

inventors were trying to achieve, e.g. improved processability; improved durability; cost

Application/Control Number:                                      Page 126
95/000,123
Art Unit: 3993

effectiveness; user acceptance of performance (similar "click" and "feel" to balata) of the golf

ball product made from those materials.  The request on page 42, ll. 12-20, explains why one of

ordinary skill in the art would be motivated to substitute the outer cover layer taught in Molitor

'637 for the outer cover layer disclosed in Proudfit and those remarks are incorporated herein.

Therefore, one of ordinary skill in the art would find the claimed invention as obvious for

the motivation given in the request on page 43, ll. 12-20.

This rejection of claim 5 based on Proudfit in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 33: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 5: Patent Owner's Argument," *supra*.


Ground 33: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 5: Third Party Requester's Comments," *supra*.


Ground 33: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 5 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

Application/Control Number:                                    Page 127
95/000,123
Art Unit: 3993

'637 is maintained.   See "Ground 5:  Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #34**

The requester submits on pages 63 through 64 that claim 5 under 35 U.S.C. § 103(a) as

being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Wu, U.S. Pat. No.

5,334,673 (Wu).

Claim 5 is rejected under 35 U.S.C. 103(a) as being unpatentable over Proudfit in view of

Wu, as evidenced by Exhibit C.

Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

| Claim 5 | Proudfit |
|---|---|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2) "Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1. One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55) See figure 1 with respect to showing the spherical shaped core. |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24) |

Application/Control Number:                                    Page 128
95/000,123
Art Unit: 3993

| | |
|---|---|
| | "The inner layer can be molded in one of two methods:<br>1. Injection molded over the core in a manner which is conventionally used to injection mold ionomers over a solid core.<br>2. Injection mold halfshells, place halfshells over a solid core, compression mold the inner cover over the core." (Proudfit, col. 8, lines 32-38.) |
| said inner cover having Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30)<br>See below with respect to the Shore D limitation. |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid and | "The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30)<br>See below with respect to the % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790. (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.)<br>"Specific standard SURLYN resins which can be used in the inner layer include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.)<br>"The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover<br>(Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30) |

Application/Control Number:                          Page 129
95/000,123
Art Unit: 3993

| | |
|---|---|
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches | "the thickness of the inner layer can be within the range of about 0.0250 to 0.2875 inches to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40.)<br>"The preferred dimensions are ... inner layer thickness of 0.037 inch ...." (Proudfit, col. 7, ll.43-44.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | see Figure 1. |
| said outer cover having a Shore D hardness of about 64 or less | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17)<br>This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| said outer cover layer comprising a polyurethane, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi | "The relatively soft elastomeric material of the outer layer has a flexural modulus in the range of about 20,000 to 25,000 psi, and in one specific embodiment had a flexural modulus of from 22,165 to 22,379 psi. (Proudfit, col. 6, ll. 28-31.) |
| said outer cover layer having a thickness of 0.010 to 0.070 inches, | "The thickness of the outer layer can be within the range of about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |

Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993.
Wu further teaches in col. 1:36-46 that SURLYN covered golf balls lack the "click" and "feel"
of balata which golfers have become accustomed to such sensations and polyurethane covered
golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches
that polyurethanes made according to its invention will have Shore D hardness directly
proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30,
preferably 12 to 20 on the Shore D scale, see col. 6:26-38. This teaching of Shore D hardness is
directed to an intermediate curing step product prior to the final molding process to finish the
golf ball. Exhibit C demonstrates the actual finished golf ball product having the cover layer that

Application/Control Number:                                                     Page 130
95/000,123
Art Unit: 3993

Wu teaches within its disclosure. Exhibit C teaches that the golf ball taught therein is covered by

the following patents: 4,783,078; 4,846,910; 4,858,923; 4,904,320; 4,915,390; 5,007,594;

5,080,367; 5,133,509; **5,334,673**; and D339,074. The '673 Patent teaches the cover sock of the

Exhibit C finished golf ball. Exhibit C teaches that the golf ball taught therein has a cover

material made from an "elastomer", having a thickness of .050", and 58 Shore D hardness. All

three properties are within the range of mechanical properties of the claim invention

(polyurethane is an elastomer, cover layer thickness ranges from 0.010 to 0.070 inches and the

Shore D hardness is less that 64). Because it has been admitted by the inventor of the Sullivan

'893 patent that the particular chemical properties of the materials (the chemical composition)

used in the construction of a golf ball lack criticality as compared to the mechanical properties

(the Shore D hardness, flexural modulus, layer thickness) of those compounds used for

constructing the different layers (Exhibit G at 334), one of ordinary skill in the art at the time the

invention was made would find it obvious to incorporate the teachings of Wu which inherently

include the teachings of Shore hardness for the fully cured cover layer as taught in Exhibit C as

obvious equivalent materials in order to achieve the same end result of providing a cover layer

that has the same "click" and "feel" of a balata cover which the extra durability of an elastomeric

material.

        This rejection of claim 5 based on Proudfit in view of Wu as evidenced by Exhibit C was

proposed by the third party requester in the request for reexamination and is being adopted

essentially as proposed in the request.


Ground 34: Patent Owner's Argument

Application/Control Number:                                        Page 131
95/000,123
Art Unit: 3993

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 6: Patent Owner's Argument," *supra*.


Ground 34: Third Party Requester's Comments

　　　Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 6: Third Party Requester's Comments," *supra*.


Ground 34: Examiner's Response to the Argument and Comments

　　　Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 5 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 6:  Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #35**

　　　The requester submits on pages 64 through 66 that claim 5 under 35 U.S.C. § 103(a) as

being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S.

Pat. No. 4,674,751 (Molitor '751).

　　　Claim 5 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '751.

　　　Below is a claim chart identifying the claim limitations and where Proudfit discloses,

teaches or suggests certain claim limitations.

Application/Control Number:                                    Page 132
95/000,123
Art Unit: 3993

| Claim 5 | Proudfit |
|---------|----------|
| A multi-layer golf ball comprising: | "This **invention relates to golf balls**, and more particularly, to a golf ball having a two-layer cover." (Proudfit, col. 1, ll. 11-12) |
| a spherical core; | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid **core 11** and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24; Figs 1 and 2)<br>"Two specific solid core compositions used with the new two-layer cover had the composition describe in Table 1.  One core was used in a golf ball which was designated as a 90 compression ball, and the other core was used in a golf ball which was designated as a 100 compression ball." (Proudfit, col. 7, ll. 51-55)<br>See figure 1 for the spherical shaped core. |
| an inner cover layer disposed over said spherical core to form a spherical intermediate ball, | "FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a **cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins** and a relatively soft outer layer 14 of polymeric material." (Proudfit, col. 7, ll. 21-24)<br>"The inner layer can be molded in one of two methods:<br>1. Injection molded over the core in a manner which is conventionally used to injection mold ionomers over a solid core.<br>2. Injection mold halfshells, place halfshells over a solid core, compression mold the inner cover over the core." (Proudfit, col. 8, lines 32-38.) |
| said inner cover having Shore D hardness of at least 60, | "The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30)<br>See below with respect to the Shore D limitation. |
| said inner cover layer comprising an ionomeric resin having no more than 16% by weight of alpha, beta-unsaturated carboxylic acid and | "The composition of the inner cover layer is described in Table 6." |

| | TABLE 6 |
|---|---|
| | **Composition of Inner Layer of Cover**<br>**(Parts by Weight)** |
| | **Ionomer Type** · **Blend Ratio**<br>Sodium- Surlyn 8940 · 75%<br>Zinc- Surlyn 9910 · 25% |
| | (Proudfit, col. 8, ll. 22-30)<br>See below with respect to the % by weight limitation. |
| having a modulus of from about 15,000 to about 70,000 psi; and | "The standard resins have a flexural modulus in the range of about 30,000 to about 55,000 psi as measured by ATM Method D-790. (Standard resins are referred to as "hard SURLYNS" in U.S. Patent No. 4,884,814." (Proudfit, col. 5, l. 66 - col. 6, l. 1.)<br>"Specific standard SURLYN resins which can be used in the inner layer include 8940 (sodium), 9910 (zinc)...." (Proudfit, col. 6, ll. 6-7.)<br>"The composition of the inner cover layer is described in Table 6."<br><br>**TABLE 6**<br>**Composition of Inner Layer of Cover**<br>**(Parts by Weight)**<br>**Ionomer Type** · **Blend Ratio**<br>Sodium- Surlyn 8940 · 75%<br>Zinc- Surlyn 9910 · 25%<br><br>(Proudfit, col. 8, ll. 22-30) |
| and said inner cover layer having a thickness from about 0.100 to about 0.010 inches | "the thickness of the inner layer can be within the range of about 0.0250 to 0.2875 inches to provide a total diameter of the inner layer and core within the range of about 1.550 to 1.590 inch." (Proudfit, col. 7, ll. 37-40.)<br>"The preferred dimensions are ... inner layer thickness of 0.037 inch ...." (Proudfit, col. 7, ll.43-44.) |
| a dimpled outer cover layer disposed over said spherical intermediate ball to form a multi-layer golf ball, | see Figure 1 |
| said outer cover having a Shore D hardness of about 64 or less | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17)<br>This material inherently has a Shore D hardness of less than 64, see the reasoning below. |
| said outer cover layer comprising a polyurethane, | "... an **outer layer** of soft material such as balata or **a blend of balata and other elastomers.**" (Proudfit, col. 5, ll. 15-17) |
| said outer cover layer having a modulus in a range of about 1,000 to about 30,000 psi | "The relatively soft elastomeric material of the outer layer has a flexural modulus in the range of about 20,000 to 25,000 psi, and in one specific embodiment had a flexural modulus of from 22,165 to 22,379 psi. (Proudfit, col. 6, ll. 28-31.) |
| said outer cover layer having a thickness | "The thickness of the outer layer can be within the range of |

Application/Control Number:                                    Page 134
95/000,123
Art Unit: 3993

| of 0.010 to 0.070 inches, | about 0.0450 to 0.0650 inch to provide a total ball diameter of 1.680 inch. The preferred dimensions are ... an outer layer thickness of 0.0525 inch...." (Proudfit, col. 7, ll. 40-46) |
|---|---|

As expressed in the request on page 64 and identified above within the claim chart,

Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer

and a soft balata blend outer cover layer.  Proudfit lacks in disclosing the use of polyurethane as

the material for the outer cover layer.  Instead, as shown in Table 7, reproduced below, Proudfit

discloses the outer cover layer being made of a blend of balata.

**TABLE 7**

Composition of Outer Layer
(Parts by Weigh:)

| Trans Polylsoprene (TP-301) | 60.00 |
|---|---|
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls.  As

admitted by the patent owner:

> [d]espite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-
> hit.  Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42).  With this disadvantage of balata covered golf balls, golf ball

designers looked for materials that would provide the same "click" and "feel" golfers expected

and have increased durability.

As pointed out in the request on page 28, lines 4-15, in an analogous golf ball, Molitor

'751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core

Application/Control Number:                                            Page 135
95/000,123
Art Unit: 3993

> a cover having a **shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> The novel cover of the golf ball of the invention is made of a composition comprising a blend of
> (1) a **thermoplastic urethane having a shore A hardness** less than 95 and (2) an ionomer having
> a shore D hardness greater than 55. The ionomer comprises olefinic groups having two to four
> carbon atoms copolymerized with acrylic or methacrylic acid groups and cross-linked with metal
> ions, preferably sodium or zinc ions. **The primary components of the blended cover are set at a
> weight ratio so as to result in a cover material after molding having a shore C hardness
> within the range of 70 to 85, preferably 72 to 76.** Preferably, the urethane component of the
> cover material has a tensile strength greater than 2500 psi and an elongation at break greater than
> 250%. A preferred cover material comprises about 8 parts of the thermoplastic urethane and
> between 1 and 4 parts ionomer. Preferably, the cover is no greater than 0.060 inch thick. Thinner
> covers appear to maximize the short iron playability characteristics of the balls.

(Molitor '751, col. 33-57 (emphasis added)).  Thus, Molitor '751 teaches having a outer cover

layer with a Shore C hardness less than 85 and preferably between 72 and 76.  Moreover,

Molitor '751 teaches what golf balls are included in the definition of "two-piece" ball within its

instant specification.

> The phrase "two-piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as
> disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-
> wound cores.**

Molitor '751, col. 3, ll. 7-12 (emphasis added)).  Proudfit, likewise, teaches the two-piece golf

balls can fit within this definition.

> FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which
> comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
> layer 14 of polymeric material.

(Proudfit, col. 7, ll. 21-24).

     As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76.  As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73.  Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material. How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance a polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate. Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C. This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

As stated in the request on page 29

Therefore, it would have been obvious to one of ordinary skill in the art at the
time of the invention to substitute the soft outer cover layer of Nesbitt and replace
it with an outer cover layer made of the soft polyurethane material taught by
Molitor '751 to provide a golf ball that includes "playability properties as good or
better than balata-covered wound balls but are significantly more durable," and
"have better wood playability properties than conventional two-piece balls, and
permit experienced golfers to apply spin so as to fade or draw a shot" while
having improved puttability. (Molitor '751, col. 2, ll. 61-68)

Application/Control Number:                                      Page 137
95/000,123
Art Unit: 3993

    This rejection of claim 5 based on Proudfit in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 35: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 7: Patent Owner's Argument," *supra*.


Ground 35: Third Party Requester's Comments

    Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 7: Third Party Requester's Comments," *supra*.


Ground 35: Examiner's Response to the Argument and Comments

    Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 5 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 7:  Examiner's Response to the Argument and

Comments," *supra*.


Re. Claim 6


**Proposed third party requester rejection:  Ground #36**

Application/Control Number:                                    Page 138
95/000,123
Art Unit: 3993

The requester submits on pages 66 through 67 that claim 6 is unpatentable under 35

U.S.C. § 102(b) as being anticipated by Nesbitt, U.S. Pat. No. 4,431,193.

In the request on pages 66 through 67 the third party requester proposes that claim 6 be

rejected based upon Nesbitt alone with the incorporation by reference of Molitor '637.  The third

party requester points out that Molitor '637 is incorporated by reference into Nesbitt because

Nesbitt refers to Molitor '637.  (See Nesbitt col. 3, ll. 54-60).

**This rejection is <u>adopted</u> in this office action.**

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Nesbitt |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The disclosure embraces a golf ball and method of making same wherein the golf ball has a ... multilayer cover construction which involves a first layer or play of molded hard, high flexural modulus resinous material on the core, and a second or cover layer of soft, low flexural modulus resinous material molded over the first layer to form a finished golf ball." (Nesbitt, abstract).<br>"[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2, ll. 46-47.)<br>**Molitor '637** teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As mentioned above, Nesbitt incorporating by reference Molitor '637 as describing an

number of compositions suitable for the inner cover layer 14.  Of particular interest in this case

are Examples 1-7 within Molitor '637.  Examples 1-7 use a ratio of SURLYN 1605 and

SURLYN 1557.  The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat.

Application/Control Number:                                    Page 139
95/000,123
Art Unit: 3993

No. 4,690,981.  The preferred composition in the '981 Patent has "from about 5[%] to about 15%

by weight of unsaturated carboxylic acid."  '981 Pat., col. 3, ll. 59-60.  Those of ordinary skill in

the art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph.  Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid.  Also, as mentioned above,

Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane

identified as ESTANE 58133.  A review of the scientific literature yields that ESTANE 58133

has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU Product Data

Sheet".  A Shore D hardness of 55 is within the range claimed of Shore D hardness less than 64.

Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the claim

limitation of providing a outer cover layer of polyurethane material having a Shore hardness of

less than 64.  Nesbitt discloses its outer layer was made from SURLYN 1855 (now SURLYN

9020).  This material had inherently flexural modulus of about 14,000 psi and a Shore hardness

of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN".  Moreover, as

admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334.

This rejection of claim 6 based on Nesbitt incorporating Molitor '637 was proposed by

the third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 36: Patent Owner's Argument

Patent Owner does not argue this rejection.


Ground 36: Third Party Requester's Comments

Third Party Requester's arguments for this claim are the same as given *supra* at "Ground

1: Third Party Requester's Comments."


Ground 36: Examiner's Response to the Argument and Comments

Upon review, the Examiner agrees with the arguments of the Third Party Requester and

adopts this suggested rejection.  See "Ground 1:  Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #37**

Application/Control Number:                                  Page 141
95/000,123
Art Unit: 3993

As an alternative to Ground #36, the requester submits on pages 66 and 67 of the request

that claim 6 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Nesbitt |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The disclosure embraces a golf ball and method of making same wherein the golf ball has a ... multilayer cover construction which involves a first layer or play of molded hard, high flexural modulus resinous material on the core, and a second or cover layer of soft, low flexural modulus resinous material molded over the first layer to form a finished golf ball." (Nesbitt, abstract). "[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38). Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47.) **Molitor '637** teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

Application/Control Number:                                    Page 142
95/000,123
Art Unit: 3993

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Also, as mentioned above,

Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane

identified as ESTANE 58133. A review of the scientific literature yields that ESTANE 58133

has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU Product Data

Sheet". A Shore D hardness of 55 is within the range claimed of Shore D hardness less than 64.

Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the claim

limitation of providing a outer cover layer of polyurethane material having a Shore hardness of

less than 64. Nesbitt discloses its outer layer was made from SURLYN 1855 (now SURLYN

9020). This material had inherently flexural modulus of about 14,000 psi and a Shore hardness

of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN". Moreover, as

admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334. Thus, because the

actual chemical composition of the material is not critical to the practice of the invention with

respect to its mechanical performance, i.e. its "click and feel" for a golfer, one of ordinary skill

in the art at the time the invention was made would find it obvious to substitute one material for

another material if both materials had substantially the same mechanical properties.

This rejection of claim 6 based on Nesbitt in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 37: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 2: Patent Owner's Argument," *supra*.

Ground 37: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 2: Third Party Requester's Comments," *supra*.

Ground 37: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 2:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #38**

Application/Control Number:                                    Page 144
95/000,123
Art Unit: 3993

As an alternative to Ground #36, the requester submits on pages 66 and 67 of the request

that claim 6 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193 in view of Wu, U.S. Pat. No. 4,274,637, (Molitor '637).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt

mentioning Molitor et al., U.S. Pat. No. 4,274,637 (Molitor '637) in view of Wu, as evidenced

by Exhibit C.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Nesbitt |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The disclosure embraces a golf ball and method of making same wherein the golf ball has a ... multilayer cover construction which involves a first layer or play of molded hard, high flexural modulus resinous material on the core, and a second or cover layer of soft, low flexural modulus resinous material molded over the first layer to form a finished golf ball." (Nesbitt, abstract).<br>"[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47.)<br>**Molitor '637** teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14. Of particular interest in this case are

Examples 1-7 within Molitor '637. Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557. The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981. The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid." '981 Pat., col. 3, ll. 59-60. Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66. Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi." See '873

Patent, col. 2, ll. 43-50. Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph. Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid. Also, as mentioned above,

Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane

identified as ESTANE 58133. A review of the scientific literature yields that ESTANE 58133

has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU Product Data

Sheet". A Shore D hardness of 55 is within the range claimed of Shore D hardness less than 64.

Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the claim

limitation of providing a outer cover layer of polyurethane material having a Shore hardness of

less than 64. Nesbitt discloses its outer layer was made from SURLYN 1855 (now SURLYN

9020). This material had inherently flexural modulus of about 14,000 psi and a Shore hardness

of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN". Moreover, as

admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334. Thus, because the

Application/Control Number:                                    Page 146
95/000,123
Art Unit: 3993

actual chemical composition of the material is not critical to the practice of the invention with

respect to its mechanical performance, i.e. its "click and feel" for a golfer, one of ordinary skill

in the art at the time the invention was made would find it obvious to substitute one material for

another material if both materials had substantially the same mechanical properties.

Wu teaches that polyurethane was being used as the outer layer of golf ball *circa* 1993.

Wu further teaches in col. 1:36-46 that SURLYN covered golf balls lack the "click" and "feel"

of balata which golfers have become accustomed to such sensations and polyurethane covered

golf balls can be made to have a similar "click" and "feel" of balata. Wu also at least teaches

that polyurethanes made according to its invention will have Shore D hardness directly

proportional to the degree of cure of the cover; and this Shore D hardness ranges from 10 to 30,

preferably 12 to 20 on the Shore D scale, see col. 6:26-38. This teaching of Shore D hardness is

directed to an intermediate curing step product prior to the final molding process to finish the

golf ball. Exhibit C demonstrates the actual finished golf ball product having the cover layer that

Wu teaches within its disclosure. Exhibit C teaches that the golf ball taught therein is covered by

the following patents: 4,783,078; 4,846,910; 4,858,923; 4,904,320; 4,915,390; 5,007,594;

5,080,367; 5,133,509; **5,334,673**; and D339,074. The '673 Patent teaches the cover sock of the

Exhibit C finished golf ball. Exhibit C teaches that the golf ball taught therein has a cover

material made from an "elastomer", having a thickness of .050", and 58 Shore D hardness. All

three properties are within the range of mechanical properties of the claim invention

(polyurethane is an elastomer, cover layer thickness ranges from 0.010 to 0.070 inches and the

Shore D hardness is less that 64). Because it has been admitted by the inventor of the Sullivan

'893 patent that the particular chemical properties of the materials (the chemical composition)

used in the construction of a golf ball lack criticality as compared to the mechanical properties

(the Shore D hardness, flexural modulus, layer thickness) of those compounds used for

constructing the different layers (Exhibit G at 334), one of ordinary skill in the art at the time the

invention was made would find it obvious to incorporate the teachings of Wu which inherently

include the teachings of Shore hardness for the fully cured cover layer as taught in Exhibit C as

obvious equivalent materials in order to achieve the same end result of providing a cover layer

that has the same "click" and "feel" of a balata cover which the extra durability of an elastomeric

material.

    This rejection of claim 6 based on Nesbitt mentioning Molitor '637 in view of Wu as

evidenced by Exhibit C was proposed by the third party requester in the request for

reexamination and is being adopted essentially as proposed in the request.


Ground 38: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as those at

"Ground 3: Patent Owner's Argument and Ground 31: Patent Owner's Argument," *supra*.


Ground 38: Third Party Requester's Comments

    Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 3: Third Party Requester's Comments and Ground

31: Third Party Requester's Comments," *supra*.


Ground 38: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 3:  Examiner's Response to the Argument and

Comments and Ground 31:  Examiner's Response to the Argument and Comments,"

*supra.*

**Proposed third party requester rejection:  Ground #39**

As an alternative to Ground #36, the requester submits on pages 66 and 67 of the request

that claim 6 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Nesbitt, U.S. Pat.

No. 4,431,193, in view of Molitor et al., U.S. Pat. No. 4,674,751, (Molitor '751).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Nesbitt

mentioning Molitor et al., U.S. Pat. No. 4,274,637 (Molitor '637) in view of Molitor '751.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Nesbitt |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The disclosure embraces a golf ball and method of making same wherein the golf ball has a ... multilayer cover construction which involves a first layer or play of molded hard, high flexural modulus resinous material on the core, and a second or cover layer of soft, low flexural modulus resinous material molded over the first layer to form a finished golf ball." (Nesbitt, abstract).<br>"[I]nner cover 14 of molded hard, high flexural modulus resinous material such as type 1605 SURLYN marketed by E.I. DuPont de Nemours." (Nesbitt, col. 2, ll. 36-38).<br>Sullivan '873 Patent: "Type 1605 SURLYN (now designated SURLYN 8940) ('873 patent, col. 2. ll. 46-47.)<br>**Molitor '637** teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane identified as ESTANE 58133. |

Application/Control Number:                                           Page 149
95/000,123
Art Unit: 3993

As mentioned above, Nesbitt references Molitor '637 as describing an number of

compositions suitable for the inner cover layer 14.  Of particular interest in this case are

Examples 1-7 within Molitor '637.  Examples 1-7 use a ratio of SURLYN 1605 and SURLYN

1557.  The use of SURLYN grades for golf ball covers is also disclosed in U.S. Pat. No.

4,690,981.  The preferred composition in the '981 Patent has "from about 5[%] to about 15% by

weight of unsaturated carboxylic acid."  '981 Pat., col. 3, ll. 59-60.  Those of ordinary skill in the

art understand that SURLYN 1605 has been "redesignated" as SURLYN 8940 and SURLYN

1557 has been "redesignated" as SURLYN 9650, see e.g. U.S. Pat. No. 4,679,795, col. 6, ll. 10-

15 and U.S. Pat. No. 5,150,906, col. 4, ll. 66.  Furthermore, the Patent Owner in the Sullivan

'873 Patent admitted that SURLYN 1605 is now designated as 8940 and was used in Nesbitt's

first (inner) layer and is a sodium ion based low acid "(less than or equal to 15 weight percent

methacrylic acid) ionomer resin having a flexural modulus of about 51,000 psi."  See '873

Patent, col. 2, ll. 43-50.  Moreover, as shown in the "Properties Grid for Selected Industrial

Grades of SURLYN" SURLYN 9650's ordinate compared to the other grades of SURLYN is

toward the "Low % Acid" side of the graph.  Thus, based on this evidence, Nesbitt referencing

Molitor '637 inherently teaches using as an inner layer at least one ionomer resin having no more

than 16% by weight of alpha, beta-unsaturated carboxylic acid.  Also, as mentioned above,

Molitor '637 teaches in TABLE 10 an outer layer made from a thermoplastic polyurethane

identified as ESTANE 58133.  A review of the scientific literature yields that ESTANE 58133

has an inherent Shore D hardness of 55, see Exhibit J "ESTANE 58133 TPU Product Data

Sheet".  A Shore D hardness of 55 is within the range claimed of Shore D hardness less than 64.

Therefore, Molitor '637's teaching of using ESTANE 58133 inherently meets the claim

Application/Control Number:                                     Page 150
95/000,123
Art Unit: 3993

limitation of providing a outer cover layer of polyurethane material having a Shore hardness of

less than 64. Nesbitt discloses its outer layer was made from SURLYN 1855 (now SURLYN

9020). This material had inherently flexural modulus of about 14,000 psi and a Shore hardness

of 55, see Exhibit I "Typical Properties for Selected Grades of SURLYN". Moreover, as

admitted by the inventor Sullivan of the '873 patent, golf ball designers knew that the

mechanical properties of the materials used as a golf-ball cover layer were more critical to golf

ball performance than the actual materials themselves, see Exhibit G at 334. Thus, because the

actual chemical composition of the material is not critical to the practice of the invention with

respect to its mechanical performance, i.e. its "click and feel" for a golfer, one of ordinary skill

in the art at the time the invention was made would find it obvious to substitute one material for

another material if both materials had substantially the same mechanical properties.

> In an analogous golf ball, Molitor '751 teaches that:
>
> > It has now been discovered that a key to manufacturing a two-piece ball having playability
> > properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> > **a cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> > The novel **cover of the golf ball** of the invention is made of a composition comprising a blend of
> > (1) **a thermoplastic urethane having a shore A hardness less than 95** and (2) **an ionomer
> > having a shore D hardness greater than 55**.

(Molitor '751, col. 2, ll.33-49 (emphasis added)).

Moreover, in explaining what constitutes a two-piece golf ball, Molitor '751 teaches that:

> > The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core
> > and a cover, **but also includes balls having a separate solid layer beneath the cover as
> > disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt**, and other balls have non-wound
> > cores.

(Molitor '751, col. 3, ll. 7-12 (emphasis added)).

> As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76. As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73. Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material. How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate. Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C. This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

As stated in the request on page 21

It would have been obvious to one of ordinary skill in the art at the time of the
invention to substitute the soft outer cover layer of Nesbitt and replace it with an
outer cover layer made of the soft polyurethane material taught by Molitor '751 to
provide a golf ball that includes "playability properties as good or better than
balata-covered wound balls but are significantly more durable," and "have better
wood playability properties than conventional two-piece balls, and permit

Application/Control Number:                                      Page 152
95/000,123
Art Unit: 3993

experienced golfers to apply spin so as to fade or draw a shot" while having
improved puttability. (Molitor '751, col. 2, ll. 61-68)

This rejection of claim 6 based on Nesbitt mentioning Molitor '637 in view of Molitor

'751 was proposed by the third party requester in the request for reexamination and is being

adopted essentially as proposed in the request.

Ground 39: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as those at

"Ground 4: Patent Owner's Argument," *supra*.

Ground 39: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 4: Third Party Requester's Comments," *supra*.

Ground 39: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained. See "Ground 4: Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #40**

Application/Control Number:                                      Page 153
95/000,123
Art Unit: 3993

The requester submits on page 67 that claim 6 is unpatentable under 35 U.S.C. § 103(a)

as being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S.

Pat. No. 4,274,637 (Molitor '637).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '637.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Proudfit |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The inner layer is formed from hard resin material such as ionomer resin, and the outer layer is formed from a soft material such as balata or a blend of balata and other elastomers." (Proudfit, col. 1, ll. 11-16.)<br><br>"The composition of the inner cover layer is described in Table 6."<br>**TABLE 6**<br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>Ionomer Type — Blend Ratio<br>Sodium- Surlyn 8940 — 75%<br>Zinc- Surlyn 9910 — 25%<br><br>(Proudfit, col. 8, ll. 22-30)<br><br>"...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core,

inner layer and outer layer) with the layers within the range of claimed thicknesses each layer

made from a material having the mechanical properties substantially similar to the claimed

mechanical properties.  What Proudfit lacks in clearly disclosing are the particular mechanical

and chemical properties of the claimed invention.  However, Proudfit either incorporates by

reference these mechanical and chemical properties and/or the materials used within the Proudfit

golf ball inherently have these mechanical and chemical properties.  For instance, Proudfit

Application/Control Number:                                      Page 154
95/000,123
Art Unit: 3993

incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention. (Proudfit,

col. 1, ll.39-43). The '981 patent discloses the preferably amount of unsaturated carboxylic acid

is "from about 5[%] to about 15% by weight." ('981 Pat, col. 3, ll. 59-60). If Proudfit discloses

using blends SURLYN the chemical for making the inner cover and the '981 Patent is the

formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such

as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more

than 16% by weight of an alpha, beta-unsaturated carboxylic acid. As taught from Exhibit I,

SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, <u>see</u>

Exhibit I. Therefore, this cover blend inherently has a hardness of 60 or more. Proudfit

discloses the outer layer being a blend of balata. An example of the blend is disclosed in Table 7

reproduced below.

**TABLE 7**

| Composition of Outer Layer (Parts by Weight) | |
|---|---|
| Trans PolyIsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 250 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one

of the first types of synthetic rubber or elastomer. As described in the Rule 132 Declaration of

Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the

golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52. Thus, Proudfit's

outer layer cover inherently has a Shore hardness of less than 64.

Application/Control Number:                                    Page 155
95/000,123
Art Unit: 3993

This rejection of claim 6 based on Proudfit in view of Molitor '637 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.


Ground 40: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as those at

"Ground 5: Patent Owner's Argument," *supra*.


Ground 40: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 5: Third Party Requester's Comments," *supra*.


Ground 40: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 5: Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #41**

The requester submits on page 67 that claim 6 is unpatentable under 35 U.S.C. § 103(a)

as being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Wu, U.S. Pat. No.

5,334,673 (Wu).

Application/Control Number:                                  Page 156
95/000,123
Art Unit: 3993

    Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Wu, as evidenced by Exhibit C.

    The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Proudfit |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The inner layer is formed from hard resin material such as ionomer resin, and the outer layer is formed from a soft material such as balata or a blend of balata and other elastomers." (Proudfit, col. 1, ll. 11-16.)<br><br>"The composition of the inner cover layer is described in Table 6."<br>**TABLE 6**<br><br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>Ionomer Type    Blend Ratio<br>Sodium- Surlyn 8940    75%<br>Zinc- Surlyn 9910    25%<br><br>(Proudfit, col. 8, ll. 22-30)<br><br>"...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

    As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core, inner layer

and outer layer) with the layers within the range of claimed thicknesses each layer made from a

material having the mechanical properties substantially similar to the claimed mechanical

properties.  What Proudfit lacks in clearly disclosing are the particular mechanical and chemical

properties of the claimed invention.  Proudfit teaches a golf ball have a two-piece cover

including a hard, ionomeric inner cover layer and a soft balata blend outer cover layer.  Proudfit

lacks in disclosing the use of polyurethane as the material for the outer cover layer.  Instead, as

shown in Table 7, reproduced below, Proudfit discloses the outer cover layer being made of a

blend of balata.

Application/Control Number:                                        Page 157
95/000,123
Art Unit: 3993

**TABLE 7**

| Composition of Outer Layer (Parts by Weight) | |
|---|---|
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls. As

admitted by the patent owner

> [d]espite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-
> hit. Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). The next step in golf ball cover technology to overcome the

problems with balata was the use of SURLYN as an outer cover. However, as described in the

request on page 26 Wu teaches the problem with SURLYN as a outer cover on a golf ball.

> **The problem with SURLYN covered golf balls ... is that they lack the "click" and "feel"**
> **which golfers had become accustomed to with balata.** "Click" is the sound when the ball is hit
> by a golf club and "feel" is the overall sensation imparted to the golfer when the ball is hit.
>
> It has been proposed to employ polyurethane as a cover stock for golf balls because, like
> SURLYN, it has a relatively low price compared to balata and provides superior cut resistance
> over balata. **However, unlike SURLYN covered golf balls, polyurethane-covered golf balls**
> **can be made to have the "click" and "feel" of balata.**

(Wu col. 1, ll. 36-46 (emphasis added)).

    As explained in the request on page 26, line 22 through page 27, line 27 those skilled in

the art at the time the claimed invention was made were more critical of the mechanical

properties of the materials that constructed the layers which impacted the performance of the golf

ball more than the materials themselves. See Exhibit G. As identified above Proudfit lacks

disclosing polyurethane as the outer cover layer. In analogous golf ball device, Wu's

polyurethane material inherently has a flexural modulus of 23,000 psi as averred within the Rule

132 Declaration of Jeffrey L. Dalton at para. 7. Proudfit's outer cover layer material is disclosed

as having a flexural modulus of between about 20,000 psi and 25,000 psi. (Proudfit, col. 6, ll.

28-31) Thus, Wu's cover material's flexural modulus falls within the range of Proudfit's cover

material. Moreover, Wu's polyurethane material inherently has a Shore D hardness of about 58.

See Decl. of Dalton at para. 6. Thus, as evidenced by this declaration, Wu's polyurethane

material falls within the claimed range of the outer layer material have a Shore D hardness of

less than 64.

Thus, as pointed out in the request on page 27, lines 3-18, one of ordinary skill in the art

at the time the invention was made would find it obvious to substitute Wu's polyurethane golf

ball cover material for Proudfit's balata-blend cover material for the advantages described in this

part of the request which are incorporated herein.

This rejection of claim 6 based on Proudfit in view of Wu as evidenced by Exhibit C was

proposed by the third party requester in the request for reexamination and is being adopted

essentially as proposed in the request.


Ground 41: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as

those at "Ground 6: Patent Owner's Argument," *supra*.


Ground 41: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter

arguments are the same as those at "Ground 6: Third Party Requester's Comments," *supra*.

Application/Control Number:                                           Page 159
95/000,123
Art Unit: 3993

Ground 41: Examiner's Response to the Argument and Comments

　　　　Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

'637 is maintained.   See "Ground 6:  Examiner's Response to the Argument and

Comments," *supra*.

**Proposed third party requester rejection:  Ground #42**

　　　　The requester submits on page 67 that claim 6 is unpatentable under 35 U.S.C. § 103(a)

as being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S.

Pat. No. 4,674,751 (Molitor '751).

　　　　Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '751.

　　　　The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Proudfit |
|---------|----------|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The inner layer is formed from hard resin material such as ionomer resin, and the outer layer is formed from a soft material such as balata or a blend of balata and other elastomers." (Proudfit, col. 1, ll. 11-16.) <br> **TABLE 6** <br><br> Composition of Inner Layer of Cover (Parts by Weight) <br><br> Ionomer Type — Blend Ratio <br> Sodium- Surlyn 8940 — 75% <br> Zinc- Surlyn 9910 — 25% <br><br> "The composition of the inner cover layer is described in Table 6." <br><br> (Proudfit, col. 8, ll. 22-30) <br><br> "...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core,

inner layer and outer layer) with the layers within the range of claimed thicknesses each layer

made from a material having the mechanical properties substantially similar to the claimed

mechanical properties.  What Proudfit lacks in clearly disclosing are the particular mechanical

and chemical properties of the claimed invention.  However, Proudfit either incorporates by

reference these mechanical and chemical properties and/or the materials used within the Proudfit

golf ball inherently have these mechanical and chemical properties.  For instance, Proudfit

incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention.  (Proudfit,

col. 1, ll.39-43).  The '981 patent discloses the preferably amount of unsaturated carboxylic acid

is "from about 5[%] to about 15% by weight."  ('981 Pat, col. 3, ll. 59-60).  If Proudfit discloses

using blends SURLYN the chemical for making the inner cover and the '981 Patent is the

formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such

as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more

than 16% by weight of an alpha, beta-unsaturated carboxylic acid.  As taught from Exhibit I,

SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, see

Exhibit I.  Therefore, this cover blend inherently has a hardness of 60 or more.  Proudfit

discloses the outer layer being a blend of balata.  An example of the blend is disclosed in Table 7

reproduced below.

Application/Control Number:                                    Page 161
95/000,123
Art Unit: 3993

| TABLE 7 | |
| --- | --- |
| Composition of Outer Layer (Parts by Weight) | |
| Trans PolyIsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one

of the first types of synthetic rubber or elastomer.  As described in the Rule 132 Declaration of

Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the

golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52.  Thus, Proudfit's

outer layer cover inherently has a Shore hardness of less than 64.

Also, as expressed in the request on page 26 and identified above within the claim chart,

Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer

and a soft balata blend outer cover layer.  Proudfit lacks in disclosing the use of polyurethane as

the material for the outer cover layer.  Instead, as shown in Table 7, reproduced below, Proudfit

discloses the outer cover layer being made of a blend of balata.

| TABLE 7 | |
| --- | --- |
| Composition of Outer Layer (Parts by Weight) | |
| Trans PolyIsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls.  As

admitted by the patent owner

Application/Control Number:                                    Page 162
95/000,123
Art Unit: 3993

> Despite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-hit.
> Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42).  With this disadvantage of balata covered golf balls, golf ball

designers looked for materials that would provide the same "click" and "feel" golfers expected

and have increased durability.

As pointed out in the request on page 28, lines 4-15, in an analogous golf ball, Molitor

'751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> **a cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> The novel cover of the golf ball of the invention is made of a composition comprising a blend of
> (1) a **thermoplastic urethane having a shore A hardness** less than 95 and (2) an ionomer having
> a shore D hardness greater than 55. The ionomer comprises olefinic groups having two to four
> carbon atoms copolymerized with acrylic or methacrylic acid groups and cross-linked with metal
> ions, preferably sodium or zinc ions. **The primary components of the blended cover are set at a
> weight ratio so as to result in a cover material after molding having a shore C hardness
> within the range of 70 to 85, preferably 72 to 76.** Preferably, the urethane component of the
> cover material has a tensile strength greater than 2500 psi and an elongation at break greater than
> 250%. A preferred cover material comprises about 8 parts of the thermoplastic urethane and
> between 1 and 4 parts ionomer. Preferably, the cover is no greater than 0.060 inch thick. Thinner
> covers appear to maximize the short iron playability characteristics of the balls.

(Molitor '751, col. 33-57 (emphasis added)).  Thus, Molitor '751 teaches having a outer cover

layer with a Shore C hardness less than 85 and preferably between 72 and 76.  Moreover,

Molitor '751 teaches what golf balls are included in the definition of "two-piece" ball within its

instant specification.

> The phrase "two-piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as
> disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-
> wound cores.**

Molitor '751, col. 3, ll. 7-12 (emphasis added)).  Proudfit, likewise, teaches the two-piece golf

balls can fit within this definition.

> FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer layer 14 of polymeric material.

(Proudfit, col. 7, ll. 21-24).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of less than 85, preferably 70-80, most preferably 72-76. As described in Molitor '751's TABLE bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover is taught to have a Shore C hardness of 73. Patent Owner has admitted that a Shore C hardness of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L). Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore C value to a Shore D value for the polyurethane material. How one of ordinary skill in the art "translates" a Shore C value to a Shore D value is by taking the known Shore hardness values with a given range, in this instance Shore C, for given materials, in this instance a polyurethane golf ball covers materials, and taking corresponding measurements with a different set of Shore gauges, in this instance Shore D (but could also be Shore A). A resulting trendline plot occurs from performing this procedure wherein the range of known Shore C values are the abscissa and the range of measured Shore D values are the ordinate. Then, said plot can be use to read equivalent Shore D value for any given Shore C value within the known range of Shore C. This is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness value for any given Shore C hardness value.

Application/Control Number:                                   Page 164
95/000,123
Art Unit: 3993

As stated in the request on page 29

Therefore, it would have been obvious to one of ordinary skill in the art at the
time of the invention to substitute the soft outer cover layer of Nesbitt and replace
it with an outer cover layer made of the soft polyurethane material taught by
Molitor '751 to provide a golf ball that includes "playability properties as good or
better than balata-covered wound balls but are significantly more durable," and
"have better wood playability properties than conventional two-piece balls, and
permit experienced golfers to apply spin so as to fade or draw a shot" while
having improved puttability.  (Molitor '751, col. 2, ll. 61-68)

This rejection of claim 6 based on Proudfit in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 42: Patent Owner's Argument

Patent Owner does not specifically argue this rejection.  The arguments are the same as

those at "Ground 7: Patent Owner's Argument," *supra*.

Ground 42: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection.  The counter

arguments are the same as those at "Ground 7: Third Party Requester's Comments," *supra*.

Ground 42: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the

rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

Application/Control Number:                                    Page 165
95/000,123
Art Unit: 3993

'637 is maintained.   See "Ground 7:  Examiner's Response to the Argument and

Comments," *supra*.


## Unexpected Results and Commercial Success

Patent Owner's Argument

Besides arguing the outstanding rejections of individual claims as explained *supra*, the

Patent Owner argues generally for non-obviousness of the invention based on unexpected results

and commercial success (*see* Patent Owner's Response at pages 6-9).  The crux of the argument

is that, although the instant invention is made of individual elements known in the art, the unique

combination of elements of the claimed invention results in a golf ball with excellent

""distance"" and ""feel"" (Patent Owner's Response at page 7).  Consequently, golf balls within

the ambit of the claimed invention (*i.e.*, the Rule 35 ball of the Patent Owner and the Pro V1 of

the Third Party Requester) have great commercial success.  Hence, the "[u]nexpected and

overwhelming success of Mr. Sullivan's golf ball technology thus demonstrates that his

invention was not simply the predictable result of combining known materials, but in fact

represented the best solution even conceived for the distance-versus-control problem" (Patent

Owner's Response at page 9).


Third Party Requester's Comments

The Third Party Requester comments that:  (1) the Sullivan '103 patent does not disclose

or suggest the Pro V1 because the Pro V1 has a construction different in several aspects (*e.g.*,

core size) from the ball disclosed in the Sullivan '130 patent (Third Party Requester's Comments

at middle of page 35 to bottom of page 37); (2) there is no nexus between the commercial

success of the Third Party Requester's Pro V1 and the Sullivan '130 patent because the Pro V1's

success rests upon specific types of advertising (Third Party Requester's Comments at bottom of

page 37 to middle of page 40) along with different technology (Third Party Requester's

Comments at middle of page 40 to bottom of page 42); (3) many golf balls purport to have

solved the distance and "feel" problem (Third Party Requester's Comments at bottom of page 43

top of page 45); and, (4) even though there were other three-piece, polyurethane balls available,

there was little demand for the ball on the PGA tour until shortly before the introduction of the

Pro V1 (Third Party Requester's Comments at page 45 to page 46).


Examiner's Response to the Argument and Comments

     Examiner generally agrees with the comments of the Third Party Requester and finds the

arguments of the Patent Owner of unexpected results and commercial success to be

unpersuasive.

     As a preliminary matter, the argument(s) presented for secondary considerations

presented by the Patent Owner are not relevant to the rejections made under 35 USC 102 (*see*

MPEP 2131.04). Thus only the rejections under 35 USC 103 are considered.

     To show unexpected results (*i.e.*, unique and excellent combination of distance and

"feel") the Patent Owner uses testimonial-type evidence of statements, or endorsements, by well

known golfers such as Arnold Palmer (Patent Owner's Response at bottom on page 8).

Examiner considers this to be opinion evidence because the statements are not accompanied by

objective data. Due to this lack of objective data, the probative value of the presented opinion

Application/Control Number:                                    Page 167
95/000,123
Art Unit: 3993

evidence is not sufficient to overcome the *prima facie* rejections, *supra*, maintained in this office

action.

The evidence of commercial success proffered by the Patent Owner is similarly

testimonial in nature (*e.g.*, "Pro V1 is the "most successful golf ball in the history of the golf

industry . . ."" citing an article in the Golf Gazette). Again no objective data is presented as

support. With no objective data, the probative value of the presented evidence is again not

sufficient to overcome the *prima facie* rejections, *supra*, maintained in this office action.

As to the comments of the Third Party Requester concerning, *inter alia*, the scope of the

claims of the Sullivan '130 patent and its nexus with the Pro V1, the Examiner did not evaluate

these comments since the secondary considerations presented by the Patent Owner were not

found sufficient for the reasons given immediately above.

### Shore D hardness value measured on the ball

Patent Owner's Argument

Besides arguing the outstanding rejections of individual claims as explained *supra* and

commercial success *id.*, the Patent Owner argues that the claims in the instant patent require the

Shore D hardness value's of the cover layers to be measured "on the ball" (Patent Owner's

Response at pages 10-12). Since the two base references (Nesbitt and Proudfit) do not disclose

measuring hardness "on the ball" for their covers, the outstanding rejections are flawed (Patent

Owner's Response at pages 12-13).

Application/Control Number:                                    Page 168
95/000,123
Art Unit: 3993

Third Party Requester's Comments

The Third Party Requester comments that:  (1) in a reexamination claims are given their

broadest reasonable interpretation consistent with the specification, and, here, "on the ball" is too

narrow a construction (Third Party Requester's Comments at page 7);  (2) the specification of the

instant patent clearly states at col. 16, lines 15-16, that "Shore hardness was measured in

accordance with ASTM test 2240" which calls for "off the ball" testing (Third Party Requester's

Comments at page 8);  (3) the Patent Owner knew how to claim "on the ball" because in a sister

patent the language of "as measured on the curved surface thereof" is explicitly used (Third

Party Requester's Comments at bottom of page 9 to middle of page 10);  and,  (4) even if

measured "on the ball" the prior art is still good because measuring Shore D hardness "on the

ball" does not affect the disclosed values enough to make the instant patent's claims patentable

over the prior art (Third Party Requester's Comments at bottom of page 10 to page 13).


Examiner's Response to the Argument and Comments

Examiner generally agrees with the comments of the Third Party Requester and finds the

arguments of the Patent Owner concerning measuring of hardness "on the ball" to be

unpersuasive.

The rule is that "[d]uring reexamination claims are given the broadest reasonable

interpretation consistent with the specification" (MPEP 2658(I) and 2258(I)(G)).  Here, the

claims are silent as to whether the Shore D hardness value is measure "on the ball" or not.  In the

specification, hardness measurements are disclosed at col. 7, lines 12-14, and col. 16, lines 1-16,

and are to be conducted "in accordance with ASTM method D-2240."  ASTM D-2240's method

Application/Control Number:                                            Page 169
95/000,123
Art Unit: 3993

of testing uses a specimen of material, and are not measured "on the ball" (Exhibit C).  To be

consistent with the specification, then, the claims in the instant patent do not require a Shore

hardness value measured "on the ball."

Application/Control Number:                                    Page 170
95/000,123
Art Unit: 3993

### *Correspondence*

**All** correspondence relating to this *inter partes* reexamination proceeding should be directed as follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Inter Partes* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
              Central Reexamination Unit

By hand to:    Customer Service Window
              ATTN:  Central Reexamination Unit
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Jeffrey L. Gellner
CRU Examiner
GAU 3993

conferees:

# EXHIBIT 3



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz Alerts | News | Help

| Portal Home | | Patents | | Trademarks | | Other |

**Patent eBusiness**   – ☐

☐ Electronic Filing
☐ Patent Application Information (PAIR)
☐ Patent Ownership
☐ Fees
☐ Supplemental Resources & Support

**Patent Information**

Patent Guidance and General Info
☐ Codes, Rules & Manuals
☐ Employee & Office Directories
☐ Resources & Public Notices

**Patent Searches**

Patent Official Gazette
☐ Search Patents & Applications
☐ Search Biological Sequences
☐ Copies, Products & Services

**Other**

Copyrights
Trademarks
Policy & Law
Reports

---

**Patent Application Information Retrieval**                             ☐

ℹ️ Order Certified Application As Filed   Order Certified File Wrapper   📄 View Order List

| 09/873,594 | Golf ball having multi-layer cover with unique inner cover characteristics |

| Select New Case | Application Data | Transaction History | Continuity Data | Published Documents | Address & Attorney/Agent |

## Bibliographic Data

| | | | |
|---|---|---|---|
| Application Number: | 09/873,594 | Customer Number: | - |
| Filing or 371 (c) Date: | 06-04-2001 | Status: | Abandoned -- Failure to Respond to an Office Action |
| Application Type: | Utility | Status Date: | 04-19-2004 |
| Examiner Name: | TRIMIEW, RAEANN | Location: ℹ️ | RECORD ROOM 308-2733 |
| Group Art Unit: | 3711 | Location Date: | 01-18-2008 |
| Confirmation Number: | 5315 | Earliest Publication No: | US 2001-0039219 A1 |
| Attorney Docket Number: | P-3724-F1-C1-C2 | Earliest Publication Date: | 11-08-2001 |
| Class / Subclass: | 473/374 | Patent Number: | - |
| First Named Inventor: | Michael Sullivan , Barrington, RI | Issue Date of Patent: | - |

| Title of Invention: | Golf ball having multi-layer cover with unique inner cover characteristics |

---

*If you need help:*

- *Call the Patent Electronic Business Center at (866) 217-9197 (toll free) or e-mail EBC@uspto.gov for specific questions about Patent Application Information Retrieval (PAIR).*
- *Send general questions about USPTO programs to the USPTO Contact Center (UCC) .*
- *If you experience technical difficulties or problems with this application, please report them via e-mail to Electronic Business Support or call 1 800-786-9199.*

You can suggest USPTO webpages or material you would like featured on this section by E-mail to the webmaster@uspto.gov. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.

---

Home | Site Index | Search | eBusiness | Help | Privacy Policy

United States Patent & Trademark Office                                      Page 1 of 1

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz Alerts | News | Help

| Portal Home | | Patents | | Trademarks | | Other |

---

**Patent eBusiness**    – ☐

- ⊞ Electronic Filing
- ⊞ Patent Application Information (PAIR)
- ⊞ Patent Ownership
- ⊞ Fees
- ⊞ Supplemental Resources & Support

**Patent Information**

Patent Guidance and General Info
- ⊞ Codes, Rules & Manuals
- ⊞ Employee & Office Directories
- ⊞ Resources & Public Notices

**Patent Searches**

Patent Official Gazette
- ⊞ Search Patents & Applications
- ⊞ Search Biological Sequences
- ⊞ Copies, Products & Services

**Other**

Copyrights
Trademarks
Policy & Law
Reports

---

**Patent Application Information Retrieval**    ☐

ⓘ Order Certified Application As Filed   Order Certified File Wrapper   🛒 View Order List

| 09/873,594 | Golf ball having multi-layer cover with unique inner cover characteristics | 📄 |

| Select New Case | Application Data | Transaction History | Continuity Data | Published Documents | Address & Attorney/Agent |

## Parent Continuity Data

| Description | Parent Number | Parent Filing or 371(c) Date | Parent Status | Patent Number |
|---|---|---|---|---|
| This application is a Continuation of | 09/776,278 | 02-02-2001 | Patented | 6,595,873 |
| is a continuation of | 09/470,196 | 12-21-1999 | Patented | 6,210,293 |
| is a continuation of | 08/870,585 | 06-06-1997 | Abandoned | - |
| is a continuation of | 08/556,237 | 11-09-1995 | Abandoned | - |
| is a Continuation-in-part of | 08/070,510 | 06-01-1993 | Abandoned | - |

## Child Continuity Data

**No Child Continuity Data Found**

*If you need help:*

- *Call the Patent Electronic Business Center at (866) 217-9197 (toll free) or e-mail EBC@uspto.gov for specific questions about Patent Application Information Retrieval (PAIR).*
- *Send general questions about USPTO programs to the USPTO Contact Center (UCC).*
- *If you experience technical difficulties or problems with this application, please report them via e-mail to Electronic Business Support or call 1 800-786-9199.*

You can suggest USPTO webpages or material you would like featured on this section by E-mail to the webmaster@uspto.gov. While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.

---

Home | Site Index | Search | eBusiness | Help | Privacy Policy

# EXHIBIT 4

1

# Mike Yagley – Golf Ball R&D at Callaway Golf



> Vice President of Product Management at Callaway Golf
> Came to Callaway Golf in 1997 to work on golf ball development
> Led golf ball research and development team at Callaway Golf

2

# Callaway Golf







> Founded by Ely Callaway in 1982
> Headquartered in Carlsbad, California
> 2600+ employees
> Launched Big Bertha driver in 1991
> Premier manufacturer of golf clubs in the world

3

# Callaway Golf





> Decided in 1996 to make golf balls

> Started R&D from scratch

> Introduced the Rule 35 golf ball in January 2000

- Solid core, ionomer inner cover, polyurethane outer cover
- Received critical acclaim

> Bought Spalding's golf business, Top-Flite, including all patents, in 2003

4

# Callaway Golf Ball Introductions

**Jan. 2000**



Rule 35 Red



Rule 35 Blue

**Oct. 2001**



CTU 30 Red



CTU 30 Blue

**Mar. 2002**



HX Red



HX Blue

**2004-2005**



HX Tour



HX Tour 56

5



# Tom Kennedy – Golf Ball Development at Spalding



> Senior Vice President, Intellectual Property Development at Callaway Golf
> 20+ years in golf ball development at Spalding and Callaway
> Worked with Mike Sullivan at Spalding
> Working at Callaway Golf since 2003

7

# Spalding Owned the Sullivan Patents

   

> One of earliest and best known sporting goods companies
> Manufactured golf balls sold under Top-Flite brand
> Technology leader in golf balls since the 1960s
> Built on work of Sullivan, Nesbitt, Molitor and others
> Competed with Acushnet for years

8



# Spalding Company Timeline



**1876**

> A.G. Spalding & Bros. was founded by Hall of Fame pitcher Albert Goodwill Spalding

**SPALDING**

> Introduced first major-league baseball



**1887**

Introduced first American-made football

**1888**

Introduced first American-made tennis ball

**1894**

Introduced first American-made golf club

**1895**

First U.S. manufacturer of golf balls

**1903**

First to use Balata in a golf ball cover

**1909**

First U.S. manufacturer of dimpled golf balls

**1968**

**Executive**
First 2-piece golf ball



**1971**

**Top-Flite XL**
First 2-piece, Surlyn-covered golf ball



**1996**

**Strata**



| 0s | 1850s | 1860s | 1870s | 1880s | 1890s | 1900s | 1910s | 1920s | 1930s | 1940s | 1950s | 1960s | 1970s | 1980s | 1990s | 2000s |

9

# Prior Art: Wound Golf Balls



— Small solid or liquid-filled center

— Surrounded by rubber windings

— Capped with a soft cover

> Advantage: Soft cover provides superior spin and "feel"
> Disadvantage: Less distance; easily cut
> Was popular with professionals, not with amateurs
> Examples: Titleist Professional, Titleist Tour Prestige

10



# Prior Art: Two-Piece Solid-Core Golf Balls



Solid rubber core

Surrounded by cover layer

> Advantage: Superior distance
> Disadvantage: Less spin, control, click and "feel"
> Popular with amateurs, not with professionals
> Examples: Spalding Executive, Spalding Top-Flite

12



# Two-Piece Ball

> Long, straight drives

> Poor feel and control around the green

# Prior Art: Three-Piece Surlyn-Covered Golf Ball



Solid rubber core

Inner cover layer of hard Surlyn

Outer cover layer of soft Surlyn

> Advantage: Better "feel" than two-piece balls
> Disadvantage: Less distance than two-piece balls
> Used by amateurs, few professionals
> Example: Spalding Strata

14

# Patented Invention



Core

Thin ionomer inner cover layer

Thin polyurethane outer cover layer

The present invention is directed to an improved multi-layer golf ball comprising a core, an inner cover layer and an outer cover layer. The inner cover layer is comprised of a low acid ionomer blend which may or may not include a filler such as zinc-stearate. The outer cover layer is comprised of a soft, non-ionomeric thermoplastic or thermosetting elastomer such as polyurethane, polyester or polyesteramide. The resulting multi-layered golf ball of the present invention provides for enhanced distance without sacrificing playability or durability when compared to known multi-layer golf balls.

U.S. Patent No. 6,210,293
Abstract [PX-3]

15



# Claimed Invention in More Detail



## Core

## Inner cover layer

- Blend of low acid ionomers ("blend claims") or including a low acid ionomer ("non-blend claims")

- Shore D hardness of 60 or more measured on the ball

- Thickness between 0.010 and 0.100 inches (3 claims)

- Modulus between 15,000 and 70,000 psi (4 claims)

## Outer cover layer

- Polyurethane

- Shore D hardness of 64 or less measured on the ball

- Thickness between 0.010 and 0.070 inches (5 claims) or between 0.010 and 0.050 inches (1 claim) or between 0.030 and 0.060 inches (1 claim)

17

# Michael Sullivan - Inventor



> Scientist at Spalding from 1984 to 1999
> Bachelors Degree in Chemistry; Masters in polymer science
> Inventor on nearly 300 golf ball patents; more than any other person

18

# Michael Sullivan - Inventor



> Worked with Dennis Nesbitt and Bob Molitor at Spalding
> Invented the golf balls of the patents-in-suit in 1991
> Applied for the patents beginning in 1993
> Hired away from Spalding by Acushnet in 1999

# Patents-in-Suit

(12) **United States Patent**
Sullivan

(10) Patent No.: **US 6,210,293 B1**
(45) Date of Patent: **Apr. 3, 2001**

(54) **MULTI-LAYER GOLF BALL**

(75) Inventor: **Michael J. Sullivan**, Chicopee, MA (US)

(73) Assignee: **Spalding Sports Worldwide, Inc.**, Chicopee, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/470,196**

(22) Filed: **Dec. 21, 1999**

**Related U.S. Application**

(63) Continuation of application No. 08/... 1997, which is a continuation of app... filed on Nov. 9, 1995, now abando... ation-in-part of application No. 08/... 1993, now abandoned.

(51) Int. Cl.⁷ ...........................................

(52) U.S. Cl. ...........................................

(58) Field of Search ...................... 473/370–378

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,431,193 * 2/1984 Nesbitt .................... 473/374
5,068,151 * 11/1991 Nakamura .............. 473/377
5,314,187 * 5/1994 Proudfit ................. 473/374

* cited by examiner

*Primary Examiner*—Mark S. Graham

(57) **ABSTRACT**

The present invention is directed to an improved multi-layer golf ball comprising a core, an inner cover layer and an outer cover layer. The inner cover layer is comprised of a low acid ionomer blend which may or may not include a filler such as

PX-3

### Related U.S. Application Data

Continuation of application No. 08/870,585, filed on Jun. 6, 1997, which is a continuation of application No. 08/556,237, filed on Nov. 9, 1995, now abandoned, which is a continuation-in-part of application No. 08/070,510, filed on Jun. 1, 1993, now abandoned.

20



# Three Examiners Allowed the Patents-in-Suit



PX-3,2,1,4    21

# Sullivan Told PTO About Acushnet's Prior Art



(10) **Patent No.:**    **US 6,210,293 B1**
(45) **Date of Patent:**    **Apr. 3, 2001**

(56)    **References Cited**

**U.S. PATENT DOCUMENTS**

| 4,431,193 | * | 2/1984 | Nesbitt | 473/374 |
| 5,068,151 | * | 11/1991 | Nakamura | 473/377 |
| 5,314,187 | * | 5/1994 | Proudfit | 473/374 |

* cited by examiner

*PX-3*

22

# Sullivan Discussed Nesbitt at Length



PX-3

23

# Sullivan Also Discussed Molitor '751



PX-3

The hardness of the ball is the second principal property involved in the performance of a golf ball. The hardness of the ball can affect the playability of the ball on striking and the sound or "click" produced. Hardness is determined by 10 the deformation (i.e., compression) of the ball under various load conditions applied across the ball's diameter (i.e., the lower the compression value, the harder the material). As indicated in U.S. Pat. No. 4,674,751, softer covers permit the accomplished golfer to impart proper spin. This is because 15 the softer covers deform on impact significantly more than balls having "harder" ionomeric resin covers. As a result, the better player is allowed to impart fade, draw or backspin to the ball thereby enhancing playability. Such properties may 20 be determined by various spin rate tests such as the "nine iron" spin rate test described below in the Examples.

*U.S. Patent No. 6,210,293, Col. 5: 6-22*

24

# Sullivan Also Disclosed Molitor '637 and Wu



PX-3

| | | | |
|---|---|---|---|
| 4,218,543 | A | 8/1980 | Weber et al. |
| 4,248,432 | A | 2/1981 | Hewitt et al. |
| 4,272,079 | A | 6/1981 | Nakade et al. |
| 4,274,637 | A | 6/1981 | Molitor |
| 4,337,946 | A | 7/1982 | Saito et al. |
| 4,431,193 | A * | 2/1984 | Nesbitt ................ |
| 4,442,282 | A | 4/1984 | Kolycheck |
| 4,570,937 | A | 2/1986 | Yamada |
| 4,582,887 | A | 4/1986 | Dominguez et al. |
| 4,590,219 | A | 5/1986 | Nissen et al. |
| 4,607,090 | A | 8/1986 | Dominguez |
| 4,650,193 | A | 3/1987 | Molitor et al. |
| 4,674,751 | A | 6/1987 | Molitor et al. |
| 4,679,795 | A | 7/1987 | Melvin et al. |
| 4,688,801 | A | 8/1987 | Reiter |
| 4,690,981 | A | 9/1987 | Statz |

| | | | |
|---|---|---|---|
| 5,314,187 | A * | 5/1994 | Proudfit ............... |
| 5,324,783 | A | 6/1994 | Sullivan |
| 5,330,837 | A | 7/1994 | Sullivan |
| 5,334,673 | A | 8/1994 | Wu |
| 5,338,610 | A | 8/1994 | Sullivan |
| 5,368,304 | A | 11/1994 | Sullivan et al. |
| 5,368,806 | A | 11/1994 | Harasin et al. |

25

# Presumption of Validity

> Patents are presumed to be valid

> All of Acushnet's prior art was before the Patent Office Examiners who issued the patents

> To find the claims invalid, there must be clear and convincing evidence that the Patent Office should not have issued the patents

# Acushnet





> **Golf division of Fortune Brands**
> **Includes Titleist as well as Pinnacle, Footjoy and Cobra**
> **Leading golf ball manufacturer**
> **In 2000, when the Rule 35 came out, Titleist's premium golf balls were all wound (Professional, Tour Prestige)**

27

# Acushnet





Core

Inner Cover Layer

Outer Cover Layer

> Had to play catch-up to Callaway Golf,
  as well as Nike and Bridgestone

> Recognized the revolutionary technology

> Introduced Pro V1 in October 2000

- Core, ionomer inner cover, polyurethane outer cover

> Received patents – the Hebert Patents – on the "veneer concept"

28

# Acushnet Had to Play Catch-Up



## Veneer Core Research

## May 1, 2000

## Purpose:

With the introduction of the Callaway Red (Firm Feel) and Callaway Blue (Soft Feel) golf balls, the Veneer project has become a high priority in the R&D department. These new competitive products have shown distance advantages over our new design. After dissecting the golf balls, the Veneer core was determined to be slower than Callaway cores.

PX-985



# Acushnet's Hebert '172 Patent



**United States Patent** [19]

**Hebert et al.**

[54] MULTILAYER GOLF BALL WITH A THERMOSET OUTER LAYER

[75] Inventors: Edmund A. Hebert, North Dartmouth, Mass.; William E. Morgan, Barrington, R.I.; Dean Snell, Oceanside, Calif.

[73] Assignee: Acushnet Company, Fairhaven,

[21] Appl. No.: 863,788

[22] Filed:        May 27, 1997

[51] Int. Cl.⁶ .............. A63B 37/08; A
[52] U.S. Cl. .............. 473/354; 473/
[58] Field of Search ...................... 473/
                            473/364, 354, 363, 3

[56]            References Cited
        U.S. PATENT DOCUMENTS

INNER COVER —
Flex.Mod. 65,000psi - 120,000psi
Thickness: 0.026in. - 0.045in.
Shore D: 65 - 74

        Wound or Solid Core
        Solid or Liquid Center

OUTER COVER
Shore D: 30 - 60
Thickness: < 0.05in.

PX-17

---

## United States Patent [19]

### Hebert et al.

[54] **MULTILAYER GOLF BALL WITH A THIN THERMOSET OUTER LAYER**

[75] Inventors: **Edmund A. Hebert**, North Dartmouth, Mass.; **William E Morgan**, Barrington, R.I.; **Dean Snell**, Oceanside, Calif.

[73] Assignee: **Acushnet Company**, Fairhaven, Mass.

[21] Appl. No.: **863,788**

[22] Filed:    **May 27, 1997**

[51] **Int. Cl.⁶** ........................ A63B 37/08; A63B 37/12; A63B 37/06

[52] **U.S. Cl.** ........................ **473/354**; 473/365; 473/363; 473/376; 473/378

[58] **Field of Search** ........................ 473/377, 378, 473/384, 354, 363, 365, 374, 376

[56]            **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,147,324 | 9/1964 | Ward | 264/254 |
| 3,177,280 | 4/1965 | Ford et al. | 264/275 |
| 3,262,272 | 7/1966 | Barakauskas et al. | 60/39.05 |
| 3,616,101 | 10/1971 | Satchell et al. | 161/7 |
| 3,989,568 | 11/1976 | Isaac | 156/182 |
| 4,203,941 | 5/1980 | Brooker | 264/250 |
| 4,431,193 | 2/1984 | Nesbitt | 273/235 |
| 4,625,964 | 12/1986 | Yamada | 273/62 |
| 4,848,770 | 7/1989 | Shama | 273/228 |
| 4,919,434 | 4/1990 | Saito | 273/235 R |
| 4,959,000 | 9/1990 | Giza | 425/116 |

---

[11]    **Patent Number:    5,885,172**

[45]    **Date of Patent:    Mar. 23, 1999**

| | | | |
|---|---|---|---|
| 5,002,281 | 3/1991 | Nakahara et al. | 273/220 |
| 5,006,288 | 4/1991 | Rhodes et al. | 264/46.6 |
| 5,006,297 | 4/1991 | Brown et al. | 264/234 |
| 5,072,944 | 12/1991 | Nakahara et al. | 273/220 |
| 5,112,556 | 5/1992 | Miller | 264/279 |
| 5,253,871 | 10/1993 | Viollaz | 273/228 |
| 5,314,187 | 5/1994 | Proudfit | 273/235 R |
| 5,334,673 | 8/1994 | Wu | 273/235 R |
| 5,415,937 | 5/1995 | Cadorniga et al. | 473/385 X |
| 5,609,535 | 12/1991 | Morgan | 473/378 X |
| 5,692,974 | 12/1997 | Wu et al. | 473/377 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2278609 | 7/1994 | United Kingdom . |
| 2291811 | 7/1996 | United Kingdom . |
| 2291812 | 7/1996 | United Kingdom . |
| 2291817 | 7/1996 | United Kingdom . |

Primary Examiner—George J. Marlo
Attorney, Agent, or Firm—Pennie & Edmonds LLP

[57]            **ABSTRACT**

The present invention is directed towards a multilayer golf ball which comprises a core, an inner cover layer and an outer cover layer, wherein the outer cover layer comprises a thermoset material formed from a castable, reactive liquid, said outer layer having a thickness of less than 0.05 inches and said inner cover layer comprises a high flexural modulus material. The golf balls of the present invention are believed to provide a "progressive performance" from driver to wedge.

**18 Claims, 1 Drawing Sheet**

# Acushnet's Hebert '172 Patent



PX-17

> Covers three-piece, solid-core balls with cast polyurethane cover

> Acushnet insisted that Callaway Golf buy a license to the Hebert Patents

> Callaway Golf and Acushnet both learned later that it was Sullivan, not Hebert, who invented this new technology

# Acushnet's Hebert '172 Patent



The invention is particularly directed towards a multilayer golf ball which comprises a core, an inner cover layer and an outer cover layer. The thickness of the outer cover layer

Thermoset polyurethanes and urethanes are particularly preferred for the outer cover layers of the balls of the present invention. Polyurethane is a product of a reaction between a polyurethane prepolymer and a curing agent. The polyurethane prepolymer is a product formed by a reaction between a polyol and a diisocyanate. The curing agent is typically either a diamine or glycol. Often a catalyst is employed to promote the reaction between the curing agent and the polyurethane prepolymer.

PX-17

# Spalding's Golf Business Struggled in Late 1990's

> Bought by New York investment bank in 1996

> The bank saddled Spalding with huge debt load

> Management struggled to service that debt

> Made it difficult for Spalding to capitalize on R&D

# Acushnet Hired Sullivan Away from Spalding



> Hired by Acushnet in 1999

> Acushnet wanted Mr. Sullivan's golf ball design experience

> Acushnet wanted Mr. Sullivan to help them build their patent portfolio

> Acushnet wanted to keep Mr. Sullivan from going to Callaway Golf

35

# Sullivan's Work at Acushnet



PX-619

AC0090622-715

# Sullivan's Work at Acushnet



PX-619 at AC0090649

"Clearly a high priority for Titleist is freedom to operate in the multi-layer golf ball area."

"Next 5-7 years will be dominated by these ball types."

"CAUTION: SPALDING DOMINATES THIS ART..."

# Sullivan's Work at Acushnet



"PROBLEM for Titleist is SPALDING WAS THERE MUCH earlier than Titleist…. What were you guys doing??? Watching & waiting??"

PX-619 at AC0090653

38

# The '293 Patent Issued Right After Callaway Golf Signed the Hebert License with Acushnet

(10) **Patent No.:**    **US 6,210,293 B1**

(45) **Date of Patent:**    **Apr. 3, 2001**



> **Early 2001** – Acushnet and Callaway Golf sign the Hebert license

> **April 3, 2001** – The Sullivan '293 Patent issues to Spalding

*PX-3*

39

# Acushnet Realized that Spalding, Not Acushnet, Owned the Patents on the Key Concept

## United States Patent

**Sullivan**

(10) Patent No.: **US 6,210,293 B1**
(45) Date of Patent: **Apr. 3, 2001**

**MULTI-LAYER GOLF BALL**

Inventor: **Michael J. Sullivan**, Chicopee, MA (US)

Assignee: **Spalding Sports Worldwide, Inc.,** Chicopee, MA (US)

Appl. No.: **09/470,196**

Filed: **Dec. 21, 1999**

**Related U.S. Application Data**

Continuation of application No. 08/870,585, filed on Jun. 6, 1997, which is a continuation of application No. 08/556,237, filed on Nov. 9, 1995, now abandoned, which is a continuation-in-part of application No. 08/070,510, filed on Jun. 1, 1993, now abandoned.

Int. Cl.[7] .................................................. A63B 37/12
U.S. Cl. .............................................................. 473/374

*PX-3*

## United States Patent [19]

**Hebert et al.**

[11]  Patent Number:  **5,885,172**
[45]  Date of Patent:  **Mar. 23, 1999**

[54]  **MULTILAYER GOLF BALL WITH A THIN THERMOSET OUTER LAYER**

[75]  Inventors: **Edmund A. Hebert**, North Dartmouth, Mass.; **William E Morgan**, Barrington, R.I.; **Dean Snell**, Oceanside, Calif.

[73]  Assignee: **Acushnet Company**, Fairhaven, Mass.

[21]  Appl. No.: 863,788

[22]  Filed:  May 27, 1997

[51]  Int. Cl.[6] .......................... A63B 37/08; A63B 37/12; A63B 37/06

[52]  U.S. Cl. .......................... 473/354; 473/365; 473/363; 473/376; 473/378

[58]  Field of Search ............................ 473/377, 378, 473/384, 354, 363, 365, 374, 376

*PX-17*

40

# Reaction at Acushnet to the Issuance of the Sullivan '293 Patent

> Internal Acushnet e-mails regarding the '293 Patent on the same day it issued

> Frantic search for prior art

> Result:  Acushnet changed opinion – concept of polyurethane-covered multilayer golf ball was now "obvious"

41

# Dr. Risen Will Explain that the Asserted Claims Are Not Obvious



> **Dr. Bill Risen**

> Professor of Chemistry at Brown University

> 20 years in golf ball design

# Dennis Nesbitt Does Not Think He Invented the Polyurethane Covered Three-Piece Golf Ball



Q.  Do you think that you invented the polyurethane three-piece golf ball?
A.  No, I didn't.

*Nesbitt Deposition, April 11, 2007,*
*Page 249:13-15*

43

# The Market Demanded the Patented Technology



*PX-583*

# Acushnet Introduced the Pro V1 in Response to Competition, including Callaway Golf



**New Pro V1 Product Brief**

**Golfer Audience**

1. Current competitive golf ball users:

   - **Callaway Red**
   - **Callaway Blue**
   - Nike Tour Accuracy
   - Bridgestone Precept Tour Premium
   - Strata Tour Professional
   - Maxfli Revolution

2. Current Titleist users who are vulnerable to switching to competitive models.
3. Avid core, serious golfers seeking the highest performance technology.
4. High ball/club speed players.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PX-1116

45

# Acushnet's Strategy Was to Watch and Wait



**Why has Titleist waited so long to introduce this ball?**

• Given the current competitive golf ball environment, Titleist's introduction strategy was to allow the competition to launch what was their first and, what we considered to be, their best shot. We watched and responded accordingly with the high performance multi-component Pro V1, a product of superior performance.

• The Pro V1 has been designed to respond to the changing nature of the game. Many of today's highly skilled golfers are placing a greater premium on distance.

• The new Pro V1 accomplishes the distance objective through its high launch, low spin performance characteristics while retaining the playability the golfer expects in a high performance golf ball.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PX-1116

46

# The Bunker



PX-984

**October 13, 2000**

The Acushnet Company has mounted a counterattack against Nike (Tour Accuracy) and Callaway (Rule 35) with the launch of its solid-core, three-layer Titleist Pro V1 392 ball.

"Clearly, this is a bit of a Normandy landing," said Wally Uihlein, president and CEO of the Acushnet Company. "Apart from the fact [the V1] has been in development for as long as it has, our strategy is to watch what everybody else is going to do—the feeling is their first shot is their best shot—and respond appropriately."

47

# PGATOUR.COM



PX-1090

**OCTOBER 17, 2000**

"It goes to show you that we can take appropriate action to respond to changes in product performance warranted by the best players in the game," Titleist chief Wally Uihlein said.

"In a competitive environment, it's better to know what you're shooting at than shooting in the dark," Uihlein said. "We watched everyone launch their ships, then we responded."

48

# Golfweek: "Titleist's Big Makeover"



## Titleist's big makeover

Development of the then-unnamed golf ball continued at a fairly steady pace through the 2000 PGA Merchandise Show in Orlando, Fla.

"But then things really accelerated," Uihlein says. "We had made the decision to wait and see what our competitors came out with at the show and where we had to be for our product to be better. And once we knew what they had, we really pushed on."

PX-722

49

# Before Introducing the Pro V1, Acushnet Was Facing Obsolescence

This is Wally's note to the team in Las Vegas, telling the V1 story
To: Bill Morgan, George Sine, Joe Gomes, Mary Lou Bohn
cc: Ed Abrain, Herb Boehm, Joe Nauman, Dennis Doherty, Dale Shenk, Peg Nicholson, Bill Young, Mac Fritz
Subject: V1-Las Vegas

I do not need to put into historical perspective the magnitude of the challenge before us. In the genre of the Pro Shop only decision of the 1930's, the recovery from the hurricane of '54, the comeback from the 'A' ball introduction of 73, the Pinnacle launch of 1980 and the rebuff of the Nippon invaison of the

late 1980's, this is one of those STRATEGIC INFLECTION POINTS/MOMENTS OF TRUTH where the history of the company and the long term viability of the entity is at risk and in play.

PX-1174

50

# Before Introducing the Pro V1, Acushnet Was Facing Obsolescence

This is Wally's note to the team in Las Vegas, telling the V1 story
To: Bill Morgan, George Sine, Joe Gomes, Mary Lou Bohn
cc: Ed Abrain, Herb Boehm, Joe Nauman, Dennis Doherty, Dale Shenk, Peg
Nicholson, Bill Young, Mae Fritz
Subject: V1-Las Vegas

ok, the game is on....

You should already h
story be at week's end

"Titleist affirms its p
Titleist ProV1 392 g
#1 non wound ball o

This is the story.

FOREWARNED; B
the death of the woun
media will want to w
story.

BULL.___.    Writte

And if a brand story
that after the competi
still #1 FAR AND AW

The next two to three years will be the most critical years that we will, as individuals, will experience as part of this company's history.

Twenty, Thirty and Forty years from now when the story is told as to how we looked down the gun barrel of potential technological obsolescence, refused to blink and then prevailed with faster guns and better shots will be the stuff that legends grow from.

leader on tour. If this story does not get told as such, SHAME ON US.

Ed Abrain, I want Sirak, Nugent/Gardner/Seanor and Adam Barr called today with
the tidbits shown below and the themes expressed above.

Lou, George and Joe...........you need to be sure that the media is headed
this way during your briefings.

If on Thursday/Friday or in next week's tabloids this week's Normandy landing
counter attack reads like our funeral rather than our finest hour, then we all
have some explaining to do to 5000 fellow associates.

This is spin time and I am confident that I have the best team possible in
front of this one.

The fact that the competition has already begun the trash talk ("wound is
dead", "the ball's too hot", etc. etc), is all the evidence that you need that
THEY ARE SCARED S___ of what the future holds.

I do not need to put into historical perspective the magnitude of the challenge
before us. In the genre of the Pro Shop only decision of the 1930's, the
recovery from the hurricane of '54, the comeback from the 'A' ball introduction
of '73, the Pinnacle launch of 1980 and the rebuff of the Nippon invasion of the

*PX-1174*

51

# Golfweek: "Titleist's Big Makeover"



## Titleist's big makeover

Titleist management began grappling with whether to undertake a vast conversion of much of its wound-ball production capability—even before the success of the Pro V1 was assured—that would end up costing $15 million.

"There were a number of days when we had cottonmouth and tight underwear," says Wally Uihlein, the chief executive officer of Acushnet Co., the parent of Titleist. "The anxiety level was extremely high because we were betting the farm on the success of this ball. We essentially elected to obsolete ourselves in a very important area and put everything behind the Pro V1."

PX-722

# Golfweek: "Titleist's Big Makeover"



PX-722

## Titleist's big makeover

But the consumer response to Pro V1 did not give Titleist that luxury of time, and the company feverishly began converting urethane-cover production to that new ball.

"Yes, we were very confident about this ball because we were getting a lot of enthusiastic feedback from our Tour players," Uihlein says. "Still, it was a challenging process, and the speed at which this all took place is unprecedented, especially as it related to increasing capacity to meet the demand. I think it is the most massive paradigm shift ever seen in the golf ball category, and certainly the most intense and accelerated one in any product category I've ever witnessed."

53

# The Pro V1 Has Been Extremely Successful

## Question for you:

## Was this success due in part to the patented technology, or not?

# Before Sullivan Patents Issued, Acushnet Emphasized the Patented Technology

How does the Pro V1 perform? And how does this differ from multi-layer or high performance wound golf balls?

* The exclusive and proprietary large core multi-component and thin Urethane Elastomer technology of the Pro V1 provides a combination of high launch and low driver spin which creates a flatter trajectory to improve distance.

* The Pro V1 produces lower spin with full iron shots for greater distance, however with less than full swings, the very soft urethane elastomer outer surface increases spin and combines with the higher launch to produce a very controlled shot to the green.

* The Pro V1 design combines the short game control of a soft covered high performance golf ball with the driver distance of a solid distance ball.

* The Pro V1 differs from multi-layer golf balls in that the very soft urethane elastomer outer surface increases spin and combines with the inherent steep angle of descent to create a Drop-and-Stop™ type of shot into the green.

* High performance wound balls offer a softer feel, and higher spin off the driver, long and mid-irons, allowing better players the ability to "work" their shots more efficiently. Solid construction golf balls generally deliver lower spin and longer distance off the driver, long and mid irons and a higher trajectory and steeper angle of descent into the greens.

PX-1116

# Before Sullivan Patents Issued, Acushnet Emphasized the Patented Technology



PX-583

# Before Sullivan Patents Issued, Acushnet Emphasized the Patented Technology



PX-583

57

# Acushnet Advertisement in Golfweek Magazine



PX-1195

ACUSHNET COMPANY

Wally Uihlein
Chairman and Chief Executive Officer

August 2001

As you undoubtedly know, the introduction of the Titleist Pro V1 golf ball has been an unprecedented success. Since its tour debut in October 2000, the Titleist Pro V1 has been the #1 ball on the worldwide professional tours. With this groundswell of tour usage and acceptance, word of Titleist's new high-performance golf ball quickly traveled to players everywhere and demand grew prior to it even being introduced to the marketplace. As a result, we accelerated our planned introduction date by four months, the timing of which did not allow us to build adequate inventory to address the overwhelming consumer demand that would soon follow.

Our manufacturing facilities have been working overtime since the December 2000 marketplace introduction in an effort to supply golf shops with ample Pro V1 inventory. We have had to allocate Pro V1 shipments among all of our valued customers to ensure that each has at least a minimum supply.

- Our associates have been working a 24-hour per day, 7-day per week Pro V1 production schedule. Dedicated work crews have continued production through the Memorial Day and Fourth of July holidays as well as during Titleist's traditional two week summer manufacturing shutdown for the first time in company history. The $1.6 million in overtime and other expenses have delivered an incremental 250,000 dozen Pro V1 golf balls which otherwise would not have been available for sale.
- We're investing an additional $14 million in capital equipment, both in core expansion and urethane elastomer capacity. This significant capital investment will contribute to our expanded capacity this fall as well as prepare us for future demand.

Sincerely,

Wally Uihlein

Titleist

P.O. Box 965
Fairhaven, MA 02719-0965

# SouthCoast Today





PX-723

**JULY 21, 2002**

**Economy hits golf industry**
**Acushnet Co. layoffs are just a symptom**
By AARON NICODEMUS, Standard-Times staff writer

FAIRHAVEN -- Wally Uihlein, head of The Acushnet Co., sees bad times ahead for the golf industry.

"The Pro V1 saved this company," said Mr. Uihlein. When demand for that golf ball took off in 2000, the company added equipment and employees. With the layoffs, the company's total number of employees is back to where it was in 2000, at 2,086, he said.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

Plaintiff,

v.

ACUSHNET COMPANY,

Defendant.

C. A. No. 06-91 (SLR)

**EXPERT REPORT OF WILLIAM M. RISEN, JR.**

## I.    PERSONAL BACKGROUND

1.  I am a Professor of Chemistry at Brown University. I have been retained by Callaway Golf as a consultant and expert witness in this case.

2.  I have worked in the areas of ionomers, polyurethanes, molecular spectroscopy, organometallic chemistry, physical-inorganic chemistry, aerogels, quantized ion motion in condensed phases, and solid state chemistry. Based on my experience and education, I believe I am an expert in the chemistry and materials science of polymers and other amorphous materials.

3.  I have been employed as a research and development consultant in the golf ball industry, in various capacities, for about 20 years. Based on this experience, I believe I possess expertise in the field of golf ball design.

4.  I graduated from Georgetown University in 1962 with a B.S. in chemistry. I earned a Ph.D. in chemistry from Purdue University in 1967. I was a Research Fellow-Instructor at Brown University in 1966-1967. I was an Assistant Professor of Chemistry at Brown University 1967 to 1972. I was an Associate Professor of Chemistry at Brown University from 1972 to 1975. I have been a Professor of Chemistry at Brown University since 1975. From 1972 to 1980 I served as the chairman of the Department of Chemistry at Brown University.

5.  I received a Foreign Invitational Fellowship from the Japan Society for the Promotion of Science for 2002-2003.

6.  I was a Visiting Professor at McGill University in Montreal, Canada in 1991-1992.

7.  In 1998, I was a Visiting Scientist at the Paul Scherrer Institute of ETH-Zurich and the Swiss Federal Science Foundation.

1

| | • the thickness of the outer cover layer. |
|---|---|

129. I have been advised that, when considering the validity of a claim, the claim must be considered as a whole, that is, in view of all the claim's limitations and not just some subset of them. Thus, I do not believe that the BPAI's rejection of the broad claims at issue in the *Ex Parte Sullivan* appeal establishes that Nesbitt '193, or Wu '673, or the combination of the two, has any effect on the validity of the narrower claims at issue in this litigation.

130. Significantly, none of the claims at issue in *Ex Parte Sullivan* included limitations on outer-cover Shore D hardness. Accordingly, the BPAI made no determination as to whether Nesbitt '193 or Wu '673 expressly or inherently discloses such a limitation.

131. Likewise, none of the claims at issue in *Ex Parte Sullivan* recited a blend of ionomers or a blend of low-acid ionomers. Thus, the BPAI's decision does not suggest that either of these limitations is expressly or inherently disclosed by Nesbitt '193, Wu '673, or the combination of those references.

      **(e)**      **Acushnet's Statement to the Patent Office Regarding Materiality of Nesbitt '193 and Wu '673**

132. Finally, I note that Acushnet, when prosecuting its '172 patent, which claims the same urethane-over-ionomer construction as the patents-in-suit, told the Patent Office that Nesbitt '193 nor Wu '673 was "material" to patentability. (See para. 206 below.) If the '193 and '673 patents were not "material" to the patentability of the '172 claims, then they cannot be "material" to any of the urethane-over-ionomer claims asserted in this lawsuit – that is, neither can show, either by itself or in combination with other references, that these claims are anticipated or obvious.

      **3.**      **Nesbitt '193 + Molitor '751**

133. I believe that combining the Nesbitt '193 and Molitor '751 patents to achieve the claimed invention would not have been obvious to one of ordinary skill in the art. I also believe that the inventions described in the asserted claims of the patents-in-suit would not have been recognized as the predictable result of such a combination. Therefore, I believe this combination does not render any of the asserted claims obvious.

      **(a)**      **No Express or Inherent Disclosure of Outer Cover Shore D Hardness of 64 or Less**

134. Neither Nesbitt '193 nor Molitor '751 expressly discloses a Shore D hardness for any composition.

135. I disagree with Dr. Statz's assertion that the limitation of an "outer cover layer having a Shore D hardness of 64 or less" is met through inherency.

      **(i)**      **Plaque Hardness is Not Representative of or Predictive of Outer Cover Layer Hardness**

136. As discussed above, the plaque hardness of the Surlyn 1855 disclosed in the Nesbitt patent is not representative of or predictive of the Shore D hardness that such a composition would exhibit as the outer cover layer of a three (or more)-piece golf ball. (See para. 72 above.)

<div align="center">

(ii)     **The Disclosure of a Shore C Hardness Does Not Inherently Disclose a Shore D Hardness**

</div>

137. Dr. Statz argues that Molitor '751 does disclose an outer cover layer comprising polyurethane and having a Shore D hardness of 64 or less. (Statz ¶ 92.) Although Molitor lacks any express disclosure of Shore D hardness, Dr. Statz argues that the patent discloses a preferred cover hardness of 72 to 76 on the Shore C scale," and that a cover with this Shore C hardness "will certainly have a Shore D hardness of well below 64." (Statz ¶ 92.)

138. In other words, Dr. Statz is arguing that a cover with a Shore C hardness of 72 inherently has a Shore D hardness of 64 or less. I disagree – I do not believe that, given the certainty required under the legal principle of inherency, that a disclosing a Shore C hardness inherently discloses a Shore D hardness.

139. As mentioned above (para. 62), the ASTM D-2240 specification expressly warns against trying to convert between Shore C and Shore D, or between any other hardness scales:

> This test method is based on the penetration of a specific type of indentor when forced into the material under specified conditions. The indentation hardness is inversely related to the penetration and is dependent on the viscoelastic behavior of the material. The shape of the indentor and the applied force influence the results obtained so there may be <u>no simple relationship between the results obtained with one type of durometer and those obtained with another type of durometer or other instruments used for measuring hardness</u>. This test method is an empirical test intended primarily for control purposes. No simple relationship is known to exist between indentation hardness determined by this test method and any fundamental property of the material tested.

(ASTM D-2240 (1995) section 4.1 (emphasis added).)

140. The 1995 edition of ASTM D-2240 included a "durometer scale comparison chart," but cautioned that "This is not and cannot be used as a conversion reference":

NOTE 2—Durometer scale comparison chart only. This is not and cannot be used as a conversion reference.

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type A | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | | | |
| Type B | | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | | |
| Type C | | | | | 10 | | 20 | 30 | 40 | | 50 | 60 | 70 | 80 | 90 | 100 |
| Type D | | | | | | 10 | | 20 | | 30 | 40 | 50 | 60 | 60 | 70 | 80 | 90 | 100 |
| Type DO | | | | | 10 | 20 | 30 | 40 | 50 | 60 | | 70 | 80 | 90 | 100 |
| Type O | | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | | |
| Type OO | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | | 90 | | 100 | | | |

<div align="center">22</div>

(ASTM D-2240 (1995) section 4.1.)

141. A person of ordinary skill in the art would thus understand D-2240 to prohibit converting a hardness from one Shore scale to another, and certainly would not purport to do so with the level of certainty required to opine that a Shore C hardness measured on the cover of a golf ball "necessarily" equates to a particular Shore D hardness.

142. As further support for his argument, Dr. Statz refers to a so-called "comparison chart" from the Rex Gauge company that was cited in the prosecution of the '873 patent. (Statz ¶ 92(c).) The Rex Gauge chart, however, contains the same warning as the D-2240 standard – that "This is not and cannot be used as a conversion chart."

*Appendix B*

## Comparison Chart
*This chart is for comparison purposes only. This is not and cannot be used as a conversion chart.*

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | | | |
| B | | | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | | | |
| C | | | | | 10 | | 20 | 30 | 40 | | 50 | 60 | 70 | 80 | 90 | 100 | |
| D | | | | | | 10 | | 20 | | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| DO | | | | | 10 | 20 | | 30 | 40 | | 50 | 60 | 70 | 80 | 90 | 100 | |
| O | | | | 10 | 20 | 30 | | 40 | 50 | 60 | 70 | 80 | | 90 | 100 | | |
| OO | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | | 90 | | | 100 | | | | |
| M | | | | | 30 | 40 | 50 | 60 | 70 | 80 | 90 | | | | | | |

© 2001 Rex Gauge Company, Inc. all rights reserved
1250 Busch Pkwy Buffalo Grove IL 60089
Toll Free 1-800-827-3962 | Phone 847-465-8009 | International 011 01 847-465-8009
Fax 847-465-8228 | E-mail info@durometer.com

A division of Schuttco Precision Manufacturing Inc.

(CW309061.)

143. Given that both the 1995 ASTM D-2240 specification and the 2001 Rex Gauge chart expressly disapprove of attempts to correlate Shore C and Shore D hardness, and that no general formula is known for such a conversion, I do not believe that a golf ball measured as having an outer-cover Shore C hardness of 72 would inevitably and necessarily exhibit an outer-cover Shore D hardness of 64 or less. Even if this property were inherent, I do not believe a person of ordinary skill in the art would have known of that inherency.

144. Other evidence cited by Dr. Statz does not dissuade me from this conclusion.

145. Dr. Statz claims that Table 19 of Callaway Golf's U.S. Patent No. 6,905,648 "shows that a Shore C hardness of 73 correlates to a Shore D hardness of 47." (Statz ¶ 92(b).) I disagree. This data does not imply that Shore C values can be accurately translated into Shore D values, or that a sample with a Shore C hardness of 73 inevitably and necessarily has a Shore D hardness of 47.

23

The only conclusion that can reasonably drawn from these two measurements is that a certain sample of Hytrel G-4074 exhibited a Shore C hardness of 73 and a Shore D hardness of 47. I also note that this pair of measurements illustrates the unreliability of the Rex Gauge and D-2240 "comparison charts," which, if used to predict Shore D from Shore C, would correlate a Shore C hardness of 70 or more to a Shore D hardness of 50 or more. (See paras. 140, 142 above.)

146. Dr. Statz also writes that the patents-in-suit give a "translation" between Shore C and Shore D by stating that the outer cover layer preferably "has a Shore D hardness of about 45 (i.e. Shore C hardness of about 65)." (Statz ¶ 92(a), citing '293 patent col. 3:49-54.) The text cited from the '293 patent is not an example of a "translation" between Shore C and Shore D. At most, it suggests that an outer cover with a Shore D hardness of "about" 45 might possibly exhibit a Shore C hardness of "about" 65. This text does not indicate that a cover such as that discussed in Molitor '751 with a Shore C hardness of 72 will inevitably and necessarily have a Shore D hardness of 64 or less.

147. Dr. Statz relies on a declaration submitted by Mark Binette in support of a Callaway Golf patent application in which Mr. Binette refers to Shore C and Shore D measurements of certain ionomer-over-ionomer golf balls. (Statz ¶ 92(e), citing 7/22/97 Binette Decl. from prosecution history of U.S. Patent No. 5,803,831.) These values, says Dr. Statz, indicate "a correlation between Shore C of 75 and Shore D of 49, and between Shore C of 72 and Shore D of 48." (Statz ¶ 92(e).) These measurements, however, do not establish a general or universal "correlation" between Shore C and Shore D measurements. All they show is that certain ionomer-over-ionomer golf balls exhibited certain Shore C hardnesses and certain Shore D hardnesses. Mr. Binette's data does not show that a polyurethane cover such as that discussed in Molitor '751 with a Shore C hardness of 72 will inevitably and necessarily have a Shore D hardness of 64 or less. And again, as in the "Table 19" discussion above, I note that this pair of measurements shows the unreliability of the Rex Gauge and D-2240 "comparison charts" – if either chart were used to predict Shore D from Shore C, it would correlate a Shore C hardness of 70 or more to a Shore D hardness of 50 or more. (See paras. 140, 142 above.)

148. Dr. Statz additionally relies on a chart he says Du Pont provides "for the purpose of translating Shore hardness measurements," which, he claims, "shows that Shore C measurements of 77 or less translate to a Shore D of 58 or less." (Statz ¶ 92(d), citing Ex. O to Acushnet's Comments to Callaway Golf's Response to Office Action in the reexamination proceedings.) I note, however, that this chart expressly states that "CONVERSIONS ARE APPROXIMATE" and "VALUES DEPENDENT ON GRADES AND CONDITIONS OF MATERIALS INVOLVED." I further note that the chart does not specify what materials its "durometer conversion" table supposedly applies to. Therefore, I believe this chart shows, at most, that a material that exhibits a Shore C measurement of 77 or less might possibly exhibit a Shore D hardness of 58 or less. It does not show that a polyurethane cover such as that discussed in Molitor '751 with a Shore C hardness of 72 will inevitably and necessarily have a Shore D hardness of 64 or less.

       (iii)     **Dr. MacKnight's Golf Balls are Not Proof of Inherency**

149. Dr. Statz cites, as further support for his theory of inherency, outer-cover Shore D measurements of golf balls Dr. MacKnight created for this litigation. (Statz ¶ 93.) Supposedly, these balls comprise:

- a core made from a composition described in the Nesbitt patent (MacKnight ¶ 8);
- an inner cover layer made from either a single-ionomer composition described in the Nesbitt patent (MacKnight ¶ 10), or a blended-ionomer composition described in the Molitor '637 patent (MacKnight ¶ 11); and
- an outer cover made from a polyurethane-ionomer composition described in the Molitor '751 patent, except that Surlyn 1605 (8940) was substituted for Surlyn 1702 (9970) (MacKnight ¶ 15).

At this time, I have no way of knowing whether these balls are or are not what Dr. MacKnight has represented them to be, but, for the purpose of this report, I will assume that they are.

150. The materials and cover thicknesses used in these two types of balls represent only two possible combinations of the materials and thicknesses collectively disclosed by Nesbitt '193 and Molitor '751. Therefore, the hardness properties these balls exhibit are not the inevitable result of combining these two references.

151. Thus, I do not believe that a ball made from the combination of Nesbitt '193 and Molitor '751 would inevitably and necessarily have an outer cover having a Shore D hardness of 64 or less.

152. Even if this hardness were inherent to the outer cover of such a ball, I do not believe that, at the time of Sullivan's invention, a person of ordinary skill in the art would have known of that inherency. At best, such a person could only recognize a possibility or probability that a golf ball made from this combination of references might have a Shore D hardness of 64 or less.

153. I therefore believe that, in Acushnet's obviousness arguments regarding the combination of these references, the limitation of "an outer cover having a Shore D hardness of 64 or less" cannot be met through inherency.

154. Also, if Molitor '637 is not incorporated by reference into Nesbitt '193, the combination of Nesbitt and Molitor '751 does not disclose an inner cover layer comprising a blend of two or more ionomers or a blend of two or more low-acid ionomers, in which case the combination of Nesbitt and Molitor '751 cannot invalidate any claim that includes either of those limitations.

155. Additionally, as noted above (para. 109), Nesbitt teaches away from using a polyurethane outer cover, suggesting that ionomer covers are preferable. This teaching would discourage a person of skill in the art from using the polyurethane-ionomer cover of Molitor '751 in a Nesbitt-type multi-layer ball.

### (b) Acushnet's Statement to the Patent Office Regarding the Materiality of Nesbitt '193

156. Finally, I note that Acushnet, when prosecuting its '172 patent, which claims the same urethane-over-ionomer construction as the patents-in-suit, told the Patent Office that Nesbitt '193

25

177. I therefore believe that, in Acushnet's obviousness arguments regarding the combination of these references, the limitation of "an outer cover having a Shore D hardness of 64 or less" cannot be met through inherency.

(b) **Acushnet's Statement to the Patent Office Regarding the Materiality of Proudfit '187 and Wu '673**

178. Finally, I note that Acushnet, when prosecuting its '172 patent, which claims the same urethane-over-ionomer construction as the patents-in-suit, told the Patent Office that Proudfit '187 and Wu '673 were not "material" to patentability. (See para. 206 below.) If the '187 and '673 patents were not "material" to the patentability of the '172 claims, then neither can be "material" to any of the urethane-over-ionomer claims asserted in this lawsuit – that is, neither of these references can show, either by itself or in combination with other references, that these claims are anticipated or obvious.

6. **Proudfit +Molitor '751**

179. I believe that combining the Proudfit '187 and Molitor '751 patents to achieve the claimed invention would not have been obvious to one of ordinary skill in the art. I also believe that the inventions described in the asserted claims of the patents-in-suit would not have been recognized as the predictable result of such a combination. Therefore, I believe this combination does not render any of the asserted claims obvious.

(a) **No Express or Inherent Disclosure of Outer Cover Shore D Hardness of 64 or Less**

180. Neither Proudfit '187 nor Wu '673 expressly discloses a Shore D hardness for any composition.

181. I disagree with Dr. Statz's assertion that the limitation of an "outer cover layer having a Shore D hardness of 64 or less" is met through inherency.

(i) **Proudfit's Disclosure of a Balata Outer Cover Does Not Inherently Disclose an Outer-Cover Shore D Hardness**

182. As discussed above (para. 85), I disagree that a person of skill in the art would have regarded Proudfit's disclosure of "an outer layer of soft material such as balata or a blend of balata and other elastomers" as an inherent disclosure of an outer cover layer with a Shore D hardness of 64 or less.

(ii) **The Disclosure of a Shore C Hardness Does Not Inherently Disclose a Shore D Hardness**

183. As discussed in paragraphs 137-148 above, regarding the combination of Nesbitt '193 and Molitor '751, I do not believe that a golf ball measured as having an outer-cover Shore C hardness of 72 would inevitably and necessarily exhibit an outer-cover Shore D hardness of 64

or less. Even if this property were inherent, I do not believe a person of ordinary skill in the art would have known of that inherency.

### (iii)    Dr. MacKnight's Golf Balls are Not Proof of Inherency

184. Dr. Statz relies on, as alleged proof of inherency, outer-cover Shore D measurements of a golf ball Dr. MacKnight created for this litigation. (Statz ¶ 113.) Supposedly, this ball comprises:

- a core made from a composition described in the Proudfit '187 patent (MacKnight ¶ 9);
- an inner cover layer made from a blended-ionomer composition described in the Proudfit '187 patent (MacKnight ¶ 12); and
- an outer cover made from a polyurethane-ionomer composition described in the Molitor '751 patent, except that Surlyn 1605 (8940) was substituted for Surlyn 1702 (9970) (MacKnight ¶ 15).

At this time, I have no way of knowing whether this ball is or is not what Dr. MacKnight has represented it to be, but, for the purpose of this report, I will assume that it is.

185. The materials and cover thicknesses used in this ball represent only one possible combination of the materials and thicknesses collectively disclosed by Proudfit '187 and Molitor '751. Therefore, the hardness properties this ball exhibits are not the inevitable result of combining these two references.

186. Thus, I do not believe that a ball made from the combination of Proudfit '187 and Molitor '751 would inevitably and necessarily have an outer cover having a Shore D hardness of 64 or less.

187. Even if this hardness were inherent to the outer cover of such a ball, I do not believe that, at the time of Sullivan's invention, a person of ordinary skill in the art would have known of that inherency. At best, such a person could only recognize a possibility or probability that a golf ball made from this combination of references might have a Shore D hardness of 64 or less.

188. I therefore believe that, in Acushnet's obviousness arguments regarding the combination of these references, the limitation of "an outer cover having a Shore D hardness of 64 or less" cannot be met through inherency.

### (b)    Acushnet's Statement to the Patent Office Regarding the Materiality of Proudfit '187

189. Finally, I note that Acushnet, when prosecuting its '172 patent, which claims the same urethane-over-ionomer construction as the patents-in-suit, told the Patent Office that Proudfit '187 was not "material" to patentability. (See para. 206 below.) If the '187 patent was not "material" to the patentability of the '172 claims, then it cannot be "material" to any of the urethane-over-ionomer claims asserted in this lawsuit – that is, it cannot show, either by itself or in combination with other references, that these claims are anticipated or obvious.

### 7.    Wilson Ultra Tour Balata + Titleist Professional or Titleist Professional 2P

were redesigned for the 2007 versions of those products. (Bellis ¶ 77.) Mr. Bellis also states that the 2007 Pro V1x has a softer cover than before. (Bellis ¶ 77.)

303. Thus, although Acushnet has implemented various changes to the Pro V1 balls since their introduction, Acushnet has never changed the design in a way that would avoid infringement of the patents-in-suit.

304. Dr. Statz explains that Acushnet obtained opinions of counsel stating that the patents-in-suit were invalid, and that Acushnet has consequently felt it unnecessary to design around those patents. (Statz ¶ 271.) I do not see how Acushnet could reasonably have relied on these opinions, however, since Acushnet has successfully prosecuted patent claims on a urethane-over-ionomer multi-layer construction that are very similar to the claims of the patents-in-suit. (See paras. 198-209 above.)

305. Given that Acushnet could not have reasonably believed that the patents-in-suit were invalid, that the Pro V1 balls infringe these patents, and that infringement of these patents carries the risk of sizable liability, I have to assume that Acushnet would design around the patents if it were possible to do so without losing the performance advantages the patented technology confers.

## VIII.  CONCLUSION

306. I reserve the right to rebut any arguments or evidence offered in response to this report, and to supplement this report based on newly presented evidence or further analysis. I also reserve the right to supplement or amend this report based on the Court's construction of the patents-in-suit. I also intend to use graphics and/or demonstrative exhibits to illustrate some of the facts and opinions I have stated here.


Dated:  July 6, 2007

William M. Risen, Jr.

# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CALLAWAY GOLF COMPANY,

           Plaintiff,

vs.                                    Civil Action No.
                                       06-91 (SLR)
ACUSHNET COMPANY,

           Defendant.

_____

   VIDEOTAPED DEPOSITION OF R. JAMES GALIPEAU,

called by counsel for the Plaintiff, taken

pursuant to the Federal Rules of Civil Procedure

before Leigh B. Gershowitz, Certified Shorthand

Reporter, Registered Merit Reporter, Certified

Realtime Reporter and Notary Public, at the Crowne

Plaza, One West Street, Pittsfield, Massachusetts

01201, on Wednesday, October 17, 2007, commencing at

12:00 p.m.


JOB NO. 74968

Page 2

1    APPEARANCES:

2

3    FOR THE PLAINTIFF:

4        FISH & RICHARDSON, P.C.

5        12390 El Camino Real

6        San Diego, California 92130-2081

7        (858) 678-5070

8    BY:  DAVID S. SHUMAN, ESQUIRE

9

10   FOR THE DEFENDANT:

11       HOWREY LLP

12       1299 Pennsylvania Avenue, N.W.

13       Washington, D.C. 20004-2402

14       (202) 383-7108

15   BY:  KENNETH W. DONNELLY, ESQUIRE

16

17   ALSO PRESENT:

18       JOANNE YACOVONE, Videographer

19

20

21

22

23

24

25

Page 3

1                          I N D E X

2

3    WITNESS:      DIRECT     CROSS      REDIRECT     RECROSS

4

5    R. JAMES GALIPEAU

6    By Mr. Shuman   6

7    By Mr. Donnelly

8

9

10

11    EXHIBITS:              DESCRIPTION                   PAGE

12

13    1          Flexural Report                          8

14   *2          Green box of golf balls labeled

15               "Ultra Tour Balata-90"                   13

16   *3          Box of golf balls labeled

17               "Ultra Tour Balata-90"                   16

18   *4          White box of golf balls                  27

19    5          PTLI 101 through 103                     29

20    6          SPC Check of Shore D                     33

21    7          Certificate of Calibration               36

22    8          Report from Rubber Program Cycle #153    38

23

24    *RETAINED EXHIBITS

25

R. JAMES GALIPEAU                          10/17/07

                                                        Page 4

1               S T I P U L A T I O N S

2

3            It is agreed by and between the parties that

4       all objections, except as to the form of the

5       question, are reserved to be raised at the time of

6       trial for the first time.

7

8            It is further agreed by and between the

9       parties that all motions to strike unresponsive

10      answers are also reserved to be raised at the time of

11      trial for the first time.

12

13           It is also agreed that the deponent will

14      read and sign the deposition.

15

16           It is further agreed by and between the

17      parties that notification to all parties of the

18      receipt of the original deposition transcript is also

19      hereby waived.

20

21

22

23

24

25

R. JAMES GALIPEAU                          10/17/07

Page 5

1                P R O C E E D I N G S

2                (The proceedings commenced at 12:04 p.m.)

3                THE VIDEOGRAPHER:  Good afternoon.

4    Here begins media number one and the deposition of

5    James Galipeau in the case of Callaway Golf Company

6    versus Acushnet.  The case is in the U.S. District of

7    Delaware, Case Number 06-91 (SLR).  Today's date is

8    October 17, 2007.  The time is 2:04 p.m.  The

9    deposition is being taken at the Crowne Plaza in

10   Pittsfield, Massachusetts and is being taken on

11   behalf of the plaintiff.

12                The videographer is Joanne Yacovone,

13   appearing on behalf of Sarnoff Legal Technologies

14   located in Irvine, Los Angeles, and San Francisco,

15   California.

16                Would the attorneys please identify

17   themselves and state whom you represent.

18                MR. SHUMAN:  David Shuman of Fish &

19   Richardson, representing plaintiff, Callaway Golf

20   Company.

21                MR. DONNELLY:  Kenneth Donnelly of

22   Howrey, representing the Acushnet Company and also

23   the witness.

24                THE VIDEOGRAPHER:  Would the court

25   reporter please identify herself and swear in the

Page 6

 1   witness.

 2                    THE COURT REPORTER:  Leigh Gershowitz.

 3

 4                         R. JAMES GALIPEAU

 5   a witness called for examination by counsel for the

 6   Plaintiff, being first duly sworn, was examined and

 7   testified as follows:

 8

 9                    DIRECT EXAMINATION

10   BY MR. SHUMAN:

11        Q.   Good afternoon, Mr. Galipeau.

12        A.   Good afternoon.

13        Q.   Could you start by stating your full name

14   and residential address for the record.

15        A.   R. James Galipeau, 56 Elmore Drive in

16   Dalton, Massachusetts.

17        Q.   Mr. Galipeau, have you ever had your

18   deposition taken before?

19        A.   Yes.

20        Q.   When was the last time?

21        A.   It has to be about ten years ago.

22        Q.   What kind of case was that?

23        A.   It regarded tensile properties of a

24   material.

25        Q.   Okay.  Let me just give you a short

R. JAMES GALIPEAU                                    10/17/07

Page 7

```
 1    overview of how things will proceed this afternoon.
 2    Since you've been through this before, you'll
 3    probably find it's very similar to the last time.  I
 4    will try to make my questions as clear as possible.
 5    If you don't understand what I'm asking, please feel
 6    free to tell me that you don't understand and I'll
 7    try to rephrase it.  Okay?
 8         A.   Mm-hmm.  Yes.
 9         Q.   You're represented today by Mr. Donnelly?
10         A.   Yes.
11         Q.   Okay.  So occasionally Mr. Donnelly may
12    interpose objections to the things that I say, but
13    it's important that you understand that, unless he
14    specifically instructs you not to answer, you're
15    still obligated to give an answer.  Okay?
16         A.   Yes.
17         Q.   You're with PTLI, right?
18         A.   Yes.
19         Q.   What does PTLI stand for?
20         A.   Plastics Technology Laboratories,
21    Incorporated.
22         Q.   How long have you been with PTLI?
23         A.   Over 20 years.
24         Q.   Do you remember the exact year you joined
25    them?
```

R. JAMES GALIPEAU                          10/17/07

Page 8

1        A.   19 -- December, 1986.

2        Q.   What is your current title at PTLI?

3        A.   Laboratory manager.

4        Q.   How long have you held that title?

5        A.   Since 1986.

6        Q.   Where were you employed before joining

7   PTLI?

8        A.   General Electric Plastics.

9        Q.   What was your job at GE Plastics?

10        A.   Marketing technologist.

11        Q.   To whom, if anyone, do you report to at

12   PTLI?

13        A.   Jim Beauregard.

14        Q.   What's his title?

15        A.   President.

16        Q.   Who reports directly to you at PTLI?

17        A.   All the technicians, the assistant

18   laboratory manager, and customer service personnel.

19        Q.   How many employees does PTLI have right

20   now?

21        A.   Twenty-four people.

22             MR. SHUMAN:  Let's mark the first

23   exhibit.  This will be Galipeau 1.

24             (Exhibit No. 1 was marked

25                for identification.)

Page 9

1                    MR. DONNELLY:  If I could interrupt,

2       there was one document that Mr. Galipeau may not have

3       included in the production, which is his biography.

4       So we're making that available for --

5                    MR. SHUMAN:  Okay.  Thank you very

6       much.

7                    MR. DONNELLY:  -- production.  Just

8       his biography.

9                    MR. SHUMAN:  Can we go off the record

10      for a moment?

11                   MR. DONNELLY:  Sure.

12                   THE VIDEOGRAPHER:  Going off the

13      record at 12:10 p.m.

14                   (Discussion off the record)

15                   THE VIDEOGRAPHER:  Back on the record

16      at 12:11 p.m.

17      BY MR. SHUMAN:

18          Q.   Mr. Galipeau, I'm going to hand you what

19      we've labeled Galipeau Exhibit 1.  Can you take a

20      look at it and tell me what Exhibit 1 is.

21          A.   This is a test report for flexural

22      properties of plastics per ASTM D790.

23          Q.   Okay.  That is, the first page is for D790,

24      correct?

25          A.   First, second, third, fourth, and the fifth

Page 10

1    page of photos deals with that report.

2        Q.    Okay.  Then beginning on page 131407, as

3    labeled in the bottom right-hand corner --

4        A.    Yes.  That's durometer hardness testing

5    modified per ASTM D2240.

6        Q.    On this page, 131407, it says, under "Test

7    Method," "ASTM D2240-05, modified test specimen, golf

8    ball."  What does "modified test specimen" refer to

9    there?

10       A.    Typically the specimen required for this

11   test, as specified in ASTM D2240, is a flat specimen

12   with a minimum thickness of .25 inches.

13       Q.    And so the golf ball, because it isn't --

14   doesn't have that shape, is considered a modified

15   test specimen?

16       A.    Yes.  It's a modification of the test

17   method.

18       Q.    Have you ever before used the nomenclature

19   "modified test specimen" in connection with a D2240

20   test?

21       A.    Yes.

22       Q.    On what occasions?

23       A.    Many times, when dealing with specimens

24   that don't meet the geometry, but a customer would

25   like a relative comparison of hardness between two

R. JAMES GALIPEAU                                          10/17/07

Page 11

 1    samples.

 2         Q.    When a modified test specimen is being

 3    used, is it inaccurate to call the test an ASTM D2240

 4    test?

 5         A.    Not if you stipulate that it is modified in

 6    the report header.

 7         Q.    What were the samples being measured in the

 8    documents given to you as Exhibit 1?

 9                   MR. DONNELLY:  Object to the form of

10    the question.  Compound.

11                   Are you referring to any -- all of the

12    documents or --

13                   MR. SHUMAN:  Well, you're right.

14    That's kind of a strange question.  Let me rephrase

15    it.

16    BY MR. SHUMAN:

17         Q.    Let's turn to page 131407.  On that page, I

18    see the heading "Set 1" and "Set 2," what do those

19    headings refer to?

20         A.    Sets of golf balls.

21         Q.    What was the origin of these golf balls?

22         A.    They were supplied to us by Acushnet

23    Company.

24         Q.    By whom at Acushnet?

25         A.    Troy Lester.

R. JAMES GALIPEAU                          10/17/07

Page 12

1        Q.    Did you also receive samples from Mr. Jeff

2    Dalton?

3        A.    Yes.

4        Q.    Flipping ahead a few pages, I see the set

5    numbers go up to Set 12.  Does that reflect that you

6    received 12 sets of golf balls from Acushnet?

7        A.    Yes.

8        Q.    Okay.  And then on the next page, 131413,

9    there are two headings, "Wilson Ultra Tour Balata 90

10   Box 93007," and "Wilson Ultra Tour Balata 90 New

11   Box."  Do you see those?

12       A.    Yes.

13       Q.    What do those reflect?

14       A.    Golf balls received from them also.

15       Q.    Under the "Box 93007" heading, there are

16   six samples; is that correct?

17       A.    Yes.

18       Q.    The first two are labeled "Sample No. 1"

19   and "Sample No. 2."  The rest are labeled a different

20   way.  Why were the samples labeled in those two

21   different fashions?

22       A.    They were labeled as supplied by the

23   customer.

24       Q.    Okay.  You brought with you today several

25   boxes of golf balls, including two boxes that look

R. JAMES GALIPEAU                    10/17/07

Page 13

1    like original packaging for the Wilson Ultra Tour

2    Balata; is that correct?

3        A.    That's correct.

4        Q.    I have a few questions about these.

5                MR. SHUMAN:  Let's mark this Exhibit

6    Galipeau No. 2, with the understanding that

7    Mr. Galipeau will be retaining it after the

8    deposition.

9                (Exhibit No. 2 was marked

10                   for identification.)

11   BY MR. SHUMAN:

12       Q.    Mr. Galipeau, what I've just had labeled

13   Exhibit 2 is -- it's a green box labeled on its

14   exterior as "Ultra Tour Balata," the number "90" on

15   it.  Would you agree with that characterization?

16       A.    Yes.

17       Q.    And it looks like inside the box are three

18   golf balls and three empty sleeves, correct?

19       A.    Correct.

20       Q.    Is Exhibit 2 the same box referred to on

21   page 131413 as Box 93007?

22       A.    Not necessarily.  They came in the -- that

23   large box, but the -- that you have in your hand --

24   with those two sleeves -- are indicative.  The two

25   sleeves in there, they are labeled, are indicative of

R. JAMES GALIPEAU                          10/17/07

Page 14

1    where the bars came from the six balls.

2        Q.    Okay.  So that is, there are two sleeves

3    inside Exhibit 2 --

4        A.    Yes.

5        Q.    -- that are specifically labeled 93007?

6        A.    Exactly.

7        Q.    Okay.  Those sleeves are empty.  What

8    happened to the balls that were in them?

9        A.    Three of the balls are in the -- in the

10   box.  And we misplaced three of the other balls.

11       Q.    Okay.  But Acushnet provided you six of

12   these --

13       A.    Yes.

14       Q.    -- these balls originally?

15       A.    Exactly.

16       Q.    Okay.  I'm going to hand you one of these

17   balls from Exhibit 2.  And can you describe it for

18   the record?  Then I'll have some questions about it.

19       A.    Okay.  This is a ball we received,

20   identified number 93007, and lot Sample No. 1.  And

21   this is the same sample that is identified in the

22   report as Sample No. 1.

23       Q.    Okay.  There are, what look like, various

24   red and black pen markings on the ball.  Do you see

25   those?

R. JAMES GALIPEAU                                  10/17/07

Page 15

1        A.    Yes.  I see some various marks on the

2    balls.

3        Q.    Okay.  Can you describe what those various

4    markings are?

5        A.    The only marks I can describe are the ones

6    that we applied to the bar, and those are those red

7    dots.  The red dots.

8        Q.    Okay.  What do the single red dots

9    represent?

10        A.    Where the hardness test was taken.

11        Q.    Okay.  The other red and black patterns

12    that seem to form triangles and other shapes, those

13    weren't placed there by PTLI?

14        A.    No.

15        Q.    The ball was like that when you got it from

16    Acushnet?

17        A.    Yes.

18        Q.    Let me have that back, then.  Thank you.

19    Excuse me.

20            Actually, let me hand you back Exhibit 2

21    for a moment.  Can you verify for the record that

22    each of the three golf balls in the box labeled

23    Exhibit 2 is stamped with the legend "Wilson 90"?

24        A.    Yes.

25                MR. SHUMAN:  Okay.  Let's mark the

R. JAMES GALIPEAU                         10/17/07

Page 16

1    next exhibit Galipeau 3.  It will also be retained by

2    the witness.

3                    (Exhibit No. 3 was marked

4                     for identification.)

5                    MR. SHUMAN:  Okay.  For the record,

6    Galipeau 3 is a box that looks like original Wilson

7    packaging.  It's labeled "Ultra Tour Balata 90," has

8    the Wilson logo on it.  Inside it are two golf balls

9    and three empty sleeves.

10   BY MR. SHUMAN:

11        Q.   Can you confirm that, Mr. Galipeau?

12        A.   Yes.

13        Q.   Mr. Galipeau, can you confirm that the two

14   balls in Exhibit 3 are also marked "Wilson 90"?

15        A.   Yes.

16        Q.   Mr. Galipeau, to your knowledge, did you

17   ever receive from Acushnet any balls labeled "Wilson

18   100"?

19        A.   Not to my knowledge.

20        Q.   Did you ever receive any packaging from

21   Acushnet labeled "Wilson 100"?

22        A.   Not to my knowledge.

23        Q.   Let's look back to Exhibit 1, the PTLI

24   report, on page 131413.  Exhibit 3 corresponds to the

25   second group on that page, the Wilson Ultra Tour

Page 17

1    Balata, New Box?

2         A.    Correct.

3         Q.    Under that heading, there are nine entries.

4    Does that mean PTLI tested nine balls from that box?

5         A.    Yes.  Correct.

6         Q.    Okay.  There are only two balls in this box

7    now.  What happened to the other seven?

8         A.    Those were misplaced.

9         Q.    Do you have any knowledge of how those

10   balls came to be misplaced?

11        A.    No.

12        Q.    How did you come to understand that they

13   had been misplaced?

14        A.    After these -- the specimens were retained,

15   per the customer, in a conditioned area, upon being

16   subpoenaed, we reviewed the samples and those were

17   missing.

18        Q.    Do you have any idea at what time these

19   balls might have gone missing?

20        A.    No.

21        Q.    But it was sometime in between the testing

22   of the balls and your receipt of the subpoena?

23        A.    Correct.

24        Q.    Fair enough.

25              On page AC131413, it says the analyst is

R. JAMES GALIPEAU                                    10/17/07

Page 18

1       "J. McCarthy"?

2            A.    Yes.

3            Q.    Who is J. McCarthy?

4            A.    He is a test technician for plastics -- for

5       Plastics Technology Laboratories.

6            Q.    What does the "J" stand for?

7            A.    James.

8            Q.    How long has Mr. McCarthy worked for PTLI?

9            A.    Eighteen years.

10           Q.    Mr. McCarthy is certified to perform D2240

11      tests?

12           A.    Yes, he is.

13           Q.    Do you require Mr. McCarthy to take any

14      continuing education or certification to maintain

15      that rating?

16           A.    What we do is we participate in

17      Collaborative Testing Service round robin testing,

18      where every quarter we have to perform tests and

19      we're compared to different laboratories to determine

20      whether our results are comparable.

21           Q.    When was the last time PTLI participated in

22      round robin testing related to D2240?

23           A.    Last quarter.

24           Q.    That is third quarter 2007?

25           A.    I'm not -- I'm not sure whether it was the

R. JAMES GALIPEAU                                    10/17/07

Page 19

1    third -- I think it is the third quarter.  I did

2    supply documents related to CTS testing with the

3    discovery documents.

4         Q.   Okay.  We --

5         A.   And it does -- it does contain those

6    quarters.

7         Q.   All right.  We may get to those later.

8              To your knowledge, has Mr. McCarthy ever

9    failed a certification test related to D2240?

10        A.   No.  There is no certification test, per

11   se, for that method.

12        Q.   Suffice it to say, you trust Mr. McCarthy

13   to perform these tests accurately?

14        A.   Yes.  He performs a verification test

15   before running the test on a known sample.  And we

16   correlate those results to make sure that the testing

17   is done properly.

18        Q.   That's standard procedure for PTLI?

19        A.   Standard procedure.  It's a verification

20   test.

21        Q.   What is the known sample that you use to

22   perform the D2240 verification test?

23        A.   There are Shore -- there are blocks of a

24   specified hardness that are purchased for

25   verification purposes.

R. JAMES GALIPEAU                          10/17/07

Page 20

1          Q.    Purchased from what source?

2          A.    I would have to take a look at that.

3     Obviously, an equipment supplier.

4          Q.    Looking back to page AC131413, it says

5     "indenter used" was, in quotes, "D;" do you see that?

6          A.    Yes.

7          Q.    What does that refer to?

8          A.    That refers to the shape of the indenter

9     used to determine hardness.  And that's prob --

10    that's the geometry used.

11         Q.    The geometry of a D indenter is different

12    from a C indenter?

13         A.    Yes.

14         Q.    Did Acushnet ask PTLI to perform any Shore

15    C tests on the samples it provided?

16         A.    No.

17         Q.    Did you offer to perform any Shore C tests?

18         A.    No.

19         Q.    If Acushnet had asked you to supply Shore C

20    data for the balls you tested, would you have

21    performed those tests using a C indenter?

22         A.    No.

23         Q.    How would you have provided that data?

24         A.    We do not have a Shore C.  Each indenter is

25    a separate piece of equipment.  D2240 specifies

Page 21

1    multiple methods from A to G, I believe, or double O.

2    And we do not -- we have A and D indenters.

3        Q.   Okay.  So you could not provide Shore C

4    readings to Acushnet because PTLI does not have a

5    Shore C durometer?

6        A.   Yes.  It's a rare -- it's a very rare test.

7        Q.   If Acushnet had asked you to translate the

8    Shore D measurements you obtained into Shore C

9    ratings, could you have done that for Acushnet?

10        A.   According to the standard, there's no

11    simple relationship between indenters.

12        Q.   Okay.  In other words, no?

13            MR. DONNELLY:  Object.  Object to the

14    form of the question.

15        A.   According to the method, there is no simple

16    relationship.  So I couldn't transfer it based on the

17    method.

18    BY MR. SHUMAN:

19        Q.   Let's turn back to Exhibit 1.  And let me

20    direct your attention to pages AC131417 through 425.

21    These pages appear to be a list under the heading,

22    "Scope of Accreditation."  Can you describe what

23    these pages reflect?

24        A.   This reflects the tests under where -- for

25    which we are accredited to ISO 17025.  ISEO -- ISO

Page 22

1    17025 accredits your proficiency for specific test

2    methods.

3         Q.    So PTLI has been accredited by ISO for each

4    of these methods?

5         A.    AALA, the American Association for

6    Laboratory Accreditation, which accredits to ISO

7    17025, for each and every one of these methods.

8         Q.    Okay.  D2240 is one of these methods,

9    right?

10        A.    Correct.

11        Q.    Among all of these methods that PTLI is

12   accredited to perform, would you say D2240 is among

13   the more common or the less common?

14        A.    More common.

15        Q.    How about D790, more common or less common?

16        A.    More common.

17        Q.    To your knowledge, before this project you

18   received from Mr. Lester, had PTLI done any work

19   previously for the Acushnet Company?

20        A.    No.

21        Q.    Do you know whether PTLI has ever done any

22   work for Callaway Golf Company?

23        A.    I don't recollect.

24        Q.    Do you know whether PTLI has ever done any

25   work for Spalding or Top-Flite?

Page 23

1        A.   Actually, we might have done work for

2   Callaway, now that I remember.  I think we might

3   have.

4        Q.   On what occasion?

5        A.   It was years ago, but I do remember

6   something to that respect.

7        Q.   It would've pertained to golf balls?

8        A.   Not necessarily.

9        Q.   All right.  Do you recall whether PTLI has

10  ever performed any work for Spalding or Top-Flite?

11       A.   Out of Springfield, Mass.?

12       Q.   Springfield or Chicopee, yes.

13       A.   Years -- years ago we did, relating to golf

14  clubs.

15       Q.   That is golf clubs, not golf balls?

16       A.   Golf clubs, yeah.

17       Q.   Who was the first person to contact you

18  about this work for Acushnet?

19       A.   I believe Troy Lester.

20       Q.   What did Mr. Lester tell you when he first

21  contacted you?

22       A.   Whether we could perform ASTM D2240

23  hardness and plus some flexural testing.

24       Q.   And what was your reply?

25       A.   That's what we do all the time.  That's our

Page 24

1    job.

2        Q.    What else did Mr. Lester tell you on this

3    occasion?

4        A.    I don't recall.

5        Q.    Do you recall the date when Mr. Lester

6    first contacted you?

7        A.    I don't recall the date.  I do know that it

8    was in the spring of this year.

9        Q.    Did you create any documentation on the

10   occasion when Mr. Lester first contacted you?

11       A.    No.

12       Q.    How did you leave things with Mr. Lester?

13   That is, did he tell you there would be a follow-up

14   conversation?

15       A.    I don't recall the specifics.  Typically,

16   our marketing or our customer service would get in

17   contact with Mr. Lester.  I'm the -- I'm sort of

18   downstream.  I talk technical.  They hand it over to

19   our customer service, which will carry it forward

20   with the additional information and requests.

21       Q.    I took Mr. Dalton's deposition yesterday,

22   Jeffrey Dalton.  You've met him before?

23       A.    Yes.

24       Q.    Mr. Dalton told me that he attended a

25   meeting at PTLI with you on May 17th of this year.

R. JAMES GALIPEAU                                    10/17/07

Page 25

1        A.   Correct.

2        Q.   Is that your recollection?

3        A.   Correct.

4        Q.   Who else was present at that meeting?

5        A.   Troy Lester, Dr. McKnight.

6        Q.   William McKnight?

7        A.   Yeah.  And Rick Kondel from PTLI.

8        Q.   Could you spell his name for the record?

9        A.   K O N D E L.

10       Q.   What is Mr. Kondel's title at PTLI?

11       A.   He's the assistant laboratory manager and

12   head analytical chemist.

13       Q.   What was the purpose of this May 17th

14   meeting?

15       A.   To discuss the testing that would be

16   performed -- be performed for Acushnet.

17       Q.   And at this meeting, you received the

18   instructions by which you carried out the testing

19   reported in Exhibit 1?

20       A.   Yes.

21       Q.   Who gave you those instructions?

22       A.   I believe it was a discussion between

23   Mr. Dawson --

24       Q.   Dalton?

25       A.   Or Dalton, excuse me -- myself and Troy

Page 26

1    Lester and Professor McKnight.

2         Q.    What specifically was Dr. McKnight's

3    participation in this meeting?

4         A.    Just to review the testing that we were

5    going to be performing as the expert.

6         Q.    How did he review the testing you would be

7    performing?

8         A.    We showed him the equipment it was going to

9    be tested on and the methodology that was going to be

10   used.

11        Q.    What was his reaction to being shown this

12   equipment?

13        A.    That it was a well-wired lab --

14   professional laboratory and everything was in good

15   order.

16        Q.    Had you ever worked with Professor McKnight

17   before?

18        A.    No.

19        Q.    Had you heard of Professor McKnight before?

20        A.    No.

21        Q.    At the May 17th meeting, you were delivered

22   various golf balls samples, correct?

23        A.    Correct.

24        Q.    And then Mr. Dalton testified yesterday

25   that there was a second group of golf balls delivered

1    to you on May 19th; is that your recollection?

2         A.    Correct.

3         Q.    Are all of the samples Acushnet delivered

4    to you, with the exception of the missing Ultra Tour

5    Balata balls, here today?

6         A.    Correct.

7         Q.    I am picking at random a white golf ball

8    box from a large cardboard box produced here today.

9    Among these white golf ball boxes, each of which

10   contains, or can contain, a dozen balls, did PTLI add

11   any writing or marking to these boxes?

12        A.    Yes.

13        Q.    In what way?

14        A.    We -- I -- the set number, the project

15   number, to identify the golf balls to a specific

16   project, and what was their contents.

17                    MR. SHUMAN:  Okay.  For the record,

18   let's mark one of these boxes as an exhibit.  This

19   will be Galipeau 4.  This will be retained by the

20   witness.

21                    (Exhibit No. 4 was marked

22                     for identification.)

23   BY MR. SHUMAN:

24        Q.    Mr. Galipeau, I'm going to hand you Exhibit

25   4.  Can you first describe the exterior of the box

Page 28

1    and confirm the origin of the markings on it?

2         A.    It's a white nondescript box.  The origin

3    of the markings on the box, number one, is the

4    project number to identify the box as being

5    associated with a project related to Acushnet, the

6    identification of the set -- for this sample is Set

7    1 -- and the contents, golf balls.

8         Q.    How are the contents of this box deemed to

9    be Set 1?

10        A.    If you look -- you open the box with the

11   balls up and you look at the sample, they're

12   identified as a 1, dash, 1, through 1, dash, 12.

13        Q.    Where did the 1 dash markings come from?

14        A.    They were on the balls when we received

15   them.

16        Q.    I also see that the balls inside the box

17   have various red dots on them.  Can you explain the

18   origin of those dots?

19        A.    The red dot is where the actual hardness

20   test was taken.

21        Q.    That is where the indenter was placed?

22        A.    Exactly.

23        Q.    How many red dots, then, does each of these

24   balls have?

25        A.    There should -- there should be five,

R. JAMES GALIPEAU                                    10/17/07

Page 29

 1    associated with the number of readings.

 2         Q.    Whose decision was it to take five indenter

 3    readings per ball?

 4         A.    The -- the decision came from, I believe,

 5    Acushnet and through our discussions at the meeting.

 6               MR. SHUMAN:  Why don't we take a short

 7    break while I organize my next exhibit.

 8               MR. DONNELLY:  Sure.

 9               THE VIDEOGRAPHER:  Going off record at

10    12:37 p.m.

11     (A recess was taken at 12:37 p.m. until 12:40 p.m.)

12               (Exhibit No. 5 was marked

13                for identification.)

14               THE VIDEOGRAPHER:  Back on record at

15    12:40 p.m.

16    BY MR. SHUMAN:

17         Q.    Mr. Galipeau, I'm going to hand you what

18    we've marked as Exhibit 5.  This is a three-page

19    stapled document in your document production labeled

20    "PTLI 101 through 103."  Can you look that over and

21    tell me what it is?

22         A.    Basically, it's a -- just an outline of

23    what was received by Acushnet on May 17th.

24         Q.    Okay.  The first page, 101, seems to be

25    dated May 17th, correct?

Page 30

1        A.   Yes.

2        Q.   The next page has the date May 19th on it;

3    do you see that?

4        A.   Yes.

5        Q.   And then there's initials next to that.

6    Whose initials are those?

7        A.   Those are my initials.

8        Q.   On page 102?

9        A.   Yes.

10        Q.   That's RJG?

11        A.   Yes.

12        Q.   Okay.  And on the first page, that is Rick

13    Kondel's signature?

14        A.   That is Rick Kondel, yes.

15        Q.   Whose handwriting is on page 101?

16        A.   I believe that's Rick Kondel.

17        Q.   And on page 102?

18        A.   That's me, my handwriting.

19        Q.   On page 101, upper left-hand corner,

20    there's the sum, 144 plus 7 plus 15.  What does that

21    reflect?

22        A.   That's just the number of durometers that

23    were going to be done, durometer hardness test.

24        Q.   Okay.  That reflects 144 balls from sets 1

25    through 12, correct?

R. JAMES GALIPEAU                              10/17/07

Page 31

1        A.    Yes.

2        Q.    And 15 Wilson Ultra Tour Balata balls?

3        A.    I believe so.

4        Q.    And then the 7 extra Shore D readings were

5    on the circular pucks you had provided?

6        A.    Yes.  Yes.

7        Q.    I see.

8              When you met with Mr. Dalton and

9    Mr. Lester, were you told anything about the

10   litigation between Acushnet and Callaway Golf?

11       A.    No.

12       Q.    Did they mention that these measurements

13   could or would be used in the litigation with

14   Callaway Golf?

15       A.    Yes.

16       Q.    Did you have any reaction to that?

17       A.    No.  It's something we do all the time.

18       Q.    Have you ever had any discussion with

19   Acushnet about being a witness at the trial between

20   Acushnet and Callaway Golf?

21       A.    In support of our data?

22       Q.    In -- for any purpose.

23       A.    Yes.

24       Q.    On what occasion?

25       A.    This morning.

Page 32

1      Q.   With Mr. Donnelly?

2      A.   Yes.

3      Q.   Have you had any previous discussions with

4    anyone at Acushnet or Howrey about being a trial

5    witness?

6      A.   No.

7      Q.   Looking back to Exhibit 5, let's take a

8    look at page PTLI 103.  What is shown on page PTLI

9    103?

10     A.   I -- I don't -- I wasn't informed on what

11   this was.  This was, again, additional information we

12   just attached and received.

13     Q.   You received this page from Acushnet?

14     A.   Yes.

15     Q.   At the May 17th meeting?

16     A.   Yes.

17     Q.   Was any explanation provided as to what it

18   was?

19     A.   No.

20     Q.   Do you have any understanding now of what's

21   shown on page 103?

22     A.   Yeah.  It looks like some of these

23   materials, outer covers, are some of the materials we

24   tested, as -- as pucks or as flexural specimens, raw

25   materials.

R. JAMES GALIPEAU                          10/17/07

Page 33

1        Q.    In any of your discussions with Acushnet or

2    Dr. McKnight, or any of Acushnet's attorneys, were

3    you ever made aware of how the materials to be tested

4    had been selected?

5        A.    No.

6        Q.    Do you have any understanding of that now?

7        A.    No, I don't, really.

8        Q.    Do you have any awareness of the issues in

9    the current litigation between Callaway Golf and

10   Acushnet?

11       A.    No.

12       Q.    Have you read anything in the press about

13   it?

14       A.    No.

15              MR. SHUMAN:   Let's mark this next

16   exhibit, Galipeau No. 6.

17              (Exhibit No. 6 was marked

18               for identification.)

19              MR. DONNELLY:   Mr. Shuman, will you

20   identify what that is?

21              MR. SHUMAN:   Certainly.   This is PTLI

22   108.

23              MR. DONNELLY:   I'll get that from

24   my...

25

R. JAMES GALIPEAU                               10/17/07

Page 34

1    BY MR. SHUMAN:

2        Q.   Okay.  Mr. Galipeau, I'm going to hand you

3    a page we've labeled Exhibit 6.  Could you please

4    explain what Exhibit 6 is?

5        A.   This is a Shore D hardness verification

6    check sheet.  Basically, before an operator

7    runs equipment -- or during when he's running a piece

8    of equipment, he performs a verification to make sure

9    that the equipment is operating properly since its

10   last yearly calibration.  And this is basically where

11   they record the results.

12       Q.   There are three columns on there, "Blue

13   18," "Grey 35," and "Black 80."  What do those refer

14   to?

15       A.   Those are different Shore D durometer

16   hardness value samples that we have.  In other words,

17   if we were running, we would try to choose a

18   verification block which is close to where we are

19   running so we could verify whether the equipment is

20   operating properly.  Again, this is a verification.

21       Q.   It looks like the row dated May 22, 2007 is

22   highlighted; do you see that?

23       A.   Yes.

24       Q.   Do you know why that row would be

25   highlighted?

R. JAMES GALIPEAU                          10/17/07

Page 35

1        A.    I highlighted it because that was the date

2    and time frame that the testing was performed.

3        Q.    In the operator column there, it looks like

4    there are the initials "JM"?

5        A.    That's Jim McCarthy.

6        Q.    Okay.  And in the right-hand column,

7    there's the number "80.9"?

8        A.    Yes.

9        Q.    What does 80.9 reflect?

10        A.    That's the actual durometer reading.  The

11    verification, the SPC, must be within plus or minus

12    two points of the stated value.  For this puck, it is

13    80, so that's within acceptable tolerance for that

14    piece of equipment.

15        Q.    Does the fact that a reading of 80.9 was

16    measured on the Black 80 specimen -- let me start

17    over again.  I'm getting myself confused.

18            In the 80.9 reading obtained on May 22nd,

19    does the .9 difference represent some kind of error?

20        A.    No.  It represents -- represents normal

21    variation for that piece of equipment -- acceptable

22    variation for that piece of equipment.

23        Q.    Acceptable for what purpose?

24        A.    For verification that it's within

25    operating parameter -- correct operating parameters.

Page 36

1        Q.    Those operating parameters are that the

2    reading should be within plus or minus two points of

3    the stated value?

4        A.    Exactly.

5        Q.    Who provides that plus or minus two

6    specification?

7        A.    The company that supplies the verification

8    blocks.

9        Q.    Not the company who supplies the durometer?

10       A.    No.

11              MR. SHUMAN:  Let's mark the next

12    exhibit Galipeau 7.

13              Mr. Donnelly, this is pages 112 and 113.

14              MR. DONNELLY:  Thank you.

15              (Exhibit No. 7 was marked

16               for identification.)

17    BY MR. SHUMAN:

18       Q.    Mr. Galipeau, I'm handing you Exhibit 7.

19    Can you explain what that is?

20       A.    This is a certification of calibration of a

21    Shore D durometer, hardness tester, or the indenter,

22    that Plastics Technology Laboratory used for this

23    testing.

24       Q.    This calibration was performed December 21,

25    2006?

R. JAMES GALIPEAU                          10/17/07

Page 37

1          A.    Yes.

2          Q.    And it says it's scheduled for its next

3     calibration on the same date in 2007?

4          A.    Yes.

5          Q.    Why was PTLI Shore D durometer calibrated

6     on December 21, 2006?

7          A.    We are required to calibrate yearly.

8          Q.    Required by whom?

9          A.    By our certification accreditation and our

10    quality policy.

11         Q.    The Shore D durometer mentioned in this

12    document is the same durometer used to perform the

13    testing on Acushnet samples?

14         A.    Yes.

15         Q.    On the second page, page 113, inside the

16    box there, it says, "Mitutoyo Gage Block set."  Do

17    you see that?

18         A.    Yes.

19         Q.    What is that?

20         A.    That's the instrument that the calibration

21    expert used to calibrate the equipment.  Those are

22    some of the instruments he used.

23         Q.    Are the Mitutoyo blocks the same blocks

24    that PTLI uses to calibrate its equipment regularly?

25         A.    No.  The Mitutoyo are gage blocks that are

Page 38

1    used to accurately determine the indentation depth

2    when calibrating a piece of equipment.  So it's used

3    specifically for calibration indentation depth by the

4    calibration company.

5         Q.   This document also refers to an "Omegadyne

6    0 to 25 pound load cell."  What is that?

7         A.   That's the load cell which determines the

8    pressure that the indenter excerpts on the specimen.

9    That's how they calibrate that to verify that it

10   hasn't changed.

11                  MR. SHUMAN:  This will be Galipeau

12   Exhibit 8, PTLI pages 122 through 125.

13                  (Exhibit No. 8 was marked

14                    for identification.)

15   BY MR. SHUMAN:

16        Q.   Mr. Galipeau, I'm handing you what we've

17   marked as Exhibit 8.  Can you explain what it is?

18        A.   This is a -- basically, a report of our

19   results for Collaborative Testing Service round robin

20   that we participate in to verify our proficiency in

21   Shore hardness testing.

22                  And basically what this is is this

23   basically reports the results of multiple

24   laboratories that basically submit data using the

25   same identical specimens.  And they see where PTLI

Page 39

1   fits within that statistical sampling.  As you can

2   see, there's an eclipse in the page 000125.  And if

3   you look at --there's one dot that's circled, that's

4   our laboratory and how we fit within the other

5   laboratories, which is very close to the grand mean,

6   central eclipse.

7        Q.   Let's turn to page PTLI 124.  What is the

8   meaning of the bar graph on page 124?

9        A.   Where you deviate your variation from the

10  grand mean of all the laboratories.

11       Q.   The "Y" axis of this graph is labeled

12  "CPV."  What does that stand for?

13       A.   Co-efficient variation, process variation.

14  That's just a variation around the grand mean.

15       Q.   Variation in standard deviations or by what

16  units?

17       A.   I believe -- I'm not an expert on -- in the

18  statistics involved in this, but I believe it's

19  variation in standard deviations, but I'm not 100

20  percent sure.

21       Q.   The X axis of this bar graph says "cycle,"

22  what does that refer to?

23       A.   That is -- that's basically the quarter at

24  which it was tested.  Each quarter is a cycle.

25       Q.   Okay.  So this chart shows that the most

R. JAMES GALIPEAU                              10/17/07

Page 40

1    recent cycle of this round robin testing was number

2    153?

3        A.    Correct.

4        Q.    In each cycle, there are two bars

5    represented, a gray one and kind of a darker one.

6    What do those two bars represent?

7        A.    Two samples sets.

8        Q.    In other words, these two samples are the

9    samples passed from lab to lab in the round robin

10   test?

11       A.    Exactly.  There will be two sets of samples

12   passed.

13       Q.    Apart from the May 17th meeting, have you

14   ever spoken to Dr. McKnight on any other occasion?

15       A.    No.

16       Q.    Do you know if anyone else from PTLI has

17   spoken to Dr. McKnight on any other occasion?

18       A.    I wouldn't know.  I wouldn't know that.  I

19   know that I haven't.

20       Q.    Since the May 17th meeting, have you spoken

21   at all with Jeffrey Dalton?

22       A.    Yes.  May 19th, on Saturday, he dropped

23   samples off and I spoke to him then.

24       Q.    Okay.  That's right.  After the May 19th

25   conversation with Mr. Dalton, did you speak to him

Page 41

1    further?

2        A.    No.  Not that I recall.

3        Q.    When this testing was completed, you sent

4    the results to Mr. Lester at Acushnet, correct?

5        A.    I didn't personally send them.  The

6    laboratory sent the results, correct.

7        Q.    Do you have any understanding as to why

8    these results were sent to Mr. Lester as opposed to

9    someone else?

10       A.    He was the originating customer.  He is the

11   customer on the PO, so that's why they were sent to

12   him.

13       Q.    Have you had any discussions with

14   Mr. Lester subsequent to the May 17th meeting?

15       A.    Not necessarily.  No, I didn't.  I'm

16   not -- not regarding these results.

17       Q.    Regarding anything?

18       A.    Regarding confidentiality of the -- the

19   documents, the original documents I was going to send

20   to Lowrey for copying.

21       Q.    Oh, yes.  Okay.  I saw that in your

22   document production.

23       A.    Yeah.

24       Q.    PTLI billed Acushnet approximately $19,000

25   for this testing, correct?

Page 42

```
 1       A.   Yes.

 2       Q.   Has Acushnet paid that invoice in full?

 3       A.   I'm not sure.

 4       Q.   Are you receiving any compensation from

 5   Acushnet for your time today?

 6       A.   Yes.

 7       Q.   How much?

 8       A.   We charge 150 -- 40 -- 50 dollars an hour

 9   for preparation and $250 an hour for appearance fee.

10       Q.   How much preparation time did you put in

11   before today's deposition?

12       A.   Approximately an hour.

13       Q.   How did you spend that hour of preparation?

14       A.   Putting the documents together for copying.

15       Q.   Did you meet with any of Acushnet's

16   attorneys before this deposition?

17       A.   Yes.

18       Q.   Who?

19       A.   (Indicating).

20       Q.   Mr. Donnelly?

21       A.   Mr. Donnelly.

22       Q.   On what date?

23       A.   This morning.

24       Q.   For approximately how long?

25       A.   One hour.
```

R. JAMES GALIPEAU                              10/17/07

Page 43

1       Q.   Mr. Galipeau, have you given any thought as
2   to whether you might attend trial in this matter in
3   Delaware in December?
4       A.   Do I have a choice?  Yes.
5       Q.   And what are your thoughts in that regard?
6       A.   If called -- if called, I will be present.
7       Q.   That is, if Acushnet asks you to be
8   present, you will be present?
9       A.   Yes.
10              MR. SHUMAN:  Okay.  Mr. Galipeau,
11   thank you for your time today.  I have no further
12   questions.
13              THE WITNESS:  Thank you.
14              MR. DONNELLY:  I don't have any
15   questions, but the witness will -- we're reserving
16   the right for him to read and sign.  We can go off
17   the record.
18              THE VIDEOGRAPHER:  Okay.  This
19   concludes the deposition at 1:02 p.m.  And the number
20   of media used is one.  We are off the record at
21   1:02 p.m.
22              (Whereupon, the deposition was
23               concluded at 1:02 p.m.)
24
25

R. JAMES GALIPEAU                                          10/17/07

Page 44

1

2

3

4

5

6

7

8

9        I, R. JAMES GALIPEAU, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15            EXECUTED this _____ day of _____,

16   20_____, at _____, _____.
                                (City)                    (State)

17

18

19

20            _____

21                     R. JAMES GALIPEAU

22

23

24

25

R. JAMES GALIPEAU                                    10/17/07

Page 45

1    COMMONWEALTH OF MASSACHUSETTS)

2    HAMPDEN, SS.                    )

3         I, Leigh B. Gershowitz, Registered Merit Reporter

4    and Notary Public in and for the Commonwealth of

5    Massachusetts, do hereby certify that there came

6    before me on October 16, 2007, at 12:04 p.m., the

7    person hereinbefore named, who was by me duly sworn;

8    that he was thereupon examined upon his oath, and his

9    examination reduced to typewriting under my direction;

10   and that the deposition is a true record of the

11   testimony given by the witness.

12        I further certify that I am neither attorney or

13   counsel for, nor related to or employed by, any of

14   the parties to the action in which this deposition is

15   taken, and further that I am not a relative or

16   employee of any attorney or counsel employed by the

17   parties hereto or financially interested in the

18   action.

19        In witness whereof, I have hereunto set my hand

20   and seal this 23rd day of October, 2007.

21

22

23                     Notary Public

24                     My commission expires

25                     May 4, 2012