# EXHIBIT I

# Teeing off in court

## Legal battles over Acushnet Co.'s high-end golf ball will last a long time

January 06, 2008 6:00 AM

Callaway Golf won a battle against Acushnet Co. last month when a jury ruled in its favor in a patent infringement case, but the war is far from over.

Callaway, based in Carlsbad, Calif., brought the suit against Fairhaven-based Acushnet Co. in February 2006, alleging that the Titleist Pro V1 golf ball line, which is used by nearly three-quarters of the players on the PGA Tour and countless weekend golfers, violated four patents owned by Callaway.

The verdict, which came a year and a half after the case was filed by Callaway, found for Callaway on eight of the nine patent claims being contested. On the remaining claim, the jury ruled in favor of Acushnet Co., which is a subsidiary of Fortune Brands Inc.

Judge Sue L. Robinson, who presided over the case in Federal District Court in Delaware, affirmed the jury verdict on Dec. 20, setting in motion the next phase of the trial: a series of motions by both sides and potentially an appeal to the Federal Circuit Court.

All this — years spent wrangling in court, countless thousands of dollars in legal fees — over a little white ball.

"When you look at a golf ball, you just see this white sphere, and it looks pretty simple," said Acushnet Co. Executive Vice President Joseph Nauman.

But, he continued, "There are a lot of different moving parts in a golf ball."

How those moving parts are put together govern how far that ball will fly when hit off the tee and how responsive and accurate it will be when putted on the green. Golf ball designers have spent years trying to create balls that combine both properties because what golfer — whether a professional or a weekend hack — wouldn't buy a ball that would make drives a little longer and putts a little cleaner?

The extensive research and development surrounding golf ball design has created a highly secretive industry that jealously guards its technologies and manufacturing processes, giving rise to hundreds upon thousands of patents. The Titleist Pro V1 golf ball is based on 70 different patents, according to a statement by Acushnet Co., while Callaway lists 96 patents that have contributed to its HX Tour golf ball on its Web site.

It's also an industry that, when combined with companion products like golf clubs and accessories, makes a lot of money: Acushnet Co. and Callaway alone generated more than $2.3 billion in revenues in 2006, according to their respective annual reports.

That little white ball clearly is worth fighting over.

Now that the judge has entered the verdict, Acushnet Co. will file two motions, according to Mr. Nauman, the first requesting a new trial and the second asking the court to reverse the jury verdict.

"This case is far from over," Mr. Nauman said in a statement released by Acushnet Co. on Dec. 21. "We will continue to defend ourselves vigorously and fully expect to prevail in having all claims of all four patents determined to be invalid."

Callaway does not comment on cases under litigation, according to Michele Szynal, a spokeswoman for the company. However, in a brief statement made by the company following the jury verdict, Ms. Szynal said Callaway will immediately begin the process of seeking injunctive relief and damages.

Acushnet Co. will fight any injunction aimed at preventing the company from manufacturing and selling its golf balls, according to a statement.

About 600 million Pro V1 golf balls have been sold since the line was introduced in 2000, according to Mr. Nauman. In its initial court complaint, Callaway estimated that Acushnet Co. sells more than $200 million worth of the Pro V1 balls per year.

In 2006, Acushnet Co. made $1.31 billion in net sales, of which Titleist products accounted for $750 million, according to Fortune Brands' annual report.

The court case, which has been ongoing for almost two years and looks like it will continue for several more, has it roots back in 1995 in a golf-ball patent application filed by Spalding, a sporting goods company originally from Chicopee that was acquired by Callaway in 2003.

That patent application was abandoned by Spalding, but the company filed a continuation of the application in 1997 and then a second continuation in 1999. This second continuation was granted a patent on April 3, 2001.

Spalding went on to receive three more patents, all stemming from the original patent application in 1995, that were issued at three different dates in 2003. All four patents involved multi-layer golf balls, according to Callaway's initial complaint.

Although the first of these patents was not granted until 2001, Spalding was able to claim a priority date back to 1995, when the initial application was filed.

Acushnet Co. introduced the Titleist Pro V1, based on its own patents, at the PGA Tour's Invensys Classic on Oct. 12, 2000, several months before the first Spalding patent was issued.

But some legal experts point out that having a patent is not always enough.

"Having a patent is not a safe harbor," said Michael J. Meurer, a professor at Boston University School of Law who teaches patent law. "Even though I've got a patent on my technology, I still might be infringing."

Mr. Meurer continued, "Most infringers of patents are not pirates. Most infringers have independently created the technology on their own."

According to Mr. Nauman, Acushnet Co. developed the technology that led to the Pro V1 line of golf balls without any knowledge of the patent applications Spalding had pending. Until patents are issued,

communications between the inventor and the patent office are normally private.

One patent directly related to the Pro V1 was issued in 1999, before Spalding's 1999 application that led to a patent in 2001, Mr. Nauman said.

According to Mr. Meurer, however, "Having a patent is never a source of defense."

In the court case, Acushnet Co. had to prove, not that they had a patent on the technology they were using for the Pro V1 golf balls, but that the patents owned by Callaway were invalid, Mr. Nauman said.

In trying to prove the claims of the patent invalid, Acushnet Co. was relying in part on an argument of "obviousness," which means that the advancements claimed in the patent would have been obvious to someone experienced in the field based on information — or "prior art" — that was already available, according to Mr. Nauman.

Although Acushnet Co. recently settled a different patent infringement case with Bridgestone Sports, makers of a variety of golfing products, Mr. Nauman said the company has no intention of settling with Callaway because it strongly believes that the Callaway patents in question are invalid.

Additionally, the U.S. Supreme Court decided a patent infringement case in April, Mr. Nauman said, that supports Acushnet Co.'s claims of obviousness.

In that case, KSR International Co. v. Teleflex Inc., the Supreme Court said that if an individual or a company takes two known elements in a given field and combines them to create a new element, that new element is not necessarily patentable: "The results of ordinary innovation are not the subject of exclusive rights under the patent laws," wrote Justice Anthony Kennedy in the opinion of the court.

"The standard articulated by the Supreme Court when applied to the facts of these patents makes it clear that these patents are invalid," Mr. Nauman said. "If you take known elements in the art and simply combine them and get an expected result, then you haven't invented anything."

Mr. Meurer, the law professor, agreed that the KSR decision might hurt Callaway's position.

"The Federal Circuit might not be as reliable for the patent owner as they would have been in the past," he said. "The Federal Circuit might be more willing now to upset a jury verdict of validity."

Spalding, the original owner of the patents in the court suit, first approached Acushnet Co. about possible infringement in December 2001. After a number of discussions between the companies over about nine months, Spalding dropped the issue.

Even then, Acushnet Co. thought the patents were invalid, according to Mr. Nauman, but since Spalding ended the conversations without taking any additional action, Acushnet Co. didn't think any proactive action was necessary.

After Spalding went bankrupt in 2003, Callaway purchased its assets, including the patents in question, and about a year later, they approached Acushnet Co. about the patents.

"What they wanted was for us to pay them money," Mr. Nauman said. "They wanted to negotiate

some type of license arrangement where we would pay them a significant amount of money."

The two companies held private conversations over 18 months, but eventually, it became clear that no conclusion was going to be reached.

As a result, Acushnet Co. decided to file for a re-examination of the patents with the U.S. Patent and Trademark Office in January 2006. By filing for a re-examination, Acushnet Co. was asking the patent office to take a second look at the patents and decide whether they were valid.

"We only filed the re-examination once those discussions (with Callaway) broke down," Mr. Nauman said. "We had always wanted to take it to the patent office."

Callaway countered a month later by filing its suit in federal district court in Delaware.

The U.S. Patent Office has issued an initial report on the four Spalding patents and found all the claims of each patent to be invalid, upholding Acushnet Co.'s position, according to Mr. Nauman. Both Acushnet Co. and Callaway responded, and a second report on one of the patents came out in November that continued to side with Acushnet Co.

"We don't see any reason the patent office would reach a different determination of any of the other three that are still outstanding," Mr. Nauman said.

The district court judge did not allow Acushnet Co. to present any information about the re-examination in the jury trial. Acushnet Co. also filed for a stay of the court proceedings until after the re-examination was complete on three separate occasions and was denied all three times.

The re-examination in the patent office and the court case will continue along parallel timelines. Second reports from the patent office on the last three patents should be issued by the end of January, according to Mr. Nauman.

Both parties will have a chance to respond to the second reports, and the patent office will issue a final decision on each patent, Mr. Nauman said.

In the court case, the motion and appeals process could take years to play out, according to Mr. Nauman, although Mr. Meurer, the law professor, said timelines in cases such as this can vary significantly.

"The appeals process could take a number of years," Mr. Meurer said. "It could take a long time, or it could be done in something like a year."

But, he continued, —It makes a lot of sense for Callaway to be pushing the litigation. They want to be pushing it faster than the re-examination is going to go."

According to Mr. Nauman, the initial briefing schedule following the jury's verdict will conclude some time during the end of February. During this time, each side will be able to file motions and a series of briefs responding to the opposing side.

Judge Robinson, the district court judge, will then review the motions before her and issue a decision. Historically, she has taken from six months to a year to reach decisions on these type of briefs, Mr. Nauman said.

After the judge makes her decision, either side can appeal to the Federal Circuit Court, which will again involve a series of briefs as well as oral arguments in front of a three-judge panel.

The Federal Circuit process could take 12 to 18 months from when the initial appeal was filed, according to Mr. Nauman. And even after that court reaches a decision, the process still might not be over: The Federal Circuit judges could send the case back to district court for a new trial, according to Mr. Nauman.

If the case is appealed to the Federal Circuit court, both sides will be able to present evidence that was not presented at the jury trial, according to Mr. Nauman — like the fact that a re-examination of the patents in questions is under way at the U.S. Patent Office after being requested by Acushnet Co.

"We think that regardless of who gets to the end first, whether it's the patent office or whether it's the federal circuit ... whomever's going to reach the final conclusion is going to reach it in our favor," Mr. Nauman said.

undefined