IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

               Plaintiff,

    v.

ACUSHNET COMPANY,

              Defendant.

C. A. No. 06-91 (SLR)

**REDACTED**

## CALLAWAY GOLF COMPANY'S *OPPOSITION* TO ACUSHNET'S RULE 50(b) and 59 POST-TRIAL MOTIONS TO REVERSE OR VACATE THE JURY'S VERDICTS

FISH & RICHARDSON P.C.

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

Attorneys for Plaintiff
CALLAWAY GOLF COMPANY

Dated: February 25, 2008

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  ACUSHNET IS NOT ENTITLED TO REVERSAL OF THE
     VERDICTs ..........................................................................................................2

    A.   To Reverse the Jury's Eight Verdicts, Acushnet Faces a
     Doubly Difficult Standard ................................................................................2

    B.   Substantial Evidence Supports the Jury's Verdicts .........................................3

        1.   Sullivan's Inventions Were Truly Revolutionary...............................3

            a.   The Inventions Obsoleted a Long-Dominant
          Technology .........................................................................3

            b.   Sullivan Combined Elements In A Way
          Never Done Before..............................................................5

        2.   There are Thousands of Choices of Materials that
     can be used in Golf Ball Design – a Highly
     Complex and Unpredictable Art .........................................................6

        3.   Acushnet's Pro V1 Creators Uniformly Believed
     that its Basic Construction was a Novel Concept
     Worthy of a Patent in 1995/1996 .......................................................8

        4.   Substantial Evidence Supports the Jury's Presumed
     Finding That the Prior Art Does Not Render the
     Claims Obvious ..................................................................................9

            a.   Proudfit Combined with Molitor Does Not
          Render the Claims Obvious...............................................11

                i.   Proudfit's patent contains no
               teaching of the Shore D hardness of
               an outer cover made of any material ......................12

                ii.  Acushnet presented no evidence that
               would have required a reasonable
               juror to believe that Molitor '751
               taught a polyurethane cover with a
               Shore D hardness of less than 64
               when used on a multi-layered ball ..........................12

                iii. Molitor's disclosure of a Shore C
               value does not help Acushnet ..................................13

i

## TABLE OF CONTENTS (cont'd)

Page

iv.    One of skill in the art would have no expectation of success if they were to combine the references in the manner argued by Acushnet ...................................14

b.    Proudfit Combined with Wu Does Not Render the Claims Obvious..............................................15

i.    All testimony linking the Pro V1 to Wu is irrelevant ......................................15

ii.    There is no link between the Professional and the Wu patent..............................15

iii.    Even if relevant, Wu's plaque formulation and properties were not publicly known in 1995...........................................16

iv.    There is no reason to believe that a plaque hardness of 48 shows an on-the-ball hardness of 64 or less.................................16

v.    One of skill in the art would have no expectation of success by combining Proudfit and Wu .....................................17

c.    The Wilson Ultra Tour Balata Combined with Molitor '751 or Wu Does Not Render the Claims Obvious.............................................18

d.    Objective Indicia Amply Support the Jury's Rejection of Acushnet's Obviousness Defense .............................................................19

i.    The Infringing Pro V1 Enjoyed Unprecedented Commercial Success...................................................20

ii.    Substantial Evidence Supports the Jury's Presumed Finding that a Nexus Exists Between the Inventions and the Commercial Success...................................................22

iii.    Sullivan's Inventions Were the "Holy Grail" of Golf Ball Design – a Combination of Long Distance and Good Control ...................................23

ii

## TABLE OF CONTENTS (cont'd)

Page

iv.  Some Were Skeptical of Sullivan's
Approach................................................................23

v.  The Success of Sullivan's
Inventions Surprised Even Acushnet ......................24

vi.  Acushnet's Response to
Overwhelming Objective Indicia of
Non-Obviousness is a Mistaken
"Simultaneous Invention"
Argument ...............................................................25

vii.  Callaway Golf's Latest Golf Balls
Have Advanced The Sullivan
Technology to the Next Step ...................................27

viii.  Acushnet Offers No Evidence That
Other Patents Cover the Pro V1 .............................27

C.  The Court's "On-the-Ball" Claim Construction was Correct
and has Now been Supported Without Contradiction by the
Evidence ...........................................................................28

III.  NOTHING ENTITLES ACUSHNET TO A NEW TRIAL ON
THE ASSERTED CLAIMS ...................................................................28

A.  Acushnet's Complaints About the Court's Evidentiary
Rulings Lack Merit ............................................................30

1.  The Court Properly Excluded the Frankenstein Balls
Created, With the Benefit of Hindsight, by
Acushnet's Attorneys......................................................30

2.  Acushnet *Stipulated* to the Admission of the Hebert
Patent ...............................................................................31

3.  The Court Properly Excluded the Irrelevant and
Prejudicial *Ex Parte Sullivan* and Reexamination
Materials ..........................................................................32

B.  Dr. Risen's Expert Report Reasonably Disclosed the
Substance of His Testimony.........................................................34

C.  The Jury's Verdict Regarding Claim 5 of the '293 Patent
Does Not Require a New Trial Regarding All Eight
Verdicts Upholding the Validity of the Other Claims ...................38

## TABLE OF CONTENTS (cont'd)

Page

1.  Acushnet's Silence During Trial Waived Any Right to Now Complain About Any Alleged Inconsistency of the Verdicts...........................................................39

    a.  Acushnet Failed to Object to the Lack of Any Definition of Dependent and Independent Claims in Either the Draft Jury Instructions or the Verdict Form.........................................39

    b.  Acushnet Also Failed to Object Prior to the Jury's Dismissal..................................................................41

2.  Even If the Merits of Acushnet's Inconsistent-Verdict Argument Are Addressed, No New Trial is Warranted.........................................................................46

    a.  The Majority of the Asserted Claims are Easily Distinguished from the One Invalidated Claim..................................................................46

    b.  Inconsistent General Verdicts May be Allowed to Stand .................................................................47

    c.  Acushnet Fails to Establish that Allowing the Jury's Verdicts to Stand would Result in a Miscarriage of Justice.......................................................49

IV.  CONCLUSION.........................................................................................50

iv

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
  725 F.2d 1350 (Fed. Cir. 1984) ............................................................................................15, 28

*Babcock v. General Motors Corp.,*
  299 F.3d 60 (1st Cir. 2002) ....................................................................................................42, 47

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
  434 F.Supp.2d 308 (D.Del. 2006) ........................................................................................48

*Bradford Co. v. Jefferson Smurfit Corp.,*
  2001 WL 35738792 (Fed.Cir. 2001) ....................................................................................49, 50

*Brokerage Concepts, Inc. v. U.S. Healthcare Inc.,*
  140 F.3d 494 (3rd Cir. 1998) ................................................................................................45

*Caisson Corp. v. Ingersoll-Rand Co.,*
  622 F.2d 672 (3d Cir.1980).....................................................................................................48

*Care v. Reading Hospital,*
  448 F.Supp.2d 657 (E.D. Pa. 2006)......................................................................................52

*Cell Pro,* 894 F.Supp. 819 (D.Del.)..........................................................................................47

*China Resource Prods. (U.S.A.) v. Fayda Int'l,*
  856 F. Supp. 856 (D. Del. 1994) ..........................................................................................53

*Continental Can Co. v. Monsanto Co.,*
  948 F.2d 1264 (Fed.Cir. 1991) ..............................................................................................21

*Crown Ops. Int'l v. Solutia, Inc.,*
  289 F.3d 1367 (Fed.Cir. 2002) ..............................................................................................21

*Cudone v. Gehret,*
  838 F. Supp. 267 (D. Del. 1993) ..........................................................................................53

*Cundiff v. Washburn,*
  393 F.2d 505 (7th Cir.1968) ..................................................................................................48

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.,*
  851 F.2d 1387 (Fed. Cir. 1988)........................................................................................24 - 26

### TABLE OF AUTHORITIES (cont'd)

Page(s)

*Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,*
  791 F.2d 1416 (10th Cir.) ................................................................48

*Dystar v. C.H. Patrick,*
  464 F.3d 1356 (Fed. Cir. 2006).......................................................23

*Eli Lilly & Co. v. Zenith Goldline Pharm.,*
  471 F.3d 1369 (Fed.Cir. 2006).........................................................23

*Federal Ins. Co. v. Dean Const. Co.,*
  432 F.Supp.2d 1256 (M.D.Ala. 2006)...............................................43

*Finch v. Hercules Inc.,*
  941 F.Supp. 1395 (D.Del.1996) ........................................................48

*Gillette Co. v. S.C. Johnson & Son, Inc.,*
  919 F.2d 720 (Fed. Cir. 1990) ..........................................................14

*Globus v. Law Research Service, Inc.,*
  418 F.2d 1276 (2d Cir.1969) ............................................................52

*Graham v. John Deere & Co.,*383
  U.S. 1 (1966)....................................................................................23

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
  78 F.3d 1575 (Fed. Cir. 1996)..........................................................37

*Home Indemnity Co. v. Lane Powell Moss and Miller,*
  43 F.3d 1322 (9th Cir. 1995) ...........................................................48

*In re Corkill,*
  771 F.2d 1496 (Fed. Cir. 1985)........................................................36

*In re Kotzab,*
  217 F.3d 1365 (Fed. Cir. 2000) ........................................................12

*In re Piasecki,*
  745 F.2d 1468 (Fed. Cir. 1984).........................................................36

*In re Rijckaert,*
  9 F.3d 1531 (Fed. Cir. 1993) .....................................................14, 22

*In re Spormann,*
  363 F.2d 444 (C.C.P.A. 1966) ..........................................................22

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

*Interconnect Planning Corp. v. Feil,*
    774 F.2d 1132 (Fed. Cir. 1985)...................................................................36

*Jacobs v. City of Philadelphia,*
    2005 WL 1899499 (E.D.Pa. Aug. 8, 2005) ...................................42, 52

*Jarvis v. Ford Motor Co.,*
    283 F.3d 33 (2d Cir. 2002)..................................................................42, 44

*Jayne v. Mason & Dixon Lines,*
    124 F.2d 317 (2d Cir.1941) ....................................................................53

*Joy Techs., Inc. v. Flakt, Inc.,*
    820 F.Supp. 802 (D Del 1993) ..............................................................48

*Kirkendoll v. Neustrom,*
    379 F.2d 694 (10th Cir.1967) ...............................................................48

*L&W Inc. v. Shertech Inc.,*
    471 F.3d 1311 (Fed.Cir. 2006)........................................................49, 50

*Lindemann Masch. v. American Hoist & Derrick Co.,*
    730 F.2d. 1452 (Fed. Cir. 1984)...........................................................28

*Los Angeles Nut House v. Holiday Hardware Corp.,*
    825 F.2d 1351 (9th Cir.1987) ...............................................................48

*Los Angeles v. Heller,*
    475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 .................................52

*Malley-Duff & Assoc. v. Crown Life Ins. Co.,*
    734 F.2d 133 (3rd Cir. 1984) ................................................................47

*Mason v. Ford Motor Co., Inc.,*
    307 F.3d 1271 (11th Cir. 2002)............................................................47

*McAdam v. Dean Witter Reynolds, Inc.,*
    896 F.2d 750 (3d Cir 1990) ..................................................................50

*McIsaac v. Didriksen Fishing Corp.,*
    809 F.2d 129 (1st Cir.1987)..................................................................42

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.,*
    244 F.3d 1365 (Fed. Cir. 2001)...............................................................6

vii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Merchant v. Ruhle,*
    740 F.2d 86 (1st Cir.1984) ........................................................................................... 42, 48

*Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,*
    976 F.2d 1559 (Fed. Cir. 1992) ............................................................................................ 23

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,*
    139 F.3d (Fed. Cir. 1998) ...................................................................................................... 30

*Mosley v. Wilson,*
    102 F.3d 85 (3d Cir.1996) ............................................................................................... 51, 52

*Motorola, Inc. v. Interdigital Tech. Corp.,*
    121 F.3d 1461 (Fed.Cir.1997) ............................................................................................... 48

*Neely v. Club Med Management Services, Inc.,*
    63 F.3d 166 (3rd Cir. 1995) ................................................................................................... 44

*Odetics, Inc. v. Storage Technology Corp.,*
    185 F.3d 1259 (Fed. Cir. 1999) ..................................................................................... 6, 7, 13

*Olefins Trading, Inc. v. Han Yang Chem. Corp.,*
    9 F.3d 282 (3rd Cir. 1993) .................................................................................................... 53

*Pentec, Inc. v. Graphic Controls Corp.*
    776 F.2d 309 (Fed. Cir. 1985) .............................................................................................. 26

*Perkin-Elmer Corp. v. Computervision Corp.,*
    732 F.2d 888 (Fed.Cir.1984) .................................................................................................. 6

*Railroad Dynamics v. Stucki,*
    727 F.2d 1506 (Fed. Cir. 1984) ...................................................................................... 46, 47

*Repola v. Morebark Indus.,*
    934 F.2d 483 (3rd Cir. 1991) ................................................................................................ 47

*Robotic Vision Systems v. View Engineering,*
    189 F.3d 1370 (Fed.Cir. 1999) ............................................................................................. 23

*Scimed Life Systems, Inc. v. Johnson & Johnson,*
    225 F.Supp.2d 422 (D.Del. 2002) ........................................................................................ 50

*Strauss v. Stratojac Corp.,*
    810 F.2d 679 (7th Cir.1987) ................................................................................................. 48

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Tennessee Consol. Coal Co. v. UMW,*
    416 F.2d 1192 (6th Cir.1969) ......................................................................48

*Union Pacific R. Co. v. Hadley,*
    246 U.S. 330 (1918) (Holmes, J.) ...............................................................50

*United States Football League v. National Football League,*
    644 F.Supp. 1040 (S.D.N.Y.1986), *aff'd,* 842 F.2d 1335 (2d Cir.1988)............52

*Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.,*
    278 F.3d 1366 (Fed. Cir. 2002)...................................................................36

*White v. Celotex Corp.,*
    878 F.2d 144 (4th Cir. 1989) ......................................................................48

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed.Cir. 1999) ....................................................................27

*Zhang v. American Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) ........................................................ 42, 44, 50-51


**STATUTES AND OTHER AUTHORITIES**

Black's Law Dictionary (8th ed. 2004)...........................................................45, 47

Fed. R. Civ. P. 50(a)(1) ..................................................................................... 6

Fed. R. Civ. P. 51.............................................................................................44

Fed. R. Civ. P. 59.............................................................................................51

Fed. R. Civ. P. 49...............................................................................47, 50, 52

Fed. R. Civ. P. 49(a) ..........................................................................45, 47, 50

Fed. R. Civ. P. 49(b) ..........................................................................47, 48, 50

Fed. R. Civ. P. 61.............................................................................................36

Wright & Miller, § 2511 ..................................................................................45

Wright & Miller, 2513 at 208 ..........................................................................48

## I.  INTRODUCTION

This dispute concerns an invention that, by everyone's account, revolutionized the game of golf. In a matter of months, wound technology that had dominated the golf ball landscape for almost a hundred years was obsoleted by balls that use the Sullivan inventions at issue here – combining the distance of a solid core ball with the control of a wound ball.  Sullivan's inventions literally were the Holy Grail sought by every golf ball designer for decades.  It is difficult to imagine stronger evidence of objective factors establishing non-obviousness of an invention than those presented to this jury.

Facing the daunting task of overturning the eight separate instances in which the jury rejected its obviousness defenses, Acushnet does the only thing it can – ignore all evidence it does not like, and substitute (or invite the Court to substitute) its own judgment and credibility assessments for those of the jury.  But one simple fact compels denial of Acushnet's motions: *none* of the prior art, alone or in the combinations argued by Acushnet, disclosed, taught, or suggested a multi-layer ionomer ball with a polyurethane outer cover layer having a Shore D hardness of less than 64.  Given that Acushnet bore the burden to show by clear and convincing evidence that the four patents in suit were invalid, and given that all inferences are to be drawn in Callaway Golf's favor, Acushnet cannot carry its burden with this critical gap in the evidence.  Aside from ignoring evidence and re-weighing credibility, Acushnet alleges legal error concerning its "off-the-ball" claim construction, but the Court has now seen that Acushnet's position is at odds with the undisputed evidence from Acushnet's *own* witnesses.  JMOL in favor of the party bearing burden at trial is only granted in "extreme cases" and this simply is not one of them.

Similarly, Acushnet's alternate effort to seek a new trial lacks merit.  The result at trial was not only just and consistent with the great weight of the evidence, but the bases Acushnet cites to overturn that result would lead to injustice – not remedy it.  This is best illustrated by Acushnet assigning error to the Court's exclusion of interim results from the reexamination proceedings – which exist only because of Acushnet's own unlawful acts.  Likewise, Acushnet seeks a new trial because of an alleged inconsistency in the results but, again, the fault is Acushnet's.  Acushnet failed to ensure the jury was provided with an instruction regarding how independent and dependent claims relate to one another, failed to object to a verdict form that did not explicitly define the relationship between such claims, and,

most critically, waived any challenge to the alleged inconsistency by failing to pursue corrective measures when something could have been done – before the jury was dismissed. Prior to dismissing the jury, the Court invited counsel to raise any issues requiring attention. Acushnet's counsel stood silent. The law does not reward post-trial attempts to capitalize on "errors" which a party strategically decides not to remedy at trial. Moreover, because the jury returned general verdicts concerning the legal issue of obviousness for each of the asserted claims, the Court is authorized by extensive precedent, including from the Third Circuit, to simply allow the verdicts to stand as-is. Thus, Acushnet is entitled to neither reversal of the jury's verdicts nor a new trial, and its post-trial motions should be denied.

## II. ACUSHNET IS NOT ENTITLED TO REVERSAL OF THE VERDICTS

### A. To Reverse the Jury's Eight Verdicts, Acushnet Faces a Doubly Difficult Standard

To be granted judgment as a matter of law, Acushnet must show that it provided the jury with clear and convincing evidence of obviousness, and that no reasonable juror could conclude otherwise. This only happens in "extreme cases." *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001) ("Courts grant JMOL for the party bearing the burden of proof only in extreme cases."). Indeed, "[t]he grant of a motion for JMOL is permissible *only* when 'there is no legally sufficient basis for a jury to find for [the non-moving] party.'" *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1269 (Fed. Cir. 1999) (*citing* Fed. R. Civ. P. 50(a)(1)).[1] "In order to determine whether a legally sufficient basis in fact exists, 'the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine the credibility of witnesses,[2] and must not substitute its choice for that of the jury." *Id.* (*citing Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984)). "If, after this analysis, substantial evidence, being that minimum quantum of evidence from which a jury might

---

[1]  Emphasis of quoted material set forth through-out this brief has been added, unless otherwise noted.

[2]  For example, here, the jury was entitled to discount the credibility of Acushnet's expert, Dr. Statz, because, *inter alia*: (i) one of Dr. Statz's patents was taken away and given to Mike Sullivan (the inventor of the patents-in-suit) while he worked for Spalding (*see* Statz Tr. 735:21-737:8); (ii) Dr. Statz made extensive prior inconsistent statements that undercut his opinion at trial regarding the obviousness of polyurethane as a cover material on a multi-layer ionomer ball (*see, e.g.,* Statz Tr. 660:6-673:5 (noting, *e.g.*, "I worked on ionomers, not urethane. I'm selling ionomers, not urethanes."); 686:6-687:9); and (iii) Dr. Statz reached his opinion based upon the five primary references that Acushnet's attorneys gave to him – references that he had never previously seen (Statz Tr. 643:17-645:5).

reasonably afford relief, exists to support the jury's verdict, then the motion for JMOL *must* be denied."

*Odetics*, 185 F.3d at 1269. Thus, all evidence must be viewed in a light most favorable to Callaway Golf and the jury is presumed to have resolved all fact issues in its favor. Acushnet ignores this standard, along with all of the evidence showing that Acushnet cannot possibly meet it.

### B. Substantial Evidence Supports the Jury's Verdicts

#### 1. Sullivan's Inventions Were Truly Revolutionary

##### a. The Inventions Obsoleted a Long-Dominant Technology

For almost a century, one type of premium golf ball stood at the top – a wound-core golf ball with a soft cover. [Bellis Tr.[3] 269:13-17; 271:4-11; 272:24-273:4; 277:16-25; 310:5-21; PX 1175] Acushnet was the preeminent wound ball company, and therefore dominated the sales of premium golf balls. [Bellis Tr. 224:16-225:15; 228:12-229:6; PX 1175] However, almost overnight, professional golfers turned their collective back on a century's worth of proven technology and switched to the technology disclosed and claimed in the Sullivan Patents. [DX 1-4 (patents in suit)] This "immediate paradigm shift from wound urethane to solid urethane technology" was unprecedented. [Bellis Tr. 271:4-11; Hebert Tr. 1104:1-8; PX 1201] Forty-seven professionals, more than half of the players under contract with Titleist, put the infringing Pro V1 in play at the very first tournament that it was available. [Bellis Tr. 218:4-22; Trial Tr. 131:8-11; D.I. 367 (infringement stipulation); Bellis Tr. 306:9-13 ("the largest pluralistic shift of golf equipment at any one event in golf history"); PX 722 at AC0089552]

Golfers switched because the new balls were the first to solve an age-old dilemma – hard balls flew a great distance but performed poorly on shorter shots around the green, which required control and finesse; conversely, soft balls were great for shorter shots but lacked the distance of the hard balls. A ball that could effectively do both was the "Holy Grail." [Bellis Tr. 274:11-15; Risen Tr. 1146:9-21; Statz Tr. 650:4-8; 651:20-652:21; 737:24-738:21] The Pro V1 was such a ball. [Bellis Tr. 275:12-23] Acushnet's own witnesses acknowledged that such "complete" performance had not existed in one ball before the advent of this technology and that it enabled the Pro V1's success.

> So we believe the beauty of Pro V1 is that it excels in each of those categories and makes it the best total performance golf ball, which ***prior to then* there were many golf balls that did**

---

[3] All references to witness testimony trial exhibits are from the trial record, unless otherwise noted.

**two or three things very well but maybe the fourth and fifth not as well** and maybe **the Titleist Pro V1 from a performance perspective does *all* of those things extremely well**.

[Bellis Tr. 237:11-238:9; 276:4-23 ("*first time we made that combination*"); 240:12-18 ("*for the very first time*, the ball that is the most popular, most played on tour is also the very best ball for the average golfer")]  Bill Morgan, Acushnet's Vice President of Research and Development for Golf Balls agreed:

> Q.      Now, summing it all up, in terms of the performance characteristics of the ball, you would agree that the Pro V1 has been a success because, *like no other ball before it*, it delivers a balance of performance attributes, the combined attributes of long-distance off the tee with soft feel and control into the green.  True?
> A.      Yes.

[Morgan Tr. 438:9-22; PX 973 at AC 0028385.UR-386.UR]  The polyurethane-covered, solid-core, multilayer Pro V1 obsoleted Titleist's wound ball franchise that had dominated for nearly a century, and drove a huge change in premium golf balls.  [Kennedy Tr. 939:4-8; Bellis Tr. 307:9-308:6]  Acushnet's own graph shows this dramatic impact:



[Halkowski Decl. Ex. A (graph from an Acushnet document, PX 1175, at AB 0118092 (with color added))][4]  By the end of 2003, Acushnet – having made wound balls since the 1930's – completely stopped selling wound balls, in favor of Sullivan's technology. [PX 1175 at AB 0118045; Bellis Tr. 279:5-18; 269:14-20; 273:2-4; 308:2-3]

---

[4] All citations to "Ex. __" are exhibits attached to the Halkowski declaration, unless otherwise noted.

### b. Sullivan Combined Elements In A Way Never Done Before

While all of the elements that Sullivan used to create his invention were known, the key was choosing those elements from a vast array of possibilities and combining them in a particular way to yield extraordinary results.  For example, solid core balls had existed since Spalding created the first two-piece solid core balls in the 1960's.  [Kennedy Tr. 940:3-12; Morgan Tr. 328:20-22; PX 1175]  Multi-layer ionomer balls were also invented by Spalding (Dennis Nesbitt) in the late 1970's or early 1980's [DX 9; Nesbitt Tr. 1122:23-1123:3]  Polyurethane was tried as the cover of a solid-core (but not multi-layer) ball in the 1960's when, once again, Spalding was among the first.  [Statz Tr. 549:18-23; Kennedy Tr. 956:2-957:3]  Yet, despite the fact that everyone had been searching for a ball that offered the distance of a solid core ball and the control of a soft covered wound ball, no one tried to make and sell a ball like Sullivan's.  Notably, Acushnet was unable to present any anticipation defense at trial, and the inventors of each of Acushnet's principal prior art references testified that they did not invent a polyurethane-covered multilayer golf ball. [Nesbitt Tr. 1129:10-12; Proudfit Tr. 530:9-24]  James Proudfit, inventor of the only principal reference still being asserted as part of Acushnet's post-trial obviousness arguments, testified that he did not invent a solid core ball utilizing polyurethane over a low acid ionomer boundary layer.  Indeed, it never even occurred to him to use polyurethane on his ball, the Wilson Ultra Tour Balata – despite the fact that polyurethane had been used as a cover material for decades prior to the introduction of the Ultra Tour Balata.

> Q. When you were designing the Wilson Ultra Tour Balata, did you ever consider using polyurethane as an outer cover material?
> A. No.
> Q. Did anybody ever suggest to you that polyurethane might be a good outer cover material?
> A. No.
> Q. At any time after you created the Ultra Tour Balata, did it ever occur to you to replace the outer cover layer with a polyurethane outer cover?
> A. No.

[Proudfit Tr. 530:9-19]  Proudfit's failure to pursue polyurethane as a cover material is not surprising.[5]  For example, as the jury heard, in the 1980's Spalding had difficulty (yellowing, durability, and poor distance) with a polyurethane-covered 2-piece ball that was also documented in Spalding's earlier patent applications.

[*See, supra,* n.5] Thus, substantial evidence supports the jury's presumed finding that when Sullivan set out -- in his own words – to "make an improved three-piece golf ball" that had "advantages over those of the Nesbitt '193 patent" (Sullivan Tr. 829:25-831:4), he conceived inventions that were not only novel, but revolutionary.

### 2. There are Thousands of Choices of Materials that can be used in Golf Ball Design – a Highly Complex and Unpredictable Art

Given the complex, chemical nature of golf balls, there are thousands of materials that can be used to make a ball. [Kennedy Tr. 937:12-938:8, 960:19-961:1; Yagley Tr. 1024:2-14] Unlike the cases relied on by Acushnet which addressed predictable arts (including *KSR* which concerned a simple mechanical device), this case concerns an unpredictable art. Indeed, every technical witness – both Callaway Golf's and Acushnet's – who was asked about this issue testified that golf ball design is unpredictable:

- **James Proudfit, Tr. 530:20-24**

Q. In general, would you say that golf ball design is a predictable art?

A. My experience has been to develop a ball that's been trial and error, not predictable. It's not as -- in my opinion it's not a science.

- **Dennis Nesbitt, Tr. 1128:25-1129:9**

Q. In your experience as a golf ball designer over the years, have you found that golf ball design is a predictable employ?

A. Never predictable, no. You don't know until you try.

Q. What do you mean by that?

A. You play around in the lab. You make examples, and you test it and see if it does what you think it is going to do. If it doesn't, then you go back and make modifications.

- **Chris Cavallaro, Tr. 1115:11-14**

Q. In your experience as a golf ball designer, is golf ball design a predictable discipline?

A. In my opinion, no.

- **Mike Sullivan, Tr. 815:18-24**

Q. Now, you described in your direct exam that you did a lot of investigation into materials and constructions for use in golf balls, right?

A. Yes.

Q. And you would agree that making golf balls is a challenging process; right?

A. Yes.

- **William Risen, Tr. 1146:22-1147:2**

---

[5] Sullivan Tr. 846:11-848:21; DX 1002 at 2:1-15; *see also* Morgan Tr. 401:17-402:2 (discussing problems Acushnet had with polyurethane cover on Titleist's Professional 2P); Sullivan Tr. 849:9-13 ("all other things being equal" designer would choose the material with the lower cost, ionomer, instead of polyurethane).

> Q. Professor Risen, in your experience designing golf balls, is golf ball design a predictable art?
>
> A. No, it seems to me what I have seen done and participated in makes it a real art. It's very hard to predict what you are going to get until you actually do the experiments.
>
> [*See also* Risen Tr. 1147:3-7]

> - **Tom Kennedy, Tr. 938:9-12**
>
> Q. In your experience, can a golf ball designer predict what performance will result from a particular combination of materials?
>
> A. Not in my experience, no.
>
> [*See also* Kennedy Tr. 941:15-944:21]

Even Dr. Statz, Acushnet's expert, implicitly conceded the point:

> Q. In fact, you go on to state, the different combinations of core size and inner cover thickness and outer cover thickness will lead to *wildly different performance*; isn't that right?
>
> A. Oh, yes, that's true.

[Statz Tr. 659:16-660:5 (also admitting in his report that just putting a polyurethane cover on a multi-layer ball would require a "*huge amount of experimentation*").] In addition to this direct testimony,[6] the difficulty in designing and making a golf ball, particularly one of the complexity and performance of Sullivan's inventions, is confirmed by the effort it took Callaway Golf to design the Rule 35. Callaway Golf set out in 1997 to make a ball that would have the performance characteristics described in Sullivan's patents. It took 25 to 40 designers, including Ph.D. polymer chemists, chemical engineers, mechanical engineers, and Ph.D. physicists, three years and over $170 million to design and launch the Rule 35. [Yagley Tr. 1026:17-1027:11; 1048:9-14] Acushnet also toiled for years to design the Pro V1 – allegedly beginning in 1996 and not finishing until shortly before the Pro V1 launched in the fall of 2000 [Morgan Tr. 427:12-17] And Acushnet had the benefit of testing the Rule 35 (and other golf balls), comparing those results to its prototype, and modifying that prototype to improve its performance. [*Id.* at 433:11-434:6] Had Sullivan's patents been obvious as Acushnet suggests, it would not have taken such enormous effort from two leading golf companies to create and commercialize golf balls embodying the Sullivan inventions. [Risen Tr. 1146:6-21]

---

[6] *See also* Dalton Tr. 510:13-19 (agreeing that a "fairly large number of materials" go into making a golf ball); 511:23-512:19 (confirming an example where a "small change [had] a big consequence in golf ball design").

### 3. Acushnet's Pro V1 Creators Uniformly Believed that its Basic Construction was a Novel Concept Worthy of a Patent in 1995/1996

It is undisputed that the Pro V1 and, likewise, the balls of Sullivan's Patents are the product of a coalescence of known materials [Bellis Tr. 239:2-10] – but no one prior to Sullivan thought to combine them in the unconventional manner that he did. A concept is not obvious merely because the components were drawn from among known materials. *In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) ("Most if not all inventions arise from a combination of old elements."). The testimony of the designers of the Pro V1 confirms this – each thought that the basic concept of a polyurethane-covered, ionomer multilayer, solid-core ball was novel in the 1996 time frame, despite having known at that time of the *same* prior art Acushnet relied on at trial.

Bill Morgan, the Senior Vice President of Research and Development for Golf Balls at Acushnet who had over 20 years of experience and was one of the named inventors of the Pro V1, had never heard of anyone making a polyurethane-covered, solid-core multi-layer ball before he and his co-inventors thought of it in or around late 1995 or early 1996. [Morgan Tr. 325:24-326:19; 393:16-394:1; *see also* 407:8-19 (Pro V1 performance "unlike any golf ball Acushnet had ever made before")] Morgan thought the concept was new [*id.* at 394:2-3], as did his co-inventor, Edmund Hebert. [Hebert Tr. 1098:10-19] In fact, they submitted an invention record on the concept that resulted in United States Patent No. 5,885,172. [Morgan Tr. 394:2-20] Prior to coming up with his novel concept, Morgan testified he was aware of multi-layer solid-core balls, including the Nesbitt patent that describes those types of balls. [*Id.* at 395:16-396:18] He was also aware of polyurethane-covered balls, particularly those using the Wu patent's polyurethane, like the Titleist Professional. [*Id.* at 394:4-11; 395:8-15] Nevertheless, Morgan believed a combination of those concepts – polyurethane over ionomer on top of a solid core – was new and novel. [*Id.* at 394:2-3] Remarkably, during trial, Morgan and others repeatedly referred to the concept of a polyurethane-covered, solid-core, multi-layer ball as "new," "novel," and even "pioneering." [Hebert Tr. 1090:17-21; 1098:10-19; Morgan Tr. 374:10-14; 375:1-4, 11-14; 392:13-20; 394:2-3; 400:24-401:5; 405:8-12; 406:15-24; 407:17-19; 438:16-19] Both Hebert and

Morgan were also surprised by the unexpected results that this new design produced. [Hebert Tr. 1098-10-1099:3, 1102:21-1103:13; Morgan Tr. 404:12-408:6; PX 973][7]

What neither Hebert nor Morgan knew was that Mike Sullivan had actually come up with the concept five years earlier. In 1991, while at Spalding, Mike Sullivan conceived of the idea of putting a polyurethane cover on a solid core multi-layer ionomer ball. As Sullivan's November 18, 1991 notebook entry states:

> I will concentrate on the stiffest, highest, COR ionomers as inner layers (i.e. Ex. 959/Ex. 960 blend as well as in-house ionomers and Tour and Tour Edition type covers as outer layers as well as closely looking at non-ionomeric outer layers of soft TPU, Hytrel, Pebax, etc.

[PX 613 at CW 611786.01 (emphasis in original)] "TPU" is thermoplastic polyurethane. [Hebert Tr. 1093:7-8] The jury was free to discredit Acushnet's belated disavowal at trial of what it had believed to be true in 1996 – when Acushnet thought its scientists were the first to conceive of a polyurethane-covered, solid-core, multi-layer ball. Substantial evidence showed that Acushnet was correct in 1996 in believing, as the jury has found, that this concept was new and novel over the prior art that Acushnet's inventors were aware of, that was considered by the PTO, and that was presented to the jury.

### 4. Substantial Evidence Supports the Jury's Presumed Finding That the Prior Art Does Not Render the Claims Obvious

Acushnet ignores any evidence contrary to its position, instead focusing on the few snippets that it believes support its motion. In particular, Acushnet ignores that Dr. Risen, a tenured chemistry professor at Brown University for over 40 years who specializes in polymer science and has consulted for the golf ball industry for the last 18 years, reviewed the same evidence as Dr. Statz and reached the opposite conclusion – that all of the asserted claims of the asserted patents are valid. [Risen Tr. 1134:2-9; 1135:6-13; 1137:4-8; 1141:20-1143:13] Dr. Risen's testimony alone, which the jury is presumed to have credited (*Odetics*, 185 F.3d at 1269), constitutes substantial evidence supporting the jury's verdicts, and compels denial of Acushnet's motion all by itself.

Dr. Risen's testimony is not the only substantial evidence Acushnet ignores. Acushnet never substantively addresses the glaring hole in its evidence: the failure to show a combination ball, based on

---

[7] Notably, even Acushnet's expert Dr. Statz conceded that the surprising results that these witnesses testified to was evidence of non-obviousness. [Statz Tr. 739:21-740:12]

the prior art, having multiple layers including a low acid ionomer inner cover layer and a polyurethane outer cover with a Shore D hardness of less than 64. Acushnet presented no evidence of this critical combination. Instead, Acushnet points to distractions such as a Shore C measurement on 2-piece golf balls, shore D measurements of balata/ionomer covered balls, a Shore D plaque measurement of a proprietary polyurethane material that was not shown to be publicly available and was used only on a wound ball, and a Shore D measurement of the polyurethane cover on the infringing ball. [Mtn. at 9, 13-14; *see also e.g.,* Dalton Tr. 466:18-467:18; 468:24-469:7; 502:1-25; Statz Tr. 615:15-617:13] It could not have been difficult for the jury to see through this shell game.

It was Acushnet's burden to show by clear and convincing evidence that, despite the lack of such a key disclosure in any of the prior art references, a person of ordinary skill in the art in 1995 would have known to combine particular characteristics from particular references in a particular manner resulting in a polyurethane outer cover of a multi-layer ball with a Shore D hardness of less than 64.[8] *See In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) (holding that properties of proposed combinations must have been obvious at the relevant time). Stated more generally, Acushnet had to show not merely that each limitation of the asserted claims was present individually in the prior art, but that each claimed invention as a whole would have been obvious. *See Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990) (section 103 "requires analysis of the claimed invention as a whole"). As the jury found, Acushnet failed to do so for each of the eight claims that it now challenges. Moreover, despite the fact that Callaway Golf had no such burden, it presented ample evidence to support the jury's finding that a person of skill in the art in 1995 would not have understood any of Acushnet's prior art combinations to disclose or teach a polyurethane outer cover layer having a Shore D hardness of 64 or less over an ionomer mantle layer.

Acushnet's burden is made all the more difficult because every prior art reference presented to the jury was before the original patent examiners.[9] Undeterred, Acushnet ignores the ***actual*** prosecution

---

[8]  Both the materials and construction of the ball underneath the cover layer are critical because, as Acushnet's own witness explained, the Shore D value when measured on the ball is influenced by what is underneath the cover layer. [*See, infra*, n.11]

[9]  *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) ("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of

histories of the Sullivan patents and instead argues in its motion that the examiner did not consider Proudfit because the inventor swore behind the reference in the parent '585 application. [Mtn. at 16.] This argument is at odds with the record. The applicant did swear behind the Proudfit reference in a parent application, but Acushnet fails to advise the Court that the examiner explicitly, and repeatedly, considered the substance of Proudfit during prosecution of the patents *at issue in this case* and that Callaway Golf did not swear behind the reference for the patents-in-suit. [*See, e.g.,* PX 7 at CW 0307923-24 (Proudfit reference cited by examiner for interest, but not used as a basis for rejection); PX 8 at CW0309016-017 (Examiner cited Proudfit + another reference as a basis for 35 U.S.C. 103 rejection – patent issued after Proudfit was distinguished) PX 5 at CW 0308329 (Proudfit reference cited by examiner); and PX 6 at CW 0308064 (Proudfit reference cited by examiner).]

Turning to the merits, as Callaway Golf proved at trial and as the jury found, each of the prior art combinations Acushnet continues to press in its motion was defective for multiple reasons.

### a.   Proudfit Combined with Molitor Does Not Render the Claims Obvious

First, and perhaps foremost, the jury was entitled to believe the testimony of James Proudfit. Proudfit's patent featured prominently in Acushnet's obviousness case. Yet, Proudfit himself testified that putting a polyurethane cover on his three-piece golf ball – the substitution that Acushnet argued would have been obvious to any person of ordinary skill in the art – had never occurred to him:

> Q.   When you were designing the Wilson Ultra Tour Balata, did you ever consider using polyurethane as an outer cover material?
> A.   No.
> Q.   Did anybody ever suggest to you that polyurethane might be a good outer cover material?
> A.   No.
> Q.   At any time after you created the Ultra Tour Balata, did it ever occur to you to replace the outer cover layer with a polyurethane outer cover?
> A.   No.

[Proudfit Tr. 530:9-19] Proudfit's testimony provided persuasive rebuttal to Acushnet's theory that substituting polyurethane for the cover material on a Proudfit-ball would have been obvious.

---

overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.").

### i. Proudfit's patent contains no teaching of the Shore D hardness of an outer cover made of any material

The Proudfit patent itself does not teach a polyurethane outer cover layer [Statz Tr. 693:23-694:3], and does not teach any particular Shore D hardness for the outer cover layer. [DX 10] Given these gaps, Acushnet argued that the limitation of a polyurethane outer cover having a Shore D hardness of 64 or less would have been obvious by combining the Proudfit patent with either the Molitor '751 patent or the Wu '673 patent. As discussed below, however, substantial evidence supports a finding that neither Molitor nor Wu teaches the requisite hardness for a polyurethane-covered multi-layer ball.

### ii. Acushnet presented no evidence that would have required a reasonable juror to believe that Molitor '751 taught a polyurethane cover with a Shore D hardness of less than 64 when used on a multi-layered ball

At best, the only thing that Molitor '751 discloses is a 2-piece golf ball with a cover comprising polyurethane. There is no teaching whatsoever of a Shore D hardness. Nor is there any teaching of what a Shore D hardness for the same polyurethane would be on a multi-layer ball. Yet, to prove obviousness, Acushnet had to show by clear and convincing evidence that a person of ordinary skill in the art would have known that using the Molitor cover as the outer cover of a 3-piece Proudfit-type ball would have provided an outer-cover Shore D hardness of 64 or less. As the jury determined, Acushnet failed to meet its burden with regard to all eight claims that Acushnet now challenges. This conclusion is supported by substantial evidence, particularly in light of the evidence that the physical properties of a particular ball construction are unpredictable and that one must manufacture and test prototype golf balls to understand their properties. In addition to the evidence of unpredictability noted above,[10] Christopher Cavallaro, an Acushnet golf ball designer explained:

> Q. Right. In your experience as a golf ball designer, is golf ball design a predictable discipline?
> A. In my opinion, no.
> Q. What do you mean by that?
> A. Because just changing one particular material, one material may perform differently than another material, totally out of the realm of the design that you're looking to achieve.

[Cavallaro Tr. 1115:11-19.]

---

[10] *See, e.g.,* Dennis Nesbitt [Tr. 1128:25-1129:9], James Proudfit [Tr. 530:20-24], Mike Sullivan [Tr. 815:18-24], Tom Kennedy [Tr. 938:9-12, 841:15-944:21] and Dr. Bill Risen [Tr. 1146:22-1147:2].

The jury was entitled to consider this testimony when it determined what a person of ordinary skill would expect as the result of combining the Proudfit and Molitor patents. Indeed, the unpredictable nature of golf ball design applies with special force in the case of multi-layer golf balls; as Acushnet's own witnesses again acknowledged, the material underneath the outer cover layer in particular influences the Shore D measurement when taken on the ball.[11] The record, therefore, amply supports a finding that a skilled artisan would not have thought that a Molitor '751 cover would exhibit the same hardness, when used as the outer cover of a Proudfit-type ball, as it did when used as the single cover of a 2-piece ball, let alone exhibit the hardness as-claimed in the patents-in-suit.

### iii. Molitor's disclosure of a Shore C value does not help Acushnet

With the exception of Acushnet's paid expert, witnesses from both sides uniformly testified that one cannot simply convert from Shore C to Shore D. [Dalton Trial Tr. 515:7-516:4; Kennedy Trial Tr. 1017:24-1018:19; Risen Trial Tr. 1162:3-18] Acushnet's primary evidence for the conversion itself, the ASTM D-2240 and the Rex Gauge charts, both contain a strict admonition that the chart "is not and cannot be used as a conversion reference [chart]." [PX 804; and PX 08 at CW 0309061][12] Tom Kennedy, a golf ball designer with decades of experience, testified that he had actually sat down one day to try show a mathematical relation between Shore C and D but was unable to do so. [Kennedy Tr.. 1017:24-1018:19] Acushnet's purported evidence to the contrary [Mtn. at 14] fails.

First, with regard to Dr. Risen's patent that showed both Shore C and Shore D values [DX 1108], Dr. Risen had no recollection as to whether those numbers were actually measured or not, and he

---

[11] Dalton Tr. 516:14-19; PX 604 at col. 10:8-24 PX 604, at Col. 10 and Statz Tr. 719:4-720:25 (discussing portion of one of Acushnet's own patents which explains that, among other things, the *material composition of adjacent layers" impacts hardness measurement"*).

[12] The jury was also free to conclude that Spalding's citation to the Rex Gauge chart during the prosecution of the '873 patent in 2002 did not compel a finding that 72 to 76 Shore C necessarily translates to 64 Shore D or less. Spalding's attorney had characterized the chart as showing that "[a] Shore C of 65 converts to a Shore D of less than 64, approximately 40 to 50." [Risen Tr. 1225:8-12; PX 08 at CW 0309056] The jury was not obligated to accept Acushnet's argument that this comment was indicative of what would have been obvious to one of ordinary skill in the art in 1995. Moreover, even if the jury did consider the prosecuting attorney's remark as evidence in Acushnet's favor, it was entitled to weigh it against contrary evidence (*e.g.* the prominent disclaimers against using the tables for "conversion") and conclude that, on balance, Acushnet's evidence did not amount to a clear and convincing showing that a person of ordinary skill in the art in 1995 would have understood the Molitor patent to disclose a cover hardness of 64D or less when used on a multi-layer ball like the one disclosed in Proudfit.

13

affirmatively testified that he never converted between Shore C and Shore D. [Risen Tr. 1233:3-20] When Dr. Risen offered to read through the patent so that he could affirmatively testify whether the numbers were measured or arrived at by some other approach, Acushnet's counsel declined. [Risen Tr. 1233:13-18] In any event, the measurements in Dr. Risen's patent were all for polyurethane as measured on the particular ball described in his patent and provided no credible evidence of how to convert from a Shore C to a Shore D of polyurethane for the multilayer ball in question. This is hardly the uncontroverted evidence Acushnet purports it to be.

Acushnet also claims "Callaway offered no evidence that a Shore C measurement of 72-76 could correspond to a Shore D measurement greater than 64." [Mtn. at 15.] Acushnet's argument misses the point entirely – not only did Callaway Golf have no such obligation, but Acushnet does not even properly characterize the leap that it was asking the jury to take. Acushnet bore the burden by clear and convincing evidence to prove that a Shore C measurement between 72 and 76 for a polyurethane blend on a *2-piece ball* converted to a Shore D value of less than 64 on the *multi-layer balls* claimed in the patents. Substantial evidence (*see, e.g., supra* notes 10 and 11) supports the jury's presumed refusal to make this leap for any of the eight verdicts that Acushnet now seeks to overturn.

### iv. One of skill in the art would have no expectation of success if they were to combine the references in the manner argued by Acushnet

A person of skill in the art would have had no expectation that using a Molitor '751 cover as a replacement for Proudfit's balata-polybutadiene cover would be successful – and hence, would have had no motivation to make such a combination. It was widely known throughout the industry that there were significant problems with the Molitor '751 cover material, which was used on the Spalding Tour Edition ball. [Risen Tr. 1148:17-1149:2; Statz Tr. 734:5-15] In fact, because of the problems with the Tour Edition, Spalding sought the help of Dr. Statz, then with DuPont, to find a fix – and his solution was to replace the polyurethane cover with an ionomer cover. [Statz Tr. 704:25-706:15] Given these admissions, the jury was free to find that one of skill would not been motivated to combine Molitor 751 and Proudfit at all.

14

### b. Proudfit Combined with Wu Does Not Render the Claims Obvious

Like the Proudfit patent, the Wu patent contains no disclosure whatsoever of the on-the-ball Shore D (or even Shore C) hardness of the cover material. [Statz Tr. 715:16-19; DX 13] As with the combination of Proudfit and Molitor, substantial evidence supports the jury's presumed finding that a person of ordinary skill in the art would not have known in 1995 that using the Wu polyurethane cover on a Proudfit-type 3-piece ball would yield a Shore D hardness of 64 or less.

Acushnet relied on three statements by its expert, Dr. Statz, as evidence that the Proudfit/Wu combination would have had an outer-cover hardness of 64D or less:

(1) Given that the "plaque" (off-the-ball) Shore D hardness of the "Wu polyurethane" is 48, this material would exhibit a Shore D hardness of 64 or less if used as the outer cover of a three-piece ball [Statz Tr. 615:15-617:2];

(2) The Titleist Professional golf ball included a polyurethane cover like the one described in the Wu patent, and the Professional exhibited an on-the-ball hardness of 52 or 53 Shore D [*id.* at 617:3-13];

(3) The Titleist Pro V1 also includes the same type of polyurethane cover described in the Wu patent, and the Pro V1 exhibits an on-the-ball hardness of 56D [*id.* at 617:3-13, 618:12-619:4.]

Substantial evidence supports the jury's rejection of these statements and its presumed finding that a person of skill in the art in 1995 would not have understood the combination of Proudfit and Wu to teach a three-piece ball with a polyurethane outer cover having a Shore D hardness of 64 or less.

### i. All testimony linking the Pro V1 to Wu is irrelevant

Dr. Statz's attempt to link the hardness properties of the Titleist Pro V1 with the inherent disclosures of the Wu patent was an exercise in futility. Since the Titleist Pro V1 was not publicly released until 2000 [Bellis Tr. 219:21-220:5], it is not, and was not, prior art. There was clearly no reason for the jury to believe that a person of skill in the art in 1995 would have associated the hardness properties of the Pro V1, a ball not launched until years later, with the disclosures of the Wu patent.

### ii. There is no link between the Professional and the Wu patent

Dr. Statz also attempted to show that a person of skill in the art in 1995 would have understood the Wu patent to disclose a cover having the same hardness properties as the Titleist Professional golf

ball. [Statz Tr. 615-19]  In doing so, Dr. Statz's obviousness combination expanded from two items of prior art (Proudfit and Wu) to three (Proudfit, Wu, and the Titleist Professional), though Dr. Statz avoided characterizing his argument in this manner.  In any event, no evidence demonstrates, nor did Dr. Statz provide testimony to prove, that in 1995 a person of ordinary skill would have associated the Wu patent, or any particular polyurethane formulation it encompassed or disclosed, with the Titleist Professional golf ball.  Thus, the jury would have been justified in concluding that the hardness properties of the Titleist Professional would not have been recognized as inherent to the Wu patent.  In any event, the Professional was a wound ball so the hardness of its cover is not probative of the cover hardness of a ball with an entirely different construction.

### iii. Even if relevant, Wu's plaque formulation and properties were not publicly known in 1995

Plaques of proprietary material are not publicly available – and Acushnet offered no evidence whatsoever to suggest that one of skill in the art had access to a plaque of Wu's polyurethane in 1995. Thus, the jury was free to disregard Dr. Statz's assertions regarding the plaque hardness of the "Wu polyurethane."  The 48D measurement Dr. Statz cited in his testimony came from Acushnet's internal test documents, which were not public, and Dr. Statz did not establish that the "Wu polyurethane" used in the Titleist Professional and Titleist Pro V1 would have been publicly known in 1995.

### iv. There is no reason to believe that a plaque hardness of 48 shows an on-the-ball hardness of 64 or less

Dr. Statz offered no credible basis to establish that a cover material having a plaque hardness of 48D would necessarily exhibit an on-the-ball hardness of 64D or less, let alone that the material would have the requisite hardness when used specifically as the outer cover layer in a multi-layer ball having all the other properties required by the claims.  *See, e.g., supra,* notes 10 and 11.  Therefore, this evidence is insufficient as a matter of law to show that Wu inherently discloses a cover with an on-the-ball Shore D hardness of 64 or less, since at best it implies only a "probability or possibility" that a ball made according to Wu's process would exhibit that hardness.  *See Crown Ops. Int'l v. Solutia, Inc.,* 289 F.3d 1367 (Fed. Cir. 2002); *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264 (Fed. Cir. 1991).

### v. One of skill in the art would have no expectation of success by combining Proudfit and Wu

The jury was also entitled to consider whether a person of skill in the art would have had any motivation to use a Wu polyurethane cover as a replacement for Proudfit's balata-polybutadiene cover. Again, the jury was under no obligation to credit any testimony Acushnet may have presented on this point, and was free to conclude that Acushnet failed to meet its burden.

Given the substantial evidence that golf ball design is an unpredictable art, and that golf ball components that worked well in one design would not necessarily be expected to work well in a different design, the jury could have reasonably concluded that no motivation existed for combining the polyurethane disclosed in the Wu patent with the three-piece, ionomer-inner-cover construction taught by Proudfit. The Wu patent discusses using polyurethane covers in only two contexts: either as the cover of a 2-piece solid construction, or the outer cover of a wound construction. [DX 13 at col. 7] The Wu patent does not include any discussion of three-piece, solid-construction balls such as those described by the patents-in-suit, even though the Nesbitt patent showing a multi-layer construction issued in 1984, six years before Wu filed for her patent and ten years before her patent issued.

Interestingly, Wu helped the designers of the Pro V1 in the early stages of the conception of their design. [Hebert Tr. 1104:15-1105:1] While working with them, she never suggested that putting her polyurethane on a three-piece ball was old hat or had even been considered before. [*Id.* at 1105:2-20].

Nor was the use of Wu's polyurethane a guarantee of success as Acushnet appears to presume. Titleist's Professional 2P, a 2-piece ball using Wu's polyurethane, was a failure. [Morgan Tr. 401:9-24; Dalton Tr. 522:2-523:1] Acushnet test-marketed the 2P for a brief period *in 1995*, but discontinued the ball after identifying problems with its design – a key problem being that Wu's cover formulation allowed moisture to reach the core, hampering performance. [Morgan Tr. 401:17-402:2.] The jury was free to conclude that one of skill in the art would have avoided use of the Wu material, had they become aware of the negative properties of Wu's cover formulation (assuming that somehow they gained access to Acushnet's confidential information to know that the formulation set forth in Wu was in fact used on the two-piece Professionals – a fact that Acushnet ignores).

### c. The Wilson Ultra Tour Balata Combined with Molitor '751 or Wu Does Not Render the Claims Obvious

The Proudfit patent and the Wilson Ultra Tour Balata golf ball are separate items of prior art – one is a written document, the other a physical object. Rather than presenting prior art combinations that included both the Proudfit patent and the Ultra Tour Balata ball (in addition to a third reference disclosing polyurethane), Acushnet skirted the issue by treating the Proudfit patent and the Ultra Tour Balata ball as one and the same, expecting the jury to treat the disclosures of the patent as if they were known properties of the ball, and the properties of the ball as if they were inherent disclosures of the patent. In the absence of a direct connection between the patent and the ball that was publicly known as of 1995, however, the jury was free to find that a person of ordinary skill in the art in 1995 would not have known the Ultra Tour Balata ball to possess any particular characteristics described in the Proudfit patent. For these reasons, as well as those addressed above with regard to the Proudfit patent, the record supports the jury's conclusion that the Ultra Tour Balata, in combination with the Molitor '751 patent or Wu patent, did not amount to clear and convincing evidence of obviousness.

For example, Acushnet presented no evidence that, in 1995, one of ordinary skill would have known that the Ultra Tour Balata possessed an inner cover layer comprising a blend of low-acid ionomers, at least one of which was a low-acid ionomer.[13] Although Acushnet's expert, Dr. Statz, alleged that, in 1995, he knew the ball to possess this feature [Statz Tr. 701:8-703:19], he admitted that the only reason he had this knowledge was through discussions he had had with Proudfit when visiting the Wilson manufacturing facility as a representative of DuPont. [*Id.*] The jury was free to conclude from this evidence that Dr. Statz's knowledge regarding the formulation of the Ultra Tour Balata was the result of his personal access to Proudfit, and was not representative of the knowledge of an ordinary person of skill in the art.

The jury was also free to reject Acushnet's suggestion that, because the packaging of the Ultra Tour Balata was marked with the number of the Proudfit patent, the marking would have indicated to a

---

[13] Even assuming that the Ultra Tour Balata did, in fact, have an inner cover comprising a blend of low-acid ionomers, Acushnet was obligated to show that this property would have been apparent to one of ordinary skill in the art in 1995. *Rijckaert*, 9 F.3d at 1534 ("Obviousness cannot be predicated on what is unknown.") (quoting *In re Spormann*, 363 F.2d 444, 448 (C.C.P.A. 1966)).

person of ordinary skill in the art that the ball included the blend of low-acid ionomers described in the patent. [Statz Tr. 699:24-701:4.] Among other things, the jury also heard Dr. Risen explain that the patent marking indicated only that the balls may have embodied a *single* claim of the Proudfit patent. [Risen Tr. 1289:4-1290:23.] For example, because claim 1 of the Proudfit patent requires only that the inner cover comprise "ionomer resin," one could not have understood the marking to indicate that the balls necessarily included a low-acid ionomer, or blend of ionomers. [*Id.*] For at least these reasons, as well as the fact that the jury was free to find that Acushnet's witnesses were not credible, the jury could properly have found that a person of ordinary skill in the art in 1995 would not have known the inner-cover formulation of the Ultra Tour Balata, much less that such a person would have known that the inner cover of the ball included a low-acid ionomer or a blend of ionomers. Consequently, the jury was justified in concluding that Acushnet's combinations of prior art based on the Ultra Tour Balata ball failed to provide clear and convincing proof of obviousness.

Finally, for the same reasons discussed above (*see, supra*, section III.B.a.iv-v), the jury could have reasonably concluded that one of ordinary skill in the art in 1995 would not have thought to use the polyurethane covers described in Molitor '751 and Wu in a new solid-construction design because of known problems with the polyurethane covers of the original Top-Flite Tour Edition and the Titleist Professional 2P.

### d. Objective Indicia Amply Support the Jury's Rejection of Acushnet's Obviousness Defense

Before a conclusion can be reached on obviousness, "objective evidence such as commercial success, failure of others, long-felt need, and unexpected results *must* be considered...." *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1573 (Fed. Cir. 1992).[14] Acushnet provided little, if any, substantive response at trial to the extraordinary evidence of objective indicia that support the validity of the claims at issue. Moreover, Acushnet fails to mention that the

---

[14] In Acushnet's Opening Brief, it cites two cases suggesting that the weight given to secondary considerations is a matter of law (Mtn. at 17): *Graham v. John Deere & Co.*, 383 U.S. 1, 35-36 (1966); *Dystar v. C.H. Patrick*, 464 F.3d 1356, 1371 (Fed. Cir. 2006). While both cases state that the overall determination of obviousness is a matter of law, neither case holds that the weight given to those considerations is a legal issue. To the contrary, the Federal Circuit has repeatedly stated that obviousness is a legal conclusion based

burden of disproving the effect of objective indicia of non-obviousness shifted to Acushnet as a

consequence of its infringement:

> In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus. . . A prima facie case of **nexus is generally made out when the patentee shows** both that there is **commercial success, and that the thing** (product or method) **that is commercially successful is** the invention disclosed and **claimed in the patent**. . .
> **When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger, as in any civil litigation**. . . It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc. As discussed in *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546, 221 USPQ 1, 7 (Fed.Cir.1984), "argument" and "conjecture" are insufficient.

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd* ., 851 F.2d 1387, 1392-93 (Fed. Cir. 1988).

Acushnet's own witnesses repeatedly admitted that the Pro V1 was an extraordinary commercial success

and, because Acushnet stipulated that the ProV1 line of balls infringe the patents-in-suit, the burden of

disproving the presumed nexus shifted to Acushnet.[15] Yet, Acushnet's witnesses also had to concede

that the Pro V1's performance was a factor, if not the primary factor, in the ball's tremendous success.

### i. The Infringing Pro V1 Enjoyed Unprecedented Commercial Success

Substantial evidence supports a finding that the Pro V1 line of golf balls has been and still is an

unprecedented commercial success. Even Acushnet's witnesses, while reluctant at times, could not deny

the remarkable commercial success of the Pro V1:

> Q. Since its introduction in October of 2001, the Pro V1 you said sold 50 million dozen?
> A. Yes
> Q. So sales are over about 1.5 billion at this point?
> A. That would be correct, yes.
> Q. Would you say it is an unqualified success, the Pro V1?
> A. I would say it has been a significant success, yes.
> Q. So you can't even say an unqualified success?
> A. I am not sure what unqualified means.
> Q. It is the most successful ball in the history of golf, isn't it, Mr. Bellis?
> A. It may end up to be.

[Bellis Tr. 313:22-314:9]

---

upon underlying findings of fact. *See, e.g., Robotic Vision Systems v. View Engineering,* 189 F.3d 1370, 1376 (Fed.Cir. 1999); *Eli Lilly & Co. v. Zenith Goldline Pharm.*, 471 F.3d 1369, 1377 (Fed.Cir. 2006).

[15] Acushnet's expert, Dr. Statz, offered nothing more than conclusions without analysis when addressing the evidence of secondary considerations presented by Callaway Golf. [*See, e.g,* Statz Tr. 636:1-637:5.] This is exactly the type of "conjecture" and "argument" that the Federal Circuit has held is insufficient to rebut Callaway's Golf evidence. *Demaco*, 851 F.2d at 1393.

Q. But your opinion is the Pro V1 is the most successful golf ball in the history of this company. Right?

A. I think that the combination of the tour play that the Pro V1 experiences and the regular golfer purchasing it defines the Pro V1 as the most successful golf ball.

[Morgan Tr. 440:22-441:1.] Acushnet's witnesses further admitted that, unlike its previous golf balls designed for professionals and low-handicap golfers (wound balls that were susceptible to cutting and going out of shape), the Pro V1 (solid construction) appealed to both professional and average golfers – enabling it to be the most successful golf ball of all time. [Bellis Tr. 276:1-7; Morgan Tr. 440:24-441:1.]

Finally, Acushnet's CEO, internal Acushnet documents, and its own witnesses at trial all confirmed that the unprecedented success of the Pro V1 led to a wholesale paradigm shift, obsoleting the wound-ball technology upon which the company had been built:

- Shortly after the introduction of the Pro V1, Wally Uihlein, Acushnet's CEO, was quoted as saying, "We essentially elected to *obsolete ourselves* in a very important area [wound golf balls] and put everything behind the Pro V1." and "I think it is the *most massive paradigm shift ever* seen in the golf ball category, and certainly the most intense and accelerated one in any product category that I have ever witnessed." [PX-722, Bellis Tr. 308:11-310:17.]

- In a letter to loyal Acushnet customers, Uihlein noted the unprecedented success of the Pro V1 led to 24-hour per day production to meet the demand. [PX - 1195; Bellis Tr. 311:20-312:12.]

- George Sine, a marketing executive for Acushnet, wrote in a 2001 e-mail to Bellis, "Acushnet has endured considerable challenges, as well as exhibited incredible responsiveness to the immediate *paradigm shift from wound urethane to solid urethane technology* resulting from the immense success of the Titleist Pro V1 golf ball." [PX-1201.]

- Bellis acknowledged that about a year after the Pro V1 was introduced it had obsoleted its wound balls, like the Tour Prestige, Professional and Balata. [Bellis Tr. 307:9- 308:3.]

- Bellis at trial could not even recall which Titleist ball was its best selling ball in 2000 – the year before the Pro V1 was launched publicly. [Bellis Tr. 214:17-20.] Nobody at Acushnet or anywhere else in the golfing world would have a problem identifying the Pro V1 as the best selling golf ball since 2001.

- To meet the unprecedented demand for the Pro V1, Acushnet "abandoned [its] traditional two-week summer manufacturing shutdown period *for the first time in Company history*." [PX-1201.]

- Uihlein stated that "*the Pro V1 saved the company*" – a statement that Bellis admitted was something that Uihlein believed. [PX-723; Bellis Tr. 311:12-19.]

Acushnet's statements at trial that the success of the Pro V1 is simply an extension of its marketing practices and brand exposure fail to take into account that the Pro V1 has enjoyed success like no other golf ball ever – even though all of Acushnet's other golf balls had the same branding and marketing muscle behind them. A ball that the CEO claims saved the company is special – not just the next ball in

line.[16] As discussed below, the Sullivan technology that Acushnet admits covers the Pro V1 family

played a key role in making the Pro V1 the most successful golf ball ever.

### ii. Substantial Evidence Supports the Jury's Presumed Finding that a Nexus Exists Between the Inventions and the Commercial Success

Acushnet has stipulated that the Pro V1 family of golf balls infringe the patents-in-suit, and, as

shown above, the Pro V1 family has been an unprecedented commercial success. Therefore, Callaway

Golf established a prima facie nexus between the claimed technology and the success of the Pro V1.

*Demaco*, 851 F.2d at 1392-93. Under the law, Acushnet had to rebut this presumption. *Id.*

Yet, far from rebutting the nexus, Acushnet's trial witnesses actually conceded that the superior

performance of the Pro V1 is greatly responsible for its success both on Tour and commercially. Bellis

admitted that the performance of the Pro V1 is a major reason for its success. [Bellis Tr. 276:1-3.] He

also noted that the best players, those at the top of the pyramid of influence, want to play the very best

product. [*Id.* at 280:5-13.] Morgan also admitted that "an important reason for the success" of the Pro

V1 is its "superior performance" (Morgan Tr. 434:14-17), and that the patented features contribute to the

outstanding performance of the Pro V1:

- Morgan acknowledged that the patented resilient ionomer casing (.0375 inches thick according to PX 1121) or inner cover layer is responsible in part for the speed enhancing and spin controlling properties of the Pro V1, which in part allows players to hit long and straight tee shots. [Morgan Tr. 436:14-437:8; PX 1121 at AC 0044460-61.]

- Morgan further acknowledged that the patented polyurethane cover of the multi-layer Pro V1 line of golf balls is a contributing factor that allows players to impart spin to and control the golf ball near the greens. [Morgan Tr. 437:17-438:8; PX 1121 at AC 0044467.]

Morgan further agreed that the Pro V1 enjoyed unprecedented success because of its performance –

performance made possible by the patented combination of features:

---

[16] Acushnet wrongly asserts that that the remarkable commercial success achieved by the Pro V1 should be ignored because Acushnet successfully sold golf balls before the Pro V1. Mtn. at 19. The *Pentec* case cited by Acushnet simply notes that when a predecessor non-infringing product was just as successful as the product covered by the patent, commercial success should not be given controlling weight in the overall obviousness determination. *Pentec, Inc. v. Graphic Controls Corp.* 776 F.2d 309, 316 (Fed. Cir. 1985). Conversely, here, the predecessor wound ball had an entirely different construction than the infringing Pro V1, and the Pro V1 has achieved unprecedented sales figures, has become the best selling golf ball of all time, and, as Acushnet's CEO proclaimed, has "saved the company."

> The Pro V1 has been a success because, *like no other ball before it*, it delivers a balance of performance attributes, the combined attributes of long distance off the tee with the soft feel and control into the green.

[Morgan Tr. 438:10-15; *see also* Bellis Tr. 282:5-7 (confirming that a "superior-performing ball is *critical to the success* of the pyramid of influence").]

### iii. Sullivan's Inventions Were the "Holy Grail" of Golf Ball Design – a Combination of Long Distance and Good Control

As discussed above, because it combined distance off the tee with control around the green, the ball of Sullivan's Inventions, the Pro V1, was the "Holy Grail" that, as Dr. Statz testified, designers had been looking for since the 1970's. [Risen Tr. 1144:20-1146:5; Bellis Tr. 274:11-275:23;Statz Tr. 650:4-8; *see also* Statz Tr. 651:20-652:21 and 737:24-738:21.] Satisfying this long-felt need is a factor supporting the validity of the Sullivan patents. *WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1359 (Fed. Cir. 1999) (long-felt need for "virtual wheel" slot machines supported a finding of non-obviousness).

Prior to Sullivan's patents, the idea of putting polyurethane on a golf ball had been around for some time with limited success. Yet, no one had ever successfully developed and tried to sell a multi-layer ionomer golf ball with a polyurethane cover. Sullivan's idea, conceived in 1991 and later arrived at by Acushnet, resulted in the Holy Grail of the golf ball design world. [Morgan Tr. 438:9-22; *see also* PX-973 at AC00283.82.UR (patented technology addressed long-felt need – "many players have told us it's like playing with two different balls: one for the driver and one for the short game.") Morgan's testimony during cross-examination confirms that the Pro V1 enjoyed overwhelming success because its performance addressed a long-felt and unresolved need. [*Id.*] This same long-felt need was expressed by Mike Sullivan in his 1991 notebook entry explaining his goal of achieving a golf ball with low spin off the driver (will go longer) and higher spin when exerting lower swing speeds with clubs like a wedge (control around the greens). [PX-612 at second ¶ of CW 611786.01.] Dr. Risen also confirmed Sullivan's dual-personality ball addressed a long-felt need in the industry. [Risen Tr. 1176:15-1177:11.]

### iv. Some Were Skeptical of Sullivan's Approach

Even though Sullivan's invention resulted in a golf ball that was phenomenally successful, Acushnet was uncertain about this new approach and, before introducing the Pro V1, waited and

# REDACTED

watched competitors, like Callaway Golf, enter the multi-layer golf ball market. [PX-984; *see also* Bellis Tr. 217:6-15.]

After watching and analyzing Callaway Golf's adoption of the patented technology, Acushnet rushed to finalize its design of the Pro V1, including making some changes after testing the Callaway Golf Rule 35. [PX 985; Morgan Tr. 432:21-434:6.] Acushnet made these changes and accelerated production so that it could offer a competitive golf ball to its professional players before their contracts expired and the 2001 season commenced. [*Id.*; *see also* Bellis Tr. 298:18-21.] In response to Callaway Golf's offering, Acushnet's CEO, Wally Uihlein, said, "Clearly, this is bit of a Normandy Landing…our strategy is to watch what everybody else is doing, our feeling is their first shot is their best shot, and respond appropriately." [PX 984; Bellis Tr. 217:6-15 ("we really weren't sure whether the tour professional would embrace and want to play a non-wound golf ball"); 313:4-15.] Acushnet argues that it had the ball in production for some time. Even if that evidence is believed (and it need not be), the record shows that Acushnet still chose to wait and see how other balls, like the Rule 35, fared before it commercially released the Pro V1.

### v.    The Success of Sullivan's Inventions Surprised Even Acushnet

Substantial evidence supports the jury's presumed finding (*American Hoist,* 725 F.2d at 1360-61) that surprising and unexpected results were discovered when the claimed golf balls were put in play – another factor weighing in favor of validity. *Lindemann Masch. v. American Hoist & Derrick Co.,* 730 F.2d. 1452, 1461 (Fed. Cir. 1984). Hebert, one of the designers of the Pro V1, testified that when Acushnet began testing golf balls using the veneer concept, it tested both wound and solid cores. Hebert recalled that it was "exciting" that many of the professionals who tested the solid and wound-core prototypes actually preferred the solid-core construction or could not tell the difference. [Hebert Tr. 1097-1100; 1102-1103.] These results were "surprising" to Hebert as he thought the better players would still prefer wound constructions. [*Id.*]

After Acushnet decided to offer the Pro V1, it never imagined it would enjoy such tremendous success. Bellis believed that the Pro V1 would merely be adopted by about 50% of the professionals and that the wound Professional golf ball and Pro V1 would co-exist as a 50/50 tandem offering. [Bellis Tr. 247:15-24; 304:6-16.] However, more than half of Acushnet's professional golfers switched to the Pro V1 in the very first week and within a few months nearly all of its contract players had switched. [Bellis Tr. 307:9-16.] Within about a year, the remarkable success of the Pro V1 led Acushnet to completely abandon its 70-year history of manufacturing wound golf balls. [*Id.* at 307:24-308:3.] Internal documentation at Acushnet also shows that Acushnet was pleasantly surprised by the performance attributes of the Pro V1. The Pro V1 was "longer" than one would expect out of a soft-urethane covered ball. [PX-973 at AC 028386.UR.] The Pro V1 also performed like a soft-covered wound ball (the Tour Prestige), which was unexpected for a long-distance ball. [*Id.* at AC 028387.UR.] The record, therefore, supports the jury's presumed finding that Acushnet, just like the professional golfers, was surprised by the successful performance of the patented technology.

### vi. Acushnet's Response to Overwhelming Objective Indicia of Non-Obviousness is a Mistaken "Simultaneous Invention" Argument

Acushnet claims, in essence, that all of the secondary consideration evidence presented should be ignored because of alleged simultaneous invention. Acushnet's theory, however, is at odds with both the facts and the case it cites. Sullivan, now an employee at Acushnet, admits that he initially thought of the concept of a polyurethane covered multi-layer ball back in 1991. [PX-613 at CW 611786.01-611786.02; Sullivan Tr. at 780:3-12.] Sullivan and Spalding began filing patent applications based on his concept of a multi-layer polyurethane covered ball starting back in 1993 and Acushnet has conceded the asserted patents are entitled to a 1995 filing date.

Acushnet, on the other hand, admits that it did not come up with the idea for a polyurethane-covered multilayer ball until the 1995-1996 time frame. [Hebert Tr. 1089:10-1091:25; Morgan Tr. 408:20-21 .] It did not file a patent application on such a concept until 1997. [Morgan Tr. 394:2-10; PX-17.] Thus, Sullivan is the uncontested first inventor of the technology.

Acushnet also claims that others in the field simultaneously invented multi-layer polyurethane-covered balls because Bridgestone and Nike released polyurethane multi-layer balls in ***late 1999***. First,

25

Bridgestone manufactures the golf balls for Nike, which essentially makes Nike and Bridgestone one entity and not two. [Bellis Tr. 296:22-25.] More importantly, Acushnet has presented minimal evidence to show when Bridgestone/Nike actually began developing its polyurethane multi-layer golf ball, and no evidence at all to show whether the ball was even covered by the patents-in-suit. In fact, the jury was told that the covers of the Bridgestone/Nike balls are "fairly thick." [Morgan Tr. 384:25-385:16.] Callaway Golf did develop a ball that was covered by the patents, but it did not begin its development until 1997 – again, years after Sullivan. [*See generally* Yagley Tr. 1025:25-1026:16.]

Just as the facts fail to support Acushnet's alleged simultaneous invention argument, so too does the law it cites: *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d, 877 (Fed. Cir. 1998). While *Monarch* does note that the decision-maker can consider contemporaneous invention, it also says that alleged contemporaneous inventions need to be weighed in light of all the circumstances, especially evidence of long-felt need. [*Id.* at 883.] Furthermore, the alleged simultaneous inventions in *Monarch* occurred *before* the patents' critical date. Here, Acushnet has presented no such evidence of earlier invention by others. Also, even though *Monarch* involved evidence of two prior inventions, the Federal Circuit overruled the lower court's finding of invalidity and remanded the case because of an issue regarding long-felt need that had not been addressed. [*Id.* at 884.]

Finally, Acushnet continues to argue an irrelevancy in its brief – as well as trumpet it in a multitude of public press releases[17] – that the Pro V1 was released before any of the patents-in-suit *issued*. [Mtn. at 21.] Regardless of when the patents were issued, Sullivan undeniably came up with the concept of polyurethane multi-layer golf balls years before Acushnet, and Acushnet has *admitted* infringement of the claims covering Sullivan's inventions. The issuance of the patents by the Patent Office a year or so after the Pro V1 was released is immaterial to any issue concerning the patents' validity, and Acushnet fails to cite any law to the contrary.

---

[17] Callaway Golf has identified a number of examples of Acushnet's misleading emphasis on the patents' issue dates in its injunction briefing. [DI 412 at pg. 19-20, 35.] Yet, Acushnet's campaign of misinformation continues, most recently in a letter sent by Acushnet's CEO to all Acushnet accounts worldwide. To assure that its still "business as usual" at Acushnet, that letter continues to trumpet the unlawfully commenced PTO reexamination proceedings as well as mislead the public by emphasizing that the patents *issued* after the Pro V1 was first sold. [Ex. G; *see also* Ex. I.]

### vii. Callaway Golf's Latest Golf Balls Have Advanced The Sullivan Technology to the Next Step

Acushnet also claims the patents are somehow obvious because Callaway Golf stopped practicing the claims during the 2003-2004 time frame. Acushnet's argument makes no sense under the law and twists the relevant facts. As Tom Kennedy testified at trial, Callaway Golf's efforts to improve the performance of its golf balls has led to a steady progression of technology. [Kennedy Tr. 1016:10-17.] One such improvement is Callaway Golf's patented ability to use reaction injection molding (RIM) when adhering outer cover materials to an inner cover layer. [*Id.* 954:17-955:10.] This molding process allows Callaway Golf to make remarkably thin outer covers. [*Id.*] The construction of Callaway Golf's later premium golf balls, such as the HX Tour, therefore falls outside some of the limitations of the Sullivan patent claims. [*See id.*; 1013:9-1014:1; 1016:10-17.] Yet, Callaway Golf has not simply "abandoned" Mike Sullivan's inventions as Acushnet contends. To the contrary, it has built upon Sullivan's pioneering approach, by continuing to pursue technological improvements that result in thinner covers for its current line of golf balls which puts them slightly outside the asserted claims. Yet, all of Callaway's premium golf balls, just like Acushnet's, have solid cores, ionomer inner covers, and soft polyurethane outer covers.

### viii. Acushnet Offers No Evidence That Other Patents Cover the Pro V1

Acushnet also claims it is not clear which patents are important to the success of the product, because Pro V1 sleeves are marked with a lot of patent numbers. But, Acushnet has presented no technical evidence that all, or even any one, of those patents actually covers the Pro V1 – as opposed to covering processes or tools related to the manufacture of the ball. Even if another patent did cover the ball, Acushnet provides no law or evidence that would then require the jury to ignore the overwhelming objective indicia of non-obviousness presented at trial. Thus, Acushnet's reliance upon the mere marking of its packaging fails to undermine the reasonableness of the jury's presumed finding that objective indicia strongly support a conclusion that the inventions are not obvious.

### C. The Court's "On-the-Ball" Claim Construction was Correct and has Now been Supported Without Contradiction by the Evidence

The Court correctly construed the term "Shore D" to require the measurement be taken "on the ball." As Callaway Golf extensively briefed during claim construction, D.I. 204 and 260, ample support exists for this construction. The intrinsic evidence of course has not changed since then. Nor does Acushnet offer any new argument to support its proposed "off the ball" construction. It merely rehashes an argument based on flex modulus -- which **must** be measured on a plaque, because of the very nature of the test. [D.I. 260 at 4-5.] Nothing about the entirely different flex modulus test requires that Shore D hardness also be measured on a plaque, so Acushnet's view is as erroneous now as it was before. [*See* D.I. 260 (Callaway Golf's Response to Acushnet's Markman Brief ) at 4-5; *see also* Ex. J.]

What has changed, however, is the extrinsic evidence: the trial testimony of Acushnet's *own* witnesses now confirms that the "on the ball" construction is the correct one. Jeff Dalton testified that the common practice in the industry is to measure Shore D hardness "on the ball" [Dalton Tr. 514:21-515:1], and Bill Morgan also confirmed that the standard practice in the industry in the 1990's was to measure Shore D "on the ball." [Morgan Tr. 344:12-14.] Acushnet never presented this evidence to the Court during claim construction, and now finds it necessary to ignore it entirely.

Acushnet's argument that a "special definition" exists in the specification is equally without merit. Mtn. at 28. If there is a "special definition" in the specification, it is clear that it requires the Shore D to be measured in accordance with ASTM D-2240 *on the ball*. The definition is confirmed by the language of the claims and the repeated examples of "on the ball" measurements in the specification. As noted above, even Acushnet's own technical witnesses confirmed at trial that in the golf ball industry, and consequently to one of skill in the art, the standard practice is to take the Shore D measurement on the ball. The Court's claim construction was correct before trial and has been further supported now by the testimony from Acushnet's own witnesses.

## III. NOTHING ENTITLES ACUSHNET TO A NEW TRIAL ON THE ASSERTED CLAIMS

Given the jury's rejection of Acushnet's validity attacks for eight of the nine asserted claims, and given the evidence described in the foregoing section that amply supports the validity of the eight claims

now challenged by Acushnet, granting Acushnet a new trial would lead to a "manifest injustice" – not remedy one. Acushnet, nonetheless, complains about a number of the Court's evidentiary rulings relating to: (i) the Frankenstein golf balls, which were designed with perfect hindsight by Acushnet's attorneys and to which Acushnet's experts had minimal, if any, connection; (ii) the Hebert patent, which Acushnet, itself, expressly agreed was admissible; and (iii) PTO determinations that concern different patent claims and/or substantially different claim interpretations than those at issue here. As explained below, the Court's rulings on these issues were correct and do not warrant a new trial.

Next, Acushnet complains that all eight verdicts upholding validity of the claims must be set aside and a new trial convened because of the jury's one verdict invalidating claim 5 of the '293 patent. Yet, Acushnet was silent when the Court invited counsel to raise any issues concerning the jury's verdicts at a time when corrective action could have been taken – before the jury was dismissed. Acushnet therefore waived the right to raise any such arguments long ago. Acushnet also cannot fairly blame the jury for reaching a determination that might have been aided by the jury instructions and a verdict form to which Acushnet, itself, failed to object. Moreover, nothing requires the Court to vacate allegedly inconsistent general verdicts – to the contrary, Third Circuit precedent along with ample other authority allows such verdicts to stand as-is.

Lastly,[18] Acushnet continues to argue that the Court erred in construing the claims because the proper interpretation of the patents-in-suit requires the Shore D hardness measurements to be made *off-the-ball*. Callaway Golf addressed that argument above. Simply put, none of Acushnet's arguments has merit, much less satisfies the lofty standard of establishing that the jury's verdict shocks the conscience or cries out to be overturned.

---

[18] Acushnet also briefly argues that the Court erred in ruling that Nesbitt does not incorporate the Molitor '637 patent. For the reasons set forth in Callaway Golf's materials filed in opposition to Acushnet's summary judgment motion, the Court's ruling properly addressed this issue. [D.I. 202 and 258; *see also* D.I. 34; and Ex. J.] Likewise Acushnet presents a cursory argument regarding claims 1 and 2 of the '130 patent which lacks merit for the reasons previously presented by Callaway Golf to the Court. [*See* D.I. 372.]

# REDACTED

### A. Acushnet's Complaints About the Court's Evidentiary Rulings Lack Merit

#### 1. The Court Properly Excluded the Frankenstein Balls Created, With the Benefit of Hindsight, by Acushnet's Attorneys

Both before and during trial, Acushnet sought to rely on evidence created by its lawyers to purportedly represent "prior art" combinations (*a.k.a.*, the Frankenstein balls). None of these balls actually reflects particular teachings of any prior art reference; rather, the construction was dictated by Acushnet's attorneys. Acushnet aptly describes the Frankenstein balls as being "created" evidence. Mtn. at 38. Neither the balls, nor anything like them, ever existed prior to this litigation and certainly did not exist as of 1995, the priority date of the patents in suit.

The Court properly excluded this "created" evidence.

In accord with the Court's rulings, which minimized any possible prejudice to Acushnet, Callaway Golf carefully limited its questions at trial to the prior art known and in existence as of 1995, and did nothing to put Dr. Statz or any other witness in a compromising position with respect to Acushnet's "created" evidence. [Trial Tr. 747:20-748:7.] In truth, the Frankenstein balls are probative

---

[19]

[20]  Callaway Golf fully briefed this issue at D.I. 282 and D.I. 308. Rather than repeat the arguments raised there, Callaway Golf respectfully references and incorporates the discussion from those briefs.

of nothing other than the fact that Acushnet, a golf ball company, can make a golf ball. And to the extent the balls do have any minimal probative value, it was far outweighed by the prejudice that would have resulted from their admission. As noted by the Court when denying Acushnet's effort to get the "created" evidence into the record, the jury would have been left with the mistaken impression that "surely [the patents] are obvious. We did it, here it is, anyone can do this." [Trial Tr. 749:8-9.] In reality, it took the most prolific inventor in the history of golf to conceive of the idea that everyone in the industry had been seeking. For the above reasons and those set forth in Callaway Golf's *Daubert* motion regarding this issue [D.I. 282], the Court's exclusion of the Frankenstein balls was proper and does not entitle Acushnet to a new trial.

### 2.  Acushnet *Stipulated* to the Admission of the Hebert Patent

Prior to trial, Callaway Golf approached Acushnet for permission to use the Hebert patent in its opening statement and, consequently, put it into evidence – and Acushnet approved. Ex. D(2) ("as to DX [sic] 17 (Hebert patent), we do not object and that one is in"). Similarly, during trial, Callaway Golf exchanged deposition designations with Acushnet for Edmund Hebert which contained extensive discussion of whether Hebert believed a polyurethane-covered, solid-core, multi-layer ball was a novel concept – Acushnet never objected.[21] Also, during trial, Morgan was questioned extensively about his knowledge of the prior art by both Acushnet and Callaway Golf – the vast majority of which was not the subject of an objection.

Acushnet's real reason for objecting to certain of the testimony relating to the Hebert patent and the concept it covers was to help get the reexaminations into evidence. As the Court noted:

> The question is whether this objection is really put on the record to
> continue to press for the admission of evidence that I don't think is
> admissible and I will not admit it, as opposed to a bona fide objection to
> a witness who has testified that these three technologies, as he described
> it, were new and different, that is my concern.
>
> At this point, I believe it's fair game.

---

[21] Despite the fact that Hebert and Morgan similarly testified of a belief they had conceived of an invention (*see, e.g.,* Morgan Tr. 439:12-15; *and* Hebert Tr. 1089:10-1092:18), Acushnet never objected to the testimony from Hebert. Thus, any error in admitting similar testimony from Morgan was harmless. *See* FRCP 61.

# REDACTED

[Trial Tr. 422:18-25.]  As suggested in the colloquy above, at the time Acushnet belatedly raised an objection, Morgan had already testified that he believed the veneer concept was new and different from the prior art he knew about in 1995.  [*See* Morgan Tr. 374:10-14; 375:1-4, 11-14; 392:13-20; 394:2-3; 400:24-401:5; 405:8-12; 406:15-24; 407:17-19; 438:16-19.]  Acushnet now argues that Morgan's testimony was irrelevant and prejudicial because he is not an attorney nor qualified to render an expert opinion on patentability, novelty or non-obviousness.  But Acushnet's argument misses the point. Morgan was asked about his view as a golf ball designer, who, as Acushnet adduced on direct examination, was well aware of the prior art.  [*See e.g.* Morgan Tr. 338:20-339:21; 348:2-23; 350:3-351:3; 357:4-10.]  And his view was that, in 1995 and 1996, the basic combination of a polyurethane-covered solid-core multi-layer ball was new and different than what had existed before.  [*Id.* at 438:9-22.]  This testimony – not an expert opinion about patentability per se, but testimony from one in the field[22] as to whether an invention was different than what came before – is certainly relevant to the ultimate analysis of obvious.[23]

### 3.  The Court Properly Excluded the Irrelevant and Prejudicial *Ex Parte Sullivan* and Reexamination Materials

Despite the Court's consistent denials, Acushnet repeatedly attempted to interject extraneous PTO rulings into this case whether by seeking admission of materials from reexaminations or the *Ex Parte Sullivan* decision.  The Court was correct to exclude this material.[24]

---

[22] *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) ("Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made."); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 -1144 (Fed. Cir. 1985) ("Recognizing the difficulty of casting one's mind back to the state of technology at the time the invention was made, courts have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention. A retrospective view of the invention is best gleaned from those who were there at the time."); *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985) (*citing In re Piasecki*, 745 F.2d 1468, 1473-75 (Fed. Cir. 1984)) ("Opinions of the contemporaneous beliefs of those skilled in the field as to the nonobviousness of an invention merit fair weight.").

[23]



[24] Callaway Golf has briefed these issues before and therefore respectfully references those earlier submissions to the Court.  [D.I. 188, 382, and 384.]

The non-final office actions in a reexamination are probative of nothing. The PTO applies the broadest possible claim construction rather than the correct one, and does not consider nearly the breadth of evidence that the Court does. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). The PTO does not, did not, and cannot engage in fact-finding or hear testimony and evaluate the credibility of witnesses. Here, Acushnet has merely received interim PTO decisions in addition to the initial grant of its reexamination requests. Neither of these actions removes the presumption of validity enjoyed by the patents-in-suit. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996); 35 U.S.C. 282 ("A patent is presume valid"); 35 U.S.C. 301 *et. seq*. Even if there were some probative value to be gleaned from the PTO's lengthy interim decisions regarding the pending reexaminations, it would be far outweighed by the prejudicial effect of their admission – particularly in this case, where the Court has already issued rulings that differ from the PTO on a number of important issues. [*See e.g.,* D.I. 345 and 347.] Lastly, it is difficult to imagine how it would be a miscarriage of justice to prevent Acushnet from introducing into evidence reexaminations it filed in breach of a settlement agreement. To allow Acushnet to further profit from that unlawful behavior by prejudicing the jury in this proceeding would have been extremely unfair to Callaway Golf,[25] and tantamount to an end-run on the Court's breach of contract ruling.

Like its efforts regarding the reexaminations, Acushnet repeatedly tried to interject the *Ex Parte Sullivan* Board of Patent Appeals decision into the case. The Court properly excluded it each time. Even leaving aside for a moment that the PTO applies the broadest possible construction rather than the correct one, that it fails to adequately consider secondary considerations, and that patents enjoy no presumption of validity in the PTO, the *Ex Parte Sullivan* decision would still have no relevance to this case. First, the PTO's *split* decision addressed a different patent application than those at issue here. Second, as discussed above, a key limitation in *all* of the asserted claims is that the polyurethane cover of the multilayered ball have a Shore D of less than 64 when measured on the ball – *there is no such limitation in the application Ex Parte Sullivan addresses.* Therefore, the decision would have provided no

33

probative value. Admitting it would have required Callaway Golf to explain to a lay jury why the decision is irrelevant, which would have distracted from the real issues the jury had to decide. Finally, it is worth noting that the *Ex Parte Sullivan* decision dealt with the Nesbitt reference, and Acushnet is not pursuing any obviousness combination involving Nesbit in its post-trial motions. Thus, because the Court properly excluded both the reexaminations and the *Ex Parte Sullivan* decision, neither ruling provides a basis for a new trial.

### B. Dr. Risen's Expert Report Reasonably Disclosed the Substance of His Testimony

Acushnet argues that Dr. Risen exceeded the scope of his expert report in two areas: lack of motivation to combine either the Nesbitt[26] or Proudfit patent (multi-layer ionomer golf balls) with the Molitor '751 patent (golf ball with polyurethane cover).[27] [Mtn. at 43-45 ] Rather than try to establish the sort of meaningful prejudice that might warrant a new trial, Acushnet plays a game of "gotcha" by essentially arguing that Dr. Risen did not state the words "motivation to combine" in his report. But when the Court looks to substance, it will see that Dr. Risen's report repeatedly expresses his opinion that those of skill in the art had little reason to expect higher performance by combining a polyurethane cover (*e.g.,* Wu, Molitor '751 or '637) with either the Proudfit or Nesbitt multi-layer ionomer golf balls, and hence, that no motivation existed to form any such combinations. Acushnet, therefore cannot satisfy the relevant standard for securing a new trial by establishing that Dr. Risen's testimony so far exceeded his report that allowing the jury's verdicts to stand would be a miscarriage of justice.

First, Dr. Risen's report states that Nesbitt, itself, "teaches away from using a polyurethane outer cover" and that this "would discourage a person of skill in the art from using the polyurethane-ionomer cover of Molitor '751 in a Nesbitt-type multi-layer ball." Ex. E (Risen Rpt.) ¶ 155. This portion of Dr.

---

[25] Indeed, Acushnet – seemingly undeterred by the fact that its reexaminations were unlawfully commenced – has continued to use the existence of those proceedings to harm Callaway Golf in every way possible. [*See* D.I. 412 at 20-21, 34-37; Ex. G and I.]

[26] Acushnet's argument regarding the Nesbitt / Molitor '751 combination suggests that its attempted invocation of the beyond-the-scope rule is tactical rather than substantive, because its post-trial brief has given up on pursuing that combination as invalidating the asserted claims. *See* Mtn. at part II.C.

[27] The limited testimony that Acushnet objects to regarding Nesbitt / Proudfit / Molitor '751 is: (i) Risen Tr. at 1171 ("I don't know of any motivation to do it."); and (ii) Risen Tr. at 1168-70 ("I don't know of any motivation to combine it or try it.").

Risen's report, alone, disposes of Acushnet's claim that the report did not support Dr. Risen's testimony that one of ordinary skill would have had no motivation to combine these references.

Second, Dr. Risen's opinions relating to a lack of motivation are also included in the "Unexpected Results" section of his report (¶¶ 250-281) where he discusses the great control, yet superior distance of the Sullivan golf balls and opines, *inter alia*, that "no one of skill in the art would have expected these advantages from this design." [Ex. E ¶ 278 (discussing Molitor '637 and '751 patents).][28] Dr. Risen also states in paragraph 254 of his report that because those of skill in the art knew of the various cover materials that were in existence, the fact that no one successfully made a urethane-over-ionomer ball suggests that "persons of skill in the art either did not think to do so, or did not think that such an effort was *worth pursuing* . . . ."[29] The lack of motivation to create the combinations in the asserted claims was also discussed by Dr. Risen in paragraph 255:

> The persons of greatest skill in the art were motivated . . . to design the best golf balls possible. Therefore, if those persons, as Acushnet now argues, would have 'expected' that combining the various prior art references as Dr. Statz says would result in improved performance, these designers had every opportunity and motivation to create such combinations.

[Ex. E ¶ 255; *see also* ¶ 258 ( "widespread knowledge of the prior art" and fact that no one before Sullivan successfully implemented a urethane-over-ionomer golf ball evidences that "even the most skilled golf ball designers either did not *expect any benefit* from such a design, *did not think the construction was possible*, or *did not consider the combination at all*."); ¶ 262 (noting "trend among [Sullivan's] Spalding colleagues *away from* polyurethane cover materials").] Plainly, Dr. Risen expressed his opinion that those of skill in the art did *not* expect that the claimed combination of

---

[28] Within a section of the report concerning the Nesbitt patent, Dr. Risen also references a list of materials from Molitor '637, which includes polyurethane, and notes that *no person* of skill in the art "*would anticipate any of these materials would improve Nesbitt's* design more than any other, particularly since Molitor echoes *Nesbitt's preference for ionomeric foam covers*." *Id.* at ¶ 105; *see also* ¶ 107 (noting no motivation to pursue "massive undertaking" to see if any particular material in a long list "would achieve a significant advance", and opining that neither "the prior art itself or the general knowledge of one of skill in the art would provide any such assurance.").

[29] Indeed, at the outset of his report, Dr. Risen also explained that there was no motivation to combine Proudfit and/or Nesbitt with a polyurethane cover and/or that the record evidences no reasonable expectation of success for such combinations. *See* Ex. E ¶ 22 (combination was not obvious to Proudfit or Shenshen Wu).

elements would result in improved performance and hence he was aware of no motivation to pursue this approach via any combination of the prior art – just as he testified at trial.[30]

To show prejudice, Acushnet complains it would have "focused on the motivation issue during Dr. Statz's direct examination," if Dr. Risen's report had expressly used the "motivation to combine" language in the particular sections upon which Acushnet now focuses.  Mtn. at 45.  Acushnet, however, *did* squarely address the "motivation issue" during Dr. Statz's direct examination:

> Q.  Now, in the combination that we're talking about between the Nesbitt patent and the Molitor '751 patent, would a person of ordinary skill in the pat be motivated to combine *Molitor '751 with the Nesbitt patent*?
>
> A.  Yes, because Nesbitt says you can use the compositions in Molitor.

[Statz Tr. at 625:11-16.]

> Q.  In your opinion, would someone of ordinary skill in the art have been motivated to combine the cover material described in the *Molitor '751 patent with the ball of the Proudfit patent*?
>
> A.  Yes.  Molitor sort of teaches that you can do this, that you want to do this.  And Proudfit really says that his ball is pretty good.  Has quick [sic: click], feel, spin and distance that he wants but the balata material is not as durable as it can be.  And we all know, we've known for 30 years, that urethanes are the most durable material that you could use practically anywhere.

[Statz Tr. at 604:23-605:8.]  Thus, Acushnet's suggestion that it was somehow prejudiced by not addressing the motivation to combine issue via testimony from Dr. Statz is at odds with the record.[31]

Moreover, had Acushnet truly been concerned with having been prejudiced on the motivation issue, it

---

[30]  Similarly, in paragraph 133 (Nesbitt + Molitor '751) and again in paragraph 179 (Proudfit + Molitor '751), Dr. Risen opined "that the inventions described in the asserted claims of the patents-in-suit would not have been recognized as the predictable result of such a combination."  [Ex. E at ¶¶ 133 and 179.]  Dr. Risen's opinion that one of ordinary skill would *not* have recognized that a combination of the references would predictably result in the successful Sullivan inventions put Acushnet on notice regarding Dr. Risen's view that no apparent motivation existed to form such a combination.

[31]  Acushnet's post-trial brief also alleges it obtained a damaging admission from Dr. Risen's deposition that the Molitor '751 patent included a suggestion to use the '751 cover on the Nesbitt ball.  [*Id.* at 44 (*citing* Risen Depo. at 81:20-82:5).]  Acushnet can only blame itself for not working this "admission" into its cross-examination.  If true, it relates not only to motivation to combine but also to the issue of obviousness in general – and perhaps, more importantly, could have been used to undermine Dr. Risen's credibility.
Also, that Acushnet deposed Dr. Risen on the subject of motivation, and, in its summary judgment briefing, emphasized the importance of his answers, belies Acushnet's post-trial argument that it had no notice that Dr. Risen would testify at trial on that issue.  [*See* D.I. 216 at 18 (*citing* Risen deposition testimony regarding motivation to combine).]

# REDACTED

had ample opportunity to minimize any such alleged prejudice by having Dr. Statz testify in its rebuttal case. By doing so, Acushnet could have addressed Dr. Risen's testimony as well as have the last word regarding this issue. Acushnet's decision not to do so speaks volumes regarding its post-verdict claims of prejudice, and raises the question whether Acushnet preferred to set up an argument to undo the jury's verdict rather than take reasonable, available steps at trial to cure any alleged prejudice stemming from the two questions to which it objected as eliciting testimony beyond the scope.

Indeed, to the extent any prejudice occurred by the introduction of the limited testimony of Dr. Risen to which Acushnet now objects, it was harmless. Simply put, whether or not any motivation existed to combine the prior art references, substantial evidence at trial showed that each of the combinations argued by Acushnet lacked critical hardness limitations. *See, supra*, Section II.B.4.a-c.

[33] Thus, Acushnet believed that it was proper for Dr. Statz to testify about the motivation to combine these references despite the absence of specific "motivation to combine" language in his

---

[32] Conspicuously, Acushnet's brief does not complain about Dr. Risen's "motivation to combine" testimony regarding these references. [Risen Tr. at 1175:8-1176:10.]

[33] For example, at trial Dr. Statz was asked "would a person of ordinary skill in the art in 1995 be motivated to use the Wu polyurethane in place of the outer cover of the Proudfit ball or the Wilson Ultra-Tour Balata ball?" Dr. Statz testified that "you would be motivated to take her cover material and put it on Proudfit core." [Statz Tr. at 617:25-618:11.] Dr. Statz was also asked, "would a person of a person of ordinary skill in the art be motivated to use the Wu polyurethane in place of the outer cover of the Nesbitt ball?" To which Dr. Statz responded, "Yes." [*Id.* at 628:10-13.]

report.[34]  For the reasons noted above, Callaway respectfully submits that Dr. Risen's testimony was likewise reasonably within the bounds of his report.

### C. The Jury's Verdict Regarding Claim 5 of the '293 Patent Does Not Require a New Trial Regarding All Eight Verdicts Upholding the Validity of the Other Claims

Acushnet seeks to vacate all of the jury's verdicts and convene a new trial because the jury's verdict regarding dependent claim 5 of the '293 patent is purportedly inconsistent with the verdicts upholding the validity of the other eight asserted claims, including independent claim 4 of the '293 patent.  Acushnet voices this complaint: (i) after having made no effort to add an explanation of dependent and independent claims to the Court's final draft jury instructions; (ii) after agreeing to the verdict form, which provides no explicit guidance regarding the treatment of independent versus dependent claims; and (iii) after hearing the jury announce the allegedly inconsistent verdict, listening to the Court specifically invite counsel to advise of any issues prior to dismissing the jury, and yet raising no objection, comment, or concern.  Having kept silent until it was too late to do anything with the perceived error – other than use it as a weapon to undo the jury's other verdicts – Acushnet now argues that the entire trial should be vacated.  Federal courts, not surprisingly, have denounced such practices:

> We cannot sanction the time and expense of a new trial on the basis of an alleged inconsistency that, had it been raised earlier, could have been remedied by proper instructions to the jury.

*Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020, 1034 (9th Cir. 2003)(ruling that failure to raise concern, that record could not possibly support a split verdict, waives right to later complain about an inconsistent verdict).[35]

---

[34]  Callaway Golf also notes that Dr. Statz testified at trial regarding the on-the-ball hardness measurements of the Wu polyurethane as measured on the Titleist Pro V1 and the Professional.  [Statz Trial Tr. at 616:10-619:4.]  Yet, no such data is discussed in Dr. Statz' report.

[35]  *Accord Jacobs v. City of Philadelphia,* 2005 WL 1899499, at *10 (E.D.Pa. Aug. 8, 2005) (noting with regard to jury instructions "… it is likely that Plaintiff's counsel intentionally remained silent realizing that Plaintiff had received an advantage.  Considering this '**deliberate inaction**,' it would be unfair and improper now to grant the Plaintiff a new trial and allow him to profit …"); *see also Jarvis v. Ford Motor Co.,* 283 F.3d 33, 62 (2d Cir. 2002) ("To excuse [the defendant] from the well-established rules of waiver would permit precisely the sort of "**sandbagging**" that the rules are designed to prevent, while undermining the ideal of judicial economy that the rules are meant to serve."); *Babcock v. General Motors Corp.,* 299 F.3d 60, 63-64 (1st Cir. 2002) (holding that a litigant "forfeited its objection to the alleged inconsistency by failing to object at the critical time," because "**[t]o decide otherwise would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'** " (*quoting McIsaac v. Didriksen Fishing Corp.,* 809 F.2d 129, 134 (1st Cir.1987) (*quoting Merchant,* 740 F.2d at 92)).

> The Plaintiff should not be allowed to request the very form of verdict which was used, wait for the jury to return a verdict, allow the jury to be discharged, and then contend for the first time that the verdict was inconsistent. This would amount to a party inviting error, speculating on the jury verdict, and then asking for a new trial after the jury had been discharged and it became too late to do anything about it.

*Federal Ins. Co. v. Dean Const. Co.*, 432 F.Supp.2d 1256, 1259 (M.D.Ala. 2006). Acushnet's silence during trial allows it to now use the alleged inconsistency to attack the jury's verdict. Because the law and basic notions of fairness require litigants to voice any concerns about the consistency of a jury's verdicts before a jury is dismissed – at a time when something can be done to address the situation – Acushnet has waived any right it had to seek a new trial due to alleged inconsistencies in the jury's verdicts. Moreover, a consideration of the merits of Acushnet's complaint regarding the jury's verdicts also shows that a new trial is not warranted.

     1.     **Acushnet's Silence During Trial Waived Any Right to Now Complain About Any Alleged Inconsistency of the Verdicts**

            a.     **Acushnet Failed to Object to the Lack of Any Definition of Dependent and Independent Claims in Either the Draft Jury Instructions or the Verdict Form**

Acushnet now asserts that because dependent and independent claims are linked (*i.e.*, where an independent claim is valid, so too must be the dependent claim), the jury returned inconsistent verdicts when it invalidated dependent claim 5 of the '293 patent while, *inter alia*, upholding the validity of claim 4 from which it depends. Yet during trial Acushnet raised no objection to the verdict form, and, therefore, failed to provide the jury with a verdict form clearly indicating that a verdict upholding the validity of independent claim 4 of the '293 patent required a similar verdict on the validity of dependent claim 5 (*e.g.*, by telling the jury to skip consideration of the dependent claims if it found that the corresponding independent claims were not invalid).

Similarly, Acushnet raised no objection to the jury instructions which emphasized that the validity of each of the claims must be separately assessed:

> Each claim is a *separate* statement of the patented invention and each of the asserted claims must be considered *individually*. The validity of the patent claim, therefore, is *independent of* the validity of other claims in the patent.
>         *                  *               *

Each claim must be considered in its entirety, *separate* from other claims.

[Tr. 1400, 1403-04.] Prior to closing arguments, when the Court provided the parties with the final draft jury instructions for this matter, Acushnet could have objected to the lack of any description of the relationship between dependent and independent claims in the Court's draft instructions.[36] Rather than exercise any of the above rights, Acushnet chose to accept a verdict form and instructions regarding the law that could have been modified to preclude the jury from reaching allegedly inconsistent verdicts regarding claims 4 and 5 of the '293 patent.

Acushnet cannot now fault the jury for reaching an allegedly inconsistent result that it was allowed to reach by the instructions and verdict form to which Acushnet agreed:[37]

> Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed.R.Civ.P. 51. Yet to avail itself of relief under this Rule, a party must object before the jury retires to deliberate.

*Jarvis*, at 56 (2d Cir.) (ruling that appellant waived argument regarding alleged inconsistency of jury's verdict by failing to timely object to jury instructions and verdict form); *Zhang* at 1037 ("Like defects in the sufficiency of the evidence, the potential for a legally irreconcilable verdict should be addressed through jury instructions properly proposed under Rule 51."); *see generally Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 200 (3rd Cir. 1995) ("[W]here a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form had been submitted to counsel, objections are waived."). Thus, having failed to take action that would have expressly defined for the jury the relationship between claims 4 and 5, Acushnet should not be allowed to now fault the jury for any purported inconsistency in those two verdicts.

---

[36] A set of jointly proposed instructions initially had included a discussion regarding dependent and independent claims. [D.I. 389 at 29.] This discussion was absent from the Court's final draft instructions. During the charging conference, objections were raised regarding various instructions [Tr. 1248-1282.] Yet, Acushnet never objected to the lack of an instruction on the relationship between dependent and independent claims.

[37] The point is not that either the jury instructions or verdict form misstated the law – they did not. Moreover, because Acushnet's post-trial motion does not raise any such objections regarding the jury instructions or verdict form, even if Acushnet now desired to raise such arguments it would be too late to do so.

b.    **Acushnet Also Failed to Object Prior to the Jury's Dismissal**

The form of a jury's verdict can have a decisive impact regarding the treatment of post-trial

motions. Here, the jury was asked to, and did, return general verdicts. Where a jury returns a general

verdict on ultimate issues, or multiple general verdicts on different claims, the jury is presumed to have

made findings of fact, applied the law, and determined who should prevail. Not surprisingly, as

explained below in parts III.C.2 and III.C.1.a-b, courts readily conclude both that inconsistent general

verdicts can be allowed to stand, and that a litigant can waive its right to complain about inconsistent

general verdicts just as it can waive other objections during trial.

First, it is clear that the verdict form in this case was a general one. The Third Circuit has

explained that where, as here, each claim is the subject of a single question that does not facilitate

the court's inquiry into the basis for the jury's verdict on that claim, the verdict is a general one.

*Brokerage Concepts, Inc. v. U.S. Healthcare Inc*., 140 F.3d 494, 534 n.32 (3rd Cir. 1998)

(determining that one question within a FRCP 49(a) verdict form was "the functional equivalent of a

general verdict" and applying a general verdict rule to that question); *see also* Wright & Miller, §

2511, at n.2.1; *Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir. 2003) ("Although the

federal rules do not define general verdicts, they generally are considered legal conclusions rather than

findings of fact."); Black's Law Dictionary (8[th] ed. 2004) ("*general verdict*: A verdict by which the jury

finds in favor of one party or the other, as opposed to resolving specific fact questions.").

The jury, here, provided a nine-part general verdict to address the legal conclusion of

obviousness for each of the nine asserted claims. [D.I. 398-399.] The verdicts here are similar to those

addressed in *Railroad Dynamics v. Stucki*, 727 F.2d 1506 (Fed. Cir. 1984), where the jury returned

answers to ten questions, including seven addressing the various invalidity attacks on the patent-in-suit.

The Federal Circuit explained that the jury's verdict form consisted of a multi-part general verdict:

> Though labeled as "interrogatories", the ten questions put to the jury were designed to elicit,
> and were treated by all concerned as having elicited, *a ten-part verdict.* Because validity was
> the only issue tried, and the ten interrogatories encompassed each of RDI's numerous
> defenses, RDI can hardly complain that the jury returned a separate verdict on each of those
> defenses, instead of returning a general verdict reading, for example, "we find in favor of
> Stucki" (which of course it could have done absent the ten "interrogatories"). The jury's
> responses were *not special verdicts*, because they were not simply "written finding[s] upon

41

each issue of fact". Rule 49(a), Fed.R.Civ.P. Nor was there a single general verdict, *per se,* accompanied by "written answers" to "one or more issues of fact the decision of which is necessary to a verdict". Rule 49(b) Fed.R.Civ.P. Nonetheless, as above indicated, the parties have correctly viewed the jury's ten responses as the equal of a *general verdict* for Stucki.

*Id.* at 1516;[38] *see also Richardson-Vicks v. Upjohn,* (stating that the jury returned a "general verdict" with regard to a question on whether each of the asserted claims was invalid).[39] Likewise, this Court has described questions concerning the validity of asserted claims as being a part of a "general verdict":[40]

> While generally preferring to receive a general verdict, this court will submit special interrogatories to the jury to elicit specific findings of fact where appropriate. In this case, the court found its preference for a *general verdict* outweighed any need to submit interrogatories to the jury in the light of the facts and circumstances of this case.

*Cell Pro,* 894 F.Supp. 819, at 840 (D.Del. 1995); *see also, GNB Battery Techn., Inc. v. Exide Corp.,*876 F.Supp. 605, 609 (D. Del. 1995) (describing as a "general verdict" a form that set forth questions concerning the validity of each asserted claim; included in a separate section were "interrogatories" submitted by the parties).[41]

---

[38] This approach is generally described in *Zhang:*
> A jury may return *multiple general verdicts* as to each claim, and each party, in a lawsuit, without undermining the general nature of its verdicts. *See, e.g.,* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2504.1 (2d ed. Supp.2003) ("In cases involving multiple claims ... or defendants, the district court may ... have the jury render multiple general verdicts."). Although some general verdicts are more general than others, encompassing multiple claims, the key is not the number of questions on the verdict form, but whether the jury announces the *ultimate legal result of each claim.*

[39] The question referenced as a "general verdict" by the Federal Circuit was (*id.*):
> **Invalidity-Obviousness**
> Do you find that defendants Upjohn and McNeil have proven by clear and convincing evidence that any of the claims 36, 37, 47 and 48 of plaintiff Richardson-Vicks' B1 '899 patent is invalid because the differences between the subject matter of the claims and the prior art as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made.
>     [listing of each asserted claim]

[40] Like the verdict form used here, the questions in *CellPro* included the following (*id.* at 842):
> **II. *VALIDITY***
>     12. Do you find that defendant has shown by clear and convincing evidence that any of the following claims of the patents in suit is invalid due to obviousness? (A "YES" answer is a finding for CellPro. A "NO" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson.)
>     [listing of each asserted claim]

[41] Again, like the verdict form used here, the questions in GNB included the following:  (*id.* at 612)
> **II. *VALIDITY OF THE PATENTS IN SUIT***

The cases Acushnet has cited to support its demand for a new trial, by contrast, concern conflicts among "special verdicts" under FRCP 49(a) or "written questions" under FRCP 49(b) and therefore simply do not apply here.[42]  Acushnet assumes but never establishes the premise for its argument – that the verdict form at issue in this case is even subject to Rule 49.[43]  As explained above, many courts faced with substantially identical verdict forms have concluded the answer is no.

As noted above, failure to object to allegedly inconsistent general verdicts constitutes waiver of that issue.  In *Mason v. Ford Motor Co., Inc.*, 307 F.3d 1271, 1274 (11th Cir. 2002), the 11th Circuit Court of Appeals squarely addressed this issue and ruled "if the jury render[s] inconsistent general verdicts, failure to object timely waives that inconsistency as a basis for seeking retrial." *See also Babcock v. General Motors*, 299 F.3d 60, 63 n.1 (1st Cir. 2002) (stating that objections to "allegedly inconsistent general verdicts" must be raised before the jury is dismissed).  Thus, while no controlling precedent from the Third Circuit appears to exist, ample authority from this court and others supports the approach that a failure to object at a time when something could be done should result in waiver.[44]

---

A. VALIDITY OF THE '386 PATENT
 Have defendants proven by clear and convincing evidence that the following Claims of the '386 patent are invalid? (A "YES" answer to this question is a finding for Exide and General Battery. A "NO" answer is a finding for GNB.)
 [listing of each asserted claim]

[42] *See* Mtn. at 30 (*citing Malley-Duff & Assoc. v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (3rd Cir. 1984) (addressing conflict between special verdicts under FRCP 49(a)); *Repola v. Morebark Indus.*, 934 F.2d 483, 485 (3rd Cir. 1991) (addressing conflict between "interrogatories" under FRCP 49(b))); *see generally* Black's Law Dictionary (8th ed. 2004) ("***special verdict***: A verdict in which the jury makes findings only on factual issues submitted to them by the judge, who then decides the legal effect of the verdict.") ("***general verdict with interrogatories***: A general verdict accompanied by answers to written interrogatories on one or more issues of fact that bear on the verdict.").

[43] Indeed, where a jury returns answers to special verdicts under FRCP 49(a) which concern "a special written finding on each issue of fact" or "written questions on one or more issues of fact" under FRCP 49(b), the jury plays its quintessential fact-finder role under the 7th Amendment.  In that context, two opposing and inconsistent findings of fact explicitly implicate some portion of a jury's Constitutional role and courts are therefore loath to allow the inconsistency to stand, or to conclude that a litigant has waived its right to challenge the inconsistency.  The verdict form in this case, however, did not consist of or even include any "special written finding" or answers to "written questions on one or more issues of fact" and Acushnet does not argue otherwise.

[44] *See generally Boston Scientific Scimed, Inc. v. Cordis Corp.*, 434 F.Supp.2d 308, 318 (D.Del. 2006) (a party may not seek a new trial on the basis of objections not raised in the original trial) (*citing Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1469 (Fed.Cir.1997); *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 681 (3d Cir.1980); *Finch v. Hercules Inc.*, 941 F.Supp. 1395, 1416 (D.Del.1996)); *see also Joy Techs., Inc. v. Flakt, Inc.*, 820 F.Supp. 802, 814 (D Del 1993) ("District courts will generally grant [a motion

This approach has also been adopted by the majority of courts addressing the waiver issue in the related context of general verdicts and written questions submitted pursuant to FRCP 49(b). Therefore, even if the verdict form in this case is somehow viewed as being a hybrid, which it is not, waiver still applies. *See* Wright & Miller, § 2513 at 208 ("Most of the federal courts that have addressed the issue have held that a party's failure to object to an inconsistency between the response to a special interrogatory and the general verdict waives the right to further deliberation by the jury or to the grant of a new trial motion."). The reasons cited for the waiver rule in the context of Rule 49(b) verdicts apply equally in the context of inconsistent general verdicts. *See, e.g., Merchant v. Ruhle,* 740 F.2d 86, 92 (1st Cir.1984) (application of waiver rule prevents trial counsel from using "agreeable acquiescence to perceivable error as a weapon of appellate advocacy"); *White v. Celotex Corp.,* 878 F.2d 144, 146 (4th Cir. 1989) (intent of FRCP 49(b) is "to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body"); *Strauss v. Stratojac Corp.,* 810 F.2d 679, 682-83 (7th Cir.1987) (invocation of the waiver rule promotes the just and efficient operation of the federal courts).

The Federal Circuit, applying Sixth Circuit law, has *twice* ruled that a litigant waives any argument for a new trial based upon inconsistent jury verdicts where the litigant fails to object prior to the dismissal of the jury on facts nearly identical to those present here – *i.e.,* where the jury upheld the validity of an independent claim but invalidated a dependent claim . *L&W Inc. v. Shertech Inc.,* 471 F.3d

---

for new trial] only if some grievous error occurred during trial which rendered the trial unfair. . . . Even in the case of grievous error, however, ***courts are not inclined to grant such motions where the moving party made no effort to bring the alleged error to the Court's attention at the time it occurred.***")); *see also Home Indemnity Co. v. Lane Powell Moss and Miller,* 43 F.3d 1322, 1331 (9th Cir. 1995) ("When counsel is invited to consider whether or not to discharge the jury, counsel risks waiver of objections to any inconsistencies in the jury's findings if counsel does not raise the issue before the jury is excused.") (*citing Los Angeles Nut House v. Holiday Hardware Corp. ,* 825 F.2d 1351, 1354-55 (9th Cir.1987) (*citing Cundiff v. Washburn*, 393 F.2d 505 (7th Cir.1968) (counsel's failure to object to inconsistency when asked by court before jury was excused constituted waiver of objection)); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1423 (10th Cir.); *Tennessee Consol. Coal Co. v. UMW,* 416 F.2d 1192, 1200-01 (6th Cir.1969); *Kirkendoll v. Neustrom,* 379 F.2d 694, 699 (10th Cir.1967) (all finding waiver when court inquired whether counsel had anything to raise before excusing jury and counsel replied negatively)).

1311 (Fed.Cir. 2006); *Bradford Co. v. Jefferson Smurfit Corp.,* 2001 WL 35738792 (Fed.Cir. 2001).[45]
In both *Bradford* and *L&W*, the alleged infringer failed to timely object to the verdicts, and the Federal
Circuit ruled that the alleged infringer had waived any argument for a new trial based upon the
inconsistency. *Bradford*, at *8; *L&W*, 471 F.3d at 1318. In *Bradford*, the trial court mistakenly failed to
rule upon a separate JMOL motion. So, after affirming the trial court's denial of the new trial motion,
the Federal Circuit directed the trial court to consider the JMOL motion on the merits and then "decide
whether to enter JMOL for Bradford or to let the otherwise illogical result stand." *Bradford*, at *8. In
*L&W*, the JMOL motions had been properly addressed, so the Federal Circuit simply proceeded to
"affirm the portions of the judgment holding [independent] claim 7 valid and [dependent] claim 10
invalid." *L&W*, 471 F.3d at 1314. In other words, in *L&W*, the Federal Circuit let the inconsistent
verdict stand as-is.

　　Here, the Court invited counsel to advise of any issues after the jury returned its multiple verdicts
on the asserted claims: "Counsel, is there anything we need to address before we dismiss this jury?" Tr.
1427. Counsel for Acushnet stood before the Court and remained silent.[46] Because it chose not to raise
any objection at the relevant time, Acushnet has waived any effort to seek a new trial on the basis of the
alleged inconsistency of the verdict.

---

[45] While the opinions in *L&W* and *Bradford* do not set forth all of the actual questions posed to the jury, the
Federal Circuit characterized one verdict form as a Rule 49(a) form and the other as a Rule 49(b) form. The
Court's comments regarding the particular form of the verdict were apparently not the subject of any
argument presented by the litigants, and the Federal Circuit in *L&W* itself recognized:

> Although the jury here returned a special verdict containing written factual findings pursuant to
> Federal Rule of Civil Procedure 49(a), as opposed to a general verdict together with responses to
> factual interrogatories pursuant to Rule 49(b), that distinction does not make a difference. In both
> cases, the waiver rule promotes judicial efficiency by requiring that the trial court be given a
> chance to let the original jury resolve any inconsistency in its responses.

Thus, in the above cases, it was immaterial whether the overall verdict forms were subject to any particular
provision of FRCP 49 or were simply general verdicts.

[46] Even when Callaway Golf noted that the one claim found to be invalid was a dependent claim,
Acushnet said nothing. [Tr. 1427:12-1428:23.] Acushnet, of course, cannot rely upon Callaway Golf's
actions to cure Acushnet's failure to preserve its rights. *See Zhang*, 339 F.3d at 1037 (finding waiver even
where the court, itself, initially raised a concern about a possible inconsistency in the verdict). Indeed, had
Acushnet joined Callaway Golf in raising the concern regarding the one verdict of invalidity, a jointly
stipulated course of action could have been considered or pursued. But Acushnet, having every incentive
to preserve a basis for wiping-out all eight adverse verdicts, remained silent.

    2.      **Even If the Merits of Acushnet's Inconsistent-Verdict Argument Are Addressed, No New Trial is Warranted**

Even if Acushnet had not waived the right to make any argument concerning the alleged inconsistency of the verdicts, Acushnet would not be entitled to an order vacating the jury's verdicts and requiring a new trial. Even where a jury's general verdicts are in fact inconsistent, the Third Circuit has ruled that trial courts can allow the verdicts to stand as-is. And Acushnet fails, in any event, to show that the alleged inconsistency has resulted in a manifest injustice of such magnitude as to warrant an order vacating all the verdicts and requiring a new trial on all claims, or that the jury's verdicts were against the great weight of the evidence. For all these reasons, Acushnet's complaints regarding the jury's verdicts do not warrant a new trial – even if Acushnet had timely voiced its objections and properly preserved its right to pursue such arguments.

    a.      **The Majority of the Asserted Claims are Easily Distinguished from the One Invalidated Claim.**

Given the constitutional implications of disregarding a jury's verdict, courts scrupulously examine a jury's verdict for any view that would support it.[47] Here, Acushnet concedes, as it must, that the majority of the nine asserted claims are distinguishable from the one invalidated by the jury, because Claims 1-3 of the '156, claim 1 of the '293, and claim 1 of the '873 all require that the inner layer of the golf ball include a blend of low-acid ionomers.[48] *See Scimed Life Systems, Inc. v. Johnson & Johnson,* 225 F.Supp.2d 422, 441 (D.Del. 2002) (rejecting post-trial challenge where claim upheld by jury had an additional limitation over invalidated claim). The jury's verdicts upholding the validity of at least these

---

[47] *Union Pacific R. Co. v. Hadley,* 246 U.S. 330, 334 (1918) (Holmes, J.) ("[S]ince the [jury] finding was possible on the evidence it cannot be attributed to disregard of duty.... Beyond the question of attributing misconduct to the jury we are not concerned to inquire whether its reasons were right or wrong"); *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 764 (3d Cir 1990) ("a trial court is "under a constitutional mandate to search for a view of the case that makes the jury's answers consistent." ").

[48] Acushnet argues, nonetheless, that even the verdicts on the five "blend" claims must be vacated and re-tried because they are "not patentably distinguishable" in light of double-patenting objections raised by the Patent Office during prosecution of the asserted claims. Of course, whether patent claims are different enough to be "patentably distinguishable" is not the test for determining whether the jury's verdicts were irreconcilably inconsistent. To the contrary, as explained above, at least five of the claims include a limitation not found in invalidated claim 5 and that is more than sufficient under the cases to support the jury's verdicts.

  Moreover, Callaway Golf's terminal disclaimer, which overcame the Patent Office's objections, is not an admission of obvious-type double patenting.

five claims is, therefore, easily supported by the fact that they include an additional limitation beyond those set forth in the invalidated claim 5 of the '293 patent.

### b.    Inconsistent General Verdicts May be Allowed to Stand

Given that no inconsistency exists regarding the jury's verdicts upholding the validity of the five "blend" claims, Acushnet's argument is reduced to a question of whether any alleged inconsistency with regard to the four non-blend claims (claims 4 and 5 of the '293 patent, claim 3 of the '873 patent, and claim 5 of the '130 patent) automatically requires that the Court vacate the jury's verdicts and convene a new trial on those claims.  Ample authority provides the answer – "No" -- including opinions from the Third Circuit, Justice Stevens, and Judge Learned Hand.

Federal Rule of Civil Procedure 59 authorizes the granting of a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  No controlling precedent appears to *require* the convening of a new trial due solely to a jury's return of inconsistent *general* verdicts.  *See, e.g., Mosley*, 102 F.3d at 91 (noting that "little precedent" exists regarding the issue of inconsistent general verdicts); *see also Zhang*, 339 F.3d at 1035 ("We have found no Supreme Court or Ninth Circuit cases in which an appellate court has directed the trial court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit precedent dictates that we cannot do so.").  Indeed, the Third Circuit has expressly allowed inconsistent general verdicts to stand.

In *Montgomery County v. Microvote*, the dispute concerned malfunctioning voting machines and the jury determined that Microvote did not breach its contract but that it did breach warrantees of merchantability and fitness.  On appeal, the Third Circuit did not address the trial court's explanation regarding how these verdicts purportedly could be reconciled (*see Montgomery County*, 152 F.Supp.2d 784, 799-800 (EDPA 2001)).  Instead, the Third Circuit simply ruled:

> We also conclude that Westchester's three remaining arguments lack merit. . . .  Second, even if the jury's verdict that Microvote breached implied warrantees of merchantability and fitness for a particular purpose are inconsistent with the jury's finding that Microvote did not breach the May 25, 1994, contract with the County, there is sufficient evidence to support the verdict on the breach of warranty claim and "consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment." *Mosley v. Wilson*, 102 F.3d 85, 90 (3d Cir.1996).  **In *Mosley*, this Court held that "in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently *inconsistent verdict* to stand."**  *Id.* (quoting *Los Angeles v. Heller*, 475 U.S. 796, 805, 106 S.Ct. 1571, 89 L.Ed.2d 806 (Stevens, J.,

dissenting)).  **Those circumstances are where the verdict appears to be the result of compromise, as opposed to jury confusion**. *See Heller*, 475 U.S. at 806 n. 12, 806 n. 13, 106 S.Ct. 1571 (Stevens, J., dissenting).  In the present case, the apparently inconsistent verdict would appear to be the result of compromise, as evidenced by the fact that the jury awarded the County approximately half the expectation damages the County sought on its breach of contract claim.

*Montgomery County,* 320 F.3d 440, 451 n.5.  The Third Circuit's decision in *Mosley* similarly states:

> Although the Supreme Court did not address the issue before us in its per curiam decision, Justice Stevens' dissent did discuss at some length whether inconsistent general verdicts in a civil case should be allowed to stand.  Justice Stevens noted that when faced with apparently inconsistent verdicts in a civil case, the district court can take several approaches.  He noted that **"in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand."** *Heller*, 475 U.S. at 805 [];  *see United States Football League v. National Football League*, 644 F.Supp. 1040, 1045 (S.D.N.Y.1986) (stating that "inconsistent verdicts on separate claims in a civil action are fully permissible."), *aff'd,* 842 F.2d 1335 (2d Cir.1988); *see also Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1290 n. 17 (2d Cir.1969) (stating that "consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment")....

102 F.3d at 91 (footnote omitted).[49]  Trial courts within this Circuit have similarly recognized their authority to allow inconsistent verdicts to simply stand as-is:

> In the present case, the apparently inconsistent verdict could very well be the result of juror compromise. The jury was properly instructed on all the counts and there is no reason to believe that the jury was confused.[FN13] It is more likely that the jury, in order to reach a unanimous verdict, simply agreed to compromise. Thus, any apparent inconsistency in the verdict sheet does not warrant a new trial.

*Jacobs v. City of Philadelphia*, 2005 WL 1899499 at *13 (EDPA 2005) (approving compromise even with regard to verdict covered by Rule 49); *Care v. Reading Hospital*, 448 F.Supp.2d 657, 663 (E.D. Pa. 2006) ("[I]n certain circumstances, courts retain authority to allow an apparently inconsistent verdict to stand.  One such circumstance is jury compromise.") (citations omitted).

Indeed, the Ninth Circuit has recognized the approach of allowing inconsistent general verdicts to stand as being a "rule that is historically sound and remains the majority rule." *Zhang* 339 F.3d at

---

[49]  The court also explained that a trial court cannot address the inconsistency by simply retaining a portion of the verdict and dismissing the remainder.  *Id.*  In other words, a district court can simply allow an entire verdict to stand or it can order a new trial – but it cannot effectively grant a JMOL by keeping a portion of the verdict and dismissing the remainder.  In *Mosley*, neither party apparently argued for simply allowing the verdict to stand.  The Third Circuit, therefore, reversed the trial court's effort to effectively grant a JMOL and, instead, ordered a new trial.  102 F.3d at 89.

1035 (ruling that "even if the error had been raised before the district court, we could not grant a new trial on the basis of legally irreconcilable general verdicts") (collecting cases); *see also Jayne v. Mason & Dixon Lines,* 124 F.2d 317, 319 (2d Cir. 1941) (Judge Learned Hand noting in dicta that it would not have necessarily been "fatal to the wife's recovery if no rational reconciliation of the verdicts was possible.").

Here, approximately one hour after asking whether "all eight jurors have to be unanimous on each yes or no vote on each claim?" (Tr. 1423), the jury returned its verdicts upholding the validity of three of the four non-blend claims and all five of the blend claims. One possibility, of course, is that the jury simply reached a compromise as part of its resolution of this matter. Whatever the reasoning behind the jury's verdicts, nothing requires that all the verdicts simply be dismissed. To the contrary, under Third Circuit precedent and extensive related case law, the Court has ample authority to allow the allegedly inconsistent general verdicts to stand as-is, and should do so.

### c.    Acushnet Fails to Establish that Allowing the Jury's Verdicts to Stand would Result in a Miscarriage of Justice

When seeking a new trial, a litigant must establish that allowing the verdict to stand would result in a "miscarriage of justice" or worse. In other words, simply showing an inconsistency is not enough.[50] Upholding the eight verdicts against Acushnet here would in no way result in a miscarriage of justice. First, this Court has previously assessed much of the evidence supporting the asserted claims and found it sufficiently substantial to reject Acushnet's motion for summary judgment regarding the issue of obviousness. [D.I. 348; *see also* Ex. J.] Second, the verdicts rejecting Acushnet's validity attacks for eight of the nine asserted claims show that the jury was firmly persuaded that the asserted claims were in general valid claims. Third, as detailed above in opposition to Acushnet's motion for judgment as a matter of law, the record in fact amply supports the jury's verdicts upholding the validity of eight of the

---

[50] *See* FRCP 61 (court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"); *China Resource Prods. (U.S.A.) v. Fayda Int'l,* 856 F. Supp. 856, 862 (D. Del. 1994) (*quoting Cudone v. Gehret,* 828 F. Supp. 267, 269 (D. Del. 1993)) ("new trial should only be granted where a 'miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'"); *see also Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282, 289 (3rd Cir. 1993) ("[T]he district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand.") (quotations omitted).

nine asserted claims.  Fourth, even if a new trial were ordered with regard to the "non-blend" claims, Acushnet's infringement of the five "blend" claims would support a damages claim for the maximum period of time.  In other words, if a new trial were ordered and Acushnet prevailed on every one of the four "non-blend" claims, Acushnet would still be subject to the same damages claim because of its infringement of the five "blend" claims, including claim 1 from the '293 patent (the earliest of the asserted patents to issue from the PTO).  Therefore, no "miscarriage of justice" would occur and no substantial rights of Acushnet would be impacted, if the verdicts on the four "non-blend" claims are allowed to stand along with the verdicts on the five "blend" claims.

Lastly, whether or not the Court formally precludes Acushnet from presenting any argument regarding the allegedly inconsistent verdicts, allowing Acushnet to now succeed in undoing the jury's eight verdicts upholding the validity of nearly all the asserted claims, when Acushnet raised no such objection to the verdict at a time when corrective action could have been taken, would *result* in a miscarriage of justice – not remedy one.[51]  Thus, even setting aside Acushnet's waiver of its right to seek a new trial based upon alleged inconsistencies in the jury's verdict, Acushnet has not established, and cannot establish, that the grant of a new trial is necessary to avoid a miscarriage of justice.

## IV.    CONCLUSION

For the foregoing reasons, Callaway Golf respectfully requests that the Court DENY Acushnet's motion for post-trial relief in its entirety.

---

[51]  Indeed, allowing Acushnet to extensively delay this matter by the grant of a new trial would multiply the injustice to Callaway Golf.  As the Court will recall, a final resolution of this matter (i.e., after appeals are exhausted) will moot the unlawful reexaminations being conducted by Acushnet, because the PTO will be estopped from invalidating the claims upheld in this trial.  Thus, any significant delay in this matter increases the likelihood that Acushnet's unlawful reexamination proceedings will be concluded and become effective before they would otherwise have been mooted by a final determination of this suit.

Dated: February 25, 2008

FISH & RICHARDSON P.C.

By: /s/ *Thomas L. Halkowski*

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

Attorneys for Plaintiff
CALLAWAY GOLF COMPANY

51

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2008, the attached document was electronically filed with the Clerk of Court using CM/ECF which will send electronic notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on February 25, 2008, I have Electronically Mailed the document to the following person(s):

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com


Alan M. Grimaldi, Esq.                      Attorneys for Defendant
Joseph P. Lavelle                           ACUSHNET COMPANY
Brian Rosenthal
Clint Brannon
Kenneth Donnolly
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com


                                  /s/ Thomas L. Halkowski
                                  Thomas L. Halkowski

1