# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ACUSHNET'S BRIEF IN OPPOSITION TO
## CALLAWAY GOLF'S MOTION FOR PERMANENT INJUNCTION

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Mark L. Whitaker
Brian A. Rosenthal
Nicholas J. Little
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: February 25, 2008
Public Version Dated: March 3, 2008
852455 / 30030

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL STATEMENT .......................................................................................4

    A.    Spalding and Callaway Have Consistently Demonstrated ████████
          ████████ ...................................................................................................4

    B.    Callaway Delayed Filing This Lawsuit For Several Years.............................6

    C.    The Bulk of the Allegedly Irreparable Harm Occurred in 2000 and 2001
          When Callaway was also Infringing The Patents ..........................................7

    D.    Acushnet Made No Misrepresentations in Its Public Statements ..................7

    E.    Callaway's Misleading Statements in the Market ..........................................8

    F.    The Patent Office Has Twice Rejected Every Claim-In-Issue in the
          Reexamination ..............................................................................................8

    G.    Callaway Does Not Use the Patents, and Spalding Never Did ......................9

III.  ARGUMENT ..........................................................................................................9

    A.    Applicable Standards Governing Injunctive Relief ......................................9

          1.    Callaway *Must* Demonstrate Each of the Four *eBay* Factors Before
                    Injunctive Relief *May* Issue ...........................................................9

          2.    An Injunction's Purpose Is Not To Remedy Past Harm But To
                    Prevent Irreparable Future Harm ...................................................11

    B.    Callaway's ████████████ And Unreasonable Delay Warrant
          Denial Of Its Request For An Injunction .................................................12

          1.    ████████████████████
                    Strongly Suggests That Callaway Has Not Suffered Irreparable
                    Injury ...........................................................................................12

          2.    Spalding's and Callaway's Unreasonable Delay in Filing Suit, and
                    Callaway's Failure to Seek a Preliminary Injunction Warrant
                    Denial of Callaway's Motion..................................................14

    C.    Callaway's Request for Permanent Injunction Is Premature ..................15

          1.    Any Injunction Decision Should Be Delayed Pending Appeal and
                    Entertained Only After a Damages Trial .....................................16

          2.    Constitutional Issues Might Require Any Permanent Injunction
                    Decision Await a Jury Trial ........................................................19

    D.    Callaway's Brief Does Not Establish Its Entitlement to a Permanent
          Injunction .................................................................................................20

          1.    Callaway Cannot Assert as a Basis for Recovery in Equity Any
                    Irreparable Injury Suffered By It Before It Purchased the Patents-
                    in-Suit, or Before the Patents Ever Issued ................................20

2.    Callaway Relies on Inadmissible, Untrustworthy Evidence......................22

    a.    Mr. Yagley's Declaration Should Be Largely Excluded from Evidence............................................................................23

    b.    Mr. Mickelson's Testimony Should Be Largely Excluded From Evidence..........................................................................25

3.    Callaway's Evidence Is Cherry-Picked ....................................27

4.    Callaway Fails to Demonstrate That Acushnet's Pro V1 Sales Caused or Are Causing Callaway Irreparable Market Injuries.................28

5.    Callaway's Claim of "Innovator/Reputation" Injury Should Also Be Rejected ...............................................................................30

6.    Acushnet's Public Statements Are Not a Basis for Entering An Injunction .................................................................................32

7.    Callaway Has Failed to Prove That a Damages Award Will Be Inadequate to Compensate for Its Harm ....................................33

8.    The Balance of Equities, Hardships and Public Interest...........................34

    a.    Acushnet Did Not Copy and Was Not a Willful Infringer; the Pro V1 Preceded the Patents......................................34

    b.    The Patents-In-Suit Are Subject to Re-Examination and Have Twice Been Rejected in Re-Examination by the Patent Office .............................................................................35

    c.    The Inconsistent Jury Verdict Should Caution Against An Injunction; Issuing Callaway's Injunction Would Violate Public Policy............................................................................36

    d.    Harm to Acushnet .......................................................37

E.    Any Injunction Should Be Appropriately Tailored ...............................................38

1.    The Scope of Any Injunction Should Be Limited to Golf Balls That Use the Claimed Construction............................................38

2.    Callaway's Proposed Order Seeks Relief Not Properly Granted As a Remedy for Patent Infringement.............................................40

3.    The Court Should Allow a Transition Period ...........................................42

    a.    Acushnet Plans to Release, New Non-Infringing Pro V1 and Pro V1x Balls in the First Quarter.................................42

    b.    Allowing Acushnet to Release New, Non-Infringing Product in the First Quarter of 2009 Would Minimize the Disruption to Acushnet's Business and to Distributors and Golfers..........................................................................43

IV.    CONCLUSION..............................................................................................46

# TABLE OF AUTHORITIES

## CASES

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007)......................................................................................10

*Additive Controls & Measurement System v. Flowdata,*
    986 F.2d 476 (Fed. Cir. 1993)......................................................................................39

*Advanced Medical Optics, Inc. v. Alcon Laboratories, Inc.,*
    C.A. No. 03-1095-KAJ, 2005 U.S. Dist. LEXIS 33378 (D. Del. Dec. 16, 2005) ..................29

*Ampex Corp. v. Abekas Video Systems, Inc.,*
    No. C-88-5081 EFL, 1990 U.S. Dist. LEXIS 11309, (N.D. Cal. Feb. 7, 1990) .....................13

*Amstar Corp. v. Envirotech Corp.,*
    823 F.2d 1538 (Fed. Cir. 1987)......................................................................................11

*Arthrocare Corp., v. Smith & Nephew, Inc.,*
    315 F. Supp. 2d 615 (D. Del. 2004)...............................................................................42

*Baden Sports, Inc. v. Kabushiki Kaisha Molten, Corp.,*
    2007 U.S. Dist. LEXIS 70776 (W.D. Wash. Sept. 25, 2007)...............................................34

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 500 (1959)......................................................................................................19

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*
    No. 04 C 7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006)..............................................31

*Docusign, Inc. v. Sertifi, Inc.,*
    468 F. Supp. 2d 1305 (W.D. Wash. 2006).......................................................................14

*eBay, Inc. v. MercExchange, L.L.C.,*
    126 S. Ct. 1837 (2006)........................................................................................... *passim*

*Foster v. American Mach. & Foundry Co.,*
    492 F. 2d 1317 (2d Cir. 1974)........................................................................................13

*Gemveto Jewelry Co. v. Jeff Cooper, Inc.,*
    800 F.2d 256 (Fed. Cir. 1986)........................................................................................42

*High Technology Medical Instrumentation, Inc. v. New Image Industries, Inc.,*
    49 F.3d 1551 (Fed. Cir. 1995)...............................................................................1, 12, 14

*IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*,
   No. 07-2544, 2007 U.S. App. LEXIS 23709 (3d Cir. Oct. 9, 2007) ......................................31

*IMX, Inc. v. Lendingtree, LLC*,
   469 F. Supp. 2d 203 (D. Del. 2007)......................................................................................13

*Illinois Tool Works v. Grip-Pak, Inc.*,
   906 F.2d 679 (Fed. Cir. 1990)...............................................................................................11

*Innogenetics, N.V. v. Abott Laboratories*,
   No. 2007-1145, -1161, 2008 U.S. App. LEXIS 976
   (Fed. Cir. Jan. 17, 2008) ...............................................................................................11, 16

*Johns Hopkins University v. CellPro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998)......................................................................................11, 21

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)..................................................................................23, 24, 25

*MGM Well Services, Inc. v. Mega Lift Systems, LLC*,
   505 F. Supp. 2d 359 (S. D. Tex. 2007) ..............................................................................13

*MercExchange L.L.C. v. eBay Inc.*,
   500 F. Supp. 2d 556 (E.D. Va. 2007) ........................................................................ *passim*

*Minco Inc. v. Combustion Engineering*,
   95 F.3d 1109 (Fed. Cir. 1996)..............................................................................................21

*Monsanto Co. v. Scruggs*,
   459 F.3d 1328 (Fed. Cir. 2006)............................................................................................10

*Moxness Products, Inc., v. Xomed, Inc.*,
   No. 86-100-CIV-J-14, 1988 U.S. Dist. LEXIS 16060 (M.D. Fla. May 10, 1988) ................42

*Muniauction, Inc. v. Thomson Corp.*,
   502 F. Supp. 2d 477 (W.D. Pa. 2007)..........................................................................18, 34

*National Presto Industrial v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996)..............................................................................................22

*Novartis Pharm. Corp. v. Teva Pharms. USA, Inc.*,
   No. 05-CV-1887 (DMC), 2007 WL 2669338 (D.N.J. Sept. 6, 2007) ..............................32, 34

*Novo Nordisk A/S v. Pfizer Inc.*,
   No. 06 Civ 5819, 2006 U.S. Dist. LEXIS 90387 (S.D.N.Y. Dec. 14, 2006)..........................30

*Oakley, Inc. v. Sunglass Hut International,*
   316 F.3d 1331 (Fed. Cir. 2003).................................................................................39

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004)................................................................................14

*Paice, LLC v. Toyota Motor Corp.,*
   No. 2:04-CV-211-DF, 2006 U.S. Dist. LEXIS 61600 (E.D. Tex., Aug. 16, 2006),
   *aff'd in part and vacated in part,* 504 F.3d 1293 (Fed. Cir. 2007)....................................28, 29

*Polymer Technology, Inc. v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996).........................................................................1, 12, 14

*Praxair, Inc. v. ATMI, Inc.,*
   479 F. Supp. 2d 440 (D. Del. 2007)..........................................................................10

*Precision Automation, Inc. v. Technology Services, Inc.,*
   No. 07-CV-707-AS, 2007 U.S. Dist. LEXIS 93200 (D. Or. Dec. 14, 2007)...........................31

*Rizzo v. Goode,*
   423 U.S. 362 (1976).............................................................................................10

*Rondeau v. Mosinee Paper Corp.,*
   422 U.S. 49 (1975)...........................................................................................11, 12

*Rosco, Inc. v. Mirror Lite Co.,*
   No. CV-96-5658, 2006 WL 2844400 (E.D.N.Y., Sept. 29, 2006) ............................39, 40, 41

*Sampson v. Murray,*
   415 U.S. 61 (1974).............................................................................................34

*Shiley, Inc., v. Bentley Laboratories, Inc.,*
   601 F. Supp. 964 (C.D. Cal. 1985) ...........................................................................42

*Shum v. Intel Corp.,*
   499 F.3d 1272 (Fed. Cir. 2007)...............................................................................19

*Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,*
   C.A. No. 07-190-SLR, 2008 U.S. Dist. LEXIS 1486 (D. Del. Jan. 8, 2008) ........10, 11, 14, 33

*Simon Property Group, L.P. v. mySimon, Inc.,*
   No. IP 99-1195-C H/G, 2001 U.S. Dist. LEXIS 852 (S.D. Ind. Jan. 24, 2001) .....................42

*Southtech Orthopedics v. Dingus,*
   428 F. Supp. 2d 410 (D.N.C. 2006) ..........................................................................29

*Standard Havens Products v. Gencor Industrial,*
    27 U.S.P.Q. 2d 1959 (Fed. Cir. 1993)..................................................................35

*Sun Optics, Inc. v. FGX International, Inc.,*
    C.A. No. 07-137-SLR,2007 U.S. Dist. LEXIS 56351 (D. Del. Aug. 2, 2007)........................11

*Sundance, Inc. v. Demonte Fabricating Ltd.,*
    No. 02-73543,2007 U.S. Dist. LEXIS 158 (E.D. Mich. Jan. 4, 2007) ...............................18, 29

*Sundance, Inc. v. Demonte Fabricating Ltd.,*
    2007 U.S. Dist. LEXIS 77728 (E.D. Mich. Oct. 19, 2007) .....................................................18

*T.J. Smith & Nephew Ltd. v. Consolidated Medical Equipment, Inc.,*
    821 F.2d 646 (Fed. Cir. 1987)..................................................................................12, 14

*Tiber Laboratories v. Hawthorn Pharm., Inc.,*
    Nos. 02:02-CV-0069, -0092, -0093,2007 U.S. Dist. LEXIS 67381
    (N.D. Ga. Sept. 11 2007) ..................................................................................13, 15

*U.S. v. Bell,*
    414 F.3d 474 (3rd Cir. 2005) ......................................................................................32

*Vas-Cath, Inc. v. Curators of University of Mo.,*
    No. 05-0400-CV-W-GAF, 2007 WL 4287865 (W.D. Mo. Dec. 6, 2007) ............................31

*Voda v. Cordis Corp.,*
    2006 U.S. Dist. LEXIS 63623 (W.D. Okl. Sept. 5, 2006)..................................................21, 31

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982)..................................................................................................10

## STATUTES

35 U.S.C. § 283..................................................................................................9, 11, 40

Fed. R. Civ. P. 65(d)(1)........................................................................................................39

## I.    INTRODUCTION

Acushnet Company ("Acushnet") files this memorandum in opposition to Callaway Golf Company's ("Callaway") Motion for Permanent Injunction. D.I. 411. In this memorandum, Acushnet will show the following.

No Permanent Injunction Should Issue. Callaway's request for a permanent injunction should be denied. Callaway cannot show irreparable harm to it in the absence of an injunction.



The patentee's willingness to license negates any claim of irreparable harm. *See e.g. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996). ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that Callaway never had any expectation or intention of using the patents it bought to exclude Acushnet. Money is all Callaway ever wanted, and money will make it whole.

Spalding/Callaway's delay in bringing suit further demonstrates the absence of irreparable harm. The first patent issued to Spalding in April 2001, after the Pro V1 was on the

market. Spalding never sued Acushnet. Callaway bought the patents in September 2003,

███████████ ███ Callaway did not sue until 2006, almost five years after the first patent-in-suit issued and

more than five years after the Pro V1 was on the market. The extensive delay demonstrates that

Callaway's claim of irreparable injury is hollow.

Substantively, Callaway's alleged proofs of irreparable harm are legally insufficient.

Callaway claims that it had a "leadership" position in the market following the introduction of

the Rule 35 ball, and was harmed at this "critical time" by the introduction of the Pro V1.

However, nearly all of this alleged "harm" occurred in 2000-01, before the patents issued. After

the patents issued to Spalding, Callaway was just another infringer of the patents. Any "harm" it

claims to have suffered as an infringer is not cognizable in a patent case. One wonders to what

audience Callaway's brief (filed earlier than scheduled to coincide with the annual PGA golf

trade show in Orlando) was intended, for these arguments do not constitute legally cognizable

injury. Likewise, Callaway's claims of innovation injury, public statements it does not like, and

damage that occurred long ago (the vast majority of its brief) do not entitle it to an injunction.

Additionally, Callaway does not use the technology in suit. It bought the patents in a

bankruptcy auction, does not use them, and filed this case to collect money. While Callaway

undoubtedly is a competitor of Acushnet, as to this technology it much more resembles the single

purpose entities that routinely have requests for injunction denied post *e-Bay*.

Stripped of the above insufficient matters, Callaway's request for an injunction boils

down to its claim that it is a competitor and hence "must" be irreparably harmed. Callaway

makes conclusory, unsubstantiated claims to market effects from the infringement. However,

these claims are mere lawyer argument; no meaningful evidence supports them. In total,

Callaway's brief is long on hyperbola but largely devoid of facts supporting a finding of irreparable harm. Instead, it is a not-too-veiled plea for an injunction based on a presumption of irreparable harm, which presumption is no longer the law after *e-Bay*. In all, Callaway has not proven its entitlement to an injunction.

Callaway's Request For Injunction Is Premature.  Many of the factual issues raised in Callaway's injunction request are also at issue in its legal claim for damages. Harm that Callaway claims is "irreparable" here, its damages expert used to calculate Callaway's damages. Callaway's positions are inconsistent and irreconcilable. Both prudential and constitutional considerations thus dictate withholding an injunction until after the decision in any damages trial.

Any Injunction Should Be Stayed Pending Appeal.  This was a close case. The Court acknowledged that the dispositive claim construction could have gone either way. The jury deliberated for two days and rendered an inconsistent, split verdict, invalidating one claim patentably indistinct from the others. The Patent Office has rejected all the claims-in-issue twice on many grounds during the reexaminations. There is a significant likelihood Acushnet will prevail on appeal. If, despite the weak case for an injunction that Callaway presented, the Court were inclined to issue an injunction, a stay pending appeal would be appropriate in this case. Acushnet has therefore filed at this time a motion to stay any injunction pending appeal.

Any Injunction Should Contain A Transition Period And Be Tailored.

As explained through a declaration, Acushnet intends to introduce new golf balls that will avoid the patents-in-suit when it launches the 2009 version of the Pro V1 family in the first quarter of 2009. Acushnet requests a transition period for any injunction such that it may launch the new balls on the current schedule early in 2009. Also, any injunction that is issued should only run against the ball construction that was adjudicated. Acushnet should be permitted to sell

balls labeled the "Pro V1," provided they do not infringe. Callaway's suggestion that Acushnet stop using the name Pro V1 is overreaching and wrong.

## II.    FACTUAL STATEMENT





[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

### B.    Callaway Delayed Filing This Lawsuit For Several Years

Callaway's allegations of irreparable harm cannot be squared with the patent owners'
long delay in bringing this lawsuit. The '293 patent issued in April 2001, after the Pro V1 was
on the market and successful. By December 2001, [REDACTED]
[REDACTED] Acushnet's Pro V1 had become the best selling golf ball in the industry. Ex. 4, Nauman
Decl. at ¶ 4. Yet, Spalding did not sue. [REDACTED]
[REDACTED] Spalding took no action
thereafter, and never filed suit.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Finally, almost five years
after the '293 patent issued, Callaway filed this lawsuit in February of 2006. It did not plead in
its complaint that it was suffering irreparable injury, or seek a preliminary injunction.

---

2 [REDACTED]
[REDACTED]

**C.    The Bulk of the Allegedly Irreparable Harm Occurred in 2000
and 2001 When Callaway was also Infringing The Patents**

The bulk of Callaway's brief relies on the fact that Acushnet's introduction of the Pro V1

in late 2000 allowed it to keep its leading position on tour, at the expense of Callaway's golf

balls. *See, e.g.,* D.I. 412 at 9-16. The thrust of this argument is that professional golfers were

bound to play Titleist products, and thus could not switch to Callaway's Rule 35 ball in early

2000. *Id.* at 12. As a result, Callaway says, Acushnet was able to quickly introduce the Pro V1

and thereby "stole the praise and buzz that Callaway Golf was enjoying." *Id.* at 15.

Even assuming all of Callaway's allegations were true, all of these relevant facts took

place well before Callaway had any rights to the patents-in-suit. Callaway introduced its Rule 35

golf ball in January of 2000. D.I. 216 Ex. 48. Acushnet introduced its Pro V1 golf ball in

October of 2000. D.I. 216 Ex. 42. The '293 patent would not issue until April 2001. DX-1. But

even then, Callaway could have suffered no compensable harm by Acushnet's actions. Callaway

did not acquire the patents-in-suit until September 2003, when it purchased the assets of

Spalding's golf ball business. D.I. 30, Tab 1, at ¶ 10. Before that, Callaway was admittedly just

another infringer of the patents-in-suit. Ex. 13, DX-804; Tr. at 1012:23-1013:21.

**D.    Acushnet Made No Misrepresentations in Its Public Statements**

Callaway makes much of the fact that Acushnet has issued public statements throughout

this litigation that it alleges are "misleading." D.I. 412 at 19-21. Callaway is wrong. First,

Callaway faults Acushnet for stating that the oldest of the patents-in-suit was filed on December

12, 1999. *Id.* at 19-209; D.I. 412, Exs. A, B, I. However, this is the filing date indicated on the

face of the '293 patent. *See* D.I. 217, Ex. 1, '293 patent. Second, Callaway faults Acushnet for

stating publicly that the Patent Office has issued action finding the claims-in-suit invalid, and

that Acushnet was unable to present that evidence at trial. But again, there is nothing untrue about those statements.

### E.    Callaway's Misleading Statements in the Market

Since the jury verdict in this case, Callaway's sales force has embarked on a campaign of misinformation and confusion in an attempt to interfere with Acushnet's contractual relations with its accounts (including retailers). Callaway has used the threat of an injunction as the show-piece in its efforts. Specifically, Callaway has told Acushnet accounts that they are no longer allowed to sell Pro V1 balls, that the Pro V1 would now be known as the "Callaway Pro V1," that they will have to pull Pro V1 balls from their shelves, that they will not be able to ship Pro V1 balls this spring, and that an injunction will soon issue from this Court. Ex. 14, Maher Decl. ¶ 5, Exs. A-E.

Callaway filed a public version of its motion for injunction on January 16, the day before the start of the PGA Golf Show in Orlando from January 17-19, 2008 and days before it was due under the agreed scheduling order. Ex. 4, Nauman Decl. ¶ 26. This annual show is a major event in the industry. *Id.* A Callaway sales representative has also circulated a link to Callaway's brief, posted on a website, to Acushnet retailers. Ex. 14, Maher Decl. ¶ 5, Ex. B.

### F.    The Patent Office Has Twice Rejected Every Claim-In-Issue in the Reexamination

At the time of trial, the Patent Office had issued office actions rejecting each claim of the patents-in-suit over the prior art advanced by Acushnet at trial. Since the trial, the Patent Office has further considered Callaway's arguments and secondary considerations evidence, and issued second office actions. Again, the Patent Office has rejected all of the claims as invalid. Copies of the Patent Office's office actions, if not already of record, are provided herewith. See Exs. 15-17; D.I. 328 Att. 1-2; D.I. 185, Exs. A-D.

8

### G.    Callaway Does Not Use the Patents, and Spalding Never Did

Callaway does not use the patents-in-suit today. Callaway identified the golf balls that embody one or more claims of the patents-in-suit as the Rule 35, CTU-30, and HX golf balls. Ex. 13, DX-804 at 7. Callaway no longer sells any of those golf balls, and has not done so since 2005. Tr. at 1007:5-1008:19. Spalding never used the patents-in-suit. Tr. at 1015:6-10.

## III.    ARGUMENT

Acushnet's argument has the following structure: (A) the applicable law; (B) why Callaway's motion should be denied based on its █████████████ and unreasonable delay; (C) why the Court should find that Callaway's motion is premature; (D) why Callaway's arguments should be rejected; and (E) why, if any injunction is issued, Callaway's proposed order should not be adopted. Acushnet files separately a formal motion to stay any injunction pending appeal.

### A.    Applicable Standards Governing Injunctive Relief

#### 1.    Callaway *Must* Demonstrate Each of the Four *eBay* Factors Before Injunctive Relief *May* Issue

Section 283 of the Patent Act provides that district courts "may grant injunctions in accordance with the principles of equity … on such terms as the court deems reasonable." 35 U.S.C. § 283. Whether to grant a permanent injunction is "an act of equitable discretion." *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).

To obtain a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* In *eBay*, the Supreme Court expressly

rejected the view that the statutory right to exclude granted by the Patent Act creates a "general rule" in favor of granting a permanent injunction. *Id.* at 1840-41.[3] After *eBay*, "there are no special assumptions unique to a patent case; rather, 'the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts.'" *MercExchange L.L.C. v. eBay Inc.*, 500 F. Supp. 2d 556, 568 (E.D. Va. 2007).

Moreover, under the established principles of equity, an "injunction should issue *only* where the intervention of a court of equity is *essential* in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (emphasis added) (internal citations omitted). "Even in an action between private individuals, it has long been held that an injunction is 'to be used sparingly, and only in a clear and plain case.'" *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (internal citations omitted).

Application of categorical rules once applied in favor of granting injunctions are rejected after *eBay*. *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, C.A. No. 07-190-SLR, 2008 U.S. Dist. LEXIS 1486, at *19 (D. Del. Jan. 8, 2008).[4] This includes the once-categorical rule that a direct competitor establishes irreparable injury by asserting that its direct competitor status will cause it to "likely lose additional market share, profits, and goodwill." *Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp.2d 440, 443-44 (D. Del. 2007);

---

[3] *See eBay*, 126 S. Ct. at 1841 (also rejecting Federal Circuit's view that injunction should be rarely denied in a patent case); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007) (eBay "struck down the general rule . . ., making clear that the traditional four-factor test for injunctions applies to patent cases") (vacating permanent injunction); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341-42 (Fed. Cir. 2006) (eBay "reverses [the] rule that 'courts will issue permanent injunctions against patent infringement absent exceptional circumstances'") (vacating permanent injunction).

[4] "Plaintiff incorrectly argues that the court should apply a legal presumption that the economic harm ... caused by defendant's purported infringement is irreparable. The law no longer recognizes such a presumption." *Siemens*, 2008 U.S. Dist. LEXIS 1486, at *19 (citing *eBay*, 126 S. Ct. at 1841).

*MercExchange*, 500 F. Supp. 2d at 577. As this Court has noted, reliance merely on market share losses that "'would apply in every patent case where the patentee practices the invention'" "does not establish irreparable injury." *Siemens*, 2008 U.S. Dist. LEXIS 1486, at *20; *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990). *See also Sun Optics, Inc. v. FGX Int'l, Inc.*, C.A. No. 07-137-SLR, 2007 U.S. Dist. LEXIS 56351, at *9 (D. Del. Aug. 2, 2007).

### 2.    An Injunction's Purpose Is Not To Remedy Past Harm But To Prevent Irreparable Future Harm

Callaway must demonstrate irreparable *future* harm to warrant the issuance of an injunction; it may not simply rely on evidence of past harm. As taught in *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998): "Section 283 does not provide remedies for past infringement; it only provides for injunctive relief to prevent future infringement. The section under which a litigant must seek compensation for past infringement is Section 284." *Id.* at 1367 (referencing 35 U.S.C. § 283). The court in *Johns Hopkins* concluded: "We … do not find persuasive [plaintiff's] argument that the scope of the district court's order can be justified because it is necessary to fashion a meaningful remedy for [defendant's] past infringement." *Id.*

Punishment for past infringement "is not the purpose of injunction." *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1549 (Fed. Cir. 1987). Nor is a permanent injunction "a form of extra damages" for the patentee. *Innogenetics, N.V. v. Abott Lab.*, No. 2007-1145, -1161, 2008 U.S. App. LEXIS 976, at *41 n.8 (Fed. Cir., Jan. 17, 2008). *See also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) ("The historic injunctive process was designed to deter, not punish.").

**B.** **Callaway's** ███████████████ **And Unreasonable Delay Warrant Denial Of Its Request For An Injunction**

1.



Callaway's "irreparable" injury claim lacks merit. ███████████████

The Federal Circuit has held that licensing is "incompatible with the emphasis on the right to exclude." *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987). The Court has similarly stated that where "the patentee was willing to forgo its right to exclude by licensing the patent," the facts "clearly negat[e] irreparable harm." *Polymer Techs.*, 103 F.3d at 975. Licensing evidence "suggests that any injury suffered … would be compensable in damages assessed as part of the final judgment." *High Tech*, 49 F.3d at 1557.

---

[5] A no-license policy by golf ball manufacturers would effect a mutually assured destruction upon industry sales. In fewer than thirty years, the Patent Office has issued close to 2,000 patents on golf balls. *See* D.I. 215 Ex. 17, 8/7/07 Morgan Dec. ¶¶ 46-47.

This Court also has held that a plaintiff's licensing activities and "willingness to forego its patent rights for compensation ... suggest that [its] injury would be compensable in damages." *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203, 225 n.24 (D. Del. 2007). Other courts have agreed that the offer of a license is incompatible with a plaintiff's claim of irreparable injury. *See, e.g., MercExchange,* 500 F. Supp. 2d at 569 ("MercExchange has continued to follow a consistent course of licensing its patents to market participants and is plainly willing to accept royalties for future utilization of the patents."); *see also Foster v. American Mach. & Foundry Co.*, 492 F. 2d 1317, 1324 (2d Cir. 1974) (An injunction "is not intended as a club to be wielded by a patentee to enhance his [license] negotiation stance.").[6] Courts will also consider license offers during the course of the litigation as evidence that undermines a claim of irreparable injury. *See, e.g. IMX, Inc.*, 469 F. Supp. 2d at 225 (considering license given in settlement with previously-named defendant in same action); *see also Tiber Labs. v. Hawthorn Pharm., Inc.*, No. 02:07-CV-0069, -0092, -0093, 2007 U.S. Dist. LEXIS 67381 at *22 (N.D. Ga. Sept. 11 2007) (considering license offers from settlement negotiations); *see also Ampex Corp. v. Abekas Video Systems, Inc.*, No. C-88-5081 EFL, 1990 U.S. Dist. LEXIS 11309 at *15 (N.D. Cal. Feb. 7, 1990). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ They did so with full knowledge of the Pro V1's tremendous success in the

---

[6] *Compare with MGM Well Services, Inc. v. Mega Lift Systems, LLC*, 505 F. Supp.2d 359, 379 n.24 (S.D. Tex. 2007)(observing rule, but granting injunction on facts including that "MGM has proven an existing policy not to license its patented technology").

market.  Callaway's claim of irreparable harm is fully belied by the fact that ████████████

████████████████████████████████████████████████████████

> **2.  Spalding's and Callaway's Unreasonable Delay in Filing Suit, and Callaway's Failure to Seek a Preliminary Injunction, Warrant Denial of Callaway's Motion**

Callaway's assertion of irreparable injury also rings hollow in view of its (and

Spalding's) delay in bringing suit.  Almost *five years* passed from the issuance of the '293 patent

to the filing of this lawsuit.  Such a long delay negates an assertion of irreparable injury.  *See*

*Polymer*, 103 F.3d at 974 (delay "in bringing suit ... negat[es] the idea of irreparability"); *High*

*Tech*, 49 F.3d at 1557 ("Absent a good explanation ... 17 months is a substantial period ... that

militates against the issuance of a preliminary injunction by demonstrating that there is no

apparent urgency ...."); *Siemens*, 2008 U.S. Dist LEXIS 1486, at *21-22 n.27; *Docusign, Inc. v.*

*Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1310 (W.D. Wash. 2006) (waiting nearly a year to file suit

"undermines [a] claim of irreparable harm and request for immediate injunctive relief.")

Moreover, Callaway never moved for a preliminary injunction in this case.  Failure to seek a

preliminary injunction also militates against a finding of irreparable injury.[7]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

After this, Acushnet did not hear again from Spalding on the patents-in-suit.  ████████████

---

[7] *See MercExchange,* 500 F. Supp. 2d at 573 ("MercExchange never sought a preliminary injunction against eBay.  Such factor ... is plainly not dispositive; however, on these facts, it is yet another factor ... indicating both that MercExchange is not being irreparably harmed ... and that money damages are adequate."); *PGBA, LLC v. United States,* 389 F.3d 1219, 1229-31 (Fed. Cir. 2004); *T.J. Smith,* 821 F.2d at 648 (delay in seeking a preliminary injunction is incompatible with a patent holder's right to exclude).



18.  Only after all of this time did Callaway file suit, in February 2006.[8]

Spalding's delay alone would warrant a finding of no irreparable injury.  In any case, Spalding's delay is chargeable to Callaway: "the assignee of a patent must 'accept the consequences of [the assignor's] dilatory conduct.'" *Tiber Labs.,* 2007 U.S. Dist. LEXIS 67381, at*21 n.7 (rejecting irreparable injury assertions in view of offer to license and delay in filing lawsuit).

The nearly five-year delay between the issuance of the '293 patent and the filing of this lawsuit is inconsistent with Callaway's position that it has been irreparably harmed, and will continue to be irreparably harmed. ████████████████████████████████

████████  If Acushnet's continuing infringement was harming "irreparably" these competitors, they would not have waited, ████████████████████████████████████

███████████████████████

### C.    Callaway's Request for Permanent Injunction Is Premature

Callaway's request for an injunction is also premature.  The issues of damages and willfulness remain to be tried.  As many of the issues raised in Callaway's motion for injunction

---

[8] ████████████████████████████████████████████

15

are also at issue in the damages case, the Court should await this jury event before deciding whether it is appropriate to issue a permanent injunction.

### 1.    Any Injunction Decision Should Be Delayed Pending Appeal and Entertained Only After a Damages Trial

On the present record there exist significant numbers of factual issues connected to damages and willfulness still remaining for a jury to decide. Many of those same issues are relevant to the Court's consideration of a permanent injunction as it is framed by Callaway. By determining such facts at this stage, the Court would be denying itself access to the damages trial testimony and the information that a jury decision on these issues would provide -- information which courts have typically used to determine whether an injunction should be granted.

In a recent case, the Federal Circuit overruled the grant of a permanent injunction, after concluding that the district court's analysis failed to account for the scope of the patentee's damages award. *Innogenetics*, 2008 U.S. App. LEXIS 976. The Federal Circuit found there was no irreparable harm where the damages award made by the jury included compensation "for both Abbott's past infringement and possible future sales of its accused products." *Id.* at *38. The court held specifically: "[t]he reasonable royalties awarded to Innogenetics include an upfront entry fee that contemplates or is based upon future sales by Abbott in a long term market. *When a patentee requests and receives such compensation, it cannot be heard to complain that it will be irreparably harmed by future sales.*" *Id.* at *41. (Emphasis added.)

In this case, a closely related issue is present. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

In addition, Callaway's expert, Mr. Napper, claims that many of the same "harms" that Callaway now says are "irreparable" are in fact already calculated and included into his damages award. ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████

Based on nearly all of these factors noted by Mr. Napper, he has enhanced his damages calculations for Callaway by finding them "upward" factors on the running royalty that Acushnet should pay to Callaway in this case. Hence, contrary to Callaway's claim that these damages are "incalculable" and "irreparable," Callaway's damages expert has found he can consider and calculate damages based on these factors and claims to have done so.

One of these two, Callaway or Napper, is wrong. At a minimum, the Court should wait until after the damages trial to determine which one cannot be relied on. More likely, Callaway is simply overreaching in its injunction motion, but it is at least highly logical that the injunction should be denied at this time, as Callaway has injected many of the same issues into both its injunction and damages cases.

Acushnet, of course, disputes Callaway's estimation of damages, just as Callaway disputes Acushnet's theories. However, the determination between those theories is for a jury. Either way, both parties have put forward theories under which Callaway is fully compensated for its harm by a monetary award. *eBay* makes it clear that absent a determination that monetary damages, or legal remedies in general, are inadequate, an injunction may not issue. 126 S. Ct. at 1838-39. Even cases cited by Callaway recognize the importance of looking at the jury's determinations on damages to consideration of the award of a permanent injunction. *See, e.g., Muniauction, Inc.*, 502 F. Supp. 2d at 482-83; *see also Sundance, Inc. v. Demonte Fabricating Ltd.*, No. 02-73543, 2007 U.S. Dist. LEXIS 158, at *8 n.2 (E.D. Mich. Jan. 4, 2007) (denying injunction where "damages have yet to be determined"; *contrast Sundance, Inc. v. Demonte Fabricating Ltd.*, No. 02-73543, 2007 U.S. Dist. LEXIS 77728, at *5 (E.D. Mich. Oct. 19, 2007)

(awarding injunction in same case after "[a] trial on damages has been held and a money judgment in favor of Sundance has issued.")

With a determination of damages unresolved and so closely tied to the same facts that are predicates to Callaway's motion, any decision on the inadequacy of Callaway's monetary damages is at this stage premature.

> **2.    Constitutional Issues Support Delaying Any Permanent Injunction Decision Until After A Jury Trial On Damages**

While it is practical that the determination of a permanent injunction be postponed until after the jury has ruled on the efficacy of monetary damages to fully compensate Callaway, Acushnet also has a constitutional right to have any overlapping factual issues arising in the equity determination tried to a jury. "[O]nly under the most imperative circumstances … can the right to a jury trial of legal issues be lost through prior determination of equitable claims." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959). Under this Supreme Court precedent and its progeny, "when legal claims involve factual issues that are 'common with those upon which [the] claim to equitable relief is based, the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims.'" *Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2007) (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962)). In this case, many of the factual issues to be determined in the damages and willfulness phase of the case also bear upon the injunction theory articulated by Callaway. The Court's findings regarding the permanent injunction, depending on what they are, might deny Acushnet its constitutional right to have the facts determined by a jury.

D.    **Callaway's Brief Does Not Establish Its Entitlement to a Permanent Injunction**

Callaway's Brief has failed to prove its entitlement to a permanent injunction under the principles of equity set forth in *eBay*. Therefore this Court should exercise its discretion by denying Callaway's motion for permanent injunction.

1.    **Callaway Cannot Assert as a Basis for Recovery in Equity Any Irreparable Injury Suffered By It Before It Purchased the Patents-in-Suit, or Before the Patents Ever Issued**

Callaway's principal "irreparable injury" assertion is based on injury it has no right to claim. Callaway argues, "[a]mong the more important facts supporting injunctive relief" is that its golf ball's "market success was undercut when Acushnet introduced the infringing Titleist Pro V1." D.I. 412 at 1. Callaway argues that Acushnet launched the Pro V1 only "after it received troubling input from its tour players who were threatening to switch away from Acushnet's wound golf balls" to Callaway's Rule 35, and that history "certainly would have been different had Acushnet not used the infringing Pro V1 to compete … during this critical time when nearly all elite golfers abandoned 'wound/balata cover' technology and adopted sold-core / multilayer / urethane-covered constructions." *Id.* Callaway posits, with much speculation, that had Acushnet not infringed, Callaway would have taken the "leadership position with respect to premium golf balls" and received the "collateral benefits" of sales in other golf equipment product markets on account of a leadership position in golf. *Id.* at 2.

The fundamental flaw with Callaway's evidence and arguments is its timing. Callaway relies almost exclusively on actions Acushnet took in 2000, when the Pro V1 was first launched, before the patents issued. The first major problem with this theory of irreparable harm is that it deals with harm allegedly suffered in the past. As cases hold, the Court may not grant injunctive

relief to remedy past infringement or to enhance difficult-to-prove past injuries. Instead, the Court must look to see whether Callaway has proven that it will be irreparably harmed in the future. *See Johns Hopkins Univ.*, 152 F.3d at 1367-68; *see also supra* 12-16.

Second, even if Callaway's backward-looking approach were proper, it does not support an injunction since Callaway was not the owner of the patents at the time the alleged harm occurred. Callaway focuses on 2000 to 2002 as the "critical time" period -- the time in which the transition by the vast majority of golfers from "'wound/balata cover' technology" to "solid core / multilayer / urethane-covered" technology took place. But Callaway did not own the patents-in-suit until it purchased them from the bankruptcy of Spalding *in September 2003*. This date is more than a year after the transition during which Callaway's asserts it suffered irreparably. Notably, during this "critical" period when Acushnet allegedly gained an advantage in the premium market, Callaway itself was an open infringer of the patents-in-suit. *See supra* 7.

Since Callaway did not own the patents during the time of the allegedly irreparable harm, it did not suffer remediable injury as a matter of law. *See Minco, Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) ("Infringement … harms only the owner of the patent at the time of the infringing acts.") *Cf. Voda v. Cordis Corp.*, No. CIV-03-1512-L, 2006 U.S. Dist. LEXIS 63623, at *18-19 (W.D. Okl. Sept. 5, 2006) ("[P]laintiff identifies no harm to himself [but] relies on alleged harm to a non-party, Scimed.… [S]uch harm is irrelevant because Scimed elected not to sue to enforce the patent rights. As patents have 'the attributes of personal property,' the person seeking [an] injunction must demonstrate harm from infringement of those rights that is personal as well.").

Third, the primary focus of Callaway's brief is on events that occurred in 2000, *__before the patents-in-suit even issued__*. Callaway argues that "Acushnet's launch of the Pro V1 in late

2000 came at a critical time -- just as its contracts with professional golfers were nearing

expiration and *after* Acushnet had been told many would leave if they did not come up with a

ball that could compete with the Rule 35." D.I. 412 at 30 (emphasis in original). There is no

theory that would justify legal recognition of injury to Callaway resulting from Acushnet's use of

the October 2000 launch of the Pro V1 to re-sign its golfers. Not only did Callaway not own any

rights to the patents, the first of the patents would not even issue (to Spalding) until ***April 2001***.

 Mr. Mickelson's contract, on which Callaway relies heavily, illustrates the fundamental

flaw with Callaway's theory of irreparable harm. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Callaway cannot claim

irreparable harm for these events that took place before it owned rights to the patents-in-suit, let

alone before the patents-in-suit even issued. *See, e.g., Nat. Presto Indus. v. West Bend Co.*, 76

F.3d 1185, 1196 (Fed. Cir. 1996) (holding that there can be no liability for pre-issuance

activities).

## 2. Callaway Relies on Inadmissible, Untrustworthy Evidence

 Callaway relies heavily on two sources of purported evidence of irreparable harm that are

no more than hearsay, speculation, and improper opinion. First, Callaway relies on a declaration

of one of its Vice Presidents, Michael Yagley, in which Mr. Yagley provides hearsay evidence,

rank speculation, and improper and unfounded opinions about why he believes the golf ball

market has developed the way it did. Second, Callaway relies heavily on the testimony of its

paid endorser and ▮▮▮▮▮▮▮▮▮▮, Phil Mickelson, for his opinions as to what other golfers would have done had Acushnet not released the Pro V1. Mr. Mickelson's testimony, which was excluded from trial, is full of hearsay and unsupported opinion testimony. None of this purported evidence is of the type appropriate to support a permanent injunction.

Courts distinguish between evidence supporting a request for a preliminary injunction and that supporting a permanent injunction. The Third Circuit has noted that "many of our sister Circuits have recognized that 'affidavits and other hearsay materials are often received in preliminary injunction proceedings.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) *citing Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986). Thus, "'[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which ***would not be admissible evidence for a permanent injunction***.'" *Kos Pharms.*, 369 F.3d at 718, *quoting Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (emphasis added). It follows that at the stage of consideration of a permanent injunction, the evidence supplied must be admissible. Since neither Mr. Yagley's declaration nor Mr. Mickelson's testimony is admissible, they cannot support an injunction here.

### a.  Mr. Yagley's Declaration Should Be Largely Excluded from Evidence

Mr. Yagley opines at length regarding his views as to the effect of Callaway's entry and Acushnet's launch of the Pro V1 had on the golf ball market since 2000. *See* D.I. 412, Yagley Decl. ¶¶ 10-19. This is the realm of economic expert testimony. Mr. Yagley has never been offered as an expert economist; nor has Acushnet been able to challenge the admissibility of his opinions by a *Daubert* motion. As a glaring example, Mr. Yagley speculates that the reason Callaway's market share plateaued in 2001 was Acushnet's introduction of the Pro V1. *Id.* at ¶

16. There is no showing that Mr. Yagley is competent to offer these opinions and Callaway never provided an expert report on these issues.

Mr. Yagley's declaration also draws sweeping conclusions that the introduction of the Pro V1 allegedly enabled Acushnet to implement the "Titleist Exclusive Pro Shop" program, about which he admits he has no personal knowledge. *See id.* at ¶¶ 25-28. Mr. Yagley provides no evidence to support his assertions, simply pointing to unspecified market data and hearsay statements of others to support his *ipse dixit* explanations of such trends. Similarly, he opines that the perception that Pro V1 was the technology leader was "shared by both golf ball retail outlets and consumers," a proposition he would have no possible basis to make other than through hearsay. *Id.* at ¶ 19. Further examples of his speculation pervade his declaration.[9]

Tellingly absent from Mr. Yagley's declaration is any attestation that he has personal knowledge of the "facts" that he relays. Indeed, on the face of his declaration, he plainly relies on third party statements and hearsay. These include statements by professional golfers about whether they would prefer to play Callaway's Rule 35 golf ball over their current ball, statements from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See, e.g.,id.* at ¶¶ 9-10, 27.

Since Mr. Yagley's testimony consists primarily of inadmissible hearsay, rank speculation, and opinion testimony, it should be given little or no weight by the Court. *See Kos Pharms.*, 369 F.3d at 718.

---

[9] *See, e.g.,* D.I. 412, Yagley Decl. at ¶ 10 ("Callaway Golf anticipated signing contracts with a significant number of tour professionals to play the Rule 35 when their existing contracts expired."); ¶ 16 (alleging Acushnet retained its professionals under contract "by offering a ball with similar performance to the Callaway Golf Rule 35."); ¶ 25 ("The success of the Pro V1 balls ... has assisted Acushnet in implementing and maintaining another program ... the "Titleist Exclusive Pro Shop."); ¶ 26 ("Although there are no published statistics, ... it is my belief ... that prior to the introduction of the Pro V1 [exclusive relationships] were not nearly so widespread.").

**b.    Mr. Mickelson's Testimony Should Be Largely Excluded From Evidence**

Callaway's second principal source of support for its injunction request is the testimony of Mr. Mickelson.  Mr. Mickelson ███████████████████████████████████████ ██████████████████████████████████████████████ He earns ████ ████████████████████████████████████████████ ████████████████ Through his contract, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████

The Court excluded Mr. Mickelson's testimony at trial.  T. Tr. 995:18-24; Ex. 43.  The Court noted that his testimony had only marginal relevance, *id.*, and only in one specific area -- "his specific experience with Acushnet." T. Tr. 979:20-21.  ███████████████ ████████████████████████████████ ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████ While such hearsay might be appropriate, for limited use, in an argument for a preliminary injunction, it cannot support a permanent injunction.  *See Kos Pharms.*, 369 F.3d at 718.  Mr. Mickelson's testimony should thus be limited to what the Court said was relevant – his *personal* experience with Acushnet and its golf balls.

According to Callaway, the Rule 35 had "superior performance."  D.I. 412 at 13.  Mr. Mickelson, however, had a very different opinion of this ball when he tested it.  Before he was

paid in excess of ████████ per year to endorse Callaway's golf products, he blind-tested Callaway's Rule 35 Red and Blue balls in June 2000 against a Pro V1 prototype. He did not mince words over Callaway's "innovation."

Mr. Mickelson described the Rule 35 Red with a vulgarity as, "the epitome of a sh*tty ball…. It spins like cr*p around the greens. It goes short and flutters with the irons. You can have that one." Ex. 23, DX-1008. Neither was he complementary about the Rule 35 Blue: "[T]he misses are just so magnified with the [Rule 35 Blue]. It flutters up and to the left. I'm not all that high on that one." *Id.* The Pro V1, on the other hand, met with Mr. Mickelson's whole hearted approval. "The [Pro V1] is a frickin' awesome ball. It has a tight ball flight. Into the wind it is holding a tight flight, there's no flutter. The sauce is tremendous around the green. It flew by those other two [the Callaway Rule 35 Red & Blue balls] that I hit well." *Id.*[10]

Mr. Mickelson's testimony thus supports Acushnet's argument that the Pro V1 outsold the Rule 35 because it was a better golf ball, for reasons other than the technology-in-suit that ***both*** balls practiced. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

The Court should limit its consideration of Mr. Mickelson's testimony to those subjects it found might be relevant, and should not credit his self-serving, biased opinions about what hundreds of other golfers were thinking.

---

[10] ██████████████████████████████████████████████████
████████████████████

### 3.    Callaway's Evidence Is Cherry-Picked

Callaway's evidence of past irreparable harm -- as remote and irrelevant as to time as it is -- is also suspiciously lacking data, which, if considered, disproves Callaway's main assertion.

Callaway purports to prove with selected tour usage data from the LPGA and SPGA that it lost substantial "pyramid of influence" opportunities with the Pro V1's entry against Callaway's Rule 35. Callaway draws a dramatic graph to argue *with LPGA and SPGA data* that in light of this "evidence" showing the acceptance of the Rule 35 with senior and lady tour golfers, Callaway "anticipated a similar migration of *PGA Tour* players toward the Rule 35" but that "because of the Pro V1, that never happened." D.I. 412 at 13.

Leaving aside that Mr. Yagley's graph proves little in itself,[11] Mr. Yagley has cherry-picked his data. During the "critical time" that Callaway claims it did not achieve a migration of PGA Tour players to its golf ball, Callaway actually did achieve a substantial migration. As shown in the backup data beneath Callaway's graph, certain more direct data -- *PGA Tour usage data* -- was readily available to Mr. Yagley but was not presented in his affidavit or graph. This data shows that from 2000 to 2002 -- when the Pro V1 allegedly dealt its blow to Callaway's ability to attract PGA Tour golfers to the Rule 35 ball -- the percentage of golfers on the PGA Tour using a Callaway golf ball *jumped four-fold*, from 2.9% to 12.2%. D.I. 412, Yagley Decl., Ex. 1 (second page). This data, contrary to Callaway's story, should have been presented.

---

[11] As with Callaway's other evidence, its argument here is devoid of rigor and analysis that would demonstrate proof of anything. Callaway could just as well have lost LPGA and SPGA players on account of Bridgestone or Nike, which had their own popular three-piece, solid core polyurethane golf balls, or on account of any number of other factors during this time period.

4.    **Callaway Fails to Demonstrate That Acushnet's Pro V1 Sales Caused or Are Causing Callaway Irreparable Market Injuries**

Callaway also fails to establish the required nexus between the sale of infringing Pro V1 golf balls and Callaway's claimed irreparable losses. Callaway must prove "that it will suffer irreparable harm *in the absence of an injunction.*" *Paice, LLC v. Toyota Motor Corp.,* No. 2:04-CV-211-DF2006 U.S. Dist. LEXIS 61600, at *14 (E.D. Tex. Aug. 16, 2006), *aff'd in part and vacated in part,* 504 F.3d 1293 (Fed. Cir. 2007) (emphasis added). Hence, it must demonstrate irreparable harm on account of infringement, and not that which may be due to other market-driven or product-driven factors. Callaway's proof of such a nexus is non-existent.

Callaway never answers the question whether Acushnet's practicing of the eight claims left standing by the jury drove the Pro V1's success, and whether, as Callaway frames it, the Pro V1's presence *as an infringing golf ball* led or will continue to lead to elite golfers playing and endorsing Titleist goods over Callaway goods. The trial evidence showed that there are other forces at work -- distinct from practicing the particular three-piece design of the patent claims -- that have led to the Pro V1 being the number #1 ball in golf. *See* D.I. 417 at 23-24 (discussing factors that cause the Pro V1's success disconnected with practicing the claims-in-issue).[12]

Beyond assumptions and lawyer say-so, Callaway ultimately offers no proof that in the future, today, or recent past -- as opposed to claims of injury seven years ago -- the infringing Pro V1 actually *and irreparably* (i.e., uncompensably) will, does or did harm Callaway's market

---

[12] In offering candid reasons for why Acushnet immeasurably outshines Callaway in the market, despite Callaway's "superior ball," Callaway's director of marketing explained to the jury, *inter alia,* (1) that Callaway has no strategic emphasis on securing tour players to endorse its golf ball products, (2) that the Titleist brand, and the customer loyalty to that brand, is superior to Callaway's, (3) that Titleist "is in many, many more pro shops" and has "greater distribution and penetration" than Callaway, and (4) that Acushnet "spend[s] more money" in marketing and advertising, a "lot of money." T. Tr. at 891:14-24; 893:2-5; 897:7-14.

position. Callaway, for example, offers no expert studies or other form of rigorous analysis demonstrating that in the absence of the Pro V1, Callaway's alleged harms will be ameliorated. Callaway's motion simply assumes, without proving, that there is even a likelihood, with sales of the infringing models of Pro V1 golf balls enjoined, that Callaway will catapult to the "leadership" position it claims or that Callaway's "reputation for innovation" will be restored. Indeed, Callaway does not even consider the fact that Titleist will still offer redesigned Pro V1s or that others in the market will continue to compete aggressively with it.[13]

As a result Callaway has not proven that Acushnet's infringement is to blame for its alleged irreparably injuries and perceived failures in the marketplace. *See, e.g., Paice, LLC,* 2006 U.S. Dist. LEXIS 61600, at *11-18; *Sundance, Inc. v. Demonte Fabricating Ltd.,* 2007 U.S. Dist. LEXIS 158, at *8; *Southtech Orthopedics, Inc. v. Dingus,* 428 F. Supp. 2d 410, 422 (D.N.C. 2006) ("Plaintiff has failed to demonstrate a threat of irreparable harm … in that [its] alleged loss of customers and goodwill may be wholly or partially attributable to [its] own strategic business decisions."); *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.,* C.A. No. 03-1095-KAJ. 2005 U.S. Dist. LEXIS 33378, at *36-37 (D. Del. Dec. 16, 2005) (granting stay in view of failure to prove that the competitor's practicing of the invention caused patentee's claimed irreparable lost market share).

---

[13] Callaway would clearly *not* become the exclusive or dominant provider of premium golf balls in the absence of Titleist's Pro V1. Callaway acknowledges numerous competitors selling "premium" golf balls. D.I. 412 at 42. Callaway's own damages expert, Mr. Napper, ███████

5.    **Callaway's Claim of "Innovator/Reputation" Injury
Should Also Be Rejected**

Callaway also argues that Acushnet's Pro V1 presence "harm[s] [its] reputation and

standing in the market as an innovator" and that "issuance of an injunction would at least

mitigate some of the damage to Callaway Golf's reputation, standing, and goodwill." D.I. 412 at

5-6. But neither the facts nor the law support Callaway's claim as an "innovator" of the patents.

Factually, Callaway was ***not*** the innovator of the patents-in-suit or even the full innovator

of the golf balls it did sell. Callaway infringed Spalding's Sullivan patents all-the-while selling

its golf ball, the Rule 35. D.I. 412 at 9 n.3. Callaway did not design its golf ball until after

Acushnet designed the Pro V1.[14] ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Callaway did not

come to market its three-piece polyurethane golf ball until after Bridgestone and Nike. T, Tr.

243:22-244:7. Nor, as Mr. Mickelson observed, was Callaway's Rule 35 a very good ball to

begin with.

Hence, the facts do not support Callaway's exaggerated suggestion that it has a unique

reputation of innovation to protect with respect to this technology. *See also Novo Nordisk A/S v.*

*Pfizer Inc.*, No. 06 Civ 5819, 2006 U.S. Dist. LEXIS 90387, at *14-15 (S.D.N.Y., Dec. 14, 2006)

("[R]egardless of whether or not Pfizer is enjoined, Novo's claim to preserving a role as a unique

---

[14] The evidence showed at trial that long before Callaway's sketched its Rule 35 golf ball, at the
infamous pizza party, Acushnet designed and sketched the Pro V1 golf ball. *See* Ex. 40, DX-
830; T. Tr. at 357:22-363:12. If the "innovation" was to create a "solid-core / multilayer /
urethane-covered construction," D.I. 412 at 1, Acushnet was testing such balls with professional
players by 1996. *See* T.Tr. 362:7-16. Also, Bridgestone and Nike launched a "solid-core /
multilayer / urethane-covered" golf ball months before Callaway. T, Tr. 243:22-244:7.

innovator … will not go unchallenged. …. [O]ther pharmaceutical companies are further along in developing a marketable inhalable insulin product than Novo.") (denying injunction).

Callaway also misquotes case law. Callaway cites to *Black & Decker Inc. v. Robert Bosch Tool Corp.,* No. 04 C 7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006), for example, to support its position. Callaway cites: "[H]arm to reputation… is a type of harm that is not often fully compensable by money." The section that Callaway chose to replace with an ellipse is instructive. The case states, contrary to the impression created by Callaway's quote, that "harm to reputation ***resulting from confusion between products*** is a type of harm…" *Id. Slip op.* at *4 (emphasis added). There is no argument in this case that consumers have at any stage been confused between Callaway and Titleist golf balls. *See also IDT Telecom, Inc. v. CVT Prepaid, Inc.,* No. 07-2544, 2007 U.S. App. LEXIS 23709, at *8-9 (3d Cir. Oct. 9, 2007) ("The only other evidence … in support of a potential irreparable injury is [IDT's] loss of reputation or goodwill. … [O]ur case law … indicates that such harm is limited to 'the special problem of confusion that exists in cases involving trademark infringement and unfair competition.'") (internal citations omitted).[15]

As one court recently held in denying a permanent injunction, so-called irreparable injury to customer relationships (in that case with an exclusive licensee) is "simply the other side of the right-to-exclude coin and is not sufficient to justify granting an injunction." *Voda,* 2006 U.S. Dist. LEXIS 63623 at *20. *See also Precision Automation, Inc. v. Technical Servs., Inc.,* No. 07-CV-707-AS, 2007 U.S. Dist. LEXIS 93200, at *11 (D. Or. Dec. 14, 2007) ("Plaintiffs … have

---

[15] In addition, Callaway's recitation of patent cases post *eBay* in which "[p]ermanent injunctions were granted" (D.I. 412 at 23) includes two cases in which the district court actually ***refused*** to grant an injunction. *See Precision Automation, Inc. v. Technical Services, Inc.,* 2007 WL 4480739 (D.Or. Dec. 14, 2007); *Vas-Cath, Inc. v. Curators of University of Mo.,* 2007 WL 4287865 (W.D. Mo. Dec. 6, 2007) (Westlaw citations as in Plaintiff's Brief).

not offered any evidence of consumer confusion, complaints or lost sales that would support a finding of lost goodwill."); *see also Novartis Pharm. Corp. v. Teva Pharms. USA, Inc.*, No. 05-CV-1887 (DMC), 2007 WL 2669338, at *14-15 (D.N.J. Sept. 6, 2007) (claim of irreparable harm based on loss of goodwill and price erosion was "purely speculative.").

### 6.    Acushnet's Public Statements Are Not a Basis for Entering An Injunction

Callaway asserts that Acushnet's public statements, and its initiation of reexaminations of the patents, have imposed irreparable injury, allegedly on Callaway's "image, credibility and reputation as an innovator." D.I. 412 at 36. At the outset, these alleged injuries are not compensable by the Patent Act. The Patent Act provides remedies for patent infringement, not allegedly misleading public statements or breach of contract.[16]

It is not improper for either party to discuss this case. Acushnet's statements have been straightforwardly factual and may be readily verified. Callaway has issued its own statements. Callaway has repeated that the jury upheld its patents, but omitted the fact that the jury found one of the claims invalid -- a claim patentably indistinguishable from the remainder.

Insofar as Callaway continues to complain of the reexamination process, the essence of its complaint is that its alleged image is tarnished because the Patent Office's examiners have ruled that the patents it purchased should never have issued. The Patent Office's rulings are consistent with Callaway's own assertions that the '293 patent was invalid before it owned the patents. ▬▬▬▬▬. More to the point, that a patent has been rejected by the Patent Office is

---

[16] Callaway even goes so far as to suggest, without any supporting law, that this Court could restrain Acushnet from speaking publicly of the litigation or proceedings in the Patent Office. D.I. 412 at 36 n.18. *But see U.S. v. Bell*, 414 F.3d 474,478 (3d Cir. 2005) ("Permanent injunctions [that target speech] are classic examples of prior restraints on speech, and prior restraints are generally presumed unconstitutional."). Callaway's argument in this vein should be rejected.

not irreparable injury; if the Patent Office determines the patents should never have issued, it is

obligated by statute to revoke them. Callaway suffers no compensable injury as a result.

Similarly, Callaway's arguments that it cannot compete in making public statements with

the same acumen as Acushnet (D.I. 412 at 36) are inapposite. The purpose of the Patent Act, and

injunctions authorized thereby, is not to remedy advertising injury or to arbitrate the puffery in

public statements. Moreover, Callaway, as a sophisticated, publicly traded company is fully

capable of market statements of its own. Indeed, Callaway has been distributing its version of

the facts surrounding this case to the public, including directly to Acushnet's accounts. *See*

*supra* at 8-9.

### 7.    Callaway Has Failed to Prove That a Damages Award Will Be Inadequate to Compensate for Its Harm

Just as Callaway has failed to prove irreparable injury, it has also failed to prove the

second factor of the *eBay* test. Callaway argues for a categorical rule that when the patentee and

the infringer are competitors, "the patentee's statutory right exclude infringers from the market

represents a benefit that cannot be equated by an award of cash." D.I. 412 at 26. This is exactly

the kind of shortcut the Supreme Court in *eBay* rejected. Callaway must provide "compelling

reasons why monetary damages would be insufficient to compensate" for any Acushnet

infringement of its patents. *Siemens*, 2008 U.S. Dist LEXIS 1486, at \*20. Callaway has not.

Callaway's latest assertions also appear contrary to its damages case. As discussed

above, Callaway's damages expert has accounted for many of the things Callaway now claims

are irreparable injuries, and has enhanced Callaway's damages claim to ████████ based on

his professed ability to account for them in his damages award. *See infra* at 40-43. The Court

would be better informed to await any damages trial after an appeal to the Federal Circuit on the

liability phase, before deciding -- based on all the evidence of record -- whether Callaway's assertion of non-compensable harm holds water.

At this stage, Callaway has not proven that a damages award will be inadequate to compensate it for its injuries. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Novartis Pharms.*, 2007 WL 2669338, at *14 ("Loss of market share and price erosion are economic harms and are compensable by money damages.").

### 8.    The Balance of Equities, Hardships and Public Interest

Callaway has not shown that the remedy of an injunction is warranted by the equities or by considerations of the public interest. Acushnet addresses below these third and fourth *eBay* factors. Apart from what is discussed already -- including ██████████████████ ████████████████, its delay in suing and seeking injunction, its lack of meaningful and credible evidence of injury, and its massive claim in lost profits and royalty damages that should first be decided before an injunction issues -- there are many other considerations that decidedly tip the equities in Acushnet's favor, and against an injunction.

### a.    Acushnet Did Not Copy and Was Not a Willful Infringer; the Pro V1 Preceded the Patents

In the balance of equities, courts consider whether defendant came into the technology as a willful infringer or copied the patent.[17] Neither factor is present here. Acushnet developed the Pro V1 independently, on its own technology.  T. Tr. 367:24-368:4; D.I. 216, Ex. 17 at ¶¶ 38-45.

---

[17] *See e.g. Baden Sports, Inc. v. Kabushiki Kaisha Molten, Corp.*, No. C06-210MJP, 2007 U.S. Dist. LEXIS 70776, at *5 (W.D. Wash. Sept. 25, 2007); *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007) ("The jury's finding that defendants have willfully infringed plaintiff's patents for over six years supports our conclusion that plaintiff has suffered irreparable injury.").

When Spalding sought the first of the patents, the '293 patent, in December 1999, Acushnet had already, years earlier, built the Pro V1 as a prototype, and was testing the golf ball with golfers. *Id.* Acushnet remained unaware of Spalding's patent application when it launched the Pro V1 to market in October 2000. T. Tr. 368:5-21; 373:16-374:16. ██████████████████████████

███████████████████████████████████████ While Callaway has maintained that Acushnet *willfully* infringed the patents, Callaway offers no evidence of this in support of its motion, and the facts are to the contrary, as articulated already.[18]

> **b.    The Patents-In-Suit Are Subject to Re-Examination and Have Twice Been Rejected in Re-Examination by the Patent Office**

Courts since *eBay* also consider in the equities whether a patent has been subject to a second review by the Patent Office: "[W]hen the court considers a *prospective* motion in equity, it would be imprudent not to consider [any] ongoing reexamination." *MercExchange*, 500 F. Supp. 2d at 574-76 & n.15. The "suspect validity" of some patents may suggest to the court that it should deny, or at least delay for later consideration, the issuance of a permanent injunction. *See eBay*, 126 S. Ct. at 1842 (Kennedy, J., concurring) ("trial courts should bear in mind … the nature of the patent being enforced" and the "potential vagueness and suspect validity of some of these patents may affect the calculus under the four-factor test"); *see also Standard Havens*

---

[18] There is no merit to Callaway's argument that Acushnet's stipulation of infringement after claim construction shifts the balance of equities in this case. D.I. 411 at 3, 7. The very limited scope of Acushnet's non-infringement arguments (which primarily related to the contested term "Shore D hardness") were clear to Callaway throughout the litigation, since Acushnet answered requests for admission admitting the presence of most other claim elements early in discovery. After the claim construction order, Acushnet decided to stipulate to infringement by 95% of the accused products to streamline and simplify the trial. Callaway is in no position to fault Acushnet for doing so, especially since it withdrew claims 1 and 2 of the '130 patent on the eve of trial after they had been vigorously litigated throughout the case.

*Prods. v. Gencor Indus.*, 27 U.S.P.Q.2d 1959 (Fed. Cir. 1993) (staying imposition of a district

court's permanent injunction until reexamination decision becomes final).

Here, the Patent Office -- with the participation of four examiners -- has *twice* rejected

every one of the patent claims-at-issue. The Patent Office's office actions have been so

thoroughly considered, that there has been more than a thousand pages of analysis written by

examiners rejecting Callaway's patent over numerous combinations of prior art. *See, e.g.,* Exs.

15-17; D.I. 118, Exs. 1-4; D.I. 328, Exs. 1-2.

> **c.    The Inconsistent Jury Verdict Should Caution Against An Injunction; Issuing Callaway's Injunction Would Violate Public Policy**

The jury meanwhile rendered a split and inconsistent verdict on the patent claims. The

jury reached this verdict despite patentably indistinguishable claims sharing the same prior art,

and a trial that focused on the patents as a single invention. Callaway does not hesitate to

continue this theme with an effort to paint itself as the innovator of the "solid core / multilayer /

urethane-covered" golf ball, urging this as a basis for injunction. But in order for the jury to

have rendered its verdict *on claim 5 of the '293 patent*, which it found invalid, it must have

necessarily also determined that Callaway's "innovative" construction was obvious and

unpatentable, thus rejecting the argument Callaway advances.

When the jury's invalidation of claim 5 of the '293 patent is coupled with the Patent

Office twice recently declaring every claim of the patents-in-suit invalid, this court has

"legitimate reason to question whether [Callaway] will suffer irreparable harm" and whether the

equities of an injunction favor Callaway. *MercExchange*, 500 F. Supp. 2d at 575 n.15; *id.* at 574

("when crafting *prospective* equitable relief the court cannot ignore such realities") (emphasis in

original).

### d.    Harm to Acushnet

Acushnet will be harmed by an injunction, especially in the form advanced by Callaway. Callaway seeks the immediate cessation of Pro V1 sales, subject to the unpredictable timing of the judicial determination of Callaway's motion. (Callaway is willing to allow professionals to continue to play the Pro V1 until January 1, 2009.) Callaway also asks that all sales of anything called a Pro V1 be enjoined. This last point would cause tremendous damages to Acushnet, and is harm way beyond a remedy against future patent infringement. Callaway's proposal is grossly overreaching in other respects, problems which are discussed *infra* at 44-50.

As explained in Section C.3 hereafter, Acushnet plans to introduce a new version of the Pro V1 in the First Quarter of 2009. That ball will be outside the claims of the litigated patents.

In addition, Acushnet's hardships from an injunction would be aggravated by the media and marketing campaign one suspects Callaway has planned as a means of exploiting any injunction to its favor. Inasmuch as Callaway has already exploited the filing of its motion merely *seeking* an injunction, using this event to spread uncertainty in the industry and disparagement of the Titleist products, *see supra* 8; Ex. 14, Maher Decl. ¶¶ 5-8 Exs. A-E, it should be expected to act likewise, even more aggressively, upon the issuance of any injunction. Callaway's pre-injunction efforts to begin to exploit any injunction demonstrates that even Callaway recognizes the harm an injunction will cause.

An improvidently granted injunction would do severe harm to Acushnet's reputation, goodwill and market share, even if later reversed. Acushnet will never be in the same position as if no injunction had been granted.[19]

In contrast, Callaway is put in no great hardship at all if an injunction does not issue, particularly until after the appeal, given that it waited nearly five years to file suit to begin with. Callaway argues the importance of the enforcement of patent rights to the functioning of the patent system, but it is not as if Callaway's patent rights will not be enforced in this case, if they are ultimately held up on appeal. Callaway, if it proves damages, will get them.

All in all, Callaway has not shown that that the balance of hardships, the public interest, and other equities weigh in favor of an injunction, particularly at this time.

### E. Any Injunction Should Be Appropriately Tailored

For the reasons given above, no injunction should issue, especially at this time. But should the Court consider and grant Callaway's motion for injunction, it would be both reversible error, and inequitable, to grant Callaway's proposed order, for the reasons that follow.

#### 1. The Scope of Any Injunction Should Be Limited to Golf Balls That Use the Claimed Construction

First, the scope of Callaway's proposed injunction is overly broad because, as written, it would enjoin Acushnet from selling golf balls that do not utilize the claimed construction.

---

[19] Callaway argues that any Acushnet harm must be altogether ignored. It is not however "irrelevant" that Acushnet may suffer harm from immediately "ceasing the sale of infringing products." D.I. 412 at 40 n.19. If Callaway's argument were accepted, it would mean that in no case could the balance of harms weigh in favor of the infringer because the infringer would always have proceeded in the face of a patent granted by the Patent Office. It would also mean that the third factor of equity articulated in *eBay* is always met by the patentee. Post-*eBay*, Callaway bears the burden of demonstrating that the hardships tip in its favor, and cannot simply shift its burden by citing categorical rules applied in patent infringement cases before *eBay*.

"Every order granting an injunction ... must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). In a patent cases, this means that an injunction against infringement must 1) state which acts of the defendant constitute infringement, and 2) limit its prohibition to the manufacture, use, or sale of the specific infringing device, or to infringing devices no more than colorably different from the infringing device. *Additive Controls & Measurement Sys. v. Flowdata,* 986 F.2d 476, 479-80 (Fed. Cir. 1993); *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1346 (Fed. Cir. 2003).

Callaway's proposed order is not limited to infringing products but purports to enjoin Acushnet from selling "*any of the Pro V1 line of golf balls* including the Pro V1, Pro V1x, Pro V1*...*." D.I. 411-2 ¶ 1. It also states that "Acushnet shall not supply any distributors, retailers and/or customers with *Pro V1 products* as of the date of this order." *Id.* ¶ 3. Such language is overly broad and appears intended even to prevent Acushnet from marketing non-infringing balls under the Pro V1 name, even when future Pro V1 variants do not fit within the claims-at-issue.

An injunction under the patent laws cannot restrain Acushnet from using a particular tradename, as long as the product sold under that name does not infringe the claims-in-issue. At least one court was recently confronted with a similar request to Callaway's proposed order, and found that the type of injunction sought is not allowed by the patent laws:

> Without resolving ... whether Mirror Lite has improperly suggested to customers that Rosco is totally out of the business and that all of its Hawk Eye and Mini Hawk Eye mirrors infringe, ¶ 2(b) of the proposed permanent injunction, specifically referring to certain Hawk Eye and Mini Hawk Eye mirrors, should also be struck in order to avoid potential misunderstanding on the part of the customers. Specifically naming the Hawk Eye and Mini Hawk Eye models might mislead customers into thinking that all Hawk Eye and Mini Hawk Eye mirrors are enjoined. It is sufficient to list the characteristics of infringing mirrors, which would preclude the sale of infringing Hawk Eye and Mini Hawk Eye mirrors, but not all mirrors marketed under those names.

*Rosco, Inc. v. Mirror Lite Co.,* No. CV-96-5658, 2006 WL 2844400, at *6 (E.D.N.Y., Sept. 29, 2006). Callaway's proposed order shows that, like the patentee in *Rosco*, its true goal is not to prevent others from using its claimed technology, but rather to diminish Titleist's reputation by removing its valuable Pro V1 tradename from the market.

Tailoring any injunction to only infringing products is supported for other good reasons, too, apart from Federal Circuit and other exemplary precedent. Callaway admits that the Pro V1 was an immediate success at launch and instantly developed a very strong brand reputation. D.I. 411 at 14-16. The initial brand prestige associated with Pro V1 thus was garnered with *non-infringing* activity, as well as years before Callaway bought the patents at auction.

In sum, any injunction should be tailored to restrain the production and sale of only infringing products, in accordance with the claims-in-issue, rather than products that might be sold under "Pro V1" label. As an example, an appropriate order, if any is warranted, should simply enjoin further infringement, without enjoining balls named "Pro V1." This is conventional in patent cases.

### 2.    Callaway's Proposed Order Seeks Relief Not Properly Granted As a Remedy for Patent Infringement

Callaway's proposed order also seeks inappropriately to impose affirmative duties on Acushnet that have little or nothing to do with patent infringement. Such obligations are not properly within the scope of an injunction issued pursuant to § 283. For example, Callaway's order would require Acushnet to serve notice of the injunction to "all distributors, retailers, customers, or other third-parties who have ordered, received, or purchased any Pro V1 products" within ten (10) business days of the entry of the Order on the Court's docket. D.I. 411-2 ¶ 4.

This provision is improper for at least two reasons. First, an injunction issued pursuant to § 283 must be limited to only the specific issue of patent infringement. Requiring notice to these

individuals has no relation to preventing Acushnet's patent infringement, and appears designed simply to harass and to impugn Acushnet's industry goodwill. Callaway concedes, by its proposal, that these individuals may freely dispose of their Pro V1 product inventory. D.I. 411-2 ¶ 3. Acushnet would also be ordered to provide them no further infringing inventory. *Id.* Thus, serving notice of Callaway's order on these individuals, apart from an effort to tarnish the Pro V1 brand name, could only serve to confuse them that they have some affirmative obligation. Callaway's provisions would further confuse them should they receive non-infringing Pro V1 product from Acushnet, which Acushnet has the right to sell them.[20]

Second, Callaway's provision is not triggered by a time period relevant to the effect of the injunction. If the Court provides a transition period under any injunction, or stays the injunction pending appeal, such notice would only serve to confuse Acushnet's customers, as the injunction might not take effect until after appeal, and if Acushnet prevails on appeal, will never take effect at all. Acushnet will likely want to give notice to its customers if any injunction issues, but that the manner, method and timing should appropriately left to Acushnet.[21]

Callaway's proposed order also requires Acushnet to provide a similar notice to all professional golfers currently playing Pro V1 balls. *Id.* at ¶ 2. Again, such "relief" is not properly granted pursuant to the patent laws, is again not triggered by a relevant event, and again is designed simply to harass Acushnet and confuse those who use its products.

---

[20] If proper at all, these provisions are also too unclear. "Retailers and distributors" are perhaps clear enough terms. But "customers," identified separately, is not. It would seem especially unnecessary to require notice of any injunction to end-users and direct purchasers. Callaway's demand that notice issue to all "third-parties who have ordered, received or purchased" Pro V1 product from Acushnet has still further problems. Does Callaway really mean anyone who has *ever* bought or received a Pro V1, or even found one on a golf course?

[21] This provision also appears unnecessary as Callaway has already circulated its motion for permanent injunction to many of those customers. If an injunction issues, it seems certain customers will be aware of it through Callaway.

Injunctive relief should be narrowly tailored to fit "specific legal violations." *Gemveto Jewelry Co. v. Jeff Cooper, Inc.,* 800 F.2d 256, 259 (Fed. Cir. 1986). As Callaway's provisions are not so tailored, they should not be included within the scope of any injunction.

### 3.    The Court Should Allow a Transition Period

When a permanent injunction issues, it is recognized as appropriate to provide a transition period before the injunction takes effect.[22] In this case, any injunction should provide for a transition period until March 2009 for the reasons set forth below.

### a.    Acushnet Plans to Release, New Non-Infringing Pro V1 and Pro V1x Balls in the First Quarter

Golf ball companies typically announce new products in the First Quarter of the year. Acushnet follows this practice. Accordingly, new versions of the Pro V1 have been introduced every two years, in the First Quarter of 2003, 2005 and 2007. Ex. 18, Morgan Decl. ¶¶ 8 & 24. With this event in mind, Acushnet is currently planning to launch new versions of the Pro V1 and Pro V1x in the First Quarter of 2009. *Id.* at ¶¶ 8-10. The plans associated with this product launch have been in place for some time. *Id.* at ¶¶ 15-16.

---

[22] *See, e.g, Arthrocare Corp., v. Smith & Nephew, Inc.,* 315 F.Supp. 2d 615, 622 (D. Del. 2004) (providing 3-month transition prior to effective date of injunction); *Simon Prop. Group, L.P. v. mySimon, Inc.,* No. IP 99-1195-C H/G, 2001 U.S. Dist. LEXIS 852, at *58-62 (S.D. Ind. Jan. 24, 2001) (providing 12-month transition and staying injunction pending appeal in a trademark case); *Moxness Prods., Inc., v. Xomed, Inc.,* No. 86-100-CIV-J-14,1998 U.S. Dist. LEXIS 16060, at *14-16 (M.D. Fla. May 10, 1988) (providing 4-month transition for any injunction ultimately entered by the Court); *Shiley, Inc., v. Bentley Labs., Inc.,* 601 F. Supp. 964, 971 (C.D. Cal. 1985) (providing 6-month transition).



       **b.**     **Allowing Acushnet to Release New, Non-Infringing Product in the First Quarter of 2009 Would Minimize the Disruption to Acushnet's Business and to Distributors and Golfers**

As discussed above, the fact that Callaway and Spalding ████████████████████ ████████████████████ shows that Callaway believes that it can be compensated with monetary damages for Acushnet's infringement. Callaway's expert's damages report shows likewise. Thus, if Callaway ultimately prevails on appeal, it can be compensated with money damages for any infringing sales of old model Pro V1 balls through March 2009, even assuming that the Court decides that Acushnet should be enjoined prior to any appeal. The new model Pro V1 and Pro V1x balls will be separately tracked and side-stamped.

43



Furthermore, as Callaway recognized it its brief, professional golfers typically have contracts that are renewed at the first of the year. D.I. 411-2 at ¶ 2. These contract renewals correspond to the start of the PGA professional golf tour schedule in the United States. Ex. 18, Morgan Decl. ¶ 8. Callaway's proposed injunction in fact provides for a transition period for professional golfers through the end 2008 that would allow them to continue playing the current Pro V1 and Pro V1x golf balls. D.I. 411-2. Thus, Callaway seems to recognize that providing a transition period through the First Quarter of 2009 as a provision of any injunction would minimize the disruption caused to golfers and golf ball distributors that would result from changeover to new products by allowing the switch to occur in the normal cycle. Such a transition period would also minimize any inconvenience to amateur golfers that would result from them changing golf balls mid-season, as fewer rounds are typically played in the winter months. These golfers would also be able to begin their golf year in the Spring of 2009 with non-infringing alternatives, rather than changing balls during the 2008 golfing season.

Any transition period until March 2009 would thus minimize the disruption to Acushnet, its customers, its employees, and those that use and sell its balls, and such a provision should be included in any injunction that issues. Indeed, the measure of harm avoided to Acushnet by granting it a few additional months should any injunction issue easily outweighs any running harm to Callaway that does exist. Callaway waited more than four years to file suit, and we now stand more seven years removed from Callaway's "critical" time of irreparable injury. Thus, a few relatively short additional months of time allowing Acushnet to implement its new model in the normal course of its product launch practices, thus reducing the harm to Acushnet should any injunction issue, would seem to have minimal harm, if any, to Callaway. This proposal for more time, however, is not to concede in any manner that an injunction would be appropriate.

## IV.    CONCLUSION

For the foregoing reasons, Callaway's request for an injunction should be denied since it has not demonstrated irreparable harm or the other factors required by the Supreme Court in *eBay*. Even if Callaway had proven the *eBay* factors, the Court should in its discretion deny the request for injunction for the reasons stated herein. Alternatively, Callaway's motion should be denied as premature since many of the facts underlying the injunction issue have yet to be litigated by a jury in the damages phase of the case. Finally, if any injunction is granted, which Acushnet has shown it should not be, the scope of Callaway's proposed injunction is far too broad, and should be narrowly tailored to enjoin infringement and provide Acushnet with a reasonable transition period.


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Mark L. Whitaker
Brian A. Rosenthal
Nicholas J. Little
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 783-0800

Dated: February 25, 2008
Public Version Dated: March 3, 2008
852455 / 30030

By:  */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19899
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendant*
*Acushnet Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 3, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on March 3, 2008, the attached document was Electronically Mailed to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE 19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA 92130
denning@fr.com
shuman@fr.com
shear@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
lamberson@fr.com
cjordan@fr.com
compton@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030