IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALLAWAY GOLF COMPANY, | |
| Plaintiff, | C. A. No. 06-91 (SLR) |
| v. | |
| ACUSHNET COMPANY, | **REDACTED** |
| Defendant. | |

*REPLY* **IN SUPPORT OF CALLAWAY GOLF COMPANY'S
MOTION FOR PERMANENT INJUNCTION**

FISH & RICHARDSON P.C.

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel:  (302) 652-5070
Fax:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel:  (617) 542-5070
Fax:  (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax:  (858) 678-5099

Attorneys for Plaintiff
CALLAWAY GOLF COMPANY

Dated:  March 14, 2008

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................................1

II.   A PERMANENT INJUNCTION IS APPROPRIATE .......................................................2

    A.   Acushnet Criticizes the Form of Callaway Golf's Evidence of Harm
       but Fails to Present Contrary Evidence.....................................................................4

    B.   Acushnet's Two Primary Arguments Against the Granting of an
       Injunction, Delay and License, are Without Merit ...................................................5

    C.   Callaway Golf Continues to Suffer Irreparable Harm as a Result
       of Acushnet's On-going Infringement .....................................................................5

        1.   Acushnet's "Nexus" Argument Ignores the Record as Well as the Jury's
           Verdicts .........................................................................................................6

        2.   Despite the Jury's Eight Verdicts, Acushnet Continues to Flaunt
           Callaway Golf's Intellectual Property Rights and Disparage
           Callaway Golf .................................................................................................9

        3.   Acushnet's Argument that Callaway Golf has Engaged in
           a "Campaign of Misinformation" is Nonsense .........................................11

        4.   Acushnet's Argument that Callaway Golf is Relying Upon
           Pre-Acquisition Harm is Incorrect .............................................................13

    D.   Acushnet's Alleged Constitutional Considerations do not Warrant
       Denial of the Injunction .........................................................................................14

    E.   Monetary Damages Would be Inadequate to Compensate for the
       Harm Callaway Golf Continues to Suffer...............................................................15

    F.   The Balance of Equities, Hardships and Public Interest in No Way
       Supports Acushnet .................................................................................................16

    G.   Callaway Golf's Proposed Injunction is Appropriately Tailored to
       Prevent Further Harm .............................................................................................18

    H.   It Would be Unfair to Delay Any Injunction Either to Allow a
       Transition Period or to Await the Outcome of an Appeal and/or
       a Damages Trial .....................................................................................................18

III.  CONCLUSION.....................................................................................................22

## TABLE OF AUTHORITIES

Page(s)

*Arthrocare Corp., v. Smith & Nephew, Inc.,*
  315 F. Supp. 2d 615 (D. Del. 2004)................................................................................14

*eBay Inc. v. MercExchange, L.L.C.,*
  126 S. Ct. 1837 (2006)...................................................................................................2

*Fisher-Price, Inc. v. Safety 1st, Inc.,*
  279 F. Supp. 2d 526 (D. Del. 2003)..............................................................................14

*H.H. Robertson, Co. v. United Steel Deck, Inc.,*
  820 F.2d 384 (Fed.Cir.1987)........................................................................................3, 6

*MercExchange v. eBay, Inc.,*
  500 F. Supp. 2d 556 (E.D.Va 2007) .............................................................................11

*Minco, Inc. v. Combustion Engineering,*
  95 F.3d 1109 (Fed. Cir. 1996).......................................................................................8

*Moxness Products, Inc., v. Xomed, Inc.,*
  No. 86-100-CIV-J-14, 1998 U.S. Dist. LEXIS 16060
  (M.D. Fla. May 10, 1998) .............................................................................................14

*Novozymes A/S v. Genencor International, Inc.,*
  474 F. Supp. 2d 592 (D. Del. 2007).........................................................................5, 6, 10

*Ortho-McNeil Pharmaceuticals, Inc. v. Mylan Laboratories Inc.,*
  2007 WL 869545 (D. N.J. 2007) ...................................................................................5

*Rondeau v. Mosinee Paper Corp.,*
  422 U.S. 49 (1975)........................................................................................................10

*Shiley, Inc. v. Bentley Laboratories, Inc.,*
  601 F. Supp. 964 (C.D. Cal. 1985) ...............................................................................14

*Smith & Nephew v. Synthes,*
  466 F.Supp.2d 978 .......................................................................................................21

*Siemens Medical Solutions USA Inc. v. Saint-Gobain Ceramics & Plastics,*
  2008 WL 114361 (D. Del. Jan. 8, 2008)........................................................................2, 5

*Sun Optics, Inc. v. FGX International Inc.,*
  2007 U.S. Dist. LEXIS 56351 (D. Del. Aug. 2, 2007) ...................................................2

**TABLE OF AUTHORITIES   (cont'd)**

**Page(s)**

*Swift & Co. v. United States,*
    276 U.S. 311, 326 .......................................................................................................21

*Tivo, Inc v. EchoStar,*
    446 F. Supp. 2d 664 (E.D. Tex. 2006) .................................................................6

*Voda v. Cordis Corp.,*
    2006 WL 2570614 (W.D. Okla. Sept. 5, 2006) ...................................................8

**INTRODUCTION**

Acushnet makes no argument that it was unaware of the patents it has knowingly infringed for the past seven years, nor can it, as the evidence shows it knew of the first patent literally as it issued.  Despite numerous product iterations and releases, Acushnet never made any attempt to design around the patents.  Nor is Acushnet able to make any credible argument to deny that the inventions of the patents-in-suit propelled the Pro V1 to become the most successful ball in the history of golf.  Yet, for the six years prior to trial, Acushnet flouted Spalding and Callaway Golf's intellectual property rights – it continues to do so today.  In fact Acushnet has told the public that it is "business as usual" and that, even if a final decision is reached in this case, it would not occur until years in the future.  It also fills the marketplace with press releases that harp on the unlawfully-filed reexaminations or that mislead the reader into believing that Acushnet was first to invent this technology even though it has conceded – in court – that it was not.  And despite the fact that Callaway Golf had already raised these issues with the Court, Acushnet's CEO recently sent a letter to all Acushnet customers, playing on their lack of patent-related knowledge to *again* misleadingly imply that Acushnet was the first to invent the technology and trumpet the unlawfully filed reexaminations

The two primary excuses Acushnet provides to avoid the consequences of its deliberate actions – that Callaway Golf and Spalding were willing to license the patents and that Callaway Golf delayed in filing suit – lack any basis in law or the facts.  Acushnet knows that the timing of this suit and the efforts to resolve this dispute were largely dictated by the mandatory ADR procedures specified in the 1996 Settlement Agreement.  And, while Callaway Golf did indicate in complying with that Agreement that it would entertain the possibility of a license, it was in the context of a denial of infringement and an assertion that the patents were invalid prior to

litigating those issues.  The record now shows that neither assertion was true.  Acushnet also knows the patents-in-suit have *never* been licensed to anyone.  Moreover, contrary to Acushnet's argument, willingness to license is far from a dispositive factor regarding whether to grant injunctive relief.  In fact, Courts have generally continued to enter permanent injunctions in the wake of *eBay*, including in cases where the plaintiff has been willing to license.  Callaway Golf respectfully submits that, however one draws the new line as to when injunctions should issue and when they should not in view of *eBay*, Callaway Golf's showing, coupled with Acushnet's conduct (both prior to and during this litigation), amply supports granting injunctive relief here.  Particularly given that Callaway Golf will be left without any remedy for years in the absence of injunctive relief, Callaway Golf requests that the Court enter an immediate injunction.

## I.    A PERMANENT INJUNCTION IS APPROPRIATE

The vast majority of cases since *eBay Inc.* v. *MercExchange, L.L.C.*, 126 S.Ct. 1837 (2006), that have considered whether to issue a permanent injunction have granted it.  [D.I. 412 (Mtn. for Injunction) at 23.]  Acushnet does not even attempt to refute this weight of authority – instead relying on *preliminary* injunction cases, like *Siemens Medical Solutions USA Inc. v. Saint-Gobain Ceramics & Plastics*, 2008 WL 114361 (D. Del. Jan. 8, 2008) and *Sun Optics, Inc. v. FGX Int'l. Inc.*, 2007 U.S. Dist. LEXIS 56351 (D. Del. Aug. 2, 2007).  A preliminary injunction assessment is quite different from the situation here, where Acushnet has conceded infringement, a full trial has been held, an impartial jury correctly rendered eight verdicts rejecting Acushnet's validity challenges, and the admitted infringer is the number one competitor of the patent holder.  Under those type of facts, and consistent with Chief Justice Roberts' concurrence in *eBay*, Courts have uniformly entered an injunction:

2

> From at least the early 19th century, courts have granted injunctive relief upon on a finding of infringement in the vast majority of patent cases. This "long tradition of equity practice" is not surprising, given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes – a difficulty that often implicates the first two factors of the traditional four-factor test.

*eBay*, 126 S.Ct. at 1841 (emphasis in original). As Justice Roberts correctly noted, the reason permanent injunctions typically issue in patent cases, even under a rigorous application of the four-factor test, is that a patentee's right to exclude, the sole right given by a patent, is necessarily injured by an infringer's use of an invention against the patentee's will. That injury can rarely be compensated with money, particularly in circumstances like those before the Court, where the patentee and infringer are the two top competitors in the market and the infringer is entrenched as number one. *See, e.g., H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987) ("The nature of the patent grant ... weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude."). As Justice Roberts points out, nothing in the Court's decision in *eBay* suggests that courts should deviate from the historical tendency to grant injunctions:

> This historical practice [of issuing injunctions], as the Court holds, does not *entitle* a patentee to a permanent injunction or justify a *general rule* that such injunctions should issue. ... At the same time, there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate. Discretion is not whim, and limiting discretion according to legal standards help promote the basic principle of justice that like cases should be decided alike. When it comes to discerning and applying those standards, in this area as others, a page of history is worth a volume of logic.

*Id.* at 1841-42 (emphasis in original) (internal citations omitted). Callaway Golf, thus, respectfully requests that the Court enter a permanent injunction, consistent with historical practice and the strong showing of harm that Callaway Golf has made in this case.

A.    **Acushnet Criticizes the Form of Callaway Golf's Evidence of Harm but Fails to Present Contrary Evidence.**

Acushnet goes to great lengths to *procedurally* challenge Callaway Golf's use of Mike Yagley's declaration and Phil Mickelson's deposition, but does little to substantively dispute the facts they contain.[1]  [Opp. at 22-26.]  Acushnet took Phil Mickelson's deposition, yet offers precious few designations to support its arguments or to contradict the testimony relied upon by Callaway Golf.  Acushnet's reticence in this regard is understandable, given that much of what Mr. Yagley and Mr. Mickelson said is corroborated by Acushnet's own internal documents, many of which were admitted at trial, as well as by testimony presented at trial.  [*See, e.g.,* PX 1175; PX 985; PX 1195;  PX 1174 at AC 0109480.UR-81.UR; *see also, e.g.,* Bellis Tr. 226:10-227:7; 280:5-281:12; 294:8-295:1; 301:8-25; 307:14-16; Yagley Tr. 1046:6-13; 1049:9-21; and Morgan Tr. 433:11-434:6.]

Moreover, the Court's decision to preclude Mr. Mickelson from appearing at trial does nothing to aid Acushnet now.  As the Court expressed on the record, while it was primarily concerned with the potential effect a celebrity would have on the jury, the Court acknowledged that Mr. Mickelson had relevant, first hand knowledge of facts pertinent to this case.  [Trial Tr. at 995:18-996:6.]  No similar concern exists that the Court, sitting in equity, would be prejudiced

---

[1]  Acushnet appears to go so far as to argue that declarations cannot be considered when assessing whether to issue a permanent injunction.  Acushnet's assertion, however, relies upon dicta taken from a different context – where a court was merely distinguishing the assessment of permanent injunctions from preliminary injunctions. [D.I. 434 (Opp.) at 23.]  Moreover, Acushnet's argument fails to acknowledge that it is not unusual at all for declarations to be submitted in support of motions for permanent injunction filed in this court.

Acushnet's related argument, that the Yagley declaration "should be largely excluded" because Mr. Yagley allegedly lacks sufficient knowledge (Opp. at 23-24), is long on rhetoric but short on support.  Mr. Yagley's significant experience in the industry is detailed in both his declaration and trial testimony and amply supports the sworn testimony in his declaration.

Lastly, contrary to Acushnet's unsupported suggestion that Callaway Golf needed to submit so-called "expert studies or other form of rigorous analysis" (Opp. at 29), no specialized submissions have ever been required either pre- or post-*eBay*.  This record contains the facts supporting Callaway Golf's request for injunctive relief.  No particular form is required.

by Mr. Mickelson's celebrity.  Finally, if Acushnet could legitimately dispute the substance of

the evidence which Callaway Golf has adduced, doubtless it would have done so, including by

submitting declarations of its own.  It certainly had every incentive to do so in order to avoid the

alleged harm that it would suffer if an injunction were entered.  That failing alone is reason

enough for the Court to reject Acushnet's request that the Court simply ignore Mr. Mickelson's

and Mr. Yagley's sworn testimony.

### B.    Acushnet's Two Primary Arguments Against the Granting of an Injunction, Delay and License, are Without Merit

As explained in Callaway Golf's opposition to Acushnet's motion for a stay of injunctive

relief, Acushnet's arguments regarding alleged undue delay and a willingness to license[2] are at

odds with reality and do not support Acushnet's efforts to avoid the injunctive relief sought by

Callaway Golf.  [D.I. 457, at 13-16.]

### C.    Callaway Golf Continues to Suffer Irreparable Harm[3] as a Result of Acushnet's On-going Infringement

Acushnet's attempt to analogize Callaway Golf to a "single purpose entit[y]" "who

routinely ha[s] requests for injunction denied post *e-Bay*" has no basis in the facts.  [Opp. at 2.]

Acushnet cannot quite bring itself to say what it means, but Callaway Golf will: Callaway Golf is

no troll.  The evidence is undisputed that, from the start, Callaway Golf  sold balls that directly

---

[2]   Indeed, this Court has stated:  "The [Supreme] Court also rejected a categorical rule that a patentee's willingness to license its patent is enough to establish that the patentee would not suffer irreparable harm in the absence of an injunction."  *Novozymes A/S v. Genecor Intern*, 474 F.Supp.2d 592, 612 (D.Del. 2007).

[3]   After *eBay*, Courts have come down on both sides of whether a presumption of irreparable harm continues to follow from infringement, and the Federal Circuit has yet to squarely address the issue.  *See e.g. Novozymes A/S v. Genencor Int'l, Inc.*, 474 F.Supp.2d 592 (D. Del. 2007); *Ortho-McNeil Pharmaceuticals, Inc. v. Mylan Labs. Inc.*, 2007 WL 869545 (D. N.J. 2007); *cf. Siemens Medical*, 2008 WL 114361.  Callaway Golf, however, needs no such presumption – it has made a strong showing of irreparable harm.  [*See* D.I. 412 (Mtn. for Injunction) at 24-37.]

competed with the infringing Pro V1 and it continues to do so today. [*See, e.g.,* PX 1175.] This

market reality, alone, provides solid support for the issuance of an injunction. *See, e.g., H.H.*

*Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987); *Novozymes A/S v.*

*Genencor Int'l, Inc.,* 474 F.Supp.2d 592, 613 (D. Del. 2007) (concluding that legal remedies are

not adequate to compensate the patentee because, *inter alia,* "[t]hese are head-to-head

competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use

of proprietary technology.").[4]

### 1. Acushnet's "Nexus" Argument Ignores the Record as Well as the Jury's Verdicts.

Acushnet argues that Callaway Golf failed to establish a nexus between the Pro V1's

infringement, the golf ball's success, and the harm suffered by Callaway Golf. Acushnet's

argument, however, ignores both the record and the result at trial. Callaway Golf has already

explained that, under the law, there is a presumed nexus between Acushnet's infringement of the

asserted claims and the success enjoyed by the Pro V1. [D.I. 455 (Opp. To Acushnet Post-Trial

Mtns.) at 20-21.] Further, the jury heard considerable evidence that the success of the Pro V1 is

driven by the performance of the ball. [*See e.g., id.* at 21-23; D.I. 412 at 30-31, 36.] Acushnet

did present evidence that it believes shows other factors contributed to the success of the Pro V1.

[Opp. at 28.] But, in addition to ignoring the law which established a presumptive nexus,

Acushnet fails to acknowledge that the jury is presumed to have rejected Acushnet's version of

events. [*See, e.g.,* D.I. 455, at 2-3.] It is understandable that the jury did so, particularly

considering that Acushnet does not appear to believe that version itself.

---

[4] Callaway Golf also respectfully references the evidence and argument set forth in other post-trial submissions regarding the irreparable harm which Callaway Golf is suffering. [*See* D.I. 412 at 24-37; and 457 at 11-17.]

In an advertisement just released in the April 2008 edition of Golf Digest, Acushnet

acknowledges that there was a long felt need for balls that performed like the Pro V1 and makes

clear that it is the performance of the Pro V1 that sets it apart:

> Ten years ago, most golf balls played on the PGA Tour were a bad
> choice for the vast majority of amateur golfers. Soft balata covers
> were not durable enough and high driver and iron spin reduced
> accuracy and distance. In contrast, the multi-layer, urethane
> covered golf balls played today on the PGA Tour are a good choice
> for most amateur golfers. With Pro V1 and Pro V1x, *players no
> longer have to trade-off distance and durability for spin, feel and
> control around the green.*

[D.I. 458, (Halkowski Decl. filed in support of Callaway Golf's Opposition to Acushnet's

Motion to Stay), Ex. E (emphasis added) (also stating that the Pro V1 golf balls "have a thin, soft

urethane cover that generates high spin for excellent control and short game performance").]

Once again, Acushnet tells the public something very different than it told this Court and the

jury. Acushnet now apparently agrees that it is the performance of the Pro V1 that results in a

player no longer having to trade distance and durability for spin, feel and control – performance

that is achieved through the use of Sullivan's inventions.

As for those "other factors" that Acushnet said were the reason for the ball's success –

e.g., Acushnet's ability to secure Tour players, the Titleist brand, Titleist existing in more pro

shops – they were all plainly *enabled* by Acushnet's infringement. In other words, if the ball did

not match the performance of the competition by utilizing the claimed inventions, Acushnet's

pyramid of influence would have collapsed and none of those factors would exist. [*See, e.g.,*

Bellis Trial Tr. 237:11-238:9; 276:1-7; Morgan Trial Tr. 438:9-22; 440:24-441:1.] And even

Acushnet's own witnesses testified at trial that these "other factors" applied equally to the

Titleist balls which preceded the Pro V1 (*see e.g.* Bellis Trial Tr. 298:22-300:23), yet it was the

# REDACTED

Pro V1, and not these prior balls, that became the most successful ball ever and that revolutionized the game of golf.

Finally, as part of its nexus argument Acushnet also argues that Callaway Golf would have been harmed regardless of the infringement, because Acushnet could have easily released a non-infringing alternative which would have been as successful as the Pro V1.[5] [Opp. at 29.]

If any of this is actually true – and there is no sworn or admitted evidence to support that it was true in 2001 – it begs the question why didn't Acushnet do it rather than spend the last seven years knowingly infringing the patents and accruing, at a minimum, significant damages exposure? The answer is either that Acushnet could not or that it simply did not care to – either answer is damning to Acushnet.

### 2. Despite the Jury's Eight Verdicts, Acushnet Continues to Flaunt Callaway Golf's Intellectual Property Rights and Disparage Callaway Golf

As Callaway Golf pointed out in its opening brief, Acushnet has repeatedly issued press releases that prey upon the public's naïveté to create the impression that it produced the Pro V1 *before* the patents in suit were even filed.  [D.I. 412 (Mtn. for Injunction) at 3.]  Acushnet continues to publicize these misleading statements even in the midst of the post-trial briefing.

---

[5]

For example, on February 20, 2008, Wally Uhlein, Acushnet's CEO, sent a letter to Acushnet's

customers discussing the lawsuit, which said :

> First and foremost, I want to assure you that it is ***business as
> usual***, and you can continue to order, sell and play Pro V1 and Pro
> V1x golf balls with confidence.
>
> This dispute relates to ***patents that were issued*** by the U. S. Patent
> and Trademark Office ***after the Pro V1*** came into the market and
> became the best-selling ball in golf.  At Acushnet's request, in
> early 2007 the Patent Office re-examined these patents and issued
> initial decisions finding that all claims of all four patents were
> invalid.  Over the last 90 days, the Patent Office issued second
> decisions on each of the four patents and again determined all
> claims of all four patents invalid.  The last three second ***Patent
> Office decisions*** were issued after the jury trial ended on
> December 14, 2007.  In this process, four separate patent
> examiners have reached the same conclusion – ***that it was a
> mistake to issue these patents in the first place***.
>
> ***Unfortunately, this pivotal information was not allowed as
> evidence at the trial*** in which the jury rendered an inconsistent and
> unsupportable verdict.  As a result, Acushnet has asked the Court
> to come to the same conclusion as did the Patent Office and
> determine that all claims of all four patents are invalid, thereby
> reversing the jury verdict.
>
> Second, I want to assure you that we will vigorously oppose
> Callaway's request for an injunction against the sale of the Pro V1.
> Acushnet's opposition will include the inconsistency of the jury
> verdict, the recent decisions from the Patent Office and ***Callaway's
> long delay in filing the law suit***.
>
> These matters will take the court some time to decide.  We are
> confident in our positions and believe that they are correct.
> ***However, regardless of what the Court decides, these matters will
> likely be appealed to a higher court, resulting in final decisions
> not being made until well into the future***.

[D.I. 458 (Halkowski Decl. ISO Opposition to Acushnet's Motion to Stay Injunctive Relief), Ex.

I (emphasis added).][6]

---

[6] These misleading statements have been pervasive, made in letters sent to customers like Mr.
Uhlein's, advertisements, press releases, and separate letters sent to professional golfers. [*See,
e.g.,* D.I. 458 (Halkowski Decl. ISO Opp. to Acushnet's Motion to Stay Injunctive Relief), Exs.
E, H, and I.]  Fortune Brands, Acushnet's parent corporation, has furthered the effort, making

The many problems with these statements are obvious, but a few are worth highlighting. First, "business as usual" at Acushnet has led to seven years of knowing infringement of Spalding and Callaway Golf's intellectual property rights. Second, the patents-in-suit indisputably date back until at least 1995. [D.I. 334 ¶¶ 16-17 (statement of admitted facts).] The record is equally clear that Sullivan actually conceived the basic approach for the solid-core ionomer-inner-layer polyurethane-covered golf ball – essentially as Acushnet describes the Pro V1 in its April 2008 Golf Digest ad – in 1991. [PX 613 (Sullivan's 1991 lab notebook).] Third, Acushnet continues to seek to profit from its unlawfully-filed reexaminations.

It is remarkable that Acushnet's opposition brief has *no* meaningful response for this conduct. It makes no effort to argue that the statements are not misleading; nor does Acushnet offer any defense to the fact that the statements were made to disparage Spalding and Callaway Golf.[7] Acushnet's only answer is that everything is technically true and that Callaway Golf is a publicly traded company capable of launching its own marketing campaign to undo the damage. Acushnet misses the point entirely. It is Acushnet's willingness to repeatedly mislead the public about the facts of this case, the Court's rulings, and the law, that further support entry of an injunction. Because history, including very recent history, has shown that unless an injunction

---

similar statements in its most recent earnings call to industry analysts. [*Id.*, Ex. J at 10 ("The other is that the golf ball actually was out being sold before these patents were issued.").]

[7] Acushnet continues the misdirection even in its briefing before the Court. [Opp. at 35.] ("When Spalding sought the first of the patents, the '293 patent, in December of 1999, Acushnet had already, years earlier, built the Pro V1 as a prototype, and was testing the golf ball with golfers."). This is despite the fact, as Acushnet has conceded, that the patent is entitled to priority to 1995, and the claims of 1995 application are identical in all important respects to the claims that issued in 2001. [*See* DX 1037; and Tr. 1344:16-1346:19.]

issues outlining exactly what Acushnet can and cannot do, Acushnet will disregard the rights of

others[8] and mislead the public in the process.

### 3.  Acushnet's Argument that Callaway Golf has Engaged in a "Campaign of Misinformation" is Nonsense

Plainly hoping that the Court will gloss over the facts and simply take "a pox on both of

your houses" approach to the parties, Acushnet struggles to show that Callaway Golf "has

embarked on a campaign of misinformation and confusion in an attempt to interfere with

Acushnet's contractual relations with its accounts (including retailers)."  [Opp. at 8.]  Acushnet's

own purported evidence shows that this charge is nonsense.[9]

Callaway Golf's business is international and its extensive sales force spans the globe.

The exhibits attached to Mr. Maher's declaration plainly show that Acushnet told *all* of its

employees to have their collective ears perked up for any statements about this case by Callaway

Golf.  Yet, they produce evidence of just a few instances – one, an obvious joke.[10]  The exhibits

---

[8] With no sense of irony, Acushnet says the following on its website: "Acushnet Company expects that others will respect its intellectual property rights. Acushnet Company vigorously enforces its intellectual property rights, whether infringement takes the form of "knock-off" products, unauthorized use of trademarks or copyrights or in any other manner." [D.I. 458, Ex. K (Halkowski Decl. ISO Opp. to Acushnet's Mtn. to Stay Injunctive Relief).]

[9] Acushnet's questioning of the timing of Callaway Golf's Motion for a Permanent Injunction is baseless. First, it is ironic that Acushnet criticizes Callaway Golf for not engaging in a marketing campaign to correct the misleading statements and press releases that Acushnet has issued and then, at the same time, chastises Callaway Golf for filing a Court document that properly addresses the issues. Second, Acushnet overlooks the fact that Callaway Golf's brief responded, in part, to some of the misleading allegations set forth in Acushnet's 6-page "Notice of Motion" that was issued just nine days *before* the response Acushnet complains of (10 days before the PGA show Acushnet highlights), and that unfairly criticized the Court's rulings and the jury's verdicts.

[10] Acushnet claims that the names of the Callaway Golf employees and their purported statements are not only Acushnet confidential information, but so confidential as to necessitate an "Outside Counsel Eye's Only" designation. Acushnet has refused to allow Callaway Golf's outside counsel to discuss these purported statements with its client (*or even the in-house counsel for its client*), and, thus, has frustrated any reasonable effort to investigate their veracity.

upon which Acushnet bases its broad-brushed attack actually show that Callaway Golf

employees have made virtually no comments. [*See, e.g.,* D.I. 435 (Maher Decl.) at Ex C

attached thereto ("Lawsuit chatter has been very quiet." "I've only gotten a couple occasional

questions.").] Indeed, some of Acushnet's field sales people candidly admit that they have heard

nothing from their customers.[11] [*Id.* ("I haven't had any consumers approach me on this topic."

"I've heard nothing from accounts regarding conversations they've had with any competitors.").]

It appears instead that whatever questions Acushnet has fielded from customers have been

prompted by media accounts of the case – media accounts driven in large part by Acushnet's

own misinformation blitz. [*Id.*] And presumably, of course, this is the worst that Acushnet was

able to dig-up for use in its briefing. Moreover, one of the acts that Acushnet appears to

complain of was merely the emailing of a link to a popular golf legal blog. The blog, run by the

self-proclaimed "IP Golf Guy" (an attorney unaffiliated with either of the parties in this case),

posts the public version of all of the parties' court filings. Thus any visitors to the cite would be

able to have a complete view of the redacted materials filed in this case, which is a far cry from

the one-sided, misleading press releases that Acushnet has formally issued.[12]

---

[11]  Callaway Golf's policy has been to not issue press releases on the trial or post-trial
proceedings of this case, whether through its sales force, marketing department, or public
relations group. Thus, it is no accident that Acushnet has exactly zero Callaway Golf press
releases, letters to valued customers and the like for Acushnet to point to, in comparison to
Acushnet's multiple official misstatements from, among other sources, its own CEO.

[12] Acushnet's reliance on negative comments purportedly made by Phil Mickelson, in documents
Acushnet has chosen to make public for the first time after the trial, is surprising given that
Acushnet's own witness testified that, if Acushnet did not come up with a ball that competed
with the Rule 35, Phil Mickelson was leaving, (Bellis Trial Tr. 301:21-25) and that Acushnet
only launched its Pro V1 *after* analyzing Callaway Golf's Rule 35 and then adjusting the Pro
V1's construction. [Morgan Trial Tr. 433:11-434:6.]

# REDACTED

### 4.  Acushnet's Argument that Callaway Golf is Relying Upon Pre-Acquisition Harm is Incorrect

Acushnet's criticism of Callaway Golf's discussion of the market in 2000-2001 misses the point. [Opp. at 20.] That discussion illustrated what would likely happen if Acushnet were enjoined. No better way exists to establish how an injunction against infringement would impact the market than by looking at what *did* happen when Acushnet was not using infringing technology to compete. The results are plain. In 2000-2001, Callaway Golf was the company with the best technology and it enjoyed substantial market buzz and increased market penetration and share as a result. [D.I. 412 (Mtn. for Injunction) at 27-30.] But the progress made by Callaway Golf in 2000-2001 was then halted, and continues to be stymied now, by Acushnet's infringement. [*Id.*] The reduced market share and penetration cannot and will not be fully compensated by monetary damages and Acushnet cannot show otherwise.[13] [*Id.*]

Nor did Callaway Golf argue, as Acushnet suggests, that all of the harm was done in the 2000-2001 timeframe. The harm is on-going and pervasive. Callaway Golf repeatedly emphasized the unfair advantage that Acushnet enjoys against Callaway Golf's *current* premium ball offerings because of its infringement. [D.I. 412, at 25-37.] Notably, Acushnet has no response to this on-going harm.

Moreover, Acushnet's complaint that Callaway Golf cannot show it would have immediately vaulted into the leadership position absent Acushnet's infringement is irrelevant. Callaway Golf is the number two premium golf ball manufacturer behind Acushnet. [*See e.g.,* PX 1175 at AB 118086-90.] Thus, if the Pro V1 were enjoined, Callaway Golf would sell more

---

[13]

balls. Callaway Golf reasonably believes that, but for Acushnet's infringement, it would therefore be the number one manufacturer of premium balls – with all the collateral market benefits the market leader enjoys – and Acushnet has no evidence to suggest otherwise. But even if Callaway Golf were incorrect and some other manufacturer who is presently a distant third (or worse) would inexplicably vault to the top instead, that still does not negate the harm that Callaway Golf experiences as a result of Acushnet's infringement.

Finally, the cases that Acushnet relies on to show the absence of irreparable harm are inapposite. First, *Minco, Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996), which Acushnet relies on for the proposition that "infringement . . . harms only the owner of the patent at the time of the infringing acts," has nothing to do with permanent injunctions. [Opp. at 21.] Rather, *Minco* focused on whether a later assignee could sue for past damages; the Court ultimately determined that, because all rights had been transferred to the assignee, it could. The quote Acushnet plucks makes perfect sense when viewed in the facts of that case – a third party having nothing to do with the patent cannot sue for past damages. That has nothing to do with permanent injunctions, and in any event as the *Minco* court itself recognized is very different from a party (like Callaway Golf) that **does** have the right to sue for past damages.

Acushnet's reliance on *Voda* is no better, as there again the facts are very different. In *Voda v. Cordis Corp.*, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006), Dr. Voda argued that Cordis should be enjoined because his licensee, Scimed, who had chosen not to be a party to the suit, was being harmed by Cordis's infringement. Dr. Voda made no showing that he was being harmed, and the Court held that Dr. Voda could not rely on harm to non-party Scimed. This has nothing to do our case. There is no absent licensee here; there are no licensees, period. And Callaway Golf is not relying on harm to some third party (absent or otherwise) to justify its

14

injunction request. Callaway Golf has instead demonstrated its own direct and irreparable harm, not the least of which is that its primary competitor is using Callaway Golf's own technology to compete head-to-head in the marketplace against it.

### D. Acushnet's Alleged Constitutional Considerations do not Warrant Denial of the Injunction

Acushnet says that if an injunction is entered now, it "might" be precluded from its right to a jury trial regarding certain factual issues. [Opp. at 19.] Specifically, Acushnet speculates that if injunctive relief is entered, it will somehow be denied a jury trial regarding facts related to the damages and willfulness portions of the case. The argument is speculative. While the Court bifurcated damages, Acushnet will still have the opportunity to argue all factual issues related to damages before a jury. Acushnet has not cited any cases suggesting that an injunction cannot be entered because the damages (or willfulness) portion of a case has been bifurcated, and Callaway Golf has not argued that Acushnet is not entitled to a jury trial on damages. Callaway Golf *wants* a jury trial on damages, as soon as it can get one.[14] Moreover, it would undoubtedly come as a surprise to the many courts who routinely bifurcate damages and/or willfulness that doing so violates the Constitutional right to trial by jury.

### E. Monetary Damages Would be Inadequate to Compensate for the Harm Callaway Golf Continues to Suffer

Other than to say that monetary damages are adequate (which they are not), and that Callaway Golf argues for a categorical rule that a patentee's statutory right to exclude can never be fully compensated with a cash award (which Callaway Golf does not argue for), Acushnet

---

[14] The *Shum v. Intel Corp.* case that Acushnet cites is not applicable, because the Court in that case concluded Shum was denied his right to a jury trial when the trial court conducted a bench trial regarding inventorship issues that were factually intertwined with his companion state law fraud claims, which depended on Shum's alleged status as an inventor. 499 F.3d 1272, 1277-78 (Fed. Cir. 2007).

# REDACTED

presents little if any challenge to the reality that monetary damages are inadequate in this case. [Opp. at 33.] As to the two arguments that it does raise, first, Callaway Golf provided ample evidence and case law to support the notion that monetary damages are inadequate here, including the fact that Acushnet and Callaway Golf are head-to-head competitors in the exact field of the patented technology. *See Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007) (holding that when the patentee and the infringer are head-to-head competitors, the patentee enjoys "a right, granted by Congress, not to assist its rival with the use of [the patentee's] proprietary technology."); *see also, e.g.,* D.I. 412 (Mtn. for Injunction), at 24.

Acushnet also argues that "the historic injunctive process was designed to deter, not punish." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975). [Opp. at 11.] Callaway Golf agrees. But the facts of this case, including Acushnet's ongoing improper behavior, show that an injunction is essential to deter Acushnet. Acushnet has admittedly infringed the patents for seven years, so clearly nothing short of an injunction is going to deter ongoing and future infringement. Being forced to stop infringing another's intellectual property rights after trial is not a form of "extra damages," (Opp. at 11), it is the only way to ensure that the patentee enjoys its statutory right to exclude.

## F.    The Balance of Equities, Hardships and Public Interest in No Way Supports Acushnet

Under the rubric of balancing equities, hardships and public interest, Acushnet raises a number of arguments that have been previously addressed by Callaway Golf. First, Acushnet argues that it is not a willful infringer and that it did not copy Sullivan's inventions. Callaway Golf disagrees with many of Acushnet's assertions regarding the nature of its actions,[15] but has

---

15

# REDACTED

not, in any event, relied upon the willful and reckless nature of Acushnet's infringement as a basis for seeking injunctive relief. Thus, Acushnet's arguments are irrelevant.

Next, Acushnet argues that the patents-in-suit are of suspect validity because they have been the subject of adverse interim administrative decisions by the PTO. Callaway Golf has explained, multiple times, that the PTO simply views the claims in the broadest manner and makes no effort to conduct a balanced and proper assessment either of the scope of the patent claims or of all the evidence that bears on their validity. The PTO's assessment, therefore, has no bearing at all upon the claims as properly construed by the Court and does not undermine either the Court's substantive decisions or the verdicts of the jury.[16] In fact, to the extent Acushnet's unlawful instigation of the reexaminations is relevant at all, it directly undercuts any suggestion that Acushnet is entitled to the benefit of the Court's discretion regarding the scope and timing of any injunctive relief.

---

[16] Acushnet also cites *MercExchange v. e Bay, Inc.*, 500 F.Supp.2d 556 (E.D.Va 2007) for the proposition that a court should take into account the suspect nature of a patent's validity. Here, of course, no such suspect validity exists for the reasons previously noted regarding the flaws in the PTO's assessments and the ample support for the jury's eight verdicts rejecting Acushnet's validity attacks. [D.I. 455, at 2-29.] Moreover, the court in *MercExchange* considered a wide range of factors before exercising its discretion to deny injunctive relief, including evidence that:

> MercExchange has often acted with an eye toward litigation, and emails and other evidence suggest that MercExchange may have attempted to generate evidence of irreparable harm in order to advance its litigation position.

*Id.* at 589.

Acushnet also argues that the jury's verdict invalidating claim 5 of the '293 patent supports denial of injunctive relief. But Acushnet's arguments regarding the nature of the jury's verdict are without merit for the reasons previously explained by Callaway Golf (D.I. 455, at 36-50) and, thus, are irrelevant to the injunction requested by Callaway Golf.

Lastly, Acushnet points to the inconvenience of having to "modify its normal cycle of new product introductions" (Opp. at 37), yet provides no evidence of any truly significant harm, much less any irreparable harm.

### G.     Callaway Golf's Proposed Injunction is Appropriately Tailored to Prevent Further Harm

Callaway Golf's proposed injunction is properly focused upon the infringing golf balls and incorporates standard language used to enjoin adjudicated infringers from further acts of patent infringement. Acushnet complains that the injunction names the product being enjoined, but specifically identifying the products being enjoined is standard, and indeed arguably required, for injunctions in patent infringement cases. Nothing would prohibit Acushnet from marketing a truly different ball under the Pro V1 name as long as it does not incorporate the patented inventions or any colorable variation. Because, of course, customers could be confused whether the allegedly "new" Pro V1 infringes or not, Acushnet may want to choose a different name.

Similarly, the requirement to notify others of the existence of the injunction is also a common element of injunctions – particularly those involving consumer products – to ensure the marketplace is on notice of the Court's determination. Absent notice, such third-parties might otherwise have a ready-made defense to any effort to actually enforce the injunction.

18

# REDACTED

Finally, Callaway Golf's proposed injunction already provides reasonable flexibility by allowing professional golfers to play the Pro V1 through the end of the 2008 calendar year[17] and by allowing distributors and retailers of Acushnet's products to dispose of remaining Pro V1 inventory that they possess as of the date the injunction order is issued.

### H.    It Would be Unfair to Delay Any Injunction Either to Allow a Transition Period or to Await the Outcome of an Appeal and/or a Damages Trial

Acushnet does not believe there should be any consequences for knowingly infringing Callaway Golf's patents.

In other words, Acushnet does not believe its admission of infringement and the jury's verdict of validity should have any effect whatsoever on its operations.

Acushnet has already had a 7-year "transition period" to create and build-up an inventory of non-infringing alternative golf balls.

---

[17]  The fact that Callaway Golf allows for an extremely limited exception for the unique concerns of professional golfers who are contracted to play Acushnet's equipment through the end of the calendar year in no way suggests that Acushnet should be allowed to continue to mass-produce the infringing golf balls for the general public.

**REDACTED**

[*Id.*] In part because it knew that Spalding in 2002 was suffering serious financial difficulties, however, and thus could not enforce its patents, Acushnet made the same decision then as it made after the jury's verdict three months ago – to conduct "business as usual" and proceed with its infringing activities. The time for Acushnet to take "a few weeks" to design around has long since passed.

The three patent cases Acushnet cites regarding its request for a transition period are readily distinguishable.[18] All concern medical-devices for humans, where *innocent third parties* needed time to transition and, therefore, the public interest warranted such a period. By contrast, Acushnet's transition request is based on its own business convenience and is entitled to no consideration. And even in these medical device cases, where public health is a real issue, the transition periods granted are much more limited than the lengthy period Acushnet requests to continue selling its infringing golf balls. Obviously there are no public health concerns with golf balls and Callaway Golf and others in the market can amply supply the market with alternatives.

---

[18] *See e.g., Arthrocare Corp., v. Smith & Nephew, Inc.,* 315 F.Supp. 2d 615, 622 (D. Del. 2004) (denying stay, rejecting Defendant's request for a 6-12 month transition period because the infringer could have used time after verdict to transition to selling non-infringing alternative, and allowing a 3-month transition period so that surgeons could learn how to use the non-infringing alternatives); *Moxness Prods., Inc., v. Xomed, Inc.,* No. 86-100-CIV-J-14, 1998 U.S. Dist. LEXIS 16060, at *13-16 (M.D. Fla. May 10, 1998) (denying motion for stay to the injunction and allowing a 4-month transition period so that hospitals could transition to non-infringing ear-ventilation tubes and to prevent a short-term decrease in supply); *Shiley, Inc. v. Bentley Labs., Inc.,* 601 F.Supp. 964, 971 (C.D. Cal. 1985) (denying stay for bubble blood oxygenators employed during open heart surgery and granting 6-month transition period to train hospitals that previously used the infringing device).

# REDACTED

[D.I. 412 (Mtn. for Injunction) at 42-43.]  This Court, when faced with a similar request for a

transition period relating to a product that was not healthcare related, denied the request and

ordered the defendant to contact its major retailers and try and recover its infringing products.

*Fisher-Price, Inc. v. Safety 1st, Inc.,* 279 F.Supp.2d 526, 529-530 (D. Del. 2003) (denying

request for transition period when product involved was an infant seat and requiring infringer to

recover infringing inventory from its retailers).  Callaway Golf already has been more generous

in this regard than needed, by agreeing in its proposed order to let Acushnet's retailers sell off

their infringing inventory.


Presumably the personnel and machines that are currently dedicated to

producing Acushnet's infringing golf balls could be transitioned to the production of its alleged

non-infringing alternative.

Acushnet's decision to knowingly infringe patents of a direct competitor for seven years

rather than switch to a                                non-infringing substitute understandably

raises concerns regarding whether, or if, Acushnet will ever willingly switch to a new golf ball

construction – or, if it attempts to do so, whether the alleged design-around will in fact avoid

infringement.[19]

---

[19] The court in *Smith & Nephew v. Synthes*, 466 F.Supp.2d 978, 984 (W.D. Tenn. 2006),
recognized similar concerns in granting a permanent injunction against the infringer, Synthes:
    Even if Synthes were to terminate its sales of the infringing products voluntarily, it would be
    free to return to its offending conduct, thereby further imposing monetary and intangible
    losses on Smith & Nephew.  It is "[t]he purpose of an injunction ... to prevent future
    violations." *Swift & Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587
    (1928).  Indeed, "the entire purpose of an injunction is to take away defendant's discretion
    not to obey the law." *Canadian Lumber*, 441 F.Supp.2d 1259, 1266-67.

**REDACTED**

Finally, if Acushnet gets its way (a stay or 15-month transition period), it will have created the perfect roadmap for all future infringers. Granting a stay or transition period in this situation would send the message to every patent infringer that it is wiser to continue infringement and not seek out or implement non-infringing alternatives because doing so can be later used to delay the entry of an injunction or avoid it altogether.

## II.    CONCLUSION

Callaway Golf has proposed a fair and just order that is designed to minimize impact on third parties, but that does not mean that Acushnet should be granted a further transition period, when it has already had over 7 years to do the right thing. Callaway Golf, therefore, respectfully requests the prompt entry of a permanent injunction against Acushnet's continued infringement of the patents-in-suit.

Dated:  March 14, 2008                    FISH & RICHARDSON P.C.


                                          By:   */s/ Thomas L. Halkowski*
                                               Thomas L. Halkowski (#4099)
                                               919 N. Market Street, Suite 1100
                                               P.O. Box 1114
                                               Wilmington, DE 19899-1114
                                               Tel:  (302) 652-5070
                                               Fax:  (302) 652-0607

                                               Frank E. Scherkenbach
                                               225 Franklin Street
                                               Boston, MA 02110-2804
                                               Tel:  (617) 542-5070
                                               Fax:  (617) 542-8906

                                               Roger A. Denning
                                               12390 El Camino Real
                                               San Diego, CA 92130
                                               Tel: (858) 678-5070
                                               Fax:  (858) 678-5099

                                          **ATTORNEYS FOR PLAINTIFF
                                          CALLAWAY GOLF COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2008, the attached document was electronically filed with the

Clerk of Court  using CM/ECF which will send electronic notification to the registered attorney(s) of

record that the document has been filed and is available for viewing and downloading.

I hereby certify that on March 14, 2008, I have Electronically Mailed the document to the

following person(s):

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Alan M. Grimaldi, Esq.                      Attorneys for Defendant
Joseph P. Lavelle                           ACUSHNET COMPANY
Brian Rosenthal
Clint Brannon
Kenneth Donnolly
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
grimaldia@howrey.com
lavellej@howrey.com
rosenthalB@howrey.com
brannonC@howrey.com
donnellyk@howrey.com


                                            /s/ Thomas L. Halkowski_____
                                            Thomas L. Halkowski