# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,                )
                                      )
                Plaintiff,        )    C.A. No. 06-91 (SLR)
                                      )
      v.                              )
                                      )    **JURY TRIAL DEMANDED**
ACUSHNET COMPANY,                     )
                                      )
                Defendant.        )

## ACUSHNET'S REPLY BRIEF IN SUPPORT OF ITS MOTION UNDER RULE 50(B) FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE  MOTION FOR NEW TRIAL UNDER RULE 59

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Mark L. Whitaker
Brian A. Rosenthal
Nicholas J. Little
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 783-0800

Dated:  March 24, 2008
856872 / 30030

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................1

II.   THE COURT SHOULD GRANT JUDGMENT THAT THE ASSERTED
      CLAIMS ARE INVALID AS A MATTER OF LAW .......................................2

      A.    The Evidence Establishes that the Claims at Issue are *Prima Facie*
            Obvious as a Matter of Law...................................................................2

            1.    Proudfit in Combination with Molitor '751 ................................3

            2.    Proudfit in Combination with Wu................................................6

            3.    Wilson UTB in Combination with Wu or Molitor '751 ..............7

            4.    The Testimony of the Pro V1 Creators Is Irrelevant....................7

      B.    The Evidence of Secondary Considerations Does Not, as a Matter of Law,
            Outweigh the Clear Showing of Obviousness .........................................8

            1.    The Weight to be Given to Secondary Considerations is a Question
                  of Law, Not Fact .......................................................................8

            2.    Here, the Secondary Considerations Cannot as a Matter of Law
                  Outweigh the Strong Showing of Obviousness ..........................11

III.  AT A MINIMUM, A NEW TRIAL IS WARRANTED ...................................13

      A.    Callaway Cannot Reconcile the Jury's Findings ...................................13

      B.    Callaway's "Waiver" and "Verdict" Arguments Lack Merit .................15

            1.    Acushnet Is Not Precluded To Challenge The Verdict
                  Inconsistency By Any Failure To Object Beforehand................16

            2.    Acushnet Is Not Precluded To Challenge The Verdict
                  Inconsistency By Any Failure To Object At The Verdict ..........17

            3.    The Jury Verdict Was Rendered Under Rule 49(a) ...................19

            4.    Waiver Would Not Apply Here In Any Case ............................21

      C.    The Jury's Answers Are Against The Great Weight Evidence ...............22

      D.    The Evidentiary Issues Call For A New Trial .......................................23

            1.    The Test Balls Should Have Been Admitted .............................23

2.      Hebert Testimony / Related Evidence Was Improper ................................23

3.      The *Ex Parte Sullivan* Decision Warranted Admission.............................24

IV.    CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Andersons-Black Rock, Inc. v. Pavement Salvage Co.*,
   396 U.S. 57 (1969).............................................................................................11

*Andrasko v. Chamberlain Manufacturing Corp.*,
   608 F.2d 944 (3d Cir. 1979)............................................................................20

*Brokerage Concepts, Inc. v. United States Healthcare, Inc.*,
   140 F.3d 494 (3d Cir. 1998).......................................................................19, 21

*Care v. Reading Hospital*,
   448 F. Supp. 2d 657 (E.D. Pa. 2006) ...............................................................15

*Connell v. Sears, Roebuck & Co.*,
   722 F.2d 1542 (Fed. Cir. 1983)........................................................................20

*Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*,
   791 F.2d 1416 (10th Cir. 1986) .......................................................................22

*Dystar Textilfarben, GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006).....................................................................5, 10

*Figg v. Schroeder*,
   312 F.3d 625 (4th Cir. 2002) ...........................................................................17

*Fineman v. Armstrong World Industrial, Inc.*,
   980 F.2d 171 (3d Cir. 1992).............................................................................23

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966)...........................................................................................9, 11

*Halprin v. Mora*,
   231 F.2d 197 (3d Cir. 1956).............................................................................17

*Henry v. Mississippi*,
   379 U.S. 443 (1965)..........................................................................................22

*Jacobs v. City of Phila.*,
   No. Civ. 03-cv-950, 2005 WL 1899499 (E.D. Pa. Aug. 8, 2005) ...........................15

*Jarvis v. Ford Motor Co.*,
   283 F.3d 33 (2d Cir. 2002)..........................................................................18, 21

*KSR International Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007).............................................................................................2

*Kissell v. Westinghouse Electric Corp.,*
    367 F.2d 375 (1st Cir. 1966)......................................................................... 20-21

*L & W, Inc. v. Shertech, Inc.,*
    471 F.3d 1311 (Fed. Cir. 2006)......................................................................18, 21

*Loughman v. Consolidated-Pennsylvania Coal Co.,*
    6 F.3d 88 (3d Cir. 1993)...............................................................................16, 19

*Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.,*
    734 F.2d 133 (3d Cir. 1984).................................................................14, 17, 18, 19

*Marra v. Philadelphia Housing Authority,*
    404 F. Supp. 2d 839 (E.D. Pa. 2005), *aff'd by* 497 F.3d 286 (3d Cir. 2007) ...........................5

*Mason v. Ford Motor Co.,*
    307 F.3d 1271 (11th Cir. 2002) .....................................................................18

*Mercer v. Long Manufacturing N.C., Inc.,*
    671 F.2d 946 (5th Cir. 1982) ........................................................................17

*Monarch Knitting Machine Corp. v. Sulzer Morat GmbH,*
    139 F.3d 877 (Fed. Cir. 1998).......................................................................13

*Montgomery County v. Microvote Corp.,*
    320 F.3d 440 (3d Cir. 2003)..........................................................................15

*Mosley v. Wilson,*
    102 F.3d 85 (3d Cir. 1996)..................................................................14, 15, 19

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
    243 F.3d 1316 (Fed. Cir. 2001)...................................................................15, 16

*Newell Cos., Inc. v. Kenney Manufacturing Co.,*
    864 F.2d 757 (Fed. Cir. 1988)......................................................................9, 10

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991)........................................................................2

*Paladino v. Philadelphia Housing Authority,*
    65 F. App'x 385 (3d Cir. 2003) ......................................................................5

*Pennsylvania Environmental Defense Foundation v. Canon-McMillan School District,*
    152 F.3d 228 (3d Cir. 1998)..............................................................................22

*Quaker City Gear Works, Inc. v. Skil Corp.,*
    747 F.2d 1446 (Fed. Cir. 1984)..........................................................................20

*Richardson-Vicks Inc. v. Upjohn Co.,*
    122 F.3d 1476 (Fed. Cir. 1997)..........................................................................10

*Riley v. K Mart Corp.,*
    864 F.2d 1049 (3d Cir. 1988)..............................................................................14

*Ryko Manufacturing Co. v. Nu-Star, Inc.,*
    950 F.2d 714 (Fed. Cir. 1991)..........................................................................9, 10

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,*
    225 F.3d 1349 (Fed. Cir. 2000)..........................................................................10

*Simmons v. City of Philadelphia,*
    947 F.2d 1042 (3d Cir. 1991)..........................................................................17, 20

*Simone v. Golden Nugget Hotel & Casino,*
    844 F.2d 1031 (3d Cir. 1988)..............................................................................20

*Syntex (U.S.A.) LLC v. Apotex, Inc.,*
    407 F.3d 1371 (Fed. Cir. 2005)............................................................................6

*United States Football League v. NFL,*
    644 F. Supp. 1040 (S.D.N.Y. 1986)....................................................................22

*Upjohn Co. v. Mova Pharm. Corp.,* 225 F.3d 1306 (Fed. Cir. 2000)..............................2

*Weeks v. Angelone,*
    528 U.S. 225 (2000)..........................................................................................15

*White v. Celotex Corp.,*
    878 F.2d 144 (4th Cir. 1989) ..............................................................................22

## STATUTES

Fed. R. Civ. P. 49(a) .......................................................................................... *passim*

Fed. R. Civ. P. 49(b) ....................................................................................17, 18, 19

Fed. R. Evid. 105 ....................................................................................................24

**MISCELLANEOUS**

9B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2506 (3d ed. 2008) ........................................................................................................................................21

12 Moore's *Federal Practice* §59.13[2][f][ii][A] (3d ed. 2000) ....................................................15

## I.    INTRODUCTION

Acushnet has demonstrated that no reasonable juror could find the claims at issue are valid, and thus judgment as a matter of law should be granted. The Proudfit patent undisputedly discloses all of the elements of the asserted claims except the use of a polyurethane as the outer cover. Molitor '751 explicitly teaches to use a polyurethane cover on a ball like Proudfit's, and to adjust the "on the ball" hardness of the cover to be in the range of 72 to 76 Shore C, which correlates to a Shore D hardness well under 64. Thus, Acushnet has demonstrated a clear *prima facie* case of obviousness from the explicit teaching of the prior art.

The secondary considerations in this case, even if assumed proven, cannot as a matter of law alter the clear showing of obviousness. The Court decides *de novo* how much weight to give to these secondary considerations in making its legal determination. Here, they do not outweigh the explicit teaching of the prior art. When the prior art is so close to the invention in suit, secondary considerations cannot save the claims at issue from invalidity.

Alternatively, Acushnet has demonstrated that a new trial is warranted. The verdict is irreconcilably inconsistent. Callaway argues that Acushnet waived its right to object to this verdict. The Third Circuit has unambiguously held that where inconsistent special verdicts are rendered, as here, no waiver applies. Even if the verdicts are considered general verdicts, there is no controlling case law that imposes such a waiver rule. The purpose behind such a rule is satisfied here in any event, since the Court was made aware of the inconsistency before the jury was dismissed. Regardless of how the verdicts are characterized, they are fundamentally inconsistent as opposed to merely apparently so, and it would be plain error to let them stand.

Callaway also fails to address many of the other bases for a new trial that Acushnet raised in its motion. The improper exclusion of key evidence, including prior art testing, evidence of the Patent Office's determination regarding motivation to combine key references, and other

rulings, materially prejudiced Acushnet, warranting a new trial.

## II. THE COURT SHOULD GRANT JUDGMENT THAT THE ASSERTED CLAIMS ARE INVALID AS A MATTER OF LAW

### A. The Evidence Establishes that the Claims at Issue are *Prima Facie* Obvious as a Matter of Law

Beyond its conclusory rhetoric, Callaway identifies only two sources of "evidence" regarding *prima facie* obviousness that it argues support the jury's eight-of-nine claims validity verdict. First, Callaway identifies Dr. Risen's opinion that he thought the patents were valid. D.I. 455 at 9. However, Dr. Risen's testimony that the patents are not obvious is a legal conclusion, not factual evidence. "The ultimate judgment of obviousness is a legal determination." *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1745 (2007). An expert's *ipse dixit,* unsupported by underlying facts in the record that provide a basis for the expert opinion, is not sufficient to support a jury verdict. *Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion."); *see also Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) ("An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all."). Dr. Risen's testimony that the patents-in-suit are not obvious is not enough to sustain the jury's verdict on the eight claims at issue.

Second, Callaway claims that there was no evidence that a "combination ball" based on the prior art would meet all of the claim limitations. D.I. 455 at 9-11. Callaway is incorrect. Acushnet proved that the prior art explicitly teaches the combination of claim elements in the claims at issue. Specifically, the Proudfit patent undisputedly teaches each element of the claims but polyurethane. The Molitor '751 and Wu patents explicitly suggest using polyurethane in place of the cover of a ball like Proudfit's. Moreover the references teach, as shown below, that the resulting "on the ball" Shore D hardness would be within the claimed range.

2

### 1.    Proudfit in Combination with Molitor '751

Callaway does not dispute that Proudfit discloses every element of the asserted claims

except the use of a polyurethane cover with a Shore D hardness of less than 64. D.I. 455 at 11.

Similarly, Callaway does not dispute that the Molitor '751 patent <u>explicitly teaches</u> putting its

polyurethane/ionomer cover on a three piece ball such as that disclosed in Proudfit. *Id.* at 9-13.

Nor did Dr. Risen dispute these facts at trial.

Thus, Callaway is left with a <u>single</u> argument with respect to the Proudfit / Molitor '751

combination. Callaway argues that Molitor '751 does not disclose that the polyurethane cover of

the three-piece ball taught therein would have a Shore D hardness of less than 64, as measured

on the ball. *Id.* at 12-14. Callaway's argument is based on two incorrect premises. First,

Callaway incorrectly argues that Molitor '751 does not disclose what the hardness of the

polyurethane cover would be on a three-piece ball, and instead only discloses what the hardness

would be on a two-piece ball. *Id.* at 12. Callaway ignores the language of Molitor '751. Molitor

'751 teaches that the golf ball designer should ***adjust the hardness of the outer cover*** to ensure

that the hardness of the finished ball falls within the range of 72-76 on the Shore C scale, as

measured on the ball. Specifically, Molitor '751 states: "The primary components of the blended

cover are ***set at a weight ratio so as to result in a cover after molding*** having a shore C hardness

within the range of 70 to 85, preferably 72 to 76." Molitor '751, col. 2:46-49 (emphasis added).

This passage, fairly read, does not teach that Molitor's cover happened to measure at 72-76 on a

two-piece ball. Instead, it teaches that whatever substrate the cover is molded on, the designer

should ensure that the ***resulting*** hardness is between 72 and 76 on the Shore C scale.[1]

Callaway argues that the materials under the cover affect its hardness, and thus a person

---

[1] Dr. Risen conceded that this passage of Molitor '751 referred to Shore C properties of the cover
as measured on the ball. Tr. at 1220:13-1221:8. The Molitor '751 patent states on its face that
the cover disclosed there can be used on either a two- or three-piece ball. DX-11, col. 3:7-12.

of ordinary skill would not be able to predict the hardness of Molitor's cover on a three-piece

ball. This argument is misplaced. D.I. 455 at 12. A skilled artisan would not have to predict the

"on the ball" hardness at all; instead, Molitor teaches to adjust the outer cover hardness to make

sure it falls within the preferred range. Molitor explains that the outer cover hardness is key to

his invention. DX-11, Molitor '751, col. 2:23-25 ("Such covers must have an appropriate

hardness to permit the accomplished golfer to impart proper spin."); 3:13-16 ("The increased

spin that can be applied during a proper hit to balls having the cover of the invention is believed

to be due primarily to the softness of the blended cover material."); Tr. at 596:16-598:4.

Callaway's second flawed premise is that Molitor 751's disclosure of a target Shore C

hardness does not teach a target Shore D hardness. Callaway's brief merely argues that it is

improper (or impossible) to "convert" a Shore C measurement to a Shore D measurement. D.I.

455 at 13-14. Indeed, this no-conversion admonition is the only "evidence" that Callaway

identifies as support for its argument. *Id.* Dr. Risen repeated the same line during his testimony.

Tr. at 1162:3-9. However, Callaway takes too narrow a view of the record.

While the evidence shows that no *exact, one to one conversion* formula existed to convert

Shore C measurements to Shore D measurements, the evidence also shows that one of ordinary

skill could determine, with more than adequate precision, that Shore C measurement of 72-76

was much less than a Shore D hardness of 64, which is all Acushnet needed to prove.

***Every single piece*** of evidence that actually compared Shore C and Shore D

measurements on the same material told exactly the same story: that a Shore D hardness would

be about 15 to 20 points less than a Shore C hardness measurement of the same material. Tr. at

599:18-604:22; 802:20-803:17; 1222:7-1233-8; DX-1, col. 3:53-54; PX-8 at CW0309061; PX-

804; DX-1108 table 27; DX-981. All the evidence, including the Rex Gauge comparison chart

Spalding used to get one of the patents allowed in the first place, showed that a Shore C measurement of 72-76 would be in the 50s on the Shore D scale, would be less than 60 D, and much less than 64 D. D.I. 417 at 3. There was no contrary evidence, and Callaway cites none.

In the face of the uncontroverted evidence that material with a Shore C hardness of 72 to 76 would certainly have a Shore D hardness of well less than 64, Callaway's claim that precise mathematical conversions are not possible is not sufficient to sustain a verdict in its favor. While the evidence did not show the exact Shore D value of Molitor's cover, no reasonable juror could have found that the less than 64 limitation was not met.[2]

Callaway argues that a person of ordinary skill would not expect success in combining Molitor '751 and Proudfit. D.I. 455 at 14. It argues that because Spalding stopped using the Molitor '751 material as the cover of the Tour Edition ball, an artisan would have ignored the explicit teaching of Molitor to use its polyurethane. *Id.* The Tour Edition ball that used the '751 patent was a tremendous success, winning the 1986 British Open shortly after it was introduced. Tr. at 957:17-959:3. It is hard to imagine that any designer would have been discouraged from following Molitor's explicit instructions given the Tour Edition apparent success. Moreover, if Callaway is arguing that Spalding's *internal* experience would somehow "teach away" from a Molitor '751 and Proudfit combination, then there is no support in the Molitor patent for such an argument. *Dystar Textilfarben, GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1364 (Fed. Cir. 2006) ("We will not read into a reference a teaching away from a process where no such language exists."). To the contrary, Molitor '751 instructs the reader to make the combination.

---

[2] The jury's uncontested verdict that claim 5 of the '293 patent is invalid also fatally undercuts Callaway's argument that the prior art did not teach a three-piece ball with a polyurethane cover whose Shore D hardness is less than 64. *See Paladino v. Phila. Housing Auth.*, 65 F. App'x 385, 387 (3d Cir. 2003) (uncontested verdict overturns contested, inconsistent second verdict by the same jury, holding that the "verdict regarding the individual defendants fatally undercuts the verdict finding the PHA liable."); *Marra v. Phila. Housing Auth.*, 404 F. Supp. 2d 839 (E.D. Pa. 2005), *aff'd by* 497 F.3d 286 (3d Cir. 2007) (same).

### 2. Proudfit in Combination with Wu

Like Molitor '751, Wu contains an explicit suggestion to use a polyurethane cover on a ball like that of Proudfit. Specifically, Wu teaches that polyurethane is a good replacement for balata covers, such as the cover used by Proudfit. DX-13 at col. 1:36-46. By 1995, the Wu polyurethane had been used on the most popular ball on the PGA Tour, the Titleist Professional. Tr. at 397:7-10; 465:19-25. Thus, in 1995, there can be no plausible argument that one would be dissuaded from using polyurethane in a golf ball construction, as taught by Molitor '751 or Wu.

Callaway's only argument with respect to Wu is that it contains no explicit teaching of the hardness of the material Wu discloses. The Wu polyurethane has an "off the ball" Shore D hardness of 48-50. *Id.* at 493:23-494:3. Callaway does not dispute this. D.I. 455 at 16. Instead, it argues without evidence that a person of skill would not know the "off the ball" hardness of the Wu polyurethane. The Wu patent, however, contains precise instructions of how to make the polyurethane. DX-13 at col. 3:62-7:4. These instructions were available in 1994, when the Wu patent issued. DX-13. Moreover, the ASTM D-2240 test contains precise instructions how to measure the plaque hardness of a material. PX-804. Thus, that the Wu polyurethane was a soft material, with a Shore D hardness between 48 and 50, was easily ascertainable by anyone skilled in the art in 1995. *See Syntex (U.S.A.) LLC v. Apotex, Inc.,* 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("What a reference teaches a person of ordinary skill is not … limited to what a reference specifically 'talks about' or what is specifically 'mentioned' or 'written' in the reference.").

Callaway offered no evidence at all to rebut Dr. Statz's testimony that a polyurethane like Wu's that has an "off the ball" Shore D hardness of 48-50 would have an "on the ball" Shore D hardness of less than 64 when used on a three-piece ball. Tr. at 618:12-23. Dr. Risen did not opine that the Wu polyurethane would, or even could, have a Shore D hardness greater than 64, when on the ball. Thus, the uncontested evidence demonstrates that the Wu polyurethane would

6

have met the claim limitations when used on a ball like Proudfit, which Wu suggests to do.

### 3.    Wilson UTB in Combination with Wu or Molitor '751

Molitor '751 explicitly teaches a person of ordinary skill to use its polyurethane as the cover of a three-piece ball, like the Wilson Ultra Tour Balata ("UTB"). DX-11, col. 3:7-12. The UTB was on sale before 1995 and had all of the properties of the asserted claims except a polyurethane outer cover. D.I. 417 at 15-16. Callaway's only argument with respect to the UTB is that an ordinary artisan would not have necessarily known that the inner cover of the ball was a blend of low-acid ionomers. D.I. 455 at 18-20. Callaway's lawyer argument is unsupported by any evidence, and is contradicted by the evidence at trial.

The UTB was in public use and on sale in 1993 and thus prior art under § 102(b). Several witnesses testified that people in the golf ball industry routinely test the properties of competitors' balls. Tr. at 341:12-342-14; 495:3-496:19; 795:19-796:11. These tests showed that the ball satisfies all of the elements of the asserted claims but the polyurethane outer cover. Tr. at 342:8-345:13; 496:22-503:1; DX-68; DX-1044; DX-1035; DX-1033; DX-1030. Hence, that the UTB had the claimed properties was readily available to any interested person of ordinary skill in 1995. Given this, it is not plausible for Callaway to argue that its physical properties would not have been known to a hypothetical person of ordinary skill in the golf industry.

### 4.    The Testimony of the Pro V1 Creators Is Irrelevant

Callaway twists and confuses the testimony of the Pro V1 creators to try to argue that they admitted the novelty of Sullivan's claims. D.I. 455 at 7-9. Callaway points to testimony by Dr. Morgan and Mr. Hebert that they thought their design of the "veneer concept" was new and worthy of a patent. *Id.* These witnesses plainly did not testify, to create a fact issue, that the "basic construction" of polyurethane on a three-piece ball was patentable. Instead, they testified that they believed in 1995 and 1996 that the specific ball they had created and described in a

7

different patent not at issue -- the Hebert patent -- was new. The Hebert ball, the evidence showed, used an ultra-thin urethane made by a casting process (such as the Wu polyurethane) in a three-piece or wound golf ball. Tr. at 392:13-20; 1092:6-1093:10. None of the Hebert inventors testified or intimated that the Sullivan patents were valid or patentable.

The testimony of Hebert and Morgan that they felt their ball was new is irrelevant to the question of validity of the patents-in-suit. The Hebert patent (PX-17) had a different specification and claims, a different prosecution history, and a different effective filing date. While the jury was not told any of this by Callaway, the fact remains that the Hebert patent was a different patent, and the inventors statements about it simply are not probative of whether the patents-in-suit are valid, even assuming that the witnesses had the expertise to offer such and opinion about the Sullivan patents, which they clearly did not. Nevertheless, Callaway improperly paints this testimony about the Hebert patent as an admission that three piece balls with polyurethane covers were somehow new or patentable in 1995.[3]

### B. The Evidence of Secondary Considerations Does Not, as a Matter of Law, Outweigh the Clear Showing of Obviousness

#### 1. The Weight to be Given to Secondary Considerations is a Question of Law, Not Fact

Callaway contends that the weight to be given to secondary considerations is a fact question. D.I. 455 at 20 n. 15. But Callaway provides no cases to support its conclusion. Instead, Callaway cites to cases holding that the question of obviousness, while a legal one, is based on underlying questions of fact. *Id.* It is of course true that factual questions underlie the

---

[3] Callaway's misuse of this testimony is precisely why Acushnet objected to this line of questioning about whether the Hebert inventors thought their invention was new. Tr. at 261:3-265:11; 400:7-17. There is too real a danger that Messrs. Morgan's and Hebert's statements on their own invention in 1995 (a very specific type of three-piece polyurethane construction ball) would be twisted to mean that the patents at issue are valid. Callaway's brief does exactly that.

legal question of obviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).

The Supreme Court in *John Deere* explained, however, that the weighing of objective indicia of

non-obviousness against the primary showing of obviousness is a **legal question**, not a factual

one:

> Cook Chemical insists, however, that the development of [the invention] eluded
> Calmar, who had long an unsuccessfully sought to solve the problem [and] that
> the long-felt need in the industry for a device such as Scoggin's together with its
> wide commercial success supports its patentability. These *legal inferences or
> subtests* do focus attention on economic and motivational rather than technical
> issues and are, therefore, more susceptible of judicial treatment than are the highly
> technical facts often present in patent litigation.... However, these factors do not,
> in the circumstances of this case, tip the scales of patentability.

*Id.* at 35-36 (emphasis added).

The Federal Circuit has also made clear that the weight to be given to secondary

considerations, once established, is a matter of law. This rule was explicitly stated in *Newell*,

which upheld the district court's reversal of a jury verdict of non-obviousness:

> [W]e have held that where the ultimate legal conclusion of obviousness is
> disputed, but not the underlying facts, there is no issue of fact requiring a trial,
> even though some facts favor obviousness, some nonobviousness. This is so even
> in a case where a jury is demanded, because **it is not the function of the jury** to
> pick and choose among *established facts* relating to obviousness in contrast to its
> obligation to sift through *conflicting evidence* and determine what those facts are.

*Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 763 (Fed. Cir. 1988) (citation omitted)

(italics in original, bold face added).

Another Federal Circuit case particularly on point is *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950

F.2d 714 (Fed. Cir. 1991). There, the court affirmed the grant of summary judgment of

obviousness. The court accepted as true the evidence of secondary considerations, and the nexus

between the commercial success and the patented invention. *Id.* at 719. Nonetheless, it held as a

matter of law that while "the secondary considerations weighed in favor of [the patentee]," they

"did not carry sufficient weight to override a determination of obviousness based on primary

considerations." *Id.* In doing so, it noted, "a court is entitled to weigh all the considerations, primary and secondary, and then render its decision." *Id. See also Dystar Textilfarben*, 464 F.3d at 1371 ("The presence of certain secondary considerations ... are **insufficient as a matter of law** to overcome ... that the evidence only supports a **legal conclusion** that claim 1 would have been obvious.") (emphasis added).

If Callaway were correct that the weighing of secondary considerations is a fact issue, it would be rare for a court to overturn a jury verdict of non-obviousness. But courts do not hesitate to overturn jury verdicts when they determine that secondary considerations (even if assumed proven) do not outweigh the clear showing of obviousness. *See, e.g., Newell*, 864 F.2d at 768; *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) (affirming this Court's reversal of jury verdict, holding "[t]he unexpected results and commercial success ..., although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter ... is obvious"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1359 (Fed. Cir. 2000) (reversing judgment on a jury verdict of non-obviousness, holding that "the mere existence of ... licenses is **insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art** that would have motivated one of ordinary skill in the art to modify [the prior art]") (emphasis added).

Since the weighing of the secondary considerations is a legal question, the jury's verdict on the eight claims at issue does not lead to an inference that these considerations outweigh the strong showing of obviousness in this case. As the Federal Circuit held in *Newell*:

> Newell argues that the trial court was required to consider the evidence in the light most favorable to Newell and to draw the "inference" of obviousness in Newell's favor. However, the requirement to draw favorable "inferences" relates only to *factual* inferences, not to legal conclusions based on an established set of facts, even though those facts do not all favor that conclusion.

864 F.2d at 767 (emphasis in original). Thus, the only inferences, if any, that can be drawn from

the verdicts on the claims at issue is that Callaway established the existence of the secondary

considerations it argued, but not that those secondary considerations outweigh the showing of

obviousness, since that weighing is a legal conclusion that the Court makes *de novo*.

### 2. Here, the Secondary Considerations Cannot as a Matter of Law Outweigh the Strong Showing of Obviousness

Even if all of Callaway's secondary evidence is credited, it cannot, as a matter of law,

outweigh the facts establishing obviousness in this case. As shown above, the obviousness of the

claims-in-suit is demonstrated by the explicit teachings of the prior art itself. When there is such

a clear case of *prima facie* obviousness from the plain text of the prior art, the mere existence of

secondary considerations cannot save an invalid patent. *See also Andersons-Black Rock, Inc. v.*

*Pavement Salvage Co.*, 396 U.S. 57, 63 (1969) ("Use of the radiant-heat burner in this important

field marked a successful venture. But as noted, more than that is needed for invention.").

Here Callaway wants the Court to ignore the explicit teachings of the prior art and instead

reason that if the invention was so obvious, someone would have made it before Mr. Sullivan

did. The Supreme Court was faced with the same argument that Callaway now makes in the

*John Deere* case, and found that such an argument fails in the face of an explicit teaching to

make the invention in the prior art. The Supreme Court stated, "It is also irrelevant that no one

apparently chose to avail himself of knowledge stored in the Patent Office and readily available

by the simple expedient of conducting a patent search – a prudent and nowadays common

preliminary to well organized research." *John Deere*, 383 U.S. at 36. Similarly, here, the fact

that no one in the golf ball industry apparently followed the explicit instructions of Molitor '751

to put its polyurethane cover on a three piece ball like that of Nesbitt or Proudfit is irrelevant.

That the teaching to do so existed in the art is enough to render the claims at issue obvious.

Callaway's arguments with respect to commercial success also do not save the claims.

11

Callaway spends great effort trying to prove what Acushnet has conceded since the beginning of this case: the Pro V1 was extremely successful. D.I. 455 at 21-22. But even assuming that this success was due in part to the patents-in-suit, that success does not answer whether these claims are obvious. The evidence showed that the Pro V1 was successful for many reasons unrelated to the patents-in-suit. The ball was the successor to the market-leading Titleist Professional, benefited from the industry-leading Titleist brand name, marketing capabilities, and the Titleist Pyramid of Influence, among many other reasons. *See* D.I. 417 at 20-24. Indeed, sales of the Callaway Rule 35 ball, which also used the patents, objectively paled in comparison to that of the Pro V1. D.I. 417 at 20-21. These undisputed facts greatly diminish the weight that should be given to the Pro V1's success in the overall determination of obviousness.

Callaway conspicuously does not address one of the most compelling objective indications proven in this case. Spalding, despite having what Callaway calls the "holy grail" of golf ball design (D.I. 455 at 23-24), never used it. Callaway argues that Mr. Sullivan conceived of the idea of the patents-in-suit in 1991. D.I. 455 at 24. Yet Spalding went about its business for 12 more years, never commercializing such a ball. Indeed, Spalding did not even consider making a three-piece polyurethane-covered ball until 2002, long after the industry had already released such balls. Tr. at 968:15-19. Common sense teaches that if Spalding had uncovered this "holy grail," it would have sold it. In weighing the secondary considerations against the strong obviousness case here, the Court should consider this objective, undisputed fact as well.

Callaway tries to downplay the fact that it stopped using the patents-in-suit itself in 2003 or 2004. D.I. 455 at 28. That Callaway purports to have good reasons for using different technology (for example, it feels that its new RIM injection process is better than the patents-in-suit) does not change the objective facts. Callaway is trying to convince the Court to find that

objective facts outweigh the explicit teachings of the prior art. But these facts show that Callaway used the patents, unsuccessfully, for only a few years before moving on to different technology, and that Spalding never used the patents. Given this, the Court should not disturb what the prior art mandates as the proper legal conclusion: that the patents-in-suit are obvious.

Finally, Callaway urges the Court to ignore the undisputed fact that four other companies (Acushnet, Callaway, Nike, Bridgestone) all independently introduced three-piece, polyurethane covered balls. D.I. 455 at 26-28. Callaway tries to argue that since Mr. Sullivan allegedly conceived of the patents-in-suit in 1991, later development of the same technology by others is irrelevant. *Id.* at 26. But the parties agreed that the relevant filing date is November or October 1995, and thus the fall of 1995 is the relevant time in which to determine obviousness. The undisputed evidence shows that Acushnet conceived of a Pro V1 type construction no later than April 28, 1995, *before* the effective filing date of the patents-in-suit. Tr. at 358:23-359:25; DX-830. Thus, this evidence is properly considered as contemporaneous invention of others. *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 883-84 (Fed. Cir. 1998). The fact that Callaway, Nike and Bridgestone also later developed similar balls with no knowledge of the patents-in-suit is still further evidence that the claims are not obvious.

## III.    AT A MINIMUM, A NEW TRIAL IS WARRANTED

Alternatively, Acushnet has shown that the Court should grant a new trial. *See* D.I. 417 at 29-49. Callaway does not answer substantively many of Acushnet's arguments for a new trial. It instead posits flawed, mostly procedural arguments, in an effort to resist a new trial. All of Callaway's arguments should be rejected.

### A.    Callaway Cannot Reconcile the Jury's Findings

There is no way to reconcile the jury's directly contradictory findings on obviousness. The claims are not patentably distinct, and were not tried that way. The "disputed" issue was the

13

novelty of polyurethane on a three-piece golf ball, and the "less than Shore D 64" hardness limitation found in the claims. The claims also shared the same commercial success evidence. Callaway's opening and closing treated the patents (and their alleged novelty) uniformly. Tr. at 161:8-17, 176:11-177:9, 194:8-25, 1338:23-1339:11, 1340:6-8, 1376:1-5. Hence, it is not surprising that Callaway makes no meaningful effort to reconcile what the jury did. It cannot.

Callaway argues that five of the eight upheld claims are "blend" claims and thus have an added limitation over the invalidated claim 5 of the '293 patent. This theory is not plausible. It is undisputed that the Proudfit patent, which was at the center of Acushnet's proofs, plainly contained a blend of ionomers in the inner cover. DX-10, Table 6. Thus, the jury could not have drawn a distinction between claims based on the blend limitation. In addition, three claims upheld by the jury were *not* blend claims. *See* Claim 4, '293 patent; claim 3, '873 patent; claim 5, '130 patent. The verdict on these claims is plainly inconsistent with claim 5 of the '293 patent. Thus, the verdict answers in no way indicate that the jury drew the distinction (blend v. non-blend) Callaway posits. Any effort to reconcile the verdict must be factually plausible and consistent with the evidence and theories at trial. D.I. 417 at 31. Callaway's argument is not.

The jury's answers are not only *apparently*, but *genuinely* inconsistent. The Court's judgment, which followed the verdict, is infected likewise. The "fundamental inconsistencies among answers ... fatally undermines the judgment entered and mandates a new trial." *Riley v. K Mart Corp.*, 864 F.2d 1049, 1054 (3d Cir. 1988). *See, e.g., Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (3d Cir. 1984) (new trial ordered as no evidence adduced could reasonably explain differing verdicts); *Mosley v. Wilson*, 102 F.3d 85, 90-91 (3d Cir. 1996) ("[W]hen faced with an *apparently* inconsistent verdict, [the court] can take several approaches. ... [But] if verdicts are *genuinely* inconsistent ... the appropriate remedy is ordinarily ... to order

an entirely new trial."); *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1325 (Fed. Cir. 2001) ("In the Third Circuit, an inconsistent verdict is grounds for ordering a new trial.").[4]

Callaway is thus also wrong to argue that the inconsistent verdicts may stand, if considered general verdicts, because they *might* represent jury compromise. D.I. 455 at 46-49. Each of the Third Circuit cases Callaway cites in support of its jury compromise argument holds only that *apparently* inconsistent general verdicts may in some circumstances stand, not that *genuinely* inconsistent verdicts can stand, citing *Mosley*. *Montgomery Co. v. Microvote Corp.*, 320 F.3d 440, 451 (3d Cir. 2003) (allowing "apparently inconsistent verdict" to stand); *Care v. Reading Hosp.*, 448 F. Supp. 2d 657, 663 (E.D. Pa. 2006) ("apparently inconsistent verdict"); *Jacobs v. City of Phila.*, 2005 WL 1899499 at *13, 16 (E.D. Pa. Aug. 8, 2005) (verdict sheet was "not facially inconsistent," but instead was an "apparently inconsistent verdict"). Since the verdicts in this case are genuinely inconsistent, rather than apparently inconsistent, they cannot stand.[5]

### B.    Callaway's "Waiver" and "Verdict" Arguments Lack Merit

Callaway spends nearly all of its briefing on new trial issues arguing that the Court must allow the verdict to stand, regardless of its fundamental inconsistency. These arguments lack

---

[4] *See also* 12 Moore's *Federal Practice* §59.13[2][f][ii][A] (3d ed. 2000) ("A general verdict that is facially inconsistent and reflects confusion … is substantial grounds for new trial. [A] general verdict that shows that the jury abused its power or otherwise conducted itself inappropriately must result in a new trial; appellate courts have held that a trial court's refusal to grant a new trial under these circumstances constitutes an abuse of discretion.").

[5] Callaway's jury compromise argument must also be rejected as mere speculation. The jury was directly instructed *not* to compromise their views for the sake of finality. *See* Tr. at 1409-10 ("But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that – your vote."). Callaway would suggest apparently that every member of the jury disregarded the Court's instruction "to reach unanimous agreement, but only if you can do so honestly and in good conscience." *Id.* at 1410. Moreover, juries are presumed to follow the Court's instructions and to have understood the Court's answer to any questions the jury poses. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

merit. Many are predicated on other circuit law or a mischaracterization of Third Circuit law.[6]

### 1.    Acushnet Is Not Precluded To Challenge The Verdict Inconsistency By Any Failure To Object Beforehand

Callaway argues first that Acushnet needed to object to the lack of a description of the relationship of dependent and independent claims in the verdict and the Court's instructions to preserve an objection to the later-to-come inconsistent verdict. This is wrong for several reasons.

First, as Callaway admits, there was no error in the instruction or the form of verdict. D.I. 455 at 40 n.38 ("Neither the jury instructions [n]or verdict form misstated the law."). Second, there is no contention here that an alleged error in the instructions or verdict form caused the inconsistent verdict. Callaway's featured case, from the Second Circuit, agrees that the inconsistent verdict must "trace[] to an alleged error in the jury instructions or verdict sheet" for its waiver rule to apply. D.I. 455 at 39. Third, Callaway's argument is not one well accepted in the Third Circuit in any event. *See Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 103 (3d Cir. 1993) ("To the extent that the defendants' argument is premised on failure to object to the instructions or interrogatories under [Rule] 51, we are unpersuaded. The question … is not whether there was error in the instruction or in the interrogatories, but the legal effect of the jury's answers, and, more specifically, whether the jury's answers can be reconciled.").

Callaway is also wrong that Acushnet "made no effort" to prevent the possibility of an inconsistent verdict. The immaterial, untried differences between the claims is exactly why Acushnet urged at the charging conference that the Court should *not* remove the phrase "although certain claims may fall or stand together based on the content of the prior art and the alleged point of novelty" from its draft jury instructions. Tr. at 1257, 58-59. The Court

---

[6] "The issue of inconsistent verdicts is a procedural issue [and] the Federal Circuit applies the law of the regional circuit, in this case, the Third Circuit, to the issue of inconsistent verdicts." *Mycogen Plant Sci., Inc.*, 243 F.3d at 1326.

sustained Callaway's request, however, and overruled Acushnet's objection. *Id.* at 1284:24-25. The Court thus instructed merely that every claim be considered separate from any other claims.

Callaway's argument also wrongly assumes that the jury had no explanation of independent and dependent claims. Yet Callaway gave such an explanation to the jury through examination of Dr. Statz. Tr. at 691-92; 698-99. Moreover, Callaway readily acknowledges that the joint proposed instructions included a dependent and independent claim discussion. D.I. 455 at 38 n.37. The Court ruled, at Callaway's own request, that the parties' submissions served to preserve all objections as to any elements of those instructions that the Court omitted from its draft instructions. Tr. at 1281:1-14. Hence, there was no pre-verdict waiver.

### 2.     Acushnet Is Not Precluded To Challenge The Verdict Inconsistency By Any Failure To Object At The Verdict

Callaway next argues that Acushnet waived the right to object to the inconsistent verdict by not objecting when the verdict was rendered. This argument fails in at least two respects.

First, the contemporaneous objection rule relied upon does not apply to *Rule 49(a) special verdicts*, such as the one in this case. In the Third Circuit, special verdicts, governed by Rule 49(a), carry no contemporaneous objection rule to preserve arguments. *See, e.g., Malley-Duff*, 734 F.2d at 144-45 (distinguishing verdicts under Rule 49(a) from verdicts under Rule 49(b) and holding that, in the case of a Rule 49(a), review is not precluded by the absence of objection before discharge); *Simmons v. City of Phila.*, 947 F.2d 1042, 1056-57 (3d Cir. 1991) (Becker, J., announcing the judgment) ("It is clear [that] to preserve the objection, it is not necessary in this circuit…, prior to the district court's dismissal of the jury, to lodge an inconsistency objection to special verdicts rendered under Rule 49(a)."). *See also Halprin v. Mora*, 231 F.2d 197, 201 (3d Cir. 1956); *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947-48 (5th Cir. 1982); *Figg v. Schroeder*, 312 F.3d 625, 643 (4th Cir. 2002).

Second, even if *arguendo*, the jury's verdict was not a Rule 49(a) verdict, Callaway's argument still fails. Callaway agrees that the verdict is *not* a Rule 49(b) verdict.[7] Callaway also acknowledges that there is no Third Circuit precedent for advancing any waiver rule to the case of multiple non-hybrid *general* verdicts, which are governed by neither Rule 49(a) nor Rule 49(b). D.I. 455 at 43. Callaway is left to argue, therefore, that although the Third Circuit clearly has rejected application of the contemporaneous objection rule under Rule 49(a), it would nonetheless readily recognize such a rule for all other forms of verdict. Callaway relies on non-Third Circuit authority and a host of Rule 49(b) verdict cases to press its point.

In support of its waiver rule, Callaway cites *Mason v. Ford Motor Co.,* 307 F.3d 1271 (11th Cir. 2002). *Mason,* in turn, relies on a footnote in a Second Circuit decision, *Jarvis v. Ford Motor Co.*, 283 F.3d 33 (2d Cir. 2002), which held only, far more narrowly, that a waiver occurred when Ford Motors sought to challenge a conflicted verdict *based on an erroneous instruction* to the jury, against which it had not lodged any objection. *Id.* at 57.

Callaway also cites two Federal Circuit case, decided under Sixth Circuit jurisprudence. One of them, *Bradford Company*, is an inapplicable Rule 49(b) case. The other, *L & W, Inc. v. Shertech, Inc.*, addressed a Rule 49(a) special verdict nearly identical to the verdict in this case. This case reasoned that the Sixth Circuit would apply a contemporaneous objection rule as equally to Rule 49(a) special verdicts as it had in the past to Rule 49(b) verdicts. *See* 471 F.3d 1311, 1319 (Fed. Cir. 2006). That, however, is just the opposite of what the Third Circuit has done when presented with the same issue. *See Malley-Duff*, 734 F.2d at 144-45.

---

[7] As Callaway agrees, the jury verdict was not a Rule 49(b) verdict because the Court did not submit a general verdict and special interrogatories coupled together. Fed. R. Civ. P. 49(b). All of the obviousness interrogatories were identical, and each addressed in scope the same issue. Hence, the parties at least agree that the verdict in this case is either of a form under Rule 49(a) (as Acushnet argues), or is under no rule at all (as Callaway contends).

Indeed, in the Third Circuit, it even remains an open question whether the objection rule would apply to any type of verdict. *See Loughman*, 6 F.3d at 104 n.15. Even assuming the Third Circuit adopted, for example, a Rule 49(b)-based waiver rule for Rule 49(b) verdicts, the Third Circuit has already indicated why such a rule does *not* extend to other verdict forms. *Malley-Duff* refused to adopt the contemporaneous-objection rule for Rule 49(a) verdicts for the simple reason that there was no mandate outside of Rule 49(b) verdicts that the judge actually return the jury for continued deliberation upon an inconsistency in its findings. 734 F.2d at 145 ("Rule 49(a) contains no provision similar to that contained in Rule 49(b) that the 'court shall return the jury for further consideration of its answers and verdict ....'"). Given this rationale, that the waiver rule some courts apply to Rule 49(b) is tied to the Rule's language and hence is inapplicable to Rule 49(a) verdicts, it seems inconceivable that the Third Circuit would apply any waiver to other types of verdicts in the absence of specific language in a rule requiring it.

The Third Circuit has emphasized "the need to preserve symmetry between the treatment of general and special verdicts," *Brokerage Concepts, Inc. v. U. S. Healthcare, Inc.*, 140 F.3d 494, 535 (3d Cir. 1998). The Third Circuit has held, for example in *Mosley*, that decisions under Rule 49(a) "illustrat[e] the procedure to be used" with respect to inconsistent general verdicts. 102 F.3d at 91. These statements suggest that the Third Circuit's refusal to apply the contemporaneous objection rule to Rule 49(a) special verdicts would apply equally to inconsistent "general" verdicts otherwise governed by no rule. Thus, the Court should reject Callaway's waiver and other "general verdict" contentions, regardless of the type of verdict.

### 3.    The Jury Verdict Was Rendered Under Rule 49(a)

In any case, Callaway's assertion that the verdict was a series of general verdicts is in error. Rather, the verdict is properly viewed as one under Rule 49(a). The jury returned no single or "multi-part" general verdict for either side, nor were they instructed in this way. In this

19

bifurcated trial, where damages and many other claim-related issues were not in issue, the jury's task was to make only particular findings on nine defenses on a single cause of action by Callaway (or at most four causes of action). The instructions simply stated: "The verdict form asks you a series of questions about Acushnet's obvious claims. Unless you are directed otherwise in the form of the verdict, you must answer all of the questions posed, and you must agree on each answer." The jury thus answered nine identical questions, referred to as a "list [of] interrogatories, or questions," (Tr. at 1391), each directed to whether Acushnet had proven by clear and convincing evidence its obviousness defenses claim-by-claim.

Callaway's position hinges on the minority view that Rule 49(a) fails to govern where the jury has been asked to "apply legal principles." In most circuits, including the Third Circuit, the fact that jury interrogatories intermingle issues of fact and law does not render the verdict a series of general verdicts, or otherwise outside the purview of a special verdict: "[I]n current practice under Rule 49(a), the special verdict . . . is typically used to divide the dispute into 'ultimate,' not actual, facts, with each 'ultimate fact' constituting, like the general verdict, its own impenetrable intermingling of law and fact." *Simmons*, 947 F.2d at 1057 (citation and internal quotations omitted).[8] *See id.* at 1057 ("We have held, implicitly, if not explicitly, that special verdicts under Rule 49(a) may, like the findings rendered by the jury in this case, constitute findings of fact that actually blend factual with legal conclusions.") (citing cases).

Callaway's position is not the law of the Federal Circuit nor most other circuits.[9]

_____

[8] *See, e.g., Andrasko v. Chamberlain Mfg. Corp.*, 608 F.2d 944, 945 (3d Cir. 1979) (treating verdict interrogatories on whether defendant breached its legal duties under Rule 49(a) and mandating new trial in view of irreconcilably nature of answers); *Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1033 (3d Cir. 1988) (employing special verdicts to divide dispute into ultimate findings, each of which actually requires a legal, as well as a factual, determination).

[9] *See, e.g., Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1453 (Fed. Cir. 1984) (citing *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1550 (Fed. Cir. 1983)); *Kissell v.*

Callaway also mischaracterizes the Third Circuit's *Brokerage Concepts* opinion, which actually

held that the verdict at issue was a Rule 49(a) verdict, not a "general one" (D.I. 455 at 40). *See*

140 F.3d at 534 n.32 ("case was submitted to the jury on special interrogatories and ... the jury

did not render a general verdict."). Callaway finds dicta in Federal Circuit decisions supporting

its position. D.I. 455 at 44. These cases do not apply Third Circuit law. Further, Federal Circuit

opinions supporting Acushnet are likewise obtainable. In a recent case cited by Callaway, the

Federal Court considered the waiver rule on a verdict form nearly identical to the form used in

this case. *See* Ex. 1 (copy of verdict form). It repeatedly referred to this verdict form as a

"special verdict." *L & W*, 471 F.3d 1311, 1314, 1318-19 (Fed. Cir. 2006). This determination

was a part of its core holding in the case when it then further decided that it had to consider

whether the Sixth Circuit would recognize the waiver rule under Rule 49(a) (a rule rejected by

the Third Circuit). Thus, Callaway's insistence that the jury rendered general verdicts is wrong.

### 4. Waiver Would Not Apply Here In Any Case

Even assuming that Callaway's waiver argument had legs in the Third Circuit, it would

remain inappropriate to apply that rule in this case, for at least two reasons. First, the purpose of

the contemporaneous-objection rule was met here. Before Acushnet could raise any objection,

Callaway objected to the inconsistent verdict. As the verdict had just been read, Callaway

sought a sidebar to discuss the verdict, wherein it acknowledged the problem, putting the Court

on notice, and beginning to urge a return of the jury for deliberation. Tr. at 1427-28. The Court,

in turn, at counsel's first words of this suggestion, cut off the discussion, and ruled that the jury

---

*Westinghouse Elec. Corp.*, 367 F.2d 375, 376 (1st Cir. 1966) ("It would be a purposeless
restriction to say that special interrogatories cannot be mixed questions of law and fact, provided
that the jury is properly instructed as to the law."); *Jarvis*, 283 F.3d at, 69-70 (Van Graafeiland,
J., dissenting) (cataloging law of circuits on issue). *See also* 9B Wright & Miller, *Federal
Practice and Procedure* § 2506 (3d ed. 2008) (special verdicts not limited to questions of fact
from which a legal proposition may be deduced and applied by the Court).

would not be sent back: "I'm not going to do this. All right?" *Id.* at 1428. Counsel responded: "I just wanted to raise it." *Id.* The sidebar ended, and the jury was dismissed. To suggest that Acushnet was supposed to repeat Callaway's comment, which would have been futile in view of the Court's ruling, would be an improper reliance of form over substance.

Where it has been recognized, the purpose of the contemporaneous-objection rule is to alert the trial court to the inconsistent verdict so that it may decide whether to return the jury to attempt to fix the verdict. *See White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir. 1989). Here, that purpose was satisfied by Callaway's own objection and the Court ruling that the jury would not be returned. *Compare United States Football League v. NFL*, 644 F. Supp. 1040, 1049 (S.D.N.Y. 1986). Contrary to Callaway's rhetoric, neither it nor the Court was "sandbagged." *See also Henry v. Miss.*, 379 U.S. 443, 448-49 (1965) ("giving effect to [a] contemporaneous-objection rule for its own sake 'would be to force resort to an arid ritual of meaningless form.'").

Second, the Court's judgment of validity against Acushnet is plain error, regardless of any waiver. *See Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1424-25 (10th Cir. 1986) (finding facially inconsistent verdict to be plain error, excusing any waiver); *Pennsylvania Envtl. Def. Found. v. Canon-McMillan Sch. Dist.*, 152 F.3d 228, 234 (3d Cir. 1998) (clear deviation from established legal rule can qualify as plain error). Because the verdict answers are facially inconsistent, it would be plain error to allow a judgment on them to stand.

### C.    The Jury's Answers Are Against The Great Weight Evidence

As Acushnet demonstrated in its opening brief and above related to JMOL, the jury's verdict on eight of nine interrogatories is inconsistent with the great weight of the evidence. To allow the judgment on the verdict to stand, without a new trial, would be a miscarriage of justice.

Callaway argues principally that "simply showing an inconsistency is not enough" to satisfy a miscarriage of justice standard. D.I. 455 at 49. But this is wrong in two respects. First,

there is no such law, as claimed. Callaway cites cases that simply do not address the issue, since they did not involve inconsistent verdicts. The law is actually, as cited in Acushnet's opening memorandum, that a new trial is granted *either* for inconsistent verdicts, or for verdicts against the great weight of the evidence, if manifest justice so requires. D.I. 417 at 30. Second, the purpose of the miscarriage of justice standard as applied to the great weight of the evidence standard is to avoid "usurp[ing] the prime function of the jury as the trier of facts." *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir. 1992). If the verdicts are legally inconsistent, then the Court will not usurp the jury as triers of fact. If the jury's verdicts are factually inconsistent, then their function has failed, which certain is a miscarriage of justice. (Callaway's hodge-podge of other arguments as to miscarriage of justice are similarly weak.)

### D.    The Evidentiary Issues Call For A New Trial

#### 1.    The Test Balls Should Have Been Admitted

Callaway's flippant response to Acushnet's argument that the prior art test balls should have been admitted into evidence is to call them names ("Frankenstein balls"). As demonstrated in the first part of this brief, Acushnet demonstrated that both Wu and Molitor '751 expressly suggest using their polyurethane covers as the cover of a ball like Proudfit's. The prior art testing demonstrates what properties the resulting ball would have if someone followed those express teachings. D.I. 417 at 35-39. Given the Court's claim construction, it is hard to think of more probative evidence of what the hardness of the balls taught by the prior art would be than testing evidence of balls that were made according to the prior art's teachings.

#### 2.    Hebert Testimony / Related Evidence Was Improper

Over Acushnet's objections at trial Callaway repeatedly misused Acushnet's Hebert patent as evidence that the claims of Callaway's patents-in-suit are valid. Acushnet was prejudiced by this, and by the Court's admission of other allegedly related evidence. D.I. 417 at

39-43. Callaway's retort is that since Acushnet stipulated to the admission of the Hebert patent, it cannot complain about how the patent was used at trial, or about the Court's other rulings. This side-steps the point, however, and answers none of Acushnet's arguments.

Evidence can be admissible for some purposes but not others. *See* Fed. R. Evid. 105. The Hebert patent was admissible for some purposes, and Acushnet agreed to its admissibility for that reason. But Callaway was not then licensed to, without consequence, parade the patent around to support its legally unsustainable arguments of so-called "patentable concepts." Callaway offered the Hebert patent as evidence of the non-obviousness of its own claims, which as its own witnesses testified, were different from those of the Hebert patent. It is this abuse of the Hebert evidence, among others catalogued already, that was improper and properly objected to, not the admission of the Hebert patent *per se*. Callaway used this evidence, as seen in its opening and closing, to confuse the jury as to what was relevant in the inquiry of the obviousness of Callaway's patents. Callaway was out-of-bounds, and Acushnet was prejudiced.[10]

### 3.    The *Ex Parte Sullivan* Decision Warranted Admission

Callaway argues that the Court correctly excluded the Patent Office's final decision in *Ex Parte Sullivan*. This is wrong for several reasons. In the first instance, Callaway inappropriately seeks to link *Ex Parte Sullivan* to the reexaminations, and the breach of contract decision by this Court. Whatever the effect of the breach of contract on the admissibility of the reexaminations,[11] it is certainly irrelevant to the admissibility of *Ex Parte Sullivan*. **Callaway was a party to that decision, and failed to appeal it – it is long final.** It is hard to see how the admission of a final finding against Callaway could have been a "miscarriage of justice" (D.I. 455 at 32) in the face

---

[10] The cases cited by Callaway refer to recognition of ***the invention*** by others as relevant.

[11] Acushnet has briefed how Callaway is incorrect as a matter of Delaware law to seek punitive responses to a breach of contract. D.I. 464 at 10. Callaway is hardly entitled to seek to use a contract breach to exclude important evidence from a validity trial.

of Callaway's repeated arguments that the agency correctly decided to issue the patents-in-suit.

Callaway's sole substantive argument against the admission of *Ex Parte Sullivan* is a footnote disputing its relevance, asserting Patent Office did not address there a limitation of Shore D hardness less than 64. This is a red herring. Acushnet did not seek to admit *Ex Parte Sullivan* for this purpose. Instead, it sought to use the decision to show what the Patent Office found concerning a motivation to combine Nesbitt's ball with Wu's polyurethane. Callaway disputed at trial that such a motivation existed in the art. The Patent Office found against Callaway in a final decision on that issue. As such, the decision was highly relevant; and indeed admissible under the cases and evidentiary rules cited by Acushnet, unchallenged by Callaway.

\* \* \*

In all, Acushnet has shown that several erroneous evidentiary rulings warrant a new trial, *see* D.I. 417 at 34-43, 45-49, to which Callaway's opposition devotes little, if any, response.[12] Callaway mostly sidesteps Acushnet's evidentiary arguments, and ignores Acushnet's case law. The Court's exclusion of the test balls, especially, was highly prejudicial error that surely impacted the trial. The various errors had a cumulative effect, even if not individually severely prejudicial to Acushnet. To avoid a serious miscarriage of justice, a new trial should be given.

## IV.    CONCLUSION

Acushnet respectfully requests the Court to grant JMOL under Rule 50(b) that the claims at issue in this case are invalid as obvious, or in the alternative order a new trial under Rule 59.

---

[12] Acushnet rests on its opening brief with respect to Dr. Risen's departure from his expert report and the improper exclusion of the reexamination evidence. Callaway tries to piece together various passages in Dr. Risen's report to find a statement that there was no motivation to combine Molitor '751 and Proudfit, but fails to find one. D.I. 455 at 32-36. Moreover, Callaway does not squarely address Acushnet's argument that its over-emphasis of the deference given to PTO decisions opened the door to the admission of the reexamination evidence. *Id.* at 31-32.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph P. Lavelle
Kenneth W. Donnelly
Mark L. Whitaker
Brian A. Rosenthal
Nicholas J. Little
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: March 24, 2008
856872 / 30030

By:    /s/ David E. Moore
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 24, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on March 24, 2008, the attached document was Electronically

Mailed to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com
shear@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
lamberson@fr.com
cjordan@fr.com
compton@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030

# EXHIBIT 1

2

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

L&W, INC.,

                              Plaintiff,

                                              Case No. 01-73892
V.
                                              Hon. John Corbett O'Meara

SHERTECH, INC.,

and

STEVEN W. SHERIDAN,

                              Defendants.
_____/

### FORM OF VERDICT

I.    Shertech's and Sheridan's patent claims against L&W:

      A.    Has L&W proved by clear and convincing evidence that the following

            claims of the '264 patent are invalid?

            Claim 1:     Valid _____      Invalid __✓__

            Claim 4:     Valid _____      Invalid __✓__

            Claim 6:     Valid _____      Invalid __✓__

            Claim 7:     Valid __✓__        Invalid _____

            Claim 10:    Valid _____      Invalid __✓__

            If you find that all five of the claims of the '264 patent are invalid in A,

            above, skip to Roman II below.

B.     If you find that any of the claims of the '264 patent were <u>valid</u>, what

damages, if any, do you award Shertech against L&W for L&W's

infringement of this patent.

$ _838,179.93_


II.    L&W's claims against Shertech for L&W's expenditures allegedly induced by

Shertech's or Sheridan's fraud or innocent misrepresentation.


A.     Was L&W induced to pay consulting fees and make other expenditures by

Shertech's or Sheridan's fraud or innocent misrepresentation?

Yes _✓_   No _____


B.     If you answered "no" in A above, go no further, have your foreperson sign

the Form of Verdict and notify the Court that a verdict has been reached.


C.     If you answered "yes" to the question to A above, what damages do you

award L&W for its expenditures induced by Shertech and Sheridan's fraud

and innocent misrepresentation?

$ _194,486.50_


Dated: _5-19-05_                              _____

                                                          **FOREPERSON**


2