Application/Control Number: 95/000,122                                    Page 176
Art Unit: 3993

(3)  "The Examiner is bound to give claim terms their broadest *reasonable* construction,"

and "indisputable evidence" leads to the conclusion that the claims require Shore D hardness

values to be measured on the ball.  The language of the claims refer to a "layer" and not a resin

for hardness.  Similarly, the specification uses hardness values on the ball when comparing

finished golf balls.  Persons skilled in the art recognize that for three-piece golf balls, hardness

values are measured on the ball while hardness is measured off the ball for plaques of material.

For example, in the Sullivan article (Exhibit G) Shore hardness is measured on the finished ball.

Another example is Molitor '751 which discloses hardness on the ball since it is "Finished Ball

Data" (Patent Owner's Response at middle of page 5 to middle of page 8).

For rejections with specific prior art references, use of Proudfit requires impermissible

inherency based on the hardness value of the Wilson Ultra Tour Balata ball.  Use of Nesbitt,

Molitor '637, Wu, and Molitor '751 are premised on commercial literature that reports hardness

of plaques of polymer resins.  In particular, for Wu the Examiner relies on comparisons between

the Wu patent and commercial literature of the Titlest 1 ball.  However, the relationship between

the Titlest 1 ball and the Wu patent is flimsy at best with respect to what the Wu patent discloses

(Patent Owner's Response at middle of page 8 to bottom of page 11).

(4)  the Examiner erred by failing to give weight to the evidence of commercial success

(e.g., sales of the ProV1 golf ball) of nonobviousness submitted by the Patent Owner.  The

Examiner's dismissal of this evidence as "testimonial in nature" is improper because the form the

evidence takes is not relevant.  For example, the Fed. Cir. recently vacated and remanded a

decision of the BPAI because the Board failed to consider objective evidence of nonobviousness

presented in the form of declarations.  Further, the Examiner's treatment here is inconsistent with

the treatment given the Third Party Requester's evidence of hardness of the Proudfit' outer layer

which was declaratory in nature (Hebert Declaration).  Finally, the Examiner's decision to give

little weight to the evidence is "particularly egregious" because the PTO's rules do not allow

confidential material to remain confidential, thus, the Patent Owner is limited in the type of

material submitted (Patent Owner's Response at bottom of page 11 to bottom of page 12);  and,

        (5) the *KSR* holding quoted by the Examiner is not dispositive because the Examiner's

quote also relates to predictability.  Patent Owner's evidence shows the instant patent's invention

to be "anything but predicable."  Further, *KSR* did not change the court's censure against use of

hindsight.  The obviousness rejections , here, are "hindsight-laced reconstructions based upon

selectively choosing bits and pieces from various references and then stitching them together

using the '130 patent claims for guidance."  Finally, the instant invention is not the product of

common sense because other designers of golf balls did not create the invention which

revolutionized the golf ball industry and achieved "enormous commercial success" (Patent

Owner's Response at bottom of page 12 to middle of page 14).


### *Third Party Requester's comments received 31 January 2008*

        The Third Party Requester's rebuttal comments to the Patent Owner's arguments are as

follows:

        As to argument (2), the Third Party Requester comments that the district court's analysis

of this issue "contained numerous flaws."  First, the court relied on *Zenon Environ. Inc.* for its

holding but applied the holding improperly.  When interpreted correctly, *Zenon Environ. Inc.*

supports "the Third Party Requester's position - that Nesbitt incorporates all of the specific

foamable compositions of Molitor '637 by reference" (Third Party Requester's comments at

middle of page 4 to page 6). Second, the court misconstrued the disclosure of Molitor '637 by

convoluting ionomeric compositions, foamable compositions, and polyurethane (Third Party

Requester's comments at page 6). Third, Nesbitt and *In re Voss* "provide the same type of

incorporation statement for exactly the same purpose (the use of know materials in the claimed

invention). The statements of incorporation found in Nesbitt and *S. Clay Prods.* have similar

specificity. Finally, both Nesbitt and *In re Hughes* incorporate several examples (Third Party

Requester's comments at bottom of page 7 to middle of page 8).

As to argument (3), the Third Party Requester counters that the Sullivan article's

language on hardness is different than that of the '130 patent. Further, other characteristics, such

as flexual modulus, has the same language in the claims as Shore hardness but modulus

characteristics can not be measured on the ball (Third Party Requester's comments at top of page

2 to middle of page 4).

As to argument (4), the Patent Owner has submitted as objective evidence "a hodgepodge

of news clippings and provide[d] an anecdotal assortment of quotes from paid endorsers."

Further, "in order to make a showing of unexpected results, Patent Owner must offer evidence of

what results would be expected by a person of ordinary skill in the art from the combination of a

three piece golf ball with a polyurethane cover." Finally, Patent Owner has not compared the

claimed invention to the closest prior art (Third Party Requester's comments at middle of page

21 to bottom of page 22).

As to argument (5), evidence introduced in the parallel court proceedings establish "that

is was simply the exercise of ordinary skill in the art to apply urethane, such as taught by Wu's

Application/Control Number: 95/000,122                                    Page 179
Art Unit: 3993

1994 patent, to prior art three-piece balls, such as Proudfit or Nesbitt, in order to achieve the

same results taught for polyurethane two-piece golf balls - improved durability over balata and

improved spin, click, and feel over Surlyn"  (Third Party Requester's comments at page 16 to

middle of page 20).


### Examiner's Response to the Argument and Comments received 2 Jan. and 21 Jan. 2008, respectively

*Parallel Litigation*

As to the Patent Owner's first argument, Examiner agrees with the Patent Owner and

notes that a "*non-final* Court decision concerning a patent under reexamination shall have no

binding effect on a reexamination proceeding" (MPEP 2686.04(IV) emphasis in original).

Hence, the Examiner has reviewed the holdings of the District Court but is not bound by them.


*Incorporation by Reference*

As to the Patent Owner's second argument, the Examiner agrees, in general, with the

arguments presented by the Third Party Requester and maintains the rejections based on Nesbitt

incorporating by reference Molitor '637.  The MPEP of the approximate time Nesbitt was filed

(Original Fourth Edition, June 1979; Latest Revision September 1982) states that "[a]n

application for a patent when filed may incorporate "essential material" by reference" (MPEP

608.01(p)(B) of Rev. 8 Oct. 1981;  Third Party Requester's Exhibit B; emphasis in original).  In

the next sentence "essential material" is defined as necessary to "(1) support the claims, or (2)

for adequate disclosure of the invention."  The Patent Owner cites the District Court's use of

Application/Control Number: 95/000,122                                          Page 180
Art Unit: 3993

*Advanced Display Sys.* for the standard governing incorporation by reference (Patent Owner's

Response at middle of page 3). This standard is that "[t]o incorporate material by reference, the

host document must identify with detailed particularity what specific material it incorporates and

clearly indicate where that material is found in the various documents" (*Advanced Display Sys.*,

212 F.3d at 1282). Further, "the standard of one reasonably skilled in the art should be used to

determine whether the host document describes the material to be incorporated by reference with

sufficient particularity" (*Advanced Display Sys.*, 212 F.3d at 1283).

Nesbitt discloses that his invention is a three-piece golf ball with a core having inner and

outer layers on the core.(Nesbitt at col. 1, lines 45-56). Both the inner and outer layers can be

made of either "resinous material or of cellular or foam composition" (Nesbitt at col. 1, lines 49

and 53, respectively). Nesbitt then states that the resinous materials for the two layers can be

different types of Surlyn resins (Nesbitt at col. 1, lines 57-64). Surlyns resins are then discussed

in the rest of the specification and the claims (see for example claims 7 and 8).

At col. 3, lines 51-61, Nesbitt discusses other materials for the two layers. Here it is

disclosed that both the inner and outer layers "may be cellular when formed of a foamed natural

or synthetic polymeric material." Nesbitt then states that "[p]olymeric materials are preferably

such as ionomer resins which are foamable." Examiner construes this sentence to mean that the

polymeric materials preferred by Nesbitt are those that, like ionomer resins, are foamable. Since

Nesbitt does not disclose a list of foamable polymeric materials he references Molitor '637

"which describes a number of foamable compositions of a character which may be employed for

one or both layers."

Molitor '637 states that his invention "relates to the use of cellular material as cover stock for conventional golf ball centers" (Molitor '637 at col. 3, line 10-13). The preferred embodiment for the outer cover, similarly to Nesbitt, is a Surlyn resin (Molitor '667 at col. 3, lines 36-42). Farther into the specification, however, Molitor states that other materials both synthetic and natural can be used as the outer layer material (Molitor '637 at col. 5, lines 27-32). Molitor then lists "suitable polymer materials" (Molitor '637 at col. 5, lines 30-55). Included in this list, *inter alia*, are polyethylene, polypropylene, polyurethanes, and thermoplastic rubbers (Molitor '637 at col. 5, lines 33-55). The examples of covers that Molitor '637 discloses use Surlyn resins, polypropylene, polyethylene, and thermoplastic rubbers (Tables 1 to 12).

The Examiner considers Nesbitt to incorporate by reference Molitor '637 because Nesbitt's invention encompasses use of foamable material other than Surlyn resins as cover materials (see above). Since only Surlyn resins are discussed in his specification, Nesbitt incorporates by reference Molitor '637 to supply the "essential material" of other foamable compositions that may be employed. Without this incorporation, Nesbitt's specification appears to lack adequate disclosure for compositions other than Surlyn.

Nesbitt in "sufficient particularity" states that "foamable compositions" are to be referenced, or incorporated. One of reasonable skill, when reading the specification of Molitor '637, would know that Nesbitt meant to incorporate the list of materials found at col. 5, lines 30-55, of Molitor '637, because the list is juxtaposed as an alternative to Surlyn (Molitor '637 at col. 5, lines 27-32). Nesbitt's language of incorporation is similarly juxtaposed as an alternative to Surlyn (Surlyn being "ionomer resins" of col. 3, lines 51-61, of Nesbitt). Both references, then,

Application/Control Number: 95/000,122                                     Page 182
Art Unit: 3993

disclose foamable materials, or compositions, other than Surlyn resins that can be used in golf

ball construction.   One of these listed materials is polyurethane.

Agreeing with the comments of the Third Party Requester (Third Party Requester's

comments at page 7), the Examiner considers the holdings of *In re Voss* and *In re Hughes* to

support the decision reached here.   The pertinent language of incorporation in *In re Voss* was

"Reference is made . . . for a general discussion of . . . materials and their production" (557 F.3d

at 816).   Nesbitt is similar in that both patents incorporate materials.   The pertinent language of

incorporation in *In re Hughes* was "Reference is made . . . for a complete description of methods

of preparing aqueous polymeric dispersions" (550 F.3d at 1275).   Nesbitt is similar in that both

patents incorporate polymeric materials.


*Shore hardness measured on or off the ball*

As to the Patent Owner's third argument, Examiner generally agrees with the comments

of the Third Party Requester and finds the arguments of the Patent Owner concerning measuring

of hardness "on the ball" in the claim language to be unpersuasive.

The rule is that "[d]uring reexamination claims are given the broadest reasonable

interpretation consistent with the specification" (MPEP 2658(I) and 2258(I)(G)).   Here, the

claims are silent as to whether the Shore D hardness value is measured "on the ball" or not.   In

the specification, examples of hardness measurements are disclosed at col. 6, lines 62-64 and col.

14, lines 60-61.   For these examples the hardness value was conducted "in accordance with

ASTM method D-2240."   ASTM D-2240's method of testing uses a specimen, or plaque, of

material, and are not measured "on the ball" (Exhibit C).   However, in the "EXAMPLE" portion

of the specification there is language that appears to support an interpretation of hardness values measured "on the ball." An example is the Shore D hardness data of Table 8 and its accompanying language of ""ball data"" of col. 19, lines 64-67. Also, there is the language of "properties of the finished balls are set forth below" at col. 21, lines 7-9, and Table 9.

The specification, then, appears ambiguous as to the interpretation of the claim language. However, the Federal Circuit has held that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment (MPEP 2111.01(II) citing *Superguide Corp. v. DirecTV Enterprises, Inc.*). Further, the Fed. Cir. has stated that "[t]he problem is to interpret claims 'in view of the specification' without unnecessarily importing limitations from the specification into the claim" (MPEP 2111.01(II) citing *E-Pass Techs., Inc. v. 3Com Corp.*).

Since there is ambiguity in the specification as to how hardness values are measured and mindful of not reading limitations into the claim language, the Examiner considers the broadest reasonable interpretation of this claim language to not require the hardness values to be measured "on the ball."

The Patent Owner argues that the language of the claims, themselves, requires hardness to be measured on the ball. "The claims refer to "layer," and then to the Shore hardness of the "layer," as opposed to the Shore D hardness of a resin used to make the layer" (Patent Owner's Response at bottom of page 6). Here, the Examiner agrees with the comments of the Third Party Requester (Third Party Requester's comments at bottom of page 3) and finds this argument unpersuasive. As the Patent Owner states the claim language does place "layer" and "hardness" within the same clause. However, in these clauses similar language is used for "modulus." For

example, the language of claim 6 is "outer cover layer . . . having a modulus in. . . and Shore D

hardness of" (Sullivan '130 at cols. 23 and 24). The modulus value can not be determined "on

the ball" (*see* Third Party Requester's comments at bottom of page 3). Since both modulus and

hardness are presented with similar language in the claims, the Examiner does not consider this

argument dispositive.

The Patent Owner further argues that the Sullivan article supports their interpretation of

"off the ball" because in this article hardness is measured "on the ball" (Patent Owner's

Response at bottom of page 7 and top of page 8). Again, the Examiner agrees with the

comments of the Third Party Requester (Third Party Requester's comments at bottom of page 2

and top of page 3). As the Third Party Requester point outs the language in the Sullivan article is

"Shore Hardness was measured in general accordance with ASTM Test D-2240, measured on the

parting line of a fixtured, finished ball" (Patent Owner's Response at top of page 8). Since the

phrase "measured on the parting line of fixtured, finished ball" is neither in the specification nor

in the claims of the instant patent, the Examiner does not consider this argument to be

dispositive.

Finally, the Patent Owner argues the inherencies the Shore hardness values of Proudfit

(Patent Owner's Response at middle of page 8) and Wu (Patent Owner's Response at bottom of

page 9). Examiner has considered these arguments previously for the individual rejections,

*supra,* and considers them unpersuasive.


*Evidence of Commercial Success*

As to the Patent Owner's fourth argument, Examiner generally agrees with the comments

of the Third Party Requester and finds the arguments of the Patent Owner concerning

commercial success to be unpersuasive.  The Examiner has not disregarded the evidence

presented by the Patent Owner.  As stated in the previous office action, the probative value of the

evidence presented by the Patent Owner for unexpected results and commercial success is not

enough to overcome the *prima facie* case of obviousness presented in the rejections, *supra*.

MPEP 716.01(c)(III) states that "[i]n assessing the probative value of an expert opinion, the

examiner must consider the nature of the matter sought to be established, the interest of the

expert in the outcome of the case, and the presence or absence of factual support for the expert's

opinions."  Here, it is not clear to the Examiner if the opinions of the individuals proffered by the

Patent Owner have a interest in the outcome of the case.  Also, no factual data is presented to

show commercial success or unexpected results.

As to the use of the Hebert Declaration, Examiner considers it proper because Hebert

presented objection data for his observations, or conclusions.


*Claims are nonobvious under the KSR standards*

As to the Patent Owner's fifth argument, Examiner generally agrees with the comments

of the Third Party Requester and finds the arguments of the Patent Owner concerning the KSR

obvious standard to be unpersuasive.  In *KSR* the Supreme Court stated that "[o]ne of the ways in

which a patent's subject matter can be proved obvious is by noting that there existed at the time

of invention a known problem for which there was an obvious solution encompassed by the

patent's claims." (*KSR*, slip opinion at page 16).  The Court further stated that the "combination

of familiar elements according to known methods is likely to be obvious when it does no more

that yield predictable results." (*KSR*, slip opinion at page 12).

It was known in the art that two-piece golf balls having a hard cover lack the "feel"

characteristics of balata covered golf balls (Nesbitt at col. 1, lines 26-33). Nesbitt's three-piece

golf ball (a core, a hard inner layer, and a soft outer layer) was an attempt to provide both

distance and "feel" (Nesbitt at col. 1, lines 65-68 continuing to col. 2, lines 1-9). An outer layer

of balata was not effective, however, because of its lack of "cut" resistance (Wu at col. 1, lines

40-46). Polyurethane was proposed for use as an outer layer on a two-piece because it was

known to provide both "feel" and cut resistance (Wu at col. 1, lines 47-53) and found to be

comparable to three-piece, balata covered balls (Wu at cols. 7 and 8). In other words,

polyurethane was found to be a solution to a known problem. With this information, it would be

predictable, then, for one of ordinary skill to use polyurethane as the outer layer on a three-piece

golf ball to achieve the same results of "feel" and cut resistance. The resultant three-piece golf

ball with an outer layer of polyurethane did, as predicted, achieve the goal of "feel" (playability)

and cut resistance (durability) (Sullivan '103 at abstract).

As to hindsight, the Court stated that a "factfinder should be aware, of course, of the

distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post*

reasoning." (*KSR*, slip opinion at page 17; emphasis in original). Here, hindsight is not used

because the reasoning for use of a soft, outer layer of polyurethane were explicitly stated in the

prior art - to combine "feel" and cut resistance. The reasoning for combining the references,

then, is not *ex post* reasoning but supplied in the references, themselves.

As to the use of common sense, the Examiner considers it common sense to use

polyurethane as an outer layer on a golf ball given the prior art as explained immediately above.

Commercial success without objective data and the fact that no one else invented the invention

are tangential to the case of *prima facie* obviousness presented in this office action.


### *Patent Owner's Response received 4 April 2008 (after ACP)*

As to the amendment of the claims in the Response, beginning at the bottom of page 8,

the Patent Owner adds claims 7-12 which, in general, are the same claim language as claims 1-6

with the additional limitation of the "Shore D hardness values" being measured "on the golf ball"

in the independent claim. Each added claim, then, expressly recites what the District Court has

"recognized is already required by issued claims 1-6." Further, added claims are of identical

scope of issued claims 1-6 and find support in the specification by Examiner admission. Since

these claims "respond to the Examiner's objection set forth in the March 4, 2008 Office Action"

and "simplify the issues before the Examiner" the amendment should be entered (Response at

top of page 9).


As to the arguments in the Response, since the Patent Owner does not argue rejections of

individual claims (demarcated as such), the arguments will be addressed by topic as given in the

Response received 4 April 2008. Patent Owner argues:

(1) Beginning on page 6, that "[t]he Examiner is bound to give claim terms their broadest

reasonable construction." "[T]o determine whether construction is "reasonable," requires

examination of the claim language and the patent's specification, as well as how persons of

ordinary skill in the field (here, golf ball designers and manufactures) would interpret the term"

(citing MPEP 2111). The broadest reasonable construction of the language of the claims is to

require the "Shore D hardness values for both the inner and outer cover layers to be measured on

the ball, itself."

Proof for this is that: (a) the claims refer to a "layer" for hardness which implies

measuring on the ball, even though it also refers to a "layer" with flex modulus which can not be

measured on the ball, since those skilled in the art would interpret and understand the claim

language to differentiate between the two measurements; (b) in the specification of the patent at

issue Shore hardness values are measured on the ball for finished golf balls and off the ball for

resins; and, (c) "[i]nterpreting the claims to require measuring Shore D hardness 'on the ball' is

also consistent with the way in which hardness values are measured in the field of golf ball

design and manufacture" as shown by the testimony of Dalton and Morgan;

(2) Beginning on page 9, that in *KSR* the Supreme Court "emphasized the role of

predictability in determining whether a claimed invention would have been obvious" and not

simply whether the combined, individual elements were previously known. Patent Owner's

evidence shows the instant invention to be "anything but predicable."

At the trial the Patent Owner introduced evidence of unpredictability in golf ball

construction by testimony of Proudfit (inventor of the '187 patent used in several rejections),

Nesbitt (inventor of the '193 patent used in several rejections), and Sullivan (inventor of the

patent at issue), along with several golf ball designers. Further, evidence was offered by the

statements of professional golfers, such as Phil Mickelson, that the Pro V1 was " 'the best golf

ball that's ever been created.' " Since professional golfers desire to "maximize their

performance" their opinions "are actually the **best evidence** for purposes of assessing golf ball

performance and predictability" (emphasis in Response). Finally, the unprecedented success of

the Pro V1 demonstrated the unpredictability of the instant claimed invention because the

technology used in the ball - polyurethane over ionomer on top of a solid core - was new and

novel.

(3) Beginning on page 15, that the obviousness rejections of claim 5 of the instant patent

are barred because a jury upheld the validity of this claim, and their decision was not challenged

in post-trial filings. Hence, any challenge to this decision on appeal was waived.

(4) Beginning on page 16, that the rejections based on Proudfit improperly use

information on the Wilson Ultra Tour Balata Ball as evidence of what Proudfit inherently

discloses. For inherency, the Examiner must prove "the prior art **necessarily** constrains the

missing characteristic" (citing MPEP 2112(IV); emphasis in MPEP). The Hebert Declaration,

used by the Examiner to show that the Wilson Ultra Tour is representative of Proudfit's balls,

has potential bias and is factually flawed. Thus, does to meet the standards of MPEP

716.01(c)(III).

Possible bias arises because the Declarant is employed by the Third Party Requester. The

declaration's analysis is flawed because it was: (a) an internal analysis by the Third Party

Requester thus never subject to objective scrutiny; (b) the analysis fails to provide key

information regarding the composition including amounts of the two named polymers and

amounts and identities of any other ingredients; (c) regardless of whether the ball is

"representative" of Proudfit's ball it, is not "a 'necessary' result of the patent - as is required

under law;  (d) the scale used to measure to the hardness is not given;  and  (e) a Court "correctly

recognized that Proudfit and the Wilson Ultra Tour Balata Ball were "discrete, separate items of

prior art for purposes of anticipation;' "

  (5) Beginning on page 19, that the rejections based on Wu improperly use commercial

literature of the Titleist Professional (Examiner notes that in his earlier office action the

Examiner erroneously called this ball the Titleist 1) as evidence of what Wu inherently discloses.

The Titleist Professional is not competent of the disclosure of the Wu patent because this patent

"in no meaningful way necessarily discloses the specific construction of the Titleist

Professional." For example, neither hardness nor thickness of the golf ball are disclosed in the

Wu patent;  and,

    (6) Beginning on page 20, that Nesbitt does not incorporate by reference Molitor '637

because the Examiner misconstrues Nesbitt's language of incorporation at col. 3, lines 51-61, to

mean that foamable materials are preferred.  As interpreted by the Patent Owner and a district

court, Nesbitt states that "ionomer resins were preferred." Proof for this interpretation is that "all

of Nesbitt's claims explicitly recite ionomer resins - not foamable resins generally." Since

polyurethane is not an ionomer resin, its incorporation by reference is not needed for adequate

disclosure, or support, of Nesbitt's claimed invention.


### Third Party Requester's Comments received 5 May 2008 (after ACP)

        As to the amendment of the claims, beginning at page 2, the Third Party Requester argues

that after an ACP, 37 CFR 1.116(b) controls entry of an amendment.  Under 37 CFR 1.116(b),

amendments can be entered to cancel claims, to place in better form for appeal, or "touching the

merits" of the patent "upon a showing of good and sufficient reasons why the amendment is

necessary and was not earlier presented." Since, here, no changes have been made to the

presently rejected claims and new claims have been added, this amendment goes to "touching the

merits" of the patent, and the Patent Owner has not shown why the amendment is now necessary.


As to Patent Owner's argument (1), Requester argues beginning on page 4 of the

Comments that the Patent Owner is arguing that Shore D hardness can be measured on the ball

since one of ordinary skill in the art is capable of measuring hardness on the ball. This argument

is tangential to the real inquiry which is: Do the instant claims require hardness to be measured

on the ball?

Here, the broadest reasonable interpretation of the claims should not exclude hardness

measured off the ball because: (1) the instant patent's specification explicitly defines Shore D

hardness measurements by reference to ASTM test 2240, which indisputably calls for off the ball

measurement; and, (2) the Patent Owner's proposed amendment seeks to add new claims which

explicitly claim "on the ball" measurements for hardness. Following rules of claim construction,

claims with different language, or limitations, are construed to have different scopes. Hence, the

Patent Owner's amendment is a "tacit admission" that the construction of the original claims was

proper for hardness to be measured on and off the ball.

As to Patent Owner's argument (2), Requester argues beginning on page 14 of the

Comments that the Patent Owner provides "few concrete examples of unpredictability" but only

"conclusory opinion evidence." The inquiry here is not whether golf ball design is, in general,

unpredictable, but rather whether the instant claim language is unpredictable. For the instant

claim language, "[a]s to the combination itself, the motivation to combine is expressly taught in

the art such as Molitor '751. In addition, polyurethane was a known cover material, and its

selection for an outer cover layer was therefore a straightforward matter, particularly once the

Wu polyurethane, published by patent in 1994, became an astounding success in the early

1990s."

Further, Shore hardness "on the ball" can be predicted by "off the ball" measurements.

"Soft D hardness materials 'off the ball' such as Wu polyurethane (with hardness of about 48

Shore D), generally stay soft on the ball."

As to Patent Owner's argument (3), Requester argues beginning on page 19 of the

Comments that the Patent Owner misconstrues 35 USC 317(b) by confusing a final finding by

the jury with a court's final decision. While the Third Party Requester did not challenge the

jury's finding in post-trial briefings, this finding is still appealable, and, hence, not final.

As to Patent Owner's argument (5), Requester argues beginning at the bottom of page 25

of the Comments that testimonial evidence disclosed that Wu's castable polyurethane was used

on the Titleist Professional and, later, the ProV1. Further testimony disclosed that the Shore D

hardness of the polyurethane on the ball of the Titleist Professional was 56. Other test data

showed a hardness of 56.8 when "put on the core and inner cover of Proudfit's ball and a

hardness of 56.0 when put on the core and inner cover of Nesbitt's ball." Finally, the Patent

Owner in patent no. 5,803,831 disclosed that Wu's polyurethane could be used on a ball outer

cover with a Shore D hardness of less than 55.

As to Patent Owner's argument (6), Requester argues beginning at the bottom of page 6

of the Comments that the holding in *Zenon*, when correctly read, supports the Third Party

Application/Control Number: 95/000,122                                        Page 193
Art Unit: 3993

Requester's contention that Nesbitt incorporates all the foamable compositions of Molitor '637

and that Nesbitt's incorporation statement is comparable in detail to those of *In re Voss* and *In re*

*Hughes*. Finally, that the Patent Owner's presently advanced argument of incorporating only

ionomers fails because the relevant passage of Nesbitt "clearly states that Molitor '637 discloses

'foamable compositions' for use as cover layers and not simply ionomers."


### *Examiner's Response to the Amendment/Response and Comments received 4 April 2008 (after ACP) and 5 May 2008( after ACP) , respectively*

*Amendment to the claims*

        As to the amendment of the claims in the Response where new claims 7 through 12 are

added, the Examiner, in general, agrees with the conclusion of the Third Party Requester and the

amendment is not entered.  After ACP the Patent Owner may file comments which can include a

proposed amendment to the claims (MPEP 2672; 37 CFR 1.951).  As pointed out by the Third

Party Requester, 37 CFR 1.116(b) controls entry of an amendment to the claims.  Under 37 CFR

1.116(b), amendments can be entered to cancel claims, to place in better form for appeal, and

"touching the merits" of the patent "upon a showing of good and sufficient reasons why the

amendment is necessary and was not earlier presented."  Since, here, no changes have been made

to the presently rejected claims and new claims have been added, this amendment goes to

"touching the merits" of the patent which requires the Patent Owner to show "good and

sufficient reasons why the amendment is necessary and was not earlier presented" (37 CFR

1.116(b)(3)).

Application/Control Number: 95/000,122                                    Page 194
Art Unit: 3993

The Patent Owner reasons that the amendment should be entered because it "respond[s]
to the Examiner's objection set forth in the March 4, 2008 Office Action that the claims do not
explicitly recite measuring Shore D hardness 'on the ball,' and because they simplify the issues
before the Examiner" (Patent Owner's Response at top of page 9).

The Examiner disagrees. The Examiner does not "object" to the claims for not disclosing
hardness measured "on the ball" but only agues that the claims (1 through 6) do not require
hardness to be measured on the ball. Hence, the issues are not simplified because the new claims
raise a new issue - requiring a search and possible rejection of the new claims because of their
new limitation of hardness measured "on the ball." Finally, the Patent Owner has not presented
any reason why these new claims were not earlier presented.


*Shore D hardness measured on or off the ball*

As to Patent Owner's argument (1), Examiner agrees with the conclusion of the Third
Party Requester and finds the arguments of the Patent Owner concerning measuring of hardness
"on the ball" in the claim language to be unpersuasive.

As argued previously by the Examiner, the rule is that "[d]uring reexamination claims are
given the broadest reasonable interpretation consistent with the specification" (MPEP 2658(I)
and 2258(I)(G)). Here, the claims are silent as to whether the Shore D hardness value is
measured "on the ball" or not. In the specification, examples of hardness measurements are
disclosed at col. 6, lines 62-64, and col. 14, lines 60-61. For these examples the specification
explicitly states that the hardness value was conducted "in accordance with ASTM method D-
2240." The ASTM D-2240 method of testing uses a specimen, or plaque, of material, which is

not measured "on the ball" (Exhibit C). However, in the "EXAMPLE" portion of the

specification there is language that appears to support an interpretation of hardness values

measured "on the ball." An example is the Shore D hardness data of Table 8 and its

accompanying language of " 'ball data' " of col. 19, lines 64-67. Also, there is the language of

"properties of the finished balls are set forth below" at col. 21, lines 7-9, and Table 9.

The specification, then, appears ambiguous as to the interpretation of the claim language.

However, the Federal Circuit has held that "a particular embodiment appearing in the written

description may not be read into a claim when the claim language is broader than the

embodiment (MPEP 2111.01(II) citing *Superguide Corp. v. DirecTV Enterprises, Inc.*). Further,

the Fed. Cir. has stated that "[t]he problem is to interpret claims 'in view of the specification'

without unnecessarily importing limitations from the specification into the claim" (MPEP

2111.01(II) citing *E-Pass Techs., Inc. v. 3Com Corp.*).

Since there is ambiguity in the specification as to how hardness values are measured and

mindful of not reading limitations into the claim language, the Examiner considers the broadest

reasonable interpretation of this claim language to not require the hardness values to be measured

"on the ball."

Specifically, the Patent Owner argues that the language of the claims, themselves,

requires hardness to be measured on the ball. Although both hardness and modulus are in the

same clause in the claim, one of ordinary skill would know to measure modulus off the ball and

hardness on the ball. The Examiner considers this argument to be unpersuasive because the term

"layer" is used in the claim for both measurements and since modulus is measured off the ball, it

reasonably follows that hardness would be measured off the ball. Requiring one measurement

on the ball and the other off the ball with no discussion of this difference in the specification

appears to be an unneeded, or unwarranted, complication in claim interpretation.

The Patent Owner further argues that in the specification hardness is measured off the

ball for resins and on the ball for finished balls. The Examiner disagrees. For "intermediate

balls (i.e., cover plus inner cover layers)" "Shore hardness was measured in accordance with

ATM test 2240" at col. 14, line 14, and col. 14, lines 50-61). Although not a finished ball, the

intermediate ball is not a resin and appears to be use plaque-tested hardness values. Hence, the

specification is ambiguous as to hardness measured on or off the ball for resins or finished balls.

The Patent Owner finally argues that those of ordinary skill in the art would know to

measure hardness on the ball. Patent Owner points to the testimony of Dalton and Morgan who

stated that the common practice in the industry is to measure Shore D hardness "'on the ball'"

(Response at page 8). The Examiner does not consider the "standard practice" in the industry to

be dispositive because the specification of the patent at issue discusses hardness measured both

on and off the ball.


*KSR holds that predictability is obvious and golf ball design is unpredictable*

As to Patent Owner's argument (2), Examiner agrees with the comments and conclusion

of the Third Party Requester and finds the arguments of the Patent Owner concerning

unpredictability to be unpersuasive.

Examiner agrees with the Patent Owner that the holding in *KSR* is focused on

"predictable solutions" being "not of innovation but of ordinary skill and common sense" (*KSR*,

82 USPQ2d at 1397). The converse, then, being that unpredictable solutions are probably

nonobvious since "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions" (*KSR*, 82 USPQ2d at 1396).

Here, agreeing with the Third Party Requester, the issue is only whether a three-piece golf ball with a harder inner cover and softer outer cover is obvious, or predicted. The general predictability of golf ball design is not dispositive. Nor is success of the ProV1 dispositive since the exact reason for its success is not known. The Examiner considers the prior art to disclose the claimed ball's construction. Hence, the claimed invention was predicted, or predictable.

Nesbitt stated that his invention was "a golf ball having a multilayer or two-ply cover" (Nesbitt at col. 1, lines 36-40). The inner layer was "a hard . . . composition which has a high coefficient of restitution" (Nesbitt at col. 1, lines 45-50). The outer layer was "a comparatively soft . . . composition" (Nesbitt at col. 1, lines 51-56). The motivation for this construction was to have a ball with "the 'feel' and playing characteristics simulating those of a softer balata covered golf ball" with "the coefficient of restitution of the golf ball closely approach[ing] or attain[ing] that which provides the maximum initial velocity" (Nesbitt at col. 1, lines 55-56; col. 1, lines 65-68). Nesbitt, then, predicts the claimed ball's general construction.

Similarly, Proudfit stated his invention was a golf ball with "an inner layer formed from a relatively hard, cut-resistant material such as ionomer resin and an outer layer of soft material" (Proudfit at col. 5, lines 13-17). The motivation for this construction was to have a ball with an inner cover providing "good cut resistance, and the outer layer provid[ing] the sound, feel, and spin characteristics of a balata cover" (Proudfit at col. 5, lines 27-31). Proudfit, then, predicts the claimed ball's general construction.

Finally, Wu predicts the use of polyurethane as the outer cover since the polyurethane

provides "good shear resistance, cut resistance, durability and resiliency" while maintaining "the

'click' and 'feel' of balata" (Wu at col. 2, lines 39-44; col. 1, lines 43-46). Molitor '637 predicts

the use of polyurethane as the outer cover since polyurethane is one of a number of materials that

can alter the "cut resistance, the abrasion resistance, the coefficient of restitution, the feel, the

click, and the ability to impart back spin to a golf ball" (Molitor '637 at col. 2, lines 34-38).

Molitor '751 predicts the use of outer covers with a Shore D hardness less than 64 which have

"short iron playability properties as good as or better than balata-covered wound balls but are

significantly more durable" (Molitor '751 at col. 2, lines 61-68). Wu and Molitor '637, then,

predict the use of polyurethane as an outer cover of a golf ball while Molitor '751 predicts the

use of a cover with a Shore D hardness value of less than 64.

*Claim 5 and a final court decision*

As to Patent Owner's argument (3), Examiner agrees with the comments and conclusion

of the Third Party Requester and finds the arguments of the Patent Owner concerning a final

court decision to be unpersuasive. As stated by the Third Party Requester in the Comments at

page 19, while there was no challenge to the jury's finding of validity for claim 5 in post-trial

briefings, this finding is still appealable, and, hence, not final within the meaning of MPEP

2686.04(IV).

*Rejections with Proudfit can not be based on the Wilson Ultra Tour Balata Ball*

As to the Patent Owner's argument (4), Examiner finds the Patent Owner's arguments
unpersuasive and maintains the rejections using Proudfit because the facts reasonably support the
determination that the Wilson Ultra Tour Balata is the ball disclosed in the patent to Proudfit. As
pointed out by the Patent Owner, MPEP 2112(IV) states that when making an argument for
inherency "the examiner must provide a basis in fact and/or technical reasoning to reasonably
support the determination that the allegedly inherent characteristic necessarily flows from the
teachings of the applied prior art" (citing *Ex parte Levy*).

Here, Hebert's Declaration states that in the normal course of business the Third Party
Requester tests golf balls on the market (from "Acushnet regularly performs" of Hebert
Declaration at ¶ 3). The data presented in the Declaration show the Wilson Ultra Tour Balata has
an inner cover of Na-Surlyn as the primary component and Zn-Surlyn as the other polymer.
These two constituents in these relative proportions are the same as listed in Table 6 of Proudfit.
This is a fact that reasonably supports the conclusion that the inner cover disclosed in Proudfit's
Table 6 is the inner cover of the Wilson Ultra Tour Balata.

For the outer cover, Hebert's Declaration shows data that the Wilson Ultra Tour Balata
has an inner cover of c-polybutadiene as the primary component and synthetic balata as the other
polymer (trans polyisoprene is synthetic balata - see Proudfit at col. 1, lines 23-25). These two
constituents are the major constituents listed in Table 7 of Proudfit. However, in Proudfit's
Table 7 the relative proportions of these two components is reversed. That is, the primary
component is synthetic balata and the other polymer is c-polybutadiene.

However, in a declaration made by Proudfit during prosecution of the Proudfit patent, he
stated that the Ultra Tour Balata was a "balata/Surlyn covered golf ball made by Wilson in

accordance with this application" (1993 Proudfit Declaration at ¶ 2). Confusingly, at this

paragraph Proudfit called this ball a two-piece ball. Further in the declaration, however, Proudfit

calls the Ultra Tour Balata a three-piece ball (1993 Proudfit Declaration at ¶ 12 in that Exhibit K,

the Ultra Tour Balata, is a three-piece ball when compared to Exhibit N). Also, at ¶ 14 the

declaration states that the outer, or balata, cover of the Ultra Tour Balata contains the

components listed in Table 7 of the Proudfit patent. When this declaration of Proudfit is

combined with the Hebert Declaration the result is a fact that reasonably supports the conclusion

that the outer cover disclosed in Proudfit's Table 7 is the outer cover of the Wilson Ultra Tour

Balata.

Patent Owner specifically argues that bias may arise because Declarant (Hebert) is an

employee of the Third Party Requester. This argument is not persuasive because the declaration

presents objective data that is supported by the Proudfit Declaration which was submitted during

the prosecution of the '187 patent.

Further, Patent Owner specifically argues that the data in the Hebert Declaration was an

internal analysis, hence, not public. This argument is not persuasive because MPEP 2258(I)(E)

states that "declarations . . . which explain the contents or pertinent dates of prior art . . . may be

considered in reexamination." Here, the Hebert Declaration is used to explain the Proudfit

patent. Whether the declaration is public information is not dispositive.

Further, Patent Owner specifically argues that the analysis fails to provide information

regarding the outer layer's composition. This argument is not persuasive because the Proudfit

Declaration presented during prosecution of the '187 patent clarifies the analysis.

Further, Patent Owner specifically argues that this ball is not necessarily the ball the result of the Proudfit patent. This argument is not persuasive because the combined declarations of Hebert and Proudfit result in a fact that reasonably supports the conclusion that the outer cover disclosed in Proudfit's Table 7 is the outer cover of the Wilson Ultra Tour Balata.

Further, Patent Owner specifically argues that the scale for hardness of the outer cover is not given in the data of the Hebert Declaration. This argument is not persuasive because the value given in the data of the declaration is "52" which regardless of scale meets the claim's limitation of 64 or less when measured on the Shore D scale. If Hebert's data was measured on the Shore D scale then the value "52" itself is less than "64." If measured on the C scale a value of "52" would convert to less than "64" on the Shore D scale by using the conversion chart submitted by the Third Party Requester.

Finally, Patent Owner specifically argues that a court has concluded that the disclosure pf the patent to Proudfit and the Wilson Ultra Tour Balata are "'discrete, separate items.'" This argument is not persuasive because a "*non-final* Court decision concerning a patent under reexamination shall have no binding effect on a reexamination proceeding" (MPEP 2686.04(IV); emphasis in original).

*Rejections with Wu can not be based on the Titleist Professional Ball*

As to the Patent Owner's argument (5), Examiner finds the Patent Owner's arguments unpersuasive and maintains the rejections using Wu because the technical reasoning reasonably support the determination that the Titleist Professional has cover layer as disclosed in the patent by Wu. First, as stated in previous office actions, the Examiner considers the commercial

literature on the Titleist Professional to disclose the fact that the Professional's cover is disclosed

by the Wu patent because the patent is cited in the literature.

Further, as the Third Party Requester points out, the inventor of the instant patent of

interest in his other '831 patent disclosed a ball with a "preferred form" of an outer cover layer

with "a Shore D hardness of no more than 55" (col. 3, lines 46-52). Several "alternative

embodiments" had outer covers of "polyester polyurethane" (col. 22, lines 60-62). The patent

then stated that other "thermoplastic materials may be utilized to produce the outer cover" some

of which are "nonionomeric thermoset polyurethanes including but not limited to those disclosed

in the [Wu patent] U.S. Pat. No. 5,334,673" (col. 23, 14-25). From these quotes, one can

conclude that the polyurethane cover of the Wu patent would have a Shore D hardness value of

no more than 55.

Therefore, the commercial literature of the Titleist Professional Ball and the disclosure of

the '831 patent results in technical reasoning that reasonably supports a determination that the

cover layer of this ball is disclosed in the Wu patent.

*Incorporation by Reference*

As to the Patent Owner's argument (6), the Examiner agrees with the conclusion of the

arguments presented by the Third Party Requester and maintains the rejections based on Nesbitt

incorporating by reference Molitor '637. The MPEP of the approximate time Nesbitt was filed

(Original Fourth Edition, June 1979; Latest Revision September 1982) states that "[a]n

application for a patent when filed may incorporate 'essential material' by reference" (MPEP

608.01(p)(B) of Rev. 8 Oct. 1981; Third Party Requester's Exhibit B; emphasis in original). In

the next sentence "essential material" is defined as necessary to "(1) support the claims, or (2)

for adequate disclosure of the invention." The Patent Owner cites the District Court's use of

*Advanced Display Sys.* for the standard governing incorporation by reference (Patent Owner's

Response at middle of page 3). This standard is that "[t]o incorporate material by reference, the

host document must identify with detailed particularity what specific material it incorporates and

clearly indicate where that material is found in the various documents" (*Advanced Display Sys.*,

212 F.3d at 1282). Further, "the standard of one reasonably skilled in the art should be used to

determine whether the host document describes the material to be incorporated by reference with

sufficient particularity" (*Advanced Display Sys.*, 212 F.3d at 1283).

Nesbitt discloses that his invention is a three-piece golf ball with a core having inner and

outer layers on the core (Nesbitt at col. 1, lines 45-56). Both the inner and outer layers can be

made of either "resinous material or of cellular or foam composition" (Nesbitt at col. 1, lines 49

and 53, respectively). Nesbitt then states that the resinous materials for the two layers can be

different types of Surlyn resins (Nesbitt at col. 1, lines 57-64). Surlyns resins are then discussed

in the rest of the specification and the claims (see for example claims 7 and 8).

At col. 3, lines 51-61, Nesbitt discusses other materials for the two layers. Here it is

disclosed that both the inner and outer layers "may be cellular when formed of a foamed natural

or synthetic polymeric material." Nesbitt then states that "[p]olymeric materials are preferably

such as ionomer resins which are foamable." Examiner construes this sentence to mean that the

polymeric materials preferred by Nesbitt are those that, like ionomer resins, are foamable. Since

Nesbitt does not disclose a list of foamable polymeric materials, he references Molitor '637

"which describes a number of foamable compositions of a character which may be employed for one or both layers."

Molitor '637 states that his invention "relates to the use of cellular material as cover stock for conventional golf ball centers" (Molitor '637 at col. 3, line 10-13). The preferred embodiment for the outer cover, similarly to Nesbitt, is a Surlyn resin (Molitor '667 at col. 3, lines 36-42). Farther into the specification, however, Molitor states that other materials both synthetic and natural can be used as the outer layer material (Molitor '637 at col. 5, lines 27-32). Molitor then lists "suitable polymer materials" (Molitor '637 at col. 5, lines 30-55). Included in this list, *inter alia*, are polyethylene, polypropylene, polyurethanes, and thermoplastic rubbers (Molitor '637 at col. 5, lines 33-55). The examples of covers that Molitor '637 discloses use Surlyn resins, polypropylene, polyethylene, and thermoplastic rubbers (Tables 1 to 12).

The Examiner considers Nesbitt to incorporate by reference Molitor '637 because Nesbitt's invention encompasses use of foamable material other than Surlyn resins as cover materials (see above). Since only Surlyn resins are discussed in his specification, Nesbitt incorporates by reference Molitor '637 to supply the "essential material" of other foamable compositions that may be employed. Without this incorporation, Nesbitt's specification appears to lack adequate disclosure for compositions other than Surlyn.

Nesbitt in "sufficient particularity" states that "foamable compositions" are to be referenced, or incorporated. One of reasonable skill, when reading the specification of Molitor '637, would know that Nesbitt meant to incorporate the list of materials found at col. 5, lines 30-55, of Molitor '637, because the list is juxtaposed as an alternative to Surlyn (Molitor '637 at col. 5, lines 27-32). Nesbitt's language of incorporation is similarly juxtaposed as an alternative to

Surlyn (Surlyn being "ionomer resins" of col. 3, lines 51-61, of Nesbitt).  Both references, then,

disclose foamable materials, or compositions, other than Surlyn resins that can be used in golf

ball construction.  One of these listed materials is polyurethane.

Agreeing with the comments of the Third Party Requester (Third Party Requester's

Comments at page 7), the Examiner considers the holdings of *In re Voss* and *In re Hughes* to

support the decision reached here.  The pertinent language of incorporation in *In re Voss* was

"Reference is made . . . for a general discussion of . . . materials and their production" (557 F.3d

at 816).  Nesbitt is similar in that both patents incorporate materials.  The pertinent language of

incorporation in *In re Hughes* was "Reference is made . . . for a complete description of methods

of preparing aqueous polymeric dispersions" (550 F.3d at 1275).  Nesbitt is similar in that both

patents incorporate polymeric materials.

Finally, The Patent Owner specifically argues that incorporation by reference is not

needed to give adequate support for use of polyurethane because off the claims have limitations

to ionomer resins and not foamable resins generally.  Examiner finds this argument unpersuasive

because the specification, as originally filed, claimed "resinous foamable material" for example

in claim 10.  Hence, incorporation of Nesbitt is needed to support claims that claim foamable

material.  (For convenience, the Examiner includes with this office action a copy of the

specification (without drawings) of 07/296,146, the application of US 4,431,193 to Nesbitt).

### *Right of Appeal Notice*

This is a **RIGHT OF APPEAL NOTICE (RAN)**; see MPEP § 2673.02 and § 2674.  The

decision in this Office action as to the patentability or unpatentability of any original patent

claim, any proposed amended claim and any new claim in this proceeding is a FINAL

DECISION.

No amendment can be made in response to the Right of Appeal Notice in an *inter partes*

reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can be submitted in an

*inter partes* reexamination proceeding after the right of appeal notice, except as provided in 37

CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37 CFR 1.116(f).

Each party has a **thirty-day or one-month time period, whichever is longer**, to file a

notice of appeal. The patent owner may appeal to the Board of Patent Appeals and Interferences

with respect to any decision adverse to the patentability of any original or proposed amended or

new claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR

41.20(b)(1). The third party requester may appeal to the Board of Patent Appeals and

Interferences with respect to any decision favorable to the patentability of any original or

proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set

forth in 37 CFR 41.20(b)(1).

In addition, a patent owner who has not filed a notice of appeal may file a notice of cross

appeal within **fourteen days of service** of a third party requester's timely filed notice of appeal

and pay the fee set forth in 37 CFR 41.20(b)(1). A third party requester who has not filed a

notice of appeal may file **a notice of cross appeal within fourteen days of service** of a patent

owner's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).

Any appeal in this proceeding must identify the claim(s) appealed, and must be signed by

the patent owner (for a patent owner appeal) or the third party requester (for a third party

requester appeal), or their duly authorized attorney or agent.

Any party that does not file a timely notice of appeal or a timely notice of cross appeal

will lose the right to appeal from any decision adverse to that party, but will not lose the right to

file a respondent brief and fee where it is appropriate for that party to do so. If no party files a

timely appeal, the reexamination prosecution will be terminated, and the Director will proceed to

issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

Application/Control Number: 95/000,122                                        Page 208
Art Unit: 3993

## *Conclusion*

All correspondence relating to this *inter partes* reexamination proceeding should be directed as follows:

By **U.S. Postal Service Mail** to:

       Mail Stop *Inter Partes* Reexam
       ATTN:  Central Reexamination Unit
       Commissioner for Patents
       P.O. Box 1450
       Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
             Central Reexamination Unit

By hand to:    Customer Service Window
             ATTN:  Central Reexamination Unit
             Randolph Building
             401 Dulany St.
             Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications should be directed to the Examiner.  Questions concerning status of this proceeding should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.  If attempts to reach the Examiner are unsuccessful,  the Examiner's Supervisor, Lynne H. Brown, can be reached at 571.272.3670.

*/Jeffrey L. Gellner/*
Central Reexamination Unit
Art Unit 3993
phone:  571.272.6887

conferees:

| Notice of References Cited | | Application/Control No. 95/000,122 | | Applicant(s)/Patent Under Reexamination 6506130 | |
|---|---|---|---|---|---|
| | | Examiner Jeffrey L. Gellner | | Art Unit 3993 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Specification (without drawings) of 07/296,146 as originally filed that resulted in US 4,431,193 to Nesbitt (12 pages). |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited            Part of Paper No. 20080527

***Search Notes***

| | |
|---|---|
| Application/Control No. | Applicant(s)/Patent Under Reexamination |
| 95/000,122 | 6506130 |
| Examiner | Art Unit | |
| Jeffrey L. Gellner | 3993 | |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| none | | 6/18/2008 | JLG |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | | |
|---|---|---|
| | DATE | EXMR |
| none | 6/18/2008 | JLG |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. 20080527

## Index of Claims

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 95/000,122 | 6506130 |
| Examiner | | Art Unit | |
| Jeffrey L. Gellner | | 3993 | |

| √ | Rejected | − | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | + | Restricted | I | Interference | O | Objected |

| Claim | | Date | Claim | | Date | Claim | | Date |
|---|---|---|---|---|---|---|---|---|
| Final | Original | 6/18/08 | Final | Original | | Final | Original | |
| | 1 | √ | | 51 | | | 101 | |
| | 2 | √ | | 52 | | | 102 | |
| | 3 | √ | | 53 | | | 103 | |
| | 4 | √ | | 54 | | | 104 | |
| | 5 | √ | | 55 | | | 105 | |
| | 6 | √ | | 56 | | | 106 | |
| | 7 | | | 57 | | | 107 | |
| | 8 | | | 58 | | | 108 | |
| | 9 | | | 59 | | | 109 | |
| | 10 | | | 60 | | | 110 | |
| | 11 | | | 61 | | | 111 | |
| | 12 | | | 62 | | | 112 | |
| | 13 | | | 63 | | | 113 | |
| | 14 | | | 64 | | | 114 | |
| | 15 | | | 65 | | | 115 | |
| | 16 | | | 66 | | | 116 | |
| | 17 | | | 67 | | | 117 | |
| | 18 | | | 68 | | | 118 | |
| | 19 | | | 69 | | | 119 | |
| | 20 | | | 70 | | | 120 | |
| | 21 | | | 71 | | | 121 | |
| | 22 | | | 72 | | | 122 | |
| | 23 | | | 73 | | | 123 | |
| | 24 | | | 74 | | | 124 | |
| | 25 | | | 75 | | | 125 | |
| | 26 | | | 76 | | | 126 | |
| | 27 | | | 77 | | | 127 | |
| | 28 | | | 78 | | | 128 | |
| | 29 | | | 79 | | | 129 | |
| | 30 | | | 80 | | | 130 | |
| | 31 | | | 81 | | | 131 | |
| | 32 | | | 82 | | | 132 | |
| | 33 | | | 83 | | | 133 | |
| | 34 | | | 84 | | | 134 | |
| | 35 | | | 85 | | | 135 | |
| | 36 | | | 86 | | | 136 | |
| | 37 | | | 87 | | | 137 | |
| | 38 | | | 88 | | | 138 | |
| | 39 | | | 89 | | | 139 | |
| | 40 | | | 90 | | | 140 | |
| | 41 | | | 91 | | | 141 | |
| | 42 | | | 92 | | | 142 | |
| | 43 | | | 93 | | | 143 | |
| | 44 | | | 94 | | | 144 | |
| | 45 | | | 95 | | | 145 | |
| | 46 | | | 96 | | | 146 | |
| | 47 | | | 97 | | | 147 | |
| | 48 | | | 98 | | | 148 | |
| | 49 | | | 99 | | | 149 | |
| | 50 | | | 100 | | | 150 | |

| *Reexamination* | Application/Control No.<br>95/000,122<br>Certificate Date | Applicant(s)/Patent under<br>Reexamination<br>6506130<br>Certificate Number |
|---|---|---|

| Requester | Correspondence Address: | ☐ Patent Owner | ☒ Third Party |
|---|---|---|---|

Joseph P. Lavelle
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 2004

| LITIGATION REVIEW ☒ | JLG<br>(examiner initials) | 15 May 2008<br>(date) |
|---|---|---|
| **Case Name** | | **Director Initials** |
| Callaway Golf Co. v. Acushnet Co., 1:06cv91 (Del. filed: 9 Feb. 2006)<br>(OPEN) | | AKJ or GM |
| | | |
| | | |
| | | |
| | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| **TYPE OF PROCEEDING** | **NUMBER** |
| 1.    none | |
| 2. | |
| 3. | |
| 4. | |

U.S. Patent and Trademark Office

DOC. CODE  **RXFILJKT**