Ground 40: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as those at "Ground 5: Patent Owner's Argument," *supra*.

Ground 40: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter arguments are the same as those at "Ground 5: Third Party Requester's Comments," *supra*.

Ground 40: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained. See "Ground 5: Examiner's Response to the Argument and Comments," *supra*.

**Proposed third party requester rejection:  Ground #41**

The requester submits on page 67 that claim 6 is unpatentable under 35 U.S.C. § 103(a) as being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Wu, U.S. Pat. No. 5,334,673 (Wu).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view of Wu, as evidenced by Exhibit C.

The below claim chart identifies the new limitations introduced by dependent claim 6.

Application/Control Number: 95/000,123                              Page 152
Art Unit: 3993

| Claim 6 | Proudfit |
|---|---|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The inner layer is formed from hard resin material such as ionomer resin, and the outer layer is formed from a soft material such as balata or a blend of balata and other elastomers." (Proudfit, col. 1, ll. 11-16.)<br><br>"The composition of the inner cover layer is described in Table 6."<br>**TABLE 6**<br><br>Composition of Inner Layer of Cover (Parts by Weight)<br><br>| Ionomer Type | Blend Ratio |<br>|---|---|<br>| Sodium- Surlyn 8940 | 75% |<br>| Zinc- Surlyn 9910 | 25% |<br><br>(Proudfit, col. 8, ll. 22-30)<br><br>"...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core, inner layer and outer layer) with the layers within the range of claimed thicknesses each layer made from a material having the mechanical properties substantially similar to the claimed mechanical properties.  What Proudfit lacks in clearly disclosing are the particular mechanical and chemical properties of the claimed invention.  Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer and a soft balata blend outer cover layer.  Proudfit lacks in disclosing the use of polyurethane as the material for the outer cover layer.  Instead, as shown in Table 7, reproduced below, Proudfit discloses the outer cover layer being made of a blend of balata.

**TABLE 7**

| Composition of Outer Layer (Parts by Weight) | |
|---|---|
| Trans Polylsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Application/Control Number: 95/000,123                                    Page 153
Art Unit: 3993

However, those skilled in the art understand the disadvantages of balata covered golf balls. As

admitted by the patent owner

> [d]espite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-
> hit. Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). The next step in golf ball cover technology to overcome the

problems with balata was the use of SURLYN as an outer cover. However, as described in the

request on page 26 Wu teaches the problem with SURLYN as a outer cover on a golf ball.

> **The problem with SURLYN covered golf balls ... is that they lack the "click" and "feel"**
> **which golfers had become accustomed to with balata.** "Click" is the sound when the ball is hit
> by a golf club and "feel" is the overall sensation imparted to the golfer when the ball is hit.
>
> It has been proposed to employ polyurethane as a cover stock for golf balls because, like
> SURLYN, it has a relatively low price compared to balata and provides superior cut resistance
> over balata. **However, unlike SURLYN covered golf balls, polyurethane-covered golf balls**
> **can be made to have the "click" and "feel" of balata.**

(Wu col. 1, ll. 36-46 (emphasis added)).

As explained in the request on page 26, line 22 through page 27, line 27 those skilled in

the art at the time the claimed invention was made were more critical of the mechanical

properties of the materials that constructed the layers which impacted the performance of the golf

ball more than the materials themselves. See Exhibit G. As identified above Proudfit lacks

disclosing polyurethane as the outer cover layer. In analogous golf ball device, Wu's

polyurethane material inherently has a flexural modulus of 23,000 psi as averred within the Rule

132 Declaration of Jeffrey L. Dalton at para. 7. Proudfit's outer cover layer material is disclosed

as having a flexural modulus of between about 20,000 psi and 25,000 psi. (Proudfit, col. 6, ll.

28-31) Thus, Wu's cover material's flexural modulus falls within the range of Proudfit's cover

material. Moreover, Wu's polyurethane material inherently has a Shore D hardness of about 58.

See Decl. of Dalton at para. 6. Thus, as evidenced by this declaration, Wu's polyurethane

material falls within the claimed range of the outer layer material have a Shore D hardness of less than 64.

Thus, as pointed out in the request on page 27, lines 3-18, one of ordinary skill in the art at the time the invention was made would find it obvious to substitute Wu's polyurethane golf ball cover material for Proudfit's balata-blend cover material for the advantages described in this part of the request which are incorporated herein.

This rejection of claim 6 based on Proudfit in view of Wu as evidenced by Exhibit C was proposed by the third party requester in the request for reexamination and is being adopted essentially as proposed in the request.

Ground 41: Patent Owner's Argument

Patent Owner does not specifically argue this rejection. The arguments are the same as those at "Ground 6: Patent Owner's Argument," *supra*.

Ground 41: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter arguments are the same as those at "Ground 6: Third Party Requester's Comments," *supra*.

Ground 41: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor

Application/Control Number: 95/000,123                                    Page 155
Art Unit: 3993

'637 is maintained.   See "Ground 6: Examiner's Response to the Argument and

Comments," *supra*.


**Proposed third party requester rejection:  Ground #42**

The requester submits on page 67 that claim 6 is unpatentable under 35 U.S.C. § 103(a)

as being obvious over Proudfit, U.S. Pat. No. 5,314,187 (Proudfit) in view of Molitor et al., U.S.

Pat. No. 4,674,751 (Molitor '751).

Claim 6 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Proudfit in view

of Molitor '751.

The below claim chart identifies the new limitations introduced by dependent claim 6.

| Claim 6 | Proudfit |
|---------|----------|
| wherein the Shore D hardness of said outer cover layer is less than the Shore D hardness of said inner cover layer. | "The inner layer is formed from hard resin material such as ionomer resin, and the outer layer is formed from a soft material such as balata or a blend of balata and other elastomers." (Proudfit, col. 1, ll. 11-16.) <br><br> **TABLE 6** <br><br> Composition of Inner Layer of Cover (Parts by Weight) <br><br> <table><tr><td>Ionomer Type</td><td>Blend Ratio</td></tr><tr><td>Sodium- Surlyn 8940</td><td>75%</td></tr><tr><td>Zinc- Surlyn 9910</td><td>25%</td></tr></table> <br> "The composition of the inner cover layer is described in Table 6." <br><br> (Proudfit, col. 8, ll. 22-30) <br><br> "...an **outer layer of soft material** such as balata or a blend of balata and other elastomers." (Proudfit, col. 5, ll. 15-17)  This material inherently has a Shore D hardness of less than 64, see the reasoning below. |

As shown above Proudfit discloses, teaches and suggests a three-piece golf ball (core,

inner layer and outer layer) with the layers within the range of claimed thicknesses each layer

made from a material having the mechanical properties substantially similar to the claimed

mechanical properties. What Proudfit lacks in clearly disclosing are the particular mechanical

and chemical properties of the claimed invention. However, Proudfit either incorporates by

reference these mechanical and chemical properties and/or the materials used within the Proudfit

golf ball inherently have these mechanical and chemical properties. For instance, Proudfit

incorporates by reference U.S. Pat. No. 4,690,981 in the background of this invention. (Proudfit,

col. 1, ll.39-43). The '981 patent discloses the preferably amount of unsaturated carboxylic acid

is "from about 5[%] to about 15% by weight." ('981 Pat, col. 3, ll. 59-60). If Proudfit discloses

using blends SURLYN the chemical for making the inner cover and the '981 Patent is the

formulation for ionomer known in the art as SURLYN, then inherently grades of SURLYN such

as SURLYN 8940 and SURLYN 9910 would be low acid ionomer resins containing no more

than 16% by weight of an alpha, beta-unsaturated carboxylic acid. As taught from Exhibit I,

SURLYN 8940 has a Shore D hardness of 65; SURLYN 9910 has a Shore D hardness of 64, see

Exhibit I. Therefore, this cover blend inherently has a hardness of 60 or more. Proudfit

discloses the outer layer being a blend of balata. An example of the blend is disclosed in Table 7

reproduced below.

| TABLE 7 | |
|---|---|
| Composition of Outer Layer (Parts by Weight) | |
| Trans PolyIsoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

Note that Trans PolyIsoprene is basically the chemical name for balata and Polybutadiene is one

of the first types of synthetic rubber or elastomer. As described in the Rule 132 Declaration of

Edmund A. Hebert, the outer cover layer disclosed in Proudfit is the outer cover layer for the

golf ball disclosed in Exhibit A and that cover has a Shore D hardness of 52. Thus, Proudfit's

outer layer cover inherently has a Shore hardness of less than 64.

Also, as expressed in the request on page 26 and identified above within the claim chart,

Proudfit teaches a golf ball have a two-piece cover including a hard, ionomeric inner cover layer

and a soft balata blend outer cover layer. Proudfit lacks in disclosing the use of polyurethane as

the material for the outer cover layer. Instead, as shown in Table 7, reproduced below, Proudfit

discloses the outer cover layer being made of a blend of balata.

**TABLE 7**

| Composition of Outer Layer (Parts by Weight) | |
| --- | --- |
| Trans Polyisoprene (TP-301) | 60.00 |
| Polybutadiene | 40.00 |
| Zinc Oxide | 5.00 |
| Titanium DiOxide | 17.00 |
| Ultramarine Blue color | .50 |
| Zinc DiAcrylate | 35.00 |
| Peroxide (Varox 230 XL) | 2.50 |
| Total | 160.00 |

However, those skilled in the art understand the disadvantages of balata covered golf balls. As

admitted by the patent owner

> Despite all the benefits of balata, balata covered golf balls are easily cut and/or damaged if mis-hit.
> Golf balls produced with balata or balata-containing cover compositions therefore have a
> relatively short lifespan.

(Sullivan '873, col. 1, ll. 39-42). With this disadvantage of balata covered golf balls, golf ball

designers looked for materials that would provide the same "click" and "feel" golfers expected

and have increased durability.

As pointed out in the request on page 28, lines 4-15, in an analogous golf ball, Molitor

'751 teaches that:

> It has now been discovered that a key to manufacturing a two-piece ball having playability
> properties similar to wound, balata-covered balls is to provide about an inner resilient molded core
> a **cover having a shore C hardness less than 85**, preferably 70-80, and most preferably 72-76.
> The novel cover of the golf ball of the invention is made of a composition comprising a blend of

Application/Control Number: 95/000,123                                    Page 158
Art Unit: 3993

> (1) a **thermoplastic urethane having a shore A hardness** less than 95 and (2) an ionomer having
> a shore D hardness greater than 55. The ionomer comprises olefinic groups having two to four
> carbon atoms copolymerized with acrylic or methacrylic acid groups and cross-linked with metal
> ions, preferably sodium or zinc ions. **The primary components of the blended cover are set at a**
> **weight ratio so as to result in a cover material after molding having a shore C hardness**
> **within the range of 70 to 85, preferably 72 to 76.** Preferably, the urethane component of the
> cover material has a tensile strength greater than 2500 psi and an elongation at break greater than
> 250%. A preferred cover material comprises about 8 parts of the thermoplastic urethane and
> between 1 and 4 parts ionomer. Preferably, the cover is no greater than 0.060 inch thick. Thinner
> covers appear to maximize the short iron playability characteristics of the balls.

(Molitor '751, col. 33-57 (emphasis added)).   Thus, Molitor '751 teaches having a outer cover

layer with a Shore C hardness less than 85 and preferably between 72 and 76.   Moreover,

Molitor '751 teaches what golf balls are included in the definition of "two-piece" ball within its

instant specification.

> The phrase "two-piece ball" as used herein refers primarily to balls consisting of a molded core
> and a cover, **but also includes balls having a separate solid layer beneath the cover as**
> **disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-**
> **wound cores.**

Molitor '751, col. 3, ll. 7-12 (emphasis added)).   Proudfit, likewise, teaches the two-piece golf

balls can fit within this definition.

> FIG. 1 illustrates a two-piece golf ball 10 which includes a solid core 11 and a cover 12 which
> comprises a relatively hard inner layer 13 of one or more ionomer resins and a relatively soft outer
> layer 14 of polymeric material.

(Proudfit, col. 7, ll. 21-24).

As stated above, Molitor '751 teaches the cover of the golf ball has a Shore C hardness of

less than 85, preferably 70-80, most preferably 72-76.   As described in Molitor '751's TABLE

bridging columns 7 and 8, Sample 8 constitutes one of the preferred embodiments and its cover

is taught to have a Shore C hardness of 73.   Patent Owner has admitted that a Shore C hardness

of 73 is equal to a Shore D hardness of 47, see U.S. Pat. No. 6,905,648, Table 19 (Exhibit L).

Thus, a cover having a Shore C hardness of between 72 and 76 will inherently have a Shore D

hardness of less than 64.

How one of ordinary skill in the art would discover this inherent mechanical property of

Shore D hardness for the polyurethane material used in Molitor '751 is by "translating" a Shore

C value to a Shore D value for the polyurethane material.  How one of ordinary skill in the art

"translates" a Shore C value to a Shore D value is by taking the known Shore hardness values

with a given range, in this instance Shore C, for given materials, in this instance a polyurethane

golf ball covers materials, and taking corresponding measurements with a different set of Shore

gauges, in this instance Shore D (but could also be Shore A).  A resulting trendline plot occurs

from performing this procedure wherein the range of known Shore C values are the abscissa and

the range of measured Shore D values are the ordinate.  Then, said plot can be use to read

equivalent Shore D value for any given Shore C value within the known range of Shore C.  This

is how one of ordinary skill in the art can know the equivalent Shore D or even Shore A hardness

value for any given Shore C hardness value.

As stated in the request on page 29

> Therefore, it would have been obvious to one of ordinary skill in the art at the
> time of the invention to substitute the soft outer cover layer of Nesbitt and replace
> it with an outer cover layer made of the soft polyurethane material taught by
> Molitor '751 to provide a golf ball that includes "playability properties as good or
> better than balata-covered wound balls but are significantly more durable," and
> "have better wood playability properties than conventional two-piece balls, and
> permit experienced golfers to apply spin so as to fade or draw a shot" while
> having improved puttability.  (Molitor '751, col. 2, ll. 61-68)

This rejection of claim 6 based on Proudfit in view of Molitor '751 was proposed by the

third party requester in the request for reexamination and is being adopted essentially as

proposed in the request.

Ground 42: Patent Owner's Argument

Application/Control Number: 95/000,123                         Page 160
Art Unit: 3993

Patent Owner does not specifically argue this rejection. The arguments are the same as those at "Ground 7: Patent Owner's Argument," *supra*.

## Ground 42: Third Party Requester's Comments

Third Party Requester does not specifically counter argue this rejection. The counter arguments are the same as those at "Ground 7: Third Party Requester's Comments," *supra*.

## Ground 42: Examiner's Response to the Argument and Comments

Examiner agrees with the general comments of the Third Party Requester, and the rejection of claim 6 under 35 USC 103(a) as being obvious by Nesbitt in view of Molitor '637 is maintained. See "Ground 7: Examiner's Response to the Argument and Comments," *supra*.

## Unexpected Results and Commercial Success

Patent Owner's Argument

Besides arguing the outstanding rejections of individual claims as explained *supra*, the Patent Owner argues generally for non-obviousness of the invention based on unexpected results and commercial success (*see* Patent Owner's Response at pages 6-9). The crux of the argument is that, although the instant invention is made of individual elements known in the art, the unique combination of elements of the claimed invention results in a golf ball with excellent ""distance"" and ""feel"" (Patent Owner's Response at page 7). Consequently, golf balls within the ambit of the claimed invention (*i.e.*, the Rule 35 ball of the Patent Owner and the Pro V1 of

Application/Control Number: 95/000,123                                        Page 161
Art Unit: 3993

the Third Party Requester) have great commercial success. Hence, the "[u]nexpected and

overwhelming success of Mr. Sullivan's golf ball technology thus demonstrates that his

invention was not simply the predictable result of combining known materials, but in fact

represented the best solution even conceived for the distance-versus-control problem" (Patent

Owner's Response at page 9).


Third Party Requester's Comments

    The Third Party Requester comments that: (1) the Sullivan '103 patent does not disclose

or suggest the Pro V1 because the Pro V1 has a construction different in several aspects (*e.g.*,

core size) from the ball disclosed in the Sullivan '130 patent (Third Party Requester's Comments

at middle of page 35 to bottom of page 37); (2) there is no nexus between the commercial

success of the Third Party Requester's Pro V1 and the Sullivan '130 patent because the Pro V1's

success rests upon specific types of advertising (Third Party Requester's Comments at bottom of

page 37 to middle of page 40) along with different technology (Third Party Requester's

Comments at middle of page 40 to bottom of page 42); (3) many golf balls purport to have

solved the distance and "feel" problem (Third Party Requester's Comments at bottom of page 43

top of page 45); and, (4) even though there were other three-piece, polyurethane balls available,

there was little demand for the ball on the PGA tour until shortly before the introduction of the

Pro V1 (Third Party Requester's Comments at page 45 to page 46).


Examiner's Response to the Argument and Comments

Examiner generally agrees with the comments of the Third Party Requester and finds the arguments of the Patent Owner of unexpected results and commercial success to be unpersuasive.

As a preliminary matter, the argument(s) presented for secondary considerations presented by the Patent Owner are not relevant to the rejections made under 35 USC 102 (*see* MPEP 2131.04). Thus only the rejections under 35 USC 103 are considered.

To show unexpected results (*i.e.,* unique and excellent combination of distance and "feel") the Patent Owner uses testimonial-type evidence of statements, or endorsements, by well known golfers such as Arnold Palmer (Patent Owner's Response at bottom on page 8). Examiner considers this to be opinion evidence because the statements are not accompanied by objective data. Due to this lack of objective data, the probative value of the presented opinion evidence is not sufficient to overcome the *prima facie* rejections, *supra,* maintained in this office action.

The evidence of commercial success proffered by the Patent Owner is similarly testimonial in nature (*e.g.,* "Pro V1 is the "most successful golf ball in the history of the golf industry . . ."" citing an article in the Golf Gazette). Again no objective data is presented as support. With no objective data, the probative value of the presented evidence is again not sufficient to overcome the *prima facie* rejections, *supra,* maintained in this office action.

As to the comments of the Third Party Requester concerning, *inter alia,* the scope of the claims of the Sullivan '130 patent and its nexus with the Pro V1, the Examiner did not evaluate these comments since the secondary considerations presented by the Patent Owner were not found sufficient for the reasons given immediately above.

### Shore D hardness value measured on the ball

Patent Owner's Argument

      Besides arguing the outstanding rejections of individual claims as explained *supra* and

commercial success *id.*, the Patent Owner argues that the claims in the instant patent require the

Shore D hardness value's of the cover layers to be measured "on the ball" (Patent Owner's

Response at pages 10-12). Since the two base references (Nesbitt and Proudfit) do not disclose

measuring hardness "on the ball" for their covers, the outstanding rejections are flawed (Patent

Owner's Response at pages 12-13).


Third Party Requester's Comments

      The Third Party Requester comments that: (1) in a reexamination claims are given their

broadest reasonable interpretation consistent with the specification, and, here, "on the ball" is too

narrow a construction (Third Party Requester's Comments at page 7); (2) the specification of the

instant patent clearly states at col. 16, lines 15-16, that "Shore hardness was measured in

accordance with ASTM test 2240" which calls for "off the ball" testing (Third Party Requester's

Comments at page 8); (3) the Patent Owner knew how to claim "on the ball" because in a sister

patent the language of "as measured on the curved surface thereof" is explicitly used (Third

Party Requester's Comments at bottom of page 9 to middle of page 10); and, (4) even if

measured "on the ball" the prior art is still good because measuring Shore D hardness "on the

Application/Control Number: 95/000,123                                    Page 164
Art Unit: 3993

ball" does not affect the disclosed values enough to make the instant patent's claims patentable

over the prior art (Third Party Requester's Comments at bottom of page 10 to page 13).


Examiner's Response to the Argument and Comments

Examiner generally agrees with the comments of the Third Party Requester and finds the

arguments of the Patent Owner concerning measuring of hardness "on the ball" to be

unpersuasive.

The rule is that "[d]uring reexamination claims are given the broadest reasonable

interpretation consistent with the specification" (MPEP 2658(I) and 2258(I)(G)).  Here, the

claims are silent as to whether the Shore D hardness value is measure "on the ball" or not.  In the

specification, hardness measurements are disclosed at col. 7, lines 12-14, and col. 16, lines 1-16,

and are to be conducted "in accordance with ASTM method D-2240."  ASTM D-2240's method

of testing uses a specimen of material, and are not measured "on the ball" (Exhibit C).  To be

consistent with the specification, then, the claims in the instant patent do not require a Shore

hardness value measured "on the ball."


***Patent Owner's Arguments received 7 March 2008***

Since the Patent Owner does not argue rejections of individual claims (demarcated as

such), the arguments will be addressed by topic as given in the Response received 7 March 2008.

Patent Owner argues:

(1) On page 2, that in litigation a district court ruled on a number of validity issues and its jury upheld the validity of claims 1 and 3 of the patent of issue. While not bound by the verdict, these decisions are relevant and instructive and deserve consideration by the Examiner;

(2) Beginning on page 2, that Nesbitt does not incorporate by reference Molitor '637 because the correct legal standard for incorporation is *Advanced Display Systems* as relied upon by the District Court. "Under this standard, the host document 'must cite the material [to be incorporated by reference] in a manner that makes clear that it is effectively part of the host document as if it were explicitly contained therein.' Accordingly, the host document must 'identify with detailed particularity what specific material it incorporates' and 'clearly indicate where that material is found in the various documents.'" (citing *Advanced Display Systems*). The court distinguished *In re Voss* and *In re Hughes* due to level of detail found in their incorporation statements;

(3) Beginning on page 5, that "[t]he Examiner is bound to give claim terms their broadest *reasonable* construction" (emphasis in original). "[T]o determine whether construction is "reasonable," as opposed to merely broad (and thus unreasonable) requires examination of the claim language and the patent's specification, as well as how persons of ordinary skill in the field (here, golf ball designers and manufactures) would interpret the term" (citing MPEP 2111). The broadest reasonable construction of the language of the claims is to require the Shore D hardness values for both the inner and outer cover layers to be measured on the ball, itself.

Proof for this is that: (a) since there is no simple correlation between hardness measured on the ball and on a plaque of the material, hardness must be measured on the ball; (b) the claims refer to a "layer" for hardness which implies measuring on the ball, even though it also

refers to a "layer" with flex modulus which can not be measured on the ball, since those skilled

in the art would interpret and understand the claim language to differentiate the two

measurements; and, (c) "[i]nterpreting the claims to require measuring Shore D hardness "on

the ball" is consistent with the way in which hardness values are measured in the field of golf

ball design and manufacture" as shown by the testimony of Dalton and Morgan, the Sullivan

article, and the Molitor '751 patent;

    (4) Beginning on page 9, that the rejections based on Proudfit uses information from

commercial golf balls (Wilson Ultra Tour Balata Ball) which a district court, as a matter of law,

held did not anticipate a sister patent because the ball of Proudfit's patent and the Wilson ball

were "discrete, separate items of prior art for purposes of anticipation." Therefore, the Wilson

ball does not represent what the patent at issue here claims. Particularly, for hardness the

Examiner has failed to establish, *necessarily and unambiguously*, that the Wilson ball inherently

has the required Shore D value (emphasis in Response);

    (5) Beginning on page 10, that the rejections using Molitor '637, Molitor '751, or Wu,

impermissibly use commercial literature of the Titleist Professional (Examiner notes that in his

earlier office action the Examiner erroneously called this ball the Titleist 1) to disclose Shore D

hardness values;

    (6) Beginning on page 12, that the Examiner erred in failing to give weight to the

evidence of commercial success (e.g., sales of Pro V1 golf balls) of nonobviousness submitted

by the Patent Owner. The Examiner's dismissal of this evidence as "testimonial in nature" is

improper because the form the evidence takes is not relevant. For example, the Fed. Cir. recently

vacated and remanded a decision of the BPAI because the Board failed to consider objective

evidence of nonobviousness presented in the form of declarations. Further, the Examiner's

treatment here is inconsistent with the treatment given the Third Party Requester's evidence of

hardness of Proudfit's outer layer which was declaratory in nature (Hebert Declaration). Finally,

the Examiner's decision to give little weight to the evidence is "particularly egregious" because

the PTO's rules do not allow confidential material to remain confidential, thus, the Patent Owner

is limited in the type of material submitted; and,

(7) Beginning on page 13, the *KSR* holding quoted by the Examiner is not dispositive

because the Examiner's quote also relates to predictability. Patent Owner's evidence shows the

instant invention to be "anything but predicable." Further, *KSR* did not change the court's

censure against use of hindsight. The obviousness rejections, here, are "hindsight-laced

reconstructions based upon selectively choosing bits and pieces from various references and then

stitching them together using the '873 patent claims for guidance." Finally, the instant invention

is not the product of common sense because other designers of golf balls did not create the

invention which revolutionized the golf ball industry and achieved "enormous commercial

success."

### Third Party Requester's Comments received 4 April 2008

The Third Party Requester's rebuttal comments to the Patent Owner's arguments are as

follows:

As to argument (2), beginning at page 5, that the district court's analysis of this issue

"contained numerous flaws." First, the court relied on *Zenon Environ. Inc.* for its holding but

applied the holding improperly. When interpreted correctly, *Zenon* supports the Third Party

Requester's position - that "Nesbitt incorporates all of the specific foamable compositions of

Molitor '637 by reference." Second, the district court misconstrued the disclosure of Molitor

'637 by convoluting ionomeric compositions, foamable compositions, and polyurethane. Third,

Nesbitt and *In re Voss* "provide the same type of incorporation statement for exactly the same

purpose (the use of known materials in the claimed invention); Nesbitt and *S. Clay Prods.* have

similar specificity; and, Nesbitt and *In re Hughes* both incorporate several examples. And

fourth, that many of Nesbitt's claims would lack support if Nesbitt did not incorporate Molitor

'637. Since "issued patents are presumed to contain an adequate written description, absent clear

contrary showing," here Nesbitt needs to incorporate Molitor '637 to provide support.

      As to argument (3) beginning on page 2, that "the question is not whether Shore D

hardness **can** be measured on the ball as well as on the plaque, but rather whether the [patent at

issue has claims that require Shore D hardness] be measured **only** on the ball" (emphasis in

Comments). Patent Owner has failed to show that hardness for these claims needs be measured

only on the ball because: (a) the district court conceded that "either construction (on or off the

ball) was supported by the intrinsic evidence and, thus, was reasonable; (b) the patent at issue

states that "Shore hardness was measured in accordance with ASTM test 2240" which is

measured on the plaque (at col. 16, lines 15-16) (emphasis in Comments); (c) the claims have

limitations to flexual modulus for the cover layers using the same language as for hardness, and

flexual hardness can not be measured on the ball, hence, hardness need not be measure on the

ball; and, (d) "[w]hile it is true that claims are interpreted from the perspective of one of

ordinary skill, this doesn't mean that they may be interpreted in ways that are completely

inconsistent." Here, with "an explicit definition (*see supra* section (b)) provided by the applicant

for a term, that definition will control interpretation of the term as it is used in the claim" (citing

MPEP 2111.01(IV) which in turn cites *Toro Co. v. White Consolidated Industries Inc.*).

As to argument (4), beginning on page 10, that the Patent Owner has not met its burden

of persuasion with any evidence for refuting inherency after the Examiner has established a

*prima facie* case of unpatentability.  Further, even if measured on the ball, the Wilson Ultra Tour

Balata ball has a Shore D hardness value of less that 64 because of data from testing of samples

of balls collected in 1993 (Requester's Exhibits 3-5).  And, this Wilson ball is representative of

the ball disclosed in Proudfit's patent because of the declaration of Proudfit that was offered

during the prosecution of his patent (Requester's Exhibit 9).

As to argument (5), beginning on page 18, that Wu's polyurethane cover has a Shore D

hardness of less that 64 because of statements made during litigation.  Also, that in U.S. Patent

5,803,831 a polyurethane is discloses with a Shore D hardness value of less than 64 ("39" of col.

23, lines 1-13).

As to argument (6), beginning at page 12, that for "unexpected results" the Patent Owner

has not provided a comparison with "evidence of what results would be expected by a person of

ordinary skill in the art from the combination of a three piece golf ball with a polyurethane

cover" (citing *Pfizer v. Apotex*).  Nor has the Patent Owner provided a comparison of the

invention to the closest prior art (e.g., Wilson Ultra Tour Balata) but only to the Titleist

Professional.  "Finally, even if Patent Owner's secondary considerations evidence is deemed

probative in this case" it is not persuasive enough to overcome the rejections (citing *Agrizap, Inc.

v. Woodstream Corp.*).

Application/Control Number: 95/000,123                                    Page 170
Art Unit: 3993

As to argument (7), beginning at page 14, that "sworn testimony and documents before the PTO establish that it was a simply the exercise of ordinary skill in the art to apply polyurethane, such as taught by Wu's 1994 patent, to prior art three-piece balls, such as Profit or Nesbitt, in order to achieve the same results taught for polyurethane on two-piece golf balls - improved durability over balata and improved spin, click, and feel over Surlyn." That is, a "practitioner of ordinary skill certainly can take known cover layer materials, like polyurethane, and assemble a three-piece ball following the directions of the prior art, such as Nesbitt and Proudfit."

### *Examiner's Response to the Arguments and Comments received 7 March 2008 and 4 April 2008*

#### *Parallel Litigation*

As to Patent Owner's argument (1), Examiner agrees with the Patent Owner and notes that a "*non-final* Court decision concerning a patent under reexamination shall have no binding effect on a reexamination proceeding" (MPEP 2686.04(IV)) (emphasis in original). Hence, the Examiner has reviewed the holding of the District Court but is not bound by them. While not bound by a non-final determination of claim validity, Examiner notes that a *final* Court decision of validity for one or more claims resulting from litigation beteen the Patent Owner and the Third Party Requester will result in the termination of *inter partes* reexamination as to those claims (MPEP 2686.04(IV)).

#### *Incorporation by Reference*

Application/Control Number: 95/000,123                                    Page 171
Art Unit: 3993

As to the Patent Owner's argument (2), the Examiner agrees with the conclusion of the

arguments presented by the Third Party Requester and maintains the rejections based on Nesbitt

incorporating by reference Molitor '637. The MPEP of the approximate time Nesbitt was filed

(Original Fourth Edition, June 1979; Latest Revision September 1982) states that "[a]n

application for a patent when filed may incorporate "essential material" by reference" (MPEP

608.01(p)(B) of Rev. 8 Oct. 1981; Third Party Requester's Exhibit B; emphasis in original). In

the next sentence "essential material" is defined as necessary to "(1) support the claims, or (2)

for adequate disclosure of the invention." The Patent Owner cites the District Court's use of

*Advanced Display Sys.* for the standard governing incorporation by reference (Patent Owner's

Response at middle of page 3). This standard is that "[t]o incorporate material by reference, the

host document must identify with detailed particularity what specific material it incorporates and

clearly indicate where that material is found in the various documents" (*Advanced Display Sys.*,

212 F.3d at 1282). Further, "the standard of one reasonably skilled in the art should be used to

determine whether the host document describes the material to be incorporated by reference with

sufficient particularity" (*Advanced Display Sys.*, 212 F.3d at 1283).

Nesbitt discloses that his invention is a three-piece golf ball with a core having inner and

outer layers on the core (Nesbitt at col. 1, lines 45-56). Both the inner and outer layers can be

made of either "resinous material or of cellular or foam composition" (Nesbitt at col. 1, lines 49

and 53, respectively). Nesbitt then states that the resinous materials for the two layers can be

different types of Surlyn resins (Nesbitt at col. 1, lines 57-64). Surlyns resins are then discussed

in the rest of the specification and the claims (see for example claims 7 and 8).

At col. 3, lines 51-61, Nesbitt discusses other materials for the two layers. Here it is

disclosed that both the inner and outer layers "may be cellular when formed of a foamed natural

or synthetic polymeric material." Nesbitt then states that "[p]olymeric materials are preferably

such as ionomer resins which are foamable." Examiner construes this sentence to mean that the

polymeric materials preferred by Nesbitt are those that, like ionomer resins, are foamable. Since

Nesbitt does not disclose a list of foamable polymeric materials he references Molitor '637

"which describes a number of foamable compositions of a character which may be employed for

one or both layers."

Molitor '637 states that his invention "relates to the use of cellular material as cover stock

for conventional golf ball centers" (Molitor '637 at col. 3, line 10-13). The preferred

embodiment for the outer cover, similarly to Nesbitt, is a Surlyn resin (Molitor '667 at col. 3,

lines 36-42). Farther into the specification, however, Molitor states that other materials both

synthetic and natural can be used as the outer layer material (Molitor '637 at col. 5, lines 27-32).

Molitor then lists "suitable polymer materials" (Molitor '637 at col. 5, lines 30-55). Included in

this list, *inter alia*, are polyethylene, polypropylene, polyurethanes, and thermoplastic rubbers

(Molitor '637 at col. 5, lines 33-55). The examples of covers that Molitor '637 discloses use

Surlyn resins, polypropylene, polyethylene, and thermoplastic rubbers (Tables 1 to 12).

The Examiner considers Nesbitt to incorporate by reference Molitor '637 because

Nesbitt's invention encompasses use of foamable material other than Surlyn resins as cover

materials (see above). Since only Surlyn resins are discussed in his specification, Nesbitt

incorporates by reference Molitor '637 to supply the "essential material" of other foamable

compositions that may be employed. Without this incorporation, Nesbitt's specification appears to lack adequate disclosure for compositions other than Surlyn.

Nesbitt in "sufficient particularity" states that "foamable compositions" are to be referenced, or incorporated. One of reasonable skill, when reading the specification of Molitor '637, would know that Nesbitt meant to incorporate the list of materials found at col. 5, lines 30-55, of Molitor '637, because the list is juxtaposed as an alternative to Surlyn (Molitor '637 at col. 5, lines 27-32). Nesbitt's language of incorporation is similarly juxtaposed as an alternative to Surlyn (Surlyn being "ionomer resins" of col. 3, lines 51-61, of Nesbitt). Both references, then, disclose foamable materials, or compositions, other than Surlyn resins that can be used in golf ball construction. One of these listed materials is polyurethane.

Agreeing with the comments of the Third Party Requester (Third Party Requester's Comments at page 7), the Examiner considers the holdings of *In re Voss* and *In re Hughes* to support the decision reached here. The pertinent language of incorporation in *In re Voss* was "Reference is made . . . for a general discussion of . . . materials and their production" (557 F.3d at 816). Nesbitt is similar in that both patents incorporate materials. The pertinent language of incorporation in *In re Hughes* was "Reference is made . . . for a complete description of methods of preparing aqueous polymeric dispersions" (550 F.3d at 1275). Nesbitt is similar in that both patents incorporate polymeric materials.


*Shore D hardness measured on or off the ball*

As to the Patent Owner's argument (3), Examiner agrees with the conclusion of the Third

Party Requester and finds the arguments of the Patent Owner concerning measuring of hardness

"on the ball" in the claim language to be unpersuasive.

The rule is that "[d]uring reexamination claims are given the broadest reasonable

interpretation consistent with the specification" (MPEP 2658(I) and 2258(I)(G)).  Here, the

claims are silent as to whether the Shore D hardness value is measured "on the ball" or not.  In

the specification, examples of hardness measurements are disclosed at col. 6, lines 62-64 and col.

14, lines 60-61.  For these examples the hardness value was conducted "in accordance with

ASTM method D-2240."  ASTM D-2240's method of testing uses a specimen, or plaque, of

material, and are not measured "on the ball" (Exhibit C).  However, in the "EXAMPLE" portion

of the specification there is language that appears to support an interpretation of hardness values

measured "on the ball."  An example is the Shore D hardness data of Table 8 and its

accompanying language of "'ball data'" of col. 19, lines 64-67.  Also, there is the language of

"properties of the finished balls are set forth below" at col. 21, lines 7-9, and Table 9.

The specification, then, appears ambiguous as to the interpretation of the claim language.

However, the Federal Circuit has held that "a particular embodiment appearing in the written

description may not be read into a claim when the claim language is broader than the

embodiment (MPEP 2111.01(II) citing *Superguide Corp. v. DirecTV Enterprises, Inc.*).  Further,

the Fed. Cir. has stated that "[t]he problem is to interpret claims 'in view of the specification'

without unnecessarily importing limitations from the specification into the claim" (MPEP

2111.01(II) citing *E-Pass Techs., Inc. v. 3Com Corp.*).

Since there is ambiguity in the specification as to how hardness values are measured and mindful of not reading limitations into the claim language, the Examiner considers the broadest reasonable interpretation of this claim language to not require the hardness values to be measured "on the ball."

Specifically, the Patent Owner argues that since there is no simple correlation between hardness measured on the plaque and on the ball the reasonable interpretation would require measuring hardness on the ball. Whether there is a simple correlation between measurements for hardness between the plaque and on the ball is not dispositive and is a somewhat tangential inquiry. The correct inquiry here is whether the claim language is broad enough to encompass measuring off the ball, i.e., on the plaque. Because of the ambiguity in the specification, the Examiner considers the broadest reasonable interpretation to encompass hardness measured off the ball. In summary, since the hardness of the cover layers on a completed ball is not considered to be claimed here, the requirement for a simple correlation between the two measurements is not at issue.

The Patent Owner further argues that the language of the claims, themselves, requires hardness to be measured on the ball. "The claims refer to "layer," and then to the Shore hardness of the "layer," as opposed to the Shore D hardness of a resin used to make the layer" (Patent Owner's Response at bottom of page 6). Here, the Examiner agrees with the comments of the Third Party Requester (Third Party Requester's comments at bottom of page 3) and finds this argument unpersuasive. As the Patent Owner states the claim language does place "layer" and "hardness" within the same clause. However, in these clauses similar language is used for "modulus." For example, the language of claim 5 is "dimpled outer cover layer . . . having a

Shore D hardness of . . . having a modulus in" (Sullivan '873 at col. 24). As is well known, the

modulus value can not be determined "on the ball" (*see* Third Party Requester's Comments at

bottom of page 3). Since both modulus and hardness are presented with similar language in the

claims, a reasonable interpretation of the claim would be that both measurements can be made

off the ball.

The Patent Owner counter argues that those of ordinary skill would know to measure

modulus off the ball and to measure hardness on the ball (Response at middle of page 7).

Examiner considers this argument to be unpersuasive because the term "layer" is used in the

claim for both measurements and since modulus is measured off the ball, it reasonably follows

that hardness would be measured off the ball. Requiring one measurement on the ball and the

other off the ball with no discussion of this difference in the specification appears to be an

unneeded, or unwarranted, complication in claim interpretation.

The Patent Owner finally argues that those of ordinary skill in the art know to measure

hardness on the ball. For example, Patent Owner points to the Sullivan article for support of the

interpretation of "off the ball" because in this article hardness is measured "on the ball" (Patent

Owner's Response at bottom of page 8). Again, the Examiner agrees with the comments of the

Third Party Requester (Third Party Requester's Comments at page 3). As the Third Party

Requester point outs the language in the Sullivan article is "Shore Hardness was measured in

general accordance with ASTM Test D-2240, measured on the parting line of a fixtured, finished

ball" (Patent Owner's Response at top of page 8). Since the phrase "measured on the parting line

of fixtured, finished ball" is neither in the specification nor in the claims of the instant patent, the

Examiner does not consider this argument to be dispositive. As to the Dalton and Morgan

Application/Control Number: 95/000,123                                   Page 177
Art Unit: 3993

testimony, the Examiner does not consider the "standard practice" in the industry to be

dispositive because the specification of the patent at issue discusses hardness measured both on

and off the ball.

*Proudfit rejections can not be based on the Wilson Ultra Tour Balata Ball*

As to the Patent Owner's argument (4), Examiner generally agrees with the conclusion of

the Third Party Requester and maintains the rejections using Proudfit.  In addition to the Hebert

Declaration, the Third Party Requester has provided Exhibits 3, 4, and 5 which all disclose the

cover with a Shore D hardness of less than 64 for the Wilson Ultra Tour Balata 90.  Further, the

Third Party Requester has provided evidence of the Wilson ball as representative of the ball

disclosed in Proudfit's '187 patent in the form of Proudfit's declaration offered during

prosecution of his patent where he describes the "Ultra Tour Balata" as a "[t]wo-piece

balata/Surlyn covered golf ball made by Wilson in accordance with this application" at ¶ 2.  The

Examiner construes this description to mean that his golf ball disclosed in the patent would have

the same characteristics as the Wilson ball, hence, a cover Shore D hardness of less than 64 for

his ball.

*Shore D hardness for Molitor '637, Molitor '751, and Wu*

As to the Patent Owner's argument (5), Examiner generally agrees with the conclusion of

the Third Party Requester and maintains the rejections using Molitor '637, Molitor '751, or Wu.

Patent Owner's arguments here are prefaced on the contention that the claims require Shore D

hardness values being measured on the ball.  Examiner disagrees with this contention for the

Application/Control Number: 95/000,123                                    Page 178
Art Unit: 3993

reasons given *supra*. When the claims allow for hardness measured off the ball (as the Examiner

concludes), both Molitor references can be shown to disclose use of ESTANE as an outer cover.

Commercial literature on ESTANE is considered to unambiguously disclose specific types of

ESTANE to have Shore D hardness values of less than 64 as required by the claims.

A similar argument can be made for Wu. Wu discloses use of polyurethane as an outer

cover layer. Commercial literature on polyurethane is considered to unambiguously disclose

specific types of them to have Shore D hardness values of less than 64 as required by the claims.


*Evidence of Commercial Success*

As to the Patent Owner's argument (6), Examiner generally agrees with the comments of

the Third Party Requester and finds the arguments of the Patent Owner concerning commercial

success to be unpersuasive. As stated in the previous office action, the probative value of the

evidence presented by the Patent Owner for unexpected results and commercial success is not

enough to overcome the *prima facie* case of obviousness presented in the rejections, *supra*.

MPEP 716.01(c)(III) states that "[i]n assessing the probative value of an expert opinion, the

examiner must consider the nature of the matter sought to be established, the interest of the

expert in the outcome of the case, and the presence or absence of factual support for the expert's

opinions." Here, it is not clear to the Examiner if the opinions of the individuals proffered by the

Patent Owner have an interest in the outcome of the case. Also, no factual data is presented to

show commercial success or unexpected results. For commercial success, for example, the

Patent Owner has not supplied objective data that shows that "whatever commercial success may

have occurred is attributable to the product or process defined by the claims" (MPEP 716.03(a)

citing *Ex parte Standish*).  For unexpected results, for example, the Patent Owner has not

supplied objective data that compares "the claimed subject matter with the closest prior art"

(MPEP 716.02(e)).

As to the use of the Herbert Declaration, Examiner considers it proper because Hebert

presents objective data for his observations, or conclusions.

*Claims are nonobvious under the KSR standards*

As to the Patent Owner's argument (7), Examiner generally agrees with the conclusion of

the Third Party Requester and finds the arguments of the Patent Owner concerning the KSR

obvious standard to be unpersuasive.  In *KSR* the Supreme Court stated that "[o]ne of the ways in

which a patent's subject matter can be proved obvious is by noting that there existed at the time

of invention a known problem for which there was an obvious solution encompassed by the

patent's claims" (*KSR*, slip opinion at page 16).  The Court further stated that the "combination

of familiar elements according to known methods is likely to be obvious when it does no more

that yield predictable results" (*KSR*, slip opinion at page 12).

Here, it was known in the art that two-piece golf balls with a hard cover lack the "feel"

characteristics of balata covered golf balls (Nesbitt at col. 1, lines 26-33).  Nesbitt's three-piece

golf ball (a core, a hard inner layer, and a soft outer layer) was an attempt to provide both

distance and "feel" (Nesbitt at col. 1, lines 65-68 continuing to col. 2, lines 1-9).  An outer layer

of balata was not effective, however, because of its lack of "cut" resistance (Wu at col. 1, lines

40-46).  Polyurethane was proposed for use as an outer layer on a two-piece because it was

known to provide both "feel" and cut resistance (Wu at col. 1, lines 47-53) and found to be

comparable to three-piece, balata covered balls (Wu at cols. 7 and 8). In other words, polyurethane was found to be a solution to a known problem. With this information, it would be predictable, then, for one of ordinary skill to use polyurethane as the outer layer on a three-piece golf ball to achieve the same results of "feel" and cut resistance. The resultant three-piece golf ball with an outer layer of polyurethane did, as predicted, achieve the goal of "feel" (playability) and cut resistance (durability) (Sullivan '873 at abstract).

As to hindsight, the Court stated that a "factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning" (*KSR*, slip opinion at page 17; emphasis in original). Here, hindsight is not used by the Examiner because the reasoning for use of a soft, outer layer of polyurethane was explicitly stated in the prior art - to combine "feel" and cut resistance. The reasoning for combining the references, then, is not *ex post* reasoning but supplied in the references, themselves.

As to the use of common sense, the Examiner considers it common sense to use polyurethane as an outer layer on a golf ball given the prior art as explained immediately above. Commercial success without objective data and the fact that no one else invented the invention are tangential to the case of *prima facie* obviousness presented in this office action.

Application/Control Number: 95/000,123                               Page 181
Art Unit: 3993

### *Conclusion*

   **This is an ACTION CLOSING PROSECUTION (ACP)**; see MPEP § 2671.02.
   (1) Pursuant to 37 CFR 1.951(a), the patent owner may once file written comments
limited to the issues raised in the reexamination proceeding and/or present a proposed
amendment to the claims which amendment will be subject to the criteria of 37 CFR 1.116 as to
whether it shall be entered and considered. Such comments and/or proposed amendments must
be filed within **a time period of 30 days or one month (whichever is longer) from the mailing
date of this action**. Where the patent owner files such comments and/or a proposed amendment,
the third party requester may once file comments under 37 CFR 1.951(b) responding to the
patent owner's submission within **30 days from the date of service** of the patent owner's
submission on the third party requester.
   (2) If the patent owner does not timely file comments and/or a proposed amendment
pursuant to 37 CFR 1.951(a), then the third party requester is precluded from filing comments
under 37 CFR 1.951(b).
   (3) Appeal **cannot** be taken from this action, since it is not a final Office action.


   **All** correspondence relating to this *inter partes* reexamination proceeding should be
directed as follows:


By **U.S. Postal Service Mail** to:

       Mail Stop *Inter Partes* Reexam
       ATTN: Central Reexamination Unit
       Commissioner for Patents
       US Patent & Trademark Office
       P.O. Box 1450
       Alexandria, VA 22313-1450


By FAX to:    (571) 273-9900
              Central Reexamination Unit


By hand to:   Customer Service Window
              ATTN: Central Reexamination Unit
              Randolph Building
              401 Dulany St.
              Alexandria, VA 22314

Application/Control Number: 95/000,123                                    Page 182
Art Unit: 3993

       Any inquiry concerning this communication or earlier communications from the
Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination
Unit at telephone number (571) 272-7705.


/Jeffrey L. Gellner/
Central Reexam Unit
571.272.6887



Conferees: