# FISH & RICHARDSON P.C.

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

17ᵀᴴ Floor
222 Delaware Avenue
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

Thomas L. Halkowski
302 778-8407

Email
halkowski@fr.com

November 7, 2008

**VIA ECF**

The Honorable Sue L. Robinson
United States District Court
for the District of Delaware
844 King Street
Wilmington, DE  19801

Re:  *Callaway Golf Company v. Acushnet Company*
    **USDC-D. Del. - C. A. No. 06-91 (SLR)**



ATLANTA
AUSTIN
BOSTON
DALLAS
DELAWARE
HOUSTON
MUNICH
NEW YORK
SAN DIEGO
SILICON VALLEY
TWIN CITIES
WASHINGTON, DC

Dear Judge Robinson:

While Callaway Golf is reluctant to provide the Court with additional paper regarding Acushnet's reexaminations, we offer this response to Acushnet's letter of October 9, 2008 in order to complete the record.  [D.I. 487.]

Acushnet's most recent letter continues its effort to benefit from its unlawful reexaminations by attempting to influence the post-trial rulings of this Court. However, Acushnet's repeated announcements of various decisions being reached during the unlawful reexamination process are merely a distraction to the critical issue pending before this Court – whether the jury's verdict is supported by substantial evidence presented during the trial in this matter.  Thus, no reason exists for wading into the merits of Acushnet's four on-going reexaminations. Nevertheless, to the extent the Court chooses to examine those issues, Callaway Golf briefly addresses below the matters highlighted in Acushnet's latest filing.[1]

**The Patent Office Concedes that *No* Reference Anticipates the Asserted Patent Claims as Properly Construed**

Acushnet trumpets the examiner's decision to reject claims that expressly include a limitation that the Shore D measurement be made "on the ball."  Yet, absent from Acushnet's letter is any reference to the failure of the patent examiner to assert any section 102 rejection against the new "on the ball" claims.[2]  In other words, when the

---

[1]  To the extent the Court desires further information regarding arguments being presented in the reexaminations, Callaway Golf also submits for the Court's convenience Exhibit A to this letter, which is a brief filed with the Patent Office providing Callaway Golf's response to one of the recent decisions by the PTO in the pending reexaminations.

[2]  For two of the reexaminations, the examiner refused to even consider the new claims with the express "on the ball" language.

F ISH & R ICHARDSON P.C.

The Honorable Sue L. Robinson
November 7, 2008
Page 2

claims are properly interpreted as requiring measurement of Shore D hardness on the ball, even the patent examiner, who has generally sided with Acushnet, had to conclude that ***no reference anticipates*** the claims in the asserted patents.  This fact alone undermines Acushnet's allegations concerning the invalidity of the patents-in-suit.

**As to Obviousness, the Results of Acushnet's Reexaminations Continue to be Flawed**

The patent examiner's analysis of the alleged obviousness of the patent claims at issue reflects a number of errors and omissions.  For example, the examiner continues to all but ignore the extensive evidence of critical secondary considerations.  *See generally* D.I. 442 (Callaway Golf's Opposition to Acushnet's Post-Trial Motions), at 20-29.

Next, Acushnet mistakenly states that "the PTO found that the Molitor '751 patent disclosed the claimed hardness values, measured 'on the ball.'"  [D.I. 487.]  Molitor '751 discloses no such thing.  Rather, it discloses Shore C measurements of a 2-piece ball – not the Shore D measurements of a 3-piece ball required by the asserted claims.  DX 11 ('751 Patent), at col. 4:18-25.  Not surprisingly, the examiner had to resort to a number of other references and certain leaps of logic to get from Molitor '751 to the limitations in the asserted claims.[3]  Indeed, it appears the examiner is of the opinion that if a person had selectively put various prior art pieces together as taught by the

---

[3]  The examiner stated [D.I. 487, Ex. 1, part 4.]:

"Not disclosed [in any of the originally cited references] is the Shore D hardness values measured on the ball for the inner and outer cover layers. Molitor '751, however, discloses measuring hardness of the cover layer of a golf ball 'on the ball' (from 'cover layer after molding having a shore C hardness' in that 'after molding' indicates the hardness value measured 'on the ball'). The golf ball being either two- or three-piece balls (from 'also includes balls having a separate solid layer beneath the cover' of col. 3, lines 7-12); Shore C and Shore D hardness values considered by the Examiner to be interchangeable (see Third Party Requester's Exhibit O received 29 May 2007 for correlation between Shore C and Shore D hardness values).

It would have been obvious to one of ordinary skill in the art at the time of the invention to modify the golf ball of Nesbitt by measuring hardness on the ball of the outer and inner cover layers as disclosed by Molitor '751 so as to have a ball with superior short iron and other playability characteristics (Molitor '751 at col. 1, lines 11-15)."

F ISH & R ICHARDSON P.C.

The Honorable Sue L. Robinson
November 7, 2008
Page 3

patented invention, based upon Shore D values measured off the ball on plaques, and then measured Shore C hardness of the layers on the ball as Molitor '751 suggests, and then translated those values to Shore D, one could have arrived at a ball that inherently had the Shore D "on the ball" hardness that the Sullivan claims required. Callaway Golf respectfully submits that this "Rube Goldberg" approach to building the patented invention with perfect hindsight using the claims as a template is a less than persuasive basis for finding that the claims would have been obvious to one of ordinary skill at the time of the inventions in 1995. And it certainly doesn't aid the Court's consideration of whether the result reached by the jury in this case is supported by substantial evidence.

Indeed, the examiner made no attempt to show that *any* of the prior art references recognized the importance of the interactions between layers when determining ball performance – a fundamental aspect of the invention which is reflected in the requirement that Shore D values be measured on the ball. The obviousness inquiry is not simply addressed by stitching together the prior art and then measuring hardness on the ball after the fact to see if you have the values set forth in the claims. To the contrary, the examiner must show why a person of ordinary skill in the art would have been motivated in the first place to create a ball with the particular recited hardness values – as measured on the ball.

Also, contrary to the patent examiner's latest assessment, the evidence at trial established—and indeed Acushnet's own witnesses conceded—that the type and number of layers in a golf ball (among other factors) would impact the hardness of the ball. *See, e.g.,* D.I. 442, at 6 (Acushnet's own expert confirming that "different combinations of core size and inner cover thickness and outer cover thickness will lead to wildly different performance"); *id*. at 12 n.12 (referencing one of Acushnet's own patents which explains that, among other things, the "material composition of adjacent layers" impacts the hardness measurement). Similarly, ample evidence showed that Shore C measurements could *not* be reliably converted to Shore D values.[4] The evidence of record, therefore, shows that the Shore C measurements of the 2-layer ball discussed in Molitor '751 are of little relevance to what one could reasonably expect from measuring the Shore D hardness for the claimed 3-layer ball that also includes additional, different materials. Thus, substantial evidence supports

---

[4] D.I. 442, at 9-14 (noting, *inter alia*, witnesses from both sides testifying that one cannot simply convert from Shore C to Shore D; showing that charts cited by Acushnet contain a strict admonition that each "is not and cannot be used as a conversion [reference/chart]"; and noting that Tom Kennedy, a golf ball designer with decades of experience, testified that he had in the past attempted to show a mathematical relation between Shore C and D but was unable to do so. [Kennedy Tr. 1017:24-1018:19]).

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
November 7, 2008
Page 4

the jury's presumed finding that the claimed inventions were not rendered obvious by Molitor '751 either alone or in combination with any of the other asserted prior art.

Moreover, to the extent Acushnet's letter attempts to imply that the examiner performed a careful analysis of the "on the ball" claims, the record is to the contrary. In the two reexaminations where the "on the ball" claims were not ignored by the examiner, the examiner merely cut and pasted the old claim charts for use with the new claims, copied the 103 analysis he previously used (in fact, he did not even change the patent number because the charts for both the '156 and '293 actions still refer to the '873 patent), and then tacked on the same two paragraphs quoted above in footnote 1 for both the '156 and '293 analyses. Thus, in addition to the flaws noted above regarding the merits of the examiner's analysis, the format of the analysis reflects a process that was less than ideal.

**Examiner's Alleged "Skill" Is Entitled to No Deference**

A patent examiner may, of course, have some scientific competence in the field in which he works. However, Acushnet mistakenly suggests that the examiner is without question a person of ordinary skill in the art. Absent evidence of the examiner's actual credentials and experience (both academic and professional), it is simply not possible to make this assessment with regard to the on-going reexaminations. Therefore, the examiner's apparent position that the Shore C and Shore D are "interchangeable"—a position directly at odds with substantial evidence presented at trial in this matter, *see, e.g., supra*, n. 4—in no way reflects what a person of ordinary skill in the art in the field of golf ball design and manufacture would believe, much less whether one of ordinary skill would have known or had this belief in 1995 at the time of the inventions. In this regard, the effort of one patent examiner to review a limited written record is certainly no better, and Callaway Golf believes decidedly worse, than the application of the Court's experience or the collective wisdom of the jury in assessing the full record of evidence presented live at trial in this matter.

**Acushnet's Reexaminations Are Far From Done**

Lastly, Acushnet mistakenly implies that the PTO proceedings are close to being wrapped up. The '130 patent is the only one of the four pending reexaminations that has proceeded to appeal to the PTO Board. Even with regard to that one matter—which is the most advanced of all the Acushnet reexaminations—the case is at least a year away from being ready for appeal to the Federal Circuit. Conversely, the judgment in this suit will be ready for appeal as soon as the Court rules on the post-trial motions.

FISH & RICHARDSON P.C.

The Honorable Sue L. Robinson
November 7, 2008
Page 5

Nonetheless, by pursuing its unlawful reexaminations, Acushnet plainly seeks to circumvent the work of this Court and jury, invalidate the patents-in-suit on the incomplete written record presented to the Patent Office, and then have the PTO's decisions affirmed by the Federal Circuit *before* the appellate court can affirm a final judgment in this case. On the other hand, if the Court's judgment in this suit is affirmed before the unlawful reexaminations are addressed on appeal, the reexaminations, by operation of law, will become moot with respect to all of the patent claims addressed in this suit. *See* 35 U.S.C. § 317(b); MPEP 2686.04 (II)(A). As Acushnet's Executive Vice-President, Mr. Nauman, said in a recent article addressing this suit and Acushnet's unlawful reexamination effort:

"This is a little bit of a race."[5]

Thus, delay in this matter increases the possibility that the reexaminations will be the first proceedings to become final and Acushnet would thereby further benefit from its unlawfully-filed reexamination proceedings.

Callaway Golf, therefore, respectfully submits that Acushnet's repeated efforts to distract this Court with various decisions from the four on-going reexaminations should be ignored.

Respectfully,

/s/ *Thomas L. Halkowski*

Thomas L. Halkowski

TLH:sb

Attachments

cc:   Clerk of Court (via hand delivery)
      Counsel of Record (via ECF)

80070499.doc

---

[5]   D.I. 475, Ex. A, at 1 (Acushnet's Executive Vice-President, Mr. Joseph Nauman explaining Acushnet's interest in avoiding the judgment in this suit, by pursuing its unlawfully commenced reexaminations of the patents-in-suit).