# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CALLAWAY GOLF COMPANY | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ACUSHNET'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE EVIDENCE REGARDING ACUSHNET'S "HEBERT PATENTS" AND RELATED INVENTIONS

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 783-0800

Dated:  December 1, 2009
Public Version Dated: December 9, 2009
945476/30030

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND.................................................................................3

    A.    Background of the Hebert Patents and Invention Record...........................3

    B.    Callaway's Emphasis on Hebert Patent Evidence in the First Trial ...........6

    C.    The Court's Rulings in the First Trial.........................................................9

II.   ARGUMENT.................................................................................................11

    A.    Evidence Regarding the Hebert Patents and Related Inventions is
        Irrelevant..............................................................................................11

        1.    The Claims of the Hebert Patents are Substantially Different from
            the Sullivan Patents.......................................................................11

        2.    The Hebert Patents Do Not Cover the Accused Products..............13

    B.    Evidence Regarding the Hebert Patents and Inventions is Highly
        Confusing and Prejudicial.......................................................................13

    C.    █████████████████████████████████████.............................14

    D.    Callaway Should be Precluded From Offering Evidence Regarding its
        License to the Hebert Patents..................................................................15

    E.    Acushnet has not Waived its Objections to the Hebert Evidence and
        Arguments.............................................................................................16

## TABLE OF AUTHORITIES

**CASES**

*Great Lakes Carbon Corp. v. Continental Oil Co.*,
23 F.R.D. 33 (W.D. La. 1958) ............................................................................12

*In re Van Geuns*,
988 F.2d 1181 (Fed. Cir. 1993).............................................................................3

*Key Technology, Inc. v. Simco/Ramic Corp.*,
137 F.R.D. 322 (D. Or. 1991) ............................................................................12

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*,
554 F.3d 1010 (Fed. Cir. 2009).........................................................................11

*Rosenfeld v. Basquiat*,
866 F. Supp. 790 (S.D.N.Y. 1994), *rev'd on other grounds,* 78 F.3d 84 (2d Cir. 1996).........16

**FEDERAL STATUTES**

Fed. R. Evid. 402 ............................................................................................13

Fed. R. Evid. 403 ............................................................................................13

**MISCELLANEOUS**

Graham, *Handbook of Federal Evidence* § 103.4 (3d ed. 1991) ..................................16

Defendant Acushnet Company ("Acushnet") files this motion *in limine* to exclude evidence related to the so-called "Hebert Patents" and related inventions that are not at issue in this lawsuit. The parties met and conferred on this Motion; Callaway will oppose.

## INTRODUCTION

Callaway repeatedly argued in the first trial that certain Acushnet patents (and related inventions) relating to the development of the Pro V1 in the mid-1990s somehow demonstrate the validity of the Sullivan Patents-in-Suit. From the opening statement through closing, Callaway repeated the mantra that Acushnet thought "the concept" of the Sullivan patents was patentable in 1996, but now is arguing that it is not patentable. Callaway's arguments on this point were highly prejudicial, and legally baseless. Callaway should not be permitted to introduce this highly confusing evidence about these patents, which are irrelevant to the issues presented in this lawsuit.

Acushnet's Hebert patents, which resulted from its Veneer project, were directed to a three-piece ball with a specific type of castable liquid material for the outer cover and an ionomer for the inner cover. In particular, the Veneer project used, and the Hebert patents claimed, a castable reactive liquid to form a thin, thermoset outer cover over a high-acid ionomer inner cover. Each piece of testimony Callaway elicited regarding the Hebert patents pertained only to the novelty of using such a material in a three-piece ball. Acushnet's views on the novelty of that ball construction, however, have no relevance to the validity question presented to the jury in this case.

Callaway incorrectly tried to characterize Acushnet's testimony as saying that it was a novel concept in 1996 to put polyurethane on a three-piece golf ball. Acushnet said nothing of the sort. Indeed, Acushnet cited on the face of the Hebert patents at least three patents disclosing

polyurethane-covered three-piece golf balls, and several more examples exist in the art before the Hebert patents were filed. Instead, what certain Acushnet personnel viewed as new in 1996 was the use of a particular type of soft castable reactive liquid on a three-piece ball with an inner cover having a very high flexural modulus, which can only be obtained with high acid ionomers or other stiff materials. Whether Acushnet was right or wrong that the use of that particular material made the ball construction patentable, or whether the PTO was right or wrong in granting the patents, is utterly immaterial to the case at hand. In particular, the claims of the Sullivan patents-in-suit require no particular type of polyurethane and specifically require a low acid ionomer for the inner cover.

The Hebert patent evidence would also create substantial prejudice and jury confusion. Callaway's implication is that since Acushnet got a patent on a "three piece polyurethane covered ball," Callaway's patent on a "three piece polyurethane covered ball" must be valid. To counter that argument would involve a very detailed, claim-element comparison of the Hebert patent and the Sullivan patents-in-suit. The claims of the patents are substantially different with respect to both the inner and outer cover layer materials. One conclusive demonstration of the difference in the scope of the patents is that the accused Pro V1 products fall within the claims of the Sullivan patents-in-suit, but do not fall within the claims of the Hebert patents because they use a different inner cover layer material. Conversely, the 2009 Pro V1 golf balls fall within the Hebert claims, but not the asserted claims. The sort of satellite litigation necessary to combat Callaway's broad-brush approach to the Hebert patents is not only unnecessary, confusing, and wasteful, it was expressly precluded by the Court in the first trial.

Since the Court is correctly disinclined to drag the jury through a claim-level comparison between the Hebert patents and the Sullivan patents-in-suit, Callaway should not be permitted to

grossly mislead the jury into thinking that the Hebert patents and the Sullivan patents-in-suit are somehow the "same concept" or the same idea. Patents are not granted on "concepts." They are granted on specifically-defined claims. *See In re Van Geuns,* 988 F.2d 1181, 1184 (Fed. Cir. 1993) ("It is axiomatic that the claims define the invention which an applicant believes is patentable."). In this case, the claims of the Hebert patents are substantially different than those of the patents-in-suit and are directed to different golf balls.

## I.   FACTUAL BACKGROUND

### A.   Background of the Hebert Patents and Invention Record

The evidence at issue in this motion relates to an Invention Record and a series of patents whose named inventors include Ed Hebert, an Acushnet engineer. In 1996, Mr. Hebert, along with Bill Morgan and Dean Snell, arrived at a golf ball design they had not seen before in the prior art. Specifically, they conceived of a three-piece golf ball with a solid core, a stiff inner cover layer made of a high-acid ionomer, and a super-thin outer cover comprised of a thermoset castable reactive material, such as castable polyurethane.[1]  Ex. 1 (Invention Record (PX-523)). They named this concept the "Veneer Project."[2]  Acushnet filed patent applications on the Veneer construction and received several patents, including U.S. Patent No. 5,885,172 ("The Hebert '172 Patent") (Ex. 2).

---

[1] Thermoset materials are materials that cannot be re-melted and formed once molded. Ex. 12, T. Tr. 398:2-15. In contrast, thermoplastic materials are those that can be melted after molding, and re-molded. *Id.* Polyurethanes exist in both thermoset and thermoplastic varieties. *See* Ex. 12, T. Tr. 347:3-15.

[2] The term "veneer" reflected the fact that the outer cover layer was a thin, castable urethane. The veneer project ultimately grew into the development of the Pro V1.

Mr. Morgan and Mr. Hebert testified that the construction of the Veneer ball was new to them.  For example, Mr. Morgan testified that he was not aware of a prior art golf ball that used castable thermoset polyurethane as the outer cover of a three-piece construction:

> Q.     And you thought your Veneer concept was different and new because it had a solid-core three-piece construction with an ionomer inner cover and a polyurethane, a cast polyurethane outer cover.  Right?
>
> A.     A thin cast polyurethane cover of the new composition, yes. (Ex. 12, T. Tr. at 439:12-17.)

Mr. Morgan's deposition testimony was consistent with his trial testimony.  Mr. Hebert also testified in his deposition that one of the key inventive aspects of the Veneer design was the use of a castable reactive liquid to form a thin, thermoset polyurethane outer cover.  Ex. 12, T. Tr. at 1092:1-10.

Acushnet was not the first to conceive of a three-piece golf ball with a polyurethane outer cover.  To the contrary, on the face of the Hebert patent, Acushnet disclosed to the patent office at least three patents that disclosed precisely that construction for a golf ball.  *See* Hebert '172 patent, col. 3:1-5, col. 3:31-37.  In particular, U.S. Patent No. 5,253,871, a 1993 patent cited in the Hebert '172 patent, described a three piece golf ball with a solid core, an inner cover comprising ionomer, and an outer cover comprising thermoplastic polyurethane.  *See* Ex. 3, Fig. 1, col. 2:43-46 (solid rubber core); col. 2:65-67 (ionomer-blend inner cover); col. 4:14-21 (polyurethane outer cover).  Similarly, GB 2,278,609, a 1994 patent cited in the Hebert '172 patent, described a three-piece golf ball comprising a core, a high acid ionomer inner cover, and a polyurethane outer cover.[3]  *See* Ex. 4, Abstract.  Finally, U.S. Patent No. 4,919,434, a 1990 patent cited in Hebert '172, described a three piece golf ball comprising a core, an ionomer inner

---

[3] GB 2,278,609 is a Spalding patent in the Sullivan family, claiming priority to the same grandparent application of the Patents-in-Suit.

4

cover layer, and a thermoplastic polyurethane outer cover layer. *See* Ex. 5, col. 3:32-41 (solid core); col. 5:16-23 (ionomer inner cover layer); col. 6:5-9 (polyurethane outer cover layer).[4] Thus, it was clearly not the use of polyurethane in a three-piece construction that Acushnet argued it had invented.

Neither Mr. Morgan nor Mr. Hebert testified that the idea of a three piece golf ball with a polyurethane cover was new in 1996. Of course that concept was not new—the Hebert '172 patent discloses as much. Instead, what the inventors of the Hebert patents said is that their Veneer design, which used a castable reactive liquid material to form a very thin, "veneer" outer cover was, to their knowledge, new in 1996.

This distinction is the same as that set forth in the Hebert patent itself. In the specification of the Hebert '172 patent, Acushnet distinguished existing prior art disclosing three-piece golf balls covered with polyurethane by focusing on the use of a castable reactive liquid such as thermoset polyurethane. After describing several prior art multilayer golf balls, the patent stated that "none of these patents disclose a multilayer ball having a very thin thermoset outer layer formed from a castable reactive liquid as disclosed herein...." Hebert '172 Patent, col. 3:38-40. The specification stressed the importance of using such a material in the cover layer: "[I]t has been found that castable, reactive liquids which react to form a thermoset material provide desirable very thin outer cover layers." Hebert '172 Patent, col. 8:4-6.

---

[4] Other patents not cited on the face of the Hebert patents also plainly disclose the use of polyurethane as the outer cover of a three piece golf ball well before the Veneer project. For example, GB 2,248,067, published in 1992, discloses a three piece golf ball with a solid core, an inner cover layer of blended ionomer, and an outer cover layer of thermoplastic ionomer. Ex. 6 at 4-5. Further, as Acushnet demonstrated in the first trial and as Callaway's own expert agreed, the Molitor '751 patent, issued in 1987, explicitly teaches the use of thermoplastic polyurethane as the outer cover layer of a three-piece ball. Ex. 13 at col. 3:7-12; Ex. 12, T. Tr. at 594:13-21.

The Patent office agreed with Acushnet by issuing the Hebert 172 patent. Whether Acushnet was wrong in its assessment of the Veneer project, or the Patent Office was wrong to issue the Hebert patent, is utterly irrelevant to the validity issues presented in this case. While Callaway used a broad brush to try to argue that the validity of the Hebert patent (and the novelty of Acushnet's Veneer project) is somehow the same question as the validity of the Sullivan Patents-in-Suit, there are plain differences between the claimed inventions. The similarities stop at the fact that they both claim three-piece golf balls with outer covers, inner covers and cores as did many other patents at that time.

While the Hebert patents arose out of the Veneer project, which led to the development of the Pro V1, none of the accused Pro V1 golf balls are covered by the Hebert patents. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ The Hebert patents were directed at three-piece golf balls that use a high acid inner cover layer. In contrast, the Pro V1 golf balls accused in this case use a low-acid inner cover layer, which results in a cover having a substantially lower flexural modulus.

### B.   Callaway's Emphasis on Hebert Patent Evidence in the First Trial

Callaway placed enormous emphasis on the Hebert Patent and Acushnet's views about the novelty of the Veneer project in the first trial. From its opening statement through its closing, one of the primary themes of Callaway's case seemed to be that Acushnet believed the "concept" of the Sullivan patents was patentable in 1996, but now has "changed its mind." Indeed, seven slides of Callaway's opening featured the Hebert patent. *See* Ex. 9, slides 31, 32,

33, 39, 40, 56, and 57.  Below are some examples of Callaway's misleading and confusing

statements in its opening statement (emphasis added):

- "[T]he ideas they now say are obvious *are ideas that their own engineers got a patent on.*" (Ex. 12, T. Tr. at 164:6-8).

- "[Acushnet] claimed it was an invention, got their own patent, and it wasn't until Mike Sullivan's patents issued later…that they *changed their minds* and now claim that those patents are obvious." (Ex. 12, T. Tr. at 164:9-15).

- "*They all use the basic concept of Mike Sullivan's patents.*  Cover, ionomer inner cover, polyurethane outer cover.  And as I said already, Acushnet, when they came up with this idea, in 1996, … *they thought it was a great idea.*  They filed an invention disclosure on it.  *They got a patent on it.*  And in this case, they now want you to believe that they shouldn't have." (Ex. 12, T. Tr. at 184:22-185:4).

- "Now, I mentioned that *Acushnet got its own patent on this concep*t….  This patent Acushnet received, … *they thought it covered exactly the same concept that's in Mike Sullivan's patents*." (Ex. 12, T. Tr. at 186:10-18).

- "So if you put side by side Mr. Sullivan's patents with Acushnet's Hebert patent, you see that Mr. Sullivan's patents were filed earlier, by about a year-and-a-half earlier, but they issued later, just because of how long it took in the Patent Office….  What does Acushnet do when *they realize that this very concept that they thought was theirs that they had patented, now they learn that they didn't*?  Somebody else did?  Well they argue its obvious.  And without characterizing it and arguing it, you're going to see evidence about this.  You're going to see how the day the patent issued, Acushnet set to work looking for prior art to show that the concept is invalid.  *Never mind that they got a patent on the same thing*." (Ex. 12, T. Tr. at 190:13-191:3).

- "Now, the other thing you'll see on their own slide is how much they emphasized *their patent on the same concept.  This is the Hebert '172 patent.*" (Ex. 12, T. Tr. at 195:10-12).

In cross-examination of Acushnet witnesses, Callaway introduced evidence of

Acushnet's views as to the novelty of the Veneer construction.  For example, Mr. Morgan

testified that he thought the Veneer construction was "different and new."  Ex. 12, T. Tr. at

439:12-15.  Mr. Hebert testified similarly.  Ex. 12, T. Tr. at 1092:1-10.  Hebert was also asked

whether Ms. Wu ever told him that the Veneer construction was not new:

Q.      Did she ever suggest to you at any time during her collaboration with you on the Veneer project that -- that that construction was not a new construction?

A.      Not that I can recall, no. (Ex. 12, T. Tr. at 1105:2-6.)

Again, neither Mr. Morgan or Mr. Hebert testified that using polyurethane in a three-piece construction was new in 1996; as set forth above that concept was old and Acushnet cited patents showing that concept on the face of the Hebert '172 patent. Nonetheless, Callaway twisted Mr. Morgan's and Mr. Hebert's testimony about the Veneer construction into some sort of general admission that they thought using polyurethane on a three-piece ball was new in 1996 in its closing arguments. Some examples of Callaway's improper and prejudicial use of this testimony in its closing arguments are set forth below (emphasis added):

- "Fundamentally, the evidence in the case shows that *Acushnet itself believed that the concept covered by these patents was new and novel itself and it only changed its mind when it realized that it infringed*." (Ex. 12, T. Tr. at 1337:23-1338:1).

- "[Acushnet's] own employees said the concept of a multi-layer golf ball with a polyurethane cover was a new idea. They said it was a novel idea. Its own employees filed an invention record on that idea. *Its own employees got a patent related to that concept*." (Ex. 12, T. Tr. at 1338:1-6).

- "Now, in deciding obviously the validity issue in this case, there is Acushnet's own information and material. *In other words, that they themselves thought it was a patent*." (Ex. 12, T. Tr. at 1338:21-24).

- "You have to find that at the time, *when Acushnet believed this concept was new and not obvious*, that that either wasn't true or they didn't believe it. In any event, you don't believe that. You believe what their lawyers are saying now." (Ex. 12, T. Tr. at 1339:1-5).

- "This is their own person saying that was the veneer concept, and it was. *And they thought that was novel*. Now, *this is not about the details of the patent they ultimately got*, and they did ultimately get a patent on that concept, the '172 patent. And *you don't have to compare the claims of that patent to the claims of*

*the Sullivan patent*. They thought a much broader idea was novel and new and not obvious, and that was the very idea of putting a polyurethane on the outside of a three-piece golf ball. They filed an invention record on it." (Ex. 12, T. Tr. at 1342:22-1343:7).

- "And in this case, *Acushnet wants you to believe not only was that concept not new at the time, so not only do they disavow what their own people believed about the concept*, but ... the concept plus the specific implementation of the concept in these claims, that's all obvious, too." (Ex. 12, T. Tr. at 1344:9-15).

Thus, while the Hebert patent and the Veneer construction rested on the use of a particular type of material (castable reactive liquid, formed into thermoset polyurethane) that is nowhere claimed in the Patents-in-Suit, Callaway insisted throughout the trial of arguing that Acushnet thought it invented, and filed for a patent on, the "same concept" as that claimed in the Sullivan Patents-in-Suit. Moreover, Callaway even went so far as to steer the jury away from the differences in the claims of the patents by telling the jury "you don't have to compare the claims." Ex. 12, T. Tr. at 1343:2-3.

C.    **The Court's Rulings in the First Trial**

After Callaway's opening statement, Acushnet objected to Callaway's attempts to equate the Hebert patent's validity with that of the Patents-in-Suit. The Court asked what Callaway intended to do with the Hebert patents:

THE COURT: In terms of how you are using Hebert, would that require the jurors to basically compare the Hebert patent with the patent at issue in order to determine that they are, in fact, sufficiently alike that it is a relevant examination? And I think that's the objection.

MR. LAVELLE: That's what they argued.

THE COURT: I think that would be a concern to me, if that's out --

MR. SCHERKENBACH: My answer to that is at a conceptual level, yes. At a claim level, no. I suppose if they want to make that argument, they can, but we're talking about what the Acushnet people believed at the time to be novel and nonobvious in the art. Was the idea of a polyurethane cover on a multi-piece ball patentable or not?

9

Ex. 12, T. Tr. at 263:11-264:1.  As Callaway's response to that question, and its subsequent use of the Hebert patents, makes clear, Callaway's intention is to broadbrush the Hebert patents, equate them to the Sullivan patents-in-suit, and avoid a claim-element comparison that demonstrates their differences.

The Court did not rule on the objection at that time, instead deferring the question to a later time when the issue would be raised in witness testimony.  Ex. 12, T. Tr. at 265:21-24.  The issue was next addressed during Mr. Morgan's testimony, after he was asked several questions about the Veneer construction and his views as to its novelty.  Acushnet objected and after some discussion (Ex. 12, T. Tr. at 416:22-423:10), the Court ruled that the examination could continue:

> At this point, I believe it's fair game.  Now, if it gets to the point where the examination is going to require somehow the jury to compare claim to claim then obviously that is not – that is satellite litigation and it truly is not relevant.  But I don't think Mr. Scherkenbach has crossed over that line in fair examination.

Ex. 12, T. Tr. at 422:25-423:6.

In these exchanges, Acushnet submits that the Court recognized the inappropriateness of conducting satellite litigation into the validity of patents not at issue in this lawsuit, and a claim-level comparison of the Hebert patents to the patents-in-suit.  However, the resulting situation was one in which Callaway was permitted to broadly state that the Hebert patents were the "same" as the patents-in-suit, which is clearly not the case.  The only way to counter Callaway's incorrect characterization would be to engage in precisely the sort of claim-level comparison that the Court and the parties recognize would not be appropriate.

## II.   ARGUMENT

### A.   Evidence Regarding the Hebert Patents and Related Inventions is Irrelevant

Acushnet's Veneer construction, and the Hebert patents that resulted from that construction, was based on the use of a particular type of castable liquid cover in a three-piece construction golf ball.  As set forth above, this is the very distinction that the Hebert '172 patent itself makes over the prior art, which included three-piece, polyurethane-covered golf balls. Hebert '172 patent, col. 3:38-40.  Hence, Acushnet's procurement of the Hebert patents, and its views about the novelty of the Veneer project, have to do with whether the use of that particular type of castable outer cover with a high acid inner cover in a three piece ball was patentable over existing three-piece balls that used thermoplastic, injection moldable polyurethane materials like Sullivan's Estane X-4517.  That inquiry is irrelevant to the validity question facing the jury, namely whether the use of generic polyurethane in a three piece ball with broad hardness characteristics, as claimed in the patents-in-suit, was novel and non-obvious in 1995.

### 1.   The Claims of the Hebert Patents are Substantially Different from the Sullivan Patents

Despite Callaway's statements that the Hebert Patents cover the "same concept" as the Sullivan patents-in-suit, the claims of the patents clearly demonstrate otherwise.  Patents are granted on claimed inventions, not "concepts."  *See Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.,* 554 F.3d 1010, 1027 (Fed. Cir. 2009) ("It is the words of the claim that define the scope of the patent.").

To illustrate the important differences in the claims of the Hebert '172 patent and the Sullivan Patents-in-Suit, representative claims are set forth side-by-side below (emphasis added):

| Hebert '172 Patent, claim 1 | Sullivan '293 Patent, claim 4 |
|---|---|

| | |
|---|---|
| 1. A golf ball comprising a cover and a core, wherein said cover is disposed about the core and said cover comprises:<br><br>(a) an inner cover layer of a flexural modulus of *at least about 65,000 psi*; and<br><br>(b) an outer cover layer having a Shore D hardness of greater than 30 to 60, having a *thickness of less than 0.050* inches and comprising a thermoset material that includes at least one of a *castable reactive liquid material and reaction products thereof.* | 4. A multi-layer golf ball comprising:<br><br>a spherical core;<br><br>an inner cover layer having a Shore D hardness of 60 or more molded over said spherical core, said inner cover layer comprising an ionomeric resin including *no more than 16%* by weight of an alpha, beta-unsaturated carboxylic acid and having a modulus of from about *15,000 to about 70,000 psi*; and<br><br>an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, said outer cover layer comprising *polyurethane.* |

There are two key differences in these claims.  <u>First</u>, whereas the Hebert patent recites an

outer cover using a castable reactive liquid material or the reaction product thereof, the '293

patent claims any generic polyurethane.  <u>Second</u>, the Hebert patent recites an inner cover layer

formed of very stiff material (at least 65,000 psi).  Low acid ionomers are not that stiff.  In

contrast, the '293 patent claims an inner cover layer that comprises a low-acid ionomer that can

be much softer (15,000 to 70,000 psi).  ████████████████████████████

████████████████████

    Since the claims of the Hebert patents are substantially different from the claims of the

patents-in-suit, the validity of the Hebert patents (and Acushnet's success in procuring those

patents) has no relevance to this case.  *See Key Tech., Inc. v. Simco/Ramic Corp.*, 137 F.R.D.

322, 324-25 (D. Or. 1991) ("Whether or not [the infringer] subjectively believed that any product

of [patentee] was patentable is irrelevant to the [infringer's] defense that the patents of [patentee]

are not valid.").  Older cases, albeit in the context of estoppel claims, have recognized that there

is little probative value in an accused infringer's statements about its own patent applications.

See, e.g., Great Lakes Carbon Corp. v. Continental Oil Co., 23 F.R.D. 33, 35 (W.D. La. 1958)

(denying plaintiff's attempt to inspect defendant's patent applications for an "admission,"

holding "such an admission would have little probative value on the issue of patentability").

### 2.   The Hebert Patents Do Not Cover the Accused Products

The clearest demonstration of the differences in claim scope between the Hebert patents

and the patents-in-suit is that the Accused Products are covered by the patents-in-suit (as

Acushnet stipulated before the first trial), but they are not covered by the Hebert patents.

As set forth above, the Hebert patents require an inner cover layer material whose

flexural modulus is at least about 65,000 psi.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

On the other hand, the patents-in-suit require an inner cover layer material whose flexural

modulus is between 15,000 and 70,000 psi.  The inner cover layer of the Accused Products is

within that range.  Thus, the Hebert patents do not cover any of the Accused Products.

Conversely, the Modified 2007 and the 2009 Pro V1 balls are not covered by the patents-in-suit

but are covered by the Hebert patent.  ███████████████████████████████

███████████████████████████████████  This further

demonstrates the irrelevance of the Hebert patents to the patents-in-suit.  The Hebert patent

evidence should thus be excluded under Fed. R. Evid. 402.

### B.   Evidence Regarding the Hebert Patents and Inventions is Highly Confusing and Prejudicial

Callaway's introduction of the Hebert patents and related inventions will also create

substantial prejudice and jury confusion and should be excluded under Fed. R. Evid. 403.  The

prejudice and confusion caused by this evidence is illustrated in the record of the first trial.

13

Callaway insisted on repeatedly telling the jury that the Hebert patents and the patents-in-suit cover the "same concept." *See supra* § II.B.  Acushnet was precluded from challenging this broad assertion by demonstrating the differences between the patents, because as the Court recognized, such a claim-element comparison would be wasteful and inappropriate satellite litigation.  Thus, the uncorrected impression left with the jury was that the patents, and the constructions to which they relate, were identical.  Such an impression is incorrect and highly prejudicial.

Even if Acushnet were permitted to counter Callaway's broad statements that the Hebert patents and the Sullivan patents-in-suit cover the "same concept," by differentiating the claims as it has done in this brief, such satellite litigation would be extremely confusing to the jury.  The jury has enough to decide with the validity of the patents-in-suit, without having to then determine whether the Hebert patents are valid, whether the Veneer construction was new, and whether the differences between the Hebert patents and the patents-in-suit are substantially different.  The jury cannot be expected to process these side-issues and still remain focused on the question presented to them in this case—the validity of the patents-in-suit.

**C.**  ███████████████████████████████████████████████

There is a further reason Callaway should not be permitted to introduce evidence about the Hebert patents and related inventions.  ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

14



### D. Callaway Should be Precluded From Offering Evidence Regarding its License to the Hebert Patents

In addition to the evidence about Acushnet's views as to the novelty of the Veneer design, Callaway also stated in its opening statement (without presenting evidence) that it took a license to the Hebert patents:

> There's no dispute that [the Hebert Patent] covers a three-piece solid core ball with a cast polyurethane cover. In fact, when Callaway came out with its Rule 35 ball first, Acushnet said, hey, we had the patent on that. You have to take a license. And we did. We did.

Ex. 12, T. Tr. at 186:23-187:2; Ex. 9, slide 39. The clear implication was that since Callaway took a license to the Hebert patent, somehow Callaway had acted appropriately whereas Acushnet is acting improperly by challenging the validity of the Sullivan Patents-in-Suit. Again, this tends to improperly and incorrectly equate the validity of the Hebert patents with that of the Sullivan patents-in-suit.

The prejudice generated by this argument is enormous. Without understanding the circumstances surrounding Callaway's license to the Hebert patents or the differences in validity

issues presented by the Hebert patents, the jury is left with a sense of inequality and injustice that

Callaway should have to pay for the right to use the "same concept" that Acushnet is now

challenging the validity of.  For the same reasons as those stated above, Callaway should be

precluded from arguing or offering any evidence regarding Callaway's license to the Hebert

Patents in the liability trial.[5]

### E.      Acushnet has not Waived its Objections to the Hebert Evidence and Arguments

It appears from Callaway's correspondence to the Court that it intends to argue that

Acushnet is somehow precluded from objecting to the Hebert evidence to the extent it did not do

so in the first trial.  To the contrary, Acushnet is not bound by objections it made or did not make

in the first trial.  *See, e.g., Rosenfeld v. Basquiat*, 866 F. Supp. 790, 792 (S.D.N.Y. 1994), *rev'd*

*on other grounds,* 78 F.3d 84 (2d Cir. 1996) ("Objections not raised at the first trial of the case

may be urged at a later trial and are not waived, even though the later trial is one *de novo* on

appeal or on remand.") (*quoting* Graham, *Handbook of Federal Evidence* § 103.4 (3d ed. 1991)).

Hence, to the extent Acushnet did not object to certain pieces of evidence or argument relating to

the Hebert patents, Acushnet is still free to raise those objections here in the retrial.  Indeed, it is

the prevalence and extent of Callaway's misuse of this evidence in the first trial that prompted

Acushnet to raise this evidentiary issue in briefing rather than through the Court's standard *in*

*limine* practice.

### CONCLUSION

For all of the foregoing reasons, all evidence and arguments pertaining to the Hebert

patents, Acushnet's views on the validity of those patents and the novelty of the Veneer

---

[5] Callaway's license to the Hebert patents may be relevant to damages, but that issue is not being tried with liability.

construction, the Hebert Invention Record, and Callaway's license to the Hebert patents should

be excluded from evidence in the retrial.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Henry C. Bunsow                          By:    /s/ David E. Moore
Joseph P. Lavelle                                Richard L. Horwitz (#2246)
Brian A. Rosenthal                               David E. Moore (#3983)
HOWREY LLP                                       Hercules Plaza 6th Floor
1299 Pennsylvania Avenue, N.W.                   1313 N. Market Street
Washington, D.C. 20004                           Wilmington, DE  19899
Tel:  (202) 783-0800                             Tel:  (302) 984-6000
                                                 rhorwitz@potteranderson.com
Dated:  December 1, 2009                          dmoore@potteranderson.com
Public Version Dated: December 9, 2009
945476 / 30030                                   *Attorneys for Defendant Acushnet Company*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on December 9, 2009, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on December 9, 2009, the attached document was Electronically Mailed to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com
shear@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
lamberson@fr.com
cjordan@fr.com
compton@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030