# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,     )
    )
       Plaintiff,     )     C.A. No. 06-91 (SLR)
    )
       v.     )
    )     **PUBLIC VERSION**
ACUSHNET COMPANY,     )
    )
       Defendant.     )

## ACUSHNET'S OPPOSITION TO CALLAWAY'S MOTION *IN LIMINE* TO PRECLUDE ANY REFERENCE TO ACUSHNET'S NEW PRO V1 GOLF BALLS

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: January 14, 2010
Public Version Dated: January 21, 2010
950555 / 30030

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................3

        A.     Acushnet Introduced the New Pro V1 Balls After the First Trial...............3

        B.     The New Pro V1 Balls Do Not Infringe the Patents-in-Suit........................3

        C.     Acushnet Disclosed the Design of the New Pro V1 Golf Balls During
               Discovery ...................................................................................................4

        D.     Acushnet's New Pro V1 Balls Do Not Infringe Any Other Callaway
               Patents ........................................................................................................5

III.    ARGUMENT..........................................................................................................7

        A.     The New Pro V1 Balls Are Relevant to Commercial Success ....................7

        B.     The New Pro V1 Balls Are Specific Embodiments of the Non-Infringing
               Alternative Disclosed by Acushnet's Damages Expert Dr. Kerr................9

               1.     The Success of the New Pro V1 Balls Shows the Feasibility of
                      Available Non-Infringing Alternatives in 2001 ............................10

               2.     The New Pro V1 Balls Are Relevant to Lost Profits.....................12

               3.     The New Pro V1 Balls Are Relevant to Reasonable Royalty
                      Damages........................................................................................16

               4.     Callaway's Argument that the New Pro V1 Infringes Other Patents
                      is a Red Herring ..........................................................................17

        C.     Acushnet Disclosed the Non-Infringing Alternative Embodied By the New
               Pro V1 Balls..............................................................................................18

IV.     CONCLUSION....................................................................................................19

## TABLE OF AUTHORITIES

### CASES

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
    377 U.S. 476 (1964)..................................................................................13

*BIC Leisure Products, Inc. v. Windsurfing International, Inc.*,
    1 F.3d 1214 (Fed. Cir. 1993)............................................................13, 15

*Chicago Title Insurance Corp. v. Magnuson*,
    No. 2:03-cv-368, 2009 WL 3321372 (S. D. Ohio Oct. 9, 2009) ...........................19

*Cleveland v. Piper Aircraft Corp.*,
    985 F.2d 1438 (10th Cir. 1993) ..........................................................19

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
    430 F. Supp. 2d 346 (D. Del. 2006).....................................................15

*Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)...........................................................14

*In re Ecast, Inc.*,
    96 F. App'x. 710 (Fed. Cir. 2004) .......................................................16

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
    249 F. Supp. 2d 434 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005)...........14

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).............................................................................8

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)..........................................10, 11, 13, 14

*Izume Products Co. v. Koninklijke Philips Electrics N.V.*,
    315 F. Supp. 2d 589 (D. Del. 2004)...................................................15

*Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006)...........................................................6

*Linear Technology Corp. v. Micrel, Inc.*,
    2006 U.S. Dist. LEXIS 96860 (N.D. Cal. June 9, 2006) ..............................11

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)...........................................................16

*Slimfold Manufacturing Co. v. Kinkead Industrial, Inc.,*
    932 F.2d 1453 (Fed. Cir. 1991).................................................................................14

*State Industrial, Inc. v. Mor-Flo Industrial, Inc.,*
    883 F.2d 1573 (Fed. Cir. 1989).................................................................12, 13, 15

*Zygo Corp. v. Wyko Corp.,*
    79 F.3d 1563 (Fed. Cir. 1996).................................................................................16

Defendant Acushnet Company ("Acushnet") files this brief in opposition to Callaway's motion *in limine* to preclude Acushnet from reference to its new Pro V1 golf balls.

## I.   INTRODUCTION

Acushnet's new Pro V1 golf balls are relevant to several issues in this case and the motion *in limine* to exclude them should be denied.

First, the new Pro V1 balls are relevant to the question of commercial success. Callaway argues that the accused golf balls, the pre-2009 Pro V1 products, were highly successful and that that commercial success is probative of the non-obviousness of the patents-in-suit. Indeed, this was a cornerstone of Callaway's case in the first trial.

The redesigned 2009 Pro V1 balls do not practice the patents-in-suit. Yet the new balls are **even more successful** in the market than the accused balls. Thus, the redesigned balls demonstrate that the success of the Pro V1 product line has nothing to do with the patents-in-suit.

████████████████████████████████████████████████

████████. Acushnet should be able to defend itself by showing that the commercial success of the Pro V1 balls was not tied to the patents-in-suit.

Second, the 2009 Pro V1 balls are relevant to damages. Acushnet's damages expert, Dr. Kerr, relies on the existence of non-infringing alternatives as a reason why lost profits are unavailable in this case. The existence of such non-infringing alternatives is also relevant to the quantum of any reasonable royalty. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ The fact that the new Pro V1 golf balls were readily made and accepted by the market demonstrates the feasibility and practicality of the non-infringing alternatives relied on by Dr. Kerr.

Callaway erroneously argues that the existence of non-infringing substitutes is irrelevant to a market share approach to lost profits. Callaway is incorrect. In fact, the presence of non-infringing substitutes can have a significant impact on the reconstruction of a "but-for" market even in a market share analysis. Moreover, the existence of non-infringing substitutes is undeniably a factor in the calculation of reasonable royalty damages. Here, the success of the new Pro V1 balls demonstrates the feasibility and costs associated with the non-infringing alternatives on which Dr. Kerr relies in his lost profits and reasonable royalty analyses.

Callaway's unsupported assertion that the new Pro V1 balls infringe other Callaway patents is a red herring. The Callaway patents at issue in the other litigation between the parties had not issued in 2001, which is when the alleged infringement began and the relevant time for the hypothetical negotiation required in the *Georgia Pacific* analysis. The new Pro V1 balls do not infringe the two later-issued Callaway patents, and Acushnet has already demonstrated to the Patent Office that those patents are invalid. In any event, the new Pro V1 balls demonstrate lack of nexus between commercial success and the patents-in-suit, irrespective of whether the new products infringe another patent.

Callaway's argument that Acushnet failed to disclose the new Pro V1 balls during discovery is illogical and misplaced. The new Pro V1 balls were not introduced until after the first trial. They are, however, manifestations of one of the non-infringing alternatives Acushnet fully disclosed during trial. Callaway had every opportunity to fully explore that design around, and indeed it did so, taking depositions directed to that very subject matter. Moreover, Callaway fully analyzed the new product and decided not to sue the 2009 products for infringement of the patents-in-suit. It knows the 2009 product does not infringe, and needs no discovery on this

point. Nonetheless, if Callaway wishes to take an additional deposition regarding the new balls, Acushnet will provide such discovery to avoid any argument of prejudice.

## II.    FACTUAL BACKGROUND

### A.    Acushnet Introduced the New Pro V1 Balls After the First Trial

After the jury's verdict against Acushnet in the first trial, it became apparent that the Court could issue an injunction against the Pro V1 and Pro V1x balls. Thus, Acushnet set in motion the steps to implement a non-infringing alternative design. Acushnet modified the 2007 Pro V1 and Pro V1x to use the non-infringing design and adjusted its manufacturing process to make the modified balls in September 2008. Ex. 3, 11/18/2008 Bellis Decl. at ¶ 12. These balls became known as the "Modified 2007 Pro V1" and "Modified 2007 Pro V1x" balls. Later, Acushnet introduced its 2009 versions of the balls using the same non-infringing material.[1] Those balls were known as the 2009 Pro V1 and 2009 Pro V1x balls. In compliance with the injunction issued by this Court, all sales of 2007 Pro V1 and Pro V1x were discontinued on or before January 1, 2009.

Acushnet refers to the Modified 2007 and 2009 balls together in this brief as the "New Pro V1 Balls."

### B.    The New Pro V1 Balls Do Not Infringe the Patents-in-Suit

---

[1] Typically, Acushnet releases new versions of its golf balls every other year, so there was no planned or actual "2008 Pro V1" golf ball.

██████████████████████████████████████████████████████

████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

### C.   Acushnet Disclosed the Design of the New Pro V1 Golf Balls During Discovery

Acushnet's damages expert, Dr. Kerr disclosed in his report the existence of several non-infringing alternatives as part of his analysis of lost profits and reasonable royalty.[3]  ██████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

_____

█████████████████████████████████████████████████████████

[3] Callaway's brief does not seek to preclude Acushnet's reliance on the non-infringing alternatives disclosed by Dr. Kerr.

After the Federal Circuit remanded this case for a retrial, this Court ordered damages to be tried along with liability. In light of this ruling, Callaway requested that Acushnet provide updated damages information related to "all Pro V1-type balls." Ex. 13, correspondence from Thomas Halkowski. In response to that request, Acushnet produced, on January 12, 2010, updated damages documents. Those documents include sales information for the accused products and New Pro V1 Balls, specifications for the New Pro V1 Balls, and market share data including both the accused products and New Pro V1 Balls.

**D.      Acushnet's New Pro V1 Balls Do Not Infringe Any Other Callaway Patents**

Callaway filed a lawsuit in early 2009 alleging that the New Pro V1 Balls infringe two of its patents, U.S. Patent Nos. 6,495,633 ("the '633 patent") and 6,623,381 ("the '381 patent"). Exs. 14 and 15. Those patents issued in December of 2002 and September of 2003 respectively.

*Id.* That lawsuit, referred to herein as *Callaway v. Acushnet II*, is scheduled for trial in March of 2012.



---

[4] There are several other bases for non-infringement of the '633 and '381 patents, but for the sake of avoiding a sideshow regarding the infringement of these patents, Acushnet does not here discuss the other reasons for non-infringement.

Moreover, both the '633 and '381 patents are undergoing reexamination. All issued claims of those patents have been rejected by the Patent Office.[5] *See* Ex. 16, 05/26/2009 Office Action in Reexam. Cont. No. 95/000,444; Ex. 17, 05/15/2009 Office Action in Reexam. Cont. No. 95/000,445. Callaway has been forced to add over 100 new claims to those patents in an effort to find acceptable claims. *See* Ex. 18, 07/27/2009 Response in Reexam Cont. No. 95/000,444; Ex. 19, 07/15/2009 Response in Reexam. Cont. No. 95/000,445.

## III.   ARGUMENT

### A.   The New Pro V1 Balls Are Relevant to Commercial Success

Callaway's primary theme in the first trial to avoid a verdict of obviousness was commercial success. Callaway argued throughout the trial – from opening statement through closing argument – that the accused Pro V1 golf balls were highly successful and that this success was due to the use of the patents-in-suit. Thus, the even greater success of the New Pro V1 Balls (which do not use the patents-in-suit) directly refutes Callaway's argument. Acushnet's commercial success with the Pro V1 line of balls is now clearly revealed not to be the result of using the claimed teachings of the patents-in-suit.

If the commercial success of the accused Pro V1 balls had anything at all to do with the patents-in-suit, then surely the non-infringing new balls would be less successful once Acushnet stopped using those patents. However, that is not what happened.

To the contrary, the non-infringing New Pro V1 golf balls have achieved ***even greater market acceptance and an even higher market share than the accused balls***. *See* Ex. 21, Golf Datatech Data (showing increased share year over year between 2008 and 2009 for Pro V1 and

Pro V1x). The increased success of the New Pro V1 Balls directly contradicts the nexus Callaway must establish between the commercial success of the accused Pro V1 balls and the patents-in-suit. The success of the non-infringing balls demonstrates that Pro V1s succeed due to other factors, such as the strength of the Titleist brand and the quality and properties of the materials used by Acushnet in its golf balls.

Callaway argues that the New Pro V1 Balls, introduced in 2008, could not be relevant to the obviousness of a patent filed in 1995. D.I. 539 at 9. That logic is specious. Secondary consideration evidence, such as commercial success, often is taken from the period after the patent application is filed. Indeed, that was the case in the seminal *John Deere* case on secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1 (1966). Callaway's core argument is that the success of the Pro V1 golf ball, which was not introduced until 2000, shows the non-obviousness of the patents-in-suit in 1995. Equally, that the New Pro V1 Balls, which do not use the patents-in-suit, are more successful rebuts that nexus with real world evidence that the patents-in-suit just do not matter to the success of the ball. Thus, Callaway's sole argument against use of the New Pro V1 Balls for commercial success fails.[6]

Indeed, it is hard to imagine a more compelling direct test of whether the patents mattered than what transpired in the real world. When the patented feature was removed but the name of the product and its basic marketing strategy remained the same, the ball's success increased. The jury should be permitted to infer from this the obvious conclusion that Callaway's commercial success evidence is just hand-waving folderol, flatly contradicted by the real world evidence.

---

[6] Callaway's assertion that the New Pro V1 Balls infringe other patents has no applicability to commercial success. Whether those balls infringed other patents is irrelevant to the issue of commercial success. Acushnet should be permitted to demonstrate that the New Pro V1 balls do not use the patents-in-suit, and are even more successful than the accused balls, rebutting the nexus between commercial success and the patents-in-suit. This is true whether or not the New Pro V1 Balls allegedly infringe some other Callaway patents.

It would be fundamentally unfair to allow Callaway to argue to the jury that the commercial success of the Pro V1 is due to the patents-in-suit without telling the jury that the New Pro V1 Balls, which do not use the patents-in-suit, are even more successful.  Exclusion of such evidence would constitute manifest injustice.

### B.   The New Pro V1 Balls Are Specific Embodiments of the Non-Infringing Alternative Disclosed by Acushnet's Damages Expert Dr. Kerr

The New Pro V1 Balls are specific embodiments of non-infringing alternatives relied on by Acushnet's damages expert Dr. Kerr, making them highly relevant to damages.  Dr. Kerr relied on the existence of several potential non-infringing alternatives to the Pro V1 in his analysis of damages under lost profits and reasonable royalty theories.  *See* Ex. 8, Kerr Report at 27-30; 54-55.  Callaway's motion does not seek to exclude Acushnet's reference to those non-infringing alternatives.  Instead, Callaway seeks only to exclude reference to the New Pro V1 Balls themselves.

However, the New Pro V1 Balls are specific embodiments of one of the non-infringing alternatives expressly relied on in Dr. Kerr's report. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████

1.   **The Success of the New Pro V1 Balls Shows the Feasibility of Available Non-Infringing Alternatives in 2001**

Callaway argues that the New Pro V1 Balls are not relevant because they were not available in 2001, at the time infringement began. D.I. 539 at 7-9. However, Acushnet does not contend that the New Pro V1 Balls themselves were on the market as substitutes during the infringement period. Instead, Acushnet contends that the New Pro V1 Balls are specific embodiments of non-infringing alternatives that were considered by Acushnet in the 2001-2002 time frame. The non-infringing design, including the specific materials selected for the New Pro V1 Balls, was an available substitute in 2001 under Federal Circuit law.

Acushnet need not show that a product was actually on the market during the infringement period to qualify as a non-infringing substitute. To the contrary, to be a non-infringing substitute, "the product or process must *have been available or* on the market at the time of infringement." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (emphasis added).

The facts of *Grain Processing* are similar to this case. There, after it was found to infringe, the defendant developed a new process for producing the accused product that did not infringe the plaintiff's patent. 185 F.3d at 1345-46. Despite the fact that the design-around was not adopted until almost a decade after infringement began, the Federal Circuit held that the new process should be considered as a non-infringing alternative to the patents-in-suit, since the technology was available when infringement began: "[defendant] had the necessary chemical

materials, the equipment, the know-how and experience, and the economic incentive to produce [the non-infringing substitute] throughout the entire accounting period." *Id.* at 1354. *See also Linear Tech. Corp. v. Micrel, Inc.*, 2006 U.S. Dist. LEXIS 96860, at *256 (N.D. Cal. June 9, 2006) (stating "the ease of the re-design, the short period of time it took to make the circuitry changes and the miniscule cost, all support a finding of availability [during the claimed infringement period].").

11

### 2.    The New Pro V1 Balls Are Relevant to Lost Profits

Callaway's principal argument to exclude the New Pro V1 Balls is that the presence of non-infringing alternatives is irrelevant to lost profits when the plaintiff uses a "market share" approach. Callaway is wrong.

As an initial matter, Callaway's purported reconstruction of the market "but for" infringement is fatally flawed. Acushnet filed a *Daubert* motion to exclude Mr. Napper's testimony and Callaway's lost profits case on this basis, among others.[7] Among other errors, Napper's lost profits analysis looks at the market in 2003. Callaway ignores the fact that the alleged infringement began in 2001. Thus, a hypothetical negotiation in 2001 would have resulted in a fully paid-up license for the life of the patents, eliminating the possibility of a lost-profits period starting in 2003. D.I. 285 at 15-16. Callaway also incorrectly characterizes the market for golf balls, ignoring the substitutability of golf balls across many price ranges. D.I. 285 at 20-25.

Most germane to this motion, though, Callaway's "but-for" market ignores the presence of non-infringing alternatives that Acushnet could have pursued rather than giving up its entire market share in the face of infringement. D.I. 285 at 16-19.

Callaway misinterprets the case law regarding whether non-infringing alternatives are relevant to a lost profits analysis based on "market share." The Federal Circuit held in *Mor-Flo* that the second *Panduit* factor (the absence of non-infringing alternatives) can be satisfied in some cases by proof of the patentee's market share. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). The reasoning behind this rule is clear: in the ordinary

---

[7] Acushnet's *Daubert* motion was not resolved before the first trial due to the Court's bifurcation of damages. Since the Court has now indicated that damages should be tried together with liability, Acushnet's *Daubert* motion is now ripe for consideration by the Court.

multi-competitor market, it would be impossible to establish the absence of non-infringing alternatives if competitors sell non-infringing substitutes. In such a situation, strict application of the *Panduit* test would never allow recovery of lost profits. Thus, *Mor-Flo* allowed for an alternate theory of lost profits for which proof of the absence of non-infringing substitutes on the market is not required.

However, the existence of non-infringing substitutes is still relevant to lost profits, even under a market share theory. Regardless of the test used, fundamentally any plaintiff seeking lost profits must prove what it would have made but for the defendant's infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964). The burden of establishing the causal link between infringement and lost sales rests firmly on the patentee. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1217-18 (Fed. Cir. 1993).

"The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee 'would ... have made.'" *Grain Processing*, 185 F.3d at 1350. The recreation of that "but for" market necessitates an examination of alternative actions the infringer may have taken, such as introducing non-infringing substitutes:

> [A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner.

*Id.* at 1350-51. While the facts of *Grain Processing* involved essentially a two-player market, its description of the necessity to recreate the "but-for" market was not limited to two-player markets, and is cited with regularity in cases with multiple competitors in the market. *See, e.g.,*

13

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001).

Accordingly, courts have rejected a market share theory of lost profits when there is evidence that the defendant would have chosen to adopt an acceptable non-infringing alternative rather than leave the market. For example, the Federal Circuit upheld the rejection of a lost profits theory premised on market share since the plaintiff did not show that defendant could not have reverted to old, non-infringing technology. *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991).

An instructive district court decision, *Fuji Photo Film Co. v. Jazz Photo Corp.*, sets forth a helpful discussion of the interplay between non-infringing alternatives and the market share theory of lost profits. 249 F. Supp. 2d 434, 454-56 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005). There, like in this case, evidence showed that the defendant could have used a different, non-infringing methodology rather than infringing. *Id.* at 455. The court rejected the claim for lost profits, despite proof of market share, holding that "[patentee's] reliance on proof of its own market share, without more, is insufficient as a matter of law to support a reasonable probability of 'but for' causation of lost profits." *Id.* (citing *Slimfold* and *Grain Processing*).

Thus, any market share analysis of lost profits must take into account the effect that non-infringing substitutes – including Acushnet's New Pro V1 Balls – would have on sales. Indeed, since the "but for" reconstruction required by *Grain Processing* is intended to project what would have happened if the infringer could no longer infringe, evidence of what actually happened when Acushnet stopped infringing is highly germane. Callaway's lost profits theory is premised on the fact that if Acushnet did not use the patents-in-suit, Callaway would have made a large portion of Acushnet's sales. Indeed, Callaway seemed to believe that the injunction

14

against sales of the old Pro V1 balls would increase its market share, taking out a full page ad in the Wall Street Journal trumpeting the injunction. Ex. 25. However, the New Pro V1 Ball evidence shows that when Acushnet actually stopped using the patents-in-suit, there was virtually no effect on Callaway's market share. This evidence rebuts Callaway's "but-for" case for lost profits. *See BIC Leisure Prods.*, 1 F.3d at 1218 (denying lost profits and noting that the plaintiff's sales continued to decline after defendant was enjoined from infringing)

None of the cases Callaway cites considered evidence that an infringer could have introduced alternative products that did not infringe. The primary case Callaway relies on, *Mor-Flo*, holds only that the existence of third party products *on the market* is not relevant to a market share analysis since the market share effectively subtracts those alternatives out of the lost profits award. *See Mor-Flo*, 883 F.2d at 1578. Similarly, this Court's decisions that Callaway cites are inapposite. Neither *Cryovac* nor *Izume Products* hold that evidence of an alternative design available to the infringer is irrelevant to lost profits when a market share approach is used. *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 361 (D. Del. 2006); *Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004). Indeed, neither case considered such facts.

Thus, the cases cited by Callaway are inapposite here. Acushnet seeks to introduce evidence of a non-infringing alternative that was not on the market, but was an available course of action if Acushnet did not infringe. As set forth above, such evidence is relevant to the "but for" market under any analysis of lost profits. Accordingly, Acushnet should not be precluded from addressing the New Pro V1 Balls in the context of lost profits.

### 3.     The New Pro V1 Balls Are Relevant to Reasonable Royalty Damages

The New Pro V1 Balls are also relevant to calculation of damages under a reasonable royalty theory.  Callaway's arguments about the relevance of non-infringing alternatives to a market share analysis of lost profits have no impact on their relevance to reasonable royalty calculations.

The Federal Circuit has long held that the presence or absence of non-infringing alternatives is relevant to a reasonable royalty analysis.  *See Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("[I]n the hypothetical negotiation that characterizes the reasonable royalty calculation, Shell may have had non-infringing alternatives to installing with temporary pilings.  Thus, under the constraints of the hypothetical negotiation, the market could not award Riles a royalty for his method divorced of all relation to a potential non-infringing alternative method."); *see also In re Ecast, Inc.*, 96 F. App'x. 710, 711 (Fed. Cir. 2004) (non-precedential) ("We note that, as Ecast urges, under Federal Circuit precedent evidence of the availability of an acceptable noninfringing alternative is relevant to a lost profits analysis and to a reasonable royalty analysis.") (internal citations omitted).

The Federal Circuit's decision in *Zygo Corp. v. Wyko Corp.* is particularly instructive.  There, the defendant Wyko argued that at the time of the hypothetical negotiation, it could have switched to an earlier non-infringing product.  79 F.3d 1563, 1571-72 (Fed. Cir. 1996).  The Federal Circuit held that the existence and feasibility of that non-infringing alternative should have been considered in the reasonable royalty analysis:

> [T]he fact that Wyko could have continued marketing the [earlier product] is a factor relevant to the determination of a proper royalty during hypothetical negotiations. Wyko would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing device 'in the wings.'

16

*Id.* Similarly, in 2001, Acushnet could have changed the design of its Pro V1 golf balls to use a different, non-infringing inner cover layer, as it later did in 2008. Dr. Kerr opined as much in his expert report. Ex. 8, Kerr Report at 28-30.

The fact that Acushnet successfully implemented the non-infringing alternative by using a blend of high-acid ionomer and metallocene in the inner cover layer of the Pro V1 is strong evidence that the alternative was feasible in 2001, and not just a theoretical possibility. Thus, Acushnet should be permitted to use that evidence in its analysis of reasonable royalties.

### 4.   Callaway's Argument that the New Pro V1 Infringes Other Patents is a Red Herring

Callaway acknowledges that the relevant time frame for determining the availability of non-infringing substitutes is 2001, at the time when the alleged infringement began. D.I. 539 at 7-8. Callaway's allegation that the 2009 Pro V1 infringes other later-issued Callaway patents is thus a red herring. The '633 and '381 patents were not in existence in 2001. The '633 patent did not issue until the end of 2002. The '381 patent did not issue until 2003. Thus, in the hypothetical negotiation that would have taken place in April/May of 2001, the two patents Callaway says are infringed had not yet issued, and thus would not have carried any weight in the negotiations.

Moreover, Callaway has not demonstrated by any modicum of proof that the New Pro V1 Balls infringe, or even likely infringe, its '633 or '381 patents. The only evidence Callaway presents is the fact that it has alleged infringement in *Callaway v. Acushnet II*. However, the New Pro V1 Balls do not infringe those patents as they are missing key limitations of the claims. *See supra* § II.D. at 5-6. Moreover, the Patent Office has issued office actions rejecting all issued claims of those patents as invalid. Thus, it is not reasonable to assume infringement of a valid patent.

17

In light of the strong non-infringement arguments Acushnet has with respect to the two additional Callaway patents, and the likelihood that they will be deemed invalid by the Patent Office, Callaway has not established any likelihood that the New Pro V1 Balls infringe any valid Callaway patents.

### C.   Acushnet Disclosed the Non-Infringing Alternative Embodied By the New Pro V1 Balls



Since the New Pro V1 Balls are a specific embodiment of the non-infringing alternative design disclosed during discovery, Callaway is not unduly prejudiced by the admission of the new balls into evidence. After all, Callaway already recognizes that the new balls do not infringe the patents-in-suit. Further, Acushnet disclosed during discovery documents showing costs and properties associated with the specific materials used in the inner cover layer of the Pro V1. In response to Callaway's recent request to update damages discovery, Acushnet also produced documents showing sales, market share, and manufacturing guidelines for the New Pro V1 Balls. Thus, there is no undue prejudice to Callaway to allowing Acushnet to discuss the New Pro V1 Balls.

Courts routinely allow parties to update damages discovery after remand and before a retrial to take account of new factual developments. *See, e.g., Chicago Title Ins. Corp. v. Magnuson,* No. 2:03-cv-368, 2009 WL 3321372, at *1-2 (S. D. Ohio Oct. 9, 2009). Indeed, Callaway requested that Acushnet update its damages discovery. The introduction and acceptance of the New Pro V1 Balls is new evidence that was not available to Acushnet during discovery. Since it is highly probative of both damages and commercial success, the Court should permit Acushnet to offer such evidence to prevent manifest injustice. *See Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1450 (10th Cir. 1993) (holding in a retrial, "if a party makes a timely motion to produce new and material evidence which was not otherwise readily accessible or known, the court should, within the exercise of discretion, consider whether denial of the new evidence would create a manifest injustice.").

If Callaway believes it needs additional deposition time to address the New Pro V1 Balls, Acushnet will agree to provide such discovery. Acushnet does not believe such discovery is necessary, but it is willing to provide it to avoid any argument of undue prejudice.

## IV.   CONCLUSION

For all of the foregoing reasons, Acushnet should be permitted to offer evidence and testimony regarding the New Pro V1 Balls.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:                      By:   /s/ David E. Moore
                                        Richard L. Horwitz (#2246)
Henry C. Bunsow                         David E. Moore (#3983)
Joseph P. Lavelle                       Hercules Plaza 6th Floor
Brian A. Rosenthal                      1313 N. Market Street
HOWREY LLP                              Wilmington, DE  19899
1299 Pennsylvania Avenue, N.W.          Tel:  (302) 984-6000
Washington, D.C. 20004                  rhorwitz@potteranderson.com
Tel:  (202) 783-0800                    dmoore@potteranderson.com

Dated: January 14, 2010                 *Attorneys for Defendant Acushnet Company*
Public Version Dated:  January 21, 2010
950555 / 30030

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 21, 2010, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on January 21, 2010, the attached document was Electronically

Mailed to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

Robert A. Denning
David S. Shuman
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shuman@fr.com
shear@fr.com

Jonathan J. Lamberson
Christina D. Jordan
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
lamberson@fr.com
cjordan@fr.com
compton@fr.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030