# EXHIBIT 17



**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,445 | 03/18/2009 | 6495633 | 634.0004.RXUS07 | 7203 |

27885        7590        05/15/2009
Fay Sharpe LLP
1228 Euclid Avenue, 5th Floor
The Halle Building
Cleveland, OH 44115

| EXAMINER |
|---|
| DIAMOND, ALAN D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/15/2009 | PAPER |

Please find below and/or attached an Office communication concerning this application or proceeding.

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

Clinton H. Brannon

HOWREY LLP

1299 Pennsylvania Avenue, NW

Washington, DC 20004

Date: **5-15-09**

### Transmittal of Communication to Third Party Requester
### Inter Partes Reexamination

REEXAMINATION CONTROL NO. : 95000445

PATENT NO. : 6495633

TECHNOLOGY CENTER : 3999

ART UNIT : 3991

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

| *OFFICE ACTION IN* **INTER PARTES** *REEXAMINATION* | Control No.<br>95/000,445 | Patent Under Reexamination<br>6495633 | |
|---|---|---|---|
| | Examiner<br>ALAN DIAMOND | Art Unit<br>3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response:*
<u>2</u> MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II. SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-15</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>1-15</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____      ☐ are acceptable      ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:   ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
      ☐ been received.      ☐ not been received.      ☐ been filed in Application/Control No _____.
10. ☐ Other _____

| **Transmittal of Communication to Third Party Requester Inter Partes Reexamination** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/000,445 | 6495633 |
| | Examiner | Art Unit | |
| | ALAN DIAMOND | 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| INTER PARTES REEXAMINATION COMMUNICATION | Control No. | Patent Under Reexamination | |
|---|---|---|---|
| | 95/000,445 | 6495633 | |
| | Examiner | Art Unit | |
| | ALAN DIAMOND | 3991 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

Application/Control Number: 95/000,445                                    Page 2
Art Unit: 3991

### Summary of Proceedings

1.      A Request pursuant to 37 CFR 1.913 for inter partes reexamination of claims 1-9

and 12-15 of U.S. Patent 6,495,633 (hereinafter "the '633 patent") was filed March 18,

2009 by third party requester.  An Order granting inter partes reexamination of claims 1-

9 and 12-15 of the '633 patent accompanies the instant Office action.  37 CFR 1.935.

### Claims to be Reexamined

2.      Claims 1-15 of the '633 patent will be reexamined in the instant proceeding.  As

noted in MPEP 2640, "[t]he decision to reexamine any claim for which reexamination

has not been requested lies within the sole discretion of the Office, to be exercised

based on the individual facts and situation of each individual case.  If the Office chooses

to reexamine any claim for which reexamination has not been requested, it is permitted

to do so."

### Scope of Claims

3.      In reexamination, patent claims are construed broadly.  In re Yamamoto, 740

F.2d 1569, 1571, 222 USPQ 934, 936 (Fed. Cir. 1984) (claims given "their

broadest reasonable interpretation consistent with the specification").  This

reexamination proceeding contains claims 1-15 drawn to a golf ball.  Claims 1 and 12

are representative:

Application/Control Number: 95/000,445                                     Page 3
Art Unit: 3991


1.    A golf ball comprising:

a dual core comprising a center component, and a core layer disposed about said center component;

an inner cover layer disposed on said dual core, the inner cover layer consisting essentially of a high acid ionomer including at least 16% by weight of an alpha, beta-unsaturated carboxylic acid, and

an outer cover layer formed about said inner cover layer, said outer cover layer comprising a low flexural modulus ionomer resin which includes a blend of a hard high modulus ionomer resin with a soft low modulus ionomer resin, the high modulus ionomer being a sodium, zinc, magnesium or lithium salt of a copolymer having from 2 to 8 carbon atoms and an unsaturated monocarboxylic acid having from 3 to 8 carbon atoms, the low modulus ionomer being a sodium or zinc salt of a terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid and an unsaturated monomer of the acrylate ester class having from 1 to 21 carbon atoms.


12.    A golf ball comprising:

a dual core comprising a center component, and a core layer disposed about said center component, said core layer comprising polybutadiene;

an inner cover layer disposed on said dual core, the inner cover layer consisting essentially of a high acid ionomer including at least 16% by weight of an alpha, beta-unsaturated carboxylic acid; and

an outer cover layer formed about said inner cover layer, said outer cover layer comprising a relatively soft polymeric material selected from the group consisting of low flexural modulus ionomer resins and non-ionomeric elastomers.

Claims 10 and 11 recite the following:

10.    A golf ball according to claim 1, wherein the non-ionomeric thermoplastic elastomer is a polyester elastomer.

Application/Control Number: 95/000,445                    Page 4
Art Unit: 3991

11.     A golf ball according to claim 1, wherein the non-ionomeric thermoplastic elastomer is a polyester amide.

Claim 1 does not recite a "non-ionomeric thermoplastic elastomer" and thus, "the non-ionomeric thermoplastic elastomer" recited in claims 10 and 11 lacks positive antecedent basis in claim 1.

Claim 12 requires that the outer cover layer comprises a relatively soft polymeric material selected from the group consisting of low flexural modulus ionomer and non ionomeric elastomers.  Claim 13 sets forth that the non-ionomeric elastomer is a polyurethane.  Thus, the outer cover layer in claim 13 is met by either a low flexural modulus ionomer or non-ionomeric elastomer polyurethane.


### References Relied Upon

Cavallaro et al, U.S. Patent 5,688,191, hereinafter "Cavallaro".

Sullivan, U.S. Patent 4,884,814, hereinafter "Sullivan '814".

Proudfit, U.S. Patent 5,314,187.

Kim et al, U.S. Patent 5,184,828, hereinafter "Kim".

Nesbitt, U.S. Patent 4,431,193.

Horiuchi et al, U.S. Patent 5,222,739.

Statz, "'Surlyn' ionomers for golf ball covers," Science and Golf: Proceedings of the World Scientific Congress of Golf, 1994, pp. 205-212, hereinafter "Statz".

E.I. DuPont de Nemours & Co., Research Disclosure No. 297003, January 1989, hereinafter "Research Disclosure".

Application/Control Number: 95/000,445                                    Page 5
Art Unit: 3991

## *Priority*

4.      As noted on page 11 of the request, the claims of the '633 patent are entitled only

to a filing date of April 10, 1996, i.e., the filing date of application Serial No. 08/631,613,

because no other earlier applications in the '633's priority chain provides support for the

instantly claimed requirement of a dual core.  Indeed, at p. 2 of the non-final Office

action mailed 08/01/2001 during prosecution of the '633 patent, the Examiner stated

that "[t]he effective filing date of the claims is April 10, 1996 because the earlier

applications do not provide basis for dual cores."

## *Claim Rejections - 35 USC § 102 and 103*

5.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

6.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 95/000,445                                     Page 6
Art Unit: 3991

**Rejections based on Cavallaro:**

7.      **On pages 62-64 and 69 of the request, third party requester proposes that**

**claims 12 and 13 be rejected under 35 U.S.C. 102(e) as being anticipated by**

**Cavallaro.**

        This third party proposed rejection of claims 12 and 13 **is not adopted** for the

following reasons.  Independent claim 12 requires that the golf ball has a dual core

comprising a center component and a core layer disposed about said center

component, said core layer comprising polybutadiene.  Claim 12 further requires an

inner cover layer disposed on said dual core, the inner cover layer consisting essentially

of a high acid ionomer including at least 16% by weight of an alpha, beta-unsaturated

carboxylic acid; and an outer cover layer formed about said inner cover layer, said outer

cover layer comprising a relatively soft polymeric material selected from the group

consisting of low flexural modulus ionomer resins and non-ionomeric elastomers.  Third

party requester points to Cavallaro's discussion of the prior art at col. 2, lines 18-29, of

core and mantle layers that are made from polybutadiene, and Cavallaro's teaching at

col. 3, lines 37-39 that the core can have one or more layers (see the claim chart

bridging pages 62 and 63 of the request).  However, a selection has to be made since

Cavallaro's core does not always have to have a dual structure or be made from

polybutadiene (see col. 5, lines 26-42).  Additionally, a selection has to be made with

respect to the Cavallaro's cover.  Cavallaro teaches that a preferred material for its

cover layer is an inonomer having 15-35% of acrylic or methacylic acid monomer (col. 5,

line 66 through col. 6, line 16), but that the layer can be a single layer or multiple layer

Application/Control Number: 95/000,445                                        Page 7
Art Unit: 3991

(col. 5, lines 66-67).  In view of the multiple selections, Cavallaro does not anticipate

claims 12 and 13.


8.      **Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable**

**over Cavallaro.  This is an Examiner rejection.**

        Cavallaro teaches a golf ball that includes a core having one or more layers; one

or more mantle layers; and at least one cover layer; wherein the mantle layer is

disposed between the core and the cover layer (see col. 3, lines 37-44).  The core may

comprise a variety of materials, including those conventionally employed as golf ball

cores, an example of a conventional material being polybutadiene (see col. 5, lines 26-

42).  Indeed, as part of the prior art, Cavallaro teaches a dual core as here claimed

having a central portion (i.e., central component) and an integral outer layer (i.e., core

layer), both of which comprise polybutadiene (see col. 2, lines 18-29 and 53-60).

Cavallaro's cover layer comprises at least one layer of thermoplastic or thermosetting

material, the preferred material being ionomer resin including 5-35%, more preferably

10-35%, most preferably 15-35% by weight of acrylic or methacrylic acid (see col. 5, line

66 through col. 6, line 16).  Thus, the use of one or more than one layer of the ionomer

resin for Cavallaro's cover is within the scope of Cavallaro's disclosure.  Cavallaro

teaches that the outer cover layer is made from a "dead" but durable material, such as

ionomers with low modulus or polyurethane (see col. 6, lines 60-65).

        Cavallaro teaches the limitations of claims 12 and 13, the difference being that

Cavallaro does not specifically teach preparing its golf ball such that the golf ball has a

structure including said dual core and a cover comprising an inner layer of ionomer

resin having 15-35% acrylic acid or methacrylic acid, and an outer layer of said ionomer

with low modulus or polyurethane.  However, it would have been obvious to one of

ordinary skill in the art at the time the invention was made to have prepared Cavallaro's

golf ball so that it has said structure because such a structure is within the scope of

Cavallaro's disclosure.


9.      **Claims 1-9, 14 and 15 are rejected under 35 U.S.C. 103(a) as being**

**unpatentable over Cavallaro in view of Sullivan '814.**

        This rejection of claims 1-9, 14 and 15 was proposed by third party requester and

**is adopted** for the reasons set forth in the request at pages 23-27, 44-46, 48, 50-52,

54-59 and 71-73 which are hereby incorporated by reference, and for the reasons that

follow.

        Cavallaro is relied upon for the reasons stated above in section 8.  With respect

to claims 2 and 3, Cavallaro's core can be a dual core of polybutadiene, as noted

above.  Alternatively, Cavallaro teaches a core of polybutadiene around which is a

mantle layer (i.e., core layer) comprising up to 100% by weight of a dynamically

vulcanized thermoplastic elastomer, a functionalized styrene-butadiene elastomer, a

thermoplastic polyurethane, a metallocene polymer or blends thereof (see col. 3, lines

37-44; col. 4, lines 27-34; and col. 5, lines 26-43).  In a preferred embodiment, the

mantle layer comprises Santoprene®, thermoplastic polyurethane or blends thereof (see

col. 4, lines 27-34).

With respect to claims 4 and 5, as noted above, Cavallaro's most preferred ionomer resin has 15-35% by weight of acrylic or methacrylic acid.

With respect to claims 6 and 7, Cavallaro teaches that the inner cover layer preferably has a thickness of about 0.010 inches to about 0.030 inches; the outer cover layer preferably has a thickness of about 0.030 inches to about 0.090 inches; and the preferred diameter of the golf ball is from about 1.680 inches to about 1.800 inches, more preferably about 1.680 inches to about 1.760 inches (see col. 7, lines 21-27; and the paragraph bridging cols. 7 and 8).

Cavallaro teaches the limitations of 1-9, 14 and 15, the difference being that Cavallaro does not teach that the low modulus ionomer for its outer cover is the claimed blend of hard high modulus ionomer resin with a soft low modulus ionomer resin.

Sullivan '814 teaches that ionomers have been widely used as golf ball cover materials for many years and that while these ionomers are very durable, they have a deficiency as a golf ball cover material in that they tend to be hard (see abstract; and col. 1, line 10 through col. 3, line 16). Sullivan '814 teaches a mixture of a hard ionomer with a soft ionomer in order to produce a golf ball cover composition wherein the cover is softer than the prior art ionomer covers (see abstract; and col. 3, lines 26-68). Sullivan '814 teaches that a golf ball covered in accordance with his invention is durable and a skilled golfer can impart back spin to the ball in play (see abstract).

Sullivan '814 teaches that (1) for over a decade the trade attempted to solve the problem associated with Surlyn® (ionomer) covered golf balls by the blending of hard Surlyn® with a soft Surlyn®; (2) until his invention, the blending of a hard Surlyn® and a

soft Surlyn® was totally unsatisfactory in the production of a commercially viable golf

ball; and (3) in accordance with his invention, it has been found that when a hard

Surlyn® or a mixture of hard Surlyn® resins are blended with a soft Surlyn® which is a

terpolymer of methacrylic acid and iso- or n-butylacrylate partially neutralized with a

metal salt, a superior golf ball cover formulation is produced (see col. 2, line 64 through

col. 3, line 57). Sullivan '814 teaches that the resulting cover composition of his

invention is intermediate in softness between a balata covered golf ball and a hard

Surlyn® covered golf ball, to such a degree that an adequate back spin can be imparted

to the ball by a skilled golfer (see col. 3, lines 48-52). Further, the resulting golf ball

exhibits a degree of cut resistance which is adequate for play and which exhibits

outstanding distance properties which is exhibited by its coefficient of restitution and/or

initial velocity (see col. 3, lines 53-57).

The high modulus ionomer taught by Sullivan '814 has a flexural modulus of from

about 30,000 to 55,000 psi and a hardness of from about 60 to 66 on the Shore D scale

(see col. 4, lines 9-13). Sullivan '814's hard Surlyn® resins are ionic copolymers which

are the sodium or zinc salts of the reaction product of an olefin having from 2 to 8

carbon atoms and an unsaturated monocarboxylic acid having from 3 to 8 carbon atoms

(see col. 4, lines 25-31). The low modulus ionomer taught by Sullivan '814 has a

modulus of from about 3,000 to about 7,000 psi and a hardness of from about 25 to

about 40 as measured on the Shore D scale (see col. 4, lines 37-40). The low modulus

ionomer may be a sodium or zinc salt of a terpolymer of an olefin having from 2 to 8

carbon atoms, an unsaturated monocarboxylic acid having from 3 to 8 carbon atoms

and an unsaturated monomer of the acrylate ester class having from 2 to 22 carbon

atoms (see col. 4, lines 42-47).  Sullivan '814 teaches that the blend of ionomers should

be mixed so that the cover layer consists of about 25 to about 75% by weight of the

hard ionomer, and from about 75 to about 25% of the soft ionomeric terpolymer (see

claim 1 at col. 18).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the resinous material used for the outer cover

layer of Cavallaro's golf ball to be a blend of a hard high modulus ionomer with a soft

low modulus ionomer, the high modulus ionomer being a sodium, zinc, magnesium or

lithium salt of a copolymer having from 2 to 8 carbon atoms and an unsaturated

monocarboxylic acid having from 3 to 8 carbon atoms, the low modulus ionomer being a

sodium or zinc salt of a terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid

and an unsaturated monomer of the acrylate ester class having from 2 to 22 carbon

atoms as taught by Sullivan '814 in order to improve the impact resilience of the outer

cover and thus increase the coefficient of restitution of the golf ball while maintaining the

ability of a skilled golfer to impart adequate back spin to the golf ball.


**10.     Claims 10 and 11 are rejected under 35 U.S.C. 103(a) as being unpatentable**

**over Cavallaro in view of Sullivan '814.  This is an Examiner rejection.**

Cavallaro and Sullivan '814, as relied upon for the reasons stated above in

section 9, teach the limitations of claims 10 and 11, the difference being the Cavallaro

does not specifically require polyester elastomer or polyester amide.  However, among

other materials, Cavallaro teaches that its mantle layer can be made from thermoplastic

polyetheresters such as Hytrel® 3078, G3548W or G4078W; or made from a

polyetheramide such as Pebax® 2533, 3533 or 4033 (see col. 4, lines 27-51). It would

have been obvious to one of ordinary skill in the art at the time the invention was made

to have prepared the golf ball of Cavallaro in view of Sullivan '814 such that mantle is

made from a thermoplastic polyetherester or a thermoplastic polyetheramide because

such is clearly within the scope of Cavallaro's disclosure.


**Rejections based on Proudfit:**

**11.    Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable
over Proudfit in view of Kim.**

On pages 28-31, 45-47, 49, 51, 53, 57, 59, 64-66, 69-70 and 72-74, third party

requester proposes that claims 1-6, 8, 9 and 12-15 be rejected under 35 U.S.C. 103(a)

as being unpatentable over Proudfit in view of Kim. For the reasons that follow, the

proposed rejection **is not adopted** as to claims 1-6, 8, 9, 14 and 15 but **is adopted** as

to claims 12 and 13. Independent claim 1, and claims 14-15 which depend from

independent claim 12, require that the outer cover layer is a blend of a hard high

modulus ionomer resin and a soft low modulus ionomer resin. In discussing the prior

art, Proudfit describes the teachings of U.S. Patent 4,884,814, i.e. Sullivan '814 (see

col. 4, lines 61-68). Proudfit does not incorporate Sullivan '814 by reference, but does

describe Sullivan '814 as having a golf ball cover formed from a blend of hard Surlyn®

and soft Surlyn® (see col. 4, lines 61-68). Proudfit does not teach using Sullivan '814's

blend for its outer cover layer, and exemplifies balata or balata blends for its outer layer (see col. 5, lines 13-17).

As to the rejection of claims 12 and 13 being unpatentable over Proudfit in view of Kim, this rejection of claims 12 and 13 was proposed by third party requester and **is adopted** for the reasons set forth in the request at pages 64-66 and 69-70 and for the reasons that follow.

Proudfit teaches a golf ball comprising a core and a cover which is formed from two separate inner and outer layers (see abstract). The core can be a solid core or a wound core (see col. 5, lines 43-46). The inner cover layer can be made from ionomer resin, such as high modulus Surlyn®, e.g., Surlyn® 9920, 8220 or 9240 (see col. 5, line 57 through col. 6, line 18). Surlyn® 9920, 8220 and 9240 are ionomer resins having from about 18.5% to about 21.5% by weight methacrylic acid, i.e., "high acid" ionomer resins as here claimed (see col. 9, lines 14-21 of the '633 patent). Proudfit's outer cover layer is made from a soft elastomeric material such as one having a low flexural modulus of 20,000-25,000 psi (see col. 5, lines 13-17; and col. 6, lines 28-31). The exemplified material for the outer cover layer is balata, or a blend of balata and polybutadiene, wherein the balata or said blend are crosslinked with zinc diacrylate (see col. 5, lines 13-31; and Table 7 at col. 8). This crosslinked material is an ionomer due to the presence of the diacrylate crosslinker. Thus, Proudfit's outer cover is made from a low flexural modulus ionomer as here claimed.

Proudfit teaches the limitations of 12 and 13, the difference being that Proudfit does not specifically teach that its core is a dual core.

Application/Control Number: 95/000,445                                    Page 14
Art Unit: 3991

Kim teaches a solid three piece golf ball with a core comprising inner core (1)

(i.e., center component) and outer core layer (2) (i.e., a core layer), and then a cover (3)

on the outer core layer (see col. 1, lines 4-60; and Fig. 1).  Thus, Kim's golf ball has a

dual core comprising center component (1) and outer core layer (2).  Kim's center

component (1) and outer core layer (2) can be made from polybutadiene (see col. 3,

lines 65-68).  Kim teaches that said cover (3) can comprise, balata, ionomer resins or

polyurethane (see col. 6, lines 35-38).  Kim teaches that the dual core construction

provides a golf ball having superior rebound characteristics and carry distance, while

maintaining adequate spin rate (see col. 1, lines 42-43).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have replaced the solid one piece core or wound core of

Proudfit's golf ball with a dual core construction so as to provide for superior rebound

characteristics and carry distance, while maintaining adequate spin rate, as taught by

Kim.

In an alternative to the claimed requirement that the outer cover layer is made

from "low flexural modulus ionomer", it noted that the claim 12 states that the outer

cover layer can be made from "non-ionomeric elastomers".  Claim 13 further states that

the non-ionomeric elastomer is a polyurethane.  Proudfit does not specifically teach that

its outer cover layer can be polyurethane.  However, as noted above, Kim teaches that

its cover layer can be made from balata, ionomers or polyurethane.  It would have been

obvious to one of ordinary skill in the art at the time the invention was made to have

used polyurethane to prepare Proudfit's outer cover layer in place of, for example,

balata, because polyurethane is a conventional cover material, and can be used in

place of balata, as taught by Kim.


12.     Claims 1-6, 8, 9, 14 and 15 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Proudfit in view of Kim as applied to claims 12 and 13 above,

and further in view of Sullivan '814. This is an Examiner rejection.

        Proudfit in view of Kim is relied upon for the reasons stated above. With respect

to claim 6, Proudfit discusses thickness at col. 7, lines 35-47. In particular, Proudfit

teaches that the diameter of the core of either the two-piece or the three-piece ball can

be within the range of about 1.000 to 1.500 inch. The thickness of the inner cover layer

can be within the range of about 0.0250 to 0.2875 inch to provide a total diameter of the

inner cover layer and core within the range of about 1.550 to 1.590 inch. The thickness

of the outer cover layer can be within the range of about 0.0450 to 0.0650 inch to

provide a total ball diameter of 1.680 inch. The preferred dimensions are a core

diameter of 1.500 inch, an inner cover layer thickness of 0.037 inch, and an outer cover

layer thickness of 0.0525 inch (total ball diameter of 1.680 inch).

        Proudfit teaches the limitations of 1-6, 8, 9, 14 and 15, the difference being that

Proudfit does not teach that the soft material for its outer cover layer is the claimed

blend of hard high modulus ionomer resin with a soft low modulus ionomer resin.

        Sullivan '815 is relied upon for the reasons stated above in section 9.

        It would have been obvious to one of ordinary skill in the art at the time the

inventions was made to have modified the resinous material used for the outer cover

layer of Cavallaro's golf ball to be a blend of a hard high modulus ionomer with a soft

low modulus ionomer, the high modulus ionomer being a sodium, zinc, magnesium or

lithium salt of a copolymer having from 2 to 8 carbon atoms and an unsaturated

monocarboxylic acid having from 3 to 8 carbon atoms, the low modulus ionomer being a

sodium or zinc salt of a terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid

and an unsaturated monomer of the acrylate ester class having from 2 to 22 carbon

atoms as taught by Sullivan '814 in order to improve the impact resilience of the outer

cover and thus increase the coefficient of restitution of the golf ball while maintaining the

ability of a skilled golfer to impart adequate back spin to the golf ball.

## Rejections based on Nesbitt:

13.     **Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable
over Nesbitt in view of Horiuchi and Kim.**

        This rejection of claims 12 and 13 was proposed by third party requester and **is
adopted** for the reasons set forth in the request at pages 66-67 and 70 which are

hereby incorporated by reference, and for the reasons that follow.

        Nesbitt teaches a golf ball having a multilayer or two-ply cover construction for a

solid resilient center or core, the multilayer cover construction involving two stage

molded cover compositions over a solid center or core of resilient polymeric material;

wherein an increased coefficient of restitution is attained, and "feel" or playing

characteristics are attained similar to those derived from a balata covered golf ball (see

col. 1, lines 36-44).  The golf ball has a solid center or core (12) of resilient polymeric or

similar material covered by a first layer or ply (14) of molded hard, highly flexural

modulus resinous material or of cellular or foam composition which has a high

coefficient of restitution (see col. 2, lines 31-65; and col. 3, line 62 through col. 4, line 6).

The first layer or ply is provided with a second or cover layer (16) of a comparatively

soft, low flexural modulus resinous material or of cellular or foam composition molded

over the first layer and core or center assembly.  Nesbitt teaches (col. 1, lines 57-60)

that "[t]hrough the use of the first ply or layer of hard, high flexural modulus resinous

material on the core or center, a maximum coefficient of restitution may be attained."

Nesbitt further teaches that hard, highly flexural modulus resin is employed to attain or

approach maximum initial velocity for the golf ball (see col. 2, lines 59-65).  The

resinous material for the first ply or layer (14) is a resinous material such as type 1605

Surlyn® which is a hard, high flexural modulus ionomer resin which produces a

substantial gain of coefficient of restitution over the coefficient of restitution of the core

or center (see col. 1, lines 9-19) col. 2, lines 34-43).  Specifically, Surlyn® 1605, re-

designated as Surlyn® 8940, "is a sodium ion based low acid (less that or equal to 15

weight percent methacrylic acid) ionomer resin having a flexural modulus of about

51,000 psi" (see col. 2, lines 61-64 in the '633 patent).  Nesbitt teaches that the outer

layer ply or cover (16) is a resinous material such as type 1855 Surlyn® which is a

comparatively soft, low flexural modulus ionomer resinous material (see col. 1, lines 9-

19; and col. 2, lines 43-49).  Alternatively, Nesbitt teaches that outer cover (16) can be a

foamable material as described in U.S. Patent 4,274,637 (col. 3, lines 56-61 of Nesbitt).

Non-ionomeric elastomers, such as polyurethanes, polyolefins, polyamides, etc, are

well known foamable cover materials in the golf ball art, and are taught by said U.S.

Patent 4,274,637 at col. 5, lines 27-55 and Example 16.

Nesbitt teaches the limitations of claims 12 and 13, the difference being that

Nesbitt does not specifically teach that the ionomer resin for its first ply or layer (14) has

at least 16% by weight of an alpha, beta-unsaturated carboxylic acid; or that its core

(12) is a dual core comprising a center component and a core layer disposed about said

center component, said core layer comprising polybutadiene.

Horiuchi teaches a golf ball having excellent impact resilience and flying

performance, of which the cover is formed from an ionomer resin which contains an

alpha, beta-ethylenic unsaturated carboxylic acid in a larger amount than conventional

ionomer resins (see col. 1, lines 6-44).  In the background of the invention, Horiuchi

teaches that it is known to compose a golf ball of a core and a cover covering the core

wherein the ionomer resin which is used as the cover of the golf ball contains alpha,

beta-ethylenic unsaturated carboxylic acid in an amount of less than 15% by weight

(see col. 1, lines 13-29).  In the summary of the invention, Horiuchi states that

> It has been surprisingly found that a carboxyl-rich ionomer resin which
> contains 16 to 30% by weight of an alpha, beta-ethylenic unsaturated carboxylic
> acid significantly improves the properties of the golf balls, such as impact
> resilience and flying performance.  Thus, the present invention provides a golf
> ball which comprises a core and a cover covering the core, wherein the cover
> contains at least 20% by weight of a carboxyl-rich ionomer resin prepared by
> neutralizing 15 to 80 mol % of carboxylic acid groups of an olefinic copolymer
> containing 16 to 30% by weight of an alpha, beta-ethylenic unsaturated
> carboxylic acid with monovalent or divalent metal ions.

Horiuchi then teaches (column 1, lines 50-59) that

an amount of the alpha, beta-ethylenic unsaturated carboxylic acid is limited to
16 to 30% by weight, preferably 20 to 30% by weight, based on the total
monomer weight.  Thus, the balance of the monomer is the alpha-olefin.  If the
amount of the alpha, beta-ethylenic unsaturated carboxylic acid is less than 16%
by weight, a stiffness modulus is low and an impact resilience is low, thus
resulting in poor flying performance.

Horiuchi also teaches (column 2, lines 16-18) that it is preferred that the carboxyl-rich

ionomer resin has a stiffness modulus of 3,000 to 6,000 Kgf/cm$^2$ which converts to

about 42,670 to 85,340 psi.

In affirming similar rejections of related claims in Appeal No. 2005-0806 in

application Serial No. 10/179,812, the Board of Patent Appeals and Interferences

concluded that "[i]*t would have been obvious to one of ordinary skill in the art at the time*

*the invention was made to have modified the resinous material used for the inner cover*

*layer of Nesbitt's golf ball to be an ionomer resin containing about 20% alpha, beta-*

*ethylenic unsaturated carboxylic acid as suggested by the teachings of Horiuchi to*

*improve the impact resistance of the inner cover and thus increase the coefficient of*

*restitution of the inner cover and the golf ball.*"  The same conclusion was reached in

Appeal No. 2004-1262 in Application Serial No. 08/815,556.

With respect to the claimed dual core, Kim is relied upon for the reasons stated

above in section 11.  It would have been obvious to one of ordinary skill in the art at the

time the invention was made to have replaced the solid center or core (12) of Nesbitt's

golf ball with a dual core construction so as to provide for superior rebound

characteristics and carry distance, while maintaining adequate spin rate, as taught by

Kim.

14.     **Claims 1-9, 14 and 15 are rejected under 35 U.S.C. 103(a) as being**
**unpatentable over Nesbitt in view of Horiuchi, Kim and Sullivan '814.**

This rejection of claims 1-9, 14 and 15 was proposed by third party requester and **is adopted** for the reasons set forth in the request at pages 32-38, 45, 47, 49-57, 59, 72 and 74 which are hereby incorporated by reference, and for the reasons that follow.

Nesbitt in view of Horiuchi and Kim is relied upon for the reasons stated above in section 13. With respect to claims 6 and 7, Nesbitt teaches that the inner layer of ply (14) has a preferred thickness in the range of 0.020 inches to 0.070 inches; the outer cover (16) may be in the range of 0.020 inches to 0.100 inches; and the golf ball can have a diameter of 1.680 inches (see col. 3, lines 16-43). As noted above, Nesbitt teaches that the outer layer ply or cover (16) can be a resinous material such as type 1855 Surlyn® which is a comparatively soft, low flexural modulus ionomer resinous material. Nesbitt differs from claims 1-9, 14 and 15 in that Nesbitt does not specifically teach that its outer cover (16) can be made from the claimed blend of hard high modulus ionomer resin with a soft low modulus ionomer resin.

Sullivan '814 is relied upon for the reasons stated above in section 9. In affirming similar rejections of related claims in Appeal No. 2004-1262 in application Serial No. 08/815,556, the Board of Patent Appeals and Interferences concluded that "*[i]t would have been obvious at the time the invention was made to a person of ordinary skill in the art to have modified ... the resinous material used for the outer cover of Nesbitt's golf ball to be a blend of a hard high modulus ionomer with a soft low modulus ionomer,*

*the high modulus ionomer being a sodium, zinc, magnesium or lithium salt of a*

*copolymer having from 2 to 8 carbon atoms and an unsaturated monocarboxylic acid*

*having from 3 to 8 carbon atoms, the low modulus ionomer being a sodium or zinc*

*terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid and an unsaturated*

*monomer of the acrylate ester class having from 2 to 22 carbon atoms as suggested by*

*the teachings of Sullivan ['814] to improve the impact resilience of the outer cover and*

*thus increase the coefficient of restitution of the golf ball while maintaining the ability of*

*a skilled golfer to impart adequate back spin to the golf ball."*

**15.    Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable**
**over Nesbitt in view of Statz and Kim.**

This rejection of claims 12 and 13 was proposed by third party requester and **is**
**adopted** for the reasons set forth in the request at pages 67 and 70-71 which are
hereby incorporated by reference, and for the reasons that follow.

Nesbitt is relied upon for the reasons stated above in section 13. Nesbitt teaches
the limitations of claims 12 and 13, the difference being that Nesbitt does not specifically
teach that the ionomer resin for its first ply or layer (14) has at least 16% by weight of an
alpha, beta-unsaturated carboxylic acid; or that its core (12) is a dual core comprising a
center component and a core layer disposed about said center component, said core
layer comprising polybutadiene.

Statz, published in 1991, is directed to the usage of ionomers as golf ball covers
(see the entire document). It explores the history of ionomer golf ball covers, provides

information about the properties of ionomers, and describes the benefits and

disadvantages of various ionomers and blends thereof when they are used in golf ball

covers (see the entire document). Statz teaches that ionomers with acid levels of 9 to

15% percent range by weight acid have been available since at least 20 years before

the publication of the Statz article (see p. 209). Statz also teaches that new, higher acid

ionomers, with up to 20% by weight copolymerized acid such as methacrylic acid, have

been developed by manufacturers such as DuPont (see pp. 209-210). Statz teaches

that the newer, high acid materials were already under active investigation at golf ball

manufacturers and that golf ball covers based on these ionomers are harder and stiffer

and offer an advantage in coefficient of restitution and possibly in velocity off of the club

(see p. 209). As noted on p. 38 of the request, the contents of the Statz article were

presented by Dr. Statz at the World Scientific Congress of Golf in 1990; and that many

participants in the industry have attended these conventions. Thus, as also noted on p.

23 of the request, the potential applications and benefits of high acid ionomers for golf

balls were widely known in the golf industry.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the resinous material used for the inner cover

layer of Nesbitt's golf ball to be a harder, high acid ionomer resin such as one

containing 20% copolymerized acid, as taught by Statz, in order to increase the

coefficient of restitution of the golf ball and increase the golf ball's initial velocity.

With respect to the claimed dual core, Kim is relied upon for the reasons stated

above in section 11. It would have been obvious to one of ordinary skill in the art at the

time the invention was made to have replaced the solid center or core (12) of Nesbitt's

golf ball with a dual core construction so as to provide for superior rebound

characteristics and carry distance, while maintaining adequate spin rate, as taught by

Kim.

16.    **Claims 1-3, 6-9, 14 and 15 are rejected under 35 U.S.C. 103(a) as being**

**unpatentable over Nesbitt in view of Statz, Kim and Sullivan '814.**

This rejection of claims 1-3, 6-9, 14 and 15 was proposed by third party requester

and **is adopted** for the reasons set forth in the request at pages 38-41, 45, 47, 54, 56,

58, 59, 72 and 74 which are hereby incorporated by reference, and for the reasons that

follow.

Nesbitt in view of Statz and Kim is relied upon for the reasons stated above in

section 15. With respect to claims 6 and 7, Nesbitt teaches that the inner layer of ply

(14) has a preferred thickness in the range of 0.020 inches to 0.070 inches; the outer

cover (16) may be in the range of 0.020 inches to 0.100 inches; and the golf ball can

have a diameter of 1.680 inches (see col. 3, lines 16-43). As noted above, Nesbitt

teaches that the outer layer ply or cover (16) can be a resinous material such as type

1855 Surlyn® which is a comparatively soft, low flexural modulus ionomer resinous

material. Nesbitt differs from claims 1-3, 6-9, 14 and 15 in that Nesbitt does not

specifically teach that its outer cover (16) can be made from the claimed blend of hard

high modulus ionomer resin with a soft low modulus ionomer resin.

Application/Control Number: 95/000,445                                    Page 24
Art Unit: 3991

Sullivan '814 is relied upon for the reasons stated above in section 9.  In affirming

similar rejections of related claims in Appeal No. 2004-1262 in application Serial No.

08/815,556, the Board of Patent Appeals and Interferences concluded that "*[i]t would

have been obvious at the time the invention was made to a person of ordinary skill in

the art to have modified ... the resinous material used for the outer cover of Nesbitt's

golf ball to be a blend of a hard high modulus ionomer with a soft low modulus ionomer,

the high modulus ionomer being a sodium, zinc, magnesium or lithium salt of a

copolymer having from 2 to 8 carbon atoms and an unsaturated monocarboxylic acid

having from 3 to 8 carbon atoms, the low modulus ionomer being a sodium or zinc

terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid and an unsaturated

monomer of the acrylate ester class having from 2 to 22 carbon atoms as suggested by

the teachings of Sullivan ['814] to improve the impact resilience of the outer cover and

thus increase the coefficient of restitution of the golf ball while maintaining the ability of

a skilled golfer to impart adequate back spin to the golf ball.*"


**17.    Claims 4 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable**

**over Nesbitt in view of Statz, Kim and Sullivan '814.  This is an Examiner**

**rejection.**

Nesbitt in view of Statz, Kim and Sullivan '814 is relied upon for the reasons

stated above in section 16.  Claims 4 and 5 set forth that the alpha, beta-unsaturated

carboxylic acid content of the ionomer of the inner cover layer is about 17% to about

25% by weight, and about 18.5% to about 21.5% by weight, respectively.  This acid

Application/Control Number: 95/000,445                                      Page 25
Art Unit: 3991

content is not taught by Nesbitt for the ionomer of its inner layer or ply (14). However,

as noted above, Statz teaches that new, higher acid ionomers, with up to 20% by weight

copolymerized acid, have been developed by manufacturers such as DuPont (see p.

209). As noted above, it would have been obvious to one of ordinary skill in the art at

the time the invention was made to have modified the resinous material used for the

inner cover layer of Nesbitt's golf ball to be a harder, high acid ionomer resin such as

one containing 20% copolymerized acid, as taught by Statz, in order to increase the

coefficient of restitution of the golf ball and increase the golf ball's initial velocity.


**18.    Claims 12 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable**
**over Nesbitt in view of Research Disclosure and Kim.**

This rejection of claims 12 and 13 was proposed by third party requester and **is**

**adopted** for the reasons set forth in the request at pages 68 and 71 which are hereby

incorporated by reference, and for the reasons that follow.

Nesbitt is relied upon for the reasons stated above in section 13. Nesbitt teaches

the limitations of claims 12 and 13, the difference being that Nesbitt does not specifically

teach that the ionomer resin for its first ply or layer (14) has at least 16% by weight of an

alpha, beta-unsaturated carboxylic acid; or that its core (12) is a dual core comprising a

center component and a core layer disposed about said center component, said core

layer comprising polybutadiene.

Research Disclosure, published in 1989, teaches that ionomers produced from

polymers of ethylene/acrylic or methacrylic acid with greater than 15 wt % acid can

Application/Control Number: 95/000,445                                    Page 26
Art Unit: 3991

produce articles, such as golf balls, with superior properties (see entire document).

These materials can be used to improve articles such as golf balls because they have

significantly improved stiffness, hardness and clarity compared with ionomers with low

acid levels (see entire document).  Research Disclosure also teaches that these

ionomers can be used in blends with other ionomers or polymers where they may

impart improved stiffness and hardness (see entire document).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the resinous material used for the inner cover

layer of Nesbitt's golf ball to be a harder, high acid ionomer resin such as one

containing greater than 15 wt% copolymerized acid, as suggested by the teachings of

Research Disclosure, so that the inner cover layer has improved stiffness and hardness,

as taught by Research Disclosure; and so as to increase the coefficient of restitution of

the golf ball and increase the golf ball's initial velocity, as desired by Nesbitt.

With respect to the claimed dual core, Kim is relied upon for the reasons stated

above in section 11.  It would have been obvious to one of ordinary skill in the art at the

time the invention was made to have replaced the solid center or core (12) of Nesbitt's

golf ball with a dual core construction so as to provide for superior rebound

characteristics and carry distance, while maintaining adequate spin rate, as taught by

Kim.


19.     **Claims 1-3, 6-9, 14 and 15 are rejected under 35 U.S.C. 103(a) as being**

**unpatentable over Nesbitt in view of Research Disclosure, Kim and Sullivan '814.**

Application/Control Number: 95/000,445                                      Page 27
Art Unit: 3991

This rejection of claims 1-3, 6-9, 14 and 15 was proposed by third party requester

and **is adopted** for the reasons set forth in the request at pages 41-44, 46, 47, 54, 56,

58, 60, 73 and 74 which are hereby incorporated by reference, and for the reasons that

follow.

Nesbitt in view of Research Disclosure and Kim is relied upon for the reasons

stated above in section 18. With respect to claims 6 and 7, Nesbitt teaches that the

inner layer or ply (14) has a preferred thickness in the range of 0.020 inches to 0.070

inches; the outer cover (16) may be in the range of 0.020 inches to 0.100 inches; and

the golf ball can have a diameter of 1.680 inches (see col. 3, lines 16-43). As noted

above, Nesbitt teaches that the outer layer ply or cover (16) can be a resinous material

such as type 1855 Surlyn® which is a comparatively soft, low flexural modulus ionomer

resinous material. Nesbitt differs from claims 1-3, 6-9, 14 and 15 in that Nesbitt does

not specifically teach that its outer cover (16) can be made from the claimed blend of

hard high modulus ionomer resin with a soft low modulus ionomer resin.

Sullivan '814 is relied upon for the reasons stated above in section 9. In affirming

similar rejections of related claims in Appeal No. 2004-1262 in application Serial No.

08/815,556, the Board of Patent Appeals and Interferences concluded that "*[i]t would

have been obvious at the time the invention was made to a person of ordinary skill in

the art to have modified ... the resinous material used for the outer cover of Nesbitt's

golf ball to be a blend of a hard high modulus ionomer with a soft low modulus ionomer,

the high modulus ionomer being a sodium, zinc, magnesium or lithium salt of a

copolymer having from 2 to 8 carbon atoms and an unsaturated monocarboxylic acid*

*having from 3 to 8 carbon atoms, the low modulus ionomer being a sodium or zinc*

*terpolymer of an olefin having 2 to 8 carbon atoms, acrylic acid and an unsaturated*

*monomer of the acrylate ester class having from 2 to 22 carbon atoms as suggested by*

*the teachings of Sullivan ['814] to improve the impact resilience of the outer cover and*

*thus increase the coefficient of restitution of the golf ball while maintaining the ability of*

*a skilled golfer to impart adequate back spin to the golf ball."*

20.     **Claims 4 and 5 are rejected under 35 U.S.C. 103(a) as being unpatentable
over Nesbitt in view of Research Disclosure, Kim and Sullivan '814. This is an
Examiner rejection.**

Nesbitt in view of Research Disclosure, Kim and Sullivan '814 is relied upon for

the reasons stated above in section 19. Claims 4 and 5 set forth that the alpha, beta-

unsaturated carboxylic acid content of the ionomer of the inner cover layer is about 17%

to about 25% by weight, and about 18.5% to about 21.5% by weight, respectively. This

acid content is not taught by Nesbitt for the ionomer of its inner layer or ply (14).

However, as noted above, Research Disclosure teaches that ionomers produced from

polymers of ethylene/acrylic or methacrylic acid with greater than 15 wt % acid can

produce articles, such as golf balls, with superior properties; and explains that these

materials can be used to improve articles such as golf balls because they have

significantly improved stiffness, hardness and clarity compared with ionomers with low

acid levels (see entire document). As noted above, it would have been obvious to one

of ordinary skill in the art at the time the invention was made to have modified the

resinous material used for the inner cover layer of Nesbitt's golf ball to be a harder, high

acid ionomer resin such as one containing greater than 15 wt% copolymerized acid, as

suggested by the teachings of Research Disclosure, so that the inner cover layer has

improved stiffness and hardness, as taught by Research Disclosure; and so as to

increase the coefficient of restitution of the golf ball and increase the golf ball's initial

velocity, as desired by Nesbitt.  Determination of an appropriate higher acid content,

such as the about 17% to about 25% by weight, and about 18.5% to about 21.5% by

weight here claimed, would have been a matter of routine experimentation since acid

content is a known results-effective variable.


### *Conclusion*

21.    The patent owner is reminded of the continuing responsibility under 37 CFR

1.985 to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,495,633 throughout the course of this reexamination

proceeding.  The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding.  MPEP 2686.

22.    In order to ensure full consideration of any amendments, affidavits or

declarations, or other documents as evidence of patentability, such documents must be

submitted in response to this Office action.  Submissions after the next Office action,

which is intended to be an Action Closing Prosecution (ACP), will be governed by 37

CFR 1.116(b) and (d), which will be strictly enforced.

Application/Control Number: 95/000,445                                    Page 30

Art Unit: 3991

      **All** correspondence relating to this *inter partes* reexamination proceeding should

be directed:

By EFS: Registered users may submit via the electronic filing system EFS-Web
        at https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

By Mail to:    Attn: Mail Stop "Inter Partes Reexam"
            Central Reexamination Unit
            Commissioner for Patents
            P. O. Box 1450
            Alexandria VA  22313-1450

Please FAX any communications to:
        (571) 273-9900
        Central Reexamination Unit

Please hand-deliver any communications to:
        Customer Service Window
        Attn:  Central Reexamination Unit
        Randolph Building, Lobby Level
        401 Dulany Street
        Alexandria, VA  22314

Signed:

Alan Diamond
Primary Examiner
Central Reexamination Unit
Art Unit 3991

DEBORAH D. JONES
CRU SPE-AU 3991

JERRY D. JOHNSON
PRIMARY EXAMINER
CRU - AU 3991