IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALLAWAY GOLF COMPANY,<br><br>　　　　Plaintiff,<br><br>v.<br><br>ACUSHNET COMPANY,<br><br>　　　　Defendant. | C. A. No. 06-91 (SLR)<br><br>**REDACTED** |

**CALLAWAY GOLF'S *REPLY* BRIEF
IN SUPPORT OF ITS MOTION *IN LIMINE* TO
PRECLUDE REFERENCE TO ACUSHNET'S NEW PRO V1 GOLF BALLS**

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
222 Delaware Avenue., 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

*Attorneys for Plaintiff
Callaway Golf Company*

DATED: February 2, 2010


## TABLE OF CONTENTS

Page

I. Argument ........................................................................................................3

    A. The New Pro V1 Was Not Disclosed During Discovery, and Should be Excluded for That Reason Alone ........................................3

    B. Callaway Golf Will Be Unduly and Unfairly Prejudiced If Acushnet Is Allowed to Introduce The New Balls At Trial ..................................................................................................5

    C. The Creation of the New Pro V1 Years After Infringement Began is Irrelevant to Callaway Golf's Damages Theories ..........................................................................7

    D. If The Court Denies Callaway Golf's Motion, Callaway Golf Would Need to Be Prepared to Address Acushnet's Arguments that The New Pro V1 Does Not Infringe Other Callaway Golf Patents and that Those Patents are Invalid ..........................................................................................9

    E. The New Pro V1 Golf Balls Are Irrelevant to the Secondary Considerations Regarding the Original Pro V1 Golf Balls ............................................................................10

II. Conclusion ..................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*,
   430 F. Supp. 2d 346 (D. Del. 2006)...........................................................................................9

*Fromson v. Advance Offset Plate*,
   755 F.2d 1549 (Fed. Cir. 1985).................................................................................................10

*Grain Processing Corp. v. American Maize-Products Co.*,
   185 F.3d 1341 (Fed. Cir. 1999)...............................................................................................7, 8

*Izume Products Co. v. Koninklijke Philips Electronics N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004)...........................................................................................9

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
   106 F.3d 1563 (Fed. Cir. 1997).................................................................................................10

*Pall Corp. v. Micron Separations, Inc.*,
   66 F.3d 1211 (Fed. Cir. 1995)....................................................................................................9

*State Industries, Inc. v. Mor-Flo Industries, Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989)..................................................................................................9

**OTHER AUTHORITIES**

Rule 35 ................................................................................................................................................10

Callaway Golf asks this Court to exclude reference to the newly designed Pro V1 because that ball was not even created, let alone disclosed, during discovery. Acushnet chose to gamble by continuing to infringe the Sullivan patents until forced to stop by this Court's injunction. Now, Acushnet seeks to take advantage of its gamble — and over seven years of infringement at the expense of Callaway Golf — by belatedly injecting the new Pro V1 into a retrial of this suit, despite the absence of any discovery regarding a multitude of key issues. Acushnet's opposition only highlights the lack of factual discovery on the new Pro V1. For example, Acushnet states that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [Opp.[1] at 10.] But the specific formulations actually disclosed in the 2002 correspondence (and in the expert report of Acushnet's damages expert, Dr. Kerr) are *not* the same as what Acushnet eventually adopted in 2008 for the new Pro V1. In fact, the technical data sheets for the new Pro V1 were not even produced until January 12, 2010, over a *month* after Callaway Golf filed this motion *in limine*. No witness was ever asked about this new Pro V1 formulation, about the differences between that formulation and the one disclosed in Acushnet's expert report, or about why Acushnet did not switch to this design sooner if it truly was "readily available" in 2001. Moreover, Callaway Golf has not even had the opportunity to question witnesses to ensure that full production of relevant documents has occurred. Indeed, Acushnet has not produced any documents showing how it arrived at this choice of formulation after the injunction was entered. Acushnet should not be allowed to introduce hand-picked new evidence for the first time during the upcoming retrial that was not vetted during discovery –

---

[1] "Opp." refers to Acushnet's Opposition to Callaway's Motion in Limine to Preclude any Reference to Acushnet's New Pro V1 Golf Balls (Docket No. 554).

**REDACTED**

particularly where the decision to delay introduction of the new golf ball was entirely up to Acushnet.

Moreover, evidence of the new Pro V1 balls is of questionable, if any, relevance. The golf balls are not available non-infringing alternatives for purposes of damages assessment because they infringe other Sullivan patents that stem from the same pioneering discovery that also led to the patents-in-suit.[2] Also, the new Pro V1 does not alter the undisputed fact that Sullivan's pioneering invention of a three-piece, polyurethane-covered golf ball was far superior to any pre-existing golf ball at the time, including the wound golf balls that had dominated the premium ball market for many decades. Thus, the new Pro V1 recently designed by Acushnet does nothing to undercut the fundamental premise that if the pioneering golf ball invented by Sullivan was obvious, certainly someone during the many decades of the wound ball's dominance would have come up with the invention before Sullivan did so in 1995. Indeed, the new Pro V1 evidences that the only apparent alternative Acushnet could come up with – after over seven years of infringing the four Sullivan patents-in-suit – was a golf ball that infringes another version of the original Sullivan pioneering invention. *See supra*, n.2. For these reasons, and the reasons stated in its opening brief, Callaway Golf respectfully requests that the Court exercise its discretion and preclude Acushnet from belatedly injecting the new Pro V1 into this retrial.

---

[2] 

**REDACTED**

## I. ARGUMENT

### A. The New Pro V1 Was Not Disclosed During Discovery, and Should be Excluded for That Reason Alone

Acushnet presents several arguments for why it believes the new Pro V1 is relevant to obviousness and damages. None of these arguments was vetted during discovery, however, and the principle evidence Acushnet cites are a few documents it chose to produce over a *month* after Callaway Golf filed this motion *in limine*. For this reason alone, the new Pro V1 should be excluded from the retrial of this matter.

For example, Acushnet states that the new Pro V1 balls have "achieved even greater market acceptance and an even higher market share than the accused balls," and argues that this shows the commercial success of the original Pro V1 was not due to the patented invention. [Opp. at 7.] No witness has ever been asked about the sales, market share or "market acceptance" of the new Pro V1. No witness has ever been asked about the contribution of the new design of the Pro V1 to that alleged "success" – for example, it is possible that Acushnet built up its market share using the superior performance of the patented invention, and that the new Pro V1 has simply been able to ride the coat-tails of that original infringement. No witness was ever asked how the performance of the new Pro V1 compares to the performance of the old Pro V1. Acushnet's only evidence is a report from Golf Datatech about golf ball sales that was produced by Acushnet on January 12, 2010 – over a *month* after Callaway Golf filed this motion *in limine*, and *two days* before Acushnet filed its opposition brief. Even that document does not give any explanation for what allegedly drove the sales of the new Pro V1. There has been absolutely no testimony about whether Titleist changed its marketing strategy, its pricing strategy, its tour strategy, or any other factor after the first trial that might have impacted the sales of the new Pro V1. Essentially, Acushnet is seeking to cherry pick the documents it wants

3

to rely on to prove its point and then present whatever testimony it desires at trial, all without having been subject to a complete examination with full discovery.

Similarly, regarding damages, Acushnet states that the new Pro V1 balls were "available to Acushnet throughout the infringement period" and that "Acushnet possessed all the materials, equipment, know-how and experience to make balls like the New Pro V1 Balls in 2001." [Opp. at 11.] Acushnet argues that this impacts both lost profits and royalty damages, but again, no witness has ever testified that Acushnet could have made this ball in 2001. The only evidence Acushnet cites are two e-mails from 2002, not 2001, and Acushnet admits that the specific formulation disclosed in those e-mails (and in its expert report) is *not* the same as the formulation in the new Pro V1. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Acushnet appears to argue that the differences between the 2002 formulation and the new Pro V1 are insubstantial, but again no witness was asked about whether or not this is true because Acushnet chose not to adopt that ball in 2002 and instead kept infringing the patents-in-suit. Similarly, no documents have been produced on this issue, and no expert discovery has occurred.[3] No witnesses have been asked why Acushnet chose this new formulation for the Pro V1, rather than the exact formulation disclosed in Acushnet's expert report,[4] why it waited so long to do so, or whether the new formulation could have even feasibly

---

[3] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

[4] Given that Acushnet only developed the new formulation when faced with an injunction, and given its need to at least attempt to avoid the many other Sullivan patents pertaining to the fundamental construction of a 3-piece, polyurethane over ionomer golf ball, it is virtually

4

REDACTED

been concocted and implemented with the materials, equipment, and processes that were available nearly a decade ago. Again, while Acushnet seeks to convince this Court that the differences between its 2002 ball and the new Pro V1 are minor, all of the testimony has been that golf ball design is an unpredictable art, and that even small changes can have a drastic impact on performance. [*See* D.I. 424 (Trial Tr.) at 511:23-512:25, 530:20-24; D.I. 426 at 660:1-5; D.I. 427 at 815:22-816:7, 941:15-944:21; D.I. 428 at 1022:15-18, 1128:25-1129:9, 1146:22-1147:7, 1115:11-19.] Thus, the decision by Acushnet not to pursue what it now says was another "readily available" alternative – and to thereby preclude the parties from being able to fully vet this issue during fact and expert discovery – warrants exercise of the Court's discretion to exclude the belated evidence and argument now being offered by Acushnet.

### B. Callaway Golf Will Be Unduly and Unfairly Prejudiced If Acushnet Is Allowed to Introduce The New Balls At Trial

The prejudice from lack of discovery is manifest. Acushnet, with impunity, can rely upon the handful of documents it has selected. Similarly, Acushnet can have multiple witnesses make statements (like those in its opposition) about the alleged success of the new Pro V1, about its alleged availability as an alternative design in 2001, about why the new Pro V1 allegedly does not infringe other Sullivan patents, and why those Sullivan patents are allegedly invalid. Callaway Golf has not had the opportunity to ask Acushnet's witness about these assertions, making it impossible to effectively cross-examine them at trial. Callaway Golf's discovery occurred long before the new Pro V1 had even been designed, let alone released and sold. Any discovery Callaway Golf took concerned the *different* formulation disclosed in Acushnet's expert report – a formulation that was never actually used in any ball.

---

certain that, once again – as in the case of Acushnet's test balls – the chief architects of the new Pro V1 were the lawyers.

Acushnet seems to argue that the only fact Callaway Golf needs to know is that these new balls do not practice the asserted patents. Acushnet is mistaken. If these balls are allowed to be introduced at trial, the parties would need additional discovery—including document discovery—on a number of related issues. For example, discovery would be necessary on the alleged success of the new Pro V1, including on what caused that success.[5] The parties would need further discovery on whether a ball with this exact formulation could have been produced with the technology available in 2001, and why (if this is true) it was not adopted sooner. For damages, the parties would need to vet Acushnet's arguments concerning alleged non-infringement and invalidity of the other two Sullivan patents. The parties also would need critical facts, such as the cost of this alleged design-around alternative. Experts for both sides would need a chance to review this information, which would in turn require expert reports and depositions, an impossible task in the month remaining before trial – and one that should not be necessary given that this is a *remand* from the Federal Circuit, not a new trial.

Acushnet offers to allow "additional deposition time" to address this prejudice, but this is impossible and insufficient. The pretrial order in this case is to be filed in barely three weeks (on February 24th). Callaway Golf would have to re-depose Acushnet's technical and marketing witnesses (after receiving and reviewing relevant document discovery from Acushnet) – as well as whatever experts Acushnet expects to present concerning its non-infringement and invalidity assertions concerning the other Sullivan patents – to have any hope of having a fair opportunity to rebut the arguments that Acushnet seeks to present. The burden of conducting such extensive

---

[5] Acushnet argues that the success of the new Pro V1 means that the old Pro V1 design was obvious, but it could equally support a conclusion that both alternative designs were non-obvious. Indeed, the fact that the new Pro V1 alternative design was not created until 2008 would further demonstrate that the Sullivan inventions of the patents-in-suit are not obvious.

discovery, on short notice, and during trial preparation, would fall entirely on Callaway Golf. It was Acushnet that decided to roll the dice and wait until after the close of discovery to create a design-around for the asserted patents. Callaway Golf should not be unfairly prejudiced by Acushnet's intentional delay while it continued to infringe and take advantage of an unjustly-filed reexamination.

Moreover, excluding these balls will not unduly prejudice Acushnet because it can still rely on the alternatives that were (unlike the new Pro V1) disclosed in Dr. Kerr's report, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But because the design-around Acushnet actually adopted in 2008 did not use the same formulation disclosed during discovery, and the documents Acushnet relies on now were not produced until January 12, 2010, over a month after Callaway Golf filed this motion *in limine*, and because extensive discovery (both documents and depositions) would be necessary to address Acushnet's arguments regarding the new Pro V1 golf balls, Callaway Golf respectfully requests that the Court grant this motion and preclude any reference to the new Pro V1 at trial.

### C. The Creation of the New Pro V1 Years After Infringement Began is Irrelevant to Callaway Golf's Damages Theories

Acushnet argues that it "could have pursued" the new Pro V1 in 2001 rather than continuing to sell the old, infringing Pro V1. It argues that Callaway Golf is therefore not entitled to lost profits, and that this would have reduced the reasonable royalty the parties would have negotiated in 2001. As discussed above, there is no evidence regarding whether or not Acushnet actually could have made the new Pro V1 in 2001, as opposed to a year or several years later, and the very cases that Acushnet cites note that late-developed alternatives are irrelevant to a lost profits analysis.

**REDACTED**

For example, in *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999), a case Acushnet relies on in its opposition, the Federal Circuit stated:

> When an alleged alternative is not on the market during the accounting period, a trial court ***may reasonably infer that it was not available as a noninfringing substitute*** at that time. The accused infringer then has the burden to overcome this inference by showing that the substitute was available during the accounting period. Mere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing, rather than noninfringing, product. Thus, the trial court must ***proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement.***

*Id.* at 1353 (emphasis added). Here, Acushnet's only evidence that the new Pro V1 formulation was allegedly "available" in 2001 is ████████████████████████████████ ████████████████████████████. [Opp. Exs. 1 & 2.] But this alternative formulation was never actually finalized, much less implemented at that time, and it is not the same as what Acushnet actually chose to use in the new Pro V1. [*Compare* Opp. Exs. 1 & 2 *with* Opp. Exs. 4-7.] Unlike the cases cited in Acushnet's brief, there is no testimony here about whether or not Acushnet could have made the new Pro V1 formulation in 2001, on the importance of the differences between these formulations, or the impact of those differences on price, quality, or performance. Acushnet can only present speculation and attorney argument, which is insufficient to overcome the inference that a substitute is unavailable when it does not exist at the time of infringement.[6]

Apart from the practical problems and unfairness to Callaway Golf of facing this late-disclosed alternative, there is also no need to do so when a market share theory of liability is used. As Callaway Golf explained in its opening brief, under a market share theory, the Court

---

[6] It is surely no accident that Acushnet chose in the end to adopt something different than the alternative identified by Dr. Kerr, and the changes it chose to make to that earlier formulation must have mattered for Acushnet to risk doing so knowing the many issues it would create.

REDACTED

need not focus on whether or not there are non-infringing alternatives. Instead, the existence of alternatives that are actually in the market place is taken into account as a consequence of the market share approach, because the patentee is only awarded lost profits based on its own demonstrable share of the but-for market. *See State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). "[I]n these circumstances the presence or absence of acceptable non-infringing alternatives does not matter." *Id.*; *see also Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 361 (D. Del. 2006); *Izume Products Co. v. Koninklijke Philips Electronics N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004). Acushnet does not cite a single case that supports its argument that non-existent non-infringing alternatives are somehow relevant in a market-share analysis. Acushnet's belated effort to finally arrive at a design for the new Pro V1 ball in 2008 is therefore irrelevant to Callaway Golf's market share theory of liability, which reconstructs the market as it existed *at the time of infringement*. This is another reason for granting Callaway Golf's motion.

### D. If The Court Denies Callaway Golf's Motion, Callaway Golf Would Need to Be Prepared to Address Acushnet's Arguments that The New Pro V1 Does Not Infringe Other Callaway Golf Patents and that Those Patents are Invalid

Golf balls that infringe other Sullivan patents are not available as non-infringing alternatives to the patents-in-suit. S*ee Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1222-23 (Fed. Cir. 1995). Acushnet does not argue otherwise.[7] Indeed, recognizing the governing law, Acushnet argues that its new Pro V1 does not infringe the two patents asserted in the *Callaway v. Acushnet II* case and that those patents are, in any event, invalid. As discussed above, if the Court determines that the new Pro V1 was not disclosed during discovery, that is a

---

[7] Acushnet's infringement would also be relevant to the royalty analysis because, even if the other Sullivan patents had not issued at that time, they were still in prosecution and the parties would have, therefore, taken them into account as part of the hypothetical negotiation.

9

sufficient basis to exclude it from the upcoming trial. If the Court allows Acushnet to present the new Pro V1, however, Acushnet itself asserts that it would argue that the new Pro V1 – ▮ ▮ – does not infringe other Sullivan patents that claim an inner cover layer "consisting essentially of" a high acid ionomer, and that the other Sullivan patents are invalid. To address the merits of such arguments by Acushnet would require briefing on claim construction, expert reports from both sides, and of course further discovery. Thus, if the new Pro V1 balls are allowed to now be injected into this case, the upcoming trial could degenerate into a sideshow of a trial within a trial. But for the reasons discussed above, this sideshow is unnecessary because, due to Acushnet's own decisions, the new Pro V1 was not developed until late 2008, and documents were not disclosed until just weeks ago, long after the close of fact and expert discovery during which such issues were supposed to be fully vetted.

### E. The New Pro V1 Golf Balls Are Irrelevant to the Secondary Considerations Regarding the Original Pro V1 Golf Balls

The fundamental premise underlying the secondary consideration of commercial success is that if an invention is sufficiently superior to enjoy substantial commercial success, it is likely not a mere obvious extension of the prior art – otherwise the product would almost certainly have been conceived earlier or, conversely, would not have been so successful. *See Fromson v. Advance Offset Plate*, 755 F.2d 1549, 1557 (Fed. Cir. 1985). And, if a product embodies the claimed invention, it is presumed that the invention was at least a factor contributing toward the product's commercial success. *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention"). Here, the relevant facts are principally undisputed: the premium ball

**REDACTED**

market was dominated for decades by various wound balls; Callaway Golf's Rule 35 golf ball and Acushnet's Pro V1 golf ball both embody the invention claimed in the Sullivan patents-in-suit; when those golf balls embodying the Sullivan invention were introduced in 2000, golfers flocked to the new design; and the previously-dominant wound ball became extinct within a year or two – despite having all the same advantages that Acushnet now touts concerning its marketing machine, the Titleist brand name, and the endorsement of many pro golfers. [*See* Docket No. 442 at 3-6.]

Acushnet now seeks to use the new, 2009 Pro V1 to show that the technology embodied in the original, 2000 Pro V1 was not even a factor contributing to the commercial success of that golf ball (including the paradigm shift of the entire golfing world that occurred almost ten years ago in 2000-01). But the nexus between the technology of the Sullivan invention and the commercial success of the Pro V1 is presumed under the law because Acushnet has admitted infringement (in other words, the Pro V1's success is presumed to be due in part to its use of Sullivan's technology), and that relationship is amply confirmed by the undisputed historical facts of record from the time of the Pro V1's introduction in 2000 up to and including the year it was last offered for sale. Indeed, the conclusion that the technology of the patents in suit was at least one reason for the success of the original Pro V1 is so clear that Acushnet's damages expert, Dr. Kerr, conceded the point in his expert report. [*See* Opp. Ex. 8 at ¶ 60.]

The new Pro V1 *at best* shows that use of another version of Sullivan's pioneering invention is also technologically superior to wound balls – not that Acushnet's original use of the Sullivan patents-in-suit is any less novel. Thus, to whatever marginal extent the new Pro V1 allegedly has relevance to this dispute, it does not warrant turning the upcoming trial into a sideshow and imposing an undue and unfair burden upon Callaway Golf to conduct substantial

11

discovery in what is supposed to be a straightforward retrial of a case on remand – particularly where Acushnet is the one who chose to gamble and wait until the last possible moment to implement its purportedly "readily available" alternative.

## II.   CONCLUSION

For the reasons discussed above and in its opening brief, Callaway Golf respectfully requests that this Court exclude reference to the new Pro V1 from the upcoming retrial.

Dated: February 2, 2010          FISH & RICHARDSON P.C.

By: /s/ Thomas L. Halkowski
    Thomas L. Halkowski (#4099)
    222 Delaware Avenue, 17th Floor
    P.O. Box 1114
    Wilmington, DE  19899-1114
    Tel:  (302) 652-5070
    Fax:  (302) 652-0607

    Frank E. Scherkenbach
    225 Franklin Street
    Boston, MA 02110-2804
    Tel:  (617) 542-5070
    Fax:  (617) 542-8906

**ATTORNEYS FOR PLAINTIFF
CALLAWAY GOLF COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2010, I electronically filed with the Clerk of Court CALLAWAY GOLF'S *REPLY* BRIEF IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE REFERENCE TO ACUSHNET'S NEW PRO V1 GOLF BALLS using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel.

I further certify that the attached document was sent via electronic mail to the following person(s):

| | |
|---|---|
| Richard L. Horwitz<br>David E. Moore<br>Potter Anderson & Corroon LLP<br>1313 North Market Street, 6th Floor<br>Hercules Plaza, 6th Floor<br>P.O. Box 951<br>Wilmington, DE 19899-0951 | Attorneys for Defendant<br>ACUSHNET COMPANY |
| Alan M. Grimaldi<br>Joseph P. Lavelle<br>Brian A. Rosenthal<br>Howrey LLP - DC<br>1299 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | Attorneys for Defendant<br>ACUSHNET COMPANY |

/s/ Thomas L. Halkowski
Thomas L. Halkowski

1