IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 06-91 (SLR) |
| v. | ) ) | |
| ACUSHNET COMPANY, | ) ) | PUBLIC VERSION |
| Defendant. | ) ) ) | |

**ACUSHNET'S REPLY BRIEF IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 2 TO EXCLUDE EVIDENCE REGARDING ACUSHNET'S "HEBERT PATENTS" AND RELATED INVENTIONS**

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: February 2, 2010
Public Version Dated: February 9, 2010
952958/30030

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................................1

II.  ARGUMENT ........................................................................................................................3

    A.  The Veneer Concept Golf Ball Claimed in the Hebert Patents is Not the Same as That Claimed in the Patents-in-Suit....................................................3

        1.  The Hebert Patents Claim Different Subject Matter than the Patents-in-Suit..............................................................................4

        2.  The Hebert Patents were Deemed Patentable Over the Sullivan Three-Piece Polyurethane Ball Disclosed in the Patents-in-Suit..........6

        3.  The Veneer Concept Is Not Same as the Patents-in-Suit......................7

        4.  Demonstrating the Differences Between the Hebert Patents and the Patents-in-Suit Will Be Confusing and Time Consuming.....................8

    B.  Neither the Mandate Rule nor Waiver Preclude Acushnet from Seeking Exclusion of the Hebert Patent Evidence.................................................10

    C.  Acushnet's Expert's Reliance on the Hebert Patent License Does Not Make the Hebert Patent Evidence Admissible.............................................11

    D.  The Court's Prior Evidentiary Rulings Regarding Related Patents Require Exclusion of the Hebert Patent Evidence..................................................12

III. CONCLUSION ...................................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) .......................................................................................... 10

*Belmont Industries, Inc. v. Bethlehem Steel Corp.*,
   512 F.2d 434 (3d Cir. 1975) ............................................................................................ 9, 11

*Exxon Corp. v. United States*,
   931 F.2d 874 (Fed. Cir. 1991) ............................................................................................ 10

*Interconnect Planning Corp. v. Feil*,
   774 F.2d 1132 (Fed. Cir. 1985) ........................................................................................ 3, 6

*Moran v. Clarke*,
   296 F.3d 638 (8th Cir. 2002) .............................................................................................. 10

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*,
   576 F. Supp. 107 (D. Del. 1983) ......................................................................................... 11

*Rosenfield v. Basquiat*,
   866 F. Supp. 790 (S.D.N.Y. 1994), *rev'd on other grounds*, 78 F.3d 84 (2d Cir. 1996) ......... 11

*Vulcan Engineering Co. v. FATA Aluminum, Inc.*,
   278 F.3d 1366 (Fed. Cir. 2002) ............................................................................................ 3

## MISC.

Graham, *Handbook of Federal Evidence* § 103.4 (3d ed. 1991) ............................................. 11

Acushnet hereby submits its reply brief in support of its motion *in limine* to exclude evidence regarding Acushnet's Hebert Patents and related inventions.

## I. INTRODUCTION

Callaway argues that Acushnet's "veneer concept" and Hebert Patents are the "same invention" as the patents-in-suit. Callaway is wrong and should not be permitted to mislead and confuse the jury.

To be clear, Acushnet seeks to exclude the following evidence and arguments:

1) the Hebert Patents (PX-17 and PX-531);

2) Acushnet's views as to the novelty or patentability of its "veneer concept" or the balls covered by the Hebert Patents;

3) any argument suggesting that Acushnet's veneer concept or Hebert Patents are the "same invention" as the patents-in-suit;

4) the Hebert Invention Record (PX-989); and

5) Callaway's license to the Hebert Patents (PX-663).[1]

Contrary to Callaway's suggestion, Acushnet does not seek to exclude all evidence pertaining to the development of the veneer concept, which ultimately led to the Pro V1 golf ball. That evidence is appropriate and admissible, but Acushnet's views as to the novelty or patentability of that concept should be excluded.

Callaway has argued repeatedly in this case that Mr. Sullivan's invention was not merely the use of polyurethane on a three-piece ball, but instead was the selection of particular combinations of materials, dimensions and other properties of the golf ball. Ex. 15, 03/10/09 Appellee's Brief at 6-7. (attached hereto) But now, for purposes of trying to admit the Hebert Patent evidence, Callaway argues that any ball using polyurethane in a three-piece construction

---

[1] Acushnet refers to this group of evidence collectively herein as the "Hebert Patent evidence."

is the "same invention" as that of the patents-in-suit. Callaway's convenient change of story is an attempt to improperly confuse the jury into thinking that since Acushnet invented and got a patent on a three-piece golf ball, Callaway's three-piece golf ball patent must be valid.

The invention of the Hebert Patents was <u>not</u> the use of polyurethane on a three-piece golf ball. That had been invented long beforehand. Instead, the Hebert invention was the use of a very thin, castable reactive liquid (such as castable polyurethane) on a three piece golf ball that used a high flexural modulus inner cover layer. That ball is substantially different from the ball claimed in the patents-in-suit. As such, it is not relevant that Acushnet personnel thought the ball of the Hebert Patents was novel and sought patent protection on that ball. Indeed, the Patent Office found the Hebert Patents to be distinguishable from the three-piece polyurethane golf balls described in the Sullivan patent family.[2]

Callaway relies on Acushnet's stipulation of infringement to try to equate the Hebert Patents to the patents-in-suit. Callaway's argument is misplaced. While the Pro V1 grew out of the veneer concept, it was <u>not the same ball</u> as that initially developed and patented in the Hebert Patents. ███████████████████████████████████████████ Callaway's repeated attempts to paint these balls as the "same invention" illustrate the danger of serious prejudice that would result from the admission of the Hebert Patent evidence. The Court should exercise its gatekeeper function to exclude this confusing and misleading evidence, and avoid the sideshow of a claim-level analysis of the Hebert Patents required to rebut Callaway's broad-brush approach.

---

[2] The UK counterpart to the predecessor application to the patents-in-suit, GB 2 278 609, was cited by and discussed in the Hebert Patents. That patent describes the three-piece polyurethane golf ball invented by Sullivan.

Callaway misapplies the "mandate rule" to improperly conclude that the Federal Circuit's decision forecloses consideration of the admissibility of the Hebert Patent evidence. The Federal Circuit did not address the admissibility of the Hebert Patent evidence. That issue was not briefed on appeal. Absent direct instructions from an appellate court, trial courts may revisit evidentiary issues prior to a new trial.

Finally, Callaway argues that the Hebert Patent evidence should be admissible because Dr. Kerr relies on a license to the Hebert Patents. Experts are permitted to rely on inadmissible evidence. The mere fact that Dr. Kerr relies on a license to the Hebert Patents does not make that license, or the patents themselves or Acushnet's statements about their validity, admissible.

## II. ARGUMENT

### A. The Veneer Concept Golf Ball Claimed in the Hebert Patents is <u>Not</u> the Same as That Claimed in the Patents-in-Suit

Callaway relies on several cases that stand for the proposition that statements by contemporaries about "the invention" are relevant to obviousness. D.I. 552 at 2-3. Those cases are inapplicable as they pertain only to the relevance of statements about the patentability of "the invention" of the patents-in-suit. *Vulcan Eng'g Co. v. FATA Alum., Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) ("Appreciation ... of <u>the invention</u> is a useful indicator of whether the invention would have been obvious") (emphasis added); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143-1144 (Fed. Cir. 1985) (recognizing "the usefulness of evidence of the contemporaneous attitude toward <u>the asserted invention</u>") (emphasis added). Since none of Acushnet's statements Callaway seeks to admit were about the claimed invention, they are not relevant and should not be admitted.

The novel aspect of the Hebert Patents (and the veneer concept) was the use of "casting" to form a thin outer cover made of a castable reactive liquid on a distance ball having a hard,

3

high flexural modulus ionomer inner cover layer. The point of novelty was not the use of polyurethane on a three-piece ball. Since the patents-in-suit do not require casting or a high flexural modulus ionomer, they claim different balls than those covered by the Hebert Patents. Acushnet's views about the novelty or patentability of golf balls different from those claimed in the patents-in-suit should not be admitted.

### 1. The Hebert Patents Claim Different Subject Matter than the Patents-in-Suit

The claims of the Hebert Patents are substantially different from the asserted claims of the patents-in-suit. In particular, the Hebert Patents are directed to the use of a thin layer of "castable reactive liquid" as the outer cover layer of a three-piece ball. *See, e.g.*, Ex. 2, claim 11; col. 5:7-14. Callaway's attempt to equate that cover material with the "polyurethane" of the patents-in-suit fails. Not all castable reactive liquids are polyurethanes, and conversely not all polyurethanes are castable reactive liquids.

First, not all polyurethanes are castable. Polyurethanes generally fall into one of two categories: thermoset and thermoplastic. Thermoplastic polyurethanes, once molded, can be re-melted and re-molded. Ex. 16, T. Tr. at 398:2-15.[3] Such thermoplastic polyurethane materials (such as the Estane material disclosed in the patents-in-suit) do not meet the definition of "castable reactive liquid" as used in the Hebert Patents. In contrast, thermoset polyurethanes cannot be re-melted and re-shaped once molded. Ex. 16, T. Tr. at 398:2-15. Acushnet's "casting" process employs only such thermoset polyurethane materials to create a thin cover on a

---

[3] Until Acushnet invented and perfected the technique of "casting" polyurethane on a golf ball with its Wu patent, polyurethanes used on golf ball covers were thermoplastic materials molded through a conventional injection molding process.

4

golf ball.[4] Thus, the polyurethane claimed in the patents-in-suit includes materials other than castable reactive liquids as claimed by Hebert.

Conversely, not all castable materials are polyurethanes. For example, polyurea materials can also be cast as golf ball covers. *See, e.g.,* Ex. 19, U.S. Patent No. 5,484,870 at col. 3:54-59. Thus, the "castable reactive liquid" claimed by the Hebert Patents includes many more materials than just polyurethane. While there may be some overlap between the outer cover layer materials claimed in Hebert and Sullivan (namely castable thermoset polyurethane), the claims do not have the same scope.

The use of casting was the distinction made in the Hebert '172 Patent over the prior art, including the Sullivan three-piece ball. Ex. 2 at col. 3:38-40 ("none of these patents disclose a multilayer ball having a very thin thermoset outer layer formed from a castable reactive liquid as disclosed herein...."). This point of novelty has nothing whatsoever to do with the invention claimed in the Sullivan patents-in-suit since those claims do not recite a castable outer cover layer.

Callaway argues that even if the Hebert '172 Patent is different from the patents-in-suit, another Hebert patent, U.S. Patent No. 6,132,324 ("Hebert '324 Patent"), is similar. D.I. 552 at 4-5. But the link between the Hebert '324 Patent and the patents-in-suit is even more tenuous. Instead of claiming a product made with a castable material, as the Hebert '172 Patent did, Hebert '324 is specifically directed to the <u>method</u> of casting the outer cover layer. *See* Ex. 20,

---

[4] In 1995, the only thermoset polyurethane that could be used in the "casting" process of the Hebert Patents was the polyurethane developed by Ms. Wu at Acushnet. That polyurethane is described in the Wu '673 patent, which Acushnet asserts as prior art in this case. Ex. 17. Acushnet's casting process was the first of its type in the industry, and was by all accounts a breakthrough technology. ▮

Hebert '324 Patent, claim 1. Since the patents-in-suit do not claim a castable cover layer, the '324 patent also bears no relevance to the asserted claims.

As set forth in Acushnet's opening brief on pages 11-12, there are other differences between Hebert and the patents-in-suit other than the use of casting including: (1) different flexural modulus requirements; and (2) different acid content for the inner cover layers. That there is "some overlap" in the ranges claimed in the Hebert Patents and the patents-in-suit is neither the test for relevance nor the point. D.I. 552 at 7 n.4. The claims are directed to substantially different golf balls, and hence the patentability of the Hebert Patents says nothing about "the asserted invention." *Interconnect Planning Corp.*, 774 F.2d at 1143-1144. Since there are substantial and material differences between the claims of the Hebert Patents and the claims of the patents-in-suit, the fact that Acushnet filed for and obtained the Hebert Patents is not relevant and should not be admissible.[5]

### 2. The Hebert Patents were Deemed Patentable Over the Sullivan Three-Piece Polyurethane Ball Disclosed in the Patents-in-Suit

Callaway's argument that the Hebert Patents relate to the "same invention" as the patents-in-suit also fails because the Patent Office considered Sullivan's disclosure of three-piece polyurethane balls in granting the Hebert Patents. Specifically, the Hebert Patents cite and discuss the United Kingdom counterpart of Mr. Sullivan's parent application. *See* Ex. 2, References Cited (citing GB 2 278 609); col. 3:30-37 (discussing same). The disclosure of GB 2

---

[5] While the Hebert Patents on their face would not be objectionable (which is why Acushnet did not object before Callaway's opening statement to Callaway referring to them), Callaway's use of those patents was misleading and objectionable. To ensure that Callaway does not mislead the jury into thinking that the Hebert Patents are the "same invention" as the patents-in-suit, the patents themselves should be excluded from evidence.

278 609 ("Sullivan '609") is virtually identical to the parent application of the patents-in-suit, and contains substantially the same disclosure as the patents-in-suit themselves.[6]

Even though Sullivan's polyurethane golf ball was before the Patent Office when the Hebert Patents were examined, the Examiner found the claims of the Hebert Patents to be new and patentable. Whether the Patent Office was right or wrong in allowing the Hebert Patents is not the subject of or germane to this lawsuit. The validity of the Hebert Patents is not presented in this lawsuit. However, that the Patent Office allowed the Hebert Patents over the Sullivan disclosure is compelling evidence that Callaway is wrong that those inventions are "the same."

### 3. The Veneer Concept Is Not Same as the Patents-in-Suit

Acushnet's views about the novelty or patentability of veneer concept should be excluded for the same reasons as those for the Hebert Patents. The veneer concept was the use of a thin, castable reactive liquid on a distance ball that used a high flexural modulus ionomer in the inner cover layer. All of the evidence Callaway introduced at the first trial regarding the novelty of the veneer concept was specifically directed to that use of a "casting" process on a three-piece ball, not the use of polyurethane in general on a three-piece ball. *See, e.g.*, Ex. 16, T. Tr. at 439:12-17 (stating that the novel feature of the Veneer concept was the use of a "thin cast polyurethane cover of the new composition" on a "solid-core three-piece construction with an ionomer inner cover"). Since the claims of the patents-in-suit do not recite the use of such a castable reactive liquid, Acushnet's views as to the novelty of the veneer concept are not relevant.

Throughout its opposition, Callaway incorrectly conflates Acushnet's veneer concept balls with the commercial Pro V1. D.I. 552 at 5-6. Specifically, Callaway argues that since the

---

[6] For example, the description of the Estane polyester polyurethane golf ball disclosed in the patents-in-suit is also disclosed in Sullivan '609. *Compare* Ex. 4 at 45-46 *to* '293 patent, col. 19:21-20:22.

7

Pro V1 is stipulated to infringe the patents-in-suit, the veneer concept is the "same" as the patents-in-suit. *Id.* Callaway's argument fails because the veneer concept prototypes were different from the Pro V1 in a key material respect. While the veneer concept ultimately led to the development of the commercial Pro V1 ball, the construction of the ball evolved over time. By the time the Pro V1 was introduced, the inner cover layer was vastly different than that of the veneer concept balls. ███████████████████████████████████████

███████████████████████████████████████

███████████████ Thus, whether Acushnet engineers thought these veneer prototypes were "new" or "novel" is immaterial to the validity of the patents-in-suit.[7]

    **4.    Demonstrating the Differences Between the Hebert Patents and the Patents-in-Suit Will Be Confusing and Time Consuming**

In light of the differences in claim scope between the Hebert Patents and the Sullivan patents-in-suit, Callaway protests that "the jury does not need to consider the claims of the Hebert patent." It is not surprising that Callaway wants to avoid looking at the Hebert claims – they are different from those of the patents-in-suit. Instead, Callaway wants to argue that since Acushnet has a patent that covers certain three-piece covered golf balls, all three-piece polyurethane covered golf ball patents are valid. Such broad-brushing is not permitted, and demonstrates the prejudicial nature of this evidence. It is claims that define inventions, not broad concepts.

---

[7] In general, testimony regarding the veneer concept and its relationship to the development of the Pro V1 is relevant to the development of the accused products, and Acushnet does not seek to exclude such testimony. On the other hand, Acushnet's views about the novelty and patentability of the veneer concept, which is not the same as the patents-in-suit or the Pro V1, are not relevant and should be excluded.

8

Callaway concedes that if the Hebert Patents are admitted, any dispute about whether the patents-in-suit are equivalent to the Hebert patents would be left for the jury to decide. D.I. 552 at 7-8. Indeed, Callaway states that "[e]ven if the jury on its own was inclined to consider the claims of the Hebert '172 patent, it could do so without any difficulty." D.I. 552 at 7 n.4. The parties' briefs on this complicated technical issue demonstrate the absurdity of Callaway's statement. The Court recognized (and Acushnet agrees) that the jury should not engage in such a claim level analysis of a patent not at issue in this case. Ex. 16, T. Tr. at 422:18-423:10. But if Callaway makes broad-brush and inaccurate statements to the effect that Acushnet got its own patent on "the same invention," such a claim level analysis of the Hebert patent will be necessary to dispute those statements.

The sideshow created by admission of the Hebert patents would consume an enormous amount of trial time, in addition to creating extraordinary confusion for the jury. Courts are reluctant to admit such side-show evidence when it will distract the jury from the main issues and take an undue amount of time. *See Belmont Indus., Inc. v. Bethelem Steel Corp.*, 512 F.2d 434, 438-39 (3d. Cir. 1975) ("There are several counter-balancing factors which may move the court to exclude relevant evidence if they outweigh the probative value . . . . Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that the evidence offered in the counterproof will consume an undue amount of time.").

Thus, to avoid wasting trial time on a satellite issue, the Court should exercise its gatekeeper role and exclude Callaway's confusing and unduly prejudicial Hebert evidence. The Court may thus keep the trial focused on the relevant issues of validity of the patents-in-suit and damages.

### B. Neither the Mandate Rule nor Waiver Preclude Acushnet from Seeking Exclusion of the Hebert Patent Evidence

Callaway argues that the mandate rule bars the Court from reconsidering evidentiary decisions prior to the second trial. D.I. 552 at 6. Callaway is incorrect. First, Callaway says that Acushnet did not appeal the Court's evidentiary rulings, then claims that the mandate rule prevents the Court from revisiting those issues. *Id.* Callaway's argument is logically disjointed because the mandate rule applies only if an issue is appealed. *See Exxon Corp. v. United States,* 931 F.2d 874, 878 (Fed. Cir. 1991) ("We hold that when a judgment has come before us for review, and certain findings of fact were not examined in, relied on, or otherwise necessary to our decision in that appeal, law of the case does not prevent the trial court on remand from reexamining those findings, with no more deference than if the decision had never been appealed at all."). *Amado v. Microsoft Corp.,* 517 F.3d 1353, 1360 (Fed. Cir. 2008) ("The mandate rule provides that issues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration.").

Here the Federal Circuit remanded for a new trial on the issue of obviousness. That new trial will necessarily include the admission of evidence in the form of exhibits and testimony. This evidence will in turn no doubt draw objections. A mandate for a new trial inherently allows a Court to decide any evidentiary issues attendant to that new trial, as long as they are not specifically addressed in the mandate. *See, e.g., Moran v. Clarke,* 296 F.3d 638, 649 (8th Cir. 2002) ("[O]ur remand for a new trial wipes the evidentiary slate clean and permits Moran to reargue the admissibility of each item to the district court.").

Callaway also argues that Acushnet has somehow waived its right to try to exclude the Hebert Patent evidence since certain Hebert evidence was admitted in the first trial. But this is a

10

new trial; the Court is not bound by what evidence was admitted, or what objections Acushnet made or did not make, at the first trial. *See, e.g., Rosenfield v. Basquiat*, 866 F. Supp. 790 792 (S.D.N.Y. 1994), *rev'd on other grounds*, 78 F.3d 84 (2d Cir. 1996) ("Objections may be urged at a later trial and are not waived, even though the later trial is one *de novo* on appeal or on remand.") (*quoting* Graham, *Handbook of Federal Evidence* § 103.4 (3d ed. 1991)).

The purpose of waiver rules for evidentiary issues is to ensure that the Court has the opportunity to rule on objections, allow the party proffering the evidence to cure any defects, and if necessary, allow the Court to issue a limiting instruction to the jury. *See, e.g., Belmont*, 512 F.2d 434 at 438. This procedure allows the judge to protect the jury from hearing misleading or prejudicial evidence, or to correct the record. Because this trial involves a new jury, yet to be tainted by Callaway's introduction of the Hebert Patent evidence, the purpose of the waiver rules is not implicated here. Now that Callaway's intent with respect to the Hebert Patent evidence is clear from the record of the first trial, a fresh examination of the admissibility of such evidence is warranted.

### C. Acushnet's Expert's Reliance on the Hebert Patent License Does Not Make the Hebert Patent Evidence Admissible

Callaway argues that Hebert Patent evidence should be admitted because Acushnet's damages expert, Dr. Kerr, relies on the Hebert patent license as part of his opinion as to a reasonable royalty. D.I. 552 at 9. However, an expert's reliance on evidence is irrelevant to its admissibility. Indeed, experts may (and routinely do) rely on inadmissible evidence when formulating their opinions. *See Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 158 (D. Del. 1983) ("CMOBC concedes the testimony was hearsay, but argues that it was admissible because an expert may base his opinion on inadmissible evidence. This contention, however, misses the mark. While an expert witness may base his opinion on such

11

evidence, this does not magically render the hearsay evidence admissible."). Thus, that Dr. Kerr considered the license to the Hebert patent in connection with his opinion regarding damages is irrelevant to whether Hebert Patent evidence is admissible. Indeed, the Hebert Patent license, which was made under threat of litigation, is a settlement agreement that is inadmissible under the Court's standard practice. *See, e.g.*, Ex. 22 at 8.

Callaway's suggestion that Dr. Kerr's reliance on the Hebert license requires an examination of the Hebert Patents themselves is also contradicted by the fact that Callaway's expert engages in no such analysis. Mr. Napper does not engage in any analysis whatsoever of the Hebert Patent of the sort Callaway argues would be necessary, despite serving a supplemental expert report after Dr. Kerr's reliance on the Hebert license. Thus, Callaway's arguments that Dr. Kerr's reliance on the Hebert Patent license would result in discussion of details of the Hebert Patents does not ring true.

### D. The Court's Prior Evidentiary Rulings Regarding Related Patents Require Exclusion of the Hebert Patent Evidence

This Court has already excluded from evidence numerous Board of Patent Appeals ("BPAI") decisions in which the BPAI rejected claims in the Sullivan family that are very similar to the asserted claims of the patents-in-suit. Ex. 16, T. Tr. at 257:21-258:6. Those BPAI decisions were <u>final</u> administrative actions denying the patentability of claims nearly the same as those of the patents-in-suit. *See, e.g.*, Ex. 23. The Court determined that those decisions did not involve claims identical to those of the patents-in-suit, and that it would be confusing to introduce evidence pertaining to similar but not identical claims. D.I. 350 at 26.

The same reasoning requires exclusion of the Hebert Patent evidence. If Acushnet is not permitted to introduce evidence of similar claims (from the same patent family) that were

determined unpatentable in a final administrative proceeding, Callaway should not be permitted to introduce evidence of Acushnet's views of what it calls similar claims.

### III. CONCLUSION

For all of the foregoing reasons, evidence and argument that Acushnet's Hebert patents or veneer concept represent the same invention as the patents-in-suit should be excluded and Acushnet's Motion to exclude such evidence should be granted.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: February , 2010
Public Version Dated: February 9, 2010
952958/30030

By: /s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## **CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on February 9, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on February 9, 2010, the attached document was Electronically Mailed to the following person(s):

| | |
|---|---|
| Thomas L. Halkowski<br>Fish & Richardson P.C.<br>222 Delaware Avenue, 17th Floor<br>P.O. Box 1114<br>Wilmington, DE 19899-1114<br>halkowski@fr.com | Frank E. Scherkenbach<br>Fish & Richardson P.C.<br>225 Franklin Street<br>Boston, MA 02110-2804<br>scherkenbach@fr.com |
| Robert A. Denning<br>David S. Shuman<br>W. Chad Shear<br>Fish & Richardson P.C.<br>12290 El Camino Real<br>San Diego, CA 92130<br>denning@fr.com<br>shuman@fr.com<br>shear@fr.com | Jonathan J. Lamberson<br>Christina D. Jordan<br>Craig R. Compton<br>Fish & Richardson P.C.<br>500 Arguello Street, Suite 500<br>Redwood City, CA 94063<br>lamberson@fr.com<br>cjordan@fr.com<br>compton@fr.com |

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030