# FISH & RICHARDSON P.C.

17TH FLOOR
222 DELAWARE AVENUE
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

Thomas L. Halkowski
302 778-8407

Email
halkowski@fr.com

**VIA ELECTRONIC FILING**                    **REDACTED**

February 22, 2010

The Honorable Sue L. Robinson
United States District Court
844 North King St., Lock Box 31
Wilmington, DE 19801

Re:    Acushnet's *Daubert* Motion (D.I. 284)
       *Callaway Golf v. Acushnet*, C.A. No. 06-91 (SLR)

Dear Judge Robinson:

Pursuant to the instruction from the Court, Callaway Golf respectfully submits the following response to Acushnet's letter brief regarding its pending *Daubert* motion (D.I. 284).

Acushnet, via its letter brief, has apparently withdrawn most of its challenges to Mr. Napper's testimony. Thus, Callaway Golf will limit its response to those issues now being pursued by Acushnet, which it understands are the only issues currently disputed.

## 1.    Calculating lost profits for a portion of an infringer's sales is permissible

In its letter brief, Acushnet states that "Mr. Napper only eliminates Pro V1 sales from the market starting in 2003," not 2001, and alleges that this is somehow improper. This complaint is ironic because, had Mr. Napper actually opined on lost profits starting in 2001, his damages number would have been even greater. This complaint is also at odds with hornbook law: "Courts may grant a mixed or split award, using lost profits as a measure for some infringing sales or uses and lost royalties (established or reasonable) as a measure for other such sales of uses." *See* Chisum on Patents § 20.03[1]e. Acushnet cites no case to the contrary.

The goal of the damages inquiry is to compensate a patent owner for an infringer's illicit activity, and to restore the patent holder to the position it would have occupied but for the infringement. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). Flexibility is necessary in computing damages, especially for lost profits, because circumstances may change over time – a patentee may manufacture a competing product in some years, but not in others; a patentee may change his capacity to manufacture competing goods; and non-infringing alternatives may enter or leave the market. A district court "may choose at its discretion the methodology with which to assess and compute damages. The only limitation upon the court is that the award must be 'adequate to compensate for the infringement,' and cannot be 'less than a reasonable royalty.' *See Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.*, 756 F.2d 1574, 1581 (Fed. Cir. 1985) (citing 35 U.S.C. § 284). As in this case, lost profits may not be available for all periods of infringement. *After* it has been determined that lost profits are not available for all of the infringing sales, a reasonable royalty is calculated

**REDACTED**

The Honorable Sue L. Robinson
February 22, 2010
Page 2

for the remainder of the sales, because that is the floor set by the statute.  [*See* Uniform Jury Instructions for Patent Cases in for the District of Delaware, Instruction 6.5.]

Numerous cases spanning several decades have upheld damages awards that give a royalty for a portion of an infringer's sales, and lost profits for a different portion.  *See, e.g., H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1122 (6th Cir. 1976) (awarding "a reasonable royalty … of 8% of Goodyear's infringing sales in 1962-63 and 1968-71" and "lost profits for the years 1964-67"); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336, 1354 (Fed. Cir. 2001) ("a patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate 'but for' causation and reasonable royalties for any remaining infringing"); *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 902 (Fed. Cir. 1986) (finding no error in trial court determination that the patentee "is entitled to lost profits for the years its lost profits exceeded its reasonable royalty"); *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996) ("A segment of the infringer's sales may not warrant a lost profits award…However, the patentee would still be entitled to a reasonable royalty on each of those sales"); *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F.2d 1554, 1555 (Fed. Cir. 1986) (affirming lost profits for sales to K-Mart, and a reasonable as to other sales); *American Medical Systems Inc. v. Medical Engineering Corp.*, 794 F. Supp. 1370, 1387 (E.D. Wis. 1992), *aff'd in part, rev'd in part & remanded*, 6 F.3d 1523 (Fed. Cir. 1993) , *cert. denied*, 511 U.S. 1070 (1994) (awarding lost profits up to date the infringer developed a non-infringing product and a reasonable royalty thereafter); *Paper Converting Mach. Co. v. FMC Corp.*, 432 F. Supp. 907, 916 (E.D. Wis. 1977) , *aff'd*, 588 F.2d 832 (7th Cir. 1978) (awarding lost profits as to most sales, and a reasonable royalty as to sales to one foreign customer).

Acushnet ignores that a hypothetical negotiation is a legal fiction, not an actual license.  It is a separate legal framework to determine the ***floor*** below which damages cannot fall.  Lost profits is an entirely separate inquiry that has nothing to do with the hypothetical negotiation.  Indeed, if Acushnet's argument were correct – that the hypothetical license, presumed to result from a reasonable royalty negotiation that never happened, constitutes an "alternative" that would insulate  all future sales – lost profits would cease to exist.  An infringer could always hypothesize a license as an "alternative" whose "existence . . . negates any claim for lost profits." [AC brief at 4]  Yet the Federal Circuit has repeatedly affirmed lost profits awards – including awards based on a market share approach, which *always* awards a royalty on just a portion of the infringing sales.  *See State Indus. v. Mor-Flo Indus.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989)

**2.      Mr. Napper's market share analysis was otherwise proper**

Acushnet complains that Mr. Napper's market share approach did not properly reconstruct the "but for" world in other ways, and makes several arguments regarding alleged "flaws."  None has merit.

First, Acushnet argues that the recreation of the marketplace had to begin in 2001, not 2003, but as discussed above that is legally incorrect and factually flawed.  Indeed, Mr. Napper's approach

**REDACTED**

The Honorable Sue L. Robinson
February 22, 2010
Page 3

in calculating lost profits was not "fundamentally flawed," it was in fact conservative – Mr. Napper opined that the conditions for lost profits did not arise until 2003, and that is when he began his lost profits calculation. It would have made no sense to further opine on what would happen in the "but for" world of lost profits for those years where he determined that the conditions for such damages were not met. There is no legal error in this approach,[1] and no reason to exclude his opinions.

Second, Acushnet argues that Mr. Napper's opinions are "too speculative." But as the Federal Circuit has noted, the patentee "need not meet the impossible burden of negating every possibility that a purchaser might not have bought another product or might not have bought any comparable product at all." *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 864 (Fed. Cir. 1985). Instead, the patentee "need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement." *Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed. Cir. 1991). "Any doubts regarding the calculatory precision of the damage amount must be resolved against the infringer." *Id.* at 1141. As discussed in Callaway Golf's opposition brief, Mr. Napper relied on over 51,000 pages of documents, including well-respected industry studies that Acushnet itself relies on; depositions of Acushnet employees; interviews with Callaway Golf employees; and many other sources to formulate his opinions over hundreds of hours spent working on this case. [*See* D.I. 300 at 9.] As discussed below, any disputes about his calculations go to their weight, not to their admissibility.

Third, Acushnet argues that it would have offered non-infringing alternatives to the Pro V1 in 2001, which allegedly preclude a lost profits award. As discussed in Callaway Golf's pending motion *in limine* to exclude the new Pro V1, however, the presence or absence of non-infringing alternatives is generally irrelevant under a market share approach for lost profits, which attempts to recreate the market as it existed at the time of infringement. *See Mor-Flo*, 883 F.2d at 1578 (noting that under a market-share approach, "the presence or absence of acceptable non-infringing alternatives does not matter"); *Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 361 (D. Del. 2006) (same); *Izume Products Co. v. Koninklijke Philips Electronics N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004) (same).

More fundamentally, as discussed in the pending motion *in limine* briefing, there is simply no evidence that Acushnet could have released a *viable* non-infringing alternative in 2001, as it now alleges with 20-20 hindsight. While it's letter attempts to conjure a few more, the only two alleged alternatives relied on by Acushnet's damages expert were (1) reverting to wound balls, and (2) creating a ball with a specific formulation high-acid ionomer inner-cover layer. With respect to the wound ball alternative, the record is replete with evidence that no golfer would have accepted this approach – Phil Mickelson, for example, testified that ███████████████

---

[1] As Callaway Golf has noted, Acushnet's own expert did not know of any legal requirement that a "but for" analysis must be conducted at the time infringement began. [*See* D.I. 300 at 16-17.]

**REDACTED**

The Honorable Sue L. Robinson
February 22, 2010
Page 4

████████████████████████████████████████████████ [D.I. 393
Ex. A  (Mickelson Depo.) at 159:2-9.][2]

With respect to Acushnet's alleged high-acid alternative, as discussed in the pending briefing,
Acushnet's only evidence on this alleged alternative includes two e-mails from 2002, not 2001.
Also, those e-mails disclose a formulation that has never been marketed by anyone – ████████
████████████████████████████████████████████████████████

There is no testimony about whether or not Acushnet could have made the 2008 version in 2001,
and no explanation for why it chose to create a new formulation in 2008 rather than adopt the
formulation described in its expert report that was allegedly available in 2002. Indeed,
Acushnet's behavior in this case speaks volumes — Acushnet chose not to make a change but to
instead continue its infringement for many years until forced to stop by issuance of an injunction.

Fourth, Acushnet argues that Callaway Golf's adoption of a $30 per dozen market definition is
"improper" and "flawed." But Mr. Napper relied, *inter alia*, on: (1) Acushnet's own Chief
Financial Officer, ████████████████████████████████████
██████████████████████ [*See* D.I. 286, Ex. 1 (Expert Report of Brian Napper) at
page 24]; and (2) Acushnet's own documents showing ██████████████████ [*See, e.g.,* D.I.
300 at 24-26.] Again, any disputes about this categorization go to weight, not admissibility.

Finally, Acushnet argues that Callaway Golf is not entitled to lost profits because certain of its
sales were made by wholly-owned subsidiaries. But the case law Acushnet cites deals only with
separate sister corporations, not wholly owned subsidiaries. *See Poly-America, L.P. v. G.S.E.
Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004). Later cases clarified that *Poly-America*
did not deal with a situation where "profits of a subsidiary actually do flow inexorably up to the
parent." *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008).

---

[2] Acushnet has objected to Mr. Mickelson's testimony, but it is critical with respect to whether a
wound ball was an acceptable non-infringing alternative, as well as to Callaway Golf's damages
case generally (*i.e.*, Mr. Mickelson's testimony also describes what he, as a pro golfer, was
seeking in a golf ball and how the Pro V1 (and Rule 35) golf balls satisfied those demands in a
manner far superior to the then dominant wound balls – testimony directly concerning the value
of the invention, given that use by pro players drives the entire pyramid of influence). Indeed, it
is difficult to imagine testimony that could possibly be more relevant to the core issue of the
invention's value. The Court previously concluded that Mr. Mickelson should not testify live
due to the risk of unfair prejudice caused by his celebrity as compared to the relevance of his
testimony to the limited issue of secondary considerations. Callaway Golf respectfully submits
that the risk of prejudice would be minimized, if not eliminated, by the submission of deposition
testimony to the jury, and, given the critical nature of Mr. Mickelson's testimony to rebut a
number of allegations being made by Acushnet relating to damages issues, Callaway Golf
respectfully submits that allowing limited excerpts of his deposition into the record would be
warranted during this trial.

# REDACTED

The Honorable Sue L. Robinson
February 22, 2010
Page 5

Moreover, at least in the context of reasonable royalties, the Federal Circuit has expressly allowed damages for subsidiaries' sales. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377 (Fed. Cir. 2005). Here, the evidence will show that any sales made by subsidiaries flow inexorably to Callaway Golf (the patent holder): all transfer pricing between subsidiaries is eliminated, and all profits are attributed solely to the reporting entity, Callaway Golf Company. [*See, e.g.*, Callaway Golf Company form 10-K for period ending 2003, available at [*http://www.sec.gov/Archives/edgar/data/837465/000093639204000209/a96880e10vk.htm* at Part 1, Item 1]. Consequently, this final argument is a red herring and Callaway Golf is entitled to recover for any lost profits.

### 3.     Acushnet's complaints can be addressed during cross-examination

Acushnet cites the Federal Circuit's recent decision in *i4i Ltd. Partnership v. Microsoft Corp.*[3] at the end of its letter brief, and attempts to argue that this decision is limited to *Daubert* challenges of reasonable royalty calculations. Yet the Federal Circuit spoke more broadly, noting that "[w]hen the [expert's] methodology is sound, and the evidence relied upon is sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." Slip. Op. at 28. Because Microsoft's challenges were to the conclusions of the damages expert, not his methodology, they were not a proper basis for a *Daubert* challenge. *Id.* at 31.

Here too, Acushnet challenges Mr. Napper's ***conclusions*** that Callaway Golf is entitled to lost profits and a reasonable royalty for Acushnet's years of infringement. Yet even Acushnet must admit that his ***methodology*** – specifically, the market-share approach for lost profits and the *Georgia-Pacific* analysis for a reasonable royalty – are well-accepted, and his conclusions are based in large part on Acushnet's own testimony and documents. All of Acushnet's complaints are fact disputes that can and should be resolved by a jury at trial. For this reason, and the reasons stated in Callaway Golf's original briefing, Acushnet's *Daubert* motion should be denied.

Respectfully,

*/s/ Thomas L. Halkowski*

Thomas L. Halkowski

cc:     Clerk of the Court (via hand delivery)
        Counsel of Record (via electronic filing)

---

[3] Available at http://www.cafc.uscourts.gov/opinions/09-1504.pdf.