IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-091-SLR |
| | ) | |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Thomas L. Halkowski, Esquire of Fish & Richardson P.C., Wilmington, Delaware.
Counsel for Plaintiff.  Of Counsel: Frank E. Scherkenbach, Esquire of Fish and
Richardson P.C., Boston, Massachusetts; Roger A. Denning, Esquire of Fish and
Richardson P.C., San Diego, California.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon
LLP, Wilmington, Delaware.  Counsel for Defendant.  Of Counsel: Henry C. Bunsow,
Esquire, Joseph P. Lavelle, Esquire and Brian A. Rosenthal, Esquire of Howrey LLP,
Washington, D.C.

## MEMORANDUM OPINION

Dated:  March 3, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Callaway Golf Company ("Callaway") brought suit against defendant Acushnet Company ("Acushnet"), alleging that Acushnet has infringed various claims of four golf ball patents owned by Callaway (known as the "Sullivan patents").[1]  At the conclusion of the claim construction exercise, Acushnet stipulated that its golf balls infringed[2] but maintained that the asserted claims were invalid for anticipation and obviousness.  The case presents itself on remand from the Federal Circuit for re-trial on the issues of obviousness and anticipation.[3]  Pending before the court is Acushnet's renewed motion for summary judgment on anticipation, as well as various other pretrial motions.

## II. BACKGROUND

Callaway and Acushnet are manufacturers of golf equipment, including golf balls.

---

[1] The four Sullivan patents are U.S. Patent Nos. 6,210,293 ("the '293 patent"). 6,503,156 ("the '156 patent"), 6,506,130 ("the '130 patent"), and 6,595,873 ("the '873 patent").  At issue are claims 1,4 and 5 of the '293 patent, claims 1-3 of the '156 patent, claim 5 of the '130 patent, and claims 1 and 3 of the '873 patent.

[2] The accused products at issue are Acushnet's Titleist Pro V1, Pro V1* (since discontinued) and Pro V1x golf balls.  The Pro V1 has a three-piece construction consisting of a solid core, an ionomer-blend inner cover, and a polyurethane outer cover.  The Pro V1* and Pro V1x balls are "dual-core" balls having an inner core, an outer core, an ionomer inner cover, and a polyurethane outer cover.  I held that the claim limitation "[c]over layer having a Shore D hardness" requires that the Shore D hardness measurement of the cover layer be taken on the ball.  Based on this on-the-ball construction, Acushnet stipulated that its Pro V1 ball infringed all of the asserted claims, and that its Pro V1* and Pro V1x balls infringed all claims except claim 1 of the '293 patent.  This claim construction was affirmed on appeal.

[3] On appeal, the Federal Circuit reversed the entry of summary judgment of no anticipation, vacated the judgment of nonobviousness as based upon irreconcilably inconsistent jury verdicts, and remanded for a new trial.

As described in prior opinions, historically, golf balls designed to travel long distances when struck by a driver were relatively hard.  In contrast, golf balls designed to exhibit other desirable playability characteristics (such as spin control for approach shots, and the proper "click" and "feel" upon being struck) typically were softer.

Callaway is the current owner of the Sullivan patents, which share nearly identical specifications and contain similar claims to a multi-layer polyurethane-covered golf ball. According to the specification, a major advantage of the patented invention is that it presents a "dual personality" ball that is capable of traveling great distances, yet does not exhibit diminished playability or durability.  *See* '293 patent, col. 3:21-29, col. 5:23-30.

Claim 1 of the '293 patent is generally representative of the asserted claims:

1. A golf ball comprising:

> a core;
>
> an inner **cover layer having a Shore D hardness of 60 or more** molded on said core, said inner cover layer having a thickness of 0.100 to 0.010 inches, **said inner cover layer comprising a blend of two or more low acid ionomer resins** containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid;
>
> and an **outer cover layer having a Shore D hardness of 64 or less** molded on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and **said outer cover layer comprising a relatively soft polyurethane material.**

'293 patent, col. 23:48-61 (emphasis added).  Callaway's other asserted claims vary slightly from claim 1 of the '293 patent, but each claims a golf ball with a core, an ionomer resin (or ionomer blend) inner cover layer with a Shore D hardness of 60 or

more, and a polyurethane outer cover layer with a Shore D hardness of 64 or less. "Shore D hardness" refers to a hardness standard published by the American Society for Testing and Materials.[4]

## III. RENEWED MOTION FOR SUMMARY JUDGMENT ON ANTICIPATION

### A. Standard of Review

#### 1. Summary judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*,

---

[4]The standard, ASTM D-2240, describes a method of testing hardness by forcing an indentor into the material to be tested. The indentor's penetration into the material under specified conditions indicates the relative hardness of the material. The standard descirbes several standard sized of indentors (type A, B, C, D, etc.), with "Shore D" hardness referring to hardness measured using a size "D" indentor. American Society for Testing and Materials, Standard Test Method for Rubber Property-Durometer Hardness 1 (1995) ("ASTM D-2240").

475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 2. Anticipation

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *See Key Phar. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *See id.*

Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps*

4

Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

The elements of the prior art must be arranged or combined in the same manner as in

the claim at issue, but the reference need not satisfy an ipsissimis verbis test. In re

Gleave, 560 F.3d 1331, 1334 (Fed. Cir. Mar. 26, 2009) (citations omitted). "In

determining whether a patented invention is [explicitly] anticipated, the claims are read in

the context of the patent specification in which they arise and in which the invention is

described." Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc., 45 F.3d

1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted

"[i]f needed to impart clarity or avoid ambiguity" in ascertaining whether the invention is

novel or was previously known in the art. Id. (internal citations omitted).

"A claimed invention cannot be anticipated by a prior art reference if the allegedly

anticipatory disclosures cited as prior art are not enabled." Amgen, Inc. v. Hoechst

Marion Roussel, Inc., 314 F.3d 1313, 1354 (Fed. Cir. 2003). Additionally, the reference

must "enable one of ordinary skill in the art to make the invention without undue

experimentation." In re Gleave, 2009 WL 777398 at *2 (citing Impax Labs., Inc. v.

Aventis Pharms. Inc., 545 F.3d 1312, 1314 (Fed. Cir. 2008)). "As long as the reference

discloses all of the claim limitations and enables the 'subject matter that falls within the

scope of the claims at issue,' the reference anticipates – no 'actual creation or reduction

to practice' is required." In re Gleave, 2009 WL 777398 at *2 (quoting Schering Corp. v.

Geneva Pharms., Inc., 339 F.3d 1373, 1380-81 (Fed. Cir. 2003) and In re Donohue, 766

F.2d 531, 533 (Fed. Cir. 1985)).

## B. Analysis

5

Acushnet maintains that the text of U.S. Patent No. 4,431,193 ("Nesbitt") anticipates the Sullivan patents, as follows: (1) the text of Nesbitt itself discloses a three-piece golf ball meeting all limitations of the Sullivan patents save two - a polyurethane outer cover and a blend of ionomers in the inner cover: (2) Nesbitt incorporates by reference of U.S. Patent No. 4,274,637 ("Molitor '637"), which teaches both polyurethane and ionomer blends as cover materials;[5] and (3) the necessary hardness limitations for these cover layers ("Shore D hardness") are either explicitly or inherently disclosed. With respect to Nesbitt's "explicit" disclosure, Acushnet argues that, "[w]hile Nesbitt does not provide a numerical range for the 'on-the-ball' hardness of the outer cover, it does explicitly state that the outer cover should emulate the characterisitics of balata-covered balls, which were known to be very soft and well under 64 Shore D." (D.I. 572 at 15) With respect to Nesbitt's "inherent" disclosure, Acushnet argues that this has been demonstrated through the preparation and measurement of test golf balls which, as characterized by the Federal Circuit, "combin[e] the polyurethane outer cover described by Molitor '637 with **the core** and ionomer-blend inner cover **of Nesbitt."** (D.I. 511 at 6) (emphasis added)

## 1. Explicit disclosure

In support of its argument that Nesbitt explicitly discloses the outer cover Shore D

---

[5]I had concluded that Nesbitt did not describe the use of polyurethane or blends of ionomer resins in Molitor '637 with sufficient particularity to effectuate an incorporation by reference of those features. The Federal Circuit disagreed, concluding that Nesbitt did incorporate "the entire list of foamable compounds ('a number of foamable compositions') disclosed by Molitor '637 as appropriate materials for use in golf ball cover layers, including polyurethane and mixtures of ionomer resins." (D.I. 511 at 27)

hardness limitation, Acushnet cites to the following passage from Nesbitt: "The soft Surlyn resin cover would have about the same thickness and shore hardness of a balata covered golf ball . . . ." (Nesbitt, col. 3"40-42) According to Acushnet, since "[i]t was well known to those in the art that balata-covered golf balls in 1995 had 'on the ball' hardness of approximately 47-54 on the Shore D scale"[6] (D.I. 572 at 15-16), "Nesbitt's teaching would be understood to teach that the outer cover of the Nesbitt ball should have a similar Shore D hardness." (D.I. 534 at 17; D.I. 572 at 16)

Keeping in mind that Acushnet is moving for summary judgment on anticipation, not obviousness, Acushnet nevertheless argues generally that Shore D hardness measurements taken on balata balls would teach a person of skill in the art that a polyurethane outer cover must invariably have the same Shore D hardness. Aside from attorney argument, no evidence (let alone Nesbitt) cited by Acushnet makes that causative leap, to wit, that if A equals B, and A equals C, then C equals B. At a minimum, there are genuine issues of material fact that preclude the granting of summary judgment on this ground.

## 2. Inherent disclosure

Based on the Federal Circuit's understanding of the test ball evidence, that is, that the test balls combine the outer cover disclosed by Molitor '637 with the core and inner cover of Nesbitt, the Federal Circuit instructed that "re-creations or models of balls described in **individual** prior art references may be relevant" to an anticipation inquiry. (D.I. 511 at 28) (emphasis added) On remand, the parties dispute whether Acushnet

[6]Citing to multiple sources, D.I. 534 at 4 n.10.

7

has actually presented such evidence.  In this regard, Acushnet contends that "Nesbitt discloses a multi-layer golf ball having a) **a solid rubber core**; b) a hard, stiff resinous inner cover layer; and c) a soft, low flexural modulus outer cover." (D.I. 557 at 2) (emphasis added)  Although Acushnet concedes that "Nesbitt does not specify a particular type of solid core to use,"[7] Acushnet argues, in the alternative, that the core material was "well known to those of ordinary skill in the art" or that the core formulation is immaterial to the anticipation discussion because the core material has no bearing on the measurement of Shore D hardness.

Neither argument is persuasive on this record.  In the first instance, the Federal Circuit opened the door to the test ball evidence on the issue of anticipation (having rejected its use to prove obviousness) based on the proposition that the test balls re-created a **single** prior art reference (consistent with an anticipation analysis).  Indeed, the Federal Circuit characterized Acushnet's argument to be that the test balls (including the cores) incorporated only the teachings of the Nesbitt/Molitor '637 reference. (*See* D.I. 511 at 6)  Having reviewed the record, the cores used by Acushnet are not disclosed in any prior art reference of record.  More specifically, Acushnet argues that the core formulation is found in a 1994 U.K. patent issued to Sullivan (GB 2 278 609) and attributed to Nesbitt.  A careful reading of the record reveals, however, that the same core formulation[8] was used by Sullivan in testing multiple different "inner cover

---

[7]Nesbitt generally teaches that the core should be a "resilient polymeric material or rubber-like material," and that the density and size of the core can be adjusted to make a ball that complies with the size and weight restrictions in the rules of golf. Nesbitt, col. 2:31-34; col. 2:66-3:7.

[8]A formulation that is mirrored in the '293 patent at col. 16:15-30.

compositions," including "[c]omposition D represent[ing] the inner layer (i.e., Surlyn 1605) used in U.S. Patent No. 4,431,193;" the resulting ball "comprising inner layer formulation D and Surlyn 9020 identifies the ball in the Nesbitt 4,431,193 patent." (D.I. 536, ex. 30 at 39-41, 46)  In other words, the core formulation was not attributed by Sullivan to Nesbitt, and Nesbitt itself does not disclose a specific core formulation. Therefore, the very reason the Federal Circuit opened the door has not proved true. Moreover, because Acushnet did not even follow the Sullivan recipe (having deleted one ingredient, Papi 94), it is unclear what prior art Acushnet is following in this regard. Acushnet's second argument, that the core material does not affect Shore D hardness measurements, finds support in Table 7 of the '293 patent, which reports the same Shore D hardness for balls having different core formulations but the same outer cover layers.  Acushnet concludes from this data that, "[a]s the claims [of the Sullivan patents] recite no limitations affected by the core, and the patents do not teach using the core to affect cover hardness, Nesbitt's failure to disclose a specific core formulation is irrelevant." (D.I. 557 at 18)  Aside from attorney argument, Acushnet cites to no expert opinion on this subject.[9]

Based on my review of both the Federal Circuit's opinion and the record, I conclude that the test ball evidence[10] does not represent a re-creation of a single prior

----

[9]Acushnet apparently has performed more tests "that demonstrate the choice of core formulation has virtually no effect on the outer cover Shore D hardness of the ball disclosed by Nesbitt." (D.I. 557 at 16 n.5)  I do not believe that these tests have been vetted through the discovery process.

[10]As I understand it, only BALL_1 and BALL_4 of the test ball evidence were characterized by Acushnet as re-creations of Nesbitt.

9

art reference. While I agree in principle with the proposition that the core formulation may be irrelevant to the Shore D hardness limitations of the Sullivan patents, it is Acushnet's burden to prove this proposition by clear and convincing evidence. Attorney argument and testing that has not been fully vetted through the discovery process is insufficient in this regard. For these reasons, Acushnet's renewed motion for summary judgment on anticipation (D.I. 533)[11] is denied and Callaway's motion in limine to preclude admission of the test ball evidence (D.I. 537) is granted.

## IV. DAMAGES

These are two pending motions related to damages. Acushnet has renewed its motion to preclude the expert testimony of Brian Napper pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Callaway has filed a motion in limine to preclude evidence of Acushnet's latest golf ball offering, the new Pro VI.

With respect to Acushnet's *Daubert* motion, a trial court's gatekeeping role under Rule 702 of the Federal Rules of Evidence is intended to ensure that all "expert testimony is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). A trial judge does so by determining whether: (1) an expert witness is qualified to testify about the subject matter; (2) the methodology the expert uses is reliable; and (3) the opinion fits the facts of the case. *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). I find that Mr. Napper is a "qualified" expert and, therefore, will only address Acushnet's concerns regarding the latter two prongs, which are informed by Federal Circuit case law.

---

[11]The earlier filed motion (D.I. 515) is denied as moot, having been superceded by the revised motion (D.I. 533).

The patent code provides that, upon a finding of infringement of a valid patent, the court shall award to the patentee "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Section 284 instructs that the damages award shall be "in no event less than a reasonable royalty; the purpose of this alternative is not to direct the form of compensation, but to set a floor below which damage awards may not fall." *Rie-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995). If the patentee is in the market with a competing product at any time there are infringing sales, the patentee is entitled to "lost profits as actual damages to the extent they can be proven and a reasonable royalty for the remainder." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989). A patentee who claims lost profits must show: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) capacity to exploit the demand in the absence of the infringing products; and (4) the amount of profit the patentee would have made. *See Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 75 F.2d 1152 (6th Cir. 1978); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d at 1545. In calculating lost profits, absolute certainty is not required; rather, a party must only show with reasonable probability that he would have made additional sales in the absence of the infringing product. *See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353-54 (Fed. Cir. 2001).

Acushnet seeks to disqualify Mr. Napper on three bases: (1) Mr. Napper should have created the "but for" world for lost profits starting at the date of first infringement;

11

(2) the premium ball market (more than $30 per dozen) used by Mr. Napper for his lost profits analysis does not account for what "all Pro VI users [would] play in the absence of that ball" (D.I. 286 at 25); and (3) Mr. Napper's reasonable royalty analysis does not treat as dispositive unconsummated negotiations over the Sullivan patents.[12]

With respect to the first of Acushnet's concerns, Acushnet has argued that Mr. Napper did not appropriately reconstruct the market as it would have developed "absent the infringing product," as required by *Grain Processing Corp. v. American Maize Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999). More specifically, according to Acushnet, Mr. Napper does not assess what Acushnet would have offered in 2001 if the Pro VI were not available, how the market would have responded to these offerings, or what the market might have looked like in 2003 had Acushnet withdrawn the Pro VI from the market.

In claiming lost profits, Callaway must only show with a reasonable probability that it would have made those sales for which lost profits are claimed "but for" Acushnet's infringing Pro VI sales. *Crystal Semiconductor*, 246 F.3d at 1353-43. Although Acushnet's proposal is not inconsistent with this legal framework, it carries with it the risk of recreating a "fantasy" world, not simply a "but for" world.[13] To credibly demonstrate

---

[12]Acushnet has withdrawn this aspect of the motion in the interests of streamlining the proceeding. I will note in this regard, however, that the fact that actual negotiations took place between Acushnet and Callaway at a time when the accused infringer (Acushnet) was challenging infringement and validity of the Sullivan patents certainly is not dispositive of the royalty issue, and has been accorded some weight by Mr. Napper consistent with *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 116 (S.D.N.Y. 1970).

[13]Ironically, Acushnet argues that Mr. Napper's opinions are too speculative.

that Acushnet would have had viable, non-infringing alternatives to offer in 2001 - as well as to predict how the market would have responded to these alternatives by 2003 - is an exercise that may be appropriate, but certainly is not one that is mandatory in light of its speculative nature.[14] Moreover, Mr. Napper has accounted for non-infringing alternatives by allocating market share to Callaway and all other competitors, consistent with *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003).

With respect to the premium market, I have reviewed Mr. Napper's expert report and find his reasoning to be grounded on real world facts and, therefore, acceptable. For any economic hypothesis to account for **all** variables is not possible, let alone required.

Finally, in connection with Acushnet's criticism that Mr. Napper has calculated lost profits on sales by companies that do not own the Sullivan patents, I conclude that where the profits of a wholly-owned subsidiary flow up to the parent, inclusion of such profits is appropriate. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008). Moreover, at least in the context of a reasonable royalty analysis, the Federal Circuit has expressly allowed damages for subsidiaries' sales. *See Union Carbide Chems. &. Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377 (Fed. Cir.

---

[14]In this regard, Callaway has moved to exclude evidence concerning Acushnet's new Pro VI golf balls, offered to the market in 2008. Acushnet argues in response that its new Pro VI balls follow essentially the same formulation as that described in its expert's report as a non-infringing alternative and, therefore, constitutes evidence that is relevant both to commercial success and damages. The problem with such evidence, however, is that it has not been vetted through discovery to allow such issues as the development and formulation of the new Pro VI to be tested. Absent such a foundation, such evidence would be unduly prejudicial. Callaway's motion in limine will be granted in this regard, on the record as I understand it.

2005).

In sum, Acushnet's *Daubert* motion (D.I. 284) is denied, as all of its concerns go to weight, not admissibility, and can be addressed during cross-examination. Callaway's motion in limine to preclude evidence relating to Acushnet's new ProVI golf ball (D.I. 539) is granted.

## V. ACUSHNET'S MOTIONS IN LIMINE

Acushnet has filed two motions in limine. Its motion in limine to exclude "Callaway's improper bolstering" of the validity of the Sullivan patents (D.I. 521) is granted in part and denied in part. In the first instance, Callaway has agreed that it will not reference the fact that three examiners considered the Sullivan patents. Second, no reference to the on-going re-examination proceedings shall be allowed. Third, while it is a fact that all the relevant prior art was identified and before the PTO, Callaway shall not be permitted to speculate as to the extent to which such prior art was actually considered by the examiners (aside from what is specifically disclosed in the prosecution histories).

With respect to Acushnet's second motion in limine, it is undisputed at this juncture that the "Veneer project" was the development effort that led to the ProVI golf ball (a ball that meets all of the limitations of the asserted claims), as well as an invention disclosure form and multiple patent applications and issued patents ("the Hebert patents"). Acushnet has moved to exclude "all evidence and arguments pertaining to the Hebert patents, Acushnet's views on the validity of those patents and the novelty of the Veneer construction, the Hebert Invention Record, and Callaway's license to the Hebert patents." (D.I. 532 at 16)

14

In addressing this motion, I start with the proposition that "[a]ppreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made." *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002); *see also Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143-44 (Fed. Cir. 1985). Consistent with this guidance, the story of the Veneer project (as it relates to the development of the ProVI) is relevant to the issue of obviousness. Moreover, the substance of the inventions discussed in several of the Hebert patents (the '172 and '324 patents) is directly related to Acushnet's analysis of the license Callaway took to these patents.

To exclude the evidence as requested by Acushnet would be to parse the actual story of this dispute with too broad a stroke. However, in recognition of the limited trial time and the risks of satellite litigation over the Hebert patents, I shall require Callaway to notify Acushnet before offering documents and testimony concerning the Hebert patents (not the Veneer project). Any resulting disputes shall be resolved in a focused context. In sum, Acushnet's second motion in limine (D.I. 523) is granted in part and denied in part.

## VI. CONCLUSION

For the reasons stated, Acushnet's renewed motion for summary judgment on anticipation (D.I. 533) is denied, as is its *Daubert* motion (D.I. 284). Acushnet's motions in limine (D.I. 521; D.I. 523) are granted in part and denied in part. Callaway's motions in limine (D.I. 537; D.I. 539) are granted. An order shall follow.

15