IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**REDACTED**

CALLAWAY GOLF COMPANY,

        Plaintiff,

      v.

ACUSHNET COMPANY,

        Defendant.

C. A. No. 06-91 (SLR)

## CALLAWAY GOLF COMPANY'S MOTION FOR A NEW TRIAL AND JUDGMENT AS A MATTER OF LAW

Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

**ATTORNEYS FOR PLAINTIFF
CALLAWAY GOLF COMPANY**

# TABLE OF CONTENTS

PAGE(S)

I.    Nature and Stage of the Proceedings ....................................................1

II.   Summary of the Argument....................................................................2

III.  Factual Background ...............................................................................2

IV.   Legal Standards for Granting a Motion for New Trial .........................4

V.    The Court Has Broad Discretion to Grant a New Trial. ........................5

      A.    Seven Evidentiary and Legal Errors, Caused and Capitalized
            Upon by Acushnet, Warrant a New Trial on Anticipation and
            Obviousness. ...............................................................................5

            1.    Exclusion of the Hebert Patents Allowed Acushnet to
                  Paint a Misleading Picture of the Technological Value
                  of the Sullivan Patents. ...................................................6

            2.    Acushnet's Injection of its Opinions of Counsel on the
                  Last Day of Trial to Improperly Bolster Its Invalidity
                  Case Warrants a New Trial. .........................................19

            3.    Dr. Statz Capitalized on the Exclusion of Nesbitt and
                  Proudfit. ........................................................................23

            4.    Acushnet's Previously Undisclosed Evidence it Sold
                  High Acid ProV1s Led to the Erroneous Admission of
                  its Opinions of Counsel..................................................26

            5.    Acushnet Took Advantage of the Exclusion of Mr.
                  Mickelson's Testimony to Undermine the Technological
                  Value of the Sullivan Inventions..................................28

            6.    An Instruction on the Presumption of Validity Was
                  Appropriate, Especially After Acushnet Speculated
                  About the PTO's Examination.......................................32

            7.    Acushnet Did Not Justify the "Pieces of the Puzzle"
                  Instruction Because All Its Witnesses Testified the Art
                  Was Unpredictable........................................................34

      B.    The Anticipation Verdict Was Against the Great Weight of the
            Evidence......................................................................................35

|   | 1. | Anticipation Requires that a Reference Disclose Each Element as Arranged in the Claims. ...........................................36 |

|   | 2. | Nesbitt/Molitor '637 Does Not Disclose a Relatively Soft Polyurethane Outer Cover with a Shore D Hardness of 64 or Less..............................................................................37 |

|   | 3. | Nesbitt/Molitor '637 at Most Discloses an Overbroad Genus, Which No Reasonable Jury Could Find Sufficient for Anticipation. .........................................41 |

|   | 4. | There Was No Evidence that Nesbitt/Molitor '637 Discloses All Elements Arranged as in the Asserted Claims. ..................................................................................45 |

| C. | | The Obviousness Verdict Was Against the Great Weight of the Evidence..................................................................................47 |

|   | 1. | Golf Ball Design Is an Unpredictable Art....................................49 |

|   | 2. | There Was No Reason to Combine Acushnet's References or to Expect Doing So Would Lead to a Reasonable Chance of Success. ...................................................50 |

|   | 3. | The Objective Criteria Strongly Support a Finding of Non-Obviousness and Greatly Outweigh Acushnet's Evidence..................................................................................54 |

| D. | | A Manifest Injustice Would Result if the Verdict of Anticipation and Obviousness Were Allowed to Stand..........................59 |

| VI. | | Conclusion ..........................................................................................60 |

## TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
    725 F.2d 1350 (Fed. Cir. 1984)..........................................................................33

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
    310 F. Supp. 2d 638 (D. Del. 2004) ....................................................4, 5, 26, 60

*Atofina v. Great Lakes Chem. Corp.,*
    441 F.3d 991 (Fed. Cir. 2006)..................................................................37, 41

*Callaway Golf Co. v. Acushnet Co.,*
    576 F.3d 1331 (Fed. Cir. 2009)....................................................3, 42, 43, 44

*Connell v. Sears, Roebuck & Co.,*
    722 F.2d 1542 (Fed. Cir. 1983)..........................................................................49

*Crown Operations Intern., Ltd. v. Solutia, Inc.,*
    289 F.3d 1367 (Fed. Cir. 2002)..........................................................................40

*Ecolochem, Inc. v. Southern California Edison Co.,*
    227 F.3d 1361 (Fed. Cir. 2000)..........................................................................45

*Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.,*
    471 F.3d 1369 (Fed. Cir. 2006)..........................................................................42

*Fineman v. Armstrong World Indus.,*
    980 F.2d 171 (3d Cir. 1992)...................................................................4, 5, 47

*Goodman v. Pennsylvania Turnpike Com'n,*
    293 F.3d 655 (3d Cir. 2002).................................................................................4

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)................................................................................................47

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
    909 F.2d 1464 (Fed. Cir. 1990)..........................................................................47

*Impax Labs. v. Aventis Pharms., Inc.,*
    468 F.3d 1366 (Fed. Cir. 2006)..........................................................................41

*In re Arkley,*
    455 F.2d 586 (C.C.P.A. 1972) ...........................................................................46

## TABLE OF AUTHORITIES (CONT'D)

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009) ................................................................................... 45

*In re Petering*,
    301 F.2d 676 (C.C.P.A. 1962) ..................................................................................... 44

*In re Ruschig*,
    343 F.2d 965 (C.C.P.A. 1965) ............................................................................... 42, 44

*In re Schaumann*,
    572 F.2d 312 (C.C.P.A. 1978) ..................................................................................... 44

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985) ............................................................................... 7, 23

*J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ................................................................................... 55

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ............................................................................................ passim

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*,
    730 F.2d 1452 (Fed. Cir. 1984) ............................................................................... 46, 58

*Minn. Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992) ................................................................................... 54

*Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*,
    139 F.3d 877 (Fed. Cir. 1998) ..................................................................................... 47

*Motorola, Inc. v. Interdigital Technology Corp.*,
    121 F.3d 1461 (Fed. Cir. 1997) ................................................................................... 39

*NetMoneyIN, Inc. v. Verisign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ............................................................................... 37, 45

*Perricone v. Medicis Pharm. Corp.*,
    432 F.3d 1368 (Fed. Cir. 2005) ................................................................................... 45

*Quinn v. Consol. Freightways Corp.*,
    283 F.3d 572 (3d Cir. 2002) ........................................................................................ 28

*Respironics, Inc. v. Invacare Corp.*,
    303 Fed. Appx. 865 (Fed. Cir. 2008) .......................................................................... 21

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991) ................................................................................... 37

## TABLE OF AUTHORTIES (CONT'D)

*Siemens Med. Solns. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,*
   615 F. Supp. 2d 304 (D. Del. 2009) ........................................................................4

*Spectralytics, Inc. v. Cordis Corp.,*
   650 F. Supp. 2d 900 (D. Minn. 2009) ....................................................................21

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,*
   492 F.3d 1350 (Fed. Cir. 2007) ........................................................................50, 52

*Therasense, Inc. v. Becton, Dickenson & Co.,*
   593 F.3d 1325 (Fed. Cir. 2010) ............................................................................36

*Trintec Indus., Inc. v. Top-U.S.A. Corp.,*
   295 F.3d 1292 (Fed. Cir. 2002) ............................................................................36

*Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.,*
   278 F.3d 1366 (Fed. Cir. 2002) ........................................................................7, 23

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.,*
   721 F.2d 1540 (Fed. Cir. 1983) ........................................................................30, 54

*WMS Gaming Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1999) ............................................................................57

### STATUTES

35 U.S.C. § 102 ........................................................................................37, 44

### OTHER AUTHORITIES

Federal Rule of Evidence 402 ........................................................................5, 22

Federal Rule of Evidence 403 ....................................................................5, 18, 22

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Acushnet stayed silent when the first jury returned a partially inconsistent verdict, instead of joining Callaway Golf's effort to help the Court remedy the situation.  That strategic decision has, for the moment, paid off.  Without the hook of the inconsistent verdict—on one claim of nine—Acushnet would not have gotten a second trial on obviousness, because the Federal Circuit otherwise affirmed the first jury's rejection of that defense.  Acushnet took full advantage of its second chance, this time with a retooled strategy.  As its counsel told the press, the first trial "made it easier to prepare and told me what issues we needed to pre-empt and what weaknesses to focus on."  (Halkowski Decl., Ex. A.)  This time, Acushnet decided to avoid the "traditional technical approach to the case" that led to its initial defeat.  (*Id.*)  Acushnet executed this strategy by urging and capitalizing on a number of errors that allowed it to spin a story touting its other "patented" technology, while never confronting its own Hebert/Morgan patents, which (a) covered the Sullivan technology but were filed two years *after* Sullivan's patents, (b) were deemed novel and non-obvious by Acushnet itself and the PTO despite the very prior art Acushnet now relies upon, and (c) were used to extract a significant royalty from Callaway Golf.  As a result, Acushnet presented a distorted and unbalanced picture to the jury and obtained a verdict against the great weight of the evidence.  The anticipation verdict, which lacks any factual support, leaves little doubt that Acushnet's exploitation of the Court's rulings enticed the jury to decide the case on a basis other than the evidence.

While respectfully requesting a new trial on anticipation and obviousness, Callaway Golf is very mindful of the burden that would fall upon the Court and a new jury from an Order granting a new trial.  Nonetheless, the Court should not permit the manifest injustice that would result from allowing Acushnet to use its studied silence after the first trial, and its exploitation of evidentiary rulings in this one, to present a view of the facts divorced from reality.

1

## II.    SUMMARY OF THE ARGUMENT

1.    Callaway Golf respectfully requests a new trial on the basis of seven prejudicial evidentiary and legal errors triggered and exploited by Acushnet, all but one of which were absent from the first trial.  Each error, either alone or when combined with the others, warrants the Court exercising its broad discretion to grant a new trial on all issues.

2.    Callaway Golf also respectfully requests a new trial because the verdict was against the great weight of the evidence and would result in a manifest injustice.  The anticipation verdict was critically deficient in at least three respects, and the jury's finding of anticipation necessarily infected its finding of obviousness.

## III.   FACTUAL BACKGROUND

The four patents-in-suit cover a ball that combines long distance off the tee with good feel, spin, and control for approach shots to the green— the "Holy Grail" of golf ball design that the industry had sought since at least the 1970s.  (PX-3 at 3:21-28, 4:6-14.)  The designers of Acushnet's key prior art—Nesbitt and Molitor—each claimed to have solved the problem, as had many others, but to no avail.  (DX-12 at 2:34-46; DX-9 at 1:35-44.)  Even Acushnet's own expert, Dr. Robert Statz, unsuccessfully pursued the Holy Grail.  (Tr. at 628:23-630:1, 637:13-16.)[1]  The Sullivan invention, embodied in Callaway Golf's Rule 35 and Acushnet's ProV1 families of balls, finally solved the problem that no one else could.

The asserted claims concern a multi-layer golf ball with a core, an inner cover layer comprising a low-acid ionomer or blend of low-acid ionomers (two claims require a blend, two do not), an outer cover layer comprising polyurethane, and various thickness and hardness requirements for the covers.  Claim 1 of the U.S. Patent No. 6,210,293 patent is representative:

1. A golf ball comprising:

---

[1] Citations to "Tr." refer to the trial transcript, the docket numbers of which are not yet available.

> a core;
>
> an inner cover layer having a Shore D hardness of 60 or more molded on said core, said inner cover layer having a thickness of 0.100 to 0.010 inches, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and
>
> an outer cover layer having a Shore D hardness of 64 or less molded on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a relatively soft polyurethane material.

(PX-3 at 23:48-61.) The other asserted claims—U.S. Patent Nos. 6,503,156 (claim 1); 6,506,130 (claim 5); and 6,595,873 (claim 3)—vary slightly and do not raise any materially different validity issues. (PX-1 at 22:47-58; PX-2 at 23:9-21; PX-4 at 24:24-38.) On the eve of the first trial, Acushnet stipulated its ProV1 family infringes the patents-in-suit. (D.I. 367.)

At the first trial, Callaway Golf asserted each of the claims tried in the second trial. The first jury concluded that each of these claims was non-obvious. (D.I. 399.) The Federal Circuit found that substantial evidence supported that verdict and affirmed certain evidentiary rulings, but revived Acushnet's anticipation defense and granted a new trial on obviousness only because of an inconsistent verdict on one claim. *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1338-43 (Fed. Cir. 2009). Acushnet did not appeal this Court's admission, in the first trial, of the Hebert/Morgan '172 patent or the Nesbitt and Proudfit testimony.

At the second trial, Acushnet argued anticipation by Patent No. 4,431,193 to Nesbitt and the portions of Patent No. 4,274,637 to Molitor that the Federal Circuit held to be incorporated by reference. (Tr. at 556:13-20.) Acushnet also argued the asserted claims were obvious based on: (1) Nesbitt in view of Molitor '637, (2) Patent No. 4,674,751 to Molitor in view of Nesbitt, (3) Molitor '751 in view of Patent No. 5,314,187 to Proudfit, (4) Molitor '751 in view of the Wilson Ultra Tour Balata—which Acushnet says embodies Proudfit, and (5) the Ultra Tour Balata in view of the Titleist Professional—which Acushnet says embodies Patent No. 5,334,673

to Wu. (Tr. at 575:1-576:4.)  Unlike the first jury, which also considered these references, this

jury—lacking all the relevant evidence—found the claims anticipated and obvious. (D.I. 608.)

## IV.   LEGAL STANDARDS FOR GRANTING A MOTION FOR NEW TRIAL

"The decision to grant or deny a new trial is within the sound discretion of the trial court

and, unlike the standard for determining judgment as a matter of law, the court need not view the

evidence in the light most favorable to the verdict winner." *Siemens Med. Solns. USA, Inc. v.

Saint-Gobain Ceramics & Plastics, Inc.*, 615 F. Supp. 2d 304, 310 (D. Del. 2009). "A motion

for a new trial should be granted where substantial errors occurred in admission or rejection of

evidence." *Goodman v. Pennsylvania Turnpike Com'n*, 293 F.3d 655, 676 (3d Cir. 2002). "A

court's inquiry in evaluating a motion for a new trial on the basis of trial error is, therefore,

twofold:  (1) whether an error was in fact committed, and (2) whether that error was so

prejudicial that denial of a new trial would be inconsistent with substantial justice.  With respect

to the second prong of this two-part test, a new trial must be granted unless it is highly probable

that [the erroneous ruling] did not affect the [objecting party's] substantial rights." *Arthrocare

Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 666-67 (D. Del. 2004) (internal cites

omitted), *vacated in part on other grounds*, 406 F.3d 1365 (Fed. Cir. 2005).

Alternatively, new trials are "commonly granted" when "the jury's verdict is against the

clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice"

or "improper conduct by an attorney . . . unfairly influenced the verdict." *Id.* at 653.  A new trial

can be granted even if the evidence presents a number of inferences supporting the verdict and

JMOL would be impossible. *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 211 (3d Cir.

1992).  Although the Court must take care not to substitute its judgment for the jury's,

> Where a trial is long and complicated and deals with a subject matter not lying within the
> ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial
> judge than is necessary where the litigation deals with material which is familiar and

4

simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action.

*Id.* (quoting *Lind v. Schenley Indus.*, 278 F.2d 79, 90-91 (3d Cir.1960).)

## V.     THE COURT HAS BROAD DISCRETION TO GRANT A NEW TRIAL.

The total absence of evidence regarding anticipation raises serious questions regarding the jury's verdict, especially given the errors Acushnet urged and exploited to present a distorted view of the prior art, the technological value of the Sullivan patents, and the ProV1's development. As unpalatable as the possibility of another trial might seem, letting this verdict stand is worse. Callaway Golf respectfully asks the Court to exercise its broad discretion to grant a new trial (1) to remedy the errors triggered by Acushnet, and (2) because the verdict is against the great weight of the evidence and would result in a manifest injustice.

### A.     Seven Evidentiary and Legal Errors, Caused and Capitalized Upon by Acushnet, Warrant a New Trial on Anticipation and Obviousness.

The four evidentiary rulings discussed below were erroneous under Rules 402 and 403. Acushnet's improper introduction of a fifth piece of evidence was at odds with its discovery responses and the Court's *in limine* order. The two additional points regarding jury instructions allowed Acushnet to take full advantage of the other improprieties. Each point applies to both anticipation and obviousness, and each was prejudicial because it is not "highly probable that [it] did not affect [Callaway Golf's] substantial rights." *Arthrocare*, 310 F. Supp. 2d at 666-67. Indeed, the errors' prejudicial impact is apparent because all but one was not made in the first trial and the result here was different. Therefore, Callaway Golf believes any one of these errors justifies a new trial. Taken together, they created a far different picture for this jury than the prior one. Yet, after the last trial, Acushnet did not even appeal the admission of the Hebert patents and the Proudfit and Nesbitt testimony, or the presumption of validity instruction, despite

appealing other evidentiary rulings.  Therefore, in addition to the errors themselves, it is

fundamentally unfair that Acushnet won the chance to persuade the Court to alter these rulings

by shielding them from Federal Circuit review.[2]

### 1.   Exclusion of the Hebert Patents Allowed Acushnet to Paint a Misleading Picture of the Technological Value of the Sullivan Patents.

Acushnet's Ed Hebert, Bill Morgan, and Dean Snell obtained patents that cover

technology nearly identical to the asserted Sullivan patents.  For example, their '172 patent, filed

in May 1997, discloses the concept of a three-piece golf ball with a core, a stiff, hard inner cover

layer, and a soft, thin outer cover layer that preferably includes cast polyurethane.  (D.I. 523, Ex.

2.)  The Hebert specification, like the Sullivan patents, showed that those skilled in the art

around the relevant time period—including Acushnet's own technical personnel—knew the prior

art generally presented a choice between (1) two-piece balls that provide durability and distance

and (2) wound balls that provide more desirable spin properties.  (*Id.* at 1:17-2:4.)  It references

several three-piece golf balls that were intended to optimize distance, durability, and spin—

including the Wilson Ultra Tour Balata, and those covered by Nesbitt and Proudfit—but explains

that none of this prior art "provide[s] golf balls exhibiting a 'progressive performance' such as

those golf balls of the present invention."  (*Id.* at 2:24-34, 3:6-17, 3:38-42.)  The Hebert

specification attributes this enhanced performance to a multi-layer construction with a thin cast

outer cover layer that preferably includes polyurethane.  (*Id.* at 3:38-42, 4:63-5:9.)  The various

Hebert patent figures and claims extensively overlap with the asserted claims of the Sullivan

patents.  They show an ionomer inner cover layer with a Shore D, flexural modulus, and

---

[2] Indeed, Acushnet should have been barred from raising those objections at all under the
mandate rule.  *See, e.g., Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008)
("[T]he mandate rule precludes reconsideration of *any issue* within the scope of the judgment
appealed from-not merely those issues actually raised.").

thickness within the Sullivan claims, and an outer cover layer, preferably comprising polyurethane, with a hardness and thickness within the Sullivan claims. (*Id.* at Fig. 1, claims 1-3, 6-8, 11, 15.) Another Hebert patent (the '324) includes everything from the '172 specification, adds more detail about the polyurethane cover, and has *broader* claims. (D.I. 553-2 at 8:30-9:3.)

The Hebert patents and their disclosures were highly relevant to many issues at trial. First, they show that Acushnet's own technical personnel, including Messrs. Hebert and Morgan, believed in 1997 that a concept nearly identical to that claimed two years earlier in the Sullivan applications was novel and non-obvious despite the very prior art Acushnet relied upon at trial—*i.e.*, Nesbitt, Proudfit, the Ultra Tour Balata, and Wu. This bears on both anticipation and obviousness. Such contemporaneous evidence is critical to avoid the trap of hindsight—especially because it shows what Acushnet considered novel two years *after* the Sullivan 1995 priority date. *See Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) ("Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made."); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143-44 (Fed. Cir. 1985) ("Recognizing the difficulty of casting one's mind back to the state of technology at the time the invention was made, courts have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention. A retrospective view of the invention is best gleaned from those who were there at the time.").

The Hebert patents were especially important in this case because Acushnet's main obviousness argument was that one of ordinary skill in 1995 would have thought it obvious to put the polyurethane cover from two-piece or wound ball technology on a three-piece ball, and adjust the resulting thicknesses and hardnesses to fall within the claims. But this was nearly the same concept its own engineers patented in 1997 and that it characterized as "pioneering" when

it launched the ProV1 years later. (PX-955; Tr. at 355:17-356:11 (Morgan).) Indeed, the Hebert patents specifically discuss the use of the then-known Wu polyurethane as the outer cover layer of a multi-layer golf ball, but nevertheless claim a new invention that "is not limited to the use of these techniques [in the Wu patent]." (D.I. 523, Ex. 2 at 8:7-23.) Acushnet's assertion in the Hebert patents that use of known polyurethane on a dual-covered ball was patentable was directly contrary to Acushnet's mantra at trial that the Sullivan patents were nothing special because polyurethane (including the Wu polyurethane) was already well-known. The Hebert patents also expressly distinguish the Nesbitt patent, which Acushnet now says anticipates the Sullivan patents.

Second, the absence of the Hebert/Morgan patents severely restricted Callaway Golf's ability to rebut the testimony of Acushnet's witnesses, such as Mr. Morgan, who dismissed the "pioneering" nature of Sullivan's invention, even though it was earlier than and nearly identical to his own patent. (PX-955; Tr. at 355:17-356:11.) Mr. Morgan also claimed he was "astounded" at the patents Sullivan could obtain. (Tr. at 330:17-331:2.) Yet he never had to face his own broader patents, allowed over the same prior art, on cross-examination. The Hebert patents' absence also permitted Acushnet to emphasize that the PTO did not consider the Ultra Tour Balata during prosecution of the Sullivan patents, (Tr. at 196:25-197:5; 1421:17-1422:6), even though the Hebert patents cite the UTB and were still allowed. (D.I. 523, Ex. 2 at 2:34-35, 3:38-42.)

Third, the absence of the Hebert patents facilitated Acushnet's efforts to emphasize its own "patented" prior technology at the expense of the Sullivan invention. For example, Acushnet devoted much of its case to suggesting the ProV1 was a "culmination of many technologies invented by Acushnet," (Tr. at 175:6-7), created by taking "the best of the best from our shelf of golf ball technology" (Tr. at 177:17-20), rather than acknowledging the ProV1's

8

performance was due, at least in part, to Sullivan's patented invention.  (Tr. at 184:1-3 (opening);

1463:8-17, 1409:20-1410:19 (closing); 281:20-282:19, 300:15-301:14, 318:14-18 (Morgan);

PTX-973; 750:24-751:15 (Bellis); Halkowski Decl., Ex. B.)  Acushnet even claimed "the patents

in this case have ***nothing to do with the success of the Pro V1***." (Tr. at 178:10-16.)

     Instead, Acushnet repeatedly attributed the ProV1's performance to everything but the

Sullivan/Hebert patents, including:

- o  Acushnet's "super-duper"[3] Wu polyurethane, and the casting process for applying it.  (Tr. at 162:16-163:4, 169:19-170:4, 174:24-175:14, 191:24-192:5 (opening); 1410:11-1411:2, 1463:13-14 (closing); 267:17-268:14, 272:23-274:9, 279:11-17, 280:14-281:5, 282:4-15, 301:4-7, 315:17-23, 316:9-317:19, 318:11-13, 372:18-373:6 (Morgan); 390:22-393:7, 400:21-401:2 (Dalton); 751:23-752:2 (Bellis).)

- o  Acushnet's "large" and "unusual" core for the ProV1, which originated from the earlier Titleist HVC product.  (Tr. at 161:14-162:7, 190:20-25 (opening); 1410:8-9, 1463:13 (closing); 258:9-259:10, 278:22-279:2, 279:18-280:6, 282:4-10, 300:15-22, 305:24-306:3, 314:24-315:14, 318:2-7, 322:1-13 (Morgan); 383:16-18, 391:11-13, 396:11-398:23, 407:18-23 (Dalton); 751:2-8 (Bellis).)

- o  Acushnet's corona process for treating the ionomer inner cover layer.  (Tr. at 163:5-11, 166:18-167:9, 176:4-13, 198:8-9 (opening); 1410:10-11, 1463:14-15 (closing); 274:10-16, 280:7-13, 288:3-291:16, 296:4-300:12, 301:8-10 (Morgan); 383:21-384:4, 384:11-390:25, 399:23-400:20, 409:12-22 (Dalton).)

- o  Acushnet's 392-dimple design.  (Tr. at 167:14-20, 172:3-15, 198:10 (opening); 1411:3-4, 1463:15-16 (closing); 279:5-10, 301:11-14 (Morgan); 383:24-384:1, 395:8-11, 406:23-407:3, 408:2-6 (Dalton).)

Both Acushnet's opening statement and Mr. Bellis's testimony also stressed that Acushnet held

***patents*** on these technologies.  (Tr. at 168:25-169:4, 175:3-14, 198:9-10 (opening); 734:9-12,

751:12-15 (Bellis).)  At the time, the Court expressed concern that Acushnet's repeated

references to its "patented" technology may have been misleading the jury:

    I guess my concern is – well, my concern is, ***we're not telling the jury the whole story***. But my greater concern is, is that your president of the company got up here on the stand,

---

[3] Acushnet's opening claimed Callaway Golf, apparently so impressed by the Wu polyurethane, referred to it as the "super-duper" polyurethane.  (Tr. at 162:21-24.)  No such evidence was ***ever*** presented to the jury.

and very proudly mentioned on multiple occasions *that your products are patented*. They're terrific. And how you use that is of concern to me because at this point, you know and I know, but *the jury does not know that what patented could include and we're not telling them*.

(Tr. at 1027:1-9; *see also* 754:17-24.) A prime example of the jury's incomplete view of the evidence came when Callaway Golf was forced to redact Mr. Morgan's presentation directly tying the ProV1 to the Hebert '172 patent, as shown below. (Tr. at 1171:8-1172:6 (Napper); PX-583 at AC80.UR.)



The prejudicial effect of this slanted view of the value of Sullivan's technology was enormous. Acushnet repeatedly disparaged the Sullivan patents because they allegedly do not discuss other technology incorporated into the ProV1. According to Acushnet, "[t]he patents don't give you the five things you really need to know in order to make these products. Are they truly innovative?" (Tr. at 1419:12-14, 1411:5-8 (closing); 198:11-16 (opening); 327:12-24 (Morgan); 615:21-617:24 (Statz).) Acushnet leveraged this testimony and argument by having Mr. Morgan agree that the distance and feel characteristics of the ProV1 "have nothing to do" with the Sullivan patents. (Tr. at 321:19-24, 322:11-13.) And it delivered the punch-line in closing, with an improper and thinly veiled reference to injunctive relief, inviting the jury to invalidate the patents so Acushnet could continue making the ProV1: "That's our invention, and we ought to be able to use it. Okay? That's our invention." (Tr. at 1411:1-2.) Indeed,

following a deposition excerpt from Mr. Hebert, Acushnet counsel's last words to the jury were: "We did that, not them.  We did that.  The people at Acushnet, the 2,000-plus employees at Acushnet, they deserve your support."  (Tr. at 1474:15-17.)  Mr. Hebert's deposition testimony, and counsel's argument following it, would have looked quite different to the jury had it known that Mr. Hebert obtained patents on nearly the same technology as Sullivan—two years *after* Sullivan—and that Acushnet had proudly recognized those patents' contribution to the Pro V1 by directly linking them to the ProV1's "progressive performance."

This Court also knows that Acushnet not only received the patents, it forced Callaway Golf to license them for $10.5 million at the very inception of its entry into the golf ball business. Although the Hebert license was admitted, it was of no use without the patents to explain it.  The net result was that Acushnet argued Callaway Golf bought the Sullivan patents at a fire-sale price and set about harassing Acushnet rather than competing in the marketplace.  (Tr. at 1467:17-1468:6.)  In fact, Acushnet first approached Callaway Golf, with patents on essentially the same technology.  The jury was entitled to hear the whole story on this issue.

Fourth, the importance of the Hebert patents was further increased after Acushnet's damages expert volunteered on the last day of trial that Acushnet believed the patents were invalid due to its "lawyers' opinions."  (Tr. at 1332:5-10.)  Mr. Nauman subsequently testified that Acushnet believed the patents were invalid based on those opinions.  (Tr. at 1374:23-1377:13.)  The propriety of permitting testimony on the opinions is discussed separately below. But when that testimony was coupled with the exclusion of the Hebert patents, it created the misleading impression that Acushnet *never* believed the Sullivan concept was patentable, when Acushnet's own golf ball developers—including Messrs. Hebert and Morgan—obtained two patents on nearly the same thing after Mr. Sullivan.  The opinion testimony would have looked quite different had the jury known that (1) Mr. Nauman's own department reviewed and

11

approved the Hebert/Morgan invention disclosure, (2) Acushnet sought and received patents based on it, while aware of the same prior art used in the opinions, and (3) Mr. Nauman extracted a license for those patents. Likewise, the exclusion of the Hebert patents permitted Mr. Dalton to claim he immediately thought the Sullivan patents were invalid when he saw them. (Tr. at 427:13-428:5.) This left the jury with the erroneous view that all Acushnet's designers thought the Sullivan concept was unpatentable when, in fact, exactly the opposite was true.

Fifth, the Hebert patents were necessary to correct misimpressions regarding the ProV1 invention story. Acushnet led Mr. Morgan through the invention disclosure form that led to the Hebert patents, (Tr. at 282:23-283:6), but Callaway Golf could not cross-examine him regarding whether the invention disclosure led to a patent. (Tr. at 350:7-13.) As a result, the jury was left with the mistaken and unfairly prejudicial inference that Acushnet (or the PTO) concluded the idea was unpatentable and never followed through by filing a patent application. This would be a natural inference for this jury because it heard Acushnet tout its other "patented" technologies, while describing its invalidity opinions for the Sullivan patents.[4] In addition, the Hebert patents would have undermined Acushnet's argument that Dr. Wu and Mr. Harris invented the ProV1 in 1995, before Sullivan. (Tr. at 280:23-283:6 (Morgan); 176:14-21 (opening); 1406:17-25, 1472:8-15 (closing); DX-830; Halkowski Decl., Ex. B.) The Hebert patents establish the ProV1 concept was developed separately from any earlier alleged work because they do not name either Dr. Wu or Mr. Harris as inventors.

Sixth, because the PTO separately issued Acushnet patents on the very same concept, the Hebert patents would have rebutted Acushnet's claim that an overworked or incompetent examiner granted the Sullivan patents by mistake.

The error invited by Acushnet was real, as shown by the following examples of specific

testimony and argument that Callaway Golf could have challenged with the Hebert patents.

| Acushnet Testimony/Argument to Impeach | Probative Value of Hebert Patents |
|---|---|
| **1. Unsolicited testimony from Mr. Bellis that Acushnet's "patented" technology was responsible for the ProV1's performance:**<br><br>Q. So you would agree with me that one of the factors for the Pro V1's success was that it has superior technology that delivers superior performance; true?<br><br>A. Yes.  We believe that it includes Titleist *patented* technology that was superior to anything else out there, that made it different and better than other balls and delivered superior performance.<br>(Tr. at 734:6-12 (Bellis).)<br>             * * *<br>Q. Does Titleist use a very large solid core measuring 1.550 in diameter?<br><br>A. Yes, we did, on the original Pro V1.<br><br>Q. Is that core larger than that of competitors and gives the Pro V1 a bigger engine for more power and good feel?<br><br>A. Yes, it does.<br><br>Q. Are you able to achieve that large core because of your manufacturing skill and applying a very thin casing layer and very thin cast urethane elastomer coat?<br><br>A. Yes.  Those are *patented* Titleist technologies.<br><br>(Tr. at 751:2-15, objections omitted (Bellis).) | Admission of the Hebert patents was necessary to impeach the misleading suggestion that everything about the ProV1—i.e., the Wu polyurethane, corona process, and core—was patented except the fundamental construction covered by the Sullivan patents.  Without the Hebert patents, the jury was left with the impression that all the constituents of the Pro V1 were novel and non-obvious, but that the combination of a known polyurethane and a three-piece golf ball—the subject of claims in both the Hebert and Sullivan patents— was not.  The jury was also effectively forced into concluding the success of the ProV1 was due to something other than its construction because it would have erroneously assumed that, if the construction was important, Acushnet surely would have patented it, as it did all of the other technology in the ProV1.<br><br>Also, because the Hebert patents were frequently highlighted in Acushnet's documents as the patents that protected the ProV1 technology, Callaway Golf was prevented from telling its side of the story. |
| **2. Attorney argument and testimony from Mr. Dalton that the patented Wu polyurethane was the reason for the ProV1's performance:**<br><br>Mr. Bunsow:  That's accomplished by the Wu polyurethane, the *patented* polyurethane that Acushnet | The Hebert patents would have shown that Acushnet patented not just the Wu polyurethane but the basic construction of the ProV1, just as claimed in the Sullivan patents.  In addition, the Hebert patents discuss |

---

[4] No one, including Mr. Morgan, testified at trial and Acushnet's counsel never even argued that the concept for which Mr. Morgan and Mr. Hebert filled out an invention disclosure was any different from the Sullivan invention.

| | |
|---|---|
| used on its professional ball and uses on the Pro V1. The Pro V1 is the culmination of many technologies all *invented by* Acushnet, all went into this ball, and we're very proud of it. This is Shenshen Wu, the *inventor* of the Wu polyurethane that is used for the cover of the Pro V1. . . . And this is the *patent* that Dr. Wu was granted on her invention for the formulation of polyurethane that is used on the Pro V1.<br>(Tr. at 175:3-14 (opening).)<br><div align="center">* * *</div>Q. Do you recognize this patent, sir?<br><br>A. Yes. Yes, sir. It's entitled, polyurethane golf ball, and the inventor is Shenshen Wu.<br><br>Q. And is this the polyurethane that's used on the Pro V1?<br><br>A. Yes, it is.<br>(Tr. at 391:25-392:5 (Dalton).) | the Wu patent and explain that their invention is different. Cross-examination would have undermined Acushnet's suggestion that it was obvious to put the patented Wu polyurethane on a three-piece ball. |
| **3. Mr. Morgan's testimony that the ProV1's performance is unrelated to the Sullivan patents:**<br><br>Q. Do the distance characteristics of the ProV1 ball have anything to do with the patents in this case?<br><br>A. No.<br><br>Q. Do the feel characteristics of the ProV1 ball have anything to do with the patents in this case?<br><br>A. No.<br>(Tr. at 321:19-24 (Morgan).) | The Hebert patents teach that the Sullivan construction—a three-piece ball with a hard, stiff inner cover layer, and a soft outer cover layer preferably of polyurethane—is responsible for "progressive performance" that optimizes distance, spin, and feel, unlike prior art such as Nesbitt, Proudfit, the Ultra Tour Balata, and Wu. Also, Mr. Morgan's own documents explicitly link the performance of the ProV1 to the Hebert patents. (*E.g.*, PX-583.) |
| **4. Mr. Morgan's pleas of ignorance regarding whether the Sullivan/Hebert technology was "pioneering":**<br><br>Q. The press release [PX-955] goes on to say, this golf ball represents a pioneering effort in combining solid large core, multi-component and high performance urethane elastomer cover technology. Right?<br><br>A. Yes.<br><br>Q. Pioneering?<br><br>A. Yes.<br><br>Q. And, in fact, that phrase appears in quite a few | The Hebert patents cover the same construction as the Sullivan patents, and Acushnet convinced the PTO they were novel and non-obvious. Had the Hebert patents been admitted, Mr. Morgan could not have dismissed them—including their enforcement against a competitor—as mere "marketing documents" or quibbled over the definition of "pioneering," as he did to explain away the press release. They were his own patents. |

| | |
|---|---|
| Acushnet documents marketing the golf ball, doesn't it? | |
| A. In a few marketing documents, yes. | |
| Q. You didn't disagree with that, did you, at the time? | |
| A. You know, we had talked about colorful language earlier this morning or this afternoon, and I guess that's an example of that as well. | |
| Q. Colorful. Is that true? | |
| A. Pioneering? I'm not even sure I know what that means in this context.<br>(Tr. at 355:17-356:11 (Morgan).) | |
| **5. Mr. Dalton's claim that he believed the '293 patent was invalid from the day it issued:**<br><br>Q. So the top, the title of this memo [PX-556] is possible prior art. Do you see that?<br><br>A. Yes.<br><br>Q. And what were you discussing in this memo?<br><br>A. Well, they were examples that I found in other patents that I thought possibly might be prior art to the '293 patent.<br><br>Q. Okay. What was your initial reaction when you read that '293 patent and did this research?<br><br>A. Well, I saw the '293 patent again on the day it issued and I looked at it and I said, you know, I know I – I know I've seen prior art for this thing, prior art being examples of something that show that the invention had not been made in the patent, but actually before the patent by somebody else. So I looked at that and said, I know I've seen – seen this before.<br>(Tr. at 427:5-21 (Dalton).) | The Hebert patents show that Acushnet's other engineers and two of its trial witnesses—Messrs. Morgan and Hebert—believed that nearly the same concept claimed in the '293 patent was patentable despite the prior art.<br><br>Indeed, the Hebert patents would have shown that Mr. Dalton *had* seen this before—in the Hebert patents, not the prior art. Without the admission of the Hebert patents, the jury was left with the erroneous impression that *everyone* in Acushnet's R&D department, where Messrs. Morgan, Hebert and Dalton all worked together, thought the Sullivan concept was unpatentable. |
| **6. Mr. Nauman's testimony that all Acushnet's in-house technical personnel and lawyers, and outside counsel, believed the Sullivan patents were invalid:**<br><br>Q. Now, did you at some point become aware that the '293 patent had issued, the one that's I this case? | As with the last example, admission of the Hebert patents would cure the misleading impression that everyone at Acushnet who considered the Sullivan concept—including Acushnet's technical personnel and |

15

| | in-house patent lawyers—concluded that Acushnet's technical personnel and in-house lawyers obtained patents on the same subject matter and forced Callaway Golf to license them. |
|---|---|
| Q. And what did you do when you learned about that?<br><br>A. At some point shortly after seeing – the patent attorneys in our company always look at new patents as they issue as well as some of the other people in our R&D group. I think they saw that that patent, the '293 patent issued on April 3rd of 2001, and they reviewed that patent and made some conclusions about that patent.<br><div align="center">* * *</div>Q. And what were those conclusions?<br><br>A. The conclusion was that the patent, the '293 patent was invalid over the prior art.<br><div align="center">* * *</div>Q. Now, in addition to receiving a review and input from your own legal staff, did you go outside the corporation to seek a further review?<br><br>A. Yes, we did.<br><br>Q. And what did you do?<br><br>A. We had an outside law firm that was doing our outside patent work at that time. We went to them and asked them for their views with respect to the validity of the '293 patent.<br><div align="center">* * *</div>Q. Did you get a response from your outside counsel telling you their view on the '293 patent?<br><br>A. Yes, we did.<br><br>Q. And what was that?<br><br>A. Their view, they agreed with our internal assessment, that the '293 patent was invalid.<br>(Tr. at 1375:6-1377:13 (Nauman).) | |
| **7. Mr. Morgan's testimony that he was "astounded" the asserted claims got through the PTO:**<br><br>Q. What do you mean when you wrote, no one uses the Patent Office as well as Mike?<br><br>A. We had – we had seen patents granted to Spalding | The Hebert patents would have shown that Mr. Morgan could not have honestly thought the Sullivan patents-in-suit were an example of an "astounding" concept Sullivan was able to patent, because Mr. Morgan obtained his own patent on the same |

<div align="center">16</div>

| | |
|---|---|
| over the years with Mike listed as either the sole inventor or one of the inventors, and they had gotten a lot of patents, and, frankly, a number of them, we read them. We were **astounded**. We **couldn't believe that a patent would be granted for such a thing**, and it clearly indicated to me that maybe Mike just knows something we didn't know and was able to get patents through the Patent Office better than we were. (Tr. at 330:17-331:2 (Morgan).) | concept but filed it nearly two years after Sullivan. The concept was patentable, but Acushnet was second, not first. |
| **8. Acushnet's misleading story that it invented the ProV1 in 1995, before Sullivan.**<br><br>Mr. Bunsow: Acushnet invented the Pro V1 start[ing] in 1995. This is a memo from April of 1995 in which prototypes are being made. You will see that it's referred to as the Veneer Project in these documents. And, interestingly, April of 1995 is before the effective filing date of any of the Spalding parents in this case that we're accused of infringing. We were making this before those patents are entitled to a filing date. (Tr. at 176:14-21 (opening).)<br><div align="center">* * *</div>Mr. Bunsow: Acushnet invented the Pro V1 they made samples of the Pro V1 in 1985 [sic: 1995], before samples were made by Mr. Sullivan at Spalding. It wasn't until September of 1995 that Mr. Binette made those samples at Spalding. (Tr. at 1406:18-21 (closing).)<br><div align="center">* * *</div>Mr. Bunsow: We did it starting in 1995. And, you know, this is why documents are so important. We're a lot of years later. But this is an Acushnet documents in 1995 and there is no question that these are early prototypes of the Veneer concept. It's April 1995. It's five months before Mr. Sullivan and his tech did their work. Nobody is contesting the authenticity of this document. It speaks for itself. (Tr. at 1472:8-15 (closing).) | The Hebert patents would have shown that the Veneer concept that led to the ProV1 was separate from the earlier work of Wu and Harris that Acushnet relied upon for its 1995 invention story because Wu and Harris are not named as inventors on the Hebert patents. And, in fact, the Hebert patent says its invention "is not limited to the use of" the Wu techniques. (D.I. 523, Ex. 2 at 8:11-23.) |

The absence of the Hebert patents was not cured by the admission of the Hebert invention disclosure, or the testimony of Messrs. Morgan and Hebert. None of this evidence permitted Callaway Golf to rebut, among other things: (1) suggestions Acushnet patented everything about the ProV1 except the construction covered by the Sullivan patents, or (2) Acushnet's story that

the Sullivan/Hebert patents had "nothing to do" with the ProV1's success. Indeed, the invention disclosure probably made things worse by misleading the jury into thinking Acushnet or the PTO concluded the Hebert Veneer concept was *not* patentable, especially in combination with Mr. Dalton's testimony and Mr. Nauman's testimony regarding the invalidity opinions.

Acushnet's pre-trial objections to the Hebert patents as inviting "satellite litigation" masked the real reason Acushnet urged the Court to reverse its earlier ruling. As just explained, Acushnet's witnesses and lawyers repeatedly took advantage of the absence of the Hebert patents to paint an inaccurate picture of the prior art, Acushnet's beliefs about what that art taught, and the development of the ProV1. Having spun a story that is inconsistent with the Hebert patents and the true facts, and having used substantial time to tout its other patents, Acushnet should not have been able to keep the Hebert patents from the jury. Acushnet had ample time to make whatever arguments it wanted to distinguish the Hebert patents from the Sullivan patents—*e.g.*, their use of a known cast polyurethane. (D.I. 523 at 11-12.) Acushnet should have had to make those arguments to the jury, as it did in the first trial, and deal with the retort that cast polyurethane could not have been the novel feature of the Hebert patents because it was already known in the art. (Tr. at 352:24-353:6 (Morgan).) Indeed, now that the Court has seen how Acushnet characterized the prior art, Acushnet could not have distinguished the validity of the Hebert patents from that of the Sullivan patents on any principled basis. That is probably why Acushnet never attempted at trial to distinguish the Hebert/Morgan concept from Mr. Sullivan's.

Finally, Rule 403 permits exclusion of evidence only if the risks of "unfair" prejudice or other ill consequences *substantially* outweigh the probative value. Here, the Hebert patents' probative value was so high, especially given Acushnet's actions, that it would not be "substantially" outweighed by other considerations. The truth certainly would have been prejudicial to Acushnet's case, but that is no reason to exclude it.

> **2.      Acushnet's Injection of its Opinions of Counsel on the Last Day of
> Trial to Improperly Bolster Its Invalidity Case Warrants a New Trial.**

Acushnet waited until the last day of trial to inject its opinions of counsel, which were not

admitted into the first trial.  The trouble began with Mr. Dalton's testimony—never before

offered—that he "believed" Acushnet had *sold* a non-infringing "high acid" alternative ProV1.

(Tr. at 415:19-416:10.)  Despite Mr. Dalton's slight caveat, Acushnet's damages expert Dr. Kerr

ran with this testimony, emphasizing repeatedly that Acushnet had certainly *sold* a non-

infringing "high-acid" alternative to the Pro V1.  (Tr. at 1269:24-1277:17, 1315:15-1317:1.)  Dr.

Kerr further explained that Acushnet had not devised this alternative as part of its ordinary

research, rather than to avoid infringement of the Sullivan patents, but had decided not to

implement it because its performance was no better than the existing ProV1.  (Tr. at 1276:20-

1277:17.)  The implication was that Acushnet had an alternative to the original ProV1 with

equivalent performance that was less expensive to make.

On cross-examination, Callaway Golf had to challenge the fanciful suggestion that

Acushnet had a perfectly acceptable and cheaper alternative, yet decided *not* to adopt it even

though it knew the Sullivan patents covered the Pro V1.  (Tr. at 1328:18-1331:22 (Kerr).)  After

confirming Mr. Dalton's testimony—first elicited by Acushnet—that he believed the Sullivan

patents were invalid, (Tr. at 427:5-428:5; PX-556), Callaway Golf sought to summarize

Acushnet's position for the jury.  But, in response to Callaway Golf's last question, Dr. Kerr

volunteered, without prompting, that Acushnet also obtained legal opinions regarding invalidity:

> Q.      So instead of switching, they accrue $275 million a year in additional damages
> rather than doing that switch; right?
>
> A.      I don't think they were accruing $275 million a year damages.  I don't think they
> did.
>
> Q.      Because they thought the patent was invalid; right?

19

A.    That is my understanding.

Q.    And yet they had in their pocket a guaranteed acceptable substitute that they could easily have gone to with no effect, in your opinion; right?

A.    They certainly did. *I mean, whether they thought it was valid or not is something that has to do with the lawyers' opinions and I can't talk about that.*

(Tr. at 1331:23-1332:10 (Kerr).)

Dr. Kerr could have answered with a simple yes or no. His reference to the opinions was not responsive to the question, which simply asked if the high-acid alternative was acceptable and feasible to implement. And in fact his unsolicited answer contradicted his testimony on direct that Acushnet had not adopted the high-acid alternative for a different reason—because it performed no better than the ProV1. (Tr. at 1276:20-1277:17.) In other words, when asked by his own lawyer, Dr. Kerr said nothing about opinions; but when Callaway Golf probed that testimony—voilà—the opinions suddenly appeared and were used to fabricate a door-opening argument to do even more damage to Callaway Golf. This was not the first time an Acushnet witness gave unsolicited and improper testimony: Dr. Statz referred to the last trial and to the Federal Circuit decision—despite warnings from the Court—and Mr. Bellis mentioned Acushnet's patents twice. (Tr. at 625:13-14, 641:5-14, 667:19-668:11; 734:6-12, 751:2-15.) Nonetheless, Dr. Kerr's remark was fleeting and might have gone unnoticed by the jury.

But, interestingly, Acushnet without hesitation latched onto Dr. Kerr's reference to "opinions," sprang into action at the ensuing sidebar, and, in the heat of the moment, convinced the Court to admit Mr. Nauman's testimony that in-house counsel had determined the Sullivan patents were invalid, and that Acushnet received invalidity opinions for the four asserted patents from outside counsel. (Tr. at 1337:14-1346:14, 1368:18-1370:14.) In doing so, Acushnet timed the introduction of the opinions to maximize their impact. Because the remaining trial time was short, it could rely on the opinions but avoid scrutiny about their legitimacy. (Tr. at 1370:3-6.)

20

And Acushnet could now close its presentation of evidence with testimony that Acushnet's technical employees, in-house counsel, and "independent" outside counsel all subjectively believed the patents were invalid from day one,  (Tr. at 1374:23-1377:13 (Nauman))—safe in the knowledge that the Hebert patents would not be available to put the lie to it all.

The opinions were unquestionably irrelevant to the substantive question of whether the Sullivan patents are valid.  *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 920 (D. Minn. 2009); *Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865, 877 (Fed. Cir. 2008) (non-precedential).  And any probative value they had regarding the feasibility of implementing the high-acid alternative was substantially outweighed by the risk of unfair prejudice and confusion of the issues.  The last-minute introduction of the opinions (1) created a greater risk they would sway the jury on validity because it was the jury's last impression of Acushnet's case before closing argument and (2) left inadequate time for Callaway Golf to provide the full context regarding the opinions.  The prejudice from admitting the opinion testimony was particularly acute given the exclusion of the Hebert patents because Callaway Golf was forced to cross-examine Mr. Nauman with both hands tied behind its back.  Callaway Golf was unable to confront his assertions that Acushnet's technical department, in-house counsel, and outside counsel all thought the Sullivan concept was unpatentable, with the fact that Mr. Morgan, Acushnet's patent review committee, and prosecution counsel all pursued and obtained the Hebert patents on nearly the same technology.

The Court initially recognized the great risks involved with admitting the opinions when, asked to permit Mr. Nauman to testify about the invalidity opinions, the Court observed that:

o "That's *bolstering with opinions* that nobody has seen because the willfulness issue dropped out.  So I believe that some accommodation needs to be made because I think the questioning did elicit that, *but to bring in the fact that there were opinions is, I think, truly problematic*."  (Tr. at 1340:13-19.)

21

- o "[T]here's *no way to test what they [the opinions] said and what they meant and how valid they were*, et cetera, because willfulness was not in the case." (Tr. at 1341:18-21.)

- o "I've never seen an opinion letter where it says, does not support the parties' position. So it is not as though it's a Court or really some objective person. It's someone you pay, and the opinion letters you rely on are the ones that support the position you want to take. *So that's the problem, is that it's really not an objective exercise*. At least I've never found it to be one." (Tr. at 1345:7-15.)

- o "[T]his is all getting very complicated. *I mean, this is a complicated area of the law that we weren't prepared to address with the jury*." (Tr. at 1346:5-7.)

Callaway Golf respectfully submits that exclusion of Mr. Nauman's testimony under Rules 402 and 403 was necessary because of precisely these concerns. In the heat of the moment, Acushnet took advantage of a situation created by the unsolicited testimony of its own expert. The substantial risks of unfair prejudice and confusion of the issues the Court identified were real, amplified by the absence of the Hebert patents, and likely led the jury astray.

Moreover, Acushnet triggered the need for the questioning that led to Dr. Kerr's spontaneous revelation after its witnesses stressed that, contrary to Acushnet's discovery responses, Acushnet *sold* rather than simply considered a high acid alternative. To whatever extent Callaway Golf's questioning was relevant to Acushnet's subjective beliefs about validity, Acushnet could have just reiterated its previously introduced internal belief in invalidity. (Tr. 330:17-331:2 (Morgan); 427:5-12 (Dalton); 1329:24-1330:14, 1331:23-1332:4 (Kerr).) Instead, Acushnet obtained a windfall based on its own expert's unsolicited, and admittedly improper, testimony. Allowing Callaway Golf to confirm Acushnet received no non-infringement opinion did not solve the problem. As Callaway Golf explained at sidebar, the jury could have still believed an impartial opinion writer analyzed the same issue the jury was going to decide and concluded the patents were all invalid. (Tr. at 1344:22-1345:1.)

### 3.   Dr. Statz Capitalized on the Exclusion of Nesbitt and Proudfit.

A new trial is also warranted based on the Court's exclusion of testimony from Messrs.

Nesbitt and Proudfit, testimony that was admitted without objection at the first trial.  At the pre-

trial conference, Acushnet objected to two statements from Mr. Nesbitt's deposition:  (1)

testimony that he does not believe he invented the polyurethane covered three-piece golf ball and

(2) testimony that he does not believe that somebody reading his patent would have thought he

must have been referring to polyurethane as a potential cover material.  (Halkowski Decl., Ex. C

at 22:12-18, 24:15-21.)  The Court excluded the testimony due to concern it contradicted the

Federal Circuit's opinion regarding incorporation by reference.  (*Id*. at 25:6-15, 29:14.)  At trial,

Callaway Golf also sought to play Mr. Proudfit's testimony that (1) he never considered using

polyurethane as an outer cover layer material on the Ultra Tour Balata, (2) no one else suggested

that he use polyurethane, and (3) it never occurred to him to replace the UTB's outer cover layer

with a polyurethane cover.  (Tr. at 692:9-693:14.)  The Court excluded his testimony because it

was unsure he was aware polyurethane was a potential cover material.  (Tr. at 754:3-16.)

Callaway Golf respectfully urges that the exclusion of the proffered testimony was

erroneous.  It was relevant to obviousness, for it shows the very same prior art inventors did not

think it would have been obvious to modify their inventions to use an outer over layer of

polyurethane at a Shore D less than 64.  *Vulcan Eng'g*, 278 F.3d at 1373; *Interconnect Planning*,

774 F.2d at 1143-44.  The testimony also bears on anticipation because it cuts against Acushnet's

argument that the skilled artisan would immediately select the claimed materials and hardnesses

from Nesbitt and Molitor '637 and combine them as arranged in the claims instead of following

the many other options disclosed by Nesbitt/Molitor '637.

As to Mr. Nesbitt, his testimony did not contradict the Federal Circuit's finding that his

patent incorporated polyurethane by reference because the question whether the mere listing of

23

polyurethane would teach one of ordinary skill in the art to use it in the arrangement set forth in

the claims (*i.e.*, as an outer cover layer for a three-piece ball with all the other claim limitations)

was still an open one.  As to Mr. Proudfit, he was a golf ball designer and chemist who was

undoubtedly aware of polyurethane, for his patent cites at least two pieces of prior art discussing

polyurethane golf ball covers.  (DX-10, *citing* Halkowski Decl., Exs. D & E; Tr. at 575:20

(Statz); D.I. 424 at 527:14-20.)  In addition, Mr. Proudfit is the sole inventor on another patent

that discusses use of a polyurethane cover.  (*See* Halkowski Decl., Ex. F at 2:36-47.)  His

testimony was therefore admissible, and, as the Court correctly observed after the first trial,

would have been substantial evidence supporting a finding of nonobviousness.  (D.I. 492 at 13.)

Again, Acushnet invited error, then pounced on it.  Realizing Nesbitt and Proudfit could

not speak for themselves, Dr. Statz repeatedly speculated about what they would have thought or

done, and personalized their work to imply they thought Sullivan's claims were invalid.  That

testimony was particularly ironic because Acushnet had vigorously argued their subjective views

were irrelevant to win exclusion of their testimony.  (Halkowski Decl., Ex. C at 27:11-16, 27:21-

23; Tr. at 694:2-16, 696:15-697:12.)  For example, Dr. Statz implied that Nesbitt had personally

concluded polyurethane was an appropriate outer cover layer and wanted to use it for his ball:

> Q.      Dr. Statz, going back to the Nesbitt patent, and the next slide, please, I'm going to
> read this reference to you.  Reference is made to the application Serial No. 155658 of
> Robert P. Molitor issued into U.S. Patent. No. 4,274,637, which describes a number of
> foamable compositions of a character which may be employed for one or both layers 14
> and 16 for the golf ball of this invention.  What does this passage of the Nesbitt patent
> teach, in your opinion?
>
> A.      Okay.  What is basically teaches, ***Nesbitt says I've looked at the Molitor patent***.
> The Molitor patent has a lot of different things in it.  *I conclude* what is necessary to
> make *my* ball from the materials that Molitor used for *my* inner cover layer or *my* outer
> cover layer.
> * * *
> Q.      Let's move to the next table [of Molitor].  Table 10 is depicted.  What does this
> table show?

> A.      This table shows you that you could take, and *Nesbitt points you in this direction*, that you could take the soft flexible polyurethane and put it as the outer cover layer because it's soft and flexible.  And you would have the shore hardness close to Balata. *So you would get what Nesbitt wanted*:  A soft covered golf ball with an inner cover layer that's relatively hard and stiff over a solid core.

(Tr. at 565:5-19, 567:13-23.)  Acushnet's counsel stressed this theme in closing by arguing that "Mr. Nesbitt says" using a blend of ionomers in the inner cover layer and polyurethane in the outer cover layer is advisable and that narrowing the long list of materials in Molitor to the examples referencing a blend of ionomers and polyurethane is "what Mr. Nesbitt tells you to do." (Tr. at 1415:3, 1415:15.)  In fact, Mr. Nesbitt believed the opposite: he did not think someone would have thought his patent taught use of polyurethane as the outer cover of a three-piece ball.  (D.I. 428 at 1128:12-16.)

Dr. Statz took similar liberties in his treatment of Mr. Proudfit.  He began by repeatedly personalizing Mr. Proudfit, insinuating that he knew what "Jim, in his patent" was really saying, referencing "[t]he balata type material that was used by Jim," and explaining that "Jim specifies the thickness of .03." (Tr. at 590:15-16, 591:9, 592:1.)  With this foundation in place, Dr. Statz then improperly answered a question about what one of ordinary skill would do by speculating about Jim Proudfit's knowledge of polyurethane and what he would have done:

> Q.      In your opinion, would a person of ordinary skill in the art in 1995 be motivated to try and use the Wu polyurethane as used on the Titleist Professional in place of the outer cover of the Wilson Ultra Tour Balata ball?

> A.      Oh yes. *If Jim had known about this urethane coated material, he would have tried it*, because it really is a wonderful material for making a golf ball that is durable and has the properties you want for a soft covered three-piece ball.

(Tr. at 605:19-606:3.)  In fact, Mr. Proudfit *did* know polyurethane could be used as a cover material, as shown by his discussion of polyurethane as a cover material in one of his other patents, his citation to patents disclosing polyurethane covers, and his general background in chemistry, materials research, and golf ball design.  In addition, Mr. Proudfit's 20 years of

industry experience, including golf ball design, also qualified him as one skilled in the art under

Dr. Statz's definition. (Tr. at 546:5-10.) Mr. Proudfit's testimony would have shown that,

despite that knowledge and experience, he never considered trying polyurethane. (D.I. 424 at

530:9-19.) And no one else advised Mr. Proudfit to use polyurethane, even though his

colleagues were surely skilled in the art and aware of polyurethane as well. (*Id.*)

### 4. Acushnet's Previously Undisclosed Evidence it Sold High Acid ProV1s Led to the Erroneous Admission of its Opinions of Counsel.

A new trial is appropriate where "improper conduct by an attorney," such as closing

argument or preparing a witness to give improper testimony "unfairly influenced the verdict."

*Arthrocare*, 310 F. Supp. 2d at 653. Here, Acushnet snuck in testimony, for the first time at trial,

that it allegedly *sold* over 100,000 units of an allegedly non-infringing ProV1 with a high-acid

inner cover layer (rather than low-acid, as claimed in the four Sullivan patents-in-suit). This

testimony contradicted Acushnet's discovery responses, and Callaway Golf's reasonable reliance

on those responses resulted in the issue not being vetted during discovery. Acushnet's counsel

then used this surprising new testimony to undercut non-obviousness by suggesting the ProV1's

success was not due to the Sullivan technology.

During discovery, Acushnet admitted, without qualification, that the inner cover layer of

the ProV1 (defined broadly by Callaway Golf's Requests for Admission to include "any and all

golf balls" that Acushnet manufactured bearing the ProV1 mark) comprised a low-acid ionomer.

(Halkowski Decl., Ex. G.) Dr. Kerr's expert report contained no mention Acushnet had *sold* a

high-acid alternative, even though he had talked to Mr. Dalton before submitting it, ██████

████████████████████████████████ (Halkowski Decl., Ex. H at p. 28-29.)

████████████████████████████████████



with a high acid ionomer inner cover layer. (Halkowski Decl., Ex. I at 516:16-21.) Acushnet

and Dr. Kerr never modified those discovery responses and testimony before the second trial.

But at trial, Mr. Dalton and Dr. Kerr insisted Acushnet had sold over 100,000 balls "as

Pro V1s" comprising a high-acid ionomer rather than a low acid ionomer in the inner cover

layer. (Tr. at 415:19-416:10 (Dalton); 1330:23-1331:8, 1265:22-1266:2 (Kerr); *see also* 332:17-

335:8 (Morgan).) Acushnet used this testimony to bolster its claim that the value of the Sullivan

technology was minimal. (*Id.*) Acushnet's counsel then drove the point home in closing by

emphasizing that Mr. Dalton said "the high acid inner covered balls were equivalent in every

way to the ProV1," that the high-acid balls were allegedly "every bit as good as the existing Pro

V1," and that "they worked so well, that we put them into the warehouse and we sold them.

They actually ***sold*** them on the market ***as Pro V1s***." (Tr. at 1464:18-1465:9.) That previously

undisclosed testimony and argument was improper attorney conduct for two reasons.

First, Acushnet's counsel used this testimony to circumvent the Court's *in limine* ruling

excluding evidence ███████████████████████████████████

███████████████ not disclosed during discovery. (D.I. 595 at 13 n.14.) Acushnet effectively

made the same argument—███████████████████████████████████

███████████████████ without having disclosed it in discovery. Because this

surprising testimony had never been disclosed, Callaway Golf was never able to vet it, much less

meaningfully respond to or cross-examine it at trial. Thus, the testimony regarding its alleged

sales of the high-acid alternative was improper, unfairly prejudicial to Callaway Golf, and

violated the rationale of this Court's *in limine* ruling.

Second, Acushnet's counsel used this improper testimony to pave the way for the

erroneous introduction of the opinions of counsel. When Dr. Kerr volunteered that Acushnet

sold the high acid alternative on cross-examination, Callaway Golf had to address this newly

REDACTED

disclosed information by pursuing the issue of why Acushnet did not actually switch to this high-acid approach sooner. (Tr. at 1331:3-8.)  As noted above, Callaway Golf's questions resulted in Dr. Kerr volunteering, without solicitation, a reference to Acushnet's legal opinions the Sullivan patents are invalid. (Tr. at 1331:9-1332:10.)  This in turn opened the door to Mr. Nauman's lengthy testimony regarding the invalidity opinions. (Tr. at 1374:23-1377:13.)  In other words, Acushnet leveraged the surprise of its previously undisclosed information about the sale of the high-acid alternative into an opportunity to inject its irrelevant and highly prejudicial opinions of counsel to bolster its invalidity case.  A new trial is therefore warranted at which Acushnet is prohibited from introducing evidence of the alleged sale of its high-acid alternative, which will make it unnecessary to address all the issues related to its opinions of counsel.  Alternatively, a new trial would at least allow Callaway Golf to prepare for and address this new information.

### 5. Acushnet Took Advantage of the Exclusion of Mr. Mickelson's Testimony to Undermine the Technological Value of the Sullivan Inventions.

Although Callaway Golf understands that, to date, it has failed to convincingly explain the decisive nature of Phil Mickelson's testimony, it respectfully submits that it was error to again exclude his deposition testimony.

Mr. Mickelson's testimony was relevant to several objective criteria of non-obviousness. Its admission was crucial to counteract Acushnet's consistent and repeated efforts to denigrate the technological value of the Sullivan technology relative to its own "patented" technology and to claim it invented the ProV1 in 1995. "[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *See, e.g., Quinn v. Consol. Freightways Corp.*, 283 F.3d 572, 576 (3d Cir. 2002).  Here, Callaway Golf was prohibited from presenting a professional golfer's testimony that the distance and spin advantages of the Rule 35 and ProV1

were critical to his game and, more importantly, that the Callaway Golf Rule 35 golf ball—a ball

with none of the technologies Acushnet alleged to be the basis for the Pro V1's success—was far

superior to balls being offered by Acushnet in early 2000.



Mr. Mickelson's testimony was relevant to commercial success, long-felt need, praise for

the invention by others, the importance of the Sullivan technology, skepticism of others, and

unexpected results. The testimony is high praise of both the Rule 35 and ProV1, showing that



their impressive performance was due to the only thing they had in common—use of the Sullivan

(and Hebert/Morgan) technology.  It also demonstrates the performance of these two balls was

superior to Acushnet's prior products, demonstrating the value of the patented ball construction,

and it evidences that the Sullivan technology satisfied a long-felt need that went unmet by

Acushnet's prior offerings.  The testimony also highlights the reason for the ProV1's

unprecedented commercial success and links that success to the Sullivan patents.  And it shows

that Acushnet was skeptical the Sullivan technology could produce a superior product and was

pushed into adopting the Sullivan technology rather than an innovator that invented the

technology in 1995, before Sullivan.  Finally, the testimony shows the Rule 35 ball, a golf ball

that Acushnet used throughout trial as a proxy for attacking the technological value of the

Sullivan inventions, was in reality far superior to all of the premium golf balls being sold by

Acushnet in early 2000.  The jury needed to hear this objective evidence of nonobviousness "as

insurance against the insidious attraction of the siren hindsight."  *W.L. Gore & Assoc., Inc. v.*

*Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983).

The absence of Mr. Mickelson's testimony permitted Acushnet to tout its "patented" Wu

polyurethane as the reason for the ProV1's stellar performance—with Mr. Morgan agreeing the

ProV1's success and performance had "nothing to do" with the Sullivan technology.  (Tr. at

321:19-24 (Morgan); 751:23-752:2 (Bellis).)  But Mr. Mickelson testified ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  (D.I. 393, Ex. A at 56:14-19; Tr. at 348:14-23 (Morgan).)  This testimony

demonstrates the Sullivan technology was responsible for the improved performance of the both

Rule 35 and ProV1 because it was common to both.  Without Mr. Mickelson's testimony,

Messrs. Morgan and Bellis had free rein to rewrite history at trial.  They took full advantage.

REDACTED

What is more, Acushnet unfairly and repeatedly cloaked its case in celebrity golfers of its own—a remarkable turn of events given its objection that Mr. Mickelson's celebrity status warranted exclusion. Mr. Bellis relied on the actions of the biggest celebrity in golf—Tiger Woods. In an effort to denigrate Callaway Golf's Rule 35 and the Sullivan technology, Mr. Bellis volunteered that Acushnet's biggest concern at the time was Tiger Woods's switch to a Nike three-piece ball—a ball there is no evidence was covered by the Sullivan patents:

> Q.   So Acushnet accelerated the development of the ProV1 to preempt what you've called the competitive solid ball attack from Callaway Golf; is that right?
>
> A.   There were several companies that were launching those types of products and we were *concerned equally with all of them*, maybe even more so Nike, because earlier in the year *Tiger Woods* had played a Titleist golf ball, and he switched in the middle of the year to a Nike solid core, ionomer cover, elastomer ionomer casing, ionomer covered golf ball, and when Tiger switched, he was quite successful with that, so then tour players were a little more open-minded. *So I would say that Tiger Woods switched* [sic] *to Nike caught our attention more than anything or anyone else in the year 2000*.

(Tr. at 742:21-743:9 (Bellis).)  Mr. Mickelson would have directly refuted this testimony ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ not Tiger Woods and Nike a year or so earlier, that caught Acushnet's attention and forced it to adopt the Sullivan technology to stay competitive. Mr. Mickelson's testimony could have also refuted Acushnet's suggestion while cross-examining Mr. Yagley that the Nike ball used by Mr. Woods was superior to the Callaway Golf Rule 35.  (Tr. at 791:17-792:2.)

Acushnet also proudly linked the Molitor '751 patent to a ball pro golfer Greg Norman used to win millions.  This enabled Acushnet to downplay the problems that use of polyurethane generated for that ball and suggest it was obvious to use the same successful technology on a three-piece ball. (Tr. at 575:14-18, 614:2-9, 615:3-9 (Statz); 507:6-10 (Sullivan); 191:15-21 (opening).)  Acushnet also showed the jury a video montage of professionals talking about its



products. (Tr. at 716:1-7; 735:6-9 (Bellis).) Again, Mr. Mickelson's testimony would have shown that the Rule 35 was a marked advantage over prior polyurethane covered two-piece balls but a change that, far from being obvious, was one Acushnet was exceedingly reluctant to make.

The Court has previously acknowledged Mr. Mickelson's testimony is relevant but excluded it because of the risk of unfair prejudice due to Mr. Mickelson's "celebrity" status. (D.I. 428 at 995:20-23.) Callaway Golf continues to believe its high probative value is not "*substantially* outweighed" by the risk of unfair prejudice, particularly given the unbalanced story that Acushnet has been able to present in the absence of critical facts set forth by Mr. Mickelson. Perhaps most importantly, there are no sources of this highly relevant evidence other than Mr. Mickelson. Acushnet refused to permit Callaway Golf to depose its CEO, Wally Uihlein, about the influence of Mr. Mickelson's views, instead insisting that Callaway Golf should direct those questions to Mr. Mickelson. (D.I. 184 at 8 & n.5 ("Callaway claims that 'only Mr. Uihlein' can answer what was the content of his conversation with Phil Mickelson. Callaway totally fails to explain why Phil Mickelson, now under a lucrative endorsement contract with Callaway, is unable to provide these answers.").) After preventing Callaway Golf from deposing Mr. Uihlein and urging Mr. Mickelson as a substitute, Acushnet should not have been permitted to seek exclusion of Mr. Mickelson because he is a "celebrity."

### 6. An Instruction on the Presumption of Validity Was Appropriate, Especially After Acushnet Speculated About the PTO's Examination.

Acushnet successfully persuaded the Court to remove the instruction on the presumption of validity given at the first trial—in both the preliminary as well as the final instructions—only to exploit that lack of guidance by speculating about the PTO's failure to spend adequate time considering the prior art relied on at trial. Acushnet's speculation about what the PTO considered was particularly improper because it won a motion *in limine* that "Callaway shall not

be permitted to speculate as to the extent to which such prior art was actually considered by the examiners (aside from what is specifically disclosed in the prosecution histories)." (D.I. 595 at 14.) The lack of instruction on the presumption, coupled with the liberties Acushnet took in its treatment of the PTO's consideration of the relevant art, also warrant a new trial.

An instruction the Sullivan patents are presumed valid is an accurate statement of the law, and the presumption exists because the Patent Office is presumed to have done its job. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). The Court opted not to include an instruction on the presumption because some recent model instructions omit it. (Tr. at 957:11-959:14.) But the instruction was important here given Acushnet's actions and because the art relied on at trial was in substance the same art cited to the PTO. From the beginning, Acushnet questioned the PTO's competency, with Mr. Morgan commenting that he was "astounded" at the way Mr. Sullivan used the Patent Office and that, for a number of Sullivan's inventions, "[w]e couldn't believe that a patent would be granted for such a thing." (Tr. at 330:17-331:2.) Acushnet's "grandstanding," as the Court politely put it, continued during its cross-examination of Dr. Risen, when it presented him with a banker's box full of prior art, implied that the PTO could not have closely reviewed all that material because Dr. Risen himself had not looked at it all, and suggested that Spalding should have pointed out specific obviousness combinations to the PTO. (Tr. at 1082:11-1083:6 (Risen); 1086:20-1087:9, 1089:4-9 (sidebar).) At the ensuing sidebar, the Court was understandably "chagrined and surprised to be hearing this, especially when none of this is in the record." (Tr. at 1086:12-14.) In response, Acushnet claimed its questioning was meant to address Callaway Golf's correct statement during opening that patents are presumed valid, but agreed to move on. (Tr. at 1088:24-1089:3.)

33

Acushnet may have finished pursuing the issue with Dr. Risen, but it was hardly done.

Near the end of its closing rebuttal—when, of course, Callaway had no way to respond further—

Acushnet told the jury that if it did nothing else, it should consider that the PTO must have spent

only two minutes considering each reference cited:

> What about the Patent Office? Well, Spalding sent over 200 references to the examiner. We know that. I showed those to you. There's an information disclosure statement and they say, oh, but look. The examiner checked, indicating that the examiner had considered all of those. Please, please, *if you don't do anything else*, look at the invention [sic] disclosure statement where Spalding sent all of these in. They are ten pages long. *There are over 200 references*. They all say that the examiner considered them on the same day. There's a box that says date considered. They all say the same day. *Even if the Examiner worked eight hours and this is all she did, she spent two minutes apiece on the references*.

(Tr. at 1473:20-25; *see also* 1413:20-1414:6.) That was pure speculation about "the extent to

which such prior art was actually considered by the examiners," which was forbidden by the

Court's prior order. (D.I. 595 at 14.) It was one of the last things Acushnet left the jury to

consider before it began deliberating and was highly prejudicial. An instruction on the

presumption of validity was critical to attempt to repair some of the damage. Thus, the Court

should grant a new trial at which it instructs on the presumption of validity and Acushnet is

prohibited from such grandstanding and from violating the Court's orders.

### 7. Acushnet Did Not Justify the "Pieces of the Puzzle" Instruction Because All Its Witnesses Testified the Art Was Unpredictable.

Finally, Acushnet successfully urged the Court to instruct the jury that it could find that

"[i]n many case[s], a person of ordinary skill in the art will be able to fit the teachings of multiple

patents together like pieces of a puzzle." (Tr. at 1514:10-13.) Acushnet's proposal was based on

language from *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), that comes from a paragraph

in which the Supreme Court was discussing the specific question of whether a person skilled in

the art of automotive design would have put a sensor on an adjustable gas pedal. *Id.* at 420.

That language is not applicable to the advanced chemistry at issue here.  Acushnet's witnesses repeatedly acknowledged the art here includes many variables that, when slightly changed, can dramatically alter performance and yield unexpected results with respect to golf ball design.  (Tr. at 249:17-23, 342:4-24 (Morgan); 383:15-384:10, 406:12-16, 407:16-19, 410:11-20 (Dalton); 485:7-13 (Sullivan); 874:9-876:16 (Hebert); 881:24-882:12, 884:18-885:9, 886:18-25 (Cavallaro); DX-385 at AC40403; *see also* 915:6-916:2 (Risen); PX-3 at 2:34-42.)  Indeed, Acushnet focused on the fact that the size of the core, thickness of the cover layers, type of inner and outer cover layer material, and even the type of polyurethane can have a dramatic impact on performance when cross-examining Mr. Yagley.  (Tr. at  803:9-804:10.)  Thus, the instruction was an erroneous statement of the law of obviousness in the context of this case, and could well have influenced the outcome on obviousness.  It also may have infected the verdict on anticipation by encouraging the jury to accept Acushnet's argument that it was a simple matter to combine Acushnet's selected examples from Nesbitt and Molitor '637, when there were in fact thousands of choices, all unpredictable.

The fact that the instruction was not given in the last trial, even though *KSR* had been decided by that time, further suggests giving it here may have influenced the contrary outcome.  And the sentence about "unpredictable" arts that was added to the instruction for balance at Callaway Golf's suggestion did not completely cure the problem.  (Tr. at 1297:16-1302:4, 1514:13-16.)  Given the lack of evidence that this was a predictable art, the jury should not have received the "pieces of the puzzle" instruction suggesting it was predictable.  Any decision the jury made to that effect could not have been on the basis of the evidence presented.

**B.      The Anticipation Verdict Was Against the Great Weight of the Evidence.**

In addition to the above errors, a new trial on anticipation is also warranted because the verdict was against the great weight of the evidence—indeed, all the evidence—and would result

in a manifest injustice.  The lack of evidence at trial confirmed what this Court recognized in its

opinion denying summary judgment and at the pre-trial conference:  that Acushnet could not

prove that Nesbitt/Molitor '637 anticipates the asserted claims.  (D.I. 595 at 6-10; Halkowski

Decl., Ex. C at 13:18-22.)  Indeed, the anticipation verdict so strikingly conflicts with the

evidence that it suggests the jury decided the case on something other than the relevant evidence.

     The asserted claims all require at least a golf ball with a core, an inner cover layer

comprising a low-acid ionomer or blend of low-acid ionomers, and outer cover layer comprising

a relatively soft polyurethane having a Shore D hardness of 64 or less, as measured on the ball.

Acushnet failed to adduce clear and convincing evidence at trial that Nesbitt, with the portions of

Molitor '637 it incorporates by reference, disclosed such a golf ball to one of ordinary skill in the

art for three independent reasons:  (1) the reference nowhere discloses a three-piece ball with a

polyurethane outer cover layer having a Shore D less than 64, (2) the reference's laundry list of

possible cover materials would not disclose to one of ordinary skill the specific claimed

combination, and (3) even if the reference discloses all the claim limitations somewhere, it does

not disclose them "as arranged in the claims."  The anticipation verdict is not supported by the

great weight of the evidence for each of these reasons.

### 1.    Anticipation Requires that a Reference Disclose Each Element as Arranged in the Claims.

     Anticipation requires that a single prior art reference disclose each and every limitation of

the claimed invention, either explicitly or inherently.  *See, e.g, Therasense, Inc. v. Becton,*

*Dickenson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010).  A limitation is not inherently disclosed

unless it necessarily, or always, results from the practice of the prior art alleged to anticipate.

*See, e.g.*, *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002).

"There must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). Two principles follow from this general proposition. First, "[i]t is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus. There may be species encompassed within a genus that are not disclosed by a mere disclosure of the genus." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) (internal citation omitted). Second, "[b]ecause the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements arranged as in the claim." *NetMoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (internal quotes omitted).

> ### 2. Nesbitt/Molitor '637 Does Not Disclose a Relatively Soft Polyurethane Outer Cover with a Shore D Hardness of 64 or Less.
>
> #### a. Nesbitt/Molitor '637 Does Not Expressly Disclose a Polyurethane Outer Cover Layer With a Shore D of 64 or Less.

Neither Nesbitt nor Molitor '637 expressly discloses a Shore D hardness for a polyurethane outer cover layer for any 3-piece ball. It was undisputed there is no explicit disclosure of a numerical "on the ball" Shore D hardness for an outer cover layer made of *any* material in Nesbitt/Molitor '637. (Tr. 651:1-10 (Statz); 927:6-9, 938:18-22 (Risen).) Instead, Acushnet's expert Dr. Statz sought to concoct a disclosure from passages in Nesbitt that reference balata-covered balls. (Tr. 568:23-570:18, 571:12-17 (Statz); *see also* 192:17-193:2, 195:18-20 (opening); 1416:10-1417:9 (closing).) This Court's ruling denying Acushnet summary judgment of anticipation considered the key passage in Nesbitt relied upon at trial by Acushnet and concluded it did not expressly disclose a polyurethane outer cover layer with a

Shore D hardness of less than 64. (D.I. 595 at 6-7.) Acushnet did not introduce any additional evidence at trial that would alter the Court's finding that there was no evidence of an express disclosure of the Shore D.

The relevant passage in Nesbitt comes at the end of two paragraphs describing a specific embodiment—a three-piece ball with a core, an inner cover layer of ionomer Surlyn 1605, and an outer cover layer of ionomer Surlyn 1855 that is 0.0575 inches thick. (DX-9 at 3:26-44.) After describing this ionomer over ionomer embodiment, Nesbitt observes that "[t]he soft *Surlyn* resin cover would have about the same thickness and shore hardness of a balata covered golf ball and would have the advantageous 'feel' and playing characteristics of a balata covered golf ball." (DX-9 at 3:40-44.) This passage merely describes the thickness and hardness of the outer cover layer of that particular embodiment, as its reference to a specific cover material (Surlyn 1855) and outer cover layer thickness (0.0575 inches) demonstrates. (Tr. at 926:24-927:20 (Risen).) On its face, then, the most the sentence discloses is a three-piece ball with the *ionomer* outer cover layer taught by Nesbitt that has about the same hardness as a balata covered ball, although it is not even apparent whether this disclosure relates to an "on the ball" or "off the ball" hardness. Acushnet introduced no evidence to make the leap between this disclosure and its argument the passage teaches that a three-piece ball with a *polyurethane* outer cover layer would (or should) have a Shore D hardness similar to a balata cover. The Court's observation at summary judgment thus remains equally applicable after trial: "Aside from attorney argument, no evidence (let alone Nesbitt) cited by Acushnet makes that causative leap, to wit, that if A equals B, and A equals C, then C equals B." (D.I. 595 at 7.)

Indeed, Dr. Statz initially recognized the passage only teaches the "soft *Surlyn* resin cover would have about the same thickness and shore hardness of a Balata covered ball." (Tr. at 569:5-10.) He never explained why this passage would also teach that use of a polyurethane

38

outer cover layer would also have the same shore hardness as a balata cover—much less that such a hardness would still result after substituting a blend of low-acid ionomers from Molitor '637 for the inner cover and then substituting the use of polyurethane for the outer cover. Rather, Dr. Statz's subsequent colloquy with counsel simply assumed, without any further explanation, that this passage was also a broader teaching that the outer cover layer must have a balata-like hardness, regardless of the outer cover layer's composition. (Tr. at 570:8-18.) That is not what the passage says. (*Accord* Tr. at 927:6-20 (Risen).) "An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Motorola, Inc. v. Interdigital Technology Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). The evidence from Dr. Statz and Mr. Morgan suggesting that other balata-covered balls, with different constructions, had a Shore D hardness below 64 is all irrelevant because there was no evidence that Nesbitt was teaching that a three-piece *polyurethane* outer cover layer should have a similar Shore hardness to balata.

Acushnet's other passage from Nesbitt is even weaker, so much so that Dr. Statz did not use it as affirmative evidence on direct. On cross-examination, Dr. Statz suggested that Nesbitt's statement that his 3-piece golf ball "has the 'feel' and playing characteristics simulating those of a softer balata covered ball" (DX-9 at 1:55-56) teaches that the outer cover layer should have "Balata like softness." (Tr. at 651:18-652:13.) That testimony is not sufficient to support the verdict for several reasons. First, it contradicts the plain language of the passage, which supports Callaway Golf because it suggests a balata cover is *softer than*, not the same as, the outer cover of Nesbitt's ball. Second, Dr. Statz never explained why one of ordinary skill in the art would interpret the passage as he did, and conclusory expert testimony cannot support the verdict. *Motorola*, 121 F.3d at 1473. Third, the Nesbitt patent's previous sentence says the outer

39

cover layer is "comparatively soft" vis-à-vis the inner cover layer and does not impose any

additional requirements regarding how soft it should (or must) be.  (DX-9 at 1:51-54.)

> **b.      Nesbitt/Molitor Does Not Inherently Disclose a Polyurethane
> Outer Cover Layer With a Shore D Hardness of 64 or Less.**

Acushnet also presented no evidence to show that a three-piece ball with an inner cover

layer that comprised a low acid ionomer or blend of low-acid ionomers and polyurethane outer

cover would necessarily have an outer cover layer Shore D hardness of less than 64.  As an

initial matter, it is unclear whether Acushnet even tried to argue inherency.  Dr. Statz could not

do so because no such admissible opinion appears in his expert report.  Some of Acushnet's

remarks during opening and closing hinted at inherency because they suggested "it was common

knowledge" that a high performance golf ball "*had* to have a softness like Balata, and that's well

below Shore D 64."  (Tr. at 1416:10-20; *see also* 192:17-195:20 (opening).)  But these remarks

are not evidence, and they are irrelevant to whether Nesbitt/Molitor itself inherently disclosed a

Shore D less than 64.  For his part, Dr. Statz never discussed inherency or applied the correct

legal standard for it during his testimony.  And although Messrs. Morgan and Dalton discussed

examples of two-piece polyurethane covered balls with a Shore D less than 64, (Tr. at 268:25-

270:17, 272:5-22 (Morgan); 379:10-380:9 (Dalton)), neither they nor any other witness

presented evidence from which the jury could infer that a polyurethane outer cover layer molded

onto a ball with the Nesbitt core and an inner cover layer that was comprised of a low-acid

ionomer or blend of low-acid ionomers would *necessarily* have an on the ball Shore D less than

64.  It was Acushnet's burden to prove inherency by clear and convincing evidence, and its

failure to do so warrants a new trial.  *See Crown Operations Intern., Ltd. v. Solutia, Inc.*, 289

F.3d 1367, 1377-78 (Fed. Cir. 2002) (rejecting the proposition "that if a prior art reference

discloses the same structure as claimed by a patent, the resulting property . . . should be assumed").

### 3. Nesbitt/Molitor '637 at Most Discloses an Overbroad Genus, Which No Reasonable Jury Could Find Sufficient for Anticipation.

Acushnet never presented any evidence that Nesbitt/Molitor '637 discloses a specific example of a three-piece ball with a core, an inner cover layer comprising a low-acid ionomer or blend of low-acid ionomers, and an outer cover layer comprising polyurethane, with both cover layers meeting the thickness and hardness requirements in the claims.  Instead, Acushnet's Dr. Statz relied on the disclosure of a *generic* three-piece ball in Nesbitt along with materials included in what he acknowledged was a "long laundry list" in Molitor to concoct a three-piece ball having the claimed combination of inner cover and outer cover materials along with the other requisite elements.  (Tr. 649:6-16, 644:13-648:22, 556:13-574:14.)  That was insufficient to establish anticipation.

A prior art reference that discloses a broad class of items (*i.e.*, a genus) does not anticipate claims to a specific item in the genus (*i.e.*, a species) where the reference does not explicitly mention that species because the prior art has not actually arrived at the same invention claimed. *See, e.g., Impax Labs. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1383 (Fed. Cir. 2006) (finding claims to a method of treating ALS with riluzole not anticipated by a reference disclosing a class of hundreds of compounds useful for treating ALS, even though riluzole was a member of that class because the class included a "large number of compounds" and there was "no specific identification of riluzole"); *Atofina*, 441 F.3d at 999-1000 (holding as a matter of law that a prior art reference describing a temperature range of 100 to 500 °C and a preferred range of 150 to 350 °C did not disclose a claim limitation requiring a temperature range of 330 to 450 °C, and that description of an oxygen to methylene chloride molar ratio of 0.001 to 1.0% did

not disclose a claim limitation requiring a 0.1 to 5.0% ratio); *Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 471 F.3d 1369, 1376-77 (Fed. Cir. 2006) (finding no anticipation where a reference disclosed a large genus, even though the reference also examined "forty-five specific compounds (as opposed to a genus of compounds)," and "listed several preferred compounds and substituents," because none of them resembled claimed invention); *In re Ruschig*, 343 F.2d 965, 972-75 (C.C.P.A. 1965) (finding claims to set of compounds not anticipated by a reference that included alternatives which could be combined to yield 156 compounds, some of which fell within the scope of the claims, but did not name a specific example falling within the claims).

Here, the genus of three-piece golf balls disclosed by Nesbitt/Molitor '637 is exceedingly broad. The Federal Circuit held, at Acushnet's urging, that the "entire list" of "foamable compositions" disclosed at column 5 of Molitor '637, as well as mixtures of those compositions, may be employed for one or both layers of the Nesbitt three-piece golf ball. *Callaway Golf*, 576 F.3d at 1345-47; *see also* DX-9 at 3:50-61; DX-12 at 5:27-55. It is undisputed that Molitor '637 discloses 9 broad categories of materials, as well as mixtures of materials from the same category or different categories, as potential golf ball covers. (Tr. at 645:24-649:8 (Statz); DX-12 at 5:27-55.) It is also undisputed that Molitor discloses its list "is not meant to be limiting or exhaustive, but merely illustrates the wide range of polymeric materials which may be employed in the present invention." (DX-12 at 5:51-54, Tr. at 648:10-14 (Statz).) Even making all assumptions favorable to Acushnet—*e.g.*, treating each category as a single material, and accounting for mixtures of two materials only—there are a minimum of 54 potential materials for each cover layer.[5] This in turn yields 54 x 53 = 2,862 potential golf balls, when each of the unique

---

[5] There are 9 possible single material cover layers. Then, each material can either be mixed with itself (e.g., two Surlyns) or a material from one of the other 8 categories. The result is 9 + (9 + 8 + 7 + 6 + 5 + 4 + 3 + 2 + 1) = 54 possible materials.

combinations of inner and outer cover layers is considered. One can hardly even imagine the number of combinations if the list is interpreted to disclose the thousands of materials it actually does. (Tr. at 933:9-935:15 (Risen).) Whatever the exact of number of species, a disclosed genus of thousands is far too large to anticipate every species within it, particularly when Nesbitt's incorporation yields "no basis to differentiate between" the various materials. 576 F.3d at 1347.

Indeed, Acushnet presented no credible evidence that Nesbitt/Molitor '637 discloses preferences regarding materials for use in a generic three-piece ball that would direct one skilled in the art to the claimed species. The only guidance in Nesbitt/Molitor '637 itself regarding the preferred materials for use in a three-piece golf ball *teaches away* from the asserted claims. It was undisputed that Nesbitt indicates both the inner and outer cover layers are "preferably such as ionomer resins," not polyurethane. (DX-9 at 3:54-56, Tr. at 642:24-643:12 (Statz).) Molitor '637 also indicates that its preferred cover material is ionomer resins. (DX-12 at 3:36-42, Tr. at 645:3-23 (Statz).) And the only examples of three-piece golf balls in Nesbitt/Molitor '637 use a single low-acid ionomer in both the inner and outer cover layers, not polyurethane. (DX-9 at 3:19-44, 2:34-49, & Abstract.) These examples all pointed away from the claimed three-piece golf ball, which uses polyurethane in the outer cover layer. Dr. Statz speculated that one skilled in the art would divine preferences in Molitor '637 based on the fact that some materials cracked when used. (Tr. at 565:8-568:22, 650:2-15.) But this contradicts the Federal Circuit's holding that there is "no basis to differentiate" between the materials listed in Molitor, *Callaway Golf*, 576 F.3d at 1347, and it ignores the fact that Molitor itself still included the materials on its list of potential cover materials. Acushnet's attempt to manufacture a distinction between materials now is particularly ironic given that it previously convinced the Federal Circuit to adopt the opposite position. For his part, Mr. Sullivan was aware of the reference to Molitor '637 in

Nesbitt, yet still thought his claims were patentable. (Tr. at 535:12-15, 486:7-11, 496:11-24, 504:12-17.)

Instead of focusing on whether Nesbitt/Molitor '637 disclosed preferences for three-piece balls, Dr. Statz focused on examples of cover materials in the two-piece balls of Molitor '637. (Tr. at 567:2-568:22; DX-12 at 14:54-65, 18:33-47.) This testimony was irrelevant because Nesbitt/Molitor '637 never discloses those as preferred materials for any particular combinations of specific inner or outer cover layers of *three-piece* balls. (Tr. at 644:2-24, 649:14-16, 650:16-18 (Statz).) The Federal Circuit's predecessor court rejected exactly the sort of "mechanistic dissection and recombination of the components of the specific illustrative compounds in every chemical reference containing them, to create hindsight anticipations with the guidance of an applicant's disclosures, on the theory that such reconstructed disclosures merely describe specific compounds within the meaning of section 102." *In re Ruschig*, 343 F.2d at 974. Contrary to that rule of law, Dr. Statz stitched together Nesbitt with selected single cover layers in Molitor '637 to arrive at the two-layer cover with the specific combination of materials in the asserted claims.

It is true that a prior art reference that discloses a "definite and limited" genus may anticipate claims to a species. *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962) (20 compounds); *In re Schaumann*, 572 F.2d 312, 313 (C.C.P.A. 1978) (7 compounds). But the Federal Circuit held that *all* the materials listed in Molitor '637 are incorporated into Nesbitt, *Callaway Golf*, 576 F.3d at 1345-47, and even Dr. Statz agreed that is a "long laundry list." (Tr. at 649:6-16.) Likewise, the disclosure in Molitor '637 that its list is "not meant to be limiting or exhaustive" is the antithesis of disclosing a "definite and limited" genus of three-piece balls. (DX-12 at 5:51-54.)

Finally, the Federal Circuit's cases holding that claims involving a compound are anticipated by a reference that includes the precise compound in a list—even if it is a long list—

are inapplicable. *See, e.g., In re Gleave*, 560 F.3d 1331, 1333-34, 1338 (Fed. Cir. 2009) (finding claims to a nucleotide sequence anticipated by a reference that included such a sequence in a long list of sequences); *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1376-77 (Fed. Cir. 2005) (finding claims to applying a type of compound to treat sunburn anticipated by a reference that included two compounds of that type, along with 12 others, where the district court found the "disclosed compositions include *all* the various ingredients in the concentrations claimed"). Unlike the prior art references in those cases, Nesbitt/Molitor does not contain a long list of three-piece golf balls that includes a specific example of a ball that has an inner cover layer with a low-acid ionomer or blend of low-acid ionomers and a polyurethane outer cover layer, much less such a ball with the other requisite elements of the Sullivan claims. So it merely discloses a genus of three-piece golf balls, and anticipation should be analyzed under the above genus cases.

### 4. There Was No Evidence that Nesbitt/Molitor '637 Discloses All Elements Arranged as in the Asserted Claims.

The flaws in Acushnet's anticipation case are compounded by the fact that, even assuming Nesbitt/Molitor '637 had actually disclosed all the material and hardness requirements of the Sullivan claims somewhere within its four corners, which it does not, nowhere does it disclose them *as arranged in the claims*. The Federal Circuit has repeatedly held that a reference that discloses all the claim limitations still does not anticipate unless the reference itself links all the elements together as claimed. *See, e.g., Net MoneyIN*, 545 F.3d at 1369 (finding no anticipation of a claim to an Internet payment system comprising five "links" by a reference that disclosed all five "links" in two separate embodiments, "[n]either of [which] contains all five links arranged or combined in the same way as claimed in the [asserted] patent"); *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1369 (Fed. Cir. 2000) (finding no anticipation of claims directed to the use of hydrazine with a mixed resin bed to deoxygenate

45

water by a reference that included one portion teaching deoxygenation with hydrogen and a mixed bed and a separate passage that discussed deoxygenation with hydrazine, but that did not link the disclosure of hydrazine and the disclosure of a mixed bed); *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452 (Fed. Cir. 1984) (reversing finding of anticipation, even though the prior art reference could be said to contain all of the elements of the claimed invention, because the disclosed device as a whole was "entirely different" from the claimed invention and because it was erroneous to "treat[] the claims as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning"); *In re Arkley*, 455 F.2d 586, 587-89 (C.C.P.A. 1972) (reversing an anticipation rejection of claims to a class of compounds by a reference that disclosed two precursors to the claimed compound and separately mentioned that compounds like those precursors could be converted into a claimed compound because the reference itself did not link the two disclosures or otherwise teach converting the precursors into a claimed compound).

Nesbitt/Molitor '637 does not disclose the limitations of the Sullivan claims "as arranged in the claims" because nowhere does it disclose even one golf ball meeting the material and hardness requirements for each layer—*i.e.*, a core, an inner cover layer comprising a low-acid ionomer or blend of low-acid ionomers with a Shore D greater than 60, and an outer cover layer comprising polyurethane with a Shore D less than 64. There are three-piece golf ball embodiments in Nesbitt, but none of them includes polyurethane or a blend of ionomers. There are two-piece golf ball embodiments in Molitor '637 that include polyurethane or an ionomer blend in the cover, but none of them have an inner and outer cover layer. And, at best, there is a disclosure in Nesbitt that an outer cover layer composed of a specific type of ionomer ended up having a balata-like hardness, but no disclosure of the desirable hardness to achieve both good distance and reasonable feel if one were to choose a different material with different properties,

46

such as polyurethane, for the outer cover layer. Nothing in Nesbitt/Molitor '637 itself discloses the golf ball that Dr. Statz created by (1) using the blend of ionomers in the single cover layer of Table 2 of Molitor as an inner cover layer of Nesbitt's ball, (2) using the polyurethane single cover layer of Table 10 of Molitor as an outer cover layer of Nesbitt's ball, and (3) using the generic reference to the Shore D hardness of an embodiment in Nesbitt with an ionomer outer cover layer as the harness of a polyurethane outer cover layer with two different materials borrowed from Molitor (blend of ionomers for inner cover and polyurethane for outer cover). (Tr. at 567:2-571:25.) Thus, Dr. Statz's testimony fails to demonstrate anticipation.

C.    **The Obviousness Verdict Was Against the Great Weight of the Evidence.**

A new trial is appropriate on obviousness not just because of the issues noted above, but because the verdict was against the great weight of the evidence and would result in a manifest injustice. A new trial can be granted on the basis of the weight of the evidence even where JMOL cannot be. *Fineman*, 980 F.2d at 211.

An obviousness analysis requires assessing four factors: (1) the scope and content of the prior art, (2) the differences between the prior art the claimed invention, (3) the level of ordinary skill in the art, and (4) the objective criteria of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). This analysis cannot be based on hindsight. "It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve a desired result." *Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*, 139 F.3d 877, 882 (Fed. Cir. 1998) (citation omitted). Because issued patents are presumed valid, Acushnet had to prove obviousness by clear and convincing evidence. *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). The presumption of validity is especially hard to overcome when the Patent Office considered the allegedly invalidating prior art during prosecution. *Id.*

47

Acushnet's obviousness case, while simple to summarize, was strikingly lacking in substance. Dr. Statz argued one of ordinary skill in the art would have found it obvious to (1) start with the three-piece ball of either Nesbitt, Proudfit, or the Wilson Ultra Tour Balata, (2) use the blend of low-acid ionomers from either Molitor '637 or Proudfit as an inner cover layer, (3) change the outer cover from an ionomer or balata to the polyurethane outer cover from the two-piece balls of either Molitor '751 or the Titleist Professional, (4) adjust the polyurethane outer cover layer's Shore D, and/or modify layers beneath it, to ensure the outer cover on-the-ball hardness was less than 64, and (5) adjust the ball's properties, to ensure the other claimed material, hardness, and thickness requirements are still met after the first four steps.

The problem with Dr. Statz's approach is that the prior art cannot be used as a mere catalog of parts, especially in an unpredictable field such as golf ball design. "[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 419. Here, Dr. Statz's failure to articulate a coherent reason *why* one skilled in the art would combine the references as he did when the references themselves teach away from the solution, the strong objective criteria showing that no one thought to combine these long-existing building blocks until Mr. Sullivan, the unpredictability of the art, the fact many prior designers thought they had found the "Holy Grail" only to come up short, and the failure of any reference to disclose a polyurethane outer cover layer with Shore D hardness less than 64 show the obviousness verdict was against the great weight of the evidence. Acushnet itself certainly thought the basic concept covered by the Sullivan inventions was patentable (before learning that the Sullivan patents had issued to Spalding and had priority over the Hebert patents), because Acushnet's Hebert patents claimed nearly the same concept—albeit two years too late.

The jury's findings on anticipation also likely drove its verdict on obviousness. As the Federal Circuit has said, anticipation is the "epitome of obviousness." *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983). Once the jury found anticipation based on Nesbitt's incorporation of a portion of Molitor '637—a finding that is not supported by any evidence—it is not surprising it quickly found obviousness despite the many flaws in Acushnet's case, given that one of Acushnet's combinations was Nesbitt and the entirety of Molitor '637.

### 1.    Golf Ball Design Is an Unpredictable Art.

When golf ball design is viewed as the truly unpredictable field that it is, it shows that Dr. Statz's conclusory testimony regarding obviousness was against the great weight of the evidence. Witnesses on both sides agreed that golf ball design must account for many variables, small changes to any one of which can yield large changes in performance:

- o  Mr. Cavallaro (of Acushnet): "Q. In your experience as a golf ball designer, is golf ball design a predictable discipline? A. In my opinion, no." (Tr. at 885:7-9.)

- o  Mr. Cavallaro: "Q. You testified a little bit ago about the unpredictability of golf ball design. Does that apply also when you are adding additional cover layers to a golf ball? A. In my opinion, *if you are adding another layer to the ball*, and you're – you have not done so before, *you have no idea what the effect is going to be*, so experimentally, you would have to prove it out." (Tr. at 886:18-25.)

- o  Mr. Cavallaro: "Q. So you are never sure until you actually test the product and see how it performs? A. Correct. In my opinion." (Tr. at 882:10-12.)

- o  Mr. Dalton (of Acushnet): "Q. Can small changes in the design of a ball have a big performance impact? A. Yes, they can." (Tr. at 384:8-10.)

- o  Mr. Dalton: "Golf balls look simple, but they're really complex, and all of the parts have to work together." (Tr. at 406:12-16.)

- o  Mr. Sullivan (of Acushnet): "Q. Changing the materials on a golf ball can dramatically alter the overall characteristics of the ball? A. Sure it can, yes." (Tr. at 485:7-13.)

- o  Mr. Morgan (of Acushnet): "As we design golf balls, there are many variables in the design that will influence what occurs on that type of shot, and the hardness of the cover is clearly one of the things we have to consider." (Tr. at 249:17-23.)

- Mr. Kennedy (of Callaway Golf): "Q. In your experience, can a golf ball designer predict what performance would result in a given combination of materials in a given construction? A. It sounds funny after working in three years, but not really. You really have to make the product and test it out, because we're always getting surprised by the results that we get with different combinations of materials." (Tr. at 829:9-15.)

- Mr. Yagley (of Callaway Golf): Explanation on cross-examination that the size and composition of the core, the inner cover layer material and thickness, and the outer cover layer material, construction, and thickness can all have a dramatic impact on performance. (Tr. at 803:9-804.1)

By contrast, Acushnet introduced no evidence to suggest golf ball design was predictable. So its suggestion in closing that this was a case in which there were "a finite number of identified predictable solutions" is against the great weight of all this evidence. (Tr. at 1471:19-24.) There were thousands of potential options to try and, as Mr. Cavallaro observed, the skilled artisan would have "no idea" whether he could expect a given combination of properties to succeed. Indeed, all of the skilled prior art artisans thought they had succeeded by doing something else.

## 2. There Was No Reason to Combine Acushnet's References or to Expect Doing So Would Lead to a Reasonable Chance of Success.

"[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418-19. Failure to identify a reason to modify or combine references to arrive at the claimed invention or that such a combination would lead to a reasonable chance of success can be fatal to an obviousness challenge. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1357-62 (Fed. Cir. 2007) (affirming finding of non-obviousness where the evidence did not show a reason why the skilled artisan would select a lead compound and modify it to arrive at the claimed compound from broad selection available in the art). This is because the absence of such evidence shows the alleged "obviousness" of the proffered combination is

based purely on hindsight. *KSR*, 550 U.S. at 418-19. Acushnet's failure to identify such a reason is fatal to its obviousness case here for just that reason.

Acushnet had ample warning its "reason to combine" case was weak. During the last trial, it could not muster any testimony from Dr. Statz that one skilled in the art would have a reason to combine the Wilson Ultra Tour Balata with either Molitor '751 or the Wu patent, leading the Court to conclude Acushnet's obviousness case with respect to these combinations was "deficient as a matter of law." (D.I. 492 at 18.) His testimony addressing reason to combine his five obviousness combinations was barely better this time. This is hardly surprising given that he did not think to use polyurethane as an outer cover layer himself in 1995 during his own search for the "Holy Grail" that Sullivan found. (Tr. at 628:23-630:1, 637:13-16 (Statz).)

Dr. Statz's testimony regarding reason to combine occupies a precious few transcript pages. (Tr. at 548:9-16, 576:8-19, 583:22-584:6, 590:12-22, 597:7-15, 605:20-606:16.) His argument seemed to be that there were only three materials available for use in making a golf ball—ionomers, balata, and polyurethane—and that if someone had used ionomer and balata outer cover layers on a three-piece ball already, he would also try polyurethane because it is more durable than balata. Dr. Statz's testimony is contrary to the Molitor '637 patent, which explains that there are many, many materials that could be used as a golf ball cover. (DX-12 at 5:27-55.) But instead of addressing that point, Dr. Statz lapsed into simply assuming one skilled in the art would try adding polyurethane to a three-piece ball without explaining why one of ordinary skill in the art would try that design over the thousands of other tiny changes to an existing two- or three-piece ball's design that could impact performance. His testimony regarding the Wilson Ultra Tour Balata and Molitor '751—which had been wholly absent from the first trial—is representative of the problem:

51

> Q.   So in your opinion, would someone of ordinary skill in the art have been motivated to combine the polymer material as described in the Molitor 751 patent with the Wilson Ultra-Tour Balata ball?
>
> A.   Yes, because we know that urethanes are more durable than Balata, and *if one use[s] a multi-layer ball,* that's in the Proudfit case or this ball *covers it with a urethane in the '751, you end up with a urethane covered multi-layer ball.*

(Tr. at 597:7-15.)  In other words, Dr. Statz simply notes polyurethane is durable and says that if one takes a three-piece ball and covers it with polyurethane, one has all the claim elements.  That is not actually true because the combination still does not disclose a Shore D less than 64 for a polyurethane outer cover layer.  But putting that aside, it still fails to explain *why* one of ordinary skill in the art would (1) start with a three-piece rather than a two-piece ball, (2) switch to polyurethane instead of an ionomer (or some other material), or (3) consider a change to the outer cover layer material at all, rather than one of the thousands of other changes one could make.  He also never analyzed the other changes one skilled in the art would think that replacing balata with polyurethane would have on the ball's distance, feel, and spin—changes that could have been enormous as the testimony quoted in the previous section demonstrates.  He never discussed why one would employ the hardness, thickness, and other properties in the claims along with polyurethane.  Nor did he explain why the skilled artisan would employ a low-acid ionomer or blend of low-acid ionomers in the inner cover layer, rather than a high acid ionomer, which Acushnet's other witnesses trumpeted as a readily available non-infringing alternative.  And when analyzing whether there was a reason to combine the Ultra Tour Balata with the Titleist Professional, he improperly testified simply about what "Jim" would have done rather than what a hypothetical person of ordinary skill would have known.  (Tr. at 605:19-606:3.)

Against Acushnet's dearth of evidence was a mountain of testimony suggesting that combining the references in the manner proposed by Dr. Statz was far from intuitive and would not have a reasonable expectation of success. *Takeda*, 492 F.3d 1361.  As an initial matter, the

52

evidence of unpredictability quoted above weighs against a reasonable likelihood of success in any new combination. And prior poor experience with polyurethane demonstrated its drawbacks. Mr. Sullivan testified that thermoplastic urethanes, such as those described in Molitor '751, are "generally dead materials" whose use results in less distance off the tee. (Tr. at 509:3-510:4.) In addition, it was widely known that the Molitor '751 ball (the Spalding Tour Edition) encountered manufacturing and performance problems because of its polyurethane cover. (Tr. at 543:21-544:20, 655:3-25 (Statz); 506:14-507:6, 508:17-510:10 (Sullivan); 837:5-8 (Kennedy); 951:25-952:21 (Risen); DX-1002.) When asked to fix those problems, Dr. Statz and his colleagues at DuPont solved those problems by *removing* polyurethane from the material entirely and making it a pure ionomer. (Tr. at 655:3-25.) Even in 2000, Spalding was reluctant to use polyurethane because "we had some bad experience[s] with it" before. (Tr. at 836:18-837:1 (Kennedy).) And when Max-Fli chose to use polyurethane in its new ball in the mid-1990s, it did so with a wound ball, rather than a solid-core ball. (Tr. at 765:10-19 (Yagley).)

What is more, there are an enormous number of potential solutions—not the finite number that Dr. Statz suggested. As Acushnet was fond of noting, the patents-in-suit themselves cite over 200 prior art references. Ironically, many of those references—including the Nesbitt and Molitor references—believed that they had discovered the "Holy Grail" that golf ball designers had been searching for since the 1970s. (DX-12 at 2:34-36, 5:51-54; DX-9 at 1:35-44.) But these balls, especially Nesbitt's, were now "unacceptable by today's standards." (PX-3 at 3:11-20.) Likewise, Mr. Kennedy explained there were "thousands" of different choices for materials alone in 1995, before one even considered thickness, hardness, and other variables. (Tr. at 828:21-829:8.) That testimony was corroborated by the Molitor '637 patent, which, as explained in detail above in connection with anticipation, lists 9 diverse categories of materials that include thousands of members each. (DX-12 at 5:27-55.) Dr. Statz's testimony that there

was a reason to combine the prior art to obtain the claimed invention and a reasonable likelihood that doing so would succeed was thus against the great weight of the evidence.

### 3. The Objective Criteria Strongly Support a Finding of Non-Obviousness and Greatly Outweigh Acushnet's Evidence.

The objective criteria of nonobviousness "often serve as insurance against the insidious attraction of the siren hindsight when confronted with a difficult task of evaluating the prior art." *W.L. Gore*, 721 F.2d at 1553. Indeed, "evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art is not." *Minn. Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1573 (Fed. Cir. 1992). Objective considerations relevant here include commercial success, long-felt need, skepticism of others, and unexpected results. Dr. Statz's conclusory assertion that these considerations did not change his opinion of obviousness because "all the elements are described in the prior art" should be given little, if any, weight. (Tr. at 610:20-611:24.) After all, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418.

### a. The Infringing ProV1 Enjoyed Unprecedented Commercial Success.

Commercial success is an important indicator of non-obviousness because an invention with significant commercial value is likely to come to market immediately after it becomes obvious. An objectively reasonable company would not leave large sums of money on the table by not adopting technology that was obvious in 1995 until years later. Yet that is precisely what Acushnet now claims it did with the ProV1—a ball it reluctantly launched in late 2000, despite claiming the idea was obvious in 1995. The great weight of the evidence was otherwise. Acushnet did not implement the ProV1 until late in 2000 because, even then, it was not entirely

sure it was a good idea.  (Tr. at 357:7-360:25 (Morgan); PX-711.)  When it finally started selling

the ProV1, it enjoyed "unprecedented" commercial success, as its own witnesses and documents

concede.  The ProV1 admittedly embodies the Sullivan patents, and its success is therefore

presumptively due to the patented invention.  *J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue

Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  Acushnet did nothing to rebut that presumption.  *All*

the "other" technology on the ProV1—the Wu polyurethane, the large core, the corona process,

and dimple pattern—had been used on other balls, (Tr. at 258:9-259:10, 279:5-10, 280:7-13,

348:14-23 (Morgan)), yet none was as successful or rendered the wound ball obsolete.  Thus, the

ProV1's commercial success was due to its fundamental, and patented—by both Sullivan and

Hebert/Morgan—construction and thus strongly supported a finding of non-obviousness.

Acushnet's witnesses could not deny the ProV1 was a "fantastic success," "phenomenally

successful," far more successful than its prior solid golf balls, and was perhaps the most

successful ball ever.  (Tr. at 366:1-3 (Morgan); 732:20-733:4 (Bellis); PX-1201.)  The total

revenue from the ProV1 was almost $2 billion.  (Tr. at 717:18-20 (Bellis).)  The ProV1 broke

sales and market share records within months of its launch and throughout its commercial life.

For example, in October 2006, it attained a "record" on golf course market share of 23.1%, and

70% of PGA tour players currently use it.  (Tr. at 1121:10-19 (Bohn); 1123:2-7 (Sine).)

Acushnet's CEO, and its own documents and witnesses confirmed the ProV1's

unprecedented success led to a wholesale paradigm shift, quickly rendering the wound-ball

technology upon which the company had been built obsolete:

- o   Shortly after the introduction of the Pro V1, Wally Uihlein, Acushnet's CEO, was quoted
    as saying, "We essentially elected to *obsolete ourselves* in a very important area [wound
    golf balls] and put everything behind the Pro V1." and "I think it is the *most massive
    paradigm shift ever* seen in the golf ball category, and certainly the most intense and
    accelerated one in any product category that I have ever witnessed."  (PX-722; Tr. at
    744:19-745:7 (Bellis).)

o  George Sine, a marketing executive for Acushnet, wrote in a 2001 e-mail to Bellis, "Acushnet has endured considerable challenges, as well as exhibited incredible responsiveness to the immediate *paradigm shift from wound urethane to solid urethane technology* resulting from the immense success of the Titleist Pro V1 golf ball." (PX-1201; Tr. at 730:18-731:24 (Bellis).)

o  Uihlein stated that "*the Pro V1 saved the company*." (PX-723; Tr. at 745:8-16 (Bellis).)

o  Acushnet's Vice President of Advertising and Communications confirmed that the shift to the ProV1 was "the *largest pluralistic shift of equipment at one event in golf history*" and that "never before has one golf ball registered such a significant share during its first month." (Tr. at 1119:12-1120:14 (Bohn).)

Acushnet's suggestion its overall market share and profits did not increase when the ProV1 replaced its wound balls is a red herring. The entire company would have suffered a quick demise if it were not "saved" by adoption of the Sullivan technology. Acushnet accelerated the ProV1's launch to stave off the competition. (Tr. at 743:12-16 (Bellis).) Maintaining dominant market share despite a wholesale paradigm shift to a solid-core, multi-layer ball with a polyurethane cover, and away from the type of premium wound ball Acushnet produced for many decades, is a success Acushnet would not have enjoyed without the infringing ProV1.

The weight of the evidence also showed the ProV1's commercial success was due to its improved performance. Messrs. Morgan and Bellis readily admitted the ProV1's improved performance as a result of the patented combination of features drove its success and was the centerpiece of Acushnet's marketing. (Tr. at 366:1-367:12 (Morgan); 726:17-730:12, 733:5-734:16 (Bellis); 1118:5-24, 1120:15-1122:2 (Bohn); 874:8-18 (Hebert); PX-1121.) Acushnet relies on top players' endorsements to market its products to the masses, and the top players want a ball with superior performance—the ProV1. (Tr. at 734:13-735:9, 736:1-4 (Bellis).) Acushnet's claim the ProV1's success was due to its marketing practices and branding ignores the fact that Acushnet's marketing is successful only because the ProV1's superior performance allows it to maintain the endorsements of top players. Indeed, Mr. Mickelson's testimony would have reinforced this point by showing that, without a ball comparable to the Rule 35, Acushnet

would likely have lost many top players and its pyramid of influence marketing scheme would have collapsed.  Acushnet's prior wound balls had the same marketing and branding behind them but suffered a quick death after the Pro V1's launch.

<div align="center">

**b.**   **Sullivan's Inventions Were the "Holy Grail" of Golf Ball Design—a Combination of Long Distance and Good Control.**

</div>

Golf ball designers had been searching for the "Holy Grail"—a ball that could combine long distance off the tee with spin and control around the green—since the 1970s.  (Tr. at 728:25-730:1 (Bellis); 625:8-627:8, 628:23-630:1 (Statz); 913:4-914:18 (Risen).)  The Sullivan invention, embodied in the ProV1, was that "Holy Grail."  (*Id.*; *see also* Tr. at 367:4-12 (Morgan); PX-1121; PX-973 at AC00283.82.UR (saying, of the ProV1 that "many players have told us it's like playing with two different balls:  one for the driver and one for the short game.")  The marketplace recognized this immediately, for Acushnet's customers switched to the ProV1 from its wound balls almost overnight, and the switch was due to the ProV1's superior performance.  (Tr. at 356:18-21, 366:1-367:12 (Morgan); 726:17-727:17, 730:18-731:24, 733:5-734:16, 744:19-745:7 (Bellis); 1118:5-24, 1120:15-1122:2 (Bohn); PX-1201; PX-722.)  No other ball was ever adopted so quickly or to such a large extent.  (Tr. at 1119:12-1120:14, 1121:10-19 (Bohn); 1123:2-7 (Sine).)  The Sullivan invention's ability to satisfy this long-felt need strongly supports the validity of the Sullivan patents.  *WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1359 (Fed. Cir. 1999).

<div align="center">

**c.**   **Acushnet Was Skeptical of Sullivan's Approach Until Others Adopted It.**

</div>

Even though Sullivan's invention resulted in a golf ball that would prove to be phenomenally successful, Acushnet was uncertain about this new approach at the time.  Mr. Morgan's testimony and internal e-mail from June 2000 demonstrated that upper management at Acushnet was still convinced that "wound is best" and was reluctant to release the ProV1.  (Tr. at

<div align="center">57</div>

357:7-360:25 (Morgan); PX-711.)  It was not until the Callaway Golf Rule 35 ball entered the

market and posed a threat that Acushnet begrudgingly released the ProV1.  (Tr. at 361:4-364:16

(Morgan); 741:17-743:16 (Bellis).)  But even after the ProV1's release, Acushnet doubted it

would enjoy the success that it did.  The product brief from the ProV1 at the time hypothesized

that "Wound golf balls will continue to enjoy consumer demand. . . ." (PX-954 at

AC101060.UR.)  And Mr. Bellis conceded that Acushnet had planned on going forward with

both the ProV1 and its wound balls for some time but that the switch to the ProV1 "happened

more quickly than we anticipated."  (Tr. at 725:18-727:11; PX-954.)  Acushnet's skepticism

about the invention at the time flatly contradicts the story it spun at trial, and strongly shows non-

obviousness.

### d.    The Success of Sullivan's Inventions Surprised Even Acushnet.

The skepticism of others about the ProV1's prospects for success was met with

unexpected results about how it performed.  Those unexpected results strongly support

nonobviousness. *Lindemann,* 730 F.2d at 1461.  Mr. Hebert, one of the ProV1's designers,

testified that when Acushnet began testing golf balls using his Veneer concept, it tested both

wound and solid cores.  Hebert recalled that it was "exciting" that many of the professionals who

tested the solid and wound-core prototypes actually preferred the solid-core construction or could

not tell the difference.  (Tr. at 874:4-877:3.)  These results were "surprising" to Hebert as he

thought the better players would still prefer wound constructions.  (*Id.*)  Mr. Hebert's

contemporaneous documents confirm that he obtained unexpected results from his Veneer

Prototypes, which became the infringing ProV1.  (DX-385 at AC40403; Tr. at 341:18-342:19.)

Mr. Morgan's 2001 presentation expressed similar surprise that the ProV1 was "longer" than

expected for a soft-urethane covered ball, yet still performed like a soft-covered wound ball (the

Tour Prestige). (PX-973 at AC 028386-87.UR.)

**D.      A Manifest Injustice Would Result if the Verdict of Anticipation and Obviousness Were Allowed to Stand.**

Letting the verdict stand in the face of Acushnet's complete failure of proof on anticipation, the strong evidence of non-obviousness, and the prejudicial errors discussed above would be a manifest injustice in any case.  But it would be particularly unjust here because the only reason Acushnet was able to get "another bite at the apple" on obviousness, (D.I. 492 at 25), was because it remained silent and permitted the previous inconsistent verdict to be accepted, knowing it would jump on that inconsistency at the Federal Circuit.  Acushnet says it did not object before the jury was dismissed because it was "beaten to the punch."  (D.I. 492 at 23.)  But had it raised its objections to the verdict before the jury was dismissed and simply joined Callaway Golf's request to remedy the situation, rather than lie in wait until post-trial briefing, it is possible—indeed likely—that faced with a joint request from the parties, the sole problem with the first verdict would have been fixed on the spot.  Acushnet did not need to do any legal research to know the verdict was inconsistent.  It must have had the same arguments in mind when the verdict was read that it eventually made in its post-trial briefs.  Yet, it said nothing.  The likelihood the inconsistency would have been remedied—removing an appellate issue—is a more likely explanation for Acushnet's silence than having been "beaten to the punch."

After its lying in the weeds paid off at the Federal Circuit, Acushnet took full advantage of its second chance.  As the comments of Acushnet's counsel quoted at the outset show, it retooled its case in a way that encouraged the jury to decide the case based on something other than the technical evidence.  As part of that strategy, it made a key evidentiary objection to the Hebert patents that it had not dared to raise at the Federal Circuit, which allowed it to tout its other "patented" technology without fear of repercussion.  It also encouraged, and then exploited, a number of other changed rulings from the last trial.  Callaway Golf understands it is asking a

busy, overworked, and long-understaffed Court to undertake a third trial.  Nevertheless,

Callaway Golf respectfully submits that a manifest injustice would result if the verdict here is

allowed to stand, and only a new trial can remedy that injustice.

## VI.    CONCLUSION

For the reasons explained above, Callaway Golf respectfully requests that the Court

exercise its broad discretion to grant a new trial on obviousness and anticipation.  In addition, the

verdict is not supported by substantial evidence for the same reasons it is against the great weight

of the evidence.  Thus, judgment as a matter of law is appropriate.  *Arthrocare*, 310 F. Supp. 2d

at 666-67.  Nonetheless, Callaway Golf respectfully submits that simply granting a new trial on

both issues may be the more efficient way to resolve the case at this juncture.

Dated:  April 30, 2010               FISH & RICHARDSON P.C.


By:   */s/ Thomas L. Halkowski*
        Thomas L. Halkowski (#4099)
        222 Delaware Avenue, 17th Floor
        P.O. Box 1114
        Wilmington, DE  19899-1114
        Tel:  (302) 652-5070
        Fax:  (302) 652-0607

        Frank E. Scherkenbach
        225 Franklin Street
        Boston, MA 02110-2804
        Tel:  (617) 542-5070
        Fax:  (617) 542-8906

        Roger A. Denning
        12390 El Camino Real
        San Diego, CA 92130
        Tel: (858) 678-5070
        Fax:  (858) 678-5099

        ATTORNEYS FOR PLAINTIFF
        **CALLAWAY GOLF COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2010, I electronically filed with the Clerk of Court

Callaway Golf's Motion for a New Trial and Judgment as a Matter of Law using CM/ECF which

will send electronic notification of such filing(s) to the following Delaware counsel.  In addition,

the filing will also be sent via hand delivery:

Richard L. Horwitz                          Attorneys for Defendant
David E. Moore                              ACUSHNET COMPANY
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE  19899-0951


Henry Bunson                               Attorneys for Defendant
Joseph P. Lavelle                           ACUSHNET COMPANY
Brian A. Rosenthal
Howrey LLP - DC
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004


                                    /s/ Thomas L. Halkowski
                                    Thomas L. Halkowski

1