**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-91 (SLR) |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ACUSHNET'S OPPOSITION TO CALLAWAY GOLF COMPANY'S MOTION FOR A NEW TRIAL AND JUDGMENT AS A MATTER OF LAW

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel:  (202) 783-0800

Dated:  June 1, 2010
Public Version Dated: June 8, 2010
969736/30030

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................................... 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ...................................... 5

III.   FACTUAL BACKGROUND ......................................................................... 6

    A.    The Patents-in-Suit ............................................................................ 6

    B.    The Prior Art ...................................................................................... 7

IV.   LEGAL STANDARDS ................................................................................. 8

    A.    Motion for a New Trial ...................................................................... 8

        1.    New Trials Based on Court Errors Should be Granted Sparingly ............... 8

        2.    New Trials Should Not Be Granted Unless the Jury's Verdict was
            Against the Great Weight of Evidence and it is a "Miscarriage of
            Justice" to let the Verdict Stand ............................................... 8

    B.    Motion for Judgment as a Matter of Law ......................................... 9

V.    ARGUMENT ............................................................................................... 10

    A.    The Court Should Not Grant a New Trial Based on Alleged Evidentiary
        Errors ............................................................................................... 10

        1.    Exclusion of the Hebert Patents Was Proper and Prevented
            Substantial Jury Confusion ....................................................... 11

            a.    The Hebert Patent Claims are Substantially Different from
               those of the Patents-in-Suit ........................................... 12

            b.    Whatever Probative Value the Hebert Patents Could Offer
               Was Obtained From Other Evidence ............................. 14

            c.    Acushnet Did Not Exploit the Exclusion of the Hebert
               Patents ......................................................................... 17

            d.    That the PTO Issued the Hebert Patents Does Not Support
               the Validity of the Patents-in-Suit ............................... 18

        2.    Acushnet's Testimony That It Relied on Outside Counsel's
            Opinions Was Necessary to Rebut Callaway's Misleading Line of
            Questioning .............................................................................. 19

i

3.      The Testimony from Both Nesbitt and Proudfit Was Properly Excluded Because the Testimony Was Irrelevant to the Issue of Invalidity..................................................................................23

4.      Acushnet's Damages Evidence that it Developed and Tested Golf Balls With High-Acid Inner Cover Layers Was Not "Previously Undisclosed"...........................................................................27

5.      Callaway Proffered Mr. Mickelson's Testimony As Relevant to Damages, Not Obviousness and Anticipation ............................................30

VI.     THE COURT'S JURY INSTRUCTIONS WERE PROPER............................................33

        A.      The Court's Omission of a Jury Instruction on the Presumption of Validity Does Not Warrant a New Trial..........................................................................33

        B.      The Court's Decision to Include the "Pieces of the Puzzle" Instruction Was Not Legally Erroneous ..............................................................................36

VII.    CALLAWAY'S MOTION FOR A NEW TRIAL OR JMOL BASED ON THE EVIDENCE ADDUCED AT TRIAL SHOULD BE DENIED ......................................38

        A.      The Jury's Anticipation Verdict Is Not Against the Great Weight of the Evidence ...................................................................................................38

                1.      Nesbitt/Molitor '637 Expressly Discloses a Polyurethane Outer Cover with a Shore D Hardness of 64 or Less ...........................................38

                2.      Callaway's Genus/Species Arguments are Inapplicable to Nesbitt...........41

                3.      Nesbitt/Molitor '637 Discloses All of the Elements As Arranged in the Asserted Claims ..............................................................................45

        B.      Acushnet Presented Substantial Evidence that the Asserted Claims are Obvious.....................................................................................................46

                1.      Acushnet Demonstrated Ample Motivation to Combine .........................47

                2.      Acushnet Proved Reasonable Expectation of Success .............................49

                3.      Callaway's Unpredictability Arguments Cannot Overcome the Prior Art's Express Teachings .................................................................51

                4.      Secondary Considerations Cannot Outweigh the Strong Showing of Obviousness ..................................................................................52

                        a.      There is No Nexus Between the Claims and the Pro V1's Success..........................................................................................54

     b.  The Patents-in-Suit Were Not The "Holy Grail"............................56

     c.  Callaway's "Skepticism" and "Unexpected Results"
        Assertions Are Misplaced.............................................................57

VIII. CONCLUSION ....................................................................................59

# TABLE OF AUTHORITIES

## CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) ...................................................................25, 26

*Anderson's Black Rock, Inc. v. Pavement Salvage Co.,*
396 U.S. 57 (1969) ...............................................................................................54

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
406 F.3d 1365 (Fed. Cir. 2005) ..........................................................................46

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
310 F. Supp. 2d 638 (D. Del. 2004) ......................................................................8

*Aventis Pharma Deutchland GmbH v. Lupin, Ltd.,*
499 F.3d 1293 (Fed. Cir. 2007) ..........................................................................37

*Caisson Corp. v. Ingersoll-Rand Co.,*
622 F.2d 672 (3d. Cir. 1980) .........................................................................8, 29

*Callaway Golf Co. v. Acushnet Co.,*
576 F.3d 1331 (Fed. Cir. 2009) ....................................................................*passim*

*Chiron Corp. v. Genentech, Inc.,*
363 F.3d 1247 (Fed. Cir. 2004) ..........................................................................33

*In re Corkill,*
771 F.2d 1496 (Fed. Cir. 1985) ..........................................................................52

*Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.,*
807 F.2d 955 (Fed. Cir. 1986) ............................................................................25

*Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.,*
471 F.3d 1369 (Fed. Cir. 2006) ..........................................................................44

*In re Farrenkopf,*
713 F.2d 714 (Fed. Cir. 1983) ............................................................................58

*Fineman v. Armstrong World Industries, Inc.,*
980 F.2d 171 (3d Cir. 1992) .................................................................................9

*Fineman v. The Industry Network Systems, Inc.*
774 F. Supp. 225 (D. N.J. 1991) ..........................................................................9

*Fujinon Corp. v. Motorola, Inc.*,
    Civ. No. 07-533-GMS-LPS, 2009 U.S. Dist. LEXIS 83088 (D. Del. Sept. 11, 2009) ...........44

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ......................................................................................................53

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006) .................................................................................44

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ..................................................................................................36

*Key Technology, Inc. v. Simco/Ramic Corp.*,
    137 F.R.D. 322 (D. Or. 1991)....................................................................................14

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*,
    554 F.3d 1010 (Fed. Cir. 2009) .................................................................................13

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ..............................................................................24, 44

*Marra v. Philiadelphia Housing Authority*,
    497 F.3d 286 (3d Cir. 2007) .......................................................................................9

*Media Technologies Licensing, LLC v. Upper Deck Co.*,
    596 F.3d 1334 (Fed. Cir. 2010) .................................................................................58

*Merck & Co. v. Biocraft Laboratories, Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) ...................................................................................52

*Miniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed Cir. 2008) .............................................................................57, 58

*Motorola, Inc. v. Interdigital Technology Corp.*,
    121 F.3d 1461 (Fed. Cir. 1997) ...................................................................................8

*Net MoneyIN, Inc. v. Verisign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) .................................................................................46

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988) ...................................................................................52

*Ormco Corp. v. Align Technology, Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) .................................................................................17

*Pannu v. Iolab Corp.*,
   155 F.3d 1344 (Fed. Cir. 1998) ........................................................................ 9

*Perkin-Elmer Corp. v. Computervision Corp.*,
   732 F.2d 888 (Fed. Cir. 1984) ..................................................................... 9, 10

*Perricone v. Medicis Pharmaceutical Corp.*,
   432 F.3d 1368 (Fed. Cir. 2005) ..................................................................... 42

*In re Petering*,
   301 F.2d 676 (C.C.P.A. 1962) ................................................................ 41, 42

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ................................................................ 37, 52

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (U.S. 2000) ............................................................................. 10

*In re Ruschig*,
   343 F.2d 965 (C.C.P.A. 1965) ..................................................................... 44

*In re Schaumann*,
   572 F.2d 312 (C.C.P.A. 1978) ..................................................................... 43

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) ................................................................ 33, 34

*Syngenta Seeds, Inc. v. Monsanto Co.*,
   404 F. Supp. 2d 594 (D. Del. 2005) ........................................................... 9, 10

*Weinar v. Rollform, Inc.*,
   744 F.2d 797 (Fed. Cir. 1984) ..................................................................... 37

*Williamson v. Consolidated Rail Corp.,*,
   926 F.2d 1344 (3d Cir. 1991) ....................................................................... 9

*Wilson v. Vermont Castings, Inc.*,
   170 F.3d 391 (3d Cir. 1999) ..................................................................... 26, 36

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
   631 F. Supp. 2d 1010 (N. D. Ill. 2009) ........................................................ 42

## STATUTES

35 U.S.C. § 135 ........................................................................................ 19

Fed. R. Civ. P. 61 ...................................................................................................... 8

## MISCELLANEOUS

American Intellectual Property Law Ass'n Model Patent Jury Instructions ................................. 35

Federal Circuit Bar Ass'n Model Patent Jury Instructions .......................................................... 35

Patent Case Management Judicial Guide § 7.3.4.3 ............................................................... 34, 35

## I.   INTRODUCTION

Callaway's claim that the verdict represents manifest injustice is simply not well founded.  In the course of this case, Callaway successfully excluded Acushnet's test ball evidence showing the properties of golf balls made according to the prior art.  Callaway successfully excluded evidence that the PTO has reexamined the patents-in-suit and found them invalid.  Callaway successfully excluded evidence that the Board of Patent Appeals has consistently found virtually identical claims unpatentable.  █████████████████

███████████████████████████████████████████

███████ Despite the exclusion of all of this evidence, Acushnet presented substantial evidence to convince the jury that the patents-in-suit were both anticipated and obvious.

Callaway's brief incorrectly paints the first trial in this case as a Callaway victory from which Acushnet escaped only because of a technicality.  In reality, as the Federal Circuit recognized, the first trial was just as much a victory for Acushnet:  "Although it is true that the jury found 'without reservation' that eight claims were not invalid, it is equally true that the jury found claim 5 invalid without reservation."  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1334 (Fed. Cir. 2009).  Given the second jury's clear and consistent verdict that the claims were anticipated and obvious, a third trial is not warranted.

While Callaway asks for judgment as a matter of law, Callaway's stated preference is *not* for such a judgment, but instead for a third trial.  As such, Callaway's brief barely mentions its motion for judgment as a matter of law, and does not even address the standards required to prevail on such a motion.  Callaway avoids its JMOL motion for good reason; the Federal Circuit has already held in this case on a very similar record that "the evidence at trial was such that the jury could have rationally reached either verdict with regard to the asserted claims; neither party

was entitled to judgment as a matter of law." *Id.* (emphasis added). Thus, the short shrift Callaway gives to its JMOL is warranted; there is no basis to grant Callaway's motion for judgment as a matter of law.

Callaway argues that a new trial should be granted for two reasons: (1) the Court committed evidentiary and legal errors that were so prejudicial that denial of a new trial would be inconsistent with "substantial justice;" and (2) the verdict is against the clear weight of evidence and it would be a "miscarriage of justice" for Callaway to lose. Callaway identifies five evidentiary issues allegedly "triggered and exploited by Acushnet" that it says warrant a new trial. Callaway fails to prove error or prejudice that would warrant a third trial.

First, the Hebert patents were properly excluded. Callaway demonstrated in the first trial that its intended use of those patents was to improperly convince the jury that Acushnet received a patent on the "same invention" as that of the patents-in-suit, despite the fact that the claims are substantially different. Indeed, each of Callaway's arguments for the admission of the Hebert patents is based on the faulty premise that the Hebert patents are the same invention as the Sullivan patents. The Court's exclusion of the Hebert patents properly prevented Callaway from so misleading the jury in the second trial. At the same time, the Court allowed substantial evidence on related issues, including the invention record and testimony of Acushnet personnel that they thought the veneer concept was new and novel. Whatever probative value the Hebert patents might have had was already obtained through those other evidentiary sources.

Second, the admission of Acushnet's reliance on opinions of counsel to proceed with its business was done as a remedy for Callaway's improper questioning of Acushnet's damages expert on the last day of trial. Even though privilege was waived on this topic, Acushnet had no intention of mentioning the opinions of counsel until Callaway brought Acushnet's state of mind

2

squarely into question by implying that Acushnet had no good reason to continue to knowingly use an infringing design. The Court corrected this willful implication by allowing a very limited reference to the opinions of counsel. Acushnet did not take unfair advantage of that ruling, and did not seek to introduce the reexaminations that likewise supported its conclusion that the Sullivan patents are invalid. Acushnet asked a few limited questions about the opinions, did not mention that the opinions relied on the same art before the jury (Nesbitt and Molitor '637), and did not offer the opinions into evidence. Moreover, Acushnet intentionally avoided mentioning the opinions of counsel in closing to avoid any argument that it took unfair advantage of the ruling.

Third, the Court correctly excluded certain testimony of Messrs. Proudfit and Nesbitt. Mr. Proudfit's statements that he did not think of using polyurethane on a three piece ball are simply not probative of any issue in the case since there was no evidence presented that Mr. Proudfit knew anything about polyurethane covers. Mr. Nesbitt's testimony that his patent's reference to Molitor was not a reference to polyurethane was in direct conflict with the Federal Circuit's ruling and was thus properly excluded. Callaway's arguments that Dr. Statz improperly capitalized on the exclusion of this testimony are not well taken. Indeed, Callaway did not object to Dr. Statz's testimony, nor did Callaway try to offer the Nesbitt or Proudfit testimony after Dr. Statz testified.

Fourth, Callaway's complaint that evidence of Acushnet's 2001 high-acid Pro V1 alternatives was undisclosed in discovery is not well taken. Mr. Dalton testified in a deposition specifically conducted to address the 2001 high-acid Pro V1 alternative. Callaway chose not to ask Mr. Dalton at that time whether those alternatives were ever sold. Moreover, even if Callaway felt that somehow the testimony was inconsistent with disclosures in discovery,

3

Callaway should have objected during trial. Callaway made no such objection, and has waived any right to seek a new trial on that basis. Moreover, evidence of the 2001 high acid Pro V1 alternative was presented as part of Acushnet's damages case, not for invalidity. Hence the admission of that evidence cannot serve as the basis for a third trial on invalidity.

Fifth, Callaway's argument that the exclusion of Mr. Mickelson's testimony should lead to a new trial is misplaced. Callaway made abundantly clear during trial that Mr. Mickelson's testimony was being offered principally to rebut Acushnet's damages theory. Now Callaway argues that the exclusion of his testimony warrants a new trial on validity. Callaway's convenient change of tune aside, Mr. Mickelson's testimony had extremely limited probative value (if any), and the Court correctly ruled (as it did in the first trial) that the prejudice caused by his celebrity status would outweigh any probative value of his testimony. Moreover, Callaway agreed on the record that as long as Acushnet did not argue that players would switch back to a wound ball after playing the Pro V1, Mickelson's testimony was not necessary.

The alleged "legal errors" Callaway identifies relate to two jury instruction issues regarding the presumption of validity and obviousness. With respect to the presumption of validity, the Federal Circuit has explicitly approved omitting that instruction, and it appears in none of the current leading model patent instructions. In addition, the language Callaway objects to in the obviousness instruction comes directly from the Supreme Court's opinion in *KSR*, and was balanced (at Callaway's request) by a clarifying instruction. As such, the Court's instructions in no way constitute legal error warranting a new trial.

As to its motion for a new trial based upon the weight of the evidence, as discussed below, Callaway does not provide any credible argument that the verdict was against the great weight of evidence. Indeed, the Federal Circuit has already stated on a very similar record that

4

substantial evidence would support either an obviousness or non-obviousness verdict. Thus, Callaway's motion should be denied.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Callaway filed this lawsuit on February 9, 2006. On November 20, 2007, the Court granted Callaway's motion for summary judgment of no anticipation, and denied Acushnet's summary judgment motion of invalidity based on anticipation and obviousness. D.I. 347 & 348. Among Acushnet's bases for its invalidity motion was that the asserted claims were anticipated by Nesbitt, incorporating Molitor '637 by reference. The Court rejected that argument on the basis that Nesbitt did not incorporate Molitor '637 by reference. D.I. 347 at 6-13.

The remaining issue of obviousness was tried to a jury beginning on December 7, 2007. On December 14, the jury returned a verdict holding dependent claim 5 of the '293 patent invalid as obvious, but holding the other eight asserted claims, including independent claim 4 of the '293 patent, not invalid.[1] Acushnet filed a motion for JMOL on obviousness, or in the alternative a new trial in view of the jury's inconsistent verdicts. D.I. 409 & 417. Acushnet's motion was denied and judgment was entered on the verdict. D.I. 492 & 493.

Acushnet appealed to the Federal Circuit. The Federal Circuit issued its decision on August 14, 2009. In its opinion, the Federal Circuit reversed the Court's finding of no incorporation by reference, remanded for a determination of anticipation, and ordered a new trial on obviousness due to the inconsistencies in the verdicts. *Callaway*, 576 F.3d at 1348.

On March 3, 2010, the Court denied Acushnet's renewed motion for summary judgment on anticipation. D.I. 595 & 596. The basis for Acushnet' motion was again that the asserted claims were anticipated by Nesbitt, incorporating Molitor '637 by reference. The Court denied

---

[1] The asserted claims in this case are claims 1, 4, and 5 of the '293 patent, claims 1-3 of the '156 patent, claim 5 of the '130 patent, and claims 1 and 3 of the '873 patent (the "Asserted Claims").

5

that motion and held that the test golf balls that Acushnet created to demonstrate inherent

disclosure of the Shore D hardness limitations were inadmissible. D.I. 595 at 7-10.

The issues of anticipation and obviousness were tried to a jury beginning on March 22,

2010. On March 29, 2010, the jury returned a verdict finding all of the asserted claims invalid as

anticipated and obvious.[2] D.I. 608. Callaway filed its present motion for a new trial or judgment

as a matter of law on April 28, 2010. D.I. 616.

## III.   FACTUAL BACKGROUND

### A.   The Patents-in-Suit

The patents-in-suit relate to solid construction multi-layer balls that use polyurethane as

the outer cover material. Callaway has stipulated that the effective priority date of the '293,

'156, and '873 patent is November 9, 1995, and that the effective priority date of the '130 patent

is October 13, 1995. D.I. 334, Exhibit 1 ¶¶ 16-17.

The patents-in-suit have virtually identical specifications, and all claim essentially the

same basic subject matter: a multi-layer golf ball having a hard ionomer inner cover layer and a

soft polyurethane outer cover layer. The inner cover layer is either a low acid ionomer or a

blend of low-acid ionomers, having a Shore D hardness of 60 or greater. DX-1 at 3:49-53. The

outer cover layer is made from a polyurethane and has a Shore D hardness of 64 or less. *Id.*,

claim 1. The Court construed these "Shore D hardness" limitations to refer to measurements

---

[2] Pursuant to the March 22, 2010 Stipulated Order Regarding Asserted Claims ("the Stipulation"), the parties agreed to limit the number of asserted claims that would be presented at trial to claim 1 of the '293 patent; claim 1 of the '156 patent; claim 5 of the '130 patent; and claim 3 of the '873 patent. D.I. 601. The parties also agreed that the determination of the validity of these four claims would apply to the validity of each of the other five claims for which Acushnet has stipulated to infringement ("i.e., for the '293 patent, the validity determination in this matter for claim 1 also applies to the validity of claims 4 and 5; for the '156 patent, the validity determination in this matter for claim 1 also applies to the validity of claims 2 and 3; and for the '873 patent, the validity determination in this matter for claim 3 also applies to the validity of claim 1"). D.I. 601.

taken on the surface of the ball. D.I. 345 at 1-3. The claims also include broad limitations
directed to certain material properties of the cover layers, such as their thickness or flexural
modulus.

### B.    The Prior Art

Solid-core, multi-layer golf balls, such as those claimed by the patents-in-suit have been
described by the patent literature since the 1980s. For example, U.S. Patent No. 4,431,193
("Nesbitt"), DX-9, discloses a multi-layer golf ball with a core, an inner cover layer made of a
hard Surlyn material, and an outer cover layer made of a soft Surlyn material. *See, e.g., id.,* Fig.
2 at 3:16-25. Similarly, U.S. Patent No. 5,314,187 ("Proudfit") (DX-10) discloses a multi-layer
golf ball with a core, an inner cover layer consisting of a blend of low acid Surlyns and an outer
cover layer consisting of a synthetic balata blend. Cover layers made from blends of low acid
ionomers, as claimed in the patents-in suit is also shown in U.S. Patent Nos. 4,274,637 ("Molitor
'637"), DX-12 at 14:55-65.

Polyurethane covers have been known for decades to golf ball designers, as the inventor
of the patents in suit admitted. T. Tr.[3] at 469:7-471:4; 265:16-268-:18. Polyurethanes were
discussed extensively as golf ball covers in prior Spalding and Acushnet patents and publications
many years before the patents-in-suit were filed. *See, e.g,* DX-12 (Molitor '637); DX-13 (Wu);
DX-11. These patents and publications taught skilled artisans that polyurethane was a suitable
cover material for all types of golf ball constructions. By the mid 1990s, polyurethane had been
proven as a commercially viable cover material on both solid and wound balls. T. Tr. at 471:5-
15. By 1994, the polyurethane disclosed in the Wu patent was used on the most popular ball on
the PGA Tour, the Titleist Professional. T. Tr. at 377:21-378:2; 379:3-6.

---

[3] References herein to "T. Tr." are to the transcript of the second trial in this matter. References
to the transcript from the 2007 trial are identified by "2007 T. Tr."

The Wu patent explicitly suggested that its polyurethane cover material was an excellent replacement for balata or Surlyn covers. DX-13 at 1:40-46. The Molitor '751 patent explicitly stated that the polyurethane cover disclosed therein could be used in place of the Surlyn cover of a solid-core, multi-layered ball such as the Nesbitt ball. DX-11 at 3:7-12; *Callaway Golf,* 576 F.3d at 1337 n.3.

## IV.   LEGAL STANDARDS

### A.   Motion for a New Trial

#### 1.   New Trials Based on Court Errors Should be Granted Sparingly

Under Federal Rule of Civil Procedure 61, evidentiary errors are not grounds for granting a new trial unless denying a new trial would be "inconsistent with substantial justice." Fed. R. Civ. P. 61. Therefore, in determining whether to grant a motion for a new trial based on evidentiary errors, the court should determine "(1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be inconsistent with substantial justice." *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 666 (D. Del. 2004) (internal citations omitted). When "it is highly probable that [the erroneous ruling] did not affect the [movant's] substantial rights," a new trial should not be granted. *Id.* at 667.

A party may not seek a new trial on the basis of objections to evidence not raised during the trial. *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1469 (Fed. Cir. 1997) (quoting *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 681 (3d. Cir. 1980)).

#### 2.   New Trials Should Not Be Granted Unless the Jury's Verdict was Against the Great Weight of Evidence and it is a "Miscarriage of Justice" to let the Verdict Stand

While the decision to grant or deny a new trial is within the sound discretion of the trial Court, the Court should avoid substituting its own judgment of the facts and the credibility of the

8

witnesses for those of the jury. *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 600 (D. Del. 2005) (denying motions for JMOL and new trial after jury verdict finding invalidity of asserted patent claims). Thus, a court should not grant a new trial unless the jury's verdict was against the weight of the evidence and a miscarriage of justice would result if the verdict were to stand. *Id.; see Williamson v. Consolidated Rail Corp.*, 926 F.2d at 1352; *EEOC v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989). Consequently, the grant of a new trial on this basis is viewed as "extraordinary relief." *Marra v. Philia. Hous. Auth*, 497 F.3d 286, 311 n.18 (3d Cir. 2007). As discussed below, such relief is not warranted here.

In the rare cases where courts have chosen to grant the extraordinary relief that Callaway now seeks, factors not present at the second trial in this matter were in play. For example, the few cases cited in Callaway's brief involved particularly complicated, particularly long and complex trials, or large numbers of witnesses. *See, e.g., Fineman v. Armstrong World Indus.*, 980 F.2d 171(3d Cir. 1992), appealed from *Fineman v. The Industry Network Systems*, 774 F. Supp. 225, 229 (D. N.J. 1991) (three month trial with many breaks, over 50 witnesses, and complex issues). In contrast, the one-week trial that occurred here, which addressed only the validity of four virtually identical patents and damages, was short and simple.

**B.     Motion for Judgment as a Matter of Law**

To prevail on a renewed motion for judgment as a matter of law following a jury trial, Callaway "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review."

9

*Syngenta*, 404 F. Supp. 2d at 599 *(quoting Perkin-Elmer Corp.*, 732 F.2d at 893*)*.

In reviewing the jury's finding of anticipation and obviousness, the court must give

Acushnet, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from

the evidence presented, resolve all conflicts in the evidence in [its] favor and, in general, view

the record in the light most favorable to [Acushnet]." *Perkin-Elmer Corp., 732 F.2d at 893; see*

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (U.S. 2000). "[T]he court may not

determine the credibility of the witnesses nor 'substitute its choice for that of the jury between

conflicting elements of the evidence.'" *Syngenta*, 404 F. Supp 2d at 599-600 (*quoting Perkin-*

*Elmer Corp., 732 F.2d at 893; see, e.g., Reeves*, 530 U.S. at 151 ("although the court should

review the record as a whole, it must disregard all evidence favorable to the moving party that

the jury is not required to believe.").

## V.   ARGUMENT

### A.   The Court Should Not Grant a New Trial Based on Alleged Evidentiary Errors

Callaway argues that it was prejudiced by five alleged evidentiary errors, and that

"substantial justice" therefore requires a new trial.  Specifically, Callaway alleges the following

rulings were made in error:  (1) the exclusion of the Hebert patents; (2) the admission of

testimony regarding Acushnet's reliance on opinions of counsel to cure the misconceptions

created by Callaway's improper questioning of Dr. Kerr; (3) the exclusion of certain testimony

of Messrs. Proudfit and Nesbitt; (4) admission of evidence related to a 2001 high-acid non-

infringing alternative; and (5) the exclusion of Mr. Mickelson's testimony regarding the

suitability of wound golf balls as non-infringing substitutes.

Callaway argues that the "prejudicial impact" of these rulings "is apparent because all but

one was not made in the first trial and the result here was different."  D.I. 619 at 5.  Callaway's

flawed logic is inconsistent with the record in this case. As the Federal Circuit held on appeal, the evidence in this case is sufficient to support a verdict for either party on the issue of obviousness. Hence, that the jury found for Acushnet on the issue of obviousness in the second trial, on very similar obviousness evidence presented by Acushnet, does not prove that the Court's rulings prejudiced Callaway. Callaway can prove neither error nor prejudice.

## 1. Exclusion of the Hebert Patents Was Proper and Prevented Substantial Jury Confusion

Callaway's conduct in the first trial made abundantly clear what use it intended to make of the Hebert patents[4] in this case. Callaway sought to equate the Hebert patents to the patents-in-suit to argue that since Acushnet got a patent on a three-piece polyurethane covered ball, Callaway's patent on a three-piece polyurethane covered ball must be valid.

Specifically, in the first trial, Callaway offered the Hebert '172 patent to show that "[t]he ideas that they now say are obvious are ideas that their own engineers got a patent on," (2007 T. Tr. at 164:7-8):

> [T]hey all use the basic concept of Mike Sullivan's patents. Cover, ionomer inner cover, polyurethane outer cover. And as I said already, Acushnet, when they came up with this idea, in 1996, . . . they thought it was a great idea. They filed an invention disclosure on it. They got a patent on it. And in this case, they now want you to believe that they shouldn't have.

2007 T. Tr. at 184:22-185:4. Callaway repeatedly stated that the Hebert patent was the same invention as the patents-in-suit. D.I. 423, 2007 T. Tr. at 164:9-15 ("[Acushnet] claimed it was an invention, got their own patent"); 186:10-18 ("Acushnet got its own patent on this concept. . . . This patent Acushnet received, . . . they thought it covered exactly the same concept that's in Mike Sullivan's patents."); 190:13-191:3 ("Never mind that they got a patent on the same

---

[4] Callaway sought to admit two Hebert patents in the second trial: the Hebert '172 patent (PX-17) and the Hebert '324 patent (PX-531).

thing."); 195:10-12 ("they emphasized their patent on the same concept. This is the Hebert '172

patent."); 1338:1-6 ("[Acushnet's] own employees got a patent related to that concept.");

1338:21-24 ("In other words, that they themselves thought it was a patent."); 1342:22-1343:7

("Now, this is not about the details of the patent they ultimately got, and they did ultimately get a

patent on that concept, the '172 patent. And you don't have to compare the claims of that patent

to the claims of the Sullivan patent.") (emphasis added).

Callaway's attempt to equate the Hebert '172 patent with the patents-in-suit was

improper, misleading and highly prejudicial in the first trial. There are clear differences between

the patents, and they cannot be treated in the broad brush manner that Callaway applied in the

first trial, and advances here. The prejudice of Callaway's argument is heightened because the

only way to rebut Callaway's claim is to engage in a claim element-by-element comparison of

the Hebert '172 patent and the patents-in-suit. Such satellite litigation would be confusing,

prejudicial and wasteful especially given the limited time for trial.

In its pretrial memorandum, the Court correctly recognized the risks of the satellite

litigation that would ensue if the Hebert patents were introduced at trial. D.I. 595 at 15.

Accordingly, the Court properly excluded the Hebert patents from evidence to avoid the sort of

argument Callaway made in the first trial and ensure fair presentation of evidence in the time

allowed for trial. Thus, the exclusion of the Hebert patents did not mislead the jury. Instead,

their exclusion merely prevented Callaway from misleading the jury.

### a.   The Hebert Patent Claims are Substantially Different from those of the Patents-in-Suit

It is not surprising that Callaway told the first jury not to compare the claims of the

Hebert patent with those of the patents-in-suit. The claims are significantly different. It is those

claims, not the broad concept of a three-piece golf ball, that define the scope of the patents. *See*

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1027 (Fed. Cir. 2009) ("It is

the words of the claim that define the scope of the patent.").

To illustrate the differences in the claims of the Hebert '172 patent and the patents-in-

suit, representative claims are set forth side-by-side below (emphasis added):

| **Hebert '172 Patent (PX-17), claim 1** | **Sullivan '293 Patent (PX-3), claim 4** |
| --- | --- |
| 1. A golf ball comprising a cover and a core, wherein said cover is disposed about the core and said cover comprises:<br><br>(a) an inner cover layer of a flexural modulus of *at least about 65,000 psi*; and<br><br>(b) an outer cover layer having a Shore D hardness of greater than 30 to 60, having a *thickness of less than 0.050* inches and comprising a thermoset material that includes at least one of a *castable reactive liquid material and reaction products thereof.* | 4. A multi-layer golf ball comprising:<br><br>a spherical core;<br><br>an inner cover layer having a Shore D hardness of 60 or more molded over said spherical core, said inner cover layer comprising an ionomeric resin including *no more than 16%* by weight of an alpha, beta-unsaturated carboxylic acid and having a modulus of from about *15,000 to about 70,000 psi*; and<br><br>an outer cover layer having a Shore D hardness of about 64 or less disposed about said inner cover layer and defining a plurality of dimples to form a multi-layer golf ball, said outer cover layer comprising *polyurethane*. |

There are at least two key differences in these claims. First, whereas the Hebert patent

recites an outer cover using a castable reactive liquid material or the reaction product thereof, the

'293 patent claims any generic polyurethane. Second, the Hebert patent recites an inner cover

layer formed of very stiff material (at least 65,000 psi). Low acid ionomers are not that stiff. In

contrast, the '293 patent claims an inner cover layer that comprises a low-acid ionomer that can

be much softer (15,000 to 70,000 psi). Most low acid ionomers have a flexural modulus of

30,000 psi to 55,000 psi. *See* D.I. 523 at 12, Ex. 14. High acid ionomers have flexural modulus

of about 70,000 psi and greater. *Id.*

These distinctions between the claims of the Hebert '172 patent and the patents-in-suit

are illustrated by the fact that the accused Pro V1 golf balls were not covered by the Hebert '172 patent, whereas Acushnet stipulated that those products are covered by the patents-in-suit. Specifically, the accused Pro V1 balls did not satisfy the limitation that the inner cover layer have a flexural modulus of at least 65,000 psi. D.I. 523 at 13.

Since the claims of the Hebert patents[5] are substantially different from the claims of the patents-in-suit, the validity of the Hebert patents (and Acushnet's success in procuring those patents) has no relevance to this case. *See Key Tech., Inc. v. Simco/Ramic Corp.*, 137 F.R.D. 322, 324-25 (D. Or. 1991) ("Whether or not [the infringer] subjectively believed that any product of [patentee] was patentable is irrelevant to the [infringer's] defense that the patents of [patentee] are not valid.").

    **b.  Whatever Probative Value the Hebert Patents Could Offer Was Obtained From Other Evidence**

Callaway argues at length that it would have used the Hebert patents to (1) demonstrate that Acushnet personnel believed the concept of a three-piece polyurethane covered golf ball was new and novel in 1995, D.I. 619 at 7; (2) challenge Mr. Dalton's belief that there was prior art to the patents-in-suit, *id.* at 11-12; and (3) challenge the connection between the 1995 memorandum between Dr. Wu and Mr. Harris and the Pro V1. *Id.* at 12. However, Callaway was able to address all of these issues through other evidence, namely the invention disclosure that led to the Hebert '172 patent and testimony from the inventors, Messrs. Morgan and Hebert.

Callaway elicited ample testimony from Acushnet personnel that they thought the veneer

---

[5] The Hebert '324 patent is even more distinguishable from the patents-in-suit. The Hebert '324 patent claims a method for casting a reactive liquid as the cover of a golf ball. PX-531 at 9:62-12:10. The claims of that patent bear no resemblance to the patents-in-suit, and indeed Callaway did not even attempt to argue that the scope of the Hebert '324 patent is similar to that of the patents-in-suit. Likewise the refined manufacturing methods described in the Hebert '324 patent are in no way comparable to Sullivan's makeshift manufacturing technique, which used C clamps and hose clamps to cast a black polyurethane. T. Tr. at 463:4-25; T. Tr. at 602:14-23.

14

concept was a new and novel idea in the mid 1990s. Mr. Morgan testified that he thought the Veneer concept was a novel idea. T. Tr. at 340:23-341:9; 347:4-348:3. Mr. Hebert described the Veneer construction as "relatively unique" and "quite different." T. Tr. at 874:20-875:1; 875:6-14. Mr. Dalton described the concept for the ball as different from what had been done before. T. Tr. at 381:3-22. In addition, Callaway cross-examined Mr. Morgan on the Veneer invention record (T. Tr. at 345:24-350:11), and also cross-examined him on marketing documents describing the Pro V1 as representing a "pioneering effort." T. Tr. at 354:7-356:11; PX-955. On this point, the Hebert patent was at best cumulative of other evidence Callaway offered. That Acushnet ultimately obtained a patent on its high acid veneer concept would provide no more probative information about what persons skilled in the art believed about the novelty of the Veneer concept than the testimony from Messrs Morgan, Hebert and Dalton provided.

Similarly, Callaway amply cross-examined Mr. Dalton on his belief that there existed prior art to the patents-in-suit. Mr. Dalton testified that when the '293 patent first issued, he sent a memo to his colleagues describing what he thought was relevant prior art to the patent. T. Tr. at 428:1-5; PX-556. On cross-examination, Mr. Dalton admitted that the examples he sent in that particular memo were not prior art to the patents-in-suit because their filing dates were after the priority date. T. Tr. at 429:16-430:19. The existence of the Hebert patents would have no additional probative value in Callaway's line of questioning of Mr. Dalton, and is completely irrelevant on that point.

Callaway's argument that the Hebert patents would have allowed it to challenge "Acushnet's misleading story that it invented the Pro V1 in 1995" is similarly misplaced. D.I. 619 at 17. Callaway already elicited, through the Hebert invention disclosure, that neither Dr. Wu nor Mr. Harris were listed as inventors on the invention disclosure, and that the date of

15

invention was listed as 1996, not 1995. T. Tr. at 1436:10-14; PX-989.[6] There is no additional

probative value that the Hebert patents would have provided that the invention disclosure did not

already provide to Callaway in this line of argument.

Finally, Callaway's argument that it should have been permitted to tell the jury that

Callaway paid $10.5 million for a license for Acushnet's Hebert and Calabria patents is

unsupported in view of the trial record. D.I. 619 at 11. At Callaway's request, the Court ruled

that the Hebert license would be admitted. T. Tr. at 1093:11-12. Despite that ruling, Callaway

never sought to admit the Hebert license, and did not even mention its existence to the jury.

Callaway now claims the license would have been "of no use without the patents to explain it."

D.I. 619 at 11. That claim does not ring true. Callaway discussed the terms of the Dunlop

license at length through its damages expert Mr. Napper,[7] despite not admitting the patents at

issue in that license. T. Tr. at 1252:7-1253:22. There is no reason Callaway could not have

similarly discussed the Hebert license, once the Court allowed it to be admitted. In truth, the

reason Callaway did not seek to admit the Hebert license was likely the same reason it filed a

motion *in limine* to exclude the Hebert license in the first trial: the amount and lump-sum nature

of the license undermines Callaway's damages theory. Callaway's decision to refrain from

admitting the Hebert license as unhelpful to its damages case was a tactical decision it made and

---

[6] The golf balls described by the April 28, 1995 memo from Mr. Harris to Shenshen Wu (DX-830) had a construction that was closer to the accused Pro V1 golf balls than the construction covered by the Hebert patent claims. The golf balls described in the memo had Acushnet's traditional Lithium Surlyn low acid inner cover layer, like the accused Pro V1 golf balls. In contrast, as discussed above, the Hebert patents cover a golf ball construction that has a high modulus, high acid inner cover layer. Thus, the connection between the 1995 prototypes and the Pro V1 is actually much stronger than the connection between the veneer concept prototypes and the Pro V1.

[7] Notably, the patents licensed by Dunlop in this agreement, U.S. Patent Nos. 6,042,768; 5,947,843; 5,897,884; 5,888,437; and 5,733,428 were also licensed from Acushnet by Callaway for a lump sum as part of the so-called Hebert license.

should not provide any basis for Callaway to seek a new trial on validity.

<b>c.    Acushnet Did Not Exploit the Exclusion of the Hebert Patents</b>

Callaway's allegation that Acushnet "used substantial time to tout its other patents" is not well taken. Acushnet did not argue that it patented every technology related to the Pro V1 except for the construction covered by the Sullivan patents, as Callaway alleges. D.I. 619 at 18. The only evidence offered by Acushnet regarding specific features of the Pro V1 that were patented related to the Wu polyurethane,[8] which was key prior art at issue in this case, and was what made the Pro V1 possible. Whether the success of the Pro V1 is due to the patents-in-suit or the prior art was a central issue for the jury to decide in this case. *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant. So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent."). Accordingly, there was nothing improper about Acushnet stressing that the prior art Wu patent was used in, and a substantial contributor to the success of, the accused products.

Callaway recites a list of technologies Acushnet identified as contributing to the Pro V1's success. D.I. 619 at 9. However, with the exception of the prior art Wu patent, Acushnet did not identify any other patents that cover the technologies used the Pro V1 ball. In fact, Acushnet carefully and intentionally avoided identifying the many patents that cover the Pro V1, including those covering its dimple design, corona discharge adhesion process, and core and inner cover formulations. As stated during the trial, Acushnet had prepared to discuss all the patented features in its products if the Hebert patents were in evidence. T. Tr. at 1026:17-21. Since the

---

[8] Callaway referred to the Wu polyurethane as the "super-duper" polyurethane at the first trial in 2007. D.I. 429, 2007 T. Tr. at 1342:18-19.

17

Hebert patents were not in evidence, however, Acushnet avoided doing so to avoid any argument it was taking unfair advantage of the Court's ruling. *Id.* at 1026:17-25; 1027:10-1028:10.

In fact, the only evidence Callaway identifies regarding Acushnet patents that was not clearly linked to the prior art Wu patent was Mr. Bellis's two sentences of testimony stating that one reason for the Pro V1's success its use of "Titleist patented technology." T. Tr. at 734:6-12; 751:12-15. As an initial matter, the record seems quite clear that Acushnet did not intentionally elicit Mr. Bellis's reference to patented technology. *Id.* More importantly, Mr. Bellis's testimony should have no bearing whatsoever on the admissibility of the Hebert '172 patent, as that patent is undisputedly not used in the accused Pro V1 balls, and thus by definition could not have contributed to that ball's success. In addition, the two sentences in question, without elaboration or emphasis by either party, did not create the impression that Acushnet had patents on every technology in the ball other than its construction, as Callaway urges. Neither Mr. Bellis nor Acushnet enumerated the dozens of patents covering the Pro V1; indeed Acushnet did not follow up with Mr. Bellis's statement or refer in any way to his testimony about patented technology. Hence, Mr. Bellis's vague reference to patented technology in the Pro V1 was not so unduly prejudicial as to warrant a new trial.

### d.   That the PTO Issued the Hebert Patents Does Not Support the Validity of the Patents-in-Suit

Callaway makes the illogical argument that since the PTO separately issued Acushnet patents on the "very same concept" as the patents-in-suit, the Hebert patents would rebut the claim that the PTO mistakenly granted the patents-in-suit. D.I. 619 at 12. But if the Patent Office granted a patent on the "very same concept," this would show not that the Sullivan patents were valid, but that the PTO examining process is rife with mistakes. The jury would have been left to wonder: why would the Patent Office grant a patent on the "very same concept" as an

18

earlier filed patent? Such evidence would hardly bolster the jury's confidence in the PTO's procedures as Callaway suggests.[9]

Moreover, the reason the Patent Office granted the Hebert patent is irrelevant to the issues presented in this case, namely the validity of the patents-in-suit. In fact, Acushnet disclosed to the Patent Office, and discussed in the specification, a U.K. version of the Sullivan patents that published in 1995 during the prosecution of the Hebert '172 patent. PX-19 (citing GB 2,278,609 patent). Despite this disclosure, the Hebert '172 patent was allowed, suggesting that the Patent Office found the Hebert '172 patent to claim a patently different invention than the Sullivan patents.

### 2.     Acushnet's Testimony That It Relied on Outside Counsel's Opinions Was Necessary to Rebut Callaway's Misleading Line of Questioning

The Court properly allowed Mr. Nauman to testify that, in making the business decision to continue selling the accused Pro V1 golf balls from 2001 to 2008, Acushnet relied on its internal analysis that the patents-in-suit were invalid and obtained opinions from outside counsel confirming that analysis. T. Tr. at 1375:10-20; 1376:9-1377:13. Callaway's argument accusing Acushnet of somehow orchestrating the events that led to the introduction of this testimony is a desperate attempt to gloss over the fact that it was Callaway's own hard line of questioning, which insinuated willful infringement, that prompted the Court to allow the testimony.

Focused on its damages case, it was Callaway's counsel who first asked Dr. Kerr on cross whether Acushnet thought the patents were invalid, during a remarkably prejudicial line of questioning:

> Q. All right. So from April of 2001 up until the experiment with

---

[9] Indeed, if the Hebert patent and the Sullivan patents were the "same concept," the PTO should have declared an interference proceeding pursuant to 35 U.S.C. § 135.

19

these high acid alternatives almost a year later, there was no switch made to the formulation of the Pro V1; is that right?

A. Yes, that's right.

Q. And, in fact, for the entire time relevant to this case, all the way up to September of 2008, Acushnet never switched to any of these high acid alternatives; right?

A. Except for the testing that was actually done in 2002.

Q. They never commercialized the ball during the period relevant to this case that had the high acid alternatives; right?

A. They sold the balls, they sold them in 2002, but they never switched their process from the existing low acid to the high acid.

Q. Right. Even though -- well, okay. Let me get back to that.  So 2001 to 2008, no switch to commercially introduce these high acid alternatives.

A. Right.

Q. Even though they were, from a performance perspective, to your understanding, just as good as the Pro V1?

A. That's right.

Q. One of them was cheaper to make than the Pro V1; right?

A. Yes.

Q. A switch could have taken a couple of weeks according to Mr. Dalton?

A. Yes.

Q. *So instead of switching, they accrue $275 million a year damages rather than doing that switch; right?*

A. I don't think they were accruing $275 million a year damages. I don't think they did.

Q. *Because they thought the patent was invalid; right?*

A. That is my understanding.

Q. And yet they had in their pocket a guaranteed acceptable substitute that they could easily have gone to with no effect, in

> your opinion; right?
>
> A. They certainly did.  I mean, whether they thought it was valid or
> not is something that has to do with the lawyers' opinions and I
> can't talk about that.

T. Tr. 1330:18-1332:10 (emphasis added).

Callaway's questions gave the prejudicial impression that Acushnet was willfully

infringing a valid patent so it could sell $275 million worth of golf balls per year.  This line of

questioning put Acushnet's state of mind, and specifically the reason it continued to infringe

despite having a possible design-around, squarely at issue.

The Court found that this highly prejudicial line of questioning opened the door to allow

Acushnet to explain the real reasons it decided to continue selling the accused Pro V1 golf balls:

- "Mr. Scherkenbach…unfortunately, you opened the door, to some
  extent, with your questioning. T. Tr. at 1338:17-20.

- "By your questioning, Mr. Scherkenbach, you inferred that Acushnet
  could have easily changed and didn't, but should have, when Acushnet
  believed it had – that it wasn't obligated to change, so it didn't." T. Tr. at
  1342:1-4.

- "Acushnet should be able to tell the jury that it did do what it considered
  due diligence." T. Tr. at 1369:16-17.

Indeed, Callaway's counsel admitted that it was his questioning that elicited the

testimony regarding the validity of the patents: "In fact, I elicited that from the witness, and the

witness said that was his understanding.  Fine." T. Tr. at 1341:1-2.  Dr. Kerr never mentioned

Acushnet's views about the validity of the patents-in-suit until Callaway introduced the issue by

asking, "Because they thought the patent was invalid; right?" T. Tr. at 1332:3.  Even in its

motion for a new trial, Callaway admits that it was only "when Callaway Golf probed" the

testimony about why Acushnet did not switch to the Pro V1 that Acushnet's views about the

validity of the patents were put into issue. D.I. 619 at 20.  A close examination of Callaway's

questioning of Dr. Kerr above reveals that Callaway repeatedly asked Dr. Kerr essentially the same question several times, until Dr. Kerr was finally baited into discussing Acushnet's views of the validity of the patents. Callaway has no one to blame but itself for the introduction of Acushnet's state of mind as an issue in the case.

The Court's decision to allow limited reference to the opinions was necessary to avoid prejudice to Acushnet caused by Callaway's questioning. Callaway's line of questioning took unfair advantage of the fact that the opinions of counsel were not in evidence. The clear impression left by Callaway's questioning was that since Acushnet had a non-infringing substitute, but nonetheless sold hundreds of millions of dollars of infringing products, Acushnet's infringement was intentional and willful. In reality, as Callaway knew full well, Acushnet had consulted outside counsel, been advised that the patents-in-suit were invalid, and had relied on that advice. Allowing Callaway's line of questioning to stand without reference to the opinions of counsel would have caused severe prejudice to Acushnet.

Callaway suffered no unfair prejudice by Mr. Nauman's very limited testimony that Acushnet relied on opinions of counsel. First, the opinions themselves were not admitted into evidence, and the substance of the opinions was not discussed. Second, the jury heard no evidence on the prior art that the outside counsel relied upon or the fact that the outside counsel relied on the same arguments Acushnet advanced at trial.[10] In fact, the entire line of Mr. Nauman's direct testimony about the opinions of counsel takes up less than three pages in the trial transcript. T. Tr. at 1375:6-1377:13. Third, Mr. Nauman testified on direct and cross examination that Acushnet did not ask its outside counsel for an opinion regarding infringement.

---

[10] The opinions at issue indicate that the patents-in-suit are, among other things, anticipated by Nesbitt incorporating Molitor '637, which is precisely the basis on which the jury found the claims of the patents-in-suit anticipated. Callaway took extensive depositions regarding these opinions.

22

T. Tr. at 1376:13-17; 1381:21-25. Fourth, it was Callaway's own questioning that put Acushnet's state of mind at issue by insinuating that Acushnet was knowingly infringing a valid patent. Finally, Acushnet did not capitalize in any way on Mr. Nauman's testimony regarding the opinions of counsel. During closing arguments, Acushnet did not make a single reference to the opinions.[11]

Callaway also complains that the timing of the reference to the opinions of counsel was prejudicial. However, that the testimony on the opinions was introduced so close to the end of trial was a direct result of Callaway's bold tactics on the last day of trial – Acushnet had no control over the timing. Callaway's complaint about not having enough time to challenge the legitimacy of the opinions rings hollow. Callaway had more than enough time to question Mr. Nauman about the opinions, but chose not to introduce the opinions or their substance. Hence, the limited reference to opinions does not warrant a new trial.

### 3. The Testimony from Both Nesbitt and Proudfit Was Properly Excluded Because the Testimony Was Irrelevant to the Issue of Invalidity

The Court properly excluded Mr. Nesbitt's testimony that (1) he does not believe somebody reading his patent would have thought it referred to polyurethane as a cover material; and (2) he does not believe he invented the polyurethane covered three-piece golf ball.

First, Mr. Nesbitt's testimony interpreting the reference to the Molitor '637 patent directly contradicts the Federal Circuit's ruling that the Nesbitt patent incorporates Molitor '637

---

[11] Callaway was also not unfairly prejudiced by not being allowed to cross-examine Mr. Nauman on the validity of the Hebert patents. As discussed above, the Hebert patents are not relevant as to whether Acushnet thought the patents-in-suit were valid. The claims of the Hebert patents do not cover the accused Pro V1 golf balls, which have low acid inner covers; instead the Hebert patents cover the high acid non-infringing alternatives. Indeed, the claims of the Hebert patents instead cover the New 2009 Pro V1 golf balls, D.I. 523 at 13, Ex. 10, which this Court excluded from evidence at Callaway's request. D.I. 595 at 14.

by reference. March 3, 2010 Pretrial Tr. at 25:6-15, 28:15-29:14; *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1347 (Fed. Cir. 2009). Mr. Nesbitt's testimony also contradicted the Court's ultimate instruction on incorporation by reference. The Court instructed the jury: "In this case, you are instructed that the Nesbitt patent incorporates the entire list of ... foamable compositions in the Nesbitt patent, disclosed by Molitor '637 as appropriate materials for use in golf ball cover layers, ***including polyurethane*** and ionomer resin blends." T. Tr. at 1510:17-22 (emphasis added). Moreover, Mr. Nesbitt's opinion about what people would have thought the reference to Molitor '637 meant is the proper subject of expert testimony. Mr. Nesbitt was never disclosed or qualified as an expert in this case, nor was any expert report submitted for him. Mr. Nesbitt is a Callaway consultant who provided, on Callaway's questioning, the self-serving, and irrelevant, statement that Callaway's reading of his patent was correct. Since his testimony was improper expert testimony, had no probative value, and contradicted the Court's jury instructions, the Court properly excluded the testimony.

Mr. Nesbitt's testimony that he did not invent the polyurethane covered three-piece golf ball was also properly excluded. This testimony was both irrelevant and highly prejudicial. The jury was asked in this case to assess whether the disclosure of Mr. Nesbitt's patent anticipated the claims of the patents-in-suit. What the prior art inventor thought he invented in 1981 is wholly irrelevant to that question. *See Markman Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) ("The subjective intent of the inventor ... is of little or no probative weight."). The relevant inquiry in an anticipation analysis is what Mr. Nesbitt's patent discloses to someone of ordinary skill in the art in 1995, not what he believes he invented. Indeed, Acushnet agreed not to play portions of Mr. Nesbitt's testimony that demonstrated that in 1977 and 1978 Mr. Nesbitt in fact made hundreds of three piece golf balls with an ionomer inner cover and

24

polyurethane outer cover (far more than Sullivan ever made), directly contradicting his testimony that he did not invent the three-piece polyurethane covered golf ball. Mr. Nesbitt's testimony would have been very confusing to the jury, as it would have led to a substantial probability that the jury would have confused whether the Nesbitt patent *discloses* a three-piece polyurethane covered golf ball with whether Mr. Nesbitt thought he *invented* such a ball.

The Court also properly excluded Mr. Proudfit's testimony that he did not think of using polyurethane on a three piece ball because it found there was no evidence in Mr. Proudfit's deposition transcript showing that he was aware of polyurethane as a potential golf ball cover material. T. Tr. at 754:3-16. The Court reasoned, "he's not a chemist. He didn't devote himself to golf ball design. He didn't devote himself to materials other than the ones that he worked with. I believe he said God gave him the idea." T. Tr. at 754:6-9. As there is no evidence in the record that Mr. Proudfit knew about polyurethane, his testimony has no relevance at all, since the person of ordinary skill in the art is presumed to have knowledge of all the relevant prior art, which in this case includes polyurethane golf ball covers. *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.,* 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent art."). Instead, the relevant inquiry is whether a hypothetical person with ordinary skill in the art would have thought the invention was obvious in light of the prior art available at the time the patent application was filed. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1364 (Fed. Cir. 2001).

Callaway now argues, for the first time, that Mr. Proudfit "was undoubtedly aware" of polyurethane, because Mr. Proudfit's patent lists two prior art references discussing polyurethane golf ball covers. D.I. 619 at 24. Callaway also cites a Proudfit patent related to optical brighteners that can be used to brighten any golf ball cover, regardless of the cover material,

25

including polyurethane. *Id.* Callaway never presented this evidence at trial when the admissibility of Proudfit's testimony was being discussed, despite being on notice of Acushnet's objections long before trial.

Moreover, Callaway's purported evidence does not show that Mr. Proudfit knew anything about polyurethane as a golf ball cover material. Callaway offers no evidence that Mr. Proudfit read the prior art references cited on his patents. Nor does it offer any evidence that Mr. Proudfit prepared the patent application that makes the unremarkable statement that Mr. Proudfit's patented optical brighteners can be used with all well-known prior art cover materials. Thus, there is no foundation for the assertion that Proudfit was aware of polyurethane, or more importantly its properties as a cover material. The Court properly excluded Mr. Proudfit's testimony that he personally never thought to use polyurethane as a cover on the Wilson Ultra Tour Balata, as it is simply irrelevant to what the <u>hypothetical</u> person of ordinary skill in the art would have thought obvious in 1995. *Amazon.com*, 239 F.3d at 1364.

Finally, Callaway argues that Dr. Statz somehow took unfair advantage of the exclusion of Mr. Nesbitt's and Mr. Proudfit's testimony by discussing the disclosures of the Nesbitt and Proudfit patents. At the outset, Callaway <u>never</u> made this objection at trial, during or after Dr. Statz's testimony. Nor did Callaway seek to admit the Nesbitt and Proudfit testimony in question after Dr. Statz testified, or even cross-examine Dr. Statz on the testimony Callaway now complains about. As such, Callaway has waived any argument for a new trial on this basis. *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 395 (3d Cir. 1999).

Moreover, Callaway warps Dr. Statz's testimony in support of its argument. For example, when asked by Callaway what he thought a particular passage in the Nesbitt patent taught, Dr. Statz's replied by answering "Nesbitt says," or "Nesbitt points you in this direction,"

26

or "Nesbitt wanted." Dr. Statz's references to "Nesbitt" are unambiguous references to the Nesbitt patent, not to Mr. Nesbitt the person. T. Tr. at 565:5-19; 567:13-23. Callaway was free to cross examine Dr. Statz and offer testimony from its own expert, Dr. Risen, as to what he thought the Nesbitt patent taught in rebuttal, but chose not to. In addition, Dr. Statz testified that he thought "Jim" (Mr. Proudfit) would have tried the 1994 Wu polyurethane if he had known about it. T. Tr. at 605:19-606:3. This was not prejudicial at all since Mr. Proudfit's work on his patent took place before his patent was filed in 1991, so there was no way for Proudfit to know about the later-introduced Wu polyurethane at that time. Nothing Mr. Proudfit said in his deposition would contradict Dr. Statz's testimony at all. Dr. Statz was testifying, as he should, about whether a person having ordinary skill in the art in 1995 would have been motivated to use polyurethane as an outer cover layer. T. Tr. at 605:19-606:7.

Dr. Statz's testimony about the Nesbitt and Proudfit patents was not inappropriate. It correctly focused on the hypothetical person of ordinary skill in the art. Since there was nothing prejudicial about Dr. Statz's testimony, and Callaway failed to make any objections to it or cross-examine Dr. Statz on it, the exclusion of the Nesbitt and Proudfit testimony certainly does not warrant a third trial.

### 4.   Acushnet's Damages Evidence that it Developed and Tested Golf Balls With High-Acid Inner Cover Layers Was Not "Previously Undisclosed"

Callaway provides no convincing argument as to why testimony regarding the sales of high-acid golf balls was so prejudicial to its validity case as to necessitate a third trial on that issue. As an initial matter, the evidence of 2001-2002 Pro V1 golf balls with high-acid inner cover layers was introduced in support of Acushnet's damages case. Indeed, Acushnet did not offer this evidence in the first trial, where validity was the only issue. Rather, the evidence that Acushnet had the capability to produce technically equivalent non-infringing alternatives at the

27

time of the hypothetical negotiation was offered as a predicate to Dr. Kerr's opinion on damages,

which relied extensively on this point. Dr. Kerr's report, filed years ago in July 2007, disclosed

its reliance on the high-acid balls. Callaway has known of this issue for years.

By contrast, the 2001-2002 high acid Pro V1 balls have no real relevance to the validity

of Callaway's patents—the issue on which Callaway now seeks a third trial.

Callaway also incorrectly argues that evidence related to high-acid alternatives was

"previously undisclosed." In reality, Callaway knew very well that Acushnet developed and

tested golf balls with high acid inner cover layers in 2001-2002. Callaway took ample discovery

related to these golf balls. First, Dr. Kerr discussed the high-acid alternatives in his expert report

dated July 13, 2007. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Callaway identifies a request for admission as support for its "non-disclosure" argument.

However, this request, which Acushnet admitted, was clearly directed to infringement, and

directed to a limitation of the claims that Acushnet has never disputed:

REQUEST FOR ADMISSION NO. 14:

Admit that at least one of the ionomer resins comprising the Pro V1's inner cover
layer contains no more than 16% by weight of an alpha, beta-unsaturated
carboxylic acid.

There is nothing misleading or evasive about Acushnet's admission on this request. The Pro V1

was introduced in 2000. Since the Pro V! was introduced, over 60 million dozen accused Pro

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

V1's were sold. T. Tr. 717:11-17. All of them, save the few thousand test units Dalton made in 2001-02, use low acid inner covers. The substance of the admission is true, accurate, and proper. Acushnet admitted what was undeniable—the production recipe for the Pro V1 included a low acid inner cover. Nothing in this admission suggests in any way that a high acid inner cover was never tested or sold for a brief time many years ago. Callaway's contrary argument is frivolous.

Importantly, Callaway never objected to Mr. Dalton's testimony (or Mr. Morgan's or Dr. Kerr's for that matter) regarding the sale of high acid Pro V1s during trial on the basis that it was not disclosed during discovery. T. Tr. at 414:17-416:10. Thus, Callaway cannot now, after trial, seek a new trial based on the admission of that evidence. *Caisson*, 622 F.2d at 681. Similarly, Callaway made no objection to Acushnet's reference to this testimony in closing argument, and has waived any objection to that argument. *Id.*

Next, Callaway argues that Mr. Dalton's testimony regarding 2001-2002 high-acid alternatives somehow circumvented the Court's *in limine* ruling regarding the 2007 and 2009 Pro V1 golf balls. D.I. 619 at 27. However, that *in limine* ruling was based on the fact that the 2007 and 2009 golf balls were not vetted through discovery as they were not introduced until *after* the first trial. In contrast, the 2001-2002 high acid Pro V1s were the subject of extensive discovery, as discussed above. The evidence of the 2001-2002 high acid Pro V1 balls were never the subject of a motion *in limine* or other objection before or during trial.

Callaway also argues that Mr. Dalton's testimony regarding the sales of the high-acid golf balls somehow led to opening the door to the introduction of Acushnet's outside counsel's invalidity opinions. As discussed above, the Court allowed this testimony to counter Callaway's insinuation during its aggressive cross-examination of Dr. Kerr that Acushnet knowingly infringed and accrued $275 million a year in damages. T. Tr. at 1369:7-1370:6. As noted above,

Callaway took a calculated risk in choosing to press its damages case at the expense of its

validity case, and cannot now seek a new trial based on its choice of trial strategy.

### 5.   Callaway Proffered Mr. Mickelson's Testimony As Relevant to Damages, Not Obviousness and Anticipation

The Court has considered and reaffirmed its exclusion of Mr. Mickelson's testimony on

numerous occasions. Yet again, Callaway asks the Court to revisit this issue. This time,

Callaway argues that Mr. Mickelson's testimony was critical to its validity case at trial, stating

that "Callaway Golf understands that, to date, it has failed to convincingly explain the decisive

nature of Phil Mickelson's testimony." D.I. 619 at 28. But when Callaway exhaustively

explained the relevance of Mr. Mickelson's testimony to the Court in this trial, it stated

repeatedly that this testimony was necessary for its <u>damages</u> case.

First, at the pre-trial conference, Callaway argued that Mr. Mickelson's testimony was

necessary to rebut what it considered to be Acushnet's main defense on damages: the

availability of wound golf balls as non-infringing alternatives. March 3, 2010 Pretrial Tr. at

31:4-13. Then, late on the eve of the last day of trial, Callaway submitted a "Motion to Introduce

Deposition Testimony From Phil Mickelson. D.I. 605. That motion too was directed almost

entirely to showing why Mr. Mickelson's testimony was critical to Callaway's <u>damages</u> case:

- "Mr. Mickelson's testimony is critical as it *directly* refutes Acushnet's expert's opinion that a wound golf ball would have been an acceptable non-infringing substitute and addresses one of the central damages issues . . . ." D.I. 605 at 1.

- "Callaway Golf respectfully submits that the balance in this trial, which includes damages, is different from anything the Court considered during the first trial." D.I. 605 at 2.

- As discussed below, the Court should conduct a new balancing test, weighing the relevance of Mr. Mickelson's testimony to damages issues not present during first trial . . . ." D.I. 605 at 3-4.

- "While Mr. Mickelson's testimony is still relevant to these secondary

considerations of non-obviousness, the presence of damages adds a number of additional issues for which Mr. Mickelson is uniquely situated to testify, including demand for the patented product (a factor for lost profits), the utility and advantages of the patented property over the old modes or devices (*Georgia Pacific* factor 9), and the benefits to those who used the invention (*Georgia Pacific* factor 10)." D.I. 605 at 4.

- "Perhaps most critically, Acushnet's damages expert, Dr. William Kerr, has opined that Acushnet could have continued selling the wound Titleist Professional golf ball as a non-infringing alternative to the patents-in-suit." D.I. 605 at 4.

- "The relevance is more weighty, given Mr. Mickelson's key testimony concerning Acushnet's alleged non-infringing alternative." D.I. 605 at 8.

During the last day of trial, Callaway likewise argued that Mr. Mickelson's testimony was relevant to its damages case, not its validity case:

> The highlights I just wanted to hit was that, in this case we've got a different balance. As you recall last time, he was excluded under 403, which is a balancing act of relevance and prejudice. In this case, we've got damages, and it's actually fairly critical now, his testimony, because as you have heard from Acushnet, their main argument is that the patented technology is really not worth anything. I mean, that's what we've heard repeatedly. And a critical fact is that when the Rule 35s came out, he was going to move over to Callaway and start playing the Rule 35 because the technology was that important. Acushnet disputes this, of course. So that's critical, the importance of the technology, particularly in this damages case.

T. Tr. at 1287:10-23 (emphasis added).

Thus, throughout the trial, Callaway urged the Court to admit Mr. Mickelson's testimony for damages issues, not validity issues. In view of the fact that Acushnet did not rely heavily on the availability of wound golf balls as a non-infringing alternative, the Court correctly decided that the introduction of Mr. Mickelson's testimony was not relevant or necessary. T. Tr. at 1371:14-24; 1373:22-1374:1.

Critically, Callaway agreed on the record that it could live with the exclusion of Mr. Mickelson's testimony provided that Acushnet didn't later argue that players would switch back

31

to the Professional golf ball, which Acushnet agreed to do. T. Tr. at 1374:2-7. Only after it lost its validity case did Callaway retool its story to argue that Mr. Mickelson's testimony was primarily relevant to validity, and go back on the deal that was struck with the Court and with Acushnet during trial.

Callaway's next attempt to bootstrap Mr. Mickelson's testimony into the trial rests on the fact that Acushnet presented displayed advertisements featuring professional golfers at trial. D.I. 619 at 31-32. The commercial Callaway refers to focused on the Titleist brand, and was an example of Titleist advertising; it was not directed to golf ball technology and has no bearing on the admissibility of Mickelson's testimony. Moreover, it was a demonstrative exhibit to which Callaway had no objection, and it was not admitted as evidence. T. Tr. 716:1-7 (Bellis).

Similarly, Callaway claims that because Acushnet presented evidence related to Tiger Woods switch to a Nike golf ball, and Greg Norman's use of the Spalding Tour Edition golf ball, Callaway should have been allowed to play Mr. Mickelson's testimony. D.I. 619 at 31-32. Acushnet did not present any testimony from these golfers, however. Thus, Callaway's comparisons are inapt. The record is replete with Callaway's questioning about Mr. Mickelson's (and other professional golfer's) preferences for golf balls. T. Tr. at 359:22-360:2; 365:6-14; 779:13-781:9; 1119:1-8; 1165:15-20; 1205:2-6. The only reason Callaway could have wanted to introduce Mr. Mickelson's testimony itself is for the "star power" it would lend to its case.

The Mickelson testimony was properly excluded as highly prejudicial and of limited probative value. In any event, it was being offered primarily for damages reasons, and Callaway agreed that the testimony would not be played in exchange for Acushnet's stipulation regarding non-infringing substitutes. The exclusion of this testimony does not warrant a new trial.

## VI.   THE COURT'S JURY INSTRUCTIONS WERE PROPER

### A.   The Court's Omission of a Jury Instruction on the Presumption of Validity Does Not Warrant a New Trial

Callaway argues that the lack of a jury instruction on the presumption of validity was erroneous, and requires a new trial. Callaway's argument is incorrect. Federal Circuit precedent directly on point holds that it is <u>not</u> legally erroneous for a court to omit a jury instruction on the presumption of validity when the jury has already been instructed on the burden of proof. The burden of proof instruction is sufficient because, as the Federal Circuit recognized, "the presumption of validity and heightened burden of proving invalidity 'are static and in reality different expressions of the same thing - a single hurdle to be cleared.'" *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004). Thus, "the district court [does] not err in declining to include a jury instruction on the presumption of validity [when] the jury applied the correct 'clear and convincing evidence' standard." *Id.* at 1259. Callaway's argument that the Court erred ignores the Federal Circuit's holding in *Chiron*.[13]

Moreover, Callaway has not shown how the omission of the instruction had a prejudicial effect. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004) ("A jury verdict will be set aside, based on erroneous jury instructions, if the movant can establish that 'those instructions were legally erroneous,' and that 'the errors had prejudicial effect.'") (*quoting Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000)). "Prejudicial error exists if the outcome of the case would have been different had the correct instruction been given." *Id.* at 1367. When the error could not have changed the outcome of the case, the erroneous instruction is harmless and will be upheld. *Id.* at 1364.

---

[13] Tellingly, Callaway never told the jury about the presumption of validity in its opening statement or closing argument, despite the Court's explicit permission to do so at the charging conference. T. Tr. at 955-56.

"The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law." *Id.* at 1363. In reviewing the Court's jury instructions, "the full trial record and the jury instructions in their entirety must be examined because 'instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury.'" *Id.* at 1363 (quoting *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1522 (Fed. Cir. 1995).

No prejudice was present at trial because, in accordance with *Chiron*, the Court stated the "clear and convincing evidence" standard *four times* in the preliminary jury instructions.[14] Similarly, in the final jury instructions, the Court referred to Acushnet's burden of proof by stating the "clear and convincing evidence" standard *five times*.[15] Thus, the jury was undoubtedly aware of the correct standard in determining whether Acushnet sufficiently proved that the asserted claims of the patents-in-suit were invalid.[16]

---

[14] T. Tr. at 124:11-13 ("In essence, however, you must decide: One whether Acushnet has proven, by *clear and convincing evidence*, that the patents in suit are invalid."); *id.* at 125:12-18 ("Acushnet has the burden of proving that each of the patents in suit are invalid by *clear and convincing evidence. Clear and convincing evidence* is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by *clear and convincing evidence* is thus a higher burden than proof by a preponderance of the evidence.").

[15] *Id.* at 1506:2-9 ("Acushnet, as the defendant, has the burden of proving that each one of the asserted claims of the Callaway patents is invalid by *clear and [] convincing evidence. Clear and convincing evidence* is evidence that produces an abiding conviction that the truth of a fact is highly probable. You must decide, as to each of the asserted claims, whether Acushnet has proven, by *clear and convincing evidence*, that the claim is invalid. . ."); *id.* at 1507:8:10 ("therefore, put it out of your mind in considering whether or not Acushnet has met its *clear and convincing burden of proof* . . ."); *id.* at 1510 ("If you find that Acushnet has proven, by *clear and convincing evidence*, that any of the asserted claims are anticipated by the Nesbitt/Molitor '637 prior art reference, then you must find that those claims are invalid.").

[16] Because the presumption underlies the requirement that invalidity be proven by clear and convincing evidence, reciting the presumption in addition to the burden of proof could have been confusing to the jury and redundant. Patent Case Management Judicial Guide § 7.3.4.3 at 7-7, 7-8 (Fed. Jud. Ctr. 2009) (emphasis added) ("[I]t is now generally agreed that juries should be instructed as to the higher burden of proof required to prove invalidity, but should not be told

Callaway's argument that Acushnet "exploited [the] lack of guidance [from the Court's removal of the instruction on the presumption of validity] by speculating about the PTO's failure to spend adequate time considering the prior art relied on at trial" is without merit. Acushnet was permitted to respond to Callaway's repeated statements – both in its opening statement and closing argument – that the PTO considered all the relevant prior art. T. Tr. at 227:5:8 ("There are five patents, prior art patents Acushnet is going to rely on. They were all cited to the Patent Office. So there is nothing new in terms of whether the reference was cited. Okay?"); *id.* at 1441:3-4 ("Now, you already know all of the prior art in this case was before the Patent Office.").

In response to Callaway's theme that the PTO considered all of the prior art Acushnet would present, Acushnet questioned Dr. Risen on the extent to which the prosecution history revealed PTO consideration of the combinations of prior art Acushnet advanced to the jury. T. Tr. at 1083:23-1085:21. This was consistent with the Court's pretrial order that prohibited speculation as to the extent prior art was considered by the examiners "aside from what is specifically disclosed in the prosecution histories." D.I. 595 at 14. When Callaway objected, the Court ruled that the prosecution histories would be admitted into evidence. T. Tr. at 1091:8-11. Indeed, Callaway showed the jury several portions of the file history in its closing argument, attempting to show that the PTO considered the art Acushnet advanced. T. Tr. at 1443:4-19.

Callaway now argues that Acushnet's questioning of Dr. Risen and Acushnet's closing

---

that there is a presumption of validity, which would be redundant and likely confusing."); Fed. Cir. Bar Ass'n Model Patent Jury Instructions, Note to 10.1 ("In light of the procedural role of the presumption of validity, instruction the jury on the presumption in addition to informing it of the clear and convincing burden of proof may cause jury confusion as to its role in deciding validity."); *see also* American Intellectual Prop. Law Ass'n Model Patent Jury Instructions (omitting any reference to presumption of validity). Indeed, as the Court noted at the charging conference, the model patent instructions from the AIPLA and Federal Circuit Bar Association all omit the presumption of validity instruction. T. Tr. at 957:22-958:5.

35

argument, in which it similarly showed the jury portions of the admitted file history, was so prejudicial that it required a curative instruction on the presumption of validity. D.I. 619 at 34. However, Callaway never made such an argument at trial. Callaway did not object either during or after Acushnet's closing argument. Nor did Callaway seek to add a presumption of validity instruction to cure any alleged prejudice from Acushnet's closing argument. Callaway has waived the right to argue now, after the jury has been dismissed, that a curative instruction should have been given. *Wilson*, 170 F.3d at 395.

**B.     The Court's Decision to Include the "Pieces of the Puzzle" Instruction Was Not Legally Erroneous**

Callaway contends that the Court's decision to include the "pieces of the puzzle" instruction was improper. The instruction in question was lifted almost verbatim from the Supreme Court's most recent, and definitive holding on obviousness, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). There, the Supreme Court stated: "In many cases, a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* In comparison, the Court's instruction read: "In many cases, a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle." T. Tr. at 1514:10-13. Hence, there is no question that the instruction the Court gave is an accurate statement of the law of obviousness, and is not legally erroneous.

Callaway seems to argue that *KSR* does not apply to golf ball construction patents on the basis that golf ball design is unpredictable and involves "advanced chemistry." D.I. 619 at 35. While there was testimony that the golf ball art is an "unpredictable" art, such unpredictability has no bearing on the predictable task of combining polyurethane with a three piece golf ball explicitly taught in the prior art. DX-11 at 3:7-12. As detailed below, Callaway cannot avoid a finding of obviousness merely by a showing that there was some degree of unpredictability in the

36

golf ball art. *See Pfizer, Inc.* v. *Apotex, Inc.,* 480 F.3d 1348, 1364 (Fed. Cir. 2007)

("[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability ... so

long as there was a reasonable probability of success."). Thus, even assuming that golf ball art

has some degree of "unpredictability," instructing the jury on *KSR's* obviousness test was not

improper. D.I. 606 at 25. Indeed, *KSR* has repeatedly been applied to patent cases that do

involve far more unpredictable technologies, including the chemical arts. *See, e.g., Aventis*

*Pharma Deutchland GmbH v. Lupin, Ltd.,* 499 F.3d 1293, 1300-01 (Fed. Cir. 2007).

Moreover, the Court tempered the *KSR* instruction at Callaway's request, adding the

sentence: "However, where the art is unpredictable, a focus on known elements may still present

a difficult hurdle for one of skill in the art because the results of potential solutions may be

unknown or unexpected." D.I. 606 at 25. *See also Weinar v. Rollform, Inc.,* 744 F.2d 797, 808

(Fed. Cir. 1984) ("Where the procedural error was 'harmless', i.e., where the evidence in support

of the verdict is so overwhelming that the same verdict would necessarily be reached absent the

error, *or the error was cured by an instruction,* a new trial would be mere waste and affirmance

of the judgment is required.") (emphasis added). The Court, when faced with Callaway's

objection to the *KSR* instruction at trial, added the language Callaway requested because the

inclusion of this additional sentence "seem[ed] the more balanced approach." T. Tr. 1299:4-

1300:2. Because any concerns Callaway may have had with the *KSR* instruction were balanced

by the language it successfully added to the instruction, the inclusion of the language of *KSR* was

not an error, and certainly not an error warranting a new trial.

37

VII.   **CALLAWAY'S MOTION FOR A NEW TRIAL OR JMOL BASED ON THE EVIDENCE ADDUCED AT TRIAL SHOULD BE DENIED**

A.     **The Jury's Anticipation Verdict Is Not Against the Great Weight of the Evidence**

Callaway fails to demonstrate that the jury's verdict finding that the asserted claims of the patents-in-suit were anticipated by Nesbitt/Molitor '637 is against the great weight of the evidence. Callaway also fails to demonstrate that allowing the anticipation verdict to stand would result in a "miscarriage of justice." Thus, regardless of whether the asserted claims of the patents-in-suit were anticipated by Nesbitt/Molitor '637, the jury's verdict should be affirmed based on the independent jury finding of obviousness.

1.     **Nesbitt/Molitor '637 Expressly Discloses a Polyurethane Outer Cover with a Shore D Hardness of 64 or Less**

Callaway contends that there was no evidence that Nesbitt/Molitor '637 discloses a polyurethane outer cover with a Shore D hardness of 64 or less. D.I. 619 at 37-38. Callaway is wrong. The express disclosure of Nesbitt, and the testimony of Dr. Statz and Dr. Risen, all support a finding that Nesbitt/Molitor '637 discloses a golf ball with a polyurethane outer cover with a Shore D hardness of 64 or less.

While Nesbitt does not disclose a specific hardness value for the outer cover, Nesbitt does expressly disclose that the outer cover should have the same hardness as balata-covered golf balls. DX-9 at col. 1:26-29; 1:26-44; 1:55-56; 1:65-2:9; 3:40-44. Dr. Statz testified that balata-covered golf balls were known to be very soft, and well under 64 Shore D. T. Tr. at 569:12-570:4. Further, Callaway's expert, Dr. Risen, admitted that the balata-covered golf ball examples that Acushnet presented were known to have a hardness well under 64 Shore D:

> Q.    Okay. And he says, a Surlyn cover of the prior art or a golf ball having a softer Balata cover, and golf balls who had the softer Balata cover that were on the market at that time had a cover hardness of around Shore D of 50; right? You remember that,

38

don't you?

A.    They got -- they have the hardness, at least for the examples you brought up.

Q.   Of about Shore D 50. 52, 48, that range?

A.   A little higher, but that's about right.

Q.   In any event, it's less than a Shore D of 64, isn't it?

A.   That's right.

T. Tr. at 1071:18-1072:4.

Callaway contends that there was no evidence that Nesbitt teaches that "a three-piece *polyurethane* outer cover layer should have a similar Shore hardness to balata." D.I. 619 at 39. Specifically, it argues in error that "the relevant passage" in Nesbitt that references balata-covered balls relates only to an ionomer-over-ionomer embodiment disclosed in Nesbitt. D.I. 619 at 38. But Callaway improperly focuses on only one of Nesbitt's at least five separate references to balata-covered golf balls. DX-9 at col. 1:26-29; 1:26-44; 1:55-56; 1:65-2:9; 3:40-44. Nesbitt teaches that the hardness of the outer cover of its ball should be comparable to that of a balata-covered ball, without reference to the ionomer-over-ionomer embodiment. For example, in generally describing the outer cover, Nesbitt states:

> The first layer or ply is provided with a second or cover layer of a comparatively soft, low flexural modulus *resinous material or of cellular or foam composition* molded over the first layer and core or center assembly. Such golf ball has the 'feel" and playing characteristics *simulating those of a softer balata covered golf ball.*

DX-9 at 1:51-56 (emphasis added). Dr. Statz testified about what these passages teach a person

of ordinary skill in the art. T. Tr. at 568:19-569:25; 570:5-19; 571:13-18; 651:2-6.[17] Moreover,

Nesbitt teaches that the foaming of the outer cover layer should be adjusted to achieve this target

hardness: "The outer or cover layer or second layer 16 may be foamed to a greater degree than

the inner, intermediate or first layer 14 as the material of the layer 16 is comparatively soft."

DX-9 at 3:65-68.

Dr. Statz explained the teachings of Nesbitt, testifying that Nesbitt, col. 1:37-44,

discloses:

> [A] double cover layer -- over a resilient, and you saw the core, it's
> a resilient core. The multi-layer cover construction involves two
> stage molding. You mold one cover and then you mold the other
> one over it. So you get the increased coefficient of restitution, i.e.,
> the ball goes further, and then *from the soft outer cover*, you get
> the playing characteristics you want: The click, the feel, and the
> spin of *a Balata covered golf ball*.

T. Tr. 561:4-13.

Thus, the jury had before it both Dr. Statz's and Dr. Risen's testimony, coupled with the

express teachings of Nesbitt, all of which support an explicit finding that Nesbitt/Molitor '637

teaches that the outer cover of the golf balls should have a hardness like a balata covered ball,

and hence substantially less than 64 Shore D. The jury was permitted to credit this testimony

and find that Nesbitt disclosed a Shore D hardness of less than 64 for the outer cover.

---

[17] As Dr. Statz explained, Nesbitt's reference to a "softer" balata covered golf ball, which
Callaway latches on to, is a reference to the softness of balata compared to that of hard ionomers
used in conventional two piece balls. For example, the last paragraph of the background of the
Nesbitt patent states "A two-piece golf ball having a hard, Surlyn resin cover however does not
have the 'feel' or playing characteristics associated with softer balata covered golf balls." DX-9
at 1:26-29. This passage provides the context for the later passage in which Nesbitt states that
the use a soft outer cover provides a golf ball with the "'feel' and playing characteristics
simulating those of a softer balata covered golf ball." DX-9 at 1:55-56.

2.     **Callaway's Genus/Species Arguments are Inapplicable to Nesbitt**

Callaway's argument that Nesbitt/Molitor '637 discloses an overbroad genus is wrong. This is <u>not</u> a genus/species case. Nesbitt/Molitor '637 does not disclose a broad genus of which the claimed elements are members. Rather, Nesbitt/Molitor '637 discloses the claimed limitations themselves.

There is no dispute that Nesbitt discloses a three-piece golf ball with a core, a relatively hard ionomer-resin inner cover, and a relatively soft ionomer-resin outer cover. Moreover, Nesbitt refers to Molitor '637 for a list of cover materials to be used in each of the two cover layers:

> Reference is made to the application Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed for one or both layers 14 and 16 for the golf ball of this invention.

DX-9 at col. 3:56-61. The Federal Circuit held based on this language that "Nesbitt incorporates by reference the potential cover layer materials described in Molitor '637, including polyurethane and ionomer resin blends." *Callaway Golf*, 576 F.3d at 1347. Thus, Nesbitt discloses three piece golf balls in which the cover layers are made from the cover layer materials disclosed in Molitor '637. While Molitor '637 discloses in column 5 a number of broad categories of cover layer materials (DX-12, Col. 5), the patent also provides specific examples, complete with product numbers and amounts for each ingredient, for eight specific cover layer formulations. DX-12 at 14:55-19:59. Two of these specific cover examples anticipate the broadly claimed materials recited in the asserted claims.

The Federal Circuit in *Perricone v. Medicis Pharm. Corp.,* held that the genus line of cases does not apply where, as here, the prior art discloses the claimed limitations themselves, rather than simply disclosing a broad genus of which the claimed elements are members:

41

> While other opinions state that disclosure of a broad genus does not necessarily specifically disclose a species within that genus…, this axiomatic proposition also does not rescue Dr. Perricone's claims. In this case, the prior art does not merely disclose a genus of skin benefit ingredients without disclosing the particular claimed ingredient. Rather [the prior art reference] specifically discloses ascorbyl palmitate. *That specific disclosure, even in a list, makes this case different from cases involving disclosure of a broad genus without reference to the potentially anticipating species.*

432 F.3d 1368, 1377 (Fed. Cir. 2005) (emphasis added) (internal citations omitted). Similarly, the *In re Petering* case contradicts Callaway's genus argument. 301 F.2d 676 (C.C.P.A. 1962). There, the prior art in question disclosed the claimed broad genus, but also disclosed eight specific compounds that fell within that broad genus. *Id.* at 678. The Court found that while the broad genus covered "a vast number and perhaps even an infinite number of compounds," there were specific disclosures in the prior art reference that limited the disclosure to a meaningful subset. *Id.* at 681. On that basis, the Court found the claims anticipated. *Id.* Similarly, Molitor '637 discloses several broad categories of materials, but then describes with specificity particular cover layer formulations, each of which can be used as the inner or outer cover of the Nesbitt golf ball. DX-12 at 14:55-19:59.

Callaway also argues that Nesbitt/Molitor '637 does not disclose "preferences" regarding materials for use in a generic three-piece golf ball that would direct someone to the claims of the patents-in-suit. However, the Federal Circuit has "reject[ed] the notion that one [of a number of] ingredients cannot anticipate because it appears without special emphasis in a longer list." *Perricone,* 432 F.3d at 1376. *See also, Wm. Wrigley Jr. Co.* v. *Cadbury Adams USA LLC,* 631 F. Supp. 2d 1010, 1030 (N.D. Ill. 2009) ("An obviousness analysis requires some suggestion or motivation to combine prior art teachings in a way that would render the subject matter obvious, *but an anticipation analysis requires no such direction or guidance.* As long as all of the claimed elements are present in a prior art reference and that reference is enabling, the claim is

42

anticipated.") (emphasis added) (internal citations omitted).

In any event, Acushnet presented substantial evidence that Nesbitt/Molitor '637 indeed discloses preferences regarding the materials for use in Nesbitt's three-piece golf ball that would direct one skilled in the art to the claimed "polyurethane" limitation and the ionomer blend limitations. Dr. Statz testified about these preferences:

> Q.   Now, what would cause a person of ordinary skill in the art to choose the polyurethane that you identified in table 10 instead of other materials that are listed in the Molitor '637 patent?
>
> A.   Well, for one thing, you know the physical properties of most of the things in the patents, and Molitor used them and he picked out 7 to 12 of them.  And he actually did the tests on, say, ten of them.  And what you look at in his tests are, you pick out the most resilient materials.  In other words, the ones that were the most bouncy.  You pick out the ones that were durable.  A lot of the golf balls that Molitor made broke, so you wouldn't pick out any of those.  You would discard those.  And you would pick out the ones that were soft and flexible.  You already know Surlyn worked well as a golf ball cover, so you would take a Surlyn blend.  Which ones would you pick as a soft material?  The two urethanes that we talked about, the cast urethane or the solid urethane, and that's what you would pick as the outer cover layer.

T. Tr. 567:25-568:18.[18]  Since Molitor '637 directs a person of ordinary skill in the art to only a handful of materials, the number of potential combinations taught by Nesbitt is actually extremely small. *See In re Schaumann*, 572 F.2d 312 (C.C.P.A. 1978) (finding anticipation despite the disclosure of a formula that would include "one hundred and five or more compounds," because preferences expressed by the prior art reduced the number of compounds

---

[18] Nothing in the Federal Circuit's decision is inconsistent with Dr. Statz's testimony.  The Federal Circuit held there is "no basis to differentiate between incorporation of the ionomeric resins disclosed by Molitor '637 and the other compositions in the list, including polyurethane." *Callaway Golf*, 576 F.3d at 1347 (emphasis added).  Nothing in the Federal Circuit's decision addressed or resolved the question of whether Molitor '637 expressed any preferences for different cover layer materials.  Instead, the statement in the Federal Circuit's opinion was made in rejection of Callaway's argument that the incorporation by reference language referred only to ionomers.

actually taught by the reference to only seven).  Thus, based on this record, the jury had ample

evidence that Nesbitt/Molitor '637 fairly directed a person of ordinary skill in the art to only a

handful of golf balls.  Thus, the jury verdict is supported by the evidence.[19]

The genus/species cases Callaway relies on are readily distinguishable.  In *In re Ruschig*,

the prior art references did <u>not</u> disclose the claimed compound, nor did they disclose a genus that

included the claimed compound.  343 F.2d 965, 973 (C.C.P.A. 1965).  Instead, the prior art

disclosed a handful of examples, none of which anticipated the claim.  Similarly, in *Eli Lilly &*

*Co. v. Zenith Goldline Pharms, Inc.*, 471 F.3d 1369 (Fed. Cir. 2006), the prior art at issue did <u>not</u>

disclose the claimed chemical compound, or even a broad genus that included that compound.

*Id.* at 1376-77.  Instead, the prior art merely disclosed other chemical compounds that were in the

same broad chemical family as the claimed compound.  *Id.* at 1377.  In contrast, in *Impax Labs,*

*Inc. v. Aventis Pharms, Inc.*, 468 F.3d 1366 (Fed. Cir. 2006), one prior art reference identified

only a broad chemical genus, whereas the second also specifically called out the claimed

compound as an example.  *Id.* at 1383.  The court found that the broad genus disclosure alone did

not anticipate the claimed compound, but the reference that also included a specific example

might anticipate.  *Id.* at 1383.  The Nesbitt/Molitor reference, like the second reference in *Impax*,

sets forth specific examples of materials that include those of the claimed golf ball.  Since

---

[19] Callaway's argument that Mr. Sullivan was aware of the reference to Molitor '637 in Nesbitt, but still thought his claims were patentable is irrelevant.  The subjective intent of an inventor is of little or no probative value in a patent infringement case.  *Fujinon Corp. v. Motorola, Inc.*, 2009 U.S. Dist. LEXIS 83088, at *22 (D. Del. Sept. 11, 2009) ("The undisclosed, subjective intent of an inventor is not, by definition, available to the public, and would not (and could not) be relied on by one of skill in the art"); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) ("No inquiry as to the subjective intent of the applicant . . . is appropriate or even possible in the context of a patent infringement suit.  The subjective intent of the inventor … is of little or no probative weight.").

Nesbitt/Molitor discloses a limited, and easy to envision, number of golf balls, at least one of which meets the asserted claims, the jury reasonably found that it anticipates those claims.

### 3.    Nesbitt/Molitor '637 Discloses All of the Elements As Arranged in the Asserted Claims

Callaway argues that Nesbitt/Molitor '637 does not disclose the limitations of the patents-in-suit as arranged in the claims on the basis that it allegedly does not disclose a single golf ball meeting all the elements. D.I. 619 at 46. Callaway is incorrect. Nesbitt discloses a three-piece golf ball with a core, a soft outer cover, and a hard inner cover. Nesbitt also discloses that the cover layers can be selected from the list of foamable compositions set forth in Molitor '637. DX-9 at 3:56-61. Molitor '637 provides eight specific golf ball cover compositions, including a specific blend of low-acid ionomers and a specific polyurethane. DX-9 at col. 14:60-65; *id.* at col. 18:35-41. Hence, Nesbitt/Molitor '637 discloses a ball with a blended ionomer inner cover and a polyurethane outer cover. T. Tr. 567:25-568:18. There was ample testimony that the inner cover of the blended ionomer would have a Shore D hardness of greater than 60. T. Tr. at 564:8-16; 570:21-571:5. This was never questioned by Callaway. Moreover, as discussed above, there was ample testimony and other evidence that Nesbitt teaches that the polyurethane outer cover should have a balata-like Shore D hardness of less than 64. T. Tr. at 568:19-569:25; 570:5-19; 571:13-18; 651:2-6. Accordingly, Nesbitt/Molitor teaches at least one golf ball that satisfies all the limitations of the asserted claims.

Callaway contends that Nesbitt/Molitor '637 does not disclose the limitations of the patents-in-suit as "arranged in the claims" because "[t]here are three-piece golf ball embodiments in Nesbitt, none of which include polyurethane or a blend of ionomers," and "[t]here are two-piece golf ball embodiments in Molitor '637 that include polyurethane or an ionomer blend in the cover, but none of them have an inner and outer cover layer." D.I. 619 at 46. This argument

45

is wrong. As the Federal Circuit's unambiguously stated, Nesbitt incorporates Molitor '637's disclosure of <u>foamable compositions</u> that can be used as <u>cover layers</u> in the Nesbitt ball. *See Callaway Golf*, 576 F.3d at 1347. Hence, the text of Nesbitt teaches using the cover materials of Molitor for "one or both" layers of Nesbitt's three piece golf ball.

Further, the fact that Nesbitt/Molitor '637 does not disclose a specific *example* of a three-piece golf ball with a blend of ionomers in the inner cover layer and a polyurethane outer cover is not dispositive. "Courts <u>are not</u> constrained to proceed *example-by-example* when reviewing an allegedly anticipating prior art reference. Rather, the court must, while looking at the reference as a whole, conclude whether or not that reference discloses all elements of the claimed invention arranged as in the claim." *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369 n.5 (Fed. Cir. 2008) (emphasis added); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1371-1372 (Fed. Cir. 2005) ("[T]here is no requirement that an anticipating reference must provide specific examples; rather, the reference need only 'be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.'"). Here, the jury could readily conclude that Nesbitt and Molitor '637 taught all of the elements as arranged in the claims so as to place it in the possession of a person of ordinary skill in golf ball design.

**B.      Acushnet Presented Substantial Evidence that the Asserted Claims are Obvious**

Callaway also argues that it is entitled to a new trial on obviousness because the obviousness verdict was against the great weight of the evidence and would result in a manifest injustice. Callaway's argument is in direct contrast to the Federal Circuit's holding on appeal of the first trial that "the evidence at trial was such that the jury could have rationally reached either verdict with regard to the asserted claims." *Callaway Golf*, 576 F.3d at 1344. Here, Acushnet

46

presented very similar evidence in support of its obviousness case, and again there was more than substantial evidence to support a jury verdict of obviousness.   Indeed, Callaway's expert Dr. Risen had to concede that the only element he could not find in the combination of Proudfit and Molitor '751 was a Shore D hardness of less than 64. T. Tr. at 1075:5-20.  As set forth below, Acushnet presented ample uncontroverted evidence that it would have been obvious to one skilled in the art to make the Shore D hardness of the outer cover less than 64.

Strikingly absent from Callaway's brief is any serious dispute that all of the elements of the asserted claims are taught in the prior art.  Rather, Callaway avoids a discussion of the claim elements altogether and argues that a) golf ball design is unpredictable; b) there was no motivation to combine polyurethane with a three-piece ball, despite the express teachings in the prior art; and c) objective criteria overcome the prima facie obviousness case. D.I. 619 at 47-58. The jury was permitted to credit the express teaching in the art to make Sullivan's invention.

### 1.    Acushnet Demonstrated Ample Motivation to Combine

The evidence established a clear motivation and express teaching to combine the polyurethane references (Molitor '751 or the Titleist Professional/Wu) with Nesbitt, Proudfit or the Wilson Ultra Tour Balata to make the invention claimed in the Sullivan patents.

First, Molitor '751 contains an express teaching to combine its polyurethane cover with a three piece ball, such as Nesbitt, Proudfit, or the Wilson Ultra Tour Balata.  It states that the polyurethane-based cover material should be used on "two-piece" golf balls, DX-11 at 2:58-64, and further explains: "The phrase "two piece ball" as used herein refers primarily to balls consisting of a molded core and a cover, *but also includes balls having a separate solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt,* and other balls having non-wound cores." *Id.* at 3:7-12 (emphasis added). As Dr. Statz testified, this description of "balls having a solid layer beneath the cover" describes Nesbitt, Proudfit, and the

47

Wilson Ultra Tour Ball golf balls, and expressly teaches to use polyurethane as the outer cover for three piece balls of that type. T. Tr. at 578:15-580:7. The Federal Circuit also recognized this teaching on appeal: "Molitor '751 teaches a polyurethane cover that may be used on two-piece or three-piece golf balls." *Callaway Golf,* 576 F.3d at 1337 n.3. Thus, the jury could reasonably conclude that Molitor '751 explicitly teaches and motivates one of skill in the art to apply the polyurethane cover described therein on balls like Nesbitt, Proudfit, and the Wilson Ultra Tour Balata, namely balls that have a core, an inner cover layer, and an outer cover layer.

Second, Wu instructs skilled artisans to use its polyurethane material in place of balata covers, such as that used on the Proudfit ball. Wu explains that there are advantages to using a polyurethane cover material as a substitute for Surlyn® ionomers or balata in a golf ball cover:

> It has been proposed to employ polyurethane as a cover stock for golf balls because, like SURLYN, it has a relatively low price compared to balata and provides superior cut resistance over balata. However, unlike SURLYN-covered golf balls, polyurethane-covered golf balls can be made to have the "click" and "feel" of balata.

DX-13 at 1:36-46. Hence, Wu expressly motivates using the Wu polyurethane in place of a balata or Surlyn cover. Dr. Statz also testified to this effect. T. Tr. at 605:20-606:7.

Third, Dr. Statz testified that in 1995 there were only three materials used as commercial golf ball covers – ionomers, balata, and polyurethane. T. Tr. at 545:12-25.[20] Polyurethane was a well known cover material used on wound and solid golf balls, and known to have good durability and feel. T. Tr. at 547:24-598:9; DX-843 at AC0100935. Dr. Statz explained that one of skill in the art would be motivated to use polyurethane as the cover layer on a three-piece golf

---

[20] That Molitor '637 discloses a list of many other potential cover materials does not undercut Dr. Statz's testimony that commercial golf balls used only a few cover layer materials, and persons skilled in the art would be readily familiar with, and motivated to use, such well known materials.

ball "because somebody had already done Balata, somebody had already done soft Surlyns. So the only other material, which is probably better as far as abrasion resistance is concerned, is polyurethane." T. Tr. at 548:9-17 (emphasis added). The jury was permitted to credit this testimony as providing the reason a skilled artisan would use polyurethane on a three piece ball.

Finally, Acushnet presented real world industry evidence supporting a motivation to combine. In 1994 the Wu patent disclosed a castable polyurethane that was especially desirable and was used on the Titleist Professional golf ball, the leading tour-played ball in the 1990s. T. Tr. at 271:11-274:23. By April 1995, Kevin Harris of Acushnet asked Ms. Wu to make several balls having the basic construction of the Pro V1 -- a solid center, hard ionomer inner cover, and Wu polyurethane outer cover. DX-830; T. Tr. at 280:23-283:6. Acushnet was testing such a ball with professional players in 1996. T. Tr. at 283:7-285:2; DX-385. In September 1995, Mr. Sullivan at Spalding, also after seeing the Wu patent, asked a technician to make the same type of balls. PX-614; T. Tr. at 460:18-462:11. This work led to the filing of the patent application resulting in the patents-in-suit. T. Tr. at 464:16-465:15. Callaway too had the same idea in 1997, leading to the Rule 35 ball. *Id.* at 801:16-20. Nike/Bridgestone also independently developed a polyurethane-covered three-piece ball which was on the market in the late-1990s. *Id.* at 317:4-19.

Thus, all told, at least four separate companies had the same basic idea described in the Sullivan patents in a short period after the Wu patent was published and the Titleist Professional became successful. All worked independently. None saw or copied the patents-in-suit, which did not begin issuing until years later, in 2001. This contemporaneous and independent adoption of polyurethane covered three piece balls further demonstrates the obvious nature of combing polyurethane with a three-piece golf ball.

### 2.    Acushnet Proved Reasonable Expectation of Success

Acushnet amply demonstrated, without serious dispute, that one of ordinary skill in the

49

art would have a reasonable expectation that using polyurethane on a three-piece ball would give one a useful combination and have a balata-like Shore D hardness of less that 64, as the Sullivan claims require.

For example, the Molitor '751 patent teaches that the hardness of the cover should be adjusted to achieve a Shore C hardness of 72 or 76. T. Tr. at 580:8-20. Dr. Statz testified that this hardness corresponds to a Shore D hardness in the 50s. T. Tr. at 580:21-583:17. This was confirmed by the fact that the Tour Edition golf ball, which used the cover material of Molitor '751 had an on the ball Shore C hardness of 72 and a Shore D hardness of 54. *See* T. Tr. at 506:23-507:3; T. Tr. at 269:6-270:17; DX-70 at 79327. Thus, Molitor '751 explicitly teaches that balls using its cover should be adjusted to have an outer cover layer with a Shore D hardness less than 64, on the ball.[21]

These teachings were no coincidence. Golf ball designers knew that professional golfers wanted a golf ball with a Shore D hardness below 64 so that the ball would play like a balata ball:

> Q: In your experience with golf balls, is it unusual to have cover measurements in Shore D of less than 64?
>
> A: Not at all. An all of these balata covers, all of these had a Shore D measurement that was in this range, high 40s to the 50s but less than 64.
>
> Q: Based on your experience about golf balls, is there a reason why you would want the outer cover to be less than Shore D 64?
>
> A. Well, these are the types of covers that professional golfers and really all the game's better players had been using for years and years and years. As we designed golf ball, we design them to have the characteristics that these golfers preferred and wanted. And having a cover hardness in this Shore D range of 47 into the 50s was exactly what they wanted the balls to be, so it wasn't surprising or unusual at all.

---

[21] Likewise, on the Titleist Professional ball, the Wu polyurethane had a Shore D hardness of 56 measured "on the ball." T. Tr. at 378:9-380:9.

T. Tr. at 255:5-20 (Morgan).

> Q:  Was it important on these two urethane products to make a cover with a Shore D hardness of less than 64?

> A:  Yes.  Again, Tour players preferred a soft feel and high spin and both of those would have required Shore D hardness much less than 64 Shore D.

T. Tr. at 380:5-9 (Dalton).

There was no contrary evidence at trial.  Thus, the jury had substantial evidence to find that a person of ordinary skill in the art applying a polyurethane cover to a three-piece ball, would have a reasonable expectation of making a cover with a Shore D hardness of less than 64. In fact, such a cover was a design goal for a successful tour-played ball.

### 3.    Callaway's Unpredictability Arguments Cannot Overcome the Prior Art's Express Teachings

Callaway's assertions that golf ball design can be unpredictable do not negate the obviousness of the patents-in-suit.  Acushnet does not, and did not at trial, dispute that there are elements of golf ball design that are unpredictable.  However, as discussed above, the prior art contained an express teaching to use polyurethane on a three piece ball, and the benefits of doing so were well known; thus there was nothing unpredictable about making such a combination. Specifically, the jury saw that the Molitor '751 patent expressly taught combining a polyurethane cover with a multilayer golf ball, DX-11 at 2:7-12, and that Wu suggested polyurethane to replace balata and ionomers as an outer cover.  DX-13 at 1:36-46.  Acushnet also introduced evidence that the benefits of adding that cover to existing golf ball designs were not merely predictable, but were expressly taught in the art.  T. Tr. at 547:24-598:9; DX-843 at AC0I00935. Further, after Wu, four companies independently made the claimed invention.  T. Tr. 317:4-19. Thus, applying a polyurethane cover to a three piece ball would result in the ball of the asserted

claims and is a straightforward combination of known elements being used in their expected manner.

"[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability ... so long as there was a reasonable probability of success." *Pfizer, Inc.* v. *Apotex, Inc.,* 480 F.3d 1348, 1364 (Fed. Cir. 2007) ("[T]he expectation of success need only be reasonable, not absolute."). *See also Merck & Co.* v. *Biocraft Labs, Inc.,* 874 F.2d 804, 809 (Fed. Cir. 1989); *In re O'Farrell,* 853 F.2d 894, 903 (Fed. Cir. 1988). Some unpredictability, or the need to test or check a result, does not make an obvious idea into a patentable one. *Pfizer,* 480 F.3d at 1364; *see also In re Corkill,* 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although ... it cannot be predicted how any candidate will work [without testing], this does not overcome [the] teaching that hydrated zeolites will work.").

Under Callaway's view of unpredictability, presumably every different golf ball design would be patentable. That is not the law. The claimed invention in this case results from a simple substitution of known elements following an express teaching in the art for the exact reasons expressed in the references. As such the jury properly found the claims obvious.

### 4.    Secondary Considerations Cannot Outweigh the Strong Showing of Obviousness

Callaway asked the jury to ignore the explicit teachings of the prior art and find the patents non-obvious due to the "unprecedented" commercial success that the Pro V1 enjoyed. The jury was entitled to decline that invitation. There is no dispute in this case that the Pro V1 was extremely successful. T. Tr. at 732:20-733:4. But even assuming that this success was due in part to the patents-in-suit, that success does not dictate that these broad claims are non-obvious. Indeed, faced with the same evidence of secondary considerations in the first trial, the Federal Circuit still held that there was substantial evidence to support a verdict of obviousness.

*Callaway Golf,* 576 F.3d at 1334.

Callaway also argues that if the invention was so obvious, someone would have made it before Mr. Sullivan did. The Supreme Court was faced with the same argument that Callaway now makes in the *John Deere* case, and found that such an argument fails in the face of an explicit teaching to make the invention in the prior art. The Supreme Court stated, "It is also irrelevant that no one apparently chose to avail himself of knowledge stored in the Patent Office and readily available by the simple expedient of conducting a patent search - a prudent and nowadays common preliminary to well organized research." *Graham v. John Deere Co.,* 383 U.S. 1, 36 (1966). Similarly, here, the fact that no one in the golf ball industry apparently followed the explicit instructions of Molitor '751 to put its polyurethane cover on a three piece ball like that of Nesbitt or Proudfit is irrelevant. That the teaching to do so existed in the art is enough to render the claims at issue obvious.

Callaway conspicuously does not address one of the most compelling objective indications proven in this case. Spalding, despite having what Callaway calls the "Holy Grail" of golf ball design (D.I. 619 at 57), never used it. Indeed, Spalding did not even consider making a commercial three-piece polyurethane-covered ball until 2002, long after the industry had already released such balls. T. Tr. at 851:2-4; 851:25-852:9. No doubt this was because the black polyurethane golf balls designed by Mr. Sullivan, while covered by the patent claims, were not in fact not commercially viable. Common sense teaches that if Spalding had uncovered this "Holy Grail," it would have sold it. It was reasonable for the jury to conclude that the secondary considerations evidence offered by Callaway was insufficient to overcome the clear teachings of the prior art.

### a.    There is No Nexus Between the Claims and the Pro VI's Success

The commercial success of the Pro V I does not establish that the claims at issue are non-obvious for three principal reasons. First, the prior art is too close and the obviousness too clear for any secondary considerations evidence to change the result. Second, the required nexus is not present; Callaway proved only that the Pro V I was a success, not that this success was due in any quantifiable way to the use of the patents as opposed to existing ideas in the art, or other technology or patents. Third, it is undisputed that many other factors unrelated to technology and performance played a major role in the success of the Pro V1. Hence, the legal inference of validity that Callaway seeks to draw from the Pro V1's success is not warranted.

First, the evidence of obviousness in this case, as discussed above, is compelling. Even if all of Callaway's secondary evidence is credited, it cannot, as a matter of law outweigh the facts establishing obviousness in this case. As shown above, the obviousness of the asserted claims of the patents-in-suit is demonstrated by the explicit teachings of the prior art itself. When there is such a clear case of prima facie obviousness from the plain text of the prior art, the mere existence of secondary considerations cannot save an invalid patent. *See Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 63 (1969) ("Use of the radiant-heat burner in this important field marked a successful venture. But as noted, more than that is needed for invention.").

Second, the absence of a nexus between the success of the Pro V1 and anything novel in the patents-in-suit further precludes the inference of non-obviousness that Callaway seeks to draw. The core of the problem with Callaway's commercial success argument is that the patent claims are overbroad (and hence invalid). The jury heard that putting polyurethane on a three-piece ball was not even a new idea (Molitor '751 taught it), much less the critical ingredient in

54

commercial success. Many balls had polyurethane covers, including the black golf balls of the

Sullivan patents. The jury was shown that some balls that used the patents-in-suit, such as the

Pro V1, succeeded while others, like the Callaway Rule 35, "struggled" and failed outright. The

evidence at trial showed that the Pro V1 was vastly more successful than all of the Callaway

balls combined. T. Tr. at 741:22-742:7; 789:8-790:11. The jury was entitled to conclude based

on this evidence that the Pro V1's success was due to factors other than practicing the Sullivan

patents.

For example, the jury heard that the Pro V1's design was far superior to that of the Rule

35 Balls with a larger softer core, and a better urethane with better adhesion. T. Tr. at 314:4-

315:23; PX-973 at AC0028382; AC00283384. Likewise, the jury heard that the Pro V1

exhibited substantially better performance than the Rule 35 balls. T. Tr. at 322:14-325:19; PX-

973 at AC0028400-01.

If practicing the claims of the Sullivan patents was the reason the Pro V1 was successful,

the jury was left to wonder why Spalding never chose to use this claimed technology in its

products, and why Callaway abandoned it completely. T. Tr. 862:23-863:8; 810:5-12; DX-

175.5. In view of the trial record, the jury could have reasonably concluded that the success of

the Pro V1 was unrelated to the Sullivan patents.

Moreover, the jury learned that the actual construction of the Pro V1 is nowhere

disclosed in the Sullivan patents. The patents claim broadly any polyurethane and any low acid

ionomers. They claim broad ranges of hardnesses (greater than 60, less than 64) and thicknesses

of the covers (outer covers can be as small as 0.010 inches (which is thinner than the dimples of

most balls) to 0.070 inches (more than twice the size of the Pro V1 cover)). As Mr. Yagley and

others testified, small changes in design can have a large influence on the final commercial

product. T. Tr. at 803:9-804:10 (Yagley); 384:8-10 (Dalton).  Moreover, Mr. Yagley showed

that many vastly different balls (over 3000) can use the claimed technology, many having poor,

undesirable playing characteristics. *Id* at 773:2-774:3.  All of this work falls within the claims of

the Sullivan patents.  Hence, the jury was left to conclude that the broad, very general disclosure

of these patents in no way discloses the actual construction of the Pro V1.

The claims omit many features important to the Pro V1, such as the size and composition

of the core.  This was a critical issue at trial and shown to be a substantial contributor to the Pro

V1's success.  T. Tr. at 305:24-307:8; 314:4-317:20; PX-973 at AC0028382-84.  More

importantly, the specific castable polyurethane cover material patented by Acushnet was shown

to be the most important feature of the Pro V1.  T. Tr. at 271:2-274:23; 279:11-17; 347:22-

348:11; 378:9-13; 601:24-606:4.  Because the ranges in the patent claims are both broad in some

respects, and at the same time omit important features of the Pro V1, it is reasonable to conclude

that the success of the Pro V1 was not due to the patents in suit.

Third, the evidence showed that the Pro V1 was successful for many commercial reasons

unrelated to the patents-in-suit.  The ball was the successor to the market-leading Titleist

Professional, benefited from the industry-leading Titleist brand name, marketing capabilities, and

the Titleist Pyramid of Influence, among many other reasons. *See* T. Tr. at  712:23-713:8; 714:2-

715:25; 730:2-9; 734:17-736:4; 845:11-846:13.  The jury was free to rely on these undisputed

facts, which greatly diminish the weight that Callaway places on the Pro V1's success in the

overall determination of obviousness.

### b.      The Patents-in-Suit Were Not The "Holy Grail"

The evidence at trial demonstrated that the patents-in-suit were not the "Holy Grail" of

golf ball design.  Spalding's preferred golf ball construction used an outer cover layer made of

ionomer, not polyurethane.  T. Tr. 835:25-837:4.  Likewise, Spalding, despite having what

Callaway calls the "Holy Grail" of golf ball design, D.I. 619 at 57, never used it. T. Tr. 862:23-863:8. Callaway itself abandon the claimed subject matter, and stopped selling its Rule 35 prior to 2003. T. Tr. at 810:5-12; DX-175.5.

If Callaway's "Holy Grail" label were valid, surely the inventor or the patents owners would be using the claimed inventions. But, as shown at trial, the Sullivan patents were not the "Holy Grail" or "Best of Both Worlds." In fact, it was undisputed that the polyurethane examples in the Sullivan patents had very low COR values, and hence poor distance. T. Tr. at 612. Indeed, a comparative example in an internal Spalding memo that was used to draft Mr. Sullivan's 1995 application indicates that the type of wound golf ball that Callaway touted as short on distance throughout the trial had *greater* distance than Mr. Sullivan's "Holy Grail" of golf balls. PX-614. As shown at trial, the actual polyurethane examples in the Sullivan patents demonstrate that these polyurethane golf balls performed poorly, having low COR and excessively high spin. T. Tr. at 612:7-615:21.

In weighing the secondary considerations against the strong obviousness case here, the jury was entitled to consider and credit these objective, undisputed facts as well.

### c. Callaway's "Skepticism" and "Unexpected Results" Assertions Are Misplaced

Callaway charges that "[i]t was not until the Callaway Golf Rule 35 ball entered the market and posed a threat that Acushnet begrudgingly released the Pro V1. D.I. 619 at 58. It was this purported "skepticism," that Callaway contends strongly shows non-obviousness. Callaway's argument is misplaced. Callaway has presented no evidence demonstrating that Acushnet's decision about when to move forward with the Pro V1 had anything to do with the features claimed in the patents-in-suit. *See, e.g., Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("[T]he same press coverage . . . also demonstrates that the source of

much of the skepticism was the large investment banks who were advantaged by the existing all-or-none bidding system. This type of market-force skepticism also lacks the requisite nexus to the claimed invention.").

In fact, Mr. Morgan testified that the delay was in perfecting the mass production process for the Pro V1 and determining where the ball would fit into Acushnet's existing product line. T. Tr. at 289:8-291:22; 293:19-294:22; 295:13-296:1. The business decision to wait to launch the Pro V1 until Acushnet had decided how to position the ball, and ensured that it was not merely comparable to—but better than—competing products with similar construction had nothing to do with the technical feasibility of the invention claimed in the Sullivan patents. *See, e.g., In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983) ("That a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility. Only the latter fact would be relevant.").

Callaway next improperly conflates its unexpected results argument and its commercial success arguments, making assertions such as "But even after the Pro V1's release, Acushnet doubted it would enjoy the success that it did," and "The Success of Sullivan's Inventions Surprised Even Acushnet." D.I. 619 at 58. But such an approach has recently been denounced by the Federal Circuit:

> In arguing unexpected results, Media Tech returns to its argument that a person of ordinary skill would not have predicted commercial success. This is an attempt to recycle its commercial success arguments by making similar arguments under the "unexpected results" heading. Commercial success, however, even if unexpected, is not part of the "unexpected results" inquiry. An unexpected result must arise from combining prior art elements; commercial success is a separate inquiry from unexpected results, and in any event has not been shown here to be a result of the invention as opposed to other factors.

*Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010).

58

Similarly, no evidence tied Callaway's "unexpected results" assertion to anything related to the claims of the patents-in-suit. Absent the required nexus between the Pro V1 and the overly broad asserted claims, such assertions have no bearing on the jury's finding at trial that the claims were obvious. *Id.* at 1338-39.

Since ample evidence supported the jury's obviousness determination, a third trial is not warranted on that issue.

## VIII.   CONCLUSION

For the foregoing reasons, Acushnet respectfully submits that Callaway's motion for a new trial and renewed motion for a matter of law should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Henry C. Bunsow
Joseph P. Lavelle
Brian A. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 783-0800

Dated: June 1, 2010
Public Version Dated: June 8, 2010
969736/30030

By:   */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Acushnet Company*

59

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on June 8, 2010, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on June 8, 2010, the attached document was Electronically Mailed to

the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

Robert A. Denning
W. Chad Shear
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
shear@fr.com

Jonathan J. Lamberson
Craig R. Compton
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
lamberson@fr.com
compton@fr.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

721869 / 30030