IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CALLAWAY GOLF COMPANY,

          Plaintiff,

   v.

ACUSHNET COMPANY,

          Defendant.

C. A. No. 06-91 (SLR)

PUBLIC VERSION

## CALLAWAY GOLF COMPANY'S *REPLY* IN SUPPORT OF ITS MOTION FOR A NEW TRIAL AND JUDGMENT AS A MATTER OF LAW

Dated:  June 22, 2010

Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
 P.O. Box 1114
Wilmington, DE  19899-1114
Tel:  (302) 652-5070
Fax:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA 02110-2804
Tel:  (617) 542-5070
Fax:  (617) 542-8906

Roger A. Denning
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax:  (858) 678-5099

**ATTORNEYS FOR PLAINTIFF
CALLAWAY GOLF COMPANY**

# <u>TABLE OF CONTENTS</u>

PAGE(S)

I.  Introduction ........................................................................................1

II.  Argument .........................................................................................2

    A.  No Reasonable Jury Could Have Found Anticipation; at a Minimum, the Verdict Was Against the Great Weight of the Evidence.......................................................................................2

        1.  Nesbitt/Molitor '637 Does Not Disclose a Relatively Soft Polyurethane Outer Cover Layer with a Shore D Hardness of 64 or Less.................................................2

        2.  Nesbitt/Molitor '637 at Most Discloses an Overbroad Genus, Which No Reasonable Jury Could Find Sufficient for Anticipation. ........................................3

        3.  There Was No Evidence that Nesbitt/Molitor '637 Discloses All Limitations Arranged as in the Asserted Claims. .........................................................5

    B.  Exclusion of the Hebert Patents Allowed Acushnet to Paint a Misleading Picture of the Novelty and Technological Value of the Sullivan Patents.............................................................5

        1.  The Hebert Patents Were Admissible For the Probative Statements in Their Specification, Regardless of Their Specific Claims. .......................................6

        2.  There are No Differences Between the Hebert and Sullivan Claims That Matter to Patentability or Nexus to the ProV1's performance. .................................8

        3.  Other Evidence of the Veneer Project Was No Substitute for the Hebert Patents and Was Actually Harmfully Misleading.........................................................10

    C.  The Other Problems Caused by Acushnet Were Magnified by the Exclusion of the Hebert Patents and Separately Warrant a New Trial. ........................................................................14

        1.  The Opinions Improperly Bolstered Acushnet's Invalidity Case. ..........................................................14

i

2.      Acushnet's Introduction of Previously Undisclosed
        Evidence that It Sold High Acid ProV1s Was Improper. ............16

3.      The Nesbitt and Proudfit Testimony Demonstrated that
        Those Skilled in the Art Did Not Think the Asserted
        Claims Were Invalid. ...................................................................17

4.      Mr. Mickelson's Testimony Was Critical to Non-
        Obviousness. ...............................................................................20

5.      Acushnet's Grandstanding Warranted an Instruction on
        the Presumption of Validity. .......................................................22

6.      The "Pieces of the Puzzle" Instruction Should Not Have
        Been Given..................................................................................23

7.      These Issues—Alone or Combined—Were Prejudicial
        and Warrant a New Trial..............................................................24

D.      The Obviousness Verdict Was Against the Great Weight of the
        Evidence...................................................................................................24

1.      The Anticipation Verdict Infected the Obviousness
        Verdict.........................................................................................25

2.      There Was No Reason to Combine Acushnet's
        References....................................................................................25

3.      There Was No Reason to Expect Combining the
        References as Acushnet Suggests Would Lead to a
        Reasonable Chance of Success. ...................................................27

4.      The Objective Criteria Strongly Support Non-
        Obviousness. ...............................................................................27

E.      A Manifest Injustice Would Result if the Verdict Were Allowed
        to Stand. ...................................................................................................30

III.    Conclusion .......................................................................................................30

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Allied Chem. Corp. v. Daiflon, Inc.*,
    449 U.S. 33 (1980).................................................................................................30

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1350 (Fed. Cir. 1984).............................................................................22

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
    310 F. Supp 2d 638 (D. Del. 2004).............................................................5, 10, 24

*Connell v. Sears, Roebuck & Co.*,
    722 F.2d 1542 (Fed. Cir. 1983)........................................................................25, 26

*Fineman v. Armstrong World Indus.*,
    980 F.2d 171 (3d Cir. 1992)...................................................................................25

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985)...................................................................... passim

*J.T. Eaton v. Atlantic Paste & Glue*,
    106 F.3d 1563 (Fed. Cir. 1997).............................................................................28

*Jinks-Umstead v. Winter*,
    279 Fed. Appx. 2 (D.C. Cir. 2008) .......................................................................17

*Mar Com v. F/V Hickory Wind*,
    120 Fed. Appx. 74 (9th Cir. 2005).........................................................................17

*United States v. Burke*,
    781 F.2d 1234 (7th Cir. 1985) ...............................................................................24

*Vulcan Eng'g Co. v. Fata Aluminum, Inc.*,
    278 F.3d 1366 (Fed. Cir. 2002).....................................................................4, 7, 19

## OTHER AUTHORITIES

FED. R. EVID. 403 .......................................................................................................21

FED. R. EVID. 701 .......................................................................................................18

FED. R. CIV. PROC. 37 ................................................................................................17

## I.    INTRODUCTION

Acushnet does not deny that it strategically delayed its objection to the inconsistent verdict after the first trial, then retooled its approach to encourage this jury to decide the case on something other than the relevant evidence.  The anticipation verdict demonstrates this jury took Acushnet up on that invitation.  There is no evidence that Nesbitt/Molitor '637 discloses a polyurethane outer cover layer with a Shore D less than 64, so it cannot anticipate the asserted claims.  Abandoning the key passage in Nesbitt that Dr. Statz relied upon at trial, Acushnet now argues that the patent's statements about a ball with the "playing characteristics" of a balata-covered ball teach that polyurethane covered three-piece balls should have the same hardness as a balata-covered ball.  But, at summary judgment, the Court correctly noted that "no evidence (let alone Nesbitt)" supports such a leap.  Nothing has changed.

The jury's unsupported anticipation verdict logically required it to find the claims obvious as well.  Acushnet never suggests otherwise.  In addition, the exclusion of the Hebert patents left the jury with the mistaken impressions that (1) other "patented Titleist technologies" were responsible for the ProV1's performance and (2) no one at Acushnet thought the Sullivan concept was patentable.  Capitalizing on this revisionist history, Acushnet's closing encouraged the jury to invalidate the Sullivan claims because the ProV1 was "our invention, and we ought to be able to use it."  But Acushnet thought the Hebert patents were its invention too, yet hid this key fact and spent the entire trial exploiting its absence.  Acushnet says nary a word about this or many of Callaway Golf's other key points.  Instead, it rehashes arguments it made and lost in connection with the first trial, arguments that are even less persuasive now, having seen how Acushnet took unfair advantage of the patents' exclusion.  Callaway Golf thus respectfully requests a new trial, which, although undeniably a burden, is far better than letting this unjust verdict stand.  Callaway Golf also requests JMOL of at least no anticipation.

## II.     ARGUMENT

### A.     No Reasonable Jury Could Have Found Anticipation; at a Minimum, the Verdict Was Against the Great Weight of the Evidence.

#### 1.     Nesbitt/Molitor '637 Does Not Disclose a Relatively Soft Polyurethane Outer Cover Layer with a Shore D Hardness of 64 or Less.

When denying Acushnet summary judgment of anticipation, the Court recognized Nesbitt/Molitor '637 does not expressly disclose a polyurethane outer cover layer with a Shore D less than 64. (D.I. 595 at 6-7.)  Acushnet ignores the Court's prior opinion, and it cites no new evidence supporting a different result.  It also never argues inherency.  Instead, Acushnet repeats an argument the Court previously rejected.  It cobbles together (1) passages from the Nesbitt patent saying its ball has the same "playing characteristics" as a balata covered ball, and (2) testimony that some balata covered balls have a Shore D less than 64.  Then, it argues that if a polyurethane outer cover layer were used, it would invariably have the same Shore D hardness as those balata covers.  (D.I. 624 at 39-40; *cf.* D.I. 572 at 16-17.)  But, as the Court has said before, "[a]side from attorney argument, no evidence (let alone Nesbitt) cited by Acushnet makes that causative leap, to wit, that if A equals B, and A equals C, then C equals B."  (D.I. 595 at 7.)

Acushnet's opposition abandons the main part of Nesbitt that Dr. Statz relied upon, which links the hardness of a three-piece ball with an ***ionomer*** outer cover to a balata covered ball.  (DX-9 at 3:40-44; Tr. 569:5-571:17.)  Unable to respond to Callaway Golf's point that the passage does not teach anything about the hardness of a polyurethane outer cover, (D.I. 619 at 38), Acushnet relies instead on other references to balata covered balls.  (D.I. 624 at 39.)  But these passages only say the ball simulates the "playing characteristics" or "advantages" of a "softer balata covered ball," not that the outer cover should have the same hardness as balata:

> The first layer or ply is provided with a second or cover layer of a comparatively soft, low flexural modulus resinous material or of cellular or foam composition molded over the first layer and core or center assembly.  Such golf ball ***has the "feel" and playing***

> ***characteristics simulating those of a softer balata covered ball***.

(DX-9 at 1:55-56.)  This passages suggests only two things about the outer cover's hardness: that (1) it is "comparatively soft" in relation to the inner cover and (2) it has a higher Shore D than a "softer balata covered ball."  (D.I. 619 at 39-40.)  Acushnet claims the phrase "softer balata covered ball" just means balata covered balls are softer than a two-piece ionomer covered ball.  (D.I. 624 at 40 n.17.)  Even if that were true, it does not show the passage discloses that a polyurethane outer cover should have a Shore D hardness similar to a balata covered ball.  Acushnet quotes another passage, which again says the outer cover is "comparatively soft," but does not say that it should have the same softness as balata.  (*Id*. at 40; DX-9 at 3:65-68.)

Acushnet string cites conclusory portions of Dr. Statz's testimony where he insists Nesbitt/Molitor '637 discloses that a polyurethane outer cover should have a hardness similar to balata.  (D.I. 624 at 39-40).  But Dr. Statz's testimony cannot supply the express disclosure that is missing from Nesbitt/Molitor '637 itself.  The only part of his testimony Acushnet actually quotes and discusses suffers from the same deficiency discussed above.  It just says that Nesbitt teaches that a "soft outer cover" yields the "***playing characteristics*** . . . of a Balata covered ball," (D.I. 624 at 40; Tr. at 561:4-13), not that it has the hardness of a balata-covered ball.  So neither Nesbitt/Molitor '637 itself nor Dr. Statz's testimony demonstrates anticipation.

### 2. Nesbitt/Molitor '637 at Most Discloses an Overbroad Genus, Which No Reasonable Jury Could Find Sufficient for Anticipation.

The disclosure in Nesbitt/Molitor '637 of a broad genus of three-piece golf balls that includes thousands of possible combinations does not anticipate the asserted claims.  Acushnet never disputes the size of the genus.  Instead, it says this is not a genus/species case because Nesbitt/Molitor '637 "discloses the claimed limitations themselves."  (D.I. 624 at 41-42.)  But the genus/species line of cases applies equally when the disclosed genus relates to the type of

item claimed (*e.g.*, a golf ball) rather than just a part of the claimed item (*e.g.*, a cover material). Here, the relevant genus is the genus of multi-layer golf balls, not of cover materials alone. Thus, contrary to Acushnet's suggestion, (D.I. 624 at 44), this case is controlled by *Impax* and *Ruschig* because Nesbitt/Molitor '637 does not disclose a specific example of the claimed multi-layer ball, just as the references in those cases did not specifically disclose the claimed compound. (D.I. 619 at 41-42.)  Acushnet's reliance on *Perricone, Petering*, and *Wrigley*, (D.I. 624 at 41-43), is misplaced because the references in those cases each disclosed a specific example of precisely what was claimed.  (D.I. 619 at 44-45.)  Here, no embodiment in Nesbitt/Molitor '637 discloses any multi-layer golf ball with all the claim limitations.

Because this is a genus/species case, Nesbitt/Molitor '637 cannot anticipate unless its disclosure would guide one of ordinary skill to the claimed species.  (D.I. 619 at 43-44.) Acushnet relies on Dr. Statz's testimony to concoct such preferences.  (D.I. 624 at 43.)  But it never responds to Callaway Golf's points that (1) his testimony is inconsistent with Molitor '637's decision to list all the materials it discusses as potential cover materials and (2) the Nesbitt patent teaches the outer cover is preferably an ionomer, not polyurethane.  (D.I. 619 at 43.)  Nor does Acushnet explain why the Federal Circuit's statement that there is "no basis to differentiate between" the listed materials applies only to incorporation by reference, as opposed to meaning what it says.  (D.I. 624 at 43 n.18.)  Nothing justifies parsing that statement as Acushnet does.

Finally, Acushnet runs from Mr. Sullivan's testimony that he was aware Nesbitt referred to Molitor '637 yet still thought the claims were patentable, even though Acushnet elicited part of the testimony.  (D.I. 619 at 43-44.)  His view was relevant because it shows what one of at least ordinary skill in the art believed at the relevant time.  *Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143-44 (Fed. Cir. 1985).  Acushnet ignores these cases, and its reliance on a case saying an

4

inventor's view does not bear on claim construction is misplaced.  (D.I. 624 at 44 n.19.)  Simply

put, Nesbitt/Molitor '637 contains no guidance to the claimed species and so cannot anticipate.

### 3.    There Was No Evidence that Nesbitt/Molitor '637 Discloses All Limitations Arranged as in the Asserted Claims.

Nesbitt/Molitor '637 fails to disclose all limitations "arranged as in the claims" because

(1) it does not disclose an outer cover with a Shore D less than 64 that includes *polyurethane*;

and (2) it never connects the disparate references to various claim limitations (*i.e.*, materials,

thicknesses, and hardnesses) or suggests they should be used together in the same three-piece

golf ball.  Thus, *Net MoneyIN*, *Ecolochem*, *Lindemann*, and *Arkley* preclude a finding of

anticipation here, as discussed in Callaway Golf's opening brief.  (D.I. 619 at 45-46.)  The

Nesbitt patent's statement that the scores of Molitor '637 materials can be used in either cover

layer is far too vague, (D.I. 624 at 45-46), and still fails to account for the thickness and hardness

limitations.  Also, there is no evidence its discussion of balata covered wound balls suggests a

desired Shore D for the polyurethane outer cover of a three-piece ball with a hard inner cover.

Acushnet's brief ignores *Ecolochem*, *Lindemann*, and *Arkley*.  It quotes language from

*Net MoneyIN* and *Arthrocare* stating that courts are not constrained to proceed example by

example, (D.I. 624 at 46), but that is not what Callaway Golf seeks.  The problem with

Nesbitt/Molitor '637 is that, in addition to including no specific example of what is claimed, it

does not teach picking the various claim limitations from different examples and putting them

together into one golf ball.  Thus, as in *Net MoneyIN*, Nesbitt/Molitor '637 cannot anticipate.

### B.    Exclusion of the Hebert Patents Allowed Acushnet to Paint a Misleading Picture of the Novelty and Technological Value of the Sullivan Patents.

Admission of the Hebert patents was necessary for at least six reasons:  (1) to show

Acushnet's own employees, including Messrs. Hebert, Morgan, and Snell, thought the Sullivan

concept was novel and non-obvious in 1997; (2) to impeach the testimony of Messrs. Morgan

and Dalton that they always thought the Sullivan patents were invalid; (3) to impeach Acushnet's

assertion that the "patented" Wu polyurethane and other Acushnet technology is responsible for

the ProV1's performance; (4) to impeach Acushnet's suggestion that its opinions of counsel

showed it consistently believed the Sullivan/Hebert concept was unpatentable; (5) to impeach

Acushnet's story the ProV1 was invented in 1995 rather than 1996; and (6) to rebut Acushnet's

suggestion the PTO only issued the Sullivan patents because it was overworked or incompetent.

(D.I. 619 at 6-18.)  The Court concluded the patents were admissible in connection with the first

trial, (D.I. 424 at 422:18-423:10; D.I. 492 at 19 n.15), even after the remarks Acushnet cites.

(D.I. 624 at 11-12.)  Acushnet did not appeal that issue.  Likewise, after carefully considering the

issue before this trial, the Court again suggested the Hebert patents would be admitted, requiring

only that Callaway Golf notify Acushnet beforehand.  (D.I. 595 at 15.)  Callaway Golf

respectfully submits that those three prior rulings were correct, and that the subsequent exclusion

of the Hebert patents warrants a new trial.  The parties' disputes about the import of the Hebert

patents should have been resolved by the jury.  As it was, this jury did not hear the whole story.

### 1.     The Hebert Patents Were Admissible For the Probative Statements in Their Specification, Regardless of Their Specific Claims.

The Hebert patents were admissible on the six points above without the need to resort to a

claim-by-claim comparison of the Hebert claims and the Sullivan claims.  The Hebert

*specification* demonstrates that in 1997—two years after the filing date of the patents-in-suit—

Messrs. Hebert and Morgan believed the concept of putting an already known castable

polyurethane outer cover layer (*e.g.*, the Wu polyurethane) over a known hard ionomer inner

cover layer and core was novel, non-obvious, and resulted in superior performance.  In

particular, the specification discusses most of the prior art Acushnet relies upon here—Nesbitt,

Proudfit, and the Ultra Tour Balata—then distinguishes it all because "none of these patents

disclose a multilayer ball having a very thin thermoset outer layer formed from a castable reactive liquid as disclosed herein to provide golf balls exhibiting a 'progressive performance' such as those of the present invention." (D.I. 523, Ex. 2 at 3:38-42, 2:30-33, 3:6-17.)  In other words, the Hebert specification explicitly links the concept of using of a cast reactive liquid— which it later indicates is preferably polyurethane—as the outer cover layer of a three-piece ball to enhance performance; it then distinguishes that concept from the three-piece prior art Acushnet relied upon in this case.  (*Id*. at 3:38-42, 4:65-67.)  The specification even goes on to cite the prior Wu patent as an example of a castable polyurethane material that can be used as an outer cover layer.  (*Id*. at 8:7-23.)  Yet, it never suggests the concept discussed in the specification is obvious in light of Wu in combination with the other three-piece ball prior art.

The Hebert specification thus contradicts the claims of Messrs. Morgan and Dalton that they knew the ***narrower*** Sullivan concept—which also contemplated a three-piece ball with a relatively soft polyurethane outer cover over a hard inner cover, but added other hardness and thickness characteristics—was disclosed by the prior art.  (D.I. 619 at 13-17 (quoting their testimony).)  It also contradicts the testimony from Messrs. Morgan, Dalton and Bellis insisting the ProV1's enhanced performance was due to the patented Wu polyurethane, not the Sullivan/Hebert concept of employing such a polyurethane outer cover over a hard inner cover. (*Id*.)  Thus, the Hebert patent specification demonstrates what those in the relevant art thought about the novelty of a three-piece, cast polyurethane covered ball in 1997, regardless of the content of the Hebert claims.  *Vulcan Eng'g*, 278 F.3d at 1373; *Interconnect*, 774 F.2d at 1143-44.  The Court properly admitted the Hebert patents for this reason during the first trial.  (D.I. 424 at 421:17-422:25.)  Acushnet never addresses the Hebert specification, even though Callaway Golf discussed it in its opening brief.  (D.I. 619 at 6, 8.)  That silence speaks volumes.

## 2.   There are No Differences Between the Hebert and Sullivan Claims That Matter to Patentability or Nexus to the ProV1's performance.

After bypassing the Hebert specification, Acushnet argues the Hebert patents are irrelevant because there are small differences between their claims and the Sullivan claims.  (D.I. 624 at 12-14.)  But it cherry-picks one of the narrower Hebert claims for its comparison.  (*Id.* at 13.)  In fact, claims 1 and 18 of the Hebert '324 patent cover the broader concept of making a ball with a hard inner cover and a relatively soft cast polyurethane outer cover, without regard to the flexural stiffness, Shore D, or thickness ranges in claim 1 of the '172 Hebert patent:

> 1.  A method of forming a golf ball comprising the steps of:
>      a) forming a golf ball core;
>
>      b) injection molding an inner cover layer around said golf ball core with a material having a first shore D hardness; and
>
>      c) casting an outer cover layer around said inner cover layer and golf ball core with a thermoset material having a second shore D hardness less than the first.
>                                      * * *
> 18.  The method of claim 1, wherein the thermoset material of the outer cover layer comprises at least one of . . . ***a polyurethane***. . . .

(D.I. 553-2 at 9:62-10:3, 12:7-10.)  These claims are ***broader*** than the Sullivan claims.  Their reference to a cast polyurethane outer cover and an injection molded inner cover would not enable Acushnet to preserve their validity while arguing the Sullivan claims are invalid.  Cast polyurethane is disclosed by at least Wu, Molitor '637, and the Titleist Professional, and Proudfit discloses an injection molded ionomer inner cover.  (Tr. at 267:10-13, 268:8-13, 352:24-353:6 (Morgan), DX-10 at 8:32-38.)  Acushnet insists the '324 patent claims "bear no resemblance" to the Sullivan claims, (D.I. 624 at 14 n.5), but it identifies no specific difference between them. Acushnet's musings about manufacturing methods are irrelevant to the '324 claims.  (*Id.*)  In fact, Acushnet admits the Sullivan techniques involved a "cast" polyurethane, (*id.*), just like Hebert.

But putting the Hebert '324 claims aside, even the "differences" Acushnet identifies between claim 4 of the Sullivan '293 patent and claim 1 of the Hebert '172 patent (*id.* at 13), are insubstantial. Acushnet identifies only two differences: (1) the Hebert claim refers to a cast outer cover layer and (2) the Hebert claim requires an ionomer that has a flexural modulus of at least about 65,000, which it erroneously equates with a high acid ionomer. (D.I. 624 at 13-14.) Neither difference matters. As noted above, it is of no consequence that the Hebert claims cover cast polyurethane while the Sullivan claims refer to polyurethane generically. Cast polyurethane is disclosed in the same prior art that Acushnet relied on during trial. As for flexural modulus, the Proudfit patent discloses that the inner cover can be made of Surlyn 8220, (DX-10 at 6:16-18), which is a high-acid ionomer (*i.e.*, greater than 16% acid) with a flexural modulus of 79,000 psi. (Halkowski Decl., Ex. A at 3:40-50.) So if these references could be used against the asserted Sullivan claims, as Acushnet alleges, they would also invalidate claim 1 of Hebert '172 patent. Acushnet also never mentions that the flexural modulus, Shore D, and thickness ranges in the two claims overlap. (D.I. 619 at 6-7.) And its repeated insistence that only high acid ionomers have a flexural modulus above 65,000 psi is just wrong: Surlyn 7930 is a low-acid ionomer with a flexural modulus of 67,007 psi. (Halkowski Decl., Ex. B at 8:62 & Ex. C.)

Finally, Acushnet asserts there is no link between the Hebert patents and the infringing ProV1 because it does not practice the Hebert '172 patent claims. (D.I. 624 at 13-14.) But the ProV1 indisputably practices the '324 Hebert patent, and Mr. Morgan's marketing presentation links the ProV1's performance to the '172 Hebert patent. (PX-583 at AC80.UR.) In particular, the presentation says that the ProV1 is the combination of "three leading technologies," says they lead to "LONG Driver Distance" and "Drop and Stop™ Performance," and then displays the face of the '172 Hebert patent underneath. (*Id.*; D.I. 619 at 10 (reproducing this page).) Acushnet also marked the '172 patent on the ProV1's packaging for many years and always

9

marked the '324 patent.  (*E.g.*, Halkowski Decl., Ex. D.)  The fact that Acushnet linked the '172

patent to the ProV1 even though the ProV1 does not fall within the '172 patent's claims just

underscores Callaway Golf's earlier point—it is the ***concept*** of a soft cast polyurethane over hard

inner cover that is relevant, without conducting a comparison of the Hebert and Sullivan claims.

### 3.    Other Evidence of the Veneer Project Was No Substitute for the Hebert Patents and Was Actually Harmfully Misleading.

The exclusion of the Hebert patents was prejudicial enough to warrant a new trial because

it is not "highly probable" their exclusion "did not affect [Callaway Golf's] rights."  *Arthrocare*

*Corp. v. Smith & Nephew, Inc.*, 310 F. Supp 2d 638, 666-67 (D. Del. 2004).  Acushnet never

even attempts to apply this legal standard.  (D.I. 624 at 14-16.)  No other admitted evidence

allowed Callaway Golf to make the same six points it would have made with the Hebert patents.

Without the Hebert patents, Callaway Golf had no way to rebut the assertion that it was

Acushnet's other "patented" ProV1 technology that was responsible for the ProV1's

performance, rather than the patented Sullivan/Hebert technology.  (D.I. 619 at 17.)  The Court

recognized this problem after Mr. Bellis emphasized that Acushnet had "patented" the ProV1's

"technologies."  (Tr. at 734:6-12, 751:2-15 (Bellis); 1027:1-9, 754:17-24 (the Court).)  Acushnet

never identifies other evidence that enabled Callaway Golf to rebut the prejudice from Acushnet

stressing its other patents.  (D.I. 624 at 14-18.)  Instead, it claims that it only said the Wu

polyurethane was patented, and that it had to do so because Wu was a prior art reference.  (*Id*. at

17-18.)  But both Mr. Bellis and Acushnet's opening referred to Acushnet's "patents" or

"patented technologies," suggesting it had more patents than just Wu.  (Tr. at 751:12-15, 198:8-

10.)  And even if those assertions were just limited to Wu, they would still be highly prejudicial.

Acushnet implied to the jury that it had patented the very aspect of the ProV1 it claimed was

responsible for its performance while choosing not to patent the aspect Callaway Golf said was

responsible. That was not the real story. What is more, there was no reason for Acushnet to mention the Wu patent because none of its five obviousness combinations at trial actually relied on the Wu patent—they only involved the Titleist Professional golf ball. (Tr. at 575:1-576:4 (Statz); D.I. 619 at 3-4.) Acushnet could have made its point by discussing Ms. Wu, her technology, and the product that resulted from it. Having chosen to harp on the Wu patent, Acushnet should not have been permitted to exclude other aspects of its "patent" coverage. Acushnet's point that the Hebert patents were irrelevant because they do not cover the ProV1, (D.I. 624 at 18), misses the mark. As noted above, the '324 Hebert patent indisputably covers the ProV1, and Acushnet itself tied the '172 patent to the ProV1 when touting its technology.

Acushnet says the invention disclosure and testimony from Messrs. Morgan, Dalton, and Hebert was a sufficient substitute for the Hebert patents. (D.I. 624 at 14-15.) In fact, introduction of the invention disclosure without the patents was harmfully misleading. It suggested that the inventors, someone else at Acushnet, the PTO, or all of them, later concluded the concept was not new or novel, when Acushnet was actually obtaining patents on it in 1999 and 2000. (D.I. 619 at 18.) Also, the invention disclosure did not include the discussion of the prior art included in the Hebert specification. Acushnet's brief ignores these points. It also ignores (1) Mr. Morgan's testimony that he was "astounded" by what Mr. Sullivan could get out of the PTO, (Tr. at 330:17-331:2), implying that he was astounded the patents-in-suit issued, and (2) his claim that he did not know what the term "pioneering" meant in Acushnet's documents describing the Hebert technology. (Tr. at 355:17-356:11.) Mr. Morgan could not have credibly made these comments faced with his own patents. And although he admitted he thought the concept was new "at the time" when he developed it and submitted his invention disclosure, (Tr. at 341:8-9, 347:9-11), the combination of that testimony and the invention disclosure again left the misimpression that either he, Acushnet, or worse the PTO, later concluded the concept was

not novel.  Mr. Dalton's admission that the first batch of prior art he found did not invalidate the

Sullivan patents was also inadequate to replace the Hebert patents.  (D.I. 624 at 15.)  He went on

to insist that he found other references that he believed invalidated the Sullivan patents,

including some of the prior art Acushnet relied upon at trial.  (Tr. at 430:16-431:6.)  Callaway

Golf needed to cross-examine this claim, which he could not have maintained when confronted

with his colleagues' contrary view of the same prior art, reflected in the Hebert specification.

The Hebert patents were also irreplaceable because they were the only evidence that

would have enabled Callaway Golf to cross-examine Mr. Nauman's claim that Acushnet

reasonably relied on invalidity opinions from what the jury likely perceived was an objective

source.  Acushnet has no real response to this, just falling back on the claim that the Hebert

patents do not cover the infringing ProV1 or balls with low-acid ionomer inner covers.  (D.I. 624

at 23 n.11.)  But, regardless of whether the Hebert patents cover the Pro V1, the statements in

their specification undercut Acushnet's  suggestion that it reasonably relied on the opinions.

And, as noted above, the '324 Hebert patent *does* cover the ProV1, Acushnet linked the '172

patent to the ProV1, and the Hebert patents are not limited to "high acid" ionomer inner covers.

The Hebert patents also would have gone beyond the other evidence showing the

Harris/Wu prototypes from 1995 were separate from the ProV1's development.  The Hebert

specification explicitly mentions the Wu technology but goes on to claim a different concept,

without naming either Harris or Wu as an inventor.  (D.I. 523, Ex. 2 at 8:7-23.)  This

demonstrates that the two concepts are separate in a way the invention disclosure, which does not

mention and distinguish the earlier Wu work, does not.  Also, inventorship decisions can change

between the invention disclosure and issued patent.  So the patents would have shown that not

only did Messrs. Hebert, Morgan, and Snell not consider Ms. Wu an inventor in 1995, but

nobody else considered her an inventor even by 2000, when the '324 patent issued.

12

The Hebert patents were also necessary to explain the Hebert license, as the Court's *in limine* order recognized.  (D.I. 595 at 15.)  Acushnet never argues that other evidence could have replaced the Hebert patents for this purpose.  Instead, it says the Hebert license would have been understandable on its own.  (D.I. 624 at 16-17 & n.7)  But, to use the license, Callaway Golf would have needed to explain the nature of the patents it covered, just like it explained the Dunlop license dealt with patents to polyurethane-covered golf balls.  (Tr. at 1252:14-23.)  Any attempt by Callaway Golf to show the Hebert license dealt with Acushnet patents on a cast polyurethane over hard inner cover construction would have caused Acushnet to renew its objection.  That Callaway Golf did not use the license to inject the Hebert patents after the Court excluded them just shows that, unlike Acushnet, Callaway Golf respected the Court's rulings.

Finally, the PTO's issuance of the Hebert patents would negate Acushnet's speculation during closing that the agency's alleged inability to spend more than two minutes on each cited reference was responsible for its issuance of the patents-in-suit.  No other admitted evidence permitted Callaway Golf to make the same point.  Acushnet argues that the issuance of the Hebert patents just shows the examination process is "rife with mistakes." (D.I. 624 at 18.)  In fact, a total of five examiners considered the Sullivan and Hebert applications disclosing the same concept and all reached the same conclusion—that the concept was patentable.  The jury should have known that history.  Acushnet thinks the issuance of the Hebert patents is irrelevant because they were allowed over Sullivan's UK application, (*id*. at 19), but this misses the point.  Callaway Golf's point is not that the Sullivan patent invalidates the Hebert patent.  It is that the validity of both patents when compared with the cited prior art—Nesbitt, Proudfit, Molitor, and the Wu technology—rises and falls together.  As shown above, there is no limitation in the Hebert claims that would save their validity if the Sullivan claims fall.  Acushnet has never argued otherwise, although it has been happy to keep the $10.5 million Hebert license fee it

extracted from Callaway Golf.  Callaway Golf should have been permitted to show that Acushnet's witnesses were overreaching by insisting the narrower Sullivan claims are invalid while maintaining that the broader Hebert claims are valid.

### C.   The Other Problems Caused by Acushnet Were Magnified by the Exclusion of the Hebert Patents and Separately Warrant a New Trial.

### 1.   The Opinions Improperly Bolstered Acushnet's Invalidity Case.

Acushnet never identifies a legal issue to which its opinions of counsel were relevant nor challenges Callaway Golf's cases excluding opinions when willful infringement is not at issue. (D.I. 619 at 21.)  Indeed, given the opinions' irrelevance, Acushnet had to carefully orchestrate their introduction by using Dr. Kerr's seemingly spontaneous statement to open the door to detailed testimony by Mr. Nauman.  Acushnet feigns innocence, (D.I. 624 at 19, 21), but this is belied by the fact that (1) Acushnet's witnesses repeatedly volunteered information they were not supposed to, and (2) Dr. Kerr never mentioned invalidity or the opinions on direct examination, even when asked the same question about why Acushnet did not adopt its high-acid alternative. (D.I. 619 at 20.)  It thus appears that Acushnet carefully timed the introduction of the opinions.

The Court recognized that Acushnet's request to have Mr. Nauman discuss the opinions was asking for "a lot," that it was "truly problematic" to "bolster[]" Acushnet's invalidity case with the opinions, that there was no way to test the value of the opinions, that opinion-writing in general is "not an objective exercise," and that the opinions raised issues in a "complicated area of the law that we weren't prepared to address with the jury."  (Tr. at 1340:11-19, 1341:18-21, 1345:7-15, 1346:5-7; D.I. 619 at 21-22.)  Acushnet never acknowledges these concerns, much less explains why they did not warrant exclusion of Mr. Nauman's testimony about the opinions.

Instead, Acushnet simply blames Callaway Golf's "hard line of questioning" for Dr. Kerr's testimony and claims the opinion testimony was needed to cure the prejudice.  (D.I. 624 at

19-22.)  But Callaway Golf's questioning did not prejudice Acushnet or open the door to the opinions.  It was simply an on-the-fly attempt to deal with Dr. Kerr's surprising insistence that Acushnet had *sold* a high-acid ProV1, contrary to his earlier deposition testimony and Acushnet's RFA responses.  (D.I. 619 at 26-27.)  Dr. Kerr's insistence that Acushnet sold its high-acid alternative made it appear far more commercially viable.  Callaway Golf had to refute this misimpression by showing that Acushnet, despite knowing of the patents-in-suit and having no non-infringement defense, never adopted the supposedly equivalent high-acid alternative that cost less to manufacture than the existing Pro V1.  Callaway Golf did not put Acushnet's "state of mind" at issue or imply willful infringement.  It simply sought to use common-sense to refute Acushnet's insistence that a high-acid alternative was acceptable and easily implemented:  if it were, Acushnet would not have risked significant damages to avoid adopting it.

Putting that aside, any prejudice to Acushnet from the questioning could have been cured by permitting Dr. Kerr or Mr. Nauman to reiterate the prior testimony that Acushnet had an internal belief the Sullivan patents were invalid, as Callaway Golf's opening brief explained. (D.I. 619 at 22.)  Acushnet never responds to this argument.  (D.I. 624 at 21-22)  And, contrary to Acushnet's claim, (*id*. at 21), it was Acushnet that initially introduced testimony about its internal belief regarding invalidity.  (Tr. at 330:17-331:2, 427:5-12.)  Callaway Golf was only seeking to confirm that testimony as a foundation for subsequent questioning of Dr. Kerr.

By contrast, Callaway Golf suffered enormous prejudice from the incomplete picture of the opinions that Mr. Nauman presented the jury—one in which the opinion writer was an unbiased individual who conducted an independent validity analysis.  Acushnet portrays the fact that the substance of the opinions was not discussed as a benefit to Callaway Golf.  (D.I. 624 at 22 & n.10.)  But it was in fact a severe disadvantage because it left no way to challenge Acushnet's improper bolstering of its invalidity case.  The exclusion of the Hebert patents

15

exacerbated the prejudice to Callaway Golf because their specification includes statements that contradict the opinions.  The patents also show Acushnet patented the very concept its opinions said was unpatentable, in view of the very art relied upon in those opinions.  Acushnet dismisses this argument, claiming that the Hebert patent claims do not cover the accused ProV1 golf balls, (D.I. 624 at 23 n.11).  This is a *non sequitur*.  And, in any event, the '324 patent claims do in fact cover the infringing ProV1s, and Acushnet itself linked the '172 patent to the ProV1, as detailed above.  That Acushnet did not take further advantage of the opinion testimony by discussing it during closing (*id*. at 23), did not undo the damage already done.  And Mr. Nauman's testimony that there was no non-infringement opinion did not cure the problem because it left the opinion's assertion of invalidity—the very question the jury was to decide—unchallenged.

### 2.  Acushnet's Introduction of Previously Undisclosed Evidence that It Sold High Acid ProV1s Was Improper.

Acushnet's previously undisclosed revelation that it *sold* a high-acid ProV1 was prejudicial to Callaway Golf's validity case.  It implied that consumers who bought the high-acid ProV1 noticed no difference between it and the infringing ProV1, suggesting there was no nexus between the infringing ProV1's performance and the patents-in-suit.  Had Acushnet disclosed these alleged sales during discovery, Callaway Golf could have taken discovery from Acushnet or the alleged customers to evaluate this assertion.  But Acushnet did not disclose them, so Callaway Golf could not vet these issues during discovery, just like the issues related to the new high-acid ProV1s the Court formally excluded.  (D.I. 595 at 13 n.14.)  Acushnet's litigation by ambush should not be rewarded.

Acushnet stresses that it disclosed "evidence related to the high-acid alternative" during discovery.  (D.I. 624 at 27-28.)  But this is unresponsive to Callaway Golf's point that Acushnet did not disclose the alleged *sale* of the alternative.  It was the alleged sale that Callaway Golf

needed to vet.  Acushnet blames Callaway Golf for not asking Mr. Dalton during his supplemental deposition whether the high-acid alternative was sold.  (D.I. 624 at 28 n.12.)  But Callaway Golf was relying on Acushnet's Request for Admission responses and Dr. Kerr's deposition testimony that a high-acid product had not been sold.  (D.I. 619 at 26-27.)  Acushnet explains away those responses by claiming the vast majority of ProV1s, "save the few thousand test units Dalton made in 2001-02," use low acid inner covers.  (D.I. 624 at 28-29.)  But those "few thousand" are what proved to be crucial at trial.  The Requests define "Pro V1" to include "*any* and *all* golf balls manufactured by [Acushnet] bearing side stamps" with the Pro V1 mark. (Halkowski Decl., Ex. E.)  If Acushnet believed that all but a few ProV1s were low acid, it was required to deny the request.  "All" does not mean "all but a few thousand."

Recognizing it has no argument on the merits, Acushnet argues waiver.  (D.I. 624 at 29.) That is ironic because Acushnet's ability to overcome its initial silence about the inconsistent verdict is what enabled it to inject this previously undisclosed testimony.  That aside, the Court has broad discretion to rectify discovery abuses under Rule 37, including by granting a new trial, and Callaway Golf respectfully requests it do so here.  *Mar Com v. F/V Hickory Wind*, 120 Fed. Appx. 74 (9th Cir. 2005); *Jinks-Umstead v. Winter*, 279 Fed. Appx. 2 (D.C. Cir. 2008).

### 3.    The Nesbitt and Proudfit Testimony Demonstrated that Those Skilled in the Art Did Not Think the Asserted Claims Were Invalid.

Acushnet offers no good reason to exclude the testimony of Messrs. Nesbitt and Proudfit. It also never explains why the mandate rule does not bar its objection to their testimony (or, for that matter, why the mandate rule does not also bar Acushnet's objection to the Hebert patents), when it did not appeal its admission into the first trial.  (D.I. 619 at 6 n.2.)

Mr. Nesbitt's testimony was relevant to two issues:  (1) whether his patent and Molitor '637, taken as a single reference, disclosed a three-piece ball with all the limitations "arranged as

in the claims" and (2) whether it would have been obvious for one skilled in the art in 1995 to combine and modify the disclosures in his patent and Molitor '637 to arrive at the claimed invention.  Mr. Nesbitt is one of at least ordinary skill in the art under Dr. Statz's definition, (Tr. at 546:3-3-13), and he was undeniably aware of the relevant art.  Thus, his views about what he invented and how others in the art would read his patent are highly probative of how a hypothetical person skilled in the art who was aware of the references would have understood them.  (D.I. 619 at 7, 23, *citing Vulcan Eng'g*, 278 F.3d at 1373; *Interconnect Planning*, 774 F.2d at 1143-44.)  Acushnet complains the testimony showed what Mr. Nesbitt thought in 1981 rather than 1995, (D.I. 624 at 24-25), but there is nothing to suggest his testimony was limited to 1981, or that his view of the art changed between 1981 and 1995.  That Acushnet agreed not to play other parts of Mr. Nesbitt's deposition testimony, (*id*.), has no bearing on whether the portions Callaway Golf offered were properly excluded.  And any risk of jury confusion, (*id*. at 25), could have been cured by a limiting instruction explaining the proper use of the testimony.

Mr. Nesbitt's testimony does not contradict the Federal Circuit's finding of incorporation by reference.  As Callaway Golf's opening brief explained, the Federal Circuit opinion leaves open whether Nesbitt/Molitor '637 disclosed the invention "arranged as in the claims" or rendered it obvious.  (D.I. 619 at 23-24.)  Acushnet ignores this point.  It does say, for the first time, that Mr. Nesbitt should have submitted an expert report. (D.I. 624 at 24.)  But Acushnet suffered no prejudice, having cross-examined him at deposition.  And, to the extent any of his testimony even arguably concerns an opinion, Mr. Nesbitt, one skilled in the art at the relevant time, was qualified to offer lay opinion on these issues.  *See* FED. R. EVID. 701.

Mr. Proudfit's testimony was likewise relevant to show one skilled in the art would not have thought to make a polyurethane-covered three-piece ball.  Acushnet complains that Mr. Proudfit may not have known polyurethane could be used as a cover material.  (D.I. 624 at 25-

26.)  Of course, that argument is inconsistent with Acushnet's trial theme that everyone in the art knew that there were only three possible cover materials for golf balls—ionomers, balata, and polyurethane.  (*E.g.*, D.I. 624 at 48.)  That aside, Acushnet has no real answer for the fact that Mr. Proudfit has another patent that discusses golf balls where "[t]he cover can be formed from balata, or synthetic polymeric material ***such as urethane*. . . .**"  (D.I. 620, Ex. F at 2:40-41.)  Acushnet protests that there is no evidence Mr. Proudfit read this part of his own patent.  (D.I. 624 at 26.)  But he submitted an inventor's oath to the PTO stating that he ***did*** read the specification, so he must have been aware of its reference to polyurethane covers.  (Halkowski Decl., Ex. F.)  Acushnet complains that Callaway Golf should have presented this evidence earlier.  (D.I. 624 at 26.)  But the first time Callaway Golf learned Mr. Proudfit's testimony might be excluded for this reason was during trial, (Tr. at 694:2-16), not "long before trial," as Acushnet insinuates in a sentence that notably lacks a citation.  (D.I. 624 at 26.)  Callaway Golf had no opportunity to find such evidence in real time.  Because Mr. Proudfit was aware of polyurethane, his testimony is admissible under *Vulcan Eng'g* and *Interconnect*.  Acushnet's citations to *Custom Accessories* and *Amazon.com*, (*id*. at 25-26), do not require a different result because they could only apply if Mr. Proudfit was not aware polyurethane was an option.

Finally, the testimony of Messrs. Nesbitt and Proudfit was necessary to contradict Dr. Statz's characterization of their views.  Acushnet claims that Dr. Statz's testimony simply referred to the Nesbitt patent "not to Mr. Nesbitt the person."  (D.I. 624 at 27.)  Dr. Statz's use of first-person pronouns when discussing what "Nesbitt says" speaks for itself.  Acushnet never addresses that or its attorney's statements during closing.  (D.I. 619 at 24-25.)  Acushnet does not deny Dr. Statz was referring to "Jim" Proudfit personally but claims the testimony was about a hypothetical person.  (D.I. 624 at 27.) But Dr. Statz refers only to Mr. Proudfit—not a hypothetical person—in his answer.  (Tr. at 605:19-606:3.)  Acushnet claims Mr. Proudfit's

testimony applied only to 1991, not 1995, (D.I. 624 at 27), but (as with Mr. Nesbitt) there is nothing to suggest that Mr. Proudfit's view would have changed.  And Acushnet's waiver argument is an ironic attempt to avoid the merits that is without merit.

### 4.    Mr. Mickelson's Testimony Was Critical to Non-Obviousness.

Mr. Mickelson's testimony was relevant to objective criteria of non-obviousness.  As Callaway Golf's opening brief explained, it (1) shows a nexus between the Pro V1's commercial success and the Sullivan technology, the use of which was common to the Pro V1 and the Rule 35 ball, (2) demonstrates both balls were vastly superior to Acushnet's prior products, and (3) illustrates Acushnet's initial skepticism about the merits of the Sullivan technology as compared to its prior wound balls.  (D.I. 619 at 28-30.)  The testimony was also necessary to balance Acushnet's repeated efforts to denigrate the Sullivan technology and attribute the Pro V1's performance instead of its "patented" Wu polyurethane and other technology.  (*Id*. at 30.)  And it was unavailable from any other witness because Acushnet insisted Callaway Golf depose Mr. Mickelson, rather than its CEO, (D.I. 184 at 8 & n.5), a point of fairness that Acushnet ignores.

Acushnet never addresses any of Callaway Golf's arguments about why the Mickelson testimony was relevant, and it even admits it had at least "limited probative value."  (D.I. 624 at 32.)  Instead, Acushnet claims that Callaway Golf never tried to admit the testimony for obviousness purposes at this trial and wanted to use it only for damages.  (*Id*. at 30-31.)  Not so. Callaway Golf sought to introduce the testimony for non-obviousness, then added that it was even more relevant in this trial than the last because it also related to damages.  (Halkowski Decl., Ex. G at 33:20-34:2 (arguing that the reasons Mr. Mickelson's testimony was relevant to damages "in addition to what was already there from the last trial" outweigh any risk of unfair prejudice); D.I. 605 at 4.)  Indeed, Acushnet crops a quote from Callaway Golf's motion, which stated that Mr. Mickelson's testimony was still relevant to non-obviousness in this trial:

> During the first trial Mr. Mickelson was only being offered to address secondary considerations of non-obviousness – specifically the commercial success of the patented invention, the long-felt need in the golf industry, and praise of the invention by others. While Mr. Mickelson's testimony is ***still relevant to these secondary considerations of non-obviousness***, the presence of damages ***adds*** a number of additional issues. . . .

(D.I. 605 at 4; *cf.* D.I. 624 at 30-31 (Acushnet brief omitting first sentence).)

Acushnet next argues, in a similar vein, that Callaway Golf agreed to the exclusion of Mr. Mickelson's testimony if Acushnet did not argue the wound ball was an acceptable non-infringing alternative. (Tr. at 1374:2-9.) But that colloquy involved the admission of Mr. Mickelson's testimony for damages and did not deal with Callaway Golf's previous broader request to use it to show non-obviousness. Callaway Golf never proposed giving up the right to use any of his testimony for validity. Indeed, Acushnet was still arguing that its prior wound, polyurethane-covered Titleist Professional helped rendered the claims obvious, so Mr. Mickelson's testimony was needed to rebut that point. In any event, Acushnet never entered the formal stipulation concerning the damages issue that was discussed during trial, and it relied on the wound ball as an allegedly acceptable non-infringing alternative.

Finally, Acushnet downplays its reliance on Tiger Woods and Greg Norman because it never sought to present testimony directly from them. (D.I. 624 at 32; D.I. 619 at 31-32 (citing examples).) But Acushnet fails to explain why there was no risk of prejudice from "star power" when its witnesses described these golfers' preferences and achievements but there is allegedly a risk if one of Callaway Golf's lawyers were to read another golfer's deposition testimony into the record. That is because there is little, if any, difference—certainly not enough to tip the Rule 403 analysis in favor of exclusion. Finally, the trial testimony discussing Mr. Mickelson did not cure the prejudice because it did not discuss, among other things, (1) Mr. Mickelson's personal conversation with Bill Young, in which Young thanked him for causing Acushnet to bring the ProV1 to market, (2) his testimony that Acushnet's prior polyurethane-covered wound ball

products hindered his performance, or (3) his threat not to re-sign with Acushnet if it did not release a ball that could match the Rule 35. (*Cf.* D.I. 619 at 29 (describing Mr. Mickelson's proffered testimony); *and* D.I. 624 at 32 (citing trial testimony).)  Thus, Mr. Mickelson's testimony was highly probative and not substantially outweighed by the risk of unfair prejudice.

### 5.   Acushnet's Grandstanding Warranted an Instruction on the Presumption of Validity.

Acushnet's trial theatrics warranted an instruction reminding the jury that issued patents are presumed valid.  Acushnet never defends its closing argument that the examiner only spent two minutes evaluating each reference, (Tr. at 1473:20-24), nor explains how such a claim was permissible under the Court's *in limine* order.  (D.I. 595 at 14.)  It also stays mum about Mr. Morgan's claim he was "astounded" at the patents Mr. Sullivan could obtain from the PTO and Acushnet's suggestion that Spalding should have suggested specific obviousness combinations to the PTO.  (D.I. 619 at 33.)  Instead, Acushnet cites *Chiron* and model jury instructions for the proposition that courts are not required to instruct on the presumption.  (D.I. 624 at 33-35 & n.16.)  But Callaway Golf's point is not that courts must always instruct on the presumption.  It is that such an instruction was necessary under the unusual circumstances in this case, in which Acushnet repeatedly "grandstanded" regarding the PTO's competence.  (Tr. at 1089:6-8.) Neither *Chiron* nor the model instruction envision such tactics.

Acushnet also says the lack of instruction on the presumption was not prejudicial because the jury was instructed on the clear and convincing burden of proof.  (D.I. 624 at 33-34 & nn. 14-15.)  But the problem was that Acushnet repeatedly speculated on the PTO's competency.  An instruction on the presumption was necessary because it would have reinforced the legal principle that the PTO is presumed to do its job correctly, especially where the relevant prior art was before it.  *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed. Cir.

1984).  The burden of proof instruction was insufficient because the jury would not have understood that the burden flows from the presumption of validity, which in turn flows from the presumption of PTO competency.  Acushnet again argues waiver on this issue to avoid the merits, but Callaway Golf preserved its request for the instruction.  (Tr. at 957:11-14.)

### 6.   The "Pieces of the Puzzle" Instruction Should Not Have Been Given.

The jury should not have received the "pieces of the puzzle" instruction because that language from *KSR* only applies to cases in which the relevant art is predictable.  Testimony demonstrating that golf ball design is an unpredictable art was uncontroverted and came from witnesses on both sides.  (D.I. 619 at 35, 49-50.)  Acushnet concedes that some aspects of golf ball design are unpredictable but says that combining a polyurethane outer cover with the three-piece ball references was predictable.  (D.I. 624 at 36.)  Messrs. Morgan and Hebert certainly did not think so, and their patents would have shown this to the jury, had they been admitted.  In addition, Acushnet's Mr. Cavallaro testified that "you have no idea what the effect is going to be" of adding another layer to the ball, (Tr. at 886:18-25), demonstrating the very combination at issue here was unpredictable.  Acushnet's reliance on a passage from Molitor '751 that says nothing about how a three-piece golf ball with a polyurethane outer cover would perform, nor mentions the claimed combination of cover materials, hardnesses, and thicknesses, (D.I. 624 at 36, *citing* DX-11 at 3:7-12), is pure attorney argument that does not address unpredictability.

Acushnet next erects a straw-man argument, claiming that "Callaway Golf seems to argue that *KSR* does not apply to golf ball construction patents."  (D.I. 624 at 36.)  Not so.  Callaway Golf does not contest that *KSR*'s legal standards for obviousness apply here.  It is simply saying that *KSR*'s specific remark about what may be true "in many cases" is not true in this case because there was no evidence the art was predictable or that Acushnet's obviousness combinations had a reasonable probability of success—indeed the evidence is to the contrary.

Courts have recognized that not all language from judicial opinions is appropriate for jury instructions; it can be misleading when taken out of context, as it was here.  *See, e.g., United States v. Burke*, 781 F.2d 1234, 1240 (7th Cir. 1985) ("[R]ipped from their context and presented to lay deciders, passages from opinions may do nothing but confound.").  Finally, Acushnet says the instruction, even if erroneous, was not prejudicial because of the language added at Callaway Golf's request.  (D.I. 624 at 37.)  But the added language did not solve the problem because the instruction still permitted the jury to conclude the art was predictable and readily could be fit together like puzzle pieces, when all the record evidence was to the contrary.

### 7.   These Issues—Alone or Combined—Were Prejudicial and Warrant a New Trial.

An error is prejudicial enough to warrant a new trial "unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] rights."  *Arthrocare*, 310 F. Supp 2d at 666-67.  That all but one of these problems were absent from the first trial strongly suggests they led to the different result here.  Acushnet protests that the Federal Circuit said the evidence can support an obviousness verdict for either party.  (D.I. 624 at 11.)  But this simply reinforces Callaway Golf's point because it shows even the slightest error could have influenced the outcome.  The anticipation verdict further demonstrates the errors were not harmless.

### D.   The Obviousness Verdict Was Against the Great Weight of the Evidence.

Acushnet ignores almost all the evidence of non-obviousness.  Its analysis is also tainted by the mistaken premises that (1) a new trial must be denied if the jury was "permitted to credit" its evidence, and (2) the Federal Circuit's discussion of JMOL forecloses a new trial on obviousness based on the weight of the evidence.  But, when deciding on a new trial, the court does not view the evidence in the light most favorable to the verdict, and a new trial may be granted even if the evidence permits inferences supporting the verdict and JMOL would be

impossible.  *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 211 (3d Cir. 1992).  Callaway

Golf respectfully submits the obviousness verdict was against the great weight of the evidence.

### 1.   The Anticipation Verdict Infected the Obviousness Verdict.

Anticipation is the "epitome of obviousness."  *Connell v. Sears, Roebuck & Co.*, 722 F.2d

1542, 1548 (Fed. Cir. 1983).  Because the jury, without evidentiary support, found anticipation

by the Nesbitt patent and its incorporation of a portion of Molitor '637, its obviousness verdict

was logically dictated by the combination of Nesbitt and all of Molitor '637.  Thus, the

obviousness verdict was tainted by the flawed anticipation determination and should be set aside.

### 2.   There Was No Reason to Combine Acushnet's References.

The great weight of the evidence demonstrated that a person of ordinary skill would have

avoided using polyurethane for the outer cover of a three-piece ball—especially when seeking a

ball with both playability ***and long distance***.  Polyurethane was thought to be undesirable at the

time because (1) the commercial embodiment of Molitor '751 had performance and

manufacturing problems due to its polyurethane cover, (2) thermoplastic urethanes were viewed

as "generally dead materials," and (3) Dr. Statz and his colleagues at DuPont addressed the

problems with the Molitor '751 ball by discarding its polyurethane cover and switching to an

ionomer.  (D.I. 619 at 52-53.)  Acushnet never mentions this evidence.  It also never identifies a

reason why the skilled artisan seeking a ball with long distance would pick a soft outer cover

with a Shore D less than 64, even if there were a reason to use polyurethane.  Callaway Golf is

not claiming "every different golf ball design" is patentable, (D.I. 624 at 52), it is saying the

claimed design, which used a material fraught with problems, is patentable.

Acushnet tries to fabricate an express teaching to combine from one passage in Molitor

'751 and another from Wu.  (D.I. 624 at 47-48, 51.)  Neither gives a reason to combine a three-

piece ball design with a polyurethane outer cover and all the other claimed hardness and

25

thickness limitations.  The passage from Molitor '751 never describes the Shore D value the polyurethane outer cover layer of a three-piece ball should have, so it is not an "express teaching" to combine the prior art to obtain all the claim limitations, as Acushnet claims.  (D.I. 624 at 47, *citing* DX-11 at 2:58-64, 3:7-12.)  All the Molitor '751 examples involve balls with a single cover layer, so the Shore C values that Acushnet relies upon, (*id*. at 50-51), do not apply to the outer cover of a three-piece ball.  Acushnet identifies nothing in Molitor '751 suggesting otherwise.  Likewise, Wu discusses use of polyurethane as a cover material for wound balls and two-piece solid-core balls.  It never mentions, either in the passage Acushnet quotes or elsewhere, use of a polyurethane cover on a three-piece golf ball.  Thus, Dr. Statz's conclusory testimony regarding Wu is also insufficient.  Acushnet falls back on the argument that only ionomers, balata, and polyurethane were possible cover materials for golf balls.  (D.I. 624 at 48-49.)  But this directly contradicts Molitor '637, which discloses a much longer "laundry list" of potential materials.  (D.I. 619 at 41, 51.)  Acushnet tries to circumvent Molitor '637 by saying "commercial" golf balls only used three materials, (D.I. 624 at 48 n.20), but it never explains why a designer would limit himself to commercial materials.  Indeed, Mr. Kennedy testified, consistently with Molitor '637, that there were thousands of choices.  (Tr. at 828:22-829:9.)

Acushnet next claims that "real world" evidence supports its case.  (D.I. 624 at 49.)  In fact, the Hebert patents are the most relevant real world evidence and show that Acushnet's own engineers thought that combining and modifying the prior art to arrive at the Sullivan concept was still new and non-obvious two years after Sullivan's filing date.  But those patents were excluded, skewing the jury's view of this issue.  That aside, Acushnet's evidence does not support its position.  The Nike and Bridgestone balls, and the Rule 35, were all developed well after 1995, so none shows what was obvious to one of ordinary skill in 1995.  There was no evidence the Harris/Wu prototypes were ever made in 1995, nor is there evidence that, if they

were made, they would have all the claim limitations, such as an outer cover layer Shore D of

less than 64.  Finally, Acushnet's attempt to use Mr. Sullivan's own decision to make prototypes

embodying the asserted claims turns the obviousness inquiry on its head.  That an inventor saw a

solution that no one else did cannot be turned against him as evidence his invention was obvious.

### 3.     There Was No Reason to Expect Combining the References as Acushnet Suggests Would Lead to a Reasonable Chance of Success.

Even if there were a reason to combine the references to arrive at the asserted claims, a

person of ordinary skill would not have had a reasonable expectation that doing so would be

successful in producing a ball with good feel **and** long distance.  Witnesses from both sides

explained that the art is extremely unpredictable, (D.I. 619 at 49-50), and Acushnet presents only

attorney argument to the contrary.  Indeed, Messrs. Morgan and Hebert were both surprised by

the performance of the Veneer prototypes, suggesting they did not expect there was a reasonable

chance of success.  (D.I. 619 at 58.)  The statements in the specification of the Hebert patents

would, if admitted, have confirmed this point.  And, as explained at p. 25, the use of

polyurethane as a cover material was riddled with drawbacks.  Indeed, both Molitor '751 and the

Wu patent led to products that were inferior to the Sullivan invention.  Thus, one skilled in the

art would not reasonably expect that extending their teachings to a three-piece ball would lead to

the Holy Grail.  Acushnet never presented any testimony on "reasonable chance of success" from

Dr. Statz.  The testimony it quotes from Messrs. Morgan and Dalton, (D.I. 624 at 50-51), is

irrelevant on this issue.  Finally, its failure to demonstrate reasonable probability of success

renders *Pfizer*, *Merck*, *O'Farrell*, and *Corkill*, (*id*. at 52), inapplicable.

### 4.     The Objective Criteria Strongly Support Non-Obviousness.

The strong objective indicators of non-obviousness in this case also overcome Acushnet's

other evidence of obviousness.  Everyone was familiar with the art at issue here but no one

arrived at the claimed invention for years after the Nesbitt, Molitor, and Proudfit patents. Indeed, Messrs. Hebert and Morgan are key examples of individuals that knew of this art, plus the Wu technology, but still thought the Sullivan concept was patentable in 1997. Thus, Acushnet's quote from *Graham*, describing a delay that occurred because no one reviewed the prior art or tried to solve the same problem, (*id*. at 53), is not applicable here.

### a. Acushnet Has Not Rebutted the Presumption of a Nexus Between the ProV1's Performance and the Claims.

The ProV1 products infringe the patents-in-suit, so their undisputed commercial success is presumptively attributable to the fact they practice the claims. *J.T. Eaton v. Atlantic Paste & Glue*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). None of Acushnet's arguments is sufficient to rebut the presumption. Acushnet says there can be no nexus because the claims are so overbroad that they are invalid. (D.I. 624 at 54-55.) That is circular reasoning that assumes the conclusion (invalidity) Acushnet seeks to prove. Acushnet then claims some balls using the claims "failed outright." (*Id*. at 55.) But it mainly cites the Rule 35, which actually far-outperformed Acushnet's then-existing wound balls, and whose initial sales were strong given Titleist's market position. (Tr. 779:13-781:9, 783:22-785:3, 789:22-790:11 (Yagley).)

Acushnet attributes the ProV1's success to the other technology in the ProV1—the large core and "patented" Wu polyurethane—and the Titleist marketing machine. (D.I. 624 at 56.) But it ignores Callaway Golf's point that the Titlist marketing machine and other Acushnet technology were used in Titleist's earlier products, yet none exhibited the ProV1's performance or caused a paradigm shift that rendered prior market-leading technology obsolete. (D.I. 619 at 55-56.) Acushnet also ignores its own marketing presentation, which ties the ProV1's success to the Hebert three-piece construction, (PX-583 at AC80.UR), precisely what is claimed in the patents-in-suit. It does complain the asserted claims cover a range of core and cover layer sizes.

(D.I. 624 at 55-56.)  But the sizes of the ProV1's core (1.55 inches) and outer cover (0.03 inches) are nearly identical to the preferred values in the Sullivan patents of 1.545 inches and 0.03 inches.  (Tr. at 620:24-623:16 (Statz).)

Finally, Acushnet claims the patented invention could not be responsible for the ProV1's success because Spalding never used the technology and Callaway Golf made further improvements to its products that took them outside the patent claims.  (D.I. 624 at 53, 55-57.) But Spalding's decision to stick with an ionomer outer cover layer was due to its gross mismanagement and financial distress—the very factors that drove Mr. Sullivan to leave for Acushnet.  And even if the decision were due to a misperception that the Sullivan invention lacked value, this is merely another instance of initial skepticism that Acushnet itself had prior to launching the ProV1.  (D.I. 619 at 57-59.)  Likewise, Callaway Golf's shift to technology that used an outer cover so thin it pushed the hardness just above the asserted claims does not change the fact the Sullivan inventions were a marked improvement over the prior art.

### b.    Both the Skepticism of Others and Unexpected Results Support Non-Obviousness.

Acushnet's own witnesses observed unexpected results as a result of using the construction covered by the patents-in-suit, which demonstrates non-obviousness.  Acushnet never addresses the evidence of Mr. Hebert's excitement and surprise that his Veneer prototypes, which use the Sullivan concept and became the infringing ProV1, matched or exceeded the performance and player satisfaction of wound balls.  (D.I. 619 at 57-58.)  Nor does it explain the surprise in Mr. Morgan's 2001 presentation explaining the ProV1 was "longer" than expected for a soft-urethane covered ball yet still performed like a soft-covered wound ball.  (PX-973 at AC28386-87.UR.)  Instead it accuses Callaway Golf of conflating unexpected results and success.  (D.I. 624 at 58.)  But Callaway Golf is not relying on the ProV1's unexpected

commercial success to show unexpected results.  Rather, it is relying on the surprise of both

Messrs. Hebert and Morgan about the ProV1's technical performance.  The exclusion of the

Hebert patents prevented Callaway Golf from introducing even more evidence to that effect.

Acushnet's skepticism toward launching the ProV1 also demonstrated non-obviousness.

Acushnet attributes its skepticism to a "business decision," (*Id*. at 57-58), but its

contemporaneous documents show otherwise, reflecting the mistaken belief that "wound is best"

and that wound balls "will continue to enjoy consumer demand."  (D.I. 619 at 57-58.)  Acushnet

could not have written these things unless it doubted the ProV1's technical performance.

### E.      A Manifest Injustice Would Result if the Verdict Were Allowed to Stand.

Acushnet never responds to Callaway Golf's argument that a manifest injustice would

result if the verdict were allowed to stand.  (D.I. 619 at 59-60.)  It does not dispute that it delayed

its objection to the prior jury's inconsistent verdict until the problem could no longer be fixed,

and that it retooled its case and invited this jury to decide the case on something other than the

merits.  Acushnet's claim that the inconsistent verdict was "just as much a victory for Acushnet,"

(D.I. 624 at 1), is undermined by its refusal to join Callaway Golf's request to send the first jury

back.  It knows that approach—***jointly*** requesting the jury be sent back to resolve the

inconsistency—would have likely been entertained by the Court and, ultimately, resulted in a

win for Callaway Golf on all claims.  Thus, a new trial is warranted.

## III.   CONCLUSION

Callaway Golf respectfully requests a new trial; it also respectfully submits the evidence

warrants JMOL, but that a new trial is the more efficient course, in part because it would occur

before any appeal.  *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980) ("An order

granting a new trial is interlocutory in nature and therefore not immediately appealable.").

Dated:  June 22, 2010          FISH & RICHARDSON P.C.


By:  */s/ Thomas L. Halkowski*
     Thomas L. Halkowski (#4099)
     222 Delaware Avenue, 17th Floor
      P.O. Box 1114
     Wilmington, DE  19899-1114
     Tel:  (302) 652-5070
     Fax:  (302) 652-0607

     Frank E. Scherkenbach
     225 Franklin Street
     Boston, MA 02110-2804
     Tel:  (617) 542-5070
     Fax:  (617) 542-8906

     Roger A. Denning
     12390 El Camino Real
     San Diego, CA 92130
     Tel: (858) 678-5070
     Fax:  (858) 678-5099

**ATTORNEYS FOR PLAINTIFF**
**CALLAWAY GOLF COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2010, I electronically filed with the Clerk of Court Public

Version of Callaway Golf's Reply in Support of Its Motion for a New Trial and Judgment as a

Matter of Law using CM/ECF which will send electronic notification of such filing(s) to the

following Delaware counsel.  In addition, the filing will also be sent via electronic mail to:

Richard L. Horwitz                    Attorneys for Defendant
David E. Moore                        ACUSHNET COMPANY
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE  19899-0951


Henry Bunson                          Attorneys for Defendant
Joseph P. Lavelle                     ACUSHNET COMPANY
Brian A. Rosenthal
Howrey LLP - DC
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004


*/s/ Thomas L. Halkowski*
Thomas L. Halkowski