IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALLAWAY GOLF COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-091-SLR |
| | ) |
| ACUSHNET COMPANY, | ) |
| | ) |
| Defendant. | ) |

Thomas L. Halkowski, Esquire of Fish & Richardson P.C., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Frank E. Scherkenbach, Esquire of Fish and Richardson P.C., Boston, Massachusetts; Roger A. Denning, Esquire of Fish and Richardson P.C., San Diego, California.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Brian A. Rosenthal, Esquire, Alan M. Grimaldi, Esquire and Clinton H. Brannon, Esquire of Mayer Brown, Washington, D.C.

## MEMORANDUM OPINION

Dated: April 21, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Callaway Golf Company ("plaintiff") brought suit against defendant

Acushnet Company ("defendant"), alleging that Acushnet has infringed various claims

of four golf ball patents owned by plaintiff (known as the "Sullivan patents"): U.S.

Patent Nos. 6,210,293 ("the '293 patent"), 6,503,156 ("the '156 patent"), 6,506,130 ("the

'130 patent"), and 6,595,873 ("the '873 patent"). At the conclusion of the claim

construction exercise, defendant stipulated that its golf balls infringed but maintained

that the asserted claims were invalid for anticipation and obviousness. The case was

remanded from the Federal Circuit for re-trial on these validity issues, which retrial

occurred in March 2010. Currently before the court are plaintiff's motion for JMOL of no

anticipation and no obviousness or for a new trial (D.I. 616) and defendant's motion to

amend the judgment (D.I. 617).

## II. BACKGROUND

### A. Technology Overview

The court presumes familiarity with the golf ball technology at issue in this case,

as detailed in its prior opinions, as well as the Federal Circuit's decision. *See Callaway

Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1335 (Fed. Cir. 2009). By way of brief

summary, golf balls are typically identified as two-piece or three-piece balls. Two-piece

balls have a core, which is either solid or "wound," and an outer layer. A core that is

considered solid is made of rubber and can be one solid piece or multiple layers. A

wound core is made of elastic windings wrapped around either a solid or liquid-filled

center. Three-piece balls have an additional layer covering the core, so that the ball is

characterized as having a core, an inner cover layer and an outer cover layer.

The Sullivan patents claim a multi-layer golf ball comprising a core, an inner cover layer made of a low acid ionomer, and an outer cover layer made of polyurethane.[1] The claims differentiate between the hardness and thickness of these layers. Claim 1 of the '293 patent claims:

> 1. A golf ball comprising: a core; an inner cover layer having a Shore D hardness of 60 or more molded on said core, said inner cover layer having a thickness of 0.100 to 0.010 inches, said inner cover layer comprising a blend of two or more low acid ionomer resins containing no more than 16% by weight of an alpha, beta-unsaturated carboxylic acid; and an outer cover layer having a Shore D hardness of 64 or less molded on said inner cover layer, said outer cover layer having a thickness of 0.010 to 0.070 inches, and said outer cover layer comprising a relatively soft polyurethane material.

Figure 2 of the '293 patent is exemplary of the patented golf ball, which contains a core **10**, a multi-layer cover having an inner layer **14** (made preferably from a blend of low-acid ionomer resins) and outer layer **16** (made of a relatively soft polyurethane material), as reproduced below.



FIG. 2

---

[1]With the exception of claims 1 and 2 of the '130 patent, which do not require that the outer cover layer include polyurethane, and which claims were not at issue in the present suit.

Plaintiff's other asserted claims vary slightly from claim 1 of the '293 patent, but each claims a golf ball having a core, an ionomer resin (or blend) inner cover layer with a Shore D hardness of 60 or more, and a polyurethane outer cover layer with a Shore D hardness of 64 or less. See Callaway, 576 F.3d at 1335. "Shore D hardness" refers to a standard published by the American Society for Testing and Materials (ASTM D-2240). Id. at 1335 & n.2. Prior to trial, the court construed the claim limitation "[c]over layer having a Shore D hardness" as requiring that the Shore D hardness measurement of the cover layer be taken on-the-ball, as compared to off-the-ball, as defendant suggested. Based on the court's on-the-ball construction, defendant stipulated that its Pro V1® ball infringed all of the asserted claims, and that its Pro V1*® and Pro V1x® balls infringed all claims except claim 1 of the '293 patent.[2] This claim construction was affirmed on appeal. Id. at 1338.

## B. Procedural Posture

An overview of the present litigation provides useful context for the court's opinions herein. Plaintiff filed this patent infringement action on February 9, 2006, alleging infringement of the Sullivan patents by defendant's Pro V1®-branded golf balls. The parties filed motions for summary judgment on infringement and validity. Additionally, the parties filed cross-motions for summary judgment on plaintiff's breach of contract claim, which claim arose from defendant's filing a reexamination of the

---

[2]The Pro V1® has a three-piece construction consisting of a solid core, an ionomer-blend inner cover, and a polyurethane outer cover. The Pro V1*® and Pro V1x® balls are "dual-core" balls having an inner core, an outer core, an ionomer inner cover, and a polyurethane outer cover. All defendant's Pro V1®-branded balls also carry the Titleist® brandname.

3

Sullivan patents with the U.S. Patent and Trademark Office ("PTO"), as compared to litigation challenging the validity of the patents in this court, as per the parties' prior settlement agreement (hereinafter, "the Agreement"). Defendant filed *inter partes* reexamination requests on each Sullivan patent on January 17, 2006 – less than a month prior to plaintiff's filing the present lawsuit on February 9, 2006. The reexaminations have proceeded concurrently with this litigation since that time.

On November 20, 2007, the court issued its claim construction decision (D.I. 345) and issued its memorandum opinion on the summary judgment motions (D.I. 347), in which it granted plaintiff's motions for summary judgment of no anticipation and for breach of contract and denied defendant's motions for summary judgment of invalidity and no breach of contract. The court also denied a motion for partial summary judgment that U.S. Patent No. 4,274,637 to Molitor ("Molitor '637") was incorporated by reference into a particular piece of prior art – U.S. Patent No. 4,431,193 ("Nesbitt").[3] Following claim construction, as discussed above, defendant stipulated that its Pro V1® golf balls infringe claims 1, 4 and 5 of the '293 patent, claims 1-3 of the '156 patent, claim 5 of the '130 patent, and claims 1 and 3 of the '873 patent, and that its Pro V1x® and Pro V1*® golf balls infringe all of the foregoing claims, with the exception of claim 1 of the '293 patent. (D.I. 367) A jury trial was held between December 5 and 14, 2007 on the issue of validity of each of the asserted claims due to obviousness. The jury returned a verdict that each asserted claim was valid but one – claim 5 of the '293 patent – which it found invalid. (D.I. 399)

---

[3]The court's *Markman* order can be found at 2007 WL 4165415; the summary judgment opinion is published at 523 F. Supp. 2d 388 (D. Del. 2007).

4

After trial, defendant moved to dismiss plaintiff's breach of contract claim and to vacate the court's November 20, 2007 opinion and order based on lack of subject matter jurisdiction. More specifically, defendant (belatedly) argued that the court, in dismissing the parties' prior litigation, did not manifest an intent to retain jurisdiction over the enforcement of the Agreement. The court agreed and, on November 10, 2008, granted defendant's motion to dismiss and vacated its grant of summary judgment on the breach of contract claim. (D.I. 490) The same day, the court: (1) denied defendant's motion for judgment as a matter of law ("JMOL") or, in the alternative, for a new trial; (2) granted plaintiff's motion for a permanent injunction; and (3) denied defendant's motion to stay the injunction pending appeal. (D.I. 492) Judgment was entered against defendant; defendant appealed.

On August 14, 2009, the Federal Circuit reversed the court's grant of summary judgment of no anticipation, found that the jury verdict on obviousness was irreconcilably inconsistent, vacated the judgment of the court and remanded for a new trial. See Callaway, 576 F.3d at 1335. On March 3, 2010, the court denied defendant's renewed motion for summary judgment on anticipation. (D.I. 595) A (second) jury trial on validity commenced on March 12, 2010. The jury held each of the Sullivan patents invalid as anticipated and, additionally, as obvious. (D.I. 608) Judgment was entered in favor of defendant. (D.I. 611)

In addition to the above proceedings, plaintiff pursued concurrent litigation in the Delaware Court of Chancery by which it sought to reform the Agreement. In March 2009, Vice Chancellor Leo E. Strine, Jr. recommended that the parties file joint motions in the 1996 cases to modify the stipulations of dismissal and file a joint motion in this

litigation to reinstate the original summary judgment ruling. The parties filed a motion in June 2009 to reopen the 1996 cases, and the court subsequently entered modified stipulations of dismissal. (C.A. No. 96-73, D.I. 83; C.A. No. 96-78, D.I. 40) Following defendant's successful Federal Circuit appeal, defendant refused to join in the second joint motion. Plaintiff thereafter filed an opposed motion to vacate the court's order dismissing its breach of contract claim and to reinstate the court's November 20, 2007 decision. The court granted plaintiff's motion on January 13, 2011. (D.I. 636)

On March 9, 2011, the PTO denied plaintiff's petition requesting that the PTO recognize this court's ruling on plaintiff's breach of contract claim and to cease reexaminations of the Sullivan patents.[4] (D.I. 638, ex. A) That same day, the PTO Board of Patent Appeals and Interferences ("BPAI") affirmed the examiner's decisions to reject claims 4 and 5 of the '130 patent, claims 1-6 of the '293 patent, claims 1-22 of the '156 patent and claims 1-6 of the '873 patent as obvious over Nesbitt in view of Molitor '637. (Id., ex. B at 18-26) Although the asserted patents have now been found invalid by the BPAI, plaintiff has not requested that the court stay its consideration of the pending post-trial motions in favor of an appeal of the BPAI's ruling to the Federal Circuit. The court, therefore, turns to the pending motions.

## III. STANDARDS

### A. Motion for Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law following a jury

---

[4]Plaintiff has filed an action in the United States District Court for the Eastern District of Virginia under the Administrative Procedure Act challenging the PTO's decision in this regard. (D.I. 638, ex. C)

trial under Federal Rule of Civil Procedure 50(b), the moving party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.*, 732 F.2d at 893. In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991); *Perkin-Elmer Corp.*, 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Id.* In summary, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).

## B. Motion for a New Trial

The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. *See Allied Chem. Corp. v. Darflon, Inc.*, 449 U.S. 33, 36 (1980). Federal Rule of Civil Procedure

59(a) provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997) (citations omitted). The court, however, must proceed cautiously and not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's independent evaluation. Nevertheless,

> [w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action.

*Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960).

### C. Motion to Amend the Judgment

The standard for obtaining relief under Rule 59(e) is difficult to meet. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe, By Lou-Ann, Inc. v.*

*Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). Therefore, a court may exercise its discretion to alter or amend its judgment if the movant demonstrates one of the following: (1) a change in the controlling law; (2) a need to correct a clear error of law or fact or to prevent manifest injustice; or (3) availability of new evidence not available when the judgment was granted. *See id.*

## IV. DISCUSSION

### A. Motion for a New Trial: Evidentiary Issues

Plaintiff argues that seven separate evidentiary and legal errors warrant a new trial on both anticipation and obviousness. The court will address these grounds in turn.

#### 1. Exclusion of the Hebert patents

As noted in the court's prior opinion, the "Veneer project" was defendant's development effort that led to the Pro V1® ball, which infringes the Sullivan patent claims,[5] as well as an invention disclosure form and multiple patent applications and issued patents for defendant (the "Hebert patents"). (D.I. 595 at 14) Prior to trial, defendant moved to exclude "all evidence and arguments pertaining to the Hebert patents, [defendant's] views of the validity of those patents and the novelty of the Veneer construction, the Hebert Invention Record, and [plaintiff's] license to the Hebert patents." (D.I. 532 at 16) While noting that such evidence may be relevant to the issue of obviousness, including secondary considerations, the court sought to curtail the risk

___

[5]The court notes that the parties' arguments do not differ with respect to the Pro V1®, Pro V1*®, or Pro V1x® balls and, therefore, the court will hereinafter refer to the infringing balls as "Pro V1®," consistent with the parties.

9

of satellite litigation over defendant's patents,[6] and required plaintiff to notify defendant before offering evidence concerning the Hebert patents (as opposed to the Veneer project, evidence of which would be appropriate). (D.I. 595 at 15) The court stated that it would address any disputes over the Hebert patents in a focused context at trial. (*Id.*)

Although it is evident that the court did not ultimately admit the Hebert patents at trial, plaintiff does not describe the focused context in which the court's rulings to this effect were made. (D.I. 619 at 5-18[7]) The court is not asked, therefore, to review its specific evidentiary rulings based on the record before it. Plaintiff instead frames its argument in terms of the Hebert patents' ultimate relevance to seven issues at trial, and the prejudice later suffered by plaintiff resulting from the court's ruling(s). In the absence of an actual record to review, the court declines to conduct such an analysis.

## 2. Noninfringing alternatives and defendant's opinions of counsel

Plaintiff next presents two related concerns. First, plaintiff asserts that defendant offered at trial the previously nondisclosed opinion that defendant sold a "high acid" alternative Pro V1® golf ball. While defendant's expert, Dr. William O. Kerr ("Kerr"), discussed high acid alternatives in his expert report (D.I. 620, ex. H), Kerr testified that he did not believe that these balls "became or were ever used in a commercially sold

---

[6]Defendant in its papers collects several statements made during the first trial that aroused concern, for example, plaintiff's insistence that defendant got a patent on the "same concept" as the Sullivan patents, while emphasizing that the jury should not compare the patents on a claim by claim basis. (D.I. 624 at 11-12)

[7]On one occasion, plaintiff cites instances where the court expressed concern over defendant's repeated reference to its "patented" technology. (D.I. 619 at 10 (citing D.I. 643 at 754:17-21 & D.I. 644 at 1027:1-9)) Such is not an actual determination for review.

ball by [defendant]" (id., ex. I at 516:16-21).

Defendant introduced evidence that it made a high acid alternative to the Pro V1® at trial in order to rebut plaintiff's claims for lost profit damages.[8] Jeff Dalton ("Dalton"), defendant's former Director of Product Development and its current consultant, testified that the high acid balls defendant made and tested in the 2000/2001 time frame were released into the warehouse and were eventually packaged and sold as regular Pro V1® balls. (D.I. 642 at 416:4-10) On direct examination, Kerr stated that defendant had not adopted the high acid ionomer ball because it was no better than the Pro V1®. (D.I. 644 at 1276:20-1277:17) On cross examination, Kerr confirmed that defendant's process was never switched over to produce high acid balls, but stated the high acid balls that were made and tested were sold in 2002. (Id. at 1331:3-13) Plaintiff's counsel thereafter attempted to establish that, while defendant purported to have high acid alternatives, one of which was cheaper to make than the Pro V1®, defendant elected nevertheless to infringe the Sullivan patents throughout the 2000s. Following a line of questioning in this regard, the following exchange occurred:

> Q. So instead of switching, they accrue $275 million a year in additional damages rather than doing that switch; right?
> A. I don't think they were accruing $275 million a year damages. I don't think they did.
> Q. Because they thought the patent was invalid; right?
> A. That is my understanding.
> Q. And yet they had in their pocket a guaranteed acceptable substitute that they could easily have gone to with no effect, in your opinion; right?

---

[8]A patentee who claims lost profits must show, inter alia, the absence of acceptable noninfringing substitutes. See Penduit Corp. v. Stahlin Brothers Fibre Works, Inc., 75 F.2d 1152 (6th Cir. 1978).

A. They certainly did. I mean, whether they thought it was valid or not is something that has to do with the lawyers' opinions and I can't talk about that.

(D.I. 645 at 1331:18-1332:10) The court previously excluded opinions of counsel from trial, as it had bifurcated willfulness, as per its practice.

In view of plaintiff's line of questioning, suggesting a long period of inactivity and, in legal terms, willful infringement by defendant, defendant's counsel suggested that the court allow its chief legal officer (Joe Nauman ("Nauman")) to testify that defendant did not change the Pro V1® because it had opinions of outside counsel that the Sullivan patents are invalid. The court ultimately determined that defendant could tell the jury that it got opinions of counsel on invalidity, so long as the jury was also informed that it did not get opinions on noninfringement, and the substance of the opinions was not discussed further. (D.I. 645 at 1337:14-1346:14; 1368:18-1370:14) Nauman's testimony on subsequent (direct) examination was commensurate with this instruction, with one exception. Nauman also offered that defendant's **in-house** legal department concluded that the '293 patent claims were "so broad that they covered the [ ] Pro V1® product, and that was one of the reasons that they were invalid, [that] the claims were so broad[.]" (*Id.* at 1374:23-1377:13) Plaintiff now objects on the grounds that: (1) the opinions were irrelevant to validity of the Sullivan patents; (2) plaintiff could not cross-examine Nauman regarding the Hebert patents, specifically, why defendant thought the Sullivan patents were invalid yet the Hebert patents were valid; and (3) the insertion of the opinion of counsel caused prejudice and jury confusion that was not cured by allowing plaintiff to confirm that defendant received no noninfringement opinion. (D.I. 619 at 20-22)

12

The court disagrees that a new trial is warranted on these grounds. While defendant did not previously disclose that its test balls were ultimately mixed in with regular Pro V1® product for packaging and sold, the testimony is not prejudicial under the circumstances. Plaintiff's counsel attempted to use this same evidence to drive home its point during the cross examination of Kerr.[9] More fundamentally, for reasons discussed *infra*, the court today upholds the jury verdict of invalidity on the ground of obviousness and, consequently, its decision not to award damages to plaintiff on its invalid patents. There can be no prejudice based on any nondisclosure of sales of noninfringing alternatives under these circumstances.

With respect to Kerr's comment on cross-examination, there was no improper conduct by defendant's counsel; it was Kerr himself who alluded to the opinion of counsel. The court previously noted that plaintiff (to some degree) opened the door to Kerr's testimony with its line of questioning. The jury was informed that opinions of counsel were obtained, but not for infringement. The court instructed the jury that they, alone, were the judges of the facts in this case. (D.I. 606 at 44) The court discerns no miscarriage of justice here.

---

[9]There is no indication that plaintiff objected to Dalton's testimony on the record. Plaintiff does not describe any objections it made during trial, or any adverse determinations by the court in this regard. (D.I. 219 at 26-28) Thus, even were the court's characterization of plaintiff's intentions inaccurate, there is still no indication that plaintiff took issue with the testimony at the time. Notwithstanding, the court does not find the testimony concerning the ultimate fate of the high acid balls made and tested by defendant during the 2000-2002 timeframe to be specifically precluded by the court's prior order, as plaintiff suggests, as that order addressed such balls manufactured since 2008. (D.I. 595 at 13, n.14)

### 3. Statz's capitalization on the exclusion of Nesbitt and Proudfit

Plaintiff's next argument is that a new trial is warranted based on the court's exclusion of testimony from inventors Dennis Nesbitt and James Proudfit, inventors of two prior art patents at issue in this case. During his deposition, Mr. Nesbitt stated that he did not believe that somebody reading his patent would have thought it was referring to polyurethane (in Molitor '637) as a potential cover material. The court excluded the testimony at the pretrial conference due to concern it contradicted the Federal Circuit's opinion regarding incorporation by reference. (D.I. 647 at 26:16-29:15)

Plaintiff sought to admit at trial Mr. Proudfit's testimony that: (1) he never considered using polyurethane as a cover layer; and (2) this was not suggested to him by others. (D.I. 643 at 692:9-697:25) Having reviewed the transcript, the court concluded that there was no indication that Mr. Proudfit had enough experience and information to speak to the use of polyurethane in golf balls, and excluded the testimony. (*Id.* at 754:3-16) The court discerns no error with its prior decision.[10] In sum, the court discerns no error with its pre-trial decisions to exclude the testimony of either Mr. Nesbitt or Mr. Proudfit.

### 4. Exclusion of professional golfer's testimony

---

[10]Plaintiff objects to Statz's testimony that Mr. Proudfit "would have tried" polyurethane coating. (D.I. 619 at 25 (citing D.I. 642 at 605:25-606:4)) Statz's testimony in this regard preceded the plaintiff's raising the issue with the court and, therefore, the court is not being asked to review any decisions made by the court at trial. The court notes that plaintiff also objects to testimony solicited from Statz implying that Mr. Nesbitt intended to incorporate polyurethane from Molitor '637. (*Id.* at 24-25 (citing D.I. 642 at 565:16-20)) There is no indication that plaintiff objected to the foregoing (as speculative or otherwise) during trial and the court was not asked to review any of its determinations in these regards.

14

Plaintiff reiterates its longstanding objection to the court's exclusion of testimony by professional golfers, specifically Phil Mickelson ("Mickelson"), regarding the characteristics of the patented golf balls (as discerned through personal play). The court's first ruling to this effect was made prior to the first trial. (D.I. 362) While citing a plethora of evidence regarding the asserted relevance of Mickelson's testimony to the second trial, plaintiff here only challenges the court's ruling on the record during the **first** trial. (D.I. 619 at 32 (citing D.I. 428 at 995:20-23)) The court previously determined that, although Mickelson's testimony would have some relevance, that minimal relevance was outweighed by the danger of unfair and undue prejudice attributed to Mickelson's celebrity status. (D.I. 428 at 995:18-24) Plaintiff "understands that, to date, it has failed to convincingly explain the decisive nature of [Mickelson's] testimony[.]" (*Id.*) Even were plaintiff's petition timely in this regard, the court would discern no miscarriage of justice on the record before it.[11]

### 5. Court's unwillingness to instruct on the presumption of validity

Plaintiff argues in this regard that it was an error for the court to remove from its final jury instructions language regarding a patent's presumption of validity. Plaintiff argues that such an instruction was warranted to counteract statements made by defendant's counsel during trial, most notably, counsel's statements in closing

---

[11]Plaintiff states that Mickelson would have testified that he tested plaintiff's Rule 35® ball (which embodied the Sullivan technology) and demanded from defendant, Mickelson's sponsor, an equivalent ball, at which time defendant commercialized the Pro V1®. (D.I. 219 at 29) There was no dispute that Mickelson is not familiar with the Sullivan patents and is not a person of ordinary skill in the art as pertains to those patents. While Mickelson could speak to the balls' performances from a player's perspective, he was unfamiliar with the technology of any of the balls he used.

argument that "[e]ven if the examiner [of the Sullivan patents] worked eight hours and this is all she did, she spent two minutes apiece on the [200] references" marked as reviewed on the same day during examination. (D.I. 619 at 34 (citing D.I. 645 at 1473:20-25)) The court previously ruled that **plaintiff** could not "improper[ly] bolster[ ]" the validity of the Sullivan patents by referring to the number of examiners considering those applications (three) or "speculate as to the extent to which such prior art was actually considered by the examiners (aside from what is specifically disclosed in the prosecution histories)," yet this is what defendant's counsel did at trial. (D.I. 595 at 14)

Plaintiff did not pose an objection during defendant's closing and appears not to have addressed these statements in its rebuttal. Thus, the scope of the court's review here is limited to whether it committed legal error in excluding the presumption of validity from its jury instructions, and the court concludes that it did not. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258-59 (Fed. Cir. 2004) (such instruction is duplicative of the court's iteration of the "clear and convincing" standard or proof).

### 6. "Pieces of the puzzle" language from *KSR*

Amongst its legal instructions on obviousness, the jury received the instruction that "[i]n **many** cases, a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle." (D.I. 606 at 25) (emphasis added); *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Plaintiff argues that the instruction was erroneous "in the context of this case" because where advanced chemistry at issue, simple changes may dramatically affect results. (D.I. 619 at 34-35) As emphasized above, the instruction above is not unequivocal. The jury is instructed

16

not to apply any rigid test or formula and to use common sense, as described in *KSR*.

Upon review, it is court's view that its instructions provide a balanced iteration of the

applicable law; no error was committed in this regard.

### 7. Conclusion

For the foregoing reasons, the court discerns no improper conduct of counsel or

circumstances evidencing a miscarriage of justice sufficient to grant plaintiff's motion for

a new trial. *See Zarow-Smith*, 953 F. Supp. at 584. Plaintiff's motion is denied on

these grounds.

### B. Motion for JMOL: Anticipation

#### 1. Background

Defendant contended throughout this litigation that the asserted claims of the

Sullivan patents are invalid as anticipated by Nesbitt.[12] Defendant conceded that

Nesbitt, standing alone, does not disclose the use of polyurethane as the outer cover

---

[12]As provided in the court's summary judgment opinion, Nesbitt discloses a
three-piece golf ball having a core, a hard inner layer made of an ionomer resin, and a
relatively soft outer layer made of ionomer resin. (D.I. 216 at 23) The relevant passage
from Nesbitt states:

> The inner, intermediate, or first layer or ply 14 and the outer cover, second layer
> or ply 16 or either of the layers may be cellular when formed of a foamed natural
> or synthetic polymeric material. **Polymeric materials are preferabl[e] such as
> ionomer resins which are foamable**. Reference is made to the application
> Ser. No. 155,658, of Robert P. Molitor issued into U.S. Pat. No. 4,274,637 **which
> describes a number of foamable compositions of a character which may be
> employed for one or both layers 14 and 16** for the golf ball of this invention.

(Nesbitt, col. 3:51-61) (emphasis added) Nesbitt proceeds to state that the inner layer
may be "preferably partially or only slightly foamed," the outer layer "may be foamed to
a greater degree" than the inner layer, and that "the degree of foaming of one or the
other or both layers may be altered to provide a variation in the coefficient of restitution
of the golf ball." (*Id.*, col. 3:62-68; col. 4:7-11)

layer material, or the use of blends of ionomers in the inner cover layer. Defendant's

assertion was that Nesbitt anticipates because it incorporates by reference Molitor '637,

which teaches these missing limitations.[13] In its summary judgment opinion of

November 20, 2007, the court held that the language of the reference to Molitor '637 in

Nesbitt was not sufficiently particular to effectuate an incorporation by reference of

those features. The court also held that defendant did not proffer evidence that Nesbitt

(without Molitor '637) disclosed a cover hardness of less than Shore D 64. *See*

*Callaway*, 576 F.3d at 1336.

On appeal, the Federal Circuit disagreed with the court's analysis. *Id.* at 1346-

47. Specifically, although Nesbitt referred to ionomer resins as "preferable," and

polyurethane is not an ionomer resin, the Court found that Nesbitt's reference to "a

---

[13]The relevant passage of Molitor '637 provides as follows:

Homopolymeric and copolymeric substances, such as (1) vinyl resins formed by
the polymerization of vinyl chloride or by the copolymerization of vinyl chloride
with unsaturated polymerizable compounds, e.g., vinyl esters; (2) polyolefins
such as polyethylene, polypropylene, polybutylene, transpolyisoprene, and the
like, including copolymers of polyolefins; (3) polyurethanes such as are prepared
from polyols and organic polyisocyanates; (4) polyamides such as
polyhexamethylene; (5) polystyrene, high impact polystyrene, styrene
acrylonitrile copolymer and ABS, which is acrylonitrile, butadiene styrene
copolymer; (6) acrylic resins as exemplified by the copolymers of
methylmethacrylate, acrylonitrile, and styrene, etc.; (7) thermoplastic rubbers
such as the urethanes, copolymers of ethylene and propylene, and
transpolyisoprene, block copolymers of styrene and cispolybutadiene, etc.; and
(8) polyphenylene oxide resins, or a blend with high impact polystyrene known by
the trade name 'Noryl.' This list is not meant to be limiting or exhaustive, but
merely illustrates the wide range of polymeric materials which may be employed
in the present invention. Mixtures of the above described material may also be
used.

(Molitor '637, col. 5:33-55)

number of foamable compositions" (such as polyurethane), without specific limitation,

provided the requisite "detailed particularity" of the specific materials of polyurethane as

well as ionomer resin blends for use as cover layers. *Id.* (citing *Adv. Display Systems,*

*Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)). The Federal Circuit did

not specifically address the Shore D component of the court's holding in its analysis.

*Id.* at 1346-48.

The Federal Circuit also disagreed with the court's exclusion of defendant's "test

ball" evidence, or non-commercial balls defendant created to mimic the prior art as

asserted in this litigation. As explained in that Court's opinion,

> the district court refused to consider the test ball evidence on the issue of
> anticipation because it found that Nesbitt did not incorporate the Molitor '637
> reference, and that the test balls therefore did not embody any single item of
> anticipatory prior art. This ground for excluding the evidence necessarily fails in
> light of our holding that Nesbitt does incorporate Molitor. Second, with respect to
> obviousness, the district court refused to allow the test ball evidence at trial
> because presentation of the evidence could lead the jury to give undue weight to
> Acushnet's arguments concerning motivation to combine and obviousness. This
> ground is inapplicable to Acushnet's anticipation argument, where motivation to
> combine is not an issue. Third, at summary judgment, the district court excluded
> the testimony of Acushnet's expert, Dr. MacKnight, on the ground that MacKnight
> had not had sufficient involvement in the preparation and testing of the balls to
> vouch for their reliability. As discussed above[14] we find no error in the district

---

[14]The prior portion of the Court's opinion read:

We see no error in the district court's exclusion of the test-ball testimony on the
issue of obviousness. The introduction of evidence concerning the test balls ran
a substantial risk of leading the jury towards the inappropriate use of hindsight
and towards unduly weighting Acushnet's arguments concerning motivation to
combine the prior art; the likely outcome, as the district court perceived it, was
the jury understanding Acushnet's argument concerning the combination of prior
art as "[w]e did it, here it is, anyone can do this." Nor does the record indicate
that Callaway made arguments that would have been directly refuted by the test
ball evidence, such as a contention that it would have been impossible to
combine the prior art. The district court was in the best position in this case to

court's ruling, but the fact remains that at trial Acushnet also proffered the testimony of Jeff Dalton (who supervised preparation of the balls) and of an employee of the testing laboratory. On remand, that testimony may be sufficient to authenticate the balls, and support the admission into evidence of balls designed to replicate Nesbitt on the issue of anticipation.

*Callaway*, 576 F.3d at 1347 (internal citations and quotations omitted). Thus, while the Federal Circuit upheld the court's determination that defendant's test ball evidence was unduly prejudicial under Federal Rule of Evidence 403, it did so only in the context of obviousness (the motivation to combine references).

The court then considered defendant's renewed motion for summary judgment of anticipation, based on defendant's test ball evidence. In a detailed opinion, the court denied defendant's motion, explaining that defendant's proffered test balls: (1) were not of a formulation specific to Nesbitt, which did not disclose a core formulation; and (2) defendant cited no expert opinion in support of its assertion that Nesbitt's silence on the core formulation is irrelevant. (D.I. 595 at 9-10) The court granted plaintiff's motion to exclude the test ball evidence. (*Id.* at 10)

A second jury trial was held on the validity issues. The court instructed the jury regarding the law concerning incorporation by reference and, following the Federal Circuit's opinion, also provided the following instruction.

In this case, you are instructed that the Nesbitt patent incorporates the entire list of foamable compounds ("a number of foamable compositions") disclosed by Molitor '637 as appropriate materials for use in golf ball cover layers, including polyurethane and ionomer resin blends.

determine whether in the context of the obviousness trial the danger of unfair prejudice outweighed the probative value of the test ball evidence. We cannot say that excluding the evidence here was an abuse of discretion.

*Callaway*, 576 F.3d at 1342 (internal citations omitted).

(D.I. 606 at 22); see Callaway, 576 F.3d at 1347.

## 2. Discussion

As an initial matter, the court previously found that Nesbitt does not expressly

disclose a polyurethane cover layer having a Shore D hardness of less than 64 as the

asserted claims require, and that point is not disputed by defendant. Defendant's

anticipation argument is one of inherency. The jury was instructed that

> [a]nticipation by inherent disclosure is appropriate only when the reference
> discloses prior art that must necessarily include the unstated element. Inherency
> may not be established by probabilities or possibilities. The mere fact that a
> certain thing may result from a given set of circumstances is not sufficient.

(D.I. 606 at 20) Plaintiff challenges the verdict on the basis that defendant did not

provide any evidence sufficient to meet this legal standard. (D.I. 619 at 37-41)

Defendant asserts that, "[w]hile Nesbitt does not disclose a specific hardness

value for the outer cover, Nesbitt does expressly disclose that the outer cover should

have the same hardness as balata-covered golf balls." (D.I. 624 at 38) In support,

defendant points to several excepts from the Nesbitt specification providing that the ball

of that invention should have the "feel" and playing characteristics of a balata-covered

ball. (Id. at 38-41 (citing Nesbitt, col. 1:26-44; col. 1:51-56; col. 1:65-col. 2:9)) The

most supportive of defendant's citations is the following description relating to

hardness.

> [BEST MODE FOR CARRYING OUT THE INVENTION]
> * * *
> The soft Surlyn® resin cover [on the three-piece ball of the invention] would have
> **about the same thickness and shore hardness of a balata-covered golf ball**
> and would have the advantageous "feel" and playing characteristics of a balata-
> covered golf ball.
> * * *

21

> The outer or cover layer or second layer 16 may be foamed to a greater degree than the inner, intermediate or first layer 14 as the material of the layer 16 is comparatively soft.

(*Id.*, citing Nesbitt at col. 3:40-44, 3:65-68) That is, the specification distinguishes between Surlyn® covers on a two-piece ball, which do not have the "feel" or playing characteristics associated with balata, and a three-piece ball having a "molded hard, highly flexible" inner cover layer (e.g., type 1605 Surlyn®) and an outer cover layer of "comparatively soft, low flexural modulus resinous material" (e.g., type 1855 Surlyn®), which has the playing characteristics of the prior art balata balls. (Nesbitt at col. 1:26-34; col. 1:65-col. 2:9; col. 2:40-49)

Defendant also relies on Statz's testimony that Nesbitt taught a ball with the "click, the feel, and the spin of a balata-covered ball." (D.I. 643 at 561:1-13) The following exchanges between Statz and his counsel are instructive.

> Q. Now, looking back at the Nesbitt patent, what kind of golf ball does Nesbitt disclose there?
> A. Well, Nesbitt uses the Molitor examples. He now has a golf ball that's a solid core, an inner cover layer of a Surlyn® blend with low acid levels covered with a urethane.
> Q. And would this ball that's disclosed here in figure 1 have a Shore D hardness of less than 64?
> A. As measured on-the-ball, since you have a relatively soft urethane, you have a relatively thick layer of the soft urethane, **you have a Shore D hardness on-the-ball of less than 64.**

(*Id.* at 568:19-569:4)(emphasis added) Further:

> Q. [B]efore 1995, what did persons of ordinary skill in the art understand about the Shore D hardness of a balata-covered golf ball?
> A. Balata-covered golf balls, you could measure – there are many balata-covered golf balls. Balata is the old type of golf ball. This is the golf ball that the amateur[s]

play with. **You would know** that the Shore D
hardness of the balata-covered golf balls, **you could
measure**, is about 54 Shore D.
Q. So are you aware of any golf ball covered with balata
with a Shore D hardness of 64 or higher?
A. No, because it's a relative -- 64 is a relatively hard
hardness material, and so **no balata-covered golf ball ever
got that high**.
Q. Mr. Dalton testified earlier about this graphic. Is
this consistent with your understanding of the hardnesses of
balata covered golf balls being less than 64 Shore D?[15]
A. Yes.
Q. All right. Would a person of ordinary skill in the
art in 1995 know the hardness of golf ball covered – golf
balls covered with balata?
A. Yes.
Q. So when Nesbitt teaches that the hardness of the ball
would be the same or should be the same as balata, what
Shore D hardness is he teaching?
A. He's teaching a Shore D hardness on his outer cover
layer of less than 64 or really in the 50 range.
Q. Now, how does the ball disclosed in Nesbitt compare to
the asserted claims of the Callaway patents?
A. Okay. So the Callaway patent says that the outer
cover layer has to be less than 64. You can see if we're
shooting at balata, **it's certainly less than 64.** It's in
the 50 range.

(*Id.* at 568:19-570:19) (emphasis added); *accord id.* at 571:13-18 (stating that the Shore

D hardness of a balata-covered ball is "definitely less than 64"); *id.* at 651:2-6 ("[W]e

know Balata is [Shore D] 54 or less."). Defendant also cites testimony by plaintiff's

chemistry expert, Dr. William M. Risen ("Risen"), that certain balata-covered golf ball

examples presented by defendant were known to have a Shore D hardness of about 48

- 52, or less than 64. (D.I. 624 at 38-39 (citing D.I. 644 at 1071:18-1072:4))

While Statz did state that "no balata-covered golf ball ever got that high [as

---

[15]Defendant does not cite any supporting exhibits in its papers, and it is not clear
that the graphic mentioned was admitted into evidence.

Shore D hardness of 64]" and that balata must or "certainly" have an on-the-ball Shore D hardness value less than 64, these statements concerned balata golf balls in general. There is no connection to a particular three-piece golf ball disclosed in Nesbitt. The parties do not dispute that thousands of combinations fall within the Nesbitt/Molitor '637 disclosure. (D.I. 642 at 647:1-648:15; D.I. 624) There is no indication that Statz focused on any particular ball disclosed in Nesbitt for purposes of anticipation. Similarly, there is no indication that Risen's statement concerned an actual Nesbitt/Molitor '637 ball. Statz presents a scientific principle – that balata-covered balls cannot have a Shore D hardness value over 64 for the outer cover layer. Defendant admits that Nesbitt does not quantify the preferred "feel" and playability of balata-covered balls, such as by providing a Shore D hardness for balata. Statz provided no particular data or other evidence tying the qualitative concepts of "feel" and playability to the quantitative limitation at issue.[16] According to Statz, a person of ordinary skill in the art "would know" or "could measure" the Shore D hardness of balata-covered balls and equate that, in a general sense, to the balls of Nesbitt. For purposes of anticipation, the knowledge of persons of skill in the art may not be used to supplement the disclosure of a reference (here, the Nesbitt incorporating Molitor '637).

Defendant concedes that "Nesbitt/Molitor '637 does not disclose a specific

---

[16]The court found similarly in denying defendant's renewed motion for summary judgment of anticipation. (D.I. 595 at 7) ("[N]o evidence (let alone Nesbitt) cited by Acushnet makes that causative leap, to wit, that if A equals B, and A equals C, then C equals B.") In that motion, defendant relied on properties measured on certain test balls, which the court deemed did not actually re-create any single ball disclosed by Nesbitt. (Id. at 9-10) Here again, on defendant's third bite at the apple, defendant failed to present anything more than conclusory expert testimony on inherent anticipation.

**example** of a three-piece golf ball with a blend of ionomers in the inner cover layer and a polyurethane outer cover," but argues that the foamable compositions of Molitor '637 (including polyurethane) could be used as a cover layer on any of Nesbitt's disclosed balls. (D.I. 624 at 45-46) (emphasis in original) Again, no particular ball or combination is discussed. In its papers, defendant highlights testimony by Statz that a person of ordinary skill in the art would have been motivated to select soft and flexible materials, as per Nesbitt's instruction, leading to urethanes. (D.I. 624 at 43 (citing D.I. 642 at 567:25-568:18) This is appropriately considered in the context of obviousness, but is not the standard for proving inherent anticipation. What was required was evidence that Nesbitt/Molitor '637 **necessarily** discloses the claimed balls having a Shore D hardness of less than 64, regardless of whether a person of ordinary skill in the art recognized this inherent characteristic. *See Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") (citation omitted); *see also In re Omeprazole Patent Litigation*, 483 F.3d 1364, 1373 (Fed. Cir. 2007) ("[i]nherency is not necessarily contemporaneous with knowledge of those of ordinary skill in the art") (quotation omitted).

Defendant has not explained, on a limitation by limitation basis, how it established at trial that Nesbitt/Molitor '637 provides all of the limitations of the asserted Sullivan patents.[17] Statz never identified a particular Nesbitt ball and testified that it

---

[17]In its prior opinion, the court noted that Nesbitt does not disclose a specific core formulation. (D.I. 595 at 9) Although it is not clear to the court how (and whether)

would always or "necessarily" have a Shore D hardness less than 64, as the asserted Sullivan patent claims require. Defendant points only to conclusory testimony that fails to link qualitative concepts ("feel" and playing characteristics) to the quantitative (Shore D) values at issue. For the foregoing reasons, the court agrees with plaintiff that the jury did not have before it sufficient evidence upon which it could conclude that Nesbitt/Molitor '637 anticipated the asserted Sullivan patent claims under the appropriate legal standard.[18]

## C. Motion for JMOL: Obviousness

The court now addresses plaintiff's motion for JMOL that the jury verdict of obviousness was not supported by substantial evidence.

### 1. Effect of prior decision

The court has determined *supra* that the Nesbitt/Molitor '637 reference does not disclose a Shore D hardness of less than 64. Defendant, however, does not rely on this combination in any of its asserted obviousness combinations. Defendant argues post trial that it established a clear motivation to combine U.S. Patent No. 4,674,751 to Molitor et. al. ("Molitor '751") or the Titleist® Professional® ball, an embodiment of U.S. Patent No. 5,334,673 to Wu ("Wu"), with either Nesbitt, U.S. Patent No. 5,314,187

_____

defendant rectified this deficiency, this is not a focus of plaintiff post trial.

[18]*Compare Bayer AG v. Sony Electronics, Inc.*, 229 F. Supp. 2d 332, 351 (D. Del. 2002) (following bench trial, finding expert's testimony too conclusory to support a finding of inherent anticipation).

The court need not reach plaintiff's arguments that Nesbitt/Molitor '637 did not disclose the limitations as arranged in the Sullivan patent claims. *See, e.g., In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). Nor need the court address plaintiff's argument that Nesbitt/Molitor '637 disclosed a broad genus of thousands of possible balls, which no reasonable jury could find sufficient for anticipation.

26

("Proudfit '187"), or the Wilson Ultra Tour balata ball. (D.I. 624 at 47) While it is true that a finding of anticipation would necessitate the jury's finding the asserted claims obvious as well, it is not clear which asserted combinations were the premise of the jury's opinion.[19] As defendant does not rely here on a combination of Nesbitt and Molitor '637 in support of the verdict, the court will evaluate whether the jury verdict was supported by defendant's other cited evidence of obviousness. (D.I. 624 at 47-51)

### 2. All limitations present[20]

At trial, plaintiff's expert (Risen) conceded that the only element he could not find in the combination of Proudfit and Molitor '751 was a Shore D hardness of less than 64. (D.I. 644 at 1075:5-20) Molitor '751 teaches that the hardness of the cover should be adjusted to achieve a Shore C hardness value of 72 to 76, narrowly claimed, and Shore C 70 to 85, as broadly claimed. (D.I. 642 at 580:8-20) Statz testified that this hardness value corresponds to a Shore D hardness in the 50s.[21] (*Id.* at 580:21-583:17) Crediting Statz's testimony, the jury could have properly concluded that all elements of the

---

[19]The parties did not propose, and the court did not adopt, a verdict form with specific interrogatories regarding the asserted combinations of prior art, as is the court's more current practice. (D.I. 588, 591, 608)

[20]While plaintiff does not appear to contest that all elements of the asserted claims are taught by the prior art, the court briefly articulates the factual support in the record in this regard.

[21]The "Shore C" issue has been extensively litigated. During the first trial, defendant attempted to establish a correlation through a Shore C–Shore D correlation table; the court found post-trial that defendant's evidence fell short of clear and convincing, insofar as the prior art did not contain a Shore D value, the tables contained disclaimers on their use as conversion tools, and evidence of correlation to any "on the ball" values was lacking. *See Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 610 (D. Del. 2008). Plaintiff did not object to Statz's testimony and there is no similar dispute presented on the motions at bar.

asserted Sullivan patent claims were disclosed by, or at least rendered obvious by, the prior art.

### 3. Motivation to combine and reasonable expectation of success

The court next addresses plaintiff's contentions that defendant's expert (Statz) did not articulate a reason why one skilled in the art would combine the references as he did, when the references teach away from the combinations, and that plaintiff proffered strong evidence of objective criteria of nonobviousness. (D.I. 619 at 48-58)

Molitor '751 teaches the use of a novel golf ball cover layer comprising a thermoplastic urethane (polyurethane) and an ionomer having a Shore D hardness greater than 55. (Molitor '751,[22] col. 2:38-42) It states:

> The cover composition of the invention may be used in connection with the manufacture of thread-wound balls, but is preferably used in the manufacture of balls having molded cores. Two-piece balls made with the cover of the invention have short iron playability properties as good as or better than balata-covered wound balls but are significantly more durable.

(Id., col. 2:58-64) Molitor '751 further explains: "The phrase 'two piece ball' as used herein refers primarily to balls consisting of a molded core and a cover, but also includes balls having a separate solid layer beneath the cover as disclosed, for example, in U.S. Pat. No. 4,431,193 to Nesbitt, and other balls having non-wound cores." (Id. at col. 3:7-12) Statz testified that the phrase "balls having a separate solid layer beneath the cover" describes Nesbitt, Proudfit, and the Wilson Ultra Tour balata balls and expressly teaches polyurethane as the outer cover for three-piece balls of that

---

[22]Admitted as DTX-11.

type.[23]  (D.I. 642 at 578:15-580:7)  The jury had before it evidence to reasonably

conclude that Molitor '751 teaches (and thus motivates) one of skill in the art to apply

the polyurethane cover described therein on these particular balls, and other three-

piece balls having a core, an inner cover layer, and an outer cover layer.

The invention of Wu was an improved polyurethane-covered golf ball.  (Wu,[24]

col. 1:6-14)  Wu explains that there are advantages to using polyurethane as a

substitute for Surlyn® ionomers or balata in a golf ball cover:

> It has been proposed to employ polyurethane as a cover stock for golf balls
> because, like SURLYN®, it has a relatively low price compared to balata and
> provides superior cut resistance over balata.  However, unlike
> SURLYN®-covered golf balls, polyurethane-covered golf balls can be made to
> have the "click" and "feel" of balata.

(Wu, col. 1:40-46)  Statz testified that Wu motivates a person of skill in the art to use

the Wu polyurethane in place of a balata or Surlyn® cover.  (D.I. 642 at 605:20-606:7[25])

Statz testified that Nesbitt, since its publication in 1984, taught that "the way to

get a good golf ball that has the distance that you get from a Surlyn®-covered golf ball

and the playability from a balata-covered golf ball [is to] make a three-piece golf ball

[having] a solid core, an inner layer of stiff ionomer, and an outside of soft flexible

---

[23]The Federal Circuit also recognized this teaching on appeal:  "Molitor '751
teaches a polyurethane cover that may be used on two-piece or three-piece golf balls."
See Callaway, 576 F.3d at 1337, n.3.

[24]Admitted as DTX-13.

[25]Although Statz stated that "[i]f Jim [Proudfit] had known about this urethane
coated material, he would have tried it, because it really is a wonderful material for
making a golf ball that is durable and has the properties you want for a soft covered
three-piece ball," Statz also confirmed that a (hypothetical) person of ordinary skill in the
art would have had the same motivation.

material." (D.I. 642 at 547:9-23) This was known in 1995, a time when there were mostly two-piece balls on the market, but three-piece balls had begun to emerge. The Wilson Ultra Tour (balata-covered) ball was available, as well as multi-layer balls having covers of "Surlyn® or urethane or a blend of Surlyns® to give a soft, flexible material." (*Id.* at 545:12-25) Statz testified that "polyurethane was always the goal of the people in the golf ball industry to put on a golf ball because polyurethane, of all of the flexible materials known, has the best abrasion resistance . . . So urethane is really, of the things that are known, the ideal material." (*Id.* at 548:2-9) A person of ordinary skill in the art would have been motivated to use polyurethane "because somebody had already done balata, somebody had already done soft Surlyns®. So the only other material, which is probably better as far as abrasion resistance is concerned, is polyurethane." (*Id.* at 548:10-17) The jury was permitted to credit this testimony as providing the reason a skilled artisan would use polyurethane on a three piece ball.

As noted *supra*, Statz testified that Molitor '751 disclosed a ball with a Shore C hardness of 72 to 76 (as narrowly claimed), which corresponds to a Shore D hardness value (measured on-the-ball) in the 50s. (*Id.* at 580:8-583:17) William Morgan ("Morgan"), defendant's Senior Vice President of Research and Development, testified that balata-covered balls had a Shore D measurement of less than 64, and designers sought to create new golf balls having the properties of the balata balls to which golfers were accustomed. (D.I. 641 at 255:5-20) Dalton also stated that it was important to have a Shore D hardness less than 64 on a polyurethane-covered ball because "Tour players preferred a soft feel and high spin and both of those would have required Shore

D hardness much less than 64 Shore D." (*Id.* at 380:5-9)

The court finds the foregoing to be substantial evidence of a motivation to combine Molitor '751 or Wu with Nesbitt, Proudfit '187, and/or the Wilson Ultra Tour ball, with a reasonable expectation of success. While plaintiff adduced evidence on the objective criteria of nonobviousness – the commercial success of the infringing Pro V1®-branded balls and evidence of defendant's skepticism regarding the Pro V1®'s success[26] – it was reasonable for the jury to conclude that these secondary considerations were insufficient to overcome the teachings of the prior art.[27]

Further, while the Pro V1® admittedly infringes the Sullivan patents, the jury heard evidence that the Rule 35® ball (plaintiff's own ball) struggled in the market and ultimately failed at the expense of the Pro V1®. (D.I. 643 at 741:22-742:7; 789:8-790:11) The jury heard that the Pro V1®'s design was superior to that of the Rule 35®, and exhibited performance superior to the Rule 35® balls. (D.I. 641 at 314:4-315:23; *id.* at 322:14-325:19; PTX-973) The Pro V1® had a larger core and, in defendant's opinion, a better (castable) urethane. (*Id.*) Based on the foregoing, the jury may have reasonably concluded that plaintiff did not meet its burden to show a nexus between the

---

[26]The court notes in this regard that Morgan testified for defendant that its delay in bringing to market the Pro V1® was, as compared to skepticism, because the balls were difficult to make; a new manufacturing process was needed, and the balls were thereafter tested. (D.I. 641 at 289:8-291:22; 293:19-294:22; 295:13-296:1)

[27]As the Federal Circuit has previously recognized, the clear teachings of the relevant art is as follows: "Proudfit ['187] teaches a three-piece golf ball with a core, an ionomer-blend inner cover, and a relatively soft outer cover of balata[.] Molitor '751 teaches a polyurethane cover that may be used on two-piece or three-piece golf balls. Wu teaches a golf ball with a single cover layer made of polyurethane." *Callaway*, 576 F.3d at 1337, n.3 (internal citations omitted).

Pro V1®'s commercial success and the inventions disclosed in the asserted Sullivan claims. (D.I. 606 at 28); see Brown & Williamson Tobacco Corp. v. Philip Morris Inc., 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("A nexus between commercial success and the claimed features is required."). Put another way, a reasonable jury could have determined that it was just as likely that the success of the Pro V1® (contrasted with the Rule 35®) was due to other features – such as core size and type of polyurethane – that were not claimed by Sullivan.[28]

The court concludes, based on the foregoing, that substantial evidence supports the jury's verdict of obviousness and, for the reasons stated herein, denies plaintiff's motion for judgment as a matter of law (or for a new trial) on validity.

### D. Defendant's Motion to Amend the Judgment

The parties agree that, pursuant to their prior stipulation, the determination of the validity of the four claims at issue at trial (claim 1 of the '293 patent, claim 1 of the '156 patent, claim 5 of the '130 patent, and claim 3 of the '873 patent) applies to each of the five other claims for which defendant has stipulated to infringement (claims 4 and 5 of the '293 patent, claims 2 and 3 of the '156 patent, and claim 1 of the '873 patent). (D.I. 617, 623) Plaintiff originally opposed the motion pending the resolution of its motions for JMOL and for a new trial on validity. The court having upheld the jury's verdict of obviousness, the court will amend the judgment according to the parties' agreement.

---

[28]Plaintiff points out that Sullivan disclosed a similar core size (1.545 inches to 1.55 inches used in the Pro V1®), but this is not claimed in the claims at issue. Plaintiff makes a similar argument with respect to the size of the Pro V1® outer cover layer (0.03 inches). This thinness was disclosed by Sullivan, but is not required by the asserted claims.

## V. CONCLUSION

For the foregoing reasons, the court denies plaintiff's motion for JMOL or for a new trial (D.I. 616), and grants defendant's motion to amend the judgment (D.I. 617). An appropriate order shall issue.